Filed: April 12, 2022

Filed on behalf of:
    Patent Owner Masimo Corporation
By:    Joseph R. Re (Reg. No. 31,291)
    Stephen C. Jensen (Reg. No. 35,556)
    Jarom D. Kesler (Reg. No. 57,046)
    Stephen W. Larson (Reg. No. 69,133)
    Jacob L. Peterson (Reg. No. 65,096)
    William R. Zimmerman (admitted *pro hac vice*)
    Jeremiah S. Helm, Ph.D. (admitted *pro hac vice*)
    KNOBBE, MARTENS, OLSON & BEAR, LLP
    2040 Main Street, Fourteenth Floor
    Irvine, CA 92614
    Tel.:   (949) 760-0404
    Fax:   (949) 760-9502
    E-mail:  AppleIPR2020-1520-265@knobbe.com

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

APPLE INC.

Petitioner,

v.

MASIMO CORPORATION,

Patent Owner.

———————————

Case IPR2020-01520
U.S. Patent 10,258,265

———————————

**PATENT OWNER'S NOTICE OF APPEAL TO THE U.S. COURT OF
APPEALS FOR THE FEDERAL CIRCUIT**

Pursuant to 28 U.S.C. § 1295(a)(4)(A), 35 U.S.C. §§ 141(c), 142, and 319, 37 C.F.R. §§ 90.2(a) and 90.3, and Rule 4(a) of the Federal Rules of Appellate Procedure, Patent Owner Masimo Corporation ("Masimo") hereby appeals to the United States Court of Appeals for the Federal Circuit from the Judgement – Final Written Decision (Paper No. 39) entered on February 23, 2022 (Attachment A) and from all underlying orders, decisions, rulings, and opinions that are adverse to Masimo related thereto and included therein, including those within the Decision Granting Institution of *Inter Partes* Review, entered March 2, 2021 (Paper 7). Masimo appeals the Patent Trial and Appeal Board's determination that claims 1–4, 6–14, and 16–30 of U.S. Patent 10,258,265 are unpatentable, and all other findings and determinations, including but not limited to claim construction, as well as all other issues decided adverse to Masimo's position or as to which Masimo is dissatisfied in IPR2020-01520 involving U.S. Patent 10,258,265.

Masimo is concurrently providing true and correct copies of this Notice of Appeal, along with the required fees, with the Director of the United States Patent and Trademark Office and the Clerk of the United States Court of Appeals for the Federal Circuit.

Respectfully submitted,

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated:  April 12, 2022     /Jarom Kesler/
                           Jarom D. Kesler (Reg. No. 57,046)
                           Customer No. 64,735

                           Attorney for Patent Owner
                           Masimo Corporation

# ATTACHMENT A

Trials@uspto.gov                                           Paper 39
571-272-7822                                    Date: February 23, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE
———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD
———————

APPLE INC.,
Petitioner,

v.

MASIMO CORPORATION,
Patent Owner.

———————

IPR2020-01520
Patent 10,258,265 B1

———————

Before GEORGE R. HOSKINS, ROBERT L. KINDER, and
AMANDA F. WIEKER, *Administrative Patent Judges*.

HOSKINS, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

IPR2020-01520
Patent 10,258,265 B1

# I.    INTRODUCTION

Apple Inc. ("Petitioner") filed a Petition (Paper 2, "Pet.") pursuant to 35 U.S.C. §§ 311–319 to institute an *inter partes* review of U.S. Patent No. 10,258,265 B1 ("the '265 patent"), claims 1–4, 6–14, and 16–30.  We instituted the petitioned review (Paper 7, "Institution Decision" or "Inst. Dec.").

Masimo Corporation ("Patent Owner") filed a Patent Owner Response (Paper 21, "PO Resp.") to oppose the Petition.  Petitioner filed a Reply (Paper 24, "Pet. Reply") to the Patent Owner Response.  Patent Owner filed a Sur-reply (Paper 27, "Sur-reply") to the Reply.  With prior authorization from the Board, Petitioner filed an Identification of Testimony (Paper 33) in response to the Sur-reply.  An oral hearing was held, for which the transcript was entered into the record (Paper 37, "Tr.").

We have jurisdiction under 35 U.S.C. § 6(b)(4) and § 318(a).  This Decision is a final written decision under 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73 as to the patentability of claims 1–4, 6–14, and 16–30 of the '265 patent.  We determine Petitioner has shown by a preponderance of the evidence that those claims are unpatentable.

# II.    BACKGROUND

## A.    *Real Parties-in-Interest and Related Proceedings*

Petitioner identifies itself as the sole real party-in-interest for Petitioner.  Pet. 104.  Patent Owner identifies itself as the sole real party-in-interest for Patent Owner.  Paper 4, 1.

The parties identify one district court litigation as related to this proceeding: *Masimo Corp. et al. v. Apple Inc.*, Civil Action No. 8:20-cv-

IPR2020-01520
Patent 10,258,265 B1

00048 (C.D. Cal.).  Pet. 105; Paper 4, 1.  We are also aware of several other IPR proceedings challenging other patents at issue in that litigation.  *See, e.g.*, Pet. 105; Paper 4, 3.

### B.    The '265 Patent

The '265 patent concerns noninvasive devices for measuring blood analytes such as glucose, or other physiological characteristics such as pulse rate.  *See* Ex. 1001, code (57), 2:20–30.  Figures 3C and 3E are reproduced below:



**FIG. 3C**          **FIG. 3E**

Figure 3C is a perspective view of sensor 301a, comprising upper emitter shell 304a pivotably connected to lower detector shell 306a, to sandwich a person's finger between the shells.  *See id.* at 5:52–55, 18:39–51.  Figure 3E is a perspective view of detector shell 306b of a different but similar sensor 301b.  *See id.* at 5:59–61, 22:21–40 ("The features described with

IPR2020-01520
Patent 10,258,265 B1

respect to the detector shell 306b can also be used with the detector shell 306a of the sensor 301a.").

Emitter shell 304a houses emitter components (not shown in Figure 3C) such as LEDs, which emit light of different wavelengths, such as visible light, near infrared light, or infrared light. *See id.* at 5:3–7, 12:3–12, 13:8–15, 18:40–42, 18:62–63.

Detector shell 306a / 306b houses four photodetectors 316, one underneath each window 320–323 within finger bed 310 formed on top of the shell. *See id.* at 19:4–5, 19:13–16, 19:38–48. Finger bed 310 includes "a tissue thickness adjustor or protrusion 305," which may be removed and interchanged with other protrusions 305 to correspond to different finger characteristics. *Id.* at 19:29–37.

Sensor 301a operates in the following manner. A person places a finger on finger bed 310, and upper emitter shell 304a pivots toward lower detector shell 306a / 306b to hold the finger in place, and to shield the interior of sensor 301a from interference by ambient light. *See id.* at 16:52–64, 18:43–51, 18:66–19:20. Then, the emitters housed in emitter shell 304a emit light of different wavelengths, to pass through the person's finger and into windows 320–323 within finger bed 310, to reach photodetectors 316. *See id.* at 19:38–48. Photodetectors 316 capture and measure the light, which has been attenuated by the person's finger tissue, and output responsive signals to a processor that uses the signals to derive a physiological parameter of the person. *See id.* at 2:20–30, 10:30–39, 10:62–11:1, 14:11–19, 15:31–35, 18:39–42.

Another detector subassembly is shown in Figure 14D, reproduced below:

IPR2020-01520
Patent 10,258,265 B1



## FIG. 14D

Figure 14D shows detector subassembly 1450 including submount 1400c, cylindrical housing 1430, transparent cover 1432 with protrusion 605b disposed on it, and four detectors 1410c. *See id.* at 6:54–55, 36:38–47. The light focusing properties provided by protrusion 605b advantageously reduce the number of detectors, or rows of detectors, that are required. *See id.* at 35:56–36:10; *see also id.* at Fig. 14B, 36:11–30 (illustrating and describing function of a "partially cylindrical protrusion 605 (or alternatively, the protrusion 605b)" to focus light on detector(s) 1410b).

### C.    *The Claims of the '265 Patent*

The '265 patent lists thirty claims, including two independent claims, claims 1 and 26. Ex. 1001, 44:65–47:20. We reproduce illustrative claim 1 here:

IPR2020-01520
Patent 10,258,265 B1

1.  A noninvasive optical physiological measurement device adapted to be worn by a wearer, the noninvasive optical physiological measurement device providing an indication of a physiological parameter of the wearer comprising:

a plurality of emitters of different wavelengths;

a housing having a surface and a circular wall protruding from the surface;

at least four detectors arranged on the surface and spaced apart from each other, the at least four detectors configured to output one or more signals responsive to light from the one or more light emitters attenuated by body tissue, the one or more signals indicative of a physiological parameter of the wearer; and

a light permeable cover arranged above at least a portion of the housing, the light permeable cover comprising a protrusion arranged to cover the at least four detectors.

*Id.* at 44:66–45:15.

D.     *Prior Art and Asserted Grounds*

Petitioner relies on the following eight prior art references.  *See* Pet. 1–3.

| Name | Reference | Date | Exhibit No(s). |
|------|-----------|------|----------------|
| Aizawa | US 2002/0188210 A1 | Dec. 12, 2002 | 1006 |
| Beyer | US 7,031,728 B2 | Apr. 18, 2006 | 1019 |
| Goldsmith | US 2007/0093786 A1 | Apr. 26, 2007 | 1027 |
| Inokawa | JP 2006-296564 A | Nov. 2, 2006 | 1007 & 1008[1] |
| Lo | US 2004/0138568 A1 | July 15, 2004 | 1028 |

[1]  Exhibit 1007 is the reference, which was published in the Japanese language, and Exhibit 1008 is a certified English language translation.

IPR2020-01520
Patent 10,258,265 B1

| Name | Reference | Date | Exhibit No(s). |
|------|-----------|------|----------------|
| Mendelson-1988 | Y. Mendelson, et al., *Design and Evaluation of a New Reflectance Pulse Oximeter Sensor*, Medical Instrumentation, Vol. 22, No. 4, 167–173 (1988) | Aug. 1988 | 1015 |
| Mendelson-2006 | Y. Mendelson, et al., *A Wearable Reflectance Pulse Oximeter for Remote Physiological Monitoring*, Proceedings of the 28th IEEE EMBS Annual Int'l Conf., 912–915 (2006) | Dec. 26, 2007[2] | 1016 |
| Ohsaki | US 2001/0056243 A1 | Dec. 27, 2001 | 1014 |

Petitioner relies on the following eight grounds of unpatentability, all under 35 U.S.C. § 103.  *See* Pet. 1–2.

| Ground | Claim(s) Challenged | References |
|--------|---------------------|------------|
| 1A | 1–4, 6–14, 16, 17, 19–23, 26–29 | Aizawa, Inokawa |
| 1B | 1–4, 6–14, 16, 17, 19–23, 26–29 | Aizawa, Inokawa, Ohsaki |
| 1C | 23, 24 | Aizawa, Inokawa, Mendelson-2006 |
| 1D | 23, 24 | Aizawa, Inokawa, Goldsmith, Lo |

---

[2]  This date for Mendelson-2006 is taken from the Petition (page 3), as the date when the reference "was first cataloged by Cornell University's library" (Ex. 1026 ¶¶ 11–14).

IPR2020-01520
Patent 10,258,265 B1

| Ground | Claim(s) Challenged | References |
|--------|---------------------|-----------|
| 1E | 25 | Aizawa, Inokawa, Mendelson-2006, Beyer |
| 2A | 1–4, 6–14, 16–22, 26–30 | Mendelson-1988, Inokawa |
| 2B | 23, 24 | Mendelson-1988, Inokawa, Mendelson-2006 |
| 2C | 25 | Mendelson-1988, Inokawa, Mendelson-2006, Beyer |

### E.    Testimonial Evidence

Petitioner relies on the declaration testimony of Thomas W. Kenny, Ph.D. (Exhibits 1003 and 1047).  Patent Owner relies on the declaration testimony of Vijay K. Madisetti, Ph.D. (Exhibit 2004).

## III.    ANALYSIS

### A.    Statement of Law

Petitioner bears the burden of proving unpatentability of the challenged claims, and the burden of persuasion never shifts to Patent Owner.  *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015).  Petitioner must prove unpatentability by a preponderance of the evidence.  *See* 35 U.S.C. § 316(e); 37 C.F.R. § 42.1(d).

A patent claim is unpatentable under 35 U.S.C. § 103 if the differences between the claimed subject matter and the prior art are such that the subject matter, as a whole, would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.  *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406

8

(2007). The question of obviousness is resolved on the basis of underlying factual determinations including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and (4) objective evidence of non-obviousness, if made available in the record.[3] *See Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

### B.    Level of Ordinary Skill in the Art

Petitioner contends a person having ordinary skill in the art pertaining to the '265 patent ("POSITA") would have "a Bachelor of Science degree in an academic discipline emphasizing the design of electrical, computer, or software technologies, in combination with training or at least one to two years of related work experience with capture and processing of data or information." Pet. 3–4; Ex. 1003 ¶¶ 21–22. "Alternatively, the person could have also had a Master of Science degree in a relevant academic discipline with less than a year of related work experience in the same discipline." Pet. 4; Ex. 1003 ¶ 21.

Patent Owner "applies Petitioner's level of skill." PO Resp. 10; Ex. 2004 ¶¶ 35–38. Patent Owner emphasizes that this level of skill requires no specific education or experience "with optics or optical physiological monitors" or "in physiology," and instead "focuses on data processing and not sensor design." PO Resp. 10; Ex. 2004 ¶ 37.

Petitioner's POSITA formulation is reasonable based on the record and the agreement of the parties. We also determine it is consistent with the

---

[3] The parties have not produced any objective evidence of non-obviousness.

IPR2020-01520
Patent 10,258,265 B1

'265 patent claims and the prior art of record.  We adopt Petitioner's
POSITA formulation in this Decision.

## C.    Claim Construction

We interpret the '265 patent claims "using the same claim
construction standard that would be used to construe the claim in a civil
action under 35 U.S.C. 282(b)."  37 C.F.R. § 42.100(b).  This "includ[es]
construing the claim in accordance with the ordinary and customary
meaning of such claim as understood by one of ordinary skill in the art and
the prosecution history pertaining to the patent."  *Id.*

Petitioner asserts "no formal claim constructions are necessary in this
proceeding."  Pet. 3.  Patent Owner construes one claim term, "cover,"
seeking to distinguish Mendelson-1988 from the claims.  *See* PO Resp. 9,
50–51.  We address that claim construction here.

### 1.    "cover"

Independent claim 1 requires "a light permeable cover," and
independent claim 26 requires "a cover . . . comprising a lens portion."
Ex. 1001, 45:13–15, 46:58–60.

Patent Owner argues the claimed "cover" must be construed to
exclude "an optically clear adhesive/epoxy" and a "resin on a surface."  PO
Resp. 50; Ex. 2004 ¶¶ 111–114.  Patent Owner asserts "the '265 Patent
distinguishes a resin on a surface from a cover, explaining: 'the cylindrical
housing 1430 (and transparent cover 1432) . . . can protect the
detectors 1410c and conductors 1412c *more effectively* than currently-
available *resin epoxies*."  PO Resp. 50–51 (quoting Ex. 1001, 36:58–67).

IPR2020-01520
Patent 10,258,265 B1

Patent Owner alleges Dr. Kenny also "distinguished a sealing resin from a cover, acknowledging a 'layer of sealing resin' is 'one way to protect the components *without using a cover*.'" *Id.* at 51 (quoting Ex. 2009, 395:22–396:17); Ex. 2004 ¶ 113. Patent Owner argues its construction is consistent with the prior art. PO Resp. 51 (citing Ex. 1008 ¶ 103, Fig. 17; Ex. 1012, 5:2–6, Fig. 2B; Ex. 1013 ¶ 32, Fig. 2; Ex. 1023 ¶ 35; Ex. 1027 ¶ 85, Fig. 9B); Ex. 2004 ¶ 114.

Petitioner replies that "there is nothing in the specification or the prosecution history [of the '265 patent] that would lead a POSITA to conclude that 'cover' should be interpreted based on anything other than its plain meaning." Pet. Reply 27 (citing *Thorner v. Sony Computer Entertainment America LLC*, 669 F.3d 1362, 1368 (Fed. Cir. 2012)). That plain meaning, according to Petitioner, is that "a cover is merely 'something that protects, shelters, or guards.'" *Id.* (quoting Ex. 1050); Ex. 1047 ¶ 56. Petitioner argues Patent Owner's reliance on the '265 patent specification takes certain text out of context, and when this context is considered, it is clear that "the epoxy resin to which the '265 patent compares its cover is not [an] epoxy cover . . . but rather epoxy that is applied to solder joints." Pet. Reply 28 (citing Ex. 1001, 36:58–67); Ex. 1047 ¶ 58.

Petitioner accuses Patent Owner of mischaracterizing Dr. Kenny's testimony, because he "clarified that using a sealing resin is 'a pretty common way to protect electronic components.'" Pet. Reply 28 (citing Ex. 2009, 395:22–396:17); Ex. 1047 ¶ 57. Further according to Petitioner, "such extrinsic evidence would not justify departure from plain meaning under *Thorner*." Pet. Reply 28.

11

Patent Owner maintains in response that the '265 patent specification disclosure at issue "specifically *distinguishes* a 'resin' on a surface from a 'cover,'" and Petitioner's reading of this disclosure is not persuasive. Sur-reply 22–23.

Upon review of the foregoing, we disagree with Patent Owner's limiting construction of the term "cover" to exclude epoxy and resin. The plain and ordinary meaning of the term does not support Patent Owner's construction. A "cover" ordinarily connotes "something that protects, shelters, or guards." Ex. 1050 (*Merriam-Webster's Collegiate Dictionary*, 11th ed. (©2005)), 288. That plain and ordinary meaning is consistent with the '265 patent's description of "flex circuit cover 360, which can be made of plastic or another suitable material . . . [and] can cover and thereby protect a flex circuit (not shown)." Ex. 1001, 23:17–26. It is also consistent with the '265 patent's description and illustration of "transparent cover 1432" in Figure 14D, which covers and protects detectors 1410c and conductors 1412c, and which "can be fabricated from glass or plastic, *among other materials*." *See id.* at 36:38–67 (emphasis added), Figs. 14D–14E.

Any special definition for a claim term must be set forth in the specification with reasonable clarity, deliberateness, and precision, so as to give notice of the inventor's own lexicography. *See Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1370 (Fed. Cir. 2005); *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994). Similarly: "The patentee may demonstrate an intent to deviate from the ordinary and accustomed meaning of a claim term by including in the specification expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope."

IPR2020-01520
Patent 10,258,265 B1

*Teleflex, Inc. v. Ficosa North America Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002) (citation omitted).

Here, based on our review of the intrinsic evidence, no such special definition or express disavowal of the term "cover" to exclude epoxy and resin exists. Patent Owner relies on the following description of Figure 14D in this regard:

> In certain embodiments, *the cylindrical housing 1430 (and transparent cover 1432)* forms an airtight or substantially airtight or hermetic seal with the submount 1400c. As a result, the cylindrical housing 1430 can protect the detectors 1410c and conductors 1412c from fluids and vapors that can cause corrosion. Advantageously, *in certain embodiments, the cylindrical housing 1430 can protect* the detectors 1410c and conductors 1412c *more effectively than currently-available resin epoxies*, which are sometimes applied to solder joints between conductors and detectors.

Ex. 1001, 36:58–67 (emphases added). First, the sentence cited by Patent Owner begins with the phrase "Advantageously, in certain embodiments," which indicates the claimed invention is open to other embodiments, so there is no lexicography or disavowal here. Second, we agree with Petitioner's reading of this sentence as distinguishing the prior art from the claimed invention based on the *location* of the material (being applied only to solder joints between conductors and detectors in the prior art, as opposed to covering the conductors and detectors in the invention) and not the *type* of material. Third, at best for Patent Owner, the '265 patent expresses a preference for a cover to be made of glass or plastic, because such materials provide "more effective[]" protection than resin epoxies that were known to the inventors of the '265 patent when it was filed. *See id.* at 36:50–67. But even this reading recognizes that resin epoxies provide some amount of

protection, albeit a lesser amount than glass or plastic, and therefore may in some embodiments provide a cover.

The prior art references cited by Patent Owner do not persuade us otherwise. Patent Owner cites various descriptions of a "cover" in the prior art, but they do not even identify a material for the cover, much less suggest that a cover may not be made of epoxy or resin. *See* Ex. 1008 ¶ 103 (cover 123); Ex. 1012, 5:2–6 (cover plate 21); Ex. 1013 ¶ 32 (cover 200); Ex. 1027 ¶ 85 (cover 960). Patent Owner cites another reference which describes materials 30, 40 and 50 as formed of a "thermoplastic resin," and illustrates these materials as covering LED 22 and bonding wire 23, but does not describe the materials as being a "cover." Ex. 1023 ¶ 35, Fig. 6. This does not mean a POSITA would fail to consider these materials as being a "cover," despite that this specific term was not used in the reference.

Dr. Kenny's deposition testimony cited by Patent Owner also does not persuade us otherwise. Dr. Kenny testifies that "a layer of sealing resin" "could" be used to protect the electronic components in a sensor (Ex. 2009, 395:22–396:8). He was then asked "So that would be one way to protect the components without using a cover, correct?" to which he answered "There are many ways to protect the elements other than using a cover" and maintained his proposed combination of prior art has a "cover" to achieve purposes other than protecting electronic components. *Id.* at 396:9–17. He did not squarely testify that sealing resin could not ever be a cover.

Thus, we do not construe the claimed "cover" to exclude epoxy and resin.

IPR2020-01520
Patent 10,258,265 B1

## 2.    *Other Claim Terms*

Upon consideration of the entirety of the arguments and evidence presented, we conclude no further explicit construction of any claim term is needed to resolve the issues presented by the arguments and evidence of record. *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) (per curiam) (claim terms need to be construed "only to the extent necessary to resolve the controversy" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))).

## D.    *Ground 1A — Obviousness over Aizawa and Inokawa*

In Ground 1A, Petitioner argues claims 1–4, 6–14, 16, 17, 19–23, and 26–29 of the '265 patent would have been obvious over Aizawa and Inokawa. Pet. 1–2, 6–48. Patent Owner opposes. PO Resp. 11–40. We conclude a preponderance of the evidence supports Petitioner's assertions as to all challenged claims. We begin our analysis with brief summaries of Aizawa and Inokawa, then we address the parties' contentions.

## 1.    *Aizawa Disclosure*

Aizawa discloses a pulse rate detector comprising a sensor worn on a user's wrist. Ex. 1006, code (57). Figures 1(a) and 1(b) are reproduced below:

IPR2020-01520
Patent 10,258,265 B1

F I G . 1 (a)



F I G . 1 (b)





Figure 1(a) is a schematic underside view, and Figure 1(b) is a schematic
cross-sectional side view, of pulse rate detector 1 including pulse rate
sensor 2, and belt 7 to be wrapped around a user's wrist 10. *Id.* ¶¶ 17, 23,
26. Sensor 2 includes LED 21 which emits near infrared light. *Id.* ¶¶ 23, 27.
The emitted light enters the user's wrist 10 and reflects off red corpuscles in
artery 11. *Id.* ¶ 27. Some of the reflected light is received by four
photodetectors 22 arranged around LED 21. *Id.* ¶¶ 23, 27. Associated

IPR2020-01520
Patent 10,258,265 B1

electronics 3, 4, and 24 gather and process signals from photodetectors 22 to generate a pulse wave indicative of the user's pulse, and transmit the pulse wave to an unshown display for display to the user. *Id.*

Detector 1 includes holder 23 to hold LED 21 and photodetectors 22 in place. *Id.* ¶ 23. Acrylic transparent plate 6 is disposed between holder 23 and the user's wrist 10. *Id.* ¶¶ 23, 26, 30. "[B]elt 7 is fastened such that the acrylic transparent plate 6 becomes close to the artery 11 of the wrist 10," and "[t]hereby, adhesion between the wrist 10 and the pulse rate detector 1 is improved." *Id.* ¶ 26. "Since the acrylic transparent plate 6 is provided on the detection face 23a of the holder 23, adhesion between the pulse rate detector 1 and the wrist 10 can be improved, thereby further improving the detection efficiency of a pulse wave." *Id.* ¶ 30.

### 2. *Inokawa Disclosure*

Inokawa discloses an optical vital sensor system worn on a user's wrist. *See* Ex. 1008, code (57), ¶ 56. Figures 1 and 2 are reproduced below:



IPR2020-01520
Patent 10,258,265 B1

Figure 1 is a perspective view, and Figure 2 is a diagrammatic side view, of "a pulse sensor 1 that is able to sense the pulse, etc. by being attached, for example, to a person's . . . wrist" via wristband 5. *Id.* ¶¶ 56–57, 119.

Sensor unit 3 has green LED 21 and infrared LED 23, with a single photodiode 25 to detect light emitted from both LEDs and reflected from the user's wrist, as shown by arrows in Figure 2. *Id.* ¶¶ 57–58. The "basic function of . . . green LED 21 is to sense the pulse . . . while the . . . infrared LED 23 serves to sense body motion." *Id.* ¶ 59.

Pulse sensor 1 includes lens 27, which "makes it possible to increase the light-gathering ability of the LED as well as to protect the LED or [photodiode 25]." *Id.* ¶¶ 15, 58.

Pulse sensor 1 also uses LEDs 21 and 23 to download data to a base station, as shown in Figure 3, reproduced below.



(FIG. 3)

Figure 3 illustrates pulse sensor 1 mounted on base station 17. *Id.* ¶¶ 60, 66. Vital sign information stored in sensor 1 is downloaded to base station 17,

IPR2020-01520
Patent 10,258,265 B1

which forwards the information to a personal computer 59 (shown in Figure 7). *Id.* ¶¶ 66–67. Specifically, this information is encoded into light emitted by infrared LED 23 of sensor 1 and detected by photodetector 45 of base station 17. *Id.* ¶¶ 66–67, 76. At the same time, green LED 21 may transmit "checksum" information to another photodetector of base station 17 (as shown in Figure 19), to increase the accuracy of data transmission. *Id.* ¶ 14; *see also id.* ¶¶ 109–111 (describing how "the presence of two pairs of light-emitting and light-receiving elements makes it possible to efficiently transmit information"). Mounting sensor 1 on base station 17 further permits sensor 1 to be electrically charged via terminals 19 and 39. *Id.* ¶¶ 60, 66, Fig. 7.

"As a result" of this optical data communication from sensor 1 to base station 17, "there is no need to use a special wireless communication circuit or a communication cable as previously, which makes it possible to transmit vital sign information to the base device 17 accurately, easily, and without malfunction." *Id.* ¶ 77; *see also id.* ¶¶ 3–7 (describing a "problem" in prior art devices that require "a dedicated wireless communication circuit" to "transmit data wirelessly," which is overcome by Inokawa's optical data communication to a base station because the dedicated wireless communication circuit is unnecessary).

### 3.    *Claim 1*

Petitioner provides arguments and evidence, including testimony from Dr. Kenny, in support of contending claim 1 is unpatentable as having been obvious over Aizawa and Inokawa. Pet. 6–29; Ex. 1003 ¶¶ 53–63, 73–99.

IPR2020-01520
Patent 10,258,265 B1

Patent Owner provides arguments and evidence in opposition, including testimony from Dr. Madisetti.  PO Resp. 11–40; Ex. 2004 ¶¶ 34, 39–88.

<em>a)    Comparing Claim 1 with Aizawa</em>

Petitioner contends Aizawa's pulse rate detector 1 exhibits each and every limitation of claim 1, except that it has only one emitter (i.e., LED 21) of near infrared light instead of the claimed "plurality of emitters of different wavelengths," and its light permeable cover (i.e., acrylic transparent plate 6) lacks the claimed "protrusion."  *See* Pet. 6–9, 22–29; Ex. 1003 ¶¶ 53–58, 73–99.  Patent Owner does not challenge Petitioner's contentions in this regard.  We determine these contentions are supported by a preponderance of the evidence, as follows.

As pertinent to the undisputed limitations of claim 1, we find Aizawa's detector 1 is a noninvasive optical measurement device adapted to be worn on a user's wrist, to provide an indication of a physiological parameter of the user (i.e., pulse wave).[4]  *See* Ex. 1006, Fig. 2, ¶¶ 2, 26; Pet. 22–23; Ex. 1003 ¶ 73.  We find Aizawa's detector 1 has a single emitter (i.e., LED 21) of one wavelength (i.e., near infrared light).  *See* Ex. 1006, Figs. 1(a)–1(b), ¶¶ 23, 27; Pet. 6–7, 23–24; Ex. 1003 ¶¶ 53–54, 74.  We find Aizawa's detector 1 includes a housing having a surface and a circular wall protruding from the surface.  *See* Ex. 1006, Figs. 1(a)–1(b) & 2, ¶¶ 23–24; Ex. 1003 ¶¶ 87–88.  In particular, Petitioner annotates Aizawa's Figures to identify the "Housing" in red, the "Surface" in brown, and the "Circular wall" in purple.  *See* Pet. 24–25; Ex. 1003 ¶¶ 87–88.

---

[4] Whether the preamble is limiting need not be resolved, because the recitation in the preamble is satisfied by the prior art.

We find Aizawa's detector 1 further includes four detectors (i.e., photodetectors 22) arranged on the housing's surface and spaced apart from each other, symmetrically on a circle centered on LED 21. *See* Ex. 1006, Figs. 1(a)–1(b), ¶¶ 24, 29, 32; Pet. 25–27; Ex. 1003 ¶¶ 89–90. We find Aizawa's photodetectors 22 are configured to output signals responsive to light emitted from LED 21 and attenuated by the user's body tissue, and the signals are indicative of the user's pulse wave. *See* Ex. 1006 ¶¶ 23, 27, 28; Pet. 27; Ex. 1003 ¶ 91.

We find Aizawa's detector 1 has a light permeable cover (i.e., plate 6) mounted at detection face 23a of holder 23, to cover four photodetectors 22. *See* Ex. 1006, Fig. 1(b), ¶ 23; Pet. 28–29; Ex. 1003 ¶¶ 92–93.

### b)    *Comparing Claim 1 with Inokawa*

Petitioner contends Inokawa's pulse sensor 1 is a noninvasive optical measurement device having two emitters (i.e., LEDs 21 and 23) of different wavelengths, and a light permeable cover (i.e., lens 27) comprising a protrusion arranged to cover its light detector (i.e., detector 25). *See* Pet. 9–11; Ex. 1003 ¶¶ 59–63, 73–99. Patent Owner does not challenge Petitioner's contentions in this regard. We determine these contentions are supported by a preponderance of the evidence, as follows.

As pertinent to the undisputed limitations of claim 1, we find Inokawa's pulse sensor 1 is a noninvasive optical measurement device adapted to be worn on a user's wrist, to provide an indication of two physiological parameters of the user (i.e., pulse and body motion). *See* Ex. 1008, Figs. 1 & 2, ¶¶ 14, 56–59; Pet. 9–10; Ex. 1003 ¶¶ 59–60. We find this is accomplished using light from green LED 21 to monitor the user's

IPR2020-01520
Patent 10,258,265 B1

pulse, and using light from infrared LED 23 to monitor the user's motion, both using detector 25. *See* Ex. 1008, Fig. 2, ¶¶ 14, 58–59; Pet. 10; Ex. 1003 ¶ 60.

We find Inokawa's pulse sensor 1 also has a light permeable cover (i.e., lens 27), which according to Inokawa "makes it possible to increase the light-gathering ability of the LED as well as to protect the LED or [photodiode 25]." Ex. 1008, Fig. 2, ¶¶ 15, 58; Pet. 10; Ex. 1003 ¶ 61. We find lens 27 comprises a protrusion that covers the device's detector 25. Ex. 1008, Fig. 2; Pet. 10–11; Ex. 1003 ¶¶ 61, 95–96.

### c)    *Obviousness of Combining Aizawa and Inokawa*

Petitioner contends a POSITA would have been motivated to modify Aizawa's pulse rate detector 1, in light of Inokawa's disclosures, by: (1) adding a second emitter to emit light of a different wavelength, so that Aizawa's detector 1 can monitor the user's body motion for improved pulse detection, and so that detector 1 can transmit information more reliably to a base device with less error; and (2) adding a protrusion to Aizawa's cover 6 to improve the sensor's light detection efficiency. *See* Pet. 13–22. Patent Owner opposes these contentions, and argues a person of ordinary skill in the art would not have had a reasonable expectation of success, among other things. *See* PO Resp. 15–40. We consider each modification in turn.

### (1)    *Plurality of Emitters of Different Wavelengths*

### (i)    *Petitioner's Contentions*

Petitioner asserts that, "[w]hile Aizawa contemplates the use of multiple emitters, Aizawa never specifically identifies the use of multiple emitters operating at different wavelengths in conjunction with multiple

IPR2020-01520
Patent 10,258,265 B1

detectors." Pet. 17 (citing Ex. 1006 ¶ 33); Ex. 1003 ¶ 74. Inokawa, in

Petitioner's view, discloses using an infrared LED "to detect vital signs and

transmit vital sign information," and a separate green LED "to detect pulse."

Pet. 17 (citing Ex. 1008 ¶¶ 14, 44, 58–59); Ex. 1003 ¶ 75.

Petitioner asserts a POSITA "would have recognized Inokawa's use

of two different emitters operating at different wavelengths as a desirable

configuration that would reap similar benefits for Aizawa." Pet. 17;

Ex. 1003 ¶ 76. Specifically: "A POSITA would have recognized, in view of

Inokawa, that providing an additional emitter to Aizawa would allow

Aizawa's device to use its existing infrared LED to detect body motion

while using the added green LED to detect pulse." Pet. 17–18 (citing

Ex. 1008 ¶ 59), 23–24; Ex. 1003 ¶¶ 76–79. Dr. Kenny concludes "[t]he

added ability to measure body movement in this manner will allow for a

more reliable measurement that can, for instance, take into account and

correct for inaccurate readings related to body movement," because "the

signal component corresponding to body movement can be subtracted from

the pulse signal to help better isolate the desired pulse data." Ex. 1003 ¶ 77

(citing Exhibit 1010, 8:45–50); Pet. 18.

Petitioner provides the following illustrations to portray the proposed

modification of Aizawa's pulse rate detector 1. *See* Pet. 18; Ex. 1003 ¶ 77.



IPR2020-01520
Patent 10,258,265 B1

At the left, Petitioner has annotated Aizawa's Figure 1(b), to identify Aizawa's pre-existing single near infrared emitter 21 (colored green) in relation to two of Aizawa's four detectors 22 (colored red). *See* Pet. 18–19. At the right, Petitioner has shown the proposed modification, which would include two different emitters (colored green and purple), operating at two different wavelengths. *See id.*

As a second and independent motivation "for improving Aizawa by adding a second LED/emitter," Petitioner contends "Aizawa contemplates uploading data to a base device yet is silent about how such data transmission would be implemented, instead leaving such implementation details to the POSITA." Pet. 19–20 (citing Ex. 1006 ¶¶ 15, 23, 35); Ex. 1003 ¶ 80. Inokawa, in Petitioner's view, discloses how a wrist-worn pulse sensor 1 can transmit data to base device 17 using infrared LED 23, which advantageously means "it is not necessary to use a wireless communication circuit or to establish connections via communication cable, which makes it possible to easily transmit vital sign information with few malfunctions and with a simple structure." Pet. 19–21 (quoting Ex. 1008 ¶ 7, and citing *id.* at Fig. 3, ¶ 60); Ex. 1003 ¶¶ 81–82.

Petitioner further concludes: "A POSITA would have been motivated and found it obvious and straightforward to incorporate Inokawa's base device and LED-based data transmission into Aizawa to, for instance, 'make[] it possible to transmit vital sign information to the base device 17 accurately, easily, and without malfunction.'" Pet. 20–21 (quoting Ex. 1008 ¶ 77); *id.* at 23–24; Ex. 1003 ¶¶ 83–84. In particular, according to Petitioner, Inokawa "teaches that using *two LEDs* further helps improve data transmission accuracy by using the second LED, such as green LED, to

24

IPR2020-01520
Patent 10,258,265 B1

transmit checksum information such that 'the accuracy of data can be increased.'" Pet. 21 (citing Ex. 1008, Fig. 19, ¶¶ 44, 48, 111); Ex. 1003 ¶ 83. In Petitioner's view, this provides motivation "to supplement Aizawa's IR LED/emitter with a green LED/emitter to, as per Inokawa, improve accuracy of data transmission from its sensor." Pet. 21–22; Ex. 1003 ¶ 84.

### (ii)    Patent Owner's Contentions

Patent Owner argues Petitioner's case for the obviousness of modifying Aizawa to have two emitters of different wavelengths is not supported by the evidence of record. *See* PO Resp. 11–13, 34–40; Sur-reply 15–17.

Patent Owner firstly contends the combination of Aizawa and Inokawa does not result in the claimed invention, which requires a "plurality" of emitters and "at least four" detectors. PO Resp. 34. Patent Owner correctly points out that neither Aizawa nor Inokawa discloses a device meeting both of those claim requirements, because Aizawa's embodiments have either a single emitter and multiple detectors (e.g., Ex. 1006, Fig. 1(a)) or multiple emitters and a single detector (e.g., *id.* ¶ 33), and Inokawa discloses multiple emitters and a single detector (e.g., Ex. 1008, Fig. 2). *See* PO Resp. 11–13, 34–36 (citing Ex. 1006, code (57), ¶¶ 33, 26–27, Figs. 1, 2, 4, & 5; Ex. 1008 ¶ 58, Fig. 2); Ex. 2004 ¶¶ 40–43, 79–80. Patent Owner concludes, therefore, that a POSITA seeking to improve upon Aizawa's device to incorporate two emitters would be limited to "positioning multiple LEDs around a ***single*** detector" based on the combined disclosures of Aizawa and Inokawa. PO Resp. 35; Ex. 2004

¶¶ 81–83.  Patent Owner argues Dr. Kenny's testimony in this regard "conflicts with the references themselves" and so "is not credible." PO Resp. 35–36 (citing Ex. 1003 ¶¶ 55, 77).

Patent Owner secondly contends the evidence does not support either of Petitioner's two proffered motivations for modifying Aizawa to have two emitters of different wavelengths.  As to the first motivation of adding the capability to measure body movement using a second emitter to correct for inaccurate pulse readings, Patent Owner asserts Dr. Kenny erroneously testifies that Aizawa cannot do this with its single emitter.  PO Resp. 36 (citing Ex. 1006 ¶ 15; Ex. 2007, 400:7–401:10); Ex. 2004 ¶ 84.  This is because Aizawa states its pulse rate detector comprises "a device for computing the amount of motion load from the pulse rate."  Ex. 1006 ¶ 15; PO Resp. 36; Ex. 2004 ¶ 84.

As to Petitioner's second motivation of enabling Aizawa to transmit data to a base device using an optical communication link, Patent Owner asserts "Aizawa *already* includes a wireless transmitter . . . so Aizawa does not need to incorporate Inokawa's base device [optical] data transmission arrangement."  PO Resp. 36–37 (citing Ex. 1006 ¶¶ 23, 28, 35); Ex. 2004 ¶¶ 85–86.  Indeed, Patent Owner argues "Dr. Kenny acknowledged Aizawa does not indicate there are any problems with Aizawa's form of data transmission."  PO Resp. 37 (citing Ex. 2007, 409:13–410:2).  Patent Owner further contends "Aizawa's goal is to address problems associated with *real-time* measurement of heart rate," where Patent Owner argues the proposed combination would "*eliminate*[] the ability to take and display *real-time* measurements, one of Aizawa's stated goals."  PO Resp. 37–39 (citing Ex. 1006 ¶¶ 4, 15; Ex. 1003 ¶ 101; Ex. 2007, 402:6–11, 405:2–7,

416:5–15; Ex. 2009, 393:6–14; Ex. 2011 ¶ 69 [sic 75]); Tr. 43:7–21 (also citing Ex. 1006 ¶ 6); Ex. 2004 ¶ 86. Patent Owner insists Inokawa does not aid Petitioner's case, because Inokawa discloses the benefits of using a second emitter in only two situations, to improve over a "cable" communication or "to avoid the use of a 'dedicated wireless communication circuit,'" whereas "Aizawa *already* uses wireless transmission." PO Resp. 38 (citing Ex. 1008 ¶ 4); Ex. 2004 ¶ 87.

Patent Owner accuses Petitioner and Dr. Kenny of overlooking further complications that would ensue from modifying Aizawa to have two emitters of different wavelengths. Patent Owner contends this would further increase power consumption and cost. *See* PO Resp. 38 (citing Ex. 2009, 381:18–382:8, 383:22–385:9, 390:5–392:3); Ex. 2004 ¶ 88. Further according to Patent Owner, Dr. Kenny overlooks how placing "two LEDs in close proximity may cause thermal interference that could create significant issues for sensor performance," and would require "structural changes" to Aizawa's configuration. PO Resp. 39–40 (citing Ex. 2012, 59–60; Ex. 2007, 379:17–21, 384:16–388:16, 389:17–390:20, 394:11–395:22); Ex. 2004 ¶ 88.

### (iii)  *Petitioner's Reply*

Concerning Petitioner's first motivation, and in response to Patent Owner's reliance on Aizawa's disclosure of "a device for computing the amount of motion load from the pulse rate" (Ex. 1006 ¶ 15), Petitioner asserts Patent Owner "fails to explain—and Aizawa itself is certainly silent—regarding how Aizawa senses and computes motion load." Pet. Reply 21; Ex. 1047 ¶ 46. Petitioner also contends Aizawa "is silent on whether it uses the computed motion load *to improve the detection signal*"

27

IPR2020-01520
Patent 10,258,265 B1

and thereby provide a "*more reliable*" pulse reading, which is Petitioner's asserted improvement to Aizawa. *Id.* (emphases added) (citing Pet. 17; Ex. 1003 ¶ 77; Ex. 2007, 401:11–402:4); Ex. 1047 ¶¶ 46–47.

Concerning Petitioner's second motivation, Petitioner maintains that Inokawa's use of two emitters having different wavelengths to upload data to a base station using optical communication advantageously improves the accuracy of the transmission by providing checksum information.  Pet. Reply 22–23 (citing Pet. 20–21; Ex. 1003 ¶ 83; Ex. 1008 ¶¶ 11, 44, 48; Ex. 2007, 407:7–408:20, 416:5–15); Ex. 1047 ¶ 48.

As to the "other complications" that Patent Owner alleges would result from the proposed modification, Petitioner asserts "such minor issues are 'part of what [a POSITA] would bring . . . to the problem and would know how to make the changes needed.'"  Pet. Reply 23 (quoting Ex. 2007, 384:8–388:12); Ex. 1047 ¶ 49.

### (iv)    *Patent Owner's Sur-reply*

Concerning Petitioner's first motivation, Patent Owner asserts Inokawa's disclosure is just as sparse as Aizawa's disclosure regarding how to use optical data to measure body movement.  Sur-reply 15 (citing Ex. 1008 ¶ 59).  Patent Owner also asserts "Petitioner cites nothing in Inokawa that suggests" Inokawa's two emitter data gathering is more reliable or otherwise superior to Aizawa's single emitter data gathering.  *Id.* at 15–16.

Patent Owner also faults Petitioner for not specifying how a POSITA would have solved the alleged "additional cost, energy use, and thermal

28

IPR2020-01520
Patent 10,258,265 B1

problems" that would ensue from using two emitters in the Aizawa device.
*Id.* at 17.

### (v)    Analysis and Conclusion

Upon review of the foregoing, we conclude a preponderance of the evidence supports Petitioner's contention that a POSITA would have been motivated to replace Aizawa's single near infrared LED 21, with an infrared LED and a green LED, in light of Inokawa, with a reasonable expectation of success.

First, a POSITA would have been motivated to make this replacement to improve the pulse measurements recorded by Aizawa's detector 1. Inokawa teaches that the infrared LED's signal can be used "to detect vital signs" such as "body motion," and the green LED's signal can be "used to detect pulse." Ex. 1008, Fig. 2, ¶¶ 14, 58–59; Ex. 1003 ¶¶ 60, 75–77; Ex. 1047 ¶¶ 45–47.

Patent Owner correctly points out that Aizawa describes its single-emitter detector 1 as transmitting its pulse data to "a device for computing the amount of motion load from the pulse rate." Ex. 1006 ¶¶ 15, 28, 35. But, this description is the only disclosure in Aizawa cited by Patent Owner as relating to computing a motion characteristic of the user. Further, we are unable to discern any other disclosure in Aizawa relating to motion computation, or what Aizawa proposes to do with its motion computation. *See id.* Based on the sparse nature of Aizawa's disclosure concerning motion load, it is not clear exactly what Aizawa proposes to do with the computed motion load, after it is computed. *See, e.g.*, Ex. 1047 ¶ 46 ("Aizawa does not even say whether it uses the computed motion load to

improve the detection signal[.]").  Aizawa does, however, describe the motion load as being computed "from the pulse rate," rather than being an input to the pulse rate calculation.  Ex. 1006 ¶¶ 15, 35.

Dr. Kenny, when asked whether it was his understanding that "Aizawa's sensor could not account for motion load?", answered that "Aizawa's sensor attempts to prevent motion load rather than account for it." Ex. 2007, 400:7–11.  He explained that, because Aizawa uses only a single emitter with a single wavelength, "what [Aizawa] sees as a signal would be some mixture of pulse rate and motion load if there was no effort to prevent motion load," so Aizawa seeks to solve the problem of "prevent[ing] motion load from corrupting the pulse rate signal."  *Id.* at 400:12–401:10. Dr. Kenny did not further explain this distinction between preventing and accounting for motion load, in his deposition testimony cited by the parties as relating to this issue.  *Id.* at 400:7–402:4.  We do not rely on this distinction as a basis for our present decision, because we find no express support for it in Aizawa's disclosure (*see* Ex. 1006 ¶¶ 15, 28, 35), and it is not explained in persuasive detail by Dr. Kenny.

We nonetheless credit Dr. Kenny's declaration testimony that a POSITA, upon reviewing Inokawa' s disclosure of using two emitters of different wavelengths to calculate a user's pulse and motion separately, would understand that these two separate measurements would enable the device to calculate a "more reliable" pulse rate "that can . . . take into account and correct for inaccurate [pulse] readings related to body movement," by subtracting the signal component corresponding to body movement from the pulse signal "to help better isolate the desired pulse data."  Ex. 1003 ¶ 77; Ex. 1047 ¶ 46.  Aizawa does not disclose using the

computed motion load in this specific fashion, so it appears that this would improve upon the accuracy of Aizawa's pulse measurements, by using the computed motion load. *See* Ex. 1006 ¶¶ 15, 28, 35.

Dr. Madisetti also offers no meaningful opposing testimony in this regard. *See, e.g.*, Ex. 2004 ¶ 84. Instead, Dr. Madisetti incorrectly reads Dr. Kenny's motivation testimony as being limited to the desirability of adding the bare ability to measure body movement to Aizawa. *See id.* In fact, Dr. Kenny further testified that it would have been beneficial to *use* the measured body movement to *improve* the pulse measurement of the device. *See* Ex. 1003 ¶ 77. Dr. Madisetti does not address that testimony. *See* Ex. 2004 ¶ 84.

Dr. Kenny cites Exhibit 1010 in support of his motivation testimony in this regard. *See* Ex. 1003 ¶ 77 (citing Ex. 1010, 8:45–50). However, as we stated in the Institution Decision, "the cited passage [of Exhibit 1010] appears to discuss only a single light emitting element, so it provides very little (if any) support for the testimony in paragraph 77 of Dr. Kenny's Declaration [Ex. 1003 ¶ 77]." Inst. Dec. 17 n.5. Patent Owner notes this in the Sur-reply (at pages 16–17), but neither Dr. Kenny nor Dr. Madisetti further addresses whether or how Exhibit 1010 might bear upon Dr. Kenny's testimony in paragraph 77 of his declaration.

Nonetheless, because Dr. Madisetti's testimony sets up a straw man to attack, rather than directly addressing the entirety of Dr. Kenny's testimony in this regard, Dr. Kenny's testimony stands unrebutted in the record before us. Dr. Kenny's testimony also makes intuitive sense that measuring the user's motion *separately* from the user's pulse, for example by using two interrogating emitters of two different wavelengths, would provide a reliable

means of correcting the pulse data for motion artifacts by using the separately measured motion data, rather than by trying to segregate these two components in the single data stream provided by Aizawa's single emitter device. *See, e.g.*, Ex. 1047 ¶ 47. We, therefore, are persuaded by Dr. Kenny's unrebutted testimony that using two emitters of different wavelengths would improve Aizawa's device in this way.

Also, and independently, a POSITA would have been motivated to replace Aizawa's single near infrared LED 21, with an infrared LED and a green LED, to provide a reliable method of uploading pulse data stored by Aizawa's wrist-worn pulse rate detector 1 to another device for display to the user. Inokawa expressly touts such optically-based uploading of data from Inokawa's wrist-worn sensor 1 to Inokawa's base station 17 as a benefit of incorporating two emitters in sensor 1. *See* Ex. 1008, Figs. 3 & 19, ¶¶ 3–7, 14, 76–77, 109–111. Inokawa identifies two specific benefits of this optically-based data communication means. First, the infrared LED can transmit the pulse data, and the green LED can separately transmit "checksum" information to increase the accuracy of data transmission. *Id.* at Fig. 19, ¶¶ 14, 109–111. Second, using light emitters in this fashion to perform two functions (data collection by emitting light into the user's wrist, and data transmission by emitting light to photodetectors in a base station) obviates the need for providing "a special wireless communication circuit [in the wrist-worn sensor 1] or a communication cable." *Id.* ¶¶ 3–7, 76–77.

Patent Owner points out correctly that Aizawa already has a "transmitter" 4 for uploading pulse data stored by Aizawa's wrist-worn pulse rate detector 1 to another device for processing and for display to the user. Ex. 1006, Fig. 1(b), ¶¶ 15, 23, 28, 35. However, Aizawa's Figure 1(b)

IPR2020-01520
Patent 10,258,265 B1

illustrates transmitter 4 only as an empty box contained within outer casing 5, and Aizawa's written description does not provide further structural details concerning transmitter 4.  *See id.*  In particular, Aizawa does not describe exactly how transmitter 4 transmits its data to another device.  *See id.*

Patent Owner contends, and Dr. Madisetti and Dr. Kenny both testify, that Aizawa's transmitter 4 is a "wireless" transmitter.  *See, e.g.*, PO Resp. 37; Ex. 2004 ¶¶ 86–87; Ex. 2007, 403:17–22, 414:19–21.  They all appear to equate "wireless" communication to radio frequency communication, and not to include optical communication, even though both radio frequency and optical communication do not use a wire.  *See, e.g.*, PO Resp. 37; Ex. 2004 ¶¶ 86–87.  Petitioner disagrees that Aizawa discloses any specific form of data transmission, including wireless transmission.  *See* Tr. 71:5–72:3 ("[T]he transmitter disclosure in Aizawa, they don't say its's a wireless transmitter.  That was a conjuration by [Patent Owner].  They don't specify whether it's a wired or wireless.").  We assume, for this Decision, that Aizawa expressly contemplates radio frequency communication as one embodiment by which transmitter 4 may transmit data to devices other than detector 1.

Patent Owner argues, and Dr. Madisetti testifies, that Aizawa's express disclosure goes even further.  They assert Aizawa's "goal" is to measure and display pulse data *in real time during exercise*, using the wireless transmitter.  *See, e.g.*, Ex. 2004 ¶¶ 86–87.  We find Aizawa does not support this assertion.  Instead, Aizawa discusses prior art devices that "estimat[e] a burden on the heart of a person who takes exercise by *real-time measuring* his/her heart rate at the time of exercise" (Ex. 1006 ¶ 4 (emphasis

added)), and then describes Aizawa's detector 1 as having a transmitter for transmitting the measured pulse rate data to another device for display (*id.* ¶ 15). Aizawa also refers to "noise caused by the shaking of the body of the subject" as a problem to be addressed (*id.* ¶ 6), but this problem occurs regardless of whether the shaking results from exercise or the normal movement of the user's wrist over the course of the day. Thus, Aizawa does not tout, as an important feature of Aizawa's invention, the *real time display* of pulse rate data during exercise, regardless of whether the data gathered by Aizawa's wrist-worn detector 1 is transmitted wirelessly or otherwise. *Id.* ¶¶ 4, 6, 15.

No doubt, a POSITA would have viewed the capability of a wrist-worn pulse detector to transmit its pulse data to another device for display in real time while the user is exercising to be a desirable feature in some cases, even if this is not one of Aizawa's specific goals. *See, e.g.*, Ex. 2011 ¶ 75 (Dr. Kenny stating: "By wirelessly transmitting the collected data wirelessly, Mendelson 2006's system provides 'numerous advantages,' . . . ."); Ex. 2009, 393:6–14 (Dr. Kenny agreeing that a POSITA "would have seen the ability to wirelessly transmit collected data as an advantage"). Nonetheless, Inokawa expressly discloses that, in other cases, the benefits achieved thereby can be outweighed by obviating the need for the wrist-worn sensor to include a special wireless communication circuit. *See* Ex. 1008 ¶¶ 3–7, 76–77. We therefore conclude Petitioner's case for obviousness in this regard is supported by a preponderance of the evidence. *See, e.g.*, *In re Urbanski*, 809 F.3d 1237, 1243–44 (Fed. Cir. 2016) (persons of ordinary skill in the art may be motivated to pursue

IPR2020-01520
Patent 10,258,265 B1

desirable properties of one prior art reference, even at the expense of foregoing a benefit taught by another prior art reference).

We are not persuaded by Patent Owner's argument that Petitioner's case for obviousness is deficient on the basis that neither Aizawa nor Inokawa expressly discloses a wrist-worn sensor device that has *both* a plurality of emitters *and* at least four detectors, as claim 1 recites. Obviousness does not require "'some motivation or suggestion to combine the prior art teachings' [to] be found in the prior art." *KSR*, 550 U.S. at 407, 415–418. Nor does it require the bodily incorporation of Inokawa's device into Aizawa's device. *See, e.g.*, *In re Keller*, 642 F.2d 413, 425 (CCPA 1981) (test for obviousness is not whether the features of one reference may be bodily incorporated into the structure of the other reference, but rather is "what the combined teachings of the references would have suggested to those of ordinary skill in the art"); *see also In re Merck & Co.*, 800 F.2d 1091, 1097 (Fed. Cir. 1986) (nonobviousness is not established by attacking references individually when unpatentability is predicated upon a combination of prior art disclosures). Instead, "[a] person of ordinary skill is also a person of ordinary creativity, not an automaton," and "in many cases a person of ordinary skill will be able to fit the teachings of multiple patents together like pieces of a puzzle." *KSR*, 550 U.S. at 420–421.

In this case, a POSITA would have been motivated to modify Aizawa's wrist-worn detector 1 to replace its single near infrared LED 21 with an infrared LED and a green LED, based on Inokawa, and for all the reasons provided above. A POSITA would additionally have known to keep all four detectors 22 that are already present in Aizawa's detector 1, so that

IPR2020-01520
Patent 10,258,265 B1

"[e]ven when the attachment position of the sensor is dislocated, a pulse wave can be detected accurately," as disclosed by Aizawa.  Ex. 1006 ¶¶ 9, 27.  In short, the combination of Aizawa and Inokawa teaches that having multiple emitters is beneficial, and having multiple detectors is beneficial, for different and not inconsistent reasons.

Finally, we agree with Petitioner's position that the thermal interference and power consumption issues that will arise in Aizawa's wrist-worn pulse detector, by using two emitters instead of one emitter, are well within the capabilities of POSITA to solve.  We credit Dr. Kenny's testimony in this regard.  *See* Ex. 1003 ¶¶ 74–78, 85; Ex. 1047 ¶ 49.  For example, Dr. Kenny acknowledges this modification of Aizawa may possibly "lead to increased power consumption," but nonetheless concludes "a POSITA would have known how to make the changes needed, for example concerning circuitry, to add another LED," because "Aizawa already contemplates adding additional emitters."  Ex. 1003 ¶¶ 77–78 (citing Ex. 2006 ¶ 32 (sic ¶ 33)).  Dr. Kenny further testifies that this modification "amount[s] to nothing more than the use of a known technique [i.e., Inokawa's use of two emitters in a wrist-worn pulse detector] to improve similar devices [i.e., Aizawa's wrist-worn pulse detector] in the same way, and combining prior art elements according to known methods to yield predictable results."  *Id.* ¶¶ 79, 85 (citing Ex. 1015, 168, Fig. 2A).

Patent Owner cites several portions of Dr. Kenny's deposition testimony that, in Patent Owner's view, indicate Dr. Kenny fails to appreciate the significance of the thermal effects, optical interference complications, and power consumption needs, that are posed by adding a second emitter to Aizawa's device, and fails to explain how these issues

IPR2020-01520
Patent 10,258,265 B1

would have been overcome.  *See* PO Resp. 38, 39–40 (citing Ex. 2007, 379:17–21, 384:8–388:16, 389:17–390:20, 394:11–395:22; Ex. 2009, 381:18–382:8, 383:22–385:9, 390:5–392:3).  We have reviewed this deposition testimony, and we conclude Patent Owner overstates its significance.  It establishes, at most, that Dr. Kenny did not expressly address these issues in his declaration (Exhibit 1003), but Dr. Kenny's opinion is that these issues would have been within the capability of a POSITA to resolve.  Based on the evidentiary record presented to us, we agree with Dr. Kenny's opinion.  For example, Inokawa discloses a wrist-worn pulse sensor 1 having two emitters 21 and 23 in close proximity to each other, and Mendelson-1988 discloses an "optical sensor of a pulse oximeter [that] consists of a red and an infrared light emitting diode[s]" as 0.3 x. 0.3 millimeter chips disposed within a few millimeters of each other. *See* Ex. 1008, Figs. 1–2; Ex. 1015, 168, Figs. 2A–2C.

Dr. Madisetti's testimony opposing Dr. Kenny's foregoing opinion is premised solely on Dr. Kenny's alleged failure to explain how the issues that arise from adding a second emitter to Aizawa would have been solved; Dr. Madisetti does not provide any affirmative reason why these issues would have been difficult to solve in the context of Aizawa's device or wrist-worn pulse sensing devices in general.  *See* Ex. 2004 ¶ 88.  For example, Dr. Madisetti cites Exhibit 2012[5] as "discussing power and thermal considerations," and cites the '265 patent as disclosing "using a thermistor and heat sinks and adjusting for temperature drift in the measurements." Ex. 2004 ¶ 88 (citing Ex. 2012, 59–60; Ex. 1001, 29:22–24).  But,

---

[5] *Design of Pulse Oximeters* (J.G. Webster ed., 1997).

Dr. Madisetti does not explain why these issues would have been difficult to overcome. *See id.* Indeed, Exhibit 2012 discusses power consumption and heat generation of LED emitters in portable units as routine design considerations, rather than difficult problems. *See* Ex. 2012, 59–60. The '265 patent is to a similar effect. *See* Ex. 1001, Fig. 11A, 29:16–42.

Thus, we conclude a POSITA would have been motivated to replace Aizawa's single near infrared LED 21, with an infrared LED and a green LED, and would have had a reasonable expectation of success in doing so.

### (2)　　*Cover Comprising Protrusion*

#### (i)　　*Petitioner's Contentions*

Petitioner asserts that, although Aizawa indicates its transparent plate 6 helps to improve detection efficiency, "Aizawa does not provide much other detail" regarding plate 6, "for instance regarding its shape."[6] Pet. 13, 28 (citing Ex. 1006 ¶ 30). Petitioner contends a POSITA nonetheless would have known how to give plate 6 a shape to improve detection efficiency. *Id.* (citing Ex. 1006 ¶¶ 13, 30, 32; Ex. 1003 ¶¶ 92–94).

According to Petitioner: "A POSITA would have looked to Inokawa to enhance light collection efficiency" in Aizawa's plate 6, for example by "includ[ing] a convex protrusion that acts as a lens" like Inokawa's lens 27. Pet. 14, 28–29 (citing Ex. 1008, Fig. 2); Ex. 1003 ¶¶ 95–97. Petitioner cites Inokawa's description of lens 27 as "mak[ing] it possible to increase the light-gathering ability of the LED." Pet. 14 (quoting Ex. 1008 ¶ 15);

---

[6] Petitioner overstates the paucity of Aizawa's disclosure here. Aizawa illustrates plate 6 as having a flat surface, which Dr. Kenny notes in his testimony. *See* Ex. 1006, Fig. 1(b); Ex. 1003 ¶¶ 93–94, 97.

IPR2020-01520
Patent 10,258,265 B1

Ex. 1003 ¶ 96.  In particular, Dr. Kenny testifies a POSITA would have known that adding a convex protrusion to Aizawa's plate 6 would "increase light collection efficiency, in turn leading to an enhanced signal-to-noise ratio and ultimately more reliable pulse wave detection . . . by refracting and concentrating the light."  Ex. 1003 ¶¶ 96–97; Pet. 14.

Dr. Kenny provides the following illustrations to portray the proposed modification of Aizawa's pulse rate detector 1.  *See* Pet. 15; Ex. 1003 ¶ 97.



At the left, Dr. Kenny has excerpted and annotated Aizawa's Figure 1(b), to identify Aizawa's pre-existing cover (colored blue) which covers the light emitter (colored green) and the light detectors (colored red).  *See* Ex. 1003 ¶ 97.  At the right, Dr. Kenny has illustrated the device resulting from the proposed modification of the cover to have a convex protrusion (colored blue).  *See id.*  Dr. Kenny testifies that this modification would increase the light-gathering ability of Aizawa's four detectors 22, because "the modified cover will allow more light to be gathered and refracted toward the light receiving cavities [23b] of Aizawa . . . beyond what is achieved through the tapered cavities [23b]."  *Id.* (citing Ex. 1008 ¶ 15); Pet. 14–15.

Further according to Petitioner: "A POSITA would have understood how to implement Inokawa's lens-shaped cover in Aizawa's device with a reasonable expectation of success."  Pet. 15–16 (citing Ex. 1008, Figs. 16

& 17, ¶¶ 15, 106); Ex. 1003 ¶ 98. Petitioner adds that Aizawa's "transparent acrylic material . . . can be readily formed into a lens-like shape as in Inokawa." Pet. 16 (citing Ex. 1023, Fig. 6, ¶¶ 22, 32, 35); Ex. 1003 ¶ 99. The shape of the modified cover in Dr. Kenny's illustration of the proposed modification above is strikingly similar to the shape of an LED lens unit illustrated in Exhibit 2023[7] (hereafter "Nishikawa"), cited by Petitioner in connection with reasonable expectation of success. *Compare* Pet. 15 (illustrating proposed modification), *with* Ex. 2023, Fig. 6, ¶¶ 3, 22, 30, 32, 35 (illustrating lens unit 50 used with LED 22, and discussing how to make the illustrated device).

### (ii)    *Patent Owner's Contentions*

Patent Owner contends the evidence does not support Petitioner's argument that a POSITA would have been motivated to modify Aizawa's cover 6 to have a convex protrusion, in order to improve detection efficiency by directing incoming light to Aizawa's photodetectors 22, with a reasonable expectation of success. *See* PO Resp. 1–4, 11–34; Ex. 2004 ¶¶ 39–78.

According to Patent Owner, the evidence establishes Petitioner's proposed modification would direct light *toward the center* of Aizawa's detector 1 where emitter(s) 21 are located, rather than *toward the periphery* where detectors 22 are located. PO Resp. 13–18; Ex. 2004 ¶¶ 42–58. Thus, Patent Owner's view is that "a POSITA would ***not*** have expected Inokawa's convex surface to accomplish" the objective of enhancing light collection efficiency relied upon by Petitioner, because Petitioner's proposed modification instead "would direct light ***away*** from the ***periphery***-located

---

[7]  US 2007/0145255 A1, published June 28, 2007.

IPR2020-01520
Patent 10,258,265 B1

detectors" in Aizawa, the opposite result to Petitioner's contention.
PO Resp. 18–19; Ex. 2004 ¶¶ 56–58.

In support, Patent Owner points to Inokawa's Figure 2, in which two arrows illustrate light that passes through the convex protrusion of lens 27 toward the center of Inokawa's pulse sensor 1 where detector 25 is located. PO Resp. 13, 16 (citing Ex. 1008 ¶ 58); Ex. 2004 ¶¶ 42–43, 51–52.  Patent Owner also points to the '265 patent's Figure 14B, which illustrates several light rays 1420, 1422 passing through a partially cylindrical protrusion 605 to be centrally focused on detector(s) 1410B.  PO Resp. 17 (citing Ex. 1001, 36:11–14, 36:21–23); Ex. 2004 ¶¶ 53–54.  Patent Owner cites portions of Dr. Kenny's deposition testimony that, in Patent Owner's view, support Patent Owner's contentions in these regards.  *See* PO Resp. 2, 16, 17, 22 (citing Ex. 2006, 83:15–84:2, 86:19–87:1, 202:11–204:20).

Patent Owner also asserts "Dr. Kenny admitted that the impact of Inokawa's convex lens would not be 'obvious' in the context of [the] different configuration of LEDs and detectors" presented by Aizawa. PO Resp. 19 (citing Ex. 2006, 87:2–6).  For example, Patent Owner points out that "light reaching Aizawa's detectors must travel in an opposite direction from the light in Inokawa."  *Id.* at 19–20 (citing Ex. 1006, Fig. 1(b); Ex. 1008, Fig. 2); Ex. 2004 ¶¶ 59–62.  In addition, according to Patent Owner, "Petitioner's combination is particularly problematic because" Aizawa uses "small detectors [22] with small openings [of cavities 23c] surrounded by a *large* amount of *opaque* material." PO Resp. 20 (citing Ex. 1006, Fig. 1(a)); Ex. 2004 ¶ 63.  Patent Owner cites portions of Dr. Kenny's deposition testimony that, in Patent Owner's view,

support Patent Owner's contentions in these regards.  *See* PO Resp. 20–21 (citing Ex. 2006, 257:11–18).

Patent Owner asserts that Petitioner's illustration of the light-focusing properties of a convex protrusion lens, when discussing dependent claim 12, (*see* Pet. 38–39) "***drastically*** increases the size of the detectors compared to Aizawa and ***eliminates*** surrounding barriers" that are present in Aizawa, which when properly taken into account "confirms the light ***would not even reach***" Aizawa's peripheral detectors 22 if a convex lens were applied.  *See* PO Resp. 21–22 (citing Ex. 1006, Fig. 1(b)); Ex. 2004 ¶¶ 64–65.

Patent Owner argues further that Dr. Kenny, during his deposition, attempted to evade the foregoing problems with his declaration testimony by "disclaim[ing] Petitioner's reasoning [for obviousness] and assert[ing] new and improper opinions" that undermine the reasoning provided in the Petition.  PO Resp. 2, 22–23 (citing Ex. 1003 ¶¶ 97, 119, 200; Ex. 2006, 65:15–70:7, 108:21–109:14, 198:6–16; Ex. 2009, 310:1–20); Ex. 2004 ¶ 66. For example, Patent Owner asserts Dr. Kenny's attempt to distinguish between the '265 patent's Figure 14B as illustrating a lens that condenses *collimated* light toward the center, and Aizawa and Inokawa in which the lens focuses *diffuse* light reflected by the user's body, is not persuasive and is not supported by any evidence.  PO Resp. 23–24 (citing Ex. 2006, 170:9–171:5; Ex. 2007, 288:13–289:5, 294:17–298:10, 298:11–299:18, 423:7–424:18); Ex. 2004 ¶¶ 67–68.  Patent Owner also objects to Dr. Kenny's testimony that, "while a convex lens would generally direct more light to the center," it "would also capture some light that otherwise would not be captured" by Aizawa's detectors 22, as lacking evidentiary support other than in the '265 patent itself which is impermissible hindsight.

PO Resp. 24–25 (citing Ex. 2006, 204:21–206:5, 206:22–208:1; Ex. 2007, 294:17–298:10; Ex. 1001, 7:61–63); Ex. 2004 ¶¶ 69–70.  Patent Owner moreover asserts "Dr. Kenny repeatedly distanced himself from his own combination" of Aizawa and Inokawa by refusing to talk about the specific shape, size, material, and dimensional tolerances of the combination, so his testimony falls short because it demonstrates at most only that the references could have been combined.  PO Resp. 2–3, 25–28 (citing Ex. 1003 ¶ 111; Ex. 2006, 51:14–52:16, 75:20–77:2, 91:9–92:13, 96:20–21, 97:11–21, 100:17–101:18, 132:10–18, 154:4–7, 164:8–16, 189:11–190:3; Ex. 2007, 308:12–309:8, 310:18–311:9, 318:3–6, 324:21–325:19, 333:20–335:4); Ex. 2004 ¶¶ 71–72.

Indeed, according to Patent Owner, because ordinary skill does not require specific education or experience with optics or optical physiological monitors (*see supra* Section III.B): "It strains credibility that a POSITA . . . could balance all of the factors Dr. Kenny identified" as affecting the performance of a protruding convex lens in an optical physiological sensor to reach the claimed invention.  PO Resp. 28–29 (citing Ex. 2006, 51:21–52:16, 93:16–94:15, 100:17–101:18; Ex. 2009, 347:14–352:18); Ex. 2004 ¶¶ 73–75.  Patent Owner relies on Dr. Kenny's testimony, as establishing the complexity of designing optical physiological sensors.  PO Resp. 3–4, 29–30 (citing Ex. 2006, 86:19–87:6; Ex. 2007, 331:19–332:11, 336:11–337:15).  Patent Owner concludes Petitioner has failed to establish a reasonable expectation of success in reaching the invention of claim 1 based on Aizawa and Inokawa, because Dr. Kenny's testimony on this issue "focuses almost entirely on manufacturing."  *Id.* at 30 (citing Ex. 1003 ¶ 99); Ex. 2004 ¶ 75.

IPR2020-01520
Patent 10,258,265 B1

Patent Owner moreover asserts Petitioner errs in relying on Nishikawa as supporting the unpatentability of claim 1, because Nishikawa is "not identified as part of" Ground 1A, which instead "includes only two references," Aizawa and Inokawa.  PO Resp. 31 (citing Pet. 1–2, 28; Ex. 1003 ¶¶ 94–99); *id.* at 32–33 (citing 35 U.S.C. § 312(a)(3); *Intelligent Bio-Systems, Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1369 (Fed. Cir. 2016)).  Patent Owner asserts Dr. Kenny "relies heavily on" Nishikawa, particularly "to inform the specific shape of the cover in his combination, which is found nowhere in Aizawa and Inokawa." *Id.* at 31–32 (citing Pet. 28–29; Ex. 2006, 179:21–180:13; Ex. 2007, 364:2–13; Ex. 2008, 73:8–12); Ex. 2004 ¶¶ 76–77.

Further, in Patent Owner's view, Dr. Kenny's reliance on Nishikawa "make[s] no sense" because "Nishikawa's device is not a physiological sensor" but rather is "an encapsulated LED" that "directs ***outgoing*** light through the encapsulation material and thus focuses on the emission of light, not the detection of an optical signal."  PO Resp. 33 (citing Ex. 1023, code (57), ¶¶ 3, 32, 35); Ex. 2004 ¶ 78.  Patent Owner contrasts such disclosure with Aizawa and Inokawa, both of which "detect[] ***incoming*** light that passes through the cover and reaches the detectors," and which have a "drastically" smaller scale than Nishikawa's LEDs.  PO Resp. 33–34 (citing Ex. 1008, Fig. 2); Ex. 2004 ¶ 78.

*(iii)    Petitioner's Reply*

In reply, Petitioner insists "Inokawa's lens enhances the light-gathering ability of Aizawa," which would have motivated a POSITA "to incorporate 'an Inokawa-like lens [having a convex protrusion] into the

cover of Aizawa to increase the light collection efficiency.'" Pet. Reply 2–3 (bolding omitted) (citing Pet. 14–15, 28; Ex. 1003 ¶¶ 94–99; Ex. 1008, Fig. 2, ¶¶ 15, 58). Petitioner dismisses Patent Owner's and Dr. Madisetti's opposition as being "misinformed" regarding Inokawa's lens and lenses in general, because "a POSITA would understand that Inokawa's lens improves 'light concentration at pretty much all of the locations under the curvature of the lens,' as opposed to only at a single point at the center." *Id.* at 3 (quoting Ex. 2006, 164:8–16); *id.* at 1, 3 (citing PO Resp. 13; Ex. 1041, 89:12–19; Ex. 1042, 170:12–20); Ex. 1047 ¶¶ 3–5, 19–23.

For example, Petitioner asserts Patent Owner and Dr. Madisetti "ignore[] the well-known principle of reversibility" according to Snell's law.[8] Pet. Reply 4–7 (underlining omitted) (citing Ex. 1040, 84, 87–92; Ex. 1043, 80:20–82:20; Ex. 1049, 101, 106–111); Ex. 1047 ¶¶ 32–39. Petitioner asserts Dr. Madisetti was evasive when he was asked to apply the reversibility principle to the combination of Aizawa and Inokawa in this case. Pet. Reply 6 (citing Ex. 1041, 89:12–19, 84:2–85:7).

Petitioner also asserts Patent Owner and Dr. Madisetti overlook the fact that light rays reflected by body tissue in the user's wrist, to be received by detectors in either Aizawa's or Inokawa's pulse sensor, will be "scattered" and "diffuse" and therefore will approach the detectors "from various random directions and angles." Pet. Reply 7–8 (citing Ex. 1046, 803; Ex. 2012, 52, 86, 90); *id.* at 8–10 (annotating Inokawa's Fig. 2 to illustrate the cause and nature of the back-scattering); Ex. 1003 ¶ 128;

---

[8] Snell's law describes how a light ray will be refracted when passing between two mediums having different indices of refraction. *See* Ex. 1047 ¶ 10 (describing and illustrating Snell's law).

IPR2020-01520
Patent 10,258,265 B1

Ex. 1047 ¶¶ 6–9.  This scattered and diffuse light, according to Petitioner, means that Inokawa's "lens cannot focus all incoming light at a single point" at a central location as Patent Owner would have it.  Pet. Reply 7, 8–10 (citing Ex. 2006, 163:12–164:2); Ex. 1047 ¶¶ 6, 8, 11–13.  Petitioner asserts this is due to Snell's law, and provides several illustrations to illustrate why. Pet. Reply 8–12 (citing Ex. 1040, 84; Ex. 1043, 80:20–82:20; Ex. 1049, 101; Ex. 2012, 52, 86, 90); Ex. 1047 ¶¶ 9–10, 14–16.

Due to the random nature of this scattered light, Petitioner asserts a POSITA would have understood that "Inokawa's lens provides at best a slight refracting effect, such that light rays that otherwise would have missed the detection area are instead directed toward that area as they pass through the interface provided by the lens."  Pet. Reply 13; Ex. 1047 ¶ 18.  Petitioner applies this understanding to Aizawa, and asserts that using a lens with a convex protrusion in Aizawa would "enable backscattered light to be detected within a circular active detection area surrounding" a central light source, thereby "allowing a larger fraction of the backscattered light to reach the areas covered by the lens" including the circular detection area.  Pet. Reply 13–14 (citing Ex. 1046, 803; Ex. 2006, 164:8–16, 204:21–205:12; Ex. 2012, 86, 90); Ex. 1047 ¶ 18–22.  Dr. Kenny provides the following illustration of this alleged effect.  *See* Ex. 1047 ¶ 21; Pet. Reply 14.

IPR2020-01520
Patent 10,258,265 B1



Here, Dr. Kenny has excerpted a portion of his illustration of using a lens
with a convex protrusion (in blue) on top of Aizawa's pulse rate detector
(with a photodetector, in red) (*see* Ex. 1003 ¶ 97), and added several dotted
lines that are orthogonal to the lens surface.  Pet. Reply 14; Ex. 1047
¶¶ 20–21.  Dr. Kenny testifies that Snell's law indicates "the incoming light
rays are refracted in a way that deflects incoming rays somewhat towards
these orthogonal lines," and that because "these orthogonal lines vary in
orientation most rapidly near the edge, where the illustrated curvature of the
lens surface is the greatest," using this lens in Aizawa "would lead to an
improvement in the light concentration at the location of the detectors."
Ex. 1047 ¶¶ 21–22.

Petitioner additionally asserts a POSITA, upon reading Inokawa's
disclosure that its lens 27 "makes it possible to increase the light-gathering
ability of the LED" in an optically-based pulse sensor device (Ex. 1008
¶ 15), would have understood that this "general benefit" could also be
achieved within the context of Aizawa's optically-based pulse sensor device,
and is not limited to "the exact" structure of Inokawa's device.  Pet.
Reply 15 (citing Ex. 1003 ¶¶ 61, 96–98; Ex. 2006, 88:21–89:1, 89:21–90:3);
Ex. 1047 ¶ 23.

Petitioner asserts Dr. Madisetti's testimony in support of Patent Owner's position ignores the application of Snell's law to the random nature of backscattered light in the context of Aizawa's and Inokawa's pulse sensors, which measure light *reflected* (i.e., backscattered) by the user's tissue.  Pet. Reply 12–13 (citing Ex. 1042, 166:12–182:3); Ex. 1047 ¶ 17. Petitioner similarly dismisses the applicability of Figure 14B of the '265 patent as illustrating the operation of a *transmittance*-type of sensor that measures the attenuation of collimated light transmitted through the user's body tissue, rather than the *reflectance*-type sensors of Aizawa and Inokawa.  Pet. Reply 15–17 (citing Ex. 1001, 36:19–21, Fig. 14I; Ex. 2007, 287:12–289:5); Ex. 1047 ¶¶ 24–28.

Petitioner further disagrees with Patent Owner's argument that Petitioner's illustrations of the light-focusing properties of a convex lens when discussing dependent claim 12 (*see* Pet. 38–39) demonstrate "that a convex lens directs all light to the center."  Pet. Reply 18–19 (citing PO Resp. 15, 21, 22; Ex. 1041, 41:7–22, 60:7–61:6).  Petitioner contends these illustrations, instead, "are merely simplified diagrams included to illustrate . . . one example scenario (based on just one ray and one corpuscle) where a light permeable cover can 'reduce a mean path length of light traveling to the at least four detectors'" as recited in claim 12.  *Id.* (citing Pet. 39; Ex. 1003 ¶¶ 119–120); Ex. 1047 ¶¶ 30–31.

### (iv)    *Patent Owner's Sur-reply*

Patent Owner asserts Petitioner's Reply improperly presents several new arguments, relying on new evidence, as compared with the Petition. *See, e.g.*, Sur-reply 3 n.3 (objecting to the illustration provided at Pet.

Reply 14 as being "new"); *id.* at 4–6 ("After recognizing the fundamental error in its proposed combination, Petitioner now attempts to rewrite its petition" concerning how a lens with a convex protrusion would focus light in Aizawa's device); *id.* at 7 ("Petitioner's new theory [concerning reversibility of light rays] is improper, denying [Patent Owner] of the opportunity to respond with expert testimony, and should be rejected."); *id.* at 10 ("Petitioner next asserts a number of other new theories found nowhere in the petition.").

Patent Owner also asserts Petitioner mischaracterizes Patent Owner's position, which is not that Inokawa's lens with a convex protrusion "direct[s] '*all*' light 'only at a *single point* at the center'" of the sensor as Petitioner characterizes it.  Sur-reply 1–2 & n.1 (quoting Pet. Reply 3, and citing PO Resp. 2, 14–18, 23, 24, 27 and Ex. 2027, 63:7–64:6, 94:20–96:1, 96:18–97:7).  Patent Owner's position, rather, is that Inokawa's lens condenses more light (not necessarily all light) "*towards the center*" (not necessarily at a single, central point) relative to Aizawa's flat cover.  *Id.* at 2–3 (quoting PO Resp. 18, and citing Ex. 2004 ¶¶ 34, 43, 49, 51, 52, 54, 55, 67).

Patent Owner moreover asserts "[t]here can be no legitimate dispute that a convex surface directs light centrally (and away from the periphery)," so Petitioner errs in asserting that a POSITA would have used a convex lens with Aizawa's detector 1 to improve its light detection efficiency, because Aizawa's photodetectors 22 are disposed at the periphery of the device.  *Id.* at 4–6 (citing Pet. 13–15, 39; PO Resp. 15–18; Ex. 1003 ¶¶ 97, 119, 200; Ex. 2006, 164:8–16, 166:10–17, 170:22–171:5; Ex. 2027, 181:9–182:5). Patent Owner contends Petitioner's argument "that Inokawa would improve

light-gathering at all locations, ***regardless*** of the location of the LEDs and detectors" is belied by Dr. Kenny's testimony that "Inokawa's benefit would ***not*** be clear if Inokawa's LEDs and detectors were moved" and "confirmed that a convex surface would direct light toward the center of the underlying sensor." Sur-reply 6–7 (citing Pet. Reply 3–4; Ex. 2006, 86:19–87:6, 202:11–204:20).

Patent Owner argues Petitioner's discussion of the principle of reversibility is "irrelevant" because it "assumes ideal conditions that are not present when tissue scatters and absorbs light." Sur-reply 7–9 (citing Ex. 1040, 88, 92, 399 (citations to the exhibit's page numbers modified to refer to the document's page numbers)); Ex. 2027, 17:12–19:2, 29:11–30:7, 31:8–32:3, 38:17–42:6, 207:9–209:21, 210:8–6). The random nature of backscattered light, in Patent Owner's view, "hardly supports Petitioner's argument that light will necessarily travel the same paths regardless of whether the LEDs and detectors are reversed," and is irrelevant to the central issue presented here of "whether a convex surface—***as compared with a flat surface***—would collect and focus additional light on Aizawa's peripherally located detectors." Sur-reply 9–10 (citing Ex. 2006, 86:19–87:6; Ex. 2027, 212:3–14).

In response to Petitioner's argument that "due to its protruded shape, Inokawa's lens 'provides an opportunity to capture some light that would otherwise not be captured'" in Aizawa (Pet. Reply 14), Patent Owner asserts "Dr. Kenny was unable to support this new theory with any evidence." Sur-reply 10–11 (citing Ex. 2007, 294:17–298:10). Patent Owner further asserts Petitioner "fails to consider the greater ***decrease*** in light at the detectors due to light redirection to a ***more*** central location." *Id.* at 13

IPR2020-01520
Patent 10,258,265 B1

(citing Pet. Reply 20; Ex. 2027, 19:16–21:8).  Patent Owner explains that
"the circle of backscattered light's intensity '**decreases** in direct proportion
to the **square of the distance** between the photodetector and the LEDs,'" so
"any purported signal obtained from light redirected from the sensor's **edge**
would be relatively weak and fail to make up for the much greater loss of
signal strength when light is redirected away from the detectors and towards
a more central position." *Id.* (citing Ex. 1015, 2; Ex. 2027, 49:17–50:13,
57:10–22).

Patent Owner contends Petitioner's position concerning the
'265 patent's Figure 14B is not supported by evidence. *Id.* at 11 (citing
PO Resp. 15–17; Ex. 2007, 423:7–424:18).

### (v)    Analysis and Conclusion

Upon review of the foregoing, we conclude a preponderance of the
evidence supports Petitioner's contention that a POSITA would have been
motivated to modify Aizawa's cover 6 to include a convex protrusion, in
light of Inokawa, in order to increase the amount of backscattered light that
will be received by Aizawa's four peripheral detectors 22, versus Aizawa's
existing flat cover 6.

We find Aizawa's and Inokawa's pulse sensors both gather data by
emitting light into the user's wrist tissue, and collecting light that reflects
back to the sensor from within the user's tissue. *See, e.g.*, Ex. 1006,
Figs. 1(b) & 2 (sensor 2 has emitter 21 and four detectors 22, all facing a
user's wrist 10); Ex. 1008, Figs. 1 & 2 (sensor 1 has two emitters 21, 23 and
one detector 25, all facing the user's wrist when held in place by
wristband 5).  Dr. Kenny testifies, and Patent Owner agrees, that the

IPR2020-01520
Patent 10,258,265 B1

reflection of this light by the user's wrist tissue randomizes the propagation direction of the reflected light rays. *See* Ex. 1003 ¶ 128; Ex. 1047 ¶¶ 6–7; Sur-reply 7–8 ("Even Petitioner admits that tissue randomly scatters and absorbs light rays . . . ."); Tr. 65:23–66:13. This is illustrated by Dr. Kenny's annotations to Inokawa's Figure 2 (Ex. 1047 ¶¶ 6–7), reproduced below:



Here, Dr. Kenny has modified Inokawa's Figure 2 by removing two black arrows, by coloring Inokawa's light detector in red and Inokawa's two light emitters in green, and by adding several green arrows to illustrate the various directions that light rays may be directed after impinging on and reflecting off different tissues in the user's wrist. Ex. 1047 ¶¶ 6–7.

This randomized direction of reflected light rays results in backscattered light that is diffuse, rather than collimated, in nature. Exhibit 1040,[9] Figure 4.12, illustrates the difference between diffuse and collimated light, and is reproduced below:

---

[9] Eugene Hecht, *Optics* (2nd ed. 1990).

IPR2020-01520
Patent 10,258,265 B1



This figure provides at left a photograph and an illustration showing incoming collimated light reflecting from a smooth surface, and at right a photograph and an illustration of incoming collimated light reflecting from a rough surface. *See* Ex. 1040, 87–88. The smooth surface provides specular reflection, in which the reflected light rays are collimated like the incoming light rays. *See id.* The rough surface provides diffuse reflection, in which the reflected light rays travel in random directions. *See id.*

This diffuse nature of the light reflected from the user's wrist tissue, which both Aizawa and Inokawa aim to collect to generate pulse data, suggests that a lens might be useful to increase the amount of collected light and thereby increase the reliability of the pulse data generated using the collected light. Indeed, this is taught by Inokawa. Inokawa describes using its lens 27 to "increase the light-gathering ability" of Inokawa's light detector 25. Ex. 1008 ¶¶ 15, 58. Inokawa actually refers to the "LED" such as emitters 21, 23 in this regard (*id.* ¶ 15), rather than detector 25, but it is undisputed that detector 25 is the only component of Inokawa's sensor 1 that gathers light. Thus, in a general sense, Inokawa demonstrates that it was known in the art prior to the '265 patent to use a lens to focus diffuse light

IPR2020-01520
Patent 10,258,265 B1

reflected from body tissue on to the light detecting elements of a wrist-worn
pulse sensor, to increase the light gathered by the sensor and thereby
improve the device's calculation of the user's pulse. Inokawa also discloses,
in its Figure 2, that a convexly protruding lens may advantageously be used
for this purpose.

A preponderance of the evidence supports Petitioner's contention that
a POSITA would have been motivated to apply Inokawa's convex lens
technology to Aizawa's wrist-worn pulse sensor, to improve its light
collection in a similar manner versus Aizawa's existing flat cover. This is
illustrated by the following illustrations provided by Dr. Kenny:

 

The illustration at left modifies Aizawa's Figure 1(b) to show how Aizawa's
existing flat cover may be modified to incorporate a convex protrusion (in
blue) to act as a light-focusing lens, which covers Aizawa's four peripheral
light detectors (two shown in red) and central light emitter (colored green).
*See* Ex. 1003 ¶ 97. The illustration at right zooms in on the portion of this
modification covering one of the detectors, and adds several dotted lines that
are orthogonal to the lens surface. *See* Ex. 1047 ¶¶ 20–21. We are
persuaded by Dr. Kenny's testimony that Snell's law indicates "the
incoming light rays are refracted in a way that deflects incoming rays
somewhat towards these orthogonal lines," and that because "these
orthogonal lines vary in orientation most rapidly near the edge, where the
illustrated curvature of the lens surface is the greatest," using the illustrated

IPR2020-01520
Patent 10,258,265 B1

lens in Aizawa "would lead to an improvement in the light concentration at the location of the detectors."  Ex. 1047 ¶¶ 18–22 (applying Snell's law to Aizawa); *id.* ¶¶ 8–17 (discussing Snell's law in the abstract).

Patent Owner correctly notes that Inokawa's single detector 25 is located in the central portion of Inokawa's sensor 1, whereas Aizawa's four detectors 22 are located more towards the periphery of Aizawa's sensor 2. *Compare* Ex. 1008, Fig. 2, *with* Ex. 1006, Figs. 1(a)–1(b).  However, Petitioner's proposed modification of Aizawa takes this into account, as can be seen by the following comparison between Inokawa's sensor and Petitioner's proposed modification of Aizawa's sensor:



The illustration at left annotates Inokawa's Figure 2 to identify the central detector in red and the lens in light blue (*see* Ex. 1003 ¶ 95), and the illustration at right annotates Petitioner's proposed modification of Aizawa to illustrate the peripheral detectors in red and the lens in light blue (*see id.* ¶ 97).  As can be seen, the lenses both utilize a convex protrusion, but the convex protrusions are not identical.  In Inokawa the lens's curvature is most pronounced at the center of the lens near the central detector, and in the proposed modification to Aizawa, the lens's curvature is most pronounced at the edges of the lens near the peripheral detectors.  Thus, Dr. Kenny's proposed modification of Aizawa takes Inokawa's general teaching of using

IPR2020-01520
Patent 10,258,265 B1

a convex protrusion lens to increase the amount of incoming light directed to a light detector, and applies it to the four light detectors of Aizawa. *See, e.g.*, Ex. 1003 ¶¶ 95–97; Ex. 1047 ¶¶ 8–22.

Patent Owner also correctly observes that Dr. Kenny borrowed, from Nishikawa, the specific shape of the convex lens in Petitioner's proposed modification of Aizawa. *See, e.g.*, PO Resp. 31–32 (citing Ex. 1003 ¶ 99; Ex. 2006, 179:21–180:13; Ex. 2007, 364:2–13; Ex. 2008, 73:8–12). However, we disagree with Patent Owner's assertion that this is improper on the basis that Nishikawa is not listed as a reference in Petitioner's identification of Ground 1A. *See* Pet. 1–2, 6 (identifying Ground 1A as obviousness over Aizawa and Inokawa). Rejecting Petitioner's reliance on Nishikawa on this basis would exalt form over substance, which we decline to do. The nature of Petitioner's reliance on Nishikawa in support of Ground 1A is explained clearly in the Petition, even if Nishikawa is not listed as a third reference in the identification of the ground. *See id.* at 16 (discussing Nishikawa (Ex. 1023) and Dr. Kenny's testimony concerning Nishikawa (Ex. 1003 ¶ 99) in connection with Ground 1A); *see also supra* Section III.D.3(c)(2)(i) & (iii) (summarizing Petitioner's contentions and evidence). Thus, the Petition complies with 35 U.S.C. § 312(a)(3) (stating an IPR petition must "identif[y], in writing and with particularity . . . the grounds on which the challenge to each claim is based, and the evidence that supports the grounds for the challenge . . . ").

On the merits, the Petition discusses how Nishikawa indicates "the transparent acrylic material used to make Aizawa's plate can be readily formed into a lens-like shape as in Inokawa," with a reasonable expectation of success. Pet. 16 (citing Ex. 1023, Fig. 6, ¶¶ 22, 32, 35); Ex. 1003 ¶ 99.

IPR2020-01520
Patent 10,258,265 B1

Nishikawa supports this contention, because it describes how its "lens unit 50" can be a transparent resin formed in the shape illustrated in Figure 6 by injection molding.  As to using Nishikawa's specific lens shape in the context of Aizawa's device, Dr. Kenny explains that Nishikawa's lens shape design "*is intended to provide curvature in the lens where it can do the most good* and otherwise try to avoid excess use of material in order to create curvature in locations where it wouldn't do any good."  Ex. 2006, 179:21–180:13 (emphasis added).  This makes sense and, as discussed above, a POSITA would have understood from Inokawa's disclosure that a lens's curvature does the most good in a wrist-worn sensor when it aligns with the light detectors behind the lens, to focus the incoming light on those detectors.  This is true regardless of the fact that, as Patent Owner points out, Nishikawa's lens unit 50 redirects light *emitted from* LED 22, rather than redirecting light *gathered by* a detector such as Inokawa's detector 25 or Aizawa's detectors 22.  *See* Ex. 1023, Fig. 6, ¶¶ 3, 22.  Patent Owner's additional objection concerning the smaller scale of Aizawa's wrist-worn pulse sensor versus Nishikawa's lens unit 50 also is not persuasive of error in Petitioner's reliance on Nishikawa, given Inokawa's clear disclosure of using a lens in a wrist-worn pulse sensor like Aizawa's.

Figure 14B of the '265 patent also is consistent with Petitioner's proposed modification of Aizawa.  Figure 14B is reproduced here:

IPR2020-01520
Patent 10,258,265 B1



Figure 14B illustrates several light rays 1420, 1422 passing through a
partially cylindrical protrusion 605 to be centrally focused on
detector(s) 1410B. Ex. 1001, 36:11–14, 36:21–23. This is consistent with
Dr. Kenny's testimony, discussed above, that a POSITA would have known
how to align a lens's curvature with the light detector(s) underneath the lens
to increase the amount of incoming light directed to the detector(s). In this
specific regard, the '265 patent's Figure 14B is very similar to Inokawa's
Figure 2. As discussed above, it would have been obvious to adapt a
POSITA's understanding of Inokawa's teachings to the different detector
configuration of Aizawa, leading to the invention recited in claim 1 without
hindsight. *See, e.g.*, Ex. 2006, 202:11–20 (Dr. Kenny testifying that
"because of its shape [a lens] is able to capture more light due to the convex
shape, and *it's able to increase the concentration of the light directed
towards the cavities [of Aizawa containing detectors 22] under the regions
where the curvature of the lens is present*" (emphasis added)).

Patent Owner contends Petitioner's modification of Aizawa "fails to consider the greater *decrease* in light at the detectors due to light redirection to a *more* central location." Sur-reply 13 (citing Ex. 1015, 2; Ex. 2027, 19:16–21:8, 49:17–50:13, 57:10–22); Ex. 2004 ¶¶ 66–70. Dr. Kenny admits that, when a convex protrusion is added to Aizawa's flat cover in light of Inokawa, "*some* . . . [light] rays that would have hit the detectors [using a flat cover] are refracted away from the detectors" by the convex protrusion. *See* Ex. 2027, 19:16–20:8 (emphasis added). Dr. Kenny also admits "there is a decrease in the light as you move away from the location of the emitter towards the perimeter of the sensor," which is a "rapid" decrease, perhaps "with the square of the distance" or "exponential[ly]." *Id.* at 49:1–50:13, 57:10–22.

However, Dr. Kenny nonetheless maintains that a POSITA "would understand how to take advantage of the detector locations and the shape of this convex surface *so as to obtain an improvement [in Aizawa] in the amount of light arriving at the detectors*," despite the foregoing considerations. *Id.* at 20:9–22:18 (emphasis added) (citing Ex. 1047 ¶ 44), 213:11–19, 214:6–215:6; *see also* Paper 33 (Citation 3). This testimony is persuasive. In particular, the difference in the length traveled by the light rays depending on whether Aizawa's wrist-worn sensor 2 uses a flat plate 6 or a convex plate 6 is extremely small. *See, e.g.*, Ex. 1006, Fig. 1(b), ¶ 26 (dotted line arrows show paths of light from emitter 21 to reflect off artery 11 in wrist 10 and return to detectors 22); *id.* at Fig. 2 (showing detector 1 mounted on a user's wrist, suggesting the general scale of detector 1); Ex. 1047 ¶¶ 8–22 (discussing typical light refractions by lenses in wrist-worn pulse sensors). Based on this scale, it is reasonable to

IPR2020-01520
Patent 10,258,265 B1

conclude, as Dr. Kenny does, that the central light *lost* by adding a protrusion will be outweighed by the peripheral light *gained* by adding a protrusion, despite the greater distance traveled by the peripheral light rays and the concomitant loss of intensity acknowledged by Dr. Kenny.

We also have reviewed Dr. Kenny's deposition testimony, cited by Patent Owner, concerning the complexity of using lenses in connection with an optically-driven pulse sensor, which Patent Owner asserts detracts from Dr. Kenny's opinion of obviousness. *See* Ex. 2006, 51:14–52:16, 75:20–77:2, 86:19–87:6, 91:9–92:13, 93:16–94:15, 96:15–21, 97:11–21, 100:17–101:18, 132:10–18, 154:4–7, 164:8–16, 189:11–190:13, 257:11–18; Ex. 2007, 308:12–309:8, 310:18–311:9, 318:3–6, 324:21–325:19, 331:19–332:11, 336:11–337:15, 333:20–335:4. This testimony reflects, at best, that Dr. Kenny's illustrations identifying the proposed modification of Aizawa's cover do not precisely reflect, at the scale required for manufacturing or testing purposes, the *exact* size and shape the convex protrusion would take when making and optimizing a real-world sensor. Such detail is not required to establish the obviousness of claim 1, which does not recite any such detail. Dr. Kenny's testimony, as discussed above, sufficiently establishes the obviousness of modifying Aizawa's flat cover to incorporate a convex protrusion to focus incoming diffuse light on Aizawa's peripheral detectors.

Patent Owner additionally asserts, and Dr. Madisetti testifies, that Dr. Kenny overlooks the "small" size of Aizawa's detectors 22 and the cavities 23c in which they are housed. *See* PO Resp. 20–21 (citing Ex. 1006, Figs. 1(a)–1(b), and Ex. 2006, 257:11–18); Ex. 2004 ¶ 63. We disagree. Even if Aizawa's detectors 22 are as small as Patent Owner

60

characterizes them, this provides more motivation for using a lens in Aizawa, to increase the amount of light that can be gathered by the small detectors.

Patent Owner similarly argues, and Dr. Madisetti testifies, that Dr. Kenny's illustration of how his proposed lens would reduce a mean path length of light traveling to Aizawa's detectors 22 as recited in dependent claim 12 (Pet. 38–39) "***drastically*** increases the size of the detectors compared to Aizawa and ***eliminates*** surrounding barriers" in Aizawa, which when properly taken into account "confirms the light ***would not even reach***" Aizawa's peripheral detectors 22 if a convex lens were applied. PO Resp. 21–22; Ex. 2004 ¶¶ 64–65. We disagree. These illustrations are not scaled representations of Petitioner's proposed modification to Aizawa, as Patent Owner would have it, but rather are abstract illustrations of how a convex protrusion functions to reduce the mean path length of refracted light versus a flat surface. *See* Pet. 38–39. We note also that the light receiving detection face 22s of each detector 22 in Aizawa is disposed near the open end of the corresponding cavity 23c, which is tapered to increase the light that can be collected by the detector. *See* Ex. 1006, Figs. 1(a)–1(b), ¶ 24.

We additionally do not agree with Patent Owner's argument that Petitioner's Reply presents new arguments and evidence that should have been first presented in the Petition, to afford Patent Owner an adequate opportunity to respond. The Petition proposed a specific modification of Aizawa to include a convex protrusion in the cover, in light of Inokawa, for the purpose of increasing the light gathering ability of Aizawa's device. *See* Pet. 13–16. The Patent Owner Response then challenged that contention, with several arguments that Petitioner's proposed convex protrusion would

IPR2020-01520
Patent 10,258,265 B1

not operate in the way the Petition alleges it would operate. *See* PO Resp. 11–34, *supra* Section III.D.3(c)(2)(ii). This opened the door for Petitioner to provide, in the Reply, arguments and evidence attempting to rebut the contentions in the Patent Owner Response. *See* PTAB Consolidated Trial Practice Guide (Nov. 2019) ("Consolidated Guide")[10], 73 ("A party also may submit rebuttal evidence in support of its reply."). This is what Petitioner did here. The Reply does not change Petitioner's theory for obviousness; rather, the Reply presents more argument and evidence in support of the same theory for obviousness presented in the Petition. *Compare* Pet. 13–16, *with* Reply 2–20.

Patent Owner finally argues that our conclusion of obviousness "strains credibility" because ordinary skill (*see supra* Section III.B) does not require specific education or experience with optics or optical physiological monitors. *See, e.g.*, PO Resp. 28–29. We disagree. Concerning motivation, a POSITA would have readily appreciated that: Aizawa's detector 1 operates by gathering light data with its photodetectors 22; an optical lens would be useful to focus the light on to the photodetectors; and optical lenses often are formed by providing a convex protrusion in the lens to focus light. Indeed, Inokawa discloses this exact utility, function, and structure. *See* Ex. 1008 ¶¶ 15, 58, Fig. 2.

Concerning reasonable expectation of success in using a convex protrusion lens to increase the amount of light directed to Aizawa's photodetectors, we have relied on Dr. Kenny's testimony that a POSITA would have understood a lens operates by increasing the light concentration

---

[10]  Available at https://www.uspto.gov/TrialPracticeGuideConsolidated.

most where the curvature of the lens is the greatest, which leads to Dr. Kenny's proposed lens for use in Aizawa. *See, e.g.*, Ex. 1003 ¶¶ 95–97; Ex. 1047 ¶¶ 8–10, 15–22; Ex. 2006, 179:21–180:13, 202:11–20. We conclude a POSITA—that is, a person having a B.S. in an academic discipline emphasizing electrical, computer, or software technologies, and two years of related work experience with data collection—would have understood this general concept of optics. Moreover, the invention of claim 1 is recited at this same general level of utility and structure.

Thus, we conclude a POSITA would have been motivated to replace Aizawa's flat cover 6 with a cover comprising a convex protrusion in view of Inokawa, to improve light detection efficiency, and would have had a reasonable expectation of success in doing so.

### d)    Conclusion as to Claim 1

Based on the foregoing arguments and evidence, we conclude Petitioner has demonstrated by a preponderance of the evidence that claim 1 is unpatentable as having been obvious over Aizawa and Inokawa.

### 4.    Claims 2–4, 6–14, 16, 17, 19–23, and 26–29

Petitioner provides arguments and evidence, including testimony from Dr. Kenny, in support of contending claims 2–4, 6–14, 16, 17, 19–23, and 26–29 are unpatentable as having been obvious over Aizawa and Inokawa. Pet. 29–48; Ex. 1003 ¶¶ 100–138. In defense of these claims, Patent Owner relies solely on arguments relating to claim 1. *See, e.g.*, PO Resp. 11–40. For the reasons provided in Section III.D.3 above in relation to claim 1, we conclude Patent Owner's defense is unavailing.

IPR2020-01520
Patent 10,258,265 B1

Concerning independent claim 26, our analysis of claim 1 above applies equally well to the bulk of claim 26. Claim 26 differs from claim 1 most significantly in specifying that the device's housing is "circular" and comprises "a surface with a raised edge," and the device's cover comprises "a lens portion." *Compare* Ex. 1001, 44:66–45:15 (claim 1), *with id.* at 46:47–65 (claim 26). We find Aizawa's housing is circular and comprises a surface with a raised edge. *See* Pet. 45–46 (annotating Aizawa's Figures to identify the "Circular housing" in red, the "Surface" in brown, and the "Raised edge" in purple). We also find the cover of Aizawa, as modified by Inokawa to have a convex protrusion, comprises a lens portion. *See supra* Section III.D.3.

Concerning dependent claims 2–4, 6–14, 16, 17, 19–23, and 27–29, we find a preponderance of the evidence supports Petitioner's contentions that Aizawa's pulse rate detector 1 exhibits the limitations recited in these claims, or that a POSITA would have been motivated to implement them in Aizawa, based on the evidence cited and the reasons provided in the Petition, which we adopt as our own here. *See* Pet. 29–45, 46–48.

Thus, we conclude Petitioner has demonstrated by a preponderance of the evidence that claims 2–4, 6–14, 16, 17, 19–23, and 26–29 are unpatentable as having been obvious over Aizawa and Inokawa.

E.     *Ground 1B — Obviousness over Aizawa, Inokawa, and Ohsaki*

In Ground 1B, Petitioner argues claims 1–4, 6–14, 16, 17, 19–23, and 26–29 of the '265 patent would have been obvious over Aizawa, Inokawa, and Ohsaki. Pet. 2, 48–51. Patent Owner opposes. PO Resp. 40–44. We conclude a preponderance of the evidence supports Petitioner's

IPR2020-01520
Patent 10,258,265 B1

assertions as to all challenged claims.  We begin our analysis with a brief
summary of Ohsaki, then we address the parties' contentions.

### 1.     Ohsaki Disclosure

Ohsaki discloses a pulse wave sensor attached to the back side of the
user's wrist.  Ex. 1014, codes (54) & (57).  Figures 1 and 2 are reproduced
below:



Figure 1 is a cross-sectional view of pulse wave sensor 1 attached on a
user's wrist 4.  *Id.* ¶¶ 12, 16, 18.  Figure 2 is a schematic diagram of
detecting element 2 of sensor 1 on wrist 4, and associated electronics.  *Id.*
¶¶ 13, 17.

Figure 1 illustrates how detecting element 2 is attached to the back
side of the wrist.  In this context, the wrist's "back" side is the side opposite
to the user's palm, and the wrist's "front" side is the palm side of the hand.
*See, e.g.*, *id.* ¶¶ 5–6, 16.

Detecting element 2 comprises a light emitter (LED 6) and a light
detector (photodetector 7) for optically interrogating the user's wrist 4 tissue
to detect a pulse wave of the user.  *See id.* ¶¶ 3, 7–8, 16, 20, 22.  Translucent
board 8 of element 2 has "a convex surface . . . in intimate contact with the

surface of the user's skin," and "[t]hereby it is prevented that the detecting element 2 slips off the detecting position of the user's wrist 4." *Id.* ¶¶ 9, 17–18, 25.

Figures 3A–3B provide test data comparing the performance of a pulse wave sensor depending on whether it is mounted to the back side or the front side of the user's wrist. *See id.* at Figs. 3A–3B, ¶¶ 14, 23–24. Figures 4A–4B provide test data comparing the performance of a pulse wave sensor depending on whether translucent board 8 is convex (as shown in Figures 1 and 2) or flat. *See id.* at Figs. 4A–4B, ¶¶ 15, 25.

### 2. *Claim 1*

Petitioner provides arguments and evidence, including testimony from Dr. Kenny, in support of Petitioner's contention that claim 1 is unpatentable as having been obvious over Aizawa, Inokawa, and Ohsaki. Pet. 48–51; Ex. 1003 ¶¶ 64–65, 139–143. Patent Owner provides arguments and evidence in opposition, including testimony from Dr. Madisetti. PO Resp. 40–44; Ex. 2004 ¶¶ 90–96.

Ground 1B incorporates Ground 1A, then adds Ohsaki as providing a further motivation for modifying Aizawa's flat plate 6 to have a convex protrusion. *See* Pet. 50–51; Ex. 1003 ¶¶ 139–143. Petitioner asserts "Ohsaki teaches that adding a convex surface to the light permeable cover (*i.e.*, [Ohaski's] translucent board 8) can help prevent the device from slipping on the tissue when compared to a flat cover" such as Aizawa's plate 6. Pet. 50–51 (citing Ex. 1014 ¶ 25); Ex. 1003 ¶ 141. Petitioner asserts that Aizawa, similarly to Ohsaki, "seeks to prevent slippage between the device and the user's wrist—and pursues this objective by pressing its

[plate 6] and trying to improve 'adhesion between the wrist 10 and the pulse rate detector 11.'"  Pet. 51 (citing Ex. 1006 ¶¶ 26, 30); Ex. 1003 ¶ 142. Dr. Kenny testifies a POSITA "would have recognized that Ohsaki's addition of a convex protrusion to its light permeable cover could be similarly implemented in Aizawa's device to help achieve the two references' shared goal of minimizing slippage," which "would have allowed Aizawa's sensor device to remain better adhered to the skin and thereby increase its light-collecting efficiency."  Ex. 1003 ¶ 142 (citing Ex. 1006 ¶¶ 26, 30; Ex. 1014 ¶ 25); Pet. 51.

Patent Owner argues in opposition that the Petition is fatally deficient because it is "unclear as to whether a POSITA would have incorporated Inokawa's lens or Ohsaki's translucent board" in Aizawa.  PO Resp. 40–41; Ex. 2004 ¶ 90.  We disagree.  Ground 1A relies on Inokawa as providing a first motivation for adding a protrusion to Aizawa's flat cover: to direct more light to Aizawa's detectors 22.  *See supra* Section III.D.3(c)(2). Ground 1B relies additionally on Ohsaki as providing a second, and independent, motivation for adding a protrusion to Aizawa's flat cover: to reduce slippage between Aizawa's device and the user's wrist.  *See* Pet. 50–51.  Neither ground seeks to bodily incorporate Inokawa's lens or Ohsaki's translucent board into Aizawa's device, and this is not required for obviousness.  *See Keller*, 642 F.2d at 425.

Patent Owner next contends that Patent Owner's various arguments opposing Ground 1A also apply to Ground 1B.  *See* PO Resp. 41; Ex. 2004 ¶ 92.  For the reasons provided in Section III.D.3 above, Patent Owner's arguments opposing Ground 1A are unavailing.

Patent Owner further asserts a POSITA would have understood "Ohsaki would not prevent slippage with Aizawa's device." PO Resp. 42 (section heading modified). According to Patent Owner, Ohsaki indicates "its convex surface must have ***longitudinal directionality***" such that "one must orient its longitudinal convex surface with the longitudinal direction of the user's arm." PO Resp. 42 (citing Ex. 1014 ¶ 19); Ex. 2004 ¶ 93. Patent Owner argues Aizawa's detector 1, by contrast, uses a circular arrangement of four detectors 22 around one emitter 21, and "Aizawa specifically ***distinguishes*** its sensor from linear sensors such as Ohsaki's." PO Resp. 42–43 (citing Ex. 1006, code (57), ¶¶ 9, 27, 36; Ex. 1014 ¶ 19; Ex. 2008, 165:20–166:5); Ex. 2004 ¶ 94. Patent Owner concludes a "POSITA would not have believed Ohsaki's longitudinal convex surface would benefit Aizawa's device" due to this difference. PO Resp. 43; Ex. 2004 ¶ 95.

Patent Owner moreover argues Ohsaki's "convex surface only prevents slipping on the backhand side (i.e., watch side) of the user's wrist," and Ohsaki's "sensor has 'a tendency to slip off' if it is on the palm side of the user's wrist." PO Resp. 42–43 (citing Ex. 1014 ¶¶ 23–24, Figs. 3A–3B); Ex. 2004 ¶¶ 93, 95. Patent Owner asserts Aizawa's detector 1, by contrast, is held against the front side of the user's wrist to be close to the artery there, and "Aizawa reports that on the ***palm side*** of the wrist, a ***flat surface*** improves adhesion." PO Resp. 42–43 (citing Ex. 1006, Figs. 2 and 3, code (57), ¶¶ 2, 9, 13, 26–28, 30, 34, 36); Sur-reply 20 (further citing Ex. 1006 ¶ 33); Ex. 2004 ¶¶ 94–95. Patent Owner cites evidence demonstrating that these arteries are on the front side of the wrist. PO Resp. 43 (citing Ex. 2010, Plates 427 and 429); Ex. 2004 ¶ 95. Patent Owner concludes a POSITA would not have believed Ohsaki's convex

surface would benefit Aizawa's device based on this difference in device location on the user's wrist.  PO Resp. 43; Ex. 2004 ¶ 95.

Petitioner replies that, despite the differences between Aizawa and Ohsaki identified by Patent Owner, a POSITA would nonetheless have understood from Ohsaki that "a convex surface . . . can help prevent the device from slipping on the tissue of the wearer compared to using a flat cover without such protrusion."  Pet. Reply 23–25 (quoting Ex. 1003 ¶ 141); Ex. 1047 ¶¶ 50–52.  According to Petitioner, Ohsaki contrasts between "flat" and "convex" detecting surfaces, and explains the "detected pulse wave is adversely affected by the movement of the user's wrist" with a flat surface but not a convex surface.  Pet. Reply 24 (citing Ex. 1014, Figs. 1, 2, & 4A–4B, ¶¶ 15, 17, 25; Ex. 1003 ¶ 142); Ex. 1047 ¶ 52.  Petitioner asserts "Ohsaki was relied upon not for its exact cover configuration" as Patent Owner suggests, but instead "for the rather obvious concept that a convex surface protruding into a user's skin will prevent slippage."  Pet. Reply 25; Ex. 1047 ¶ 52 ("[A]dding a convex surface to Aizawa's flat plate will serve to *improve* its tendency to not slip off, not take away from it, since it is well understood that physically extending into the tissue and displacing the tissue with a protrusion provides an additional adhesive effect.").

Patent Owner replies "Ohsaki demonstrates that a convex surface alone does *not* prevent slipping because Ohsaki's shape is designed to fit within the underlying bone structure of the wrist and forearm on the backhand side."  Sur-reply 20 (citing Ex. 1014, Figs. 3A–3B, ¶¶ 6, 19, 23–24).  Patent Owner asserts "Ohsaki explains that a convex surface on the palm side has a tendency to slip, notwithstanding any alleged 'physical[] digging.'"  *Id.*  Ohsaki also teaches, according to Patent Owner, "that one

IPR2020-01520
Patent 10,258,265 B1

should avoid too much pressure because otherwise the user 'feels uncomfortable,' which results in movement and a tendency to slip." *Id.* (citing Ex. 1014 ¶¶ 6, 18, 24).

Upon review of the foregoing arguments and evidence, we conclude a preponderance of the evidence supports Petitioner's contention that a POSITA would have been motivated to modify Aizawa's plate 6 to include a convex protrusion, in order to help prevent slippage of Aizawa's detector 1 on the user's wrist, based on Ohsaki.

We find a POSITA would have understood from Ohsaki that forming a convex protrusion on the face of an optically-based pulse sensor where it is pressed against the user's wrist to gather optical data will beneficially prevent slippage of the sensor during operation. Ohsaki states: "The detecting element 2 is arranged on the user's wrist 4 so that *the convex surface* of the translucent board 8 *is in intimate contact with the surface of the user's skin. Thereby it is prevented that the detecting element 2 slips* off the detecting position of the user's wrist 4." Ex. 1014 ¶ 25 (emphases added). A POSITA would understand from this disclosure that forming a convex protrusion on the tissue-contacting face of a wrist-worn, optically-based pulse sensor will resist movement of the sensor on the user's wrist during use. *See* Ex. 1003 ¶¶ 141–142; Ex. 1047 ¶ 52. A POSITA would also understand this resistance to be a beneficial result, because it will improve the pulse sensor's ability to emit light into and detect light reflected from the user's wrist, to generate a pulse signal. *See* Ex. 1006 ¶¶ 26, 30, 34; Ex. 1014 ¶¶ 23, 25, 27; Ex. 1003 ¶¶ 141–142; Ex. 1047 ¶ 52.

Indeed, Ohsaki expressly compares the performance of a wrist-worn pulse wave sensor depending on whether translucent board 8 is convex or

70

flat, and concludes the former results in improved performance over the latter, especially when the user is moving. *See id.* at Figs. 4A–4B, ¶¶ 15, 25 (stating that with "a flat surface, the detected pulse wave is adversely affected by the movement of the user's wrist 4," and with "a convex surface like the present embodiment, the variation of the amount of the reflected light" collected by the sensor "is suppressed").  Ohsaki also states that, with a convex protrusion, it is "prevented that noise such as disturbance light from the outside penetrates the translucent board 8." *Id.* ¶ 25.

Patent Owner and Dr. Madisetti attempt to limit the foregoing disclosures of Ohsaki to its particular context—a sensor having one emitter 6 disposed next to one detector 7 to define a "longitudinal" sensing direction between them, and being attached to the back side rather than the front side of the user's wrist. *See* Ex. 2004 ¶¶ 93–95.  We are not persuaded.  For example, Ohsaki's disclosure does not support Dr. Madisetti's conclusion that it is *only* in this particular context that a convex protrusion will help prevent slippage. *See* Ex. 1014 ¶ 19 (discussing the longitudinal direction orientation of Ohsaki's sensor); *id.* at Figs. 3A–3B, ¶¶ 16, 23–24 (discussing attaching Ohsaki's sensor to the back side of the wrist).  Figures 3A–3B compare the performance of detecting element 2, including its translucent board 8 having a convex protrusion, and show better performance when it is attached to the back side of the wrist versus the front side of the wrist, when the user is in motion. *See* Ex. 1014 ¶ 17 (Fig. 2), ¶¶ 23–24 (Figs. 3A–3B). Because the tested device incorporates a convex protrusion in both instances, Figures 3A–3B do not support Dr. Madisetti's conclusion that "Ohsaki teaches that a convex surface on the palm side of the wrist would not prevent

slipping" — particularly in comparison to a flat surface such as Aizawa's. Ex. 2004 ¶ 95.

We credit, instead, Dr. Kenny's testimony that a POSITA would have understood from Ohsaki that a convex protrusion will help prevent slippage, even in the context of Aizawa's arrangement of four detectors surrounding a central emitter (or emitters, when modified per Inokawa) attached on the front side of the user's wrist. *See* Ex. 1047 ¶ 52. This is because, even in Aizawa's arrangement, the convex protrusion will "physically extend[] into the tissue and displac[e] the tissue," as is illustrated for example in Ohsaki's Figures 1 and 2, where translucent board 8 physically extends into and displaces the tissue of wrist 4. *Id.*

Dr. Madisetti also testifies that "Aizawa reports that on the palm side of the wrist, a flat surface improves adhesion," so "a POSITA would have believed that adding Ohsaki's convex surface would have disrupted the improved adhesion properties reported for Aizawa's flat plate." Ex. 2004 ¶ 95 (citing Ex. 1006, Figs. 3A–3B, ¶¶ 13, 26, 28, 30, 34; Ex. 1014, Figs. 3A–3B, ¶¶ 23–24). We disagree with this reading of Aizawa. It is true that Aizawa's plate 6 is illustrated as having a flat surface (Ex. 1006, Fig. 1(b)), and that Aizawa states the plate "improve[s] adhesion" (*id.* ¶ 13). Aizawa also states: "the above belt 7 is fastened such that the acrylic transparent plate 6 becomes close to the artery 11 of the wrist 10," and "[t]hereby, adhesion between the wrist 10 and the pulse rate detector 1 is improved." *Id.* ¶ 26. These disclosures, however, indicate the improved adhesion is provided by the acrylic material of plate 6, not the flat surface of plate 6 as Dr. Madisetti would have it. *See also id.* ¶¶ 30, 34 ("Since the acrylic transparent plate 6 is provided . . . adhesion between the pulse rate

IPR2020-01520
Patent 10,258,265 B1

detector 1 and the wrist 10 can be improved . . . .").  Thus, there is no
teaching away from using a convex surface to improve the adhesion of
Aizawa's detector to the user's wrist.  *See, e.g.*, Ex. 1003 ¶ 142; Ex. 1047
¶ 52.

Finally, we acknowledge that both Aizawa and Ohsaki express a
concern about exerting too much pressure against the front side of the user's
wrist, because this would make the user uncomfortable.  *See, e.g.*, Ex. 1006
¶¶ 6, 26, 31; Ex. 1014 ¶¶ 6, 18, 24.  Thus, a POSITA would understand that
there are operational limits on how large the protrusion can be made in
Aizawa.  Nonetheless, claim 1 does not place any limitations on the size of
the protrusion, and as discussed above a protrusion would improve the
ability to avoid slippage of Aizawa's detector 1 when worn on the front side
of a user's wrist.  Therefore, it would have been obvious to add a protrusion
to Aizawa's detector 1 for that purpose, and optimize the size of the
protrusion to avoid user discomfort.

Based on the foregoing arguments and evidence, we conclude
Petitioner has demonstrated by a preponderance of the evidence that claim 1
is unpatentable as having been obvious over Aizawa, Inokawa, and Ohsaki.

### 3.    *Claims 2–4, 6–14, 16, 17, 19–23, and 26–29*

Petitioner relies on its arguments from Ground 1A in contending that
claims 2–4, 6–14, 16, 17, 19–23, and 26–29 are unpatentable under
Ground 1B, which adds Ohsaki to Ground 1A.  *See* Pet. 51; Ex. 1003 ¶ 143.
In defense of these claims, Patent Owner relies solely on arguments relating
to claim 1.  *See, e.g.*, PO Resp. 40–44; Ex. 2004 ¶ 96.  Thus, for the reasons
provided above in relation to Ground 1A (all challenged claims) and

IPR2020-01520
Patent 10,258,265 B1

Ground 1B (claim 1), we conclude Petitioner has demonstrated by a preponderance of the evidence that claims 2–4, 6–14, 16, 17, 19–23, and 26–29 are unpatentable as having been obvious over Aizawa, Inokawa, and Ohsaki.

F.    *Ground 1C — Obviousness over Aizawa, Inokawa, and Mendelson-2006*

In Ground 1C, Petitioner argues claims 23 and 24 of the '265 patent would have been obvious over Aizawa, Inokawa, and Mendelson-2006. Pet. 2, 51–57.

Claim 23 depends from claim 1 to add "the noninvasive optical physiological measurement device is comprised as *part of a mobile monitoring device*," and claim 24 depends from claim 23 to add "the mobile monitoring device includes *a touch-screen display*." Ex. 1001, 46:34–40 (emphases added).

Petitioner provides arguments and evidence, including testimony from Dr. Kenny, in support of its obviousness contentions. Pet. 51–57; Ex. 1003 ¶¶ 69–71, 144–150. Petitioner relies on Aizawa and Inokawa as in Ground 1A for the parent claim 1, and cites Mendelson-2006 for the obviousness of uploading pulse data recorded by Aizawa's wrist-worn detector 1 to a mobile computing device having a touchscreen display for display to the user, thereby resulting in the device of claims 23 and 24. Pet. 51–57; Ex. 1003 ¶¶ 69–71, 144–150. In a footnote, Petitioner adds: "Alternatively, the combination of Aizawa, Inokawa, and Ohsaki, as described in [Ground 1B], may be similarly modified in view of Mendelson-2006." Pet. 54 n.2.

IPR2020-01520
Patent 10,258,265 B1

Patent Owner's opposition relies on arguments relating to claim 1 and Grounds 1A and 1B.  *See* PO Resp. 44; Ex. 2004 ¶ 97.  Patent Owner additionally objects to Petitioner's footnote reference to Ohsaki, as presenting a "conclusory alternative combination[] that add[s] another reference without any analysis, and with no motivation to combine." PO Resp. 44.  Patent Owner further asserts "arguments raised only in footnotes are waived."  *Id.* (citing *Kennametal, Inc. v. Ingersoll Cutting Tool Co.*, 780 F.3d 1376, 1383 (Fed. Cir. 2015)).

For reasons provided in Section III.D.3 above, we conclude Petitioner has demonstrated by a preponderance of the evidence that claim 1 is unpatentable over Aizawa and Inokawa pursuant to Ground 1A, over Patent Owner's objections.  We further find Petitioner's reliance on Mendelson-2006 as disclosing the additional subject matter recited in claims 23 and 24 is supported by a preponderance of the evidence.  Figure 1 of Mendelson-2006 is reproduced below:



Fig. 1.  (Top) Attachment of Sensor Module to the skin; (Bottom)
photograph of the Receiver Module (left) and Sensor Module (right).

Figure 1 is a picture of "a body-worn pulse oximeter that receives and processes PPG [photoplethysmographic] signals," comprising a Sensor

IPR2020-01520
Patent 10,258,265 B1

Module and a Receiver Module. Ex. 1016, 912–913. The Sensor Module consists of an optical transducer, a stack of round printed circuit boards, and a coin-cell battery, and is attached to the user's skin to gather the PPG data. *Id.* at 912 (abstract), 913. The Sensor Module transmits its data wirelessly to the Receiver Module, which is also "body-worn." *Id.* at 913. "The data processed by the Receiver Module can be transmitted wirelessly to a PDA," which is not shown in Figure 1. *Id.*

Figure 3 of Mendelson-2006 is reproduced below:



Fig. 3. Sample PDA Graphical User Interface (GUI).

Figure 3 is a picture of a PDA that may be used with the body-worn Sensor Module and Receiver Module, and this PDA "provides a low-cost touch screen interface." *Id.* at 913–914.

Thus, Mendelson-2006 discloses a noninvasive optical physiological measurement device comprised as part of a mobile monitoring device (claim 23) wherein the mobile monitoring device includes a touch-screen display (claim 24). We additionally conclude a person of ordinary skill in the art would have been motivated to configure Aizawa's body-worn detector 1 to transmit its data to a touch screen PDA such as is disclosed in Mendelson-2006, based on the evidence cited and the reasons provided in the Petition, which we adopt as our own here. *See* Pet. 51–57; Ex. 1003

IPR2020-01520
Patent 10,258,265 B1

¶¶ 144–150.  Thus, we conclude Petitioner has demonstrated by a preponderance of the evidence that claims 23 and 24 are unpatentable as having been obvious over Aizawa, Inokawa, and Mendelson-2006.

In addition, for reasons provided in Section III.E.2 above, we conclude Petitioner has demonstrated by a preponderance of the evidence that claim 1 is unpatentable over Aizawa, Inokawa, and Ohsaki, pursuant to Ground 1B, over Patent Owner's objections.  Petitioner's reliance on Ohsaki as providing motivation for adding a protrusion to Aizawa's flat cover to reduce slippage (Ground 1B) is unrelated to, and is not inconsistent with, Petitioner's reliance on Mendelson-2006 for the obviousness of sending data to a mobile monitoring device with a touch screen display (Ground 1C).  Thus, we conclude Petitioner has demonstrated by a preponderance of the evidence that claims 23 and 24 are unpatentable as having been obvious over Aizawa, Inokawa, Ohsaki, and Mendelson-2006.

Concerning Petitioner's reliance on Ohsaki in this Ground 1C, Patent Owner cites a Federal Circuit decision that states "[a]rguments raised only in footnotes . . . are waived."  *Kennametal*, 780 F.3d at 1383 (quoting *Otsuka Pharm. Co., Ltd. v. Sandoz, Inc.*, 678 F.3d 1280, 1294 (Fed. Cir. 2012) (citing *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1320 (Fed. Cir. 2006))).  However, this appears to be a rule applied by the Federal Circuit to briefs filed with that Court, as opposed to a precedential rule of law the Board is compelled to follow.  *See Otsuka*, 678 F.3d at 1294.  In addition, to the extent it is binding precedent on the Board, we are permitted to "exercise our discretion to consider" arguments "improperly raised" only in a footnote.  *Id.* (citing *Becton Dickinson & Co. v. C.R. Bard, Inc.*,

IPR2020-01520
Patent 10,258,265 B1

922 F.2d 792, 800 (Fed. Cir. 1990)).  We do so here, to provide a complete record for review by the Federal Circuit in the event of an appeal.

G.    *Ground 1D — Obviousness over Aizawa, Inokawa, Goldsmith, and Lo*

In Ground 1D, Petitioner argues claims 23 and 24 of the '265 patent would have been obvious over Aizawa, Inokawa, Goldsmith, and Lo.  Pet. 2, 57–62.  We have already determined claim 23 is unpatentable based on Grounds 1A, 1B, and 1C, and claim 24 is unpatentable based on Ground 1C.  Therefore, we need not, and to conserve the Board's resources we do not, reach Ground 1D.  *See Boston Sci. Scimed, Inc. v. Cook Grp. Inc.*, 809 F. App'x 984, 990 (Fed. Cir. 2020) ("[T]he Board need not address issues that are not necessary to the resolution of the proceeding.").

H.    *Ground 1E — Obviousness over Aizawa, Inokawa, Mendelson-2006, and Beyer*

In Ground 1E, Petitioner argues claim 25 of the '265 patent would have been obvious over Aizawa, Inokawa, Mendelson-2006, and Beyer. Pet. 2, 62–65.

Claim 25 recites:

25.  A physiological monitoring system comprising:

the noninvasive optical physiological measurement device of claim 1; and

a processor configured to receive the one or more signals and communicate physiological measurement information to a mobile phone.

Ex. 1001, 46:41–46.

Petitioner provides arguments and evidence, including testimony from Dr. Kenny, in support of its obviousness contentions.  Pet. 62–65; Ex. 1003

¶¶ 158–164. Petitioner relies on Aizawa, Inokawa, and Mendelson-2006 as in Ground 1C for the obviousness of "a monitoring system that includes, among other things, a wrist-worn sensor (as in Aizawa) and a mobile PC (as in Mendelson-2006)" to receive signals from the wrist-worn sensor. Pet. 62–63; Ex. 1003 ¶¶ 158–160. Petitioner then addresses the "mobile phone" limitation of claim 25, and contends it would have been obvious to implement this additional subject matter in the combination of Aizawa, Inokawa, and Mendelson-2006, based on Beyer. Pet. 62–65; Ex. 1003 ¶¶ 72, 160–164. In a footnote, Petitioner adds: "Alternatively, the combination of Aizawa, Inokawa, and Ohsaki, as described in [Ground 1B], may be similarly modified in view of Mendelson-2006 and Beyer." Pet. 62 n.4.

Patent Owner's opposition relies on arguments relating to claim 1 and Grounds 1A and 1B. *See* PO Resp. 44; Ex. 2004 ¶ 97. Patent Owner additionally objects to Petitioner's footnote reference to Ohsaki, as presenting a "conclusory alternative combination[] that add[s] another reference without any analysis, and with no motivation to combine." PO Resp. 44. Patent Owner further asserts "arguments raised only in footnotes are waived." *Id.* (citing *Kennametal*, 780 F.3d at 1383).

For reasons provided in Section III.D.3 above, we conclude Petitioner has demonstrated by a preponderance of the evidence that claim 1 is unpatentable over Aizawa and Inokawa pursuant to Ground 1A, over Patent Owner's objections. For reasons provided in Section III.F above, we also conclude the combination of Aizawa, Inokawa, and Mendelson-2006 leads to the invention of claim 25, except for the "mobile phone" limitation.

IPR2020-01520
Patent 10,258,265 B1

We further find Petitioner's reliance on Beyer as disclosing the "mobile phone" limitation of claim 25 is supported by a preponderance of the evidence. Beyer discloses "a small handheld cellular phone / PDA communications system" that is similar to the PDA of Mendelson-2006. Ex. 1019, Fig. 1, 7:17–20. We also agree with Petitioner's contention that a person of ordinary skill in the art would have been motivated to modify the PDA of Mendelson-2006, which "does not explicitly disclose the PDA to be a mobile phone," to incorporate cellular communication technology in order to provide the additional communication capabilities of a mobile phone, as disclosed by Beyer. Pet. 63–65 (citing Ex. 1016, 914; Ex. 1019, 1:6–15); Ex. 1003 ¶¶ 161–164. A person of ordinary skill in the art also would have been motivated to do this to enable review of the user's data at a location that is remote to the user. Pet. 64–65 (citing Ex. 1021, code (57), Fig. 3); Ex. 1003 ¶ 162. Thus, we conclude Petitioner has demonstrated by a preponderance of the evidence that claim 25 is unpatentable as having been obvious over Aizawa, Inokawa, Mendelson-2006, and Beyer.

In addition, for reasons provided in Section III.E.2 above, we conclude Petitioner has demonstrated by a preponderance of the evidence that claim 1 is unpatentable over Aizawa, Inokawa, and Ohsaki, pursuant to Ground 1B, over Patent Owner's objections. Petitioner's reliance on Ohsaki as providing motivation for adding a protrusion to Aizawa's flat cover to reduce slippage (Ground 1B) is unrelated to, and is not inconsistent with, Petitioner's reliance on Mendelson-2006 and Beyer for the obviousness of sending data to a mobile device with a touch screen display and mobile phone communication capability (Grounds 1C and 1E). Thus, we conclude Petitioner has demonstrated by a preponderance of the evidence that

IPR2020-01520
Patent 10,258,265 B1

claim 25 is unpatentable as having been obvious over Aizawa, Inokawa, Ohsaki, Mendelson-2006, and Beyer. As discussed above, the fact that this theory of obviousness is articulated in a footnote in the Petition does not persuade us to overlook its merits.

I.  *Ground 2A — Obviousness over Mendelson-1988 and Inokawa*

In Ground 2A, Petitioner argues claims 1–4, 6–14, 16–22, and 26–30 of the '265 patent would have been obvious over Mendelson-1988 and Inokawa. Pet. 2, 66–95. Patent Owner opposes. PO Resp. 44–60. We conclude a preponderance of the evidence supports Petitioner's assertions as to claims 1, 2, 4, 14, 17–22, and 26–30, but not claims 3, 6–13, and 16. We begin our analysis with a brief summary of Mendelson-1988, then we address the parties' contentions.

1.  *Mendelson-1988 Disclosure*

Mendelson-1988 discloses a pulse oximeter, with an optical reflectance sensor suitable for noninvasive monitoring of a user's arterial hemoglobin oxygen saturation ($SpO_2$), via the user's forehead. *See* Ex. 1015, 167 (title & abstract). Figure 2 is reproduced below:

IPR2020-01520
Patent 10,258,265 B1



Figure 2 illustrates the sensor of Mendelson-1988, including: (A) a top view diagram; (B) a side view diagram; and (C) a photograph. *Id.* at 169.

The sensor includes two red LEDs and two infrared LEDs for emitting light into the user's tissue, and six photodiodes "arranged symmetrically in a hexagonal configuration" surrounding the four emitters, to detect light reflected back to the sensor from the user's tissue. *Id.* at 168 ("SENSOR DESIGN"). The user's "SpO$_2$ can be calculated from the ratio of the reflected red and infrared photoplethysmograms." *Id.* at 167 (col. 2). "To minimize the amount of light transmission and reflection between the LEDs and the photodiodes within the sensor, a ring-shaped, optically opaque shield of black Delrin . . . was placed between the LEDs and the photodiode chips." *Id.* at 168 (col. 2). "The optical components were encapsulated inside the package using optically clear adhesive." *Id.* "The microelectronic package was mounted inside a black Delrin housing." *Id.*

### 2.    *Claim 1*

Petitioner provides arguments and evidence, including testimony from Dr. Kenny, in support of contending claim 1 is unpatentable as having been obvious over Mendelson-1988 and Inokawa.  Pet. 66–78; Ex. 1003 ¶¶ 66–68, 165–181.  Patent Owner provides arguments and evidence in opposition, including testimony from Dr. Madisetti.  PO Resp. 44–53, 58–60; Ex. 2004 ¶¶ 34, 98–117, 126–129.

### a)    *Comparing Claim 1 with Mendelson-1988*

Petitioner contends Mendelson-1988's SpO$_2$ sensor exhibits each and every limitation of claim 1, except that its light permeable cover (i.e., the "OPTICALLY CLEAR EPOXY" in Figure 2B) lacks the claimed "protrusion."  *See* Pet. 66–78; Ex. 1003 ¶¶ 66–68, 165–181.  We determine this contention is supported by a preponderance of the evidence, over Patent Owner's objections, as follows.

We find Mendelson-1988's sensor exhibits several limitations of claim 1, which are not challenged by Patent Owner.  Thus, we find the sensor is a noninvasive optical measurement device adapted to be worn on a user's forehead, to provide an indication of a physiological parameter of the user (i.e., SpO$_2$).[11]  *See* Ex. 1015, 167 (abstract); Pet. 71; Ex. 1003 ¶ 165.  We find the sensor has two infrared LED chips and two red LED chips.  *See* Ex. 1015, 168 (col. 2) ("The optical reflectance sensor used in this study consists of two red (peak emission wavelength: 660 nm) and two infrared (peak emission wavelength: 930 nm) LED chips[.]"), 169 (Fig. 2);

---

[11]  Whether the preamble is limiting need not be resolved, because the recitation in the preamble is satisfied by the prior art.

IPR2020-01520
Patent 10,258,265 B1

Pet. 71–72; Ex. 1003 ¶ 166. We find the sensor includes a housing having a surface and a circular wall protruding from the surface. *See* Ex. 1015, 169 (Fig. 2); Ex. 1003 ¶ 167. In particular, Petitioner annotates Mendelson-1988's Figures 2A and 2B to identify the "Housing" in red, the "Surface" in purple, and the "Circular wall" in green. *See* Pet. 72–73; Ex. 1003 ¶ 167. We find the sensor further includes at least four detectors (i.e., the six photodiodes) arranged on the housing's surface and spaced apart from each other, symmetrically on a circle centered on the four LEDs. *See* Ex. 1015, 168 (col. 2) (stating the six photodiodes are "arranged symmetrically in a hexagonal configuration"), 169 (Fig. 2); Pet. 75–76; Ex. 1003 ¶ 171. We find the six detectors are configured to output signals responsive to light emitted from the four emitters and attenuated by the user's body tissue, with the signals being indicative of the user's $SpO_2$. *See* Ex. 1015, 167 (col. 2) ("$SpO_2$ can be calculated from the ratio of the reflected red and infrared photoplethysmograms"); Pet. 75–76; Ex. 1003 ¶ 171.

Petitioner contends Mendelson-1988's sensor has a light permeable cover (i.e., the "OPTICALLY CLEAR EPOXY" in Figure 2B) arranged above a portion of the housing (i.e., the "AIRPAX PACKAGE" in Figure 2B) to cover the six detectors. *See* Pet. 67; Ex. 1003 ¶ 172. Patent Owner disagrees, relying on its claim construction of the term "cover" which would exclude resins and epoxies. *See* PO Resp. 50–51. For reasons provided in Section III.C.1 above, Patent Owner's claim construction is not persuasive, so Mendelson-1988 cannot be distinguished from claim 1 on this basis.

We find a preponderance of the evidence establishes that the Mendelson-1988 sensor's optically clear epoxy is a light permeable cover that covers the sensor's six detectors. In particular, it is clear from Figures 2A and 2B that the epoxy extends from the top of the sensor at the dotted line in Figure 2B, down into the well of the AIRPAX package, to cover all four LEDs and all six photodiodes disposed at the bottom of the well. *See also* Ex. 1015, 168 (col. 2) ("The optical components were encapsulated inside the package using optically clear adhesive[.]").

Thus, we find Mendelson-1988's sensor exhibits each and every limitation of claim 1, except that its light permeable cover is flat, and therefore lacks the claimed "protrusion."

> b)    *Comparing Claim 1 with Inokawa*

Petitioner contends Inokawa's pulse sensor 1 is a noninvasive optical measurement device having a light permeable cover (i.e., lens 27) comprising a protrusion arranged to cover its light detector(s) (i.e., detector 25), as discussed in Section III.D.3(b) above. *See* Pet. 68; Ex. 1003 ¶ 174. Patent Owner does not challenge Petitioner's contentions in this regard. We determine these contentions are supported by a preponderance of the evidence, as discussed in Section III.D.3(b) above.

> c)    *Obviousness of Combining Mendelson-1988 and Inokawa*

Petitioner contends a POSITA would have been motivated to modify Mendelson-1988's optical $SpO_2$ sensor, in light of Inokawa's optical pulse sensor, by adding a protrusion to Mendelson-1988's cover to improve the sensor's light detection efficiency. *See* Pet. 67–71, 76–78. Patent Owner opposes this contention, and argues a person of ordinary skill in the art

IPR2020-01520
Patent 10,258,265 B1

would not have had a reasonable expectation of success, among other things. *See* PO Resp. 44–49, 51–53, 58–60.

### (1)    Petitioner's Contentions

Petitioner asserts Mendelson-1988 describes its cover as an optically clear epoxy, but it "does not provide additional details . . . regarding the precise shape of this layer's interface with the skin."[12]  Pet. 67–68 (citing Ex. 1015, 168, 173); Ex. 1003 ¶ 173.  Petitioner asserts "a POSITA would have sought to incorporate an Inokawa-like lens into the cover of Mendelson-1988 to increase the light collection efficiency, which in turn would lead to an improved signal-to-noise ratio (and thus more reliable pulse [sic SpO$_2$] detection)."  Pet. 68–69; Ex. 1003 ¶ 175.  Petitioner asserts: "A POSITA would have been particularly interested in making such a modification because Mendelson-1988 is expressly interested in maximizing 'reflectance photoplethysmographic signals.'"  Pet. 69 (citing Ex. 1015, 173); Ex. 1003 ¶ 175.  Petitioner's theory for obviousness is otherwise substantially the same as discussed above in Ground 1A, with Mendelson-1988 replacing Aizawa, including some reliance on Nishikawa. Pet. 69–71, 76; Ex. 1003 ¶¶ 175–179.  For example, Dr. Kenny provides the following illustrations to portray the proposed modification of Mendelson-1988's sensor (Ex. 1003 ¶¶ 180–181):

---

[12]  Petitioner overstates the paucity of Mendelson-1988's disclosure here. Mendelson-1988 illustrates the epoxy as having a flat surface, which Dr. Kenny notes in his testimony.  *See* Ex. 1014, Fig. 2B; Ex. 1003 ¶ 176.

IPR2020-01520
Patent 10,258,265 B1



At the left, Dr. Kenny has excerpted and annotated Mendelson-1988's Figure 2B, to identify the pre-existing cover (colored blue) which covers the light emitters and detectors. *See* Ex. 1003 ¶ 176. At the right, Dr. Kenny has illustrated the device resulting from the proposed modification of the cover to have a convex protrusion (colored blue). *See id.*

Petitioner further asserts "there are two alternative ways of mapping the claimed 'light permeable cover,' or LPC, to the modified cover above." Pet. 77; Ex. 1003 ¶ 180. Dr. Kenny provides the following two illustrations, annotating Mendelson-1988's Figure 2B, to identify these alternative mappings:



Dr. Kenny's first mapping (at the left) equates the cover to the entire depth
of the epoxy contained within the AIRPAX package as shown in red outline,
whereas Dr. Kenny's second mapping (at the right) equates the cover to a
partial depth of the epoxy within the package as shown in red outline, which
Dr. Kenny identifies as "just the lens portion . . . that is formed over the
underlying sealing portion . . . as informed by Nishikawa." Pet. 77–78
(citing Ex. 1001, Fig. 14D; Ex. 1023, Figs. 5–6, ¶¶ 34–38); Ex. 1003
¶¶ 180–181.

Petitioner adds that "a POSITA would have realized that the epoxy
layer could have been given a shape that would help further advance
Mendelson-1988's objective of improving detection efficiency," "requir[ing]
only routine knowledge of sensor design and assembly." Pet. 68, 70 (citing
Ex. 1015, 168, 173); Ex. 1003 ¶¶ 173, 177. For example, "as demonstrated
by Nishikawa, molding clear epoxy, as in Mendelson-1988, into a lens shape
was well understood." Pet. 70–71 (citing Ex. 1023, Fig. 6, ¶¶ 22, 32, 35,
37); Ex. 1003 ¶¶ 178–179. Also according to Petitioner: "Nishikawa
expressly discloses that any gaps between the encapsulation and lens
portions [i.e., sealing portion 40 and lens unit 50 in Nishikawa's Figure 6]
can be minimized by fusing the two portions at the interface to improve
optical performance." Pet. 70–71 (citing Ex. 1023 ¶ 37, Fig. 6); Ex. 1003
¶ 179.

### (2)     *Patent Owner's Contentions*

Patent Owner asserts Petitioner has not met its burden to demonstrate
the obviousness of modifying Mendelson-1988's sensor in light of Inokawa
to have a convex protrusion, based on substantially the same analysis and

testimony discussed above in the context of combining Aizawa and Inokawa.  *See* PO Resp. 44–49; Ex. 2004 ¶¶ 98–110; *supra* Section III.D.3(c)(2).  For example, Mendelson-1988 like Aizawa provides a central emitter or emitters surrounded by several detectors.  *Compare* Ex. 1015, 169 (Fig. 2) (showing four central LEDs surrounded by six photodiodes), *with* Ex. 1006, Figs. 1(a)–1(b) (showing one central LED 21 surrounded by four photodetectors 22).

Patent Owner also objects to Petitioner's alternative mapping, providing for a cover with a protrusion to be found in two different ways.  *See* PO Resp. 51–53; Ex. 2004 ¶¶ 115–117.  This alternative mapping, in Patent Owner's view, is "ambiguous[]," and the second mapping "arbitrarily" draws a line defining the bottom of the cover in "an **undifferentiated** mass of material."  PO Resp. 52–53.  Patent Owner also argues "Petitioner's inability to consistently identify a 'cover' reveals the hindsight-driven nature of its arguments," especially as they relate to dependent claim 3.  *Id.* at 52–53.

Patent Owner moreover asserts Petitioner errs in relying on Nishikawa as supporting the unpatentability of claim 1, because Nishikawa is not identified as part of Ground 2A which instead "includes only two references," Mendelson-1988 and Inokawa.  PO Resp. 58–59 (citing Pet. 2, 70, 77–78, 80; Ex. 2007, 364:2–13; Ex. 2008, 73:8–12); Ex. 2004 ¶ 126.  Patent Owner also asserts Petitioner's reliance on Nishikawa "makes no sense" based on substantially the same analysis and testimony discussed above in the context of combining Aizawa and Inokawa.  PO Resp. 59; Ex. 2004 ¶ 127.  Patent Owner argues Petitioner improperly relies on Nishikawa "to fill missing gaps [in Mendelson-1988 and Inokawa], not as

IPR2020-01520
Patent 10,258,265 B1

evidence of general knowledge in the art," thereby attempting to "sidestep the requirements to establish a motivation and expectation of success." PO Resp. 59–60 (citing Pet. 70; *K/S HIMPP v. Hear-Wear Technologies, LLC*, 751 F.3d 1362, 1366 (Fed. Cir. 2014)); Ex. 2004 ¶ 129.

### (3)    Petitioner's Reply

In reply, Petitioner provides substantially the same analysis and testimony discussed above in the context of combining Aizawa and Inokawa. *See* Pet. Reply 26; Ex. 1047 ¶ 54. Petitioner also maintains that both of Dr. Kenny's alternative mappings of the claimed "cover" to Mendelson-1988 are justified. Pet. Reply 28–29; Ex. 1047 ¶¶ 59–60. Petitioner further asserts its reliance on Nishikawa is not improper. Pet. Reply 32; Ex. 1047 ¶ 64.

### (4)    Patent Owner's Sur-reply

Patent Owner's sur-reply reiterates Patent Owner's arguments against Petitioner's contentions of the obviousness of modifying Mendelson-1988's sensor to include a convex protrusion. *See* Sur-reply 21, 23–24.

### (5)    Analysis and Conclusion

Upon review of the foregoing, we conclude a preponderance of the evidence supports Petitioner's contention that a POSITA would have been motivated to modify the top surface of Mendelson-1988's cover to include a convex protrusion, in light of Inokawa, in order to increase the amount of backscattered light that will be received by the six peripheral detectors, versus the existing flat cover surface. Our reasoning is substantially identical to the analysis provided above in connection with Ground 1A, with

IPR2020-01520
Patent 10,258,265 B1

Mendelson-1988 replacing Aizawa in the combination. *See supra*
Section III.D.3(c)(2). Patent Owner does not cite, and we do not discern,
any material difference between Mendelson-1988 and Aizawa that might
lead to a different result here, with two possible exceptions.

The first difference is Petitioner's alternative mapping of the claimed
"cover" to Petitioner's proposed modification of Mendelson-1988's sensor.
We rely on the first mapping, but not the second mapping, to decide in
Petitioner's favor. Petitioner's first mapping is reproduced here (Ex. 1003
¶ 180):



In this modified and annotated version of Figure 2B of Mendelson-1988,
Dr. Kenny identifies how Mendelson-1988's light permeable cover ("LPC")
may be modified to have a protrusion in light of Inokawa, wherein the cover
(which Dr. Kenny has colored blue) includes the entire depth of the optically
clear epoxy contained within the AIRPAX package (as Dr. Kenny has
shown in red outline). Ex. 1003 ¶ 180; Pet. 77. Patent Owner objects to this
mapping as ambiguous, but we determine Dr. Kenny's annotations
reproduced above are sufficiently clear to establish obviousness by a
preponderance of the evidence.

IPR2020-01520
Patent 10,258,265 B1

The second difference between Grounds 1A and 2A relates to claim 1's requirement of "a housing having a surface and a circular wall protruding from the surface."  Ex. 1001, 45:5–6.  In Ground 2A, Petitioner addresses this limitation in two, alternative, ways.

First, as explained above in Section III.I.2(a), we find Mendelson-1988's sensor exhibits such a housing, as Petitioner contends in the Petition at pages 72–73.  Petitioner's annotations to Mendelson-1988's Figure 2 illustrate the basis for this finding, and are reproduced below.



Here, Mendelson-1988's Figures 2(A) and 2(B) have been annotated to identify the "circular wall" in green and the "surface" of the housing in purple.  Patent Owner does not object to the Petition's contentions in this

regard, which we find are supported by a preponderance of the evidence.
*See, e.g.*, PO Resp. 53–58; Ex. 2004 ¶ 100 ("Mendelson-1988 includes a
ring-shaped optical shield surrounding the LEDs . . . .").

Second and "[a]lternatively," Petitioner contends "the outer wall of
the AIRPAX microelectronic package" in Mendelson-1988, which is square
as shown by the red annotations in Figure 2(B) above, "can be modified to
be a circular wall," and thereby satisfy this limitation of claim 1 in a
different way.  Pet. 73–75; Ex. 1003 ¶¶ 168–170.  Patent Owner objects to
this alternative contention.  *See* PO Resp. 56–58; Ex. 2004 ¶¶ 100, 122–125.
For reasons provided below in Section III.I.3 in relation to claim 26, this
alternative obviousness contention also is supported by a preponderance of
the evidence.

### d)     Conclusion as to Claim 1

Based on the foregoing arguments and evidence, we conclude
Petitioner has demonstrated by a preponderance of the evidence that claim 1
is unpatentable as having been obvious over Mendelson-1988 and Inokawa.

### 3.     Claim 26

Petitioner provides arguments and evidence, including testimony from
Dr. Kenny, in support of contending claim 26 is unpatentable as having been
obvious over Mendelson-1988 and Inokawa.  Pet. 89–92; Ex. 1003 ¶¶ 211–
219.  Much of Petitioner's analysis for claim 26 is substantially the same as
for claim 1, which as discussed above in Section III.I.2 is persuasive.

Claim 26 differs from claim 1 in specifying "a circular housing
comprising a surface with a raised edge."  *Compare* Ex. 1001, 45:5–6
(claim 1), *with id.* at 46:52–53 (claim 26).  Petitioner correspondingly asserts

IPR2020-01520
Patent 10,258,265 B1

Mendelson-1998 includes a "housing" as the AIRPAX package.  *See* Pet. 90 (annotating Mendelson-1988's Figures 2A–2B to identify the "Housing" in green); Ex. 1003 ¶¶ 213–214.  This housing has "a square shape" rather than the "circular" shape required by claim 26.  Pet. 90–91; Ex. 1003 ¶ 215.

Petitioner contends "a POSITA would have recognized that microelectronic packaging as used in Mendelson-1988 comes in various shapes and sizes," including a circular shape as demonstrated by Mendelson '799[13].  Pet. 91 (citing Ex. 1025, Fig. 7, 9:34–36); Ex. 1003 ¶ 215.  Petitioner asserts "[a] POSITA would have considered using a differently shaped housing, namely a circular one, to be obvious," because this "was common practice well before the ['265 patent], and there was nothing new or inventive about changing one housing shape for another." Pet. 73–75, 91; Ex. 1003 ¶¶ 168–170, 216.

Patent Owner objects that "just because something 'can' be modified does not mean a POSITA would have been motivated to do so," and Petitioner "never identifies a motivation to pick a circular-shaped wall instead of the existing square shape" in Mendelson-1988.  PO Resp. 57 (citing *InTouch Techs., Inc. v. VGo Commc'ns, Inc.*, 751 F.3d 1327, 1352 (Fed. Cir. 2014)); Ex. 2004 ¶ 124.  According to Patent Owner, "[a] POSITA would have no particular motivation to change the shape unless a POSITA perceived some benefit in doing so."  PO Resp. 57; Ex. 2004 ¶ 124.

Patent Owner asserts Petitioner errs in relying on Mendelson '799 as supporting the unpatentability of claim 26, because Mendelson '799 is not

---

[13]  Exhibit 1025, US 6,801,799 B2, issued Oct. 5, 2004.

identified as part of Ground 2A which instead "includes only two references," Mendelson-1988 and Inokawa.  PO Resp. 57–59 (citing Pet. 1–2, 73–75).  Patent Owner also asserts Petitioner improperly relies on Mendelson '799 "to fill missing gaps [in Mendelson-1988 and Inokawa], not as evidence of general knowledge in the art," thereby attempting to "sidestep the requirements to establish a motivation and expectation of success." PO Resp. 59–60 (citing Pet. 75; *K/S HIMPP*, 751 F.3d at 1366); Ex. 2004 ¶ 129.

On the merits of Mendelson '799, Patent Owner argues the reference does not support Dr. Kenny's testimony that "using a circular housing having a circular wall . . . was common practice" (Ex. 1003 ¶¶ 168–170), because it "never mentions or suggests a housing with a wall or raised edge."  PO Resp. 57; Ex. 2004 ¶¶ 125, 128–129 (citing Ex. 1025, 9:22–40, Fig. 7).

Petitioner replies that "references like Mendelson [']799 have a circular wall/housing and confirm the notion that a POSITA would have found it to be simply a matter of design choice to use different shapes."  Pet. Reply 31 (citing Ex. 1025, Fig. 7, 9:34–36); Ex. 1047 ¶ 63.  Petitioner also asserts "neither the '265 patent nor [Patent Owner] provides any explanation of how the particular housing shape solves some problem or presents some unexpected result."  Pet. Reply 31 (citing *In re Kuhle*, 526 F.2d 553, 555 (CCPA 1975)).

Patent Owner responds that "Petitioner's reply reiterates its conclusory arguments that [the proposed] change would be routine, without identifying any reason to modify the shape from square to circular." Sur-reply 24–25.

IPR2020-01520
Patent 10,258,265 B1

Upon review of the foregoing, we conclude a preponderance of the evidence supports Petitioner's contention that it would have been obvious to modify the shape of Mendelson-1988's AIRPAX package from square to circular. Figure 7 of Mendelson '799 is reproduced below:



*Figure 7*

Figure 7 is a top view of optical sensor 10 comprising light source 12 composed of three LEDs 12A, 12B, and 12C emitting light of three different wavelengths, and an array of six near detectors 18 and six far detectors 16 "arranged in two concentric ring-like arrangements" surrounding light source 12. Ex. 1025, 9:23–34. "All these elements are accommodated in a sensor housing 17," which as can be seen in Figure 7, is circular. *Id.* at 9:34–35.

A POSITA would recognize that the AIRPAX package of Mendelson-1988 and the housing 17 of Mendelson '799 are performing the same function of enclosing a central collection of light emitters which are surrounded by an array of light detectors in an optical sensor attached to a user's body. *See, e.g.*, Ex. 1015, Figs. 2A–2B; Ex. 1025, Fig. 7. Also, the

evidence of record does not suggest that the shape of such a housing has any functional significance in the operation of the optical sensor. Thus, the evidence suggests that a square shape and a circular shape of such as housing were known in the art to be predictable substitutes for one another, and therefore obvious variants. *See, e.g.*, *KSR*, 550 U.S. at 416 ("[W]hen a patent claims a structure already known in the prior art that is altered by the mere substitution of one element for another known in the field, the combination must do more than yield a predictable result."); *id.* at 417 ("[W]hen a patent 'simply arranges old elements with each performing the same function it had been known to perform' and yields no more than one would expect from such an arrangement, the combination is obvious." (citation omitted)).

We further conclude Petitioner's reliance on Mendelson '799 is not improper simply because Mendelson '799 is not listed as a reference in Petitioner's identification of Ground 2A with Mendelson-1988 and Inokawa. *See* Pet. 2, 66. This would exalt form over substance, which we decline to do. The nature of Petitioner's reliance on Mendelson '799 as evidence of the understanding of a person of ordinary skill in the art, in support of Ground 2A, is explained clearly in the Petition. *See id.* at 73–75, 91. Thus, the Petition complies with 35 U.S.C. § 312(a)(3).

We conclude Petitioner has demonstrated by a preponderance of the evidence that claim 26 is unpatentable as having been obvious over Mendelson-1988 and Inokawa.

IPR2020-01520
Patent 10,258,265 B1

### 4.    *Claims 3, 6–13, and 16*

Claim 3 depends indirectly from claim 1 to add "the circular wall creates a gap between the surface and the light permeable cover."  Ex. 1001, 45:16–22 (claims 2 and 3); Ex. 1002, 351 (Certificate of Correction changing "cove" to "cover" in claim 3).  Claims 6–13 and 16 depend, directly or indirectly, from claim 3.  *See id.* at 45:30–61, 46:4–7.

For claim 3, Petitioner relies solely on Dr. Kenny's second mapping of the claimed "cover" to Petitioner's proposed modification of Mendelson-1988's sensor.  *See* Pet. 79–80; Ex. 1003 ¶ 184.  This is shown by Dr. Kenny in the following illustration (Ex. 1003 ¶ 184):



In this modified and annotated version of Figure 2B of Mendelson-1988, Dr. Kenny identifies how Mendelson-1988's light permeable cover ("LPC") may be modified to have a protrusion, wherein the cover includes "only the lens portion, which lies above the underlying sealing portion" in a "two-part structure . . . as in Nishikawa."  Ex. 1003 ¶¶ 178–181 (citing Ex. 1023, Figs. 5–6, ¶¶ 22, 32, 34–38) (addressing claim 1); *id.* ¶¶ 184–186 (addressing claim 3).  Dr. Kenny's annotations also identify how this second mapping provides a "gap" between the "Surface" of the housing and the

cover.  In support, Dr. Kenny cites a dictionary definition of the term "gap" as meaning "a separation in space."  *Id.* ¶ 185; Pet. 80; Ex. 1017 (*Merriam-Webster's Collegiate Dictionary*, 11th ed. (©2005)), 515 (definition 4a).  Dr. Kenny additionally finds "the size of the gap . . . would be defined, in part, by" the AIRPAX package wall which he has annotated in green, because that wall "surrounds the epoxy structure and serves as a mold that define[s] its overall height and, by extension, the size of the gap." Ex. 1003 ¶ 186.

Patent Owner objects that Petitioner's second mapping "arbitrarily" draws a line defining the bottom of the cover in "an ***undifferentiated*** mass of material."  PO Resp. 52–54 (citing Ex. 2007, 355:12–359:5); Ex. 2004 ¶¶ 115–120.  In Patent Owner's view, this "does not create a 'gap'" between the surface of the housing and the cover.  PO Resp. 53–54; Ex. 2004 ¶¶ 117, 120.  Patent Owner asserts "the 'gap' of claim 3 requires a 'break' . . . between the cover and the surface," and "[t]here is no such 'break' in Petitioner's combination."  PO Resp. 54 (citing Ex. 1001, 36:45–49, Fig. 14D; Ex. 1017, 515 (definition 1a) ("a break in a barrier")); Ex. 2004 ¶¶ 118, 120.  Patent Owner additionally asserts Petitioner's second mapping does not establish that the AIRPAX package wall "***creates*** a gap between the surface and the light permeable cover," as recited in claim 3, because the AIRPAX package wall "does not correspond to the size of any gap" and "extends beyond Petitioner's alleged 'gap.'"  PO Resp. 55; Ex. 2004 ¶ 121.

Petitioner replies that "the 'line' between the LPC/cover and the epoxy encapsulation layer underneath is not arbitrary, instead being formed, for instance, by a common manufacturing technique" disclosed by Nishikawa.  Pet. Reply 30; Ex. 1047 ¶ 62.  Petitioner also argues "the height

IPR2020-01520
Patent 10,258,265 B1

of [the AIRPAX package wall] necessarily impacts the position of the cover, in turn impacting the size of the 'gap' between the cover and the surface." Pet. Reply 30; Ex. 1047 ¶ 62.

Patent Owner's sur-reply reiterates the arguments on this issue. *See* Sur-reply 24.

Upon review of the foregoing, we conclude Petitioner's case for the obviousness of claim 3 falls short. Petitioner's identification of the bottom border of the "cover" in Petitioner's second mapping is arbitrary, and is not supported by a preponderance of the evidence. In particular, this is not "how a POSITA would have understood a 'cover' structure" to be found in Mendelson-1988. Ex. 2004 ¶ 117. Dr. Kenny does not provide any persuasive reasoning in support of his definition of the "cover" as ending at the bottom border he has identified. *See* Ex. 1003 ¶¶ 178–181, 184–186; Ex. 1047 ¶¶ 61–62; Ex. 2007, 355:12–359:5. We perceive no such reasoning, apart from an impermissible hindsight desire to shoehorn Mendelson-1988's disclosure into the confines of claim 3.

Dr. Kenny relies on Nishikawa in this regard. Figure 6 of Nishikawa is reproduced below:



Figure 6 is a sectional view of a lens-equipped light-emitting diode device, including sealing portion 40 that "seals a light-emitting diode 22 and a

bonding wire 23," and lens unit 50.  Ex. 1023 ¶¶ 22, 30.  Sealing portion 40 and lens unit 50 may both comprise "[a] thermosetting resin or a UV curing resin, such as a transparent epoxy resin and transparent silicone." *Id.* ¶ 32. Dr. Kenny relies on Nishikawa's disclosure that sealing portion 40 and lens unit 50 may be formed in separate injection molding steps, leading to a defined border between them which is shown as a horizontal line in Figure 6. *Id.* ¶¶ 34–35.  Thus, Nishikawa does establish, as Dr. Kenny testifies, that Mendelson-1988's epoxy layer *could* have been formed in a two-step injection molding process, leading to a border between two layers of epoxy.  *See* Ex. 1003 ¶¶ 178–179, 181, 186; Ex. 1047 ¶ 62.

However, Dr. Kenny errs in "focus[ing] on what a skilled artisan would have been *able* to do, rather than what a skilled artisan would have been *motivated* to do." *Polaris Indus., Inc. v. Arctic Cat, Inc.*, 882 F.3d 1056, 1068–69 (Fed. Cir. 2018) (citing *InTouch*, 751 F.3d at 1352). Dr. Kenny does not provide any persuasive motivation for using Nishikawa's two-step molding process within the context of Mendelson-1988's sensor.  Thus, we conclude Dr. Kenny "succumbed to hindsight bias in [his] obviousness analysis." *InTouch*, 751 F.3d at 1352.

Further, even if we were to accept Dr. Kenny's testimony of a "gap" being present in Mendelson-1988 by Nishikawa's two-step injection molding process, we are not persuaded that the AIRPAX package wall "creates" this gap as is further recited in claim 3.  *See* Ex. 1003 ¶ 186; Ex. 1047 ¶ 62.  Dr. Kenny testifies in support that "the size of the gap . . . would be defined, in part, by" the wall, which "serves as a mold that define[s] [the gap's] overall height and, by extension, the size of the gap." Ex. 1003 ¶ 186.  This testimony is belied by Dr. Kenny's own illustration, in

IPR2020-01520
Patent 10,258,265 B1

which the bottom border of the "cover" is located *underneath* the top edge of the AIRPAX package wall. *See id.* ¶ 184. In no way does the AIRPAX package wall create the gap. Instead, the gap is created by the height of the lower layer of epoxy laid down in Nishikawa's first injection molding step. *See* Ex. 1047 ¶ 62.

For the foregoing reasons, we conclude Petitioner has not demonstrated by a preponderance of the evidence that claim 3, and its dependent claims 6–13 and 16, are unpatentable as having been obvious over Mendelson-1988 and Inokawa.

5.    *Claims 2, 4, 14, 17–22, and 27–30*

Petitioner provides arguments and evidence, including testimony from Dr. Kenny, in support of contending claims 2, 4, 14, 17–22, and 27–30 are unpatentable as having been obvious over Mendelson-1988 and Inokawa. Pet. 78–79, 80–81, 86, 87–89, 92–95; Ex. 1003 ¶¶ 182–183, 188, 203, 205–210, 218–226. In defense of these claims, Patent Owner relies solely on arguments relating to independent claims 1 and 26. *See, e.g.*, PO Resp. 60. For the reasons provided in Sections III.I.2 and III.I.3 above in relation to claims 1 and 26, we conclude Patent Owner's defense is unavailing.

Concerning dependent claims 2, 4, 14, 17–22, and 27–30, we find a preponderance of the evidence supports Petitioner's contentions that Mendelson-1988's sensor exhibits the limitations recited in these claims, applying Dr. Kenny's first mapping of the claimed "cover," or that such limitations would have been obvious to implement in Mendelson-1988,

102

IPR2020-01520
Patent 10,258,265 B1

based on the evidence cited and the reasons provided in the Petition, which we adopt as our own here. *See* Pet. 78–79, 80–81, 86, 87–89, 92–95.

Thus, we conclude Petitioner has demonstrated by a preponderance of the evidence that claims 2, 4, 14, 17–22, and 27–30 are unpatentable as having been obvious over Mendelson-1988 and Inokawa.

### J.    *Ground 2B — Obviousness over Mendelson-1988, Inokawa, and Mendelson-2006*

In Ground 2B, Petitioner argues claims 23 and 24 of the '265 patent would have been obvious over Mendelson-1988, Inokawa, and Mendelson-2006. Pet. 2, 95–98. This ground is essentially a combination of Grounds 1C and 2A discussed above, with Aizawa being replaced by Mendelson-1988. Patent Owner's opposition to this Ground 2B relies solely on arguments presented against Grounds 1C and 2A, which are discussed above. *See* PO Resp. 60. For reasons provided above in connection with those grounds, we conclude Petitioner has demonstrated by a preponderance of the evidence that claims 23 and 24 are unpatentable as having been obvious over Mendelson-1988, Inokawa, and Mendelson-2006.

### K.    *Ground 2C — Obviousness over Mendelson-1988, Inokawa, Mendelson-2006, and Beyer*

In Ground 2C, Petitioner argues claim 25 of the '265 patent would have been obvious over Mendelson-1988, Inokawa, Mendelson-2006, and Beyer. Pet. 2, 98–99. This ground is essentially a combination of Grounds 1E and 2A discussed above, with Aizawa being replaced by Mendelson-1988. Patent Owner's opposition to this Ground 2C relies solely on arguments presented against Grounds 1E and 2A, which are discussed above. *See* PO Resp. 60. For reasons provided above in connection with

IPR2020-01520
Patent 10,258,265 B1

those grounds, we conclude Petitioner has demonstrated by a preponderance
of the evidence that claim 25 is unpatentable as having been obvious over
Mendelson-1988, Inokawa, Mendelson-2006, and Beyer.

## IV.   SUMMARY OF CONCLUSIONS

In summary, we determine a preponderance of the evidence
establishes claims 1–4, 6–14, and 16–30 of the '265 patent are unpatentable,
as shown in the following table:[14]

| Claim(s) | 35 U.S.C. § | References | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1–4, 6–14, 16, 17, 19–23, 26–29 | 103 | Aizawa, Inokawa | 1–4, 6–14, 16, 17, 19–23, 26–29 | |
| 1–4, 6–14, 16, 17, 19–23, 26–29 | 103 | Aizawa, Inokawa, Ohsaki | 1–4, 6–14, 16, 17, 19–23, 26–29 | |
| 23, 24 | 103 | Aizawa, Inokawa, Mendelson-2006 | 23, 24 | |

[14] Should Patent Owner wish to pursue amendment of the challenged claims
in a reissue or reexamination proceeding subsequent to the issuance of this
decision, we draw Patent Owner's attention to the April 2019 *Notice
Regarding Options for Amendments by Patent Owner Through Reissue or
Reexamination During a Pending AIA Trial Proceeding*. *See* 84 Fed. Reg.
16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application
or a request for reexamination of the challenged patent, we remind Patent
Owner of its continuing obligation to notify the Board of any such related
matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

IPR2020-01520
Patent 10,258,265 B1

| 23, 24 | 103 | Aizawa, Inokawa, Goldsmith, Lo[15] | | |
|---|---|---|---|---|
| 25 | 103 | Aizawa, Inokawa, Mendelson-2006, Beyer | 25 | |
| 1–4, 6–14, 16–22, 26–30 | 103 | Mendelson-1988, Inokawa | 1, 2, 4, 14, 17–22, 26–30 | 3, 6–13, 16 |
| 23, 24 | 103 | Mendelson-1988, Inokawa, Mendelson-2006 | 23, 24 | |
| 25 | 103 | Mendelson-1988, Inokawa, Mendelson-2006, Beyer | 25 | |
| **Overall Outcome** | | | 1–4, 6–14, 16–30 | |

## V.    ORDER

In consideration of the foregoing, it is hereby:

ORDERED that claims 1–4, 6–14, and 16–30 of the '265 patent have been proven by a preponderance of the evidence to be unpatentable; and

FURTHER ORDERED that, because this is a final written decision, parties to this proceeding seeking judicial review of our Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

---

[15] As explained above in Section III.G, we do not reach this ground, to conserve the Board's resources in considering multiple challenges to claims 23 and 24.

IPR2020-01520
Patent 10,258,265 B1

PETITIONER:

W. Karl Renner
Andrew B. Patrick
Hyun Jin In
FISH & RICHARDSON P.C.
axf-ptab@fr.com
devoto@fr.com
in@fr.com

PATENT OWNER:

Joseph R. Re
Jarom D. Kesler
Stephen W. Larson
Jacob L. Peterson
Jeremiah S. Helm (*pro hac vice*)
William R. Zimmerman (*pro hac vice*)
Stephen C. Jensen
KNOBBE, MARTENS, OLSON, & BEAR, LLP
2jrr@knobbe.com
2jzk@knobbe.com
2swl@knobbe.com
2jup@knobbe.com
2jgh@knobbe.com
2scj@knobbe.com

## CERTIFICATE OF SERVICE

I hereby certify that the original of this Notice of Appeal was filed via U.S.P.S. Priority Mail Express on April 12, 2022 with the Director of the United States Patent and Trademark Office at the address below:

Office of the Solicitor
United States Patent and Trademark Office
Mail Stop 8, Post Office Box 1450
Alexandria, VA 22313-1450

A copy of this Notice of Appeal is being filed and served on April 12, 2022 as follows:

**To the USPTO Patent Trial and Appeal Board:**
Patent Trial and Appeal Board
Madison Building East
600 Dulany Street
Alexandria, VA 22313

(*via PTAB E2E – as authorized by the Board*)

**To the U.S. Court of Appeals for the Federal Circuit:**
Clerk of Court
U.S. Court of Appeals for the Federal Circuit
717 Madison Place, N.W.
Washington, DC 20439

(*via CM/ECF – with filing fee*)

**Counsel for Petitioner Apple, Inc.**

W. Karl Renner, Reg. No. 41,265
Roberto J. Devoto, Reg. No. 55,108
Hyun Jin In, Reg. No. 70,014
Fish & Richardson P.C.
3200 RBC Plaza

60 South Sixth Street
Minneapolis, MN 55402
Tel: 202-783-5070
Fax: 877-769-7945
IPR50095-0006IP1@fr.com
PTABInbound@fr.com
axf-ptab@fr.com
devoto@fr.com
in@fr.com

(*via email pursuant to 37 C.F.R. § 42.6(e)*)


Dated:  April 12, 2022          /Jarom Kesler/
                                Jarom D. Kesler (Reg. No. 57,046)

                                **Attorney for Patent Owner**
                                **Masimo Corporation**

55435313