**Nos. 22-1631, -1632, -1633, -1634, -1635, -1636, -1637, -1638**

IN THE

# United States Court of Appeals

### FOR THE FEDERAL CIRCUIT

_____

MASIMO CORPORATION,

*Appellant,*

*v.*

APPLE INC.,

*Appellee.*

APPEAL FROM THE PATENT TRIAL AND APPEAL BOARD
CASE NOS. IPR2020-01520, IPR2020-01521, IPR2020-01536, IPR2020-01537,
IPR2020-01538, IPR2020-01539, IPR2020-01714, IPR2020-01715

## BRIEF OF APPELLANT MASIMO CORPORATION

Joseph R. Re, *Principal Counsel*
Stephen C. Jensen
Jarom D. Kesler
Stephen W. Larson
**KNOBBE, MARTENS, OLSON &
BEAR, LLP**
2040 Main Street, 14th Floor
Irvine, CA 92614
(949) 760-0404

August 5, 2022

Jeremiah S. Helm
**KNOBBE, MARTENS, OLSON &
BEAR, LLP**
1717 Pennsylvania Ave., N.W.
Washington, D.C. 20006
(202) 640-6400

*Attorneys for Appellant
Masimo Corporation*

**Illustrative Claim of U.S. Patent No. 10,292,628**

1.  A noninvasive optical physiological sensor comprising:

a plurality of emitters configured to emit light into tissue of a user;

a plurality of detectors configured to detect light that has been attenuated by tissue of the user, wherein the plurality of detectors comprise at least four detectors;

a housing configured to house at least the plurality of detectors; and

a light permeable cover configured to be located between tissue of the user and the plurality of detectors when the noninvasive optical physiological sensor is worn by the user, wherein the cover comprises an outwardly protruding convex surface configured to cause tissue of the user to conform to at least a portion of the outwardly protruding convex surface when the noninvasive optical physiological sensor is worn by the user and during operation of the noninvasive optical physiological sensor, and wherein the plurality of detectors are configured to receive light passed through the outwardly protruding convex surface after attenuation by tissue of the user.

## <u>CERTIFICATE OF INTEREST</u>

Counsel for Appellant Masimo Corporation certifies the following:

1.     The full name of every party represented by me is:

Masimo Corporation.

2.     The name of the real party-in-interest represented by me is:

Masimo Corporation.

3.     All parent corporations and any publicly held companies that own more than 10 percent or more of the stock of the party represented by me are:

Blackrock Inc.

4.     The name of all law firms and the partners or associates that appeared for the party in the lower tribunal or are expected to appear for the party in this court and who are not listed on the docket for the current case:

Knobbe, Martens, Olson & Bear, LLP: William R. Zimmerman and Jacob L. Peterson.

5.     The case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal:

- *Masimo Corporation v. Apple Inc.*, U.S. Court of Appeals for the Federal Circuit, Case No. 22-1972 (consolidated with Case Nos. 22-1973, 22-1975, 22-1976)

- *Masimo Corporation v. Apple Inc.*, U.S. Court of Appeals for the Federal Circuit, Case No. 22-2069 (consolidated with Case Nos. 22-2070, 22-2071, 22-2072)

- *Masimo Corporation and Cercacor Laboratories, Inc. v. Apple Inc.*, U.S. District Court for the Central District of California, Case No. 8:20-cv-00048-JVS

6.    Information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees):

Not applicable.

# TABLE OF CONTENTS

**Page No.**

TABLE OF ABBREVIATIONS .................................................................. 1

STATEMENT OF RELATED CASES ..................................................... 2

I.      INTRODUCTION ........................................................................ 3

II.     JURISDICTIONAL STATEMENT ............................................. 9

III.    STATEMENT OF THE ISSUES ................................................ 10

IV.    STATEMENT OF THE CASE .................................................... 11

        A.      Masimo's Claimed Inventions ........................................ 11

        B.      The Board's Prior Art Combinations .............................. 16

                1.      Aizawa And Inokawa (IPR1520, IPR1521) ........... 16

                2.      Aizawa And Ohsaki (IPR1520, IPR1521, IPR1537,
                        IPR1539, IPR1715)................................................. 19

                3.      Mendelson-1988 And Inokawa (IPR1520,
                        IPR1521) ................................................................ 21

                4.      Mendelson-799 And Ohsaki (IPR1536, IPR1538,
                        IPR1714) ................................................................ 22

V.     SUMMARY OF THE ARGUMENT ........................................... 24

VI.    STANDARD OF REVIEW ........................................................ 25

VII.   ARGUMENT................................................................................ 25

        A.      The Board's Obviousness Holdings In IPR1520 And
                IPR1521 Are Erroneous And Unsupported By Substantial
                Evidence ......................................................................... 25

## TABLE OF CONTENTS
### (cont'd)

Page No.

1.  The Board's Finding That Inokawa Would Have
    Motivated A POSITA To Add A Protrusion To
    Aizawa's Sensor To Improve Light Collection Is
    Unsupported By Substantial Evidence ................................... 25

    a.  Aizawa Expressly Discloses Why Its
        Detectors Are At The Periphery, And That A
        Flat Surface Increases Detection Efficiency ................. 25

    b.  Inokawa Would Not Have Motivated A
        POSITA To Add A Protrusion To Aizawa's
        Sensor .......................................................................... 26

    c.  The Board Erred By Ignoring Apple's
        Admissions .................................................................. 31

    d.  The Board Erroneously Adopted The
        "Greatest Curvature" Theory, Which Is
        Mentioned Nowhere In Apple's Petitions .................... 33

    e.  Inokawa and Aizawa Do Not Disclose Or
        Suggest The "Greatest Curvature" Theory .................. 40

    f.  The "Greatest Curvature" Theory Would Not
        Have Been Within The Knowledge Of A
        POSITA ........................................................................ 42

2.  The Board's Finding That Ohsaki Would Have
    Motivated A POSITA To Add A Protrusion To
    Aizawa's Sensor To Increase Adhesion Is
    Unsupported By Substantial Evidence ................................... 43

    a.  The Board's "Adhesion" Motivation
        Contradicts The Teachings Of Aizawa And
        Ohsaki .......................................................................... 44

# TABLE OF CONTENTS
### (cont'd)

Page No.

        b.    The Board Made Numerous Errors In Finding Obviousness Based On Aizawa And Ohsaki .......................................................... 46

    3.    The Board's Finding That Inokawa Would Have Motivated A POSITA To Add A Protrusion To Mendelson-1988's Sensor To Increase Light Collection Is Unsupported By Substantial Evidence .............. 52

    4.    The Board Also Erred In Finding That A POSITA Would Have Had A Reasonable Expectation Of Success ...................................................................... 53

    5.    Under The "Greatest Curvature" Theory, No Evidence Establishes Invalidity Of '265 Patent Claims 12 And 14 .................................................. 57

    6.    This Court Should Also Reverse The Board's Obviousness Findings Based On Aizawa And Inokawa Because Neither Reference Discloses Every Claim Limitation .......................................... 59

B.    The Board's Obviousness Holdings In IPR1537, IPR1539, And IPR1715 Are Erroneous And Unsupported By Substantial Evidence ........................................................ 62

    1.    The Board's Finding That A POSITA Would Have Added A Protrusion To Aizawa's Sensor To Improve Adhesion Is Unsupported By Substantial Evidence .................................................................. 62

    2.    The Board's Finding That A POSITA Would Have Added A Protrusion To Aizawa's Sensor To Protect Sensor Elements Is Unsupported By Substantial Evidence .................................................................. 67

# TABLE OF CONTENTS
## (*cont'd*)

**Page No.**

    3.    The Board's Finding That A POSITA Would Have Had A Reasonable Expectation Of Success Is Unsupported By Substantial Evidence .................................. 68

    4.    The Board's Holdings That Particular Protrusion Heights Would Have Been Obvious Are Erroneous And Unsupported By Substantial Evidence........................... 69

    5.    The Board's Reliance On Four References To Arrive At The Claimed Invention Is Unsupported By Substantial Evidence ........................................................ 71

    6.    The Board Erred When Finding '554 Patent Claims 14-18 Obvious When Claim 13 Was Found Nonobvious ............................................................................. 72

  C.    The Board's Obviousness Holdings In IPR1536, IPR1538, And IPR1714 Are Erroneous And Unsupported By Substantial Evidence ......................................................... 72

    1.    The Board's Finding That A POSITA Would Have Been Motivated To Add A Protrusion To Mendelson-799's Sensor Is Unsupported By Substantial Evidence ............................................................ 72

    2.    The Board's Finding Of A Reasonable Expectation Of Success Is Unsupported By Substantial Evidence................................................................................ 77

    3.    The Board's Holdings That Particular Protrusion Heights Would Have Been Obvious Are Erroneous And Unsupported By Substantial Evidence........................... 79

VIII.  CONCLUSION............................................................................ 80

# TABLE OF CONTENTS
### (*cont'd*)

**Page No.**

CERTIFICATE OF COMPLIANCE ....................................................................... 82

# TABLE OF AUTHORITIES

**Page No(s).**

*ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*,
    694 F.3d 1312 (Fed. Cir. 2012) ........................................................36

*Alacritech, Inc. v. Intel Corp.*,
    966 F.3d 1367 (Fed. Cir. 2020) ........................................................50

*Align Technology, Inc. v. Clearcorrect Operating, LLC*,
    745 F. App'x 361 (Fed. Cir. 2018) ....................................................64

*Apple Inc. v. Masimo Corp.*,
    No. IPR2020-01713, 2021 WL 1823926 (P.T.A.B. May 5, 2021) ...................35

*BASF Corp. v. Enthone, Inc.*,
    749 F. App'x 978 (Fed. Cir. 2018) ............................................76, 78

*Black & Decker, Inc. v. Positec USA, Inc.*,
    646 F. App'x 1019 (Fed. Cir. 2016) ..................................................61

*Brand v. Miller*,
    487 F.3d 862 (Fed. Cir. 2007) ....................................................42, 43

*Chemours Co. v. Daikin Indus.*,
    4 F.4th 1370 (Fed. Cir. 2021) ....................................................46, 50

*Cook Grp. Inc. v. Boston Scientific, Inc.*,
    809 F. App'x 990 (Fed. Cir. 2020) ....................................................32

*Cutsforth, Inc. v. MotivePower, Inc.*,
    636 F. App'x 575 (Fed. Cir. 2016) ....................................................70

*DSS Tech. Mgmt., Inc. v. Apple Inc.*,
    885 F.3d 1367 (Fed. Cir. 2018) ....................................................59, 68

*Ericsson Inc. v. Intellectual Ventures I LLC*,
    890 F.3d 1336 (Fed. Cir. 2018) ........................................................52

# TABLE OF AUTHORITIES
## (*cont'd*)

**Page No(s).**

*In re Fritch*,
　972 F.2d 1260 (Fed. Cir. 1992) ........................................72

*Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*,
　688 F.3d 1342 (Fed. Cir. 2012) ...........................46, 60, 63

*In re Magnum Oil Tools Int'l, Ltd.*,
　829 F.3d 1364 (Fed. Cir. 2016) ...........................47, 50, 65

*Mallinckrodt, Inc. v. Masimo Corp.*,
　147 F. App'x 158 (Fed. Cir. 2005) ........................................7

*Masimo Corp. v. Philips Elec. N. Amer. Corp.*,
　2015 WL 2379485 (D. Del. May 18, 2015) .......................7

*In re NTP, Inc.*,
　654 F.3d 1279 (Fed. Cir. 2011) ........................................72

*In re Nuvasive, Inc.*,
　842 F.3d 1376 (Fed. Cir. 2016) ........................................38

*Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*,
　520 F.3d 1358 (Fed. Cir. 2008) ........................................71

*Osi Pharms. v. Apotex, Inc.*,
　939 F.3d 1375 (Fed. Cir. 2019) ........................................31

*PAR Pharms., Inc. v. TWI Pharms., Inc.*,
　773 F.3d 1186 (Fed. Cir. 2014) ........................................59

*Personal Web Techs., LLC v. Apple, Inc.*,
　848 F.3d 987 (Fed. Cir. 2017) ..................................*passim*

*Polaris Indus. v. Arctic Cat, Inc.*,
　882 F.3d 1056 (Fed. Cir. 2018) ...................................46, 75

# TABLE OF AUTHORITIES
## (*cont'd*)

**Page No(s).**

*PPC Broadband, Inc. v. Iancu*,
739 F. App'x 615 (Fed. Cir. 2018) ............................................................. 32, 33

*SightSound Techs., LLC v. Apple Inc.*,
809 F.3d 1307 (Fed. Cir. 2015) ..................................................................... 25

*Star Sci., Inc. v. R.J. Reynolds Tobacco Co.*,
655 F.3d 1364 (Fed. Cir. 2011) ..................................................................... 41

*TQ Delta, LLC v. Cisco Sys., Inc.*,
942 F.3d 1352 (Fed. Cir. 2019) ..................................................................... 33

*Univ. of Strathclyde v. Clear-Vu Lighting LLC*,
17 F.4th 155 (Fed. Cir. 2021) ....................................................................... 49

*Wireless Protocol Innovations, Inc. v. TC Mobile, Inc.*,
771 F. App'x 1012 (Fed. Cir. 2019) .............................................................. 47

## OTHER AUTHORITIES

28 U.S.C. § 1295 ............................................................................................. 9

35 U.S.C. § 141 ............................................................................................... 9

35 U.S.C. § 319 ............................................................................................... 9

# TABLE OF ABBREVIATIONS

| Abbreviation | Meaning |
|---|---|
| '265 patent | U.S. Pat. No. 10,258,265 |
| '628 patent | U.S. Pat. No. 10,292,628 |
| '553 patent | U.S. Pat. No. 10,588,553 |
| '554 patent | U.S. Pat. No. 10,588,554 |
| '765 patent | U.S. Pat. No. 10,631,765 |
| IPR1520 | IPR No. IPR2020-01520 |
| IPR1521 | IPR No. IPR2020-01521 |
| IPR1536 | IPR No. IPR2020-01536 |
| IPR1537 | IPR No. IPR2020-01537 |
| IPR1538 | IPR No. IPR2020-01538 |
| IPR1539 | IPR No. IPR2020-01539 |
| IPR1714 | IPR No. IPR2020-01714 |
| IPR1715 | IPR No. IPR2020-01715 |
| Aizawa | U.S. Pat. App. Publ. No. 2002/0188210 |
| Inokawa | Japanese Pat. App. Publ. No. 20060296564 (English translation) |
| Ohsaki | U.S. Pat. App. Publ. No. 2001/0056243 |
| Mendelson-1988 | Mendelson et al., Design and Evaluation of a New Reflectance Pulse Oximeter Sensor |
| Mendelson-799 | U.S. Pat. No. 6,801,799 |
| Mendelson-2006 | Mendelson et al., A Wearable Reflectance Pulse Oximeter for Remote Physiological Monitoring |
| Nishikawa | U.S. Pat. App. Publ. No. 2007/0145255 |
| Nanba | U.S. Pat. No. 8,177,720 |

## <u>STATEMENT OF RELATED CASES</u>

Pursuant to Federal Circuit Rule 47.5, Counsel is aware of the following pending cases that will be directly affected by this Court's decision in the pending appeal:

- *Masimo Corporation v. Apple Inc.*, U.S. Court of Appeals for the Federal Circuit, Case No. 22-1972 (consolidated with Case Nos. 22-1973, 22-1975, 22-1976)

- *Masimo Corporation v. Apple Inc.*, U.S. Court of Appeals for the Federal Circuit, Case No. 22-2069 (consolidated with Case Nos. 22-2070, 22-2071, 22-2072)

- *Masimo Corporation and Cercacor Laboratories, Inc., v. Apple Inc.*, 8:20-cv-00048-JVS (C.D. Cal.)

# I. <u>INTRODUCTION</u>

This appeal addresses five patents, eight IPRs, and repeated mistakes by the Board. The Board's errors led it to invalidate numerous claims directed to Masimo's innovative optical sensors for noninvasively measuring the constituents of a person's blood.

Inventor Joe Kiani founded Masimo as a garage start-up in 1989 to improve devices for measuring oxygen saturation of blood. Masimo revolutionized technology for noninvasively measuring oxygen saturation, becoming the leading supplier worldwide. Over the years, Masimo also developed revolutionary technology for noninvasively measuring difficult and previously unattainable blood constituents. Today, Masimo's products are used yearly on over two-hundred million patients to noninvasively measure many blood constituents.

The Masimo patents at issue here arose from a search for improvements to the signal strength of noninvasive optical sensors to enable measurement of previously unmeasurable blood constituents, such as carbon monoxide, methemoglobin, total hemoglobin, and blood glucose. Noninvasive physiological optical sensors emit light into skin tissue and detect that light after passing through the tissue. Through extensive research and innovation, the inventors discovered that certain structural features surprisingly worked together to increase signal strength by an order of magnitude. During prosecution, the examiners, who collectively have decades of

experience examining applications in the field, agreed the claimed combinations were a patentable advance unique in the field.

No prior art discloses Masimo's innovative approach, including a physiological sensor with a convex cover positioned over multiple detectors (much less combined with the other claimed features). The inventors' discovery contradicted conventional wisdom, as taught in the very prior art relied upon by Apple. The petitions attempted to recreate Masimo's claims by combining disparate features from different references that actually discourage the combinations. But even small structural changes to a physiological optical sensor may have significant consequences on the weak signal that is monitored.

The Board nonetheless accepted the petitions' proposed dramatic changes to prior art sensors, with no motivation to do so coming from the references. The Board also disregarded the express teachings within the four corners of those references in favor of hindsight-driven opinions from Apple's expert. For example, the Board found a Person of Ordinary Skill in the Art ("POSITA") would have been motivated to convert a sensor's surface, which the prior art disclosed and taught should be flat, to a convex surface to supposedly increase "light collection." But the references relied on by the Board taught that a flat surface improves light detection. Moreover, those references, and thus the Board's resulting combinations, placed detectors at the sensor's **_periphery_**. Apple and its expert repeatedly admitted that a convex

surface condenses light toward the sensor's *center* and thus *away* from the periphery. Thus, far from increasing light collection, a POSITA would have expected the combinations' convex surface to *decrease* light collection—the exact opposite of the Board's motivation to combine.

After Apple filed its petitions, and Masimo exposed this fundamental flaw in Apple's combinations, Apple changed course and contradicted its initial position, expert declarations, and expert deposition testimony. Apple asserted an assortment of new and unsupported theories that allegedly showed the combinations would supposedly increase light at peripheral detectors.

The Board erred by failing to address Apple's numerous initial positions and admissions in its analysis. Instead, the Board adopted one of Apple's new theories on reply—that light would be increased by placing the "greatest curvature" of the convex surface "near" the detectors. But the Board made no attempt to reconcile that theory with Apple's original theory and numerous admissions.

The Board's adopted "greatest curvature" theory is also unsupported by the art. *No* prior art supports that a POSITA would have employed the "greatest curvature" theory, much less that a POSITA would have arrived at a physiological sensor with a *single* convex cover over multiple detectors, among other claimed features. To the contrary, the prior art discouraged such a configuration.

The Board also accepted another theory for some combinations—that a POSITA would have been motivated to add a cover with a protrusion to improve "adhesion" to a user's skin. Specifically, the Board found that a POSITA would have been motivated to add a protrusion to a prior-art sensor worn on the wrist's palm-side. But the references relied on by the Board taught the exact *opposite*. Specifically, (1) one reference taught a protrusion slips on the palm-side; and (2) the other taught a flat surface improves adhesion on the palm-side. The Board's finding contradicted the express disclosures of both references. The Board erred by failing to even address the express disclosures that undermine its finding.

The Board also erred in finding a POSITA would have believed there would have been a reasonable expectation of success. This Court's precedent requires a clear evidence-based explanation of a proposed combination and how it would function. The Board provided no such explanation, nor could it. Apple's expert repeatedly retreated from his own illustrations of the combinations, and instead emphasized the complexity of physiological sensors. Apple's expert pointed to numerous factors that would impact a convex cover's design and essentially argued that a POSITA would "figure it out" and arrive at some undisclosed structure. Such testimony falls far short of showing a POSITA would have reasonably expected success, especially given Apple's dramatic and unsupported changes to the prior-art sensors.

The Board's optics, adhesion, and expectation of success errors cut across all petitions at issue in this appeal. However, the Board also made additional petition-specific errors. For example, for one four-reference combination, the Board found that a POSITA would have replaced the prior art sensor's wireless transmitter with LED communication to a base station. The Board then found a POSITA would have ***added back*** wireless transmission to justify the combination's fourth reference. Such circuitous reasoning reflects hindsight, not obviousness.

Over the years, Masimo has developed a range of technologies that revolutionized the field of noninvasive monitoring. *See Mallinckrodt, Inc. v. Masimo Corp.*, 147 F. App'x 158, 163 (Fed. Cir. 2005) (nonprecedential); *Masimo Corp. v. Philips Elec. N. Amer. Corp.*, 2015 WL 2379485 at *1 (D. Del. May 18, 2015). Masimo's various patents over the years have withstood extensive litigation and are recognized by the industry and courts as fundamental innovations. *Id*.

PTAB decisions, however, have now invalidated hundreds of claims in dozens of Masimo patents across many patent families.[1] The consistent thread across those decisions is a willingness to disregard the four corners of the references and rely on

---

[1] To date, the Board has invalidated Masimo claims in IPR2021-00209, IPR2021-00208, IPR2021-00195, IPR2021-00193, IPR2020-01737, IPR2020-01733, IPR2020-01722, IPR2020-01716, IPR2020-01715, IPR2020-01714, IPR2020-01713, IPR2020-01526, IPR2020-01078, IPR2020-01054, IPR2020-01033, IPR2020-01019, IPR2020-01015, IPR2020-00967, IPR2020-00954, IPR2020-00912.

unsupported speculation and hindsight reconstruction.   The Board errors at issue here led the Board to invalidate 143 Masimo claims.   The Board even held some dependent claims obvious despite finding the claim from which they depend nonobvious.   That is error.   The Board's decisions are profoundly flawed and unsupported by substantial evidence.   This Court should reverse those decisions.

## II.  <u>JURISDICTIONAL STATEMENT</u>

The Board issued final written decisions in IPR2020-01520, IPR2020-01536, IPR2020-01537, IPR2020-01538, and IPR2020-01539 on February 23, 2022. Appx00001-00106; Appx00199-00276; Appx00277-00358; Appx00359-00428; Appx00429-00514.  The Board issued final written decisions in IPR2020-01714 and IPR2020-01715 on April 6, 2022.  Appx00515-00591; Appx00592-00675.  The Board issued a final written decision in IPR2020-01521 on April 11, 2022. Appx00107-00198.

Masimo timely appealed these decisions on April 12, 2022.  Appx02537-02648; Appx07624-07721; Appx13167-13250; Appx20781-20868; Appx28420-28495; Appx35638-35729; Appx42697-42779; Appx50019-50108.  The Court has jurisdiction under 35 U.S.C. §§ 141(c), 319 and 28 U.S.C. § 1295(a)(4)(A).

## III.  <u>STATEMENT OF THE ISSUES</u>

1.  Did the Board err by (1) failing to address in its analysis key prior art disclosures that undermine the Board's findings, (2) failing to address in its analysis numerous admissions by Apple and its expert, and (3) finding a reasonable expectation of success with no evidence-based explanation of the proposed combinations, resulting in unpatentability decisions unsupported by substantial evidence?

2.  Did the Board err by (1) relying on arguments the Board itself raised without providing Masimo the opportunity to respond and (2) relying on the Board's own interpretations and theories unsupported by the record?

3.  Did the Board err by holding certain dependent claims obvious despite holding nonobvious the claim from which they depend?

## IV.  **STATEMENT OF THE CASE**

### A.    **Masimo's Claimed Inventions**

The patents at issue arose from efforts to measure previously unmeasurable blood constituents through Masimo's Rainbow® technology.  As the shared patent specification explains, the inventions are directed to noninvasive optical devices for "measuring a blood constituent or analyte, such as oxygen, carbon monoxide, methemoglobin, total hemoglobin," as well as "many other physiologically relevant patient characteristics."  Appx00749 2:22-28.[2]

To detect parameters that are difficult to monitor optically and noninvasively, the inventors had to explore unconventional approaches.  The inventors' research and development included thousands of hours of analysis, design, and experimentation, which culminated in unanticipated results and novel sensor structures.

The industry conventionally believed that pressure at the measurement site problematically displaced the desirable blood from the measurement site.  *See*, *e.g.*, Appx15587 3:27-67.  The inventors through experimentation found that a protrusion which applied pressure could—together with other unique features—provide signal improvement benefits.  Those signal improvement benefits outweigh the drawbacks

---

[2] Masimo provides representative citations to the '265 patent in view of the shared patent specification unless otherwise noted.

of pressure and allow for measurement of blood constituents that are challenging to detect.

Masimo's Figure 3C (below) from the shared patent specification illustrates many features of such a device (301A), including a protrusion (305) and windows (320/321/322/323) for four detectors. Appx00691; Appx00758 19:38-48.



**Masimo Patent Sensor Illustration Fig. 3C (color added) (Appx00691)**

Masimo's specification explains that the protruding surface thins out the measurement site, resulting in less light attenuation by the measured tissue. Appx00752 7:58-61. The protruding surface further increases the area from

which attenuated light can be measured. Appx00752 7:61-63. The multiple detectors allow for an averaging of measurements, which can reduce errors due to variations in the path of light passing through the tissue. Appx00753 9:28-33; *see also* Appx00750 3:23-33, 4:25-35. The patents explain that positioning the detectors "beneath the protrusion" (including under windows in certain embodiments) can reduce the "mean optical path length from the emitters to the detectors" such that the "accuracy of blood analyte measurement can increase." Appx00758 20:25-29.

The inventors discovered that these different components work together to provide greater noise cancellation and increase signal strength. Appx00753 9:28-33; Appx00758 20:25-42; *see also* Appx00750 3:23-33, 4:25-35. None of the prior art provides these teachings.

The inventors even identified specific beneficial protrusion heights, explaining that a "convex bump of about 1 mm to about 3 mm in height" was found to "help signal strength by about an order of magnitude versus other shapes." Appx00758 20:29-33. During prosecution, the examiners agreed the claimed combinations were a patentable advance unique in the field and "the prior art of record does not teach or suggest" Masimo's claims. Appx02923-02932; Appx07971-07981; Appx13259-13266; Appx28870-28882; Appx29716-29719; Appx42872-42880. No reference asserted in the IPRs discloses a physiological

sensor with a convex cover positioned over multiple detectors (much less combined with the other claimed features).[3]

All five patents share the same comprehensive specification and the same July 2008 priority date. Appx00676-00772; Appx00773-00870; Appx00871-00973; Appx00974-01076; Appx01077-01179. The patent specification includes more than sixty pages of figures and twenty pages of detailed disclosure. *Id*. Given the extensive disclosure, Masimo unsurprisingly obtained a number of different claims directed to various disclosed features.

For example, while all patents claim aspects of a system or method that includes multiple detectors underneath a cover with a protrusion, the '265, '628, '553, and '554 patents further claim multiple emitters that emit light into tissue. Appx00770-00772; Appx00868-00870; Appx00971-00973; Appx01074-01076. The emitters may emit at different wavelengths to facilitate measurement of different and difficult-to-measure blood constituents. Appx00754-00755 12:5-13:47.

The '628, '553, and '554 patents further claim a wall that surrounds or circumscribes the at least four detectors. Appx00868-00870; Appx00971-00973; Appx01074-01076. The wall may control a positioning of the protrusion with

---

[3] Apple asserted Inokawa's Figure 19 discloses a lens over detectors. Appx02517 69:6-12. But Apple pointed to a cover over detectors in a ***base station*** designed to optically receive data. Appx03293; Appx03287-03288 ¶¶[0109]-[0111]. The ***physiological sensor*** in Figure 19 Inokawa includes only a single detector under a convex cover. *Id*.

respect to the detectors, enabling improved detection at the detectors.  Appx00766 36:43-49.

The '554 and '765 patents claim specific protrusion height ranges disclosed by the inventors in the specification as providing greater noise cancellation and an order of magnitude increase in signal strength.  Appx01074-01076; Appx01177-01179; Appx00758 20:29-33.  Those patents also claim a handheld computing device in wireless communication with the claimed physiological sensor. Appx01074-01076; Appx01177-01179.  The handheld computing device permits collecting and presenting data, enhancing usability—such as facilitating real-time user monitoring.  Appx00757 17:27-40.

Claim 1 of the '628 patent illustrates features common to the claims:

1.  A noninvasive optical physiological sensor comprising:

a ***plurality of emitters*** configured to emit light into tissue of a user;

a ***plurality of detectors*** configured to detect light that has been attenuated by tissue of the user, wherein the plurality of detectors comprise at least four detectors;

a ***housing*** configured to house at least the plurality of detectors; and

a ***light permeable cover*** configured to be located between tissue

of the user and the plurality of detectors when the noninvasive optical

physiological sensor is worn by the user, wherein the cover comprises

an ***outwardly protruding convex surface*** configured to cause tissue of

the user to conform to at least a portion of the outwardly protruding

convex surface when the noninvasive optical physiological sensor is

worn by the user and during operation of the noninvasive optical

physiological sensor, and wherein the ***plurality of detectors*** are

configured to receive ***light passed through the outwardly protruding***

***convex surface*** after attenuation by tissue of the user.  Appx00868.

## B.    The Board's Prior Art Combinations

The Board combined elements of one of three primary references (Aizawa,

Mendelson-1988, or Mendelson-799) with elements of at least one of two secondary

references (Inokawa or Ohsaki).

### 1.    Aizawa And Inokawa (IPR1520, IPR1521)

Two Board decisions combined Aizawa (Appx03242-03248) with Inokawa

(Appx03249-03271, translation Appx03272-03295) to invalidate claims of the '265

and '628 patents.

Aizawa discloses a circular sensor (below) for detecting a pulse. Appx03242-03243 Abstract, Figs. 1A-1B.[4] The sensor is worn on the wrist's palm-side and includes a "transparent plate-like member" (6) over four peripheral detectors (22) around one centrally located LED (21). Appx03247 ¶¶[0023], [0026].



**Aizawa Fig. 1B (cross-sectional view, color added) (Appx03243)**



**Aizawa Fig. 1A (top-down view, color added) (Appx03243)**

---

[4] Masimo provides representative citations to exhibits in view of common exhibits across IPRs unless otherwise noted.

Aizawa discloses that its *flat* "plate-like member" is what "makes it possible to improve adhesion between the sensor and the wrist and thereby further improve the detection efficiency of pulse waves." Appx03246 ¶[0013].

Inokawa's sensor (below) has the opposite detector/emitter configuration. Inokawa's emitters (21, 23) are located on the sensor's *periphery* and its single detector (25) is located in the sensor's *center*. Appx03282 ¶[0058]; Appx03290 Fig. 2. Inokawa places a convex cover or "lens" (27) over the emitters and single detector. *Id*.



| Inokawa's Features |
| --- |
| • **Green**: peripheral emitters (21, 23) |
| • **Red**: central detector (25) |
| • **Blue**: convex lens (27) |
| • Arrows showing direction of light in original, highlighted in yellow added |

**Inokawa Fig. 2 (cross-sectional view, color added) (Appx03290)**

The Board adopted Apple's combination (below), which substitutes Aizawa's flat plate with a modified version of Inokawa's convex cover. Appx00051; Appx00158.



**Aizawa-Inokawa Combination (Appx00054; Appx00161)**

The Board found a POSITA would have been motivated to add Inokawa's lens to Aizawa's sensor to enhance light collection.  Appx00051; Appx00158.  But Apple and its expert repeatedly admitted that the convex cover in this combination would concentrate light toward the ***center*** of the sensor.  Appx01921-01922; Appx03068-03069 ¶¶119-120; Appx05498 204:1-20.  Thus, as Masimo's expert explained, the combination would direct light ***away*** from the peripheral detectors and ***decrease*** light collection.  Appx05214-05216 ¶¶48-50; Appx10352-10355 ¶¶50-52.  The Board's combination also contradicts Aizawa's express teaching to use a ***flat*** plate for improved detection efficiency.  Appx03246 ¶[0013].

### 2.    Aizawa And Ohsaki (IPR1520, IPR1521, IPR1537, IPR1539, IPR1715)

Five Board decisions combined Aizawa with Ohsaki (Appx03352-03357) to invalidate claims of the '265, '628, '553, '554, and '765 patents.

Unlike Aizawa's ***palm-side*** sensor, Ohsaki discloses a sensor that "is worn on the ***back side*** [i.e., watch side] of a user's wrist corresponding to the back of the

user's hand."[5]   Appx03352 Abstract.   Ohsaki explains that its cover or "board" prevents slipping on the wrist's backside, but if placed on the wrist's palm-side (at Aizawa's measuring location), it "has a tendency to ***slip off*** the detecting position." Appx03356 ¶¶[0023]-[0024]; Appx03354 Figs. 3A-3B.

Masimo presented unrebutted expert testimony explaining how, based on Ohsaki's disclosure, the longitudinal structure reduces slipping by fitting within an anatomical opening on the backside of the user's wrist.  Appx25942-25945 ¶¶54-57; Appx40348-40351 ¶¶54-57; Appx54796-54799 ¶¶54-57; *see also* Appx05245 ¶93; Appx10382-10383 ¶93; Appx03355-03356 ¶¶[0006], [0019].   Masimo's expert explained, with supporting evidence, how such a longitudinal structure anchors itself in an opening between two bones (*id*.):



**Masimo's Expert's Anatomical Drawing**

---

[5] Emphasis supplied unless otherwise noted.

The Board's combination required a POSITA to change Ohsaki's longitudinal board to a circular cover to match Aizawa's sensor, eliminating the longitudinality that Ohsaki expressly explains is important to reduce slipping.  Appx03356 ¶[0019].  The Board's combination also required a POSITA to place Ohsaki's convex surface on the wrist's ***palm-side***, which Ohsaki taught would ***slip***, ignoring that Aizawa says to use a ***flat*** plate at its palm-side location.   Appx25947 ¶60; Appx40353 ¶60; Appx54801 ¶60; Appx05245-05246 ¶93; Appx10382-10383 ¶93.   The Board's combination again placed a protrusion over peripheral detectors.  Appx05214-05216 ¶¶48-50; Appx10352-10355 ¶¶50-52.   As discussed, however, Apple and its expert repeatedly admitted that the convex cover such a combination would concentrate light toward the ***center*** of the sensor and thus away from the detectors.  *See supra* Section IV.B.1.

### 3.    Mendelson-1988 And Inokawa (IPR1520, IPR1521)

Two Board decisions combined Inokawa with Mendelson-1988 (Appx03358-03364) to invalidate claims of the '265 and '628 patents.

Mendelson-1988 discloses a sensor that measures oxygen saturation. Appx03358.  Mendelson-1988's sensor (below), like Aizawa's sensor, positions detectors around a central light source.  Appx03359-03360.



**Mendelson-1988 Fig. 2B (cross-sectional view, color added) (*Id.*)**

The Board found that Inokawa would have motivated a POSITA to add Inokawa's lens to Mendelson-1988's sensor to improve light detection. Appx00090; Appx00188. As discussed, however, Apple and its expert repeatedly admitted that the convex cover in such a combination would concentrate light toward the ***center*** of the sensor and thus away from the detectors *See supra* Section IV.B.1.

### 4.    Mendelson-799 And Ohsaki (IPR1536, IPR1538, IPR1714)

Three Board decisions combined Mendelson-799 (Appx15578-15593) with Ohsaki to invalidate claims of the '553, '554, and '765 patents.

Like Mendelson-1988's sensor, Mendelson-799's sensor (below) measures oxygen saturation with a circular array of detectors surrounding a central light source. Appx15583 Fig. 7; Appx15586 1:11-13.



**Mendelson-799 Fig. 7 (top view, color added) (Appx15583)**

The Board found Ohsaki would have motivated a POSITA to combine Ohsaki's board with Mendelson-799's sensor to improve adhesion and provide protection. Appx00235; Appx00247; Appx00400; Appx00412; Appx00556; Appx00567. The Board's combination, however, once again places detectors on the sensor's *periphery*, directing light away from those detectors and decreasing light collection. Appx18352-18355 ¶¶70-75; Appx33100-33103 ¶¶71-76; Appx47501-47504 ¶¶71-76. Mendelson-799 also repeatedly warns against applying pressure and introducing "air gaps." Appx15586-15592 2:27-64, 3:27-67, 4:59-65, 5:15-21, 5:31-37, 6:1-3, 6:8-13, 6:26-31, 10:49-53, 12:62-13:5. As Masimo's expert explained, adding Ohsaki's protrusion to Mendelson-799's sensor would create pressure and air gaps, contradicting those warnings. Appx18343-18346 ¶¶59-61; Appx33091-33094 ¶¶60-62; Appx47491-47495 ¶¶60-62; Appx03353 Figs. 1-2.

# V. **SUMMARY OF THE ARGUMENT**

1.    In IPR1520 and IPR1521, the Board found a POSITA would have added a protrusion to a flat sensor surface to improve "light collection" and "adhesion," but  the prior art, Apple's admissions, and evidence established the opposite.  The Board additionally found a reasonable expectation of success without a clear evidence-based explanation of the combinations.

2.    In IPR1537, IPR1539, and IPR1715, the Board found a POSITA would have added a protrusion to a flat sensor surface to improve "adhesion" when the prior art, Apple's admissions, and evidence again established the opposite.   The Board additionally found a reasonable expectation of success without a clear evidence-based explanation of the combinations.   The Board even found specific claimed protrusion height ranges obvious though no prior art reference disclosed or suggested such ranges.   The Board also (1) relied on inconsistent motivations to combine four references to arrive at certain Masimo claims and (2) erred by finding certain dependent claims obvious despite finding the claim on which they depend nonobvious.

3.    In IPR1536, IPR1538, and IPR1714, the Board found a POSITA would have added a protrusion to a flat sensor surface to improve "adhesion" when the prior art, Apple's admissions, and evidence again established the opposite.   The Board also again found a reasonable expectation of success with no clear evidence-

based explanation of the combinations.  Finally, the Board found specific claimed

protrusion height ranges obvious though no prior art reference disclosed or

suggested those ranges.

## VI.  STANDARD OF REVIEW

The Board's "determination of obviousness under § 103 is a question of law."

*SightSound Techs., LLC v. Apple Inc.*, 809 F.3d 1307, 1318 (Fed. Cir. 2015).  The

Board's factual findings are reviewed for substantial evidence and its legal

conclusions are reviewed de novo.  *Id.*

## VII.  ARGUMENT

### A.  The Board's Obviousness Holdings In IPR1520 And IPR1521 Are Erroneous And Unsupported By Substantial Evidence

#### 1.  The Board's Finding That Inokawa Would Have Motivated A POSITA To Add A Protrusion To Aizawa's Sensor To Improve Light Collection Is Unsupported By Substantial Evidence

The Board found in IPR1520 and IPR1521 that Inokawa would have

motivated a POSITA to add a protrusion to "Aizawa's existing flat cover" to enhance

light collection.  Appx00051; Appx00158.  The Board's finding is erroneous and

unsupported by substantial evidence.

##### a.  Aizawa Expressly Discloses Why Its Detectors Are At The Periphery, And That A Flat Surface Increases Detection Efficiency

The Board's finding directly contradicts the express disclosure of the primary

reference, Aizawa.  Aizawa discloses that "a transparent *plate*-like member" is what

"makes it possible to improve adhesion between the sensor and the wrist and thereby further improve the detection efficiency of pulse waves." Appx03246 ¶[0013]. Aizawa's sensor operates by detecting pulse signals close to arteries on the wrist's **palm-side**. Appx03242-03243 Abstract, Figs. 1A-1B; Appx03246-03247 ¶¶[0013], [0023], [0026]. Aizawa places narrow tapered openings over its detectors to collect light reflected from arteries and uses multiple **peripheral** opening/detectors to ensure at least one detector is near an artery during monitoring. Appx03247 ¶¶[0022]-[0027].



**Aizawa Fig. 1B**
**(color added, Appx03243)**

**Aizawa Fig. 2**
**(Appx03244)**

Nothing in Aizawa teaches or suggests that its detectors could be moved away from the artery or that its **flat** surface could be modified to a protrusion. Indeed, these are key features of Aizawa's sensor.

### b.   Inokawa Would Not Have Motivated A POSITA To Add A Protrusion To Aizawa's Sensor

The Board's reconfiguration of Aizawa's sensor to purportedly improve light collection also finds no support in Inokawa. Inokawa addresses a fundamentally

different objective—communicating data.  Specifically, Inokawa discusses the problems of previous data transmission systems and proposes the use of a base station to optically transmit information using LED light. Appx03277 ¶¶[0004]-[0006]; Appx03290 Fig. 3.



**Inokawa Fig. 3 (color added) (Appx03290)**

Inokawa places a physiological sensor (red above) on a base station (blue above) to communicate data via LED light.  Appx03277 ¶[0006]; Appx03290 Fig. 3.

The Board's motivation finding was largely based on two sentences regarding Inokawa's lens (or protrusion): "[A] lens is placed on the surface of the ***sensor-side*** light-emitting means.  This lens makes it possible to increase the light-gathering ability of the LED, as well as to protect the LED or PD."  Appx03278 ¶[0015]; Appx03280 ¶[0030].  These sentences discuss optical data communication to a base station and confusingly refer to the "light-***gathering*** ability of the ***LED***," i.e., the light ***emitting*** diode.  Inokawa never discusses increasing light-gathering at a ***detector***, much less increasing light gathering in an optical physiological sensor.  The

Board erroneously found that "Inokawa describes using its lens … to 'increase the light-gathering ability' of Inokawa's light *detector*." Appx00053; Appx00160. But Inokawa says no such thing. Nothing in Inokawa would have motivated a POSITA to add a protrusion over multiple peripheral detectors in an optical physiological sensor to improve "light collection."

The Board also relied on Inokawa's Figure 2, which shows Inokawa's sensor placed on tissue to collect pulse data (that is later transferred to the base station shown above). Appx00055-00056; Appx00162.



**Inokawa Fig. 2 (color added) (Appx03290)**

Inokawa never describes the sensor in Figure 2 as providing any benefit of light collection. Inokawa describes Figure 2 as illustrating "a single photodiode (S-side PD) 25 that receives the reflected light" and identifies no benefit from the convex surface. Appx03282 ¶[0058].

Apple's expert claimed that a POSITA would see a benefit from Inokawa's lens. Appx03029 ¶61; Appx08080-08081 ¶60. Consistent with the arrows in Figure 2, and a POSITA's basic understanding of a convex lens, Apple's expert testified

that the lens "concentrat[es] light towards the detector *in the center*...."
Appx05377-05378 83:15-84:2.  Apple's expert explained "one of ordinary skill in
the art would understand that in Inokawa the objective is to concentrate light at the
detector, which is *in the center* axis of the drawing...."  Appx05380-05381 86:19-
87:1.

Such testimony should have doomed all of Apple's combinations.  Every
primary reference in all eight IPRs placed the detectors on the *periphery*.    As a
result, every combination placed the detectors on the *periphery*:



**Aizawa-Inokawa
Combination (Appx00054)**

**Mendelson-1988-Inokawa
Combination (Appx0087)**

**Aizawa-Ohsaki
Combination (Appx20526)**

**Mendelson-799-Ohsaki
Combination (Appx00233)**

As Masimo's expert explained, consistent with Apple's admissions and a POSITA's
understanding of a convex lens, a POSITA would have believed that the protrusions

would direct light *away* from the detectors, *decreasing* light collection. Appx05214-05216 ¶¶48-50; Appx10352-10355 ¶¶50-52.

Moreover, the combinations all placed the LEDs and detectors in the *opposite* configuration of Inokawa. While Inokawa discloses a single detector in the center with LEDs on the periphery, the combinations placed one or more LEDs in the center, with detectors on the periphery. Apple's expert admitted Inokawa disclosed *no* obvious benefit for different sensor/detector configurations:

> I think one of ordinary skill in the art would understand that in Inokawa the objective is to concentrate light at the *detector*, which is in the *center axis* of the drawing and that the lens is capable of providing that benefit. If we're going to *move the lenses and the LEDs and detectors around* and ask different questions, it's – *it isn't so obvious* that Inokawa is specifically considering those scenarios. It's a little more hypothetical.

Appx05380-05381 86:19-87:6. Apple's expert was correct—any alleged benefit of Inokawa's lens "isn't so obvious" when changing the placement of the detectors.

The Board erred by finding Inokawa would have motivated a POSITA to add a protrusion to Aizawa's sensor. Invalidity findings cannot stand where, as here, "the Board misinterpreted the asserted references to teach more than substantial

evidence supports." *Osi Pharms. v. Apotex, Inc.*, 939 F.3d 1375, 1382-83 (Fed. Cir. 2019).

### c.    The Board Erred By Ignoring Apple's Admissions

The Board also erred by failing to address Apple and its expert's admissions in its analysis.[6]    As discussed, Apple's expert admitted that Inokawa's lens "concentrate[s] light towards the detector ***in the center***."    *See supra* Section VII.A.1.b.    Apple's expert explained that "one of ordinary skill in the art would understand that in Inokawa the objective is to concentrate light at the detector, which is ***in the center*** axis of the drawing…."  Appx05380-05381 86:19-87:1.

The petition in IPR1520 asserted that Inokawa's lens, when implemented with Aizawa's sensor, "serves a ***condensing*** function and thus, as with any other lens, refracts light passing through it."    Appx01921.    That petition illustrated this "condensing function" as redirecting incoming light towards the central axis compared to a flat surface:

---

[6] The Board mentioned at least one admission in its summary of "Petitioner's Contentions," Appx00038-00040, but did not discuss or attempt to reconcile Apple's many admissions in its "Analysis and Conclusion."



**Apple's Illustrations of Light-Redirection (Appx01922)**

Apple's expert's declaration in IPR1520 included the same figures, and confirmed that when adding a protrusion, "the incoming light is 'condensed' ***toward the center***." Appx03068-03069 ¶119; *see generally* Appx03068-03070 ¶¶118-120 (discussing mean path length of light). Apple's expert testified that the convex surface in the combination would result in "more light in the center than at the outer edge in this example." Appx05498 204:1-13. He agreed "that's because light's being ***directed*** towards the center and ***away*** from the ***edge*** …." *Id*. 204:14-20.

As discussed, Apple's original position and admissions should have been fatal to all combinations. *See supra* Section VII.A.1.b. ***Every*** primary reference embodiment relied on by Apple illustrates a sensor with peripheral detectors arrayed around a central emitter. Yet, the Board never addressed these many admissions in its analysis. That is error. *See Cook Grp. Inc. v. Boston Scientific, Inc.*, 809 F. App'x 990, 999 (Fed. Cir. 2020) (nonprecedential) ("The Board erred in refusing to consider [petitioner's] admission[s] when it was weighing the evidence…."); *see also PPC Broadband, Inc. v. Iancu*, 739 F. App'x 615, 623 (Fed. Cir. 2018)

(nonprecedential) (vacating obviousness decision where Board failed to address expert's admissions). The Board should have addressed Apple's many admissions and explained why they did not undermine the Board's conclusion. *See id*. Moreover, when reviewing the Board's decisions for substantial evidence, this Court reviews "the record as a whole, taking into account evidence that both justifies and detracts" from the decisions. *TQ Delta, LLC v. Cisco Sys., Inc.,* 942 F.3d 1352, 1358 (Fed. Cir. 2019). Apple's admissions directly undermine the Board's decisions.

### d. The Board Erroneously Adopted The "Greatest Curvature" Theory, Which Is Mentioned Nowhere In Apple's Petitions

Rather than address Apple's numerous admissions, the Board adopted one of the many new theories Apple asserted after Apple discovered the flaw in its combinations. Apple's many new theories included that: (1) light would increase at certain locations (including somehow at least at the detectors), Appx05435-05437 141:22-143:5; (2) light would increase everywhere under the lens, Appx05458 164:8-16; (3) the lens would direct light more toward the center but also would capture more light overall than a flat surface (the "additional light-capture" theory), Appx05498-05499 204:21-205:12; (4) the path of light is "reversible" in a physiological sensor such that switching emitters and detectors would have no impact on optics (the "reversibility" theory), Appx04547-04551 ¶¶32-36, Appx09204-09208 ¶¶31-35; and (5) light concentration would improve at Aizawa's detectors because of where the illustrated "curvature of [Apple's] lens surface is the

greatest" (the "greatest curvature" theory), Appx04539-04541 ¶¶20-21, Appx09197-09199 ¶¶20-21.

None of these theories were in Apple's petitions, and the theories contradict Apple's expert's initial position and repeated admissions. The Board nonetheless adopted the "greatest curvature" theory without reconciling it with Apple's initial position and admissions, or Apple's many other inconsistent theories. Appx00053-00055; Appx00160-00162. To support the "greatest curvature" theory, the Board ascribed remarkable geometrical precision to Apple's figures, analyzing the figures as illustrating the "greatest curvature" "near" the detectors. *Id.* But Apple's expert refused to ascribe precision to those figures, calling them "cartoons." Appx06709-06710 20:17-21:1; Appx06893-06894 204:22-205:1.

Moreover, if anything, Apple's petition figures illustrate a "greatest curvature" well ***beyond*** the narrow detector cavities:



**Aizawa-Inokawa Combination**
**(annotated to highlight alleged "greatest curvature") (Appx00054)**

No evidence showed that the combination's "greatest curvature" was sufficiently "near" the detectors to increase light as compared to a flat surface. As shown below, Apple's many petitions illustrated different lens shapes, irrespective of the position

of any "greatest curvature" relative to the detectors, while similarly arguing the combinations would improve light collection:



**Another Aizawa-Ohsaki Combination[7]**



**Mendelson-799-Ohsaki Combination (Appx00233)**

Indeed, far from placing the "greatest curvature" "near" the detectors, the Board acknowledged Apple "borrowed" the "specific shape of the convex lens" from Nishikawa (Appx03443-03450), a ***non-ground*** reference.  Appx00056-00057; *see also* Appx00162-00164.

---

[7] *Apple Inc. v. Masimo Corp.*, No. IPR2020-01713, 2021 WL 1823926, at *9 (P.T.A.B. May 5, 2021).



**Apple's Expert's Illustration of Nishikawa's LED (Appx03056-03057 ¶99)**

Nishikawa describes an LED lens, ***not*** a lens covering multiple detectors in a physiological sensor.  Appx03443 Abstract.  No evidence explained why a POSITA would have used Nishikawa's curvature, which directs ***outgoing*** light from an LED, to design the cover of a physiological sensor monitoring ***incoming*** light.

The Board accepted that the combination adopted its shape from Nishikawa, despite ***no*** evidence of any motivation to combine Nishikawa with the other references.  Appx00057; Appx00163.  The Board cited unsupported testimony from Apple's expert that Nishikawa's lens "is intended to provide curvature in the lens where it can ***do the most good*** …."  Appx00057; Appx00163.  But that assumes some teaching of where "the most good" would be, which is nowhere in Nishikawa or any other record prior art.  Moreover, "do the most good" is not a valid motivation. *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1328 (Fed. Cir. 2012) (insufficient evidence of obviousness where expert testified "motivation to combine would be because you wanted to build something better").

Moreover, Apple's expert admitted that, even under the "greatest curvature" theory, some light rays "that would have hit the detectors" with a flat surface are "refracted away from the detectors" by a protrusion.  Appx06708-06710 19:16-21:8.  Apple's expert further admitted that light decreases exponentially when moving away from the emitter.  Appx06738-06739 49:1-50:13; Appx06746 57:10-22.  But Apple's expert provided no analysis of how this exponential decrease would affect the "greatest curvature" theory, such that a "greatest curvature" "near" the edge would have any significance at all.

Further, the Board failed to explain why the "greatest curvature" theory would have led a POSITA to place a *single* protrusion over *multiple* detectors.  If anything, a POSITA seeking to place the "greatest curvature" "near" detectors would have placed a protrusion over *each* detector to collect light to each detector, as expressly taught in the prior art.  Indeed, the examiners cited art that placed a convex surface over each detector (illustrated below[8]):

---

[8] Adapted from Chaiken (U.S. Patent No. 6,223,063).



In the reasons for allowance, the examiners found individual protrusions over individual detectors did not disclose or suggest Masimo's approach of a **single** protrusion over **multiple** detectors.   Appx02930-02931; Appx07979-07980.   No evidence explains why the "greatest curvature" theory would lead a POSITA to a **single** protrusion over multiple detectors.   If anything, the "greatest curvature" theory would instead lead to the prior art configuration illustrated above, with one lens over each detector, placing the "greatest curvature" over each detector.

The Board must "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *In re Nuvasive, Inc.*, 842 F.3d 1376, 1382 (Fed. Cir. 2016).   The Board erred by failing to do so. Indeed, adding a single protrusion would have disrupted Aizawa's approach to monitoring.   Aizawa places narrow tapered openings over its detectors to collect light reflected from arteries and uses multiple such opening/detectors to ensure at least one detector is near an artery during use, Appx03247 ¶¶[0022]-[0027]:



**Aizawa Fig. 1B (cross-sectional view, color added) (Appx03243)**



**Aizawa Fig. 1A (top-down view, color added) (*Id.*)**

As Apple's expert explained, "light has to *somehow* find those tapered openings" in Aizawa's sensor to reach the detectors. Appx05551 257:11-18.

Placing a single protrusion over *all* detectors would fundamentally disrupt Aizawa's optics by redirecting light centrally and away from the narrow openings. The Board identified no evidence explaining why a POSITA would have disregarded Aizawa's specific disclosure to use a ***flat*** plate for improved detection efficiency. Moreover, the Board identified no evidence explaining why a POSITA would have

chosen a *single* protrusion over placing individual lenses over individual openings/detectors as taught in other prior art.  It was the inventors who discovered the unexpected benefit of a single protrusion over multiple detectors in a physiological sensor.  Appx00758 20:27-29.  The Board identified no prior art that teaches such a configuration.

### e.    Inokawa and Aizawa Do Not Disclose Or Suggest The "Greatest Curvature" Theory

Apple's expert agreed that no sources he cited "discuss or provide [his] explanation regarding the impact of a convex lens on diffuse light."  Appx05591-05592 297:19-298:3.  No art of record teaches increased light collection by placing a cover's "greatest curvature" "near" a detector.

The Board examined Inokawa's Figure 2 and found that "[i]n Inokawa the lens's curvature is most pronounced at the center of the lens near the central detector."  Appx00055; Appx00162.  But Inokawa never suggests the "curvature is most pronounced at the center of the lens near the central detector."  Nor does Inokawa disclose such "greatest curvature" increases light collection, or that it would somehow increase light around the sensor's periphery, as required by the alleged motivation to combine.



**Inokawa Fig. 2 (color added) (Appx03290)**

Indeed, Apple's expert never identified any "greatest curvature" in Inokawa's Figure 2. Apple's expert testified that "the lens design in Inokawa is ***not*** actually a lens design. It's a -- just a ***cartoon*** showing the lens." Appx06907 218:15-17; *see also* Appx05635-05636 341:22-342:6 (characterizing Inokawa's and Aizawa's drawings as "cartoons"); Appx06904 215:11-13; Appx05380-05381 86:19-87:6 (Apple's expert explaining the alleged benefit of Inokawa's lens "isn't so obvious" when changing placement of detectors).

Apple's expert testified there is "***not*** enough information in [Inokawa's] drawing to identify a precise location or any particular precision around the concentration of the light." Appx05368 74:10-15. Apple's expert testified that "one would do some work" to understand the "light paths" and then choose "a particular shape which might depart from the ***cartoon*** shape" of Inokawa to "arrive at a beneficial arrangement for a particular arrangement of detectors and emitters." Appx06907-06908 218:7-219:4; *see Star Sci., Inc. v. R.J. Reynolds Tobacco Co.,*

655 F.3d 1364, 1376 (Fed. Cir. 2011) (prior art's "speculative and tentative disclosure of what might or may [cause a desired effect] does not sufficiently direct or instruct one of skill in this art").

By interpreting Inokawa in a manner unsupported by evidence and inconsistent with Apple's expert's testimony, the Board improperly "substituted its own expertise for record evidence that [patent challenger] was obligated to provide…." *Brand v. Miller*, 487 F.3d 862, 869, 870 (Fed. Cir. 2007) (reversing Board's obviousness decision).  That is error.  *See id*.

### f.    The "Greatest Curvature" Theory Would Not Have Been Within The Knowledge Of A POSITA

The Board found that a POSITA was a "person having a B.S. in an academic discipline emphasizing electrical, computer, or software technologies, and two years of related work experience with data collection."  Appx00063; *see also* Appx00116.  This description of a POSITA's knowledge includes *no* specialized education or work experience in optics, much less optics for physiological monitoring.

The Board nonetheless found that "a POSITA would have understood a lens operates by increasing the light concentration most where the curvature of the lens is the *greatest*," simply describing that as a "*general* concept of optics."  Appx00062-00063; Appx00167.  But no references show the "greatest curvature" theory is even a valid optics theory, much less a "general concept of optics" known to a POSITA with *no* optics training.  Any such concept was apparently unknown to

Apple and its expert when Apple filed its petitions, which did not mention that theory. Apple and its expert instead relied on the straightforward understanding that a protrusion acts as a lens and concentrates light towards the **center**. *See, e.g.,* Appx05498 204:1-20; Appx05377-05378 83:15-84:2; Appx05380-05381 86:19-87:1. Despite decades of lens research cited by Apple, the Board and Apple cited no example where a POSITA increased light in a physiological sensor at peripheral detectors under a single protrusion. *See Brand*, 487 F.3d at 869-70 ("[T]he path that the Board determined that a skilled artisan would follow has, so far as the record reflects, never been followed.").

Accordingly, the Board erred in finding a POSITA would have been motivated to add a single protrusion over multiple peripheral detectors in a physiological sensor. This fundamental flaw exists in and undermines **all** combinations in **all** eight IPRs.

### 2. The Board's Finding That Ohsaki Would Have Motivated A POSITA To Add A Protrusion To Aizawa's Sensor To Increase Adhesion Is Unsupported By Substantial Evidence

Apple's petitions in IPR1520 and IPR1521 also argued that Ohsaki would have motivated a POSITA to add a protrusion to Aizawa's sensor to improve "adhesion."[9] Even if such a motivation existed, however, nothing showed this

---

[9] Apple's petitions included only three pages addressing this combination, with one page of substantive analysis. Appx01931-01934; Appx07001-07004.

motivation would have led a POSITA to create an optically *flawed* sensor that directs light *away* from its peripheral detectors.    *See supra* Sections VII.A.1.b-c. Regardless, the Board's "adhesion" motivation directly contradicts the express disclosures of *both* Ohsaki and Aizawa.

### a.    The Board's "Adhesion" Motivation Contradicts The Teachings Of Aizawa And Ohsaki

Aizawa's sensor operates by detecting pulse signals close to arteries on the wrist's *palm-side* (below left).    Appx03242-03243 Abstract, Figs. 1A-1B; Appx03246-03247 ¶¶[0013], [0023], [0026].  Aizawa specifically discloses the use of a *flat* plate to improve adhesion.  *Id.*



**Aizawa Fig. 2 (Appx03244)**
**palm-side sensor with flat plate for**
**adhesion**

**Ohsaki Fig. 1 (Appx03353)**
**backhand-side sensor with**
**protruding board to prevent**
**slippage**

Ohsaki's sensor (above right) takes a different approach.  Ohsaki's sensor monitors signals from the wrist's backhand side (i.e., watch side), far from the arteries. Appx03356 ¶¶[0022]-[0023]; Appx03354 Figs. 3A-3B.    Ohsaki includes no

teaching of "adhesion" and instead merely observes that its protrusion when placed on the wrist's backside sits in "intimate contact" with the skin. Appx03352 Abstract. Ohsaki further teaches, however, that using a protrusion on the *palm-side* causes "a tendency to *slip off*" the user's wrist during motion. Appx03356 ¶[0023]. Indeed, Ohsaki illustrates with Figures 3A-3B undesirable variation in a sensor signal when using its protrusion on the wrist's palm-side, which is where Aizawa's sensor must be placed to be close to arteries. *Id.* ¶¶[0023]-[0024]; Appx03354.



**Ohsaki Figs. 3A (protrusion on backhand side), 3B (protrusion on palm-side)**

Apple's expert confirmed Ohsaki's Figures 3A and 3B show the poor performance of Ohsaki's protrusion on the palm-side. Appx05903-05904 157:6-158:1. Apple's expert also confirmed the protrusion would cause slippage on the palm-side. Appx05904-05905 158:21-159:11.

Accordingly, as Masimo's expert explained, a POSITA reviewing Ohsaki would ***not*** have been motivated to add a protrusion to Aizawa's ***palm-side*** sensor to improve adhesion when (1) Aizawa teaches that a ***flat*** plate improves adhesion on the wrist's palm-side; and (2) Ohsaki nowhere mentions adhesion and, if anything, teaches that a protrusion on the palm-side results in ***slippage***. Appx05245-05248 ¶¶93-95; Appx10382-10385 ¶¶93-95; *see also Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1369 (Fed. Cir. 2012) (where "each device independently operates effectively, a person having ordinary skill in the art, who was merely seeking to create a better device … would have no reason to combine the features of both devices into a single device.").

### b.  <u>The Board Made Numerous Errors In Finding Obviousness Based On Aizawa And Ohsaki</u>

In finding otherwise, the Board made numerous errors. First, the Board's analysis never addressed or accounted for Ohsaki's disclosure that its protrusion has a "tendency to slip off" on the wrist's palm-side.[10] Appx03356 ¶[0023]. That is error. *See Chemours Co. v. Daikin Indus.*, 4 F.4th 1370, 1376 (Fed. Cir. 2021) (reversing where Board did not "adequately grapple" with why POSITA would have made modification given prior art's express disclosure); *Polaris Indus. v. Arctic Cat,*

---

[10] The Board quoted Masimo's argument quoting this portion of Ohsaki in its summary of the parties' positions. Appx00068; *see also* Appx00171. However, the Board did not address this portion of Ohsaki in its analysis. Appx00070-00073; *see also* Appx00171-00172.

*Inc.,* 882 F.3d 1056, 1069 (Fed. Cir. 2018) ("a reference 'must [be] considered for all it taught, [including] disclosures that diverged and taught away from the invention at hand'").

Second, the Board erroneously dismissed Ohsaki's Figures 3A-3B, reasoning that, because Ohsaki's "tested device incorporates a convex protrusion in both instances, Figures 3A-3B," Ohsaki does not show that a convex protrusion would provide ***no*** benefit on the palm-side.   Appx00071-00072; *see also* Appx00171-00172.  But it was ***Apple's*** burden to show Ohsaki ***disclosed*** some benefit to using a protrusion at Aizawa's palm-side location.   By requiring Masimo to prove that Ohsaki's protrusion would have ***no*** benefit on the palm-side, the Board improperly shifted the burden to Masimo.  *See In re Magnum Oil Tools Int'l, Ltd.,* 829 F.3d 1364, 1377 (Fed. Cir. 2016) (reversing where Board "improperly shifted the burden to [the patentee]").  Apple's expert never rebutted Masimo's expert's interpretation of Figures 3A-3B. *See Wireless Protocol Innovations*, *Inc. v. TC Mobile, Inc.,* 771 F. App'x 1012, 1017 (Fed. Cir. 2019) (nonprecedential) (reversing for lack of substantial evidence where "the Board cited no reasonable support for its reading of Figure 9").

A POSITA reviewing Ohsaki, including Figures 3A-3B, would have found no reason to place Ohsaki's protrusion on a palm-side sensor.  Indeed, Ohsaki directly connects Figure 3B with its teaching that a protrusion on the palm-side has a

"tendency to slip." Appx03356 ¶[0023]. Ohsaki first explains the benefits of measuring on the wrist's palm-side, explaining (consistent with the proximity to blood-filled arteries) that the received light would be greater. *Id.* Ohsaki then explains, however, that on the palm-side:

> *the detecting element 2 has a tendency to slip off the detecting position of the user's wrist 4 as the user moves his/her wrist*, and therefore the intensity of the light received by the light receiving element 7 largely varies depending on the shift amount of the detecting element 2. *As shown in FIG. 3B*, in the case that the detecting element 2 is arranged on the front side of the user's wrist 4, the pulse wave can be detected well if the user is at rest. However, *when the user is in motion, the detected pulse wave is adversely affected by the movement of the user's wrist 4*.

*Id.* A POSITA would have read Ohsaki as a whole and understood that Ohsaki (and specifically Figure 3B) teaches the undesirability of placing a protrusion on the palm-side.

Third, the Board found that Ohsaki's protrusion may provide some benefit "if the user is at rest." Appx00172.[11] But that is grasping for a path to the claims. The motivation to combine Ohsaki with Aizawa was to supposedly improve adhesion. Appx00174. No evidence supported that adhesion was a problem when the user is at *rest*. Indeed, in IPR1537 discussed below, the Board acknowledged a POSITA reviewing Ohsaki would have focused on user movement, finding that a POSITA

---

[11] The Board included this rationale in IPR1521, but not IPR1520.

"would have understood that a protruding convex cover would reduce the ***adverse effects of user movement*** on signals…." Appx00325.

Fourth, the Board reasoned Apple's "proposed modification does not dictate any particular placement, whether on the palm side or back side of the wrist." Appx00171.[12]    But that reasoning disregards Apple's cited art and actual combination.  Apple's asserted motivation was to "apply a cover with a convex surface to ***Aizawa*** to improve ***that*** similar device in the same way and to yield predictable results…." Appx00173.  There was no dispute that Aizawa's sensor with a flat plate was designed for the wrist's ***palm-side***.  *See* Appx00070 (proposed motivation was that a POSITA would have been motivated to "help prevent slippage of ***Aizawa's detector*** 1 on the ***user's wrist***, based on Ohsaki").  And whatever the combination, Aizawa's sensor monitors arteries that Aizawa illustrates are accessible on the wrist's palm-side.  Appx03247 ¶¶[0026]-[0027]; Appx05247-05248 ¶95; Appx10384-10385 ¶95.  "What matters is the path that the person of ordinary skill in the art would have followed, as evidenced by the pertinent prior art," *Univ. of Strathclyde v. Clear-Vu Lighting LLC*, 17 F.4th 155, 165 (Fed. Cir. 2021), not Apple's description of its own combination, using the claims as a guide.

Fifth, the Board erroneously suggested that Masimo had attempted "to limit" Ohsaki's "disclosures" to a "particular context" of a longitudinal protrusion on the

_____

[12] The Board included this rationale in IPR1521, but not IPR1520.

wrist's backside. Appx00071; *see also* Appx00171. But that is incorrect. Ohsaki itself explains how its longitudinal structure is positioned on the wrist's backside, and that its protrusion slips on the palm-side. Appx03356 ¶¶[0019], [0023]-[0024]. It was ***Apple's*** burden to show a POSITA would have nonetheless seen a benefit to using Ohsaki's longitudinal shape at Aizawa's palm-side measurement location where (1) Ohsaki says its protrusion slips and (2) Aizawa says a ***flat*** plate provides improved adhesion. Appx03356 ¶[0023]; Appx03246 ¶[0013]. *See Chemours*, 4 F.4th at 1376 (reversing where Board relied on reasoning that prior art reference not clearly limited to particular disclosure rather than why POSITA would have been "motivated to" alter the reference).

Sixth, the Board developed its own theory that Aizawa's "improved adhesion is provided by the ***acrylic*** material … not the flat surface." Appx00072; *see also* Appx00173. But that is not what Aizawa discloses, Apple never argued that, and Masimo never had any opportunity to address that theory before the Board. The "Board must base its decision on arguments that were advanced by a party, and to which the opposing party was given a chance to respond." *In re Magnum Oil Tools*, 829 F.3d at 1381; *Alacritech, Inc. v. Intel Corp.*, 966 F.3d 1367, 1372 (Fed. Cir. 2020) (Board erred where its "reasoning appear[ed] to be untethered to either party's position").

The Board's "acrylic-material" theory also directly contradicts the evidence. Apple's expert never opined that Aizawa teaches acrylic improved adhesion—Apple's expert testified that "Aizawa describes the use of a, of a ***cover*** to reduce slippage." Appx06946 257:1-2. Apple's expert testified that a POSITA "would understand that you can obtain the benefits associated with Aizawa" by using "materials, including acrylic ***and*** a number of ***other*** optical transparent plastics." Appx05426-05427 132:19-133:9. Apple's expert further argued Aizawa's "plate is described as a plate-like member. It ***doesn't*** explicitly require the use of acrylic." Appx05428 134:9-14. Aizawa's teaching is clear that the improved adhesion is due to the shape of its flat plate—not the material. Appx03246 ¶[0013]. Aizawa states:

> According to a fifth aspect of the present invention, there is provided a pulse sensor, wherein a transparent ***plate-like member*** is provided on a portion including at least the light emitting face and the light receiving faces of the contact face. ***This makes it possible to improve adhesion*** between the sensor and the wrist and thereby further improve the detection efficiency of pulse waves.

*Id*.

Seventh, the Board "credited" Apple's expert's testimony on reply that a protrusion improves adhesion "even in Aizawa's arrangement" because the protrusion will allegedly "physically extend[] into the tissue and displac[e] the tissue…." Appx00072 (quoting Appx04557-04559 (Ex. 1047) ¶52).[13]   But that

---

[13] The Board included this rationale in IPR1520, but not IPR1521.

testimony contradicts ***both*** (1) Aizawa, which teaches that a ***flat*** plate on the wrist's palm-side improves adhesion and (2) Ohsaki, which teaches that its protrusion on the palm-side results in slippage. Unsupported expert testimony that contradicts the prior art is not substantial evidence. *See Ericsson Inc. v. Intellectual Ventures I LLC,* 890 F.3d 1336, 1346 (Fed. Cir. 2018)*.*

Eighth, the Board erred by failing to address Ohsaki's emphasis on longitudinal directionality. Specifically, Ohsaki states its longitudinal directionality must be oriented with the longitudinal direction of the user's arm to reduce slippage. Appx03356 ¶[0019]. The Board's combination changes Ohsaki's longitudinal structure into a ***circular*** structure to fit Aizawa's circular sensor. Appx05245-05248 ¶¶93-95; Appx10382-10385 ¶¶93-95. Apple's expert admitted a circular structure has ***no*** longitudinal directionality. Appx05911-05912 165:20-166:5. Accordingly, the Board's "adhesion" motivation contradicts both Ohsaki and Aizawa and does not support the Board's obviousness holding.

### 3. The Board's Finding That Inokawa Would Have Motivated A POSITA To Add A Protrusion To Mendelson-1988's Sensor To Increase Light Collection Is Unsupported By Substantial Evidence

The Board also found that Inokawa would have motivated a POSITA to add a protrusion to a forehead sensor in a different reference, Mendelson-1988, to increase light collection. Appx00090; Appx00083; Appx00187-00188. The Board stated its "reasoning [was] substantially identical to the analysis provided above in

connection with Ground 1A, with Mendelson-1988 replacing Aizawa in the combination." Appx00090-00091; Appx00188-00189. The Board's decision lacks substantial evidence for the same reasons as those identified above with respect to Aizawa and Inokawa. *See supra* Section VII.A.1. Mendelson-1988's sensor—like Aizawa's sensor—has ***peripheral*** detectors positioned around a central light source. Appx03359-03360. No evidence suggests a POSITA would have been motivated to place Inokawa's lens over the multiple peripherally-located detectors in Mendelson-1988's forehead sensor. Indeed, Mendelson demonstrates why placing a protrusion on Mendelson-1988's sensor would have contradicted decades of the thinking in the field. *See* Appx15586-15587 2:47-53, 3:27-67. Mendelson explained that placing pressure on tissue would result in "large errors" because blood near superficial layers of the skin may be displaced from the sensor housing. *Id.* A protrusion would also cause discomfort when used in a "headband or helmet"—Mendelson's preferred measurement location. Appx23200-23201.

### 4. The Board Also Erred In Finding That A POSITA Would Have Had A Reasonable Expectation Of Success

The Board also erred in finding that a POSITA would have had a reasonable expectation of success. Appx00056; Appx00062-00063; Appx00167. Apple's expert declarations focused on whether the proposed combinations' protrusion could be manufactured. Appx03056-03057 ¶99; Appx08105-08106 ¶96. Apple's expert never explained why a POSITA would have reasonably expected the combination

to result in an effective physiological optical sensor, as claimed.  Appx05233-05234 ¶75; Appx10370-10371 ¶75.

Indeed, the Board did not rely on those expert declarations regarding a "reasonable expectation of success."  Instead, the Board cited Apple's new "greatest curvature" theory.  *See* Appx00062-00063; Appx00167.  As discussed, the "greatest curvature" theory is unsupported and contrary to Apple's and its expert's admissions.  *See supra* Section VII.A.1.c-d.  Those admissions undermine any finding of a reasonable expectation of success.

As discussed, Apple's expert argued that a convex lens would direct light toward the center, while Apple's combination places the detectors on the periphery.  Appx05497-05498 203:3-204:20.  Apple's expert also eventually asserted many other theories not found in Apple's petitions, including that a convex lens would capture some light otherwise not captured.  Appx05498-05499 204:21-205:12.  But Apple's expert could not say how a POSITA would have balanced the effects of the "additional light-capture" theory with the convex surface's ordinary light ***condensing*** function that directs light away from the peripheral detectors.  Apple's expert testified that "[t]here isn't a simple answer to that," Appx05500-05501 206:22-207:10, and the impact "would depend on the ***details*** of the curvature design."  Appx05499-05500 205:13-206:5.  Apple's expert admitted he presented no such details or reasoning in his declarations.  Appx05501-05502 207:11-208:1.

Apple's expert also testified at length that whether a convex shape would provide a benefit depends on numerous complex factors, including (1) lens shape, (2) lens thickness, refractive index, and curvature, (3) lens length, (4) location of the sensor elements (including the LEDs and the detector), (5) corpuscles location and depth, and (6) depth of light in the tissue. Appx05604-05605 310:18-311:9; *see also* Appx05394-05395 100:17-101:18; Appx05391 97:11-21 (a "convex lens may concentrate light in ***many different locations***"); Appx05448 154:4-7 (one must know "the ***exact location*** of the reflecting corpuscles"). But Apple's expert performed no analysis balancing the many above factors. Appx05345-05346 51:21-52:16; Appx05387-05388 93:16-94:15; Appx05394-05395 100:17-101:18. Apple's expert also admitted he has never designed an optical physiological sensor and could not recall ever analyzing the impact a particular modification would have on optics. Appx06093-06098 347:14-352:18.

Apple's expert further admitted the purported benefit of Inokawa's lens would ***not*** be "obvious" when applied to a different sensor with, *e.g.*, peripheral detectors and a central emitter. Appx05380-05381 86:19-87:6. Apple's expert could not even explain the impact of a slight change in detector positioning on signal strength in the combination: "So it's ***not obvious*** because part of the answer depends on the depth of the likely location of the corpuscles that are going to provide the diffuse reflection

… [*C*]*ould* be true.  It *might not be*. It would depend on the other dimensions." Appx05625-05626 331:19-332:11.

When asked to explain why the curvature in Apple's combination extends far beyond the detectors, Apple's expert denied his figure showed any precision and agreed a POSITA "looking at Nishikawa and Inokawa and Aizawa might end up with a *number of different lens shapes*."  Appx05482-05483  188:13-189:10. Apple's expert testified a POSITA would engage in "*trial and error* trying out different shapes, different detector positions, different spacings and so on." Appx05483-05484 189:20-190:13.  Apple's expert explained that a POSITA would engage in a complicated light path analysis (called a "ray trace analysis") to arrive at a lens shape, but provided no such analysis. *Id*.  Apple's expert opined the process was "not *impossible*."  Appx05630-05631 336:11-337:15.

Moreover, "a *clear*, evidence-supported account of the contemplated workings of the combination is a prerequisite to adequately explaining and supporting a conclusion that a relevant skilled artisan would have ... reasonably expect[ed] success." *Personal Web Techs., LLC v. Apple, Inc.*, 848 F.3d 987, 994 (Fed. Cir. 2017).  No such "clear evidence-supported account" exists here.

Apple's expert repeatedly refused to clearly describe the combination. Appx05345-05346  51:14-52:16;  Appx05369-05371  75:20-77:2;  *see  also* Appx05627-05629 333:20-335:4.  Rather, Apple's expert testified that "[i]f I was

asked to analyze the optical performance of a system like this, I would need to know precisely the shapes and the tolerances around those shapes, the position of the elements, the detectors, the emitters and so on," and "there's tolerances around all of that," "[a]nd *then* an analysis can be done." Appx05345-05346 51:21-52:16. The Board erred in finding a reasonable expectation of success, and the Board's finding is unsupported by substantial evidence.

### 5. Under The "Greatest Curvature" Theory, No Evidence Establishes Invalidity Of '265 Patent Claims 12 And 14

Claims 12 and 14 of the '265 patent require that "the light permeable cover is configured to reduce a ***mean path length*** of light traveling to the at least four detectors." Appx00771. As evidence of reduced mean path length, the petition and original expert declaration in IPR1520 correctly explained that a convex surface condenses light toward the center. *See supra* Section VII.A.1.c.



**Apple's Illustrations of Light-Redirection (Appx01922)**

As discussed, however, the Board did ***not*** accept these admissions and instead embraced Apple's new "greatest curvature" theory. *See supra* Section VII.A.1.c. Under the "greatest curvature" theory, Apple's expert never explained how the

combination's cover would reduce the mean path length of light. Instead, Apple's expert analyzed these dependent claims by opining that "refraction of the incoming reflected light can shorten the path of the light before it reaches the detector. This is because the incoming light *is 'condensed' toward the center*…." Appx03068-03070 ¶¶119-120. Absent that condensing analysis, nothing explains how the protrusion in the combination would reduce the mean path length.

In IPR1520, the Board never squared its "greatest curvature" theory with the requirements of claims 12 and 14. In IPR1536, IPR1537, IPR1538, IPR1539, IPR1714, and IPR1715, discussed below, the Board found Apple's expert's analysis of "mean path length" in IPR1520 was for "a *single* ray of light" rather than "the aggregate effect on *all* light that travels through the convex surface." *See, e.g.,* Appx00245 (emphasis original). But that merely confirms that no evidence supports the invalidity of claims 12 and 14. Under the Board's interpretation, Apple's expert presented *no* analysis of how the combination satisfies the claim language, which requires a reduced path length of light on *average*. Indeed, Apple's expert agreed that "a mean path length mean[s] the same as an average path length." Appx05492 198:6-11. Accordingly, under the Board's "greatest curvature" theory, this Court should reverse the Board's holdings as to claims 12 and 14 in IPR1520 as unsupported.

6.    **This Court Should Also Reverse The Board's Obviousness Findings Based On Aizawa And Inokawa Because Neither Reference Discloses Every Claim Limitation**

Every claim in IPR1520 and IPR1521 requires (1) a plurality of emitters and (2) at least four detectors. Appx00770-00771; Appx00868-00869. To attempt to satisfy these claim limitations in one ground, the Board combined Aizawa and Inokawa, which do not disclose both multiple emitters ***and*** at least four detectors in the same sensor. Appx00104-00105; Appx00195-00196; Appx05237-05238 ¶79; Appx10374-10375 ¶79. Inokawa discloses a sensor with two emitters and one detector. Appx03282 ¶[0058]. Aizawa ***alternatively*** discloses a sensor with ***either*** (1) multiple emitters and one detector, ***or*** (2) one emitter and multiple detectors. Appx03247-03248 ¶¶[0032]-[0033]; Appx03243-03245; Appx05238 ¶80; Appx10375 ¶80.

The Board thus erred in finding obviousness based on Aizawa and Inokawa for this independent reason. The Board should "consider motivation to combine and reasonable expectation of success ***only*** 'if all the elements of an invention are found in a combination of prior art references.'" *PAR Pharms., Inc. v. TWI Pharms., Inc.*, 773 F.3d 1186, 1194 (Fed. Cir. 2014).

The Board found a POSITA's "ordinary creativity" supplied the missing limitation. Appx00035-00036; Appx00140-141. But "[o]rdinary creativity" cannot satisfy "a limitation missing from the prior art references specified." *DSS Tech.*

*Mgmt., Inc. v. Apple Inc.*, 885 F.3d 1367, 1377 (Fed. Cir. 2018). The Board also pointed to Inokawa, reasoning that Inokawa would have motivated a POSITA to add an LED to Aizawa's multi-detector/single-emitter embodiment to measure "body *motion*." Appx00022; Appx00135. But Aizawa already provides a "device for computing the amount of *motion* load from the pulse rate." Appx03246 ¶[0015]; Appx05240 ¶84; Appx10377 ¶84. Thus, Inokawa does not add functionality to Aizawa's sensor that addresses body motion. Where two devices "independently accomplish similar functions," a POSITA has no reason to "combine the features of both devices into a single device." *Kinetic Concepts,* 688 F.3d at 1369.

In IPR1520, the Board cited paragraph 77 of Apple's expert's declaration to find that a second LED would "help *better* isolate the desired pulse data." Appx00030-00031. But Apple's expert's sole support for that conclusory assertion was non-combination reference Nanba (Appx03313-03333). *Id*. The Board correctly found that Nanba (like Aizawa) corrects motion with "only a *single* light emitting element," and thus "provides *very little (if any) support* for the testimony in paragraph 77." *Id*. Unsupported and conclusory expert testimony does not establish obviousness.

The Board also found a POSITA would have been motivated to add an LED to Aizawa's sensor to communicate data as disclosed in Inokawa. Appx00032;

Appx00137-00138.  But Inokawa's sensor transmits information by LED light to a base device:



**Inokawa Fig. 3 (color added) (Appx03290)**

In contrast, Aizawa's sensor uses a ***wireless*** transmitter.  Appx03247-03248 ¶¶[0023], [0028], [0035]; Appx05240-05242 ¶¶85-86; Appx10377-10379 ¶¶85-86. Apple's expert admitted that Aizawa's sensor is for ***real-time*** heart rate measurements during exercise.  Appx05696 402:6-11; Appx03058 ¶101.  Inokawa's sensor cannot transmit data during physiological monitoring because it transmits data only when removed from the wrist and "mounted onto the base device."  *See, e.g.*, Appx03272 Abstract; Appx05699 405:2-7; Appx03290-03291 Figs. 3, 8; Appx05241-05242 ¶86; Appx10378-10379 ¶86.  A POSITA would not have replaced Aizawa's real-time monitoring and data transmission with Inokawa's cumbersome base-station approach.  *See Black & Decker, Inc. v. Positec USA, Inc.,* 646 F. App'x 1019, 1027 (Fed. Cir. 2016) (nonprecedential) (reversing Board's obviousness decision where "proposed modification" to device "seem[ed] to run

counter to the intended purpose"). Accordingly, this Court should reverse the Board's combination of Aizawa and Inokawa for this independent reason, which would render patentable '265 patent claims 3, 6-13, and 16 in IPR1520.

**B.     The Board's Obviousness Holdings In IPR1537, IPR1539, And IPR1715 Are Erroneous And Unsupported By Substantial Evidence**

The Board found in IPR1537, IPR1539, and IPR1715 that Ohsaki would have motivated a POSITA to add a protrusion to Aizawa's sensor to (1) improve adhesion (and thereby increase detection efficiency) and (2) provide protection. Appx00323-00324; Appx00478-00479; Appx00641. The Board's findings are similar to those in IPR1520 and IPR1521 discussed above and lack substantial evidence for the same reasons. *See supra* Section VII.A.2. The Board's combination again places a single protrusion over multiple ***peripheral*** detectors in a physiological sensor. As discussed, a POSITA would have expected the combination's protrusion to ***decrease*** light collection and performance. *See supra* Sections VII.A.1.b-d. Masimo addresses below Board findings in IPR1537, IPR1539, and IPR1715 that further undermine the Board's obviousness determinations.

**1.     The Board's Finding That A POSITA Would Have Added A Protrusion To Aizawa's Sensor To Improve Adhesion Is Unsupported By Substantial Evidence**

Aizawa expressly discloses its ***flat*** plate improves adhesion and detection efficiency. *See supra* Section VII.A.2.a. Because Aizawa already expressly addresses adhesion with its flat plate, a POSITA would have no reason to ignore

Aizawa's teaching and instead incorporate Ohsaki's protrusion. *See Kinetic Concepts*, 688 F.3d at 1369. This is especially true because Ohsaki teaches its protrusion *slips* on the wrist's palm-side—the measurement location required by Aizawa's principle of operation. *See supra* Section VII.A.2.a. None of the Board's findings in IPR1537, IPR1539, and IPR1715 change that conclusion.

First, the Board found that the improved adhesion from incorporating a protrusion on Aizawa's sensor would have *also* "increased the signal strength of the sensor." Appx00324; Appx00479; Appx00641. As discussed, however, Ohsaki would *not* have motivated a POSITA to add a protrusion in the first place, regardless of whether such improved adhesion would purportedly also increase "signal strength." *See supra* Section VII.A.2.a. Moreover, Ohsaki nowhere states that its protrusion improves "signal strength." Appx03356 ¶¶[0023]-[0025]. The Board repeatedly treated "signal strength" as synonymous with "detection efficiency," without explaining why these concepts are purportedly the same. Moreover, Ohsaki nowhere discusses "signal strength" or "detection efficiency." The only reference that mentions either term is Aizawa, which expressly teaches its *flat* plate improves detection efficiency. Appx03246 ¶[0013]. The Board identified no reason Aizawa's flat-plate approach, disclosed as already providing improved detection efficiency, would be insufficient and should be replaced with a protrusion that Ohsaki says slips at Aizawa's measurement location.

The Board also conflated "signal strength," which refers to the magnitude of a signal, with "signal quality," which refers to the amount of noise in a signal. *Compare* Appx00324 *and* Appx00330 *with* Appx00331; *Compare* Appx00479 *and* Appx00484 *with* Appx00486.    The Board's inconsistent and unsupported descriptions of its motivation to combine further demonstrate the Board's decisions lack substantial evidence.    *See Align Technology, Inc. v. Clearcorrect Operating, LLC*, 745 F. App'x 361 (Fed. Cir. 2018) (nonprecedential) (vacating where Board relied on "motivation to secure 'precise teeth movement'" but had "not explained adequately what 'precise teeth movement' means").

Second, the Board disregarded Masimo's unrebutted expert testimony explaining why Ohsaki's longitudinal shape is effective—it anchors in an opening between two bones.    Appx25942-25945 ¶¶54-57; Appx40348-40351 ¶¶54-57; Appx54796-54799 ¶¶54-57.    In contrast, a circular sensor would interact with the user's bones, which Ohsaki warns against and Masimo's expert explained would result in slipping.    *Id*.; Appx03355 ¶[0006].



**Illustration of Rectangular/Circular Sensor on Wrist's Backside (*Id.*)**

The Board relied on its own unsupported interpretation of Masimo's drawings, finding that a circular sensor "would *also* avoid the bones in the forearm if it were slightly smaller," and there was no reason "that such a large sensor would have been required."  Appx00328-00329 (emphasis original); Appx00483; Appx00645-00646.  But Apple never argued that.  The "Board must base its decision on arguments that were advanced by a party, and to which the opposing party was given a chance to respond."  *In re Magnum Oil Tools* , 829 F.3d at 1381.

Moreover, Masimo's illustrated circular sensor (below left) is similar in shape and size to the circular sensor illustrated in Aizawa's Figure 2 (below right):



No evidence shows an artisan would reduce Aizawa's sensor size. Indeed, the art teaches that a 20 mm diameter sensor—approximately the size pictured above—is "small." Appx23200-23201; *see also* Appx25906-25907; Appx37370-37371.

Third, the Board found that Apple does not "propose bodily incorporating the references" and Apple's "proposed modification does not dictate any particular placement, whether on the palm side or back side of the wrist." Appx00330; Appx00485; Appx00647-00648. But the Board, Apple, and Apple's expert characterized the combination as incorporating Ohsaki's protrusion on Aizawa's sensor for use on the palm-side. *See, e.g.,* Appx00319 (the Board summarizing Apple's reply argument as "Ohsaki's disclosure that a convex surface suppresses variation in reflected light would have motivated an artisan to add such a surface to Aizawa to improve detection efficiency of that sensor when placed on ***the palm side***"); Appx00329 (the Board agreeing that "Ohsaki's teaching of a convex surface would have motivated a [POSITA] to add such a surface to Aizawa's circular-shaped

sensor….”); Appx22905-22906 ¶91 (“incorporating Ohsaki's convex surface is simply improving Aizawa-Inokawa's transparent plate 6….”). The Board's suggestion that the combination could be placed anywhere is directly contrary to Aizawa, which places its sensor over arteries on the wrist's palm-side to “detect a pulse wave accurately.” Appx03247 ¶[0027].

## 2. The Board's Finding That A POSITA Would Have Added A Protrusion To Aizawa's Sensor To Protect Sensor Elements Is Unsupported By Substantial Evidence

The Board also found that a POSITA would have been motivated to add a protrusion to Aizawa's sensor to provide “protection.” Appx00323-00324; Appx00478-00479; Appx00641. But there was no dispute that Aizawa's flat plate already provided protection. Appx03243 Fig. 1B. Indeed, the Board found: “We are persuaded that adding a convex cover, such as that taught by Ohsaki, would also protect the sensor's internal components *in a manner similar to* Aizawa's flat acrylic plate.” Appx00337; Appx00491; Appx00653-00654. The Board further acknowledged “[t]hat a convex cover may be *more* prone to *scratches* than Aizawa's flat cover….” Appx00492; Appx00654; *see also* Appx00337-00338. The Board reasoned that scratching “is one of numerous tradeoffs that a [POSITA] would consider in determining whether the benefits of increased adhesion, signal strength, and protection outweigh the potential for a scratched cover.” Appx00337-00338; Appx00492; Appx00654. But that analysis uses the claims as a guide, and sidesteps

the relevant question: why would a POSITA seeking to protect Aizawa's sensor elements change Aizawa's flat cover (which already provided protection) to a shape prone to scratches and slipping?  The Board's decisions contain no answer—only hindsight.

### 3.    The Board's Finding That A POSITA Would Have Had A Reasonable Expectation Of Success Is Unsupported By Substantial Evidence

The Board again identified no substantial evidence of a reasonable expectation of success.  Instead, the Board accepted "Dr. Kenny's testimony that, for each proposed modification, the combined prior art teachings would have been applied as known, to achieve predictable results."  Appx00501; Appx00663-00664; *see also* Appx00324-00325.  Such "'conclusory statements and unspecific expert testimony' are insufficient to support the Board's findings." *DSS Tech.,* 885 F.3d at 1377.  The Board also ignored Apple's expert's contrary testimony regarding the complexity of designing a physiological sensor.  *See supra* Section VII.A.4; *see also* Appx06882-06884  193:17-195:5.    Apple's expert again provided no "clear evidence-supported account" of the contemplated combination. *See Personal Web*, 848 F.3d at 994.

**4.** **The Board's Holdings That Particular Protrusion Heights Would Have Been Obvious Are Erroneous And Unsupported By Substantial Evidence**

Claims 11, 17, and 28 of the '554 patent (in IPR1539), and claims 12, 18, and 29 of the '765 patent (in IPR1715) recite specific protrusion height ranges of greater than 1 or 2 millimeters and less than 3 millimeters, which the inventors found were surprisingly effective. Appx00758 20:29-33. The Board acknowledged that "*none* of Aizawa, Inokawa, Ohsaki or Mendelson-2006 teach the claimed range." Appx00504; Appx00666-00667.

Rather than point to any disclosure or suggestion of a particular protrusion *height*, Apple's expert pointed to a sensor housing with a *diameter* of 22 mm in one non-combination reference, and a sensor housing with a *length/width* of 19 mm in another. Appx37119 ¶275; Appx50680-50681 ¶160. As Masimo's expert explained, those non-combination references disclose forehead sensors, not wrist sensors. Appx40397-40398 ¶124; Appx54845-54846 ¶124. No evidence explained why the diameter or length/width of such forehead sensors would inform the protrusion height for the wrist-worn combination.

The Board nonetheless found Masimo's protrusion height ranges obvious, stating that "a finite number of solutions existed...." Appx00503-00504; Appx00665-00667; *see also* Appx00507-00508. But neither the Board nor Apple's expert identified any purported "finite number" of protrusion heights, much less

evidence of what the heights would be. Apple's expert testified he did not ***know*** Ohsaki's shape or dimensions. *See* Appx05816-05818 70:20-72:20 (unable to "assert that the shape [of Ohsaki's board] was necessarily circular or square or rectangular"); Appx05841 95:8-18; Appx05851-05852 105:1-106:5 (Ohsaki "doesn't ever state ***dimensions***, thicknesses, things like that"); Appx05857 111:3-10; Appx05876-05877 130:13-131:16 ("there's nothing that tells me anything in particular about the shape or ***dimensions*** of the cover, this translucent convex cover"); *see also* Appx05786-05787 40:7-41:16; Appx05794-05795 48:19-49:21; Appx05803-05804 57:18-58:16; Appx05806-05807 60:4-17, 60:18-61:21.

Apple's expert also emphasized the complexity of designing a physiological sensor, which depends on numerous choices and considerations, including the optics and intended sensor location. *See supra* Section VII.A.4. Apple's expert testified there is a "***universe*** of possible design choices." Appx05394-05395 100:17-101:6.

"Merely stating that a particular placement of an element is a design choice," as the Board did here, "does not make it obvious. The Board must offer a reason for why a person of ordinary skill in the art would have made the specific design choice." *Cutsforth, Inc. v. MotivePower, Inc.*, 636 F. App'x 575, 578 (Fed. Cir. 2016) (nonprecedential). One may not "simply retrace[] the path of the inventor with hindsight, discount[] the number and complexity of the alternatives, and

conclude[] that the invention ... was obvious." *Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*, 520 F.3d 1358, 1364 (Fed. Cir. 2008).

**5.    The Board's Reliance On Four References To Arrive At The Claimed Invention Is Unsupported By Substantial Evidence**

Claims 7, 8, and 19 of the '553 patent (in IPR1537) require communication of measurement information to a touch-screen display or mobile phone. Appx00972.  Claims 1, 20, and their dependent claims of the '554 patent (in IPR1539), Appx01074-01076, and claims 1, 21, and their dependent claims of the '765 patent (in IPR1715), Appx01177-01179, require "a handheld computing device in wireless communication with the physiological sensor device."

To address these claims, the Board combined four references, adding Mendelson-2006 (Appx23200-23203) to the Aizawa-Inokawa-Ohsaki combination. Appx00356; Appx00512; Appx00673.  But the Board relied on circuitous reasoning.

First, as discussed, the Board reasoned that a POSITA would have replaced Aizawa's wireless transmitter with Inokawa's cumbersome base-station approach. *See supra* Section VII.A.6.  That replacement makes no sense because Aizawa's sensor already includes a wireless transmitter to display real-time measurements. *See id*.

Second, even assuming a POSITA would have been motivated to make such a change, the Board adopted the ***opposite*** motivation to add Mendelson-2006. Specifically, the Board found a POSITA would have looked to Mendelson-2006 to

transmit data **wirelessly** to a handheld computing device.  Appx00347; Appx00495; Appx00657-00658.  "Care must be taken to avoid hindsight reconstruction by using the patent in suit as a guide through the maze of prior art references, combining the right references in the right way so as to achieve the result of the claims in suit."  *In re NTP, Inc.*, 654 F.3d 1279, 1299 (Fed. Cir. 2011) (internal quotations omitted).

### 6.    The Board Erred When Finding '554 Patent Claims 14-18 Obvious When Claim 13 Was Found Nonobvious

The Board held '554 patent claims 14-18 in IPR1539 obvious even though those claims depend on claim 13, which the Board held **non**obvious.  Appx00512-00513; Appx01075.  That is error.  *See In re Fritch*, 972 F.2d 1260, 1266 (Fed. Cir. 1992) ("[D]ependent claims are nonobvious if the independent claims from which they depend are nonobvious.").  This Court should reverse.

### C.    The Board's Obviousness Holdings In IPR1536, IPR1538, And IPR1714 Are Erroneous And Unsupported By Substantial Evidence

### 1.    The Board's Finding That A POSITA Would Have Been Motivated To Add A Protrusion To Mendelson-799's Sensor Is Unsupported By Substantial Evidence

The Board found in IPR1536, IPR1538, and IPR1714 that a POSITA would have been motivated to add Ohsaki's protrusion to Mendelson-799's sensor to improve adhesion and provide protection.  Appx00235; Appx00400; Appx00555.  Mendelson-799's sensor—like the Aizawa and Mendelson-1988 sensors discussed—is a physiological sensor with peripherally-located detectors.  Appx15583 Fig. 7; Appx15586 1:11-13.  The Board's finding thus lacks substantial

evidence for reasons similar to those identified above with regard to Aizawa and Mendelson-1988. *See supra* Sections VII.A.1-4.

First, as discussed, the combination's protrusion would direct light centrally and away from the peripheral detectors. *See supra* Sections VII.A.1.b-c. Moreover, Mendelson-799 teaches to avoid air gaps between its sensor and the skin because air gaps cause undesirable optics, such as specular reflection. Appx15586 2:58-64. Apple's expert agreed that a POSITA "reading Mendelson '799 would understand that an air gap between the sensor and skin could create *large errors*…." Appx05975 229:7-13. Yet, Ohsaki shows the existence of such air gaps when Ohsaki's sensor with its protrusion is placed against the skin:



**Ohsaki Figure 1 with Added Magnification
(annotated to highlight air gaps) (Appx03353)**

The Board found that Apple "does not propose including any air gaps that may be present in Ohsaki." Appx00246; Appx00411; Appx00566. But Apple's expert

confirmed that Ohsaki illustrates its protrusion *creates* air gaps.  Appx06122-06123

376:3-377:5  No evidence explains why such gaps would *not* similarly exist in the

combination, particularly when "simply [] plac[ing]" Ohsaki's board on Mendelson-

799's sensor.  *See* Appx12476; Appx27708.

The Board apparently postulated a design that would eliminate air gaps, but

never identified that design nor any evidence that a POSITA would make such a

modification.   That is error because obviousness requires a "clear evidence-

supported account" of the contemplated combination.  *See Personal Web*, 848 F.3d

at 994.  The best solution to minimize air gaps would have been a flat surface—not

the protrusion added by the Board.  Appx18358-18359 ¶¶80-81; Appx33106-33108

¶¶81-82; Appx47507-47509 ¶¶81-82.  Mendelson consistently used a flat surface—

never a convex one.  Appx03360 Fig. 2; Appx15645-15647 Fig. 1.

Second, as discussed, Ohsaki stresses the importance of its sensor's

*longitudinal* shape and orientation.  *See supra* Section VII.A.2.b.  The Board erred

by failing to acknowledge Ohsaki's express teaching and emphasis on

longitudinality.  No evidence explained why a POSITA would have been motivated

to change Ohsaki's *longitudinal* shape designed to conform to the anatomy of the

wrist's backside, to a *circular* structure to fit over Mendelson-799's circular emitter-

detector arrangement.  *See supra* Section VII.A.2.b.

Third, as discussed, Ohsaki discloses that its protrusion improves adhesion when used at a particular body location—the wrist's backside—and has a "tendency to slip" when used on the wrist's palm-side. *See supra* Section VII.A.2.a-b. Mendelson-799's sensor measures oxygen saturation. Appx15586 1:11-13. At the time of the claimed inventions, a POSITA would have believed that the wrist's backside was an unsuitable location for oxygen saturation measurements. Appx18347-18352 ¶¶63-69; Appx33095-33100 ¶¶64-70; Appx47496-47501 ¶¶64-70. Indeed, Mendelson tried to measure oxygen saturation from the back of the wrist, but reported that he "had to apply a ***considerable*** amount of external pressure on the sensor" to ***discern*** any signal. *See, e.g.*, Appx25908-25909. Both Ohsaki and Mendelson-799 warn against using too much pressure when taking measurements. *See* Appx15586-15587 2:47-53, 3:27-31; Appx03355 ¶[0018] ("the user feels uncomfortable if the pressure applied to the user's wrist … is too high"); *see Polaris,* 882 F.3d at 1069 ("a reference must considered for all it taught..."). Thus, a POSITA would not have been motivated to add Ohsaki's protrusion, designed for the wrist's backside, to Mendelson-799's sensor.

The Board rationalized that Apple's "proposed modifications to Mendelson-799 are *not* premised upon ***bodily incorporating*** Ohsaki's cover directly with Mendelson-799's sensor….." Appx00234 (emphasis in original); Appx00422; Appx00577. But the Board contradicted its own rationale by accepting Apple's

assertion that the combination would be predictable because "Ohsaki's translucent board 8 would **simply be placed** over the components accommodated within Mendelson '799's sensor housing 17, and would perform the same function as taught by Ohsaki." Appx00237; Appx00402; *see also* Appx00557-00558.  The Board erred by not acknowledging, much less attempting to reconcile, these inconsistent findings.  *See BASF Corp. v. Enthone, Inc.,* 749 F. App'x 978, 985–86 (Fed. Cir. 2018) (nonprecedential) (vacating and remanding because of inconsistent findings).

The Board also rejected Masimo's argument regarding measurement location by observing that Apple did not "discuss[] where Mendelson 799's sensor is used." Appx00242; Appx00407; Appx00562.  But Ohsaki discloses its protrusion has a particular benefit at a particular location on the wrist.  *See supra* Section VII.A.2.a-b.  Mendelson found taking measurements at that location was prohibitively difficult.  Appx18348-18349 ¶¶64-65; Appx33096-33097 ¶¶65-66; Appx47497-47498 ¶¶65-66.  That Apple purportedly did not "discuss[] where Mendelson 799's sensor is used" hardly shows a POSITA would have been motivated to add Ohsaki's protrusion to Mendelson-799's sensor.  If anything, Apple's failure to discuss underscores Apple's fundamental failure to meet its burden.

Fourth, Mendelson-799 teaches that pressure on tissue induces errors by displacing the measured superficial capillary blood to deeper tissue.  Appx15586 2:47-53.  One can observe this by pressing a finger against skin and observing the

white spot that develops.  Appx02501-02502 53:16-54:13.  Mendelson-799 warns

against applying pressure over a ***dozen times***.  Appx15586-15592 2:27-64, 3:27-67,

4:59-65, 5:15-21, 5:31-37, 6:1-3, 6:8-13, 6:26-31, 10:49-53, 12:62-13:5.  The Board

erred by failing to reconcile its decisions with these many disclosures.

Fifth, the Board found a POSITA would have been motivated to add a

protrusion to Mendelson-799's sensor for protection.  Appx00235; Appx00400;

Appx00555.  As discussed, however, it was undisputed that a flat surface already

provided protection and that a protrusion would be prone to scratches, undermining

any reason to choose that cover shape.  *See supra* Section VII.B.2.  The Board

identified no reason a POSITA would choose Ohsaki's protrusion over Mendelson's

flat resin encapsulant, which would not cause the pressure Mendelson repeatedly

warns against.    Appx18358-18359  ¶¶80-81;  Appx33106-33108  ¶¶81-82;

Appx47507-47509 ¶¶81-82.

### 2.    The Board's Finding Of A Reasonable Expectation Of Success Is Unsupported By Substantial Evidence

Rather than identify evidence of a reasonable expectation of success, the

Board credited Apple's expert's conclusory assertion that there would be

"predictable results" because "Ohsaki's translucent board 8 would ***simply be placed***

over the components accommodated within Mendelson '799's sensor housing 17,

and would perform the same function as taught by Ohsaki."    Appx00237;

Appx00402; *see also* Appx00557-00558.    As discussed, however, the Board

inconsistently found that "petitioner does ***not*** propose bodily incorporating the references…." Appx00242; Appx00407; Appx00562; *see supra* Section VII.C.1. The Board cannot make such inconsistent findings—finding predictability because components would "simply be placed" together, while finding the opposite to disregard the flaws in the combination. *See BASF Corp.,* 749 Fed. App'x at 985–86.

Further, the Board again identified no "clear evidence-supported account" of the contemplated combination. *See Personal Web*, 848 F.3d at 994. Apple's expert testified he did not know the shape of Ohsaki's board, which he said could be "circular or square or rectangular." Appx05814-05818 68:21-70:1, 71:7-72:10; Appx05851-05852 105:1-106:5 (Ohsaki "doesn't ever state dimensions, thicknesses, things like that"). Apple's expert repeatedly distanced himself from Apple's illustration of its combination, disclaiming any specific three-dimensional structure. *See supra* Sections VII.A.1.d and VIIB.3-4; Appx05809-05810 63:5-64:8; *see also* Appx05776-05777 30:5-18 (illustrated combination does not give location of emitters and detectors), 31:13-32:5 (discussing many different design considerations); Appx05781-05782 35:5-36:16 (no specific location); Appx05960-05961 214:2-11 (illustrated combination "amorphous"), 215:8-14 (no description of height of cover relative to LEDs and detectors). Such testimony undermines the

Board's finding of a reasonable expectation of success, especially given the Board's emphasis on the location of the "greatest curvature" of the lens.

Apple's expert argued that a POSITA "would [k]now how to consider th[e] [various] factors [discussed above] and put together a precision-specific design with *real* locations, *real* dimensions, and *real* objects."  Appx05782-05783 36:19-37:1. However, he pointed to no such real dimension or objects.  Apple cannot establish obviousness by asserting that a POSITA would "figure it out" and arrive at some unidentified structure. *Personal Web*, 848 F.3d at 993-94.  The Court should reverse the Board's obviousness holdings in IPR1536, IPR1538, and IPR1714.

### 3.    The Board's Holdings That Particular Protrusion Heights Would Have Been Obvious Are Erroneous And Unsupported By Substantial Evidence

The Board again found obvious Masimo's claimed protrusion height ranges of greater than 1 or 2 millimeters and less than 3 millimeters for '554 patent claim 28 (in IPR1538) and '765 patent claims 12, 18, and 29 (in IPR1714).  Appx00426; Appx00589; Appx01076; Appx01178-01179.   The Board's findings mirror the Board's findings above in IPR1539 and IPR1715 and are unsupported by substantial evidence for the same reasons.  *See supra* Section VII.B.4; Appx00423-00425; Appx00578-00580.   The Board acknowledged that "*none* of Mendelson-799, Ohsaki, Schulz, and Mendelson-2006 teach the claimed range."  Appx00424; Appx00579-00580.  This Court should reverse.

# VIII.  **CONCLUSION**

The Board's decision would have a POSITA ignore (1) Aizawa's teaching that its flat plate improves adhesion and detection efficiency, (2) Ohsaki's teaching that its protrusion slips at Aizawa's palm-side measurement location, (3) Mendelson-799's more-than-a-dozen warnings against causing pressure, (4) Mendelson-799's teaching against air gaps, (5) Mendelson's consistent use of a flat sensor to measure capillary blood, and (6) a POSITA's straightforward understanding that a protrusion would direct light toward the center, as Apple and its expert repeatedly emphasized when filing the petitions.  No prior art discloses or suggests Masimo's innovative approach.  The Board's decisions are profoundly flawed and unsupported by substantial evidence.  This Court should reverse, or in the alternative, vacate and remand.

Respectfully submitted,

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated:  August 5, 2022          */s/ Stephen W. Larson*
Joseph R. Re, *Principal Counsel*
Stephen C. Jensen
Jarom D. Kesler
Stephen W. Larson
Jeremiah S. Helm

*Attorneys for Appellant*
*Masimo Corporation*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned counsel hereby certifies that on August 5, 2022, the

foregoing **BRIEF OF APPELLANT MASIMO CORPORATION** was filed using

the Court's CM/ECF system, which will send notice of such filing to all registered

CM/ECF users.

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated: August 5, 2022            */s/ Stephen W. Larson*
                                    Joseph R. Re, *Principal Counsel*
                                    Stephen C. Jensen
                                    Jarom D. Kesler
                                    Stephen W. Larson
                                    Jeremiah S. Helm

                                        *Attorneys for Appellant*
                                        *Masimo Corporation*

# CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a).  This brief contains 13,938 words, excluding the parts of the brief exempt by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b)(2).

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).  This brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font Times New Roman.

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated:  August 5, 2022          */s/ Stephen W. Larson*
                    Joseph R. Re, *Principal Counsel*
                    Stephen C. Jensen
                    Jarom D. Kesler
                    Stephen W. Larson
                    Jeremiah S. Helm

                    *Attorneys for Appellant*
                    *Masimo Corporation*

55320794