**Nos. 22-1631, 22-1632, 22-1633, 22-1634, 22-1635, 22-1636, 22-1637, 22-1638**

# United States Court of Appeals for the Federal Circuit

## MASIMO CORPORATION,

*Appellant,*

*v.*

## APPLE INC.,

*Appellee.*

APPEALS FROM THE UNITED STATES PATENT AND TRADEMARK OFFICE, PATENT TRIAL AND APPEAL BOARD IN NOS. IPR2020-1520, IPR2020-1521, IPR2020-1714, IPR2020-1715, IPR2020-1536, IPR2020-1537, IPR2020-1538, IPR2020-1539

## RESPONSE BRIEF OF APPLE INC.

Lauren A. Degnan
Christopher Dryer
W. Karl Renner
Jared Hartzman
Adi A. Williams
FISH & RICHARDSON P.C.
1000 Maine Ave., Suite 1000
Washington, DC 20024
Tel: (202) 783-5070
degnan@fr.com

Ashley Bolt
FISH & RICHARDSON P.C.
1180 Peachtree Street NE,
21st Floor
Atlanta, GA 30309

October 5, 2022

*Attorneys for Appellee Apple Inc.*

**Representative Claim 1 of U.S. Patent No. 10,292,628:**

1. A noninvasive optical physiological sensor comprising:

a plurality of emitters configured to emit light into tissue of a user;

a plurality of detectors configured to detect light that has been attenuated by tissue of the user, wherein the plurality of detectors comprise at least four detectors;

a housing configured to house at least the plurality of detectors; and

a light permeable cover configured to be located between tissue of the user and the plurality of detectors when the noninvasive optical physiological sensor is worn by the user, wherein the cover comprises an outwardly protruding convex surface configured to cause tissue of the user to conform to at least a portion of the outwardly protruding convex surface when the noninvasive optical physiological sensor is worn by the user and during operation of the noninvasive optical physiological sensor, and wherein the plurality of detectors are configured to receive light passed through the outwardly protruding convex surface after attenuation by tissue of the user.

Appx868.

## <u>CERTIFICATE OF INTEREST</u>

Counsel for Appellee Apple Inc. ("Apple") certifies the following:

1.    Provide the full names of all entities represented by undersigned counsel in this case.

   **Apple Inc.**

2.    Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.

   **Apple Inc.**

3.    Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.

   **None**

4.    List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

   **Fish & Richardson P.C.: Robert J. Devoto, Daniel D. Smith, Andrew B. Patrick, Grace J. Kim, Hyun Jin In, and Usman Khan**

5.    Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

   ***Masimo Corporation, et al. v. Apple Inc.***
       **Case No. 8:20-cv-48 (C.D. Cal.)**

   ***Certain Light-Based Physiological Measurement Devices and Components Thereof***
       **Case No. 337-TA-1276 (ITC)**

   ***Masimo Corporation v. Apple Inc.***
       **Case Nos. 22-1972, -1973, -1975, -1976 (Fed. Cir.)**

*Masimo Corporation v. Apple Inc.*
**Case Nos. 22-2069, -2070, -2071, -2072 (Fed. Cir.)**

6.    Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

**None/Not Applicable**

Dated:  October 5, 2022                     */s/ Lauren A. Degnan*
                                            Lauren A. Degnan

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ................................................................. i

TABLE OF AUTHORITIES ................................................................ vii

STATEMENT OF RELATED CASES .................................................. 1

RESPONSIVE STATEMENT OF THE ISSUES ................................... 2

INTRODUCTION ................................................................................ 3

RESPONSIVE STATEMENT OF THE CASE ...................................... 3

I.     Masimo's Patents ...................................................................... 3

II.    The Claimed Features Were Known in the Prior Art ................... 6

       A.     Aizawa ............................................................................ 6

       B.     Inokawa .......................................................................... 8

       C.     Ohsaki ........................................................................... 10

       D.     Mendelson-1988 ............................................................ 12

       E.     Mendelson-799 .............................................................. 13

III.   The Board's Determination that the Challenged Claims Are
       Unpatentable ........................................................................... 14

       A.     The Board's Decisions in IPR1520 and IPR1521 ............. 16

       B.     The Board's Decisions in IPR1537, IPR1539, and
              IPR1715 .......................................................................... 17

       C.     The Board's Decisions in IPR1536, IPR1538, and
              IPR1714 .......................................................................... 18

SUMMARY OF THE ARGUMENT ................................................... 18

ARGUMENT ..................................................................................... 23

I.     Standard of Review ................................................................... 23

II.   Substantial Evidence Supports the Board's Motivation To Combine Findings.............................................................................24

     A.   Substantial Evidence Supports the Board's Findings that Inokawa Would Have Motivated a POSITA To Increase the Number of Emitters in Aizawa's Device [IPR1520/1521/1537/1539/1715]........................................24

          1.   Neither Aizawa Nor Inokawa Must Individually Disclose Every Claim Limitation ........................... 25

          2.   A POSITA Would Have Been Motivated To Combine the Teachings To Improve Pulse Measurement........................................................... 27

          3.   A POSITA Would Have Been Motivated To Combine the Teachings To Reliably Upload Pulse Data .......................................................................... 29

     B.   Substantial Evidence Supports the Board's Finding that Ohsaki Would Have Motivated a POSITA To Add a Convex Protrusion to Aizawa To Improve Adhesion [IPR1520/1521, IPR1537/1539/1715] ................................30

          1.   The Court Should Reject Masimo's Wrist Placement Location Arguments............................... 32

          2.   Substantial Evidence Supports the Board's Finding that Ohsaki's Cover Need Not Be Rectangular ...................... 34

          3.   Substantial Evidence Supports the Board's Findings that Improved Adhesion Increases Signal Strength and Detection Efficiency [IPR1537/1539/1715] ............................................. 36

     C.   Substantial Evidence Supports the Board's Findings that a POSITA Would Add a Convex Protrusion To Improve Light Collection...................................................................38

          1.   Substantial Evidence Supports the Board's Finding that Inokawa Would Have Motivated a POSITA

                To Add a Protrusion to Aizawa's Sensor To
                Improve Light Collection [IPR1520/1521].............................. 38

2.     The Board's Finding Does Not Disregard
        Aizawa's Disclosure of Light Detecting Elements
        on the Sensor's Periphery ......................................................... 39

3.     Masimo's Arguments Against the "Greatest
        Curvature" Theory Do Not Show Lack of
        Substantial Evidence for the Board's Findings........................ 41

4.     Dr. Kenny's So-Called Admissions About the
        Specific Convex Lens in Inokawa Are Immaterial................. 45

5.     The Board Did Not Abuse Its Discretion in
        Considering Nishikawa............................................................ 48

6.     Substantial Evidence Supports the Unpatentability
        of '265 Patent Claims 12 and 14 [IPR1520/1521].................. 50

7.     Substantial Evidence Supports the Board's Finding
        that Inokawa Would Have Motivated a POSITA
        To Add a Protrusion to Mendelson-1988's Sensor
        To Increase Light Collection [IPR1520/1521] ....................... 53

D.    Substantial Evidence Supports the Board's Finding that
     Scratches Would Not Have Prevented a POSITA from
     Using a Convex Protrusion To Protect Sensor Elements
     [IPR1537/1539/1715]...........................................................................55

E.    Substantial Evidence Supports the Board's Finding that
     Particular Protrusion Heights Would Have Been Obvious
     [IPR1538, IPR1539, IPR1714, IPR1715] ...........................................56

F.    Substantial Evidence Supports the Board's Findings
     Regarding Communication of Measurement Information
     [IPR1537/IPR1539/IPR1715] ............................................................58

G.    Substantial Evidence Supports the Board's Finding that a
     POSITA Would Have Been Motivated To Add a Convex
     Protrusion to Mendelson-799's Sensor
     [IPR1536/1538/1714]...........................................................................60

1.      Substantial Evidence Supports the Board's Finding that a POSITA Would Have Added a Protrusion To Protect Sensor Elements ....................................................... 60

2.      Substantial Evidence Supports the Board's Interpretations of Ohsaki and Mendelson-799........................ 61

3.      Ohsaki's Depiction of Air Gaps Does Not Teach Away ....................................................................................... 64

III.    Substantial Evidence Supports the Board's Findings that a POSITA Would Have Had a Reasonable Expectation of Success ....................................................................................66

A.     A POSITA Would Have Had a Reasonable Expectation of Success in Combining Aizawa with Inokawa [IPR1520/1521] ....................................................................66

B.     A POSITA Would Have Had a Reasonable Expectation of Success in Combining Aizawa with Inokawa, Ohsaki, and/or Mendelson-2006 [IPR1537/1539/1715] ...................................69

C.     A POSITA Would Have Had a Reasonable Expectation of Success in Combining Mendelson-799 with Ohsaki [IPR1536/1538/1714] .........................................................70

IV.    Masimo Presented No Objective Evidence of Nonobviousness to the Board ..................................................................................71

V.     The Court Should Set Aside the Board's Judgment for '554 Patent Claims 14-18 [IPR1539]....................................................71

CONCLUSION ......................................................................................... 72

CERTIFICATE OF SERVICE AND FILING ....................................... 73

CERTIFICATE OF COMPLIANCE ...................................................... 74

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acoustic Tech., Inc. v. Itron Networked Sols., Inc.*,
    949 F.3d 1366 (Fed. Cir. 2020) ...................................................28, 29

*Allied Erecting & Dismantling Co. v. Genesis Attachments, LLC*,
    825 F.3d 1373 (Fed. Cir. 2016) .............................................39, 44, 64

*Almirall, LLC v. Amneal Pharms. LLC*,
    28 F.4th 265 (Fed. Cir. 2022) ...............................................56

*Apple Inc. v. MPH Techs. Oy*,
    28 F.4th 254 (Fed. Cir. 2022) .......................................................34, 36

*Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*,
    876 F.3d 1350 (Fed. Cir. 2017) .................................................54

*Belden Inc. v. Berk-Tek LLC*,
    805 F.3d 1064 (Fed. Cir. 2015) .................................................48, 49

*Brown & Williamson Tobacco Corp. v. Philip Morris Inc.*,
    229 F.3d 1120 (Fed. Cir. 2000) .............................................32

*BTG Int'l Ltd. v. Amneal Pharms. LLC*,
    923 F.3d 1063 (Fed. Cir. 2019) .........................................66

*Chamberlain Grp., Inc. v. One World Techs., Inc.*,
    944 F.3d 919 (Fed. Cir. 2019) ...........................................42

*In re Epstein*,
    32 F.3d 1559 (Fed. Cir. 1994) .................................................48, 68

*In re Fritch*,
    972 F.2d 1260 (Fed. Cir. 1992) .........................................72

*In re Fulton*,
    391 F.3d 1195 (Fed. Cir. 2004) ...............................................44, 64

*Gen. Elec. Co. v. Raytheon Techs. Corp.*,
    983 F.3d 1334 (Fed. Cir. 2020) .................................................26, 61

*Hockerson-Halberstadt, Inc. v. Avia Group Int'l,*
    222 F.3d 951 (Fed. Cir. 2000) ............................................................65

*Intel Corp. v. Qualcomm Inc.,*
    21 F.4th 784 (Fed. Cir. 2021) ...............................................30, 55, 61

*Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.,*
    821 F.3d 1359 (Fed. Cir. 2016) ...........................................................23

*In re Keller,*
    642 F.2d 413 (CCPA 1981) .............................................26, 29, 32, 45

*Kinetic Concepts, Inc. v. Smith & Nephew, Inc.,*
    688 F.3d 1342 (Fed. Cir. 2012) ...........................................................28

*KSR Int'l Co. v. Teleflex Inc.,*
    550 U.S. 398 (2007).................................................................*passim*

*Medichem, S.A. v. Rolabo, S.L.,*
    437 F.3d 1157 (Fed. Cir. 2006) ...........................................................34

*In re Merck & Co.,*
    800 F.2d 1091 (Fed. Cir. 1986) ...........................................................25

*Mobility Workx, LLC v. Unified Patents, LLC,*
    15 F.4th 1146 (Fed. Cir. 2021) ............................................................71

*Novartis AG v. Torrent Pharms. Ltd.,*
    853 F.3d 1316 (Fed. Cir. 2017) ...........................................44, 50, 63

*In re NTP, Inc.,*
    654 F.3d 1279 (Fed. Cir. 2011) ....................................................24, 43

*In re Nuvasive,*
    842 F.3d 1376 (Fed. Cir. 2016) ...........................................................63

*PAR Pharm. Inc., et al. v. TWI Pharms.,*
    773 F.3d 1186 (Fed. Cir. 2014) ...........................................................66

*Provisur Techs., Inc. v. Weber, Inc.,*
    No. 2021-1942, 2022 WL 4474941 (Fed. Cir. Sept. 27, 2022)..........42

*Regents of the Univ. of Cal. v. Broad Inst., Inc.*,
  903 F.3d 1286 (Fed. Cir. 2018) ............................................................60, 67, 70

*Teva Pharms. USA, Inc. v. Corcept Therapeutics, Inc.*,
  18 F.4th 1377 (Fed. Cir. 2021) ............................................................23

*Uber Techs., Inc. v. X One, Inc.*,
  957 F.3d 1334 (Fed. Cir. 2020) ................................................................56, 57

*Universal Camera Corp. v. NLRB*,
  340 U.S. 474 (1951)................................................................................24

*Unwired Planet, LLC v. Google Inc.*,
  841 F.3d 995 (Fed. Cir. 2016) ................................................................41, 51

*In re Urbanski*,
  809 F.3d 1237 (Fed. Cir. 2016) ...........................................................30

*In re Warsaw Orthopedic, Inc.*,
  832 F.3d 1327 (Fed. Cir. 2016) ............................................................58, 71

*Winner Int'l Royalty Corp. v. Wang*,
  202 F.3d 1340 (Fed. Cir. 2000) ...........................................................37

## <u>STATEMENT OF RELATED CASES</u>

Pursuant to Federal Circuit Rule 47.5, the undersigned counsel states that no other appeal from the same *inter partes* review ("IPR") was previously before this or any other appellate court. The undersigned counsel is aware of the following pending cases that will directly affect or be directly affected by this Court's decision in the pending appeal:

- *Masimo Corporation v. Apple Inc.*, Case Nos. 22-1972, -1973, -1975, -1976 (Fed. Cir.)

- *Masimo Corporation v. Apple Inc.*, Case Nos. 22-2069, -2070, -2071, -2072 (Fed. Cir.)

- *Masimo Corporation, et al. v. Apple Inc.*, Case No. 8:20-cv-48-JVS (C.D. Cal.)

## RESPONSIVE STATEMENT OF THE ISSUES

1.     Whether substantial evidence supports the Board's conclusion that the challenged claims would have been obvious to a person of ordinary skill in the art ("POSITA") based on certain combinations of references; and

2.     Whether the Board erred by holding certain dependent claims obvious while holding nonobvious the claim from which they depend.

## INTRODUCTION

In eight detailed Final Written Decisions, the Board thoroughly considered Masimo's arguments and carefully weighed the evidence, ultimately finding nearly every challenged claim of the Masimo patents at issue unpatentable. On appeal, Masimo would have this Court reconsider countless of the Board's fact-bound findings concerning the interpretation of the prior art and a POSITA's background knowledge and motivations. However, the prior art, Apple's expert testimony, and other evidence constitute substantial evidence supporting the Board's findings. Although Masimo may disagree with those findings, this Court is not the venue for relitigating these myriad fact-specific issues. Substantial evidence supports the Board's decisions, which is all this Court needs to affirm nearly every challenged claim. Although the Board did err in invalidating certain dependent claims after upholding a parent claim, its decisions should be affirmed in all other respects.

## RESPONSIVE STATEMENT OF THE CASE

### I.    Masimo's Patents

This appeal concerns five Masimo patents sharing a common specification: U.S. Patent Nos. 10,258,265; 10,292,628; 10,631,765; 10,588,553; and 10,588,554. These Masimo patents describe data collection systems including noninvasive sensors that communicate with patient monitors. *See* Appx749 (2:20-30).[1] The systems measure blood constituents or analytes (e.g., oxygen or glucose), or other physiological characteristics such as pulse rate. *See id.* The

---

[1] In this section, Apple provides representative citations to the '265 patent.

3

specification describes sandwiching a finger between the shells of the device, similar to a conventional pulse oximeter. *See* Appx691. Figure 3C depicts a sensor, comprising an upper emitter shell connected to a lower detector shell. *See* Appx751 (5:52-55); *see also* Appx757 (18:39-51). The emitter shell houses emitter components (*e.g.*, LEDs). *See, e.g.,* Appx755 (13:8-15). The detector shell houses four photodetectors—one underneath each opening. *See* Appx758 (19:38-48). In use, the device emits light of different wavelengths, which passes through the person's finger, into the protrusion via the openings, and ultimately reaches photodetectors. *See* Appx758 (19:38-48). Photodetectors capture and measure the received light and output responsive signals to a processor that calculates the user's physiological parameter(s). *See* Appx755 (14:11-19).

Figures 4A through 4C illustrate embodiments of the protrusion:



**FIG. 4B**

**FIG. 4A**

**FIG. 4C**

Appx695. The protrusion includes a measurement site contact area 470, which "can be generally curved and/or convex with respect to the measurement site[.]"

Appx760 (23:30-60). Figure 14D depicts another detector subassembly, in which multiple detectors 1410c are located under transparent cover 1432 and protrusion 605b. Appx766 (36:38-49).



**FIG. 14D**

Appx721. Protrusion 605b's light-focusing properties may reduce the number of detectors required. *Id.* (35:61-36:10).

Claim 1 of the '628 patent is illustrative:

1. A noninvasive optical physiological sensor comprising:

a ***plurality of emitters*** configured to emit light into tissue of a user;

a ***plurality of detectors*** configured to detect light that has been attenuated by tissue of the user, wherein the plurality of detectors comprise at least four detectors;

a ***housing*** configured to house at least the plurality of detectors; and

a ***light permeable cover*** configured to be located between tissue of the user and the plurality of detectors when the noninvasive optical physiological sensor is worn by the user, wherein the cover comprises an ***outwardly protruding convex surface*** configured to cause tissue of

the user to conform to at least a portion of the outwardly protruding convex surface when the noninvasive optical physiological sensor is worn by the user and during operation of the noninvasive optical physiological sensor, and wherein the ***plurality of detectors*** are configured to receive ***light passed through the outwardly protruding convex surface*** after attenuation by tissue of the user.

Appx868.[2]

## II.     The Claimed Features Were Known in the Prior Art

The Board relied on multiple combinations of prior art references to cancel the challenged claims.  Five references are at issue in this appeal: Aizawa (Appx3242-3248), Inokawa (Appx3249-3271, translation Appx3272-3295), Ohsaki (Appx3352-3357), Mendelson-1988 (Appx3358-3364), and Mendelson-799 (Appx15578-15593).

### A.     Aizawa

Aizawa is a U.S. patent application publication titled "Pulse Wave Sensor and Pulse Rate Detector."  It discloses a wrist-worn sensor, which detects pulse rate based on light output from a light emitting diode and reflected from a patient's artery.  Appx3242-3243.  Figure 1A depicts a pulse wave sensor:

---

[2] All emphasis is added unless noted otherwise.



Appx3243 (annotations added);[3] *see also* Appx3247 (¶23).  The pulse wave sensor

includes an LED 21 (green), four photodetectors 22 (red) symmetrically distributed

around the LED, and a "holder" 23 for storing these components.  Aizawa

discloses that increasing the number of photodetectors may improve detection

efficiency.  *Id.* ¶32; Appx3245 (Fig. 4(a)).  Aizawa also describes obtaining the

"same effect" in the opposite configuration, *i.e.*, one photodetector surrounded by

multiple LEDs.  Appx3247-3248 (¶33).

Figure 1B illustrates a cross-sectional view of Figure 1A's sensor:

---

[3] The annotations depicted herein are substantially the same as those depicted in
Apple's expert declaration(s).  *See, e.g.*, Appx3025-3030 (¶¶53-62).



Appx3243 (annotations added); *see also* Appx3247 (¶23).  The LED and

photodetectors "are stored in cavities 23b and 23c."  Appx3247 (¶24). Detection

face 23a contacts the user's wrist.  *Id.*  Belt 7 "is fastened such that the acrylic

transparent plate 6 becomes close to the artery 11 of the wrist," improving

adhesion between the wrist and pulse rate detector.  Appx3247 (¶26); *see also*

Appx3248 (¶34).

### B.    Inokawa

Inokawa is a Japanese published patent application titled "Optical Vital

Sensor, Base Device, Vital Sign Information Gathering System, and Sensor

Communication Method."  It discloses a wrist-wearable pulse sensor device.

Appx3272 (Title); Appx3282 (¶56).  Figure 1 illustrates the device:



Appx3290.  Pulse sensor 1 includes a sensor unit on a flexible wristband.

Appx3282 (¶57). The sensor unit's top surface includes a display and control

switch, while the rear surface includes a component for optically sensing a user's

pulse.  *Id.*

   Figure 2 depicts this rear surface:



Appx3290 (annotations added); *see also* Appx3282 (¶58). The rear (sensor) side includes two LEDs 21, 23; a photodiode (detector) 25; and a lens 27. *Id.* In various embodiments, Inokawa describes this lens as convex. *See* Appx3286 (¶99); *see also* Appx3287 (¶107). These sensor components help measure a user's pulse and body movement. Appx3282 (¶59). The device stores this information in memory using a CPU. Appx3283-3284 (¶¶68-69).

C.    **Ohsaki**

Ohsaki is a U.S. patent application publication titled "Wristwatch-type Human Pulse Wave Sensor Attached on Back Side of User's Wrist." It discloses an optical sensor for detecting a pulse wave of a human body. Appx3352 (Title); Appx3355 (¶3). Figure 1 illustrates a pulse wave sensor 1 wrapped around a user's wrist 4:



Appx3353; *see also* Appx3355 (¶16).  Pulse wave sensor 1 includes detecting

element 2 and sensor body 3.  *Id.*  Figure 2 illustrates a mechanism for detecting

a pulse wave:



Appx3353; *see also* Appx3355 (¶13).  The detecting element includes a light-

emitting element 6, light-receiving element 7, and translucent board 8.

11

Appx3355 (¶17). "A convex surface is formed on the top of the translucent board 8." *Id.* The translucent board's convex shape puts it "in intimate contact with the surface of the user's skin," preventing the detecting element from slipping off the desired position on the wrist. Appx3356 (¶25). By preventing slippage, this convex surface suppresses "variation of the amount of the reflected light . . . reflected by the surface of the user's skin." *Id.* Additionally, the convex surface prevents penetration by "disturbance light from the outside." *Id.*

**D.    Mendelson-1988**

Mendelson-1988 is an article titled "Design and Evaluation of a New Reflectance Pulse Oximeter Sensor." It discloses a pulse oximeter to measure a user's oxygen saturation via the user's forehead:



*See* Appx3360 (Fig. 2(A)); *see also* Appx3358 (Title, Abstract). The sensor includes LEDs that emit light and photodiodes to detect light reflected back to the

sensor from the user's tissue. Appx3359. To minimize the amount of interference among the LEDs and photodiodes, an opaque optical shield "was placed between the LEDs and the photodiode chips." *Id*.

### E.   Mendelson-799

Mendelson-799 is a U.S. Patent titled "Pulse Oximeter and Method of Operation." Mendelson-799 discloses a sensor for non-invasive measurement of a blood parameter. Figure 7 illustrates an optical sensor with a light source, which includes three closely-spaced light emitting elements 12A-C:



Appx15583; *see also* Appx15590 (9:22-28). The optical sensor includes several detectors, *i.e.*, "far" detectors 16 and "near" detectors 18, "arranged in two concentric ring-like arrangements . . . surrounding the light emitting elements." *Id.* (9:29-34). A light shield is positioned between the light sources and light detectors to prevent interference. *Id.* (9:35-40). Sensor housing 17 accommodates the light source, light shield, and detectors. *Id.* (9:34-35).

### III.  The Board's Determination that the Challenged Claims Are Unpatentable

Across all eight of the Board's Final Written Decisions, only a single challenged claim survived (claim 13 of the '554 patent).  The following table illustrates the outcome of each IPR:

| IPR (Patent) | Claims Shown Unpatentable (Grounds) | Claims Not Shown Unpatentable (Grounds) |
|---|---|---|
| IPR1520 ('265) | • 1-4, 6-14, 16, 17, 19-23, 26-29 (Aizawa+Inokawa) (Aizawa+Inokawa+Ohsaki) <br> • 23, 24 (Aizawa+Inokawa+Mendelson-2006) (Mendelson-1988+Inokawa+Mendelson-2006) <br> • 25 (Aizawa+Inokawa+Mendelson-2006+Beyer) (Mendelson-1988+Inokawa+Mendelson-2006+Beyer) <br> • 1, 2, 4, 14, 17-22, 26-30 (Mendelson-1988+Inokawa)[4] | • None |
| IPR1521 ('628) | • 1-15, 17, 20-26, 28 (Aizawa+Inokawa) (Aizawa+Inokawa+Ohsaki) <br> • 18, 19, 29, 30 (Aizawa+Inokawa+Mendelson-2006+Beyer) (Mendelson-1988+Inokawa+Mendelson-2006+Beyer) | • None |

---

[4] The Board determined that Apple had not shown claims 3, 6-13, and 16 unpatentable under this ground, but did find them unpatentable under the Aizawa+Inokawa and Aizawa+Inokawa+Ohsaki grounds.

| | • 1-17, 20-28 (Mendelson-1988+Inokawa) | |
|---|---|---|
| IPR1536 ('553) | • 1-3, 5, 6, 9-18, 20-24, 29 (Mendelson-799+Ohsaki)<br>• 4, 18, 24 (Mendelson-799+Ohsaki+Schulz)<br>• 25 (Mendelson-799+Ohsaki+Griffin)<br>• 7, 19 (Mendelson-799+Ohsaki+Mendelson-2006)<br>• 8, 26-28 (Mendelson-799+Ohsaki+Mendelson-2006+Griffin) | • None |
| IPR1537 ('553) | • 1-6, 9-18, 20-24, 29 (Aizawa+Inokawa+Ohsaki)<br>• 7, 19 (Aizawa+Inokawa+Ohsaki+Mendelson-2006)<br>• 8, 25-28 (Aizawa+Inokawa+Ohsaki+Mendelson-2006+Sherman) | • None |
| IPR1538 ('554) | • 1-7, 20-28 (Mendelson-799+Ohsaki+Schulz+Mendelson-2006) | • None |
| IPR1539 ('554) | • 1-7, 20-28 (Aizawa+Inokawa+Ohsaki+Mendelson-2006)<br>• 8-12, 14-19 (Aizawa+Inokawa+Ohsaki+Mendelson-2006+Bergey) | • 13 (Aizawa+Inokawa+Ohsaki +Mendelson-2006+Bergey) |
| IPR1714 ('765) | • 1-8, 10-13, 15-16, 20-29 (Mendelson-799+Ohsaki+Schulz+Mendelson-2006)<br>• 9 (Mendelson-799+Ohsaki+Schulz+Mendelson-2006+Bergey) | • None |

| | | |
|---|---|---|
| | • 14 (Mendelson-799+Ohsaki+Schulz+Mendelson-2006+Goldsmith)<br>• 17-19 (Mendelson-799+Ohsaki+Schulz+Mendelson-2006+Aizawa) | |
| IPR1715 ('765) | • 1-8, 10-13, 15-29 (Aizawa+Inokawa+Ohsaki+Mendelson-2006)<br>• 9 (Aizawa+Inokawa+Ohsaki+Mendelson-2006+Bergey)<br>• 14 (Aizawa+Inokawa+Ohsaki+Mendelson-2006+Goldsmith) | • None |

Masimo's arguments on appeal primarily center on whether a POSITA would have been motivated to combine certain subsets of the references above. In each decision, the Board relied extensively on the references themselves and testimony from Apple's expert, Dr. Kenny. *See, e.g.*, Appx3040-3057; Appx3068-3071; Appx3095-3107; Appx4527-4557.[5]

## A.    The Board's Decisions in IPR1520 and IPR1521

In IPR1520 and IPR1521, the Board found that a POSITA would have been motivated to combine Aizawa and Inokawa, using multiple LEDs both to improve

---

[5] Dr. Kenny submitted similar declarations in each group of IPRs. *See, e.g.*, Appx15278-15286/Appx17824-17837 (IPR1536); Appx22890-22906/Appx22937-22945/Appx22995-23001/Appx25405-25409/Appx25414-25423 (IPR1537).

pulse measurements and to communicate that data for display on another device. Appx29-38; Appx135-143.

The Board also found that Ohsaki would have motivated a POSITA to add a protrusion to Aizawa's sensor to improve adhesion and help prevent slippage. Appx70-73; Appx170-174.

Finally, the Board found that a POSITA would have been motivated to combine Aizawa and Inokawa to add a convex protrusion to Aizawa to improve light collection. Appx51-63; Appx158-168. The Board applied this same reasoning to the Mendelson-1988/Inokawa combination. Appx90-93; Appx187-190.

**B.    The Board's Decisions in IPR1537, IPR1539, and IPR1715**

In IPR1537, IPR1539, and IPR1715, the Board found that a POSITA would have been motivated to combine Aizawa and Inokawa using multiple LEDs for similar reasons to IPR1520 and IPR1521. Appx301-310; Appx457-466; Appx621-629.

The Board also found a POSITA would have been motivated to combine Aizawa with Ohsaki to improve adhesion between the sensor and the user's tissue, thereby improving detection efficiency, Appx324-337; Appx479-491; Appx641-653, while also protecting sensor elements, Appx337-338; Appx491-492; Appx653-654.

The Board further found a POSITA would have been motivated to combine Aizawa, Inokawa, Ohsaki, and Mendelson-2006 to allow data transmission to a

wireless device (*e.g.*, mobile phone) for display.  Appx346-350; Appx494-500; Appx656-663.  The Board also found this same combination renders obvious certain claims[6] reciting specific protrusion height ranges.  Appx502-504; Appx665-667.

### C.    The Board's Decisions in IPR1536, IPR1538, and IPR1714

In IPR1536, IPR1538, and IPR1714, the Board found a POSITA would have been motivated to combine Mendelson-799 with Ohsaki for reasons analogous to those described in IPR1537/1539/1715 for the combination of Aizawa and Ohsaki. Appx235-248; Appx400-413; Appx556-568.

The Board further found that the combination of Aizawa, Inokawa, Ohsaki, and Mendelson-2006 renders obvious certain claims[7] reciting specific protrusion height ranges.  Appx423-425; Appx578-580.

### SUMMARY OF THE ARGUMENT

The Court should reject Masimo's fact-bound challenges to the Board's thorough decisions.  Masimo disputes that a POSITA would have been motivated to combine the references at issue, but motivation to combine is a question of fact, and the Board's decisions are supported by substantial evidence.

Although Masimo argues a POSITA would not have incorporated Inokawa's second LED into Aizawa, the Board found two independent motivations for doing

---

[6] '554 patent claims 11, 17, 28 (IPR1539); '765 patent claims 12, 18, 29 (IPR1715).

[7] '554 patent claim 28 (IPR1538); '765 patent claims 12, 18, 29 (IPR1714).

so: improving pulse measurement and transmitting data using light. For both reasons, the Board credited Apple's expert testimony and found Masimo's unpersuasive. This Court should not re-weigh the evidence.

Substantial evidence also supports the Board's detailed rejection of Masimo's various arguments against incorporating a convex protrusion into Aizawa (or Mendelson-1988), as taught by Inokawa and/or Ohsaki. First, across IPR1520, IPR1521, IPR1536, IPR1539, and IPR1715, the Board found that a POSITA would have been motivated to incorporate a convex protrusion into Aizawa to improve adhesion. The Board thoroughly addressed Masimo's arguments but found a convex shape would incrementally improve adhesion in at least some circumstances, which is sufficient to establish a motivation to combine. Apple's expert testimony provides substantial evidence supporting the Board's findings, and Masimo's procedural arguments fail to show any abuse of discretion.

Additionally, in IPR1520 and IPR1521, the Board credited Apple's expert testimony regarding how the combination would improve light collection. It considered Masimo's arguments that a convex lens protrusion might direct some light rays away from Aizawa's (or Mendelson-1988's) detectors, but found persuasive Apple's expert testimony that any such effects would be outweighed by the convex shape's light-gathering benefits. Masimo cannot show that the Board's

19

detailed analysis is unsupported by substantial evidence or the Board's evidentiary and procedural decisions were abuses of discretion.

Substantial evidence also supports the Board's findings in IPR1536, IPR1538, and IPR1714 that a POSITA would have incorporated Ohsaki's teaching of a convex lens into Mendelson-799 to improve adhesion. The Board rightly rejected Masimo's argument that this adhesive benefit would not apply to Mendelson-799's circular configuration. The Board independently found that a POSITA would have been motivated to combine these references to protect exposed components of Mendelson-799. Further, the Board properly found that Ohsaki's discussion of air gaps does not teach away and that a POSITA could have eliminated any air gaps in any event. Although Masimo disagrees with the Board's interpretation of the prior art, resolution of such issues is a question of fact, and substantial evidence supports the Board's findings.

For the Court's convenience, the combinations and rationales for adding a convex protrusion to a reference with a flat or no cover are depicted in the table below.[8]

---

[8] For simplicity, grounds addressing dependent claims not separately argued by Masimo on appeal are not listed separately.

| Combinations Appealed (Relevant Claims) | Board's Factual Findings of Motivations To Use a Convex Cover |
|---|---|
| Aizawa+Inokawa<br><br>IPR1520: all challenged claims;<br>IPR1521: all challenged claims; | Improve light collection[9] |
| Aizawa+Inokawa+Ohsaki<br><br>IPR1520: all challenged claims;<br>IPR1521: all challenged claims;<br>IPR1537: claims 1-6, 9-18, 20-24, 29 | (1) Improve adhesion;<br>(2) Improve detection efficiency;<br>(3) Protect sensor elements (IPR1537) |
| Aizawa+Inokawa+Ohsaki+Mendelson-2006<br><br>IPR1537: claims 7, 19<br>IPR1539: all challenged claims<br>IPR1715: all challenged claims | (1) Improve adhesion;<br>(2) Improve detection efficiency<br>(3) Protect sensor elements |
| Mendelson-1988+Inokawa<br><br>IPR1520: claims 1, 2, 4, 14, 17-25, 26-30;<br>IPR1521: all challenged claims | Improve light collection |
| Mendelson-799+Ohsaki[10]<br><br>IPR1536: all challenged claims;<br>IPR1538: all challenged claims;<br>IPR1714: all challenged claims | (1) Improve adhesion;<br>(2) Improve detection efficiency<br>(3) Protect sensor elements |

In IPR1538, IPR1539, IPR1714, and IPR1715, the Board's findings concerning the obviousness of certain claims reciting specific protrusion heights are supported by substantial evidence. Amply supported by Apple's expert

---

[9] Motivations apply to all listed IPRs unless otherwise noted.

[10] In IPR1714, the combination is Mendelson-799+Ohsaki+Schulz+Mendelson-2006 for all challenged claims.

testimony, the Board found that the claimed ranges fell among a finite number of predictable solutions. Thus, the prior art need not disclose them with mathematical precision.

In IPR1537, IPR1539, and IPR1715, substantial evidence supports the Board's conclusion that transmitting measurement information to a wireless device would have been obvious. Mendelson-2006 explicitly teaches implementing this functionality, and, although not required to show obviousness, other prior art expressly describes such functionality as desirable. Substantial evidence supports the Board's findings, and Masimo's arguments rest on mischaracterizing the proposed combination. This Court should uphold the Board's analysis.

Masimo's challenges to the Board's factual findings concerning reasonable expectation of success are also without merit. In IPR1520 and IPR1521, the Board's finding is supported by Apple's expert testimony. Apple's expert was not required to propose a specific lens design to show that a POSITA would have expected success in implementing the well-known general benefits of using a convex protrusion, particularly where Masimo's claims lack such detail. In IPR1537, IPR1539, and IPR1715, expert testimony again provides substantial evidence underpinning the Board's reasonable-expectation-of-success finding. Masimo's vague argument that Apple's expert testimony was inadequate fails to articulate any basis for reversal. Masimo's arguments concerning IPR1536,

IPR1538, and IPR1714 erroneously assume that Apple's expert was required to describe the proposed combination with mathematical precision or to physically combine the references. Neither has merit. Thus, Apple's expert testimony provides substantial evidence of a reasonable expectation of success across all eight IPRs, and this Court should decline Masimo's invitation to reconsider these deeply factual issues.

Finally, Apple does not dispute that the Board's obviousness holding for claims 14-18 of the '554 patent should be set aside, given that the Board upheld parent claim 13.

## ARGUMENT

### I.    Standard of Review

Masimo's arguments on appeal relate to factual determinations on which this Court must defer to the Board and apply the substantial evidence standard. "The presence or absence of a motivation to combine references in an obviousness determination is a pure question of fact." *Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1366-67 (Fed. Cir. 2016) (internal quotations omitted). Likewise, "[t]he presence or absence of a reasonable expectation of success is . . . a question of fact, which we review for substantial evidence." *Teva Pharms. USA, Inc. v. Corcept Therapeutics, Inc.*, 18 F.4th 1377, 1381 (Fed. Cir. 2021) (internal quotations omitted). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (internal quotations

omitted).

## II.   Substantial Evidence Supports the Board's Motivation To Combine Findings

Despite substantial evidence supporting the Board's findings, Masimo now

asks this Court to re-weigh the evidence, which it should decline to do.  *In re NTP,*

*Inc.*, 654 F.3d 1279, 1292 (Fed. Cir. 2011) ("This court does not reweigh evidence

on appeal, but rather determines whether substantial evidence supports the Board's

fact findings.").

To avoid repetition, Apple has organized its brief such that similar issues are

presented together, regardless of IPR number.

### A.   Substantial Evidence Supports the Board's Findings that Inokawa Would Have Motivated a POSITA To Increase the Number of Emitters in Aizawa's Device [IPR1520/1521/1537/1539/1715]

The Board found "that a POSITA would have been motivated to replace

Aizawa's single near infrared LED 21, with an infrared LED and a green LED, in

light of Inokawa."  Appx29; *see also* Appx29-38 (IPR1520); Appx135-143

(IPR1521); Appx301-310 (IPR1537); Appx457-466 (IPR1539); Appx621-629

(IPR1715).[11]  The Board identified two independent motivations: (1) "to improve

the pulse measurements recorded by Aizawa's detector"; and (2) "to provide a

reliable method of uploading pulse data stored by Aizawa's wrist-worn pulse rate

---

[11] In this section, Apple provides representative citations to IPR1520.

24

detector 1 to another device for display to the user." Appx29; Appx32.
Substantial evidence supports these findings.

### 1.    Neither Aizawa Nor Inokawa Must Individually Disclose Every Claim Limitation

The Board properly rejected Masimo's argument that the challenged claims
are nonobvious because "neither Aizawa nor Inokawa expressly discloses a wrist-
worn sensor device that has ***both*** a plurality of emitters ***and*** at least four detectors."
Appx35; *see also In re Merck & Co.*, 800 F.2d 1091, 1097 (Fed. Cir. 1986)
(nonobviousness is not established by attacking references individually when
unpatentability is predicated upon a combination of prior art disclosures).
Contrary to Masimo's assertion (at 59-60), the Board did not find that a POSITA's
"ordinary creativity" supplies any missing limitation. Rather, the Board explained
how combining Aizawa's and Inokawa's teachings renders obvious a device with
an infrared LED, green LED, and multiple detectors.

Specifically, the Board found "the combination of Aizawa and Inokawa
teaches that having multiple emitters is beneficial, and having multiple detectors is
beneficial." Appx36. Although Aizawa discloses an embodiment with four
photodetectors and one LED, it describes that arrangement as a non-limiting
example, Appx3247 (¶32), further teaching that "[t]he same effect can be
obtained" with one photodetector and multiple LEDs. Appx3247-3248 (¶33).
Additionally, as Masimo admits, "Inokawa discloses a sensor with two emitters

and one detector." Op.Br. 50 (citing Appx3282 (¶[0058])). The Board explained that a POSITA would have known "to keep all four detectors 22 that are already present in Aizawa's detector 1, so that '[e]ven when the attachment position of the sensor is dislocated, a pulse wave can be detected accurately[.]'" Appx35-36 (quoting Appx3246 (¶9); Appx3247 (¶27)) (original alteration); *see also Gen. Elec. Co. v. Raytheon Techs. Corp.*, 983 F.3d 1334, 1352 (Fed. Cir. 2020) (holding a party showing obviousness need not "re-do the work already done in the prior art reference"). Substantial evidence, including the references themselves and Dr. Kenny's testimony, *e.g.,* Appx3041-3044 (¶¶74-79), supports these findings.

In charging the Board with error because neither reference alone discloses a device having a plurality of emitters and at least four detectors, Masimo assumes the combination must bodily incorporate Inokawa's device into Aizawa's device, violating this Court's instruction to the contrary. *See, e.g.*, *In re Keller*, 642 F.2d 413, 425 (CCPA 1981). As the Board explained, Appx35, "[a] person of ordinary skill is also a person of ordinary creativity, not an automaton," and "in many cases a person of ordinary skill will be able to fit the teachings of multiple patents together like pieces of a puzzle," as is the case here. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 420-21 (2007).

### 2.    A POSITA Would Have Been Motivated To Combine the Teachings To Improve Pulse Measurement

The Board found, crediting Dr. Kenny's testimony, that:

> a POSITA, upon reviewing Inokawa's disclosure of using two emitters of different wavelengths to calculate a user's pulse and motions separately, would understand that these two separate measurements would enable the device to calculate a "more reliable" pulse rate "that can . . . take into account and correct for inaccurate [pulse] readings related to body movement," by subtracting the signal component corresponding to body movement from the pulse signal "to help better isolate the desired pulse data."

Appx30-31 (quoting Appx3042-3043 (¶77), Appx4554-4555 (¶46)) (original

alterations).  Because Aizawa does not disclose using "computed motion load in

this specific fashion," the Board found that a POSITA would have been motivated

to apply Inokawa's teachings to "improve upon the accuracy of Aizawa's pulse

measurements."  Appx31 (citing Appx3246 (¶15); Appx3247 (¶28); Appx3248

(¶35)).

Masimo faults the Board's reasoning for allegedly relying on a function

already achieved by Aizawa.  *See* Op.Br. 60 ("Aizawa already provides a 'device

for computing the amount of ***motion*** load from the pulse rate." (citing Appx3246

(¶15); Appx5240 (¶84)) (original emphasis).  However, the Board correctly found

that Aizawa does not disclose ***using*** a separately-computed motion load in the way

taught by Inokawa—to help isolate the desired pulse data better while correcting

for inaccurate readings related to body movement.  Appx29-31 (citing Appx3246

27

(¶15); Appx3247 (¶28); Appx3248 (¶35)). The Board credited Dr. Kenny's testimony that a POSITA would understand that using two LEDs to calculate a user's pulse and motion *separately* would enable the device to calculate a "more reliable" pulse rate. Appx30 (citing Appx3042-3043 (¶77); Appx4554-4555 (¶46)). As a result, this is markedly different than *Kinetic Concepts*, where there was no expert testimony on the motivation to combine, and "[t]he record [was] devoid of any reason someone would combine these references." *Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1369 (Fed. Cir. 2012).

Masimo's complaint (at 60) about Dr. Kenny's citation to Nanba is irrelevant. The Board did not rely on Nanba and explained that Dr. Kenny himself did not rely *solely* on Nanba for his opinion; he also relied on Inokawa and the POSITA's knowledge. Appx30-32; Appx3042-3043 (¶77); Appx4554-4556 (¶¶46-47). The Board further noted that Dr. Kenny's specific testimony regarding a POSITA's motivation "to *improve*" pulse rate measurements by using a separate motion measurement "stands unrebutted" because Masimo's expert "sets up a straw man to attack, rather than directly addressing the entirety of Dr. Kenny's testimony." Appx31-32 (original emphasis). This unrebutted testimony is substantial evidence supporting the Board's findings. *See Acoustic Tech., Inc. v. Itron Networked Sols., Inc.*, 949 F.3d 1366, 1374 (Fed. Cir. 2020).

### 3.    A POSITA Would Have Been Motivated To Combine the Teachings To Reliably Upload Pulse Data

The Board independently found that a POSITA would have been motivated to combine Aizawa's and Inokawa's teachings to reliably upload pulse data from Aizawa's detector to another device for display.  Appx32.  The Board relied on Inokawa's explicit teaching that using two emitters allows optically-based data uploading, which has two distinct benefits: (1) "increas[ing] the accuracy of data transmission," and (2) "obviating the need for providing a special wireless communication circuit in the wrist-worn sensor or a communication cable."  *Id.* (cleaned up).

Masimo disputes this finding because Inokawa transmits information by LED light (optical transmission) to a base device, whereas Aizawa allegedly uses a wireless transmitter (radio frequency communication) "for real-time heart rate measurements during exercise."  Op.Br. 61.  However, in seizing on Inokawa's "cumbersome base-station approach," *id.*, Masimo assumes the legally erroneous premise that the combination must bodily incorporate Inokawa's device into Aizawa's device.  *Keller*, 642 F.2d at 425.

Moreover, Masimo's argument rests on a factual interpretation of Aizawa that the Board reasonably rejected.  The Board found that "Aizawa does not describe exactly how transmitter 4 transmits its data to another device."  Even assuming, *arguendo*, that Aizawa "contemplates radio frequency

29

communications," the Board found that displaying real-time pulse data during exercise was ***not*** a goal emphasized or even disclosed by Aizawa. Appx33-34 (citing Appx3246 ¶¶4, 6, 15). The Board's finding is supported by substantial evidence, including Aizawa's disclosure that heart-rate is ***measured*** in real-time contrasted with its silence as to when pulse rate data is ***transmitted*** for display. Appx3246 (¶¶4, 15).

Finally, even if the combination has disadvantages, the Board's additional findings foreclose Masimo's argument. Specifically, the Board found that Inokawa teaches that, in at least some cases, any "benefits achieved" by Aizawa's alleged real-time transmission "can be outweighed by obviating the need for the wrist-worn sensor to include a special wireless circuit." Appx34. That independently supports the Board's motivation-to-combine finding. *In re Urbanski*, 809 F.3d 1237, 1243-44 (Fed. Cir. 2016) (POSITAs may be "motivated to pursue the desirable properties taught by [one reference], even at the expense of foregoing the benefit taught by [another]."); *Intel Corp. v. Qualcomm Inc.*, 21 F.4th 784, 796 (Fed. Cir. 2021) (affirming the Board's weighing of tradeoffs).

**B.    Substantial Evidence Supports the Board's Finding that Ohsaki Would Have Motivated a POSITA To Add a Convex Protrusion to Aizawa To Improve Adhesion [IPR1520/1521, IPR1537/1539/1715]**

Substantial evidence supports the Board's factual finding that Ohsaki would have motivated a POSITA to add a protrusion to Aizawa's sensor to improve

adhesion and help prevent slippage.  *E.g.,* Appx70 ("[A] a POSITA would have

understood from Ohsaki that forming a convex protrusion on the face of an

optically-based pulse sensor where it is pressed against the user's wrist to gather

optical data will beneficially prevent slippage of the sensor during operation.").[12]

As the Board recognized, Ohsaki itself states that its convex surface is "in

intimate contact with the surface of the user's skin," preventing the detecting

element from slipping off the user's wrist.  Appx70 (quoting Appx3356 (¶25));

Appx173; Appx325.  The Board credited Dr. Kenny's testimony that a POSITA

would have understood "that the advantages of a light permeable protruding

convex cover could apply . . . regardless of where on the body such a convex cover

was placed."  Appx4557-4559 (¶52); Appx72; Appx172; *see also* Appx331 (citing

Appx25405-25409 (¶¶22-28)).  It also credited Dr. Kenny's opinion that "adding a

convex surface to Aizawa" would "***improve*** its tendency to not slip off" because "it

is well understood that physically extending into the tissue and displacing the

tissue with a protrusion provides an additional adhesive effect."  Appx4557-4559

(¶52) (original emphasis); Appx72; Appx174; Appx25409 (¶28); Appx331.

---

[12] The Board's analysis of this issue appears at Appx70-73 (IPR1520); Appx170-174 (IPR1521); Appx324-332 (IPR1537); Appx478-487 (IPR1539); Appx641-649 (IPR1715).  In this section, Apple provides representative citations.

### 1. The Court Should Reject Masimo's Wrist Placement Location Arguments

Masimo's challenges to the Board's finding that the combination could work with a sensor on either the wrist's front (palm) side or its back side lack merit. *E.g.*, Op.Br. 49 (citing Appx171), 62-63, 66-67.

The Board properly rejected Masimo's argument that Apple should be limited to the location of Aizawa's sensor (on the wrist's palm side) because Apple's combination does not propose bodily incorporation of Ohsaki's protrusion into Aizawa's device. Appx67; *see also Keller*, 642 F.2d at 425. The Board thus did not abuse its discretion in rejecting Masimo's demand to restrict the sensor's location. Nor was it "Apple's burden to show ***Ohsaki disclosed*** some benefit to using a protrusion at Aizawa's ***palm-side*** location," Op.Br. 47, 49-50, as Masimo suggests. Apple's obviousness theory was not limited to the palm-side location; moreover, a motivation to combine need not be expressly taught ***in the references themselves***. *E.g.*, *Brown & Williamson Tobacco Corp. v. Philip Morris Inc.*, 229 F.3d 1120, 1125 (Fed. Cir. 2000) ("[T]he suggestion to combine need not be express and may come from the prior art, as filtered through the knowledge of [a POSITA]." (internal quotations omitted)).

In any event, the Board credited Dr. Kenny's opinion the combination would work on either side of the wrist. Appx71-73. The Board explained that Ohsaki's device "incorporates a convex protrusion in both instances"—*i.e.*, whether attached

to the back or front side of the wrist—and that Ohsaki teaches such a convex cover "results in improved performance over" a flat cover, "especially when the user is moving," thus indicating an improvement in both instances. Appx71; *see also* Appx325. In making this finding, the Board relied on Dr. Kenny's testimony that a convex protrusion will prevent slipping by extending into and displacing the tissue of the wrist. Appx71-72 (citing Appx4557-4559 (¶52)); *see also* Appx172 (citing Appx8131-8133 (¶¶144-145), Appx9216-9218 (¶¶50-52)); Appx331 (citing Appx23198 (¶23), Appx25408-25409 (¶¶27-28)).

Contrary to Masimo's assertion (at 45-46, 63), the Board accounted for Ohsaki's disclosure that its protrusion has a "tendency to slip off" on the palm-side, explaining that, "[b]ecause the tested device incorporates a convex protrusion in both [front- and back-side] instances, Figures 3A-3B do not support Dr. Madisetti's conclusion that 'Ohsaki teaches that a convex surface on the palm side of the wrist would not prevent slipping'—particularly in comparison to a flat surface such as Aizawa's." Appx71-72; Appx331.

Masimo itself admits that "the Board found that Ohsaki's protrusion may provide ***some benefit*** 'if the user is at rest.'" Op.Br. 48 (quoting Appx172); *see also* Appx331. Although Masimo criticizes the Board's decision in IPR1521 for focusing on this benefit, the Board did so merely to illustrate that "Ohsaki discloses that, in at least some circumstances, a convex surface located on the front

of the user's wrist achieves benefits." Appx172. As the Board noted, the challenged claims "are not limited to detection during movement or exercise." *Id.* Thus, Apple did not need to show a benefit in all locations under all circumstances to establish a motivation to combine. *Cf. Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1166 (Fed. Cir. 2006) (affirming where prior art taught "tertiary amine *sometimes* works to improve the yield" (original emphasis)).

Finally, Masimo's suggestion (at 50) that the Board improperly developed its own theory concerning adhesion is without merit. In finding that Aizawa's adhesion is provided by its acrylic material rather than the flat shape of its cover, the Board was not developing a new obviousness theory, but simply explaining why it declined to give weight to Dr. Madisetti's testimony. Appx72; Appx332. The Board is permitted—indeed, required—to ascertain when an expert's testimony contradicts the plain teaching of a reference. *Apple Inc. v. MPH Techs. Oy*, 28 F.4th 254, 262 (Fed. Cir. 2022) ("The Board [i]s free to reject [an] expert's testimony based on a lack of factual support.").

Accordingly, Masimo's highly factual wrist-location arguments provide no basis to overturn the Board's motivation-to-combine finding.

### 2. Substantial Evidence Supports the Board's Finding that Ohsaki's Cover Need Not Be Rectangular

Masimo's assertion (at 49-50, 52, 64-65) that the Board failed to address Ohsaki's emphasis on longitudinal directionality ignores the Board's extensive

discussion the shape and direction of Ohsaki's sensor, which found—based on cited portions of Ohsaki and Dr. Kenny's testimony—that "Ohsaki does not disclose the shape of its convex cover, much less require it [to] be rectangular." Appx326-329;[13] *see also* Appx71 ("Ohsaki's disclosure does not support Dr. Madisetti's conclusion that it is only in this particular context that a convex protrusion will help prevent slippage."); Appx172 (crediting Dr. Kenny's testimony that "a convex protrusion will help prevent slippage, even in the context of Aizawa's sensor"); Appx239-240 (IPR1536).

The Board rejected Masimo's theory "that the ***only way*** to avoid these bones is by aligning a rectangular cover with the longitudinal direction of the user's forearm." Appx328-329. Rather, the Board concluded, after considering Masimo's expert testimony and annotated figures, *see* Appx316, that it would be well within a POSITA's skill to appropriately size and/or modify a sensor to avoid such well-known anatomical obstacles, for example by reducing the circular sensor's size. Appx328-329 (citing *KSR*, 550 U.S. at 421; *In re Jacoby*, 309 F.2d 513, 516 (CCPA 1962)). In providing this rationale for rejecting

---

[13] Masimo makes the same argument in connection with the combination of Ohsaki and Mendelson-799. *See* Op.Br. 74. The Board's similar analysis in IPR1536/1538/1714 for this issue, *see, e.g.*, Appx238-240 (IPR1536), Appx403-405 (IPR1538), Appx558-560 (IPR1714), should be affirmed for the reasons stated here.

Masimo's expert testimony, the Board was not crafting a new obviousness

argument as Masimo suggests (at 65[14]), but merely explaining why it was

rejecting an "expert's testimony based on a lack of factual support," an activity

properly left to the Board as fact finder.  *See Apple*, 28 F.4th at 262.

> ### 3.    Substantial Evidence Supports the Board's Findings that Improved Adhesion Increases Signal Strength and Detection Efficiency [IPR1537/1539/1715]

Finally, substantial evidence supports the Board's finding that the improved

adhesion from incorporating a protrusion on Aizawa's sensor would ***also*** have

"increased the signal strength of the sensor."  Appx324.[15]

Although Masimo argues (at 63) that Ohsaki does not expressly state that its

protrusion improves signal strength, the Board found that Ohsaki teaches that

improved adhesion results in suppressed variation in the signals reaching the

detectors, reduction in noise, and accordingly better detection of the pulse wave.

Appx324 (citing Appx23198 (¶¶25, 27)); Appx23198 (¶27) (noting the sensor "can

provide high detection probability" due to the detecting element's being "stably

fixed").[16]  The Board also credited Dr. Kenny's testimony that a POSITA would

---

[14] *See also* Op.Br. 72-73 (incorporating this argument into the section regarding Mendelson-799 and Ohsaki).

[15] Masimo makes a similar argument in connection with the combination of Ohsaki and Mendelson-799.  *See* Op.Br. 75-76.  The Board's similar analysis, *see* Appx235-247 (IPR1536), Appx400-412 (IPR1538), Appx556-567 (IPR1714), should be affirmed for the reasons stated here.

[16] Masimo faults the Board for "repeatedly treat[ing] 'signal strength' as synonymous with 'detection efficiency.'"  Op.Br. 63.  In addition to Ohsaki's

have been motivated by these teachings to "apply a cover with a convex surface to Aizawa to resist sensor movement on the user's wrist and to suppress variation" in the signals detected by the sensor, thereby improving signal strength.  Appx324-325 (citing Appx22900-22903 (¶¶85, 87); Appx22944-22945 (¶152)); *see also* Appx330.

The Board properly rejected Masimo's argument that "a convex cover would condense light away from Aizawa's peripheral detectors, which [Masimo] alleges would decrease signal strength."  Appx332.  The Board's analysis mirrors its analysis in IPR1520/1521 regarding a POSITA's motivation to provide a convex protrusion to improve light collection.  As discussed below, substantial evidence supports the Board's findings in that regard, including Dr. Kenny's testimony. Appx332-337 (citing, e.g., Appx25417-25420 (¶¶46-48, 51)); *see* Sec.II.C., *infra*. Further, even if achieving the "motivating benefit" of improved adhesion "comes at the expense of another benefit," that does not negate the adhesion benefit's "use as a basis to modify the disclosure of [Aizawa] with the teachings of [Ohsaki]." *Winner Int'l Royalty Corp. v. Wang*, 202 F.3d 1340, 1349 n.8 (Fed. Cir. 2000). Thus, this Court should affirm even if it rejects the Board's light collection findings.

\* \* \*

---

teachings, Dr. Kenny's testimony establishes a relationship between the two: a convex surface increases the strength of signals that can be detected by Ohsaki's sensor.  *See, e.g.*, Appx22900-22902 (¶¶85-86) (citing, e.g., Appx3356 (¶25)).

Substantial evidence supports the Board's findings that a POSITA would have been motivated to modify Aizawa's device to include a convex protrusion to improve adhesion and prevent slippage.  Because, for all challenged claims, the Board relied on this motivation for providing a convex protrusion to Aizawa's device (as well as Mendelson-799's), this Court may affirm the convex-cover aspect of the Board's decisions on this motivation alone.

### C.     Substantial Evidence Supports the Board's Findings that a POSITA Would Add a Convex Protrusion To Improve Light Collection [17]

#### 1.     Substantial Evidence Supports the Board's Finding that Inokawa Would Have Motivated a POSITA To Add a Protrusion to Aizawa's Sensor To Improve Light Collection [IPR1520/1521]

Masimo argues (at 26) that "[t]he Board's reconfiguration of Aizawa's sensor to purportedly improve light collection . . . finds no support in Inokawa." This statement is fundamentally untrue.  Masimo itself cites one portion of Inokawa providing substantial evidence for the Board's conclusion: "[A] lens is placed on the surface of the sensor-side light-emitting means.  This lens makes it possible to *increase the light-gathering ability* of the LED, as well as to protect the LED or PD."  Op.Br. 27 (citing Appx3278 (¶15); Appx3280 (¶30)).  Although Masimo downplays these sentences by noting that they refer to the *LED's* light

---

[17] The Board's analysis of this issue appears at Appx51-63, Appx90-93 (IPR1520); Appx158-168, Appx187-190 (IPR1521).  In this section, Apple provides representative citations to IPR1520.

*gathering* ability, the Board interpreted this disclosure, in the context of Inokawa as a whole, as showing "that it was known in the art prior to the '265 patent to use a lens to focus diffuse light reflected from body tissue on to *the light detecting elements* of a wrist-worn pulse sensor, to increase the light gathered by the sensor[,]" emphasizing that "it is undisputed that detector 25 is the only component of Inokawa's sensor 1 that gathers light." Appx53-54. These findings are supported by substantial evidence, including Inokawa itself, Appx3278 (¶15), and Dr. Kenny's testimony, Appx4531-4541 (¶¶8-22). *See also* Appx3053 (¶¶95-97); *Allied Erecting & Dismantling Co. v. Genesis Attachments, LLC*, 825 F.3d 1373, 1380 (Fed. Cir. 2016) ("We review the PTAB's underlying factual findings, including what a reference teaches . . . for substantial evidence.").

### 2. The Board's Finding Does Not Disregard Aizawa's Disclosure of Light Detecting Elements on the Sensor's Periphery

Unable to legitimately challenge the Board's finding that Inokawa teaches using a convex lens to focus light on light-detecting elements, Masimo argues this teaching somehow does not apply to Aizawa because its detectors are on the periphery rather than in the center as in Inokawa. Op.Br. 30 (Apple's combinations "placed the LEDs and detectors in the opposite configuration of Inokawa." (emphasis omitted)). Because a POSITA is "a person of ordinary creativity, not an automaton," *KSR*, 550 U.S. at 421, the Board properly found that a POSITA would have known to modify the protrusion's shape to account for the locations of the LEDs and sensors. Appx54-55.

The Board fully considered and accounted for Aizawa's disclosure of detectors at the periphery of the device. *Contra* Op.Br. 25. In analyzing the Aizawa-Inokawa combination, the Board credited Dr. Kenny's proposed modification, which provides a lens whose curvature is most pronounced at its edges, near the detectors. Appx55 (citing Appx3054 (¶97)). Dr. Kenny's illustration is reproduced below, showing detectors in red, the emitter in green, and the proposed lens in blue:



Appx3054.

The Board credited Dr. Kenny's testimony that a POSITA would have understood how to modify Aizawa to add a convex protrusion as taught by Inokawa to increase the light received by the detector, while modifying the protrusion's shape to account for the position of Aizawa's detectors. Appx55-56 (citing Appx3053-3054 (¶¶95-97); Appx4531-4541 (¶¶8-22)). Rejecting Masimo's argument that the proposed convex lens would not improve light gathering at these peripheral locations, the Board explained that, in the proposed modification, "the lens's curvature is most pronounced at the edges of the lens near the peripheral detectors" and such curvature would cause the relevant diffuse light

rays to be directed towards the peripheral detectors in Aizawa. Appx54-56;[18] *see also* Appx52-53 (explaining that "backscattered light is diffuse, rather than collimated" and the significance thereof). Substantial evidence supports these findings, including Dr. Kenny's testimony and principles of physics well-known to POSITAs. *See Unwired Planet, LLC v. Google Inc.*, 841 F.3d 995, 1003 (Fed. Cir. 2016) (relying on expert testimony as substantial evidence).

### 3. Masimo's Arguments Against the "Greatest Curvature" Theory Do Not Show Lack of Substantial Evidence for the Board's Findings

The Board did not err in relying on the so-called "greatest curvature" theory, in which a POSITA would have designed the convex lens such that its greatest curvature is near the detectors thus improving light concentration at those locations. Appx53-55.

As a threshold matter, the Board did not abuse its discretion in considering this theory. Apple's petitions and Dr. Kenny's original declaration consistently state that a POSITA would have incorporated a convex lens into Aizawa to increase light-gathering, as taught by Inokawa. Appx1896-1899; Appx3053-3054 (¶¶95-97). Dr. Kenny's reply declaration merely "further expands" upon this original theory, responding to Masimo's argument that a convex lens would have directed light away from Aizawa's sensors and further showing that a convex lens would improve light-gathering, as argued in the petitions. Appx4527 (¶1); Appx4531-4541 (¶¶8-22). This type of expansion of an already-disclosed theory is

---

[18] Masimo calls this reasoning the "greatest curvature" theory. Op.Br. 33-34.

permissible, particularly where it directly responds to arguments raised by the other party. Appx61-62; *Provisur Techs., Inc. v. Weber, Inc.*, No. 2021-1942, 2022 WL 4474941, at *3 (Fed. Cir. Sept. 27, 2022) ("By concluding that [Petitioner]'s reply evidence properly rebutted [Patent Owner]'s arguments the Board necessarily also determined that Weber didn't have to submit the evidence with its petition."); *Chamberlain Grp., Inc. v. One World Techs., Inc.*, 944 F.3d 919, 925 (Fed. Cir. 2019) ("Parties are not barred from elaborating on their arguments on issues previously raised.").

Substantively, Masimo takes issue (at 34) with the geometric precision it claims the Board ascribed to Apple's figures. But the Board's decision does not rest on such geometric precision. Rather, it credits Dr. Kenny's testimony concerning a widely-known principle of physics, taught in high school—Snell's law. Appx54-55; Appx4531-4532 (¶¶9-10). As the Board found:

> Snell's law indicates "the incoming light rays are refracted in a way that deflects incoming rays somewhat towards these orthogonal lines" and that because "these orthogonal lines vary in orientation most rapidly near the edge, where the illustrated curvature of the lens surface is the greatest" using the illustrated lens in Aizawa "would lead to an improvement in the light concentration at the location of the detectors."

*See* Appx54-55 (quoting Appx4531-4541 (¶¶8-22)). The Board then relies on this finding to evaluate Apple's proposed modification of Aizawa, with the proposed cover shape—where "the lens's curvature is most pronounced at the edges of the lens near the peripheral detectors"—and finds that the modification "takes Inokawa's general teaching of a convex protrusion lens to increase the amount of

incoming light directed to a light detector and applies it to the four light detectors of Aizawa." Appx55-56 (Appx3053-3054 (¶¶95-97); Appx4531-4541 (¶¶8-22)).

Substantial evidence supports the Board's factual finding that a POSITA would have understood how the curvature of a convex lens protrusion influences a light ray's path. Appx45; Appx54-55. Although Masimo suggests (at 42-43) that "specialized education" in optics would have been necessary, the Board credited Dr. Kenny's testimony that a "POSITA would be familiar with Snell's law from high school science demonstrations of light passing through prisms, as well as from introductory required physics courses including with their bachelor's degree programs." Appx4532 (¶10). That and other testimony credited by the Board constitutes substantial evidence that a POSITA would have known "this general concept of optics." Appx63 (citing Appx3053-3054 (¶¶95-97); Appx4531-4541 (¶¶8-10, 15-22); Appx5473-5474 (179:21-180:13); Appx5496 (202:11-20)). This Court should not re-weigh the evidence. *NTP*, 654 F.3d at 1292.

Finally, Masimo argues (at 37) the Board "failed to explain why the "greatest curvature" theory would have led a POSITA to place a single protrusion over multiple detectors. Masimo ignores the Board's explanation that "a POSITA would have been motivated to apply Inokawa's convex lens technology to Aizawa's wrist-worn pulse sensor, to improve its light collection *in a similar manner* versus Aizawa's existing flat cover[,]" specifically illustrating that both covers, convex and flat, envelope multiple optical elements—two emitters and one detector in Inokawa, and four detectors and one emitter in Aizawa. Appx54-55.

43

The Board's reasonable conclusion that the single flat cover would have been replaced with a single convex cover is eminently clear.

Contrary to Masimo's assertion (at 43), Apple was not required to identify a prior art reference that discloses "increased light in a physiological sensor at peripheral detectors under a single protrusion" to show obviousness. Masimo appears to confuse the requirements for obviousness with those for anticipation. *Allied Erecting*, 825 F.3d at 1380-81 (holding it would have been obvious to modify one reference with the teachings of another). The Board was under no obligation, furthermore, to repeat before rejecting Masimo's argument that a POSITA may have preferred multiple covers to a single one, Op.Br. 37, and its failure to do so does not detract from is unmistakable reasoning. *See Novartis AG v. Torrent Pharms. Ltd.*, 853 F.3d 1316, 1328 (Fed. Cir. 2017) ("The Board is not require[d] . . . to address every argument raised by a party or explain every possible reason supporting its conclusion." (internal quotations omitted)). Indeed, Masimo's argument rests on the untenable premise that obviousness requires a showing that the prior art's combined teachings would constitute an optimal or preferred implementation. *E.g.*, *In re Fulton*, 391 F.3d 1195, 1200 (Fed. Cir. 2004) ("[O]ur case law does not require that a particular combination must be the preferred, or the most desirable, combination described in the prior art in order to provide motivation for the current invention.").

### 4.    Dr. Kenny's So-Called Admissions About the Specific Convex Lens in Inokawa Are Immaterial

Masimo faults the Board for crediting Dr. Kenny's testimony despite his supposed "admissions" that the specific configuration of Inokawa's convex lens generally directs light towards Inokawa's detector, located in the center of the device.  *See* Op.Br. 31-32.

As an initial matter, Masimo's arguments are inapposite because the proposed modification does not bodily incorporate Inokawa's specific lens (shaded blue in the central figure below), but rather *modifies* its configuration, accounting for the placement of Aizawa's sensors:



| Aizawa | Inokawa (excerpt) | Proposed Modification |

Appx39; Appx55; *see also Keller*, 642 F.2d at 425.  The Board plainly understood Masimo's argument that Inokawa's specific lens "would direct light *toward the center* of Aizawa's detector 1 where emitter(s) 21 are located, rather than *toward the periphery* where [Aizawa's] detectors 22 are located."  Appx40 (original emphasis); *see also* Appx49.  The Board also understood, however, that Apple's proposed modification was not to use the same lens configuration depicted in Inokawa's Figure 2.  Appx55 (depicting shape of cover in modification).  Instead, the Board recognized that, although Inokawa's *specific* lens may concentrate light toward its central detector, Dr. Kenny's proposed modification of Aizawa uses a

45

different configuration, "tak[ing] Inokawa's general teaching of using a convex protrusion lens to increase the amount of incoming light directed to a light detector, and appl[ying] it to the four light detectors of Aizawa." Appx55-56.

The Board likewise understood that Dr. Kenny acknowledged that "a convex lens would generally direct more light to the center[.]" Appx42; *see also* Appx40. However, Dr. Kenny further explained that a convex lens' same "ability to direct light 'toward the center'" also "would allow the detector to capture light that otherwise would have been missed by the detectors, ***regardless of their location within the sensor device***." Appx4553-4554 (¶¶42-44); *see also* Appx4538-4539 (¶19) (explaining the convex lens "provides an opportunity to capture some light that would not otherwise be captured"); Appx5485-5486 (191:4-192:17). Thus, "'there would be ***some improvement*** in the light concentration at pretty much ***all of the locations under the curvature*** of the lens.'" Appx4538-4539 (¶19) (quoting Appx5458 (164:8-16)). As Dr. Kenny explained, a POSITA would have further known that this improvement in light concentration could be maximized in the "region near the detectors" by placing the curvature in the same regions. Appx4539-4541 (¶¶20-22).

The Board credited Dr. Kenny's "persuasive" testimony "that a POSITA 'would understand how to take advantage of the detector locations and the shape of the convex surface ***so as to obtain an improvement [in Aizawa] in the amount of light arriving at the detectors***,' despite" some rays being refracted away from the detectors. Appx59 (citing Appx4531-4541 (¶¶8-22); Appx6709-6711 (20:9-

46

22:18); Appx6902-6904 (213:11-19, 214:6-215:6)) (original emphasis and alteration). Thus, the Board recognized that Dr. Kenny's testimony is fully consistent and his so-called admissions do not detract from his opinion that a POSITA would have understood the light-gathering benefits of the proposed combination.

Masimo also faults the Board for crediting Dr. Kenny's testimony despite his admission that no specific reference explains "the impact of a convex lens of diffuse light." *See* Op.Br. 40-42. However, the "obviousness analysis cannot be confined" to "the explicit content" of the cited references. *KSR*, 550 U.S. at 419. It necessarily includes "the background knowledge possessed by a person having ordinary skill in the art." *Id.* at 418; *see also* Appx5591-5592 (297:19-298:10) ("[Y]ou don't have to go into excessive, absolute detail on all the laws of physics in these disclosures."). Thus, the Board's well-supported finding that a POSITA would have understood the relevant principles of optics renders it irrelevant that those principles are not expressly stated in the prior art of the combination.

Finally, contrary to Masimo's argument (at 41), the Board's analysis does not rely on interpreting Inokawa's Figure 2 as disclosing the "precise location" where light would be concentrated. Appx54-55. Rather, the Board credited Dr. Kenny's testimony that a POSITA would have applied Inokawa's general teaching of increasing light collection using a convex lens to Aizawa by using a convex protrusion configured to direct light toward Aizawa's sensors. Appx51-63; Appx3053-3054 (¶¶95-97); Appx4531-4541 (¶¶8-22). That theory does not

depend on the prior art (or Dr. Kenny's illustrative figures) providing mathematical precision, particularly where, as the Board noted, the challenged claims "do[] not recite any such detail." Appx60; *see also In re Epstein*, 32 F.3d 1559, 1568 (Fed. Cir. 1994) (considering "the type of detail" in the patent specification). Accordingly, Dr. Kenny's testimony about the lack of detail in the prior art figures is fully consistent with Apple's and the Board's obviousness theory, which is supported by substantial evidence.

### 5.     The Board Did Not Abuse Its Discretion in Considering Nishikawa

Masimo takes issue (at 35-36) with Apple's having "borrowed" the "specific shape of the convex lens" from Nishikawa (Appx3443-3450) without relying on Nishikawa as a formal ground of invalidity. The Board's consideration of evidence outside the petition's formal grounds is a matter within its broad discretion. *Belden Inc. v. Berk-Tek LLC*, 805 F.3d 1064, 1081 (Fed. Cir. 2015).

The Board did not abuse that discretion here because "the nature of Petitioner's reliance on Nishikawa in support of Ground 1A is explained clearly in the Petition, even if Nishikawa is not listed as a third reference[.]" Appx56. Specifically, Apple's petition cites Nishikawa and Dr. Kenny's testimony concerning Nishikawa as part of its analysis regarding the combination of Aizawa and Inokawa. Appx1898-1899 (citing Appx3443-3450, Appx3056 (¶99)). Dr. Kenny explained his illustrative use of Nishikawa in his original declaration.

("[M]any prior art references of this period, *such as Nishikawa* (shown below) demonstrate exactly how such a lens shape may be incorporated into a molded cover."). Appx3056 (¶99). The Board, therefore, concluded that the Petition sufficiently identified "the grounds on which the challenge to each claim is based, and the evidence that supports the grounds for the challenge . . . ." *Id.* (citing 35 U.S.C. § 312(a)(3)). The Board did not abuse its discretion.

Masimo further argues (at 36) that "[n]o evidence explained why a POSITA would have used Nishikawa's curvature, which directs *outgoing* light from an LED, to design the cover of a physiological sensor monitoring *incoming* light." Dr. Kenny explained, however, that Nishikawa's lens is simply "a representative example of a manufacturable molded lens with similar optical and mechanical requirements," which would "do a good job of obtaining the benefits at a modest cost." Appx5475 (181:8-16). As the Board recognized, a lens shape like Nishikawa's would "'provide curvature in the lens where it can do the most good,'" Appx57 (quoting Appx5473-5475 (179:21-180:13)), by "allow[ing] more light to be gathered and refracted toward the light receiving cavities of Aizawa." *E.g.*, Appx3054-3056 (¶¶97-99). Masimo is thus incorrect (at 36) to suggest that "no evidence" explains why a POSITA would have used a lens shape like Nishikawa's.

49

### 6.  Substantial Evidence Supports the Unpatentability of '265 Patent Claims 12 and 14 [IPR1520/1521]

Claims 12 and 14 of the '265 patent require that "the light permeable cover is configured to reduce a mean path length of light traveling to the at least four detectors." Appx771. Masimo did not argue that claims 12 and 14 were separately patentable below; rather, it discussed these claims only in the context of incorrectly arguing that that Dr. Kenny's proposed modification would direct light away from Aizawa's sensors. Appx63-64; Appx2212-2219; Appx2237 (providing no separate argument for the challenged dependent claims). Thus, as a threshold matter, this Court should limit its review to the argument Masimo "actually presented to the Board" and not separately consider the patentability of claims 12 and 14. *Novartis*, 853 F.3d at 1329. At a minimum, the Board's consideration of claims 12 and 14 "was at least commensurate with [Masimo]'s presentation of those issues," confirming that the Board's treatment of those claims was adequate. *Id.* at 1327-28.

In any event, substantial evidence supports the Board's finding that claims 12 and 14 would have been obvious. Dr. Kenny explained that Inokawa's convex lens would "refract[] and concentrat[e] the light coming in through Aizawa's acrylic plate." Appx3053-3054 (¶96); Appx3068-3069 (¶119). As an example, Dr. Kenny provided illustrations showing how this would reduce the path length of an individual ray of light. Appx3068-3069 (¶¶119-120). The Board adopted his

analysis as its own. Appx64. His testimony therefore constitutes substantial evidence supporting the Board's judgment. *Unwired Planet,* 841 F.3d at 1003.

Although Masimo now argues that Dr. Kenny's illustrated examples are inadequate because they concern a single ray of light, his ***testimony*** was not so limited; instead, it was generally applicable to "the light passing through" Aizawa's modified cover. Appx3068-3069 (¶119); *see also* Appx3053-3054 (¶96); Appx5491-5492 (197:11-198:16) (testifying that the illustrated example was a "***representative*** example" and that "if I repeated this analysis for a multitude of path lengths, I would find that the majority of them would have a shorter path length"). Accordingly, the Board's finding that Dr. Kenny's illustrations of a single light ray were consistent with a reduction in ***mean*** path length is supported by substantial evidence. Appx64 (citing, e.g., Appx1921-1923); Appx335-336.

Masimo is also wrong that the Board "never squared" the "greatest curvature" theory with Dr. Kenny's testimony for claims 12 and 14. Dr. Kenny specifically acknowledged that the "refraction effect" of the lens's convex shape would shift "the distribution of light from the edge toward the center somewhat," Appx5500 (206:5-21), consistent with his explanation for why Inokawa's convex lens would reduce the mean path length. Appx3053-3054 (¶96); Appx3068-3069 (¶¶119-120). Dr. Kenny acknowledged (unremarkably) that, as a result, "some

[light] rays that would have hit the detectors" would be "refracted away from the detectors." Appx6708-6709 (19:3-20:8).

However, as noted above, Dr. Kenny also explained that this same "ability to direct light 'toward the center'" also "would allow the detector to capture light that otherwise would have been missed by the detectors," improving "the light concentration at pretty much all of the locations under the curvature of the lens." Appx4553-4554 (¶¶42-44); Appx4538-4539 (¶19) (quoting Appx5458 (164:8-16)); Appx5485-5486 (191:8-192:17). Dr. Kenny further explained that, according to Snell's law, this light-gathering benefit could be focused in the "region near the detectors" by placing the curvature in the same regions. Appx4539-4541 (¶¶20-22). The Board adopted Dr. Kenny's opinion that a POSITA "would understand how to take advantage of the detector locations and the shape of the convex surface" to improve the overall amount of light arriving at the detectors regardless of some rays being refracted away from the detectors. Appx59 (citing Appx4531-4541 (¶¶8-22); Appx6709-6711 (20:9-22:18); Appx6902-6904 (213:11-19, 214:6-215:6)). Thus, the Board amply explained why the lens's refracting light somewhat toward the center is fully consistent with also increasing the concentration of light at Aizawa's detectors in the proposed combination.

7. **Substantial Evidence Supports the Board's Finding that Inokawa Would Have Motivated a POSITA To Add a Protrusion to Mendelson-1988's Sensor To Increase Light Collection [IPR1520/1521]**

In IPR1520 and IPR1521, the Board found that a POSITA would have combined Mendelson-1988 and Inokawa to improve light collection, explaining that its "reasoning is substantially identical to the analysis provided in connection with [the Aizawa-Inokawa combination], with Mendelson-1988 replacing Aizawa in the combination." Appx90-91; *see also* Appx90-93 (IPR1520); Appx187-190 (IPR1521). Substantial evidence, including Dr. Kenny's testimony, supports the Board's finding that a POSITA would have been motivated to combine Inokawa's teaching of a convex protrusion with Mendelson-1988. Appx91 (citing Appx3105-3106 (¶180)).

Masimo says that its arguments with respect to the Aizawa-Inokawa combination apply to the Board's findings regarding Mendelson-1988 and Inokawa, but highlights only that Mendelson-1988's sensor has peripheral detectors. Op.Br. 53. As explained above, the Board fully considered Masimo's arguments pertaining to peripheral detectors and found that, in light of Inokawa's teachings, a POSITA would have been motivated to use a convex lens protrusion, configured to accommodate the detectors' peripheral location, to focus light on the detectors, thereby increasing light collection. Appx90-91 (referencing the Board's prior analysis at Appx38-63); *see also* Secs.II.C.1-4, *supra*.

53

Masimo appears to argue that the Board should have found that "Mendelson"[19] teaches away from the combination.  Op.Br. 53 ("Mendelson demonstrates why placing a protrusion on Mendelson-1988's sensor would have contradicted decades of the thinking in the field.").  Yet, Masimo resorts to a reference—Mendelson-799, Appx15586-15587 (2:47-53, 3:27-67)—that is ***not part of the combination*** at issue,[20] confirming that the prior art at issue (Mendelson-1988+Inokawa) does ***not*** teach away.  *See Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*, 876 F.3d 1350, 1360 (Fed. Cir. 2017).  As discussed below in connection with the grounds based on Mendelson-799 in IPR1536/1538/1714, the Board considered and properly rejected Masimo's arguments that this reference's caution against applying excessive pressure negates the motivations to use a convex cover to achieve the benefit of increased light collection.  *See* Sec.II.G.2, *infra*; *see also* Appx242-243.

---

[19] Throughout its brief, Masimo employs this misleading moniker to obfuscate its attempt to recast the teachings of the particular prior art used in a combination (Mendelson-1988 or Mendelson-799) by referring to other references naming Yitzhak Mendelson as a co-author (Mendelson-2006 (Appx23200-23201), Mendelson-1991 (Appx15645-15647)).  These disclosures span 18 years.  The Board was not fooled by this tactic and properly examined the teachings of the references at issue.

[20] Masimo also resorts (at 53) to Mendelson-2006, Appx23200-23201, which likewise has no bearing on the combination of Mendelson-1988 and Inokawa.

**D.     Substantial Evidence Supports the Board's Finding that Scratches Would Not Have Prevented a POSITA from Using a Convex Protrusion To Protect Sensor Elements [IPR1537/1539/1715]**

The Board did not err in finding that using a convex cover to protect sensor elements would have been obvious irrespective of Masimo's arguments concerning scratches. It recognized that the protrusion's shape "is one of numerous tradeoffs that a [POSITA] would consider in determining whether the benefits of increased adhesion, signal strength, and protection outweigh the potential for" scratches. Appx337-338 (IPR1537); Appx491-492 (IPR1539); Appx653-654 (IPR1715).[21] Accordingly, the Board's finding that "the possibility of scratches alone would not have dissuaded a [POSITA] from the proposed modification," Appx338, is supported by substantial evidence. Appx25423 (¶58); *Intel*, 21 F.4th at 796.

Although Masimo argues (at 67-68) that Aizawa's flat plate sufficiently protects the sensor components, the Board found that "adding a convex cover, such as that taught by Ohsaki, would also protect the sensor's internal components in a manner similar to Aizawa's flat acrylic plate." Appx337 (citing, e.g., Appx22903 (¶87)). Masimo also conceded at the IPR hearing "that a convex cover would indeed serve to protect the internal sensor components in Aizawa." Appx337 (citing Appx20759-20760). This is thus "simply a case of substituting one

---

[21] In this section, Apple provides representative citations to IPR1537.

known" structure for protecting sensor elements "for another" which "could be interchangeably used," which is sufficient to support the Board's motivation-to-combine finding. *Almirall, LLC v. Amneal Pharms. LLC*, 28 F.4th 265, 273-74 (Fed. Cir. 2022).

### E.    Substantial Evidence Supports the Board's Finding that Particular Protrusion Heights Would Have Been Obvious [IPR1538, IPR1539, IPR1714, IPR1715]

Certain claims at issue in four different IPRs[22] recite specific protrusion height ranges of greater than 1 or 2 millimeters and less than 3 millimeters. Substantial evidence supports the Board's finding that these protrusion heights would have been obvious.

Although Masimo argues (at 69-71, 79) that the Board acknowledged that no references expressly teaches the ranges, an express teaching is unnecessary where, as here, there are "a finite number of identified, predictable solutions" to a problem. *See KSR*, 550 U.S. at 398; *Uber Techs., Inc. v. X One, Inc.*, 957 F.3d 1334, 1340 (Fed. Cir. 2020).

Specifically, the Board found "that only a finite number of solutions existed with respect to the height of a convex protrusion on a tissue-facing sensor, which would have met the art-recognized goals of both (1) intimate contact between the

---

[22] '554 patent claims 11, 17 (IPR1539); '554 patent claim 28 (IPR1538 and IPR1539); '765 patent claims 12, 18, 29 (IPR1714, IPR1715).

sensor's surface and the user and (2) user comfort."  Appx503-504 (citing

Appx37298-37299 (Ohsaki) (¶¶6, 25)).  Indeed, Masimo's expert "did not dispute

Dr. Kenny's position that there were a finite number of options available for the

height of the convex surface."  Appx504 (citing Appx40395-40398 (¶¶121-24)).

Thus, Dr. Kenny's acknowledgement that Ohsaki does not disclose the size of its

components with geometric precision is irrelevant.  *Uber Techs.*, 957 F.3d at 1340;

*see also, e.g.*, Appx5803-5804 (57:18-58:16); Appx5841 (95:8-18).

On appeal, Masimo does not directly challenge the Board's underlying

finding that only a finite number of identified, predictable ranges existed for the

***height of the convex surface*** that comfortably makes intimate contact with human

flesh, instead focusing on the general "complexity of designing a physiological

sensor" as a whole, Op.Br. 70, which is unrelated to the Board's finding that these

particular height ranges would have been obvious.[23]

The Board credited Dr. Kenny's testimony that a POSITA "would have

found it obvious that a device designed to fit on a user's wrist would be on the

order of millimeters" given the practical limits on dimensions based on the

intended location for the device's use (wrist) and the scale of the devices described

---

[23] Similarly, Masimo cites Dr. Kenny's deposition testimony discussing the protrusion's ***shape***, Op.Br. 70 (citing, e.g., Appx5818 (testifying he had Mendelson's circular shape in mind when combining with Ohsaki)), which does not pertain to the particular protrusion ***heights*** that a POSITA would have found obvious.

in the evidence before the Board.  Appx503 (quoting Appx37119 (¶275)).  The

level of precision Masimo claims was missing from Dr. Kenny's analysis is not

required.  *See In re Warsaw Orthopedic, Inc.*, 832 F.3d 1327, 1332 (Fed. Cir.

2016) (stating the governing law does not require that a reference disclose

"dimensions that *exactly* meet the limitation" (original emphasis)).

Given this "order of millimeters" scale and the practical limitations Dr.

Kenny identified, the Board ultimately credited Dr. Kenny's testimony that

protrusion heights in the range of 2 to 3 millimeters would have been obvious "to

provide a comfortable cover featuring a protruding convex surface that prevents

slippage."  Appx504 (quoting Appx37119 (¶276)).  The Board thus offered a

reasoned, context-specific analysis, supported by substantial evidence, for its

finding about a finite number of design choices that "would have met the art-

recognized goals."  Appx503-504.

F.   **Substantial Evidence Supports the Board's Findings Regarding Communication of Measurement Information [IPR1537/IPR1539/IPR1715]**

Certain claims of the challenged patents require communicating

measurement information to a touch-screen display or mobile phone, and some

require the sensor device to wirelessly communicate with a handheld computing

device.[24]  In analyzing these claims, the Board relied on four references, adding Mendelson-2006 (Appx23200-23203) to the Aizawa-Inokawa-Ohsaki combination.  Appx346-350 (IPR1537); Appx494-500 (IPR1539); Appx656-663 (IPR1715).[25]

Masimo mischaracterizes the Board's analysis and Apple's combination in asserting (at 71-72) that the Board's findings are inconsistent because the proposed combination allegedly eschewed and embraced wireless transmission.  The Board found that combining Aizawa and Ohsaki would have resulted in multiple LEDs allowing wireless transmission of data to a base device.  Appx346.  Inokawa's base device ***thereafter*** transmits information received from the sensor to the PC.  *Id.* The Board found a POSITA would have been motivated to incorporate "a touchscreen display or mobile phone as further taught by Mendelson-2006" into this combined system.  Appx347.  Indeed, the Board noted that Aizawa and Inokawa already discuss the desirability of sending data to a computer, although without further detail.  *Id.* (citing Appx22888 (¶66); Appx22996 (¶257); Appx22998 (¶261)).  The Board then credited Dr. Kenny's testimony that a POSITA would have been motivated to transmit sensed data to a wireless

---

[24] *See* '553 patent claims 7, 8, 19 (IPR1537: Appx972); '554 patent claims 1, 20, and their dependents (IPR1539: Appx1074-1076); and '765 patent claims 1, 21, and their dependents (IPR1715: Appx1177-1179).

[25] In this section, Apple provides representative citations to IPR1537.

handheld computing device, rather than Inokawa's PC.  *Id.* (citing Appx22888 (¶66); Appx22996 (¶257); Appx22998 (¶261)).  This Court should decline Masimo's invitation to re-weigh this evidence.  *Regents of the Univ. of Cal. v. Broad Inst., Inc.*, 903 F.3d 1286, 1294 (Fed. Cir. 2018).

>   **G.  Substantial Evidence Supports the Board's Finding that a POSITA Would Have Been Motivated To Add a Convex Protrusion to Mendelson-799's Sensor [IPR1536/1538/1714]**

Substantial evidence supports the Board's finding that a POSITA would have applied a convex cover, such as that taught by Ohsaki, to Mendelson-799's sensor: (1) to "improve adhesion between the sensor and the user's tissue," (2) to "improve detection efficiency," and (3) to "protect the elements within sensor housing."  Appx235-248 (IPR1536); Appx400-413 (IPR1538); Appx556-568 (IPR1714).[26]  The same reasoning from sections II.B-D, *supra*, applies to this combination.  In addition, Masimo makes several arguments unique to Mendelson-799, none of which negates the substantial evidence supporting the Board's decision.

>   **1.  Substantial Evidence Supports the Board's Finding that a POSITA Would Have Added a Protrusion To Protect Sensor Elements**

The Board found that Mendelson-799 lacks "a cover over emitters 12a-c or detectors 16, 18[,]" unlike Ohsaki's convex cover which protects it emitter and

---

[26] In this section, Apple provides representative citations to IPR1536.

detector. Appx247 (citing Appx15583 (Fig. 7), Appx15283 (¶87)). The Board, therefore, credited Dr. Kenny's testimony that incorporating Ohsaki's convex cover would provide ***additional protection*** to Mendelson-799's components. Appx247 (citing Appx15283 (¶87). Although Masimo argues (at 77) that a POSITA would have instead added a "flat surface" to Mendelson-799's housing for protection, Ohsaki teaches a convex cover, which is sufficient to render that known approach obvious. *Gen. Elec.*, 983 F.3d at 1352.

The Board also properly rejected Masimo's scratch arguments, again concluding that this consideration "is one of numerous tradeoffs that a person of ordinary skill in the art would consider." Appx248; *see also Intel*, 21 F.4th at 796; Sec.II.D, *supra*. Thus substantial evidence—including Mendelson-799 itself, Dr. Kenny's testimony, and the POSITA's knowledge—supports the Board's findings.

### 2. Substantial Evidence Supports the Board's Interpretations of Ohsaki and Mendelson-799

Ignoring the Board's factual findings about what the prior art discloses, Masimo argues a POSITA would not have combined Ohsaki and Mendelson-799 because he would have believed that placement on the wrist's backside (disclosed by Ohsaki) was an unsuitable location for taking oxygen saturation measurements (disclosed by Mendelson-799) due to the amount of pressure required on the sensor and Mendelson-799's caution against applying too much. Op.Br. 75-77.

This argument relies on an interpretation of Ohsaki that the Board rejected: "We do not agree" that "Ohsaki's benefits are realized only when the sensor and convex surface are placed on the back of the user's wrist." Appx242. Further, the Board found that Mendelson-799 does ***not*** "discourage[] or disparage[] use on the back of the wrist or suggest[] that an unacceptably weak signal would be obtained from another location[,]" noting that Mendelson-799 itself contemplates taking measurements from multiple locations on the body. *Id.* (citing Appx15586 (2:17-19); Appx15754-15758 (§7.2)). Masimo does not directly challenge the Board's interpretation of the prior art, which is supported by substantial evidence. In addition, the Board correctly determined that Apple's combination does not require using the sensor on the back of the user's wrist. Appx242.

While that alone is sufficient to affirm the Board's motivation-to-combine findings, the Board did more. It further found that, even if a POSITA "would have expected a weaker signal if Mendelson-799's sensor was used on the back of the wrist," that result would have motivated a POSITA to improve signal quality by, for example, "employing Ohsaki's convex surface." Appx242-243. As discussed above, the Board's findings that a convex protrusion would increase light collection and thus improve signal quality, Appx241, are supported by substantial evidence. *See* Sec.II.C, *supra*.

Masimo also criticizes the Board for allegedly failing to consider Mendelson-799's warnings against applying too much pressure, but fails to explain why the combination of Mendelson-799 and Ohsaki would necessarily result in too much pressure. Op.Br. 76-77. In any event, this argument ignores the Board's finding that, if the sensor placement resulted in a weaker signal, a POSITA would have further improved signal quality by using a convex surface as Ohsaki teaches. Appx242-243. Although the Board did not explicitly state that this solution would have obviated any need for unacceptable pressure, its rationale for rejecting Masimo's argument is easily discernable, *In re Nuvasive*, 842 F.3d 1376, 1382 (Fed. Cir. 2016), and it is not required "to address every argument raised by a party or explain every possible reason supporting its conclusion,'" *Novartis*, 853 F.3d at 1328 (internal quotation omitted).

Finally, Masimo argues the Board failed "to acknowledge Ohsaki's express teaching and emphasis on longitudinality." Op.Br. 74. However, the Board did address Masimo's argument; it simply disagreed with Masimo's underlying interpretation of Ohsaki as requiring "aligning a rectangular cover with the longitudinal direction of the user's forearm." Appx239-241. As discussed above, substantial evidence supports the Board's interpretation of Ohsaki and its findings regarding how a POSITA would have applied its teachings. *See* Sec.II.B.2, *supra* & n.13.

63

### 3.    Ohsaki's Depiction of Air Gaps Does Not Teach Away

Masimo argues (at 73-74) that combining Mendelson-799 with Ohsaki would create undesirable air gaps between the sensor and the skin, causing errors that could be avoided by using a flat surface, which it argues would be the "best solution" and the solution "Mendelson consistently used."[27]  First, this Court's precedent "does not require that a particular combination must be the preferred, or the most desirable, combination described in the prior art in order to provide motivation for the current invention." *Fulton*, 391 F.3d at 1200.  Second, the specific configuration of Mendelson-799's housing is entirely irrelevant to the *obviousness* finding, which adds a convex cover like Ohsaki's.  The ground is not one of anticipation. *See Allied Erecting*, 825 F.3d at 1380-81.

Third, the Board (1) recognized that Apple did not propose "including any air gaps that may be present in Ohsaki" but rather "propose[d] modifying Mendelson-799 only to include a cover with a convex surface[,]" Appx246; and (2) found that a POSITA would have known to and been capable of "eliminat[ing] any air gap that would have decreased signal strength or quality[,]" given that the purpose of the modification was "to increase signal strength[,]" Appx246-247

---

[27] Masimo references "Mendelson" without identifying a specific reference. Op.Br. 74; *see* n.19, *supra*.  Its citations indicate it relies jointly on references that are not part of the combination at issue. *See* Appx3360 (Mendelson-1988); Appx15645-15647 (Mendelson-1991).

(citing Appx17835-17836 (¶48)).  *See also* Appx17835-17837 (¶¶48-51).  The

Board's findings in this regard are confirmed by Ohsaki's disclosure that "the

convex surface is in 'intimate contact' with the user's skin[,]" which would have

taught a POSITA "to minimize any such air gap that may be present when

including a cover with a convex surface in Mendelson-799's sensor."  Appx246-

247 (quoting Appx15572 (¶25)); *see also* Appx17836-17837 (¶50).

Masimo attempts to distract from this substantial evidence by focusing on

Dr. Kenny's testimony, Appx6122-6123 (376:3-377:5), which it mischaracterizes

as "confirm[ing] that Ohsaki illustrates its protrusion ***creates*** air gaps."  Op.Br. 74

(original emphasis).  However, Dr. Kenny merely acknowledged that Ohsaki's

drawings include small air gaps.  Appx6122-6123 (376:3-377:5).  He also

explained that a POSITA would not have interpreted Ohsaki's figures "as precise

representations of the concepts described."  Appx17836 (¶49).  The Board agreed

and rightly recognized that the small air gaps depicted in Ohsaki "do not define the

precise proportions of the elements."  *Hockerson-Halberstadt, Inc. v. Avia Group*

*Int'l*, 222 F.3d 951, 956 (Fed. Cir. 2000).  A POSITA is "a person of ordinary

creativity, not an automaton."  *KSR*, 550 U.S. at 421.  The Board's factual finding

that "it would have been within the capability of an ordinarily skilled artisan to

eliminate any air gap that would have decreased signal strength or quality" is

supported by substantial evidence and establishes that any air gaps in Ohsaki are

not relevant to the ultimate obviousness inquiry.  Appx246-247; Appx15572 (¶25);

Appx17835-17837 (¶¶48-51).

## III.  Substantial Evidence Supports the Board's Findings that a POSITA Would Have Had a Reasonable Expectation of Success

Masimo argues the Board erred in finding that a POSITA would have had a

reasonable expectation of success in each group of IPRs at issue.  *See* Op.Br. 53-57

(IPR1520/1521), 68 (IPR1537/1539/1715), 77-79 (IPR1536/1538/1714).

Substantial evidence supports the Board's factual findings concerning these

"question[s] of fact."  *PAR Pharm. Inc., et al. v. TWI Pharms.*, 773 F.3d 1186,

1196 (Fed. Cir. 2014); *see also BTG Int'l Ltd. v. Amneal Pharms. LLC*, 923 F.3d

1063, 1074 (Fed. Cir. 2019).

### A.  A POSITA Would Have Had a Reasonable Expectation of Success in Combining Aizawa with Inokawa [IPR1520/1521]

Masimo does not dispute that a POSITA would have a reasonable

expectation of success with respect to including multiple emitters in the

Aizawa/Inokawa combination.  Nor does Masimo address a POSITA's expectation

of success at improving adhesion in the Aizawa/Inokawa/Ohsaki combination for

these IPRs.[28]  Instead, Masimo's reasonable expectation of success argument for

these IPRs stems from its disagreement with Dr. Kenny's testimony about

improving light collection.  *See* Op.Br. at 53-57.  However, the Board "relied on

---

[28] Masimo challenges reasonable expectation of success for that combination, but limits its arguments to IPR1537, IPR1539, and IPR1715.  Op.Br. 62-68.

Dr. Kenny's testimony that a POSITA would have understood a lens operates by increasing the light concentration most where the curvature of the lens is the greatest," which is substantial evidence of a reasonable expectation of success. *E.g.*, Appx62-63 (citing Appx3053-3054 (¶¶95-97); Appx4531-4541 (¶¶8-22)); *see also Univ. of Cal.*, 903 F.3d at 1294 (affirming "the Board's fact-finding as to a lack of reasonable expectation of success" based in part on expert testimony). Masimo's retort to this evidence (at 54) is merely to reiterate its flawed assertion that the Board abused its discretion in considering it. *See* Sec.II.C.3, *supra*.

Masimo's remaining arguments related to a POSITA's expectation of success in combining Aizawa with Inokawa demand a level of detail that is not required here. For example, Masimo faults Dr. Kenny for not explaining to its satisfaction "how a POSITA would have balanced the effects of the 'additional light-capture' theory with the convex surface's ordinary light *condensing* function that directs light away from the peripheral detectors." Op.Br. 54 (citing Appx5499-5501 (205:13-207:10)). Yet the Board agreed with Dr. Kenny that striking this balance would have been within the level of skill in the art. Appx59 (citing Appx4531-4541 (¶¶8-22); Appx6709-6711 (20:9-22:18); Appx6902-6904 (213:11-19, 214:6-215:6). Similarly, Masimo faults Dr. Kenny for not addressing "numerous complex factors" or providing specific "details of the curvature

67

design." Op.Br. 54-55.[29]  The Board properly rejected these arguments because the

'265 patent fails to provide the detail Masimo demands from the prior art.

Appx60; *see also* Appx63 ("Moreover, the invention of claim 1 is recited at this

same general level of utility and structure.").  This parallel level of detail is

additional evidence[30] supporting the Board's findings of reasonable expectation of

success.  *See Epstein*, 32 F.3d at 1568 ("[T]he Board's observation that appellant

did not provide the type of detail in his specification that he now argues is

necessary in prior art references supports the Board's finding that one skilled in the

art would have known how to implement the features of the references.").

---

[29] Masimo claims (at 55) Dr. Kenny admitted the benefit of a curved lens would not be obvious, but Dr. Kenny merely questioned whether Inokawa contemplates the hypothetical scenario posed during his deposition.  *See* Appx5380-5384 (86:1-90:21); *see also* Appx5625-5629 (331:1-335:18).

[30] The Board also relied on Dr. Kenny's testimony that "a POSITA "would understand how to take advantage of the detector locations and the shape of this convex surface *so as to obtain an improvement [in Aizawa] in the amount of light arriving at the detectors*, despite the . . . considerations" Masimo identifies, finding it persuasive in light of the "extremely small" "difference in the length traveled by the light rays." *See, e.g.*, Appx59-60 (citing Appx6709-6711 (20:9-22:18); Appx6902-6904 (213:11-19, 214:6-215:6); Appx4531-4541 (¶¶8-22); Appx4544-4554 (¶44); Appx4243 (Fig. 1(b)); Appx4244 (Fig. 2); Appx3247 (¶26)) (internal quotations omitted, original alteration and emphasis).

**B.    A POSITA Would Have Had a Reasonable Expectation of Success in Combining Aizawa with Inokawa, Ohsaki, and/or Mendelson-2006 [IPR1537/1539/1715]**

The Board did not accept merely conclusory statements that a POSITA would have had a reasonable expectation of success in combining Aizawa with one or more of Inokawa, Ohsaki, and Mendelson-2006. *Contra* Op.Br. 68. Masimo's brief does not clearly explain whether its argument relates to any particular combination of these references. *See id.* (citing Appx501; Appx663-664; Appx324-325).[31] Regardless, substantial evidence supports the Board's determination of reasonable expectation of success.

For example, Dr. Kenny notes that applying Inokawa's teachings would have been "nothing more than improving Aizawa's pulse wave sensor that uses a single LED with the use of a known technique disclosed by Inokawa to detect and record body motion in addition to blood flow." Appx501; Appx37008 (¶78). Dr. Kenny further opined that applying Ohsaki's teachings would have been "nothing more than adjusting transparent plate 6's shape to include a convex protrusion/lens surface similar to that disclosed by Ohsaki, and one of ordinary skill would have understood that this adjustment would improve adhesion to the user's skin and

---

[31] The decisions cited by Masimo address varying combinations: IPR1539 and IPR 1715 address a combination of Aizawa, Inokawa, Ohsaki, and Mendelson-2006 (Appx501; Appx663-664), whereas IPR1537 addresses only Aizawa+Ohsaki (Appx324-325).

69

reduce variation in the signals detected by the sensor."  Appx37061-37062 (¶160).

Finally, Dr. Kenny opined that "applying Mendelson[-]2006's teachings . . . would

have led to predictable results without altering or hindering the functions

performed by the physiological sensor device.  In fact, one of ordinary skill would

have been motivated to implement the well-known technique of wirelessly

transmitting data . . . to a handheld computing device."  Appx37071 (¶178).

This testimony provides a number of reasons a POSITA would have

expected success and thus constitutes substantial evidence.  *Univ. of Cal.*, 903 F.3d

at 1294.

### C.    A POSITA Would Have Had a Reasonable Expectation of Success in Combining Mendelson-799 with Ohsaki [IPR1536/1538/1714]

Substantial evidence likewise supports the Board's reasonable expectation of

success finding for Mendelson-799+Ohsaki.  Appx237.

Masimo argues the Board contradicts itself because it stated "Ohsaki's

translucent board 8 would simply be placed over the components accommodated

within Mendelson-799's sensor housing," while also maintaining that the

combination does not require bodily incorporation.  Op.Br. 77-79 (citing Appx237,

Appx402, Appx557-558).  These conclusions are consistent.  As the Board

recognized, "Petitioner proposes incorporating [into Mendelson-799] Ohsaki's

***teaching*** of a cover with a convex surface, not the precise cover and structure

disclosed by Ohsaki."  Appx234.  The Board credited Dr. Kenny's testimony that

Ohsaki's general teachings regarding its cover and Mendelson-799's sensor

housing could be easily combined.  Appx234; Appx237.

Masimo again complains (at 78-79) about Dr. Kenny's failure to provide

"real dimensions" of the components in the combination.  Establishing obviousness

does not require such "real dimensions."  *Warsaw Orthopedic*, 832 F.3d at 1332.

## IV.   Masimo Presented No Objective Evidence of Nonobviousness to the Board

Masimo vaguely suggests that its inventions achieved commercial success,

*e.g.*, Op.Br. 3; "unexpected" results, Op.Br. 40; overcame industry skepticism, *see*

Op.Br. 53 (arguing that Mendelson-1988+Inokawa "would have contradicted

decades of thinking in the field"); or achieved recognition, *e.g.* Op.Br. 3, 7.

However, throughout all eight IPRs, Masimo presented no evidence or argument

concerning objective evidence of nonobviousness to the Board.  Appx9; Appx115;

Appx207; Appx286; Appx368; Appx439; Appx525; Appx602.  Because Masimo

"did not ask the Board to make any factual determinations" on these issues, this

Court should reject Masimo's puffery.  *Mobility Workx, LLC v. Unified Patents,*

*LLC*, 15 F.4th 1146, 1152 n.2 (Fed. Cir. 2021).

## V.    The Court Should Set Aside the Board's Judgment for '554 Patent Claims 14-18 [IPR1539]

In IPR1539, the Board found that claims 14-18 of the '554 patent would

have been obvious.  However, claims 14-18 depend from claim 13, which the

Board upheld.  Appx512-513; Appx1075.  Generally, "dependent claims are nonobvious if the . . . claims from which they depend are nonobvious." *In re Fritch*, 972 F.2d 1260, 1266 (Fed. Cir. 1992).  Although Apple does not concede that any of Masimo's claims are patentable, to streamline the issues, Apple has not cross-appealed the Board's judgment concerning claim 13.  Under these circumstances, Apple agrees that the Board's obviousness holding for claims 14-18 of the '554 patent should be set aside.

## CONCLUSION

Although this Court should set aside the Board's judgment concerning claims 14-18 of the '554 patent, it should affirm in all other respects.

Dated:  October 5, 2022                    Respectfully submitted,

                                 */s/ Lauren A. Degnan*
                                 Lauren A. Degnan
                                 Christopher Dryer
                                 W. Karl Renner
                                 Jared Hartzman
                                 Adi A. Williams
                                 FISH & RICHARDSON P.C.
                                 1000 Maine Ave., Suite 1000
                                 Washington, DC 20024
                                 Telephone: (202) 783-5070

                                 Ashley Bolt
                                 FISH & RICHARDSON P.C.
                                 1180 Peachtree Street NE, 21st Floor
                                 Atlanta, GA 30309
                                 Telephone: (404) 892-5005

## CERTIFICATE OF SERVICE AND FILING

I certify that on October 5, 2022, I electronically filed the foregoing

**RESPONSE BRIEF OF APPLE INC.** using the Court's CM/ECF filing system.

Counsel for appellee were electronically served by and through the Court's

CM/ECF filing system per Fed. R. App. P. 25 and Fed. Cir. R. 25(e).


*/s/ Lauren A. Degnan*
Lauren A. Degnan

## <u>CERTIFICATE OF COMPLIANCE</u>

The **RESPONSE BRIEF OF APPLE INC.** is submitted in accordance with the type-volume limitation of Fed. Cir. R. 32(b).  The **RESPONSE BRIEF OF APPLE INC.** contains 13,970 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Fed. Cir. R. 32(b)(2).  This **RESPONSE BRIEF OF APPLE INC.** has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in Times New Roman, 14 Point.

Dated:  October 5, 2022                    */s/ Lauren A. Degnan*
                                            Lauren A. Degnan