**[Volume VIII, Appx05295 – Appx54846]**

**Nos. 22-1631, -1632, -1633, -1634, -1635, -1636, -1637, -1638**

IN THE

# United States Court of Appeals

**FOR THE FEDERAL CIRCUIT**

———————————

MASIMO CORPORATION,

*Appellant,*

v.

APPLE INC.,

*Appellee.*

APPEAL FROM THE PATENT TRIAL AND APPEAL BOARD
CASE NOS. IPR2020-01520, IPR2020-01521, IPR2020-01536, IPR2020-01537,
IPR2020-01538, IPR2020-01539, IPR2020-01714, IPR2020-01715

## JOINT APPENDIX

Joseph R. Re, *Principal Counsel*
Stephen C. Jensen
Jarom D. Kesler
Stephen W. Larson
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
2040 Main Street, 14th Floor
Irvine, CA 92614
(949) 760-0404

Jeremiah S. Helm
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
1717 Pennsylvania Ave., N.W.
Washington, D.C. 20006
(202) 640-6400

*Attorneys for Appellant*
*Masimo Corporation*

November 16, 2022

Lauren A. Degnan, *Principal Counsel*
Christopher Dryer
W. Karl Renner
Jared Hartzman
Adi A. Williams
**FISH & RICHARDSON P.C.**
1000 Maine Ave., Suite 1000
Washington, DC 20024
Tel: (202) 783-5070

Ashley Bolt
**FISH & RICHARDSON P.C.**
1180 Peachtree Street NE,
21st Floor
Atlanta, GA 30309

*Attorneys for Appellee Apple Inc.*

**Table of Contents**

| Date | Paper No. /Ex. No. | Document | Pages |
|---|---|---|---|
| **VOLUME I** | | | |
| 2/23/2022 | 39 | Final Written Decision [IPR2020-01520] | Appx00001-Appx00106 |
| 4/11/2022 | 33 | Final Written Decision [IPR2020-01521] | Appx00107-Appx00198 |
| 2/23/2022 | 43 | Final Written Decision [IPR2020-01536] | Appx00199-Appx00276 |
| **VOLUME II** | | | |
| 2/23/2022 | 43 | Final Written Decision [IPR2020-01537] | Appx00277-Appx00358 |
| 2/23/2022 | 43 | Final Written Decision [IPR2020-01538] | Appx00359-Appx00428 |
| 2/23/2022 | 41 | Final Written Decision [IPR2020-01539] | Appx00429-Appx00514 |
| 4/6/2022 | 34 | Final Written Decision [IPR2020-01714] | Appx00515-Appx00591 |
| **VOLUME III** | | | |
| 4/6/2022 | 33 | Final Written Decision [IPR2020-01715] | Appx00592-Appx00675 |
| n/a | | U.S. Patent 10,258,265 | Appx00676-Appx00772 |
| n/a | | U.S. Patent 10,292,628 | Appx00773-Appx00870 |
| **VOLUME IV** | | | |
| n/a | | U.S. Patent 10,588,553 | Appx00871-Appx00973 |
| n/a | | U.S. Patent 10,588,554 | Appx00974-Appx01076 |
| n/a | | U.S. Patent 10,631,765 | Appx01077-Appx01179 |
| **VOLUME V** | | | |
| 5/25/2022 | 16 | Notice Forwarding Certified Lists | Appx01180-Appx01529 |
| **VOLUME VI** | | | |
| 5/25/2022 | 16 | Notice Forwarding Certified Lists | Appx01530- |

| Date | Paper No. /Ex. No. | Document | Pages |
|---|---|---|---|
|  |  | (Continued) | Appx01876 |
|  | **VOLUME VII** |  |  |
| 8/31/2022 | 2 | Petition for *Inter Partes* Review [IPR2020-01520] | Appx01878; Appx01896-1899; Appx01921-1923; Appx01953 |
| 5/28/2021 | 21 | Patent Owner's Response [IPR2020-01520] | Appx02191; Appx02212-2220; Appx02237 |
| 8/20/2021 | 24 | Petitioners Reply to Patent Owner's Response to Petition [IPR2020-01520] | Appx02275; Appx02306 |
| 1/6/2022 | 37 | December 7, 2021 Oral Hearing Transcript [IPR2020-01520] | Appx02449; Appx02458; Appx02498; Appx02501-2506; Appx02530; |
|  | Ex. 1003 | Declaration of Thomas W. Kenny [IPR2020-01520] | Appx03000; Appx03025-3030; Appx03040-3057; Appx03068-3071; Appx03095-3107 |
|  | Ex. 1006 | Aizawa U.S. Pub. No. 2002/0188210 [IPR2020-01520] | Appx03242-3248 |
|  | Ex. 1007 | Inokawa JP20060296564A [IPR2020-01520] | Appx03249-3271 |
|  | Ex. 1008 | Certified English Translation of Inokawa and Translators Declaration [IPR2020-01520] | Appx03272-Appx03295 |
|  | Ex. 1014 | U.S. Pub. No. 2001/0056243 [IPR2020-01520] | Appx03352-3357 |
|  | Ex. 1015 | Mendelson Design and Evaluation of a New Reflectance Pulse Oximeter Sensor [IPR2020-01520] | Appx03358-3364 |
|  | Ex. 1023 | Nishikawa U.S. Pub. No. 2007/0145255 [IPR2020-01520] | Appx03443-3450 |

| Date | Paper No. /Ex. No. | Document | Pages |
|------|------|----------|-------|
| | Ex. 1041 | Deposition Transcript of Dr. Vijay Madisetti Day 1 [IPR2020-01520] | Appx04112; Appx04243; Appx04244 |
| | Ex. 1047 | Second Declaration of Dr. Thomas W. Kenny [IPR2020-01520] | Appx04525; Appx04527-4559 |
| | Ex. 2004 | Madisetti Declaration [IPR2020-01520] | Appx05185; Appx05240; Appx05245-5246 |
| **VOLUME VIII** | | | |
| | Ex. 2006 | 4/22/2022 Kenny, Thomas Deposition Transcript [IPR2020-01520] | Appx05295; Appx05319; Appx05380-5384; Appx05458; Appx05473-5474; Appx05475; Appx05485-5486; Appx05491-5492; Appx05496; Appx05499-5501 |
| | Ex. 2007 | 4/23/2022 Kenny, Thomas Deposition Transcript [IPR2020-01520] | Appx05567; Appx05591-5592; Appx05625-5629 |
| | Ex. 2008 | 4/24/2021 Kenny, Thomas Deposition Transcript [IPR2020-01520] | Appx05747; Appx05803-5804; Appx05818; Appx05841; Appx05851-5852; Appx05876-5877; Appx05973-5974 |
| | Ex. 2009 | 4/25/2021 Kenny, Thomas Deposition Transcript [IPR2020-01520] | Appx06013; Appx06122-6123 |
| | Ex. 2027 | 9/18/2021 Kenny, Thomas Deposition Transcript 9/18/2021[IPR2020-01520] | Appx06690; Appx06708-6711; Appx06902-6904 |
| 9/2/2020 | 1 | Petitioner's Power of Attorney [IPR2020-01521] | Appx06952 |

| Date | Paper No. /Ex. No. | Document | Pages |
|---|---|---|---|
| 9/2/2020 | 2 | Petition for *Inter Partes* Review [IPR2020-01521] | Appx06953; Appx06973-6974 |
| 7/9/2021 | 15 | Patent Owner's Response [IPR2020-01521] | Appx07300; Appx07324-7325 |
|  | Ex. 1003 | Declaration of Dr. Thomas W. Kenny [IPR2020-01521] | Appx08051; Appx08131-8133 |
|  | Ex. 1047 | Second Declaration of Dr. Thomas W. Kenny [IPR2020-01521] | Appx09183; Appx09216-9218 |
| 8/31/2020 | 3 | Petition for *Inter Partes* Review [IPR2020-01536] | Appx12444; Appx12476-12477 |
| 6/1/2021 | 24 | Patent Owner's Response [IPR2020-01536] | Appx12820; Appx12851-12854 |
| 10/5/2021 | 32 | Patent Owner's Sur-Reply to Reply [IPR2020-01536] | Appx12955; Appx12974 |
|  | Ex. 1003 | Declaration of Dr. Kenny [IPR2020-01536] | Appx15237; Appx15278-15286 |
|  | Ex. 1009 | U.S. Pub. No. 2001/0056243 Ohsaki [IPR2020-01536] | Appx15568; Appx15572 |
|  | Ex. 1012 | U.S. Patent No. 6,801,799 Mendelson [IPR2020-01536] | Appx15578-15593 |
|  | Ex. 1017 | Mendelson Design and Evaluation of a New Reflectance Pulse Oximeter Sensor [IPR2020-01536] | Appx15638 |
|  | Ex. 1018 | Mendelson Skin Reflectance Pulse Oximetry In Vivo Measurements from the Forearm and C [IPR2020-01536] | Appx15645-15647 |
|  | Ex. 1019 | Webster Design of Pulse Oximeters [IPR2020-01536] | Appx15651; Appx15754-15758 |
|  | Ex. 1047 | Second Declaration of Dr. Thomas W. Kenny [IPR2020-01536] | Appx17805; Appx17824-17837 |
| 1/16/2022 | 41 | December 7, 2021 Oral Hearing Transcript [IPR2020-01537] | Appx20696; Appx20759-20760 |
|  | Ex. 1003 | Declaration of Dr. Kenny [IPR2020-01537] | Appx22855; Appx22888; Appx22890-22906; |

| Date | Paper No. /Ex. No. | Document | Pages |
|---|---|---|---|
| | | | Appx22937-22945; Appx22995-23001 |
| | Ex. 1009 | U.S. Pub. No. 2001/0056243 Ohsaki [IPR2020-01537] | Appx23194; Appx23198 |
| | Ex. 1010 | Mendelson A Wearable Reflectance Pulse Oximeter for Remote Physiological Monitoring [IPR2020-01537] | Appx23200-23203 |
| | Ex. 1047 | Second Declaration of Dr. Thomas W. Kenny [IPR2020-01537] | Appx25392; Appx25405-25409; Appx25414-25423 |
| | Ex. 1003 | Declaration of Thomas W. Kenny [IPR2020-01539] | Appx36967; Appx37008; Appx37061-37062; Appx37071; Appx37119 |
| | Ex. 1009 | U.S. Pub. No. 2001/0056243 Ohsaki [IPR2020-01539] | Appx37295; Appx37298-37299 |
| | Ex. 2004 | Madisetti Declaration [IPR2020-01539] | Appx40313; Appx40395-40398 |
| | Ex. 1003 | Declaration of Thomas W. Kenny [IPR2020-01715] | Appx50582; Appx50680-50681 |
| | Ex. 2004 | Declaration Madisetti [IPR2020-01715] | Appx54761; Appx54845-54846 |

56633311

Page 1

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

| | | |
|---|---|---|
| APPLE INC., | ) | |
| | ) | IPR NO. 2020-1520 |
| Petitioner, | ) | US PATENT NO: 10,258,265 |
| | ) | |
| -against- | ) | IPR NO. 2020-1537 |
| | ) | US PATENT NO: 10,588,553 |
| MASIMO CORPORATION, | ) | |
| | ) | IPR NO. 2020-1539 |
| Patent Owner. | ) | US PATENT NO: 10,588,554 |

_____ )


VIDEO-RECORDED DEPOSITION OF

THOMAS WILLIAM KENNY, JR. PH.D.

VOLUME 1

Zoom Recorded Videoconference

04/22/2021

9:02 a.m. (Pacific Daylight Time)




REPORTED BY:  AMANDA GORRONO, CLR

CLR NO. 052005-01




_____

DIGITAL EVIDENCE GROUP

1730 M Street, NW, Suite 812

Washington, D.C. 20036

(202) 232-0646

**MASIMO 2006**
**Masimo v. Apple**
**IPR2020-01520**

**Appx05295**

Page 25

1    ordinary skill in the art in view of Aizawa and

2    Inokawa would appreciate that there are several

3    improvements possible and that they would be

4    motivated to, to achieve those particular

5    improvements.

6              So, for example, one such improvement

7    would be to use -- to modify the light-permeable

8    cover in order to achieve an improvement in detection

9    efficiency.

10         Q.    Okay.  And you said several, "several

11   improvements possible."

12             What several improvements are you

13   referring to?

14             MR. SMITH:  Objection; form.

15         A.    So Inokawa, in Paragraph 96, Inokawa

16   teaches that the lens makes it possible to increase

17   the light-gathering ability of the LED and continue

18   describing that benefit in Paragraph 97, discussing

19   how the modified cover would allow more light to be

20   gathered and refracted towards the light receiving

21   cavities of Aizawa.

22         Q.    Anything else?

Page 86

1          Q.        Well, we can get there in a moment.

2     But let me just ask you about Figure 2 in Inokawa.

3     And I'm not proposing that you change the lens or any

4     of the structure in any way, other than to put the

5     LED in the middle and detectors on the outside.

6                    And my question to you is:  Would a

7     person of ordinary skill in the art have understood

8     that even in that configuration the lens would still

9     concentrate light towards the center, correct?

10                   MR. SMITH:  Objection; form.

11         A.        So I think one of ordinary skill in

12    the art would understand that a lens, in general, can

13    provide concentration of light.  The locations and

14    directions of that concentration depend on the

15    details of the design of the lens, the location of

16    the sources, and the location at which you're

17    interested in the presence or absence of

18    concentration.

19                   I think one of ordinary skill in the

20    art would understand that in Inokawa the objective is

21    to concentrate light at the detector, which is in the

22    center axis of the drawing and that the lens is

Page 87

1    capable of providing that benefit.

2              If we're going to move the lenses and

3    the LEDs and detectors around and ask different

4    questions, it's -- it isn't so obvious that Inokawa

5    is specifically considering those scenarios.  It's a

6    little more hypothetical.

7        Q.    I don't think that answers my

8    question, to be quite honest with you.  My question

9    is Figure 2 in Inokawa, you testified that a person

10   of ordinary skill in the art would look at that and

11   understand that the lens combines the benefit of

12   directing light towards the center detector.  And I'm

13   asking if, if the only thing you change in Figure 2

14   of Inokawa was to put the LED in the center and the

15   detectors on the outside, wouldn't the lens still

16   concentrate light towards the center?

17             MR. SMITH:  Objection; form.

18       A.    So in that arrangement, the lens does

19   many things to different rays of light coming in from

20   different directions, different reflection spots,

21   different corpuscles for light along the axis coming

22   into the lens.  As I explained, the lens, that

Page 88

1    particular shape, one would understand that that lens

2    would provide concentration towards the center in

3    addition to effects on light rays elsewhere in the

4    system that might also include concentration at other

5    locations.

6              Q.        Let me put it this way.  Is it your

7    opinion that the convex shape would, would affect

8    light differently simply by swapping the location of

9    the detectors and LEDs?

10             MR. SMITH:  Objection; form.

11             A.        I just want to be clear that what is

12   generally understood here isn't a single simple focal

13   point of concentration.  Light coming in from

14   different directions in this case would be understood

15   by a person of ordinary skill in the art to be

16   concentrated at different locations in this, in this

17   system.  Light coming in pretty much along the normal

18   axis in the center would tend to be concentrated by

19   this particular idea of a lens towards the center,

20   underneath the lens.  But light coming in from other

21   angles could be concentrated in other locations.  The

22   lens provides a general benefit of light

Page 89

1    concentration, not just at the center.

2        Q.      So it's your opinion that a light

3    can -- sorry -- that a lens can concentrate light in

4    more than one location?

5                MR. LARSON:  Let me strike that.

6        Q.      It's your opinion that a convex lens

7    can concentrate light to more than one location?

8                MR. SMITH:  Objection; form.

9        A.      It depends on the location of the

10   light source, yes.

11       Q.      How about overall light entering the

12   lens, your -- is it your testimony that the light can

13   be concentrated at more than one location?

14       A.      I think one of ordinary skill in the

15   art understands that light entry in a lens like this

16   is not 100 percent concentrated into a single

17   location.

18       Q.      But overall light -- overall is the

19   light that enters a convex lens concentrated to one

20   particular location?

21       A.      I think I just said one would

22   understand that light coming in from all angles is

Page 90

1    not going to be concentrated to a single location by

2    a convex lens.  One of ordinary skill would know

3    that.

4          Q.      And so when you use the term

5    "concentrating light," what do you mean?

6          A.      It's deflecting using refraction and,

7    and the shape of the surfaces to deflect the light to

8    concentrate it at a desired location.

9          Q.      Let me ask it this way.  In, in

10   Inokawa Figure 2, does the convex lens result in more

11   light, more light reaching the center detector as

12   compared to a flat surface or less light reaching the

13   center detector?

14                 MR. SMITH:  Objection; form.

15         A.      So Inokawa teaches that the lens

16   makes it possible to increase the light-gathering

17   ability.  Incorporating a convex lens-like shape, as

18   described, increases the light-collection efficiency

19   which in turn leads to an enhanced signal-to-noise

20   ratio.  The lens shape of Inokawa provides this by

21   refracting and concentrating light coming in.

22         Q.      So earlier you were very clear that

Page 164

1    single focal point.  It produces a, a sort of

2    concentration over a region.

3          Q.      What region?

4          A.      It depends on the shape of the lens

5    and the thickness of the less and other parameters,

6    distance from the, the face of the lens to the

7    locations of the detectors.

8          Q.      How about the, the, the lens in your

9    combination, the figure at the bottom right below

10   Paragraph 97?

11         A.      Yeah, I would say there's some, given

12   the arrangement of the corpuscles as the reflecting

13   objects in the space all around underneath that lens,

14   that there would be some improvement in the light

15   concentration at pretty much all of the locations

16   under the curvature of the lens.

17         Q.      And so when you said the convex shape

18   results in a concentration over a region, your

19   opinion is that the convex shape in your combination

20   in the figure on the right below Paragraph 97 would

21   increase light concentration at all the locations

22   below the curvature of the lens; is that correct?

Page 179

1        A.        -- if we go all the way to the edge

2   from like the corner at the end of the cover, for

3   example, where there's no nearby curvature to help

4   redirect the light, there would be less light there

5   and more light inwards of that.

6        Q.        Because the light is being directed

7   from an edge more towards the center, correct?

8        A.        There's a lot of different things

9   going on for different rays of light.  I'd say some

10  of the light coming to that edge has a better chance

11  of being refracted inwards because of the curvature

12  versus a flat plate.  That's not true all the way at

13  the edge but it is inwards from there.  And the

14  refraction also has the benefit of, of increasing the

15  concentration of the light.  So it's a capture and

16  refraction benefit.

17       Q.        So when it's referenced a moment ago,

18  the flat plate, your cover on the very ends is flat,

19  correct?

20       A.        In this example, yes.

21       Q.        Why did you include -- why did you

22  make the ends, the exterior of the cover flat?

Page 180

1                    MR. SMITH:  Objection; form.

2          A.        I can think of a number of reasons

3    for that.  If we look at the example provided by

4    Nishikawa, which illustrates a lens feature shaped

5    more or less of the same sort for an LED package,

6    when I read Nishikawa and look at that reference, my

7    understanding is that the design here is intended to

8    provide curvature in the lens where it can do the

9    most good and otherwise try to avoid excess use of

10   material in order to create curvature in locations

11   where it wouldn't do any good.  That's my

12   interpretation of some of what's going on in

13   Nishikawa.

14         Q.        Okay.  So if you look at Figure 6

15   from Nishikawa which is under your Paragraph 99, is

16   that what you're referring to?

17         A.        Yes.

18         Q.        One that has a similar shape to the

19   shape of your cover in the combination of

20   Aizawa-Inokawa?

21         A.        Yes.

22         Q.        Why would a person of ordinary skill

Page 181

1    in the art be motivated to include the shape Aizawa

2    as part of the -- sorry.

3              Why would a person that's skilled in

4    the art be motivated to include the shape Nishikawa

5    as a part of your combination?

6              MR. SMITH:  Objection; form.

7         A.    Could you repeat that?

8         Q.    Yeah.  Why would a person of ordinary

9    skill in the art be motivated to include the shape of

10   Nishikawa in your combination of Aizawa and Inokawa?

11        A.    So Nishikawa is a representative

12   example of a manufacturable molded lens with similar

13   optical and mechanical requirements plus details of

14   how to go about the manufacturing process that I

15   would regard as helping me do a good job of obtaining

16   the benefits at a modest cost.

17        Q.    And so you think a person of ordinary

18   skill in the art -- so it's your opinion that a

19   person of ordinary skill in the art would have relied

20   on --

21             MR. LARSON:  Strike that.

22        Q.    While we're looking at Figure 6 below

Page 191

1    implies a tight focus, that's not what I intended.  I

2    intended that there be an improvement in the

3    concentration across most -- across that surface.

4         Q.      And if the lens is not increasing the

5    total amount of light, where is that concentrated

6    light coming from?  Where would it have been in the

7    absence of a convex lens?

8         A.      So as we discussed, the convex shape

9    allows light that might have been just specularly

10   reflected off of the flat plate to be captured and

11   refracted inwards.  And in the region where there's

12   curvature, it allows the light to be concentrated,

13   and in this case, roughly speaking, in the

14   neighborhood of the detectors and inwards.

15        Q.      Why would a convex shape allow light

16   that might have been reflected off of a flat plate

17   instead be captured?

18             MR. SMITH:  Objection to form.

19        A.      The angle of incidence for a

20   particular ray coming in is different when it

21   encounters that flat plate versus a plate that has a

22   convex shape.

Page 192

1          Q.        And so the light may be more likely

2    to be reflected off the flat surface than the convex

3    shape?

4          A.        For some example of rays coming in at

5    an oblique angle, that would be true, yes.

6          Q.        And why is that?

7          A.        Well, in the extreme case imagine a

8    ray that's coming in parallel to that surface, it

9    would just slide right on by, but in case of the

10   convex lens, it encounters a protrusion which has a

11   different angle of incidence and, therefore, the, the

12   coefficient of reflection and transmission are

13   different than for the light that's just 100 percent

14   sliding along.

15              That's the extreme case, but I, I

16   point it out just to give you an example of the

17   physics that plays up here.

18         Q.        And is it your testimony that a

19   person of ordinary skill in the art would have

20   understood that?

21         A.        That a convex lens is capable of

22   gathering light over, over a wider range of angles

1          A.          Part of that that's inside the, the

2     lens, yes, is refracted more towards the center,

3     because the location where it strikes the surface,

4     there is a different angle of incidence because of

5     the curvature of the lens.

6          Q.          Let me ask you a little bit about

7     this claim limitation.  If you want to turn back to

8     Page 69.  You're discussing here, I think this is a

9     mean path length of light.  Do you see that?

10          A.          Uh-huh.

11          Q.          I think you said a moment ago you

12     were calculating a path length.  I guess I want to

13     ask you, how did you interpret mean path length for

14     your analysis?

15                    MR. SMITH:  Objection; form.

16          A.          So my understanding is that this is a

17     particular but representative example path, and

18     that -- you know, if I'm thinking about what goes on

19     here, the two situations will have the same path

20     length if the angle of incidence is the same, whereas

21     because of the curvature of the lens, the curvature

22     provides a higher angle of incidence for most path

Page 198

1    length.  So the refractive effect will lead to a

2    short mean of the path on average of the mean.

3         Q.     So what you're showing here is

4    that -- so when --

5              MR. LARSON:  Sorry, strike that.

6         Q.     So what you're discussing here when

7    you say a mean path length, you're talking about the

8    path on average; is that is that fair?

9              MR. SMITH:  Objection; form.

10        A.     So a mean path length mean the same

11   as an average patent length, yeah.

12        Q.     Is that how you're understanding it?

13        A.     My understanding, yes, would be if I

14   repeated this analysis for a multitude of path

15   lengths, I would find that the majority of them would

16   have a shorter path length.

17        Q.     If you go down to Paragraph --

18   Paragraph 119, you say, "In more detail, I noted

19   above for [1d] how the lens/protrusion of Inokawa,

20   which is used to modify Aizawa's cover, provides a

21   condensing function by refracting the light passing

22   through it."

Page 202

1    correct?

2          A.      That sentence doesn't exclude that

3    there would be light concentration taking place at

4    other locations.  It merely says that there will be

5    more light gathered and refracted towards the

6    light-receiving cavities than would have been the

7    case with a flat plate.

8          Q.      Is it your understanding that light

9    can be thought to --

10              MR. LARSON:  Strike that.

11         Q.      If the light is being refracted

12   towards the light-receiving cavities of Aizawa, isn't

13   the light being refracted away from somewhere else?

14         A.      So, you know, as we said, the lens is

15   not amplifying the light.  It's capturing and

16   redirecting the light.  It -- because of its shape is

17   able to capture more light due to the convex shape,

18   and it's able to increase the concentration of the

19   light directed towards the cavities under the regions

20   where the curvature of the lens is present.

21         Q.      Right.  And my question, though, is

22   slightly different.  I understand that you're saying

Page 205

1    general would direct more light to the center; the

2    other is your testimony that a protruding lens

3    overall would capture more light.  Am I capturing

4    your testimony correctly?

5          A.      I think one of ordinary skill in the

6    art would appreciate that those are both true,

7    simultaneously, that you have the, the, the general

8    lens-like shape of the convex lens provides

9    refraction which allows additional concentration of

10   light and light-collection efficiency, and that the

11   protrusion provides an opportunity to capture some

12   light that would otherwise not be captured.

13         Q.      So just so we're clear, though, if

14   you put aside your reasoning that the protrusion

15   would otherwise provide an opportunity to capture

16   more light that otherwise would be captured, the

17   light that's being focused more towards the center is

18   being directed away from the exterior, correct?

19         A.      So the relative amounts of that -- of

20   those two effects and the relative sizes of those

21   effects, center of the edge, would depend on the

22   details of the curvature design.  You know, if we had

Page 206

1    a spherical example or this example or some other

2    examples there would be different amounts of these

3    two effects at different locations.  So it's hard to

4    give a general accurate answer.

5         Q.      Oh, and my question, to be clear, I'm

6    trying to have you focus on just one of the effects.

7    So just for the -- and, you know, you can go on and

8    provide more testimony, you can provide testimony

9    about the other fact that you sort of -- but focusing

10   just on the first effect, the fact that the convex

11   lens will direct more light toward the center means

12   that it will be directing more light away from the

13   sides, correct?

14        A.      I think one of ordinary skill in the

15   art looking at this illustration on the bottom right

16   of Page 55 would understand that both effects are

17   present, but to the extent we're focused just on the

18   refraction effect and not the light capture effect,

19   that the, the distribution of light on that surface

20   would be shifted from the edge towards the center

21   somewhat depending on the details of the shape.

22        Q.      Let me ask you about the -- this

Page 207

1    other effect, then, and I guess my question would be

2    how would a person of skill in the art have balanced

3    the two effects overall what, what the impact would

4    be on where light falls in the sensor?

5                    MR. SMITH:  Objection; form.

6            A.      These are two effects combined with

7    many other effects that one of ordinary skill working

8    on this problem would be balancing the lens design

9    against all of those other considerations.  There

10   isn't a simple answer to that.

11           Q.      Okay.  And to be clear, your

12   Declarations don't discuss this effect of capturing

13   more light due to the convex shape, correct?

14                   MR. SMITH:  Objection; form.

15           A.      So it's, I think, one of the

16   characteristics of a convex lens that one of ordinary

17   skill in the art would understand, is able to capture

18   light at angles of incidence that a flat plate might

19   not capture.  That's, I think, within what a person

20   of ordinary skill in the art would know.

21           Q.      Okay.  But you didn't discuss that in

22   your Declarations; is that fair?

Page 273

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

| | | |
|---|---|---|
| APPLE INC., | ) | |
| | ) | IPR NO. 2020-1520 |
| Petitioner, | ) | US PATENT NO: 10,258,265 |
| -against- | ) | IPR NO. 2020-1537 |
| | ) | US PATENT NO: 10,588,553 |
| MASIMO CORPORATION, | ) | |
| | ) | IPR NO. 2020-1539 |
| Patent Owner. | ) | US PATENT NO: 10,588,554 |
| | ) | |

_____

VIDEO-RECORDED DEPOSITION OF

THOMAS WILLIAM KENNY, JR. PH.D.

VOLUME 2

Zoom Recorded Videoconference

04/23/2021

9:02 a.m. (PDT)


REPORTED BY: AMANDA GORRONO, CLR

CLR NO. 052005-01


_____

DIGITAL EVIDENCE GROUP

1730 M Street, NW, Suite 812

Washington, D.C. 20036

(202) 232-0646

**MASIMO 2007**
**Masimo v. Apple**
**IPR2020-01520**

Case: 22-1631   Document: 32-8   Page: 27   Filed: 11/16/2022

4/23/2021                Apple, Inc. v. Masimo Corp.   Thomas Kenny, Jr. Ph.D., Vol II

Page 297

1            None of the sources you cite in your

2    Declarations discuss or explain this description that

3    you're providing regarding the impact of a convex

4    lens on diffuse light, correct?

5        A.    I think it's well known to one of

6    ordinary skill in the art that if you consider a

7    diffuse light source in a lens, you have to account

8    for all the difference rays propagating in all

9    different directions and that the effect of the lens

10   on all of that is going to be complicated.

11           Some rays will be deflected towards

12   the center; some deflected towards the edge; some

13   deflected horizontally or, you know, left and right,

14   not closer to the center or the edge.

15           It's -- you have all different angles

16   possibly coming into this lens.  So it's -- there's

17   no simple statement that one can make about the

18   effect of the lens on all of light.

19       Q.    So you're saying that it would be

20   well known in one of ordinary skill in the art, but

21   you agree with me that none of the sources you cite

22   in your Declarations discuss or provide this

Case: 22-1631    Document: 32-8    Page: 28    Filed: 11/16/2022

4/23/2021                Apple, Inc. v. Masimo Corp.    Thomas Kenny, Jr. Ph.D., Vol II

Page 298

1    explanation that you're providing regarding the

2    impact of a convex lens on diffuse light, correct?

3           A.      Correct.

4                   MR. SMITH:  Objection; form.

5           A.      One of ordinary skill in the art

6    would understand that you don't have to go into

7    excessive, absolute detail on all the laws of physics

8    in these disclosures.  They assume their audience is

9    of ordinary skill and understands these things and,

10   and builds from that.

11          Q.      So you agree that as a matter of

12   basic physics, a person of ordinary skill in the art

13   would understand that collimated light that enters a

14   convex surface will be directed towards the center,

15   correct?

16          A.      If it's along -- if it's aligned down

17   the axis of the, you know, axis of symmetry of the

18   lens, as shown in Figure 14 of the '265 patent, then

19   that, that will be true.  If you bring the light in

20   from a different angle, that may not be true.  But

21   the general orientation of that figure shows the lens

22   and the light lined up in a way that would produce a

Case: 22-1631    Document: 32-8    Page: 29    Filed: 11/16/2022

4/23/2021                Apple, Inc. v. Masimo Corp.    Thomas Kenny, Jr. Ph.D., Vol II

Page 331

1          Q.        My question is:  Can you recall any

2    prior art reference that has a physiological sensor

3    with multiple detectors under a convex cover?

4                    Sitting here during the deposition,

5    can you recall any such reference?

6          A.        Not off the top of my head.

7          Q.        So looking, again, at your

8    combination of Aizawa and Inokawa on Page 55 of your

9    Declaration as previously marked Exhibit Apple 1003,

10   can you pull that up again?

11         A.        Page 65?

12         Q.        Yes -- or Page 55, the bottom of

13   Page 55, yeah.

14         A.        Uh-uh.  Okay.

15         Q.        In the bottom right figure, which

16   is -- the bottom right figure is your, your, your

17   combination of Aizawa and Inokawa, correct?

18         A.        That's correct.

19         Q.        In that bottom right figure, if one

20   were to move the detectors slightly toward the

21   center, would a person of ordinary skill in the art

22   expect an increase or a decrease in signal strength

Appx05625

Page 332

1    at the detectors?

2                    MR. SMITH:  Objection; form.

3        A.        So it's not obvious because part of

4    the answer depends on the depth of the likely

5    locations of the corpuscles that are going to provide

6    the diffuse reflection, and I don't have any

7    dimensions here to scale that against.  It would be a

8    judgment of sort of aspect ratio between those

9    distances and the distances here.  It could be true,

10   it might, might not be.  It would depend on the other

11   dimensions.

12       Q.        This is your figure, correct?

13       A.        Yes.

14       Q.        You created this figure?

15       A.        Yes.

16       Q.        Okay.  And your testimony is that

17   you're not able to tell me whether in the figure you

18   created the signal strength can go up or down if the

19   detectors were moved closer to the center?

20                    MR. SMITH:  Objection; form.

21       A.        That's correct.  The figure was

22   intended to illustrate the general concept of the

Case: 22-1631    Document: 32-8    Page: 31    Filed: 11/16/2022

4/23/2021                    Apple, Inc. v. Masimo Corp.    Thomas Kenny, Jr. Ph.D., Vol II

Page 333

1    combination of a protruding convex cover, following

2    the teachings of Aizawa and Inokawa, and that the

3    detailed implementation would be straightforward work

4    from one of ordinary skill in the art that would

5    involve the specific positioning of the elements.

6        Q.      What if the, what if the sensor was

7    placed in the same location for both series of

8    measurements, same environment, and the only change

9    was that the detectors are placed slightly towards

10   the center, would a person of ordinary skill in the

11   art expect an increase or a decrease in signal

12   strength?

13              MR. SMITH:   Objection; form.

14       A.      You know, without knowing anything in

15   a quantitative nature about the sizes of actual

16   dimensions of the objects and the expected depth in

17   the tissue where the corpuscles are likely to be

18   providing the strongest reflection, that's an un- --

19   that's an ill-posed question.

20       Q.      So you don't know the sizes of the

21   dimensions of the combination that you proposed in

22   the figure in the right-below Paragraph 97?

Case: 22-1631    Document: 32-8    Page: 32    Filed: 11/16/2022

4/23/2021                  Apple, Inc. v. Masimo Corp.    Thomas Kenny, Jr. Ph.D., Vol II

Page 334

1                        MR. SMITH:  Objection; argumentative.

2          A.       The figures are intended to

3     illustrate how one might combine a protruding

4     lens-like shape, convex lens-like shape with the

5     other details of Aizawa so as to improve light

6     collection efficiency, leading to enhanced

7     signal-to-noise and ultimately more reliable

8     detection that one of ordinary skill in the art would

9     take this example, these examples in these pieces of

10    prior art and apply them to specific dimensions and

11    specific details in a particular application.

12         Q.       So I think that was a yes, but just

13    to make -- let me make sure, you don't know the

14    specific dimensions of the combination that you

15    presented in the figure on the right-below

16    Paragraph 97; is that correct?

17                       MR. SMITH:  Objection; form.

18         A.       This figure takes the structure from

19    Aizawa and adds a convex lens-like shape per Inokawa

20    in a way that suggests how these would be combined so

21    as to improve performance.  I don't have the

22    dimensions from Aizawa's specification in terms of

Page 335

1    the lateral dimensions, the vertical dimensions,

2    thickness of the plate.  And without any of that

3    information, I can't answer an absolute quantitative

4    question in the context of vague input parameters.

5         Q.      And you testified you wouldn't be

6    able to -- you testified a person of ordinary skill

7    in the art would not be able to understand the impact

8    of signal strength when moving the detectors towards

9    the center for the additional reason that you don't

10   know the expected depth in the tissue where the

11   corpuscles are likely to provide reflection; is that

12   correct?

13              MR. SMITH:  Objection; form.

14        A.      I don't think so.  I think what I

15   said is that you would need that information in order

16   to answer those questions and that one of ordinary

17   skill in the art would know how to apply that

18   information to the situation.

19        Q.      So in your combination, did you have

20   in mind any particular depth in the tissue where the

21   corpuscles are likely to provide reflection?

22              MR. SMITH:  Objection; form.

Page 1

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

APPLE INC.,                      )
                                 )
          Petitioner,            )    US PATENT NO: 10,588,553
                                 )    IPR NO. 2020-1536
     -against-                   )
                                 )    US PATENT NO: 10,588,554
MASIMO CORPORATION,              )    IPR NO. 2020-1538
                                 )
          Patent Owner.          )
_____      )


VIDEO-RECORDED DEPOSITION OF

THOMAS WILLIAM KENNY, JR. PH.D.

VOLUME 1

Zoom Recorded Videoconference

04/24/2021

9:01 a.m. (PDT)


REPORTED BY:  AMANDA GORRONO, CLR

CLR NO. 052005-01


_____

DIGITAL EVIDENCE GROUP

1730 M Street, NW, Suite 812

Washington, D.C. 20036

(202) 232-0646

**MASIMO 2008**
**Masimo v. Apple**
**IPR2020-01520**

**Appx05747**

Page 57

1              When you wrote your Declarations, did

2    you have in mind a specific three-dimensional

3    structure for the cover that is in your combination

4    of Ohsaki and Mendelson '799?

5              MR. SMITH:  Objection; form, asked

6    and answered.

7         A.       Ohsaki provides an example of a

8    transparent protruding convex cover that is intended

9    to improve adhesion between the sensors -- between

10   the sensor and the user's tissue and to provide

11   detection efficiency and provide additional

12   protection of the elements accommodated within the

13   housing.  I think one of ordinary skill in the art

14   would understand how to design a transparent

15   protruding convex cover as described by Ohsaki so as

16   to achieve those benefits in combination with the

17   elements in Mendelson '799.

18        Q.       Well, can you answer my question now?

19   My question is:  When you wrote your Declaration --

20   the factual question, Dr. Kenny, when you wrote your

21   Declarations, did you have in mind a specific

22   three-dimensional structure for the cover that's in

Page 58

1   your combination of Ohsaki and Mendelson '799?

2          A.      A specific --

3                  MR. SMITH:  Objection; form, asked

4   and answered.

5          A.      So you're talking about a specific

6   shape --

7          Q.      Yes.

8          A.      -- size, curvature, all of the

9   dimensions, something out of a lens handbook, for

10  example?  I did not.  I think one of ordinary skill

11  in the art would understand that the choices of the

12  details of the size, shape, thickness, radius,

13  curvature, other parameters, would be dependent on

14  other -- the way the element worked with the rest of

15  design and would know how to proceed forward in

16  making those determinations and choices.

17                 MR. SMITH:  Hey, Stephen, we've been

18  going for a little more than an hour.  It might be a

19  good time for a break if you come to the end of this

20  line of this questioning.

21                 MR. LARSON:  I'm not sure if there is

22  a good -- yeah, I hear you.  We'll try to take a

Page 72

1    sensor as being worn on the back side of the user's

2    wrist, corresponding to the back of the user's hand

3    in a similar manner as a wristwatch is normally worn.

4         Q.      My question is focused on the cover

5    of Ohsaki, correct?  You understand that?

6         A.      Yes, I have a cross-sectional view.

7    I don't have a top view that would allow me to assert

8    that the shape was necessarily circular or square or

9    rectangular.  Ohsaki does not limit to a particular

10   shape from the top, that I'm aware of.

11        Q.      Okay.  But when you combined Ohsaki's

12   cover with Mendelson '799, did you have a particular

13   shape of Ohsaki's cover in mind?

14               MR. SMITH:  Objection to form.

15        A.      I have the shape of the housing of

16   Mendelson in mind, which is circular, clearly

17   indicated; and that the convex cover that I would

18   arrive at, inspired by Ohsaki, would be circular in

19   order to accommodate the shape of the housing of

20   Mendelson.

21        Q.      So you used the structure of

22   Mendelson '799 to guide the shape of the cover that

Page 95

1    would provide a system that included the benefits of

2    improved adhesion and detection and protection of the

3    elements inside the, the product.

4         Q.       Does Ohsaki provide any guidance as

5    to how the board could, should or should not be

6    changed --

7              MR. LARSON:  Let me restate that.

8         Q.       Does Ohsaki provide any guidance as

9    to how the board should or should not be changed to

10   maintain adhesion?

11        A.       So Ohsaki does not provide a

12   detailed, precise, geometrically specific description

13   of the board.  It's illustrated in Figures 1 and 2,

14   and one of ordinary skill in the art would understand

15   how to select a particular shape with a convex

16   surface so as to obtain improved adhesion and, and

17   detection.  Ohsaki does not provide a detailed

18   specification of the lens shape.

19        Q.       Where does Ohsaki provide that

20   guidance that you just described?

21             MR. SMITH:  Objection; form.

22        A.       You're asking me where does Ohsaki

1          Q.      The question is as follows:  You

2    described Paragraph 19 as describing "one portion of

3    a description of a preferred embodiment."

4                  Is there another embodiment described

5    by Ohsaki?

6                  MR. SMITH:  Objection; form.

7          A.      So I -- the summary of the invention

8    describes features and benefits of the addition of a

9    translucent member with a convex surface to an

10   element attached on the user's wrist.  The particular

11   embodiment shown in Figures 1 -- well, Figures 2 --

12   Figures 1 and 2 represent a particular example of how

13   to incorporate the invention in the context of a

14   specific watch design.

15         Q.      He only describes the structure of

16   one embodiment; is that fair?

17         A.      So --

18                 MR. SMITH:  Objection; form.

19         A.      -- very little precise description of

20   the structure of the embodiment.  It doesn't ever

21   state dimensions, thicknesses, things like that.  My

22   interpretation of this is that this particular

Page 106

1   description is an example of an embodiment that,

2   that, that Ohsaki is providing to explain the idea of

3   the benefits of a convex cover applied to the back

4   side of a watch, which would be to improve adhesion

5   and to improve detection.

6          Q.        Now, you said -- you testified that

7   one of ordinary skill in the art would consider

8   Paragraph 19 and make a decision as to how it might

9   influence their decisions in deciding a combination

10  of translucent member with a convex surface and the

11  sensor elements of Mendelson '799.

12               How did you consider Paragraph 19 in

13  putting together a combination that you, you put

14  together in your, your Declarations?

15               MR. SMITH:  Objection; form.

16         Q.        Do you remember?

17               MR. SMITH:  Objection; form.

18         Q.        For the record, are you looking at

19  your Declaration?

20         A.        I'm looking at Paragraph 19.

21         Q.        Oh, okay.  You're looking at

22  Paragraph 19 of Ohsaki?

4/24/2021                  Apple, Inc. v. Masimo Corp.              Thomas Kenny, Jr. Ph.D.

```
                                                      Page 130
 1   properly, arranged on the user's wrist -- just --

 2   context...

 3               It's really not clear that all four

 4   cases are described in rank here.  So there's two

 5   orientations of the Detecting Element 2, right, and

 6   there's the possibility of a convex surface or a flat

 7   surface.  I think the Paragraph 25 makes it clear

 8   that if the element has a flat surface, the detected

 9   pulse wave is adversely affected by movement and I

10   take that to mean that would be the case regardless

11   of the orientation of the body, but I'm interpreting.

12   It's not literally stated.

13        Q.      And you can't interpret Paragraph 25

14   without also considering Paragraph 19, correct?

15        A.      Correct.  And so Paragraph 19 --

16               MR. SMITH:  Objection; form.

17        A.      -- tells me that in one orientation

18   there is a tendency to slip.  That doesn't tell me

19   whether that tendency is worse or better than the

20   case of a flat surface.

21        Q.      Yeah.  Ohsaki doesn't discuss that

22   specific question; is that true?
```

Page 131

1                    MR. SMITH:  Objection; form.

2          A.      It doesn't.  So Ohsaki doesn't have

3     the additional paragraphs that might have described

4     the orientation of all of those elements in more

5     detail.  That's correct.  All -- what I know here is

6     that Ohsaki is specific about the two possible

7     orientations of the element, Number 2, the entire

8     structure.

9                    If, if one dimension is longer than

10    the other, there's then two choices and that it has

11    convex cover, a cover with a convex surface, that's

12    in contact with the skin.

13                   But, you know, from all of this, I --

14    there's nothing that tells me anything in particular

15    about the shape or dimensions of the cover, this

16    translucent convex cover.

17         Q.      At the very least, a person of skill

18    in the art would have understood that Ohsaki's convex

19    member did not prevent slipping when the sensor was

20    placed in the circumferential direction of the user's

21    wrist, correct?

22                   MR. SMITH:  Objection; argumentative,

4/24/2021                 Apple, Inc. v. Masimo Corp.          Thomas Kenny, Jr. Ph.D.

Page 227

1                         MR. SMITH:  Objection; form.

2          A.       This column is specific to reflection

3    pulse oximetry.

4          Q.       So the problems we've been

5    discussing, at least Mendelson's description of them,

6    he's explaining the particular challenges in

7    reflection pulse oximetry, correct?

8                         MR. SMITH:  Objection; form.

9          Q.       Let me make my question clearer.

10                        So Mendelson '799 in Column 2,

11   beginning with Line 29 and continuing, I want to say

12   all the way through Column 3, is discussing the

13   challenges associated with reflection pulse oximetry;

14   is that fair?

15                        MR. SMITH:  Objection; form.

16         A.       Yes.  I'm sorry.  I think I said yes.

17         Q.       Okay.  So just for a clear record,

18   variations in contact pressure can cause large errors

19   in reflectance pulse oximetry?

20                        MR. SMITH:  Objection; form.

21         Q.       A person of ordinary skill in the art

22   reading Mendelson '799 would understand that

Page 228

1    variations in contact pressure could cause large

2    errors in reflectance pulse oximetry, correct?

3          A.      That's correct.

4                  MR. SMITH:  Objection to form.

5    Argumentative.

6          A.      That's Lines 47 and 48 of the

7    Mendelson Specification Column 2.

8          Q.      Right.  Uh-huh.

9                  And a person of ordinary skill in the

10   art reading Mendelson '799 would understand that

11   strong reflections from the bone could adversely

12   affect reflectance pulse oximetry, correct?

13                 MR. SMITH:  Objection; form.

14         A.      That's correct.  From Lines 53

15   through 56.

16                 MR. SMITH:  Stephen, when you get to

17   a stopping point, let's take a break.

18                 MR. LARSON:  Okay.

19         Q.      You're good with the question, which

20   is fine, I was referring more to Lines 40 to 44 that

21   talks -- you see where it says "can be adversely

22   affected by a strong reflection from bone"?

Page 267

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

APPLE INC.,                   )
                              )
          Petitioner,         )    US PATENT NO: 10,588,553
                              )    IPR NO. 2020-1536
     -against-                )
                              )    US PATENT NO: 10,588,554
MASIMO CORPORATION,           )    IPR NO. 2020-1538
                              )
          Patent Owner. )
_____)

VIDEO-RECORDED DEPOSITION OF

THOMAS WILLIAM KENNY, JR. PH.D.

VOLUME 2

Zoom Recorded Videoconference

04/25/2021

8:59 a.m. (PDT)

REPORTED BY:  AMANDA GORRONO, CLR

CLR NO. 052005-01

_____

DIGITAL EVIDENCE GROUP

1730 M Street, NW, Suite 812

Washington, D.C. 20036

(202) 232-0646

**MASIMO 2009**
**Masimo v. Apple**
**IPR2020-01520**

**Appx06013**

Page 376

1          A.      I do.

2                  MR. SMITH:  Objection; form.

3          Q.      Do you see how there's air gaps in

4    either side of the convex board in Ohsaki?

5                  MR. SMITH:  Objection; form.

6    Argumentative.

7          A.      So I see a gap on the -- above

8    towards the detector and emitter.  Not so obvious to

9    me what's below.

10         Q.      Do you see a small space between the

11   tissue and on either side of the convex board in

12   Figure 2?

13                 MR. SMITH:  Objection; form.

14   Argumentative.

15         A.      You're talking about the left and

16   right edges where the board is attached to Item 2

17   which I think we called the, the element?

18         Q.      Yes.

19         A.      Yes, I see those.

20         Q.      And you see the similar air gaps

21   illustrated in Figure 1 on the -- on, on each side of

22   the convex board identified with the No. 8, correct?

Page 377

1            MR. SMITH:  Objection; form.

2    Argumentative.

3        A.    It's a little less obvious what those

4    are in Figure 1, but I think I would agree that's a

5    reasonable interpretation.

6        Q.    Quick question about a couple other

7    spots in Ohsaki's disclosure while we're here, can

8    you go to Paragraph 6.  And it reads, "The two bones

9    (the radius and ulna) pass through the front side of

10    the user's wrist.  Therefore the detecting element

11    has a tendency to slip off the detection position of

12    the user's wrist, since the skin surface of the front

13    side of the user's wrist greatly moves as the user's

14    wrist moves.  Furthermore, the user feels

15    uncomfortable since the radius and the ulna are

16    pressed.  As a result, the user further moves his/her

17    wrist unconsciously and it becomes further difficult

18    to detect the pulse wave stably."

19            Did I read that correctly?

20        A.    I believe so.

21        Q.    Can you explain the problem that

22    Ohsaki is discussing here?

Page 1

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

- - - - - - - - - - - - - - - - - -x

APPLE, INC.,                        Case IPR2020-01520

                                    U.S. Patent 10,258,265

                    Petitioner,

                                    Case IPR2020-01539

                                    U.S. Patent 10,588,554


        -against-                   Case IPR2020-01537

                                    U.S. Patent 10,588,553

MASIMO CORPORATION,                 Case IPR2020-01536

                                    U.S. Patent 10,588,553

                    Patent Owner.

                                    Case IPR2020-01538

                                    U.S. Patent 10,588,554

- - - - - - - - - - - - - - - - - -x

VIDEO-RECORDED DEPOSITION OF

THOMAS WILLIAM KENNY JR., PH.D.

Zoom Recorded Videoconference

09/18/2021

9:03 a.m. Pacific Daylight Time




REPORTED BY:  AMANDA GORRONO, CLR

CLR NO. 052005-01


_____

DIGITAL EVIDENCE GROUP

1730 M Street, NW, Suite 812

Washington, D.C. 20036

(202) 232-0646

**MASIMO 2027**
**Apple v. Masimo**
**IPR2020-01520**

Page 19

1    correct?

2          A.      That's correct.

3          Q.      The indication in this figure,

4    "Toward the center," does that indicate the

5    redirection that leads to the detector capturing

6    light that otherwise would have been missed --

7                  MR. SMITH:  Objection; form.

8          Q.      -- for a particular ray?

9                  MR. SMITH:  Same objection.

10         A.      So just again, reading from

11   Paragraph 42, the "lens' ability to direct light

12   'toward the center' would allow the detector to

13   capture light that would otherwise have been missed

14   by the detectors, regardless of their location within

15   the sensor device."

16         Q.      So there, there is some light that

17   would have been captured by the detectors that is

18   redirected and no longer hits the detectors; is that

19   correct?

20                 MR. SMITH:  Objection; form.

21         A.      So of all of the photons scattered

22   backwards from all of these sites --

Page 20

1        Q.       Correct.

2        A.       -- and interacting with this curved

3    optical surface that we're calling the lens, some of

4    those rays are diff- -- sorry -- refracted in a way

5    that directs them toward the detectors which

6    otherwise might have missed, and there would be some

7    other rays that would have hit the detectors that are

8    refracted away from the detectors; that's correct.

9        Q.       So in your analysis, did you

10   determine the relative amount of light that is

11   refracted towards the detectors that would otherwise

12   have been missed and compare it to the amount of

13   light originally going to the detector that is now

14   refracted away and misses the detector, with the

15   presence of the convex surface?

16               MR. SMITH:  Objection; form.

17       A.       In order to perform such an analysis,

18   I would need to know a full set of detailed

19   dimensions and shapes of the objects that would be

20   involved in that final design.  So there was no such

21   detailed calculation presented for this cartoon

22   representation of the combination of elements from

1    the references.

2                    What I've stated throughout the

3    earlier Declaration and throughout the earlier

4    deposition is that a person of ordinary skill in the

5    art would understand how to take advantage of the

6    detector locations and the shape of this convex

7    surface so as to obtain an improvement in the amount

8    of light arriving at the detectors.

9         Q.      The improvement in the light arriving

10   at the detectors depends on the dimensions and shapes

11   of the objects in the final design; is that correct?

12                    MR. SMITH:  Objection; form.

13        A.      Yes, yes.

14        Q.      And in this Declaration, there was no

15   detailed calculation presented for dimensions and

16   shapes that establish that relatively more light

17   reaches the detectors for a convex surface than for a

18   flat or no surface; is that correct?

19                    MR. SMITH:  Objection; form.

20        A.      So we could read from Paragraph 44,

21   "As I made clear during my deposition," and following

22   that is a quote, I think, from the transcript of the

Page 22

1    deposition, "'The convex shape [of Inokawa's lens]

2    allows light that might have been just specularly

3    reflected off of a flat plate to be captured and

4    refracted inwards.  And in the region where there's

5    curvature, it allows the light to be concentrated,

6    and in this case, roughly speaking, in the

7    neighborhood of the detectors and inwards.'  That is,

8    that the addition of a convex lens allows the

9    detectors to capture some of the reflected light

10   that...would have missed them completely, and to

11   provide some concentration of the light towards the

12   location of the detectors."

13              And again, as I explained in the

14   deposition and, and since then in these Declarations,

15   it's within the skill of one of ordinary skill in the

16   art to appreciate how to arrange the position of the

17   detectors and to arrange the shape of the lens so as

18   to obtain some benefit as described here.

19        Q.      Determining whether there is a

20   benefit as described in your Declaration, would have

21   required detailed calculations for dimensions, for

22   particular dimensions and shapes of that lens and

Page 213

1    Paragraph 22 and the illustrations there, show how

2    one of ordinary skill in the art might design a

3    convex surface so as to improve the light gathering

4    around the perimeter from a diffuse source and, and

5    carry all of that out in the context of the

6    combination of Inokawa and Ohsaki or Aizawa.

7         Q.        Would a skilled artisan use a

8    different convex surface design to increase light

9    gathering at the center of a sensor for a diffuse

10   source?

11             MR. SMITH:  Objection; vague.

12        A.        So I think around Paragraph 22, I

13   provide an illustration of a convex surface that has

14   greater curvature at the perimeter than it has in the

15   center and that the effect of that curvature on the

16   orientation of those orthogonal axes is one that

17   would allow an increase in the number of rays coming

18   in from a diffuse source to arrive at the location of

19   the detector.

20        Q.        Inokawa's detector involves diffuse

21   light, correct?

22             MR. SMITH:  Objection; vague.

Page 214

1          A.        Yes, it's a reflective pulse

2     oximeter.  I think one of ordinary skill would

3     understand that the illustrations in Inokawa are

4     describing diffuse light source that's providing

5     light back to the detectors.

6          Q.        If Inokawa's lens is beneficial

7     whether the detectors are in the middle or on the

8     periphery, why did you change its shape when you

9     applied it to Aizawa?

10               MR. SMITH:  Objection;

11     mischaracterizes prior testimony.

12          A.        So, again, the lens of Inokawa is

13     maybe conceptually described in only a few sentences

14     and the only characteristic that we're given of the

15     lens design is it improves the light gathering of the

16     LED, which is, I think, a way of saying that it

17     improves the overall efficiency of the system, but we

18     are not given a particular shape or a thickness or a

19     material or anything else that would allow me to make

20     a comparative statement between two designs.

21                    I'm just providing in Figure 22,

22     which is a sort of cropped and expanded segment of

Page 215

1    figures provided in my earlier Declaration, showing

2    the arrangement of a curvature that I think one of

3    ordinary skill in the art would understand to be

4    beneficial if the objective is to gather more light

5    from a diffuse light source and bring it to the

6    detecting elements.

7          Q.      The figure you provided, the cropped

8    figure in your Declaration, is a different shape from

9    the cover depicted in Inokawa, correct?

10             MR. SMITH:  Objection; argumentative.

11         A.      So I didn't perform a detailed

12   analysis of the shape depicted in the cartoon

13   illustration in Inokawa, and I didn't copy and paste

14   that particular shape into the combination that I

15   think one of ordinary skill would arrive at.  I

16   believe one of ordinary skill in the art would

17   understand that Inokawa is teaching that a lens-like

18   shape can be used to improve the light gathering

19   ability of the LED and that when attempting to

20   combine a lens-like shape with a particular

21   arrangement of detectors and emitters, one would

22   consider a specific convex shape that would be likely

Attorney Docket No.:  50095-0008IP1

In re Patent of:        Poeze, et al.
U.S. Patent No.:        10,292,628
Issue Date:             May 21, 2019
Appl. Serial No.:       16/261,326
Filing Date:            January 29, 2019
Title:                  MULTI-STREAM DATA COLLECTION SYSTEM FOR NONINVASIVE
                        MEASUREMENT OF BLOOD CONSTITUENTS


**Mail Stop Patent Board**
Patent Trial and Appeal Board
U.S. Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450

## <u>PETITIONER'S POWER OF ATTORNEY IN POST GRANT PROCEEDINGS BEFORE THE PATENT TRIAL AND APPEAL BOARD</u>

Petitioner, Apple Inc., hereby appoints the following practitioners as its attorneys to transact all business in the United States Patent & Trademark Office associated with any *inter partes* review, covered business method review, post grant review, or other review proceedings before the Patent Trial and Appeal Board of the above-captioned patent:

W. Karl Renner, Reg. No. 41, 265

Roberto J. Devoto, Reg. No. 55,108

Hyun Jin In, Reg. No. 70,014


and all practitioners associated with PTO Customer Number 26171.

I have the authority to execute this document on behalf of Apple Inc.


**Apple Inc.**

By: _____

Name:  Noreen Krall

Title:  Vice President and Chief Litigation Counsel

Date:  08/27/20

# IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Patent of:    Poeze, et al.
U.S. Patent No.:    10,292,628            Attorney Docket No.: 50095-0008IP1
Issue Date:         May 21, 2019
Appl. Serial No.:   16/261,326
Filing Date:        January 29, 2019
Title:              MULTI-STREAM DATA COLLECTION SYSTEM FOR NONIN-
                    VASIVE MEASUREMENT OF BLOOD CONSTITUENTS

**Mail Stop Patent Board**
Patent Trial and Appeal Board
U.S. Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450

## PETITION FOR *INTER PARTES* REVIEW OF UNITED STATES PATENT NO. 10,292,628 PURSUANT TO 35 U.S.C. §§ 311–319, 37 C.F.R. § 42



APPLE-1008, FIG. 2; APPLE-1003, ¶92.  Inokawa further discloses that the "lens makes it possible to increase the light-gathering ability of the LED."  APPLE-1008, [0015].  Thus, a POSITA would have sought to incorporate an Inokawa-like lens into the cover of Aizawa to increase light collection efficiency, thereby leading to an improved signal-to-noise ratio and more reliable pulse detection.  APPLE-1003, ¶93.  The lens of Inokawa provides precisely such a benefit to Aizawa's device by refracting/concentrating incoming light signals reflected by the blood.  *Id*.

As illustrated below, the device resulting from the obvious combination of Aizawa and Inokawa would have replaced the flat cover (left) with a curved one as per Inokawa (right) to "increase the light-gathering ability."  APPLE-1008, [0015].

Attorney Docket No. 50095-0008IP1
IPR of U.S. Patent No. 10,292,628



Light permeable cover

APPLE-1006, FIG. 1(b); APPLE-1003, ¶94.

A POSITA would have understood how to implement Inokawa's lens-shaped cover in Aizawa's device with a reasonable expectation of success, stemming from the significant overlap across the references in their teaching. APPLE-1003, ¶95. For example, as illustrated below, Inokawa teaches that its cover may be either flat (left) such that "the surface is less prone to scratches," Inokawa at [0106], or in the form of a lens (right) to "increase the light-gathering ability of the LED." Inokawa at [0015].

Filed: July 9, 2021

Filed on behalf of:
    Patent Owner Masimo Corporation
By:    Joseph R. Re (Reg. No. 31,291)
        Stephen W. Larson (Reg. No. 69,133)
        Jarom D. Kesler (Reg. No. 57,046)
        Jacob L. Peterson (Reg. No. 65,096)
        KNOBBE, MARTENS, OLSON & BEAR, LLP
        2040 Main Street, Fourteenth Floor
        Irvine, CA 92614
        Tel.: (949) 760-0404
        Fax: (949) 760-9502
        E-mail: AppleIPR2020-1521-628@knobbe.com

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

APPLE INC.

Petitioner,

v.

MASIMO CORPORATION,

Patent Owner.

Case IPR2020-01521
U.S. Patent 10,292,628

**PATENT OWNER RESPONSE**

IPR2020-01521
Apple Inc. v. Masimo Corporation



Petitioner's Proposed Combination (Pet. 16)

But neither Petitioner nor Dr. Kenny explains why a POSITA would have believed that Inokawa's convex lens, which concentrates light to a ***central*** detector, would enhance light collection in Aizawa's sensor (and the illustrated combination) with ***peripheral detectors***. *Id*. 15-16 (citing Ex. 1003 ¶¶93-94); Ex. 2004 ¶¶45-49.

## B. Ground 1A Does Not Establish Obviousness

### 1. A POSITA Would Not Have Been Motivated To Combine Inokawa's Lens With Aizawa's Sensor

#### a) Petitioner Admits Inokawa's Lens Directs Light To The Center Of The Sensor

Petitioner and Dr. Kenny both admit a convex cover condenses light towards the center of the sensor and away from the periphery. Petitioner admits in its Petition in IPR2020-01520 (Ex. 2019) filed against related patent U.S. Pat. No. 10,258,265 (Ex. 2025) that "the lens/protrusion of Inokawa ... serves a ***condensing function*** and thus, as with any other lens, refracts light passing through it." Ex. 2019 at 44; *see also* Ex. 2025. Petitioner illustrates this condensing function using "the drawing below which compares the length of non-refracted light ... bouncing off an artery with that of refracted light." *Id*. at 44-45. Petitioner's figure (below) illustrates a

-16-

IPR2020-01521
Apple Inc. v. Masimo Corporation

POSITA's understanding that Inokawa's convex lens, as implemented in Aizawa's sensor, would direct light toward the *center* of the sensor. *Id.*



Petitioner's Illustration of Inokawa's Light-Redirection (Ex. 2019 at 45)

Dr. Kenny similarly included the above illustration in his declaration in IPR2020-01520 (Ex. 2020) and explained that, when using a protruding surface such as Inokawa's lens, "the incoming light is 'condensed' *toward the center*." Ex. 2020 at 69-70; Ex. 2004 ¶¶50-52. Dr. Kenny confirmed at his deposition for IPR2020-01520 that the protruding surface would result in "more light in the *center* than at the outer edge in this example." Ex. 2006 204:1-13. Dr. Kenny agreed "that's because light's being directed *towards the center* and *away from the edge*…." Ex. 2006 204:14-20.

Petitioner's and Dr. Kenny's admissions are consistent with Inokawa's disclosure. Ex. 2004 ¶53. As shown in Figure 2 (below), Inokawa illustrates that the protruding surface condenses light towards the *central* detector 25. Ex. 1008 ¶[0058], Fig. 2. The protruding surface in Inokawa works with the particular

-17-

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | |
|---|---|---|
| In re Patent of: | Poeze et al. | |
| U.S. Patent No.: | 10,292,628 | Attorney Docket No.: 50095-0008IP1 |
| Issue Date: | May 21, 2019 | |
| Appl. Serial No.: | 16/261,326 | |
| Filing Date: | January 29, 2019 | |
| Title: | MULTI-STREAM DATA COLLECTION SYSTEM FOR NONINVASIVE MEASUREMENT OF BLOOD CONSTITUENTS | |

## <u>DECLARATION OF DR. THOMAS W. KENNY</u>

**Declaration**

I declare that all statements made herein on my own knowledge are true and that all statements made on information and belief are believed to be true, and further, that these statements were made with the knowledge that willful false statements and the like so made are punishable under Section 1001 of Title 18 of the United States Code.

By: _____

Thomas W. Kenny, Ph.D.

1

APPLE 1003

142.    As I explained above in ¶¶ 90-98 with respect to element [1d], a POSITA would have been motivated to incorporate a lens-like protrusion of Inokawa into the cover of Aizawa to increase the light collection efficiency.

143.    Ohsaki (APPLE-1014), which I briefly described above in ¶¶ 63-64, provides an alternative/additional rationale for why a POSITA would have modified the flat shape of Aizawa's acrylic plate into a "light permeable cover comprising a protrusion" as per element [1d].

144.    Among other things, Ohsaki teaches that adding a convex surface to its translucent board 8 (*i.e.*, light permeable cover) can help prevent the device from slipping on the tissue of the wearer compared to using a flat cover without such a protrusion.  APPLE-1014, [0025].



FIG. 2

Appx08131

APPLE-1014, FIG. 2

145.    Minimizing slippage between a user-worn sensor device and the tissue of the user was indeed a well-known objective in such devices.  For example, Aizawa teaches using its acrylic transparent plate 6 (*i.e.*, light permeable cover) to improve "adhesion between the wrist 10 and the pulse rate detector 11."  APPLE-1006, [0026], [0030].  While Aizawa doesn't discuss whether the shape of its acrylic plate could be modified to achieve this objective, a POSITA in possession of both Aizawa and Ohsaki would have recognized that Ohsaki's addition of a convex protrusion to its light permeable cover could be similarly implemented in Aizawa's device to help achieve the two references' shared goal of minimizing slippage.  *Id.* In other words, a POSITA seeking to achieve improved adhesion between the detector and the skin, as expressly recognized in Aizawa, would have been motivated and readily able to modify Aizawa's acrylic plate to have a convex shape as in Ohsaki.  This would have allowed Aizawa's sensor device to remain better adhered to the skin and thereby increase its light-collecting efficiency.  APPLE-1006, [0026], [0030]; APPLE-1014, [0025].  Additionally, a POSITA would have appreciated that the lens/protrusion in the Aizawa-Inokawa combination as detailed above in ¶¶ 89-98 would have provided a similar anti-slippage advantage due to the lens's convex shape, thereby providing an additional

82

motivation for a POSITA to make the above-noted modification of Aizawa in view of Inokawa's lens.

146.    The resulting Aizawa-Inokawa-Ohsaki combination satisfies all remaining elements of claims 1-15, 17, 20-26, and 28 in the same manner as previously described in Ground 1A, which is herein incorporated by reference.

### X.    GROUND 1C –Claims 18, 29, 29, and 30 Are Rendered Obvious by Aizawa in view of Inokawa, Mendelson-2006, and Beyer, Jr.

#### A.    Claim 18

**[18a] The optical physiological measurement device of claim 7 further comprising: a processor configured to: receive one or more signals from the at least four detectors, the one or more signals indicative of a physiological parameter of a wearer of the optical physiological measurement device; and**

**[18b] output information indicative of measurements of the physiological parameter to a mobile phone.**

147.    As an initial matter, I note that Aizawa teaches uploading data to an external display/device but is silent about how such data transmission would actually be implemented, instead leaving implementation details to the POSITA.  APPLE-1006, [0015], [0023], [0035].  In other words, Aizawa does not disclose a specific monitoring device, mobile or otherwise, that can display the measured physiological data to the user, but a POSITA would have nonetheless recognized that different types of monitoring devices, including those that are mobile, could be

83

# IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Patent of:        Poeze et al.
U.S. Patent No.:        10,292,628        Attorney Docket No.: 50095-00008IP1
Issue Date:             May 21, 2019
Appl. Serial No.:       16/261,326
Filing Date:            January 29, 2019
Title:                  MULTI-STREAM DATA COLLECTION SYSTEM FOR
                        NONINVASIVE MEASUREMENT OF BLOOD
                        CONSTITUENTS

## <u>SECOND DECLARATION OF DR. THOMAS W. KENNY</u>

**Declaration**

I declare that all statements made herein on my own knowledge are true and

that all statements made on information and belief are believed to be true, and

further, that these statements were made with the knowledge that willful false

statements and the like so made are punishable under Section 1001 of Title 18 of

the United States Code.

Dated: September 29, 2021          By: _____

                                       Thomas W. Kenny, Ph.D.

APPLE 1047
Apple v. Masimo
IPR2020-01521

50.    As explained in my Original Declaration, "Ohsaki teaches that adding a convex surface...can help prevent the device from slipping on the tissue of the wearer compared to using a flat cover without such protrusion" and that "a POSITA seeking to achieve improved adhesion between the detector and the skin, as expressly recognized in Aizawa, would have been motivated and readily able to modify Aizawa's acrylic plate to have a convex shape as in Ohsaki."  APPLE-1003, ¶¶144-145 (citing to APPLE-1014, [0025]; APPLE-1006, [0026], [0030]).

51.    Patent Owner, rather than attempting to directly rebut this rationale, focuses on arguments that are factually flawed and legally irrelevant.  Specifically, Patent Owner contends that Ohsaki's "convex surface must have *longitudinal directionality*," and that "Ohsaki indicates that its convex surface *only prevents slipping on the backhand side* (i.e., watch-side) of the user's wrist."  POR, 43. Patent Owner further asserts that the shape of Ohsaki's board must be limited to a long, narrow rectangular shape while ignoring that the specification includes no specific limitation on the shape of the board.

52.    Notably absent from the POR is how Ohsaki *actually* describes the benefits associated with its convex surface.  For example, Ohsaki contrasts a "convex detecting surface" from a "flat detecting surface," and explains that "if the translucent board 8 has a flat surface, the detected pulse wave is adversely affected by the movement of the user's wrist," but that if "the translucent board 8 has a

convex surface…variation of the amount of the reflected light…that reaches the light receiving element 7 is suppressed." APPLE-1003, ¶145; APPLE-1014, ¶[0025].  But a POSITA would have understood from such teachings of Ohsaki that the advantages of a light permeable protruding convex cover could apply regardless of any alleged longitudinal directionality of Ohsaki's cover and regardless of where on the body such a convex cover was placed.  *See APPLE-1014*, ¶¶[0015], [0017], [0025], FIGS. 1, 2, 4A, 4B.  This is because Ohsaki was relied upon not for its exact cover configuration but rather for the rather obvious concept that a convex surface protruding into a user's skin will prevent slippage, regardless of any directionality that may or may not exist with respect to such convex surface and regardless of where on the human body it is located.  *See* Ex. 2012, 91, 87; APPLE-1014, ¶¶[0015], [0017], [0025], FIGS. 1, 2, 4A, 4B.  In fact, Ohsaki says nothing about the exact dimensions or even anything specific about the required shape of the board, except that it provides a convex protrusion.  A POSITA would seek to combine the board of Ohsaki with Aizawa by making reasonable modifications as needed to ensure that the board of Ohsaki was compatible with the other features present in Aizawa.  A POSITA would find it obvious to consider selecting a shape for the board that is consistent with the shape of the system presented in Aizawa, and would expect that the benefits associated with the convex board of Ohsaki would be present in the combination.  And adding

a convex surface to Aizawa's flat plate will serve to *improve* its tendency to not slip off, not take away from it, since it is well understood that physically extending into the tissue and displacing the tissue with a protrusion provides an additional adhesive effect. Aizawa provides a plate that improves adhesion with the surface. Ohsaki further teaches that the convex protrusion provides "intimate contact" with the tissue, which helps prevent the detecting element from slipping off. These benefits are clearly related and complimentary, and a POSITA would appreciate that modifying the plate of Aizawa to include a convex protrusion as in Ohsaki would provide improved performance, and that these benefits can be obtained by making obvious modifications to the board in Ohsaki to accommodate the shape of Aizawa.

## II. GROUNDS 2A-2B RENDER OBVIOUS THE CHALLENGED CLAIMS

53.    As I further clarify below in response to Patent Owner's arguments, claims 1-17 and 20-28 are rendered obvious by the combination of Mendelson-1988 and Inokawa (Ground 2A).

### A.    A POSITA would have been motivated to modify Mendelson-1988 in view of Inokawa to add a lens

54.    Similar to their rebuttal of the Aizawa-based grounds, Patent Owner contends that (1) "Inokawa's convex lens focused light on a *centrally located*

# IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Patent of:    Jeroen Poeze et al.

U.S. Patent No.:    10,588,553        Attorney Docket No.: 50095-0012IP1

Issue Date:    March 17, 2020

Appl. Serial No.:    16/534,949

Filing Date:    August 7, 2019

Title:    MULTI-STREAM DATA COLLECTION SYSTEM FOR NONINVASIVE MEASUREMENT OF BLOOD CONSTITUENTS

**Mail Stop Patent Board**

Patent Trial and Appeal Board

U.S. Patent and Trademark Office

P.O. Box 1450

Alexandria, VA 22313-1450

## PETITION FOR *INTER PARTES* REVIEW OF UNITED STATES PATENT NO. 10,588,553 PURSUANT TO 35 U.S.C. §§ 311–319, 37 C.F.R. § 42

elements according to known methods to yield predictable results—improved

adhesion of the sensor to the user's skin, and improved signal strength. *KSR v.*

*Teleflex*, 550 U.S. 398, 417 (2007); APPLE-1003, ¶[0090]. Furthermore, the el-

ements of the Mendelson-Ohsaki sensor would each perform functions they had

been known to perform prior to the combination—Ohsaki's translucent board 8

would simply be placed over the components accommodated within Mendelson

'799's sensor housing 17, and would perform the same function as taught by

Ohsaki. APPLE-1003, ¶¶[0081]-[0090]; APPLE-1012, Abstract, 9:22-10:30,

FIG. 7; APPLE-1009, Abstract, ¶¶[0015], [0017], [0025], FIGS. 1, 2, 4A, 4B.

**(b)** ***Strap configured to facilitate attachment of part of the physiological***

***monitoring device to a user's arm***

As explained above with respect to Section IV.B.1, Mendelson '799 depicts

and describes "a pulse oximeter 20 utilizing … sensor 10." APPLE-1012, Ab-

stract, 9:22-10:30, FIGS. 7, 8.

As Mendelson '799 acknowledges, "reflection-mode or backscatter type

pulse oximetry…allows for measuring SaO2 from multiple convenient locations on

the body (e.g. the head, torso, or upper limbs)," and several references that are

mentioned within Mendelson '799 depict and describe pulse oximetry devices in

which at least part of the device is configured to be strapped to the arm of a user. APPLE-1012, 2:14-27, 4:13-22; APPLE-1018, 1-3, FIG. 2.

Similarly, and as shown in Ohsaki's FIG. 1 (reproduced below), Ohsaki explains that the detecting element of its "wristwatch-type human pulse wave sensor" "is attached on the back side of the user's wrist by a dedicated belt [10] so that the convex surface of the translucent member is in intimate contact with the surface of the user's skin." APPLE-1009, ¶¶[0009], [0018], FIG. 1.



APPLE-1009, FIG. 1 (annotated)

As Ohsaki explains, [t]he detecting element 2 is fixed on the user's wrist 4 by a dedicated belt 10," which "may be made from elastic material so that regular pressure is applied to the user's wrist," which is said to prevent "disturbance light from the outside" from penetrating translucent board 8. APPLE-1009, ¶[0018].

28

Filed: June 1, 2021

Filed on behalf of:
    Patent Owner Masimo Corporation
By:    Joseph R. Re (Reg. No. 31,291)
    Stephen W. Larson (Reg. No. 69,133)
    Jarom D. Kesler (Reg. No. 57,046)
    Jacob L. Peterson (Reg. No. 65,096)
    William R. Zimmerman (admitted *pro hac vice*)
    Jeremiah S. Helm, Ph.D. (admitted *pro hac vice*)
    KNOBBE, MARTENS, OLSON & BEAR, LLP
    2040 Main Street, Fourteenth Floor
    Irvine, CA 92614
    Tel.:  (949) 760-0404
    Fax:  (949) 760-9502
    E-mail:  AppleIPR2020-1536-553@knobbe.com

UNITED STATES PATENT AND TRADEMARK OFFICE

————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————

APPLE INC.

Petitioner,

v.

MASIMO CORPORATION,

Patent Owner.

————————

Case IPR2020-01536
U.S. Patent 10,588,553

————————

**PATENT OWNER RESPONSE**

IPR2020-01536
Apple Inc. v. Masimo Corporation



Mendelson '799 Fig. 7 (color added to illustrate "longitudinal" cover)

Indeed, Ohsaki illustrates the differential pressure created by its convex board.

Figures 1 and 2 show that the center of the board exerts the greatest pressure, and

pushes into the skin causing distention.  As shown below, the edges of Ohsaki's

board do not even contact the skin, and thus exert relatively less pressure.



Ohsaki Figs. 1 (left) and 2 (right) (partial view, annotation of air gaps added)

Mendelson '799 expressly warns that "mechanical pressure exerted by the sensor on

the skin" causes large and uncontrollable changes.  Ex. 1012 3:15-31.  Mendelson

-24-

**Appx12851**

IPR2020-01536
Apple Inc. v. Masimo Corporation

'799 explains that an asymmetric arrangement would result in "uncontrollable physiological and physical parameters" and "large errors in the oxygen saturation readings." *Id.* 3:44-52. Such a cover may also create air gaps over some sensors, but not others. Ex. 2004 ¶¶60-61.

Ohsaki's ***rectangular*** board would also result in a substantially different optical environment for Mendelson '799's various detectors based on the redirection of light away from some detectors and towards others. Ex. 2004 ¶62. Mendelson '799 explains the importance of ***radial symmetry*** in an oxygen saturation sensor: "a ***radially-symmetric*** photodetector array can help to maximize the detection of backscattered light from the skin." Ex. 1012 4:59-65. Mendelson '799's radial array of detectors captures reflected light from all around the centrally located emitter. In contrast, adding Ohsaki's ***rectangular*** board to Mendelson '799's oxygen saturation sensor would eliminate the ***radially*** symmetric environment and undermine the reason for Mendelson '799's use of multiple detectors arrayed in a ring pattern. *Id.* 7:25-37. The resulting structure's rectangular board would create a variable physiological environment with different detectors at different distances from the skin—the very situation Mendelson '799 tries to avoid. *See id.* 12:1-16, 12:62-13:7. Indeed, a longitudinal shape might cover some detectors completely and leave other detectors mostly uncovered. Ex. 2004 ¶62.

-25-

IPR2020-01536
Apple Inc. v. Masimo Corporation

**2. A POSITA Would Have Understood That Ohsaki's Required Measurement Location Would Result In Weak Signals For Mendelson '799's Oxygen Saturation Measurements**

In addition to creating mechanical and optical problems, a POSITA would also have believed that Petitioner's combination would decrease signal strength—the opposite of Petitioner's alleged motivation of "improved signal strength." (Pet. 26-27). To achieve any of Ohsaki's benefits, its sensor must be used at a *specific* measurement location: the ***backhand side of the wrist***. Ex. 1009 ¶[0024]; *see also id.* ¶¶[0008], [0016], Title, Abstract (wristwatch sensor worn on backside of wrist); *see also id.* ¶[0030] (wristwatch sensor worn on back of forearm). Ohsaki's measurement location would have dissuaded a POSITA from modifying Mendelson '799's ***pulse oximeter*** based on Ohsaki. At the time, a POSITA would have believed that the backhand side of the wrist was an unsuitable location for pulse oximetry. Ex. 2004 ¶63.

Indeed, the Mendelson '799 inventor previously ***tried*** to obtain usable signals for oxygen saturation measurements from the back of the wrist. *See, e.g.*, Ex. 2003 at 3-4. Mendelson reported that he "had to apply a ***considerable*** amount of external pressure on the sensor" to even ***discern*** any signal whatsoever. *See id*. Both Ohsaki and Mendelson '799 warn against using too much pressure when taking measurements. *See* Ex. 1012 2:47-53 ("Similarly, variations in contact pressure between the sensor and the skin can cause larger errors…since some of the blood

-26-

**Appx12853**

near the superficial layers of the skin may be normally displaced away from the sensor housing towards deeper subcutaneous structures."), 3:27-31 ("It is also well known for example that changes in the ratio of blood to bloodless tissue volumes may occur…through mechanical pressure exerted by the sensor on the skin."); Ex. 1009 ¶[0018] ("the user feels uncomfortable if the pressure applied to the user's wrist…is too high"); Ex. 2004 ¶64.

Dr. Kenny admitted that Mendelson's prior work reported that signals from the wrist were much weaker and much noisier than signals from other body locations.   Ex. 2008 249:10-16.   Dr. Kenny acknowledged that Mendelson concluded that it is much easier to monitor the strong signals from the forehead than the weak signals from the wrist.  *Id*. 255:12-21.

Even as late as 2013, Mendelson was the advisor for research that reported "there is **little** supporting evidence that [reflectance-based pulse oximetry] can accurately collect measurements from the chest and wrist." Ex. 2015 at 3 (Abstract); *see also id.* at 4 (thanking Mendelson for advising on project); Ex. 2014 at 1 (listing submission date of April 24, 2013 and Mendelson as advisor).  Mendelson's group ultimately obtained oxygen saturation signals from a sensor located on the ***palm-side*** of the wrist, "over the radial artery." *Id*. at 99; Ex. 2004 ¶65.

Other groups likewise reported that oxygen saturation sensors would work only if measurements were taken from the ***palm side*** of the wrist, close to the

-27-

Filed: October 5, 2021

Filed on behalf of:
    Patent Owner Masimo Corporation
By:   Joseph R. Re (Reg. No. 31,291)
    Stephen W. Larson (Reg. No. 69,133)
    Jarom D. Kesler (Reg. No. 57,046)
    Jacob L. Peterson (Reg. No. 65,096)
    William R. Zimmerman (admitted *pro hac vice*)
    Jeremiah S. Helm, Ph.D. (admitted *pro hac vice*)
    KNOBBE, MARTENS, OLSON & BEAR, LLP
    2040 Main Street, Fourteenth Floor
    Irvine, CA 92614
    Tel.:  (949) 760-0404
    Fax:  (949) 760-9502
    E-mail:  AppleIPR2020-1536-553@knobbe.com

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

APPLE INC.

Petitioner,

v.

MASIMO CORPORATION,

Patent Owner.

---

Case IPR2020-01536
U.S. Patent 10,588,553

---

**PATENT OWNER'S SUR-REPLY TO REPLY**

IPR2020-01536
Apple Inc. v. Masimo Corporation

Petitioner acknowledges the difficulty of performing pulse oximetry on the watch-side, but argues that difficulty would have made a POSITA even *more* motivated to use Ohsaki's convex cover. Reply 11. But Petitioner never explains why a POSITA would have been *motivated*—contrary to conventional wisdom—to use Mendelson '799's oximeter on the *back side* of the wrist in the first place. POR 26-31. A POSITA would have believed that oximetry measurements at that location, far from the wrist's arteries, would be weak, noisy, and require considerable pressure even to *discern* a signal. *Id*. Ohsaki's design helps reduce movement-related artifacts, but Ohsaki does not purport to improve a weak and barely discernable signal. *Compare* Ex. 1009 Fig. 4A *with* Fig. 4B. Weak signal would be a significant issue because, as discussed below, Petitioner's proposed combination erroneously places a convex surface over an oximeter with detectors at the oximeter's *periphery*. POR 31-36.

Petitioner asserts a POSITA would have "understood from Ohsaki that…a light permeable convex cover would have prevented slippage of Mendelson-'799's sensor when placed, for example, on *either* side of a user's wrist or forearm." Reply 12. But Ohsaki states the opposite—that a convex surface "has a tendency to slip" on the wrist's palm-side. Ex. 1009 ¶[0023], Figs. 3A-3B (illustrating slipping on the wrist's palm-side). Furthermore, another of Petitioner's cited references confirms that a *flat* surface—not a convex surface—improves adhesion on the palm side of

-13-

# IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Patent of:     Jeroen Poeze et al.
U.S. Patent No.:     10,588,553          Attorney Docket No.: 50095-00012IP1
Issue Date:          March 17, 2020
Appl. Serial No.:    16,534,949
Filing Date:         August 7, 2019
Title:               MULTI-STREAM DATA COLLECTION SYSTEM FOR
                     NONINVASIVE MEASUREMENT OF BLOOD
                     CONSTITUENTS

## DECLARATION OF DR. THOMAS W. KENNY

**Declaration**

I declare that all statements made herein on my own knowledge are true and that all statements made on information and belief are believed to be true, and further, that these statements were made with the knowledge that willful false statements and the like so made are punishable under Section 1001 of Title 18 of the United States Code.

By: _____

Thomas W. Kenny, Ph.D.



Fig. 3.  Sample PDA Graphical User Interface (GUI).

APPLE-1010, FIG. 3

## VII.   GROUND 1 – Claims 1-3, 5, 6, 9-18, 20-24, and 29 are Rendered Obvious by Mendelson '799 and Ohsaki

### A.   Combination of Mendelson '799 and Ohsaki

78.    As I have explained above with respect to Section VI.A, Mendelson '799

discloses a "sensor for use in an optical measurement device" featuring a sensor

housing 17 that accommodates a "light source 12 composed of three closely spaced

light emitting elements (e.g., LEDs or laser sources)," an "array of discrete

detectors (e.g., photodiodes)" including a "'far' detector 16 and a 'near' detector

18," and a "light shield 14" that is positioned between the photodiodes and the

light emitting elements."  *Id.*, APPLE-1012, Title, Abstract, 9:22-40, 10:16-37,

FIGS. 7, 8.

79.    Further, to the extent that Mendelson '799 does not explicitly disclose sensor housing 17 as including an opaque wall that circumscribes the accommodated components, one of ordinary skill would have found it obvious to connect, to the portion of sensor housing 17 illustrated in Mendelson '799's FIG. 7 (reproduced below), an opaque wall configured to circumscribe the array of discrete detectors included in detector rings 16 and 18. *Id.*, 9:24-40, FIG. 7.



APPLE-1012, FIG. 7 (annotated, with additional section view)

80.    As detailed below, one of ordinary skill would have been motivated to combine Mendelson '799 and Ohsaki (hereinafter "Mendelson-Ohsaki combination" or "Mendelson-Ohsaki") to obtain additional benefits.

42

1.     *Light permeable cover comprising a protruding convex surface*

81.     Mendelson '799 does not describe a cover configured to be located between user tissue and the components accommodated within sensor housing 17 when the sensor is worn, but one of ordinary skill would have recognized that a light permeable cover with a protruding convex surface would improve adhesion between the sensor and the user's tissue, improve detection efficiency, and protect the elements within sensor housing 17.  APPLE-1009, ¶¶[0015], [0017], [0025], FIGS. 1, 2, 4A, 4B; *see also* APPLE-1008, ¶¶14-15, FIG. 1 (depicting a convex lens that enhances signal strength and protects a LED and photodetector); APPLE-1024, ¶¶[0033], [0035], FIG. 6 (depicting an LED featuring a convex lens).

82.     Indeed, by the Critical Date, noninvasive optical physiological sensors commonly employed covers.  *See, e.g.*, APPLE-1009, ¶¶[0015], [0017], [0025], FIGS. 1, 2, 4A, 4B; APPLE-1006, ¶¶[0012], [0013], [0023], [0024], [0030], FIGS. 1(a), 1(b) (depicting a wrist-worn "pulse wave sensor" including a transparent cover located between photodetectors and the user's skin, the cover being said to improve adhesion, "thereby further improving … detection efficiency"); APPLE-1008, ¶¶14-15, FIG. 1.

83.     For example, and as described above in Section VI.B, Ohsaki discloses a wrist-worn "pulse wave sensor" that includes a light permeable convex cover – "translucent board 8" – that is configured to be located between user tissue and a

detector when the sensor is worn, where the cover comprises a single protruding convex surface operable to conform tissue of the user, and where a wall operably connects to a substrate and to the cover. *See* APPLE-1009, ¶¶ [0015], [0017], [0025], FIGS. 1, 2, 4A, 4B.

84.    In more detail, and as shown in Ohsaki's FIG. 2 (reproduced below), translucent board 8 is "attached to the opening of the package 5" and is arranged such that, when the sensor is worn "on the user's wrist … the convex surface of the translucent board … is in intimate contact with the surface of the user's skin"; this contact between the convex surface and the user's skin is said to prevent slippage, which increases the strength of the signals obtainable by Ohsaki's sensor. APPLE-1009, ¶¶ [0015], [0017], [0025], FIGS. 1, 2, 4A, 4B.



APPLE-1009, FIG. 2 (annotated)

44

85.    As Ohsaki explains with reference to FIGS. 4A and 4B (reproduced below), "if the translucent board 8 has a flat surface, the detected pulse wave is adversely affected by the movement of the user's wrist as shown in FIG. 4B," but that if "the translucent board 8 has a convex surface … variation of the amount of the reflected light … that reaches the light receiving element 7 is suppressed." *Id.*, ¶[0025]. The convex surface is also said to prevent "disturbance light from the outside" from penetrating translucent board 8. *Id.*, ¶[0025]. Thus, when a convex cover is used, "the pulse wave can be detected without being affected by the movement of the user's wrist 4 as shown in FIG. 4A." *Id.*



APPLE-1009, FIGS. 4A, 4B

45

Appx15282

86.    From this and related description, one of ordinary skill would have understood that the translucent board 8 that is operably connected to the walls of Ohsaki's package 5 improves adhesion between Ohsaki's sensor and the user's skin, improves detection efficiency, and provides protection to the elements accommodated within package 5.

87.    Accordingly, Ohsaki would have motivated one of ordinary skill to add a light permeable protruding convex cover to Mendelson '799's sensor, to improve adhesion between the sensor and the user's tissue, to improve detection efficiency, and to provide additional protection to the elements accommodated within sensor housing 17.  APPLE-1009, ¶¶[0015], [0017], [0025], FIGS. 1, 2, 4A, 4B.

88.    In more detail, and as shown below in the section view of the Mendelson-Ohsaki sensor, one of ordinary skill would have added a transparent convex cover to sensor 10, the cover being located between tissue of the user and the array of detectors 16 and 18 when worn.  APPLE-1012, Abstract, 9:22-10:30, FIG. 8; APPLE-1009, ¶¶[0015], [0017], [0025], FIGS. 1, 2, 4A, 4B; *see also* APPLE-1008, ¶¶14-15, FIG. 1.  To obtain the advantages described by Ohsaki, one of ordinary skill would have configured the cover to be sufficiently rigid to conform tissue of the user to at least a portion of the cover's surface when worn.  APPLE-1009, ¶[0025]; *see also* APPLE-1009, ¶[0030], FIG. 1(b).  And, consistent with Ohsaki's configuration, one of ordinary skill would have configured Mendelson

46

**Appx15283**

'799's circumscribing wall to operably connect, on one side, to the planar substrate on which detectors 16 and 18 are arranged and, on an opposite side, to the convex cover. APPLE-1012, Abstract, 9:22-10:30, FIG. 7; APPLE-1009, ¶[0017], FIG. 2.



APPLE-1012, FIG. 7 (annotated, with additional section view)

89. One of ordinary skill would have further recognized that the material used to make Ohsaki's translucent board could be, for example, a translucent plastic material that can be easily formed to include a convex protrusion. APPLE-1006, 3:46-41, FIG. 1; APPLE-1026, ¶¶[0022], [0032], [0035], FIG. 6. Indeed, many

prior art references of this period, such as Nishikawa (shown below) demonstrate exactly how such a convex shape may be incorporated into a molded cover. APPLE-1026, ¶¶[0022], [0032], [0035], FIG. 6. In other words, one of ordinary skill would have known that plastic is a transparent material that can be readily transformed into various shapes, including a lens shape, as needed due to its easy molding properties. Thus, one of ordinary skill preferring improved adhesion to a user's tissue and the ability to detect a pulse wave "without being affected by the movement of the user's wrist" (APPLE-1009, ¶[0025]) could have been able to incorporate a cover having a lens shape as per Ohsaki. Indeed, only a routine knowledge of sensor design and assembly, which were well within the abilities of one of ordinary skill in the art, would be required to perform such modifications. Thus, to achieve the goal of improved adhesion and detection, one of ordinary skill would have been able to, with a reasonable expectation of success, incorporate a convex protrusion as taught by Ohsaki.

90.    Indeed, the modification would have amounted to nothing more than the use of a known technique to improve similar devices in the same way, and combining prior art elements according to known methods to yield predictable results— improved adhesion of the sensor to the user's skin, and improved signal strength. *KSR v. Teleflex*, 550 U.S. 398, 417 (2007). Furthermore, the elements of the Mendelson-Ohsaki sensor would each perform functions they had been known to

perform prior to the combination—Ohsaki's translucent board 8 would simply be placed over the components accommodated within Mendelson '799's sensor housing 17, and would perform the same function as taught by Ohsaki.  APPLE-1012, Abstract, 9:22-10:30, FIG. 7; APPLE-1009, Abstract, ¶¶[0015], [0017], [0025], FIGS. 1, 2, 4A, 4B.

   2.   *Strap configured to facilitate attachment of part of the physiological monitoring device to a user's arm*

91.    As explained above with respect to Section VI.A, Mendelson '799 depicts and describes "a pulse oximeter 20 utilizing … sensor 10."  APPLE-1012, Abstract, 9:22-10:30, FIGS. 7, 8.

92.    As Mendelson '799 acknowledges, "reflection-mode or backscatter type pulse oximetry … allows for measuring SaO2 from multiple convenient locations on the body (e.g. the head, torso, or upper limbs)," and several references that are mentioned within Mendelson '799 depict and describe pulse oximetry devices in which at least part of the device is configured to be strapped to the arm of a user.  APPLE-1012, 2:14-27, 4:13-22; APPLE-1018, 1, 2, FIG. 2.

93.    Yitzhak Mendelson's 1991 paper "Skin Reflectance Pulse Oximetry: In Vivo Measurements from the Forearm and Calf," for example, describes reflectance pulse oximeter sensors that "were attached to the ventral side of the forearm," and explains that "[i]n cases where an abundance of hair prevented



US 20010056243A1

(19) **United States**

(12) **Patent Application Publication** (10) Pub. No.: **US 2001/0056243 A1**

Ohsaki et al. (43) **Pub. Date: Dec. 27, 2001**

(54) **WRISTWATCH-TYPE HUMAN PULSE WAVE SENSOR ATTACHED ON BACK SIDE OF USER'S WRIST**

(76) Inventors: **Rie Ohsaki**, Anjo-city (JP); **Teiyuu Kimura**, Nagoya-city (JP); **Naoki Fukaya**, Obu-city (JP)

Correspondence Address:
**LAW OFFICE OF DAVID G POSZ**
**2000 L STREET, N.W.**
**SUITE 200**
**WASHINGTON, DC 20036 (US)**

(21) Appl. No.: **09/852,698**

(22) Filed: **May 11, 2001**

(30) **Foreign Application Priority Data**

Jun. 14, 2000 (JP) ...................................... 2000-177999

**Publication Classification**

(51) Int. Cl.[7] .................................................... A61B 5/02
(52) U.S. Cl. ............................................ **600/503**; 600/500

(57) **ABSTRACT**

A pulse wave sensor includes a detecting element and a sensor body. The pulse wave sensor is worn on the back side of a user's wrist corresponding to the back of the user's hand. The detecting element includes a translucent member on its top, and the translucent member has a convex surface. The detecting element is attached on the back side of the user's wrist by a dedicated belt so that the convex surface of the translucent member is in intimate contact with the surface of the user's skin. The sensor body is attached on the back side of the user's wrist by another dedicated belt so that it is arranged on the detecting element. A cushion is arranged between the sensor body and the detecting element. The pulse wave sensor can stably detect the pulse wave without being affected by the movement of the user's wrist.



APPLE 1009

Appx15568

2

**[0019]** The light emitting element **6** and the light receiving element **7** are arranged side by side as shown in **FIG. 2**. Accordingly the length of the detecting element **2** from the right side to the left side in **FIG. 2** is longer than the length from the upper side to the lower side. If the detecting element **2** is arranged so that its longitudinal direction (from the right side to the left side in **FIG. 2**) agrees with the circumferential direction of the user's wrist **4**, it has a tendency to slip off. Therefore it is desirable that the detecting element **2** is arranged so that its longitudinal direction agrees with the longitudinal direction of the user's arm. The dedicated belt **10** is attached to the detecting element **2** so that it can fix the detecting element **2** on the user's wrist **4** in this way.

**[0020]** The sensor body **3** is connected to the detecting element **2** by a signal line **13**, and includes, as shown in **FIG. 2**, a drive circuit **11**, a microcomputer **12**, and a monitor display (not shown). The drive circuit **11** drives the light emitting element **6** to emit light toward the wrist **4**. The microcomputer **12** calculates the pulse rate from the reflected light received by the detecting element **2**. This reflected light varies with the user's pulsation. The monitor display shows the calculated pulse rate and the like.

**[0021]** The sensor body **3** is arranged on the top of the detecting element **2**, and fixed on the user's wrist **4** by a dedicated belt **14** attached to the sensor body **3**. A cushion **15** such as a sponge or a gel is inserted between the detecting element **2** and the sensor body **3** so that the detecting element **2** does not directly contact the sensor body **3**.

**[0022]** The pulse wave sensor **1** detects the pulse wave of the user's body as follows. The light emitting element **6** emits light toward the user's wrist **4**, a portion of the emitted light penetrates the capillary arteriole **16** in the inside of the user's wrist **4** and is absorbed by the haemoglobin in the blood. The rest of the emitted light is reflected and scattered by the capillary arteriole **16**, and partly reaches the light emitting element **7**. As the amount of the haemoglobin in the blood varies in waves due to the pulsation of the user's blood, the amount of the light absorbed by the haemoglobin also varies in waves. As a result, the amount of the light which is reflected by the capillary arteriole **16** and reaches the light receiving element **7** varies in waves. This variation in the amount of the light received by the light receiving element **7** is detected as the pulse wave information.

**[0023]** If the detecting element **2** is arranged on the front side of the user's wrist **4**, the amount of the light received the light receiving element **7** is larger. That is, the intensity of the signal received by the light receiving element **7** is higher. However, the detecting element **2** has a tendency to slip off the detecting position of the user's wrist **4** as the user moves his/her wrist, and therefore the intensity of the light received by the light receiving element **7** largely varies depending on the shift amount of the detecting element **2**. As shown in **FIG. 3B**, in the case that the detecting element **2** is arranged on the front side of the user's wrist **4**, the pulse wave can be detected well if the user is at rest. However, when the user is in motion, the detected pulse wave is adversely affected by the movement of the user's wrist **4**.

**[0024]** In contrast to this, if the detecting element **2** is arranged on the back side of the user's wrist **4**, the user will not move his/her wrist unconsciously since the radius and the ulna inside the user's wrist **4** are not pressed and consequently the user does not feel so uncomfortable. Further, the detecting element **2** will not shift so widely even if the user's wrist moves. Therefore the detecting element **2** is stably fixed to the detecting position of the user's wrist **4**. As a result, the pulse wave is detected stably without being affected by the movement of the user's wrist **4** as shown in **FIG. 3A**.

**[0025]** The detecting element **2** is arranged on the user's wrist **4** so that the convex surface of the translucent board **8** is in intimate contact with the surface of the user's skin. Thereby it is prevented that the detecting element **2** slips off the detecting position of the user's wrist **4**. If the translucent board **8** has a flat surface, the detected pulse wave is adversely affected by the movement of the user's wrist **4** as shown in **FIG. 4B**. However, in the case that the translucent board **8** has a convex surface like the present embodiment, the variation of the amount of the reflected light which is emitted from the light emitting element **6** and reaches the light receiving element **7** by being reflected by the surface of the user's skin is suppressed. It is also prevented that noise such as disturbance light from the outside penetrates the translucent board **8**. Therefore the pulse wave can be detected without being affected by the movement of the user's wrist **4** as shown in **FIG. 4A**.

**[0026]** The detecting element **2** and the sensor body **3** is attached to the user's wrist **4** by the dedicated belts **10** and **14**, respectively. That is, the detecting element **2** and the sensor body **3** are allowed to move relatively. Further the cushion **15** is arranged between the detecting element **2** and the sensor body **3**. Therefore, if force is applied to the sensor body **3** or the sensor body **3** moves, the force applied to the sensor body **3** or the movement of the sensor body **3** cannot be transmitted to the detecting element **2** easily.

**[0027]** Accordingly the detecting element **2** is stably fixed to the user's wrist **4**. As a result, the pulse wave sensor can detect the pulse wave at a high S/N ratio, that is, it can provide high detection probability, not only when the user is at rest but also when the user is taking light exercise.

**[0028]** Modifications

**[0029]** In the above embodiment, the sensor body **3** need not include the microcomputer **12** if it includes a transmitter instead. In this case, the pulse wave information detected by the detecting element **2** is transmitted to a receiver by the transmitter. The sensor body **3** can be downsized and light in weight in this case and consequently the force applied to the sensor body **3** or the movement of the sensor body **3** cannot be transmitted to the detecting element **2** easily.

**[0030]** In the above embodiment, the detecting element **2** and the sensor body **3** may be worn on the back side of the user's forearm.

What is claimed is:

1. A pulse wave sensor for detecting a pulse wave of a human body comprising:

a detecting element including a light emitting element and a light receiving element; and

a sensor body including a circuit connected to the detecting element via a signal line,

wherein the detecting element is constructed to be worn on a back side of a user's wrist or a user's forearm.

5

US006801799B2

(12) **United States Patent**
Mendelson

(10) **Patent No.:** **US 6,801,799 B2**
(45) **Date of Patent:** **Oct. 5, 2004**

(54) **PULSE OXIMETER AND METHOD OF OPERATION**

(75) Inventor: **Yitzhak Mendelson**, Worcester, MA (US)

(73) Assignee: **Cybro Medical, Ltd.**, Haifa (IL)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **10/360,666**

(22) Filed: **Feb. 6, 2003**

(65) **Prior Publication Data**

US 2003/0144584 A1 Jul. 31, 2003

**Related U.S. Application Data**

(62) Division of application No. 09/939,391, filed on Aug. 24, 2001, now abandoned.

(30) **Foreign Application Priority Data**

Oct. 5, 2000 (IL) ................................................. 138884

(51) **Int. Cl.**[7] ................................................. **A61B 5/00**
(52) **U.S. Cl.** ........................ **600/330**; 600/322; 600/336
(58) **Field of Search** ................................. 600/310, 322, 600/323, 330, 336

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,638,640 A | 2/1972 | Shaw | |
| 3,799,672 A | 3/1974 | Vurek | 356/41 |
| 3,847,483 A | 11/1974 | Shaw | 356/41 |
| 3,998,550 A | 12/1976 | Konishi et al. | 356/39 |
| 4,086,915 A | 5/1978 | Kofsky et al. | |
| 4,167,331 A | 9/1979 | Nielsen | 356/39 |
| 4,266,554 A | 5/1981 | Hamaguri | |
| 4,357,105 A | 11/1982 | Loretz | 356/40 |
| 4,407,290 A | 10/1983 | Wilber | |
| 4,446,871 A | 5/1984 | Imura | |
| 4,714,341 A | 12/1987 | Hamaguri et al. | 356/41 |

| | | | |
|---|---|---|---|
| 4,740,080 A | 4/1988 | Donohue et al. | 356/326 |
| 4,773,422 A | 9/1988 | Isaacson et al. | |
| 4,796,636 A | 1/1989 | Branstetter et al. | |
| 4,802,486 A | 2/1989 | Goodman et al. | |
| 4,819,649 A | 4/1989 | Rogers et al. | |
| 4,819,752 A | 4/1989 | Zelin | |
| 4,854,699 A | 8/1989 | Edgar, Jr. | 356/41 |
| 4,859,057 A | 8/1989 | Taylor et al. | 356/41 |
| 4,867,557 A | 9/1989 | Takatani et al. | 356/41 |
| 4,892,101 A | 1/1990 | Cheung et al. | |
| 4,928,692 A | 5/1990 | Goodman et al. | |
| 4,934,372 A | 6/1990 | Corenman et al. | |
| 4,960,126 A | 10/1990 | Conlon | |
| 5,190,038 A | 3/1993 | Polson et al. | |
| 5,224,478 A | 7/1993 | Sakai et al. | |
| 5,348,004 A | 9/1994 | Hollub | |
| 5,349,519 A | 9/1994 | Kaestle | 364/413.09 |

(List continued on next page.)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| WO | WO9403102 | 2/1994 |
| WO | WO0154573 | 8/2001 |
| WO | WO0184107 | 11/2001 |

OTHER PUBLICATIONS

*"Reflecance Pulse Oximetry at the Forehead of Newborns: The Influence of Varying Pressure on the Probe"*; A. Carin M. Dassel, MD, et el.; Dept of Obstetrics and Gynecology, Univ. Hospital Groningen, Groningen; Journal of Clinical Monitoring 12: pp. 421–428, 1996.

(List continued on next page.)

*Primary Examiner*—Eric F. Winakur
(74) *Attorney, Agent, or Firm*—Howard & Howard

(57) **ABSTRACT**

A sensor for use in an optical measurement device and a method for non-invasive measurement of a blood parameter. The sensor includes sensor housing, a source of radiation coupled to the housing, and a detector assembly coupled to the housing. The source of radiation is adapted to emit radiation at predetermined frequencies. The detector assembly is adapted to detect reflected radiation at least one predetermined frequency and to generate respective signals. The signals are used to determine the parameter of the blood.

**5 Claims, 6 Drawing Sheets**



APPLE 1012

Appx15578

US 6,801,799 B2

Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,355,880 A | | 10/1994 | Thomas et al. |
| 5,398,680 A | | 3/1995 | Polson et al. |
| 5,413,100 A | | 5/1995 | Barthelemy et al. |
| 5,421,329 A | | 6/1995 | Casciani et al. |
| 5,482,036 A | | 1/1996 | Diab et al. |
| 5,490,505 A | | 2/1996 | Diab et al. |
| 5,490,506 A | | 2/1996 | Takatani et al. |
| 5,494,032 A | * | 2/1996 | Robinson et al. ........... 600/323 |
| 5,517,988 A | | 5/1996 | Gerhard |
| 5,533,507 A | | 7/1996 | Potratz |
| 5,632,272 A | | 5/1997 | Diab et al. |
| 5,645,060 A | | 7/1997 | Yorkey |
| 5,685,299 A | | 11/1997 | Diab et al. |
| 5,758,644 A | | 6/1998 | Diab et al. |
| 5,769,785 A | | 6/1998 | Diab et al. .................. 600/364 |
| 5,782,237 A | | 7/1998 | Casciani et al. |
| 5,823,950 A | | 10/1998 | Diab et al. .................. 600/310 |
| 5,842,981 A | | 12/1998 | Larsen et al. ............... 600/323 |
| 5,853,364 A | | 12/1998 | Baker, Jr. et al. .......... 600/500 |
| 5,919,134 A | | 7/1999 | Diab ......................... 600/323 |
| 5,995,856 A | | 11/1999 | Mannheimer et al. ...... 600/322 |
| 6,011,986 A | | 1/2000 | Diab et al. .................. 600/323 |
| 6,031,603 A | | 2/2000 | Fine et al. .................... 356/41 |
| 6,036,642 A | | 3/2000 | Diab et al. .................. 600/364 |
| 6,067,462 A | | 5/2000 | Diab et al. .................. 600/310 |
| 6,081,735 A | | 6/2000 | Diab et al. .................. 600/310 |
| 6,083,172 A | | 7/2000 | Baker, Jr. et al. .......... 600/500 |

## OTHER PUBLICATIONS

"*Reflectance Pulse Oximetry—Principles and Obstetric Application in the Zurich System*"; Voker Konig, Renate Huch, and Albert Huch; Perinatal Physiology Research Dept., Dept. of Obstetrics, Computing 14: pp. 403–412, 1998.

"*Effect of location of the sensor on reflectance pulse oximetry*"; A.C. M. Dassel, Research Fellow et al. British Journal of Obstetrics and Gynecology; Aug. 1997, vol. 104, pp. 910–916.

"*Design and Evaluation of a New Reflectance Pulse Oximeter Sensor*"; Y. Mendelson, PhD, et al.; Worcester Polytechnic Institute, Biomedical Engineering Program, Worcester, MA 01609; Association for the Advancement of Medical Instrumentation, vol. 22, No. 4, 1988; pp. 167–173.

"*Skin Reflectance Pulse Oximetry: In Vivo Measurements from the Forearm and Calf*"; Y. Mednelson, PhD and M.J. McGinn, MSc; Dept. of Biomedical Engineering, Worcester Polytechnic Institute, Worcester, MA 01609; Journal of Clinical Monitoring, vol. 7, No. 1, 1991; pp. 7–12.

"*Experimental and Clinical Evaluation of a Noninvasive Reflectance Pulse Oximeter Sensor*"; Setsuo Takatani, PhD, et al.; Dept. of Surgery, Baylor College of Medicine, One Baylor Plaza, Houston, TX 77030; Journal of Clinical Monitoring, vol. 8, No. 4, Oct. 1992; pp. 257–266.

"*Wavelength Selection for Low–Saturation Pulse Oximetry*"; Paul D. Mannheimer, et al.; IEEE Transactions on Biomedical Engineering, vol. 44, No. 3, Mar. 1997; pp. 148–158.

"*Noninvasive Pulse Oximetry Utilizing Skin Reflectance Photoplethysmography*"; Yitzhak Mendelson and Burt D. Ochs; IEEE Transactions on Biomedical Engineering, vol. 35, No. 10, Oct. 1988; pp. 798–805.

"*Physio–optical considerations in the design of fetal pulse oximetry sensors*"; P.D. Mannheimer, M.E. Fein and J.R. Casciani; European Journal of Obstetrics & Gynecology and Reproductive Biology 72 Suppl. 1 (1997) S9–S19.

"*Fetal pulse oximetry: influence of tissue blood content and hemoglobin concentration in a new in–vitro model*"; Thomas Edrich, Gerhard Rall, Reinhold Knitza; European Journal if Obstetrics & Gynecology and Reproductive Biology 72 Suppl. 1 (1997) S29–S34.

* cited by examiner



*Figure 1*



*Figure 2*



## Figure 3



## Figure 4

4



REFLECTION SENSOR

*Figure 5A*



REFLECTION SENSOR

*Figure 5B*



$S_PO_2$

R/IR

*Figure 6*



*Figure 7*



*Figure 8*



*Figure 9*



*Figure 10A*



*Figure 10B*



*Figure 10C*

US 6,801,799 B2

1

# PULSE OXIMETER AND METHOD OF OPERATION

This application is a divisional application of U.S. patent application Ser. No. 09/939,391 filed Aug. 24, 2001, now abandoned.

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

This invention is generally in the field of pulse oximetry, and relates to a sensor for use in a pulse oximeter, and a method for the pulse oximeter operation.

### 2. Background of the Invention

Oximetry is based on spectrophotometric measurements of changes in the color of blood, enabling the non-invasive determination of oxygen saturation in the patient's blood. Generally, oximetry is based on the fact that the optical property of blood in the visible (between 500 and 700 nm) and near-infrared (between 700 and 1000 nm) spectra depends strongly on the amount of oxygen in blood.

Referring to FIG. 1, there is illustrated a hemoglobin spectra measured by oximetry based techniques. Graphs $G1$ and $G2$ correspond, respectively, to reduced hemoglobin, or deoxygenated hemoglobin (Hb), and oxygenated hemoglobin, or oxyhemoglobin ($HbO_2$), spectra. As shown, deoxyhemoglobin (Hb) has a higher optical extinction (i.e., absorbs more light) in the red region of spectrum around 660 nm, as compared to that of oxyhemoglobin ($HbO_2$). On the other hand, in the near-infrared region of the spectrum around 940 nm, the optical absorption by deoxyhemoglobin (Hb) is lower than the optical absorption of oxyhemoglobin ($HbO_2$).

Prior art non-invasive optical sensors for measuring arterial oxyhemoglobin saturation ($SaO_2$) by a pulse oximeter (termed $SpO_2$) are typically comprised of a pair of small and inexpensive light emitting diodes (LEDs), and a single highly sensitive silicon photodetector. A red (R) LED centered on a peak emission wavelength around 660 nm and an infrared (IR) LED centered on a peak emission wavelength around 940 nm are used as light sources.

Pulse oximetry relies on the detection of a photoplethysmographic signal caused by variations in the quantity of arterial blood associated with periodic contraction and relaxation of a patient's heart. The magnitude of this signal depends on the amount of blood ejected from the heart into the peripheral vascular bed with each systolic cycle, the optical absorption of the blood, absorption by skin and tissue components, and the specific wavelengths that are used to illuminate the tissue. $SaO_2$ is determined by computing the relative magnitudes of the R and IR photoplethysmograms. Electronic circuits inside the pulse oximeter separate the R and IR photoplethysmograms into their respective pulsatile (AC) and non-pulsatile (DC) signal components. An algorithm inside the pulse oximeter performs a mathematical normalization by which the time-varying AC signal at each wavelength is divided by the corresponding time-invariant DC component which results mainly from the light absorbed and scattered by the bloodless tissue, residual arterial blood when the heart is in diastole, venous blood and skin pigmentation.

Since it is assumed that the AC portion results only from the arterial blood component, this scaling process provides a normalized R/IR ratio (i.e., the ratio of AC/DC values corresponding to R- and IR-spectrum wavelengths, respectively), which is highly dependent on $SaO_2$, but is largely independent of the volume of arterial blood entering the tissue during systole, skin pigmentation, skin thickness and vascular structure. Hence, the instrument does not need to be re-calibrated for measurements on different patients. Typical calibration of a pulse oximeter is illustrated in FIG. 2 by presenting the empirical relationship between $SaO_2$ and the normalized R/IR ratio, which is programmed by the pulse oximeters' manufacturers.

Pulse oximeters are of two kinds operating, respectively, in transmission and reflection modes. In transmission-mode pulse oximetry, an optical sensor for measuring $SaO_2$ is usually attached across a fingertip, foot or earlobe, such that the tissue is sandwiched between the light source and the photodetector.

In reflection-mode or backscatter type pulse oximetry, as shown in FIG. 3, the LEDs and photodetector are both mounted side-by-side next to each other on the same planar substrate. This arrangement allows for measuring $SaO_2$ from multiple convenient locations on the body (e.g. the head, torso, or upper limbs), where conventional transmission-mode measurements are not feasible. For this reason, non-invasive reflectance pulse oximetry has recently become an important new clinical technique with potential benefits in fetal and neonatal monitoring. Using reflectance oximetry to monitor $SaO_2$ in the fetus during labor, where the only accessible location is the fetal scalp or cheeks, or on the chest in infants with low peripheral perfusion, provides several more convenient locations for sensor attachment.

Reflection pulse oximetry, while being based on similar spectrophotometric principles as the transmission one, is more challenging to perform and has unique problems that can not always be solved by solutions suitable for solving the problems associated with the transmission-mode pulse oximetry. Generally, comparing transmission and reflection pulse oximetry, the problems associated with reflection pulse oximetry consist of the following:

In reflection pulse oximetry, the pulsatile AC signals are generally very small and, depending on sensor configuration and placement, have larger DC components as compared to those of transmission pulse oximetry. As illustrated in FIG. 4, in addition to the optical absorption and reflection due to blood, the DC signal of the R and IR photoplethysmograms in reflection pulse oximetry can be adversely affected by strong reflections from a bone. This problem becomes more apparent when applying measurements at such body locations as the forehead and the scalp, or when the sensor is mounted on the chest over the ribcage. Similarly, variations in contact pressure between the sensor and the skin can cause larger errors in reflection pulse oximetry (as compared to transmission pulse oximetry) since some of the blood near the superficial layers of the skin may be normally displaced away from the sensor housing towards deeper subcutaneous structures. Consequently, the highly reflective bloodless tissue compartment near the surface of the skin can cause large errors even at body locations where the bone is located too far away to influence the incident light generated by the sensor.

Another problem with currently available reflectance sensors is the potential for specular reflection caused by the superficial layers of the skin, when an air gap exists between the sensor and the skin, or by direct shunting of light between the LEDs and the photodetector through a thin layer of fluid which may be due to excessive sweating or from amniotic fluid present during delivery.

It is important to keep in mind the two fundamental assumptions underlying the conventional dual-wavelength pulse oximetry, which are as follows:

9

US 6,801,799 B2

3

(1) the path of light rays with different illuminating wavelengths in tissue are substantially equal and, therefore, cancel each other; and (2) each light source illuminates the same pulsatile change in arterial blood volume.

Furthermore, the correlation between optical measurements and tissue absorptions in pulse oximetry are based on the fundamental assumption that light propagation is determined primarily by absorbable due to Lambent-Beer's law neglecting multiple scattering effects in biological tissues. In practice, however, the optical paths of different wavelengths in biological tissues is known to vary more in reflectance oximetry compared to transmission oximetry, since it most strongly depends on the light scattering properties of the illuminated tissue and sensor mounting.

Several human validation studies, backed by animal investigations, have suggested that uncontrollable physiological and physical parameters can cause large variations in the calibration curve of reflectance pulse oximeters primarily at low oxygen saturation values below 70%. It was observed that the accuracy of pulse oximeters in clinical use might be adversely affected by a number of physiological parameters when measurements are made from sensors attached to the forehead, chest, or the buttock area. While the exact sources of these variations are not fully understood, it is generally believed that there are a few physiological and anatomical factors that may be the major source of these errors. It is also well known for example that changes in the ratio of blood to bloodless tissue volumes may occur through venous congestion, vasoconstriction/vasodilatation, or through mechanical pressure exerted by the sensor on the skin.

Additionally, the empirically derived calibration curve of a pulse oximeter can be altered by the effects of contact pressure exerted by the probe on the skin. This is associated with the following. The light paths in reflectance oximetry are not well defined (as compared to transmission oximetry), and thus may differ between the red and infrared wavelengths. Furthermore, the forehead and scalp areas consist of a relatively thin subcutaneous layer with the cranium bone underneath, while the tissue of other anatomical structures, such as the buttock and limbs, consists of a much thicker layer of skin and subcutaneous tissues without a nearby bony support that acts as a strong light reflector.

Several in vivo and in vitro studies have confirmed that uncontrollable physiological and physical parameters (e.g., different amounts of contact pressure applied by the sensor on the skin, variation in the ratio of bloodless tissue-to-blood content, or site-to-site variations) can often cause large errors in the oxygen saturation readings of a pulse oximeter, which are normally derived based on a single internally-programmed calibration curve. The relevant in vivo studies are disclosed in the following publications:

1. Dassel, et al., "Effect of location of the sensor on reflectance pulse oximetry", British Journal of Obstetrics and Gynecology, vol. 104, pp. 910–916, (1997);

2. Dassel, et al., "Reflectance pulse oximetry at the forehead of newborns: The influence of varying pressure on the probe", Journal of Clinical Monitoring, vol. 12, pp. 421–428, (1996).

The relevant in vitro studies are disclosed, for example in the following publication:

3. Edrich et al., "Fetal pulse oximetry: influence of tissue blood content and hemoglobin concentration in a new in-vitro model", European Journal of Obstetrics and Gynecology and Reproductive Biology, vol. 72, suppl. 1, pp. S29–S34, (1997).

4

Improved sensors for application in dual-wavelength reflectance pulse oximetry have been developed. As disclosed in the following publication: Mendelson, et al., "Noninvasive pulse oximetry utilizing skin reflectance photoplethysmography", IEEE Transactions on Biomedical Engineering, vol. 35, no. 10, pp. 798–805 (1988), the total amount of backscattered light that can be detected by a reflectance sensor is directly proportional to the number of photodetectors placed around the LEDs. Additional improvements in signal-to-noise ratio were achieved by increasing the active area of the photodetector and optimizing the separation distance between the light sources and photodetectors.

Another approach is based on the use of a sensor having six photodiodes arranged symmetrically around the LEDs that is disclosed in the following publications:

4. Mendelson, et al., "Design and evaluation of a new reflectance pulse oximeter sensor", Medical Instrumentation, vol. 22, no. 4, pp. 167–173 (1988); and

5. Mendelson, et al., "Skin reflectance pulse oximetry: in vivo measurements from the forearm and calf", Journal of Clinical Monitoring, vol. 7, pp. 7–12, (1991).

According to this approach, in order to maximize the fraction of backscattered light collected by the sensor, the currents from all six photodiodes are summed electronically by internal circuitry in the pulse oximeter. This configuration essentially creates a large area photodetector made of six discrete photodiodes connected in parallel to produce a single current that is proportional to the amount of light backscattered from the skin. Several studies showed that this sensor configuration could be used successfully to accurately measure $SaO_2$ from the forehead, forearm and the calf on humans. However, this sensor requires a means for heating the skin in order to increase local blood flow, which has practical limitations since it could cause skin burns.

Yet another prototype reflectance sensor is based on eight dual-wavelength LEDs and a single photodiode, and is disclosed in the following publication: Takatani et al., "Experimental and clinical evaluation of a noninvasive reflectance pulse oximeter sensor", Journal of Clinical Monitoring, vol. 8, pp. 257–266 (1992). Here, four R and four IR LEDs are spaced at 90-degree intervals around the substrate and at an equal radial distance from the photodiode.

A similar sensor configuration based on six photodetectors mounted in the center of the sensor around the LEDs is disclosed in the following publication: Konig, et al., "Reflectance pulse oximetry—principles and obstetric application in the Zurich system", Journal of Clinical Monitoring, vol. 14, pp. 403–412 (1998).

According to the techniques disclosed in all of the above publications, only LEDs of two wavelengths, R and IR, are used as light sources, and the computation of $SaO_2$ is based on reflection photoplethysmograms measured by a single photodetector, regardless of whether one or multiple photodiodes chips are used to construct the sensor. This is because of the fact that the individual signals from the photodetector elements are all summed together electronically inside the pulse oximeter. Furthermore, while a radially-symmetric photodetector array can help to maximize the detection of backscattered light from the skin and minimize differences from local tissue inhomogeneity, human and animal studies confirmed that this configuration can not completely eliminate errors caused by pressure differences and site-to-site variations.

The use of a nominal dual-wavelength pair of 735/890 nm was suggested as providing the best choice for optimizing

US 6,801,799 B2

5

accuracy, as well as sensitivity in dual-wavelength reflectance pulse oximetry, in U.S. Pat. Nos. 5,782,237 and 5,421,329. This approach minimizes the effects of tissue heterogeneity and enables to obtain a balance in path length changes arising from perturbations in tissue absorbance. This is disclosed in the following publications:

6. Mannheimer et al., "Physio-optical considerations in the design of fetal pulse oximetry sensors", European Journal of Obstetrics and Gynecology and Reproductive Biology, vol. 72, suppl. 1, pp. S9–S19, (1997); and

7. Mannheimer et al., "Wavelength selection for low-saturation pulse oximetry", IEEE Transactions on Biomedical Engineering, vol. 44, no. 3, pp. 48–158 (1997)].

However, replacing the conventional R wavelength at 660 nm, which coincides with the region of the spectrum where the difference between the extinction coefficient of Hb and $HbO_2$ is maximal, with a wavelength emitting at 735 nm, not only lowers considerably the overall sensitivity of a pulse oximeter, but does not completely eliminate errors due to sensor placement and varying contact pressures.

Pulse oximeter probes of a type comprising three or more LEDs for filtering noise and monitoring other functions, such as carboxyhemoglobin or various indicator dyes injected into the blood stream, have been developed and are disclosed, for example, in WO 00/32099 and U.S. Pat. No. 5,842,981. The techniques disclosed in these publications are aimed at providing an improved method for direct digital signal formation from input signals produced by the sensor and for filtering noise.

None of the above prior art techniques provides a solution to overcome the most essential limitation in reflectance pulse oximetry, which requires the automatic correction of the internal calibration curve from which accurate and reproducible oxygen saturation values are derived, despite variations in contact pressure or site-to-site tissue heterogeneity.

In practice, most sensors used in reflection pulse oximetry rely on closely spaced LED wavelengths in order to minimize the differences in the optical path lengths of the different wavelengths. Nevertheless, within the wavelength range required for oximetry, even closely spaced LEDs with closely spaced wavelengths mounted on the same substrate can lead to large random error in the final determination of $SaO_2$.

## SUMMARY OF THE INVENTION AND ADVANTAGES

The object of the invention is to provide a novel sensor design and method that functions to correct the calibration relationship of a reflectance pulse oximeter, and reduce measurement inaccuracies in general. Another object of the invention is to provide a novel sensor and method that functions to correct the calibration relationship of a reflectance pulse oximeter, and reduce measurement inaccuracies in the lower range of oxygen saturation values (typically below 70%), which is the predominant range in neonatal and fetal applications.

Yet another object of the present invention is to provide automatic correction of the internal calibration curve from which oxygen saturation is derived inside the oximeter in situations where variations in contact pressure or site-to-site tissue heterogeneity may cause large measurement inaccuracies.

Another object of the invention is to eliminate or reduce the effect of variations in the calibration of a reflectance

6

pulse oximeter between subjects, since perturbations caused by contact pressure remain one of the major sources of errors in reflectance pulse oximetry. In fetal pulse oximetry, there are additional factors, which must be properly compensated for in order to produce an accurate and reliable measurement of oxygen saturation. For example, the fetal head is usually the presenting part, and is a rather easily accessible location for application of reflectance pulse oximetry. However, uterine contractions can cause large and unpredictable variations in the pressure exerted on the head and by the sensor on the skin, which can lead to large errors in the measurement of oxygen saturation by a dual-wavelength reflectance pulse oximeter. Another object of the invention is to provide accurate measurement of oxygen saturation in the fetus during delivery.

The basis for the errors in the oxygen saturation readings of a dual-wavelength pulse oximeter is the fact that, in practical situations, the reflectance sensor applications affect the distribution of blood in the superficial layers of the skin. This is different from an ideal situation, when a reflectance sensor measures light backscattered from a homogenous mixture of blood and bloodless tissue components. Therefore, the R and IR DC signals practically measured by photodetectors contain a relatively larger proportion of light absorbed by and reflected from the bloodless tissue compartments. In these uncontrollable practical situations, the changes caused are normally not compensated for automatically by calculating the normalized R/IR ratio since the AC portions of each photoplethysmogram, and the corresponding DC components, are affected differently by pressure or site-to-site variations. Furthermore, these changes depend not only on wavelength, but depend also on the sensor geometry, and thus cannot be eliminated completely by computing the normalized R/IR ratio, as is typically the case in dual-wavelength pulse oximeters.

The inventor has found that the net result of this nonlinear effect is to cause large variations in the slope of the calibration curves. Consequently, if these variations are not compensated automatically, they will cause large errors in the final computation of $SpO_2$, particularly at low oxygen saturation levels normally found in fetal applications.

Another object of the present invention is to compensate for these variations and to provide accurate measurement of oxygen saturation. The invention consists of, in addition to two measurement sessions typically carried out in pulse oximetry based on measurements with two wavelengths centered around the peak emission values of 660 nm (red spectrum) and 940 nm±20 nm (IR spectrum), one additional measurement session is carried out with an additional wavelength. At least one additional wavelength is preferably chosen to be substantially in the IR region of the electromagnetic spectrum, i.e., in the NIR-IR spectrum (having the peak emission value above 700 nm). In a preferred embodiment the use of at least three wavelengths enables the calculation of an at least one additional ratio formed by the combination of the two IR wavelengths, which is mostly dependent on changes in contact pressure or site-to-site variations. In a preferred embodiment, slight dependence of the ratio on variations in arterial oxygen saturation that may occur, is easily minimized or eliminated completely, by the proper selection and matching of the peak emission wavelengths and spectral characteristics of the at least two IR-light sources.

Preferably, the selection of the IR wavelengths is based on certain criteria. The IR wavelengths are selected to coincide with the region of the optical absorption curve where $HbO_2$ absorbs slightly more light than Hb. The IR wavelengths are

Appx15588

US 6,801,799 B2

7

8

in the spectral regions where the extinction coefficients of both Hb and $HbO_2$ are nearly equal and remain relatively constant as a function of wavelength, respectively.

In a preferred embodiment, tracking changes in the ratio formed by the two IR wavelengths, in real-time, permits automatic correction of errors in the normalized ratio obtained from the R-wavelength and each of the IR-wavelengths. The term "ratio" signifies the ratio of two values of AC/DC corresponding to two different wavelengths. This is similar to adding another equation to solve a problem with at least three unknowns (i.e., the relative concentrations of $HbO_2$ and Hb, which are used to calculate $SaO_2$, and the unknown variable fraction of blood-to-tissue volumes that effects the accurate determination of $SaO_2$), which otherwise must rely on only two equations in the case of only two wavelengths used in conventional dual-wavelength pulse oximetry. In a preferred embodiment, a third wavelength provides the added ability to compute $SaO_2$ based on the ratio formed from the R-wavelength and either of the IR-wavelengths. In a preferred embodiment, changes in these ratios are tracked and compared in real-time to determine which ratio produces a more stable or less noisy signal. That ratio is used predominantly for calculating $SaO_2$.

The present invention utilizes collection of light reflected from the measurement location at different detection locations arranged along a closed path around light emitting elements, which can be LEDs or laser sources. Preferably, these detection locations are arranged in two concentric rings, the so-called "near" and "far" rings, around the light emitting elements. This arrangement enables optimal positioning of the detectors for high quality measurements, and enables discrimination between photodetectors receiving "good" information (i.e., AC and DC values which would result in accurate calculations of $SpO_2$) and "bad" information (i.e., AC and DC values which would result in inaccurate calculations of $SpO_2$).

There is thus provided according to one aspect of the present invention, a sensor for use in an optical measurement device for non-invasive measurements of blood parameters, the sensor comprising:

(1) a light source for illuminating a measurement location with incident light of at least three wavelengths, the first wavelength lying in a red (R) spectrum, and the at least second and third wavelengths lying substantially in the infrared (IR) spectrum; and

(2) a detector assembly for detecting light returned from the illuminated location, the detector assembly being arranged so as to define a plurality of detection locations along at least one closed path around the light source.

The term "closed path" used herein signifies a closed curve, like a ring, ellipse, or polygon, and the like.

The detector assembly is comprised of at least one array of discrete detectors (e.g., photodiodes) accommodated along at least one closed path, or at least one continuous photodetector defining the closed path.

The term "substantially IR spectrum" used herein signifies a spectrum range including near infrared and infrared regions.

According to another aspect of the present invention, there is provided a pulse oximeter utilizing a sensor constructed as defined above, and a control unit for operating the sensor and analyzing data generated thereby.

According to yet another aspect of the present invention, there is provided a method for non-invasive determination of a blood parameter, the method comprising the steps of:

illuminating a measurement location with at least three different wavelengths $\lambda 1$, $\lambda 2$ and $\lambda 3$, the first wavelength $\lambda 1$ lying in a red (R) spectrum, and the at least second and at least third wavelengths $\lambda 2$ and $\lambda 3$ lying substantially in the infrared (IR) spectrum;

detecting light returned from the measurement location at different detection locations and generating data indicative of the detected light, wherein said different detection locations are arranged so as to define at least one closed path around the measurement location; and

analyzing the generated data and determining the blood parameter.

## BRIEF DESCRIPTION OF THE DRAWINGS

Other advantages of the present invention will be readily appreciated as the same becomes better understood by reference to the following detailed description when considered in connection with the accompanying drawings wherein:

FIG. 1 illustrates hemoglobin spectra as measured by oximetry based techniques;

FIG. 2 illustrates a calibration curve used in pulse oximetry as typically programmed by the pulse oximeters manufacturers;

FIG. 3 illustrates the relative disposition of light source and detector in reflection-mode or backscatter type pulse oximetry;

FIG. 4 illustrates light propagation in reflection pulse oximetry;

FIGS. 5A and 5B illustrate a pulse oximeter reflectance sensor operating under ideal and practical conditions, respectively;

FIG. 6 illustrates variations of the slopes of calibration curves in reflectance pulse oximetry measurements;

FIG. 7 illustrates an optical sensor according to the invention;

FIG. 8 is a block diagram of the main components of a pulse oximeter utilizing the sensor of FIG. 7;

FIG. 9 is a flow chart of a selection process used in the signal processing technique according to the invention; and

FIGS. 10A to 10C are flow charts of three main steps, respectively, of the signal processing method according to the invention.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

Referring to the Figures, wherein like numerals indicate like or corresponding parts throughout the several views, FIGS. 1 and 2 illustrate typical hemoglobin spectra and calibrations curve utilized in the pulse oximetry measurements.

The present invention provides a sensor for use in a reflection-mode or backscatter type pulse oximeter. The relative disposition of light source and detector in the reflection-mode pulse oximeter are illustrated in FIG. 3.

FIG. 4 shows light propagation in the reflection-mode pulse oximeter where, in addition to the optical absorption and reflection due to blood, the DC signal of the R and IR photoplethysmograms can be adversely affected by strong reflections from the bone.

FIGS. 5A and 5B illustrate a pulse oximeter reflectance sensor operating under, respectively, ideal and practical conditions. Referring now to FIG. 5A, it is shown that, under

US 6,801,799 B2

9

ideal conditions, reflectance sensor measures light backscattered from a homogeneous mixture of blood and bloodless tissue components. Accordingly, the normalized R/IR ratio in dual-wavelength reflection type pulse oximeters, which relies on proportional changes in the AC and DC components in the photoplethysmograms, only reflect changes in arterial oxygen saturation.

Referring now to FIG. 5B, in practical situations, the sensor applications affect the distribution of blood in the superficial layers of the skin. Accordingly, the R and IR DC signals measured by photodetectors contain a relatively larger proportion of light absorbed by and reflected from the bloodless tissue compartments. As such, the changes in DC signals depend not only on wavelength but also sensor geometry and thus cannot be eliminated completely by computing the normalized R/IR ratio, as is typically the case in dual-wavelength pulse oximeters. The result is large variations in the slope of the calibration curves, as illustrated in FIG. 6. Referring now to FIG. 6, graphs C1, C2 and C3 show three calibration curves, presenting the variation of the slope for oxygen saturation values between 50% and 100%.

Referring now to FIG. 7, there is illustrated an optical sensor 10 designed according to the invention aimed at minimizing some of the measurement inaccuracies in a reflectance pulse oximeter. The sensor 10 comprises such main constructional parts as a light source 12 composed of three closely spaced light emitting elements (e.g., LEDs or laser sources) 12a, 12b and 12c generating light of three different wavelengths, respectively; an array of discrete detectors (e.g., photodiodes), a "far" detector 16 and a "near" detector 18, arranged in two concentric ring-like arrangements (constituting closed paths) surrounding the light emitting elements; and a light shield 14. In the present example, six photodiodes form each ring. All these elements are accommodated in a sensor housing 17. The light shield 14 is positioned between the photodiodes and the light emitting elements, and prevents direct optical coupling between them, thereby maximizing the fraction of backscattered light passing through the arterially perfused vascular tissue in the detected light.

It should be noted that more than three wavelengths can be utilized in the sensor. The actual numbers of wavelengths used as a light source and the number of photodetectors in each ring are not limited and depend only on the electronic circuitry inside the oximeter. The array of discrete photodiodes can be replaced by one or more continuous photodetector rings.

In addition to the R and IR light emitting elements 12a and 12b as used in the conventional pulse oximeter sensors, the sensor 10 incorporates the third, reference, light emitting element 12c, which emits light in the NIR-IR spectrum. Wavelength $\lambda 1$ and $\lambda 2$ of the R and IR light emitting elements 12a and 12b are centered, respectively, around the peak emission values of 660 nm and 940 nm, and wavelength $\lambda 3$ of the third light emitting element 12c has the peak emission value above 700 nm (typically ranging between 800 nm and 900 nm). In the description below, the light emitting elements 12b and 12c are referred to as two IR light emitting elements, and wavelengths $\lambda 2$ and $\lambda 3$ are referred to as two IR wavelengths.

During the operation of the sensor 10, different light emitting elements are selectively operated for illuminating a measurement location (not shown) with different wavelengths. Each of the photodetectors detects reflected light of different wavelengths and generates data indicative of the intensity I of the detected light of different wavelengths.

10

It should be noted that the sensor can be of a compact design utilizing an integrated circuit manufactured by CMOS technology. This technique is disclosed in a co-pending application assigned to the assignee of the present application. According to this technique, the sensor comprises a package including the light source, a block of two tubular optical waveguides of different diameters concentrically dislocated one inside the other and surrounding the light source, and an integrated circuit plate comprising two ring-like areas of photodiodes positioned concentrically one inside the other. The integrated circuit is also provided with a plurality of printed contact areas and electric conductors intended for mounting the light source thereon, controlling the light source, and transmitting electric signals produced by the photodiodes areas for further processing.

FIG. 8 illustrates a block diagram of a pulse oximeter 20 utilizing the above-described sensor 10. The pulse oximeter typically includes a control unit 21, which is composed of an electronic block 22 including A/D and D/A converters connectable to the sensor 10, a microprocessor 24 for analyzing measured data, and a display 26 for presenting measurement results. The measured data (i.e., electrical output of the sensor 10 indicative of the detected light) is directly processed in the block 22, and the converted signal is further processed by the microprocessor 24. The microprocessor 24 is operated by a suitable software model for analyzing the measured data and utilizing reference data (i.e., calibration curve stored in a memory) to compute the oxygen saturation value, which is then presented on the display 26. The analysis of the measured data utilizes the determination of AC- and DC-components in the detected light for each wavelength, $\lambda 1$, $\lambda 2$, and $\lambda 3$, respectively, i.e., $I_1^{(AC)}$, $I_1^{(DC)}$, $I_2^{(AC)}$, $I_2^{(DC)}$, $I_3^{(AC)}$, and $I_3^{(DC)}$, and the calculation of AC/DC ratio for each wavelength, namely, $W_1 = I_1^{(AC)}/I_1^{(DC)}$, $W_2 = I_2^{(AC)}/I_2^{(DC)}$, and $W_3 = I_3^{(AC)}/I_3^{(DC)}$, as will be described more specifically further below with reference to FIGS. 9 and 10A–10C.

The pulse oximeter 20 with the sensor arrangement shown in FIG. 7 provides the following three possible ratio values: $W_1/W_2$, $W_1/W_3$ and $W_2/W_3$. It should be noted that $W_1/W_2$ and $W_1/W_3$ are the ratios that typically have the highest sensitivity to oxygen saturation. This is due to the fact that $\lambda 1$ is chosen in the red region of the electromagnetic spectrum, where the changes in the absorption between Hb and $HbO_2$ are the largest, as described above with reference to FIG. 1. Therefore, in principle, the absorption ratios formed by either wavelength pair $\lambda 1$ and $\lambda 2$ or wavelength pair $\lambda 1$ and $\lambda 3$ can be used to compute the value of $SaO_2$.

The inventor conducted extensive human and animal studies, and confirmed that either of the two ratios $W_1/W_2$ and $W_1/W_3$ can be affected not only by changes in arterial oxygen saturation, but also by sensor placement and by the amount of pressure applied by the sensor on the skin. Any calculation of $SaO_2$ based on either of the two ratios $W_1/W_2$ and $W_1/W_3$ alone (as normally done in commercially available dual-wavelength pulse oximeters) could result in significant errors. Furthermore, since at least two wavelengths are necessary for the calculation of arterial oxygen saturation, it is not feasible to self-correct the calibration curve for variations due to contact pressure or site-to-site variations utilizing the same two wavelengths used already to compute $SaO_2$.

The inventor has found that the third ratio $W_2/W_3$ formed by the combination of the two IR wavelengths is mostly dependent on changes in contact pressure or site-to-site variations. Furthermore, this ratio can depend, but to a much lesser degree, on variations in arterial oxygen saturation.

13

US 6,801,799 B2

**11**

The dependency on arterial oxygen saturation, however, is easily minimized or eliminated completely, for example by selection and matching of the peak emission wavelengths and spectral characteristics of the two IR light emitting elements **12**b and **12**c.

Generally, the two IR wavelengths $\lambda 2$ and $\lambda 3$ are selected to coincide with the region of the optical absorption curve where $HbO_2$ absorbs slightly more light than Hb, but in the spectral region, respectively, where the extinction coefficients of both Hb and $HbO_2$ are nearly equal and remain relatively constant as a function of wavelength. For example, at 940 nm and 880 nm, the optical extinction coefficients of Hb and $HbO_2$ are approximately equal to 0.29 and 0.21, respectively. Therefore, ideally, the ratio of **W2/W3** should be close to 1, except for situations when the AC/DC signals measured from $\lambda 2$ and $\lambda 3$ are affected unequally causing the ratio **W2/W3** to deviate from 1.

Fortunately, variations in the ratio **W2/W3** mimic changes in the ratios $W_1/W_2$ and $W_1/W_3$ since these ratios are all affected by similar variations in sensor positioning or other uncontrollable factors that normally can cause large errors in the calibration curve from which oxygen saturation is typically derived. Thus, by tracking in real-time changes in the ratio formed by wavelengths $\lambda 2$ and $\lambda 3$, it is possible to automatically correct for errors in the normalized ratios obtained from wavelengths $\lambda 1$ and $\lambda 2$, or from $\lambda 1$ and $\lambda 3$.

The use of an additional third wavelength in the sensor serves another important function (not available in conventional dual-wavelength pulse oximeters), which is associated with the following. Reflectance pulse oximeters have to be capable of detecting and relying on the processing of relatively low quality photoplethysmographic signals. Accordingly, electronic or optical noise can cause large inaccuracies in the final computation of $SaO_2$. Although the amount of electronic or optical noise pickup from the sensor can be minimized to some extent, it is impossible to render the signals measured by the pulse oximeter completely noise free. Therefore, pulse oximeters rely on the assumption that any noise picked up during the measurement would be cancelled by calculating the ratio between the R- and IR-light intensities measured by the photodetector. Practically, however, the amount of noise that is superimposed on the R- and IR-photoplethysmograms cannot be cancelled by calculating the ratio and, thus, can lead to significant errors in the final computation of $SaO_2$ which, in dual-wavelength pulse oximeters, is based only on the ratio between two wavelengths.

By utilizing a third wavelength, the invention has the added ability to compute $SaO_2$ based on the ratio formed from either $W_1/W_2$ or $W_1/W_3$. An algorithm utilized in the pulse oximeter according to the invention has the ability to track and compare in real-time changes between $W_1/W_2$ and $W_1/W_3$ to determine which ratio produces a more stable or less noisy signal and selectively choose the best ratio for calculating $SaO_2$.

The method according to the invention utilizes the so-called "selection process" as part of the signal processing technique based on the measured data obtained with the multiple photodetectors. The main steps of the selection process are shown in FIG. **9** in a self-explanatory manner. Here, the symbol i corresponds to a single photodetector element in the array of multiple discrete photodetector elements, the term "1st" signifies the last photodetector element in the array, and the term "DATA" signify three ratios (AC/DC) computed separately for each of the three wavelengths, namely, $W_1$, $W_2$ and $W_3$.

**12**

The selection process is associated with the following: Practically, each time one of the light emitting elements is in its operative position (i.e., switched on), all of the photodetectors in the sensor receiving backscattered light from the skin. However, the intensity of the backscattered light measured by each photodetector may be different from that measured by the other photodetectors, depending on the anatomical structures underneath the sensor and its orientation relative to these structures.

Thus, the selection process is used to discriminate between photodetectors receiving "good" signals (i.e., "good" signal meaning that the calculation of $SpO_2$ from the pulsating portion of the electro-optic signal (AC) and the constant portion (DC) would result in accurate value) and "bad" signals (i.e., having AC and DC values which would result in inaccurate calculations of $SpO_2$). Accordingly, each data point (i.e., ratio $W_{1i}$, $W_{2i}$ or $W_{3i}$ detected at the corresponding $i^{th}$ detector) is either accepted, if it meets a certain criteria based for example on a certain ratio of AC to DC values (e.g., such that the intensity of AC signal is about 0.05–2.0% of the intensity of DC signal), or rejected. All of the accepted data points (data from accepted detection locations) are then used to calculate the ratios $W_1/W_2$, $W_1/W_3$ and $W_2/W_3$, and to calculate the $SpO_2$ value, in conjunction with the signal processing technique, as will be described further below with reference to FIGS. **10A–10C**.

Besides the use of the third IR-wavelength to compensate for changes in the internal calibration curve of the pulse oximeter, the pulse oximeter utilizing the sensor according to the invention provides a unique new method to compensate for errors due to sensor positioning and pressure variability. This method is based on multiple photodetector elements, instead of the conventional approach that relies on a single photodetector.

While optical sensors with multiple photodetectors for application in reflectance pulse oximetry have been described before, their main limitation relates to the way the information derived from these photodetectors is processed. Although the primary purpose of utilizing multiple photodetectors is to collect a larger portion of the backscattered light from the skin, practically, summing the individual intensities of each photodetector and using the resulting value to compute $SaO_2$ can introduce large errors into the calculations. These errors can be caused, for example, by situations where the sensor is placed over inhomogeneous tissue structures such as when the sensor is mounted on the chest. The case may be such that, when using a continuous photodetector ring to collect the backscattered light, a portion of the photodetector ring lies over a rib, which acts as a strongly reflecting structure that contributes to a strong DC component, and the remaining part of the photodetector is positioned over the intercostals space, where the DC signal is much smaller. In this case, the final calculation of $SaO_2$ would be inaccurate, if the current produced by this photodetector is used indiscriminately to compute the DC value before the final computation of $SaO_2$ is performed. Therefore, in addition to automatically correcting errors in the calibration curve as outlined above using three different LEDs (one R and two different IR wavelengths), the sensor **10** has the optional ability to track automatically and compare changes in the R/IR ratios obtained from each of the discrete photodiodes individually. For example, if some of either the near or the far photodetectors in the two concentrically arranged arrays detect larger than normal DC signals during the operation of one of the photodiodes compared to the other photodiodes in the sensor, it could be indicative of one of the following situations: the sensor is positioned

13

14

unevenly, the sensor is partially covering a bony structure, or uneven pressure is exerted by the sensor on the skin causing partial skin "blanching" and therefore the blood-to-bloodless tissue ratio might be too high to allow accurate determination of $SaO_2$. If such a situation is detected, the oximeter has the ability to selectively disregard the readings obtained from the corresponding photodetectors. Otherwise, if the DC and AC signals measured from each photodetector in the array are similar in magnitude, which is an indication that the sensor is positioned over a homogeneous area on the skin, the final computation of $SaO_2$ can be based on equal contributions from every photodetector in the array.

Turning now to FIGS. **10**A, **10**B and **10**C, there are illustrated three main steps of the signal processing technique utilized in the present invention Here, $TH_1$ and $TH_2$ are two different threshold values (determined experimentally) related respectively to $W_2/W_3$ and $(W_1/W_2-W_1/W_3)$.

During step **1** (FIG. **10**A), measured data generated by the "near" and "far" photodetectors indicative of the detected (backscattered) light of wavelength $\lambda 2$ and $\lambda 3$ is analyzed to calculate the two ratios $W_2/W_3$ (far and near). If one of the calculated ratios (far or near) is not in the range of $1 \pm TH_1$ ($TH_1$ is for example 0.1), then this data point is rejected from the $SpO_2$ calculation, but if both of them are not in the mentioned range, a corresponding alarm is generated indicative of that the sensor position should be adjusted. Only if there are calculated ratios which are in the range of $1 \pm TH1$, they are accepted and the process (data analysis) proceeds by performing step **2**.

Step **2** (FIG. **10**B) consists of determining whether the quality of each photoplethysmogram is acceptable or not. The quality determination is based on the relative magnitude of each AC component compared to its corresponding DC component. If the quality is not acceptable (e.g., the signal shape detected by any detector varies within a time frame of the measurement session, which may for example be 3.5 sec), the data point is rejected and a corresponding alarm signal is generated. If the AC/DC ratio of $W_1$, $W_2$ and $W_3$ are within an acceptable range, the respective data point is accepted, and the process proceeds through performing step **3**.

In step **3** (FIG. **10**C), the measured data is analyzed to calculate ratios $W_1/W_2$ and $W_1/W_3$ from data generated by far and near photodetectors, and to calculate the differences $(W_1/W_2-W_1/W_3)$.

In a perfect situation, $W_1/W_2$ (far) is very close to $W_1/W_3$ (far), and $W_1/W_2$ (near) is very close to $W_1/W_3$ (near). In a practical situation, this condition is not precisely satisfied, but all the ratios are close to each other if the measurement situation is "good".

Then, the calculated differences are analyzed to determine the values (corresponding to far and near photodetectors) that are accepted and to use them in the $SpO_2$ calculation. For each detector that satisfied the condition ABS($W_1/W_2-W_1/W_3$)<$TH_2$, where ABS signifies the absolute value, its respective data point is accepted and used to calculate the oxygen saturation value that will be displayed. If the condition is not satisfied, the data point is rejected. If all data points are rejected, another measurement session is carried out.

It should be noted that, although the steps **1**–**3** above are exemplified with respect to signal detection by both near and far photodetectors, each of these steps can be implemented by utilizing only one array of detection locations along the closed path. The provision of two such arrays, however, provides higher accuracy of measurements.

ELEMENT LIST

**10** optical sensor
**12** light source
**12**a LED
**12**b LED
**12**c LED
**13** detector assembly
**14** light shield
**15** array of detectors
**16** far detector
**17** sensor housing
**18** near detector
**20** pulse oximeter
**21** control unit
**22** electronic block
**24** microprocessor
**26** display

What is claimed is:

1. A method for non-invasive determination of a blood parameter, the method comprising the steps of:

(i) illuminating a measurement location with at least three different wavelents, a first wavelength $\lambda 1$ lying in a red (R) spectrum, and at least second and third wavelengths $\lambda 2$ and $\lambda 3$ lying substantially in the infrared (IR) spectrum;

(ii) detecting light returned from the measurement location at different detection locations and generating data indicative of the detected light for the different detection locations, wherein said different detection locations are arranged so as to define at least one closed path around the measurement location; and

(iii) analyzing the generated data and determining the blood parameter.

2. The method according to claim **1**, wherein the analysis of the generated data comprises the steps of:

calculating data indicative of an AC/DC ratio in the light detected at each of the detection locations for the at least three wavelengths;

analyzing the calculated data and determining accepted detection locations to select corresponding AC/DC ratios for each of the at least three wavelengths, $\lambda 1$, $\lambda 2$ and $\lambda 3$; and

utilizing the selected ratios for determining the blood parameter.

3. The method according to claim **2**, wherein the determination of the blood parameter comprises the steps of:

calculating values of the ratio $W_2/W_3$ for the accepted detection locations in at least one closed path;

analyzing each of the calculated values to determine whether it satisfies a first predetermined condition, so as to generate a signal indicative of that a sensor position is to be adjusted, if the condition is not satisfied;

if the condition is satisfied, determining whether the quality of a photoplethysmogram is acceptable;

if the quality is acceptable, analyzing the selected ratios for calculating ratios $W_1/W_2$ and $W_1/W_3$ from the data detected in at least one closed path, and calculating the differences ABS $(W_1/W_2-W_1/W_3)$; and,

analyzing the calculated differences for determining whether each of the differences satisfies a second predetermined condition for determining the blood parameter if the condition is satisfied.

4. The method according to claim **3**, wherein said first predetermined condition consists of that the calculated value

US 6,801,799 B2

15

16

of W2/W3 is inside a predetermined range around the value one, said predeteonined range being defined by the first threshold value, and the second predetermined condition consists of that the calculated difference ABS (W1/W2−W1/W3) is less than certain, second threshold value.

**5**. A method for non-invasive determination of a blood parameter, the method comprising the steps of:

illuminating a measurement location with at least three different wavelengths, a first wavelength λ**1** lying in a red (R) spectrum, and at least second and third wavelengths λ**2** and λ**3** lying substantially in the infrared (IR) spectrum;

detecting light returned from the measurement location at different detection locations and generating data indicative of the detected light for the different detection locations, wherein said different detection locations are arranged so as to define at least one closed path around the measurement location;

calculating data indicative of an AC/DC ratio in the light detected at each of the detection locations for the at least three wavelengths; and,

analyzing the calculated data and determining the blood parameter.

\*  \*  \*  \*  \*

0090-6689/88/167–173/$02.00/0
MEDICAL INSTRUMENTATION
Copyright © 1988 by the Association for the Advancement of Medical Instrumentation

Vol. 22, No. 4

# Design and Evaluation of a New Reflectance Pulse Oximeter Sensor

Y. MENDELSON, PhD, J. C. KENT, MS, B. L. YOCUM, BS, AND M. J. BIRLE, BS

The design and construction of a new optical reflectance sensor suitable for noninvasive monitoring of arterial hemoglobin oxygen saturation with a pulse oximeter is described. The reflectance sensor was interfaced to a Datascope ACCUSAT pulse oximeter that was specially adapted for this study to perform as a reflectance oximeter. We evaluated the reflectance sensor in a group of 10 healthy adult volunteers. $SpO_2$ obtained from the forehead with the reflectance pulse oximeter and $SpO_2$ obtained from a finger sensor that was connected to a standard ACCUSAT transmittance pulse oximeter were compared simultaneously to arterial blood samples analyzed by an IL 282 CO-Oximeter. The equation for the best fitted linear regression line between the reflectance $SpO_2$ and $HbO_2$ values obtained from the reference IL 282 CO-Oximeter in the range between 62 and 100% was: $SpO_2$ (%) = 4.78 + 0.96 (IL); n = 110. The regression analysis revealed a high degree of correlation (r = 0.98) and a relatively small standard error of the estimate (SEE = 1.82%). The mean and standard deviations for the difference between the reflectance $SpO_2$ and IL 282 measurements was 1.38 and 1.85%, respectively. This study demonstrates the ability to acquire accurate $SpO_2$ from the forehead using a reflectance sensor and a pulse oximeter.

The recent development of transmittance pulse oximeters by combining optical plethysmography with the spectrophotometric determination of hemoglobin oxygen saturation in arterial blood ($SpO_2$) has provided a widely used technique for monitoring hypoxemia.

With transmittance pulse oximeters, sensor application is limited to several peripheral locations where light can be readily transmitted and detected, such as the finger tips, ear lobes, and toes on adults, and the foot or palms on infants. Alternatively, skin reflectance oximetry could enable $SpO_2$ measurement from more centrally located parts of the body such as the forearms, chest, and forehead, which cannot be monitored using conventional transillumination techniques.

It appears that reflectance pulse oximetry may be particularly suitable for direct assessment of fetal distress resulting from hypoxia during delivery, if used in addition to monitoring fetal heart rate by a scalp ECG electrode. Another suggested application of noninvasive reflectance pulse oximetry is for monitoring $SpO_2$ in the external carotid artery through a sensor applied to the skin near the superficial temporal artery.[1]

In this article we describe the design and construction

From the Worcester Polytechnic Institute, Biomedical Engineering Program, Worcester, MA 01609.

Address correspondence and requests for reprints to Yitzhak Mendelson, PhD, Biomedical Engineering Program, Worcester Polytechnic Institute, 100 Institute Rd., Worcester, MA 01609.

of an optical reflectance sensor suitable for noninvasive monitoring of $SpO_2$ with a pulse oximeter. The experimental evaluation of the new sensor and verification that $SpO_2$ obtained with the reflectance sensor compare favorably with: (a) $SpO_2$ measured simultaneously by a finger sensor connected to a standard transmittance pulse oximeter, and (b) $HbO_2$ measured by the IL 282 CO-Oximeter from samples of arterial blood in a group of 10 healthy adult volunteers is presented.

## PULSE OXIMETRY

The principle of pulse oximetry was proposed by Aoyagi et al[2] and further developed by Yoshiya et al.[3] This unique approach is based on the change in light absorption by tissue. The change is caused primarily by arterial blood pulsation. The pulsating arterioles in a vascular bed, by expanding and relaxing, modulate the amount of light absorbed by the tissue and thus produce a characteristic photoplethysmographic waveform. The changes in light absorption are used to measure $SpO_2$ noninvasively.

Initial attempts to develop a noninvasive oximeter that can measure oxygen saturation by analyzing the absolute light intensity that is diffusely reflected from the skin were only partially successful, mainly because of limited accuracy associated with variations in tissue attenuation and differences in skin pigmentation. Recently, we showed that accurate $SpO_2$ measurements can be made utilizing a reflectance sensor and the concept of pulse oximetry.[4,5] We found that $SpO_2$ can be calculated from the ratio of the reflected red and infrared photoplethysmograms based on a normalization in which the pulsatile (ac) component of the red and infrared photoplethysmograms is divided by the respective nonpulsatile (dc) component. The conversion of the red/infrared ratios to $SpO_2$ is performed by an empirical calibration of the oximeter. This process is performed by comparing the red/infrared ratios measured by the pulse oximeter with blood $HbO_2$ values obtained from an in vitro oximeter.

The excursions of photoplethysmographic signals detected by reflectance and transmittance sensors when placed on the forehead and finger, respectively, are inversely related to changes in arterial blood pulsations. Although the amplitude of the pulsatile component of the two waveforms is different, the shapes of the pho-

Appx15638

# SKIN REFLECTANCE PULSE OXIMETRY: IN VIVO MEASUREMENTS FROM THE FOREARM AND CALF

*Y. Mendelson, PhD, and M. J. McGinn, MSc*

Mendelson Y, McGinn MJ. Skin reflectance pulse oximetry: in vivo measurements from the forearm and calf.

J Clin Monit 1991;7:7–12

**ABSTRACT.** This study describes the results from a series of human experiments demonstrating the ability to measure arterial hemoglobin oxygen saturation ($SaO_2$) from the forearm and calf using a reflectance pulse oximeter sensor. A special optical reflectance sensor that includes a heating element was interfaced to a temperature controller and a commercial Datascope ACCUSAT pulse oximeter that was adapted for this study to perform as a reflectance pulse oximeter. The reflectance pulse oximeter sensor was evaluated in a group of 10 healthy adult volunteers during steady-state hypoxia. Hypoxia was induced by gradually lowering the inspired fraction of oxygen in the breathing gas mixture from 100 to 12%. Simultaneous $SaO_2$ measurements obtained from the forearm and calf with two identical reflectance pulse oximeters were compared with $SaO_2$ values measured by a finger sensor that was interfaced to a standard Datascope ACCUSAT transmittance pulse oximeter. The equations for the best-fitted linear regression lines between the percent reflectance, $SpO_2(r)$, and transmittance, $SpO_2(t)$, values in the range between 73 and 100% were $SpO_2(r) = -7.06 + 1.09\ SpO_2(t)$ for the forearm ($n = 91$, $r = 0.95$) and $SpO_2(r) = 7.78 + 0.93\ SpO_2(t)$ for the calf ($n = 93$, $r = 0.88$). The regression analysis of the forearm data revealed a mean ± SD error of 2.47 ± 1.66% ($SaO_2 = 90–100\%$), 2.35 ± 2.45% ($SaO_2 = 80–89\%$), and 2.42 ± 1.20% ($SaO_2 = 70–79\%$). The corresponding regression analysis of the calf data revealed a mean ± SD error of 3.36 ± 3.06% ($SaO_2 = 90–100\%$), 3.45 ± 4.12% ($SaO_2 = 80–89\%$), and 2.97 ± 2.75% ($SaO_2 = 70–79\%$). This preliminary study demonstrated the feasibility of measuring $SaO_2$ from the forearm and calf in healthy subjects with a heated skin reflectance sensor and a pulse oximeter.

**KEY WORDS.** Blood gas analyses. Monitoring: oxygen. Measurement techniques: pulse oximetry; optical plethysmography; reflectance oximetry. Equipment: pulse oximeters.

Transmittance pulse oximetry has become a widely used technique for noninvasively monitoring changes in arterial hemoglobin oxygen saturation ($SaO_2$). The technique is based on the spectrophotometric analysis of the optical absorption properties of blood combined with the principle of photoplethysmography.

In transmittance pulse oximetry, which is based on tissue transillumination, sensor application in adults is limited to several specific locations on the body, such as the finger tips, ear lobes, and toes. In infants, additional monitoring sites such as the palms and the feet have been used.

Recently, a new reflectance pulse oximeter has been introduced into the market. The oximeter, which is manufactured by Ciba-Corning (Ciba Corning Diagnostics, Medfield, MA), uses a special optical reflectance sensor for specific application to the forehead. Among the advantages of this technique, as advertised by the

From the Department of Biomedical Engineering, Worcester Polytechnic Institute, 100 Institute Rd, Worcester, MA 01609.

Received Sep 18, 1989, and in revised form Jan 11, 1990. Accepted for publication Jan 17, 1990.

Address correspondence to Dr Mendelson.

APPLE 1018

company, are better reliability in critical care situations such as peripheral circulatory shutdown, less interference from ambient light, and better accuracy because measurement from the forehead is relatively unsusceptible to motion artifacts.

Currently, there are no commercially available reflectance pulse oximeters for monitoring $SaO_2$ from locations other than the forehead. Therefore, the objective of this work was to investigate the feasibility of monitoring $SaO_2$ with a skin reflectance pulse oximeter from two alternative and convenient locations on the body: the ventral side of the forearm and the dorsal side of the calf. Besides extending the clinical application of pulse oximetry, it appears also that reflectance pulse oximetry from peripheral tissues may have potential advantage in the assessment of local blood oxygenation after skin transplantation and regeneration following microvascular surgery.

In this article, we describe preliminary in vivo evaluation of a new optical reflectance sensor for noninvasive monitoring of $SaO_2$ with a modified commercial transmittance pulse oximeter. We present the experimental evaluation of this sensor in a group of 10 healthy adult volunteers and compare $SaO_2$ measured with the reflectance pulse oximeter sensor, $SpO_2(r)$, with $SaO_2$ measured noninvasively from the finger by a standard transmittance pulse oximeter sensor, $SpO_2(t)$.

## REFLECTANCE PULSE OXIMETRY

The principle of reflectance, or backscatter, pulse oximetry is generally similar to that of transmittance pulse oximetry. Both techniques are based on the change in light absorption of tissue caused by the pulsating arterial blood during the cardiac cycle. The pulsating arterioles in the vascular bed, by expanding and relaxing, modulate the amount of light absorbed by the tissue. This rhythmic change produces characteristic photoplethysmographic waveforms, two of which are used to measure $SaO_2$ noninvasively.

Recently, we showed that accurate noninvasive measurements of $SaO_2$ from the forehead can be made with an unheated reflectance pulse oximeter sensor [1]. The major practical limitation of reflectance pulse oximetry is the comparatively low-level photoplethysmograms recorded from low-density vascular areas of the skin. Therefore, the feasibility of reflectance pulse oximetry depends on the ability to design an optical reflectance sensor that can reliably detect sufficiently strong reflectance photoplethysmograms from various locations on the skin.

In order to partially overcome this limitation, we have developed an optical reflectance sensor that in-



*Fig 1. (A) Frontal and (B) side views of the heated skin reflectance pulse oximeter sensor. See text for explanation. R & IR LEDs = red and infrared light-emitting diodes.*

cludes an array of six identical photodetectors arranged symmetrically in a hexagonal configuration surrounding two pairs of red (peak emission wavelength, 660 nm) and infrared (peak emission wavelength, 930 nm) light-emitting diodes (LEDs) [1]. In another related study, we showed that by locally heating the skin under the sensor to a temperature above 40°C, it is possible to achieve a four- to fivefold increase in the magnitude of the pulsatile component detected from the forearm, and thus significantly improve the detection reliability of the reflectance photoplethysmograms [2]. The new optical reflectance sensor designed for this study combines the two features described above.

## SENSOR DESIGN

The temperature-controlled optical reflectance sensor used in this study is shown in Figure 1. The major feature of the optical layout design is the multiple photodiode array, which is arranged concentric with the LEDs. This arrangement maximizes the amount of backscattered light that is detected by the sensor. The technical details related to the design and geometric

configuration of the optical components were described recently by Mendelson et al [1].

The heater consists of a ring-shaped (dimensions: 30-mm outside diameter; 15-mm inside diameter) thermofoil resistive heating element (Ocean State Thermotics, Smithfield, RI). The thermofoil heater was mounted between the surface of the optically clear epoxy, which was used to seal the optical components of the reflectance sensor, and a thin (0.005 mm) matching brass ring, which facilitates better thermal conduction to the skin. A miniature (dimensions: 2 × 5 × 1 mm) solid-state temperature transducer (AD 590, Analog Devices, Wilmington, MA) was mounted on the outer surface of the brass ring with the thermally sensitive surface facing the skin. The entire sensor assembly was potted in room-temperature vulcanizing silicone rubber to minimize heat losses to the surrounding environment. The assembled sensor weighs approximately 65 g. The sensor measures approximately 38 mm in diameter and is 15 mm thick. The heater assembly was separately interfaced to a temperature controller that was used to vary the temperature of the skin between 35 and 45°C in 1 ± 0.1°C steps.

## SUBJECTS AND METHODS

### Data Acquisition

Each of the two heated optical reflectance sensors were separately interfaced to a temperature controller and a commercially available ACCUSAT (Datascope Corp, Paramus, NJ) pulse oximeter [3].

Two of the three ACCUSAT pulse oximeters were modified to function as reflectance pulse oximeters. The modification, which was described in a separate study [1], included the adjustment of the red and infrared LED intensities in the reflectance sensors so that the reflectance photoplethysmograms were approximately equal to transmittance photoplethysmograms measured by a standard transmittance sensor from an average size adult finger tip.

The third ACCUSAT transmittance pulse oximeter was used as a reference to measure $SpO_2(t)$ from the finger tip. The specified accuracy of this transmittance pulse oximeter is ±2.0% and ±4.0% for $SaO_2$ values ranging between 70 and 100% and 60 and 70%, respectively [3]. The three pulse oximeters were adapted to provide continuous digital readouts of the AC and DC components of the red and infrared photoplethysmograms.

Readings from each of the three pulse oximeters were acquired every 2 seconds through a standard RS-232C

serial port interface using an AT&T 6300 personal computer. The conversions of the reflectance red/infrared (R/IR) ratios measured by the two reflectance pulse oximeters to $SpO_2(r)$ were performed by using the calibration algorithm obtained in a previous calibration study in which measurements were made with a similar nonheated sensor from the forehead [1].

### In Vivo Study

The ability to measure $SpO_2(r)$ from the forearm and calf was investigated in vivo during progressive steady-state hypoxia in humans.

Measurements were acquired from 10 healthy nonsmoking male adult volunteers of different ages and skin pigmentations. The study was performed in compliance with the University of Massachusetts Medical Center's review guidelines on human experimentation. Each volunteer was informed of the complete procedure as well as the possible risks associated with breathing hypoxic gas levels. Each volunteer received monetary compensation for participation in this study. The subject distribution included 1 East Indian, 3 Asians, and 2 darkly tanned and 4 lightly tanned Caucasians. Their ages ranged from 22 to 37 years old (mean ± SD, 27.5 ± 4.9 years). Measured blood hematocrits were in the range of 40 to 50.5% (mean ± SD, 45.7 ± 3.2%).

All instruments were allowed to warm up for at least 30 minutes before the study. The transmittance sensor of the pulse oximeter was attached to the index finger. The reflectance sensors were attached to the ventral side of the forearm and the dorsal side of the calf by using a double-sided transparent adhesive ring. In cases where an abundance of hair prevented intimate contact between the sensors and the skin, the contact was improved by loosely wrapping the sensor and the limb with an elastic strap. The temperature of each reflectance sensor was set to 40°C and remained unchanged throughout the entire study.

A standard lead-I electrocardiogram and end-tidal carbon dioxide levels were continuously monitored by a Hewlett-Packard 78345A patient monitor (Hewlett-Packard, Andover, MA). Each subject was placed in a supine position. A face mask was tightly fitted over the subject's nose and mouth, and the subject was instructed to breathe spontaneously while we administered different gas mixtures of nitrogen and oxygen. The inspired gas mixture was supplied by a modified Heidbrink anesthesia machine (Ohio Medical Products, Madison, WI). The breathing circuit of the anesthesia machine was equipped with a carbon dioxide scrubber (soda lime). The inspired oxygen concentration was adjusted between 12 and 100% and was monitored continuously



MEDICAL SCIENCE SERIES

# DESIGN OF PULSE OXIMETERS

EDITED BY
J G WEBSTER
IoP

moment and therefore do not absorb infrared radiation (Primiano 1997). Thus differences in the amount of light absorbed by the blood at two different wavelengths can be used to indicate arterial oxygen saturation.



**Figure 7.1** Probe using transmittance principle. Light from two LEDs passes alternately through the tissue of the finger and is detected by the photodiode.

### 7.1.2 Sensor placement

In transmission probes, as the photodiode has to detect the light transmitted through the tissue, the detector is placed in line with the LEDs so that the maximum amount of the transmitted light is detected. The photodiode should be placed as close as possible to the skin without exerting force on the tissue. The amount of force applied by reusable probes is much larger than the amount of force applied by disposable probes. The force applied also depends on the materials used to manufacture a particular probe and also on the company which produces the probes, e.g., Nellcor clip type probes exert less pressure than Ohmeda clip type probes. If the force exerted by the probe is significant, the blood under the tissue, where the probe is placed, may clot due to external pressure applied. And if we increase the distance between the LEDs and the photodiode (optical path length increases), the amount of detected light decreases as seen from Beer's law (section 4.1).

Thus we should place the LEDs and photodiode facing each other. Normally transmission probes are placed on the patient's finger, toe, ear or nose. In a clip type probe, the distance between the LEDs and the photodiode can be as much as 12 mm (without requiring much pressure).

## 7.2 REFLECTANCE PROBES

To measure arterial oxygen saturation, when pulse oximeters with transmission probes cannot be used, pulse oximeters with reflectance probes are used to monitor $S_aO_2$ based on the intensity of reflected light. The idea of using light reflection instead of light transmission in clinical oximetry was first described by Brinkman and Zijlstra (1949). They showed that $S_aO_2$ can be monitored by measuring the amount of light reflected (back scattered) from the tissue. The idea of using skin reflectance spectrophotometry marked a significant advancement in the noninvasive monitoring of $S_aO_2$ from virtually any point on the skin surface.

88      *Design of pulse oximeters*

Even though it was a major advancement, difficulties in absolute calibration and limited accuracy were the major problems with early reflectance pulse oximeters.

### 7.2.1 Principle

The intensity of the back scattered light from the skin depends not only on the optical absorption spectrum of the blood but also on the structure and pigmentation of the skin.

$S_aO_2$ is measured by analyzing the pulsatile components of the detected red and infrared plethysmograms which make use of reflected light intensities. The light from the LEDs enters the tissue, is scattered by both the moving red blood cells and the nonmoving tissue, and a part of this back scattered light is detected by the photodiode. The output of the photodiode is processed by the pulse oximeter, and measures the $S_aO_2$ of the pulsatile blood.

### 7.2.2 Sensor placement

In reflectance pulse oximetry, the LEDs and the photodiode are placed on the same side of the skin surface as shown in figure 7.2. Normally the reflectance probe is placed on the forehead or temple, but is not restricted to only those two places. Reflectance probes can be used to measure arterial oxygen saturation at virtually any place on the human body where the probe can be placed.



**Figure 7.2** Reflectance probe. The light is transmitted into the tissue, travels through the tissue, and is detected at the photodiode.

*7.2.2.1 Optimum distance between LEDs and photodiode.* One of the major design considerations required in designing a reflectance pulse oximeter sensor is determining the optimum separation distance between the LEDs and the photodiode. This distance should be such that plethysmograms with both maximum and minimum pulsatile components can be detected. These pulsatile components depend not only on the amount of arterial blood in the illuminated tissue, but also on the systolic blood pulse in the peripheral vascular bed.

There are two techniques that can enhance the quality of the plethysmogram. One way is to use a large LED driving current, which determines the effective penetration depth of the incident light, which increases light intensity. So for a given LED/photodiode separation, using higher levels of incident light, we can illuminate a larger pulsatile vascular bed. As a result the reflected plethysmograms will contain a larger AC component. But, in practice, the LED driving current is limited by the manufacturer to a specified maximum power dissipation. The other way is to place the photodiode close to the LEDs. If we place the photodiode too close to the LEDs, the photodiode will be saturated as a result of the large DC component obtained by the multiple scattering of the

incident photons by the blood-free stratum corneum and epidermal layers in the skin.

For a constant LED intensity the light intensity detected by the photodiode decreases roughly exponentially as the radial distance between the LEDs and the photodiode is increased and the same applies to the AC and DC components of the reflected plethysmograms as shown in figure 7.3. Figure 7.4 shows the effect of LED/photodiode separation on the relative pulse amplitude of the red and infrared plethysmograms. This is expected as the probability of the number of photons reaching the photodiode is decreased with the increase in separation.



**Figure 7.3** Effect of LED/photodiode separation on the DC (□) and AC (○) components of the reflected infrared plethysmograms. Measurements were performed at a skin temperature of 43 °C (adapted from Mendelson and Ochs 1988).



**Figure 7.4** Effect of LED/photodiode separation on the relative pulse amplitude of the red (+) and infrared(·) plethysmograms. The driving currents of the red(o) and infrared(*) LEDs required to maintain a constant DC reflectance from the skin are shown for comparison (adapted from Mendelson and Ochs 1988).

Appx15756

90     *Design of pulse oximeters*

Thus the selection of a particular separation distance involves a trade-off. We can achieve larger plethysmograms by placing the photodiode farther apart from the LEDs but we need higher LED driving currents to overcome absorption due to increased optical path length.

### 7.2.3 Effect of multiple photodiode arrangement

In a reflectance oximeter, the incident light emitted from the LEDs diffuses through the skin and the back scattered light forms a circular pattern around the LEDs. Thus if we use multiple photodiodes placed symmetrically with respect to the emitter instead of a single photodiode, a large fraction of back scattered light can be detected and therefore larger plethysmograms can be obtained.

To demonstrate this, Mendelson and Ochs (1988) used three photodiodes mounted symmetrically with respect to the red and infrared LEDs; this enabled them to triple the total active area of the photodiode and thus collect a greater fraction of the back scattered light from the skin. The same result can be obtained using a photodiode with three times the area.

### 7.2.4 Effect of skin temperature

Mendelson and Ochs (1988) studied the effect of skin temperature on the quality of signals detected by the photodiode. In their experiment, the LED/photodiode separation was kept constant and after attaching the reflectance sensor to the forearm, they increased the skin temperature to 45 °C in 1 °C step increments.

Figure 7.5 and figure 7.6 show that by increasing the skin temperature from 34 °C to 45 °C, they were able to obtain a five-fold increase in the pulse amplitude.



**Figure 7.5** Effect of skin temperature on the mean pulse amplitude (+) and the corresponding decrease in the coefficient of variation (*) of the infrared plethysmograms. Each pulse amplitude was normalized to a constant separation of 4 mm (adapted from Mendelson and Ochs 1988).

**Appx15757**



**Figure 7.6** Simultaneous recording of the infrared and red plethysmograms from the forearm at different skin temperatures (from Mendelson and Ochs 1988).

### 7.2.5 Advantages and disadvantages of reflectance probes over transmittance probes

The basic advantage of transmittance probes over reflectance probes is the intensity of the light detected by the photodiode. As the amount of light passing through thin tissue is greater than the amount of light reflected and as the light passing through the tissue is concentrated in a particular area, the intensity of detected light is larger for transmittance probes. The major disadvantage of the transmittance probes is that the sensor application is limited to peripheral parts of the body such as the finger tips, toes, ear and nose in the adults or on the foot or palms in the infant. Reflectance probes can be placed on virtually any place on the body where we can expect light reflection due to tissue.

### 7.3 MRI PROBES

When a pulse oximeter with either transmission or reflection probes is used in the presence of magnetic resonance imaging (MRI), it may give erroneous readings. This is due to the very high magnetic field strengths involved in MRI which makes the use of conventional electronic monitoring equipment difficult. This is due to the radio frequency magnetic pulses generated in the magnetic field. Also if there is any metal connection to the skin of the patient, this could lead to burns.

   In order to solve the problems involving MRI, the manufacturers have developed special pulse oximeters for use with MRI scanners. The MR-compatible sensor of Magnetic Resonance Equipment Corporation uses low attenuation optical filter bundles. The complete pulse oximeter unit is kept beyond the field of influence of the magnetic field from MRI and the light from the LEDs is transmitted through the optical fibers and the transmitted/reflected light is brought through the optical fibers to the photodiode. The LEDs, photodiode, and all the electronic equipment required are kept in a main unit

# IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Patent of:       Jeroen Poeze et al.
U.S. Patent No.:      10,588,553          Attorney Docket No.: 50095-0012IP1
Issue Date:            March 17, 2020
Appl. Serial No.:     16/534,949
Filing Date:           August 7, 2019
Title:                 MULTI-STREAM DATA COLLECTION SYSTEM FOR
                       NONINVASIVE MEASUREMENT OF BLOOD
                       CONSTITUENTS

## <u>SECOND DECLARATION OF DR. THOMAS W. KENNY</u>

I hereby declare that all statements made of my own knowledge are true and

that all statements made on information and belief are believed to be true. I further

declare that these statements were made with the knowledge that willful false

statements and the like so made are punishable by fine or imprisonment, or both,

under Section 1001 of the Title 18 of the United States Code.


Dated: <u>August 24, 2021</u>      By: _____

                                      Thomas W. Kenny, Ph.D.

APPLE 1047
Apple v. Masimo
IPR2020-01536



APPLE-1009, FIGS. 4A, 4B.

30.    In my opinion, a POSITA would have understood that reflectance pulse oximetry sensors like Mendelson-799's can be placed "on virtually any place on the body where we can expect light reflection due to tissue," and would have further understood from Ohsaki that, by promoting "intimate contact with the surface of the user's skin," a light permeable convex cover would provide reduced slippage of Mendelson-799's sensor when placed on either side of, for example, a user's wrist or forearm, with associated improvements in signal quality.  APPLE-1019, 91; APPLE-1009, [0015], [0017], [0025], FIGS. 4A, 4B, Claims 4-8.

**C.    Adding a convex cover to Mendelson-799 as taught by Ohsaki enhances the sensor's light-gathering ability**

31.     In defiance of fundamental principles of elementary optics, and relying on

incorrect oversimplifications of the optical capabilities of convex elements,

Masimo argues that a POSITA would not have combined Mendelson-799 and

Ohsaki as proposed because the combined sensor "would direct light away from

the detectors." *See, e.g.,* POR, 31.  As explained in more detail below, a POSITA

would have understood that the opposite is true: that Ohsaki's cover would

improve Mendelson-799's signal-to-noise ratio by causing more light

backscattered from tissue to strike Mendelson-799's detectors than would have

absent the cover.  APPLE-1019, 52, 86, 90; APPLE-1040,[1] 84, 87-92, 135-141;

APPLE-1046, 803-805; APPLE-1012, FIG. 7.

### 1.     Patent Owner ignores the behavior of scattered light in relation to reflectance-type pulse sensors and oximeters.

32.     Masimo relies heavily on FIG. 14B from the '553 patent (reproduced below)

to support its contention that a convex cover would direct light to a point in the

center of the combined sensor:

_____



APPLE-1001, FIG. 14B (as annotated at POR, 33)

33.    Masimo and Dr. Madisetti treat this figure as an illustration of the behavior of all convex surfaces with respect to all types of light, and conclude that "a convex surface condenses light away from the periphery and towards the sensor's center" as shown in FIG. 14B.  POR, 32.

34.    But FIG. 14B depicts a very special case of the claimed convex cover – a specialty convex lens specifically designed to focus collimated light arriving along the axis of symmetry to a single point at the bottom surface.  The ability of this very specific convex lens to bring all incoming light to a focus is a unique outcome

which a POSITA would know is not a general characteristic of all convex surfaces, because of the dependence of the light propagation on the orientation of the incoming collimated light, the radius of curvature or general shape of the surface, the index of refraction of the material and the distance to the intended focal point – without careful selection and control of all these parameters the convex surface is incapable of producing the intended focus.  More importantly, figure 14B is not an accurate representation of light that has been reflected from a tissue measurement site.  The light rays (1420) shown in FIG. 14B are collimated (i.e., travelling paths parallel to one another), and each light ray's path is perpendicular to the detecting surface.

Even for the collimated light shown in FIG. 14B, the focusing of light at the center only occurs if the light beam happens to be perfectly aligned with the axis of symmetry of the lens.  *See* Ex. 2007, 298:11-299:1.  If the collimated light enters the lens at any other angle, as shown below, the light will focus at a different point:



APPLE-1040, 141 (annotated)

35.    In contrast with the characteristics of the incident light in the example shown

in Figure 14B, light scattered and reflected back to the sensors in a reflective

optical physiological monitor is NOT collimated.  A POSITA would understand

that the light exits the LED and cover in a diverging pattern, as needed to

effectively illuminate the tissue throughout the measurement site.  Light is

scattered and reflected from locations throughout the measurement site in a way

that produces light rays from all locations and with all angles.  Some of this light

returns to intersect the surface of the convex cover, all with a broad range of

incident directions in all three dimensions of the true system.

36.    The detector(s) of reflectance type pulse detectors and oximeters (like the

devices disclosed by Mendelson-799 and Ohsaki) detect light that has been

"partially reflected, transmitted, absorbed, and scattered by the skin and other

tissues and the blood before it reaches the detector."  APPLE-1019, 86; *see also* 44

("Pulse oximeters determine the oxygen saturation of arterial blood by measuring

the light absorbance of living tissue at two different wavelengths and using the

arterial pulsation to differentiate between absorbance of arterial blood and other

absorbers"), 36 (describing FIG. 3.10: "On the left is a transmission pulse oximeter

measuring the transmission of light by two LEDs through the finger of a patient.

On the right is a reflectance pulse oximeter measuring the amount of light reflected

back to the probe.  Both types use the same technology differing only in

positioning of the probes and calibration").

37.    In my opinion, as a POSITA would have understood from Mendelson-799's

FIG. 7, the light that backscatters from the measurement site after diffusing

through tissue reaches the circular active detection area provided by Mendelson-

799's detectors from various random directions and angles, as opposed to all light

entering from the same direction and at the same angle as shown in FIG. 14B.

APPLE-1019, 52, 86, 90 ("In a reflectance oximeter, the incident light emitted

from the LEDs diffuses through the skin and the back scattered light forms a

circular pattern around the LEDs"), 52 ("Light scattering causes the deviation of a light beam from its initial direction").

38.    Moreover, Masimo ignores basic principles of optics in asserting that a convex cover would have focused or directed all of the light to the center of Mendelson-799's sensor. *See* POR, 31-36.

39.    Basic laws of refraction, expressed as Snell's law, dictate the behavior of light propagation through materials such as tissue and transparent materials such as glass, where the optical properties of the materials can be represented with an index of refraction. APPLE-1040, 84 ("This is the very important law of refraction, the physical consequences of which have been studied…for over eighteen hundred years…[i]n English-speaking countries…[i]t is generally referred to as Snell's law); APPLE-1049, 101; Ex. 2012, 52, 86, 90. Even Dr. Madisetti does not dispute the applicability of Snell's law. *See* APPLE-1043, 80:20-82:20. For reference, Snell's law relates to the even more fundamental Fermat's principle, which states that a path taken by a light ray between two points is one that can be traveled in the least time. *See* APPLE-1040, 87-92; APPLE-1049, 106-111. Further, Snell's law can be described on its own and applied without any referral to underlying references, and there is no lingering controversy about its validity or use.

40.     Indeed, according to Snell's law, which is stated in simple algebraic form and illustrated by the simple diagram below, light passing from one medium to another is refracted according to the angle of incidence and the values of the indices of refraction of each medium.   APPLE-1040, 84; APPLE-1049, 101; APPLE-1043, 80:20-82:20; APPLE-1047, ¶10.  A POSITA would have been familiar with Snell's law from, for example, high school science demonstrations of light passing through prisms, as well as from introductory required physics courses included with their bachelor's degree programs.  Dr. Madisetti admitted that he was familiar with Snell's law from his introductory physics courses.  APPLE-1043, 80:20-81:1.  Incidentally, while not critical to this discussion, I note that indices of refraction $n_1$ and $n_2$ must be positive for human tissue and the types of optical lenses we're dealing with in this case and that, in general $n_1 > n_2$.  *See* APPLE-1040, 84; APPLE-1049, 101; APPLE-1043, 80:20-82:20.



41.    By way of example, the illustration below shows three representative rays reflected from locations in the measurement site, as they arrive at the surface of the convex cover with three different directions and meeting the surface at three different locations.  In each case, Snell's law determines the direction of the ray within the transparent material, dependent only on the direction of the incident ray and its orientation relative to a line drawn perpendicular to the surface at the location of entry, and the indices of refraction of the surrounding medium and the transparent material.



42.    Everything shown in this figure would have been plainly understood by a POSITA, based on the understanding of Snell's law.  This basic and commonsensical understanding of the effect of the convex board on the propagation of representative light rays from a diffuse source stands in stark contrast to the position taken by Masimo.  Simple ray tracing based on Snell's law, as seen above, incontrovertibly debunks Masimo's simplistic and flawed belief that

"a convex surface condenses light away from the periphery and towards the sensor's center" as shown in FIG. 14B. POR, 32.

43.    Indeed, the POSITA would have understood that Mendelson-799's sensor, which includes multiple photodiodes placed symmetrically with respect to a central light source, offers the advantage of enabling a large fraction of light randomly backscattered from tissue to be detected within the circular active detection area surrounding that source. APPLE-1019, 86, 90 ("if we use multiple photodiodes placed symmetrically with respect to the emitter instead of a single photodiode, a large fraction of back scattered light can be detected "); APPLE-1042, 803-805; APPLE-1012, FIG. 7.

44.    Further, far from *focusing* light *to* the center as Patent Owner contends, a POSITA would have understood that Ohsaki's cover provides a refracting effect, such that some light rays that otherwise would have missed the detection area are instead directed toward that area as they pass through the interface provided by the cover. APPLE-1019, 52 ("Light scattering causes the deviation of a light beam from its initial direction. It occurs when light is refracted by an object of a size similar to the magnitude of the wavelength of the light and a change in the index of refraction at the interface of this object); APPLE-1007, [0015] (explaining that a "lens makes it possible to increase…light-gathering ability"); APPLE-1040, 87-92, 135-141; APPLE-1041, 60:7-61:6, 70:8-18 (Dr. Madisetti: "a lens...would

condense incoming light onto the detectors, thus increasing the signal to noise ratio as well as the signal strength per area of the detectors (since each detector area will receive more incoming light signals)").

45.    Moreover, a cover like Ohsaki's would have been understood to increase Mendelson-799's light-gathering ability by causing some light to refract towards the circular active detection area as it crosses the interface provided by the cover, rather than being reflected off of a flat interface between tissue and board. Additionally, the intimate contact between tissue and board provided by the convex shape reduces air gaps and therefore reduces the amount of light lost to reflection from air gaps.  Therefore, *more* of the partially reflected, transmitted, absorbed, and ultimately back scattered light strikes the detectors than otherwise would have absent the convex cover.  APPLE-1040, 84 ("This is the very important law of refraction, the physical consequences of which have been studied … for over eighteen hundred years … [i]n English-speaking countries … [i]t is generally referred to as Snell's law); APPLE-1019, 52, 86, 90.

46.    In fact, during his deposition, Dr. Madisetti contrasted the phrase "to the center" from "towards the center," and explained his view that a convex cover would redirect light "toward the center," which he further clarified to be "a general area."  APPLE-1041, 133:19-135:11.

47.    In this regard, Masimo's overly-simplistic statements ("a convex surface condenses light away from the periphery and towards the sensor's center" as shown in FIG. 14B  POR, 32) only apply to the very special case of collimated light incident on a convex lens along the axis of symmetry, and are irrelevant for the case of diffuse light returning to the convex surface from a broad detection region near the sensor.  A POSITA would have understood that these statements do not reflect the behavior of diffuse light incident on a convex surface, such as the light incident on the convex cover of the combined sensor of Mendelson-799 and Ohsaki.  Indeed, contrary to Masimo's position, a POSITA would have appreciated that the benefits associated with a light permeable convex cover when applied to Mendelson-799's system would have included improved light gathering ability. APPLE-1019, 52; APPLE-1007, [0015]; APPLE-1040, 87-92, 135-141; APPLE-1041, 60:7-61:6, 70:8-18.

> **2.    A POSITA would have implemented the sensor resulting from the combination of Mendelson-799 and Ohsaki to prevent air gaps between the skin and the detectors**

48.    Masimo argues that "Petitioner's attempt to add Ohsaki's rectangular board to Mendelson '799's sensor also contradicts Mendelson '799's warning against 'the potential for specular reflection…when an *air gap* exists between the sensor and the skin."  POR, 36.  Masimo contends that "a POSITA would have understood that air gaps near the detectors on the peripheral edge of

Mendelson '799's more complicated oximeter sensor would create significant noise." *Id*., 38. But this argument ignores Ohsaki's teachings that "the convex surface of the translucent member *is in intimate contact* with the surface of the user's skin," and thereby improves adhesion of the sensor to the skin. APPLE-1009, [0025]. In fact, Masimo infers the presence of these alleged "air gaps" entirely based on two un-labeled portions of FIG. 1 from Ohsaki. *See* POR, 37.

49.    Dr. Madisetti and I have repeatedly indicated that a POSITA would not have interpreted figures from the references at issue as precise representations of the concepts described. *See*, *e.g.*, Ex. 2006, 73:19-21 (Dr. Kenny: "this figure in [the patent document reference] is not intended as a precision engineering drawing of a[n] optimized system"); APPLE-1041, 79:19-80:2 (Dr. Madisetti: "I believe that to a POSA, these figures are not detailed optical diagrams").

50.    Even assuming for the sake of argument alone that the introduction of air gaps could arise through the incorporation of a light permeable convex cover into Mendelson-799's sensor, in my opinion, it would have been well within a POSITA's capability to apply "inferences and creative steps" when adapting Ohsaki's teachings to obviate such air gaps. *KSR Intern. Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007). Moreover, the very teachings of Mendelson-799 cited by

the POR would have motivated the POSITA to adapt Ohsaki's teachings in that manner.  APPLE-1012, 2:58-61; Ex. 2008, 229-7-13.[2]

51.    Finally, even if some minor air gaps would have remained, it is well established that "[a] given course of action often has simultaneous advantages and disadvantages, and this does not necessarily obviate motivation to combine." *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1165 (Fed. Cir. 2006); *see alsoWinner Int'l Royalty Corp. v. Wang*, 202 F.3d 1340, 1349, n. 8 (Fed. Cir. 2000).

### D.    A POSITA would have found the advantages of using a convex cover to outweigh the slight possibility of scratching the cover

52.    Masimo claims that "a POSITA would not have been motivated to combine Ohsaki's convex board with Mendelson '799's sensor" because "a POSITA would have understood that a flat cover would provide better protection than a convex surface because, as a Petitioner's cited art teaches, it would be less prone to scratches."  POR, 39-40.  Even assuming this to be true, it is my understanding that one possible disadvantage that competes with the known advantages of applying Ohsaki's teachings to Mendelson-799's sensor would not have negated a

---

[2] And Mendelson-799's discussion of reducing variations in contact pressure would have provided further motivation.  APPLE-1012, 5:60-63.

Trials@uspto.gov                                                      Paper # 41
571-272-7822                                                   Entered: 1/06/2022

UNITED STATES PATENT AND TRADEMARK OFFICE

————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————

APPLE INC.,
Petitioner,

v.

MASIMO CORPORATION,
Patent Owner.

————————

IPR2020-01520 (Patent 10,258,265 B1)
IPR2020-01536 (Patent 10,588,553 B2)
IPR2020-01537 (Patent 10,588,553 B2)
IPR2020-01538 (Patent 10,588,554 B2)
IPR2020-01539 (Patent 10,588,554 B2)

————————

Record of Oral Hearing
Held: December 7, 2021

————————

Before GEORGE R. HOSKINS, ROBERT L. KINDER, and
AMANDA F. WIEKER, *Administrative Patent Judges.*

IPR2020-01520 (Patent 10,258,265 B1)
IPR2020-01536 (Patent 10,588,553 B2)
IPR2020-01537 (Patent 10,588,553 B2)
IPR2020-01538 (Patent 10,588,554 B2)
IPR2020-01539 (Patent 10,588,554 B2)

1   the scratching, what Inokawa teaches you is that scratching is a negative for

2   a convex surface, right?  But if you put a flat surface on it it better protects

3   from the scratching and scratching --

4          JUDGE WIEKER:  I understand your --

5          MR. JENSEN:  -- (indiscernible.)

6          JUDGE WIEKER:  -- I understand your point there but let me ask my

7   question slightly differently.  Do you dispute that a convex cover would

8   protect the internal sensor components?

9          MR. JENSEN:  Okay.  In terms of just would it provide any

10  protection to it in a thing.  I think that there is -- what I would say is there is

11  no protective benefit from it being curved versus it being flat; right?

12         JUDGE WIEKER:  I understand that.

13         MR. JENSEN:  The curved ones, and what Inokawa teaches is that

14  curved is worse in protecting than it is, sorry, yes the curved is worse and it

15  doesn't identify by the way any trade-offs for going to that flat surface.  It

16  doesn't say hey, you're going to lose any benefit of that -- in fact it puts the

17  lens under the flat surface in its instance and it puts that lens over the LED

18  and remember the Examiners talked about understanding individual lens

19  being over photodetectors; right?  And Inokawa teaches that it protects -- so

20  a cover, I mean a plate, an encapsulation, there's all sorts of things that have

21  been shown in the references we've looked at which make it so the LEDs

22  themselves aren't exposed and the photodetectors aren't simply exposed.

23  However, what Inokawa teaches us is if that's your goal, which Petitioners

64

IPR2020-01520 (Patent 10,258,265 B1)
IPR2020-01536 (Patent 10,588,553 B2)
IPR2020-01537 (Patent 10,588,553 B2)
IPR2020-01538 (Patent 10,588,554 B2)
IPR2020-01539 (Patent 10,588,554 B2)

1    have said is one of the motivations, doing that with a curved surface is the

2    bad solution; right?  It's the worst solution.  Make it flat and you will protect

3    it better.  So my position the curved one is less, it provides less protection

4    because it is more likely to scratch.  Does that I think answer your question?

5          JUDGE WIEKER:  I understand your position.  Thanks.

6          MR. JENSEN:  Okay.  All right.  By the way, so I couldn't find any

7    discussion that it provides an improvement, that this lens provides an

8    improvement to measurement, the physiological measurement.  There is

9    precious little about physiological measurement.  There is a lot of discussion

10   about a communication system and using these lenses to talk between the

11   base station and the sensor.  But if you move the plate, and it doesn't talk

12   about any trade-off, when you go to a flat surface it doesn't suggest hey, so

13   there's not this broad teaching that Petitioner would have us believe.

14   There's a broad teaching that you're going to get a benefit from a curved

15   surface.  That's not Inokawa and they didn't point to any evidence that it's

16   there.

17         Inokawa teaches also that this advantage of a wireless system, they

18   want to combine that with other references that want it to be wireless.

19   Mendelson, you know, one of them wants it to be in the field with helmets.

20   One of them, Aizawa, wants it to be wireless during exercise.  Inokawa

21   teaches there's a disadvantage to having a wireless communication system.

22   I think it's important to put those into context.

23         So only briefly before I sit down and reserve the rest of my time, I just

65

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Patent of:     Jeroen Poeze et al.
U.S. Patent No.:     10,588,553          Attorney Docket No.: 50095-00012IP2
Issue Date:          March 17, 2020
Appl. Serial No.:    16,534,949
Filing Date:         August 7, 2019
Title:               MULTI-STREAM DATA COLLECTION SYSTEM FOR
                     NONINVASIVE MEASUREMENT OF BLOOD
                     CONSTITUENTS

## DECLARATION OF DR. THOMAS W. KENNY

**Declaration**

I declare that all statements made herein on my own knowledge are true and

that all statements made on information and belief are believed to be true, and

further, that these statements were made with the knowledge that willful false

statements and the like so made are punishable under Section 1001 of Title 18 of

the United States Code.

By: _____

Thomas W. Kenny, Ph.D.

APPLE-1010, FIG. 1 (left) and FIG. 2 (right)

66.    The PDA is a handheld device that provides a "touch screen" interface and a simple graphical user interface (GUI) "configured to present the input and output information to the user and allow[ for] easy activation of various functions." APPLE-1010, FIG. 3 (reproduced below); *see also* APPLE-1021, Cover, xvii-xviii, 10-12, 17, 63, 363; APPLE-1022, 4-11, 30-31.



Fig. 3.  Sample PDA Graphical User Interface (GUI).

APPLE-1010, FIG. 3

### E.    Overview of Sherman

67.    Sherman discloses a magnetic fastening mechanism for "wrist instruments," such as wristwatches.  APPLE-1011, 1:4-10.  Sherman's system provides "an improved clasp for a flexible strap which eliminates buckles or other types of

33

Appx22888

**VII. GROUND 1 – Claims 1-6, 9-18, 20-24, 29 are Rendered Obvious by Aizawa, Inokawa, and Ohsaki**

**A.     Combination of Aizawa, Inokawa, and Ohsaki**

1.     *Plurality of emitters*

68.     As I have described in Section VI.A, Aizawa discloses a pulse wave sensor in which multiple detectors are disposed around a centrally located LED/emitter. APPLE-1006, ¶[0023].  Aizawa explains that "[t]he arrangement of the light emitting diode 21 and the photodetectors 22 is not limited" to that shown or described in connection with any particular embodiment.  APPLE-1006, ¶[0032]. Although Aizawa emphasizes the desirability of disposing photodetectors "on a circle concentric to" a light source, so as to enable accurate pulse wave detection "even when the attachment position of the pulse rate detector 1 is dislocated," Aizawa describes alternative arrangements in which "a plurality of light emitting diodes 21" are employed.  *Id.*, ¶¶[0032]-[0033].

69.     One of ordinary skill would have combined the teachings of Aizawa and Inokawa such that Aizawa's pulse wave sensor would be modified to include an additional LED as taught by Inokawa to improve the detected pulse wave by distinguishing between blood flow detection and body movement.  APPLE-1008, ¶(0059) (describing the use of the "S-side green LED 21…to sense the pulse from the light reflected off of the body (i.e. change in the amount of hemoglobin in the capillary artery), while the S-side infrared LED 23 serves to sense body motion

35

Appx22890

from the change in this reflected light"); APPLE-1006, ¶[0006] (recognizing the problem of weak signals from a wearable sensor because the sensor "detects the motion of a red corpuscle…and is easily affected by noise caused by the shaking of the body of the subject), ¶[0028] (describing a device for "computing the amount of motion load" such that the motion can be compensated for).

70.    Inokawa, for example, is directed to a wearable optical sensing system that gathers "various kinds of vital sign information such as pulse."  APPLE-1008, ¶(0001).  Inokawa's physiological sensor device includes a sensor and a base station.  *Id*., ¶¶[0055]-[0066].  The sensor includes a "pair of light-emitting elements," the reflected light of which is used to "sense the pulse" of the subject by detecting "change in the amount of hemoglobin in the capillary artery" and to sense "body motion," and further includes a "single photodiode" that "receives the reflected light" from the light-emitting elements.  *Id*., ¶¶[0058]-[0059]; FIG. 2.  A convex lens is placed between the photodiode and the subject's skin; the lens is sufficiently rigid to make the tissue conform to the convex surface of the lens.  *Id*., ¶[0058].

(FIG. 2)



APPLE-1008, FIG. 2

71. The base station is "a charger with communication functionality that is used when the pulse sensor…is mounted." *Id.*, ¶[0060]; FIG. 3. When the sensor is mounted onto the base station, "vital sign information…such as pulse and body motion, is transmitted to the base device…using the…infrared LED." *Id.*, ¶[0076]. This enables the sensor component to transmit collected data to a computer through the base station, using an optical communications interface implemented through Inokawa's infrared LED. *Id.*, ¶¶[0002], [0003], [0067], [0074]-[0077].

37

(FIG. 3)   Pulse Sensor 1



Base Device 17

APPLE-1008, FIG. 3

72. In addition to enabling optical communication, the use of multiple LEDs emitting light at different wavelengths—e.g. infrared and green LEDs—enables Inokawa's sensor to detect body motion. APPLE-1008, ¶[0014]. As Inokawa explains, "when using sensor-side light-emitting means of various kinds…the manner of use can be adjusted according to the properties of each respective means" such that "work can be divided between the various means, with an

38

infrared LED used to **detect vital signs** and **transmit** vital sign information, and a green LED used to **detect pulse**." APPLE-1008, ¶¶[0014], [0040].

73.     More specifically, and as shown in Inokawa's FIG. 2, Inokawa's pulse sensor includes "a green light-emitting diode (S-side green LED) 21 and an infrared light-emitting diode (S-side infrared LED) 23, [and] a single photodiode (S-side PD) 25 that receives the reflected light from these." *Id.*, ¶[0058]. The green LED senses "the pulse from the light reflected off of the body (i.e. change in the amount of hemoglobin in the capillary artery)" and the infrared LED senses "body motion from the change in this reflected light." *Id.*, ¶[0059].



APPLE-1008, FIG. 2 (annotated)

74.     To obtain the advantages described by Inokawa (e.g., to improve the detected pulse wave by enabling the sensor to distinguish between blood flow

39

detection and body movement, in addition to enabling wireless communication between the sensor and a base station), one of ordinary skill would have been motivated to configure Aizawa's pulse wave sensor to include at least two LEDs. APPLE-1008, ¶¶[0058]-[0059]; APPLE-1008, ¶¶[0006], [0028].

75.     As I illustrate below, the Aizawa-Inokawa sensor would have featured two LEDs in place of Aizawa's LED 21.





APPLE-1006, FIGS. 1(a) (top, annotated) and 1(b) (bottom, annotated)

40

76.    Aizawa-Inokawa would utilize two LEDs that emit two different wavelengths.  LED 21 in the implementation shown in Aizawa's FIG. 1(b) would simply be replaced with two LEDs.  In this manner, Aizawa's sensor would have been improved through the implementation of a separate LED to account for motion load which the system records and accounts for.  APPLE-1006, ¶¶[0006], [0028], [0035].

77.    One of ordinary skill would have combined the teachings of Aizawa and Inokawa as doing so would have amounted to nothing more than the use of a known technique to improve similar devices in the same way and combining prior art elements according to known methods to yield predictable results.  *KSR v. Teleflex*, 550 U.S. 398, 417 (2007).  Here, one of ordinary skill would have understood the combination to be nothing more than improving Aizawa's pulse wave sensor that uses a single LED with the use of a known technique disclosed by Inokawa to detect and record body motion in addition to blood flow.  Furthermore, one of ordinary skill would have understood that the elements of the combined system would each perform similar functions they had been known to perform prior to the combination.  For instance, in Aizawa-Inokawa, Aizawa's photodetectors would still detect light emitted by the LEDs and reflected by the subject's wrist, and Inokawa's two LEDs would still be used to emit light at different wavelengths.  Furthermore, one of ordinary skill would have readily

41

Appx22896

understood how to select different photodiodes with different sensitivities to detect the different wavelengths of light emitted by the two LEDs.

78.     One of ordinary skill would have looked to Inokawa's disclosure of two LEDs emitting light of different wavelengths, in part, because it provides additional functionality, including that of wireless communication with a base station.  *Id.*  Inokawa's base device 17 receives, for example, "pulse and body motion" data through "the S-side infrared LED 23 of the pulse sensor 1 and the B-side PD 45 of the base device 17."  *Id.*, ¶(0076).  "As a result, there is no need to use a special wireless communication circuit or a communication cable as previously, which makes it possible to transmit vital sign information to the base device 17 accurately, easily, and without malfunction."  *Id.*, ¶[0077].  In other words, the LEDs provided on the sensor can be used not only to detect pulse rate but also to "accurately, easily, and without malfunction" transmit the sensed data to a base station.

79.     Although Inokawa shows its two emitters emitting light toward a centrally located detector, a POSITA would have recognized that the same effect can be achieved by having the emitters located centrally instead and emitting radially outward.  Indeed, Aizawa itself recognizes this reversibility, stating that while the configurations depicted include a central emitter surrounded by detectors, the

42

Appx22897

"same effect can be obtained when…a plurality of light emitting diodes 21 are disposed around the photodetector 22."  APPLE-1006, ¶[0033].

80.     With reference to FIG. 19 below, Inokawa further teaches that the use of two LEDs instead of one further helps improve data transmission accuracy by using the second LED to transmit checksum information.  For example, Inokawa describes that "the presence of two pairs of light-emitting and light-receiving elements makes it possible to efficiently transmit information," including increasing the "**accuracy of data**…by transmitting and receiving a **checksum signal** using, for example, the S-side green LED 165 and the other B-side PD 157."  APPLE-1008, ¶¶[0111], [0044], [0048].



(FIG. 19)

APPLE-1008, FIG. 19 (annotated)

43

81.     Intrinsic and extrinsic records confirm that one of ordinary skill would have naturally looked to another wearable physiological sensor, as disclosed in Inokawa, for transmission details.  Aizawa's device contemplates uploading data to a base device butt is silent about how such transmission would be implemented.  APPLE-1006, ¶[0023] (describing its "transmitter for transmitting the above pulse rate data to an unshown display"), ¶[0028] (describing that the transmitter also transmits data to "a device for computing the amount of motion load").  One of ordinary skill would have recognized that the LED of Aizawa could be used for data communication to a computing device for further analysis in a way that is wireless, eliminating problems associated with a physical cable, and that does not require a separate RF circuit, as taught by Inokawa.  APPLE-1008, ¶¶[0003] ("technology is also known that will transmit data wirelessly from a sensor that has obtained vital sign information to a base station that gathers this information"), [0067] ("base device 17 receives the information transmitted from the pulse sensor 1 by means of the B-side optical device component 41.  Note that the base device 17 is connected to a PC 59, and information transmitted from the pulse sensor 1 is downloaded to the PC 59 via the base device 17"), [0075] ("the base device 17, meanwhile, upon receiving the information transmitted from the pulse sensor 1, transmits this information to the PC 59.").

44

82.     One of ordinary skill would have further recognized that the use of two distinct LEDs to perform such communication would result in enhanced accuracy of the transmitted information.

83.     Although Inokawa shows its two emitters emitting light toward a centrally located detector, one of ordinary skill would have recognized that the same effect can be achieved by having the emitters located centrally instead and emitting radially outward.  Indeed, Aizawa itself recognizes this reversibility, stating that while the configurations depicted include a central emitter surrounded by detectors, the "same effect can be obtained when…a plurality of light emitting diodes 21 are disposed around the photodetector 22."  APPLE-1006, ¶[0033].

2.     *Convex surface*

84.     Additionally, one of ordinary skill would have combined the teachings of Aizawa-Inokawa with the teachings of Ohsaki such that the cover of Aizawa-Inokawa's wrist-worn sensor would include a convex surface, improving adhesion between a subject's wrist and a surface of the sensor.  APPLE-1009, ¶[0025] (the convex surface prevents slippage of the detecting element from its position on the subject's wrist, and the convex nature of the surface suppresses the "variation of the amount of the reflected light" that reaches the detecting element).

85.     In more detail, Ohsaki describes a "detecting element" that includes "a package 5, a light emitting element 6 (e.g., LED), a light receiving element 7 (e.g.,

45

PD), and a translucent board 8." APPLE-1009, ¶[0017]. "The package 5 has an opening and includes a" substrate in the form of "circuit board 9," on which light emitting element 6 and light receiving element 7 are arranged. *Id.*. As shown in Ohsaki's FIG. 2, translucent board 8 is arranged such that, when the sensor is worn "on the user's wrist … the convex surface of the translucent board … is in intimate contact with the surface of the user's skin"; this contact between the convex surface and the user's skin is said to prevent slippage, which increases the strength of the signals obtainable by Ohsaki's sensor. APPLE-1009, ¶¶[0015], [0017], [0025], FIGS. 1, 2, 4A, 4B.



APPLE-1009, FIG. 2 (annotated)

46

86.     Ohsaki explains that "if the translucent board 8 has a flat surface, the detected pulse wave is adversely affected by the movement of the user's wrist as shown in FIG. 4B," but that if "the translucent board 8 has a convex surface…variation of the amount of the reflected light…that reaches the light receiving element 7 is suppressed." APPLE-1009, [0025]. The convex surface is also said to prevent "disturbance light from the outside" from penetrating translucent board 8. *Id.* Thus, when a convex cover is used, "the pulse wave can be detected without being affected by the movement of the user's wrist 4 as shown in FIG. 4A." *Id.*



APPLE-1009, FIGS. 4A, 4B

47

Appx22902

87.     As shown below, one of ordinary skill would have found it obvious to modify the sensor's flat cover (left) to include a lens/protrusion (right), similar to Ohsaki's translucent board 8, so as to improve adhesion between the user's wrist and the sensor's surface, improve detection efficiency, and protect the elements within the sensor housing.  APPLE-1009, ¶[0025] (explaining that the convex surface of translucent board 8 prevents slippage of a detecting element from its position on the wrist, and suppresses the "variation of the amount of the reflected light" that reaches the detecting element); APPLE-1024, ¶¶[0033], [0035], FIG. 6 (depicting an LED featuring a convex lens).

88.     Indeed, by positioning a lens above the optical components of Aizawa, as shown below, the modified cover will allow more light to be gathered and refracted toward the light receiving cavities of Aizawa, thereby further increasing the light-gathering ability of Aizawa beyond what is achieved through the tapered cavities.  APPLE-1006, ¶¶[0012], [0024].



APPLE-1006, FIG. 1(b) (annotated)

48

89.    Furthermore, one of ordinary skill would have understood how to incorporate the shape of Ohsaki's cover into Aizawa's cover, and further would have expected such a modification to succeed given the high degree of overlap between the two references. For example, as discussed above, Ohsaki teaches that its light permeable cover can be flat or alternatively be in the shape of a convex lens to prevent "disturbance light from the outside" from penetrating translucent board 8. *Id.* Thus, when a convex cover is used, "the pulse wave can be detected without being affected by the movement of the user's wrist 4 as shown in FIG. 4A." *Id.* That is, depending on the desired objective of the user (e.g., simplicity or reduced variation in the amount of reflected light reaching the detector and improved adhesion to the user's wrist), the shape of the cover can be readily modified.

90.    One of ordinary skill would have further recognized that the acrylic material used to make Aizawa's "acrylic transparent plate 6" can be easily formed to include a convex protrusion. APPLE-1006, 3:46-41, FIG. 1; APPLE-1026, ¶¶[0022], [0032], [0035], FIG. 6. Indeed, many prior art references of this period, such as Nishikawa (shown below) demonstrate exactly how such a convex shape may be incorporated into a molded cover. APPLE-1026, ¶¶[0022], [0032], [0035], FIG. 6. In other words, one of ordinary skill would have known that acrylic is a transparent material that can be readily transformed into various shapes, including

49

a lens shape, as needed due to its easy molding properties. Thus, one of ordinary skill preferring improved adhesion to a user's tissue and the ability to detect a pulse wave "without being affected by the movement of the user's wrist" (APPLE-1009, ¶[0025]) could have been able to easily modify Aizawa's cover to have a lens shape as per Ohsaki. Indeed, only a routine knowledge of sensor design and assembly, which were well within the abilities of one of ordinary skill in the art, would be required to perform such modifications. Thus, to achieve the goal of improved adhesion and detection, one of ordinary skill would have been able to, with a reasonable expectation of success, modify Aizawa's light permeable cover to have a convex protrusion as taught by Ohsaki.

91.    One of ordinary skill would have combined the teachings of Aizawa-Inokawa and Ohsaki as doing so would have amounted to nothing more than the use of a known technique to improve similar devices in the same way. One of ordinary skill would have recognized that incorporating Ohsaki's convex surface is simply improving Aizawa-Inokawa's transparent plate 6 that has a flat surface to improve adhesion to a subject's skin and reduce variation in the signals detected by the sensor. *Id.* Furthermore, the elements of the combined system would each perform similar functions they had been known to perform prior to the combination—Aizawa-Inokawa's transparent plate 6 would remain in the same

50

Appx22905

position, performing the same function, but with a convex surface as taught by Ohsaki. *Id.*

3. *Substrate*

92.     One of ordinary skill would have found it obvious that Aizawa's photodetectors are arranged on a substrate.  For example, one of ordinary skill would have understood that Aizawa's photodetectors are secured to the sensor device, provided with power by a power source (also not shown), and can receive signals from and transmit signals to other portions of the device, such as drive detection circuit 24, through such a structure.  One of ordinary skill would have understood that the substrate provides physical support and electrical connectivity and is connected to the holder 23.  Indeed, one of ordinary skill would have found it obvious to use such a substrate because it provides a simpler manufacturing process and more compact design than using and routing wires would allow.  As shown in FIG. 1(b), Aizawa illustrates a substrate, but does not label or describe such a structure.

51

138.    Thus, the noninvasive optical physiological sensor resulting from the teachings of Aizawa, Inokawa, and Ohsaki would have included a wall configured to circumscribe at least the at least four detectors.  APPLE-1006, Abstract, ¶¶[0002], [0005], [0008]-[0016], [0018], [0023]-[0024], [0026]-[0029], [0032]-[0033], FIGS. 1(a), 1(b), 2, 3, 4(a); APPLE-1009, ¶[0017], FIG. 2; see also APPLE-1013, ¶[0040] (describing a "raised wall 650 defining a component cavity 652 configured to accept and retain…a detector assembly"), FIGS. 6A-B.

139.    Accordingly, [1c] would have been obvious over Aizawa in view of Inokawa and Ohsaki.

**[1d] a cover configured to be located between tissue of the user and the at least four detectors when the noninvasive optical physiological sensor is worn by the user, wherein the cover comprises a single protruding convex surface operable to conform tissue of the user to at least a portion of the single protruding convex surface when the noninvasive optical physiological sensor is worn by the user, and wherein the wall operably connects to the substrate and the cover.**

140.    As I have explained with reference to [1pre]-[1c], the noninvasive optical physiological sensor resulting from the teachings of Aizawa, Inokawa, and Ohsaki would have included a holder 23 that is configured to circumscribe the plurality of light emitting diodes and to the photodetectors 22 in addition to other structural elements.  APPLE-1006, Abstract, ¶¶[0002], [0005], [0008]-[0016], [0018], [0023]-[0024], [0026]-[0029], [0032]-[0033], FIGS. 1(a), 1(b), 2, 3, 4(a); APPLE-

82

1008, ¶¶[0001], [0006]-[0007], [0014], [0040], [0055]-[0067], [0074]-[0077],

FIGS. 2, 3, 19; APPLE-1009, ¶[0017], FIG. 2.

141.   Aizawa further discloses "an acrylic transparent plate 6" that "becomes close

to the artery 11 of the wrist 10" of a user when Aizawa's sensor is worn, improving

"adhesion between the wrist 10 and the pulse rate detector 1."  APPLE-1006,

¶[0026].



FIG. 1 (b)

APPLE-1006, FIG. 1(b) (annotated)

142.   In more detail, Aizawa discloses that acrylic transparent plate 6 is "mounted

to the detection face 23a of the holder 23," such that it is located between tissue of

the user and the plurality of detectors when the sensor is worn by the user, and

such that the detectors receive light that passes through the plate after attenuation

by the user's tissue.  *Id.*, ¶[0023].  Because the acrylic transparent plate 6 is

"provided **on the detection face 23a of the holder 23**, adhesion between the pulse

83

rate detector 1 and the wrist 10 can be improved, thereby further improving the detection efficiency of a pulse wave." APPLE-1006, ¶[0030]. One of ordinary skill would have understood this placement of the transparent plate 6 to render obvious a cover that is operably connected to the wall, or holder 23 of Aizawa, and that is configured to be located between the tissue of the user and the at least four detectors.

143. Moreover, as illustrated in Aizawa's FIG. 1(b) (reproduced below), acrylic transparent plate 6 is a single piece of material and holder 23 connects the surface on which detectors 22 are arranged to acrylic transparent plate 6.



APPLE-1006, FIG. 1(b) (annotated)

144. In the combination, the cover with a convex surface (outlined in blue in FIG. 1(b) above) is located between the user tissue and the detectors 22 when the sensor

84

is worn by the user.  APPLE-1006, ¶[0023]; APPLE-1003, ¶***.  Moreover, the surface of the user tissue conforms to the single protruding convex surface when the sensor is worn by the user.  APPLE-1003, ¶***.  In particular, one of ordinary skill would have understood that, because Aizawa's attachment belt 7 is wrapped around the user's wrist, acrylic transparent plate 6 would have been pressed against the user's skin.  And because glass is a rigid material, acrylic transparent plate 6 would have necessarily caused tissue of the user to conform to at least a portion of transparent glass when the sensor is worn by the user during its operation.

145.   From this and related description, one of ordinary skill would have understood that the transparent plate 6 that is operably connected to the opaque walls of Aizawa's holder 23 improves adhesion between Aizawa's sensor and the user's wrist, improves detection efficiency, and provides further protection to the elements stored within holder 23's cavities.

146.   One of ordinary skill would have understood FIG. 1(b) to clearly illustrate that the wall (outlined in green) portion of the holder 23 extends from the substrate to the convex plate 6 and connects the substrate to the convex plate 6.  APPLE-1003, ¶***; *see also infra* claim [2].  Furthermore, a POSITA would have understood that the convex plate 6 is a cover that covers "the detection face 23a of the holder 23" so that adhesion with the user tissue is improved.  APPLE-1006, ¶¶[0026], [0030], [0034]

147.   To the extent that acrylic transparent plate 6 does not include a "single protruding convex" surface, one of ordinary skill would have found it obvious to modify acrylic transparent plate 6 in view of Ohsaki.  More specifically,  one of ordinary skill would have found it obvious to modify the sensor's plate 6 to include a convex surface, similar to Ohsaki's translucent board 8, so as to improve adhesion between the user's wrist and the sensor's surface.  APPLE-1009, ¶[0025] (explaining that the convex surface of translucent board 8 prevents slippage of a detecting element from its position on the wrist, and suppresses the "variation of the amount of the reflected light" that reaches the detecting element); *see also* APPLE-1024, ¶¶[0033], [0035], FIG. 6 (depicting an LED featuring a convex lens).

148.   In more detail, Ohsaki describes a "detecting element" that includes "a package 5, a light emitting element 6 (e.g., LED), a light receiving element 7 (e.g., PD), and a translucent board 8."  APPLE-1009, ¶[0017].  "The package 5 has an opening and includes a" substrate in the form of "circuit board 9," on which light emitting element 6 and light receiving element 7 are arranged.  *Id.*.  As shown in Ohsaki's FIG. 2 (reproduced below), translucent board 8 is arranged such that, when the sensor is worn "on the user's wrist … the convex surface of the translucent board … is in intimate contact with the surface of the user's skin"; this contact between the convex surface and the user's skin is said to prevent slippage,

which increases the strength of the signals obtainable by Ohsaki's sensor. APPLE-1009, ¶¶[0015], [0017], [0025], FIGS. 1, 2, 4A, 4B.



APPLE-1009, FIG. 2 (annotated)

149.    Ohsaki explains that "if the translucent board 8 has a flat surface, the detected pulse wave is adversely affected by the movement of the user's wrist as shown in FIG. 4B," but that if "the translucent board 8 has a convex surface … variation of the amount of the reflected light … that reaches the light receiving element 7 is suppressed." APPLE-1009, ¶[0025]. The convex surface is also said to prevent "disturbance light from the outside" from penetrating translucent board

87

8. *Id*. Thus, when a convex cover is used, "the pulse wave can be detected without being affected by the movement of the user's wrist 4 as shown in FIG. 4A." *Id*.



APPLE-1009, FIGS. 4A, 4B

150. From this and related description, one of ordinary skill would have understood that the translucent board 8 that is operably connected to the walls of Ohsaki's package 5 improves adhesion between Ohsaki's sensor and the user's wrist, improves detection efficiency, and provides protection to the elements accommodated within package 5.

88

151.  As shown below, it would have been obvious to one of ordinary skill to modify Aizawa's wrist-worn sensor to incorporate the shape of Ohsaki's translucent board 8.



APPLE-1006, FIG. 1(b) (annotated)

152.  Such a modification would have amounted to nothing more than the use of a known technique to improve similar devices in the same way, and combining prior art elements according to known methods to yield predictable results.  *KSR v. Teleflex*, 550 U.S. 398, 417 (2007).  Indeed, the modification involves nothing more than adjusting transparent plate 6's shape to include a convex surface similar to that disclosed by Ohsaki, and one of ordinary skill would have understood that this adjustment would improve adhesion to the user's skin and reduce variation in the signals detected by the sensor.  *Id*.  Furthermore, the elements of the combined

89

system would each perform similar functions they had been known to perform

prior to the combination—Aizawa's transparent plate 6 would remain in the same

position, performing the same function, but with a convex surface as taught by

Ohsaki.  *Id.*  Accordingly, [1d] would have been obvious over Aizawa in view of

Inokawa and Ohsaki.  APPLE-1006, Abstract, ¶¶[0002], [0005], [0008]-[0016],

[0023]-[0024], [0027]-[0030], [0032]-[0033], FIGS. 1, 2, 3, 4(a); APPLE-1009,

¶¶[0015], [0017], [0025], FIGS. 1, 2, 4A, 4B.

### C.    Claim 2

**[2] The noninvasive optical physiological sensor of claim 1, wherein the wall operably connects to the substrate on one side and operably connects to the cover on an opposite side.**

153.    As I have explained with reference to [1pre]-[1d], the sensor resulting from

the combination of teachings of Aizawa, Inokawa, and Ohsaki includes a wall that

circumscribes the photodetectors and operably connects to the substrate on one

side and operably connects to the cover on an opposite side.  APPLE-1006,

Abstract, ¶¶[0002], [0005], [0008]-[0016], [0018], [0023]-[0024], [0026]-[0029],

[0032]-[0033], FIGS. 1(a), 1(b), 2, 3, 4(a); APPLE-1009, ¶¶[0015], [0017], [0025],

FIGS. 1, 2, 4A, 4B.

154.    For example, as shown in FIG. 1(b) of Aizawa, reproduced below, Aizawa,

as modified in view of the knowledge of one of ordinary skill or Ohsaki's

disclosure teaches a wall that circumscribes the photodetectors 22 and operably

90

subject"—this light emitted by the light emitting diode is necessarily attenuated by the tissue of the subject); *see also* APPLE-1006, ¶[0027].

252.   Accordingly, [29] would have been obvious over Aizawa in view of Inokawa and Ohsaki.

## VIII.  GROUND 2 – Claims 7 and 19 are obvious over Aizawa, Inokawa, Ohsaki, and Mendelson 2006

### A.      Combination of Aizawa, Inokawa, Ohsaki, and Mendelson 2006

253.   Aizawa's pulse rate detector is communicably connected to and transmits "pulse wave data to an unshown display."  APPLE-1006, ¶[0023].  This display is "for displaying the…pulse rate data."  *Id.*, ¶[0028].

254.   Although Aizawa does not depict or describe the display for its pulse wave sensor 2, one of ordinary skill would have found it obvious to implement display 26 as a touch-screen display.  *Id.*, ¶¶[0015], [0023], [0028], [0035]; APPLE-1010, 1-4, FIG. 3.

255.   Indeed, by the '553 patent's 2008 Critical Date, physiological monitoring devices commonly employed touch-screen displays.  Yitzhak Mendelson's 2006 paper "A Wearable Reflectance Pulse Oximeter for Remote Physiological Monitoring," for example, describes a "body-worn" pulse oximetry system that includes a sensor module, a receiver module, and a PDA.  APPLE-1010, 3.

140

256.   As discussed above in Section VI.D, which I incorporate here, Mendelson-2006's system includes a sensor module that transmits signals wirelessly to a PDA through a receiver module.  *Id.*, 2, FIGS. 1-3.

257.   The PDA is said to "provide[] a low-cost touch screen interface."  *Id.*, 3-4; *see also* APPLE-1020, 1-4 (depicting and describing the touch-screen display included within the HP iPAQ h4150 Pocket PC PDA utilized in Mendelson-2006's system); APPLE-1021, Cover, xvii-xviii, 10-12, 17, 63, 363; APPLE-1022, 4-11, 30-3.  In more detail, and as shown in Mendelson-2006's FIG. 3 (reproduced below), the PDA's "simple GUI" is "configured to present … input and output information to the user" and to allow "easy activation of various functions." APPLE-1010, 4.

258.   One of ordinary skill would have been motivated to look to other physiological sensor systems, such as Mendelson-2006, for details regarding data transmission and display of the data collected using the Aizawa-Inokawa-Ohsaki sensor.

259.   In more detail, and as shown in Mendelson-2006's FIG. 2, the sensor module includes an "optical reflectance transducer" for measuring photoplethysmographic (PPG) signals and a "PCB antenna" for wireless communication, and the receiver module includes "an embedded microcontroller" and a corresponding "PCB antenna."  *Id.*, 1-2.  "Signals acquired by the Sensor

141

Module are received by the embedded microcontroller which synchronously converts the corresponding PD output to R and IR PPG signals," and "[d]edicated software is used to filter the signals and compute [arterial oxygen saturation $(SpO_2)$] and [heart rate (HR)] based on the relative amplitude and frequency content of the reflected PPG signals." *Id.*



APPLE-1010, FIG. 2 (annotated)

260. "[I]nformation acquired by the Sensor Module is transmitted wirelessly via an RF link over a short range to a body-worn Receiver Module," and data processed by the receiver module is "transmitted wirelessly to a PDA." *Id.*, 2, FIG. 2. Mendelson-2006's system uses "the HP iPAQ h4150 PDA because it can

support both 802.11b and Bluetooth™ wireless communication." *Id.*, 3. The PDA is used "as a local terminal," and it "also provides a low-cost touch screen interface." *Id.*; *see also* APPLE-1020, 1-4 (depicting and describing the HP iPAQ h4150 Pocket PC PDA utilized in Mendelson-2006's system); *see also* APPLE-1021, Cover, xvii-xviii, 10-12, 17, 63, 73-101, 176, 190-193, 363; APPLE-1022, 4-11, 30-31, 56-67, 72-92, 284-297.

261.    Wireless communication with the handheld PDA is, moreover, said to enable transfer of information pertaining to physiological and wellness parameters such as "$SpO_2$, HR, body acceleration, and posture information" to the PDA; and, when the PDA is "carried by medics or first responders," this information is said to enhance their ability "to extend more effective medical care, thereby saving the lives of critically injured persons." *Id.*



APPLE-1010, FIG. 3 (left) and APPLE-1020, 1 (right)

262.   To obtain these and other advantages described by Mendelson-2006, one of ordinary skill would have been motivated to implement Aizawa's pulse wave sensor as part of a physiological measurement system including a handheld computing device, and to enable a physiological sensor device including sensor 1 to communicate wirelessly with the handheld computing device.  APPLE-1006, Abstract ("a pulse wave sensor for detecting a pulse wave by detecting light output from a light emitting diode and reflected from the artery of a wrist of a subject "), ¶¶[0002], [0005], [0008]-[0016], [0023] (describing transmitting "pulse rate data to

144

an unshown display"), [0024], [0027]-[0030], [0032]-[0033], FIGS. 1, 2, 3, 4(a);

APPLE-1010, 1-4, FIG. 3; *see also* APPLE-1020, 1-4.

263.    Indeed, by the Critical Date, physiological monitoring devices commonly

included touch-screen displays configured to provide user interfaces.  APPLE-

1009, 1-4, FIG. 3; APPLE-1024, Abstract, ¶¶[0026], [0044], FIGS. 1-6.  One of

ordinary skill would have recognized that applying Mendelson-2006's teachings to

the Aizawa-Inokawa-Ohsaki sensor would have led to predictable results without

altering or hindering the functions performed by the sensor.  In fact, one of

ordinary skill would have been motivated to implement the well-known technique

of connecting a physiological sensor to a handheld device to cause Aizawa-

Inokawa-Ohsaki's sensor to include such features to achieve the predictable

benefits offered by Mendelson-2006's description of the same.  *Id.*  For example,

one of ordinary skill would have incorporated Mendelson-2006's disclosure of a

PDA with a touch-screen display and "simple GUI" to present "information to the

user" and provide "easy activation of various functions."  APPLE-1010, 4.  Indeed,

one of ordinary skill would have had a reasonable expectation of success in making

this modification, and would have reasonably expected to reap benefits of

displaying a measured waveform representative of a patient's pulse.  *Id.*

264.    For at least these reasons, one of ordinary skill would have found it obvious

to implement Aizawa's unshown display as a PDA featuring a touch-screen display

145

Appx23000

and/or mobile phone functionality[2] using either or both of 802.11b and Bluetooth™.  APPLE-1006, ¶[0015], [0023], [0028], [0035]; *see also* APPLE-1020, 1-4; APPLE-1009, ¶[0020]; APPLE-1012, Abstract, 8:37-41, 9:22-10:30, FIGS. 7, 8; APPLE-1010, 1-4, FIGS. 1-3; APPLE-1020, 1-4.

### B.    Claim 7

**[7pre] A physiological monitoring device comprising:**

265.    As I have explained with reference to [1pre]-[1d], Aizawa discloses an optical physiological measurement sensor.  APPLE-1006, Abstract ("a pulse wave sensor for detecting a pulse wave by detecting light output from a light emitting diode and reflected from the artery of a wrist of a subject "), [0002], [0005], [0008]-[0016], [0023]-[0024], [0027]-[0030], [0032]-[0033], FIGS. 1, 2, 3, 4(a); APPLE-1009, [0015], [0017], [0025], FIGS. 1, 2, 4A, 4B.

---

[2] Mendelson-2006 does not explicitly disclose its PDA to be a mobile phone.  Yet it was well-known before the Critical Date that a PDA device was often paired with cellular communication technology to provide a combined PDA/phone device that acts a mobile phone.  APPLE-1025, Title ("Cellular Phone/PDA Communication System"), Abstract, 1:6-15, 7:6-10:11 (describing "a small handheld cellular phone/PDA communications system" featuring "an LCD display 16 that is also a touch screen system"), FIGS. 1-3.

**Appx23001**



US 20010056243A1

(19) **United States**

(12) **Patent Application Publication**     (10) Pub. No.: **US 2001/0056243 A1**

Ohsaki et al.     (43) **Pub. Date:     Dec. 27, 2001**

(54) **WRISTWATCH-TYPE HUMAN PULSE WAVE SENSOR ATTACHED ON BACK SIDE OF USER'S WRIST**

(76) Inventors: **Rie Ohsaki**, Anjo-city (JP); **Teiyuu Kimura**, Nagoya-city (JP); **Naoki Fukaya**, Obu-city (JP)

Correspondence Address:
**LAW OFFICE OF DAVID G POSZ**
**2000 L STREET, N.W.**
**SUITE 200**
**WASHINGTON, DC 20036 (US)**

(21) Appl. No.:     **09/852,698**

(22) Filed:     **May 11, 2001**

(30)     **Foreign Application Priority Data**

Jun. 14, 2000     (JP) ...................................... 2000-177999

**Publication Classification**

(51) **Int. Cl.$^7$** ...................................................... A61B  5/02
(52) **U.S. Cl.** .......................................... **600/503**; 600/500

(57)     **ABSTRACT**

A pulse wave sensor includes a detecting element and a sensor body. The pulse wave sensor is worn on the back side of a user's wrist corresponding to the back of the user's hand. The detecting element includes a translucent member on its top, and the translucent member has a convex surface. The detecting element is attached on the back side of the user's wrist by a dedicated belt so that the convex surface of the translucent member is in intimate contact with the surface of the user's skin. The sensor body is attached on the back side of the user's wrist by another dedicated belt so that it is arranged on the detecting element. A cushion is arranged between the sensor body and the detecting element. The pulse wave sensor can stably detect the pulse wave without being affected by the movement of the user's wrist.



APPLE 1009

Appx23194

US 2001/0056243 A1

Dec. 27, 2001

2

[0019]    The light emitting element **6** and the light receiving element **7** are arranged side by side as shown in **FIG. 2**. Accordingly the length of the detecting element **2** from the right side to the left side in **FIG. 2** is longer than the length from the upper side to the lower side. If the detecting element **2** is arranged so that its longitudinal direction (from the right side to the left side in **FIG. 2**) agrees with the circumferential direction of the user's wrist **4**, it has a tendency to slip off. Therefore it is desirable that the detecting element **2** is arranged so that its longitudinal direction agrees with the longitudinal direction of the user's arm. The dedicated belt **10** is attached to the detecting element **2** so that it can fix the detecting element **2** on the user's wrist **4** in this way.

[0020]    The sensor body **3** is connected to the detecting element **2** by a signal line **13**, and includes, as shown in **FIG. 2**, a drive circuit **11**, a microcomputer **12**, and a monitor display (not shown). The drive circuit **11** drives the light emitting element **6** to emit light toward the wrist **4**. The microcomputer **12** calculates the pulse rate from the reflected light received by the detecting element **2**. This reflected light varies with the user's pulsation. The monitor display shows the calculated pulse rate and the like.

[0021]    The sensor body **3** is arranged on the top of the detecting element **2**, and fixed on the user's wrist **4** by a dedicated belt **14** attached to the sensor body **3**. A cushion **15** such as a sponge or a gel is inserted between the detecting element **2** and the sensor body **3** so that the detecting element **2** does not directly contact the sensor body **3**.

[0022]    The pulse wave sensor **1** detects the pulse wave of the user's body as follows. The light emitting element **6** emits light toward the user's wrist **4**, a portion of the emitted light penetrates the capillary arteriole **16** in the inside of the user's wrist **4** and is absorbed by the haemoglobin in the blood. The rest of the emitted light is reflected and scattered by the capillary arteriole **16**, and partly reaches the light emitting element **7**. As the amount of the haemoglobin in the blood varies in waves due to the pulsation of the user's blood, the amount of the light absorbed by the haemoglobin also varies in waves. As a result, the amount of the light which is reflected by the capillary arteriole **16** and reaches the light receiving element **7** varies in waves. This variation in the amount of the light received by the light receiving element **7** is detected as the pulse wave information.

[0023]    If the detecting element **2** is arranged on the front side of the user's wrist **4**, the amount of the light received the light receiving element **7** is larger. That is, the intensity of the signal received by the light receiving element **7** is higher. However, the detecting element **2** has a tendency to slip off the detecting position of the user's wrist **4** as the user moves his/her wrist, and therefore the intensity of the light received by the light receiving element **7** largely varies depending on the shift amount of the detecting element **2**. As shown in **FIG. 3**B, in the case that the detecting element **2** is arranged on the front side of the user's wrist **4**, the pulse wave can be detected well if the user is at rest. However, when the user is in motion, the detected pulse wave is adversely affected by the movement of the user's wrist **4**.

[0024]    In contrast to this, if the detecting element **2** is arranged on the back side of the user's wrist **4**, the user will not move his/her wrist unconsciously since the radius and the ulna inside the user's wrist **4** are not pressed and

consequently the user does not feel so uncomfortable. Further, the detecting element **2** will not shift so widely even if the user's wrist moves. Therefore the detecting element **2** is stably fixed to the detecting position of the user's wrist **4**. As a result, the pulse wave is detected stably without being affected by the movement of the user's wrist **4** as shown in **FIG. 3**A.

[0025]    The detecting element **2** is arranged on the user's wrist **4** so that the convex surface of the translucent board **8** is in intimate contact with the surface of the user's skin. Thereby it is prevented that the detecting element **2** slips off the detecting position of the user's wrist **4**. If the translucent board **8** has a flat surface, the detected pulse wave is adversely affected by the movement of the user's wrist **4** as shown in **FIG. 4B**. However, in the case that the translucent board **8** has a convex surface like the present embodiment, the variation of the amount of the reflected light which is emitted from the light emitting element **6** and reaches the light receiving element **7** by being reflected by the surface of the user's skin is suppressed. It is also prevented that noise such as disturbance light from the outside penetrates the translucent board **8**. Therefore the pulse wave can be detected without being affected by the movement of the user's wrist **4** as shown in **FIG. 4A**.

[0026]    The detecting element **2** and the sensor body **3** is attached to theuser's wrist **4** by the dedicated belts**10** and **14**, respectively. That is, the detecting element **2** and the sensor body **3** are allowed to move relatively. Further the cushion **15** is arranged between the detecting element **2** and the sensor body **3**. Therefore, if force is applied to the sensor body **3** or the sensor body **3** moves, the force applied to the sensor body **3** or the movement of the sensor body **3** cannot be transmitted to the detecting element **2** easily.

[0027]    Accordingly the detecting element **2** is stably fixed to the user's wrist **4**. As a result, the pulse wave sensor can detect the pulse wave at a high S/N ratio, that is, it can provide high detection probability, not only when the user is at rest but also when the user is taking light exercise.

[0028]    Modifications

[0029]    In the above embodiment, the sensor body **3** need not include the microcomputer **12** if it includes a transmitter instead. In this case, the pulse wave information detected by the detecting element **2** is transmitted to a receiver by the transmitter. The sensor body **3** can be downsized and light in weight in this case and consequently the force applied to the sensor body **3** or the movement of the sensor body **3** cannot be transmitted to the detecting element **2** easily.

[0030]    In the above embodiment, the detecting element **2** and the sensor body **3** may be worn on the back side of the user's forearm.

What is claimed is:

1. A pulse wave sensor for detecting a pulse wave of a human body comprising:

a detecting element including a light emitting element and a light receiving element; and

a sensor body including a circuit connected to the detecting element via a signal line,

wherein the detecting element is constructed to be worn on a back side of a user's wrist or a user's forearm.

5

Proceedings of the 28th IEEE
EMBS Annual International Conference
New York City, USA, Aug 30-Sept 3, 2006

ThB14.4

# A Wearable Reflectance Pulse Oximeter for Remote Physiological Monitoring

Y. Mendelson*, *Member, IEEE,* R. J. Duckworth, *Member, IEEE,* and G. Comtois, *Student Member, IEEE*

*Abstract*—To save life, casualty care requires that trauma injuries are accurately and expeditiously assessed in the field. This paper describes the initial bench testing of a wireless wearable pulse oximeter developed based on a small forehead mounted sensor. The battery operated device employs a lightweight optical reflectance sensor and incorporates an annular photodetector to reduce power consumption. The system also has short range wireless communication capabilities to transfer arterial oxygen saturation (SpO$_2$), heart rate (HR), body acceleration, and posture information to a PDA. It has the potential for use in combat casualty care, such as for remote triage, and by first responders, such as firefighters.

## I. INTRODUCTION

STEADY advances in noninvasive physiological sensing, hardware miniaturization, and wireless communication are leading to the development of new wearable technologies that have broad and important implications for civilian and military applications [1]-[2]. For example, the emerging development of compact, low-power, small-size, light- weight, and unobtrusive wearable devices may facilitate remote noninvasive monitoring of vital signs from soldiers during training exercises and combat. Telemetry of physiological information via a short-range wirelessly-linked personal area network can also be useful for firefighters, hazardous material workers, mountain climbers, or emergency first-responders operating in harsh and hazardous environments. The primary goals of such a wireless mobile platform would be to keep track of an injured person's vital signs, thus readily allowing the telemetry of physiological information to medical providers, and support emergency responders in making critical and often life saving decisions in order to expedite rescue operations. Having wearable physiological monitoring could offer far-forward medics numerous advantages, including the ability to determine a casualty's condition remotely without exposing the first

responders to increased risks, quickly identifying the severity of injuries especially when the injured are greatly dispersed over large geographical terrains and often out-of-site, and continuously tracking the injured condition until they arrive safely at a medical care facility.

Several technical challenges must be overcome to address the unmet demand for long-term continuous physiological monitoring in the field. In order to design more compact sensors and improved wearable instrumentation, perhaps the most critical challenges are to develop more power efficient and low-weight devices. To become effective, these technologies must also be robust, comfortable to wear, and cost-effective. Additionally, before wearable devices can be used effectively in the field, they must become unobtrusive and should not hinder a person's mobility. Employing commercial off-the-shelf (COTS) solutions, for example finger pulse oximeters to monitor blood oxygenation and heart rate, or standard adhesive-type disposable electrodes for ECG monitoring, is not practical for many field applications because they limit mobility and can interfere with normal tasks.

A potentially attractive approach to aid emergency medical teams in remote triage operations is the use of a wearable pulse oximeter to wirelessly transmit heart rate (HR) and arterial oxygen saturation (SpO$_2$) to a remote location. Pulse oximetry is a widely accepted method that is used for noninvasive monitoring of SpO$_2$ and HR. The method is based on spectrophotometric measurements of changes in the optical absorption of deoxyhemoglobin (Hb) and oxyhemoglobin (HbO$_2$). Noninvasive spectrophotometric measurements of SpO$_2$ are performed in the visible (600-700nm) and near-infrared (700-1000nm) spectral regions. Pulse oximetry also relies on the detection of photoplethysmographic (PPG) signals produced by variations in the quantity of arterial blood that is associated with periodic contractions and relaxations of the heart. Measurements can be performed in either transmission or reflection modes. In transmission pulse oximetry, the sensor can be attached across a fingertip, foot, or earlobe. In this configuration, the light emitting diodes (LEDs) and photodetector (PD) in the sensor are placed on opposite sides of a peripheral pulsating vascular bed. Alternatively, in reflection pulse oximetry, the LEDs and PD are both mounted side-by-side on the same planar substrate to enable readings from multiple body locations where trans-illumination measurements are not feasible. Clinically, forehead reflection pulse oximetry has been used as an alternative approach to conventional transmission-based

Manuscript received April 3, 2006. This work is supported by the U.S. Army Medical Research and Material Command under Contract No. DAMD17-03-2-0006. The views, opinions and/or findings are those of the author and should not be construed as an official Department of the Army position, policy, or decision, unless so designated by other documentation.

*Corresponding author – Y. Mendelson is a Professor in the Department of Biomedical Engineering, Worcester Polytechnic Institute, Worcester, MA 01609 USA (phone: 508-831-5103; fax: 508-831-5541; e-mail: ym@wpi.edu).

R. J. Duckworth is a Professor in the Department of Electrical and Computer Engineering, Worcester Polytechnic Institute, Worcester, MA 01609 USA (rjduck@ece.wpi.edu).

G. Comtois is a M. S. student in the Department of Biomedical Engineering, Worcester Polytechnic Institute, Worcester, MA 01609 USA (comtoisg@wpi.edu).

1-4244-0033-3/06/$20.00 ©2006 IEEE.

APPLE 1010

oximetry when peripheral circulation to the extremities is compromised.

Pulse oximetry was initially intended for in-hospital use on patients undergoing or recovering from surgery. During the past few years, several companies have developed smaller pulse oximeters, some including data transmission via telemetry, to further expand the applications of pulse oximetry. For example, battery-operated pulse oximeters are now attached to patients during emergency transport as they are being moved from a remote location to a hospital, or between hospital wards. Some companies are also offering smaller units with improved electronic filtering of noisy PPG signals.

Several reports described the development of a wireless pulse oximeter that may be suitable for remote physiological monitoring [3]-[4]. Despite the steady progress in miniaturization of pulse oximeters over the years, to date, the most significant limitation is battery longevity and lack of telemetric communication. In this paper, we describe a prototype forehead-based reflectance pulse oximeter suitable for remote triage applications.

## II. SYSTEM ARCHITECTURE

The prototype system, depicted in Fig. 1, consists of a body-worn pulse oximeter that receives and processes the PPG signals measured by a small ($\phi$ = 22mm) and lightweight (4.5g) optical reflectance transducer. The system





Fig. 1. (Top) Attachment of Sensor Module to the skin; (Bottom) photograph of the Receiver Module (left) and Sensor Module (right).

consists of three units: A Sensor Module, consisting of the optical transducer, a stack of round PCBs, and a coin-cell battery. The information acquired by the Sensor Module is transmitted wirelessly via an RF link over a short range to a body-worn Receiver Module. The data processed by the Receiver Module can be transmitted wirelessly to a PDA. The PDA can monitor multiple wearable pulse oximeters simultaneously and allows medics to collect vital physiological information to enhance their ability to extend more effective care to those with the most urgent needs. The

system can be programmed to alert on alarm conditions, such as sudden trauma, or physiological values out of their normal range. It also has the potential for use in combat casualty care, such as for remote triage, and for use by first responders, such as firefighters.

Key features of this system are small-size, robustness, and low-power consumption, which are essential attributes of wearable physiological devices, especially for military applications. The system block diagram (Fig. 2), is described in more detail below.





Fig. 2. System block diagram of the wearable, wireless, pulse oximeter. Sensor Module (top), Receiver Module (bottom).

*Sensor Module*: The Sensor Module contains analog signal processing circuitry, ADC, an embedded microcontroller, and a RF transceiver. The unit is small enough so the entire module can be integrated into a headband or a helmet. The unit is powered by a CR2032 type coin cell battery with 220mAh capacity, providing at least 5 days of operation.

*Receiver Module*: The Receiver Module contains an embedded microcontroller, RF transceiver for communicating with the Sensor Module, and a Universal Asynchronous Receive Transmit (UART) for connection to a PC. Signals acquired by the Sensor Module are received by the embedded microcontroller which synchronously converts the corresponding PD output to R and IR PPG signals. Dedicated software is used to filter the signals and compute $SpO_2$ and HR based on the relative amplitude and frequency content of the reflected PPG signals. A tri-axis MEMS accelerometer detects changes in body activity, and the information obtained through the tilt sensing property of the accelerometer is used to determine the orientation of the person wearing the device.

To facilitate bi-directional wireless communications between the Receiver Module and a PDA, we used the DPAC Airborne™ LAN node module (DPAC Technologies, Garden Grove, CA). The DPAC module operates at a frequency of 2.4GHz, is 802.11b wireless compliant, and has a relatively small (1.6 × 1.17 × 0.46 inches) footprint. The wireless module runs off a 3.7VDC and includes a built-in

TCP/IP stack, a radio, a base-band processor, an application processor, and software for a "drop-in" WiFi application. It has the advantage of being a plug-and-play device that does not require any programming and can connect with other devices through a standard UART.

*PDA*: The PDA was selected based on size, weight, and power consumption. Furthermore, the ability to carry the user interface with the medic also allows for greater flexibility during deployment. We chose the HP iPAQ h4150 PDA because it can support both 802.11b and Bluetooth™ wireless communication. It contains a modest amount of storage and has sufficient computational resources for the intended application. The use of a PDA as a local terminal also provides a low-cost touch screen interface. The user-friendly touch screen of the PDA offers additional flexibility. It enables multiple controls to occupy the same physical space and the controls appear only when needed. Additionally, a touch screen reduces development cost and time, because no external hardware is required. The data from the wireless-enabled PDA can also be downloaded or streamed to a remote base station via Bluetooth or other wireless communication protocols. The PDA can also serve to temporarily store vital medical information received from the wearable unit.

A dedicated National Instruments LabVIEW program was developed to control all interactions between the PDA and the wearable unit via a graphical user interface (GUI). One part of the LabVIEW software is used to control the flow of information through the 802.11b radio system on the PDA. A number of LabVIEW VIs programs are used to establish a connection, exchange data, and close the connection between the wearable pulse oximeter and the PDA. The LabVIEW program interacts with the Windows CE™ drivers of the PDA's wireless system. The PDA has special drivers provided by the manufacturer that are used by Windows CE™ to interface with the 802.11b radio hardware. The LabVIEW program interacts with Windows CE™ on a higher level and allows Windows CE™ to handle the drivers and the direct control of the radio hardware.

The user interacts with the wearable system using a simple GUI, as depicted in Fig. 3.



Fig. 3. Sample PDA Graphical User Interface (GUI).

The GUI was configured to present the input and output information to the user and allows easy activation of various functions. In cases of multiple wearable devices, it also allows the user to select which individual to monitor prior to initiating the wireless connection. Once a specific wearable unit is selected, the user connects to the remote device via the System Control panel that manages the connection and sensor control buttons. The GUI also displays the subject's vital signs, activity level, body orientation, and a scrollable PPG waveform that is transmitted by the wearable device.

The stream of data received from the wearable unit is distributed to various locations on the PDA's graphical display. The most prominent portion of the GUI display is the scrolling PPG waveform, shown in Fig. 3. Numerical $SpO_2$ and HR values are displayed is separate indicator windows. A separate tri-color indicator is used to annotate the subject's activity level measured by the wearable accelerometer. This activity level was color coded using green, yellow, or red to indicate low or no activity, moderate activity, or high activity, respectively. In addition, the subject's orientation is represented by a blue indicator that changes orientation according to body posture. Alarm limits could be set to give off a warning sign if the physiological information exceeds preset safety limits.

One of the unique features of this PDA-based wireless system architecture is the flexibility to operate in a free roaming mode. In this ad-hoc configuration, the system's integrity depends only on the distance between each node. This allows the PDA to communicate with a remote unit that is beyond the PDA's wireless range. The ad-hoc network would therefore allow medical personnel to quickly distribute sensors to multiple causalities and begin immediate triage, thereby substantially simplifying and reducing deployment time.

*Power Management*: Several features were incorporated into the design in order to minimize the power consumption of the wearable system. The most stringent consideration was the total operating power required by the Sensor Module, which has to drive the R and IR LEDs, process the data, and transmit this information wirelessly to the Receive Module. To keep the overall size of the Sensor Module as small as, it was designed to run on a watch style coin-cell battery.

It should be noted that low power management without compromising signal quality is an essential requirement in optimizing the design of wearable pulse oximeter. Commercially available transducers used with transmission and reflection pulse oximeters employ high brightness LEDs and a small PD element, typically with an active area ranging between 12 to 15mm$^2$. One approach to lowering the power consumption of a wireless pulse oximeter, which is dominated by the current required to drive the LEDs, is to reduce the LED duty cycle. Alternatively, minimizing the drive currents supplied to the R and IR LEDs can also achieve a significant reduction in power consumption. However, with reduced current drive, there can be a direct impact on the quality of the detected PPGs. Furthermore, since most of the light emitted from the LEDs is diffused by the skin and subcutaneous tissues, in a predominantly forward-scattering direction, only a small fraction of the incident light is normally backscattered from the skin. In

914

3

addition, the backscattered light intensity is distributed over a region that is concentric with respect to the LEDs. Consequently, the performance of reflectance pulse oximetry using a small PD area is significantly degraded. To overcome this limitation, we showed that a concentric array of either discrete PDs, or an annularly-shaped PD ring, could be used to increase the amount of backscattered light detected by a reflectance type pulse oximeter sensor [5]-[7].

Besides a low-power consuming sensor, afforded by lowering the driving currents of the LEDs, a low duty cycle was employed to achieve a balance between low power consumption and adequate performance. In the event that continuous monitoring is not required, more power can be conserved by placing the device in an ultra low-power standby mode. In this mode, the radio is normally turned off and is only enabled for a periodic beacon to maintain network association. Moreover, a decision to activate the wearable pulse oximeter can be made automatically in the event of a patient alarm, or based on the activity level and posture information derived from the on-board accelerometer. The wireless pulse oximeter can also be activated or deactivated remotely by a medic as needed, thereby further minimizing power consumption.

## III. In Vivo Evaluations

Initial laboratory evaluations of the wearable pulse oximeter included simultaneous HR and $SpO_2$ measurements. The Sensor Module was positioned on the forehead using an elastic headband. Baseline recordings were made while the subject was resting comfortably and breathing at a normal tidal rate. Two intermittent recordings were also acquired while the subject held his breath for about 30 seconds. Fig. 4 displays about 4 minutes of $SpO_2$ and HR recordings acquired simultaneously by the sensor.



Fig. 4. Typical HR (solid line) and $SpO_2$ (dashed line) recording of two voluntary hypoxic episodes.

The pronounced drops in $SpO_2$ and corresponding increases in HR values coincide with the hypoxic events associated with the two breath holding episodes.

## IV. Discussion

The emerging development of compact, low power, small size, light weight, and unobtrusive wearable devices can facilitate remote noninvasive monitoring of vital physiological signs. Wireless physiological information can be useful to monitor soldiers during training exercises and combat missions, and help emergency first-responders operating in harsh and hazardous environments. Similarly, wearable physiological devices could become critical in helping to save lives following a civilian mass casualty. The primary goal of such a wireless mobile platform would be to keep track of an injured person's vital signs via a short-range wirelessly-linked personal area network, thus readily allowing RF telemetry of vital physiological information to command units and remote off-site base stations for continuous real-time monitoring by medical experts.

The preliminary bench testing plotted in Fig. 4 showed that the $SpO_2$ and HR readings are within an acceptable clinical range. Similarly, the transient changes measured during the two breath holding maneuvers confirmed that the response time of the custom pulse oximeter is adequate for detecting hypoxic episodes.

## V. Conclusion

A wireless, wearable, reflectance pulse oximeter has been developed based on a small forehead-mounted sensor. The battery-operated device employs a lightweight optical reflectance sensor and incorporates an annular photodetector to reduce power consumption. The system has short range wireless communication capabilities to transfer $SpO_2$, HR, body acceleration, and posture information to a PDA carried by medics or first responders. The information could enhance the ability of first responders to extend more effective medical care, thereby saving the lives of critically injured persons.

## Acknowledgment

The authors would like to acknowledge the financial support provided by the U.S. Army Medical Research and Material Command referenced.

## References

[1] G. S. F. Ling, B. K. Day, P. Rhee, and J. M. Ecklund, "In search of technological solutions to battlefield management of combat casualties," *SPIE Conference on Battlefield Biomedical Technologies*, SPIE vol. 3712, Apr. 1999.

[2] D. Malan, T. Fulford-Jones, M. Welsh, and S. Moulton, "CodeBlue: An ad-hoc sensor network infrastructure for emergency medical care," *International Workshop on Wearable and Implantable Body Sensor Networks*, 2004.

[3] U. Anliker et al., "AMON: A wearable multiparameter medical monitoring and alert system," *IEEE Trans. on Information Technology in Biomedicine*, 8(4), 2004.

[4] Y. Mendelson and V. Floroff, "A PDA based *ad-hoc* mobile wireless pulse oximeter," *Proc. IASTED International Conference Telehealth 2005*, Banff, Canada, 2005.

[5] Y. Mendelson and C. J. Pujary, "Minimization of LED power consumption in the design of a wearable pulse oximeter," *IASTED International Conference BioMED 2003*, Salzburg, Austria, 2003.

[6] Y. Mendelson and C. J. Pujary, "Measurement site and photodetector size considerations in optimizing power consumption of a wearable reflectance pulse oximeter," *Proc. of the 25th Annual International IEEE/EMBS Conference*, Cancun, Mexico, 2003.

[7] P. Branche and Y. Mendelson, "Signal quality and power consumption of a new prototype reflectance pulse oximeter sensor," *Proc. of the 31th Annual Northeast Bioengineering Conference*, Hoboken, NJ, 2005.

# IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Patent of:      Jeroen Poeze et al.
U.S. Patent No.:      10,588,553          Attorney Docket No.: 50095-0012IP2
Issue Date:           March 17, 2020
Appl. Serial No.:     16/534,949
Filing Date:          August 7, 2019
Title:                MULTI-STREAM DATA COLLECTION SYSTEM FOR
                      NONINVASIVE MEASUREMENT OF BLOOD
                      CONSTITUENTS

## SECOND DECLARATION OF DR. THOMAS W. KENNY

I hereby declare that all statements made of my own knowledge are true and that all statements made on information and belief are believed to be true. I further declare that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of the Title 18 of the United States Code.

Dated: Aug 27, 2021.          By: _____

                                   Thomas W. Kenny, Ph.D.

APPLE 1047
Apple v. Masimo
IPR2020-01537

Kenny: "this figure in [the patent document reference] is not intended as a precision engineering drawing of a[n] optimized system"); APPLE-1041, 79:19-80:2 (Dr. Madisetti: "I believe that to a POSA, these figures are not detailed optical diagrams").

21.     In addition, even if Ohsaki's translucent board 8 were somehow understood to be rectangular, I have been informed that obviousness does not require "bodily incorporation" of features from one reference into another, and that a POSITA is "a person of ordinary creativity, not an automaton." *Facebook, Inc. v. Windy City Innovations, LLC,* 953 F.3d 1313, 1333 (Fed. Cir. 2020); *KSR Intern. Co. v. Teleflex Inc.,* 550 U.S. 398, 418 (2007).  In my opinion, a POSITA would have been fully capable of modifying Aizawa to feature a light permeable protruding convex cover to obtain the benefits attributed to such a cover by Ohsaki.

### B.     A POSITA would have recognized the benefits of Ohsaki's teachings when applied to Aizawa's sensor.

22.     Masimo contends that "Ohsaki indicates that its sensor's convex board ***only*** improves adhesion when used on the ***back*** (i.e., watch) side of the wrist," that "Aizawa ***requires*** its sensor be positioned on the palm side of the wrist," and concludes that "[a] POSITA seeking to improve adhesion of Aizawa's sensor would not incorporate a feature that only improves adhesion at a different and unsuitable measurement location."  POR, 27-28.  But Ohsaki does not describe that its sensor can ***only*** be used at a backside of the wrist.  Instead, at most, Ohsaki

describes such an arrangement with respect to a preferred embodiment.  APPLE-1009, [0019] ("it is desirable that the detecting element 2 is arranged so that its longitudinal direction agrees with the longitudinal direction of the user's arm").

23.    Indeed, Ohsaki's claim language reinforces that Ohsaki's description would not have been understood as so limited.  For example, although Ohsaki's independent claim 1 states that "the detecting element is constructed to be worn on a back side of a user's wrist *or a user's forearm*."  *See also* APPLE-1009, Claim 2.  However, Ohsaki's independent claims 3, 4 and 5 each state that "the detecting element is constructed to be worn on a user's wrist or a user's forearm," *without even mentioning a backside* of the wrist or forearm.  Dependent claims 6, 7 and 8 are also not limited to the backside of the wrist.  *See also* APPLE-1009, Claims 4-8.  A POSITA would have understood this claim language to directly contradict Masimo's assertion that "[t]o achieve any of Ohsaki's benefits, its sensor must be used at a specific measurement location: the backhand side of the wrist." POR, 26.  Indeed, from this and related description, a POSITA would have understood that Ohsaki's benefits are provided when the sensor is placed, for example, on either side of the user's wrist or forearm.  APPLE-1009, ¶[0025], FIGS. 4A, 4B.

24.    Section B.2 of the POR presents several arguments with respect to Ground 1 that are premised on Ohsaki *requiring* the detecting element to be worn on a back

side of a user's wrist or a user's forearm.  *See* POR, 27-39.  Because Ohsaki

requires no such location for the translucent board 8, these arguments fail.

25.    Moreover, even assuming for the sake of argument alone that a POSITA

would have understood Aizawa's sensor as being limited to placement on the palm

side of the wrist, and would have understood Ohsaki's sensor's "tendency to slip"

when arranged on the front side as informing consideration of Ohsaki's teachings

with respect to Aizawa, that ***would have further motivated*** the POSITA to

implement a light permeable convex cover in Aizawa's sensor, to improve

detection efficiency of that sensor when placed on the palm side.  POR, 33-36;

APPLE-1009, ¶¶[0015], [0017], [0023], [0025], FIGS. 1, 2, 3A, 3B, 4A, 4B.

26.    When describing advantages associated with its translucent board, Ohsaki

explains with reference to FIGS. 4A and 4B (reproduced below) that "if the

translucent board 8 has a flat surface, the detected pulse wave is adversely affected

by the movement of the user's wrist," but that if the board "has a convex

surface…variation of the amount of the reflected light…that reaches the light

receiving element 7 is suppressed." APPLE-1003, ¶¶86, 149; APPLE-1009,

¶¶[0015], [0017], [0025].



APPLE-1009, FIGS. 4A, 4B.

27.     In my opinion, contrary to Masimo's contentions, a POSITA would not have understood these benefits of a convex surface over a flat surface to be limited to one side or the other of the user's wrist.[2]  Rather, a POSITA would have understood that, by promoting "intimate contact with the surface of the user's

---

[2] Indeed, from Ohsaki's explanation of FIGS. 3A and 3B, the POSITA would have understood that the problem of the "detected pulse wave [being] adversely affected by the movement of the user's wrist," the very problem that Ohsaki seeks to alleviate through a convex detecting surface, is present with respect to *both* sides of the wrist.  APPLE-1009, [0023]-[0025].

skin," a light permeable convex cover would have increased adhesion and reduced slippage of Aizawa's sensor when placed on the palm side of a user's wrist, with associated improvements in signal quality.  APPLE-1009, ¶¶[0015], [0017], [0025]; FIGS. 1, 2, 4A, 4B, Claims 3-8; *see also* APPLE-1019, 87, 91.  Indeed, a POSITA would have recognized that modifying Aizawa's flat plate to feature a convex protruding surface, as taught by Ohsaki, is not only consistent with Aizawa's stated goal of "improv[ing] adhesion between the sensor and the wrist" to "thereby further improve the detection efficiency," but would have furthered that goal.  APPLE-1006, [0013], [0026], [0030], [0034].

28.    In my opinion, a POSITA would have understood that adding a convex surface to Aizawa's flat plate would provide an additional adhesive effect that would reduce the tendency of that plate to slip.

### C.    Modifying Aizawa's sensor to include a convex cover as taught by Ohsaki enhances the sensor's light-gathering ability.

29.    Masimo argues that the combined sensor "would direct light away from the detectors and thus decrease light collection and optical signal strength—not increase signal strength as Petitioner incorrectly asserts." *See, e.g.,* POR, 39-40. As explained below, a POSITA would have understood the opposite to be true: that a cover featuring a convex protrusion would improve Aizawa's signal-to-noise ratio by causing more light backscattered from tissue to strike Aizawa's

## ii. *Masimo ignores the behavior of scattered light in a reflectance-type pulse sensor*

39.    Because Aizawa-Inokawa is a reflectance-type pulse detector that receives diffuse, backscattered light from the measurement site, its cover/lens cannot focus all incoming light at a single point.  APPLE-1047, ***; Ex. 2006, 163:12-164:2 ("A lens in general…doesn't produce a single focal point.").  Indeed, reflectance-type sensors work in this manner by detecting light that has been "partially reflected, transmitted, absorbed, and scattered by the skin and other tissues and the blood before it reaches the detector."  Ex. 1019, 86.  A POSITA would have understood that light backscatters from the measurement site after diffusing through tissue reaches the active detection area from various random directions and angles.  APPLE-1042, 803 ("The incident light emitted from the LED's diffuses in the skin in all directions.  This is evident from the circular pattern of backscattered light surrounding the LED's"); Ex. 1019, 90 ("In a reflectance oximeter, the incident light emitted from the LEDs diffuses through the skin and the back scattered light forms a circular pattern around the LEDs"), 52 ("Light scattering causes the deviation of a light beam from its initial direction."), 52.

40.    For example, referring to Masimo's annotated version of Inokawa FIG. 2, which I have further modified below to show additional rays of light emitted from LED 21, it is clearly seen how some of the reflected/scattered light from the

measurement site (shown in red) does not reach the centrally located detector 25 of

Inokawa:



POR, 16 (showing APPLE-1008, FIG. 2).

41.    In my opinion, for these and countless other rays that are not shown, there is

simply no way for a cover to focus all light at the center of the sensor device.

42.    Basic laws of refraction, namely Snell's law, dictate the behavior of light

passing from the tissue into the lens.  APPLE-1040, 84 ("This is the very important

law of refraction, the physical consequences of which have been studied…for over

eighteen hundred years."); APPLE-1049, 101; Ex. 1019, 52, 86, 90.  Even Dr.

Madisetti agrees that Snell's law should apply.  *See* APPLE-1043, 80:20-82:20.

43.    Indeed, the type of refraction that would require all scattered light to

somehow bend back toward and focus at the centrally located detector is physically

impossible since all rays must follow Snell's law:



APPLE-1040, 84; APPLE-1049, 101; APPLE-1043, 80:20-82:20.

44.    I have also provided an illustrative example below to clearly show how Snell's law determines the direction of the backscattered ray within the convex cover, thus providing a stark contrast to Masimo's assertions that all such rays must be redirected toward a central detector:



45.    This basic understanding of a convex cover (e.g., lens) stands in stark contrast to the position taken by Dr. Madisetti, who repeatedly and incontrovertibly

stated during deposition that Inokawa's lens redirects, condenses, and focus all light from the measurement site at the center. *See* APPLE-1042, 166:12-182:3 ("My testimony...to avoid any doubt, is that a POSA viewing the teachings of Inokawa Figure 2 would understand that the convex lens 27 of Figure 2 would redirect, condense, and focus light toward the center from the measurement site."). Snell's law handily debunks this theory.

46.    Far from *focusing* light to the center as Masimo contends, Ohsaki's convex cover provides at best a slight refracting effect, such that some light rays that otherwise would have missed the detection area are instead directed toward that area as they pass through the interface provided by the cover. This is especially the case in configurations like Aizawa's where light detectors are arranged symmetrically about a central light source, so as to enable backscattered light to be detected within a circular active detection area surrounding that source. Ex. 1019, 86, 90. The slight refracting effect is further confirmed by the similar indices of refraction between human tissue and a typical cover material (e.g., acrylic). APPLE-1044, 1486; APPLE-1045, 1484.

47.    As I clarified during my deposition, "given the arrangement of the corpuscles as the reflecting objects in the space all around underneath [a convex lens]...there would be some improvement in the light concentration at pretty much all of the locations under the curvature of the lens." Ex. 2006, 164:8-16.

Moreover, due to its protruded shape, as convex cover "provides an opportunity to capture some light that would otherwise not be captured." *Id.*, 204:21-205:12. In short, a convex cover improves the light-gathering ability of Aizawa's sensor by allowing a larger fraction of the backscattered light to reach the areas covered by the lens. Ex. 2012, 86, 90; APPLE-1046, 803.

48.     In the annotated illustration below, I have added dotted lines to indicate the approximate orientation of a line orthogonal to the surface at various locations from the center to the edge. A POSITA would have understood that the incoming light rays are refracted in a way that refracts incoming rays toward these orthogonal lines:



That is, due to the curvature of the convex lens, more light is directed toward the detectors compared to a flat plate with no curvature. *Id.*

49.     To support the misguided notion that a convex cover focuses all incoming light at the center, Masimo relies heavily on FIG. 14B from the '553 patent

(reproduced below) to support its contention that a convex cover would direct light to a point in the center of the combined sensor:



APPLE-1001, FIG. 14B (as annotated at POR, 41)

50.     Masimo and Dr. Madisetti treat this figure as an illustration of the behavior of all convex surfaces with respect to all types of light, and conclude that "a convex surface condenses light away from the periphery and towards the sensor's center" as shown in FIG. 14B.  POR, 41.

51.     But, in my opinion, FIG. 14B is not an accurate representation of light that has been reflected from a tissue measurement site.  For example, the light rays

(1420) shown in FIG. 14B are collimated (i.e., travelling paths parallel to one another), and each light ray's path is perpendicular to the detecting surface. By contrast, the detector(s) of reflectance type pulse detectors (like the devices disclosed by Aizawa, Inokawa, and Ohsaki) detect light that has been "partially reflected, transmitted, absorbed, and scattered by the skin and other tissues and the blood before it reaches the detector." APPLE-1019, 86. A POSITA would have understood from Aizawa's FIG. 1(a), the light that backscatters from the measurement site after diffusing through tissue reaches the circular active detection area provided by Aizawa's detectors from various random directions and angles, as opposed to all light entering from the same direction and at the same angle as shown in FIG. 14B. APPLE-1019, 52, 86, 90.

52.    A better representation of the light scattered from the measurement site is shown below, in which light rays scattered from many locations throughout the measurement site are directed towards the sensor with a range of initial locations and directions. The wide range of positions and angles represented by this scattered light from the measurement site is obviously far from collimated, and cannot be focused by any lens. A POSITA would understand that the general effect of a lens on this kind of diffuse light pattern cannot be simply described as condensing, converging or focusing, as asserted by POR through their expert. This

representation is more consistent with the light from a reflective pulse oximeter, and is plainly distinct from the collimated light illustrated in figure 14b:



53.     Indeed, the POSITA would have understood that Aizawa's sensor, which includes multiple photodiodes placed symmetrically with respect to a central light source, offers the advantage of enabling a large fraction of light randomly backscattered from tissue to be detected within the circular active detection area surrounding that source.  APPLE-1019, 86, 90; APPLE-1046, 803-805; *see also* APPLE-1012, FIG. 7.

### 2. A POSITA would have been motivated by a convex cover's ability to direct light "towards the center."

54.    A convex cover's *general* ability to direct light "toward" a "general area" is a concept that supports position that the addition of a convex cover allows more light to be gathered generally, including at the non-centrally located detectors as found in Aizawa.  APPLE-1008, [0015].  Indeed, even Dr. Madisetti appeared to back away from Masimo's illogical suggestion that a convex cover somehow focuses all light at a central point, POR, 13, clarifying that Inokawa focuses light "towards" a "general area," rather than a specific point.  APPLE-1041, 133:19-135:3-11.

55.    Referring to my illustration below providing a version of the modified Aizawa device further annotated with the backscattered rays from the measurement site as discussed above, it can be seen that a convex covers's ability to direct light "toward the center" would allow the detector to capture light that otherwise would have been missed by the detectors, regardless of their location within the sensor device:



56.        The condensing function performed by the cover will allow a larger fraction of light randomly backscattered from tissue to be detected within the active detection area surrounding that source.  APPLE-1019, 86, 90.

57.    As I previously stated, "the convex shape [of a cover/lens] allows light that might have been just specularly reflected off of the flat plate to be captured and refracted inwards.  And in the region where there's curvature, it allows the light to be concentrated, and in this case...in the neighborhood of the detectors and inwards."  Ex. 2006, 191:4-14.  That is, the addition of a convex cover allows the detectors to capture some of the reflected light that otherwise would have missed them completely.

### D.    A POSITA would have been motivated to select a convex cover to protect the optical elements.

58.    Masimo contends that "a POSITA would have understood that Aizawa's flat plate would provide better protection than a convex surface" and be "less prone to scratches."  POR, 47-48.  Even assuming this to be true, it is my understanding that one possible disadvantage that competes with the known advantages of applying Ohsaki's teachings to Aizawa's sensor would not have negated a POSITA's motivation to combine.  *In re Fulton,* 391 F.3d 1195, 73 USPQ2d 1141 (Fed. Cir. 2004).  Moreover, in my opinion, a POSITA would have understood the ***multiple*** advantages of a convex cover described in the Petition to outweigh any possibility of scratching.

### E.    A POSITA would have been motivated to add a second emitter to Aizawa.

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Patent of:       Jeroen Poeze et al.
U.S. Patent No.:       10,588,554       Attorney Docket No.: 50095-00013IP2
Issue Date:            March 17, 2020
Appl. Serial No.:      16,544,713
Filing Date:           August 19, 2019
Title:                 MULTI-STREAM DATA COLLECTION SYSTEM FOR
                       NONINVASIVE MEASUREMENT OF BLOOD
                       CONSTITUENTS

## DECLARATION OF DR. THOMAS W. KENNY

**Declaration**

I declare that all statements made herein on my own knowledge are true and

that all statements made on information and belief are believed to be true, and

further, that these statements were made with the knowledge that willful false

statements and the like so made are punishable under Section 1001 of Title 18 of

the United States Code.

By: _____

Thomas W. Kenny, Ph.D.

APPLE 1003

77.     Aizawa-Inokawa would utilize two LEDs that emit two different wavelengths.  Aizawa's LED 21 would simply be replaced with two LEDs.  In this manner, Aizawa's sensor is improved through the implementation of a separate LED to account for motion load which the system already records and accounts for.  APPLE-1006, ¶¶[0006], [0028], [0035].

78.     One of ordinary skill would have combined the teachings of Aizawa and Inokawa as doing so would have amounted to nothing more than the use of a known technique to improve similar devices in the same way and combining prior art elements according to known methods to yield predictable results.  *KSR v. Teleflex*, 550 U.S. 398, 417 (2007).  Here, the combination is nothing more than improving Aizawa's pulse wave sensor that uses a single LED with the use of a known technique disclosed by Inokawa to detect and record body motion in addition to blood flow.  Furthermore, the elements of the combined system would each perform similar functions they had been known to perform prior to the combination.  *Id*.  For instance, in Aizawa-Inokawa, Aizawa's photodetectors would still detect light emitted by the LEDs and reflected by the subject's wrist, and Inokawa's two LEDs would still be used to emit light at different wavelengths.  *Id*.  Furthermore, one of ordinary skill would have readily understood how to select different photodiodes with different sensitivities to detect the different wavelengths of light emitted by the two LEDs.  *Id*.

41

**Appx37008**

159.   As shown below, it would have been obvious to one of ordinary skill to modify Aizawa's wrist-worn sensor to incorporate the shape of Ohsaki's translucent board 8.



APPLE-1006, FIG. 2 (annotated)

160.   Such a modification would have amounted to nothing more than the use of a known technique to improve similar devices in the same way, and combining prior art elements according to known methods to yield predictable results.  Indeed, the modification involves nothing more than adjusting transparent plate 6's shape to include a convex protrusion/lens surface similar to that disclosed by Ohsaki, and one of ordinary skill would have understood that this adjustment would improve adhesion to the user's skin and reduce variation in the signals detected by the sensor.  *Id*.  Furthermore, the elements of the combined system would each

94

95

**Appx37061**

perform similar functions they had been known to perform prior to the combination—Aizawa's transparent plate 6 would remain in the same position, performing the same function, but with a convex/lens protrusion as taught by Ohsaki. *Id*.

161.   Accordingly, [1f] would have been obvious over Aizawa in view of Inokawa, Ohsaki, and Mendelson 2006.  APPLE-1006, Abstract, ¶¶[0002], [0005], [0008]-[0016], [0023]-[0024], [0027]-[0030], [0032]-[0033], FIGS. 1, 2, 3, 4(a); APPLE-1009, ¶¶[0015], [0017], [0025], FIGS. 1, 2, 4A, 4B.

**[1g] at least a portion of the cover is sufficiently rigid to cause tissue of the user to conform to at least a portion of a shape of the single protruding convex surface when the physiological sensor device is worn by the user; and**

162.   As explained above with respect to [1pre]-[1f] the sensor resulting from the combination of the teachings of Aizawa, Inokawa, Ohsaki, and Mendelson 2006 would have included a transparent protruding convex cover operable to conform tissue of the user to at least a portion of the cover's single protruding convex surface when worn by the user.  APPLE-1006, Abstract, ¶¶[0002], [0005], [0008]-[0016], [0023]-[0024], [0027]-[0030], [0032]-[0033], FIGS. 1, 2, 3, 4(a); APPLE-1009, Abstract, ¶¶[0015], [0017], [0025], FIGS. 1, 2, 4A, 4B.

163.   In more detail, as shown in Aizawa's FIG. 2 (reproduced below), and as described by Ohsaki, the convex surface of the modified cover would have been in **intimate contact** with the surface of the user's skin when worn, such that slippage

177.   One of ordinary skill would, for example, have found it obvious to wirelessly transmit information or data acquired or processed by the physiological sensor device's base station to a PDA such as the HP iPAQ h4150, using either or both of 802.11b and Bluetooth™.  APPLE-1006, ¶¶[0002], [0003], [0067], [0074]-[0077]; APPLE-1010, 1-4, FIGS. 1-3; APPLE-1020, 1-4.

178.   One of ordinary skill would have recognized that applying Mendelson 2006's teachings in this manner would have led to predictable results without altering or hindering the functions performed by the physiological sensor device. In fact, one of ordinary skill would have been motivated to implement the well-known technique of wirelessly transmitting data from Aizawa-Inokawa-Ohsaki's physiological sensor device to a handheld computing device such as the HP iPAQ h4150 to achieve the predictable benefits described by Mendelson 2006.  *Id*.

179.   One of ordinary skill would, for example, have been motivated by Mendelson 2006's disclosure of a wireless transmission method and PDA with a touch-screen display that provides a "simple GUI" to present "information to the user" and provide "easy activation of various functions." *Id*., 4.  Indeed, one of ordinary skill would have had a reasonable expectation of success in making this modification, and would have reasonably expected to reap benefits of displaying a measured waveform representative of a patient's arterial pulse. *Id*.

275.   In incorporating Ohsaki's teachings, one of ordinary skill would have found it obvious that a device designed to fit on a user's wrist would be on the order of millimeters.  Additionally, one of ordinary skill would have taken the user's comfort into consideration—Ohsaki's convex cover, for example, is said to solve the problem of "the user feel[ing] uncomfortable" due to pressure from the device and belt on the user's limbs.  APPLE-1009, ¶[0006]; *see also* APPLE-1010, 2 (describing its "optical reflectance transducer" as "small ($\varnothing$ = 22mm)"); *see also* APPLE-1017, 2 (describing a "standard 24-pin (dimensions: 19 x 19 mm) microeletronic package" for its sensor).

276.   One of ordinary skill would have found it obvious that in order to provide a comfortable cover featuring a protruding convex surface that prevents slippage, the surface should protrude a height greater than 2 millimeters and less than 3 millimeters.  Indeed, there would have been a finite range of possible protruding heights, and it would have been obvious to select a protruding height that would have been comfortable to the user.

277.   Accordingly, [28] would have been obvious over Aizawa in view of Inokawa, Ohsaki, and Mendelson 2006.

## VIII.  GROUND 2 – Claims 8-19 are Rendered Obvious by Aizawa, Inokawa, Ohsaki, Mendelson 2006, and Bergey

### A.    Combination of Aizawa, Inokawa, Ohsaki, Mendelson 2006, and Bergey

**Appx37119**



US 20010056243A1

(19) **United States**

(12) **Patent Application Publication**    (10) Pub. No.: **US 2001/0056243 A1**

Ohsaki et al.    (43) **Pub. Date:    Dec. 27, 2001**

(54) **WRISTWATCH-TYPE HUMAN PULSE WAVE SENSOR ATTACHED ON BACK SIDE OF USER'S WRIST**

(76) Inventors: **Rie Ohsaki**, Anjo-city (JP); **Teiyuu Kimura**, Nagoya-city (JP); **Naoki Fukaya**, Obu-city (JP)

Correspondence Address:
**LAW OFFICE OF DAVID G POSZ
2000 L STREET, N.W.
SUITE 200
WASHINGTON, DC 20036 (US)**

(21) Appl. No.:    **09/852,698**

(22) Filed:    **May 11, 2001**

(30)    **Foreign Application Priority Data**

Jun. 14, 2000    (JP) ...................................... 2000-177999

**Publication Classification**

(51) Int. Cl.$^7$ ....................................................... A61B 5/02
(52) U.S. Cl. ............................................. **600/503**; 600/500

(57)    **ABSTRACT**

A pulse wave sensor includes a detecting element and a sensor body. The pulse wave sensor is worn on the back side of a user's wrist corresponding to the back of the user's hand. The detecting element includes a translucent member on its top, and the translucent member has a convex surface. The detecting element is attached on the back side of the user's wrist by a dedicated belt so that the convex surface of the translucent member is in intimate contact with the surface of the user's skin. The sensor body is attached on the back side of the user's wrist by another dedicated belt so that it is arranged on the detecting element. A cushion is arranged between the sensor body and the detecting element. The pulse wave sensor can stably detect the pulse wave without being affected by the movement of the user's wrist.



APPLE 1009

US 2001/0056243 A1

1

Dec. 27, 2001

# WRISTWATCH-TYPE HUMAN PULSE WAVE SENSOR ATTACHED ON BACK SIDE OF USER'S WRIST

## CROSS REFERENCE TO RELATED APPLICATION

[0001]  This application is based on and incorporates herein by reference Japanese Patent Application No.2000-177999 filed on Jun. 14, 2000.

## BACKGROUND OF THE INVENTION

[0002]  1. Field of the Invention

[0003]  The present invention relates to an optical sensor for detecting the pulse wave of a human body.

[0004]  2. Related Art

[0005]  JP-A-11-70087 proposes a wristwatch-type device for detecting the pulse wave of a human body. This detecting device is worn on the user's wrist. The device includes a detecting element for detecting a pulse wave and a sensor body including a display. The detecting element is fixed on the front side of the user's wrist corresponding to the palm of the user's hand by a band attached to the sensor body. The information of pulse wave detected by the detecting element is displayed on the display of the sensor body fixed on the back side of the user's wrist.

[0006]  The two bones (the radius and the ulna) pass through the front side of the user's wrist. Therefore the detecting element has a tendency to slip off the detection position of the user's wrist, since the skin surface of the front side of the user's wrist greatly moves as the user's wrist moves. Furthermore, the user feels uncomfortable since the radius and the ulna are pressed. As a result, the user further moves his/her wrist unconsciously and it becomes further difficult to detect the pulse wave stably.

## SUMMARY OF THE INVENTION

[0007]  The present invention overcomes the above drawbacks, and has an object to provide a human pulse wave sensor which is capable of detecting the pulse wave of a human body stably and has high detection probability.

[0008]  The pulse wave sensor according to the present invention includes a detecting element and a sensor body. The pulse wave sensor is worn on the back side of the user's wrist corresponding to the back of the user's hand for detecting the pulse wave of the user. The detecting element includes a light emitting element and a light receiving element. The sensor body is connected to the detecting element by a signal line.

[0009]  Preferably, a translucent member is arranged on the light emitting element and the light receiving element. The translucent member has a convex surface. The detecting element is attached on the back side of the user's wrist by a dedicated belt so that the convex surface of the translucent member is in intimate contact with the surface of the user's skin. The light emitting element and the light receiving element are arranged in the longitudinal direction of the user's arm. The sensor body is attached on the back side of the user's wrist by a dedicated belt other than the belt of the

detecting element so that it is arranged on the detecting element. A cushion is arranged between the sensor body and the detecting element.

[0010]  According to this construction, the user does not feel uncomfortable when the pulse wave sensor is worn on the user's wrist. Furthermore the detecting element is fixed on the user's wrist without slipping off the detection position of the user's wrist, even if the user is in motion. Accordingly the pulse wave sensor can stably detect the pulse wave of the user.

## BRIEF DESCRIPTION OF THE DRAWINGS

[0011]  The above and other objects, features and advantages of the present invention will become more apparent from the following detailed description made with reference to the accompanying drawings. In the drawings:

[0012]  FIG. 1 is a cross-sectional view of a pulse wave sensor attached on the user's wrist;

[0013]  FIG. 2 is a schematic diagram of a mechanism for detecting a pulse wave;

[0014]  FIGS. 3A and 3B are graphs of the pulse wave detected by a pulse wave sensor attached on the back side of the user's wrist and the pulse wave detected by a pulse wave sensor attached on the front side of the user's wrist, respectively; and

[0015]  FIGS. 4A and 4B are graphs of the pulse wave detected by a pulse wave sensor including a convex detecting surface and the pulse wave detected by a pulse wave sensor including a flat detecting surface, respectively.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

[0016]  Referring to FIG. 1, a pulse wave sensor 1 includes a detecting element 2 and a sensor body 3. The pulse wave sensor 1 is worn on the back side of the user's wrist 4 corresponding to the back of the user's hand in the similar manner as a wristwatch is normally worn. This sensor 1 is used for detecting the pulse wave of the user's body for a medical diagnosis, a physical check up, and the like.

[0017]  Referring to FIG. 2, the detecting element 2 comprises a package 5, a light emitting element 6 (e.g., LED), a light receiving element 7 (e.g., PD), and a translucent board 8. The package 5 has an opening and includes a circuit board 9 therein. The light emitting element 6 and light receiving element 7 are included in the package 5 and arranged on the circuit board 9. The translucent board 8 is a glass board which is transparent to light, and attached to the opening of the package 5. A convex surface is formed on the top of the translucent board 8 as shown in FIG. 2.

[0018]  The detecting element 2 is fixed on the user's wrist 4 by a dedicated belt 10 attached to the detecting element 2 as shown in FIG. 1. The belt 10 may be made from elastic material so that regular pressure is applied to the user's wrist 4. In this case, it is prevented that light reflected by the surface of the skin or disturbance light from the outside penetrates the translucent board 8, since the surface of the translucent board 8 is in intimate contact with the surface of the user's skin. However the user feels uncomfortable if the pressure applied to the user's wrist 4 is too high. Therefore it is desirable that the pressure applied to the user's wrist 4 is limited to 5-15 mmHg.

4

Appx37298

US 2001/0056243 A1

Dec. 27, 2001

2

[0019] The light emitting element **6** and the light receiving element **7** are arranged side by side as shown in **FIG. 2**. Accordingly the length of the detecting element **2** from the right side to the left side in **FIG. 2** is longer than the length from the upper side to the lower side. If the detecting element **2** is arranged so that its longitudinal direction (from the right side to the left side in **FIG. 2**) agrees with the circumferential direction of the user's wrist **4**, it has a tendency to slip off. Therefore it is desirable that the detecting element **2** is arranged so that its longitudinal direction agrees with the longitudinal direction of the user's arm. The dedicated belt **10** is attached to the detecting element **2** so that it can fix the detecting element **2** on the user's wrist **4** in this way.

[0020] The sensor body **3** is connected to the detecting element **2** by a signal line **13**, and includes, as shown in **FIG. 2**, a drive circuit **11**, a microcomputer **12**, and a monitor display (not shown). The drive circuit **11** drives the light emitting element **6** to emit light toward the wrist **4**. The microcomputer **12** calculates the pulse rate from the reflected light received by the detecting element **2**. This reflected light varies with the user's pulsation. The monitor display shows the calculated pulse rate and the like.

[0021] The sensor body **3** is arranged on the top of the detecting element **2**, and fixed on the user's wrist **4** by a dedicated belt **14** attached to the sensor body **3**. A cushion **15** such as a sponge or a gel is inserted between the detecting element **2** and the sensor body **3** so that the detecting element **2** does not directly contact the sensor body **3**.

[0022] The pulse wave sensor **1** detects the pulse wave of the user's body as follows. The light emitting element **6** emits light toward the user's wrist **4**, a portion of the emitted light penetrates the capillary arteriole **16** in the inside of the user's wrist **4** and is absorbed by the haemoglobin in the blood. The rest of the emitted light is reflected and scattered by the capillary arteriole **16**, and partly reaches the light emitting element **7**. As the amount of the haemoglobin in the blood varies in waves due to the pulsation of the user's blood, the amount of the light absorbed by the haemoglobin also varies in waves. As a result, the amount of the light which is reflected by the capillary arteriole **16** and reaches the light receiving element **7** varies in waves. This variation in the amount of the light received by the light receiving element **7** is detected as the pulse wave information.

[0023] If the detecting element **2** is arranged on the front side of the user's wrist **4**, the amount of the light received the light receiving element **7** is larger. That is, the intensity of the signal received by the light receiving element **7** is higher. However, the detecting element **2** has a tendency to slip off the detecting position of the user's wrist **4** as the user moves his/her wrist, and therefore the intensity of the light received by the light receiving element **7** largely varies depending on the shift amount of the detecting element **2**. As shown in **FIG. 3B**, in the case that the detecting element **2** is arranged on the front side of the user's wrist **4**, the pulse wave can be detected well if the user is at rest. However, when the user is in motion, the detected pulse wave is adversely affected by the movement of the user's wrist **4**.

[0024] In contrast to this, if the detecting element **2** is arranged on the back side of the user's wrist **4**, the user will not move his/her wrist unconsciously since the radius and the ulna inside the user's wrist **4** are not pressed and consequently the user does not feel so uncomfortable. Further, the detecting element **2** will not shift so widely even if the user's wrist moves. Therefore the detecting element **2** is stably fixed to the detecting position of the user's wrist **4**. As a result, the pulse wave is detected stably without being affected by the movement of the user's wrist **4** as shown in **FIG. 3A**.

[0025] The detecting element **2** is arranged on the user's wrist **4** so that the convex surface of the translucent board **8** is in intimate contact with the surface of the user's skin. Thereby it is prevented that the detecting element **2** slips off the detecting position of the user's wrist **4**. If the translucent board **8** has a flat surface, the detected pulse wave is adversely affected by the movement of the user's wrist **4** as shown in **FIG. 4B**. However, in the case that the translucent board **8** has a convex surface like the present embodiment, the variation of the amount of the reflected light which is emitted from the light emitting element **6** and reaches the light receiving element **7** by being reflected by the surface of the user's skin is suppressed. It is also prevented that noise such as disturbance light from the outside penetrates the translucent board **8**. Therefore the pulse wave can be detected without being affected by the movement of the user's wrist **4** as shown in **FIG. 4A**.

[0026] The detecting element **2** and the sensor body **3** is attached to theuser's wrist **4** by the dedicated belts**10** and **14**, respectively. That is, the detecting element **2** and the sensor body **3** are allowed to move relatively. Further the cushion **15** is arranged between the detecting element **2** and the sensor body **3**. Therefore, if force is applied to the sensor body **3** or the sensor body **3** moves, the force applied to the sensor body **3** or the movement of the sensor body **3** cannot be transmitted to the detecting element **2** easily.

[0027] Accordingly the detecting element **2** is stably fixed to the user's wrist **4**. As a result, the pulse wave sensor can detect the pulse wave at a high S/N ratio, that is, it can provide high detection probability, not only when the user is at rest but also when the user is taking light exercise.

[0028] Modifications

[0029] In the above embodiment, the sensor body **3** need not include the microcomputer **12** if it includes a transmitter instead. In this case, the pulse wave information detected by the detecting element **2** is transmitted to a receiver by the transmitter. The sensor body **3** can be downsized and light in weight in this case and consequently the force applied to the sensor body **3** or the movement of the sensor body **3** cannot be transmitted to the detecting element **2** easily.

[0030] In the above embodiment, the detecting element **2** and the sensor body **3** may be worn on the back side of the user's forearm.

What is claimed is:

1. A pulse wave sensor for detecting a pulse wave of a human body comprising:

a detecting element including a light emitting element and a light receiving element; and

a sensor body including a circuit connected to the detecting element via a signal line,

wherein the detecting element is constructed to be worn on a back side of a user's wrist or a user's forearm.

5

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

APPLE INC.

Petitioner,

v.

MASIMO CORPORATION,

Patent Owner.

———————

Case IPR2020-01539
U.S. Patent 10,588,554

———————

**DECLARATION OF VIJAY K. MADISETTI, PH.D.**

**MASIMO 2004
Masimo v. Apple
IPR2020-01539**

The possibility that the proposed modification could be manufactured (Ex. 1003 ¶¶92, 179) does not demonstrate that the resulting device would successfully function.

**F.    The Challenged Dependent Claims Are Nonobvious Over Ground 1**

**1.    The Challenged Dependent Claims Are Nonobvious For The Same Reason As The Independent Claims**

120.    As discussed above, in my opinion claims 1 and 20 would not have been obvious over the cited references of Ground 1.  In addition, in my opinion, the dependent claims would be nonobvious for at least the same reasons.  *See* Sections VII.A-C, above.

**2.    Claim 28**

121.    Claim 28 ultimately depends from claim 20 and includes the additional limitation:  "wherein the single protruding convex surface protrudes a height greater than 2 millimeters and less than 3 millimeters."  The '554 Patent discloses, among other things, particular example convex shapes that improve signal strength.  Ex. 1001 20:14-30.  The '554 Patent explains:  "For example, in one embodiment, a convex bump of about 1 mm to about 3 mm in height and about 10 mm$^2$ to about 60 mm$^2$ was found to help signal strength by about an order of magnitude versus other shapes."  Ex. 1001 20:18-22.  Thus, as explained in the '554 Patent, an appropriately sized protrusion can dramatically increase the accuracy of the measurements.  Ex. 1001 20:14-30.

-79-

122.    Dr. Kenny does not point to any corresponding teaching in Aizawa, Ohsaki, Inokawa, or Mendelson 2006 for a specific protrusion height of greater than 2 millimeters and less than 3 millimeters. Ex. 1003 ¶¶273-277. Instead, Dr. Kenny asserts that when "incorporating Ohsaki's teachings, one of ordinary skill would have found it obvious that a device designed to fit on a user's wrist would be on the order of millimeters," and "there would been a finite range of possible protruding heights, and it would have been obvious to select a protruding height that would have been comfortable to the user." Ex. 1003 ¶¶275-276. But Dr. Kenny's cited references in Ground 1 do not teach or suggest a protrusion with a height greater than 2 millimeters and less than 3 millimeters would have been beneficial in terms of enhancing signal strength or user comfort.

123.    Dr. Kenny cites alleged disclosures of sensor sizes in two references, Mendelson 2006 (Ex. 1010) and Mendelson-1988 (Ex. 1017). Ex. 1003 ¶275. But neither Mendelson 2006 nor Mendelson-1988 disclose a cover, and therefore do not disclose a cover with a protrusion. Ex. 1010 Fig. 1 (no view of cover); Ex. 1017 Fig. 2 (showing flat layer of epoxy encapsulating optical components). The flat surface of encapsulating epoxy used with Mendelson-1988's sensor would not have informed or motivated a POSITA to include a cover, and likewise would not have motivated a POSITA to include a cover with a convex protrusion of a particular height.

-80-

124.    Dr. Kenny appears to have selected Mendelson 2006 and Mendelson-1988 because the references discuss a similar size (22 mm diameter and 19x19 mm square), which Dr. Kenny argues would also be used with a wrist-worn device.  Ex. 1003 ¶275.  Both Mendelson 2006 and Mendelson-1988, however, are forehead sensors, not wrist sensors.  Ex. 1010 Abstract ("wireless wearable pulse oximeter developed based on a small forehead mounted sensor"); Ex. 1017 at 1 ("SpO$_2$ obtained from the forehead….").  I further note that other references use different sized sensors.  For example, Mendelson-1991 uses an assembled sensor that "measures approximately 38 mm in diameter and is 15 mm thick."  Ex. 2022 at 3.  Dr. Kenny does not explain why a POSITA would have been motivated to select one sensor size over another, or to select one protrusion height as opposed to any other.  Dr. Kenny suggests that "a height greater than 2 millimeters and less than 3 millimeters" would "prevent[] slippage" and "provide a comfortable cover…."  Ex. 1003 ¶276.  But that disclosure is not in any of the references which are part of Ground 1.  In fact, as discussed above (Sections VII.A.1, VII.A.2, VII.B), Ohsaki explains that its sensor's width and length (including the board) are important, but does not say anything about the height of the convex surface of the board.  *See* Ex. 1009 ¶[0019] ("the length of the detecting element 2 from the right side to the left side in FIG. 2 is longer than the length from the upper side to the lower side").  In my opinion, a POSITA would not have found it obvious to include a cover with a

single protruding convex surface "wherein the single protruding convex surface protrudes a height greater than 2 millimeters and less than 3 millimeters" based on the cited references of Ground 1.

## VIII.  GROUND 2 FAILS FOR AT LEAST THE SAME REASONS AS GROUND 1

125.    Ground 2 is a five-reference combination that adds Bergey (Ex. 1016) to the combination of Ohsaki, Aizawa, Inokawa, and Mendelson 2006.  Ex. 1003 ¶¶278-320.  Ground 2 only challenges dependent claims 8-19. Pet. 11-12; Ex. 1003 ¶¶278-320.  Dr. Kenny adds Bergy to Ohsaki, Aizawa, Inokawa, and Mendelson 2006 because those references do not disclose that the substrate, wall, and cover hermetically seal the at least four detectors.  Ex. 1003 ¶278.  Bergey's disclosure, which is related to a wristwatch, does not fix the deficiencies identified for Ground 1.  As a result, in my opinion, the challenged claims of Ground 2 are nonobvious for the same reasons discussed above for Ground 1.   In addition, certain dependent claims discussed below are nonobvious for additional reasons.

### A.    Claim 11

126.    Claim 11 adds the limitation that "the single protruding convex surface protrudes a height between 2 millimeter and 3 millimeters."  Ex. 1001 Claim 11.  Dr. Kenny provides no independent analysis for this claim and instead refers back to his prior arguments for claim 28.  Ex. 1003 ¶¶292-293.  In my

# IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Patent of:      Jeroen Poeze, et al.
U.S. Patent No.:      10,631,765        Attorney Docket No.: 50095-0024IP2
Issue Date:           April 28, 2020
Appl. Serial No.:     16/725,478
Filing Date:          December 23, 2019
Title:                MULTI-STREAM DATA COLLECTION SYSTEM FOR
                      NONINVASIVE MEASUREMENT OF BLOOD
                      CONSTITUENTS

## <u>DECLARATION OF DR. THOMAS W. KENNY</u>

**Declaration**

I declare that all statements made herein on my own knowledge are true and

that all statements made on information and belief are believed to be true, and

further, that these statements were made with the knowledge that willful false

statements and the like so made are punishable under Section 1001 of Title 18 of

the United States Code.

By: _____

Thomas W. Kenny, Ph.D.

APPLE 1003

protruding convex surface. APPLE-1006, Abstract, ¶¶[0002], [0005], [0008]-[0016], [0023], [0027]-[0028], [0033]; APPLE-1009, Abstract, ¶¶[0015], [0017], [0025], FIGS. 1, 2, 4A, 4B.

159.   The convex cover taught by Ohsaki is designed to be "in intimate contact with the surface of the user's skin," so as to prevent slippage of the detecting element from its position on the user's wrist. APPLE-1009, ¶¶[0009]-[0010], FIG. 2.



APPLE-1009, FIG. 2 (annotated).

160.   In incorporating Ohsaki's teachings, a POSITA would have found it obvious that a device designed to fit on a user's wrist would be on the order of millimeters. *See also* APPLE-1010, 2 (describing its "optical reflectance transducer" as "small

Appx50680

(⌀ = 22mm)"); *see also* APPLE-1017, 2 (describing a "standard 24-pin

(dimensions: 19 x 19 mm) microeletronic package" for its sensor); APPLE-1041,

9:40-65 (describing a protrusion on a biological measurement device that causes a

subject's tissue to deform by a depth of about 2 to 20 mm).  Additionally, the

POSITA would have taken the user's comfort into consideration—Ohsaki's

convex cover, for example, is said to solve the problem of "the user feel[ing]

uncomfortable" due to pressure from the device and belt on the user's limbs.

APPLE-1009, ¶[0006].

161.   It is my conclusion that a POSITA would have found it obvious that in order

to provide a comfortable cover featuring a protruding convex surface that prevents

slippage, the surface should protrude a height between 1 millimeter and 3

millimeters.  Indeed, there would have been a finite range of possible protruding

heights, and it would have been obvious to select a protruding height that would

have been comfortable to the user.

**xii.   Claim 13**

*[13] The physiological measurement system of claim 11, wherein at least one of the detectors is configured to detect light that has been attenuated by tissue of the user.*

162.   Aizawa-Inokawa-Ohsaki renders obvious [13].  As discussed in Sections

VI.A-D, VII.A, i.-xi., and [1pre]-[1j], *supra*, the Aizawa-Inokawa-Ohsaki-

Mendelson-2006 sensor would have included a plurality of light emitting diodes,

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

APPLE INC.

Petitioner,

v.

MASIMO CORPORATION,

Patent Owner.

Case IPR2020-01715
U.S. Patent 10,631,765

**DECLARATION OF VIJAY K. MADISETTI, PH.D.**

Masimo Ex. 2004
Apple v. Masimo
IPR2020-01715

motivated a POSITA to include a cover with a convex protrusion of a particular height.

124.    Dr. Kenny appears to have selected Mendelson 2006 and Mendelson-1988 because the references discuss a similar size (22 mm diameter and 19x19 mm square), which Dr. Kenny argues would also be used with a wrist-worn device.  Ex. 1003 ¶160.  Both Mendelson 2006 and Mendelson-1988, however, are forehead sensors, not wrist sensors.  Ex. 1010 Abstract ("wireless wearable pulse oximeter developed based on a small forehead mounted sensor"); Ex. 1017 at 1 ("$SpO_2$ obtained from the forehead…").  I further note that other references use different sized sensors.  For example, Mendelson-1991 uses an assembled sensor that "measures approximately 38 mm in diameter and is 15 mm thick."  Ex. 1018 at 3. Dr. Kenny does not explain why a POSITA would have been motivated to select one sensor size over another, or to select one protrusion height as opposed to any other.  Dr. Kenny suggests that "a height between 1 millimeter and 3 millimeters" would "prevent[] slippage" and "would have been comfortable…."  Ex. 1003 ¶161. But that disclosure is not in any of the references which are part of Ground 1.  In fact, as discussed above (Sections VII.A.1, VII.A.2, VII.B), Ohsaki explains that its sensor's width and length (including the board) are important, but does not say anything about the height of the convex surface of the board.  *See* Ex. 1009 ¶[0019] ("the length of the detecting element 2 from the right side to the left side in FIG. 2

-81-

is longer than the length from the upper side to the lower side"). In my opinion, a POSITA would not have found it obvious to include a cover with a protruding convex surface "wherein the protruding convex surface protrudes a height between 1 millimeter and 3 millimeters" or "wherein the protruding convex surface protrudes a height greater than 2 millimeters and less than 3 millimeters" based on the cited references of Ground 1.

## VIII. GROUND 2 FAILS FOR AT LEAST THE SAME REASONS AS GROUND 1

125. Ground 2 is a five-reference combination that adds Bergey (Ex. 1016) to the combination of Aizawa, Inokawa, Ohsaki, and Mendelson 2006. Ex. 1003 ¶¶192-194. Ground 2 only challenges dependent claim 9. Pet. 9-10; Ex. 1003 ¶¶192-194. Dr. Kenny adds Bergy to Aizawa, Inokawa, Ohsaki, and Mendelson 2006 because those references do not disclose that the substrate, wall, and cover hermetically seal the at least four detectors. Ex. 1003 ¶192. Bergey's disclosure, which is related to a wristwatch, does not fix the deficiencies identified for Ground 1. As a result, in my opinion, the challenged claim of Ground 2 is nonobvious for the same reasons discussed above for Ground 1.

## IX. GROUND 3 FAILS FOR AT LEAST THE SAME REASONS AS GROUND 1

126. Ground 3 is a five-reference combination that adds Goldsmith (Ex. 1011) to the combination of Aizawa, Inokawa, Ohsaki, and Mendelson 2006. Ex.

Appx54846