**[Volume VII, Appx01878 – Appx05248]**

**Nos. 22-1631, -1632, -1633, -1634, -1635, -1636, -1637, -1638**

IN THE

# United States Court of Appeals

## FOR THE FEDERAL CIRCUIT

---

MASIMO CORPORATION,

*Appellant,*

v.

APPLE INC.,

*Appellee.*

---

APPEAL FROM THE PATENT TRIAL AND APPEAL BOARD
CASE NOS. IPR2020-01520, IPR2020-01521, IPR2020-01536, IPR2020-01537,
IPR2020-01538, IPR2020-01539, IPR2020-01714, IPR2020-01715

---

### CORRECTED JOINT APPENDIX

| | |
|---|---|
| Joseph R. Re, *Principal Counsel*<br>Stephen C. Jensen<br>Jarom D. Kesler<br>Stephen W. Larson<br>**KNOBBE, MARTENS, OLSON & BEAR, LLP**<br>2040 Main Street, 14th Floor<br>Irvine, CA 92614<br>(949) 760-0404 | Lauren A. Degnan, *Principal Counsel*<br>Christopher Dryer<br>W. Karl Renner<br>Jared Hartzman<br>Adi A. Williams<br>**FISH & RICHARDSON P.C.**<br>1000 Maine Ave., Suite 1000<br>Washington, DC 20024<br>Tel: (202) 783-5070 |
| Jeremiah S. Helm<br>**KNOBBE, MARTENS, OLSON & BEAR, LLP**<br>1717 Pennsylvania Ave., N.W.<br>Washington, D.C. 20006<br>(202) 640-6400 | Ashley Bolt<br>**FISH & RICHARDSON P.C.**<br>1180 Peachtree Street NE,<br>21st Floor<br>Atlanta, GA 30309 |
| *Attorneys for Appellant*<br>*Masimo Corporation* | *Attorneys for Appellee Apple Inc.* |

July 12, 2023

**Table of Contents**

| Date | Paper No. /Ex. No. | Document | Pages |
|---|---|---|---|
| **VOLUME I** | | | |
| 2/23/2022 | 39 | Final Written Decision [IPR2020-01520] | Appx00001-Appx00106 |
| 4/11/2022 | 33 | Final Written Decision [IPR2020-01521] | Appx00107-Appx00198 |
| 2/23/2022 | 43 | Final Written Decision [IPR2020-01536] | Appx00199-Appx00276 |
| **VOLUME II** | | | |
| 2/23/2022 | 43 | Final Written Decision [IPR2020-01537] | Appx00277-Appx00358 |
| 2/23/2022 | 43 | Final Written Decision [IPR2020-01538] | Appx00359-Appx00428 |
| 2/23/2022 | 41 | Final Written Decision [IPR2020-01539] | Appx00429-Appx00514 |
| 4/6/2022 | 34 | Final Written Decision [IPR2020-01714] | Appx00515-Appx00591 |
| **VOLUME III** | | | |
| 4/6/2022 | 33 | Final Written Decision [IPR2020-01715] | Appx00592-Appx00675 |
| n/a | | U.S. Patent 10,258,265 | Appx00676-Appx00772 |
| n/a | | U.S. Patent 10,292,628 | Appx00773-Appx00870 |
| **VOLUME IV** | | | |
| n/a | | U.S. Patent 10,588,553 | Appx00871-Appx00973 |
| n/a | | U.S. Patent 10,588,554 | Appx00974-Appx01076 |
| n/a | | U.S. Patent 10,631,765 | Appx01077-Appx01179 |
| **VOLUME V** | | | |
| 5/25/2022 | 16 | Notice Forwarding Certified Lists | Appx01180-Appx01529 |

| Date | Paper No. /Ex. No. | Document | Pages |
|---|---|---|---|
| **VOLUME VI** | | | |
| 5/25/2022 | 16 | Notice Forwarding Certified Lists (Continued) | Appx01530-Appx01876 |
| **VOLUME VII** | | | |
| 8/31/2022 | 2 | Petition for *Inter Partes* Review [IPR2020-01520] | Appx01878; Appx01896-01899; Appx01921-01923; Appx01931-01934; Appx01953 |
| 5/28/2021 | 21 | Patent Owner's Response [IPR2020-01520] | Appx02191; Appx02212-02220; Appx02237 |
| 8/20/2021 | 24 | Petitioners Reply to Patent Owner's Response to Petition [IPR2020-01520] | Appx02275; Appx02306 |
| 1/6/2022 | 37 | December 7, 2021 Oral Hearing Transcript [IPR2020-01520] | Appx02449; Appx02458; Appx02498; Appx02501-02506; Appx02517; Appx02530; |
| 4/12/2022 | 40 | Patent Owner's Notice of Appeal to the U.S. Court of Appeals for the Federal Circuit [IPR2020-01520] | Appx02537-02648 |
| | Ex. 1002 | File History excerpts, U.S. Patent No. 10,258,265 | Appx02923-02932 |
| | Ex. 1003 | Declaration of Thomas W. Kenny [IPR2020-01520] | Appx03000; Appx03025-03030; Appx03040-03058; Appx03068-03071; Appx03095-03107 |
| | Ex. 1006 | Aizawa U.S. Pub. No. 2002/0188210 [IPR2020-01520] | Appx03242-03248 |
| | Ex. 1007 | Inokawa JP20060296564A [IPR2020-01520] | Appx03249-03271 |

| Date | Paper No. /Ex. No. | Document | Pages |
|------|------|------|------|
| | Ex. 1008 | Certified English Translation of Inokawa and Translators Declaration [IPR2020-01520] | Appx03272-Appx03295 |
| | Ex. 1010 | U.S. Patent No. 8,177,720 [IPR2020-01520] | Appx03313-Appx03333 |
| | Ex. 1014 | U.S. Pub. No. 2001/0056243 [IPR2020-01520] | Appx03352-03357 |
| | Ex. 1015 | Mendelson Design and Evaluation of a New Reflectance Pulse Oximeter Sensor [IPR2020-01520] | Appx03358-03364 |
| | Ex. 1023 | Nishikawa U.S. Pub. No. 2007/0145255 [IPR2020-01520] | Appx03443-03450 |
| | Ex. 1041 | Deposition Transcript of Dr. Vijay Madisetti Day 1 [IPR2020-01520] | Appx04112; Appx04243; Appx04244 |
| | Ex. 1047 | Second Declaration of Dr. Thomas W. Kenny [IPR2020-01520] | Appx04525; Appx04527-04559 |
| | Ex. 2004 | Madisetti Declaration [IPR2020-01520] | Appx05185; Appx05214-05216; Appx05233-05234; Appx05237-05238; Appx05240-05242; Appx05245-05248 |
| **VOLUME VIII** | | | |
| | Ex. 2006 | 4/22/2022 Kenny, Thomas Deposition Transcript [IPR2020-01520] | Appx05295; Appx05319; Appx05345-05346; Appx05368-05371; Appx05377-05378; Appx05380-05384; Appx05387-05388; Appx05391; Appx05394-05395; Appx05426-05428; Appx05435-05437; Appx05448; |

| Date | Paper No. /Ex. No. | Document | Pages |
|---|---|---|---|
| | | | Appx05458; Appx05473-05475; Appx05482-05486; Appx05491-05492; Appx05496-05502; Appx05551 |
| | Ex. 2007 | 4/23/2022 Kenny, Thomas Deposition Transcript [IPR2020-01520] | Appx05567; Appx05591-05592; Appx05604-05605; Appx05625-05631; Appx05635-05636; Appx05696; Appx05699 |
| | Ex. 2008 | 4/24/2021 Kenny, Thomas Deposition Transcript [IPR2020-01520] | Appx05747; Appx05776-05777; Appx05781-05783; Appx05786-05787; Appx05794-05795; Appx05803-05804; Appx05806-05807; Appx05809-05810; Appx05814-05818; Appx05841; Appx05851-05852; Appx05857; Appx05876-05877; Appx05903-05905; Appx05911-05912; Appx05960-05961; Appx05973-05975 |
| | Ex. 2009 | 4/25/2021 Kenny, Thomas Deposition Transcript [IPR2020-01520] | Appx06013; Appx06093-06098; Appx06122-06123 |
| | Ex. 2027 | 9/18/2021 Kenny, Thomas Deposition Transcript 9/18/2021[IPR2020-01520] | Appx06690; Appx06708-06711; Appx06738-06739; Appx06746; |

| Date | Paper No. /Ex. No. | Document | Pages |
|------|------|----------|-------|
|  |  |  | Appx06882-06884; Appx06893-06894; Appx06902-06904; Appx06907-06908; Appx06946 |
| 9/2/2020 | 1 | Petitioner's Power of Attorney [IPR2020-01521] | Appx06952 |
| 9/2/2020 | 2 | Petition for *Inter Partes* Review [IPR2020-01521] | Appx06953; Appx06973-06974; Appx07001-07004 |
| 7/9/2021 | 15 | Patent Owner's Response [IPR2020-01521] | Appx07300; Appx07324-07325 |
| 4/12/2022 | 34 | Patent Owner's Notice of Appeal to the U.S. Court of Appeals for the Federal Circuit [IPR2020-01521] | Appx07624-07721 |
|  | Ex. 1003 | Declaration of Dr. Thomas W. Kenny [IPR2020-01521] | Appx08051; Appx08080-08081; Appx08105-08106; Appx08131-08133 |
|  | Ex. 1047 | Second Declaration of Dr. Thomas W. Kenny [IPR2020-01521] | Appx09183; Appx09197-09199; Appx09204-09208; Appx09216-09218 |
|  | Ex. 2004 | Declaration of Vijay K. Madisetti, Ph.D. [IPR2020-01521] | Appx10322; Appx10352-10355; Appx10370-10371; Appx10374-10375; Appx10377-10379; Appx10382-10385 |
| 8/31/2020 | 3 | Petition for *Inter Partes* Review [IPR2020-01536] | Appx12444; Appx12476-12477 |
| 6/1/2021 | 24 | Patent Owner's Response [IPR2020-01536] | Appx12820; Appx12851-12854 |
| 10/5/2021 | 32 | Patent Owner's Sur-Reply to Reply [IPR2020-01536] | Appx12955; Appx12974 |

| Date | Paper No. /Ex. No. | Document | Pages |
|---|---|---|---|
| 4/12/2022 | 44 | Patent Owner's Notice of Appeal to the U.S. Court of Appeals for the Federal Circuit [IPR2020-01536] | Appx13167-13250 |
| | Ex. 1002 | File History excerpts for U.S. Patent No. 10,588,553 | Appx13259-13266 |
| | | **VOLUME IX** | |
| | Ex. 1003 | Declaration of Dr. Kenny [IPR2020-01536] | Appx15237; Appx15278-15286 |
| | Ex. 1009 | U.S. Pub. No. 2001/0056243 Ohsaki [IPR2020-01536] | Appx15568; Appx15572 |
| | Ex. 1012 | U.S. Patent No. 6,801,799 Mendelson [IPR2020-01536] | Appx15578-15593 |
| | Ex. 1017 | Mendelson Design and Evaluation of a New Reflectance Pulse Oximeter Sensor [IPR2020-01536] | Appx15638 |
| | Ex. 1018 | Mendelson Skin Reflectance Pulse Oximetry In Vivo Measurements from the Forearm and C [IPR2020-01536] | Appx15645-15647 |
| | Ex. 1019 | Webster Design of Pulse Oximeters [IPR2020-01536] | Appx15651; Appx15754-15758 |
| | Ex. 1047 | Second Declaration of Dr. Thomas W. Kenny [IPR2020-01536] | Appx17805; Appx17824-17837 |
| | Ex. 2004 | Declaration of Vijay K. Madisetti, Ph.D. [IPR2020-01536] | Appx18302; Appx18343-18355; Appx18358-18359 |
| 8/27/2021 | 27 | Petitioner's Reply to Masimo Response [IPR2020-01537] | Appx20516; Appx20526 |
| 1/16/2022 | 41 | December 7, 2021 Oral Hearing Transcript [IPR2020-01537] | Appx20696; Appx20759-20760 |
| 4/12/2022 | 44 | Patent Owner's Notice of Appeal to the U.S. Court of Appeals for the Federal Circuit [IPR2020-01537] | Appx20781-Appx20868 |
| | Ex. 1003 | Declaration of Dr. Kenny [IPR2020-01537] | Appx22855; Appx22888; |

| Date | Paper No. /Ex. No. | Document | Pages |
|---|---|---|---|
| | | | Appx22890-22906; Appx22937-22945; Appx22995-23001 |
| | Ex. 1009 | U.S. Pub. No. 2001/0056243 Ohsaki [IPR2020-01537] | Appx23194; Appx23198 |
| | Ex. 1010 | Mendelson A Wearable Reflectance Pulse Oximeter for Remote Physiological Monitoring [IPR2020-01537] | Appx23200-23203 |
| | Ex. 1047 | Second Declaration of Dr. Thomas W. Kenny [IPR2020-01537] | Appx25392; Appx25405-25409; Appx25414-25423 |
| | Ex. 2003 | Mendelson, et al., Measurement Site and Photodetector Size Considerations Jin Optimizing Power Consumption of a Wearable Reflectance Pulse Oximeter [IPR2020-01537] | Appx25906-25909 |
| | Ex. 2004 | Declaration of Vijay K. Madisetti, Ph.D. [IPR2020-01537] | Appx25910; Appx25942-25945; Appx25947 |
| 9/2/2020 | 1 | Petition for Inter Partes Review of U.S. Patent No. 10,588,554 [IPR2020-01538] | Appx27672; Appx27708 |
| 4/12/2022 | 44 | Patent Owner's Notice of Appeal to the U.S. Court of Appeals for the Federal Circuit [IPR2020-01538] | Appx28420-28495 |
| **VOLUME X** | | | |
| | Ex. 1002 | File History excerpts, U.S. Patent No. 10,588,554 [IPR2020-01538] | Appx28870-28882; Appx29716-29719 |
| | Ex. 2004 | Declaration of Vijay K. Madisetti, Ph.D. [IPR2020-01538] | Appx33048; Appx33091-33103; Appx33106-33108 |
| 4/12/2023 | 42 | Patent Owner's Notice of Appeal to the U.S. Court of Appeals for | Appx35638-35729 |

| Date | Paper No. /Ex. No. | Document | Pages |
|---|---|---|---|
| | | the Federal Circuit [IPR2020-01539] | |
| | Ex. 1003 | Declaration of Thomas W. Kenny [IPR2020-01539] | Appx36967; Appx37008; Appx37061-37062; Appx37071; Appx37119 |
| | Ex. 1009 | U.S. Pub. No. 2001/0056243 Ohsaki [IPR2020-01539] | Appx37295; Appx37298-37299 |
| | Ex. 1017 | Mendelson, Design and Evaluation of a New Reflectance Pulse Oximeter Sensor [IPR2020-01539] | Appx37370-37371 |
| | Ex. 2004 | Madisetti Declaration [IPR2020-01539] | Appx40313; Appx40348-40351; Appx40353; Appx40395-40398 |
| 4/12/2022 | 35 | Patent Owner's Notice of Appeal to the U.S. Court of Appeals for the Federal Circuit [IPR2020-01714] | Appx42697-42779 |
| | Ex. 1002 | File History excerpts, U.S. Patent No. 10,631,765 [IPR2020-01714] | Appx42872-42880 |
| | Ex. 1004 | Declaration of Vijay K. Madisetti, Ph.D. [IPR2020-01714] | Appx47449; Appx47491-47504; Appx47507-47509 |
| 4/12/2022 | 34 | Patent Owner's Notice of Appeal to the U.S. Court of Appeals for the Federal Circuit [IPR2020-01715] | Appx50019-50108 |
| | Ex. 1003 | Declaration of Thomas W. Kenny [IPR2020-01715] | Appx50582; Appx50680-50681 |
| | Ex. 2004 | Declaration of Madisetti [IPR2020-01715] | Appx54761; Appx54796-54799; Appx54801; Appx54845-54846 |

**IN THE UNITED STATES PATENT AND TRADEMARK OFFICE**

| | | |
|---|---|---|
| In re Patent of: | Poeze, et al. | |
| U.S. Patent No.: | 10,258,265 | Attorney Docket No.: 50095-0006IP1 |
| Issue Date: | April 16, 2019 | |
| Appl. Serial No.: | 16/212,440 | |
| Filing Date: | December 6, 2018 | |
| Title: | MULTI-STREAM DATA COLLECTION SYSTEM FOR NONIN-VASIVE MEASUREMENT OF BLOOD CONSTITUENTS | |

**Mail Stop Patent Board**
Patent Trial and Appeal Board
U.S. Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450

<u>**PETITION FOR *INTER PARTES* REVIEW OF UNITED STATES PATENT
NO. 10,258,265 PURSUANT TO 35 U.S.C. §§ 311–319, 37 C.F.R. § 42**</u>

Attorney Docket No. 50095-0006IP1
IPR of U.S. Patent No. 10,258,265



APPLE-1008, FIG. 7, [0066]-[0077]; APPLE-1003, ¶63.

### 3.    Combination of Aizawa and Inokawa

A POSITA would have been motivated to combine Aizawa and Inokawa ("Aizawa-Inokawa") to obtain additional benefits.  APPLE-1003, ¶¶76-85, 94-99.

### (a)    Protrusion

Beyond Aizawa's disclosure that its light permeable cover is an acrylic transparent plate that helps improve "detection efficiency," Aizawa does not provide much other detail, for instance regarding its shape.  APPLE-1006, [0030].  A POSITA would have realized, however, that the plate could be given a shape to achieve Aizawa's objective of improving detection efficiency and, further, would have known how to achieve such shape.  *Id.*, [0013], [0030], [0032]; APPLE-1009 at 3:46-51; APPLE-1003, ¶94.

13

Attorney Docket No. 50095-0006IP1
IPR of U.S. Patent No. 10,258,265

A POSITA would have looked to Inokawa to enhance light collection efficiency, specifically by modifying the light permeable cover of Aizawa to include a convex protrusion that acts as a lens. APPLE-1003, ¶95-99. Indeed, as discussed above in Section III.A.2, Inokawa discloses a lens 27 that is positioned between the sensor and skin:



APPLE-1008, FIG. 2; APPLE-1003, ¶95. Inokawa further discloses that the "lens makes it possible to increase the light-gathering ability of the LED." APPLE-1008, [0015]. Thus, a POSITA would have sought to incorporate an Inokawa-like lens into the cover of Aizawa to increase the light collection efficiency, which would lead to an improved signal-to-noise ratio (and more reliable pulse detection). APPLE-1003, ¶¶96-97. The lens of Inokawa would provide precisely such a benefit to Aizawa's device by refracting/concentrating the incoming light signals reflected by the blood. *Id.*

14

Attorney Docket No. 50095-0006IP1
IPR of U.S. Patent No. 10,258,265

As illustrated below, the device resulting from the obvious combination of Aizawa and Inokawa would have replaced the flat cover (left) with a curved one as per Inokawa (right) to "increase the light-gathering ability." APPLE-1008, [0015]; APPLE-1003, ¶97.



Light permeable cover

APPLE-1006, FIG. 1(b); APPLE-1003, ¶97.

A POSITA would have understood how to implement Inokawa's lens-shaped cover in Aizawa's device with a reasonable expectation of success, stemming from the significant overlap across the references in their teaching. APPLE-1003, ¶98. For example, as illustrated below, Inokawa teaches that its cover may be either flat (left) such that "the surface is less prone to scratches," APPLE-1008 at [0106], or in the form of a lens (right) to "increase the light-gathering ability of the LED." *Id.* at [0015].

15

**Appx01898**

Attorney Docket No. 50095-0006IP1
IPR of U.S. Patent No. 10,258,265



APPLE-1008, FIG. 17 (left), FIG. 16 (right); APPLE-1003, ¶98.  A POSITA

would have further recognized that the transparent acrylic material used to make

Aizawa's plate can be readily formed into a lens-like shape as in Inokawa.  AP-

PLE-1003, ¶99 (citing to APPLE-1009 at 3:46-51, FIG. 1, APPLE-1023, FIG. 6,

[0022], [0032], [0035]).  Thus, a POSITA wanting to achieve improved light col-

lection efficiency over reduced susceptibility to scratches could have readily modi-

fied Aizawa's cover to have a lens shape as per Inokawa.  APPLE-1003, ¶99.

The above-described modification would require only routine knowledge of

sensor design and assembly, which were well within the skill of a POSITA prior to

the Critical Date.  APPLE-1003, ¶99.  Thus, to achieve Aizawa's and Inokawa's

shared goal of improving light collection efficiency, a POSITA would have been

motivated to modify Aizawa's light permeable cover to have a lens shape as per

Inokawa with a reasonable expectation of success.  APPLE-1003, ¶¶94-99.

APPLE-1006, FIG. 1(b) (modified); APPLE-1003, ¶116.

## Claim 11

**[11]: "The noninvasive optical physiological measurement device of claim 10, wherein the light permeable cover is configured to act as a tissue shaper and conform tissue of the user to at least a portion of an external surface shape of the light permeable cover when the noninvasive optical physiological measurement device is worn by the user."**

Aizawa-Inokawa renders obvious [11]. *Supra* Ground-1A [10]; APPLE-1003, ¶117. As explained for [10], the light permeable cover of Aizawa-Inokawa deforms the tissue around the lens/protrusion when pressed against the wrist of the user. APPLE-1003, ¶117. Thus, the light permeable cover shapes the tissue around its external surface when the device is worn. *Id.*

## Claim 12

**[12]: "The noninvasive optical physiological measurement device of claim 11, wherein the light permeable cover is configured to reduce a mean path length of light traveling to the at least four detectors."**

A POSITA would have recognized that such feature is rendered obvious by Aizawa-Inokawa. APPLE-1003, ¶118. For example, the lens/protrusion of Inokawa, which is used to modify Aizawa as explained in Section III.A.3(a), serves a condensing function and thus, as with any other lens, refracts light passing through it. APPLE-1008, [0015], [0058]; APPLE-1003, ¶119. Thus, referring to the drawing below which compares the length of non-refracted light (*i.e.*, without a lens, left) bouncing off an artery with that of refracted light (*i.e.*, with a lens, right),

38

it can be seen that the mean path length of light traveling to the at least four detectors is reduced—that is, the purple line is shorter than the redline.  APPLE-1003, ¶119.  This holds true for both the total length travelled as well as length travelled/attenuated through skin.  *Id.*



APPLE-1003, ¶119.

Superimposing the two drawings above clearly shows the shortened path traveled by refracted light in the presence of a protrusion/lens, both within the tissue as well as for total path length:



APPLE-1003, ¶120.

39

## Claim 13

**[13]: "The noninvasive optical physiological measurement device of claim 11, wherein the at least four detectors are evenly spaced from one another."**

Aizawa-Inokawa renders obvious [13]. *Supra* Ground-1A [1c]; APPLE-

1003, ¶121. Indeed, the four detectors of Aizawa are evenly spaced from one an-

other:



APPLE-1006, FIG. 1(a); APPLE-1003, ¶121.

## Claim 14

**[14]: "The noninvasive optical physiological measurement device of claim 1, wherein the light permeable cover is configured to reduce a mean path length of light traveling to the at least four detectors."**

Aizawa-Inokawa renders obvious [14]. *Supra* Ground-1A [12]; APPLE-

1003, ¶122.

## Claim 16

Attorney Docket No. 50095-0006IP1
IPR of U.S. Patent No. 10,258,265

APPLE-1006, FIG. 1(a); APPLE-1003, ¶137. Also, as seen above, the detectors

are arranged in a grid pattern. *Id.*

**Claim 29**

**[29]: "The noninvasive optical physiological measurement device of claim 27, wherein the first, second, third and fourth detectors form a cross pattern about the central axis."**

*Supra* Ground-1A [21]. APPLE-1003, ¶138.

### B.    [GROUND-1B] – Claims 1-4, 6-14, 16, 17, 19-23, and 26-29 are rendered obvious by Aizawa in view of Inokawa and Ohsaki

#### 1.    Overview of Ohsaki

Ohsaki is generally directed to "[a] pulse wave sensor includes a detecting

element and a sensor body" where "[t]he pulse wave sensor is worn on the back

side of a user's wrist." APPLE-1014, Abstract. As seen below, the pulse sensor of

Ohsaki is "worn on the back side of the user's wrist 4...in the similar manner as a

wristwatch is normally worn," *Id.*, [0016]; APPLE-1003, ¶65.

Attorney Docket No. 50095-0006IP1
IPR of U.S. Patent No. 10,258,265



APPLE-1014, FIG. 1.

Referring to FIG. 2 below, Ohsaki can sense pulse by emitting light through a light emitting element 6 and detecting reflected light using a light receiving element 7.  APPLE-1014, [0017].  Ohsaki also provides a translucent board 8  that is transparent to light and includes a convex surface "in intimate contact with the surface of the user's skin."  *Id.*, [0009], [0017].

49

Attorney Docket No. 50095-0006IP1
IPR of U.S. Patent No. 10,258,265

# FIG. 2



APPLE-1014, FIG. 2; APPLE-1003, ¶64.

## 2.    Analysis

As described above in Ground-1A and Section III.A.3(a), a POSITA would have sought to incorporate an Inokawa-like lens into the cover of Aizawa to increase the light collection efficiency.  Here, Ohsaki provides an additional motivation and rationale for a POSITA to modify Aizawa to include a "light permeable cover comprising a protrusion" as per element [1d].  APPLE-1003, ¶¶139-140.

For example, Ohsaki teaches that adding a convex surface to the light permeable cover (*i.e.*, translucent board 8) can help prevent the device from slipping on the tissue when compared to a flat cover.  APPLE-1014, [0025]; APPLE-1003,

Attorney Docket No. 50095-0006IP1
IPR of U.S. Patent No. 10,258,265

¶141. In this context, Aizawa similarly seeks to prevent slippage between the device and the user's wrist—and pursues this objective by pressing its light permeable cover (*i.e.*, acrylic transparent plate 6) and trying to improve "adhesion between the wrist 10 and the pulse rate detector 11." APPLE-1006, [0026], [0030].

A POSITA reviewing Aizawa and Ohsaki would have recognized Ohsaki's use of a convex protrusion in its light permeable cover as a desirable configuration that would help to further prevent slippage of Aizawa's device. APPLE-1003, ¶142. Thus, a POSITA wanting to achieve improved adhesion between the detector and the skin, as expressly recognized in Aizawa, would have readily modified Aizawa's cover to have a convex protrusion as per Ohsaki. *Id.*

The resulting combination would have provided all remaining elements of claims 1-4, 6-17, 19-23, and 26-29 in the same manner as previously described in Ground-1A; APPLE-1003, ¶143.

### C.    [GROUND-1C] – Claims 23-24 are rendered obvious by Aizawa in view of Inokawa and Mendelson-2006

#### 1.    Overview of Mendelson-2006

Mendelson-2006 is generally directed to a "wireless wearable pulse oximeter" device. APPLE-1016, 912; APPLE-1003, ¶¶69-71. Mendelson-2006's pulse oximeter can measure and transmit various physiological parameters such as "arterial oxygen saturation (SpO$_2$), heart rate (HR), body acceleration, and posture information." *Id.*

Attorney Docket No. 50095-0006IP1
IPR of U.S. Patent No. 10,258,265

A POSITA would have understood how to implement Inokawa's lens-shaped cover in Mendelson-1988 with a reasonable expectation of success, stemming from the significant overlap across the references in their teaching. APPLE-1003, ¶177. Indeed, the above-described modification would require only routine knowledge of sensor design and assembly, which were well within the skill of a POSITA prior to the Critical Date. *Id.* Further, as demonstrated by Nishikawa, molding clear epoxy, as in Mendelson-1988, into a lens shape was well understood:



FIG. 6

APPLE-1023, FIG. 6, [0022], [0032], [0035]; APPLE-1003, ¶178.

Moreover, both the optical encapsulation layer of Mendelson-1988 and the lens layer of Nishikawa are made from the same material—i.e., optically clear epoxy—that can have the same index of refraction, and, as such, the interface between the encapsulation portion and the lens portion will not adversely affect the optical performance of the modified system. APPLE-1012, [0037]; APPLE-1003,

Filed: May 28, 2021

Filed on behalf of:
    Patent Owner Masimo Corporation
By:   Joseph R. Re (Reg. No. 31,291)
    Stephen W. Larson (Reg. No. 69,133)
    Jarom D. Kesler (Reg. No. 57,046)
    Jacob L. Peterson (Reg. No. 65,096)
    William R. Zimmerman (admitted *pro hac vice*)
    Jeremiah S. Helm, Ph.D. (admitted *pro hac vice*)
    KNOBBE, MARTENS, OLSON & BEAR, LLP
    2040 Main Street, Fourteenth Floor
    Irvine, CA 92614
    Tel.:  (949) 760-0404
    Fax:  (949) 760-9502
    E-mail:  AppleIPR2020-1520-265@knobbe.com

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

APPLE INC.

Petitioner,

v.

MASIMO CORPORATION,

Patent Owner.

———————————

Case IPR2020-01520
U.S. Patent 10,258,265

———————————

**PATENT OWNER RESPONSE**

IPR2020-01520
Apple Inc. v. Masimo Corporation

## B.    Ground 1A Does Not Establish Obviousness

### 1.    A POSITA Would Not Have Been Motivated To Combine Inokawa's Lens With Aizawa's Sensor

#### a)    Petitioner Admits Inokawa's Lens Directs Light To The Center Of The Sensor

There can be no legitimate dispute that Petitioner's proposed convex lens would direct light toward the center.  Petitioner admits that "the lens/protrusion of Inokawa ... serves a ***condensing function*** and thus, as with any other lens, refracts light passing through it."  Pet. 38.  Petitioner illustrates this condensing function using "the drawing below which compares the length of non-refracted light ... bouncing off an artery with that of refracted light."  Pet. 38-39.  Petitioner's figure (below) illustrates a POSITA's understanding that Inokawa's convex lens, as implemented in Aizawa's sensor, would direct light toward the ***center*** of the sensor. *Id*.



Petitioner's Illustration of Inokawa's Light-Redirection (Pet. 39)

Dr. Kenny similarly included the above illustration and explained in his declaration that, when using a convex surface such as Inokawa's lens, "the incoming light is

IPR2020-01520
Apple Inc. v. Masimo Corporation

'condensed' **toward the center**." Ex. 1003 ¶119; *see generally* Ex. 1003 ¶¶118-120, ¶¶199-201 (discussing mean path length of light); Ex. 2004 ¶¶48-50. Dr. Kenny confirmed at his deposition that the convex surface in his proposed combination would result in "more light in the **center** than at the outer edge in this example." Ex. 2006 204:1-13. Dr. Kenny agreed "that's because light's being directed **towards the center** and **away from the edge**...." Ex. 2006 204:14-20.

Petitioner's and Dr. Kenny's admissions are consistent with Inokawa's disclosure. Ex. 2004 ¶51. As shown in Figure 2 (below), Inokawa illustrates that the convex surface condenses light towards the **central** detector 25. Ex. 1008 ¶[0058], Fig. 2. The convex surface in Inokawa works with the particular configuration of emitters and detectors: Inokawa increases light collection by increasing the amount of light that reaches the **centrally located** detector. *Id.*; Ex. 2004 ¶52.



| **Inokawa's Features** |
| --- |
| • **Green**: peripheral emitters (21, 23) |
| • **Red**: central detector (25) |
| • **Blue**: convex lens (27) |
| • Arrows showing direction of light in original, highlighted in yellow |

Inokawa Fig. 2 (color added)

-16-

IPR2020-01520
Apple Inc. v. Masimo Corporation

Dr. Kenny agreed that Inokawa "provides this benefit by concentrating light ***towards the detector in the center***…." Ex. 2006 83:15-84:2. Dr. Kenny explained that "one of ordinary skill in the art would understand that in Inokawa, the objective is to ***concentrate light at the detector, which is in the center*** axis of the drawing and that the lens is capable of providing ***that*** benefit." Ex. 2006 86:19-87:1.

The '265 Patent further confirms that a POSITA would have this understanding. Figure 14B (below) "illustrates how light from emitters (not shown) can be focused by the protrusion 605 onto detectors." Ex. 1001 36:11-14.



'265 Patent (Ex. 1001) Fig 14B (highlighting added to show direction of light)

The '265 Patent explains that "[w]hen the light rays 1420 enter the protrusion 605, the protrusion 605 acts as a lens to refract the rays into rays 1422." *Id*. 36:21-23. As shown in the '265 Patent's exemplary structure, the convex shape directs light from the sides ***toward the center***. *Id*. Fig. 14B; *see* Ex. 2004 ¶¶53-54.

-17-

IPR2020-01520
Apple Inc. v. Masimo Corporation

Accordingly, Petitioner, Dr. Kenny, and the '265 Patent all agree that a POSITA would have understood that Inokawa's convex shape would direct incoming light towards the center of the sensor.  Ex. 2004 ¶55.

> **b)** **A POSITA Would Not Have Been Motivated To Direct Light Away From Aizawa's Detectors And Would Have No Reasonable Expectation Of Success When Doing So**

Petitioner erroneously places Inokawa's convex lens on Aizawa, resulting in a sensor with the emitter (green) in the center and the detectors (red) on the *periphery*:



Petitioner's Proposed Combination (Pet. 29)

Petitioner claims a POSITA would have been motivated to "further Aizawa's objective of *enhancing* light-collection efficiency."  Pet. 28-29.  But a POSITA would *not* have expected Inokawa's convex surface to accomplish this goal.  Indeed, a POSITA would have had the exact opposite expectation.  As discussed above, a POSITA would have believed that Inokawa's convex surface would direct light *away* from the *periphery*-located detectors.  Ex. 2004 ¶¶42-43, 48-55, 56-57.  Accordingly, a POSITA would have believed that a convex surface would have

Appx02215

IPR2020-01520
Apple Inc. v. Masimo Corporation

undesirably **decreased** light-collection efficiency at Aizawa's peripheral detectors,
reducing the measured optical signal. Ex. 1006 ¶¶[0026], [0030]; Ex. 2004 ¶58. At
a minimum, Dr. Kenny admitted that the impact of Inokawa's convex lens would
not be "obvious" in the context of a different configuration of LEDs and detectors.
*See* Ex. 2006 87:2-6 ("If we're going to move the lenses and the LEDs and detectors
around and ask different questions, it **isn't so obvious** that Inokawa is specifically
considering those scenarios. It's a little more **hypothetical**.").

Indeed, light reaching Aizawa's detectors must travel in an opposite direction
from the light in Inokawa. Ex. 2004 ¶59. Aizawa illustrates the light path as (1)
leaving a single centrally located emitter, (2) passing through the body, and (3)
reflecting back to periphery-located detectors:



Aizawa Fig. 1B (cross-sectional view, color added)

Inokawa illustrates the **opposite**: (1) light leaves periphery-located emitters, (2)
passes through the body, and (3) reflects back on a single centrally located detector:

-19-

IPR2020-01520
Apple Inc. v. Masimo Corporation



| **Inokawa's Features** |
| --- |
| • **Green**: peripheral emitters (21, 23)<br>• **Red**: central detector (25)<br>• **Blue**: convex lens (27)<br>• Arrows showing direction of light in original, highlighted in yellow |

Inokawa Fig. 2 (color added)

A POSITA would have understood that Inokawa's convex surface would ***not*** be suitable if the goal was to improve light gathering at Aizawa's peripheral detectors. Ex. 2004 ¶¶59-62.

Petitioner's combination is particularly problematic because—consistent with Aizawa—Petitioner's combination includes small detectors with small openings surrounded by a ***large*** amount of ***opaque*** material. Ex. 2004 ¶63. Aizawa's top-down view, in particular, confirms the detectors' small size. *Id*. Fig. 1A.



| **Aizawa's Features** |
| --- |
| • **Green**: central emitter (21)<br>• **Red**: peripheral detectors (22) |

Dr. Kenny described the difficulty of ensuring light enters these small openings:

**Appx02217**

IPR2020-01520
Apple Inc. v. Masimo Corporation

> I think one of ordinary skill understands that the holder
> including the wall, ***everything about the holder is, is made
> of an opaque material***. That's clearly the intent in Aizawa.
> He describes rays that, that can reach the detectors if they
> can **somehow** find those tapered openings, but not if they
> pass-through **any part** of this holder so the entire holder is
> opaque.

Ex. 2006 257:11-18.

In contrast to Aizawa's actual disclosed structure (below, top), Petitioner

presents a separate figure (below, bottom) that ***drastically*** increases the size of the

detectors compared to Aizawa and ***eliminates*** surrounding barriers.



Aizawa's figure
illustrating detectors
(22, red)
(Ex. 1006 Fig. 1B)

Petitioner's depiction
drastically increasing
size of Aizawa's
detector (black)
(Pet. 39)

Applying Petitioner's illustration of the redirected light path (bottom figure, purple)

to Aizawa's ***actual detector*** (top figure, red) confirms the light ***would not even reach***

that detector.  Ex. 2004 ¶¶64-65.  That Petitioner is forced to increase the size of

IPR2020-01520
Apple Inc. v. Masimo Corporation

Aizawa's detectors approximately five-fold and eliminate Aizawa's large opaque

barriers—with no analysis or explanation of such changes or the impact on the

attenuation properties—underscores the weakness of Petitioner's position.  Ex. 2004

¶65.

<strong>c)    <u>Dr. Kenny's New Opinions Are Improper, Contradict His Declaration And Undermine Petitioner's Obviousness Challenge</u></strong>

At his deposition, Dr. Kenny confirmed that a convex lens would indeed direct

light toward the center of the underlying sensor.  *See, e.g.,* Ex. 2006 202:11-204:20.

In an attempt to evade the problems with his flawed theory, however, Dr. Kenny

disclaimed Petitioner's reasoning and asserted new and improper opinions.  The

Board should not consider these new opinions, none of which has merit.

First, Dr. Kenny attempted to distance himself from his illustrations

explaining how a convex lens condenses light:



Ex. 1003 ¶ 119.

Dr. Kenny claimed he was simply discussing how one specific ray of light would

travel.  Ex. 2006 65:15-70:7.  But that directly contradicts Dr. Kenny's declaration,

-22-

IPR2020-01520
Apple Inc. v. Masimo Corporation

which unambiguously described the above figures as illustrating how "the incoming light is '**condensed**' toward the center," Ex. 1003 ¶¶119, 200.  Dr. Kenny testified that he understood the word "condensing" to mean "focusing light" or "increasing the intensity."  Ex. 2009 310:1-20.  Dr. Kenny also acknowledged he prepared the figure above to address a claim limitation addressing the "***mean*** path length," which Dr. Kenny understood as "an ***average***" path length of the incoming light as a whole, Ex. 2006 198:6-16, not an individual ray.  *See also* Ex. 2004 ¶66.

Second, Dr. Kenny asserted that, while a convex lens would condense **collimated** light toward the center, the flow of "***diffuse***" light would be highly complex.  Ex. 2007 298:11-299:18.  Dr. Kenny admitted he cited no prior art or other evidence distinguishing between collimated and diffuse light, much less demonstrating a POSITA would make such a distinction when considering Inokawa. Ex. 2007 294:17-298:10.  As discussed above, the '265 Patent illustrates a convex lens as focusing light away from the periphery and towards the center:



'265 Patent (Ex. 1001) Fig 14B (highlighting added to show direction of light)

-23-

not address that issue. Ex. 2007 394:11-395:22. These undisclosed changes all impact the performance of the device. Such a redesign requires explanation, which is completely absent from the Petition.

## C.   The Remaining Challenged Dependent Claims Are Nonobvious Over Ground 1A

"[D]ependent claims are nonobvious if the independent claims from which they depend are nonobvious." *In re Fritch*, 972 F.2d 1260, 1266 (Fed. Cir. 1992). The Petition fails to establish that independent claims 1 and 26 would have been obvious in view of Ground 1A's cited references and thus fails to establish obviousness as to any of the challenged dependent claims. Ex. 2004 ¶89. The Board should reject Ground 1A.

## D.   Ground 1B Fails For The Same Reason As Ground 1A And For Additional Reasons

Ground 1B advances a three-reference combination that adds Ohsaki (Ex. 1014) to the combination of Aizawa and Inokawa. Pet. 48-51. In a short three-page section—the majority of which consists of headings, blank space, and a single inadequately explained figure—Petitioner suggests that a POSITA "would have sought to incorporate an Inokawa-like lens into the cover of Aizawa," with Ohsaki providing "an additional motivation and rationale." Pet. 50. Petitioner then inconsistently argues a POSITA "would have readily modified Aizawa's cover to have a convex protrusion as per Ohsaki." Pet. 51. Thus, Petitioner is unclear as to

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

APPLE INC.,
Petitioner

v.

MASIMO CORPORATION,
Patent Owners

———————————

Case IPR2020-01520
Patent 10,258,265

———————————

**PETITIONER'S REPLY TO
PATENT OWNER'S RESPONSE TO PETITION**

such a convex cover was placed.  APPLE-1047, ¶52; APPLE-1014, ¶¶[0015], [0017], [0025], FIGS. 1, 2, 4A, 4B.  For one, "[t]he test for obviousness is not whether the features of a secondary reference may be bodily incorporated into the structure of the primary reference…[r]ather, the test is what the combined teachings of those references would have suggested to those of ordinary skill in the art."  *In re Keller*, 642 F.2d 413 (C.C.P.A. 1981); *see also Allied Erecting v. Genesis Attachments*, 825 F.3d 1373, 1381 (Fed. Cir. 2016) (rejecting argument that combination would "result [in] substantial redesign" because "[t]he test for obviousness is not whether the features of a secondary reference may be bodily incorporated into the structure of the primary reference").  Indeed, Ohsaki was relied upon not for its exact cover configuration but rather for the rather obvious concept that a convex surface protruding into a user's skin will prevent slippage, regardless of any directionality that may or may not exist with respect to such convex surface and regardless of where on the human body it is located.  APPLE-1047, ¶52 (citing to Ex. 2012, 91, 87); APPLE-1014, ¶¶[0015], [0017], [0025], FIGS. 1, 2, 4A, 4B.  And adding a convex surface to Aizawa's flat plate will serve to ***increase*** its tendency to not slip off, not take away from it, since it is well-understood that physically digging into the skin with a protrusion provides an additional adhesive effect.  *Id.*; Apple-1047, ¶52.

25

Trials@uspto.gov
571-272-7822

Paper # 37
Entered: 1/06/2022

UNITED STATES PATENT AND TRADEMARK OFFICE

————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————

APPLE INC.,
Petitioner,

v.

MASIMO CORPORATION,
Patent Owner.

————————

IPR2020-01520 (Patent 10,258,265 B1)
IPR2020-01536 (Patent 10,588,553 B2)
IPR2020-01537 (Patent 10,588,553 B2)
IPR2020-01538 (Patent 10,588,554 B2)
IPR2020-01539 (Patent 10,588,554 B2)

————————

Record of Oral Hearing
Held:  December 7, 2021

————————

Before GEORGE R. HOSKINS, ROBERT L. KINDER, and
AMANDA F. WIEKER, *Administrative Patent Judges.*

IPR2020-01520 (Patent 10,258,265 B1)
IPR2020-01536 (Patent 10,588,553 B2)
IPR2020-01537 (Patent 10,588,553 B2)
IPR2020-01538 (Patent 10,588,554 B2)
IPR2020-01539 (Patent 10,588,554 B2)

1    was presented in the original form upper right with a flat surface that

2    interfaces with the skin of the body.  So the sensor in Aizawa sits on top in

3    this figure, the wrist or the body on the bottom and in between is what is

4    outlined there shaped as a flat surface on the sensor cover.  What we

5    transition to in the combination is in the bottom picture and you can see

6    there the convex protrusion that comes off the bottom and invades, if you

7    will, the space where the skin would exist.  The soft skin relative to the hard

8    sensor makes for an indentation, pressure and therefore stabilization.  Stands

9    to reason it's almost like cleat. You hold something more fast and hold more

10   true if you have it digging in or at least interfacing more aggressively with

11   the surface, the softness of the skin in fact and Dr. Kenny's declaration there

12   at paragraph 84 explains this.  Now he doesn't just rely on his own intuition,

13   he cites to Ohsaki when he does this.  You can see him citing to paragraph

14   25 and when we turn to slide 8 we get greater context, the full version of

15   paragraph 84 as well as 85 to follow from his declaration and when we look

16   at this we can see in it referenced a few things.  First, reduced slippage flows

17   from adhesion so this increased adhesion isn't an end to itself, it actually has

18   some benefits and the first one I've hinted at a bunch of times now.  It's the

19   slippage that is reduced which stands, again, to reason that you'd have

20   reduced slippage because after all the protrusion, it would lead to pressure

21   causing the adherence and therefore almost a friction fitting and given that

22   friction or that pressure you'd have less movement, less slippage.

23        Second though, and he cites to it here is you'd have a suppression in

10

IPR2020-01520 (Patent 10,258,265 B1)
IPR2020-01536 (Patent 10,588,553 B2)
IPR2020-01537 (Patent 10,588,553 B2)
IPR2020-01538 (Patent 10,588,554 B2)
IPR2020-01539 (Patent 10,588,554 B2)

1   artery and you will still have a strong signal and by the way, Aizawa also

2   makes very clear why how he does his field of view; right?  He uses the

3   multiple detectors and he talks about using tapered channels.  He wants a

4   particular field of vision, not some broader field.  He's not trying to get a

5   broader field of vision.  Remember, the Examiners had prior art, as they

6   explained in Aizawa, allowance that had a lens over each detector and still

7   found this to be patentable.  Aizawa teaches use tapered channels; right?  It

8   says use tapered channels so that the light -- now, Dr. Kenny kind of said oh,

9   that light, I think it was in his deposition, said that light somehow finds those

10  tapered openings.  But Aizawa actually teaches that that's the way he

11  intended it; right?  He teaches at paragraph 12 that the sectional forms of the

12  cavities are tapered sets if their widths increase towards the contact surface.

13  It's got a nice flat contact surface and it makes it possible to expand the light

14  emitting area and light receiving area.  A pulse rate can easily be detected

15  even when the attachment sensor is dislocated.  That was his solution; right?

16  He says put multiple detectors, put a channel, put a little taper on the end and

17  I want to see the artery below that; right?  Not the capillaries.  He says the

18  capillaries move too much.  Keep in mind Ohsaki is now looking at the

19  capillary blood, a very different application and I think Mendelson will give

20  us some very important teachings about why when we're dealing with

21  capillary blood the last thing we want to do is apply any pressure.

22       So Aizawa doesn't identify any problem with adhesion.  Doesn't

23  identify any problem with signal strength that needs to be solved further.  He

50

IPR2020-01520 (Patent 10,258,265 B1)
IPR2020-01536 (Patent 10,588,553 B2)
IPR2020-01537 (Patent 10,588,553 B2)
IPR2020-01538 (Patent 10,588,554 B2)
IPR2020-01539 (Patent 10,588,554 B2)

1   those products are on the market today.  He explains the problem, and this is

2   a really important thing, and he does this throughout.  So he's now

3   measuring capillary blood at the surface and says that -- he identifies the

4   problem as errors in the measurement from pressure on the skin.

5       He has a secondary problem which is stay after in the 70 percent

6   range which is the predominant range for fetal and neonatal applications.  He

7   explains that at column 5, lines 55 to 58.  The -- I'll go through a few but he

8   explains the problems with pressure on the skin throughout and I'll just

9   identify a few of those.  But, again, as Petitioner acknowledged, he shows a

10  flat sensor with no cover on but he teaches extensively that mechanical

11  pressure on the skin by the sensor causes large errors and how does it do

12  that?  It does that by displacing the blood from the superficial layers to

13  deeper structures that's causing large errors even when the bone is far away,

14  right?  And he says at column 2, lines 47 to 57, this is just one of many

15  examples:

16      Contact pressure leads to significant errors since some of the blood

17  near the superficial layers of the skin may be normally displaced away from

18  the sensor housing towards the deeper subcutaneous structures.

19  "Consequently, the highly reflective bloodless tissue compartment near the

20  surface of the skin can cause large errors even at body locations where the

21  bone is located too far away to influence the incident light."

22      This is really the -- he teaches this throughout and I'd like, you could

23  just try this.  It's not that complicated to understand.  If you press on the

53

IPR2020-01520 (Patent 10,258,265 B1)
IPR2020-01536 (Patent 10,588,553 B2)
IPR2020-01537 (Patent 10,588,553 B2)
IPR2020-01538 (Patent 10,588,554 B2)
IPR2020-01539 (Patent 10,588,554 B2)

1   back of your hand you will see a little white spot develop.  That's dislocating

2   that capillary blood which is being read by Mendelson and other

3   physiological monitors that are doing things with capillary blood right next

4   to the surface.

5       So Mendelson teaches that displacing that blood creates errors and he

6   does this -- I counted over a dozen places where he talks about this.  At

7   column 3, lines 15 to 31 he talks about mechanical pressure exerted by the

8   sensor on the skin causes uncontrollable changes.  Again at column 3, lines

9   19 to 31 how he shows that clinical trials showed that the adverse effects of

10  measurement from the forehead, chest and buttocks because the changes in

11  the ratio of blood to bloodless tissue volumes from any mechanical pressure

12  exerted on the skin.  He does it again at column 3, lines 27 to 31 where he

13  talks about the problems of mechanical pressure exerted on the skin.

14      I don't have time to go through all of these.  There's over a dozen.  I

15  think column 5, lines 8 to 17 he talks a lot about how the superficial layers

16  are very important and the red and infrared DC signals measured by

17  photodetectors contain a relatively larger proportion of the absorbed light

18  reflected from the bloodless tissue components if you express that blood

19  from the site.  Column 6, lines 16 to 35, there's so much of this that's good,

20  I don't know what to cut out.  He talks about the blood in the superficial

21  layers of the skin and thus they are sensitive to pressure that disturbs this

22  blood, and column 9, lines 8 to 21, that the distribution of the blood in the

23  superficial layers of the skin is displaced by sensor application.  He talks that

54

IPR2020-01520 (Patent 10,258,265 B1)
IPR2020-01536 (Patent 10,588,553 B2)
IPR2020-01537 (Patent 10,588,553 B2)
IPR2020-01538 (Patent 10,588,554 B2)
IPR2020-01539 (Patent 10,588,554 B2)

1    this depends upon sensor geometry at column 6, lines 32 to 33, that -- and he

2    has a way to get to this diffuse light that you mentioned when you look at

3    what happens when the light goes in.  It's not just a ray going in.  This is an

4    LED.  They're not lasers.  It goes in, it diffuses and he mentions what to do

5    here.  He says look, if you put multiple detectors on a concentric circle,

6    which Aizawa also mentions for a very different reason.  Aizawa wanted to

7    be over an artery.  Mendelson's now dealing with this blood in this very

8    superficial -- by the way, he's focused on fetal oximetry.  This is putting an

9    oximeter on a fetus's head during delivery and he talks about the uterine

10   contractions will press on that and cause problems and he's trying to address

11   that problem and he says add a third wavelength to deal with that.  But he

12   says use these multiple detectors to get light from all around; okay?

13          Mendelson teaches thus, he also teaches by the way away from the

14   arm at column 4, lines 30 to 35.  He talks about practical limitations, about

15   other locations.  He concludes the place to be is on the forehead.  He teaches

16   about many attempts to get a sensor to work at column 3, lines 45 to column

17   4, line 50, all of which had shortcomings and he concluded that no two

18   wavelength pulse oximeter can eliminate errors from the pressure.  He does

19   that at column 4, lines 51 to 65.  Now interestingly a later reference,

20   Mendelson 2003 which was Exhibit 2003 and that I think would be the same

21   throughout, specifically identifies the wrist as a poor location at page 3 at the

22   bottom right and page 4 of the column top left.  Mendelson concludes that

23   the forehead and the scalp are the right place to be.

55

IPR2020-01520 (Patent 10,258,265 B1)
IPR2020-01536 (Patent 10,588,553 B2)
IPR2020-01537 (Patent 10,588,553 B2)
IPR2020-01538 (Patent 10,588,554 B2)
IPR2020-01539 (Patent 10,588,554 B2)

1     Now he also teaches away from having any air gap in the sensor to the
2  skin.  At column 2, lines 58 to 61 he identifies how optical problems exist
3  when an air gap exists between the sensor and the skin.  Apple presents a
4  great deal of debate about, you know, where light will go if you just add a
5  lens but Mendelson says don't let an air gap happen and he thought that
6  disturbing the issues, the surface blood, he talked about disturbing it with
7  pressure.  So adding any design that intentionally puts pressure on the tissue
8  with a convex surface flies in the face of what he's teaching and it would
9  create an air gap as we've seen in Ohsaki.  Flies in the face of those
10  teachings.  He says the problem is from pressure being put on those
11  superficial.

12     Ohsaki says I'm going to solve this by looking at arteries.  I'm not
13  going to look at the superficial layers.  Mendelson says I'm going to use
14  another wavelength so that I can compensate for that.  Interestingly while
15  we're talking about Mendelson is Mendelson 1988 which is another one of
16  their base references, it's basically the same design.  That's in my slide 16 is
17  a picture of that and slide 16 again shows a flat sensor.  It does have some
18  encapsulant that's an optically clear epoxy.  Again, you apply it to the
19  forehead.  It explains against using the forearm, the chest or the back as
20  difficult because they have relatively small photoplethysmographic signals
21  because it's coming from these surface layers.  It teaches that any low blood
22  density areas are not good places to measure, that's at page 2 the left column
23  in the middle and he says in fact practically the major limitation in reflection

Appx02504

IPR2020-01520 (Patent 10,258,265 B1)
IPR2020-01536 (Patent 10,588,553 B2)
IPR2020-01537 (Patent 10,588,553 B2)
IPR2020-01538 (Patent 10,588,554 B2)
IPR2020-01539 (Patent 10,588,554 B2)

1   pulse oximetry is the comparatively low level plethysmograms typically

2   recorded from low density vascular areas of the skin, that feasibility of

3   reflection pulse oximetry therefore is essentially dependent on the ability to

4   design a sensor that can detect sufficiently strong reflection

5   photoplethysmographic signals from various locations on the body.  He

6   explains the wrist is one of those low density sections and there's problems

7   and concluded that the forehead was a good location.

8        I just want to make a -- I can't but help make a note in talking about

9   the Mendelson 2006 which is also one of the secondary references and that's

10  shown in my slide 20.  We're now spanning over 18 years of Mendelson

11  doing experiments in this industry with the references that have been

12  presented to the Board and he's still disclosing using the flat contacting

13  surface.  He's still focusing on the forehead and it's logical.  He says this is

14  for a headband or integrated into a soldier's helmet so they can tell with

15  soldiers in the field whether their physiological parameters is the soldier

16  desaturating?  How urgent is the situation?  That's integrated into the

17  helmet.  I just want you to think for a minute of cutting a marble in half and

18  putting it in the band of your helmet on your forehead.  It is going to

19  pressure the blood out.  It's also going to be incredibly uncomfortable.

20       He teaches again multiple discrete photodetectors on an annular

21  shaped photodetector ring or an annularly shaped photodetector ring to

22  increase the back scattered light.  No identification of a problem that he

23  needs to get more signal, that there's a problem he's still trying to solve

IPR2020-01520 (Patent 10,258,265 B1)
IPR2020-01536 (Patent 10,588,553 B2)
IPR2020-01537 (Patent 10,588,553 B2)
IPR2020-01538 (Patent 10,588,554 B2)
IPR2020-01539 (Patent 10,588,554 B2)

1   there.  Mendelson's solution to sufficient strength is put the ring of detectors

2   around it, multiple detectors surrounding the LED on a high blood area like

3   the forehead.

4        Let me talk about Ohsaki.  There's been a lot of discussion about

5   Ohsaki today.  We're back to reliable detection of the pulse on the wrist, not

6   pulse oximetry.  We don't need the ratios.  We don't need to know exactly

7   what those amplitudes are, we just need to know that something's going up

8   and down.  The ratio of two wavelengths is no longer an issue and nowhere

9   does Ohsaki, that I find, provide a general teaching that a convex surface

10  will improve signal strength or even improve adhesion.  The best is intimate

11  contact with the skin on the back of the wrist.  So imagine -- so more

12  importantly, a person of skill reading Mendelson would have known putting

13  pressure causes errors to displace the superficial blood and that's what we're

14  combining it with in one of the combinations and Aizawa also said use a flat

15  plate for adhesion and detection efficiency and as a goal (phonetic) of the

16  detector over the artery.  It would be counter-productive and against the

17  teachings of those references to now just say okay, let's just put a curve on it

18  and displace the blood in the superficial layers.

19       Its design in Ohsaki is configured for detecting pulse on the back of

20  the wrist which is inapposite to the combination that they have proposed

21  with Aizawa and Mendelson.  Mendelson says those are back placed,

22  Aizawa says go on the palm of the wrist.  The title is a Wrist Watch-type

23  Human Pulse Wave Sensor Attached to the Back of the User's Wrist.  It

58

IPR2020-01520 (Patent 10,258,265 B1)
IPR2020-01536 (Patent 10,588,553 B2)
IPR2020-01537 (Patent 10,588,553 B2)
IPR2020-01538 (Patent 10,588,554 B2)
IPR2020-01539 (Patent 10,588,554 B2)

1  patents.  I do note that a lot of the attributes mentioned by him are really not

2  found in the claims.  The claims are written quite far more broadly than how

3  he has described the inventions including things like this time averaging

4  among multiple LED signals.  That's just something not recited in the

5  claims, certainly not in the '265 patent claims.

6          I also want to talk about a comment he made that there is no

7  disclosure in the prior art of having a convex lens in front of a sensor face

8  that has multiple detectors.  It's actually not true.  In Inokawa itself and

9  Figure 19 shows a convex lens positioned over an LED that's surrounded by

10  two detectors at its periphery and as disclosed in Inokawa that would

11  provide a light gathering improvement to that sensor face and I should note

12  that when we filed the petition, Your Honors, we were actually quite taken

13  aback by the response we received from Masimo because when we looked at

14  Inokawa we saw, as we have explained today to you, a general teaching that

15  adding a lens would indeed increase the light gathering capabilities of an

16  optical sensor and would not be limited to a particular arrangement of

17  photodetectors and LEDs.  We were quite surprised to see in the reply that

18  they took Inokawa's broad teachings as set forth and as we indicated in

19  claim 8, claim 29, Figures 2, 3, 16 and 19 and suddenly said no, sorry, but

20  that lens does not provide a light gathering improvement for an optical

21  sensor unless that optical sensor looks just like Figure 2 that it has the LEDs

22  at the periphery and the detector at the center and only for that configuration

23  does a light gathering -- do you enjoy a light gathering improvement and we

69

IPR2020-01520 (Patent 10,258,265 B1)
IPR2020-01536 (Patent 10,588,553 B2)
IPR2020-01537 (Patent 10,588,553 B2)
IPR2020-01538 (Patent 10,588,554 B2)
IPR2020-01539 (Patent 10,588,554 B2)

1   good adhesion and improve detection efficiency contrary to the teachings of

2   both.  The first says use a plate-like thing on this side, Ohsaki says it slips if

3   you put it on that side.  Find that a person of skill would ignore that

4   Mendelson '799 teaches over and over and over again that pressure on the

5   tissue is a problem that Mendelson solves within the LED and he is using a

6   flat surface.  Nobody disputes that and he continued to use a flat surface for

7   18 years and who would have thought wanted to put a bump in your helmet?

8   Find that a person of skill would ignore that Mendelson 2006, just to show

9   using the flat sensor as I mentioned.  Find that a person of skill would ignore

10   that Mendelson teaches to avoid air gaps and to rather accept the conclusion

11   that a person of skill would add the convex surface to increase signal

12   strength which Ohsaki doesn't say.

13       The only reference that talks about that kind of thing is the patent in

14   suit, and then to add opaque windows by the way which I didn't really

15   address much to decrease the signal strength that you just increased because

16   you'll saturate the detector which in Schulz of course was an ear sensor

17   where there's really no bone or anything and said hey, we need to reduce it.

18   The Petitioner started with you have weak signals so you should strengthen

19   them, now let's put these windows over the top so that we can decrease

20   them.

21       They would ask you to accept that a person of skill would use extra

22   LEDs from a disclosure that says use an extra LED to eliminate wireless

23   communications for a product that avoids real time monitoring capability

82

Filed: April 12, 2022

Filed on behalf of:
    Patent Owner Masimo Corporation
By:    Joseph R. Re (Reg. No. 31,291)
    Stephen C. Jensen (Reg. No. 35,556)
    Jarom D. Kesler (Reg. No. 57,046)
    Stephen W. Larson (Reg. No. 69,133)
    Jacob L. Peterson (Reg. No. 65,096)
    William R. Zimmerman (admitted *pro hac vice*)
    Jeremiah S. Helm, Ph.D. (admitted *pro hac vice*)
    KNOBBE, MARTENS, OLSON & BEAR, LLP
    2040 Main Street, Fourteenth Floor
    Irvine, CA 92614
    Tel.:  (949) 760-0404
    Fax:  (949) 760-9502
    E-mail:  AppleIPR2020-1520-265@knobbe.com

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

APPLE INC.

Petitioner,

v.

MASIMO CORPORATION,

Patent Owner.

---

Case IPR2020-01520
U.S. Patent 10,258,265

---

# PATENT OWNER'S NOTICE OF APPEAL TO THE U.S. COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Pursuant to 28 U.S.C. § 1295(a)(4)(A), 35 U.S.C. §§ 141(c), 142, and 319, 37 C.F.R. §§ 90.2(a) and 90.3, and Rule 4(a) of the Federal Rules of Appellate Procedure, Patent Owner Masimo Corporation ("Masimo") hereby appeals to the United States Court of Appeals for the Federal Circuit from the Judgement – Final Written Decision (Paper No. 39) entered on February 23, 2022 (Attachment A) and from all underlying orders, decisions, rulings, and opinions that are adverse to Masimo related thereto and included therein, including those within the Decision Granting Institution of *Inter Partes* Review, entered March 2, 2021 (Paper 7). Masimo appeals the Patent Trial and Appeal Board's determination that claims 1–4, 6–14, and 16–30 of U.S. Patent 10,258,265 are unpatentable, and all other findings and determinations, including but not limited to claim construction, as well as all other issues decided adverse to Masimo's position or as to which Masimo is dissatisfied in IPR2020-01520 involving U.S. Patent 10,258,265.

Masimo is concurrently providing true and correct copies of this Notice of Appeal, along with the required fees, with the Director of the United States Patent and Trademark Office and the Clerk of the United States Court of Appeals for the Federal Circuit.

Respectfully submitted,

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated:  April 12, 2022    /Jarom Kesler/
                          Jarom D. Kesler (Reg. No. 57,046)
                          Customer No. 64,735

                          Attorney for Patent Owner
                          Masimo Corporation

# ATTACHMENT A

Trials@uspto.gov                                                Paper 39
571-272-7822                                        Date: February 23, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

APPLE INC.,
Petitioner,

v.

MASIMO CORPORATION,
Patent Owner.

_____

IPR2020-01520
Patent 10,258,265 B1

_____

Before GEORGE R. HOSKINS, ROBERT L. KINDER, and
AMANDA F. WIEKER, *Administrative Patent Judges*.

HOSKINS, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

IPR2020-01520
Patent 10,258,265 B1

# I.    INTRODUCTION

Apple Inc. ("Petitioner") filed a Petition (Paper 2, "Pet.") pursuant to 35 U.S.C. §§ 311–319 to institute an *inter partes* review of U.S. Patent No. 10,258,265 B1 ("the '265 patent"), claims 1–4, 6–14, and 16–30.  We instituted the petitioned review (Paper 7, "Institution Decision" or "Inst. Dec.").

Masimo Corporation ("Patent Owner") filed a Patent Owner Response (Paper 21, "PO Resp.") to oppose the Petition.  Petitioner filed a Reply (Paper 24, "Pet. Reply") to the Patent Owner Response.  Patent Owner filed a Sur-reply (Paper 27, "Sur-reply") to the Reply.  With prior authorization from the Board, Petitioner filed an Identification of Testimony (Paper 33) in response to the Sur-reply.  An oral hearing was held, for which the transcript was entered into the record (Paper 37, "Tr.").

We have jurisdiction under 35 U.S.C. § 6(b)(4) and § 318(a).  This Decision is a final written decision under 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73 as to the patentability of claims 1–4, 6–14, and 16–30 of the '265 patent.  We determine Petitioner has shown by a preponderance of the evidence that those claims are unpatentable.

# II.    BACKGROUND

## A.    *Real Parties-in-Interest and Related Proceedings*

Petitioner identifies itself as the sole real party-in-interest for Petitioner.  Pet. 104.  Patent Owner identifies itself as the sole real party-in-interest for Patent Owner.  Paper 4, 1.

The parties identify one district court litigation as related to this proceeding: *Masimo Corp. et al. v. Apple Inc.*, Civil Action No. 8:20-cv-

2

IPR2020-01520
Patent 10,258,265 B1

00048 (C.D. Cal.).  Pet. 105; Paper 4, 1.  We are also aware of several other

IPR proceedings challenging other patents at issue in that litigation.  *See,*

*e.g.*, Pet. 105; Paper 4, 3.

### B.    The '265 Patent

The '265 patent concerns noninvasive devices for measuring blood

analytes such as glucose, or other physiological characteristics such as pulse

rate.  *See* Ex. 1001, code (57), 2:20–30.  Figures 3C and 3E are reproduced

below:



**FIG. 3C**          **FIG. 3E**

Figure 3C is a perspective view of sensor 301a, comprising upper emitter

shell 304a pivotably connected to lower detector shell 306a, to sandwich a

person's finger between the shells.  *See id.* at 5:52–55, 18:39–51.  Figure 3E

is a perspective view of detector shell 306b of a different but similar

sensor 301b.  *See id.* at 5:59–61, 22:21–40 ("The features described with

3

respect to the detector shell 306b can also be used with the detector shell 306a of the sensor 301a.").

Emitter shell 304a houses emitter components (not shown in Figure 3C) such as LEDs, which emit light of different wavelengths, such as visible light, near infrared light, or infrared light. *See id.* at 5:3–7, 12:3–12, 13:8–15, 18:40–42, 18:62–63.

Detector shell 306a / 306b houses four photodetectors 316, one underneath each window 320–323 within finger bed 310 formed on top of the shell. *See id.* at 19:4–5, 19:13–16, 19:38–48. Finger bed 310 includes "a tissue thickness adjustor or protrusion 305," which may be removed and interchanged with other protrusions 305 to correspond to different finger characteristics. *Id.* at 19:29–37.

Sensor 301a operates in the following manner. A person places a finger on finger bed 310, and upper emitter shell 304a pivots toward lower detector shell 306a / 306b to hold the finger in place, and to shield the interior of sensor 301a from interference by ambient light. *See id.* at 16:52–64, 18:43–51, 18:66–19:20. Then, the emitters housed in emitter shell 304a emit light of different wavelengths, to pass through the person's finger and into windows 320–323 within finger bed 310, to reach photodetectors 316. *See id.* at 19:38–48. Photodetectors 316 capture and measure the light, which has been attenuated by the person's finger tissue, and output responsive signals to a processor that uses the signals to derive a physiological parameter of the person. *See id.* at 2:20–30, 10:30–39, 10:62–11:1, 14:11–19, 15:31–35, 18:39–42.

Another detector subassembly is shown in Figure 14D, reproduced below:

IPR2020-01520
Patent 10,258,265 B1



## FIG. 14D

Figure 14D shows detector subassembly 1450 including submount 1400c, cylindrical housing 1430, transparent cover 1432 with protrusion 605b disposed on it, and four detectors 1410c. *See id.* at 6:54–55, 36:38–47. The light focusing properties provided by protrusion 605b advantageously reduce the number of detectors, or rows of detectors, that are required. *See id.* at 35:56–36:10; *see also id.* at Fig. 14B, 36:11–30 (illustrating and describing function of a "partially cylindrical protrusion 605 (or alternatively, the protrusion 605b)" to focus light on detector(s) 1410b).

C.    *The Claims of the '265 Patent*

The '265 patent lists thirty claims, including two independent claims, claims 1 and 26. Ex. 1001, 44:65–47:20. We reproduce illustrative claim 1 here:

5

IPR2020-01520
Patent 10,258,265 B1

1.  A noninvasive optical physiological measurement device adapted to be worn by a wearer, the noninvasive optical physiological measurement device providing an indication of a physiological parameter of the wearer comprising:

a plurality of emitters of different wavelengths;

a housing having a surface and a circular wall protruding from the surface;

at least four detectors arranged on the surface and spaced apart from each other, the at least four detectors configured to output one or more signals responsive to light from the one or more light emitters attenuated by body tissue, the one or more signals indicative of a physiological parameter of the wearer; and

a light permeable cover arranged above at least a portion of the housing, the light permeable cover comprising a protrusion arranged to cover the at least four detectors.

*Id.* at 44:66–45:15.

### D.    *Prior Art and Asserted Grounds*

Petitioner relies on the following eight prior art references.  *See* Pet. 1–3.

| Name | Reference | Date | Exhibit No(s). |
|---|---|---|---|
| Aizawa | US 2002/0188210 A1 | Dec. 12, 2002 | 1006 |
| Beyer | US 7,031,728 B2 | Apr. 18, 2006 | 1019 |
| Goldsmith | US 2007/0093786 A1 | Apr. 26, 2007 | 1027 |
| Inokawa | JP 2006-296564 A | Nov. 2, 2006 | 1007 & 1008[1] |
| Lo | US 2004/0138568 A1 | July 15, 2004 | 1028 |

---

[1]  Exhibit 1007 is the reference, which was published in the Japanese language, and Exhibit 1008 is a certified English language translation.

6

IPR2020-01520
Patent 10,258,265 B1

| Name | Reference | Date | Exhibit No(s). |
|------|-----------|------|----------------|
| Mendelson-1988 | Y. Mendelson, et al., *Design and Evaluation of a New Reflectance Pulse Oximeter Sensor*, Medical Instrumentation, Vol. 22, No. 4, 167–173 (1988) | Aug. 1988 | 1015 |
| Mendelson-2006 | Y. Mendelson, et al., *A Wearable Reflectance Pulse Oximeter for Remote Physiological Monitoring*, Proceedings of the 28th IEEE EMBS Annual Int'l Conf., 912–915 (2006) | Dec. 26, 2007[2] | 1016 |
| Ohsaki | US 2001/0056243 A1 | Dec. 27, 2001 | 1014 |

Petitioner relies on the following eight grounds of unpatentability, all under 35 U.S.C. § 103.  *See* Pet. 1–2.

| Ground | Claim(s) Challenged | References |
|--------|---------------------|-----------|
| 1A | 1–4, 6–14, 16, 17, 19–23, 26–29 | Aizawa, Inokawa |
| 1B | 1–4, 6–14, 16, 17, 19–23, 26–29 | Aizawa, Inokawa, Ohsaki |
| 1C | 23, 24 | Aizawa, Inokawa, Mendelson-2006 |
| 1D | 23, 24 | Aizawa, Inokawa, Goldsmith, Lo |

---

[2]  This date for Mendelson-2006 is taken from the Petition (page 3), as the date when the reference "was first cataloged by Cornell University's library" (Ex. 1026 ¶¶ 11–14).

IPR2020-01520
Patent 10,258,265 B1

| Ground | Claim(s) Challenged | References |
|--------|---------------------|-----------|
| 1E | 25 | Aizawa, Inokawa, Mendelson-2006, Beyer |
| 2A | 1–4, 6–14, 16–22, 26–30 | Mendelson-1988, Inokawa |
| 2B | 23, 24 | Mendelson-1988, Inokawa, Mendelson-2006 |
| 2C | 25 | Mendelson-1988, Inokawa, Mendelson-2006, Beyer |

### E.    Testimonial Evidence

Petitioner relies on the declaration testimony of Thomas W. Kenny, Ph.D. (Exhibits 1003 and 1047).  Patent Owner relies on the declaration testimony of Vijay K. Madisetti, Ph.D. (Exhibit 2004).

### III.    ANALYSIS

### A.    Statement of Law

Petitioner bears the burden of proving unpatentability of the challenged claims, and the burden of persuasion never shifts to Patent Owner.  *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015).  Petitioner must prove unpatentability by a preponderance of the evidence.  *See* 35 U.S.C. § 316(e); 37 C.F.R. § 42.1(d).

A patent claim is unpatentable under 35 U.S.C. § 103 if the differences between the claimed subject matter and the prior art are such that the subject matter, as a whole, would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.  *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406

Appx02548

(2007).  The question of obviousness is resolved on the basis of underlying factual determinations including:  (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and (4) objective evidence of non-obviousness, if made available in the record.[3]  *See Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

### B.    *Level of Ordinary Skill in the Art*

Petitioner contends a person having ordinary skill in the art pertaining to the '265 patent ("POSITA") would have "a Bachelor of Science degree in an academic discipline emphasizing the design of electrical, computer, or software technologies, in combination with training or at least one to two years of related work experience with capture and processing of data or information."  Pet. 3–4; Ex. 1003 ¶¶ 21–22.  "Alternatively, the person could have also had a Master of Science degree in a relevant academic discipline with less than a year of related work experience in the same discipline." Pet. 4; Ex. 1003 ¶ 21.

Patent Owner "applies Petitioner's level of skill."  PO Resp. 10; Ex. 2004 ¶¶ 35–38.  Patent Owner emphasizes that this level of skill requires no specific education or experience "with optics or optical physiological monitors" or "in physiology," and instead "focuses on data processing and not sensor design."  PO Resp. 10; Ex. 2004 ¶ 37.

Petitioner's POSITA formulation is reasonable based on the record and the agreement of the parties.  We also determine it is consistent with the

---

[3]  The parties have not produced any objective evidence of non-obviousness.

IPR2020-01520
Patent 10,258,265 B1

'265 patent claims and the prior art of record. We adopt Petitioner's
POSITA formulation in this Decision.

### C.    Claim Construction

We interpret the '265 patent claims "using the same claim
construction standard that would be used to construe the claim in a civil
action under 35 U.S.C. 282(b)." 37 C.F.R. § 42.100(b). This "includ[es]
construing the claim in accordance with the ordinary and customary
meaning of such claim as understood by one of ordinary skill in the art and
the prosecution history pertaining to the patent." *Id.*

Petitioner asserts "no formal claim constructions are necessary in this
proceeding." Pet. 3. Patent Owner construes one claim term, "cover,"
seeking to distinguish Mendelson-1988 from the claims. *See* PO Resp. 9,
50–51. We address that claim construction here.

### 1.    "cover"

Independent claim 1 requires "a light permeable cover," and
independent claim 26 requires "a cover . . . comprising a lens portion."
Ex. 1001, 45:13–15, 46:58–60.

Patent Owner argues the claimed "cover" must be construed to
exclude "an optically clear adhesive/epoxy" and a "resin on a surface." PO
Resp. 50; Ex. 2004 ¶¶ 111–114. Patent Owner asserts "the '265 Patent
distinguishes a resin on a surface from a cover, explaining: 'the cylindrical
housing 1430 (and transparent cover 1432) . . . can protect the
detectors 1410c and conductors 1412c *more effectively* than currently-
available *resin epoxies*." PO Resp. 50–51 (quoting Ex. 1001, 36:58–67).

10

IPR2020-01520
Patent 10,258,265 B1

Patent Owner alleges Dr. Kenny also "distinguished a sealing resin from a cover, acknowledging a 'layer of sealing resin' is 'one way to protect the components *without using a cover*.'" *Id.* at 51 (quoting Ex. 2009, 395:22–396:17); Ex. 2004 ¶ 113.  Patent Owner argues its construction is consistent with the prior art.  PO Resp. 51 (citing Ex. 1008 ¶ 103, Fig. 17; Ex. 1012, 5:2–6, Fig. 2B; Ex. 1013 ¶ 32, Fig. 2; Ex. 1023 ¶ 35; Ex. 1027 ¶ 85, Fig. 9B); Ex. 2004 ¶ 114.

Petitioner replies that "there is nothing in the specification or the prosecution history [of the '265 patent] that would lead a POSITA to conclude that 'cover' should be interpreted based on anything other than its plain meaning."  Pet. Reply 27 (citing *Thorner v. Sony Computer Entertainment America LLC*, 669 F.3d 1362, 1368 (Fed. Cir. 2012)).  That plain meaning, according to Petitioner, is that "a cover is merely 'something that protects, shelters, or guards.'" *Id.* (quoting Ex. 1050); Ex. 1047 ¶ 56. Petitioner argues Patent Owner's reliance on the '265 patent specification takes certain text out of context, and when this context is considered, it is clear that "the epoxy resin to which the '265 patent compares its cover is not [an] epoxy cover . . . but rather epoxy that is applied to solder joints."  Pet. Reply 28 (citing Ex. 1001, 36:58–67); Ex. 1047 ¶ 58.

Petitioner accuses Patent Owner of mischaracterizing Dr. Kenny's testimony, because he "clarified that using a sealing resin is 'a pretty common way to protect electronic components.'"  Pet. Reply 28 (citing Ex. 2009, 395:22–396:17); Ex. 1047 ¶ 57.  Further according to Petitioner, "such extrinsic evidence would not justify departure from plain meaning under *Thorner*."  Pet. Reply 28.

Patent Owner maintains in response that the '265 patent specification disclosure at issue "specifically ***distinguishes*** a 'resin' on a surface from a 'cover,'" and Petitioner's reading of this disclosure is not persuasive. Sur-reply 22–23.

Upon review of the foregoing, we disagree with Patent Owner's limiting construction of the term "cover" to exclude epoxy and resin. The plain and ordinary meaning of the term does not support Patent Owner's construction. A "cover" ordinarily connotes "something that protects, shelters, or guards." Ex. 1050 (*Merriam-Webster's Collegiate Dictionary*, 11th ed. (©2005)), 288. That plain and ordinary meaning is consistent with the '265 patent's description of "flex circuit cover 360, which can be made of plastic or another suitable material . . . [and] can cover and thereby protect a flex circuit (not shown)." Ex. 1001, 23:17–26. It is also consistent with the '265 patent's description and illustration of "transparent cover 1432" in Figure 14D, which covers and protects detectors 1410c and conductors 1412c, and which "can be fabricated from glass or plastic, *among other materials*." *See id.* at 36:38–67 (emphasis added), Figs. 14D–14E.

Any special definition for a claim term must be set forth in the specification with reasonable clarity, deliberateness, and precision, so as to give notice of the inventor's own lexicography. *See Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1370 (Fed. Cir. 2005); *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994). Similarly: "The patentee may demonstrate an intent to deviate from the ordinary and accustomed meaning of a claim term by including in the specification expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope."

IPR2020-01520
Patent 10,258,265 B1

*Teleflex, Inc. v. Ficosa North America Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002) (citation omitted).

Here, based on our review of the intrinsic evidence, no such special definition or express disavowal of the term "cover" to exclude epoxy and resin exists. Patent Owner relies on the following description of Figure 14D in this regard:

> In certain embodiments, *the cylindrical housing 1430 (and transparent cover 1432)* forms an airtight or substantially airtight or hermetic seal with the submount 1400c. As a result, the cylindrical housing 1430 can protect the detectors 1410c and conductors 1412c from fluids and vapors that can cause corrosion. Advantageously, *in certain embodiments, the cylindrical housing 1430 can protect* the detectors 1410c and conductors 1412c *more effectively than currently-available resin epoxies*, which are sometimes applied to solder joints between conductors and detectors.

Ex. 1001, 36:58–67 (emphases added). First, the sentence cited by Patent Owner begins with the phrase "Advantageously, in certain embodiments," which indicates the claimed invention is open to other embodiments, so there is no lexicography or disavowal here. Second, we agree with Petitioner's reading of this sentence as distinguishing the prior art from the claimed invention based on the *location* of the material (being applied only to solder joints between conductors and detectors in the prior art, as opposed to covering the conductors and detectors in the invention) and not the *type* of material. Third, at best for Patent Owner, the '265 patent expresses a preference for a cover to be made of glass or plastic, because such materials provide "more effective[]" protection than resin epoxies that were known to the inventors of the '265 patent when it was filed. *See id.* at 36:50–67. But even this reading recognizes that resin epoxies provide some amount of

13

protection, albeit a lesser amount than glass or plastic, and therefore may in some embodiments provide a cover.

The prior art references cited by Patent Owner do not persuade us otherwise. Patent Owner cites various descriptions of a "cover" in the prior art, but they do not even identify a material for the cover, much less suggest that a cover may not be made of epoxy or resin. *See* Ex. 1008 ¶ 103 (cover 123); Ex. 1012, 5:2–6 (cover plate 21); Ex. 1013 ¶ 32 (cover 200); Ex. 1027 ¶ 85 (cover 960). Patent Owner cites another reference which describes materials 30, 40 and 50 as formed of a "thermoplastic resin," and illustrates these materials as covering LED 22 and bonding wire 23, but does not describe the materials as being a "cover." Ex. 1023 ¶ 35, Fig. 6. This does not mean a POSITA would fail to consider these materials as being a "cover," despite that this specific term was not used in the reference.

Dr. Kenny's deposition testimony cited by Patent Owner also does not persuade us otherwise. Dr. Kenny testifies that "a layer of sealing resin" "could" be used to protect the electronic components in a sensor (Ex. 2009, 395:22–396:8). He was then asked "So that would be one way to protect the components without using a cover, correct?" to which he answered "There are many ways to protect the elements other than using a cover" and maintained his proposed combination of prior art has a "cover" to achieve purposes other than protecting electronic components. *Id.* at 396:9–17. He did not squarely testify that sealing resin could not ever be a cover.

Thus, we do not construe the claimed "cover" to exclude epoxy and resin.

IPR2020-01520
Patent 10,258,265 B1

### 2. *Other Claim Terms*

Upon consideration of the entirety of the arguments and evidence presented, we conclude no further explicit construction of any claim term is needed to resolve the issues presented by the arguments and evidence of record. *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) (per curiam) (claim terms need to be construed "only to the extent necessary to resolve the controversy" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))).

### D. *Ground 1A — Obviousness over Aizawa and Inokawa*

In Ground 1A, Petitioner argues claims 1–4, 6–14, 16, 17, 19–23, and 26–29 of the '265 patent would have been obvious over Aizawa and Inokawa. Pet. 1–2, 6–48. Patent Owner opposes. PO Resp. 11–40. We conclude a preponderance of the evidence supports Petitioner's assertions as to all challenged claims. We begin our analysis with brief summaries of Aizawa and Inokawa, then we address the parties' contentions.

### 1. *Aizawa Disclosure*

Aizawa discloses a pulse rate detector comprising a sensor worn on a user's wrist. Ex. 1006, code (57). Figures 1(a) and 1(b) are reproduced below:

15

IPR2020-01520
Patent 10,258,265 B1

FIG. 1 (a)

FIG. 1 (b)





Figure 1(a) is a schematic underside view, and Figure 1(b) is a schematic cross-sectional side view, of pulse rate detector 1 including pulse rate sensor 2, and belt 7 to be wrapped around a user's wrist 10. *Id.* ¶¶ 17, 23, 26. Sensor 2 includes LED 21 which emits near infrared light. *Id.* ¶¶ 23, 27. The emitted light enters the user's wrist 10 and reflects off red corpuscles in artery 11. *Id.* ¶ 27. Some of the reflected light is received by four photodetectors 22 arranged around LED 21. *Id.* ¶¶ 23, 27. Associated

16

**Appx02556**

IPR2020-01520
Patent 10,258,265 B1

electronics 3, 4, and 24 gather and process signals from photodetectors 22 to generate a pulse wave indicative of the user's pulse, and transmit the pulse wave to an unshown display for display to the user. *Id.*

Detector 1 includes holder 23 to hold LED 21 and photodetectors 22 in place. *Id.* ¶ 23. Acrylic transparent plate 6 is disposed between holder 23 and the user's wrist 10. *Id.* ¶¶ 23, 26, 30. "[B]elt 7 is fastened such that the acrylic transparent plate 6 becomes close to the artery 11 of the wrist 10," and "[t]hereby, adhesion between the wrist 10 and the pulse rate detector 1 is improved." *Id.* ¶ 26. "Since the acrylic transparent plate 6 is provided on the detection face 23a of the holder 23, adhesion between the pulse rate detector 1 and the wrist 10 can be improved, thereby further improving the detection efficiency of a pulse wave." *Id.* ¶ 30.

### 2. Inokawa Disclosure

Inokawa discloses an optical vital sensor system worn on a user's wrist. *See* Ex. 1008, code (57), ¶ 56. Figures 1 and 2 are reproduced below:



17

IPR2020-01520
Patent 10,258,265 B1

Figure 1 is a perspective view, and Figure 2 is a diagrammatic side view, of "a pulse sensor 1 that is able to sense the pulse, etc. by being attached, for example, to a person's . . . wrist" via wristband 5. *Id.* ¶¶ 56–57, 119.

Sensor unit 3 has green LED 21 and infrared LED 23, with a single photodiode 25 to detect light emitted from both LEDs and reflected from the user's wrist, as shown by arrows in Figure 2. *Id.* ¶¶ 57–58. The "basic function of . . . green LED 21 is to sense the pulse . . . while the . . . infrared LED 23 serves to sense body motion." *Id.* ¶ 59.

Pulse sensor 1 includes lens 27, which "makes it possible to increase the light-gathering ability of the LED as well as to protect the LED or [photodiode 25]." *Id.* ¶¶ 15, 58.

Pulse sensor 1 also uses LEDs 21 and 23 to download data to a base station, as shown in Figure 3, reproduced below.



(FIG. 3)

Figure 3 illustrates pulse sensor 1 mounted on base station 17. *Id.* ¶¶ 60, 66. Vital sign information stored in sensor 1 is downloaded to base station 17,

18

IPR2020-01520
Patent 10,258,265 B1

which forwards the information to a personal computer 59 (shown in Figure 7). *Id.* ¶¶ 66–67. Specifically, this information is encoded into light emitted by infrared LED 23 of sensor 1 and detected by photodetector 45 of base station 17. *Id.* ¶¶ 66–67, 76. At the same time, green LED 21 may transmit "checksum" information to another photodetector of base station 17 (as shown in Figure 19), to increase the accuracy of data transmission. *Id.* ¶ 14; *see also id.* ¶¶ 109–111 (describing how "the presence of two pairs of light-emitting and light-receiving elements makes it possible to efficiently transmit information"). Mounting sensor 1 on base station 17 further permits sensor 1 to be electrically charged via terminals 19 and 39. *Id.* ¶¶ 60, 66, Fig. 7.

"As a result" of this optical data communication from sensor 1 to base station 17, "there is no need to use a special wireless communication circuit or a communication cable as previously, which makes it possible to transmit vital sign information to the base device 17 accurately, easily, and without malfunction." *Id.* ¶ 77; *see also id.* ¶¶ 3–7 (describing a "problem" in prior art devices that require "a dedicated wireless communication circuit" to "transmit data wirelessly," which is overcome by Inokawa's optical data communication to a base station because the dedicated wireless communication circuit is unnecessary).

### 3. Claim 1

Petitioner provides arguments and evidence, including testimony from Dr. Kenny, in support of contending claim 1 is unpatentable as having been obvious over Aizawa and Inokawa. Pet. 6–29; Ex. 1003 ¶¶ 53–63, 73–99.

19

IPR2020-01520
Patent 10,258,265 B1

Patent Owner provides arguments and evidence in opposition, including testimony from Dr. Madisetti.  PO Resp. 11–40; Ex. 2004 ¶¶ 34, 39–88.

a)      *Comparing Claim 1 with Aizawa*

Petitioner contends Aizawa's pulse rate detector 1 exhibits each and every limitation of claim 1, except that it has only one emitter (i.e., LED 21) of near infrared light instead of the claimed "plurality of emitters of different wavelengths," and its light permeable cover (i.e., acrylic transparent plate 6) lacks the claimed "protrusion."  *See* Pet. 6–9, 22–29; Ex. 1003 ¶¶ 53–58, 73–99.  Patent Owner does not challenge Petitioner's contentions in this regard.  We determine these contentions are supported by a preponderance of the evidence, as follows.

As pertinent to the undisputed limitations of claim 1, we find Aizawa's detector 1 is a noninvasive optical measurement device adapted to be worn on a user's wrist, to provide an indication of a physiological parameter of the user (i.e., pulse wave).[4]  *See* Ex. 1006, Fig. 2, ¶¶ 2, 26; Pet. 22–23; Ex. 1003 ¶ 73.  We find Aizawa's detector 1 has a single emitter (i.e., LED 21) of one wavelength (i.e., near infrared light).  *See* Ex. 1006, Figs. 1(a)–1(b), ¶¶ 23, 27; Pet. 6–7, 23–24; Ex. 1003 ¶¶ 53–54, 74.  We find Aizawa's detector 1 includes a housing having a surface and a circular wall protruding from the surface.  *See* Ex. 1006, Figs. 1(a)–1(b) & 2, ¶¶ 23–24; Ex. 1003 ¶¶ 87–88.  In particular, Petitioner annotates Aizawa's Figures to identify the "Housing" in red, the "Surface" in brown, and the "Circular wall" in purple.  *See* Pet. 24–25; Ex. 1003 ¶¶ 87–88.

---

[4]  Whether the preamble is limiting need not be resolved, because the recitation in the preamble is satisfied by the prior art.

We find Aizawa's detector 1 further includes four detectors (i.e., photodetectors 22) arranged on the housing's surface and spaced apart from each other, symmetrically on a circle centered on LED 21. *See* Ex. 1006, Figs. 1(a)–1(b), ¶¶ 24, 29, 32; Pet. 25–27; Ex. 1003 ¶¶ 89–90. We find Aizawa's photodetectors 22 are configured to output signals responsive to light emitted from LED 21 and attenuated by the user's body tissue, and the signals are indicative of the user's pulse wave. *See* Ex. 1006 ¶¶ 23, 27, 28; Pet. 27; Ex. 1003 ¶ 91.

We find Aizawa's detector 1 has a light permeable cover (i.e., plate 6) mounted at detection face 23a of holder 23, to cover four photodetectors 22. *See* Ex. 1006, Fig. 1(b), ¶ 23; Pet. 28–29; Ex. 1003 ¶¶ 92–93.

### b)    *Comparing Claim 1 with Inokawa*

Petitioner contends Inokawa's pulse sensor 1 is a noninvasive optical measurement device having two emitters (i.e., LEDs 21 and 23) of different wavelengths, and a light permeable cover (i.e., lens 27) comprising a protrusion arranged to cover its light detector (i.e., detector 25). *See* Pet. 9–11; Ex. 1003 ¶¶ 59–63, 73–99. Patent Owner does not challenge Petitioner's contentions in this regard. We determine these contentions are supported by a preponderance of the evidence, as follows.

As pertinent to the undisputed limitations of claim 1, we find Inokawa's pulse sensor 1 is a noninvasive optical measurement device adapted to be worn on a user's wrist, to provide an indication of two physiological parameters of the user (i.e., pulse and body motion). *See* Ex. 1008, Figs. 1 & 2, ¶¶ 14, 56–59; Pet. 9–10; Ex. 1003 ¶¶ 59–60. We find this is accomplished using light from green LED 21 to monitor the user's

IPR2020-01520
Patent 10,258,265 B1

pulse, and using light from infrared LED 23 to monitor the user's motion, both using detector 25. *See* Ex. 1008, Fig. 2, ¶¶ 14, 58–59; Pet. 10; Ex. 1003 ¶ 60.

We find Inokawa's pulse sensor 1 also has a light permeable cover (i.e., lens 27), which according to Inokawa "makes it possible to increase the light-gathering ability of the LED as well as to protect the LED or [photodiode 25]." Ex. 1008, Fig. 2, ¶¶ 15, 58; Pet. 10; Ex. 1003 ¶ 61. We find lens 27 comprises a protrusion that covers the device's detector 25. Ex. 1008, Fig. 2; Pet. 10–11; Ex. 1003 ¶¶ 61, 95–96.

### c)    *Obviousness of Combining Aizawa and Inokawa*

Petitioner contends a POSITA would have been motivated to modify Aizawa's pulse rate detector 1, in light of Inokawa's disclosures, by: (1) adding a second emitter to emit light of a different wavelength, so that Aizawa's detector 1 can monitor the user's body motion for improved pulse detection, and so that detector 1 can transmit information more reliably to a base device with less error; and (2) adding a protrusion to Aizawa's cover 6 to improve the sensor's light detection efficiency. *See* Pet. 13–22. Patent Owner opposes these contentions, and argues a person of ordinary skill in the art would not have had a reasonable expectation of success, among other things. *See* PO Resp. 15–40. We consider each modification in turn.

### (1)    *Plurality of Emitters of Different Wavelengths*

### (i)    *Petitioner's Contentions*

Petitioner asserts that, "[w]hile Aizawa contemplates the use of multiple emitters, Aizawa never specifically identifies the use of multiple emitters operating at different wavelengths in conjunction with multiple

22

**Appx02562**

IPR2020-01520
Patent 10,258,265 B1

detectors." Pet. 17 (citing Ex. 1006 ¶ 33); Ex. 1003 ¶ 74. Inokawa, in Petitioner's view, discloses using an infrared LED "to detect vital signs and transmit vital sign information," and a separate green LED "to detect pulse." Pet. 17 (citing Ex. 1008 ¶¶ 14, 44, 58–59); Ex. 1003 ¶ 75.

Petitioner asserts a POSITA "would have recognized Inokawa's use of two different emitters operating at different wavelengths as a desirable configuration that would reap similar benefits for Aizawa." Pet. 17; Ex. 1003 ¶ 76. Specifically: "A POSITA would have recognized, in view of Inokawa, that providing an additional emitter to Aizawa would allow Aizawa's device to use its existing infrared LED to detect body motion while using the added green LED to detect pulse." Pet. 17–18 (citing Ex. 1008 ¶ 59), 23–24; Ex. 1003 ¶¶ 76–79. Dr. Kenny concludes "[t]he added ability to measure body movement in this manner will allow for a more reliable measurement that can, for instance, take into account and correct for inaccurate readings related to body movement," because "the signal component corresponding to body movement can be subtracted from the pulse signal to help better isolate the desired pulse data." Ex. 1003 ¶ 77 (citing Exhibit 1010, 8:45–50); Pet. 18.

Petitioner provides the following illustrations to portray the proposed modification of Aizawa's pulse rate detector 1. *See* Pet. 18; Ex. 1003 ¶ 77.



23

IPR2020-01520
Patent 10,258,265 B1

At the left, Petitioner has annotated Aizawa's Figure 1(b), to identify
Aizawa's pre-existing single near infrared emitter 21 (colored green) in
relation to two of Aizawa's four detectors 22 (colored red).  *See* Pet. 18–19.
At the right, Petitioner has shown the proposed modification, which would
include two different emitters (colored green and purple), operating at two
different wavelengths.  *See id.*

As a second and independent motivation "for improving Aizawa by
adding a second LED/emitter," Petitioner contends "Aizawa contemplates
uploading data to a base device yet is silent about how such data
transmission would be implemented, instead leaving such implementation
details to the POSITA."  Pet. 19–20 (citing Ex. 1006 ¶¶ 15, 23, 35);
Ex. 1003 ¶ 80.  Inokawa, in Petitioner's view, discloses how a wrist-worn
pulse sensor 1 can transmit data to base device 17 using infrared LED 23,
which advantageously means "it is not necessary to use a wireless
communication circuit or to establish connections via communication cable,
which makes it possible to easily transmit vital sign information with few
malfunctions and with a simple structure."  Pet. 19–21 (quoting Ex. 1008
¶ 7, and citing *id.* at Fig. 3, ¶ 60); Ex. 1003 ¶¶ 81–82.

Petitioner further concludes: "A POSITA would have been motivated
and found it obvious and straightforward to incorporate Inokawa's base
device and LED-based data transmission into Aizawa to, for instance,
'make[] it possible to transmit vital sign information to the base device 17
accurately, easily, and without malfunction.'"  Pet. 20–21 (quoting Ex. 1008
¶ 77); *id.* at 23–24; Ex. 1003 ¶¶ 83–84.  In particular, according to
Petitioner, Inokawa "teaches that using ***two LEDs*** further helps improve data
transmission accuracy by using the second LED, such as green LED, to

24

**Appx02564**

transmit checksum information such that 'the accuracy of data can be increased.'" Pet. 21 (citing Ex. 1008, Fig. 19, ¶¶ 44, 48, 111); Ex. 1003 ¶ 83. In Petitioner's view, this provides motivation "to supplement Aizawa's IR LED/emitter with a green LED/emitter to, as per Inokawa, improve accuracy of data transmission from its sensor." Pet. 21–22; Ex. 1003 ¶ 84.

### (ii)   *Patent Owner's Contentions*

Patent Owner argues Petitioner's case for the obviousness of modifying Aizawa to have two emitters of different wavelengths is not supported by the evidence of record. *See* PO Resp. 11–13, 34–40; Sur-reply 15–17.

Patent Owner firstly contends the combination of Aizawa and Inokawa does not result in the claimed invention, which requires a "plurality" of emitters and "at least four" detectors. PO Resp. 34. Patent Owner correctly points out that neither Aizawa nor Inokawa discloses a device meeting both of those claim requirements, because Aizawa's embodiments have either a single emitter and multiple detectors (e.g., Ex. 1006, Fig. 1(a)) or multiple emitters and a single detector (e.g., *id.* ¶ 33), and Inokawa discloses multiple emitters and a single detector (e.g., Ex. 1008, Fig. 2). *See* PO Resp. 11–13, 34–36 (citing Ex. 1006, code (57), ¶¶ 33, 26–27, Figs. 1, 2, 4, & 5; Ex. 1008 ¶ 58, Fig. 2); Ex. 2004 ¶¶ 40–43, 79–80. Patent Owner concludes, therefore, that a POSITA seeking to improve upon Aizawa's device to incorporate two emitters would be limited to "positioning multiple LEDs around a ***single*** detector" based on the combined disclosures of Aizawa and Inokawa. PO Resp. 35; Ex. 2004

¶¶ 81–83.  Patent Owner argues Dr. Kenny's testimony in this regard "conflicts with the references themselves" and so "is not credible." PO Resp. 35–36 (citing Ex. 1003 ¶¶ 55, 77).

Patent Owner secondly contends the evidence does not support either of Petitioner's two proffered motivations for modifying Aizawa to have two emitters of different wavelengths.  As to the first motivation of adding the capability to measure body movement using a second emitter to correct for inaccurate pulse readings, Patent Owner asserts Dr. Kenny erroneously testifies that Aizawa cannot do this with its single emitter.  PO Resp. 36 (citing Ex. 1006 ¶ 15; Ex. 2007, 400:7–401:10); Ex. 2004 ¶ 84.  This is because Aizawa states its pulse rate detector comprises "a device for computing the amount of motion load from the pulse rate."  Ex. 1006 ¶ 15; PO Resp. 36; Ex. 2004 ¶ 84.

As to Petitioner's second motivation of enabling Aizawa to transmit data to a base device using an optical communication link, Patent Owner asserts "Aizawa *already* includes a wireless transmitter . . . so Aizawa does not need to incorporate Inokawa's base device [optical] data transmission arrangement."  PO Resp. 36–37 (citing Ex. 1006 ¶¶ 23, 28, 35); Ex. 2004 ¶¶ 85–86.  Indeed, Patent Owner argues "Dr. Kenny acknowledged Aizawa does not indicate there are any problems with Aizawa's form of data transmission."  PO Resp. 37 (citing Ex. 2007, 409:13–410:2).  Patent Owner further contends "Aizawa's goal is to address problems associated with *real-time* measurement of heart rate," where Patent Owner argues the proposed combination would "*eliminate*[] the ability to take and display *real-time* measurements, one of Aizawa's stated goals."  PO Resp. 37–39 (citing Ex. 1006 ¶¶ 4, 15; Ex. 1003 ¶ 101; Ex. 2007, 402:6–11, 405:2–7,

416:5–15; Ex. 2009, 393:6–14; Ex. 2011 ¶ 69 [sic 75]); Tr. 43:7–21 (also citing Ex. 1006 ¶ 6); Ex. 2004 ¶ 86.  Patent Owner insists Inokawa does not aid Petitioner's case, because Inokawa discloses the benefits of using a second emitter in only two situations, to improve over a "cable" communication or "to avoid the use of a 'dedicated wireless communication circuit,'" whereas "Aizawa *already* uses wireless transmission."  PO Resp. 38 (citing Ex. 1008 ¶ 4); Ex. 2004 ¶ 87.

Patent Owner accuses Petitioner and Dr. Kenny of overlooking further complications that would ensue from modifying Aizawa to have two emitters of different wavelengths.  Patent Owner contends this would further increase power consumption and cost.  *See* PO Resp. 38 (citing Ex. 2009, 381:18–382:8, 383:22–385:9, 390:5–392:3); Ex. 2004 ¶ 88.  Further according to Patent Owner, Dr. Kenny overlooks how placing "two LEDs in close proximity may cause thermal interference that could create significant issues for sensor performance," and would require "structural changes" to Aizawa's configuration.  PO Resp. 39–40 (citing Ex. 2012, 59–60; Ex. 2007, 379:17–21, 384:16–388:16, 389:17–390:20, 394:11–395:22); Ex. 2004 ¶ 88.

(iii)   *Petitioner's Reply*

Concerning Petitioner's first motivation, and in response to Patent Owner's reliance on Aizawa's disclosure of "a device for computing the amount of motion load from the pulse rate" (Ex. 1006 ¶ 15), Petitioner asserts Patent Owner "fails to explain—and Aizawa itself is certainly silent—regarding how Aizawa senses and computes motion load."  Pet. Reply 21; Ex. 1047 ¶ 46.  Petitioner also contends Aizawa "is silent on whether it uses the computed motion load *to improve the detection signal*"

27

and thereby provide a "*more reliable*" pulse reading, which is Petitioner's asserted improvement to Aizawa. *Id.* (emphases added) (citing Pet. 17; Ex. 1003 ¶ 77; Ex. 2007, 401:11–402:4); Ex. 1047 ¶¶ 46–47.

Concerning Petitioner's second motivation, Petitioner maintains that Inokawa's use of two emitters having different wavelengths to upload data to a base station using optical communication advantageously improves the accuracy of the transmission by providing checksum information. Pet. Reply 22–23 (citing Pet. 20–21; Ex. 1003 ¶ 83; Ex. 1008 ¶¶ 11, 44, 48; Ex. 2007, 407:7–408:20, 416:5–15); Ex. 1047 ¶ 48.

As to the "other complications" that Patent Owner alleges would result from the proposed modification, Petitioner asserts "such minor issues are 'part of what [a POSITA] would bring . . . to the problem and would know how to make the changes needed.'" Pet. Reply 23 (quoting Ex. 2007, 384:8–388:12); Ex. 1047 ¶ 49.

### (iv)    *Patent Owner's Sur-reply*

Concerning Petitioner's first motivation, Patent Owner asserts Inokawa's disclosure is just as sparse as Aizawa's disclosure regarding how to use optical data to measure body movement. Sur-reply 15 (citing Ex. 1008 ¶ 59). Patent Owner also asserts "Petitioner cites nothing in Inokawa that suggests" Inokawa's two emitter data gathering is more reliable or otherwise superior to Aizawa's single emitter data gathering. *Id.* at 15–16.

Patent Owner also faults Petitioner for not specifying how a POSITA would have solved the alleged "additional cost, energy use, and thermal

IPR2020-01520
Patent 10,258,265 B1

problems" that would ensue from using two emitters in the Aizawa device. *Id.* at 17.

### (v)    Analysis and Conclusion

Upon review of the foregoing, we conclude a preponderance of the evidence supports Petitioner's contention that a POSITA would have been motivated to replace Aizawa's single near infrared LED 21, with an infrared LED and a green LED, in light of Inokawa, with a reasonable expectation of success.

First, a POSITA would have been motivated to make this replacement to improve the pulse measurements recorded by Aizawa's detector 1. Inokawa teaches that the infrared LED's signal can be used "to detect vital signs" such as "body motion," and the green LED's signal can be "used to detect pulse." Ex. 1008, Fig. 2, ¶¶ 14, 58–59; Ex. 1003 ¶¶ 60, 75–77; Ex. 1047 ¶¶ 45–47.

Patent Owner correctly points out that Aizawa describes its single-emitter detector 1 as transmitting its pulse data to "a device for computing the amount of motion load from the pulse rate." Ex. 1006 ¶¶ 15, 28, 35. But, this description is the only disclosure in Aizawa cited by Patent Owner as relating to computing a motion characteristic of the user. Further, we are unable to discern any other disclosure in Aizawa relating to motion computation, or what Aizawa proposes to do with its motion computation. *See id.* Based on the sparse nature of Aizawa's disclosure concerning motion load, it is not clear exactly what Aizawa proposes to do with the computed motion load, after it is computed. *See, e.g.*, Ex. 1047 ¶ 46 ("Aizawa does not even say whether it uses the computed motion load to

29

improve the detection signal[.]").  Aizawa does, however, describe the motion load as being computed "from the pulse rate," rather than being an input to the pulse rate calculation.  Ex. 1006 ¶¶ 15, 35.

Dr. Kenny, when asked whether it was his understanding that "Aizawa's sensor could not account for motion load?", answered that "Aizawa's sensor attempts to prevent motion load rather than account for it." Ex. 2007, 400:7–11.  He explained that, because Aizawa uses only a single emitter with a single wavelength, "what [Aizawa] sees as a signal would be some mixture of pulse rate and motion load if there was no effort to prevent motion load," so Aizawa seeks to solve the problem of "prevent[ing] motion load from corrupting the pulse rate signal." *Id.* at 400:12–401:10. Dr. Kenny did not further explain this distinction between preventing and accounting for motion load, in his deposition testimony cited by the parties as relating to this issue.  *Id.* at 400:7–402:4.  We do not rely on this distinction as a basis for our present decision, because we find no express support for it in Aizawa's disclosure (*see* Ex. 1006 ¶¶ 15, 28, 35), and it is not explained in persuasive detail by Dr. Kenny.

We nonetheless credit Dr. Kenny's declaration testimony that a POSITA, upon reviewing Inokawa' s disclosure of using two emitters of different wavelengths to calculate a user's pulse and motion separately, would understand that these two separate measurements would enable the device to calculate a "more reliable" pulse rate "that can . . . take into account and correct for inaccurate [pulse] readings related to body movement," by subtracting the signal component corresponding to body movement from the pulse signal "to help better isolate the desired pulse data."  Ex. 1003 ¶ 77; Ex. 1047 ¶ 46.  Aizawa does not disclose using the

IPR2020-01520
Patent 10,258,265 B1

computed motion load in this specific fashion, so it appears that this would improve upon the accuracy of Aizawa's pulse measurements, by using the computed motion load. *See* Ex. 1006 ¶¶ 15, 28, 35.

Dr. Madisetti also offers no meaningful opposing testimony in this regard. *See, e.g.*, Ex. 2004 ¶ 84. Instead, Dr. Madisetti incorrectly reads Dr. Kenny's motivation testimony as being limited to the desirability of adding the bare ability to measure body movement to Aizawa. *See id.* In fact, Dr. Kenny further testified that it would have been beneficial to *use* the measured body movement to *improve* the pulse measurement of the device. *See* Ex. 1003 ¶ 77. Dr. Madisetti does not address that testimony. *See* Ex. 2004 ¶ 84.

Dr. Kenny cites Exhibit 1010 in support of his motivation testimony in this regard. *See* Ex. 1003 ¶ 77 (citing Ex. 1010, 8:45–50). However, as we stated in the Institution Decision, "the cited passage [of Exhibit 1010] appears to discuss only a single light emitting element, so it provides very little (if any) support for the testimony in paragraph 77 of Dr. Kenny's Declaration [Ex. 1003 ¶ 77]." Inst. Dec. 17 n.5. Patent Owner notes this in the Sur-reply (at pages 16–17), but neither Dr. Kenny nor Dr. Madisetti further addresses whether or how Exhibit 1010 might bear upon Dr. Kenny's testimony in paragraph 77 of his declaration.

Nonetheless, because Dr. Madisetti's testimony sets up a straw man to attack, rather than directly addressing the entirety of Dr. Kenny's testimony in this regard, Dr. Kenny's testimony stands unrebutted in the record before us. Dr. Kenny's testimony also makes intuitive sense that measuring the user's motion *separately* from the user's pulse, for example by using two interrogating emitters of two different wavelengths, would provide a reliable

31

IPR2020-01520
Patent 10,258,265 B1

means of correcting the pulse data for motion artifacts by using the separately measured motion data, rather than by trying to segregate these two components in the single data stream provided by Aizawa's single emitter device. *See, e.g.*, Ex. 1047 ¶ 47. We, therefore, are persuaded by Dr. Kenny's unrebutted testimony that using two emitters of different wavelengths would improve Aizawa's device in this way.

Also, and independently, a POSITA would have been motivated to replace Aizawa's single near infrared LED 21, with an infrared LED and a green LED, to provide a reliable method of uploading pulse data stored by Aizawa's wrist-worn pulse rate detector 1 to another device for display to the user. Inokawa expressly touts such optically-based uploading of data from Inokawa's wrist-worn sensor 1 to Inokawa's base station 17 as a benefit of incorporating two emitters in sensor 1. *See* Ex. 1008, Figs. 3 & 19, ¶¶ 3–7, 14, 76–77, 109–111. Inokawa identifies two specific benefits of this optically-based data communication means. First, the infrared LED can transmit the pulse data, and the green LED can separately transmit "checksum" information to increase the accuracy of data transmission. *Id.* at Fig. 19, ¶¶ 14, 109–111. Second, using light emitters in this fashion to perform two functions (data collection by emitting light into the user's wrist, and data transmission by emitting light to photodetectors in a base station) obviates the need for providing "a special wireless communication circuit [in the wrist-worn sensor 1] or a communication cable." *Id.* ¶¶ 3–7, 76–77.

Patent Owner points out correctly that Aizawa already has a "transmitter" 4 for uploading pulse data stored by Aizawa's wrist-worn pulse rate detector 1 to another device for processing and for display to the user. Ex. 1006, Fig. 1(b), ¶¶ 15, 23, 28, 35. However, Aizawa's Figure 1(b)

IPR2020-01520
Patent 10,258,265 B1

illustrates transmitter 4 only as an empty box contained within outer casing 5, and Aizawa's written description does not provide further structural details concerning transmitter 4. *See id.* In particular, Aizawa does not describe exactly how transmitter 4 transmits its data to another device. *See id.*

Patent Owner contends, and Dr. Madisetti and Dr. Kenny both testify, that Aizawa's transmitter 4 is a "wireless" transmitter. *See, e.g.*, PO Resp. 37; Ex. 2004 ¶¶ 86–87; Ex. 2007, 403:17–22, 414:19–21. They all appear to equate "wireless" communication to radio frequency communication, and not to include optical communication, even though both radio frequency and optical communication do not use a wire. *See, e.g.*, PO Resp. 37; Ex. 2004 ¶¶ 86–87. Petitioner disagrees that Aizawa discloses any specific form of data transmission, including wireless transmission. *See* Tr. 71:5–72:3 ("[T]he transmitter disclosure in Aizawa, they don't say its's a wireless transmitter. That was a conjuration by [Patent Owner]. They don't specify whether it's a wired or wireless."). We assume, for this Decision, that Aizawa expressly contemplates radio frequency communication as one embodiment by which transmitter 4 may transmit data to devices other than detector 1.

Patent Owner argues, and Dr. Madisetti testifies, that Aizawa's express disclosure goes even further. They assert Aizawa's "goal" is to measure and display pulse data *in real time during exercise*, using the wireless transmitter. *See, e.g.*, Ex. 2004 ¶¶ 86–87. We find Aizawa does not support this assertion. Instead, Aizawa discusses prior art devices that "estimat[e] a burden on the heart of a person who takes exercise by *real-time measuring* his/her heart rate at the time of exercise" (Ex. 1006 ¶ 4 (emphasis

33

added)), and then describes Aizawa's detector 1 as having a transmitter for transmitting the measured pulse rate data to another device for display (*id.* ¶ 15). Aizawa also refers to "noise caused by the shaking of the body of the subject" as a problem to be addressed (*id.* ¶ 6), but this problem occurs regardless of whether the shaking results from exercise or the normal movement of the user's wrist over the course of the day. Thus, Aizawa does not tout, as an important feature of Aizawa's invention, the *real time display* of pulse rate data during exercise, regardless of whether the data gathered by Aizawa's wrist-worn detector 1 is transmitted wirelessly or otherwise. *Id.* ¶¶ 4, 6, 15.

No doubt, a POSITA would have viewed the capability of a wrist-worn pulse detector to transmit its pulse data to another device for display in real time while the user is exercising to be a desirable feature in some cases, even if this is not one of Aizawa's specific goals. *See, e.g.*, Ex. 2011 ¶ 75 (Dr. Kenny stating: "By wirelessly transmitting the collected data wirelessly, Mendelson 2006's system provides 'numerous advantages,' . . . ."); Ex. 2009, 393:6–14 (Dr. Kenny agreeing that a POSITA "would have seen the ability to wirelessly transmit collected data as an advantage"). Nonetheless, Inokawa expressly discloses that, in other cases, the benefits achieved thereby can be outweighed by obviating the need for the wrist-worn sensor to include a special wireless communication circuit. *See* Ex. 1008 ¶¶ 3–7, 76–77. We therefore conclude Petitioner's case for obviousness in this regard is supported by a preponderance of the evidence. *See, e.g.*, *In re Urbanski*, 809 F.3d 1237, 1243–44 (Fed. Cir. 2016) (persons of ordinary skill in the art may be motivated to pursue

IPR2020-01520
Patent 10,258,265 B1

desirable properties of one prior art reference, even at the expense of foregoing a benefit taught by another prior art reference).

We are not persuaded by Patent Owner's argument that Petitioner's case for obviousness is deficient on the basis that neither Aizawa nor Inokawa expressly discloses a wrist-worn sensor device that has *both* a plurality of emitters *and* at least four detectors, as claim 1 recites. Obviousness does not require "'some motivation or suggestion to combine the prior art teachings' [to] be found in the prior art." *KSR*, 550 U.S. at 407, 415–418. Nor does it require the bodily incorporation of Inokawa's device into Aizawa's device. *See, e.g.*, *In re Keller*, 642 F.2d 413, 425 (CCPA 1981) (test for obviousness is not whether the features of one reference may be bodily incorporated into the structure of the other reference, but rather is "what the combined teachings of the references would have suggested to those of ordinary skill in the art"); *see also In re Merck & Co.*, 800 F.2d 1091, 1097 (Fed. Cir. 1986) (nonobviousness is not established by attacking references individually when unpatentability is predicated upon a combination of prior art disclosures). Instead, "[a] person of ordinary skill is also a person of ordinary creativity, not an automaton," and "in many cases a person of ordinary skill will be able to fit the teachings of multiple patents together like pieces of a puzzle." *KSR*, 550 U.S. at 420–421.

In this case, a POSITA would have been motivated to modify Aizawa's wrist-worn detector 1 to replace its single near infrared LED 21 with an infrared LED and a green LED, based on Inokawa, and for all the reasons provided above. A POSITA would additionally have known to keep all four detectors 22 that are already present in Aizawa's detector 1, so that

35

"[e]ven when the attachment position of the sensor is dislocated, a pulse wave can be detected accurately," as disclosed by Aizawa.  Ex. 1006 ¶¶ 9, 27.  In short, the combination of Aizawa and Inokawa teaches that having multiple emitters is beneficial, and having multiple detectors is beneficial, for different and not inconsistent reasons.

Finally, we agree with Petitioner's position that the thermal interference and power consumption issues that will arise in Aizawa's wrist-worn pulse detector, by using two emitters instead of one emitter, are well within the capabilities of POSITA to solve.  We credit Dr. Kenny's testimony in this regard.  *See* Ex. 1003 ¶¶ 74–78, 85; Ex. 1047 ¶ 49.  For example, Dr. Kenny acknowledges this modification of Aizawa may possibly "lead to increased power consumption," but nonetheless concludes "a POSITA would have known how to make the changes needed, for example concerning circuitry, to add another LED," because "Aizawa already contemplates adding additional emitters."  Ex. 1003 ¶¶ 77–78 (citing Ex. 2006 ¶ 32 (sic ¶ 33)).  Dr. Kenny further testifies that this modification "amount[s] to nothing more than the use of a known technique [i.e., Inokawa's use of two emitters in a wrist-worn pulse detector] to improve similar devices [i.e., Aizawa's wrist-worn pulse detector] in the same way, and combining prior art elements according to known methods to yield predictable results."  *Id.* ¶¶ 79, 85 (citing Ex. 1015, 168, Fig. 2A).

Patent Owner cites several portions of Dr. Kenny's deposition testimony that, in Patent Owner's view, indicate Dr. Kenny fails to appreciate the significance of the thermal effects, optical interference complications, and power consumption needs, that are posed by adding a second emitter to Aizawa's device, and fails to explain how these issues

36

IPR2020-01520
Patent 10,258,265 B1

would have been overcome. *See* PO Resp. 38, 39–40 (citing Ex. 2007, 379:17–21, 384:8–388:16, 389:17–390:20, 394:11–395:22; Ex. 2009, 381:18–382:8, 383:22–385:9, 390:5–392:3). We have reviewed this deposition testimony, and we conclude Patent Owner overstates its significance. It establishes, at most, that Dr. Kenny did not expressly address these issues in his declaration (Exhibit 1003), but Dr. Kenny's opinion is that these issues would have been within the capability of a POSITA to resolve. Based on the evidentiary record presented to us, we agree with Dr. Kenny's opinion. For example, Inokawa discloses a wrist-worn pulse sensor 1 having two emitters 21 and 23 in close proximity to each other, and Mendelson-1988 discloses an "optical sensor of a pulse oximeter [that] consists of a red and an infrared light emitting diode[s]" as 0.3 x. 0.3 millimeter chips disposed within a few millimeters of each other. *See* Ex. 1008, Figs. 1–2; Ex. 1015, 168, Figs. 2A–2C.

Dr. Madisetti's testimony opposing Dr. Kenny's foregoing opinion is premised solely on Dr. Kenny's alleged failure to explain how the issues that arise from adding a second emitter to Aizawa would have been solved; Dr. Madisetti does not provide any affirmative reason why these issues would have been difficult to solve in the context of Aizawa's device or wrist-worn pulse sensing devices in general. *See* Ex. 2004 ¶ 88. For example, Dr. Madisetti cites Exhibit 2012[5] as "discussing power and thermal considerations," and cites the '265 patent as disclosing "using a thermistor and heat sinks and adjusting for temperature drift in the measurements." Ex. 2004 ¶ 88 (citing Ex. 2012, 59–60; Ex. 1001, 29:22–24). But,

---

[5] *Design of Pulse Oximeters* (J.G. Webster ed., 1997).

Dr. Madisetti does not explain why these issues would have been difficult to overcome. *See id.* Indeed, Exhibit 2012 discusses power consumption and heat generation of LED emitters in portable units as routine design considerations, rather than difficult problems. *See* Ex. 2012, 59–60. The '265 patent is to a similar effect. *See* Ex. 1001, Fig. 11A, 29:16–42.

Thus, we conclude a POSITA would have been motivated to replace Aizawa's single near infrared LED 21, with an infrared LED and a green LED, and would have had a reasonable expectation of success in doing so.

### (2)    *Cover Comprising Protrusion*

### (i)    *Petitioner's Contentions*

Petitioner asserts that, although Aizawa indicates its transparent plate 6 helps to improve detection efficiency, "Aizawa does not provide much other detail" regarding plate 6, "for instance regarding its shape."[6] Pet. 13, 28 (citing Ex. 1006 ¶ 30). Petitioner contends a POSITA nonetheless would have known how to give plate 6 a shape to improve detection efficiency. *Id.* (citing Ex. 1006 ¶¶ 13, 30, 32); Ex. 1003 ¶¶ 92–94.

According to Petitioner: "A POSITA would have looked to Inokawa to enhance light collection efficiency" in Aizawa's plate 6, for example by "includ[ing] a convex protrusion that acts as a lens" like Inokawa's lens 27. Pet. 14, 28–29 (citing Ex. 1008, Fig. 2); Ex. 1003 ¶¶ 95–97. Petitioner cites Inokawa's description of lens 27 as "mak[ing] it possible to increase the light-gathering ability of the LED." Pet. 14 (quoting Ex. 1008 ¶ 15);

---

[6] Petitioner overstates the paucity of Aizawa's disclosure here. Aizawa illustrates plate 6 as having a flat surface, which Dr. Kenny notes in his testimony. *See* Ex. 1006, Fig. 1(b); Ex. 1003 ¶¶ 93–94, 97.

IPR2020-01520
Patent 10,258,265 B1

Ex. 1003 ¶ 96. In particular, Dr. Kenny testifies a POSITA would have known that adding a convex protrusion to Aizawa's plate 6 would "increase light collection efficiency, in turn leading to an enhanced signal-to-noise ratio and ultimately more reliable pulse wave detection . . . by refracting and concentrating the light." Ex. 1003 ¶¶ 96–97; Pet. 14.

Dr. Kenny provides the following illustrations to portray the proposed modification of Aizawa's pulse rate detector 1. *See* Pet. 15; Ex. 1003 ¶ 97.



At the left, Dr. Kenny has excerpted and annotated Aizawa's Figure 1(b), to identify Aizawa's pre-existing cover (colored blue) which covers the light emitter (colored green) and the light detectors (colored red). *See* Ex. 1003 ¶ 97. At the right, Dr. Kenny has illustrated the device resulting from the proposed modification of the cover to have a convex protrusion (colored blue). *See id.* Dr. Kenny testifies that this modification would increase the light-gathering ability of Aizawa's four detectors 22, because "the modified cover will allow more light to be gathered and refracted toward the light receiving cavities [23b] of Aizawa . . . beyond what is achieved through the tapered cavities [23b]." *Id.* (citing Ex. 1008 ¶ 15); Pet. 14–15.

Further according to Petitioner: "A POSITA would have understood how to implement Inokawa's lens-shaped cover in Aizawa's device with a reasonable expectation of success." Pet. 15–16 (citing Ex. 1008, Figs. 16

IPR2020-01520
Patent 10,258,265 B1

& 17, ¶¶ 15, 106); Ex. 1003 ¶ 98.  Petitioner adds that Aizawa's "transparent acrylic material . . . can be readily formed into a lens-like shape as in Inokawa." Pet. 16 (citing Ex. 1023, Fig. 6, ¶¶ 22, 32, 35); Ex. 1003 ¶ 99.  The shape of the modified cover in Dr. Kenny's illustration of the proposed modification above is strikingly similar to the shape of an LED lens unit illustrated in Exhibit 2023[7] (hereafter "Nishikawa"), cited by Petitioner in connection with reasonable expectation of success.  *Compare* Pet. 15 (illustrating proposed modification), *with* Ex. 2023, Fig. 6, ¶¶ 3, 22, 30, 32, 35 (illustrating lens unit 50 used with LED 22, and discussing how to make the illustrated device).

*(ii)    Patent Owner's Contentions*

Patent Owner contends the evidence does not support Petitioner's argument that a POSITA would have been motivated to modify Aizawa's cover 6 to have a convex protrusion, in order to improve detection efficiency by directing incoming light to Aizawa's photodetectors 22, with a reasonable expectation of success.  *See* PO Resp. 1–4, 11–34; Ex. 2004 ¶¶ 39–78.

According to Patent Owner, the evidence establishes Petitioner's proposed modification would direct light *toward the center* of Aizawa's detector 1 where emitter(s) 21 are located, rather than *toward the periphery* where detectors 22 are located.  PO Resp. 13–18; Ex. 2004 ¶¶ 42–58.  Thus, Patent Owner's view is that "a POSITA would ***not*** have expected Inokawa's convex surface to accomplish" the objective of enhancing light collection efficiency relied upon by Petitioner, because Petitioner's proposed modification instead "would direct light ***away*** from the ***periphery***-located

---

[7]  US 2007/0145255 A1, published June 28, 2007.

IPR2020-01520
Patent 10,258,265 B1

detectors" in Aizawa, the opposite result to Petitioner's contention.
PO Resp. 18–19; Ex. 2004 ¶¶ 56–58.

In support, Patent Owner points to Inokawa's Figure 2, in which two arrows illustrate light that passes through the convex protrusion of lens 27 toward the center of Inokawa's pulse sensor 1 where detector 25 is located. PO Resp. 13, 16 (citing Ex. 1008 ¶ 58); Ex. 2004 ¶¶ 42–43, 51–52. Patent Owner also points to the '265 patent's Figure 14B, which illustrates several light rays 1420, 1422 passing through a partially cylindrical protrusion 605 to be centrally focused on detector(s) 1410B. PO Resp. 17 (citing Ex. 1001, 36:11–14, 36:21–23); Ex. 2004 ¶¶ 53–54. Patent Owner cites portions of Dr. Kenny's deposition testimony that, in Patent Owner's view, support Patent Owner's contentions in these regards. *See* PO Resp. 2, 16, 17, 22 (citing Ex. 2006, 83:15–84:2, 86:19–87:1, 202:11–204:20).

Patent Owner also asserts "Dr. Kenny admitted that the impact of Inokawa's convex lens would not be 'obvious' in the context of [the] different configuration of LEDs and detectors" presented by Aizawa. PO Resp. 19 (citing Ex. 2006, 87:2–6). For example, Patent Owner points out that "light reaching Aizawa's detectors must travel in an opposite direction from the light in Inokawa." *Id.* at 19–20 (citing Ex. 1006, Fig. 1(b); Ex. 1008, Fig. 2); Ex. 2004 ¶¶ 59–62. In addition, according to Patent Owner, "Petitioner's combination is particularly problematic because" Aizawa uses "small detectors [22] with small openings [of cavities 23c] surrounded by a ***large*** amount of ***opaque*** material." PO Resp. 20 (citing Ex. 1006, Fig. 1(a)); Ex. 2004 ¶ 63. Patent Owner cites portions of Dr. Kenny's deposition testimony that, in Patent Owner's view,

41

support Patent Owner's contentions in these regards.  *See* PO Resp. 20–21 (citing Ex. 2006, 257:11–18).

Patent Owner asserts that Petitioner's illustration of the light-focusing properties of a convex protrusion lens, when discussing dependent claim 12, (*see* Pet. 38–39) "***drastically*** increases the size of the detectors compared to Aizawa and ***eliminates*** surrounding barriers" that are present in Aizawa, which when properly taken into account "confirms the light ***would not even reach***" Aizawa's peripheral detectors 22 if a convex lens were applied.  *See* PO Resp. 21–22 (citing Ex. 1006, Fig. 1(b)); Ex. 2004 ¶¶ 64–65.

Patent Owner argues further that Dr. Kenny, during his deposition, attempted to evade the foregoing problems with his declaration testimony by "disclaim[ing] Petitioner's reasoning [for obviousness] and assert[ing] new and improper opinions" that undermine the reasoning provided in the Petition.  PO Resp. 2, 22–23 (citing Ex. 1003 ¶¶ 97, 119, 200; Ex. 2006, 65:15–70:7, 108:21–109:14, 198:6–16; Ex. 2009, 310:1–20); Ex. 2004 ¶ 66. For example, Patent Owner asserts Dr. Kenny's attempt to distinguish between the '265 patent's Figure 14B as illustrating a lens that condenses *collimated* light toward the center, and Aizawa and Inokawa in which the lens focuses *diffuse* light reflected by the user's body, is not persuasive and is not supported by any evidence.  PO Resp. 23–24 (citing Ex. 2006, 170:9–171:5; Ex. 2007, 288:13–289:5, 294:17–298:10, 298:11–299:18, 423:7–424:18); Ex. 2004 ¶¶ 67–68.  Patent Owner also objects to Dr. Kenny's testimony that, "while a convex lens would generally direct more light to the center," it "would also capture some light that otherwise would not be captured" by Aizawa's detectors 22, as lacking evidentiary support other than in the '265 patent itself which is impermissible hindsight.

PO Resp. 24–25 (citing Ex. 2006, 204:21–206:5, 206:22–208:1; Ex. 2007, 294:17–298:10; Ex. 1001, 7:61–63); Ex. 2004 ¶¶ 69–70.  Patent Owner moreover asserts "Dr. Kenny repeatedly distanced himself from his own combination" of Aizawa and Inokawa by refusing to talk about the specific shape, size, material, and dimensional tolerances of the combination, so his testimony falls short because it demonstrates at most only that the references could have been combined.  PO Resp. 2–3, 25–28 (citing Ex. 1003 ¶ 111; Ex. 2006, 51:14–52:16, 75:20–77:2, 91:9–92:13, 96:20–21, 97:11–21, 100:17–101:18, 132:10–18, 154:4–7, 164:8–16, 189:11–190:3; Ex. 2007, 308:12–309:8, 310:18–311:9, 318:3–6, 324:21–325:19, 333:20–335:4); Ex. 2004 ¶¶ 71–72.

Indeed, according to Patent Owner, because ordinary skill does not require specific education or experience with optics or optical physiological monitors (*see supra* Section III.B): "It strains credibility that a POSITA . . . could balance all of the factors Dr. Kenny identified" as affecting the performance of a protruding convex lens in an optical physiological sensor to reach the claimed invention.  PO Resp. 28–29 (citing Ex. 2006, 51:21–52:16, 93:16–94:15, 100:17–101:18; Ex. 2009, 347:14–352:18); Ex. 2004 ¶¶ 73–75.  Patent Owner relies on Dr. Kenny's testimony, as establishing the complexity of designing optical physiological sensors.  PO Resp. 3–4, 29–30 (citing Ex. 2006, 86:19–87:6; Ex. 2007, 331:19–332:11, 336:11–337:15).  Patent Owner concludes Petitioner has failed to establish a reasonable expectation of success in reaching the invention of claim 1 based on Aizawa and Inokawa, because Dr. Kenny's testimony on this issue "focuses almost entirely on manufacturing."  *Id.* at 30 (citing Ex. 1003 ¶ 99); Ex. 2004 ¶ 75.

Patent Owner moreover asserts Petitioner errs in relying on Nishikawa as supporting the unpatentability of claim 1, because Nishikawa is "not identified as part of" Ground 1A, which instead "includes only two references," Aizawa and Inokawa.  PO Resp. 31 (citing Pet. 1–2, 28; Ex. 1003 ¶¶ 94–99); *id.* at 32–33 (citing 35 U.S.C. § 312(a)(3); *Intelligent Bio-Systems, Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1369 (Fed. Cir. 2016)).  Patent Owner asserts Dr. Kenny "relies heavily on" Nishikawa, particularly "to inform the specific shape of the cover in his combination, which is found nowhere in Aizawa and Inokawa." *Id.* at 31–32 (citing Pet. 28–29; Ex. 2006, 179:21–180:13; Ex. 2007, 364:2–13; Ex. 2008, 73:8–12); Ex. 2004 ¶¶ 76–77.

Further, in Patent Owner's view, Dr. Kenny's reliance on Nishikawa "make[s] no sense" because "Nishikawa's device is not a physiological sensor" but rather is "an encapsulated LED" that "directs ***outgoing*** light through the encapsulation material and thus focuses on the emission of light, not the detection of an optical signal."  PO Resp. 33 (citing Ex. 1023, code (57), ¶¶ 3, 32, 35); Ex. 2004 ¶ 78.  Patent Owner contrasts such disclosure with Aizawa and Inokawa, both of which "detect[] ***incoming*** light that passes through the cover and reaches the detectors," and which have a "drastically" smaller scale than Nishikawa's LEDs.  PO Resp. 33–34 (citing Ex. 1008, Fig. 2); Ex. 2004 ¶ 78.

### (iii)    *Petitioner's Reply*

In reply, Petitioner insists "Inokawa's lens enhances the light-gathering ability of Aizawa," which would have motivated a POSITA "to incorporate 'an Inokawa-like lens [having a convex protrusion] into the

cover of Aizawa to increase the light collection efficiency.'" Pet. Reply 2–3 (bolding omitted) (citing Pet. 14–15, 28; Ex. 1003 ¶¶ 94–99; Ex. 1008, Fig. 2, ¶¶ 15, 58). Petitioner dismisses Patent Owner's and Dr. Madisetti's opposition as being "misinformed" regarding Inokawa's lens and lenses in general, because "a POSITA would understand that Inokawa's lens improves 'light concentration at pretty much all of the locations under the curvature of the lens,' as opposed to only at a single point at the center." *Id.* at 3 (quoting Ex. 2006, 164:8–16); *id.* at 1, 3 (citing PO Resp. 13; Ex. 1041, 89:12–19; Ex. 1042, 170:12–20); Ex. 1047 ¶¶ 3–5, 19–23.

For example, Petitioner asserts Patent Owner and Dr. Madisetti "ignore[] the well-known principle of reversibility" according to Snell's law.[8] Pet. Reply 4–7 (underlining omitted) (citing Ex. 1040, 84, 87–92; Ex. 1043, 80:20–82:20; Ex. 1049, 101, 106–111); Ex. 1047 ¶¶ 32–39. Petitioner asserts Dr. Madisetti was evasive when he was asked to apply the reversibility principle to the combination of Aizawa and Inokawa in this case. Pet. Reply 6 (citing Ex. 1041, 89:12–19, 84:2–85:7).

Petitioner also asserts Patent Owner and Dr. Madisetti overlook the fact that light rays reflected by body tissue in the user's wrist, to be received by detectors in either Aizawa's or Inokawa's pulse sensor, will be "scattered" and "diffuse" and therefore will approach the detectors "from various random directions and angles." Pet. Reply 7–8 (citing Ex. 1046, 803; Ex. 2012, 52, 86, 90); *id.* at 8–10 (annotating Inokawa's Fig. 2 to illustrate the cause and nature of the back-scattering); Ex. 1003 ¶ 128;

---

[8] Snell's law describes how a light ray will be refracted when passing between two mediums having different indices of refraction. *See* Ex. 1047 ¶ 10 (describing and illustrating Snell's law).

IPR2020-01520
Patent 10,258,265 B1

Ex. 1047 ¶¶ 6–9.  This scattered and diffuse light, according to Petitioner, means that Inokawa's "lens cannot focus all incoming light at a single point" at a central location as Patent Owner would have it.  Pet. Reply 7, 8–10 (citing Ex. 2006, 163:12–164:2); Ex. 1047 ¶¶ 6, 8, 11–13.  Petitioner asserts this is due to Snell's law, and provides several illustrations to illustrate why.  Pet. Reply 8–12 (citing Ex. 1040, 84; Ex. 1043, 80:20–82:20; Ex. 1049, 101; Ex. 2012, 52, 86, 90); Ex. 1047 ¶¶ 9–10, 14–16.

Due to the random nature of this scattered light, Petitioner asserts a POSITA would have understood that "Inokawa's lens provides at best a slight refracting effect, such that light rays that otherwise would have missed the detection area are instead directed toward that area as they pass through the interface provided by the lens."  Pet. Reply 13; Ex. 1047 ¶ 18.  Petitioner applies this understanding to Aizawa, and asserts that using a lens with a convex protrusion in Aizawa would "enable backscattered light to be detected within a circular active detection area surrounding" a central light source, thereby "allowing a larger fraction of the backscattered light to reach the areas covered by the lens" including the circular detection area.  Pet. Reply 13–14 (citing Ex. 1046, 803; Ex. 2006, 164:8–16, 204:21–205:12; Ex. 2012, 86, 90); Ex. 1047 ¶ 18–22.  Dr. Kenny provides the following illustration of this alleged effect.  *See* Ex. 1047 ¶ 21; Pet. Reply 14.

Appx02586



Here, Dr. Kenny has excerpted a portion of his illustration of using a lens with a convex protrusion (in blue) on top of Aizawa's pulse rate detector (with a photodetector, in red) (*see* Ex. 1003 ¶ 97), and added several dotted lines that are orthogonal to the lens surface. Pet. Reply 14; Ex. 1047 ¶¶ 20–21. Dr. Kenny testifies that Snell's law indicates "the incoming light rays are refracted in a way that deflects incoming rays somewhat towards these orthogonal lines," and that because "these orthogonal lines vary in orientation most rapidly near the edge, where the illustrated curvature of the lens surface is the greatest," using this lens in Aizawa "would lead to an improvement in the light concentration at the location of the detectors." Ex. 1047 ¶¶ 21–22.

Petitioner additionally asserts a POSITA, upon reading Inokawa's disclosure that its lens 27 "makes it possible to increase the light-gathering ability of the LED" in an optically-based pulse sensor device (Ex. 1008 ¶ 15), would have understood that this "general benefit" could also be achieved within the context of Aizawa's optically-based pulse sensor device, and is not limited to "the exact" structure of Inokawa's device. Pet. Reply 15 (citing Ex. 1003 ¶¶ 61, 96–98; Ex. 2006, 88:21–89:1, 89:21–90:3); Ex. 1047 ¶ 23.

Appx02587

Petitioner asserts Dr. Madisetti's testimony in support of Patent Owner's position ignores the application of Snell's law to the random nature of backscattered light in the context of Aizawa's and Inokawa's pulse sensors, which measure light *reflected* (i.e., backscattered) by the user's tissue. Pet. Reply 12–13 (citing Ex. 1042, 166:12–182:3); Ex. 1047 ¶ 17. Petitioner similarly dismisses the applicability of Figure 14B of the '265 patent as illustrating the operation of a *transmittance*-type of sensor that measures the attenuation of collimated light transmitted through the user's body tissue, rather than the *reflectance*-type sensors of Aizawa and Inokawa. Pet. Reply 15–17 (citing Ex. 1001, 36:19–21, Fig. 14I; Ex. 2007, 287:12–289:5); Ex. 1047 ¶¶ 24–28.

Petitioner further disagrees with Patent Owner's argument that Petitioner's illustrations of the light-focusing properties of a convex lens when discussing dependent claim 12 (*see* Pet. 38–39) demonstrate "that a convex lens directs all light to the center." Pet. Reply 18–19 (citing PO Resp. 15, 21, 22; Ex. 1041, 41:7–22, 60:7–61:6). Petitioner contends these illustrations, instead, "are merely simplified diagrams included to illustrate . . . one example scenario (based on just one ray and one corpuscle) where a light permeable cover can 'reduce a mean path length of light traveling to the at least four detectors'" as recited in claim 12. *Id.* (citing Pet. 39; Ex. 1003 ¶¶ 119–120); Ex. 1047 ¶¶ 30–31.

### (iv)    *Patent Owner's Sur-reply*

Patent Owner asserts Petitioner's Reply improperly presents several new arguments, relying on new evidence, as compared with the Petition. *See, e.g.*, Sur-reply 3 n.3 (objecting to the illustration provided at Pet.

Reply 14 as being "new"); *id.* at 4–6 ("After recognizing the fundamental error in its proposed combination, Petitioner now attempts to rewrite its petition" concerning how a lens with a convex protrusion would focus light in Aizawa's device); *id.* at 7 ("Petitioner's new theory [concerning reversibility of light rays] is improper, denying [Patent Owner] of the opportunity to respond with expert testimony, and should be rejected."); *id.* at 10 ("Petitioner next asserts a number of other new theories found nowhere in the petition.").

Patent Owner also asserts Petitioner mischaracterizes Patent Owner's position, which is not that Inokawa's lens with a convex protrusion "direct[s] '*all*' light 'only at a *single point* at the center'" of the sensor as Petitioner characterizes it.  Sur-reply 1–2 & n.1 (quoting Pet. Reply 3, and citing PO Resp. 2, 14–18, 23, 24, 27 and Ex. 2027, 63:7–64:6, 94:20–96:1, 96:18–97:7).  Patent Owner's position, rather, is that Inokawa's lens condenses more light (not necessarily all light) "*towards the center*" (not necessarily at a single, central point) relative to Aizawa's flat cover.  *Id.* at 2–3 (quoting PO Resp. 18, and citing Ex. 2004 ¶¶ 34, 43, 49, 51, 52, 54, 55, 67).

Patent Owner moreover asserts "[t]here can be no legitimate dispute that a convex surface directs light centrally (and away from the periphery)," so Petitioner errs in asserting that a POSITA would have used a convex lens with Aizawa's detector 1 to improve its light detection efficiency, because Aizawa's photodetectors 22 are disposed at the periphery of the device.  *Id.* at 4–6 (citing Pet. 13–15, 39; PO Resp. 15–18; Ex. 1003 ¶¶ 97, 119, 200; Ex. 2006, 164:8–16, 166:10–17, 170:22–171:5; Ex. 2027, 181:9–182:5). Patent Owner contends Petitioner's argument "that Inokawa would improve

49

light-gathering at all locations, *regardless* of the location of the LEDs and detectors" is belied by Dr. Kenny's testimony that "Inokawa's benefit would *not* be clear if Inokawa's LEDs and detectors were moved" and "confirmed that a convex surface would direct light toward the center of the underlying sensor." Sur-reply 6–7 (citing Pet. Reply 3–4; Ex. 2006, 86:19–87:6, 202:11–204:20).

Patent Owner argues Petitioner's discussion of the principle of reversibility is "irrelevant" because it "assumes ideal conditions that are not present when tissue scatters and absorbs light." Sur-reply 7–9 (citing Ex. 1040, 88, 92, 399 (citations to the exhibit's page numbers modified to refer to the document's page numbers)); Ex. 2027, 17:12–19:2, 29:11–30:7, 31:8–32:3, 38:17–42:6, 207:9–209:21, 210:8–6). The random nature of backscattered light, in Patent Owner's view, "hardly supports Petitioner's argument that light will necessarily travel the same paths regardless of whether the LEDs and detectors are reversed," and is irrelevant to the central issue presented here of "whether a convex surface—*as compared with a flat surface*—would collect and focus additional light on Aizawa's peripherally located detectors." Sur-reply 9–10 (citing Ex. 2006, 86:19–87:6; Ex. 2027, 212:3–14).

In response to Petitioner's argument that "due to its protruded shape, Inokawa's lens 'provides an opportunity to capture some light that would otherwise not be captured'" in Aizawa (Pet. Reply 14), Patent Owner asserts "Dr. Kenny was unable to support this new theory with any evidence." Sur-reply 10–11 (citing Ex. 2007, 294:17–298:10). Patent Owner further asserts Petitioner "fails to consider the greater *decrease* in light at the detectors due to light redirection to a *more* central location." *Id.* at 13

50

IPR2020-01520
Patent 10,258,265 B1

(citing Pet. Reply 20; Ex. 2027, 19:16–21:8). Patent Owner explains that "the circle of backscattered light's intensity '***decreases*** in direct proportion to the ***square of the distance*** between the photodetector and the LEDs,'" so "any purported signal obtained from light redirected from the sensor's ***edge*** would be relatively weak and fail to make up for the much greater loss of signal strength when light is redirected away from the detectors and towards a more central position." *Id.* (citing Ex. 1015, 2; Ex. 2027, 49:17–50:13, 57:10–22).

Patent Owner contends Petitioner's position concerning the '265 patent's Figure 14B is not supported by evidence. *Id.* at 11 (citing PO Resp. 15–17; Ex. 2007, 423:7–424:18).

### (v)    Analysis and Conclusion

Upon review of the foregoing, we conclude a preponderance of the evidence supports Petitioner's contention that a POSITA would have been motivated to modify Aizawa's cover 6 to include a convex protrusion, in light of Inokawa, in order to increase the amount of backscattered light that will be received by Aizawa's four peripheral detectors 22, versus Aizawa's existing flat cover 6.

We find Aizawa's and Inokawa's pulse sensors both gather data by emitting light into the user's wrist tissue, and collecting light that reflects back to the sensor from within the user's tissue. *See, e.g.*, Ex. 1006, Figs. 1(b) & 2 (sensor 2 has emitter 21 and four detectors 22, all facing a user's wrist 10); Ex. 1008, Figs. 1 & 2 (sensor 1 has two emitters 21, 23 and one detector 25, all facing the user's wrist when held in place by wristband 5). Dr. Kenny testifies, and Patent Owner agrees, that the

IPR2020-01520
Patent 10,258,265 B1

reflection of this light by the user's wrist tissue randomizes the propagation direction of the reflected light rays. *See* Ex. 1003 ¶ 128; Ex. 1047 ¶¶ 6–7; Sur-reply 7–8 ("Even Petitioner admits that tissue randomly scatters and absorbs light rays . . . ."); Tr. 65:23–66:13. This is illustrated by Dr. Kenny's annotations to Inokawa's Figure 2 (Ex. 1047 ¶¶ 6–7), reproduced below:



Here, Dr. Kenny has modified Inokawa's Figure 2 by removing two black arrows, by coloring Inokawa's light detector in red and Inokawa's two light emitters in green, and by adding several green arrows to illustrate the various directions that light rays may be directed after impinging on and reflecting off different tissues in the user's wrist. Ex. 1047 ¶¶ 6–7.

This randomized direction of reflected light rays results in backscattered light that is diffuse, rather than collimated, in nature. Exhibit 1040,[9] Figure 4.12, illustrates the difference between diffuse and collimated light, and is reproduced below:

---

[9] Eugene Hecht, *Optics* (2nd ed. 1990).

52

IPR2020-01520
Patent 10,258,265 B1



This figure provides at left a photograph and an illustration showing incoming collimated light reflecting from a smooth surface, and at right a photograph and an illustration of incoming collimated light reflecting from a rough surface. *See* Ex. 1040, 87–88. The smooth surface provides specular reflection, in which the reflected light rays are collimated like the incoming light rays. *See id.* The rough surface provides diffuse reflection, in which the reflected light rays travel in random directions. *See id.*

This diffuse nature of the light reflected from the user's wrist tissue, which both Aizawa and Inokawa aim to collect to generate pulse data, suggests that a lens might be useful to increase the amount of collected light and thereby increase the reliability of the pulse data generated using the collected light. Indeed, this is taught by Inokawa. Inokawa describes using its lens 27 to "increase the light-gathering ability" of Inokawa's light detector 25. Ex. 1008 ¶¶ 15, 58. Inokawa actually refers to the "LED" such as emitters 21, 23 in this regard (*id.* ¶ 15), rather than detector 25, but it is undisputed that detector 25 is the only component of Inokawa's sensor 1 that gathers light. Thus, in a general sense, Inokawa demonstrates that it was known in the art prior to the '265 patent to use a lens to focus diffuse light

53

reflected from body tissue on to the light detecting elements of a wrist-worn pulse sensor, to increase the light gathered by the sensor and thereby improve the device's calculation of the user's pulse.  Inokawa also discloses, in its Figure 2, that a convexly protruding lens may advantageously be used for this purpose.

A preponderance of the evidence supports Petitioner's contention that a POSITA would have been motivated to apply Inokawa's convex lens technology to Aizawa's wrist-worn pulse sensor, to improve its light collection in a similar manner versus Aizawa's existing flat cover.  This is illustrated by the following illustrations provided by Dr. Kenny:

 

The illustration at left modifies Aizawa's Figure 1(b) to show how Aizawa's existing flat cover may be modified to incorporate a convex protrusion (in blue) to act as a light-focusing lens, which covers Aizawa's four peripheral light detectors (two shown in red) and central light emitter (colored green). *See* Ex. 1003 ¶ 97.  The illustration at right zooms in on the portion of this modification covering one of the detectors, and adds several dotted lines that are orthogonal to the lens surface.  *See* Ex. 1047 ¶¶ 20–21.  We are persuaded by Dr. Kenny's testimony that Snell's law indicates "the incoming light rays are refracted in a way that deflects incoming rays somewhat towards these orthogonal lines," and that because "these orthogonal lines vary in orientation most rapidly near the edge, where the illustrated curvature of the lens surface is the greatest," using the illustrated

lens in Aizawa "would lead to an improvement in the light concentration at the location of the detectors." Ex. 1047 ¶¶ 18–22 (applying Snell's law to Aizawa); *id.* ¶¶ 8–17 (discussing Snell's law in the abstract).

Patent Owner correctly notes that Inokawa's single detector 25 is located in the central portion of Inokawa's sensor 1, whereas Aizawa's four detectors 22 are located more towards the periphery of Aizawa's sensor 2. *Compare* Ex. 1008, Fig. 2, *with* Ex. 1006, Figs. 1(a)–1(b). However, Petitioner's proposed modification of Aizawa takes this into account, as can be seen by the following comparison between Inokawa's sensor and Petitioner's proposed modification of Aizawa's sensor:



The illustration at left annotates Inokawa's Figure 2 to identify the central detector in red and the lens in light blue (*see* Ex. 1003 ¶ 95), and the illustration at right annotates Petitioner's proposed modification of Aizawa to illustrate the peripheral detectors in red and the lens in light blue (*see id.* ¶ 97). As can be seen, the lenses both utilize a convex protrusion, but the convex protrusions are not identical. In Inokawa the lens's curvature is most pronounced at the center of the lens near the central detector, and in the proposed modification to Aizawa, the lens's curvature is most pronounced at the edges of the lens near the peripheral detectors. Thus, Dr. Kenny's proposed modification of Aizawa takes Inokawa's general teaching of using

IPR2020-01520
Patent 10,258,265 B1

a convex protrusion lens to increase the amount of incoming light directed to a light detector, and applies it to the four light detectors of Aizawa. *See, e.g.*, Ex. 1003 ¶¶ 95–97; Ex. 1047 ¶¶ 8–22.

Patent Owner also correctly observes that Dr. Kenny borrowed, from Nishikawa, the specific shape of the convex lens in Petitioner's proposed modification of Aizawa. *See, e.g.*, PO Resp. 31–32 (citing Ex. 1003 ¶ 99; Ex. 2006, 179:21–180:13; Ex. 2007, 364:2–13; Ex. 2008, 73:8–12). However, we disagree with Patent Owner's assertion that this is improper on the basis that Nishikawa is not listed as a reference in Petitioner's identification of Ground 1A. *See* Pet. 1–2, 6 (identifying Ground 1A as obviousness over Aizawa and Inokawa). Rejecting Petitioner's reliance on Nishikawa on this basis would exalt form over substance, which we decline to do. The nature of Petitioner's reliance on Nishikawa in support of Ground 1A is explained clearly in the Petition, even if Nishikawa is not listed as a third reference in the identification of the ground. *See id.* at 16 (discussing Nishikawa (Ex. 1023) and Dr. Kenny's testimony concerning Nishikawa (Ex. 1003 ¶ 99) in connection with Ground 1A); *see also supra* Section III.D.3(c)(2)(i) & (iii) (summarizing Petitioner's contentions and evidence). Thus, the Petition complies with 35 U.S.C. § 312(a)(3) (stating an IPR petition must "identif[y], in writing and with particularity . . . the grounds on which the challenge to each claim is based, and the evidence that supports the grounds for the challenge . . . ").

On the merits, the Petition discusses how Nishikawa indicates "the transparent acrylic material used to make Aizawa's plate can be readily formed into a lens-like shape as in Inokawa," with a reasonable expectation of success. Pet. 16 (citing Ex. 1023, Fig. 6, ¶¶ 22, 32, 35); Ex. 1003 ¶ 99.

56

IPR2020-01520
Patent 10,258,265 B1

Nishikawa supports this contention, because it describes how its "lens unit 50" can be a transparent resin formed in the shape illustrated in Figure 6 by injection molding.  As to using Nishikawa's specific lens shape in the context of Aizawa's device, Dr. Kenny explains that Nishikawa's lens shape design "*is intended to provide curvature in the lens where it can do the most good* and otherwise try to avoid excess use of material in order to create curvature in locations where it wouldn't do any good."  Ex. 2006, 179:21–180:13 (emphasis added).  This makes sense and, as discussed above, a POSITA would have understood from Inokawa's disclosure that a lens's curvature does the most good in a wrist-worn sensor when it aligns with the light detectors behind the lens, to focus the incoming light on those detectors.  This is true regardless of the fact that, as Patent Owner points out, Nishikawa's lens unit 50 redirects light *emitted from* LED 22, rather than redirecting light *gathered by* a detector such as Inokawa's detector 25 or Aizawa's detectors 22.  *See* Ex. 1023, Fig. 6, ¶¶ 3, 22.  Patent Owner's additional objection concerning the smaller scale of Aizawa's wrist-worn pulse sensor versus Nishikawa's lens unit 50 also is not persuasive of error in Petitioner's reliance on Nishikawa, given Inokawa's clear disclosure of using a lens in a wrist-worn pulse sensor like Aizawa's.

Figure 14B of the '265 patent also is consistent with Petitioner's proposed modification of Aizawa.  Figure 14B is reproduced here:

57

IPR2020-01520
Patent 10,258,265 B1



Figure 14B illustrates several light rays 1420, 1422 passing through a partially cylindrical protrusion 605 to be centrally focused on detector(s) 1410B. Ex. 1001, 36:11–14, 36:21–23. This is consistent with Dr. Kenny's testimony, discussed above, that a POSITA would have known how to align a lens's curvature with the light detector(s) underneath the lens to increase the amount of incoming light directed to the detector(s). In this specific regard, the '265 patent's Figure 14B is very similar to Inokawa's Figure 2. As discussed above, it would have been obvious to adapt a POSITA's understanding of Inokawa's teachings to the different detector configuration of Aizawa, leading to the invention recited in claim 1 without hindsight. *See, e.g.*, Ex. 2006, 202:11–20 (Dr. Kenny testifying that "because of its shape [a lens] is able to capture more light due to the convex shape, and *it's able to increase the concentration of the light directed towards the cavities [of Aizawa containing detectors 22] under the regions where the curvature of the lens is present*" (emphasis added)).

IPR2020-01520
Patent 10,258,265 B1

Patent Owner contends Petitioner's modification of Aizawa "fails to consider the greater ***decrease*** in light at the detectors due to light redirection to a ***more*** central location." Sur-reply 13 (citing Ex. 1015, 2; Ex. 2027, 19:16–21:8, 49:17–50:13, 57:10–22); Ex. 2004 ¶¶ 66–70. Dr. Kenny admits that, when a convex protrusion is added to Aizawa's flat cover in light of Inokawa, "*some* . . . [light] rays that would have hit the detectors [using a flat cover] are refracted away from the detectors" by the convex protrusion. *See* Ex. 2027, 19:16–20:8 (emphasis added). Dr. Kenny also admits "there is a decrease in the light as you move away from the location of the emitter towards the perimeter of the sensor," which is a "rapid" decrease, perhaps "with the square of the distance" or "exponential[ly]." *Id.* at 49:1–50:13, 57:10–22.

However, Dr. Kenny nonetheless maintains that a POSITA "would understand how to take advantage of the detector locations and the shape of this convex surface *so as to obtain an improvement [in Aizawa] in the amount of light arriving at the detectors*," despite the foregoing considerations. *Id.* at 20:9–22:18 (emphasis added) (citing Ex. 1047 ¶ 44), 213:11–19, 214:6–215:6; *see also* Paper 33 (Citation 3). This testimony is persuasive. In particular, the difference in the length traveled by the light rays depending on whether Aizawa's wrist-worn sensor 2 uses a flat plate 6 or a convex plate 6 is extremely small. *See, e.g.*, Ex. 1006, Fig. 1(b), ¶ 26 (dotted line arrows show paths of light from emitter 21 to reflect off artery 11 in wrist 10 and return to detectors 22); *id.* at Fig. 2 (showing detector 1 mounted on a user's wrist, suggesting the general scale of detector 1); Ex. 1047 ¶¶ 8–22 (discussing typical light refractions by lenses in wrist-worn pulse sensors). Based on this scale, it is reasonable to

59

conclude, as Dr. Kenny does, that the central light *lost* by adding a protrusion will be outweighed by the peripheral light *gained* by adding a protrusion, despite the greater distance traveled by the peripheral light rays and the concomitant loss of intensity acknowledged by Dr. Kenny.

We also have reviewed Dr. Kenny's deposition testimony, cited by Patent Owner, concerning the complexity of using lenses in connection with an optically-driven pulse sensor, which Patent Owner asserts detracts from Dr. Kenny's opinion of obviousness. *See* Ex. 2006, 51:14–52:16, 75:20–77:2, 86:19–87:6, 91:9–92:13, 93:16–94:15, 96:15–21, 97:11–21, 100:17–101:18, 132:10–18, 154:4–7, 164:8–16, 189:11–190:13, 257:11–18; Ex. 2007, 308:12–309:8, 310:18–311:9, 318:3–6, 324:21–325:19, 331:19–332:11, 336:11–337:15, 333:20–335:4. This testimony reflects, at best, that Dr. Kenny's illustrations identifying the proposed modification of Aizawa's cover do not precisely reflect, at the scale required for manufacturing or testing purposes, the *exact* size and shape the convex protrusion would take when making and optimizing a real-world sensor. Such detail is not required to establish the obviousness of claim 1, which does not recite any such detail. Dr. Kenny's testimony, as discussed above, sufficiently establishes the obviousness of modifying Aizawa's flat cover to incorporate a convex protrusion to focus incoming diffuse light on Aizawa's peripheral detectors.

Patent Owner additionally asserts, and Dr. Madisetti testifies, that Dr. Kenny overlooks the "small" size of Aizawa's detectors 22 and the cavities 23c in which they are housed. *See* PO Resp. 20–21 (citing Ex. 1006, Figs. 1(a)–1(b), and Ex. 2006, 257:11–18); Ex. 2004 ¶ 63. We disagree. Even if Aizawa's detectors 22 are as small as Patent Owner

characterizes them, this provides more motivation for using a lens in Aizawa, to increase the amount of light that can be gathered by the small detectors.

Patent Owner similarly argues, and Dr. Madisetti testifies, that Dr. Kenny's illustration of how his proposed lens would reduce a mean path length of light traveling to Aizawa's detectors 22 as recited in dependent claim 12 (Pet. 38–39) "***drastically*** increases the size of the detectors compared to Aizawa and ***eliminates*** surrounding barriers" in Aizawa, which when properly taken into account "confirms the light ***would not even reach***" Aizawa's peripheral detectors 22 if a convex lens were applied. PO Resp. 21–22; Ex. 2004 ¶¶ 64–65. We disagree. These illustrations are not scaled representations of Petitioner's proposed modification to Aizawa, as Patent Owner would have it, but rather are abstract illustrations of how a convex protrusion functions to reduce the mean path length of refracted light versus a flat surface. *See* Pet. 38–39. We note also that the light receiving detection face 22s of each detector 22 in Aizawa is disposed near the open end of the corresponding cavity 23c, which is tapered to increase the light that can be collected by the detector. *See* Ex. 1006, Figs. 1(a)–1(b), ¶ 24.

We additionally do not agree with Patent Owner's argument that Petitioner's Reply presents new arguments and evidence that should have been first presented in the Petition, to afford Patent Owner an adequate opportunity to respond. The Petition proposed a specific modification of Aizawa to include a convex protrusion in the cover, in light of Inokawa, for the purpose of increasing the light gathering ability of Aizawa's device. *See* Pet. 13–16. The Patent Owner Response then challenged that contention, with several arguments that Petitioner's proposed convex protrusion would

IPR2020-01520
Patent 10,258,265 B1

not operate in the way the Petition alleges it would operate. *See* PO Resp. 11–34, *supra* Section III.D.3(c)(2)(ii). This opened the door for Petitioner to provide, in the Reply, arguments and evidence attempting to rebut the contentions in the Patent Owner Response. *See* PTAB Consolidated Trial Practice Guide (Nov. 2019) ("Consolidated Guide")[10], 73 ("A party also may submit rebuttal evidence in support of its reply."). This is what Petitioner did here. The Reply does not change Petitioner's theory for obviousness; rather, the Reply presents more argument and evidence in support of the same theory for obviousness presented in the Petition. *Compare* Pet. 13–16, *with* Reply 2–20.

Patent Owner finally argues that our conclusion of obviousness "strains credibility" because ordinary skill (*see supra* Section III.B) does not require specific education or experience with optics or optical physiological monitors. *See, e.g.*, PO Resp. 28–29. We disagree. Concerning motivation, a POSITA would have readily appreciated that: Aizawa's detector 1 operates by gathering light data with its photodetectors 22; an optical lens would be useful to focus the light on to the photodetectors; and optical lenses often are formed by providing a convex protrusion in the lens to focus light. Indeed, Inokawa discloses this exact utility, function, and structure. *See* Ex. 1008 ¶¶ 15, 58, Fig. 2.

Concerning reasonable expectation of success in using a convex protrusion lens to increase the amount of light directed to Aizawa's photodetectors, we have relied on Dr. Kenny's testimony that a POSITA would have understood a lens operates by increasing the light concentration

---

[10] Available at https://www.uspto.gov/TrialPracticeGuideConsolidated.

IPR2020-01520
Patent 10,258,265 B1

most where the curvature of the lens is the greatest, which leads to
Dr. Kenny's proposed lens for use in Aizawa. *See, e.g.*, Ex. 1003 ¶¶ 95–97;
Ex. 1047 ¶¶ 8–10, 15–22; Ex. 2006, 179:21–180:13, 202:11–20. We
conclude a POSITA—that is, a person having a B.S. in an academic
discipline emphasizing electrical, computer, or software technologies, and
two years of related work experience with data collection—would have
understood this general concept of optics. Moreover, the invention of
claim 1 is recited at this same general level of utility and structure.

Thus, we conclude a POSITA would have been motivated to replace
Aizawa's flat cover 6 with a cover comprising a convex protrusion in view
of Inokawa, to improve light detection efficiency, and would have had a
reasonable expectation of success in doing so.

### d)     Conclusion as to Claim 1

Based on the foregoing arguments and evidence, we conclude
Petitioner has demonstrated by a preponderance of the evidence that claim 1
is unpatentable as having been obvious over Aizawa and Inokawa.

### 4.     Claims 2–4, 6–14, 16, 17, 19–23, and 26–29

Petitioner provides arguments and evidence, including testimony from
Dr. Kenny, in support of contending claims 2–4, 6–14, 16, 17, 19–23, and
26–29 are unpatentable as having been obvious over Aizawa and Inokawa.
Pet. 29–48; Ex. 1003 ¶¶ 100–138. In defense of these claims, Patent Owner
relies solely on arguments relating to claim 1. *See, e.g.*, PO Resp. 11–40.
For the reasons provided in Section III.D.3 above in relation to claim 1, we
conclude Patent Owner's defense is unavailing.

IPR2020-01520
Patent 10,258,265 B1

Concerning independent claim 26, our analysis of claim 1 above applies equally well to the bulk of claim 26. Claim 26 differs from claim 1 most significantly in specifying that the device's housing is "circular" and comprises "a surface with a raised edge," and the device's cover comprises "a lens portion." *Compare* Ex. 1001, 44:66–45:15 (claim 1), *with id.* at 46:47–65 (claim 26). We find Aizawa's housing is circular and comprises a surface with a raised edge. *See* Pet. 45–46 (annotating Aizawa's Figures to identify the "Circular housing" in red, the "Surface" in brown, and the "Raised edge" in purple). We also find the cover of Aizawa, as modified by Inokawa to have a convex protrusion, comprises a lens portion. *See supra* Section III.D.3.

Concerning dependent claims 2–4, 6–14, 16, 17, 19–23, and 27–29, we find a preponderance of the evidence supports Petitioner's contentions that Aizawa's pulse rate detector 1 exhibits the limitations recited in these claims, or that a POSITA would have been motivated to implement them in Aizawa, based on the evidence cited and the reasons provided in the Petition, which we adopt as our own here. *See* Pet. 29–45, 46–48.

Thus, we conclude Petitioner has demonstrated by a preponderance of the evidence that claims 2–4, 6–14, 16, 17, 19–23, and 26–29 are unpatentable as having been obvious over Aizawa and Inokawa.

E.     *Ground 1B — Obviousness over Aizawa, Inokawa, and Ohsaki*

In Ground 1B, Petitioner argues claims 1–4, 6–14, 16, 17, 19–23, and 26–29 of the '265 patent would have been obvious over Aizawa, Inokawa, and Ohsaki. Pet. 2, 48–51. Patent Owner opposes. PO Resp. 40–44. We conclude a preponderance of the evidence supports Petitioner's

64

**Appx02604**

IPR2020-01520
Patent 10,258,265 B1

assertions as to all challenged claims. We begin our analysis with a brief
summary of Ohsaki, then we address the parties' contentions.

### 1. *Ohsaki Disclosure*

Ohsaki discloses a pulse wave sensor attached to the back side of the
user's wrist. Ex. 1014, codes (54) & (57). Figures 1 and 2 are reproduced
below:



Figure 1 is a cross-sectional view of pulse wave sensor 1 attached on a
user's wrist 4. *Id.* ¶¶ 12, 16, 18. Figure 2 is a schematic diagram of
detecting element 2 of sensor 1 on wrist 4, and associated electronics. *Id.*
¶¶ 13, 17.

Figure 1 illustrates how detecting element 2 is attached to the back
side of the wrist. In this context, the wrist's "back" side is the side opposite
to the user's palm, and the wrist's "front" side is the palm side of the hand.
*See, e.g.*, *id.* ¶¶ 5–6, 16.

Detecting element 2 comprises a light emitter (LED 6) and a light
detector (photodetector 7) for optically interrogating the user's wrist 4 tissue
to detect a pulse wave of the user. *See id.* ¶¶ 3, 7–8, 16, 20, 22. Translucent
board 8 of element 2 has "a convex surface . . . in intimate contact with the

surface of the user's skin," and "[t]hereby it is prevented that the detecting element 2 slips off the detecting position of the user's wrist 4." *Id.* ¶¶ 9, 17–18, 25.

Figures 3A–3B provide test data comparing the performance of a pulse wave sensor depending on whether it is mounted to the back side or the front side of the user's wrist. *See id.* at Figs. 3A–3B, ¶¶ 14, 23–24. Figures 4A–4B provide test data comparing the performance of a pulse wave sensor depending on whether translucent board 8 is convex (as shown in Figures 1 and 2) or flat. *See id.* at Figs. 4A–4B, ¶¶ 15, 25.

### 2. *Claim 1*

Petitioner provides arguments and evidence, including testimony from Dr. Kenny, in support of Petitioner's contention that claim 1 is unpatentable as having been obvious over Aizawa, Inokawa, and Ohsaki. Pet. 48–51; Ex. 1003 ¶¶ 64–65, 139–143. Patent Owner provides arguments and evidence in opposition, including testimony from Dr. Madisetti. PO Resp. 40–44; Ex. 2004 ¶¶ 90–96.

Ground 1B incorporates Ground 1A, then adds Ohsaki as providing a further motivation for modifying Aizawa's flat plate 6 to have a convex protrusion. *See* Pet. 50–51; Ex. 1003 ¶¶ 139–143. Petitioner asserts "Ohsaki teaches that adding a convex surface to the light permeable cover (*i.e.*, [Ohaski's] translucent board 8) can help prevent the device from slipping on the tissue when compared to a flat cover" such as Aizawa's plate 6. Pet. 50–51 (citing Ex. 1014 ¶ 25); Ex. 1003 ¶ 141. Petitioner asserts that Aizawa, similarly to Ohsaki, "seeks to prevent slippage between the device and the user's wrist—and pursues this objective by pressing its

IPR2020-01520
Patent 10,258,265 B1

[plate 6] and trying to improve 'adhesion between the wrist 10 and the pulse rate detector 11.'" Pet. 51 (citing Ex. 1006 ¶¶ 26, 30); Ex. 1003 ¶ 142. Dr. Kenny testifies a POSITA "would have recognized that Ohsaki's addition of a convex protrusion to its light permeable cover could be similarly implemented in Aizawa's device to help achieve the two references' shared goal of minimizing slippage," which "would have allowed Aizawa's sensor device to remain better adhered to the skin and thereby increase its light-collecting efficiency." Ex. 1003 ¶ 142 (citing Ex. 1006 ¶¶ 26, 30; Ex. 1014 ¶ 25); Pet. 51.

Patent Owner argues in opposition that the Petition is fatally deficient because it is "unclear as to whether a POSITA would have incorporated Inokawa's lens or Ohsaki's translucent board" in Aizawa. PO Resp. 40–41; Ex. 2004 ¶ 90. We disagree. Ground 1A relies on Inokawa as providing a first motivation for adding a protrusion to Aizawa's flat cover: to direct more light to Aizawa's detectors 22. *See supra* Section III.D.3(c)(2). Ground 1B relies additionally on Ohsaki as providing a second, and independent, motivation for adding a protrusion to Aizawa's flat cover: to reduce slippage between Aizawa's device and the user's wrist. *See* Pet. 50–51. Neither ground seeks to bodily incorporate Inokawa's lens or Ohsaki's translucent board into Aizawa's device, and this is not required for obviousness. *See Keller*, 642 F.2d at 425.

Patent Owner next contends that Patent Owner's various arguments opposing Ground 1A also apply to Ground 1B. *See* PO Resp. 41; Ex. 2004 ¶ 92. For the reasons provided in Section III.D.3 above, Patent Owner's arguments opposing Ground 1A are unavailing.

IPR2020-01520
Patent 10,258,265 B1

Patent Owner further asserts a POSITA would have understood "Ohsaki would not prevent slippage with Aizawa's device." PO Resp. 42 (section heading modified). According to Patent Owner, Ohsaki indicates "its convex surface must have **_longitudinal directionality_**" such that "one must orient its longitudinal convex surface with the longitudinal direction of the user's arm." PO Resp. 42 (citing Ex. 1014 ¶ 19); Ex. 2004 ¶ 93. Patent Owner argues Aizawa's detector 1, by contrast, uses a circular arrangement of four detectors 22 around one emitter 21, and "Aizawa specifically **_distinguishes_** its sensor from linear sensors such as Ohsaki's." PO Resp. 42–43 (citing Ex. 1006, code (57), ¶¶ 9, 27, 36; Ex. 1014 ¶ 19; Ex. 2008, 165:20–166:5); Ex. 2004 ¶ 94. Patent Owner concludes a "POSITA would not have believed Ohsaki's longitudinal convex surface would benefit Aizawa's device" due to this difference. PO Resp. 43; Ex. 2004 ¶ 95.

Patent Owner moreover argues Ohsaki's "convex surface only prevents slipping on the backhand side (i.e., watch side) of the user's wrist," and Ohsaki's "sensor has 'a tendency to slip off' if it is on the palm side of the user's wrist." PO Resp. 42–43 (citing Ex. 1014 ¶¶ 23–24, Figs. 3A–3B); Ex. 2004 ¶¶ 93, 95. Patent Owner asserts Aizawa's detector 1, by contrast, is held against the front side of the user's wrist to be close to the artery there, and "Aizawa reports that on the **_palm side_** of the wrist, a **_flat surface_** improves adhesion." PO Resp. 42–43 (citing Ex. 1006, Figs. 2 and 3, code (57), ¶¶ 2, 9, 13, 26–28, 30, 34, 36); Sur-reply 20 (further citing Ex. 1006 ¶ 33); Ex. 2004 ¶¶ 94–95. Patent Owner cites evidence demonstrating that these arteries are on the front side of the wrist. PO Resp. 43 (citing Ex. 2010, Plates 427 and 429); Ex. 2004 ¶ 95. Patent Owner concludes a POSITA would not have believed Ohsaki's convex

surface would benefit Aizawa's device based on this difference in device location on the user's wrist.  PO Resp. 43; Ex. 2004 ¶ 95.

Petitioner replies that, despite the differences between Aizawa and Ohsaki identified by Patent Owner, a POSITA would nonetheless have understood from Ohsaki that "a convex surface . . . can help prevent the device from slipping on the tissue of the wearer compared to using a flat cover without such protrusion."  Pet. Reply 23–25 (quoting Ex. 1003 ¶ 141); Ex. 1047 ¶¶ 50–52.  According to Petitioner, Ohsaki contrasts between "flat" and "convex" detecting surfaces, and explains the "detected pulse wave is adversely affected by the movement of the user's wrist" with a flat surface but not a convex surface.  Pet. Reply 24 (citing Ex. 1014, Figs. 1, 2, & 4A–4B, ¶¶ 15, 17, 25; Ex. 1003 ¶ 142); Ex. 1047 ¶ 52.  Petitioner asserts "Ohsaki was relied upon not for its exact cover configuration" as Patent Owner suggests, but instead "for the rather obvious concept that a convex surface protruding into a user's skin will prevent slippage."  Pet. Reply 25; Ex. 1047 ¶ 52 ("[A]dding a convex surface to Aizawa's flat plate will serve to *improve* its tendency to not slip off, not take away from it, since it is well understood that physically extending into the tissue and displacing the tissue with a protrusion provides an additional adhesive effect.").

Patent Owner replies "Ohsaki demonstrates that a convex surface alone does *not* prevent slipping because Ohsaki's shape is designed to fit within the underlying bone structure of the wrist and forearm on the backhand side."  Sur-reply 20 (citing Ex. 1014, Figs. 3A–3B, ¶¶ 6, 19, 23–24).  Patent Owner asserts "Ohsaki explains that a convex surface on the palm side has a tendency to slip, notwithstanding any alleged 'physical[] digging.'"  *Id.*  Ohsaki also teaches, according to Patent Owner, "that one

IPR2020-01520
Patent 10,258,265 B1

should avoid too much pressure because otherwise the user 'feels uncomfortable,' which results in movement and a tendency to slip." *Id.* (citing Ex. 1014 ¶¶ 6, 18, 24).

Upon review of the foregoing arguments and evidence, we conclude a preponderance of the evidence supports Petitioner's contention that a POSITA would have been motivated to modify Aizawa's plate 6 to include a convex protrusion, in order to help prevent slippage of Aizawa's detector 1 on the user's wrist, based on Ohsaki.

We find a POSITA would have understood from Ohsaki that forming a convex protrusion on the face of an optically-based pulse sensor where it is pressed against the user's wrist to gather optical data will beneficially prevent slippage of the sensor during operation.  Ohsaki states: "The detecting element 2 is arranged on the user's wrist 4 so that *the convex surface* of the translucent board 8 *is in intimate contact with the surface of the user's skin*.  *Thereby it is prevented that the detecting element 2 slips* off the detecting position of the user's wrist 4."  Ex. 1014 ¶ 25 (emphases added).  A POSITA would understand from this disclosure that forming a convex protrusion on the tissue-contacting face of a wrist-worn, optically-based pulse sensor will resist movement of the sensor on the user's wrist during use.  *See* Ex. 1003 ¶¶ 141–142; Ex. 1047 ¶ 52.  A POSITA would also understand this resistance to be a beneficial result, because it will improve the pulse sensor's ability to emit light into and detect light reflected from the user's wrist, to generate a pulse signal.  *See* Ex. 1006 ¶¶ 26, 30, 34; Ex. 1014 ¶¶ 23, 25, 27; Ex. 1003 ¶¶ 141–142; Ex. 1047 ¶ 52.

Indeed, Ohsaki expressly compares the performance of a wrist-worn pulse wave sensor depending on whether translucent board 8 is convex or

70

flat, and concludes the former results in improved performance over the latter, especially when the user is moving. *See id.* at Figs. 4A–4B, ¶¶ 15, 25 (stating that with "a flat surface, the detected pulse wave is adversely affected by the movement of the user's wrist 4," and with "a convex surface like the present embodiment, the variation of the amount of the reflected light" collected by the sensor "is suppressed"). Ohsaki also states that, with a convex protrusion, it is "prevented that noise such as disturbance light from the outside penetrates the translucent board 8." *Id.* ¶ 25.

Patent Owner and Dr. Madisetti attempt to limit the foregoing disclosures of Ohsaki to its particular context—a sensor having one emitter 6 disposed next to one detector 7 to define a "longitudinal" sensing direction between them, and being attached to the back side rather than the front side of the user's wrist. *See* Ex. 2004 ¶¶ 93–95. We are not persuaded. For example, Ohsaki's disclosure does not support Dr. Madisetti's conclusion that it is *only* in this particular context that a convex protrusion will help prevent slippage. *See* Ex. 1014 ¶ 19 (discussing the longitudinal direction orientation of Ohsaki's sensor); *id.* at Figs. 3A–3B, ¶¶ 16, 23–24 (discussing attaching Ohsaki's sensor to the back side of the wrist). Figures 3A–3B compare the performance of detecting element 2, including its translucent board 8 having a convex protrusion, and show better performance when it is attached to the back side of the wrist versus the front side of the wrist, when the user is in motion. *See* Ex. 1014 ¶ 17 (Fig. 2), ¶¶ 23–24 (Figs. 3A–3B). Because the tested device incorporates a convex protrusion in both instances, Figures 3A–3B do not support Dr. Madisetti's conclusion that "Ohsaki teaches that a convex surface on the palm side of the wrist would not prevent

slipping" — particularly in comparison to a flat surface such as Aizawa's. Ex. 2004 ¶ 95.

We credit, instead, Dr. Kenny's testimony that a POSITA would have understood from Ohsaki that a convex protrusion will help prevent slippage, even in the context of Aizawa's arrangement of four detectors surrounding a central emitter (or emitters, when modified per Inokawa) attached on the front side of the user's wrist. *See* Ex. 1047 ¶ 52. This is because, even in Aizawa's arrangement, the convex protrusion will "physically extend[] into the tissue and displac[e] the tissue," as is illustrated for example in Ohsaki's Figures 1 and 2, where translucent board 8 physically extends into and displaces the tissue of wrist 4. *Id.*

Dr. Madisetti also testifies that "Aizawa reports that on the palm side of the wrist, a flat surface improves adhesion," so "a POSITA would have believed that adding Ohsaki's convex surface would have disrupted the improved adhesion properties reported for Aizawa's flat plate." Ex. 2004 ¶ 95 (citing Ex. 1006, Figs. 3A–3B, ¶¶ 13, 26, 28, 30, 34; Ex. 1014, Figs. 3A–3B, ¶¶ 23–24). We disagree with this reading of Aizawa. It is true that Aizawa's plate 6 is illustrated as having a flat surface (Ex. 1006, Fig. 1(b)), and that Aizawa states the plate "improve[s] adhesion" (*id.* ¶ 13). Aizawa also states: "the above belt 7 is fastened such that the acrylic transparent plate 6 becomes close to the artery 11 of the wrist 10," and "[t]hereby, adhesion between the wrist 10 and the pulse rate detector 1 is improved." *Id.* ¶ 26. These disclosures, however, indicate the improved adhesion is provided by the acrylic material of plate 6, not the flat surface of plate 6 as Dr. Madisetti would have it. *See also id.* ¶¶ 30, 34 ("Since the acrylic transparent plate 6 is provided . . . adhesion between the pulse rate

detector 1 and the wrist 10 can be improved . . . ."). Thus, there is no teaching away from using a convex surface to improve the adhesion of Aizawa's detector to the user's wrist. *See, e.g.*, Ex. 1003 ¶ 142; Ex. 1047 ¶ 52.

Finally, we acknowledge that both Aizawa and Ohsaki express a concern about exerting too much pressure against the front side of the user's wrist, because this would make the user uncomfortable. *See, e.g.*, Ex. 1006 ¶¶ 6, 26, 31; Ex. 1014 ¶¶ 6, 18, 24. Thus, a POSITA would understand that there are operational limits on how large the protrusion can be made in Aizawa. Nonetheless, claim 1 does not place any limitations on the size of the protrusion, and as discussed above a protrusion would improve the ability to avoid slippage of Aizawa's detector 1 when worn on the front side of a user's wrist. Therefore, it would have been obvious to add a protrusion to Aizawa's detector 1 for that purpose, and optimize the size of the protrusion to avoid user discomfort.

Based on the foregoing arguments and evidence, we conclude Petitioner has demonstrated by a preponderance of the evidence that claim 1 is unpatentable as having been obvious over Aizawa, Inokawa, and Ohsaki.

### 3.    *Claims 2–4, 6–14, 16, 17, 19–23, and 26–29*

Petitioner relies on its arguments from Ground 1A in contending that claims 2–4, 6–14, 16, 17, 19–23, and 26–29 are unpatentable under Ground 1B, which adds Ohsaki to Ground 1A. *See* Pet. 51; Ex. 1003 ¶ 143. In defense of these claims, Patent Owner relies solely on arguments relating to claim 1. *See, e.g.*, PO Resp. 40–44; Ex. 2004 ¶ 96. Thus, for the reasons provided above in relation to Ground 1A (all challenged claims) and

Ground 1B (claim 1), we conclude Petitioner has demonstrated by a preponderance of the evidence that claims 2–4, 6–14, 16, 17, 19–23, and 26–29 are unpatentable as having been obvious over Aizawa, Inokawa, and Ohsaki.

### F.     Ground 1C — Obviousness over Aizawa, Inokawa, and Mendelson-2006

In Ground 1C, Petitioner argues claims 23 and 24 of the '265 patent would have been obvious over Aizawa, Inokawa, and Mendelson-2006. Pet. 2, 51–57.

Claim 23 depends from claim 1 to add "the noninvasive optical physiological measurement device is comprised as *part of a mobile monitoring device*," and claim 24 depends from claim 23 to add "the mobile monitoring device includes *a touch-screen display*." Ex. 1001, 46:34–40 (emphases added).

Petitioner provides arguments and evidence, including testimony from Dr. Kenny, in support of its obviousness contentions. Pet. 51–57; Ex. 1003 ¶¶ 69–71, 144–150. Petitioner relies on Aizawa and Inokawa as in Ground 1A for the parent claim 1, and cites Mendelson-2006 for the obviousness of uploading pulse data recorded by Aizawa's wrist-worn detector 1 to a mobile computing device having a touchscreen display for display to the user, thereby resulting in the device of claims 23 and 24. Pet. 51–57; Ex. 1003 ¶¶ 69–71, 144–150. In a footnote, Petitioner adds: "Alternatively, the combination of Aizawa, Inokawa, and Ohsaki, as described in [Ground 1B], may be similarly modified in view of Mendelson-2006." Pet. 54 n.2.

IPR2020-01520
Patent 10,258,265 B1

Patent Owner's opposition relies on arguments relating to claim 1 and Grounds 1A and 1B. *See* PO Resp. 44; Ex. 2004 ¶ 97. Patent Owner additionally objects to Petitioner's footnote reference to Ohsaki, as presenting a "conclusory alternative combination[] that add[s] another reference without any analysis, and with no motivation to combine." PO Resp. 44. Patent Owner further asserts "arguments raised only in footnotes are waived." *Id.* (citing *Kennametal, Inc. v. Ingersoll Cutting Tool Co.*, 780 F.3d 1376, 1383 (Fed. Cir. 2015)).

For reasons provided in Section III.D.3 above, we conclude Petitioner has demonstrated by a preponderance of the evidence that claim 1 is unpatentable over Aizawa and Inokawa pursuant to Ground 1A, over Patent Owner's objections. We further find Petitioner's reliance on Mendelson-2006 as disclosing the additional subject matter recited in claims 23 and 24 is supported by a preponderance of the evidence. Figure 1 of Mendelson-2006 is reproduced below:



Fig. 1. (Top) Attachment of Sensor Module to the skin; (Bottom) photograph of the Receiver Module (left) and Sensor Module (right).

Figure 1 is a picture of "a body-worn pulse oximeter that receives and processes PPG [photoplethysmographic] signals," comprising a Sensor

75

IPR2020-01520
Patent 10,258,265 B1

Module and a Receiver Module.  Ex. 1016, 912–913.  The Sensor Module
consists of an optical transducer, a stack of round printed circuit boards, and
a coin-cell battery, and is attached to the user's skin to gather the PPG data.
*Id.* at 912 (abstract), 913.  The Sensor Module transmits its data wirelessly to
the Receiver Module, which is also "body-worn."  *Id.* at 913.  "The data
processed by the Receiver Module can be transmitted wirelessly to a PDA,"
which is not shown in Figure 1.  *Id.*

Figure 3 of Mendelson-2006 is reproduced below:



Fig. 3.  Sample PDA Graphical User Interface (GUI).

Figure 3 is a picture of a PDA that may be used with the body-worn Sensor
Module and Receiver Module, and this PDA "provides a low-cost touch
screen interface."  *Id.* at 913–914.

Thus, Mendelson-2006 discloses a noninvasive optical physiological
measurement device comprised as part of a mobile monitoring device
(claim 23) wherein the mobile monitoring device includes a touch-screen
display (claim 24).  We additionally conclude a person of ordinary skill in
the art would have been motivated to configure Aizawa's body-worn
detector 1 to transmit its data to a touch screen PDA such as is disclosed in
Mendelson-2006, based on the evidence cited and the reasons provided in
the Petition, which we adopt as our own here.  *See* Pet. 51–57; Ex. 1003

IPR2020-01520
Patent 10,258,265 B1

¶¶ 144–150.  Thus, we conclude Petitioner has demonstrated by a preponderance of the evidence that claims 23 and 24 are unpatentable as having been obvious over Aizawa, Inokawa, and Mendelson-2006.

In addition, for reasons provided in Section III.E.2 above, we conclude Petitioner has demonstrated by a preponderance of the evidence that claim 1 is unpatentable over Aizawa, Inokawa, and Ohsaki, pursuant to Ground 1B, over Patent Owner's objections.  Petitioner's reliance on Ohsaki as providing motivation for adding a protrusion to Aizawa's flat cover to reduce slippage (Ground 1B) is unrelated to, and is not inconsistent with, Petitioner's reliance on Mendelson-2006 for the obviousness of sending data to a mobile monitoring device with a touch screen display (Ground 1C).  Thus, we conclude Petitioner has demonstrated by a preponderance of the evidence that claims 23 and 24 are unpatentable as having been obvious over Aizawa, Inokawa, Ohsaki, and Mendelson-2006.

Concerning Petitioner's reliance on Ohsaki in this Ground 1C, Patent Owner cites a Federal Circuit decision that states "[a]rguments raised only in footnotes . . . are waived."  *Kennametal*, 780 F.3d at 1383 (quoting *Otsuka Pharm. Co., Ltd. v. Sandoz, Inc.*, 678 F.3d 1280, 1294 (Fed. Cir. 2012) (citing *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1320 (Fed. Cir. 2006))).  However, this appears to be a rule applied by the Federal Circuit to briefs filed with that Court, as opposed to a precedential rule of law the Board is compelled to follow.  *See Otsuka*, 678 F.3d at 1294.  In addition, to the extent it is binding precedent on the Board, we are permitted to "exercise our discretion to consider" arguments "improperly raised" only in a footnote.  *Id.* (citing *Becton Dickinson & Co. v. C.R. Bard, Inc.*,

IPR2020-01520
Patent 10,258,265 B1

922 F.2d 792, 800 (Fed. Cir. 1990)).  We do so here, to provide a complete record for review by the Federal Circuit in the event of an appeal.

G.    *Ground 1D — Obviousness over Aizawa, Inokawa, Goldsmith, and Lo*

In Ground 1D, Petitioner argues claims 23 and 24 of the '265 patent would have been obvious over Aizawa, Inokawa, Goldsmith, and Lo.  Pet. 2, 57–62.  We have already determined claim 23 is unpatentable based on Grounds 1A, 1B, and 1C, and claim 24 is unpatentable based on Ground 1C. Therefore, we need not, and to conserve the Board's resources we do not, reach Ground 1D.  *See Boston Sci. Scimed, Inc. v. Cook Grp. Inc.*, 809 F. App'x 984, 990 (Fed. Cir. 2020) ("[T]he Board need not address issues that are not necessary to the resolution of the proceeding.").

H.    *Ground 1E — Obviousness over Aizawa, Inokawa, Mendelson-2006, and Beyer*

In Ground 1E, Petitioner argues claim 25 of the '265 patent would have been obvious over Aizawa, Inokawa, Mendelson-2006, and Beyer. Pet. 2, 62–65.

Claim 25 recites:

25.   A physiological monitoring system comprising:

the noninvasive optical physiological measurement device of claim 1; and

a processor configured to receive the one or more signals and communicate physiological measurement information to a mobile phone.

Ex. 1001, 46:41–46.

Petitioner provides arguments and evidence, including testimony from Dr. Kenny, in support of its obviousness contentions.  Pet. 62–65; Ex. 1003

IPR2020-01520
Patent 10,258,265 B1

¶¶ 158–164.  Petitioner relies on Aizawa, Inokawa, and Mendelson-2006 as in Ground 1C for the obviousness of "a monitoring system that includes, among other things, a wrist-worn sensor (as in Aizawa) and a mobile PC (as in Mendelson-2006)" to receive signals from the wrist-worn sensor. Pet. 62–63; Ex. 1003 ¶¶ 158–160.  Petitioner then addresses the "mobile phone" limitation of claim 25, and contends it would have been obvious to implement this additional subject matter in the combination of Aizawa, Inokawa, and Mendelson-2006, based on Beyer.  Pet. 62–65; Ex. 1003 ¶¶ 72, 160–164.  In a footnote, Petitioner adds: "Alternatively, the combination of Aizawa, Inokawa, and Ohsaki, as described in [Ground 1B], may be similarly modified in view of Mendelson-2006 and Beyer."  Pet. 62 n.4.

Patent Owner's opposition relies on arguments relating to claim 1 and Grounds 1A and 1B.  *See* PO Resp. 44; Ex. 2004 ¶ 97.  Patent Owner additionally objects to Petitioner's footnote reference to Ohsaki, as presenting a "conclusory alternative combination[] that add[s] another reference without any analysis, and with no motivation to combine." PO Resp. 44.  Patent Owner further asserts "arguments raised only in footnotes are waived."  *Id.* (citing *Kennametal*, 780 F.3d at 1383).

For reasons provided in Section III.D.3 above, we conclude Petitioner has demonstrated by a preponderance of the evidence that claim 1 is unpatentable over Aizawa and Inokawa pursuant to Ground 1A, over Patent Owner's objections.  For reasons provided in Section III.F above, we also conclude the combination of Aizawa, Inokawa, and Mendelson-2006 leads to the invention of claim 25, except for the "mobile phone" limitation.

We further find Petitioner's reliance on Beyer as disclosing the "mobile phone" limitation of claim 25 is supported by a preponderance of the evidence.  Beyer discloses "a small handheld cellular phone / PDA communications system" that is similar to the PDA of Mendelson-2006. Ex. 1019, Fig. 1, 7:17–20.  We also agree with Petitioner's contention that a person of ordinary skill in the art would have been motivated to modify the PDA of Mendelson-2006, which "does not explicitly disclose the PDA to be a mobile phone," to incorporate cellular communication technology in order to provide the additional communication capabilities of a mobile phone, as disclosed by Beyer.  Pet. 63–65 (citing Ex. 1016, 914; Ex. 1019, 1:6–15); Ex. 1003 ¶¶ 161–164.  A person of ordinary skill in the art also would have been motivated to do this to enable review of the user's data at a location that is remote to the user.  Pet. 64–65 (citing Ex. 1021, code (57), Fig. 3); Ex. 1003 ¶ 162.  Thus, we conclude Petitioner has demonstrated by a preponderance of the evidence that claim 25 is unpatentable as having been obvious over Aizawa, Inokawa, Mendelson-2006, and Beyer.

In addition, for reasons provided in Section III.E.2 above, we conclude Petitioner has demonstrated by a preponderance of the evidence that claim 1 is unpatentable over Aizawa, Inokawa, and Ohsaki, pursuant to Ground 1B, over Patent Owner's objections.  Petitioner's reliance on Ohsaki as providing motivation for adding a protrusion to Aizawa's flat cover to reduce slippage (Ground 1B) is unrelated to, and is not inconsistent with, Petitioner's reliance on Mendelson-2006 and Beyer for the obviousness of sending data to a mobile device with a touch screen display and mobile phone communication capability (Grounds 1C and 1E).  Thus, we conclude Petitioner has demonstrated by a preponderance of the evidence that

IPR2020-01520
Patent 10,258,265 B1

claim 25 is unpatentable as having been obvious over Aizawa, Inokawa, Ohsaki, Mendelson-2006, and Beyer. As discussed above, the fact that this theory of obviousness is articulated in a footnote in the Petition does not persuade us to overlook its merits.

## I.    *Ground 2A — Obviousness over Mendelson-1988 and Inokawa*

In Ground 2A, Petitioner argues claims 1–4, 6–14, 16–22, and 26–30 of the '265 patent would have been obvious over Mendelson-1988 and Inokawa. Pet. 2, 66–95. Patent Owner opposes. PO Resp. 44–60. We conclude a preponderance of the evidence supports Petitioner's assertions as to claims 1, 2, 4, 14, 17–22, and 26–30, but not claims 3, 6–13, and 16. We begin our analysis with a brief summary of Mendelson-1988, then we address the parties' contentions.

### 1.    *Mendelson-1988 Disclosure*

Mendelson-1988 discloses a pulse oximeter, with an optical reflectance sensor suitable for noninvasive monitoring of a user's arterial hemoglobin oxygen saturation ($SpO_2$), via the user's forehead. *See* Ex. 1015, 167 (title & abstract). Figure 2 is reproduced below:

81

IPR2020-01520
Patent 10,258,265 B1



Figure 2 illustrates the sensor of Mendelson-1988, including: (A) a top view diagram; (B) a side view diagram; and (C) a photograph. *Id.* at 169.

The sensor includes two red LEDs and two infrared LEDs for emitting light into the user's tissue, and six photodiodes "arranged symmetrically in a hexagonal configuration" surrounding the four emitters, to detect light reflected back to the sensor from the user's tissue. *Id.* at 168 ("SENSOR DESIGN"). The user's "SpO$_2$ can be calculated from the ratio of the reflected red and infrared photoplethysmograms." *Id.* at 167 (col. 2). "To minimize the amount of light transmission and reflection between the LEDs and the photodiodes within the sensor, a ring-shaped, optically opaque shield of black Delrin . . . was placed between the LEDs and the photodiode chips." *Id.* at 168 (col. 2). "The optical components were encapsulated inside the package using optically clear adhesive." *Id.* "The microelectronic package was mounted inside a black Delrin housing." *Id.*

### 2. Claim 1

Petitioner provides arguments and evidence, including testimony from Dr. Kenny, in support of contending claim 1 is unpatentable as having been obvious over Mendelson-1988 and Inokawa. Pet. 66–78; Ex. 1003 ¶¶ 66–68, 165–181. Patent Owner provides arguments and evidence in opposition, including testimony from Dr. Madisetti. PO Resp. 44–53, 58–60; Ex. 2004 ¶¶ 34, 98–117, 126–129.

### a) Comparing Claim 1 with Mendelson-1988

Petitioner contends Mendelson-1988's $SpO_2$ sensor exhibits each and every limitation of claim 1, except that its light permeable cover (i.e., the "OPTICALLY CLEAR EPOXY" in Figure 2B) lacks the claimed "protrusion." *See* Pet. 66–78; Ex. 1003 ¶¶ 66–68, 165–181. We determine this contention is supported by a preponderance of the evidence, over Patent Owner's objections, as follows.

We find Mendelson-1988's sensor exhibits several limitations of claim 1, which are not challenged by Patent Owner. Thus, we find the sensor is a noninvasive optical measurement device adapted to be worn on a user's forehead, to provide an indication of a physiological parameter of the user (i.e., $SpO_2$).[11] *See* Ex. 1015, 167 (abstract); Pet. 71; Ex. 1003 ¶ 165. We find the sensor has two infrared LED chips and two red LED chips. *See* Ex. 1015, 168 (col. 2) ("The optical reflectance sensor used in this study consists of two red (peak emission wavelength: 660 nm) and two infrared (peak emission wavelength: 930 nm) LED chips[.]"), 169 (Fig. 2);

---

[11] Whether the preamble is limiting need not be resolved, because the recitation in the preamble is satisfied by the prior art.

IPR2020-01520
Patent 10,258,265 B1

Pet. 71–72; Ex. 1003 ¶ 166.  We find the sensor includes a housing having a surface and a circular wall protruding from the surface.  *See* Ex. 1015, 169 (Fig. 2); Ex. 1003 ¶ 167.  In particular, Petitioner annotates Mendelson-1988's Figures 2A and 2B to identify the "Housing" in red, the "Surface" in purple, and the "Circular wall" in green.  *See* Pet. 72–73; Ex. 1003 ¶ 167.  We find the sensor further includes at least four detectors (i.e., the six photodiodes) arranged on the housing's surface and spaced apart from each other, symmetrically on a circle centered on the four LEDs.  *See* Ex. 1015, 168 (col. 2) (stating the six photodiodes are "arranged symmetrically in a hexagonal configuration"), 169 (Fig. 2); Pet. 75–76; Ex. 1003 ¶ 171.  We find the six detectors are configured to output signals responsive to light emitted from the four emitters and attenuated by the user's body tissue, with the signals being indicative of the user's $SpO_2$.  *See* Ex. 1015, 167 (col. 2) ("$SpO_2$ can be calculated from the ratio of the reflected red and infrared photoplethysmograms"); Pet. 75–76; Ex. 1003 ¶ 171.

Petitioner contends Mendelson-1988's sensor has a light permeable cover (i.e., the "OPTICALLY CLEAR EPOXY" in Figure 2B) arranged above a portion of the housing (i.e., the "AIRPAX PACKAGE" in Figure 2B) to cover the six detectors.  *See* Pet. 67; Ex. 1003 ¶ 172.  Patent Owner disagrees, relying on its claim construction of the term "cover" which would exclude resins and epoxies.  *See* PO Resp. 50–51.  For reasons provided in Section III.C.1 above, Patent Owner's claim construction is not persuasive, so Mendelson-1988 cannot be distinguished from claim 1 on this basis.

Appx02624

We find a preponderance of the evidence establishes that the Mendelson-1988 sensor's optically clear epoxy is a light permeable cover that covers the sensor's six detectors. In particular, it is clear from Figures 2A and 2B that the epoxy extends from the top of the sensor at the dotted line in Figure 2B, down into the well of the AIRPAX package, to cover all four LEDs and all six photodiodes disposed at the bottom of the well. *See also* Ex. 1015, 168 (col. 2) ("The optical components were encapsulated inside the package using optically clear adhesive[.]").

Thus, we find Mendelson-1988's sensor exhibits each and every limitation of claim 1, except that its light permeable cover is flat, and therefore lacks the claimed "protrusion."

> b)     *Comparing Claim 1 with Inokawa*

Petitioner contends Inokawa's pulse sensor 1 is a noninvasive optical measurement device having a light permeable cover (i.e., lens 27) comprising a protrusion arranged to cover its light detector(s) (i.e., detector 25), as discussed in Section III.D.3(b) above. *See* Pet. 68; Ex. 1003 ¶ 174. Patent Owner does not challenge Petitioner's contentions in this regard. We determine these contentions are supported by a preponderance of the evidence, as discussed in Section III.D.3(b) above.

> c)     *Obviousness of Combining Mendelson-1988 and Inokawa*

Petitioner contends a POSITA would have been motivated to modify Mendelson-1988's optical SpO$_2$ sensor, in light of Inokawa's optical pulse sensor, by adding a protrusion to Mendelson-1988's cover to improve the sensor's light detection efficiency. *See* Pet. 67–71, 76–78. Patent Owner opposes this contention, and argues a person of ordinary skill in the art

would not have had a reasonable expectation of success, among other things. *See* PO Resp. 44–49, 51–53, 58–60.

### (1)    Petitioner's Contentions

Petitioner asserts Mendelson-1988 describes its cover as an optically clear epoxy, but it "does not provide additional details . . . regarding the precise shape of this layer's interface with the skin."[12]  Pet. 67–68 (citing Ex. 1015, 168, 173); Ex. 1003 ¶ 173.  Petitioner asserts "a POSITA would have sought to incorporate an Inokawa-like lens into the cover of Mendelson-1988 to increase the light collection efficiency, which in turn would lead to an improved signal-to-noise ratio (and thus more reliable pulse [sic $SpO_2$] detection)."  Pet. 68–69; Ex. 1003 ¶ 175.  Petitioner asserts: "A POSITA would have been particularly interested in making such a modification because Mendelson-1988 is expressly interested in maximizing 'reflectance photoplethysmographic signals.'"  Pet. 69 (citing Ex. 1015, 173); Ex. 1003 ¶ 175.  Petitioner's theory for obviousness is otherwise substantially the same as discussed above in Ground 1A, with Mendelson-1988 replacing Aizawa, including some reliance on Nishikawa. Pet. 69–71, 76; Ex. 1003 ¶¶ 175–179.  For example, Dr. Kenny provides the following illustrations to portray the proposed modification of Mendelson-1988's sensor (Ex. 1003 ¶¶ 180–181):

---

[12]  Petitioner overstates the paucity of Mendelson-1988's disclosure here. Mendelson-1988 illustrates the epoxy as having a flat surface, which Dr. Kenny notes in his testimony.  *See* Ex. 1014, Fig. 2B; Ex. 1003 ¶ 176.

IPR2020-01520
Patent 10,258,265 B1



At the left, Dr. Kenny has excerpted and annotated Mendelson-1988's Figure 2B, to identify the pre-existing cover (colored blue) which covers the light emitters and detectors. *See* Ex. 1003 ¶ 176. At the right, Dr. Kenny has illustrated the device resulting from the proposed modification of the cover to have a convex protrusion (colored blue). *See id.*

Petitioner further asserts "there are two alternative ways of mapping the claimed 'light permeable cover,' or LPC, to the modified cover above." Pet. 77; Ex. 1003 ¶ 180. Dr. Kenny provides the following two illustrations, annotating Mendelson-1988's Figure 2B, to identify these alternative mappings:



Appx02627

IPR2020-01520
Patent 10,258,265 B1

Dr. Kenny's first mapping (at the left) equates the cover to the entire depth of the epoxy contained within the AIRPAX package as shown in red outline, whereas Dr. Kenny's second mapping (at the right) equates the cover to a partial depth of the epoxy within the package as shown in red outline, which Dr. Kenny identifies as "just the lens portion . . . that is formed over the underlying sealing portion . . . as informed by Nishikawa." Pet. 77–78 (citing Ex. 1001, Fig. 14D; Ex. 1023, Figs. 5–6, ¶¶ 34–38); Ex. 1003 ¶¶ 180–181.

Petitioner adds that "a POSITA would have realized that the epoxy layer could have been given a shape that would help further advance Mendelson-1988's objective of improving detection efficiency," "requir[ing] only routine knowledge of sensor design and assembly." Pet. 68, 70 (citing Ex. 1015, 168, 173); Ex. 1003 ¶¶ 173, 177. For example, "as demonstrated by Nishikawa, molding clear epoxy, as in Mendelson-1988, into a lens shape was well understood." Pet. 70–71 (citing Ex. 1023, Fig. 6, ¶¶ 22, 32, 35, 37); Ex. 1003 ¶¶ 178–179. Also according to Petitioner: "Nishikawa expressly discloses that any gaps between the encapsulation and lens portions [i.e., sealing portion 40 and lens unit 50 in Nishikawa's Figure 6] can be minimized by fusing the two portions at the interface to improve optical performance." Pet. 70–71 (citing Ex. 1023 ¶ 37, Fig. 6); Ex. 1003 ¶ 179.

### (2)    *Patent Owner's Contentions*

Patent Owner asserts Petitioner has not met its burden to demonstrate the obviousness of modifying Mendelson-1988's sensor in light of Inokawa to have a convex protrusion, based on substantially the same analysis and

testimony discussed above in the context of combining Aizawa and Inokawa. *See* PO Resp. 44–49; Ex. 2004 ¶¶ 98–110; *supra* Section III.D.3(c)(2). For example, Mendelson-1988 like Aizawa provides a central emitter or emitters surrounded by several detectors. *Compare* Ex. 1015, 169 (Fig. 2) (showing four central LEDs surrounded by six photodiodes), *with* Ex. 1006, Figs. 1(a)–1(b) (showing one central LED 21 surrounded by four photodetectors 22).

Patent Owner also objects to Petitioner's alternative mapping, providing for a cover with a protrusion to be found in two different ways. *See* PO Resp. 51–53; Ex. 2004 ¶¶ 115–117. This alternative mapping, in Patent Owner's view, is "ambiguous[]," and the second mapping "arbitrarily" draws a line defining the bottom of the cover in "an *undifferentiated* mass of material." PO Resp. 52–53. Patent Owner also argues "Petitioner's inability to consistently identify a 'cover' reveals the hindsight-driven nature of its arguments," especially as they relate to dependent claim 3. *Id.* at 52–53.

Patent Owner moreover asserts Petitioner errs in relying on Nishikawa as supporting the unpatentability of claim 1, because Nishikawa is not identified as part of Ground 2A which instead "includes only two references," Mendelson-1988 and Inokawa. PO Resp. 58–59 (citing Pet. 2, 70, 77–78, 80; Ex. 2007, 364:2–13; Ex. 2008, 73:8–12); Ex. 2004 ¶ 126. Patent Owner also asserts Petitioner's reliance on Nishikawa "makes no sense" based on substantially the same analysis and testimony discussed above in the context of combining Aizawa and Inokawa. PO Resp. 59; Ex. 2004 ¶ 127. Patent Owner argues Petitioner improperly relies on Nishikawa "to fill missing gaps [in Mendelson-1988 and Inokawa], not as

IPR2020-01520
Patent 10,258,265 B1

evidence of general knowledge in the art," thereby attempting to "sidestep the requirements to establish a motivation and expectation of success." PO Resp. 59–60 (citing Pet. 70; *K/S HIMPP v. Hear-Wear Technologies, LLC*, 751 F.3d 1362, 1366 (Fed. Cir. 2014)); Ex. 2004 ¶ 129.

### (3)    Petitioner's Reply

In reply, Petitioner provides substantially the same analysis and testimony discussed above in the context of combining Aizawa and Inokawa. *See* Pet. Reply 26; Ex. 1047 ¶ 54. Petitioner also maintains that both of Dr. Kenny's alternative mappings of the claimed "cover" to Mendelson-1988 are justified. Pet. Reply 28–29; Ex. 1047 ¶¶ 59–60. Petitioner further asserts its reliance on Nishikawa is not improper. Pet. Reply 32; Ex. 1047 ¶ 64.

### (4)    Patent Owner's Sur-reply

Patent Owner's sur-reply reiterates Patent Owner's arguments against Petitioner's contentions of the obviousness of modifying Mendelson-1988's sensor to include a convex protrusion. *See* Sur-reply 21, 23–24.

### (5)    Analysis and Conclusion

Upon review of the foregoing, we conclude a preponderance of the evidence supports Petitioner's contention that a POSITA would have been motivated to modify the top surface of Mendelson-1988's cover to include a convex protrusion, in light of Inokawa, in order to increase the amount of backscattered light that will be received by the six peripheral detectors, versus the existing flat cover surface. Our reasoning is substantially identical to the analysis provided above in connection with Ground 1A, with

IPR2020-01520
Patent 10,258,265 B1

Mendelson-1988 replacing Aizawa in the combination. *See supra*
Section III.D.3(c)(2). Patent Owner does not cite, and we do not discern,
any material difference between Mendelson-1988 and Aizawa that might
lead to a different result here, with two possible exceptions.

The first difference is Petitioner's alternative mapping of the claimed
"cover" to Petitioner's proposed modification of Mendelson-1988's sensor.
We rely on the first mapping, but not the second mapping, to decide in
Petitioner's favor. Petitioner's first mapping is reproduced here (Ex. 1003
¶ 180):



In this modified and annotated version of Figure 2B of Mendelson-1988,
Dr. Kenny identifies how Mendelson-1988's light permeable cover ("LPC")
may be modified to have a protrusion in light of Inokawa, wherein the cover
(which Dr. Kenny has colored blue) includes the entire depth of the optically
clear epoxy contained within the AIRPAX package (as Dr. Kenny has
shown in red outline). Ex. 1003 ¶ 180; Pet. 77. Patent Owner objects to this
mapping as ambiguous, but we determine Dr. Kenny's annotations
reproduced above are sufficiently clear to establish obviousness by a
preponderance of the evidence.

91

IPR2020-01520
Patent 10,258,265 B1

The second difference between Grounds 1A and 2A relates to claim 1's requirement of "a housing having a surface and a circular wall protruding from the surface." Ex. 1001, 45:5–6. In Ground 2A, Petitioner addresses this limitation in two, alternative, ways.

First, as explained above in Section III.I.2(a), we find Mendelson-1988's sensor exhibits such a housing, as Petitioner contends in the Petition at pages 72–73. Petitioner's annotations to Mendelson-1988's Figure 2 illustrate the basis for this finding, and are reproduced below.



Here, Mendelson-1988's Figures 2(A) and 2(B) have been annotated to identify the "circular wall" in green and the "surface" of the housing in purple. Patent Owner does not object to the Petition's contentions in this

regard, which we find are supported by a preponderance of the evidence. *See, e.g.*, PO Resp. 53–58; Ex. 2004 ¶ 100 ("Mendelson-1988 includes a ring-shaped optical shield surrounding the LEDs . . . .").

Second and "[a]lternatively," Petitioner contends "the outer wall of the AIRPAX microelectronic package" in Mendelson-1988, which is square as shown by the red annotations in Figure 2(B) above, "can be modified to be a circular wall," and thereby satisfy this limitation of claim 1 in a different way. Pet. 73–75; Ex. 1003 ¶¶ 168–170. Patent Owner objects to this alternative contention. *See* PO Resp. 56–58; Ex. 2004 ¶¶ 100, 122–125. For reasons provided below in Section III.I.3 in relation to claim 26, this alternative obviousness contention also is supported by a preponderance of the evidence.

### d) Conclusion as to Claim 1

Based on the foregoing arguments and evidence, we conclude Petitioner has demonstrated by a preponderance of the evidence that claim 1 is unpatentable as having been obvious over Mendelson-1988 and Inokawa.

### 3. Claim 26

Petitioner provides arguments and evidence, including testimony from Dr. Kenny, in support of contending claim 26 is unpatentable as having been obvious over Mendelson-1988 and Inokawa. Pet. 89–92; Ex. 1003 ¶¶ 211–219. Much of Petitioner's analysis for claim 26 is substantially the same as for claim 1, which as discussed above in Section III.I.2 is persuasive.

Claim 26 differs from claim 1 in specifying "a circular housing comprising a surface with a raised edge." *Compare* Ex. 1001, 45:5–6 (claim 1), *with id.* at 46:52–53 (claim 26). Petitioner correspondingly asserts

93

Mendelson-1998 includes a "housing" as the AIRPAX package. *See* Pet. 90 (annotating Mendelson-1988's Figures 2A–2B to identify the "Housing" in green); Ex. 1003 ¶¶ 213–214. This housing has "a square shape" rather than the "circular" shape required by claim 26. Pet. 90–91; Ex. 1003 ¶ 215.

Petitioner contends "a POSITA would have recognized that microelectronic packaging as used in Mendelson-1988 comes in various shapes and sizes," including a circular shape as demonstrated by Mendelson '799[13]. Pet. 91 (citing Ex. 1025, Fig. 7, 9:34–36); Ex. 1003 ¶ 215. Petitioner asserts "[a] POSITA would have considered using a differently shaped housing, namely a circular one, to be obvious," because this "was common practice well before the ['265 patent], and there was nothing new or inventive about changing one housing shape for another." Pet. 73–75, 91; Ex. 1003 ¶¶ 168–170, 216.

Patent Owner objects that "just because something 'can' be modified does not mean a POSITA would have been motivated to do so," and Petitioner "never identifies a motivation to pick a circular-shaped wall instead of the existing square shape" in Mendelson-1988. PO Resp. 57 (citing *InTouch Techs., Inc. v. VGo Commc'ns, Inc.*, 751 F.3d 1327, 1352 (Fed. Cir. 2014)); Ex. 2004 ¶ 124. According to Patent Owner, "[a] POSITA would have no particular motivation to change the shape unless a POSITA perceived some benefit in doing so." PO Resp. 57; Ex. 2004 ¶ 124.

Patent Owner asserts Petitioner errs in relying on Mendelson '799 as supporting the unpatentability of claim 26, because Mendelson '799 is not

---

[13]  Exhibit 1025, US 6,801,799 B2, issued Oct. 5, 2004.

IPR2020-01520
Patent 10,258,265 B1

identified as part of Ground 2A which instead "includes only two references," Mendelson-1988 and Inokawa. PO Resp. 57–59 (citing Pet. 1–2, 73–75). Patent Owner also asserts Petitioner improperly relies on Mendelson '799 "to fill missing gaps [in Mendelson-1988 and Inokawa], not as evidence of general knowledge in the art," thereby attempting to "sidestep the requirements to establish a motivation and expectation of success." PO Resp. 59–60 (citing Pet. 75; *K/S HIMPP*, 751 F.3d at 1366); Ex. 2004 ¶ 129.

On the merits of Mendelson '799, Patent Owner argues the reference does not support Dr. Kenny's testimony that "using a circular housing having a circular wall . . . was common practice" (Ex. 1003 ¶¶ 168–170), because it "never mentions or suggests a housing with a wall or raised edge." PO Resp. 57; Ex. 2004 ¶¶ 125, 128–129 (citing Ex. 1025, 9:22–40, Fig. 7).

Petitioner replies that "references like Mendelson [']799 have a circular wall/housing and confirm the notion that a POSITA would have found it to be simply a matter of design choice to use different shapes." Pet. Reply 31 (citing Ex. 1025, Fig. 7, 9:34–36); Ex. 1047 ¶ 63. Petitioner also asserts "neither the '265 patent nor [Patent Owner] provides any explanation of how the particular housing shape solves some problem or presents some unexpected result." Pet. Reply 31 (citing *In re Kuhle*, 526 F.2d 553, 555 (CCPA 1975)).

Patent Owner responds that "Petitioner's reply reiterates its conclusory arguments that [the proposed] change would be routine, without identifying any reason to modify the shape from square to circular." Sur-reply 24–25.

IPR2020-01520
Patent 10,258,265 B1

Upon review of the foregoing, we conclude a preponderance of the evidence supports Petitioner's contention that it would have been obvious to modify the shape of Mendelson-1988's AIRPAX package from square to circular.  Figure 7 of Mendelson '799 is reproduced below:



Figure 7

Figure 7 is a top view of optical sensor 10 comprising light source 12 composed of three LEDs 12A, 12B, and 12C emitting light of three different wavelengths, and an array of six near detectors 18 and six far detectors 16 "arranged in two concentric ring-like arrangements" surrounding light source 12.  Ex. 1025, 9:23–34.  "All these elements are accommodated in a sensor housing 17," which as can be seen in Figure 7, is circular.  *Id.* at 9:34–35.

A POSITA would recognize that the AIRPAX package of Mendelson-1988 and the housing 17 of Mendelson '799 are performing the same function of enclosing a central collection of light emitters which are surrounded by an array of light detectors in an optical sensor attached to a user's body.  *See, e.g.*, Ex. 1015, Figs. 2A–2B; Ex. 1025, Fig. 7.  Also, the

96

IPR2020-01520
Patent 10,258,265 B1

evidence of record does not suggest that the shape of such a housing has any functional significance in the operation of the optical sensor. Thus, the evidence suggests that a square shape and a circular shape of such as housing were known in the art to be predictable substitutes for one another, and therefore obvious variants. *See, e.g.*, *KSR*, 550 U.S. at 416 ("[W]hen a patent claims a structure already known in the prior art that is altered by the mere substitution of one element for another known in the field, the combination must do more than yield a predictable result."); *id.* at 417 ("[W]hen a patent 'simply arranges old elements with each performing the same function it had been known to perform' and yields no more than one would expect from such an arrangement, the combination is obvious." (citation omitted)).

We further conclude Petitioner's reliance on Mendelson '799 is not improper simply because Mendelson '799 is not listed as a reference in Petitioner's identification of Ground 2A with Mendelson-1988 and Inokawa. *See* Pet. 2, 66. This would exalt form over substance, which we decline to do. The nature of Petitioner's reliance on Mendelson '799 as evidence of the understanding of a person of ordinary skill in the art, in support of Ground 2A, is explained clearly in the Petition. *See id.* at 73–75, 91. Thus, the Petition complies with 35 U.S.C. § 312(a)(3).

We conclude Petitioner has demonstrated by a preponderance of the evidence that claim 26 is unpatentable as having been obvious over Mendelson-1988 and Inokawa.

IPR2020-01520
Patent 10,258,265 B1

### 4.    Claims 3, 6–13, and 16

Claim 3 depends indirectly from claim 1 to add "the circular wall creates a gap between the surface and the light permeable cover."  Ex. 1001, 45:16–22 (claims 2 and 3); Ex. 1002, 351 (Certificate of Correction changing "cove" to "cover" in claim 3).  Claims 6–13 and 16 depend, directly or indirectly, from claim 3.  *See id.* at 45:30–61, 46:4–7.

For claim 3, Petitioner relies solely on Dr. Kenny's second mapping of the claimed "cover" to Petitioner's proposed modification of Mendelson-1988's sensor.  *See* Pet. 79–80; Ex. 1003 ¶ 184.  This is shown by Dr. Kenny in the following illustration (Ex. 1003 ¶ 184):



In this modified and annotated version of Figure 2B of Mendelson-1988, Dr. Kenny identifies how Mendelson-1988's light permeable cover ("LPC") may be modified to have a protrusion, wherein the cover includes "only the lens portion, which lies above the underlying sealing portion" in a "two-part structure . . . as in Nishikawa."  Ex. 1003 ¶¶ 178–181 (citing Ex. 1023, Figs. 5–6, ¶¶ 22, 32, 34–38) (addressing claim 1); *id.* ¶¶ 184–186 (addressing claim 3).  Dr. Kenny's annotations also identify how this second mapping provides a "gap" between the "Surface" of the housing and the

Appx02638

cover. In support, Dr. Kenny cites a dictionary definition of the term "gap" as meaning "a separation in space." *Id.* ¶ 185; Pet. 80; Ex. 1017 (*Merriam-Webster's Collegiate Dictionary*, 11th ed. (©2005)), 515 (definition 4a). Dr. Kenny additionally finds "the size of the gap . . . would be defined, in part, by" the AIRPAX package wall which he has annotated in green, because that wall "surrounds the epoxy structure and serves as a mold that define[s] its overall height and, by extension, the size of the gap." Ex. 1003 ¶ 186.

Patent Owner objects that Petitioner's second mapping "arbitrarily" draws a line defining the bottom of the cover in "an ***undifferentiated*** mass of material." PO Resp. 52–54 (citing Ex. 2007, 355:12–359:5); Ex. 2004 ¶¶ 115–120. In Patent Owner's view, this "does not create a 'gap'" between the surface of the housing and the cover. PO Resp. 53–54; Ex. 2004 ¶¶ 117, 120. Patent Owner asserts "the 'gap' of claim 3 requires a 'break' . . . between the cover and the surface," and "[t]here is no such 'break' in Petitioner's combination." PO Resp. 54 (citing Ex. 1001, 36:45–49, Fig. 14D; Ex. 1017, 515 (definition 1a) ("a break in a barrier")); Ex. 2004 ¶¶ 118, 120. Patent Owner additionally asserts Petitioner's second mapping does not establish that the AIRPAX package wall "***creates*** a gap between the surface and the light permeable cover," as recited in claim 3, because the AIRPAX package wall "does not correspond to the size of any gap" and "extends beyond Petitioner's alleged 'gap.'" PO Resp. 55; Ex. 2004 ¶ 121.

Petitioner replies that "the 'line' between the LPC/cover and the epoxy encapsulation layer underneath is not arbitrary, instead being formed, for instance, by a common manufacturing technique" disclosed by Nishikawa. Pet. Reply 30; Ex. 1047 ¶ 62. Petitioner also argues "the height

IPR2020-01520
Patent 10,258,265 B1

of [the AIRPAX package wall] necessarily impacts the position of the cover, in turn impacting the size of the 'gap' between the cover and the surface." Pet. Reply 30; Ex. 1047 ¶ 62.

Patent Owner's sur-reply reiterates the arguments on this issue. *See* Sur-reply 24.

Upon review of the foregoing, we conclude Petitioner's case for the obviousness of claim 3 falls short. Petitioner's identification of the bottom border of the "cover" in Petitioner's second mapping is arbitrary, and is not supported by a preponderance of the evidence. In particular, this is not "how a POSITA would have understood a 'cover' structure" to be found in Mendelson-1988. Ex. 2004 ¶ 117. Dr. Kenny does not provide any persuasive reasoning in support of his definition of the "cover" as ending at the bottom border he has identified. *See* Ex. 1003 ¶¶ 178–181, 184–186; Ex. 1047 ¶¶ 61–62; Ex. 2007, 355:12–359:5. We perceive no such reasoning, apart from an impermissible hindsight desire to shoehorn Mendelson-1988's disclosure into the confines of claim 3.

Dr. Kenny relies on Nishikawa in this regard. Figure 6 of Nishikawa is reproduced below:



Figure 6 is a sectional view of a lens-equipped light-emitting diode device, including sealing portion 40 that "seals a light-emitting diode 22 and a

bonding wire 23," and lens unit 50.  Ex. 1023 ¶¶ 22, 30.  Sealing portion 40 and lens unit 50 may both comprise "[a] thermosetting resin or a UV curing resin, such as a transparent epoxy resin and transparent silicone."  *Id.* ¶ 32. Dr. Kenny relies on Nishikawa's disclosure that sealing portion 40 and lens unit 50 may be formed in separate injection molding steps, leading to a defined border between them which is shown as a horizontal line in Figure 6.  *Id.* ¶¶ 34–35.  Thus, Nishikawa does establish, as Dr. Kenny testifies, that Mendelson-1988's epoxy layer *could* have been formed in a two-step injection molding process, leading to a border between two layers of epoxy.  *See* Ex. 1003 ¶¶ 178–179, 181, 186; Ex. 1047 ¶ 62.

However, Dr. Kenny errs in "focus[ing] on what a skilled artisan would have been *able* to do, rather than what a skilled artisan would have been *motivated* to do."  *Polaris Indus., Inc. v. Arctic Cat, Inc.*, 882 F.3d 1056, 1068–69 (Fed. Cir. 2018) (citing *InTouch*, 751 F.3d at 1352). Dr. Kenny does not provide any persuasive motivation for using Nishikawa's two-step molding process within the context of Mendelson-1988's sensor.  Thus, we conclude Dr. Kenny "succumbed to hindsight bias in [his] obviousness analysis."  *InTouch*, 751 F.3d at 1352.

Further, even if we were to accept Dr. Kenny's testimony of a "gap" being present in Mendelson-1988 by Nishikawa's two-step injection molding process, we are not persuaded that the AIRPAX package wall "creates" this gap as is further recited in claim 3.  *See* Ex. 1003 ¶ 186; Ex. 1047 ¶ 62.  Dr. Kenny testifies in support that "the size of the gap . . . would be defined, in part, by" the wall, which "serves as a mold that define[s] [the gap's] overall height and, by extension, the size of the gap." Ex. 1003 ¶ 186.  This testimony is belied by Dr. Kenny's own illustration, in

which the bottom border of the "cover" is located *underneath* the top edge of the AIRPAX package wall. *See id.* ¶ 184. In no way does the AIRPAX package wall create the gap. Instead, the gap is created by the height of the lower layer of epoxy laid down in Nishikawa's first injection molding step. *See* Ex. 1047 ¶ 62.

For the foregoing reasons, we conclude Petitioner has not demonstrated by a preponderance of the evidence that claim 3, and its dependent claims 6–13 and 16, are unpatentable as having been obvious over Mendelson-1988 and Inokawa.

### 5.    *Claims 2, 4, 14, 17–22, and 27–30*

Petitioner provides arguments and evidence, including testimony from Dr. Kenny, in support of contending claims 2, 4, 14, 17–22, and 27–30 are unpatentable as having been obvious over Mendelson-1988 and Inokawa. Pet. 78–79, 80–81, 86, 87–89, 92–95; Ex. 1003 ¶¶ 182–183, 188, 203, 205–210, 218–226. In defense of these claims, Patent Owner relies solely on arguments relating to independent claims 1 and 26. *See, e.g.*, PO Resp. 60. For the reasons provided in Sections III.I.2 and III.I.3 above in relation to claims 1 and 26, we conclude Patent Owner's defense is unavailing.

Concerning dependent claims 2, 4, 14, 17–22, and 27–30, we find a preponderance of the evidence supports Petitioner's contentions that Mendelson-1988's sensor exhibits the limitations recited in these claims, applying Dr. Kenny's first mapping of the claimed "cover," or that such limitations would have been obvious to implement in Mendelson-1988,

102

**Appx02642**

IPR2020-01520
Patent 10,258,265 B1

based on the evidence cited and the reasons provided in the Petition, which we adopt as our own here. *See* Pet. 78–79, 80–81, 86, 87–89, 92–95.

Thus, we conclude Petitioner has demonstrated by a preponderance of the evidence that claims 2, 4, 14, 17–22, and 27–30 are unpatentable as having been obvious over Mendelson-1988 and Inokawa.

### J.    *Ground 2B — Obviousness over Mendelson-1988, Inokawa, and Mendelson-2006*

In Ground 2B, Petitioner argues claims 23 and 24 of the '265 patent would have been obvious over Mendelson-1988, Inokawa, and Mendelson-2006. Pet. 2, 95–98. This ground is essentially a combination of Grounds 1C and 2A discussed above, with Aizawa being replaced by Mendelson-1988. Patent Owner's opposition to this Ground 2B relies solely on arguments presented against Grounds 1C and 2A, which are discussed above. *See* PO Resp. 60. For reasons provided above in connection with those grounds, we conclude Petitioner has demonstrated by a preponderance of the evidence that claims 23 and 24 are unpatentable as having been obvious over Mendelson-1988, Inokawa, and Mendelson-2006.

### K.    *Ground 2C — Obviousness over Mendelson-1988, Inokawa, Mendelson-2006, and Beyer*

In Ground 2C, Petitioner argues claim 25 of the '265 patent would have been obvious over Mendelson-1988, Inokawa, Mendelson-2006, and Beyer. Pet. 2, 98–99. This ground is essentially a combination of Grounds 1E and 2A discussed above, with Aizawa being replaced by Mendelson-1988. Patent Owner's opposition to this Ground 2C relies solely on arguments presented against Grounds 1E and 2A, which are discussed above. *See* PO Resp. 60. For reasons provided above in connection with

IPR2020-01520
Patent 10,258,265 B1

those grounds, we conclude Petitioner has demonstrated by a preponderance of the evidence that claim 25 is unpatentable as having been obvious over Mendelson-1988, Inokawa, Mendelson-2006, and Beyer.

## IV.   SUMMARY OF CONCLUSIONS

In summary, we determine a preponderance of the evidence establishes claims 1–4, 6–14, and 16–30 of the '265 patent are unpatentable, as shown in the following table:[14]

| Claim(s) | 35 U.S.C. § | References | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1–4, 6–14, 16, 17, 19–23, 26–29 | 103 | Aizawa, Inokawa | 1–4, 6–14, 16, 17, 19–23, 26–29 | |
| 1–4, 6–14, 16, 17, 19–23, 26–29 | 103 | Aizawa, Inokawa, Ohsaki | 1–4, 6–14, 16, 17, 19–23, 26–29 | |
| 23, 24 | 103 | Aizawa, Inokawa, Mendelson-2006 | 23, 24 | |

---

[14]  Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding*.  *See* 84 Fed. Reg. 16,654 (Apr. 22, 2019).  If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices.  *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

IPR2020-01520
Patent 10,258,265 B1

| 23, 24 | 103 | Aizawa, Inokawa, Goldsmith, Lo[15] | | |
|--------|-----|-----------------------------------|---|---|
| 25 | 103 | Aizawa, Inokawa, Mendelson-2006, Beyer | 25 | |
| 1–4, 6–14, 16–22, 26–30 | 103 | Mendelson-1988, Inokawa | 1, 2, 4, 14, 17–22, 26–30 | 3, 6–13, 16 |
| 23, 24 | 103 | Mendelson-1988, Inokawa, Mendelson-2006 | 23, 24 | |
| 25 | 103 | Mendelson-1988, Inokawa, Mendelson-2006, Beyer | 25 | |
| **Overall Outcome** | | | 1–4, 6–14, 16–30 | |

## V.    ORDER

In consideration of the foregoing, it is hereby:

ORDERED that claims 1–4, 6–14, and 16–30 of the '265 patent have been proven by a preponderance of the evidence to be unpatentable; and

FURTHER ORDERED that, because this is a final written decision, parties to this proceeding seeking judicial review of our Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

---

[15] As explained above in Section III.G, we do not reach this ground, to conserve the Board's resources in considering multiple challenges to claims 23 and 24.

IPR2020-01520
Patent 10,258,265 B1

PETITIONER:

W. Karl Renner
Andrew B. Patrick
Hyun Jin In
FISH & RICHARDSON P.C.
axf-ptab@fr.com
devoto@fr.com
in@fr.com

PATENT OWNER:

Joseph R. Re
Jarom D. Kesler
Stephen W. Larson
Jacob L. Peterson
Jeremiah S. Helm (*pro hac vice*)
William R. Zimmerman (*pro hac vice*)
Stephen C. Jensen
KNOBBE, MARTENS, OLSON, & BEAR, LLP
2jrr@knobbe.com
2jzk@knobbe.com
2swl@knobbe.com
2jup@knobbe.com
2jgh@knobbe.com
2scj@knobbe.com

Appx02646

# CERTIFICATE OF SERVICE

I hereby certify that the original of this Notice of Appeal was filed via U.S.P.S. Priority Mail Express on April 12, 2022 with the Director of the United States Patent and Trademark Office at the address below:

Office of the Solicitor
United States Patent and Trademark Office
Mail Stop 8, Post Office Box 1450
Alexandria, VA 22313-1450

A copy of this Notice of Appeal is being filed and served on April 12, 2022 as follows:

**To the USPTO Patent Trial and Appeal Board:**
Patent Trial and Appeal Board
Madison Building East
600 Dulany Street
Alexandria, VA 22313

(*via PTAB E2E – as authorized by the Board*)

**To the U.S. Court of Appeals for the Federal Circuit:**
Clerk of Court
U.S. Court of Appeals for the Federal Circuit
717 Madison Place, N.W.
Washington, DC 20439

(*via CM/ECF – with filing fee*)

**Counsel for Petitioner Apple, Inc.**

W. Karl Renner, Reg. No. 41,265
Roberto J. Devoto, Reg. No. 55,108
Hyun Jin In, Reg. No. 70,014
Fish & Richardson P.C.
3200 RBC Plaza

60 South Sixth Street
Minneapolis, MN 55402
Tel: 202-783-5070
Fax: 877-769-7945
IPR50095-0006IP1@fr.com
PTABInbound@fr.com
axf-ptab@fr.com
devoto@fr.com
in@fr.com

*(via email pursuant to 37 C.F.R. § 42.6(e))*


Dated:  April 12, 2022                    /Jarom Kesler/
                                          Jarom D. Kesler (Reg. No. 57,046)

                                          Attorney for Patent Owner
                                          Masimo Corporation

55435313



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

# NOTICE OF ALLOWANCE AND FEE(S) DUE

| 64735 | 7590 | 02/20/2019 |
|-------|------|------------|

KNOBBE, MARTENS, OLSON & BEAR, LLP
MASIMO CORPORATION (MASIMO)
2040 MAIN STREET
FOURTEENTH FLOOR
IRVINE, CA 92614

| EXAMINER |
|----------|
| LIU, CHU CHUAN |

| ART UNIT | PAPER NUMBER |
|----------|--------------|
| 3791 | |

DATE MAILED: 02/20/2019

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|-----------------|-------------|----------------------|---------------------|-------------------|
| 16/212,440 | 12/06/2018 | Jeroen Poeze | MASCER.002C3 | 1409 |

TITLE OF INVENTION: MULTI-STREAM DATA COLLECTION SYSTEM FOR NONINVASIVE MEASUREMENT OF BLOOD CONSTITUENTS

| APPLN. TYPE | ENTITY STATUS | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
|-------------|---------------|---------------|---------------------|----------------------|------------------|----------|
| nonprovisional | UNDISCOUNTED | $1000 | $0.00 | $0.00 | $1000 | 05/20/2019 |

**THE APPLICATION IDENTIFIED ABOVE HAS BEEN EXAMINED AND IS ALLOWED FOR ISSUANCE AS A PATENT. PROSECUTION ON THE MERITS IS CLOSED. THIS NOTICE OF ALLOWANCE IS NOT A GRANT OF PATENT RIGHTS. THIS APPLICATION IS SUBJECT TO WITHDRAWAL FROM ISSUE AT THE INITIATIVE OF THE OFFICE OR UPON PETITION BY THE APPLICANT. SEE 37 CFR 1.313 AND MPEP 1308.**

**THE ISSUE FEE AND PUBLICATION FEE (IF REQUIRED) MUST BE PAID WITHIN THREE MONTHS FROM THE MAILING DATE OF THIS NOTICE OR THIS APPLICATION SHALL BE REGARDED AS ABANDONED. THIS STATUTORY PERIOD CANNOT BE EXTENDED. SEE 35 U.S.C. 151. THE ISSUE FEE DUE INDICATED ABOVE DOES NOT REFLECT A CREDIT FOR ANY PREVIOUSLY PAID ISSUE FEE IN THIS APPLICATION. IF AN ISSUE FEE HAS PREVIOUSLY BEEN PAID IN THIS APPLICATION (AS SHOWN ABOVE), THE RETURN OF PART B OF THIS FORM WILL BE CONSIDERED A REQUEST TO REAPPLY THE PREVIOUSLY PAID ISSUE FEE TOWARD THE ISSUE FEE NOW DUE.**

**HOW TO REPLY TO THIS NOTICE:**

I. Review the ENTITY STATUS shown above. If the ENTITY STATUS is shown as SMALL or MICRO, verify whether entitlement to that entity status still applies.

If the ENTITY STATUS is the same as shown above, pay the TOTAL FEE(S) DUE shown above.

If the ENTITY STATUS is changed from that shown above, on PART B - FEE(S) TRANSMITTAL, complete section number 5 titled "Change in Entity Status (from status indicated above)".

For purposes of this notice, small entity fees are 1/2 the amount of undiscounted fees, and micro entity fees are 1/2 the amount of small entity fees.

II. PART B - FEE(S) TRANSMITTAL, or its equivalent, must be completed and returned to the United States Patent and Trademark Office (USPTO) with your ISSUE FEE and PUBLICATION FEE (if required). If you are charging the fee(s) to your deposit account, section "4b" of Part B - Fee(s) Transmittal should be completed and an extra copy of the form should be submitted. If an equivalent of Part B is filed, a request to reapply a previously paid issue fee must be clearly made, and delays in processing may occur due to the difficulty in recognizing the paper as an equivalent of Part B.

III. All communications regarding this application must give the application number. Please direct all communications prior to issuance to Mail Stop ISSUE FEE unless advised to the contrary.

**IMPORTANT REMINDER: Maintenance fees are due in utility patents issuing on applications filed on or after Dec. 12, 1980. It is patentee's responsibility to ensure timely payment of maintenance fees when due. More information is available at www.uspto.gov/PatentMaintenanceFees.**

Page 1 of 3

PTOL-85 (Rev. 02/11)

**PART B - FEE(S) TRANSMITTAL**

Complete and send this form, together with applicable fee(s), by mail or fax, or via EFS-Web.

By mail, send to:   Mail Stop ISSUE FEE
   Commissioner for Patents
   P.O. Box 1450
   Alexandria, Virginia 22313-1450

By fax, send to:   (571)-273-2885

INSTRUCTIONS: This form should be used for transmitting the ISSUE FEE and PUBLICATION FEE (if required). Blocks 1 through 5 should be completed where appropriate. All further correspondence including the Patent, advance orders and notification of maintenance fees will be mailed to the current correspondence address as indicated unless corrected below or directed otherwise in Block 1, by (a) specifying a new correspondence address; and/or (b) indicating a separate "FEE ADDRESS" for maintenance fee notifications.

CURRENT CORRESPONDENCE ADDRESS (Note: Use Block 1 for any change of address)

64735          7590          02/20/2019
KNOBBE, MARTENS, OLSON & BEAR, LLP
MASIMO CORPORATION (MASIMO)
2040 MAIN STREET
FOURTEENTH FLOOR
IRVINE, CA 92614

Note: A certificate of mailing can only be used for domestic mailings of the Fee(s) Transmittal. This certificate cannot be used for any other accompanying papers. Each additional paper, such as an assignment or formal drawing, must have its own certificate of mailing or transmission.

**Certificate of Mailing or Transmission**

I hereby certify that this Fee(s) Transmittal is being deposited with the United States Postal Service with sufficient postage for first class mail in an envelope addressed to the Mail Stop ISSUE FEE address above, or being transmitted to the USPTO via EFS-Web or by facsimile to (571) 273-2885, on the date below.

_____ (Typed or printed name)

_____ (Signature)

_____ (Date)

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 16/212,440 | 12/06/2018 | Jeroen Poeze | MASCER.002C3 | 1409 |

TITLE OF INVENTION: MULTI-STREAM DATA COLLECTION SYSTEM FOR NONINVASIVE MEASUREMENT OF BLOOD CONSTITUENTS

| APPLN. TYPE | ENTITY STATUS | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|---|
| nonprovisional | UNDISCOUNTED | $1000 | $0.00 | $0.00 | $1000 | 05/20/2019 |

| EXAMINER | ART UNIT | CLASS-SUBCLASS |
|---|---|---|
| LIU, CHU CHUAN | 3791 | 600-322000 |

1. Change of correspondence address or indication of "Fee Address" (37 CFR 1.363).

☐ Change of correspondence address (or Change of Correspondence Address form PTO/SB/122) attached.

☐ "Fee Address" indication (or "Fee Address" Indication form PTO/SB/47; Rev 03-09 or more recent) attached. **Use of a Customer Number is required.**

2. For printing on the patent front page, list
(1) The names of up to 3 registered patent attorneys or agents OR, alternatively,
(2) The name of a single firm (having as a member a registered attorney or agent) and the names of up to 2 registered patent attorneys or agents. If no name is listed, no name will be printed.

1 _____

2 _____

3 _____

3. ASSIGNEE NAME AND RESIDENCE DATA TO BE PRINTED ON THE PATENT (print or type)

PLEASE NOTE: Unless an assignee is identified below, no assignee data will appear on the patent. If an assignee is identified below, the document must have been previously recorded, or filed for recordation, as set forth in 37 CFR 3.11 and 37 CFR 3.81(a). Completion of this form is NOT a substitute for filing an assignment.

(A) NAME OF ASSIGNEE

(B) RESIDENCE: (CITY and STATE OR COUNTRY)

Please check the appropriate assignee category or categories (will not be printed on the patent) : ☐ Individual ☐ Corporation or other private group entity ☐ Government

4a. Fees submitted: ☐Issue Fee ☐Publication Fee (if required) ☐Advance Order - # of Copies _____

4b. Method of Payment: *(Please first reapply any previously paid fee shown above)*

☐ Electronic Payment via EFS-Web ☐ Enclosed check ☐ Non-electronic payment by credit card (Attach form PTO-2038)

☐ The Director is hereby authorized to charge the required fee(s), any deficiency, or credit any overpayment to Deposit Account No. _____

5. **Change in Entity Status** (from status indicated above)

☐ Applicant certifying micro entity status. See 37 CFR 1.29

☐ Applicant asserting small entity status. See 37 CFR 1.27

☐ Applicant changing to regular undiscounted fee status.

NOTE: Absent a valid certification of Micro Entity Status (see forms PTO/SB/15A and 15B), issue fee payment in the micro entity amount will not be accepted at the risk of application abandonment.
NOTE: If the application was previously under micro entity status, checking this box will be taken to be a notification of loss of entitlement to micro entity status.
NOTE: Checking this box will be taken to be a notification of loss of entitlement to small or micro entity status, as applicable.

NOTE: This form must be signed in accordance with 37 CFR 1.31 and 1.33. See 37 CFR 1.4 for signature requirements and certifications.

Authorized Signature _____ Date _____

Typed or printed name _____ Registration No. _____

Page 2 of 3

PTOL-85 Part B (08-18) Approved for use through 01/31/2020   OMB 0651-0033   U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE

 United States Patent and Trademark Office

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 16/212,440 | 12/06/2018 | Jeroen Poeze | MASCER.002C3 | 1409 |

| | |
|---|---|
| 64735          7590          02/20/2019 | **EXAMINER** |
| KNOBBE, MARTENS, OLSON & BEAR, LLP | LIU, CHU CHUAN |
| MASIMO CORPORATION (MASIMO) | |
| 2040 MAIN STREET | **ART UNIT** / **PAPER NUMBER** |
| FOURTEENTH FLOOR | 3791 |
| IRVINE, CA 92614 | |

DATE MAILED: 02/20/2019

## Determination of Patent Term Adjustment under 35 U.S.C. 154 (b)
(Applications filed on or after May 29, 2000)

The Office has discontinued providing a Patent Term Adjustment (PTA) calculation with the Notice of Allowance.

Section 1(h)(2) of the AIA Technical Corrections Act amended 35 U.S.C. 154(b)(3)(B)(i) to eliminate the requirement that the Office provide a patent term adjustment determination with the notice of allowance. See Revisions to Patent Term Adjustment, 78 Fed. Reg. 19416, 19417 (Apr. 1, 2013). Therefore, the Office is no longer providing an initial patent term adjustment determination with the notice of allowance. The Office will continue to provide a patent term adjustment determination with the Issue Notification Letter that is mailed to applicant approximately three weeks prior to the issue date of the patent, and will include the patent term adjustment on the patent. Any request for reconsideration of the patent term adjustment determination (or reinstatement of patent term adjustment) should follow the process outlined in 37 CFR 1.705.

Any questions regarding the Patent Term Extension or Adjustment determination should be directed to the Office of Patent Legal Administration at (571)-272-7702. Questions relating to issue and publication fee payments should be directed to the Customer Service Center of the Office of Patent Publication at 1-(888)-786-0101 or (571)-272-4200.

PTOL-85 (Rev. 02/11)

**OMB Clearance and PRA Burden Statement for PTOL-85 Part B**

The Paperwork Reduction Act (PRA) of 1995 requires Federal agencies to obtain Office of Management and Budget approval before requesting most types of information from the public. When OMB approves an agency request to collect information from the public, OMB (i) provides a valid OMB Control Number and expiration date for the agency to display on the instrument that will be used to collect the information and (ii) requires the agency to inform the public about the OMB Control Number's legal significance in accordance with 5 CFR 1320.5(b).

The information collected by PTOL-85 Part B is required by 37 CFR 1.311. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 30 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, Virginia 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, Virginia 22313-1450. Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

**Privacy Act Statement**

**The Privacy Act of 1974 (P.L. 93-579)** requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b) (2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether disclosure of these records is required by the Freedom of Information Act.

2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.

3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.

4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).

5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.

6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).

7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.

8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspection or an issued patent.

9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

| *Notice of Allowability* | Application No.<br>16/212,440 | Applicant(s)<br>Poeze et al. | |
|---|---|---|---|
| | Examiner<br>CHU CHUAN LIU | Art Unit<br>3791 | AIA Status<br>No |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address--*

All claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application. If not included herewith (or previously mailed), a Notice of Allowance (PTOL-85) or other appropriate communication will be mailed in due course. **THIS NOTICE OF ALLOWABILITY IS NOT A GRANT OF PATENT RIGHTS.** This application is subject to withdrawal from issue at the initiative of the Office or upon petition by the applicant. See 37 CFR 1.313 and MPEP 1308.

1. ☑ This communication is responsive to <u>the preliminary amendments filed on 01/29/2019.</u>
   ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____ .

2. ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____ ; the restriction requirement and election have been incorporated into this action.

3. ☑ The allowed claim(s) is/are <u>2-6,8-18 and 29-42</u> . As a result of the allowed claim(s), you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information , please see **http://www.uspto.gov/patents/init_events/pph/index.jsp** or send an inquiry to **PPHfeedback@uspto.gov.**

4. ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
   **Certified copies:**
   a) ☐All    b) ☐ Some    *c) ☐ None of the:
   1. ☐ Certified copies of the priority documents have been received.
   2. ☐ Certified copies of the priority documents have been received in Application No. _____ .
   3. ☐ Copies of the certified copies of the priority documents have been received in this national stage application from the International Bureau (PCT Rule 17.2(a)).

   * Certified copies not received: _____ .

   Applicant has THREE MONTHS FROM THE "MAILING DATE" of this communication to file areply complying with the requirements noted below. Failure to timely comply will result in ABANDONMENT of this application. **THIS THREE-MONTH PERIOD IS NOT EXTENDABLE.**

5. ☐ CORRECTED DRAWINGS (as "replacement sheets") must be submitted.
   ☐ including changes required by the attached Examiner's Amendment / Comment or in the Office action of Paper No./Mail Date _____ .
   **Identifying indicia such as the application number (see 37 CFR 1.84(c)) should be written on the drawings in the front (not the back) of each sheet. Replacement sheet(s) should be labeled as such in the header according to 37 CFR 1.121(d).**

6. ☐ DEPOSIT OF and/or INFORMATION about the deposit of BIOLOGICAL MATERIAL must be submitted. Note the attached Examiner's comment regarding REQUIREMENT FOR THE DEPOSIT OF BIOLOGICAL MATERIAL.

**Attachment(s)**
1. ☑ Notice of References Cited (PTO-892)
2. ☑ Information Disclosure Statements (PTO/SB/08), Paper No./Mail Date <u>12/18/2018; 01/28/2019.</u>
3. ☐ Examiner's Comment Regarding Requirement for Deposit of Biological Material _____ .
4. ☐ Interview Summary (PTO-413), Paper No./Mail Date. _____ .
5. ☑ Examiner's Amendment/Comment
6. ☑ Examiner's Statement of Reasons for Allowance
7. ☐ Other _____ .

| /CHU CHUAN LIU/<br>Examiner, Art Unit 3791 | /ERIC F WINAKUR/<br>Primary Examiner, Art Unit 3791 |
|---|---|

U.S. Patent and Trademark Office
PTOL-37 (Rev. 08-13)      **Notice of Allowability**      Part of Paper No./Mail Date 20190212

## EXAMINER'S AMENDMENT

1.      An examiner's amendment to the record appears below. Should the changes

and/or additions be unacceptable to applicant, an amendment may be filed as provided

by 37 CFR 1.312. To ensure consideration of such an amendment, it MUST be

submitted no later than the payment of the issue fee.


        Authorization for this examiner's amendment was given in an interview with Scott

Cromar on 02/11/2019. During the interview, potential claim languages associated with

"a light permeable cover" and "a lens portion" were discussed. Amendments were made

to better define over the art.


        The application has been amended as follows:

        Claim 2.        A noninvasive optical physiological measurement device adapted to

be worn by a wearer, the noninvasive optical physiological measurement device

providing an indication of a physiological parameter of the wearer comprising:

                a plurality of emitters of different wavelengths;

                a housing having a surface and a circular wall protruding from the surface;

                at least four detectors arranged on the surface and spaced apart from

each other, the at least four detectors configured to output one or more signals

responsive to light from the one or more light emitters attenuated by body tissue,

the one or more signals indicative of a physiological parameter of the wearer;

and

Application/Control Number: 16/212,440                    Page 3
Art Unit: 3791

a light permeable cover arranged above at least a portion of the housing,

the light permeable cover comprising a protrusion arranged to cover the at least

four detectors.

Claim 8.      The noninvasive optical physiological measurement device of Claim

4, wherein the ~~light permeable cover~~ protrusion comprises a continuous protrusion.

Claim 9.      The noninvasive optical physiological measurement device of Claim

8, wherein the ~~light permeable cover comprises~~ continuous protrusion comprises a

convex protrusion.

Claim 38.     A noninvasive optical physiological measurement device adapted to

be worn by a wearer providing an indication of a physiological parameter of the wearer

comprising:

a plurality of emitters of different wavelengths;

a circular housing comprising a surface with a raised edge;

at least four detectors arranged on the surface, wherein a first detector is

arranged spaced apart from a second detector, and a third detector arranged

spaced apart from a fourth detector; and

a cover of the circular housing comprising a lens portion, the lens portion

comprising a protrusion in optical communication with the at least four detectors,

wherein the at least four detectors are configured to output one or more

signals responsive to light from the one or more light emitters attenuated by body

tissue, the one or more signals indicative of a physiological parameter of the

wearer.

### *Reasons for Allowance*

2.      The following is an examiner's statement of reasons for allowance: The Terminal

Disclaimers of USPN 8,437,825 and copending application No.16/212,537 are approved

on 02/12/2019 to resolve the double patenting issues. Wong et al. (USPN 5,601,079)

teaches a noninvasive optical physiological measurement device (Figs. 4-8 and

associated descriptions) comprises a plurality of emitters of different wavelengths; a

housing having a surface and a circular wall protruding from the surface; a plurality of

detectors arranged on the surface and spaced apart from each other (see Figs. 4-8 and

associated descriptions). Schulz et al. (USPN 7,341,559 – applicant cited) teaches an

pulse oximeter (Fig. 19B and associated descriptions) comprises a plurality of emitters

of different wavelengths; a detector; a housing having a surface and a circular wall

protruding from the surface; a light permeable cover arranged above at least a portion

of the housing, the light permeable cover comprising a protrusion arranged to cover the

detector (see Fig. 19B and associated descriptions). Chaiken et al. (USPN 6,223,063 –

applicant cited) teaches an optical physiological measurement device (Figs. 1-3 and

associated descriptions) comprises a plurality of emitters of different wavelengths; four

detectors arranged on the surface and spaced apart from each other; a plurality of

lenses each covers/ in optical communication with a respective detector (see Figs. 1-3

and associated descriptions). However, the prior art of record does not teach or suggest

"a housing having a surface and a circular wall protruding from the surface; at least four

detectors arranged on the surface and spaced apart from each other; a light permeable

cover arranged above at least a portion of the housing, the light permeable cover

comprising a protrusion arranged to cover the at least four detectors" and "a circular

housing comprising a surface with a raised edge; at least four detectors arranged on the

surface, wherein a first detector is arranged spaced apart from a second detector, and a

third detector arranged spaced apart from a fourth detector; and a cover of the circular

housing comprising a lens portion, the lens portion comprising a protrusion in optical

communication with the at least four detectors" in combination with the other claimed

elements/ steps.

Any comments considered necessary by applicant must be submitted no later

than the payment of the issue fee and, to avoid processing delays, should preferably

accompany the issue fee.  Such submissions should be clearly labeled "Comments on

Statement of Reasons for Allowance."


### Conclusion

Any inquiry concerning this communication or earlier communications from the

examiner should be directed to CHU CHUAN LIU whose telephone number is (571)270-

5507.  The examiner can normally be reached on M-Th (8am-6pm).

Examiner interviews are available via telephone, in-person, and video

conferencing using a USPTO supplied web-based collaboration tool. To schedule an

interview, applicant is encouraged to use the USPTO Automated Interview Request

(AIR) at http://www.uspto.gov/interviewpractice.

Application/Control Number: 16/212,440                                    Page 6
Art Unit: 3791

If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, Jacqueline Cheng can be reached on (571) 272-5596.  The fax phone

number for the organization where this application or proceeding is assigned is 571-

273-8300.

Information regarding the status of an application may be obtained from the

Patent Application Information Retrieval (PAIR) system.  Status information for

published applications may be obtained from either Private PAIR or Public PAIR.

Status information for unpublished applications is available through Private PAIR only.

For more information about the PAIR system, see http://pair-direct.uspto.gov. Should

you have questions on access to the Private PAIR system, contact the Electronic

Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a

USPTO Customer Service Representative or access to the automated information

system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.

/ERIC F WINAKUR/
Primary Examiner, Art Unit 3791

/CHU CHUAN LIU/
Examiner, Art Unit 3791

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Patent of:    Poeze et al.
U.S. Patent No.:    10,258,265      Attorney Docket No.: 50095-00006IP1
Issue Date:    April 16, 2019
Appl. Serial No.:    16/212,440
Filing Date:    December 6, 2018
Title:    MULTI-STREAM DATA COLLECTION SYSTEM FOR NONINVASIVE MEASUREMENT OF BLOOD CONSTITUENTS

## <u>DECLARATION OF DR. THOMAS W. KENNY</u>

**Declaration**

I declare that all statements made herein on my own knowledge are true and that all statements made on information and belief are believed to be true, and further, that these statements were made with the knowledge that willful false statements and the like so made are punishable under Section 1001 of Title 18 of the United States Code.

By: _____

Thomas W. Kenny, Ph.D.

53.    Aizawa relates to a "pulse wave sensor…detecting light output from a light emitting diode and reflected from the artery of a wrist of a subject." APPLE-1006, Abstract. Similar to the '265 patent, Aizawa detects light emitted from an emitter to obtain pulse information from a user. *Id.*

54.    Referring to the annotated drawings below, Aizawa's sensor device detects a user's pulse wave by using an emitter (LED 21, colored green) to emit light that is picked up by detectors (photodetectors 22, colored red) that are arranged around the emitter. APPLE-1006, [0023]. While this particular arrangement can work with a wide range of wavelengths, Aizawa's example mentions that "[n]ear infrared radiation output toward the wrist 10 from the light emitting diode 21 is reflected by a red corpuscle running through the artery 11 of the wrist 10 and this reflected light is detected by the plurality of photodetectors 22 so as to detect a pulse wave." *Id.*, [0027].



APPLE-1006, FIGS. 1(a) and 1(b)

55.     Aizawa also teaches, in addition to the configuration above where four detectors are shown, that more detectors may be used to "further improve detection efficiency." *Id.*, [0032].  Also, in addition to the configuration above where just a single emitter is shown, Aizawa teaches that more emitters may be used as needed, for instance by surrounding a centrally located detector by a plurality of emitters. *Id.*, [0033].

56.     Referring to the annotated drawing below, Aizawa also describes the use of an "acrylic transparent plate 6" (colored blue)—which corresponds to the '265 patent's light permeable cover—that is mounted at a wrist-facing detection face 23a.



APPLE-1006, FIG. 1(b)

57.     This transparent plate provides a light permeable cover that covers and protects the emitter/detector assembly while also promoting improved adhesion

between the detector and the wrist to "further improv[e] the detection efficiency of a pulse wave." *Id.*, [0030].

58.    Referring to FIG. 2 below, the sensor of Aizawa is designed to be worn on the wrist as a wristwatch-type device. *Id.*, [0026]. The various emitters/detectors of Aizawa are housed within a circular housing structure, which has been colored in red below.



APPLE-1006, FIG. 2.

### B.    Overview of Inokawa

59.    Inokawa is generally directed to an "optical vital sensor is a pulse sensor 1 that is able to sense the pulse, etc. by being attached, for example, to a person's finger or wrist." APPLE-1008, [0056]. For example, Inokawa teaches attaching such a sensor to the user's wrist using a wristband 5. *Id.*, [0057].



APPLE-1008, FIG. 1

60.    As shown in annotated FIG. 2 below, Inokawa sense the user's pulse by using a detector (photodiode detector 25, colored red) that receives "light reflected off of the body (i.e. change in the amount of hemoglobin in the capillary artery)." *Id.*, [0058].  As for its emitters, as shown below, Inokawa teaches that a "sensor-side light-emitting means of various kinds, such as an infrared LED or a green LED" may be used and further that "work can be divided between." *Id.*, [0014]. In other words, as illustrated below, one emitter (LED 21, colored green) may be used to emit light that is used for sensing the user's pulse while the other emitter (LED 23, colored purple) may be used to emit light of a different wavelength that is used to sense the user's body motion. *Id.*, [0058]-[0059].



APPLE-1008, FIG. 2

61.    Similar to the '265 patent's light permeable cover, Inokawa also teaches a

lens 27 that can be "placed on the surface of the sensor-side light-emitting means"

to "make[] it possible to increase the light-gathering ability of the LED as well as

to protect the LED or PD." *Id.*, [0015], [0058].  As I will further explain below in

my analysis of claim 1, this lens corresponds well, both structurally and

functionally, to the light permeable cover comprising a protrusion as claimed in the

'265 patent.  *Id.*



APPLE-1008, FIG. 2

62.    Lastly, Inokawa teaches the use of a base device in conjunction with its sensor.  For example, as shown below, Inokawa teaches that its wrist sensor (colored red) may be mounted onto a base device (colored blue blue) that serves as a "charger with communication functionality."  *Id.*, [0060].



APPLE-1008, FIG. 3

31

APPLE-1019, FIG. 1 (left); APPLE-1014, FIG. 3 (right)

## VIII.  GROUND 1A – Claims 1-4, 6-14, 16, 17, 19-23, and 26-29 Are Rendered Obvious by Aizawa in view of Inokawa

### A.    Claim 1

**[1pre] A noninvasive optical physiological measurement device adapted to be worn by a wearer, the noninvasive optical physiological measurement device providing an indication of a physiological parameter of the wearer comprising:**

73.    Aizawa a pulse sensor that is designed to "detect[] the pulse wave of a subject from light reflected from a red corpuscle in the artery of a wrist of the subject by irradiating the artery of the wrist."  APPLE-1006, [0002].  Thus, the sensor of Aizawa is a noninvasive optical physiological measurement device and provides an indication of a physiological parameter, namely pulse.  *Id.*  As shown below, Aizawa's sensor is adapted to be worn by the user by being attached to the user's wrist.  *Id.*, [0026].



F I G.  2

APPLE-1006, FIG. 2

**[1a] a plurality of emitters of different wavelengths;**

74. As noted above, Aizawa teaches a pulse wave sensor having multiple detectors disposed circularly around an emitter. APPLE-1006, [0023]. As also noted, Aizawa considers the use of multiple emitters but does not expressly talk about using multiple emitters at different wavelengths. *Id.*, [0033].

75. Here, I note that Inokawa teaches the use of two different types of emitters "such as an infrared LED or a green LED" and further teaches that "work can be divided between the various means, with an infrared LED used to detect vital signs and transmit vital sign information, and a green LED used to detect pulse." APPLE-1008, [0014], [0044], [0058], [0059]. As shown below, Inokawa teaches use of a first emitter (LED 21, colored green) and a second emitter (LED 23, colored purple). *Id.*, [0058], [0059].



APPLE-1008, FIG. 2

76.    A POSITA in possession of both Aizawa and Inokawa would have realized that Inokawa's teachings concerning the use of two different emitters operating at different wavelengths would be applicable to Aizawa as well able to yield similar benefits.  For example, Aizawa only mentions using a single wavelength of light, but Inokawa teaches the benefits of dividing the role of a single LED into two different LEDs "with an infrared LED used to detect vital signs and transmit vital sign information, and a green LED used to detect pulse."  APPLE-1008, [0014], [0044], [0058], [0059].

77.    Thus, a POSITA would have recognized that providing an additional emitter of a different wavelength to Aizawa, as per Inokawa, would enable Aizawa's device to, for instance, (1) use the existing infrared LED to detect body motion and (2) use the added green LED to detect pulse.  *Id.*, [0059].  While it's possible that adding more emitters to Aizawa may lead to increased power consumption, a POSITA seeking to improve detection performance would have nevertheless looked to Inokawa's multi-emitter setup to achieve enhanced performance benefits. *Id.*  Indeed, various other prior art pulse sensing devices teach, similar to Inokawa, using a first LED emitting at below 600 nm (*e.g.*, green) to measure blood flow and a second LED emitting at above 600 nm (*e.g.*, infrared) to measure body movement.  APPLE-1010, 8:45-50.  The added ability to measure body movement in this manner will allow for a more reliable measurement that can, for instance,

take into account and correct for inaccurate readings related to body movement. *Id.* For instance, the signal component corresponding to body movement can be subtracted from the pulse signal to help better isolate the desired pulse data. *Id.* Thus, applying the teachings of Inokawa, a POSITA would have been motivated and found it obvious to divide the single emitter of Aizawa, into two emitters operating at two different wavelengths, as demonstrated below, to be able to detect both pulse and body movement signals.



APPLE-1006, FIG. 1(b)

78.    More specifically, one of ordinary skill would have replaced Aizawa's LED 21 with two LEDs, each emitting a different wavelength. As suggested by Inokawa, one of ordinary skill would have recognized that this would improve Aizawa's sensor by enabling it to account for motion load through use of the second LED, by detecting and recording body motion in addition to blood flow. APPLE-1008, [0006], [0028], [0035]. Because, Aizawa already contemplates adding additional emitters, a POSITA would have known how to make the changes

needed, for example concerning circuitry, to add another LED in this manner. APPLE-1006, [0032]. While the exemplary drawings I've provided above show two smaller emitters replacing a larger emitter, which is simply a matter of design choice to a POSITA in circuit design and assembly, a similar effect could be achieved by simply enlarging the emitter cavity and including two larger emitters, which is again a simple matter of design choice.

79.    Such a modification would have amounted to nothing more than the use of a known technique to improve similar devices in the same way, and combining prior art elements according to known methods to yield predictable results. Indeed, a POSITA would have recognized that applying Inokawa's teachings about two emitters having different wavelengths to Aizawa's sensor would have led to predictable results without significantly altering or hindering the functions performed by Aizawa's sensor. That is, a POSITA would have been motivated to provide the well-known feature of providing multiple emitters to a pulse sensor to achieve the predictable benefits that Inokawa's arrangement provides.

80.    In addition to the rationale provided above, Inokawa provides an additional, or alternative, reason to add another emitter to Aizawa.

81.    First, I note that Aizawa contemplates uploading data from its wrist sensor to an external base device but does not go into details about how such data transmission would be implemented. APPLE-1006, [0015], [0023], [0035]. Here,

a POSITA would have been able to fill this gap by looking to Inokawa, which, as shown below, teaches a base device 17 (colored blue) that both charges and receives data from the pulse sensor 1 (colored red).  APPLE-1008, [0060].



APPLE-1008, FIG. 3

82.    Inokawa further teaches that, by using the sensor's infrared emitter to transmit data, "it is not necessary to use a wireless communication circuit or to establish connections via communication cable, which makes it possible to easily transmit vital sign information with few malfunctions and with a simple structure." APPLE-1008, [0007].  In view of such teaching, a POSITA would have been motivated and found it obvious and straightforward to incorporate Inokawa's base device and LED-based data transmission into Aizawa's sensor to, for instance, "make[] it possible to transmit vital sign information to the base device 17 accurately, easily, and without malfunction."  *Id.,* [0077].  A POSITA would have

also recognized that adding Inokawa's base device and LED-based data transmission scheme to Aizawa would allow Aizawa to upload data from its sensor without having to use a separate cable and without having to incorporate a separate RF circuit into Aizawa's wrist sensor.  APPLE-1008, [0007].

83.    Here, I note that Inokawa's sensor is able to transmit data using only a single LED, for example operating at infrared wavelength.  APPLE-1008, [0062]. However, as shown below, Inokawa also teaches that it's possible to use two different LEDs operating at different wavelengths to improve data transmission accuracy, namely by using a second LED operating at green wavelength, for instance, to transmit checksum information such that "the accuracy of data can be increased."  *Id.*, [0111], [0044], [0048].



APPLE-1008, FIG. 19

84.     Accordingly, a POSITA would have found it obvious to supplement Aizawa's IR LED with an additional green LED, as per Inokawa, improve accuracy of data transmission from its sensor.

85.     Indeed, a POSITA would have found it obvious to modify Aizawa with Inokawa in this manner because doing so entails the use of known solutions (*i.e.*, using a dual-LED system to more accurately transmit pulse data from a sensor to a base device) to improve similar systems and methods in the same way.  For instance, a POSITA would have recognized that applying Inokawa's base device and dual-LED-based data transmission to Aizawa's sensor would have led to the predictable result of more accurate and convenient data transmission without significantly altering or hindering the functions performed by Aizawa's sensor.  As such, a POSITA would have had a reasonable expectation of success in making this modification, and would have reasonably expected to reap benefits of simple and accurate data transmission.  Indeed, it was common practice in the pulse oximeter field to centrally locate multiple emitters of different wavelengths, for example as further demonstrated by Mendelson-1988.  APPLE-1015, 168; FIG. 2(A).

86.     Thus, for reasons provided above, a POSITA would have found it obvious to split the single emitter of Aizawa into two emitters as in Inokawa in order to (i) acquire body motion information for improved pulse detection and/or (ii) more

reliably transmit information from the sensor to a base device with less error. APPLE-1008, [0007], [0014], [0044], [0048], [0058], [0058], [0059], [0060], [0062], [0077], [0111].

**[1b] a housing having a surface and a circular wall protruding from the surface;**

87.    Aizawa teaches a "a holder 23 for storing the above light emitting diode 21 and the photodetectors 22." APPLE-1006, [0023], [0024]. In addition to the holder 23, as illustrated below, Aizawa also provides a flat surface (colored brown) that supports the holder 23. *Id.*



APPLE-1006, FIG. 1(b)

88.    Thus, the holder and the flat surface together provide the housing element as required by this claim. Moreover, referring to FIGS. 1(b) above and (1a) below, the outer periphery of Aizawa's holder 23 provides a circular wall (colored purple) that protrudes from the surface.



Apple-1006, FIG. 1(a)

**[1c] at least four detectors arranged on the surface and spaced apart from each other, the at least four detectors configured to output one or more signals responsive to light from the one or more light emitters attenuated by body tissue, the one or more signals indicative of a physiological parameter of the wearer; and**

89.    As illustrated below, Aizawa teaches "four photodetectors 22 disposed around the light emitting diode 21 symmetrically on a circle concentric to the light emitting diode 21."  APPLE-1006, [0029], [0024], [0032].  These four detectors are, as seen below, spaced apart from each other by being arranged symmetrically in a circular pattern.  *Id.*



APPLE-1006, FIG. 1(a)

90.    Moreover, these four detectors are arranged *on the surface* of the housing as identified above for element [1c].  In particular, as shown below, the detectors are positioned within the holder 23 and are further connected, through the surface (shown in brown), to a drive circuit 24 on the other side of the housing.  *Id.*, [0023].  A POSITA would have understood that circuit 24 and other wires/electronics are connected to the detectors *through* the surface, and, therefore, the surface provides physical support to the detectors.  *Id.*  Indeed, it is well-known to mount electronic components, such as photodiodes and LEDs, to a flat surface such as a ceramic substrate or a circuit board to provide both mechanical and electrical coupling.  [0017], FIG. 2; APPLE-1015, 168, FIG. 2B.



APPLE-1006, FIG. 1(b)

91.    Regarding the signals that are output by Aizawa's detectors, Aizawa's photodetectors 22 are designed to detect light that is "reflected by a red corpuscle running through the artery 11 of the wrist 10 ... so as to detect a pulse wave." APPLE-1006, [0027].  Aizawa subsequently "detect[s] a pulse wave by amplifying the outputs of the photodetectors 22."  *Id.*, [0023].  For example, Aizawa's detectors output "waveform of a pulse wave," and this output is amplified and converted into a digital signal to compute the pulse rate.  *Id.*, [0028].  Thus, the detectors of Aizawa "output one or more signals responsive to light from the one or more light emitters attenuated by body tissue" and this signal is further "indicative of a physiological parameter of the wearer."

**[1d] a light permeable cover arranged above at least a portion of the housing, the light permeable cover comprising a protrusion arranged to cover the at least four detectors.**

92.    As explained above and shown below, Aizawa teaches a light permeable cover in the form of an acrylic transparent plate 6 (colored blue) that is mounted at the detection face 23a over at least a portion of the housing to cover the at least four detectors (colored red). APPLE-1006, [0023].



APPLE-1006, FIG. 1(b) (annotated), [0023]

93.    However, the acrylic plate of Aizawa is flat and is not described as including a protrusion.

94.    Additionally, a POSITA would have been motivated and known how to modify the flat shape of Aizawa's acrylic plate to achieve a particular, desired objective.  For example, Aizawa teaches that its light permeable cover (*i.e.*, acrylic transparent plate) helps improve "detection efficiency," but does not otherwise provide more details about how, for instance based on its shape or material properties, such an effect may be achieved.  APPLE-1006, [0030].  But a POSITA

would have readily recognized that the shape of Aizawa's plate could be modified based on well-known techniques to help achieve Aizawa's objective of improving detection efficiency. APPLE-1006, [0013], [0030], [0032]; APPLE-1009 at 3:46-51.

95.    As one example, a POSITA would have been able to look to Inokawa to enhance light collection efficiency, in particular by modifying the light permeable cover of Aizawa to include a convex protrusion that acts as a lens, as per Inokawa. APPLE-1008, FIG. 2. As illustrated below, Inokawa teaches a side lens 27 (colored blue) that is positioned between a pulse sensor and the user's skin. *Id.*



APPLE-1008, FIG. 2

96.    Inokawa teaches that the "lens makes it possible to increase the light-gathering ability of the LED." *Id.*, [0015]. Thus, a POSITA would have sought to incorporate a convex, lens-like shape as in Inokawa into Aizawa's acrylic plate to

54

thereby increase light collection efficiency, in turn leading to an enhanced signal-to-noise ratio and ultimately more reliable pulse wave detection.  The lens shape of Inokawa can provide this benefit by refracting and concentrating the light coming in through Aizawa's acrylic plate after being reflected by the blood.

97.     In more detail, a POSITA would have found it obvious to combine the teachings of Aizawa and Inokawa such that the flat cover (left) of Aizawa is modified to include a lens/protrusion (right) as per Inokawa in order to "increase the light-gathering ability."  APPLE-1008, [0015].  Indeed, by positioning a lens above the optical components of Aizawa, as shown below, the modified cover will allow more light to be gathered and refracted toward the light receiving cavities of Aizawa, thereby further increasing the light-gathering ability of Aizawa beyond what is achieved through the tapered cavities.  APPLE-1006, [0012], [0024].



APPLE-1006, FIG. 1(b)

98.     A POSITA would have further understood *how* to incorporate the shape of Inokawa's cover into Aizawa's cover, and further would have expected such a modification to succeed given the high degree of overlap between the two references.  For example, as shown below, Inokawa teaches that its light permeable cover can be flat (left) so that "the surface is less prone to scratches," or alternatively be in the form of a lens (right) to "increase the light-gathering ability of the LED."  APPLE-1008, [0015], [0016].  That is, depending on the desired objective of the user (*e.g.*, less scratches or improved light-gathering), the shape of the cover can be readily modified.  Moreover, by choosing the material of the protrusion to be scratch-resistant, such as glass, it would have been obvious for a POSITA to achieve both benefits at once.



APPLE-1008, FIG. 17 (left), FIG. 16 (right)

99.    A POSITA would have further recognized that the acrylic material used to make Aizawa's acrylic transparent plate 6 can be easily formed to include a lens. *See* APPLE-1009 at 3:46-51, FIG. 1; APPLE-1023, FIG. 6, [0022], [0032], [0035]. Indeed, many prior art references of this period, such as Nishikawa (shown below) demonstrate exactly how such a lens shape may be incorporated into a molded cover.  APPLE-1023, FIG. 6, [0022], [0032], [0035].  In other words, a POSITA would have known that acrylic is a transparent material that can be readily transformed into various shapes, including a lens shape, as needed due to its easy molding properties.  *Id.*  Thus, a POSITA preferring improved light collection efficiency over reduced susceptibility to scratches could have been able to easily modify Aizawa's cover to have a lens shape as per Inokawa.  *Id.*  Indeed, only a routine knowledge of sensor design and assembly, which were well within the skill of a POSITA, would be required to perform such modifications.  Thus, to achieve the goal of improving light collection efficiency, which both Aizawa and Inokawa share, a POSITA would have been able to, with a reasonable expectation of success, modify Aizawa's light permeable cover to have a lens shape as taught by Inokawa.



APPLE-1023, FIG. 6

### B.    Claim 2

**[2] The noninvasive optical physiological measurement device of claim 1, wherein the light permeable cover is attached to the housing and forms an airtight or substantially airtight seal enclosing the at least four detectors.**

100.    As explained above with respect to element [1d] and shown below, the Aizawa-Inokawa combination would have included a light permeable cover that covers the detectors and is attached to the housing, thereby enclosing them. APPLE-1006, [0023].



APPLE-1006, FIG 1(b)

101.   A POSITA would have also recognized that a wristwatch-like device, as in Aizawa and Inokawa, would be airtight or substantially airtight.  For instance, it was well-known that wristwatch-type monitoring devices are hermetically sealed for improved convenience and functionality.  *See* APPLE-1012, 5:11-20, 7:1-9; APPLE-1013, [0032].  This is especially true for body-worn devices because condensation, sweat, dust particles, environmental pollutants, and other undesirable elements may otherwise enter the housing and damage the sensitive internal electronics.  *Id.*  The fact that Aizawa's sensor is designed for "measuring . . . heart rate at the time of exercise" makes it even more crucial that the device be airtight.  APPLE-1006, [0004]. Thus, a POSITA would have recognized or found it obvious that the light permeable cover of Aizawa-Inokawa would form an airtight or substantially airtight seal to enclose the four detectors in a safe, well-protected environment that is safe from the elements.

## C.    Claim 3

**[3] The noninvasive optical physiological measurement device of claim 2, wherein the circular wall creates a gap between the surface and the light permeable cover.**

102.   As explained above with respect to [1b]-[1d] and shown below, the Aizawa-Inokawa combination would have included a light permeable cover that is separated from the surface of the housing by a gap.  APPLE-1006, FIG. 1(b).  The

lens/protrusion during use.  APPLE-1006, [0006], [0026]; APPLE-1008, FIG. 2. In this way, the lens/protrusion acts as a tissue shaper that helps conform the tissue of the user to an external surface of the lens/protrusion when the device is worn by the user.  *Id.*  As explained for [10], this happens because a protruded surface that is more rigid than the skin is being pressed into the skin and, accordingly, the less rigid skin will at least partially deform to conform to the rigid protrusion.  *Id.*

### K.    Claim 12

**[12] The noninvasive optical physiological measurement device of claim 11, wherein the light permeable cover is configured to reduce a mean path length of light traveling to the at least four detectors.**

118.    Regarding the reduction of mean path length, the '265 patent mentions, in the context of a transmittance-type device, that using a protruded cover to deform the skin can cause "the mean optical path length from the emitters to the detectors can be reduced and the accuracy of blood analyte measurement can increase." APPLE-1001, 20:25-20, FIG. 5.  Although the '265 patent is silent regarding how such path reduction would apply in a reflectance-type sensor, a POSITA still would have recognized that an analogous effect can be achieved the Aizawa-Inokawa combination.

119.    In more detail, I noted above for [1d] how the lens/protrusion of Inokawa, which is used to modify Aizawa's cover, provides a condensing function by refracting the light passing through it.  APPLE-1008, [0015], [0058].  As

demonstrated through my drawings below, where the left figure shows the length of non-refracted light and the right figure shows the length of refracted light, such refraction of the incoming reflected light can shorten the path of the light before it reaches the detector. This is because the incoming light is "condensed" toward the center. APPLE-1008, [0015], [0058]. Thus, as demonstrated by the drawings below, both the total length of travel as well as the length through the tissue can be reduced.



120.  Laying these two drawings on top of each other, as shown below, the shortened path length within the tissue for the purple (refracted) line can be clearly seen compared to the path length within the tissue of the green (non-refracted) line. The shortened *total* path length of the purple line compared to the green line can also be seen. Accordingly, the Aizawa-Inokawa combination, through its use of a condensing lens between the tissue and the detectors, serves to reduce a mean path length of light traveling to the at least four detectors



**L.    Claim 13**

**[13] The noninvasive optical physiological measurement device of claim 11, wherein the at least four detectors are evenly spaced from one another.**

121.    As explained above with respect to [c], Aizawa teaches at least for detectors. APPLE-1006, [0029], [0024], [0032], FIG. 1(a).  Further, as shown below, the four detectors are evenly spaced from one another.  *Id.*



APPLE-1006, FIG. 1(a)

**M.    Claim 14**

**[14] The noninvasive optical physiological measurement device of claim 1, wherein the light permeable cover is configured to reduce a mean path length of light traveling to the at least four detectors.**

122.    As I explained above for [12], the analysis for which I fully incorporate herein, the Aizawa-Inokawa combination includes a light permeable cover (i.e., lens) that is configured to reduce a mean path length of light traveling to the at least four detectors.  APPLE-1008, [0015], [0058].

### N.    Claim 16

**[16] The noninvasive optical physiological measurement device of claim 13, wherein the light permeable cover is configured to increase a signal strength per area of the at least four detectors.**

123.    As I explained above with respect to [1d], the Aizawa-Inokawa combination includes provides a light permeable cover with a convex protrusion that acts as a lens, thereby enhancing the device's light-gathering ability.  APPLE-1008, [0015], FIG. 2.  Indeed, a POSITA would have known that a lens, as in Inokawa and as incorporated into Aizawa, would condense incoming light onto the detectors, thus increasing the signal to noise ratio as well as the signal strength per area of the detectors (since each detector area will receive more incoming light signals).

### O.    Claim 17

**[17] The noninvasive optical physiological measurement device of claim 1, wherein the physiological parameter is pulse rate.**

124.    As explained above with respect to [1pre], the sensor of Aizawa is designed to measure physiological parameters including the user's pulse rate.  APPLE-1006,

side-by-side comparison of Beyer, Jr.'s PDA and Mendelson-2006's PDA below,

the two devices are highly analogues in both form and function.



APPLE-1019, FIG. 1 (left); APPLE-1014, FIG. 3 (right)

164.   In this context, a POSITA would have found it obvious to use a different

PDA than the one mentioned in Mendelson-2006, and would have further found

the same to be a routine and conventional design choice.  Indeed, using a PDA that

is also a mobile phone, as taught by Beyer, Jr. was common practice well before

the '265 patent, and there was nothing new or inventive about changing one type of

PDA for another.

## XIII.  GROUND 2A – Claims 1-4, 6-14, 16-22, and 26-30 Are Rendered Obvious by Mendelson-1988 in View of Inokawa

## A.    Claim 1

**[1pre] A noninvasive optical physiological measurement device adapted to be worn by a wearer, the noninvasive optical physiological measurement device providing an indication of a physiological parameter of the wearer comprising:**

165.    Mendelson-1988 discloses "a new optical reflectance sensor suitable for noninvasive monitoring of arterial hemoglobin oxygen saturation with a pulse oximeter."  APPLE-1015, Abstract, 167, 172.  Indeed, hemoglobin oxygen saturation is one of the physiological parameters expressly mentioned in the '265 patent.  APPLE-1001, Claim 18.  Moreover, the pulse oximeter of Mendelson-1988 is designed to be worn by being attached to the user's skin.  APPLE-1015, 168, 173.  There are also other well-known ways of wearing the Mendelson-1988's sensor, for instance as a wristwatch, a headband, or a helmet, as described by Mendelson in his other publications.  APPLE-1016, 913; APPLE-1024, 3017.

**[1a] a plurality of emitters of different wavelengths;**

166.    As illustrated below, Mendelson-1988 teaches using two red and two infrared LEDs that are centrally located within the device.  APPLE-1015, 168.  Red and infrared LEDs emit different wavelengths of light.  *Id.*



APPLE-1025, FIG. 2(A)

## [1b] a housing having a surface and a circular wall protruding from the surface;

167.   Mendelson-1988 teaches a housing having a surface and a circular wall protruding from the surface as claimed.  For example, as shown in the annotated drawings below, the LEDs and photodiode chips of Mendelson-1988(*i.e.*, emitters and detectors) are mounted on a ceramic substrate (*i.e.*, surface, shown below in purple) and are disposed within an AIRPAX microelectronic package (*i.e.*, housing, shown below in red).  APPLE-1015, 168.  Mendelson-1988 also teaches a circular wall in the form of "a ring-shaped, optically opaque shield of black Delrin" that is placed around the LEDs to shield the detectors from direct exposure to light from the LED.  APPLE-1015, 168.



APPLE-1015, FIG. 2(B)



APPLE-1015, FIG. 2(A)

168.   Under an alternative mapping, the outer wall of the AIRPAX

microelectronic package itself, as indicated below, can be modified to include a

circular wall.  APPLE-1015, 168.



APPLE-1015, FIG. 2(B)

169.   However, the particular housing shown in Mendelson-1988 appears to be rectangular and would thus have had a rectangular wall.  APPLE-1015, FIG. 2(A). Yet a POSITA would have recognized that microelectronic packaging as used in Mendelson-1988 comes in various shapes and size, for instance rectangular or circular.  In fact, a patent authored by the same author of Mendelson-1988 (Dr. Mendelson) shows a similar detector configuration but one that is instead enclosed within a *circular* housing/wall.  APPLE-1025, 9:34-36, FIG. 7.



Figure 7

APPLE-1025, FIG. 7, 9:34-36

170.   A POSITA would have found it obvious and actually quite routine to use a differently shaped housing, namely a circular one. *Id.*  Indeed, using a circular housing having a circular wall, as evidenced by Mendelson-'799, was common practice well before the Critical Date, and there was nothing new or inventive about changing one housing shape for another.

**[1c] at least four detectors arranged on the surface and spaced apart from each other, the at least four detectors configured to output one or more signals responsive to light from the one or more light emitters attenuated by body tissue, the one or more signals indicative of a physiological parameter of the wearer; and**

171.   Mendelson-1988 teaches "six silicon photodiodes ... arranged symmetrically in a hexagonal configuration," as shown below, thus providing at least four detectors as claimed.  APPLE-1015, 168.  Output from the detectors are "current

pulses ... which correspond to the red and infrared light intensities reflected from the skin" and are processed to respective photoplethysmographic waveforms. APPLE-1015, 169. Moreover, the detectors are arranged on the surface provided by the ceramic substrate. APPLE-1015, 168; FIG. 2(B).



APPLE-1015, FIG. 2(A)

**[1d] a light permeable cover arranged above at least a portion of the housing, the light permeable cover comprising a protrusion arranged to cover the at least four detectors.**

172.   As shown below, Mendelson-1988 teaches encapsulating its emitters and detectors, which are within the housing (red), with an optically clear epoxy layer (blue). APPLE-1015, 168. This epoxy layer, therefore, corresponds to a light permeable cover that is arranged above the housing and covers the detectors. *Id.*



APPLE-1015, FIG. 2(b)

173.    However, beyond Mendelson-1988's disclosure that this cover is made from "optically clear epoxy," Mendelson-1988 does not provide further details.  Among other things, the precise shape of this layer, for instance whether it's completely flat or slightly curved, is not mentioned.  It's also not mentioned whether this epoxy layer protrudes slightly above the rest of the housing to, for instance, protect the user's skin from coming in direct contact with any sharp edges of the housing.  Yet a POSITA would have recognized that the shape of the epoxy layer may be formed as needed to help further Mendelson'1988's goal of improving detection efficiency.  APPLE-1015, 168, 173.

174.    Indeed, as I described above, Inokawa teaches a similarly configured pulse sensor as in Mendelson-1988 but one in which a lens is positioned over the detectors to "increase the light-gathering ability of the LED as well as to protect the LED or [detector]."  APPLE-1008, [0015], [0058].



APPLE-1008, FIG. 2

175.   Accordingly, a POSITA would have been motivated to incorporate the lens of Inokawa into to cover of Mendelson-1988 in order to increase the light collection efficiency.  A POSITA would have been particularly interested in making such a modification because Mendelson-1988 shares a similar goal of maximizing "reflectance photoplethysmographic signals."  APPLE-1015, 173. The lens of Inokawa provides precisely this benefit to Mendelson'1988's device by providing a protective cover that further refracts and concentrates the incoming light beams to thereby enhance the light collection efficiency and, by extension, the signal to noise ratio.  APPLE-1008, [0015], [0058].

176.   Indeed, as illustrated below, the device resulting from this combination of Mendelson-1988 and Inokawa would have modified the flat epoxy cover (left) with

a curved one as per Inokawa (right) to thereby "increase the light-gathering ability." APPLE-1008, [0015].



APPLE-1015, FIG. 2(B)

177. A POSITA would have understood how to implement Inokawa's lens-shaped cover in Mendelson-1988 with a reasonable expectation of success based, among other things, on the significant overlap between these two references. Indeed, the above-described modification would require only routine knowledge of sensor design and assembly, which were well within the skill of a POSITA prior to the Critical Date.

178. Moreover, a POSITA would have easily understood how to modify the epoxy layer of Mendelson-1988 to achieve the desired shape. Indeed, Nishikawa, shown below, teaches that a clear epoxy layer as in Mendelson-1988 can be molded into a lens shape. APPLE-1023, [0022], [0032], [0035].



APPLE-1023, FIG. 6

179.    Notably, both the optical encapsulation layer of Mendelson-1988 and the lens layer of Nishikawa are made from the same material, optically clear epoxy, and thus the interface between the encapsulation portion and the lens portion will not adversely affect the optical performance of the modified system.  APPLE-1023, [0037].  Thus, to help achieve Mendelson-1988's and Inokawa's shared goal of improving light collection efficiency, a POSITA would have been motivated and able to modify Mendelson-1988's light permeable cover to have a lens shape as per Inokawa with a reasonable expectation of success.

180.    Here, I note that the claimed light permeable cover ("LPC") may be mapped in two different ways to the Mendelson-1988's epoxy layer as modified by Inokawa.  First, the entire combined epoxy structure—i.e., the sealing portion and the lens portion—may be viewed to be the LPC, as shown below.  The LPC as described in the '265 patent, for example with regard to FIG. 14D, appears to

envision a similar two-part structure comprising a flat cover portion and a

protruded lens portion.  APPLE-1001, FIG. 14D.



APPLE-1015, FIG. 2(B)

181.  <u>Second</u>, only the top lens portion, which lies above the underlying sealing

portion, may be viewed to be the LPC having a protrusion.  In forming this two-

part structure, a POSITA would have been able to use the top portion of the

housing (indicated below in purple), as in Nishikawa, to help form the LPC portion

on top of the sealing portion.  APPLE-1023, [0034]-[0038], FIGS. 5-6.



APPLE-1015, FIG. 2(B)

**B.    Claim 2**

**[2] The noninvasive optical physiological measurement device of claim 1, wherein the light permeable cover is attached to the housing and forms an airtight or substantially airtight seal enclosing the at least four detectors.**

182.    As explained above with respect to element [1d] and shown below, the modified LPC in the Mendelson-1988-Inokoawa combination, under either mapping, completely encapsulates and seals the detectors.



APPLE-1015, FIG. 2(B)

183.    A POSITA would have recognized or found it obvious that such an encapsulating layer would provide a substantially airtight seal. APPLE-1023, Abstract. Moreover, a POSITA would have recognized that a body-worn device as



US 20020188210A1

(19) **United States**
(12) **Patent Application Publication**    (10) Pub. No.: **US 2002/0188210 A1**
Aizawa    (43) Pub. Date: **Dec. 12, 2002**

(54) **PULSE WAVE SENSOR AND PULSE RATE DETECTOR**

(76) Inventor:   **Nobuyuki Aizawa**, Gunma (JP)

Correspondence Address:
**KANESAKA & TAKEUCHI**
**1423 Powhatan Street**
**Alexandria, VA 22314 (US)**

(21) Appl. No.:    **10/152,818**

(22) Filed:    **May 23, 2002**

(30)    **Foreign Application Priority Data**

Jun. 11, 2001    (JP) ...................................... 2001-175909

**Publication Classification**

(51) Int. Cl.$^7$ ....................................................... A61B  5/02
(52) U.S. Cl. ........................................... **600/503**; 600/502

(57)    **ABSTRACT**

A pulse wave sensor for detecting a pulse wave by detecting light output from a light emitting diode and reflected from the artery of a wrist of a subject, the sensor comprising four photodetectors disposed around the light emitting diode symmetrically on a circle concentric to the light emitting diode, and a pulse rate detector comprising the pulse wave sensor and means of computing the pulse rate of a subject based on the output of the pulse wave sensor.



Appx03242

FIG. 1 (a)



FIG. 1 (b)



Appx03243

FIG. 2

FIG. 3



FIG. 4 (a)    FIG. 4 (b)



FIG. 5



US 2002/0188210 A1

1

Dec. 12, 2002

# PULSE WAVE SENSOR AND PULSE RATE DETECTOR

## BACKGROUND OF THE INVENTION

[0001]  1. Field of the Invention

[0002]  The present invention relates to a pulse wave sensor for detecting the pulse wave of a subject from light reflected from a red corpuscle in the artery of a wrist of the subject by irradiating the artery of the wrist with light having a wavelength of an infrared range and to a pulse rate detector for detecting the pulse rate of the subject from the above pulse wave data.

[0003]  2. Description of the Prior Art

[0004]  In recent years, along with shift to the aging society and westernized eating habits, an increase in the number of diseases caused by life habits, such as hyperpiesia, diabetes mellitus, heart diseases and cerebrovascular diseases of the brain is becoming a big social problem. As means of preventing these diseases or treating the diseases, a personal exercise cure such as walking is widely adopted. In this exercise cure, a pedometer or kinetic calorimeter is carried to know the quantity of motion. There has recently been proposed a method of estimating a burden on the heart of a person who takes exercise by real-time measuring his/her heart rate at the time of exercise.

[0005]  For the measurement of the above heart rate, an optical pulse wave sensor for detecting the pulse wave of a subject from reflected light or transmitted light by irradiating the site of a blood vessel with light having an infrared or near infrared range is widely used. Stated more specifically, a pulse wave sensor which comprises a pair of an LED (light emitting diode) and a phototransistor (photodetector) is attached to a finger or ear to measure the heart rate by calculating the cycle (frequency) of pulse waves from the waveform of reflected light or transmitted light detected by the above photodetector.

[0006]  However, although the conventional pulse wave sensor to be attached to the finger or ear is small in size, a signal from the sensor is weak because it detects the motion of a red corpuscle in the capillary and is easily affected by noise caused by the shaking of the body of the subject. Also, as some pressure is applied to the measurement site at the time of detection, the subject cannot carry the detector for a long time when walking or the like.

[0007]  Meanwhile, since a strong signal is obtained when the motion of a red corpuscle in the artery is detected, a detector to be attached to a wrist or arm is conceivable. As understood when the pulse of the wrist is actually taken, it is difficult to attach the sensor to a predetermined position. When the attachment position is dislocated, no output can be obtained, thereby making it difficult to implement the detector.

## SUMMARY OF THE INVENTION

[0008]  It is an object of the present invention which has been made in view of the above problem to provide a pulse wave sensor which is easily attached and is capable of detecting a pulse wave accurately and a pulse rate detector comprising this pulse wave sensor.

[0009]  According to a first aspect of the present invention, there is provided a pulse wave sensor for detecting a pulse wave by detecting light output from a light emitting diode and reflected from the artery of a wrist of a subject, the sensor comprising at least three photodetectors disposed around the light emitting diode and not linearly. Even when the attachment position of the sensor is dislocated, a pulse wave can be detected accurately.

[0010]  According to a second aspect of the present invention, there is provided a pulse sensor, wherein a near infrared LED which is a general-purpose product is used as the light emitting diode. This makes it possible to produce an inexpensive sensor.

[0011]  According to a third aspect of the present invention, there is provided a pulse sensor, wherein the photodetectors are disposed at an equal distance from the light emitting diode.

[0012]  According to a fourth aspect of the present invention, there is provided a pulse sensor, wherein cavities are formed in a contact face between a holder for holding the light emitting diode and the photodetectors and the wrist, the light emitting face of the light emitting diode and the light receiving faces of the photodetectors are disposed at respective predetermined distances from the contact face, and the sectional forms of the cavities are tapered such that their widths increase toward the contact face. Since this makes it possible to expand the light emitting area and the light receiving area, a pulse wave can be easily detected even when the attachment position of the sensor is dislocated.

[0013]  According to a fifth aspect of the present invention, there is provided a pulse sensor, wherein a transparent plate-like member is provided on a portion including at least the light emitting face and the light receiving faces of the contact face. This makes it possible to improve adhesion between the sensor and the wrist and thereby further improve the detection efficiency of pulse waves.

[0014]  According to a sixth aspect of the present invention, there is provided a pulse rate detector comprising the pulse wave sensor of claim 1 and means of computing the pulse rate of a subject based on the output of the pulse wave sensor.

[0015]  According to a seventh aspect of the present invention, there is provided a pulse rate detector which comprises a transmitter for transmitting the measured pulse rate data to a display for displaying the pulse rate data and a device for computing the amount of motion load from the pulse rate.

[0016]  The above and other objects, advantages and features of the present invention will become apparent from the following description when taken in conjunction with the accompanying drawings.

## BRIEF DESCRIPTION OF THE DRAWINGS

[0017]  FIGS. 1 are schematic diagrams of a pulse rate detector according to an embodiment of the present invention;

[0018]  FIG. 2 is a diagram showing that the pulse rate detector is attached.

[0019]  FIG. 3 is a schematic diagram of a pulse wave which is the output of a photodetector;

Appx03246

[0020] FIGS. 4 are diagrams showing other arrangements of a light emitting diode and photodetectors according to the present invention; and

[0021] FIG. 5 is a diagram showing a pulse rate detector according to another embodiment of the present invention.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

[0022] Preferred embodiments of the present invention will be described hereinbelow with reference to the accompanying drawings.

[0023] FIGS. 1(a) and 1(b) are schematic diagrams of a pulse rate detector according to an embodiment of the present invention. FIG. 1(a) is a plan view and FIG. 1(b) is a sectional view of the pulse rate detector when it is attached. In these figures, reference numeral 2 denotes a pulse wave sensor which comprises an LED 21 (to be referred to as "light emitting diode" hereinafter) for emitting light having a wavelength of a near infrared range, four phototransistors 22 (to be referred to as "photodetectors" hereinafter) disposed around the light emitting diode 21 symmetrically on a circle concentric to the light emitting diode 21, a holder 23 for storing the above light emitting diode 21 and the photodetectors 22, and a drive detection circuit 24 for detecting a pulse wave by amplifying the outputs of the photodetectors 22, 3 is an arithmetic circuit for computing a pulse rate from the detected pulse wave data, 4 a transmitter for transmitting the above pulse rate data to an unshown display, 5 an outer casing for storing the above pulse wave sensor 2, the arithmetic circuit 3 and the transmitter 4, 6 an acrylic transparent plate mounted to the detection face 23a of the holder 23 to be described hereinafter, and 7 an attachment belt attached to the above outer casing.

[0024] The above light emitting diode 21 and the above photodetectors 22 are stored in cavities 23b and 23c formed in the detection face 23a which is a contact side between the holder 23 and a wrist 10, respectively, at positions where the light emitting face 21s of the light emitting diode 21 and the light receiving faces 22s of the photodetectors 22 are set back from the above detection face 23a. In this embodiment, to expand the light emitting area of the light emitting diode 21 and the light receiving areas of the photodetectors 22, the sectional forms of the above cavities 23b and 23c are tapered such that their widths increase toward the contact face.

[0025] A description is subsequently given of the method of measuring a pulse rate.

[0026] As shown in FIG. 2, a subject carries the above pulse rate detector 1 on the inner side of his/her wrist 10 with a belt in such a manner that the light emitting face 21s of the light emitting diode 21 faces down (on the wrist 10 side). As shown in FIG. 1(b), the above belt 7 is fastened such that the acrylic transparent plate 6 becomes close to the artery 11 of the wrist 10. Thereby, adhesion between the wrist 10 and the pulse rate detector 1 is improved. When the pulse rate detector 1 is attached to the wrist 10 with the belt 7, pulse wave data can be detected at the same pressure as that for attaching a wrist watch with a belt. Therefore, the wrist 10 is not pressed hard, thereby making it possible to carry it for a long time.

[0027] Near infrared radiation output toward the wrist 10 from the light emitting diode 21 is reflected by a red

corpuscle running through the artery 11 of the wrist 10 and this reflected light is detected by the plurality of photodetectors 22 so as to detect a pulse wave (see FIG. 1(b)). Since four photodetectors 22 are disposed around the light emitting diode 21 on a circle concentric to the light emitting diode 21 in this embodiment, even when the attachment position of the pulse rate detector 1 is dislocated, one of the photodetectors 22 is located near the artery 11, thereby making it possible to detect a pulse wave accurately. If the plurality of photodetectors 22 are disposed linearly, all of the photodetectors 22 may be far from the artery 11. Therefore, it is desired that the photodetectors 22 should not be disposed linearly.

[0028] FIG. 3 schematically shows the waveform of a pulse wave which is the output of the above photodetector 22. The detected pulse wave data is amplified by the drive detection circuit 24 and the amplified pulse wave data is transmitted to the arithmetic circuit 3. The arithmetic circuit 3 has a threshold value and computes the number of outputs above the threshold value per unit time so as to calculate a pulse rate and the transmitter 4 transmits the pulse rate to a display for displaying the above pulse rate data and a device for computing the amount of motion load. Since the output of the above photodetector 22 is generally low, after the output is amplified, the amplified output is converted into a digital signal for the computation of a pulse rate in this embodiment.

[0029] According to this embodiment, the pulse wave of the wrist 10 of the subject is detected by the pulse wave sensor 2 which comprises the light emitting diode 21 for emitting light having a wavelength of a near infrared range and four photodetectors 22 disposed around the light emitting diode 21 symmetrically on a circle concentric to the light emitting diode 21, and a pulse rate is computed from the pulse wave data by the arithmetic circuit 3. Therefore, even when the attachment position of the pulse rate detector 1 is dislocated, a pulse wave can be detected accurately.

[0030] Since the acrylic transparent plate 6 is provided on the detection face 23a of the holder 23, adhesion between the pulse rate detector 1 and the wrist 10 can be improved, thereby further improving the detection efficiency of a pulse wave.

[0031] In this embodiment, the pulse rate detector 1 is attached with the same pressure as that for attaching a timepiece to the wrist with a belt. Therefore, the subject can carry the pulse rate detector 1 for a long time without pressing his/her wrist excessively.

[0032] In the above embodiment, four photodetectors which are disposed symmetrically are used to detect the pulse wave of the wrist 10. The arrangement of the light emitting diode 21 and the photodetectors 22 is not limited to this. For example, to further improve detection efficiency, as shown in FIG. 4(a), the number of the photodetectors 22 may be increased. Alternatively, to reduce the size of the pulse rate detector 1, as shown in FIG. 4(b), the number of photodetectors may be reduced. In either case, it is desired that the photodetectors 22 should be disposed around the light emitting diode 21 on a circle concentric to the light emitting diode 21 to detect a pulse wave accurately even when the attachment position of the pulse rate detector 1 is dislocated.

[0033] In the above embodiment, a plurality of photodetectors 22 are provided for one light emitting diode 21. The

same effect can be obtained when the number of photode-tectors **22** is **1** and a plurality of light emitting diodes **21** are disposed around the photodetector **22**. In this case, the size and power consumption of the pulse wave sensor **2** become larger than this embodiment.

[0034]  In the above embodiment, the acrylic transparent plate **6** is provided on the detection face **23***a* of the holder **23** to improve adhesion to the wrist **10**. Even when the detection face **23***a* is projected from the outer casing **5** as shown in **FIG. 5**, adhesion can be improved.

[0035]  In the above embodiment, the pulse rate data is transmitted to the display or the device for computing the amount of motion load. When not only a pulse rate but also pulse wave data (waveform itself) are transmitted, the pulse rate detector **1** of the present invention can be coupled to devices making use of bio signals.

[0036]  As described above, according to the present invention, since a pulse wave sensor is constituted such that light output from a light emitting diode and reflected from the artery of the wrist of a subject is detected by at least three photodetectors disposed around the light emitting diode and not linearly to detect a pulse wave, even when the attach-ment position of the sensor is dislocated, the pulse wave can be detected accurately. Using this sensor, a pulse rate detector which is easily attached and has a stable output can be constructed.

What is claimed is:

1. A pulse wave sensor for detecting a pulse wave by detecting light output from a light emitting diode and reflected from the artery of a wrist of a subject, the sensor comprising at least three photodetectors disposed around the light emitting diode.

2. The pulse wave sensor of claim 1, wherein a near infrared LED is used as the light emitting diode.

3. The pulse wave sensor of claim 1, wherein the photo-detectors are disposed at an equal distance from the light emitting diode.

4. The pulse sensor of claim 1, wherein cavities are formed in a contact face between a holder for holding the light emitting diode and the photodetectors and the wrist, the light emitting face of the light emitting diode and the light receiving faces of the photodetectors are disposed at respec-tive predetermined distances from the contact face, and the sectional forms of the cavities are tapered such that their widths increase toward the contact face.

5. The pulse wave sensor of claim 1, wherein a transparent plate-like member is provided on a portion including at least the light emitting face and the light receiving faces of the contact face.

6. A pulse rate detector comprising the pulse wave sensor of claim 1 and means of computing the pulse rate of a subject based on the output of the pulse wave sensor.

7. The pulse rate detector of claim 6 which comprises a transmitter for transmitting the measured pulse rate data.

* * * * *

(19)【日本国特許庁(JP)　　(12)公 開 特 許 公 報(A)　　(11)特許出願公開番号

特開2006-296564
(P2006-296564A)

(43)公開日　平成18年11月2日(2006.11.2)

| (51)Int.Cl. | | | | F I | | | テーマコード (参考) |
|---|---|---|---|---|---|---|---|
| A 6 1 B | 5/0245 | (2006.01) | | A 6 1 B | 5/02 | 3 1 O F | 4 C O 1 7 |

審査請求 未請求　請求項の数 53　OL　（全 23 頁）

| (21)出願番号 | 特願2005-119817 (P2005-119817) | (71)出願人 | 000004260 |
|---|---|---|---|
| (22)出願日 | 平成17年4月18日 (2005.4.18) | | 株式会社デンソー |
| | | | 愛知県刈谷市昭和町１丁目１番地 |
| | | (74)代理人 | 100082320 |
| | | | 弁理士　足立　勉 |
| | | (72)発明者 | 井野川　和也 |
| | | | 愛知県刈谷市昭和町１丁目１番地　株式会社デンソー内 |
| | | (72)発明者 | 射延　恭二 |
| | | | 愛知県刈谷市昭和町１丁目１番地　株式会社デンソー内 |
| | | (72)発明者 | 西井　克昌 |
| | | | 愛知県刈谷市昭和町１丁目１番地　株式会社デンソー内 |

最終頁に続く

(54)【発明の名称】光学式生体センサ、ベース装置、生体情報収集システム、及びセンサ通信方法

(57)【要約】

【課題】　故障が少なく簡易な構成で情報の送信や受信を行うことができる光学式生体センサ、ベース装置、生体情報収集システム、及びセンサ通信方法を提供すること。

【解決手段】　Ｓ１００では、脈波センサ１とベース装置１７とが接続されたか否かを判定する。つまり、Ｓ側接触検知端子１９とＢ側接触検知端子３９とが接触し、それによって、Ｂ側接触検知端子３９からＳ側接触検知端子１９に接触検知信号が入力されたか否かを判定する。Ｓ１１０では、ＣＰＵ６１の制御モードを、測定モードから送信モードに切り換える。続くＳ１２０では、送信モードにて、メモリに記憶された脈波等のデータをベース装置１７側に送信する。即ち、データのダウンロードを実行する。つまり、脈波センサ１がベース装置１７に装着されると、脈波センサ１からベース装置１７に自動的に脈波等の情報が送信される。

【選択図】　図8



(2)    JP 2006-296564 A 2006.11.2

【特許請求の範囲】
【請求項１】
　生体に対して光を照射するセンサ側発光手段と、
　前記センサ側発光手段から照射され前記生体にて反射する反射光を受光するセンサ側受光手段と、
　前記センサ側受光手段にて受光した反射光に基づいて前記生体の状態を検出する生体状態検出手段と、
　を有するセンサ側光学装置部を備えた光学式生体センサにおいて、
　前記生体状態検出手段にて検出した前記生体の情報を、前記センサ側発光手段を用いて、前記光学式生体センサの送信相手のベース装置に送信することを特徴とする光学式生体センサ。
【請求項２】
　前記光学式生体センサは、前記生体状態検出手段によって生体の状態を検出する測定モードと、前記生体の情報を前記ベース装置に送信する送信モードと、を有することを特徴とする請求項１に記載の光学式生体センサ。
【請求項３】
　前記ベース装置に装着されたことを検知するセンサ側接触検知部を備えたことを特徴とする請求項１又は２に記載の光学式生体センサ。
【請求項４】
　前記ベース装置に装着されたことを検知した場合には、前記送信モードに設定することを特徴とする請求項３に記載の光学式生体センサ。
【請求項５】
　前記測定モードと前記送信モードとに切り換えるモード切換スイッチを備えたことを特徴とする請求項２～４のいずれかに記載の光学式生体センサ。
【請求項６】
　前記ベース装置の電力供給構成により充電される充電部を備えたことを特徴とする請求項１～５のいずれかに記載の光学式生体センサ。
【請求項７】
　前記センサ側発光手段を、２個以上備えたことを特徴とする請求項１～６のいずれかに記載の光学式生体センサ。
【請求項８】
　前記センサ側発光手段の表面側にレンズを配置したことを特徴とする請求項１～７のいずれかに記載の発光式生体センサ。
【請求項９】
　前記センサ側発光手段の表面側に透光性のカバーを配置したことを特徴とする請求項１～７のいずれかに記載の発光式生体センサ。
【請求項１０】
　前記カバーが可視光カット機能を有することを特徴とする請求項９に記載の発光式生体センサ。
【請求項１１】
　前記請求項１～１０のいずれかに記載の光学式生体センサから前記生体の情報が送信されるベース装置であって、
　前記センサ側発光手段によって送信された前記生体の情報を受信するベース側受光手段を有するベース側光学装置部を備えたことを特徴とするベース装置。
【請求項１２】
　前記ベース側光学装置部には、更に、前記センサ側光学装置部に対して信号を送信するベース側発光手段を備えたことを特徴とする請求項１１に記載のベース装置。
【請求項１３】
　前記ベース側発光手段を用いて、前記センサ側受光手段に対して、前記センサ側受光手段からの前記生体の情報の送信を指令する指令信号を送信することを特徴とする請求項１

10

20

30

40

50

2

2に記載のベース装置。

【請求項１４】
　前記ベース装置は、前記光学式生体センサが接触した状態で装着される装着構造を備えたことを特徴とする請求項１１～１３のいずれかに記載のベース装置。

【請求項１５】
　前記光学式生体センサを前記ベース装置に装着した場合に、前記光学式生体センサを傾斜させる構成としたことを特徴とする請求項１４に記載のベース装置。

【請求項１６】
　前記ベース装置に対して前記光学式生体センサを水平に装着する構成としたことを特徴とする請求項１４に記載のベース装置。

【請求項１７】
　前記光学式生体センサが装着された場合に、前記光学式生体センサに検知信号を送信するベース側接触検知部を備えたことを特徴とする請求項１１～１６のいずれかに記載のベース装置。

【請求項１８】
　前記光学式生体センサの充電部を充電するための電力供給構成を有することを特徴とする請求項１１～１７のいずれかに記載のベース装置。

【請求項１９】
　前記ベース側受光手段を、２個以上備えたことを特徴とする請求項１１～１８のいずれかに記載のベース装置。

【請求項２０】
　前記ベース装置は、前記光学式生体センサを嵌め込む凹部を備えたことを特徴とする請求項１１～１９のいずれかに記載のベース装置。

【請求項２１】
　前記凹部は、前記光学式生体センサの底部に対応した底部側凹部及び／又はセンサ側光学装置部側に対応した側面側凹部であることを特徴とする請求項２０に記載のベース装置。

【請求項２２】
　前記凹部は、前記光学式生体センサの装着方向に沿った溝であることを特徴とする請求項２０又は２１に記載のベース装置。

【請求項２３】
　前記側面側凹部の溝は、中央部が更に凹状となっていることを特徴とする請求項２１又は２２に記載の生体情報収集システム。

【請求項２４】
　前記底部側凹部の深さは、バンドを備えた前記光学式生体センサを嵌めたときに、前記バンドが邪魔にならない深さに設定されていることを特徴とする請求項２１又は２２に記載のベース装置。

【請求項２５】
　前記ベース装置は、前記光学式生体センサを載置する基台部と、該基台部から立設される立設部とを備えることを特徴とする請求項１１～２４のいずれかに記載のベース装置。

【請求項２６】
　前記基台部と前記立設部との間に段差を有することを特徴とする請求項２５に記載のベース装置。

【請求項２７】
　バンドを備えた前記光学式生体センサに対して、そのバンドを前記立設部に外嵌可能な構成としたことを特徴とする請求項２５又は２６に記載のベース装置。

【請求項２８】
　前記立設部の側面に、曲面を有することを特徴とする請求項２５～２７のいずれかに記載のベース装置。

【請求項２９】

Appx03251

（4）　　　　　　　　　　　　　JP 2006-296564 A 2006.11.2

　前記ベース側発光手段の表面側にレンズを配置したことを特徴とする請求項１１～２８のいずれかに記載のベース装置。

【請求項３０】
　前記ベース側発光手段の表面側に透光性のカバーを配置したことを特徴とする請求項１１～２８のいずれかに記載のベース装置。

【請求項３１】
　前記カバーが可視光カット機能を有することを特徴とする請求項３０に記載のベース装置。

【請求項３２】
　前記請求項１～１０のいずれかに記載の光学式生体センサと、前記請求項１１～３１のいずれかに記載のベース装置と、を備えたことを特徴とする生体情報収集システム。

【請求項３３】
　前記センサ側発光手段を用いて送信された前記生体の情報を、前記ベース側受光手段によって受信することを特徴とする請求項３２に記載の生体情報収集システム。

【請求項３４】
　前記ベース側発光手段を用いて送信された所定の指令信号を、前記センサ側受光手段にて受信することを特徴とする請求項３２又は３３に記載の生体情報収集システム。

【請求項３５】
　前記ベース側発光手段によって前記指令信号が送信された場合には、前記指令信号に基づいて、前記光学式生体センサを前記送信モードに設定することを特徴とする請求項３４に記載の生体情報収集システム。

【請求項３６】
　前記光学式生体センサを前記ベース装置に装着した場合に、前記センサ側光学装置部と前記ベース側光学装置部とが、互いに相対する位置に配置される構成としたことを特徴とする請求項３２～３５のいずれかに記載の生体情報収集システム。

【請求項３７】
　前記光学式生体センサを前記ベース装置に装着した場合に、発光手段側と受光手段側との距離及び位置が一定となるように、前記光学式生体センサと前記ベース装置とを嵌め込む構造としたことを特徴とする請求項３２～３６のいずれかに記載の生体情報収集システム。

【請求項３８】
　前記センサ側発光手段として赤外ＬＥＤを用いる場合には、前記ベース側受光手段の表面側に可視光カット部材を配置することを特徴とする請求項３２～３７のいずれかに記載の生体情報収集システム。

【請求項３９】
　前記ベース側光学装置部と前記センサ側光学装置部とにレンズが配置されている場合に、互いのレンズの凹凸が嵌合する構成を有することを特徴とする請求項３２～３８のいずれかに記載の生体情報収集システム。

【請求項４０】
　前記ベース側光学装置部と前記センサ側光学装置部とに透光性のカバーが配置されている場合に、互いのカバーの凹凸が嵌合する構成を有することを特徴とする請求項３２～３８のいずれかに記載の生体情報収集システム。

【請求項４１】
　前記ベース装置の端子と前記光学式生体センサの端子とが、機械的に接触する構成を有することを特徴とする請求項３２～４０のいずれかに記載の生体情報収集システム。

【請求項４２】
　互いに接触する前記端子の形状により、前記光学式生体センサを装着する向きが規定される構成を有することを特徴とする請求項４１に記載の生体情報収集システム。

【請求項４３】
　前記ベース装置と前記光学式生体センサとの間の信号の送受信を、電磁気を用いて行う

Appx03252

構成を備えたことを特徴とする請求項３２～４２のいずれかに記載の生体情報収集システム。

【請求項４４】

　前記ベース装置から前記光学式生体センサに対して、電磁気を用いて電力を供給する構成を備えたことを特徴とする請求項３２～４３のいずれかに記載の生体情報収集システム。

【請求項４５】

　前記センサ側光学装置部に２個以上のセンサ側発光手段が配置されている場合に、前記ベース側光学装置部に前記各センサ側発光手段に対応してそれぞれベース側受光手段を備えたことを特徴とする請求項３２～４４のいずれかに記載の生体情報収集システム。

【請求項４６】

　前記センサ側光学装置部及び前記ベース側光学装置部に、複数対の前記発光手段及び受光手段を備え、複数対の前記発光手段及び受光手段を用いて、前記生体の情報の送信を行うことを特徴とする請求項４５に記載の生体情報収集システム。

【請求項４７】

　前記センサ側光学装置部及び前記ベース側光学装置部に、複数対の前記発光手段及び受光手段を備え、ある対の前記発光手段及び受光手段を用いて、前記生体の情報の送信を行うとともに、他の対の前記発光手段及び受光手段を用いて、前記送信される生体の情報のチェックを行うためのチェック情報を送信することを特徴とする請求項４５に記載の生体情報収集システム。

【請求項４８】

　前記請求項１～１０のいずれかに記載の光学式生体センサと前記請求項１１～３１のいずれかに記載のベース装置との間のセンサ通信方法であって、

　前記センサ側発光手段を用いて、前記ベース装置に対して、前記生体の情報を送信することを特徴とするセンサ通信方法。

【請求項４９】

　前記光学式生体センサが前記ベース装置に装着された場合には、前記光学式生体センサから前記ベース装置に、前記生体の情報を送信することを特徴とする請求項４８に記載のセンサ通信方法。

【請求項５０】

　前記ベース装置から前記光学式生体センサに対して、所定の指令信号が送信された場合に、前記光学式生体センサから前記ベース装置に、前記生体の情報を送信することを特徴とする請求項４８又は４９に記載のセンサ通信方法。

【請求項５１】

　前記光学式生体センサが前記ベース装置に装着された場合には、前記光学式生体センサを待機モードに設定し、前記ベース装置から指令信号を受信した場合には、前記光学式生体センサから前記ベース装置に、前記生体の情報を送信することを特徴とする請求項５０に記載のセンサ通信方法。

【請求項５２】

　前記光学式生体センサがモード切換スイッチによって待機モードに設定されている場合に、前記光学式生体センサから前記ベース装置に前記指令信号を要求する要求信号を送信し、前記ベース装置から指令信号を受信した場合には、前記光学式生体センサから前記ベース装置に、前記生体の情報を送信することを特徴とする請求項５１に記載のセンサ通信方法。

【請求項５３】

　前記光学式生体センサがモード切換スイッチによって待機モードに設定されている場合に、前記ベース装置から指令信号を受信した場合には、前記光学式生体センサから前記ベース装置に、前記生体の情報を送信することを特徴とする請求項５０に記載のセンサ通信方法。

【発明の詳細な説明】

【技術分野】
【０００１】
　本発明は、生体から脈波などの各種の情報を得ることができる光学式生体センサ、ベース装置、生体情報収集システム、及びセンサ通信方法に関するものである。
【背景技術】
【０００２】
　従来より、例えば医療現場などにおいて、患者等の状態を的確に把握するために、例えば光学式脈波センサが使用されていた。
　この種の脈波センサでは、脈波を計測する際には、計測したデータをメモリに保存していた。そして、計測の終了後に、脈波センサと通信機能付きの充電器（基地局）とをケーブルに接続するとともに、基地局とパソコンとをケーブルで接続し、パソコンからの指令によって、脈波センサからデータをダウンロードする技術が知られている。
【０００３】
　また、またこれとは別に、生体情報検出するセンサから、その情報を収集する基地局に対して、無線通信にてデータを送信する技術もあった（引用文献１～３参照）。
【特許文献１】特開平２００３－２７５１８３号公報
【特許文献２】特開平２００３－３０９４８５号公報
【特許文献３】特開平２０００－２７０４８６号公報
【発明の開示】
【発明が解決しようとする課題】
【０００４】
　しかしながら、上述した様に、脈波センサと基地局とをケーブルによって機械的に接続するシステムでは、破損や劣化によって接触不良が生じる恐れがある。
　また、データを無線で送信するシステムの場合には、生体情報の検出の回路等とは別に、専用の無線通信回路が必要になるという問題があった。
【０００５】
　本発明は、前記課題を解決するためになされたものであり、その目的は、故障が少なく簡易な構成で情報の送信や受信を行うことができる光学式生体センサ、ベース装置、生体情報収集システム、及びセンサ通信方法を提供することにある。
【課題を解決するための手段】
【０００６】
　（１）請求項１の発明では、生体状態検出手段にて検出した生体の情報を、センサ側発光手段を用いて、光学式生体センサの送信相手であるベース装置に送信する。
　つまり、光学式生体センサ（例えば脈波センサ）には、生体の情報（例えば脈波等）を検出するために、ＬＥＤ等のセンサ側発光手段を備えているので、このセンサ発光手段を用いて、生体の情報をベース装置に送信する。
【０００７】
　これにより、従来の様な無線通信回路を用いたり通信用のケーブルで接続することが不要となるので、故障が少なく簡易な構成で容易に生体の情報を送信することができる。
　尚、送信される生体の情報としては、光学式生体センサに測定されてメモリに記憶された各種の情報、つまり、反射光から得られる各種の信号、例えば脈波（脈拍数、脈拍間隔）や体動などを示す信号や、その信号を解析したことにより得られる情報が考えられる。また、測定された生の測定データ（メモリに記憶されたデータ）を送信するようにしてもよい。
【０００８】
　（２）請求項２の発明では、光学式生体センサは、生体状態検出手段によって生体の状態を検出する測定モードと、生体の情報をベース装置に送信する送信モードとを有するので、モードを切り換えることにより、各モードに対応した動作を行う。
【０００９】
　尚、ベース装置からの指令信号（送信を指令する信号）があるまでは、ベース装置に生

体の情報を送信することを待機する待機モードを備えていてもよい。

　（３）請求項３の発明では、センサ側接触検知部により、光学式生体センサがベース装置に装着されたことを検知することができる。

【００１０】

　尚、このセンサ側接触検知部としては、ベース側の端子（ベース側接触検知部）と接触する端子が挙げられる。また、ベース側の端子と接触することなく、電磁気により検知する構成としてもよい。

【００１１】

　（４）請求項４の発明では、ベース装置に装着されたことを検知した場合には、送信モードに設定する。これにより、光学式生体センサがベース装置に装着された場合には、自動的に生体の情報を送信することができる。

【００１２】

　（５）請求項５の発明では、測定モードと送信モードとに切り換えるモード切換スイッチを備えている。従って、このモード切換スイッチによって、モードを切り換えることができるので、所望のタイミングで、光学式生体センサに所望の処理を作動させることができる。

【００１３】

　（６）請求項６の発明では、充電部を備えているので、ベース装置の電力供給構成により充電することができる。

　尚、充電を行うために、光学式生体センサとベース装置とに互いに接触する端子を備えてもよいが、電磁気により電力を供給する構成としてもよい。

【００１４】

　（７）請求項７の発明では、センサ側発光手段として、２個以上の例えばＬＥＤ等の発光手段を備えている。

　従って、複数のセンサ側発光手段を用いて生体の情報を送信することにより、効率よく送信することができる。また、生体の情報を送信する手段と、チェックサムの様な情報のチェックを行う情報を送信する手段との様に、発光手段の役割を区別することができる。更に、例えば赤外ＬＥＤや緑ＬＥＤの様に、異なる種類のセンサ側発光手段を用いる場合には、各手段の特性に合わせた使用方法ができる。例えば、赤外ＬＥＤは体動の検出や情報の送信を行い、緑ＬＥＤは脈波の検出を行うように、役割を分けることができる。

【００１５】

　（８）請求項８の発明では、センサ側発光手段の表面側にレンズを配置している。

　このレンズにより例えばＬＥＤの集光性を高めることができ、また、例えばＬＥＤやＰＤを保護することもできる。

【００１６】

　（９）請求項９の発明では、センサ側発光手段の表面側に透光性のカバーを配置している。

　このカバーにより例えばＬＥＤやＰＤを保護することができる。尚、カバーの内側にレンズを配置してもよい。

【００１７】

　（１０）請求項１０の発明では、カバーが可視光カット機能を有するので、可視光によるノイズをカットすることができる。

　（１１）請求項１１の発明は、光学式生体センサから生体の情報が送信されるベース装置であり、このベース装置では、ベース側光学装置部のベース側受光手段によって、生体の情報を受信する。

【００１８】

　（１２）請求項１２の発明では、ベース側発光手段によって、センサ側光学装置部（のセンサ側受光手段）に対して、各種の信号（例えば生体の情報送信を要求する指令信号等）を送信することができる。

【００１９】

　（１３）請求項１３の発明では、ベース側発光手段を用いて、センサ側受光手段に対して、センサ側受光手段からの生体の情報の送信を指令する指令信号を送信する。

　（１４）請求項１４の発明では、ベース装置は、光学式生体センサが接触した状態で装着される装着構造を備えている。従って、光学式生体センサをベース装置に装着することができる。

【００２０】
　（１５）請求項１５の発明では、光学式生体センサは、ベース装置に傾斜（垂直方向に対して斜め）して装着される。従って、重力によって、センサ側光学装置部とベース側光学装置部とを近接して（又は接触して）配置することができる。

【００２１】
　（１６）請求項１６の発明では、光学式生体センサは、ベース装置に対して水平に装着される。

　（１７）請求項１７の発明では、ベース装置にはベース側接触検知部を備えているので、光学式生体センサが装着された場合に、光学式生体センサのベース側接触検知部に対して、装着されたことを示す検知信号（例えば接触検知信号）を送信することができる。

【００２２】
　尚、ベース側接触検知部としては、直接に接触する端子、又は電磁気により検知信号を送信する検知部を採用できる。

　（１８）請求項１８の発明では、電力供給構成を有するので、この電力供給構成により光学式生体センサの充電部を充電することができる。

【００２３】
　尚、電力供給構成としては、直接に接触する端子、又は電磁気により充電を行う構成を採用できる。

　（１９）請求項１９の発明では、（センサ側発光手段に対応して）ベース側受光手段を、２個以上備えている。

【００２４】
　従って、複数のベース側受光手段を用いて、効率よく生体の情報を受信することができる。また、生体の情報を受信する手段と、チェックサム等の様な情報のチェックを行う情報を受信する手段との様に、役割を区別することができる。

【００２５】
　（２０）請求項２０の発明では、ベース装置には、光学式生体センサが嵌め込まれる凹部を備えているので、光学式生体センサを簡単に装着することができる。

　（２１）請求項２１の発明は、凹部を例示したものである。底部側凹部には光学式生体センサの底部（装着する方向の先端側）が嵌め込まれ、側面側凹部には光学式生体センサのセンサ側光学装置部側が嵌め込まれる。

【００２６】
　（２２）請求項２２の発明は、溝状の凹部を例示したものである。

　（２３）請求項２３の発明では、側面側凹部の溝は、中央部が更に凹状となっているので、この凹状部分に、センサ側光学装置部を配置することができる。

【００２７】
　（２４）請求項２４の発明では、底部側凹部の深さは、光学式生体センサを嵌めたときに、バンドが邪魔にならない深さに設定されているので、光学式生体センサの装着を容易に且つ確実に行うことができる。これにより、送信も確実に行うことができる。

【００２８】
　（２５）請求項２５の発明は、基台部と立設部とを備えたベース装置を例示したものである。

　（２６）請求項２６の発明は、基台部と立設部との間に段差を有するので、バンド付きの光学式生体センサの装着が容易である。

【００２９】
　（２７）請求項２７の発明では、光学式生体センサのバンドを立設部に外嵌することが

できる。
　（２８）請求項２８の発明では、立設部の側面に曲面を有するので、丸くなったバンド
を簡単にかけることができる。
【００３０】
　（２９）請求項２９の発明では、ベース側発光手段の表面側にレンズを備えている。
　このレンズにより例えばＬＥＤの集光性を高めることができ、また、例えばＬＥＤやＰ
Ｄを保護することもできる。
【００３１】
　（３０）請求項３０の発明では、ベース側発光手段の表面側に透光性のカバーを備えて
いる。
　このカバーにより例えばＬＥＤやＰＤを保護することができる。尚、カバーの内側にレ
ンズを配置してもよい。
【００３２】
　（３１）請求項３１の発明では、カバーに可視光カット機能を有する。
　（３２）請求項３２の発明では、生体情報収集システムは、光学式生体センサとベース
装置とを備えている。
【００３３】
　（３３）請求項３３の発明では、センサ側発光手段を用いて送信された生体の情報を、
ベース側受光手段によって受信することができる。
　（３４）請求項３４の発明では、ベース側発光手段を用いて送信された所定の指令信号
（例えば光学式生体センサから生体の情報を送信させる信号）を、センサ側受光手段にて
受信することができる。
【００３４】
　（３５）請求項３５の発明では、ベース側発光手段によって指令信号が送信された場合
には、指令信号に基づいて、光学式生体センサを送信モードに設定する。これにより、光
学式生体センサからベース装置に対して、生体の情報を送信することが可能になる。
【００３５】
　（３６）請求項３６の発明では、光学式生体センサがベース装置に装着された場合に、
センサ側光装置部とベース側装置部とは、互いに相対する位置に配置されるので、光学
的な手段によって、好適に情報の送受信を行うことができる。
【００３６】
　（３７）請求項３７の発明では、光学式生体センサをベース装置に装着した場合に、発
光手段側と受光手段側との距離及び位置が一定となるように、光学式生体センサとベース
装置とを嵌め込む構造としている。
【００３７】
　これにより、ベース装置に光学式生体センサを嵌め込んだ場合には、発光手段側と受光
手段側との距離及び位置が常に一定となるので、精度良く情報の送受信を行うことができ
る。
【００３８】
　尚、発光手段と受光手段としては、センサ側発光手段とベース側受光手段、ベース側発
光手段とセンサ側受光手段が挙げられる。
　（３８）請求項３８の発明では、センサ側発光手段として赤外ＬＥＤを用いる場合には
、ベース側受光手段の表面側に可視光カット部材を配置するので、可視光によるノイズを
カットすることができる。
【００３９】
　（３９）請求項３９の発明では、ベース側光学装置部とセンサ側光学装置部とにレンズ
が配置されている場合には、互いのレンズの凹凸が嵌合する構成であるので、位置ずれが
なく、光学的な手段によって、好適に情報の送受信を行うことができる。
【００４０】
　（４０）請求項４０の発明では、ベース側光学装置部とセンサ側光学装置部とに透光性

のカバーが配置されている場合には、互いのカバーの凹凸が嵌合する構成であるので、位置ずれがなく、光学的な手段によって、好適に情報の送受信を行うことができる。
【００４１】
　（４１）請求項４１の発明では、ベース装置の端子と光学式生体センサの端子とが、機械的に接触する構成である。
　（４２）請求項４２の発明では、互いに接触する端子の形状により、光学式生体センサを装着する向きが規定される構成であるので、装着する向きを間違うことがない。
【００４２】
　（４３）請求項４３の発明では、ベース装置と光学式生体センサとの間の信号の送受信を、電磁気を用いて行う構成である。
　（４４）請求項４４の発明では、ベース装置から光学式生体センサに対して、電磁気を用いて電力を供給する構成である。
【００４３】
　（４５）請求項４５の発明では、センサ側光学装置部に２個以上のセンサ側発光手段が配置されている場合に、ベース側光学装置部には、各センサ側発光手段に対応してそれぞれベース側受光手段が配置されている。
【００４４】
　従って、複数のセンサ側発光手段を用いて生体の情報を送信することにより、効率よく送信することができる。また、生体の情報を送信する手段と、チェックサム等の様な情報のチェックを行う情報を送信する手段との様に、役割を区別することができる。更に、例えば赤外ＬＥＤや緑ＬＥＤの様に、異なる種類のセンサ側発光手段を用いる場合には、各手段の特性に合わせた使用方法ができる。
【００４５】
　（４６）請求項４６の発明では、センサ側光学装置部及びベース側光学装置部に、複数対の発光手段及び受光手段を備え、複数対の発光手段及び受光手段を用いて、生体の情報の送信を行う。
【００４６】
　尚、複数対の発光手段及び受光手段としては、例えば光学式生体センサに第１発光手段を備えるとともに、それに対応して、ベース装置に第１受光手段を備え、更に、光学式生体センサに第２発光手段を備えるとともに、それに対応して、ベース装置に第２受光手段を備えた場合が挙げられる。
【００４７】
　（４７）請求項４７の発明では、センサ側光学装置部及びベース側光学装置部に、複数対の発光手段及び受光手段を備え、複数対の発光手段及び受光手段を区別して用いて、生体の情報の送信と、送信される生体の情報のチェックを行うためのチェック情報を送信する。
【００４８】
　尚、複数対の発光手段及び受光手段としては、例えば光学式生体センサに（生体の情報を送信するための）第１発光手段を備えるとともに、それに対応して、ベース装置に第１受光手段を備え、更に、光学式生体センサに（チェックサム等の情報を送信するための）第２発光手段を備えるとともに、それに対応して、ベース装置に第２受光手段を備えた場合が挙げられる。
【００４９】
　（４８）請求項４８の発明は、光学式生体センサとベース装置との間のセンサ通信方法であって、センサ側発光手段を用いて、ベース側受光手段に対して、生体の情報を送信する。
【００５０】
　（４９）請求項４９の発明では、光学式生体センサがベース装置に装着された場合には、光学式生体センサからベース装置に、生体の情報を送信する。
　（５０）請求項５０の発明では、ベース装置から光学式生体センサに対して、所定の指

令信号（生体の情報の送信を要求する信号）が送信された場合に、光学式生体センサから
ベース装置に、生体の情報を送信する。
【００５１】
　（５１）請求項５１の発明では、光学式生体センサがベース装置に装着された場合には
、光学式生体センサを待機モードに設定し、ベース装置から指令信号を受信した場合には
、光学式生体センサからベース装置に、生体の情報を送信する。
【００５２】
　（５２）請求項５２の発明では、光学式生体センサがモード切換スイッチによって待機
モードに設定されている場合に、光学式生体センサからベース装置に指令信号を要求する
要求信号を送信し、ベース装置から指令信号を受信した場合には、光学式生体センサから
ベース装置に、生体の情報を送信する。
【００５３】
　（５３）請求項５３の発明では、光学式生体センサがモード切換スイッチによって待機
モードに設定されている場合に、ベース装置から指令信号を受信した場合には、光学式生
体センサからベース装置に、生体の情報を送信する。
【発明を実施するための最良の形態】
【００５４】
　以下に本発明の最良の実施形態（実施例）を、図面と共に説明する。
【実施例１】
【００５５】
　ここでは、被験者の脈波等の生体情報を検出し、この情報をベース装置に対して送信す
ることができる光学式生体センサ、ベース装置、生体情報収集システム、及びセンサ通信
方法について説明する。
【００５６】
　ａ）まず、本実施例の光学式生体センサについて説明する。
　図１に示す様に、光学式生体センサは、人体の例えば指や手首等に取り付けて、脈波等
を検出できる脈波センサ１である。
【００５７】
　この脈波センサ１は、周知の光学式反射型センサであり、箱状のセンサ本体３と、（セ
ンサ本体３に接続され）伸縮性を有する環状のリストバンド５とを備えている。
　センサ本体３の表側の表面には、表示部７と操作スイッチ９とを備えており、裏側の表
面には、脈波等を光学的に検出するセンサ側（Ｓ側）光学装置部１１を備えている
　また、センサ本体３の左右方向（リストバンド５と垂直の方向）の一方の側面には、セ
ンサ本体３を充電するための一対のＳ側充電用端子１３、１５と、センサ本体３がベース
装置１７（図３参照）に装着されたことを検出するＳ側接触検知端子１９とを備えている
。尚、前記操作スイッチ９は、電源ＯＮと電源ＯＦＦと脈波の測定開始の３位置に切り換
えられるスイッチである。
【００５８】
　図２に示す様に、脈波センサ１は、一対の発光素子、即ち緑光の発光ダイオード（Ｓ側
緑ＬＥＤ）２１と、赤外光の発光ダイオード（Ｓ側赤外ＬＥＤ）２３と、その反射光を受
光する１個のフォトダイオード（Ｓ側ＰＤ）２５と、Ｓ側レンズ２７とを備えている。
【００５９】
　このうち、Ｓ側緑ＬＥＤ２１は、基本性能として、その人体に対する反射光から（即ち
毛細血動脈にあるヘモグロビンの量の変化から）脈波を検出するためのものであり、Ｓ側赤
外ＬＥＤ２３は、その反射光の変化から、体動を検出するためのものである。
【００６０】
　ｂ）次に、本実施例のベース装置１７について説明する。
　図３に模式的に示す様に、ベース装置１７は、脈波センサ１が装着して使用される通信
機能付き充電器であり、脈波センサ１が載置される基台部３１と、基台部３１から斜めに
立設される板状の立設部３３とを備えている。

【００６１】
　ベース装置１７の基部３１の上面側には、図４に示す様に、脈波センサ１の充電用端子１３、１５及びＳ側接触検知端子１９に対応して、脈波センサ１に対する充電を行うためのベース側（Ｂ側）充電用端子３５、３７と、Ｓ側接触検知端子１９に接触するＢ側接触検知端子３９を備えている。尚、Ｂ側充電用端子３５、３７及びＢ側接触検知端子３９は、バネ（図示せず）により上方に付勢され上下に移動可能である。

【００６２】
　前記図３に戻り、脈波センサ１のＳ側光学装置部１１に対向して、ほぼ同様なＢ側光学装置部４１が配置されている。つまり、Ｂ側光学装置部４１は、Ｂ側赤外ＬＥＤ４３、Ｂ側ＰＤ４５、Ｂ側レンズ４７を備えており、Ｂ側ＰＤ４５はＳ側赤外ＬＥＤ２３と対向して配置されるとともに、Ｂ側赤外ＬＥＤ４３はＳ側ＰＤ２５と対向するように配置されている。

【００６３】
　また、図５（ｂ）に示す様に、ベース装置１７の基部３１には、脈波センサ１の底部形状に対応して、脈波センサ１が嵌合する溝状の底部側嵌合凹部５１が設けられているので、脈波センサ１を装着方向に移動させて、ずれ無く底部側嵌合凹部５１に嵌め込むことができる。

【００６４】
　更に、図５（ａ）に示す様に、立設部３３の脈波センサ１の装着側（同図下方）には、脈波センサ１の外形形状に合わせて、側面側嵌合凹部５３が設けられており、この側面側嵌合凹部５３の中央部、即ちＳ側光学装置部１１及びＢ側光学装置部４１に対応する位置には中央凹部５５が設けられている。

【００６５】
　また、図６に示す様に、脈波センサ１のリストバンド５は、ベース装置１７の立設部３３に外嵌するように配置される。また、立設部３３の裏側（図６（ｂ）の上方）に支柱５７を設ける場合には、立設部３３及び支柱５７に外嵌するようにリストバンド５を配置する。尚、前記底部側嵌合凹部５１の深さは、脈波センサ１を立設部３３等に外嵌した場合に、リストバンド５が基部３１の表面に当たらない深さに設定されている。

【００６６】
　ｃ）次に、前記脈波センサ１及びベース装置１７からなる生体情報収集システムの電気的構成について説明する。
　本実施例の生体情報収集システムは、ベース装置１７と、ベース装置１７に装着（着座）される脈波センサ１とから構成されている。

そして、脈波センサ１の装着によって、Ｓ側光学装置部１１とＢ側光学装置部４１とが近接して対向し、それによって、Ｓ側赤外ＬＥＤ２３とＢ側ＰＤ４５とが対向するとともに、Ｓ側ＰＳ２５とＢ側赤外ＬＥＤ４３とが対向する。また、Ｓ側接触検知端子１９とＢ側接触検知端子３９とが接触する。尚、Ｓ側充電用端子１３、１５とＢ側充電用端子３５、３７とも接触する。

【００６７】
　この生体情報収集システムでは、脈波センサ１は、Ｓ側光学装置部１１により、脈波等の検出を行うとともに、脈波等の情報をベース装置１７に出力し、一方、ベース装置１７は、Ｂ側光学装置部４１により、脈波センサ１から送信された情報を受信する。尚、ベース装置１７はパソコン５９に接続されており、脈波センサ１から送信された情報は、ベース装置１７を介してパソコン５９にダウンロードされる。以下、詳しく説明する。

【００６８】
　・前記脈波センサ１は、脈波センサ１を制御するＣＰＵ６１と、検出した脈波等の情報を記憶するメモリ６３と、前記Ｓ側接触検知端子１９と、前記Ｓ側赤外ＬＥＤ２３と、前記Ｓ側緑ＬＥＤ２１と、Ｓ側赤外ＬＥＤ２３及びＳ側緑ＬＥＤ２１を駆動するＳ側ＬＥＤドライブ回路６５と、前記Ｓ側ＰＤ２５と、Ｓ側ＰＤ２５から入力した信号を増幅するＳ

側増幅回路６７と、Ｓ側増幅信号６７から入力したアナログ信号を基準電圧と比較してデジタル信号を生成するＳ側比較回路６９と、基準電圧を生成するＳ側基準電圧回路７１とを備えている。
【００６９】
　そして、前記ＣＰＵ６１は、測定モードにて、脈波や体動を検出を行うための制御を行う。即ち、Ｓ側ドライブ回路６５を駆動して、Ｓ側赤外ＬＥＤ２３及びＳ側緑ＬＥＤ２１を制御し、Ｓ側ＰＤ２５にて受光した信号から脈波や体動を検出するための処理を行い、その解析データを一旦メモリ６３に記憶する。尚、Ｓ側比較回路６９にて変換されたデジタル信号はＣＰＵ６１に入力される。
【００７０】
　また、ＣＰＵ６１は、送信モードにて、脈波等の情報をベース装置１７に送信するための制御を行う。即ち、Ｓ側ドライブ回路６５を駆動して、Ｓ側赤外ＬＥＤ２３を制御し、メモリ６３に記憶した情報を光学的な信号として、ベース装置１７側に送信する。
【００７１】
　・前記ベース装置１７は、Ｓ側接触検知端子１９に接触して信号（接触したことを報知する接触検知信号）を送信するＢ側接触検知端子３９と、Ｂ側接触検知端子３９に送信する接触検知信号を生成する接触検知信号回路７３と、前記Ｂ側ＰＤ４５と、Ｂ側ＰＤ４５から入力した信号を増幅するＢ側増幅回路７５と、Ｂ側増幅信号７５から入力したアナログ信号を基準電圧と比較してデジタル信号を生成するＢ側比較回路７７と、基準電圧を生成するＢ側基準電圧回路７９と、前記Ｂ側赤外ＬＥＤ４３と、Ｂ側赤外ＬＥＤ４３を駆動するＢ側ＬＥＤドライブ回路８１と、Ｂ側ＬＥＤドライブ回路８１の制御信号を出力するとともにＢ側比較回路７７からの信号を入力するシリアルインターフェース８３とを備えている。
【００７２】
　ｄ）次に、本実施例における制御内容について説明する。
　ここでは、脈波センサ１側にて行われる制御内容について、図８のフローチャートに基づいて説明する。
【００７３】
　まず、ステップ（Ｓ）１００では、脈波センサ１とベース装置１７とが接続されたか否かを判定する。つまり、Ｓ側接触検知端子１９とＢ側接触検知端子３９とが接触し、それによって、Ｂ側接触検知端子３９からＳ側接触検知端子１９に接触検知信号が入力されたか否かを判定する。ここで肯定判断されるとＳ１１０に進み、一方否定判断されるとその判定を繰り返す。
【００７４】
　Ｓ１１０では、脈波センサ１がベース装置１７に接続されたので、ＣＰＵ６１の制御モードを、測定モードから送信モードに切り換える。
　続くＳ１２０では、送信モードにて、メモリ６３に記憶された脈波等のデータをベース装置１７側に送信する。即ち、データのダウンロードを実行し、一旦本処理を終了する。
【００７５】
　つまり、本制御では、脈波センサ１がベース装置１７に装着されると、脈波センサ１からベース装置１７に自動的に脈波等の情報が送信される。
　一方、脈波センサ１から送信された情報を受信したベース装置１７では、その情報をパソコン５９に送信する。
【００７６】
　ｅ）この様に、本実施例では、脈波センサ１がベース装置１７に装着されたことを、脈波センサ１がＢ側接触検知端子３９とＳ側接触検知端子１９との接触によって検知した場合には、メモリ６３に記憶した脈波や体動等の生体の情報を、脈波センサ１のＳ側赤外ＬＥＤ２３とベース装置１７のＢ側ＰＤ４５を用いて、ベース装置１７に送信する。
【００７７】
　これにより、従来の特別な無線通信回路を用いたり通信用のケーブルで接続する必要が

無いので、故障が少なく、確実に且つ容易に生体の情報をベース装置１７に送信することができる。よって、パソコン５９では、ベース装置１７を介して、生体の情報をダウンロードすることにより取得することができる。

【実施例２】

【００７８】

次に、実施例２について説明するが、前記実施例１と同様な内容の説明は省略する。

本実施例では、前記実施例１とは制御内容が異なるので、その制御内容について説明する。尚、同様なハード構成には同様な番号を付す。

【００７９】

図９のフローチャートに示す様に、本実施例では、まず、Ｓ２００では、脈波センサ１とベース装置１７とが接続されたか否かを判定する。ここで肯定判断されるとＳ２１０に進み、一方否定判断されるとその判定を繰り返す。

【００８０】

Ｓ２１０では、ＣＰＵ６１の制御モードを、ダウンロード待機モードに切り換える。このダウンロード待機モードとは、ダウンロードを開始させるための信号（ダウンロード開始命令）が入力されるまでは、ダウンロードを待機させるためのモードである。

【００８１】

続くＳ２２０では、ベース装置１７からダウンロード開始命令が来たか否かを判定する。ここで肯定判断されるとＳ２３０に進み、一方否定判断されるとその判定を繰り返す。

Ｓ２３０では、ダウンロード開始命令が来たので、ＣＰＵ６１の制御モードを、送信モードに切り換える。

【００８２】

Ｓ２４０では、データのダウンロードを実行し、一旦本処理を終了する。

つまり、本制御では、脈波センサ１がベース装置１７に装着されると、ダウンロード待機モードに切り換え、ベース装置１７からダウンロード開始命令が入力されると、脈波センサ１からベース装置１７に脈波等の情報が送信される。

【００８３】

本実施例によっても、前記実施例１と同様な効果を奏する。

【実施例３】

【００８４】

次に、実施例３について説明するが、前記実施例１と同様な内容の説明は省略する。

本実施例では、前記実施例１とは、脈波センサの構成と制御内容が異なるので、異なる構成や制御内容について説明する。

【００８５】

図１０の示す様に、本実施例の脈波センサ９１は、電源のＯＮ・ＯＦＦを行う電源スイッチ９３と、制御モードを測定モードとダウンロード待機モードとに切り換えるモード切換スイッチ９５とを備えている。

【００８６】

図１１のフローチャートに示す様に、まず、Ｓ３００では、モード切換スイッチ９５が、ダウンロード待機モードか否かを判定する。ここで肯定判断されるとＳ３１０に進み、一方否定判断されるとＳ３２０に進む。

【００８７】

Ｓ３１０では、モード切換スイッチ９５がダウンロード待機モードに設定されているので、ＣＰＵ６１の制御モードを、ダウンロード待機モードに設定する。

一方、Ｓ３２０では、制御モードを測定モードに設定する。

【００８８】

そして、前記ダウンロード待機モードでは、図１２のフローチャートに示す様に、Ｓ４００にて、脈波センサ１からベース装置１７に対して、ダウンロード開始命令を要求するダウンロード開始要求信号を送信する。

【００８９】

　続くＳ４１０では、脈波センサ１がダウンロード開始命令を受信したか否かを判定する。ここで肯定判断されるとＳ４２０に進み、一方否定判断されると前記Ｓ４００に戻る。
　Ｓ４２０では、ダウンロード開始命令を受信したので、ＣＰＵ６１の制御モードを、送信モードに切り換える。
【００９０】
　Ｓ４３０では、データのダウンロードを実行し、一旦本処理を終了する。
　つまり、本制御では、脈波センサ９１のモード切換スイッチ９５が操作され、ダウンロード待機モードに切り換えられた場合には、ベース装置１７に対してダウンロード開始命令の入力を要求し、ベース装置１７からダウンロード開始命令が入力されると、脈波センサ９１からベース装置１７に脈波等の情報が送信される。
【００９１】
　本実施例によっても、前記実施例１と同様な効果を奏する。
【実施例４】
【００９２】
　次に、実施例４について説明するが、前記実施例１と同様な内容の説明は省略する。
　本実施例では、前記実施例３とは制御内容が異なるので、その制御内容について説明する。
【００９３】
　図１３のフローチャートに示す様に、まず、Ｓ５００では、モード切換スイッチ９５が、ダウンロード待機モードか否かを判定する。ここで肯定判断されるとＳ５１０に進み、一方否定判断されるとＳ５２０に進む。
【００９４】
　Ｓ５１０では、モード切換スイッチ９５がダウンロード待機モードに設定されているので、ＣＰＵ６１の制御モードを、ダウンロード待機モードに切り換える。
　一方、Ｓ５２０では、制御モードを測定モードに切り換える。
【００９５】
　そして、前記ダウンロード待機モードでは、図１４のフローチャートに示す様に、Ｓ６００にて、ベース装置１７から、ダウンロード開始命令を受信したか否かを判定する。ここで肯定判断されるとＳ６１０に進み、一方否定判断されると同じ判定を繰り返す。
【００９６】
　Ｓ６１０では、ダウンロード開始命令を受信したので、ＣＰＵ６１の制御モードを、送信モードに切り換える。
　Ｓ６２０では、データのダウンロードを実行し、一旦本処理を終了する。
【００９７】
　つまり、本制御では、脈波センサ９１のモード切換スイッチ９５が操作され、ダウンロード待機モードに切り換えられた場合に、ベース装置１７からダウンロード開始命令が入力されると、脈波センサ９１からベース装置１７に脈波等の情報が送信される。
【００９８】
　本実施例によっても、前記実施例１と同様な効果を奏する。
【実施例５】
【００９９】
　次に、実施例５について説明するが、前記実施例１と同様な内容の説明は省略する。
　本実施例では、前記実施例１とは、Ｓ側及びＢ側の光学装置部が異なる。
　図１５に示す様に、本実施例では、ベース装置のＢ側光学装置部のレンズ１０１は凹状であり、それに対向する脈波センサのＳ側光学装置部のレンズ１０３は凸状である。
【０１００】
　つまり、Ｂ側光学装置部のレンズ１０１とＳ側光学装置部のレンズ１０３の凹凸形状は、ぴったりと嵌合する形状とされている。
　従って、脈波センサをベース装置に装着した場合に、位置ずれなく装着できる。特に、Ｂ側光学装置部のレンズ１０１とＳ側光学装置部のレンズ１０３とを適切な位置に近接し

15

て配置できるので、ノイズの影響を排除して、データの送受信を好適に行うことができる。
【実施例６】
【０１０１】
　次に、実施例６について説明するが、前記実施例１と同様な内容の説明は省略する。
　本実施例では、前記実施例１とは、Ｂ側光学装置部が異なる。
　図１６に示す様に、本実施例では、ベース装置のＢ側光学装置部１１１には、レンズ１
１３とＢ側ＰＤ１１５との間に、可視光線カットフィルム１１５が配置されている。
【０１０２】
　従って、赤外光を用いてデータの送受信を行う際に、可視光線によるノイズを防ぐこと　　　10
ができる。
【実施例７】
【０１０３】
　次に、実施例７について説明するが、前記実施例１と同様な内容の説明は省略する。
　本実施例では、前記実施例１とは、Ｓ側及びＢ側光学装置部が異なる。
　図１７に示す様に、本実施例では、脈波センサのＳ側光学装置部１２１の表面（同図右
方）には、平板状の透明のカバー１２３が配置されており、カバー１２３とＳ側赤外ＬＥ
Ｄ１２５との間には、レンズ１２７が配置されている。
【０１０４】
　また、ベース装置のＢ側光学装置部１２９の表面（同図左方）には、平板状の透明のカ　　　20
バー１３１が配置されており、カバー１３１とＢ側赤外ＬＥＤ１３３との間には、レンズ
１３５が配置されている。
【０１０５】
　ここでは、カバー１３１とＢ側ＰＤ１３７との間に、可視光線カットフィルム１３９が
配置されているが、カバー１２３、１３１に可視光線カットフィルムを配置したり、カバ
ー１２３、１３１自身が可視光線をカットする性能を有するものを用いてもよい。
【０１０６】
　従って、赤外光を用いてデータの送受信を行う際に、可視光線によるノイズを防ぐこと
ができる。また、カバー１２３、１３１の表面がフラットであるので、レンズが露出する
場合に比べて表面が傷つきにくいという利点がある。　　　　　　　　　　　　　　　　　　　30
【実施例８】
【０１０７】
　次に、実施例８について説明するが、前記実施例１と同様な内容の説明は省略する。
　本実施例では、前記実施例１とは、Ｓ側及びＢ側の光学装置部が異なる。
　図１８に示す様に、本実施例では、ベース装置のＢ側光学装置部のカバー１４１は凹状
であり、それに対向する脈波センサのＳ側光学装置部のカバー１４３は凸状である。
【０１０８】
　つまり、Ｂ側光学装置部のカバー１４１とＳ側光学装置部のカバー１４３の凹凸形状は
、ぴったりと嵌合する形状とされている。
　従って、脈波センサをベース装置に装着した場合に、位置ずれなく装着できる。特に、　　　40
Ｂ側光学装置部のカバー１４１とＳ側光学装置部のカバー１４３とを適切な位置に近接し
て配置できるので、ノイズの影響を排除して、データの送受信を好適に行うことができる
。
【実施例９】
【０１０９】
　次に、実施例９について説明するが、前記実施例１と同様な内容の説明は省略する。
　本実施例では、前記実施例１とは、Ｓ側及びＢ側の光学装置部が異なる。
　図１９に示す様に、本実施例では、ベース装置１５１のＢ側光学装置部１５３には、一
対のＢ側ＰＤ１５５、１５７が配置されている。　　　　　　　　　　　　　　　　　　　　50
【０１１０】

　つまり、脈波センサ１５９のＳ側光学装置部１６１のＳ側赤外ＬＥＤ１６３に対向して、一方のＢ側ＰＤ１５５が配置され、Ｓ側緑ＬＥＤ１６５に対向して、他方のＢ側ＰＤ１５７が配置されている。
【０１１１】
　従って、本実施例では、２組の発光及び受光の素子により、効率よく情報を送信することができる。
　尚、例えばＳ側緑ＬＥＤ１６５と他方のＢ側ＰＤ１５７とを用いて、チェックサムの信号を送受信することにより、データの精度を高めることができる。
【実施例１０】
【０１１２】
　次に、実施例１０について説明するが、前記実施例１と同様な内容の説明は省略する。
　本実施例では、前記実施例１とは、脈波センサをベース装置に装着する構成が異なる。
　図２０に示す様に、本実施例では、平板状のベース装置１７１の上部に凹部１７３が設けられ、この凹部１７３に脈波センサ１７５が水平に搭載される構成である。
【０１１３】
　そして、凹部１７３内に配置されたＢ側光学装置部１７７と、脈波センサ１７５の下面側のＳ側光学装置部１７９とによって、情報の送受信を行う。
【実施例１１】
【０１１４】
　次に、実施例１１について説明するが、前記実施例１と同様な内容の説明は省略する。
　本実施例では、前記実施例１とは、脈波センサをベース装置に装着する構成が異なる。
　図２１に示す様に、本実施例では、ベース装置１８１は、上面が斜めになった円盤状の基台部１８３と、基台部１８３の上部に立設された円柱状の立設部１８５とから構成されている。
【０１１５】
　基台部１８３の上面には、立設部１８５の根元に、脈波センサ本体１８７が嵌合する底部側嵌合凹部１８９が設けられている。
　また、前記底部側嵌合凹部１８９は、立設部１８５側にわずかに傾斜しており、リストバンド１９１を立設部１８５に外嵌した際に、リストバンド１９１が上下方向にゆがまないよう程度に深さが設定されている。
【０１１６】
　従って、リストバンド１９１を立設部１８５に外嵌して、脈波センサ本体１８７を底部側嵌合凹部１８９に嵌めた場合は、Ｓ側及びＢ側の光学装置部（図示せず）は常に好ましい距離を保って配置されることになる。
【０１１７】
　尚、本発明は前記実施例になんら限定されるものではなく、本発明を逸脱しない範囲において種々の態様で実施しうることはいうまでもない。
　（１）例えば、脈波センサは、測定によって得られた信号をそのまま記憶し、そのデータをベース装置側に送信するようにしてもよい。尚、ベース装置にパソコンを接続することなく、ベース装置にパソコンが行う機能を搭載するようにしてもよい。
【０１１８】
　（２）また、赤外ＬＥＤではなく、その他のＬＥＤを使用してデータを送信するようにしてもよい。
【図面の簡単な説明】
【０１１９】
【図１】　実施例１の脈波センサを示す斜視図である。
【図２】　実施例１の脈波センサによって脈波を測定する状態を示す説明図である。
【図３】　実施例１の生体情報収集システムの構成を示す説明図である。
【図４】　実施例１の生体情報収集システムにおける端子の接触状態を示す説明図である。
【図５】　実施例１の脈波センサがベース装置に装着される状態を示す説明図である。

【図６】実施例１のバンド付きの脈波センサがベース装置に装着される状態を示す説明図である。

【図７】実施例１の生体情報収集システムの電気的構成を示すブロック図である。

【図８】実施例１の脈波センサにおける処理を示すフローチャートである。

【図９】実施例２の脈波センサにおける処理を示すフローチャートである。

【図１０】実施例３の脈波センサの構成を示す説明図である。

【図１１】実施例３の脈波センサにおけるメインの処理を示すフローチャートである。

【図１２】実施例３の脈波センサにおける待機モードの処理を示すフローチャートである。

【図１３】実施例４の脈波センサにおけるメインの処理を示すフローチャートである。

【図１４】実施例４の脈波センサにおける待機モードの処理を示すフローチャートである。

【図１５】実施例５の脈波センサとベース装置の光学装置部を示す説明図である。

【図１６】実施例６の脈波センサとベース装置の光学装置部を示す説明図である。

【図１７】実施例７の脈波センサとベース装置の光学装置部を示す説明図である。

【図１８】実施例８の脈波センサとベース装置の光学装置部を示す説明図である。

【図１９】実施例９の生体情報収集システムの構成を示す説明図である。

【図２０】実施例１０の生体情報収集システムの構成を示す説明図である。

【図２１】実施例１１の生体情報収集システムの構成を示す説明図である。

【符号の説明】

【０１２０】

　　１、９１、１５９、１７５…脈波センサ

　　１７、１５１、１７１、１８１…ベース装置

　　２１、１６５…Ｓ側緑ＬＥＤ

　　２３、１２５、１６３…Ｓ側赤外ＬＥＤ

　　２５…Ｓ側ＰＤ

　　４３、１３３…Ｂ側赤外ＬＥＤ

　　４５、１１５、１３７、１５５、１５７…Ｂ側ＰＤ

　　１１、１２１、１６１、１７９…Ｓ側光学装置部

　　４１、１１１、１２９、１５３、１７７…Ｂ側光学装置部

　　３１、１８３…基台部

　　３３、１８５…立設部

　　１９…Ｓ側接触検知端子

　　３９…Ｂ側接触検知端子

Appx03266

【図1】



【図3】



【図2】



【図4】



【図5】



Appx03267

（20）

JP 2006-296564 A 2006.11.2

【図６】



(a)



(b)

【図７】



【図８】



【図９】



**Appx03268**

【図１０】



【図１１】



【図１２】



【図１３】



【図１４】



【図１５】



【図１６】

**Appx03269**

(22)                    JP 2006-296564 A 2006.11.2

【図１７】



【図１８】







【図１９】



【図２０】



【図２１】





**Appx03270**

フロントページの続き

(72)発明者　森下　敏之
　　　　　　　愛知県刈谷市昭和町１丁目１番地　株式会社デンソー内
Ｆターム(参考) 4C017 AA09　AB02　AB08　AC26　BB12　BC11

JP 2006-296564 A 11.2.2006

(19) **Japan Patent Office (JP)**

(12) **Japanese Unexamined Patent Application Publication (A)**

(11) Japanese Unexamined Patent Application Publication Number

**2006-296564**
(P2006-296564A)

(43) Publication date **November 2, 2006 (11.2.2006)**

| (51) Int. Cl. | | | FI | | | Theme codes (reference) |
|---|---|---|---|---|---|---|
| **A61B** | **5/0245** | **(01.2006)** | A61B | 5/02 | 31OF | 4CO17 |

Request for examination  Not yet requested  Number of claims  53   OL    (Total of 23 pages)

| | | | |
|---|---|---|---|
| (21) Application number | Japanese Patent Application 2005-119817 (P2005-119817) | (71) Applicant | 000004260<br>DENSO CORPORATION<br>1 Showa-cho 1-chome, Kariya-shi, Aichi-ken |
| (22) Date of application | April 18, 2005 (4.18.2005) | (74) Agent | 100082500<br>Patent attorney TSUTOMU ADACHI |
| | | (72) Inventor | KAZUYA INOKAWA<br>% Denso Corporation<br>1 Showa-cho 1-chome, Kariya-shi, Aichi-ken |
| | | (72) Inventor | KYOJI INOBE<br>% Denso Corporation<br>1 Showa-cho 1-chome, Kariya-shi, Aichi-ken |
| | | (72) Inventor | KATSUMASA NISHII<br>% Denso Corporation<br>1 Showa-cho 1-chome, Kariya-shi, Aichi-ken |

Continued on the last page

(54) (TITLE OF THE INVENTION) OPTICAL VITAL SENSOR, BASE DEVICE, VITAL SIGN INFORMATION GATHERING SYSTEM, AND SENSOR COMMUNICATION METHOD

(57) (ABSTRACT)

(PROBLEM) Provide an optical vital sensor, base device, vital sign information gathering system, and sensor communication method that are able to transmit and receive information with few malfunctions and with a simple structure.

(MEANS FOR SOLVING) In S100, determine whether or not a pulse sensor 1 and base device 17 are connected. In short, determine whether or not an S-side contact-detecting terminal 19 and a B-side contact-detecting terminal 39 are in contact, and consequently a "contact detected" signal has been input to the S-side contact-detecting terminal 19 from the B-side contact-detecting terminal 39. In S110, switch the control mode of the CPU 16 from measurement mode to transmission mode. In the ensuing S120, transmit data stored in memory, such as pulse, to a base device 17 in transmission mode. In short, download data. In other words, information, such as pulse, is automatically transmitted to the base device 17 from the pulse sensor 1 when the pulse sensor 1 is mounted onto the base device 17.

(SELECTED DRAWING) FIG. 8



APPLE 1008

(SCOPE OF PATENT CLAIMS)

(CLAIM 1)

Optical vital sensor furnished with a sensor-side optical device component having:

A sensor-side light-emitting means that emits light onto the body;

A sensor-side light-receiving means that receives reflected light, which consists of light that has been emitted by the aforesaid sensor-side light-emitting means and reflected by the aforesaid body; and

A vital sign sensing means that senses the vital signs of the aforesaid body based on the reflected light that was received by the aforesaid sensor-side light-receiving means;

characterized in that the information about the aforesaid vital signs sensed by the aforesaid vital sign sensing means is transmitted, using the aforesaid sensor-side light-emitting means, to a base device that is the recipient of transmissions from the aforesaid optical vital sensor.

(CLAIM 2)

Optical vital sensor set forth in Claim 1, characterized in that the aforesaid optical vital sensor has a measurement mode in which vital signs are sensed by the aforesaid vital sign sensing means, and a transmission mode in which the aforesaid vital sign information is transmitted to the aforesaid base device.

(CLAIM 3)

Optical vital sensor set forth in Claim 1 or 2, characterized in that it is furnished with a sensor-side contact-detecting component that detects when [the optical vital sensor] has been mounted onto the aforesaid base device.

(CLAIM 4)

Optical vital sensor set forth in Claim 3, characterized in that [the optical vital sensor] is set to the aforesaid transmission mode upon detecting that [the optical vital sensor] has been mounted onto the aforesaid base device.

(CLAIM 5)

Optical vital sensor set forth in any of Claims 2 through 4, characterized in that it is furnished with a mode-switching switch that switches between the aforesaid measurement mode and the aforesaid transmission mode.

(CLAIM 6)

Optical vital sensor set forth in any of Claims 1 through 5, characterized in that it is furnished with a charging component that is charged by means of a power supply structure on the aforesaid base device.

(CLAIM 7)

Optical vital sensor set forth in any of Claims 1 through 6, characterized in that it is furnished with two or more of the aforesaid sensor-side light-emitting means.

(CLAIM 8)

Light-emitting vital sensor set forth in any of Claims 1 through 7, characterized in that a lens is placed on the surface of the aforesaid sensor-side light-emitting means.

(CLAIM 9)

Light-emitting vital sensor set forth in any of Claims 1 through 7, characterized in that a translucent cover is placed on the surface of the aforesaid sensor-side light-emitting means.

(CLAIM 10)

Light-emitting vital sensor set forth in Claim 9, characterized in that the aforesaid cover serves the function of blocking visible light.

(CLAIM 11)

Base device to which the aforesaid vital sign information is transmitted from the optical vital sensor set forth in any of the aforesaid Claims 1 through 10,

Characterized in that it is furnished with a base-side optical device component that has a base-side light-receiving means for receiving the aforesaid vital sign information transmitted by the aforesaid sensor-side light-emitting means.

(CLAIM 12)

Base device set forth in Claim 11, characterized in that the aforesaid base-side optical device component is further furnished with a base-side light-emitting means that transmits a signal to the aforesaid sensor-side optical device component.

(CLAIM 13)

Base device set forth in Claim 12, characterized in that a command signal instructing the aforesaid vital sign information to be transmitted from the aforesaid sensor-side light-receiving means is transmitted to the aforesaid sensor-side light-receiving means

using the aforesaid base-side light-emitting means.

(CLAIM 14)

Base device set forth in any of Claims 11 through 13, characterized in that the aforesaid base device is furnished with a mounting structure onto which the aforesaid optical vital sensor is mounted in physical contact therewith.

(CLAIM 15)

Base device set forth in Claim 14, characterized in that the aforesaid optical vital sensor is disposed so as to be mounted at an angle when the aforesaid optical vital sensor is mounted onto the aforesaid base device.

(CLAIM 16)

Base device set forth in Claim 14, characterized in that the aforesaid optical vital sensor is disposed so as to be mounted level onto the aforesaid base device.

(CLAIM 17)

Base device set forth in any of Claims 11 through 16, characterized in that it is furnished with a base-side contact-detecting component that transmits a detection signal to the aforesaid optical vital sensor when the aforesaid optical vital sensor is mounted onto [the base device].

(CLAIM 18)

Base device set forth in any of Claims 11 through 17, characterized in that it has a power supply structure for charging the charging component of the aforesaid optical vital sensor.

(CLAIM 19)

Base device set forth in any of Claims 11 through 18, characterized in that it is furnished with two or more of the aforesaid base-side light-receiving elements.

(CLAIM 20)

Base device set forth in any of Claims 11 through 19, characterized in that the aforesaid base device is furnished with a recess into which the aforesaid optical vital sensor is fitted.

(CLAIM 21)

Base device set forth in Claim 20, characterized in that the aforesaid recess is a basal recess matching the base of the aforesaid optical vital sensor and/or a flank recess matching the sensor-side optical device component.

(CLAIM 22)

Base device set forth in Claim 20 or 21, characterized in that the aforesaid recess is a groove running the length of the direction in which the aforesaid optical vital sensor is mounted.

(CLAIM 23)

Vital sign information gathering system [*sic:* base device] set forth in Claim 21 or 22, characterized in that the central part of the groove in the aforesaid flank recess is itself further recessed.

(CLAIM 24)

Base device set forth in Claim 21 or 22, characterized in that the depth of the aforesaid basal recess is set such that, when the aforesaid optical vital sensor is fitted [into the recess] with a band attached thereto, the aforesaid band does not cause any impediment.

(CLAIM 25)

Base device set forth in any of Claims 11 through 24, characterized in that the aforesaid base device is furnished with a basal component onto which the aforesaid optical vital sensor is placed and an upright component extending upwards from said basal component.

(CLAIM 26)

Base device set forth in Claim 25, characterized in that there is a difference in level between the aforesaid basal component and the aforesaid upright component.

(CLAIM 27)

Base device set forth in Claim 25 or 26, characterized in that it is designed so that, when a band is attached to the aforesaid optical vital sensor, this band fits around the outside of the aforesaid upright component.

(CLAIM 28)

Base device set forth in any of Claims 25 through 27, characterized in that the flank of the aforesaid upright component is curved.

(CLAIM 29)

JP 2006-296564 A 11.2.2006

(4)

Base device set forth in any of Claims 11 through 28, characterized in that a lens is placed on the surface of the aforesaid base-side light-emitting means.

(CLAIM 30)

Base device set forth in any of Claims 11 through 28, characterized in that a translucent cover is placed on the surface of the aforesaid base-side light-emitting means.

(CLAIM 31)

Base device set forth in Claim 30, characterized in that the aforesaid cover serves the function of blocking visible light.

(CLAIM 32)

Vital sign information gathering system characterized in that it is furnished with the optical vital sensor set forth in any of the aforesaid Claims 1 through 10 and the base device set forth in any of the aforesaid Claims 11 through 31.

(CLAIM 33)

Vital sign information gathering system set forth in Claim 32, characterized in that the aforesaid vital sign information transmitted using the aforesaid sensor-side light-emitting means is received by the aforesaid base-side light-receiving means.

(CLAIM 34)

Vital sign information gathering system set forth in Claim 32 or 33, characterized in that a designated command signal transmitted using the aforesaid base-side light-emitting means is received by the aforesaid sensor-side light-receiving means.

(CLAIM 35)

Vital sign information gathering system set forth in Claim 34, characterized in that, when the aforesaid command signal is transmitted by the aforesaid base-side light-emitting means, the aforesaid optical vital sensor is set to the aforesaid transmission mode based on the aforesaid command signal.

(CLAIM 36)

Vital sign information gathering system set forth in any of Claims 32 through 35, characterized in that the aforesaid sensor-side optical device component and the aforesaid base-side optical device component are positioned in such a way as to be situated opposite one another when the aforesaid optical vital sensor is mounted onto the aforesaid base device.

(CLAIM 37)

Vital sign information gathering system set forth in any of Claims 32 through 36, characterized in that, when the aforesaid optical vital sensor is mounted onto the aforesaid base device, the aforesaid optical vital sensor fits into the aforesaid base device in such a way as to maintain a uniform distance and position between the light-emitting means and the light-receiving means.

(CLAIM 38)

Vital sign information gathering system set forth in any of Claims 32 through 37, characterized in that, when an infrared LED is used as the aforesaid sensor-side light-emitting means, a member to block visible light is placed on the surface of the aforesaid base-side light-receiving means.

(CLAIM 39)

Vital sign information gathering system set forth in any of Claims 32 through 38, characterized in that it has a configuration whereby, if a lens has been placed on the aforesaid base-side optical device component and on the aforesaid sensor-side optical device component, the convexity of one lens fits into the concavity of the other.

(CLAIM 40)

Vital sign information gathering system set forth in any of Claims 32 through 38, characterized in that, if a translucent cover has been placed on the aforesaid base-side optical device component and on the aforesaid sensor-side optical device component, the convexity of one cover fits into the concavity of the other.

(CLAIM 41)

Vital sign information gathering system set forth in any of Claims 32 through 40, characterized in that it has a configuration whereby the terminals of the aforesaid base device and the terminals of the aforesaid optical vital sensor mechanically contact one another.

(CLAIM 42)

Vital sign information gathering system set forth in Claim 41, characterized in that it has a configuration whereby the shape of the mutually contacting aforesaid terminals determines the direction in which the aforesaid optical vital sensor is mounted.

(CLAIM 43)

Vital sign information gathering system set forth in any of Claims 32 through 42, characterized in that it has a configuration

(5)

whereby the reception and transmission of signals between the aforesaid base device and the aforesaid optical vital sensor is performed using electromagnetism.

(CLAIM 44)

Vital sign information gathering system set forth in any of Claims 32 through 43, characterized in that it has a configuration whereby power is supplied from the aforesaid base device to the aforesaid optical vital sensor using electromagnetism.

(CLAIM 45)

Vital sign information gathering system set forth in any of Claims 32 through 44, characterized in that, if two or more sensor-side light-emitting means are provided on the aforesaid sensor-side optical device component, the aforesaid base-side optical device component is furnished with as many base-side light-receiving means as there are aforesaid sensor-side light-emitting means.

(CLAIM 46)

Vital sign information gathering system set forth in Claim 45, characterized in that a plurality of pairs of the aforesaid light-emitting means and light-receiving means are provided on the aforesaid sensor-side optical device component and the aforesaid base-side optical device component, and transmission of the aforesaid vital sign information is performed using the aforesaid plurality of pairs of light-emitting means and light-receiving means.

(CLAIM 47)

Vital sign information gathering system set forth in Claim 45, characterized in that a plurality of pairs of the aforesaid light-emitting means and light-receiving means are provided on the aforesaid sensor-side optical device component and the aforesaid base-side optical device component, and transmission of the aforesaid vital sign information is performed using one of the aforesaid pairs of light-emitting means and light-receiving means, whereas transmission of check information for checking the aforesaid transmitted vital sign information is performed using the other of the aforesaid pairs of light-emitting means and light-receiving means.

(CLAIM 48)

Sensor communication method for communication between the optical vital sensor set forth in any of the aforesaid Claims 1 through 10 and the base device set forth in any of the aforesaid Claims 11 through 31,

characterized in that the aforesaid vital sign information is transmitted to the aforesaid base-side light-receiving means using the aforesaid sensor-side light-emitting means.

(CLAIM 49)

Sensor communication method set forth in Claim 48, characterized in that the aforesaid vital sign information is transmitted from the aforesaid optical vital sensor to the aforesaid base device when the aforesaid optical vital sensor is mounted onto the aforesaid base device.

(CLAIM 50)

Sensor communication method set forth in Claim 48 or 49, characterized in that the aforesaid vital sign information is transmitted from the aforesaid optical vital sensor to the aforesaid base device when a designated command signal is transmitted from the aforesaid base device to the aforesaid optical vital sensor.

(CLAIM 51)

Sensor communication method set forth in Claim 50, characterized in that the aforesaid optical vital sensor is placed in standby mode when the aforesaid optical vital sensor is mounted onto the aforesaid base device, and the aforesaid vital sign information is transmitted from the aforesaid optical vital sensor to the aforesaid base device when a command signal is received from the aforesaid base device.

(CLAIM 52)

Sensor communication method set forth in Claim 51, characterized in that, in the event that the aforesaid optical vital sensor has been placed in standby mode by means of the mode-switching switch, the aforesaid vital sign information is transmitted from the aforesaid optical vital sensor to the aforesaid base device when a signal requesting the aforesaid command signal is transmitted from the aforesaid optical vital sensor to the aforesaid base device and a command signal is then received from the aforesaid base device.

(CLAIM 53)

Sensor communication method set forth in Claim 50, characterized in that, in the event that the aforesaid optical vital sensor has been placed in standby mode by means of the mode-switching switch, the aforesaid vital sign information is transmitted from the aforesaid optical vital sensor to the aforesaid base device when a command signal is received from the aforesaid base device.

(DETAILED DESCRIPTION OF THE INVENTION)

(TECHNICAL FIELD)

(0001)

The present invention relates to an optical vital sensor, base device, vital sign information gathering system, and sensor communication method that are able to obtain various kinds of vital sign information such as pulse.

(BACKGROUND ART)

(0002)

Prior to now. in clinical settings, instruments such as optical pulse sensors have been used to accurately gauge the condition of patients, etc.

When taking a measurement of pulse, pulse sensors of this kind store the measured data into memory. Technology exists that will download the data from the pulse sensor upon completion of measurement by connecting the pulse sensor via cable to a charger (base station) with communication functionality, and then connecting the base station to a PC via cable and transmitting an appropriate command from the PC.

(0003)

Separate from this, technology is also known that will transmit data wirelessly from a sensor that has obtained vital sign information to a base station that gathers this information (see Cited Literature 1 through 3).

(PATENT LITERATURE 1) Japanese Unexamined Patent Application Publication H2003-275183

(PATENT LITERATURE 2) Japanese Unexamined Patent Application Publication H2003-309485

(PATENT LITERATURE 3) Japanese Unexamined Patent Application Publication H2003-270486

(DISCLOSURE OF THE INVENTION)

(PROBLEM TO BE SOLVED BY THE INVENTION)

(0004)

However, in mechanically connected systems such as these in which the pulse sensor is connected to the base station via cable, there is the risk of contact failure due to damage or deterioration.

On the other hand, in the case of systems that transmit data wirelessly, the problem is that a dedicated wireless communication circuit is required in addition to the circuits for detecting vital sign information, etc.

(0005)

The present invention was devised to solve the aforesaid problems, having as its objective to provide an optical vital sensor, base device, vital sign information gathering system, and sensor communication method that are able to transmit and receive information with few malfunctions and with a simple structure.

(MEANS OF SOLVING THE PROBLEM)

(0006)

(1) In the invention in Claim 1, vital sign information sensed by a vital sign sensing means is transmitted, using a sensor-side light-emitting means, to a base device that is the recipient of transmissions from the optical vital sensor.

In short, an optical vital sensor (e.g. pulse sensor) is furnished with a sensor-side light-emitting means such as an LED in order to sense vital sign information (e.g. pulse, etc.), enabling this sensor light-emitting means to be used to transmit vital sign information to a base device.

(0007)

For this reason, it is not necessary to use a wireless communication circuit or to establish connections via communication cable, which makes it possible to easily transmit vital sign information with few malfunctions and with a simple structure.

Note that the type of vital sign information that can be transmitted includes any of the various kinds of information that can be measured and stored in memory by an optical vital sensor, including the various kinds of signals obtained by reflected light such as pulse (pulse rate, pulse interval) and signals indicating body motion or the like, as well as information obtained by analysis of these signals. Furthermore, it is also possible to transmit raw measurement data (data stored in memory).

(0008)

(2) In the invention in Claim 2, an optical vital sensor as a measurement mode in which vital signs are sensed by a vital sign sensing means, and a transmission mode in which vital sign information is transmitted to a base device, enabling operation to be performed in accordance with the respective mode by switching between modes.

(0009)

Note that a standby mode may also be furnished, whereby [the optical vital sensor] waits to transmit vital sign information to

Appx03277

JP 2006-296564 A 11.2.2006

(7)

the base device until receipt of a command signal (a signal instructing to transmit) from the base device.

(3) In the invention in Claim 3, it is possible to detect when the optical vital sensor has been mounted onto the base device.

(0010)

Note that the sensor-side contact-detecting component can consist, for example, of terminals that come into contact with the terminals on the base side (base-side contact-detecting component). Alternately, detection may be performed by means of electromagnetism rather than by means of contact with the terminals on the base side.

(0011)

(4) In the invention in Claim 4, transmission mode is enabled when it is detected that [the optical vital sensor] has been mounted onto the base device. This makes it possible to automatically transmit vital sign information when the optical vital sensor is mounted onto the base device.

(0012)

(5) In the invention in Claim 5, a mode-switching switch is provided for the purpose of switching between measurement mode and transmission mode. Accordingly, because the modes can be switched by means of this mode-switching switch, it is possible to cause the optical vital sensor to perform the desired processing at the desired timing.

(0013)

(6) In the invention in Claim 6, a charging component is provided, making it possible to charge [the optical vital sensor] by means of the power supply structure of the base device.

Note that, to perform charging, terminals that come into contact with one another may be provided on the optical vital sensor and the base device, but it is also acceptable to adopt a configuration whereby power is supplied by electromagnetism.

(0014)

(7) In the invention in Claim 7, two or more light-emitting means such as LEDs are provided as the sensor-side light-emitting means.

Accordingly, by transmitting the vital sign information using a plurality of sensor-side light-emitting means, it is possible transmit efficiently. It is also possible to distinguish between the roles performed by the light-emitting means, e.g. with one means used to transmit vital sign information and another means used to transmit information used to check a checksum or the like. Furthermore, when using sensor-side light-emitting means of various kinds, such as an infrared LED or a green LED, the manner of use can be adjusted according to the properties of each respective means. For example, work can be divided between the various means, with an infrared LED used to detect vital signs and transmit vital sign information, and a green LED used to detect pulse.

(0015)

(8) In the invention in Claim 8, a lens is placed on the surface of the sensor-side light-emitting means.

This lens makes it possible to increase the light-gathering ability of the LED as well as to protect the LED or PD.

(0016)

(9) In the invention in Claim 9, a translucent cover is placed on the surface of the sensor-side light-emitting means.

This cover makes it possible to protect the LED or PD. Note that a lens may be placed on the inside of the cover.

(0017)

(10) In the invention in Claim 10, the cover serves the function of blocking visible light, making it possible to block noise caused by visible light.

(11) The invention in Claim 11 is a base device to which vital sign information is transmitted from the optical vital sensor. This base device receives vital sign information by means of a base-side light-receiving means in a base-side optical device component.

(0018)

(12) In the invention in Claim 12, a base-side light-emitting means is able to transmit a variety of signals (e.g. a command signal requesting the transmission of vital sign information, etc.) to (the sensor-side light-receiving means of) the sensor-side optical device component.

(0019)

(13) In the invention in Claim 13, the base-side light-emitting means can be used to transmit a command signal to the sensor-side light-receiving means instructing the sensor-side light-receiving means to transmit vital sign information.

(14) In the invention in Claim 14, the base device is furnished with a mounting structure enabling the optical vital sensor to be mounted in physical contact therewith. Consequently, this enables the optical vital sensor to be mounted onto the base device.

(0020)

(15) In the invention in Claim 15, the optical vital sensor is mounted onto the base device at an angle (tilted slightly off vertical). Consequently, this makes it possible to use gravity to place the sensor-side optical device component and the base-side optical device component in close proximity (or touching).

(0021)

(16) In the invention in Claim 16, the optical vital sensor is mounted onto the base device level to the ground.

(17) In the invention in Claim 17, the base device is furnished with a base-side contact-detecting component, by which means it is possible to transmit a detection signal (e.g. "contact detected" signal) indicating that the optical vital sensor has been mounted onto the base-side contact-detecting component of the optical vital sensor.

(0022)

Note that, for the base-side contact-detecting component, it is possible to use terminals that come into direct contact, or to use a detecting component that transmits a detection signal by means of electromagnetism.

(18) In the invention in Claim 18, a power supply structure is provided, making it possible to charge the charging component of the optical vital sensor by means of this power supply structure.

(0023)

Note that, for the power supply structure, it is possible to use terminals that come into direct contact, or to use a structure that performs charging by means of electromagnetism

(19) In the invention in Claim 19, two or more base-side light-receiving means are provided (according to the number of sensor-side light-emitting means).

(0024)

Consequently, this makes it possible to efficiently receive vital sign information using a plurality of base-side light-receiving means. Functions can be divided between means, e.g. with one means receiving vital sign information and another means receiving information used to check a checksum or the like.

(0025)

(20) In the invention in Claim 20, the base device is furnished with a recess into which the optical vital sensor is fitted, thereby making it possible to easily mount the optical vital sensor.

(21) The invention in Claim 21 cites examples of recesses. The basal recess fits the base of the aforesaid optical vital sensor (the tip side of the mounting direction), and the flank recess fits the sensor-side optical device component of the optical vital sensor.

(0026)

(22) The invention in Claim 22 cites a groove-shaped recess.

(23) In the invention in Claim 23, the groove in the flank recess is further recessed in the center so that the sensor-side optical device component can be placed into this recessed portion.

(0027)

(24) In the invention Claim 24, the depth of the basal recess is set such that, when the optical vital sensor is fitted therein, the band does not cause any impediment. This makes it easy to securely mount the optical vital sensor, as well as making it possible to securely perform transmission.

(0028)

(25) The invention in Claim 25 cites an example of a base device furnished with a basal component and an upright component.

(26) The invention in Claim 26 has a difference in level between the basal component and the upright component so as to facilitate the mounting of an optical vital sensor with a band attached thereto.

(0029)

(27) In the invention in Claim 27, the band of the optical vital sensor can be fitted around the upright component.

JP 2006-296564 A 11.2.2006

(9)

(28) In the invention in Claim 28, the side surface of the upright component is curved so as to facilitate sliding the rounded band.
(0030)
(29) In the invention in Claim 29, a lens is provided on the surface of the base-side light-emitting means.
This lens makes it possible to increase the light-gathering ability of the LED, as well as to protect the LED or PD.
(0031)
(30) In the invention in Claim 30, a translucent cover is provided on the surface of the base-side light-emitting means.
This cover makes it possible to protect the LED or PD. Note that a lens may be provided on the inside of the cover.
(0032)
(31) In the invention in Claim 31, the cover serves the function of blocking visible light.
(32) In the invention in Claim 32, a vital sign information gathering system is furnished with an optical vital sensor and a base device.
(0033)
(33) In the invention in Claim 33, vital sign information transmitted using a sensor-side light-emitting means is able to be received by means of a base-side light-receiving means.
(34) In the invention in Claim 34, a designated command signal (e.g. a signal that causes vital sign information to be transmitted from the optical vital sensor) transmitted using a base-side light-emitting means is able to be received by means of a sensor-side light-receiving means.
(0034)
(35) In the invention in Claim 35, when a command signal is transmitted by the base-side light-emitting means, the optical vital sensor is set to transmission mode based on the command signal. This makes it possible to transmit vital sign information from the optical vital sensor to the base device.
(0035)
(36) In the invention in Claim 36, the sensor-side optical device component and the base-side optical device component are positioned in such a way as to be situated opposite one another when the optical vital sensor is mounted onto the base device, thereby making it possible to perform transmission and reception of information in an optimal manner by optical means.
(0036)
(37) In the invention in Claim 37, a structure is adopted whereby, when the optical vital sensor is mounted onto the base device, the optical vital sensor fits into the base device in such a way as to maintain a uniform distance and position between the light-emitting means and the light-receiving means.
(0037)
By this means, when the optical vital sensor is fitted into the base device, the distance and position remain uniform between the light-emitting means and the light-receiving means, thereby making it possible to accurately perform transmission and reception of information.
(0038)
Note that light-emitting means and light-receiving means refer either to sensor-side light-emitting means and base-side light-receiving means, or to base-side light-emitting means and sensor-side light-receiving means.
(38) In the invention in Claim 38, when an infrared LED is used as the sensor-side light-emitting means, a member to block visible light is placed on the surface of the base-side light-receiving means, thereby making it possible to block noise caused by visible light.
(0039)
(39) In the invention in Claim 39, the configuration is such that, if a lens has been placed on the base-side optical device component and on the sensor-side optical device component, the convexity of one lens fits into the concavity of the other, eliminating the chance of misalignment, thereby making it possible to perform transmission and reception of information in an optimal manner by optical means.
(0040)
(40) In the invention in Claim 40, the configuration is such that, if a translucent cover has been placed on the base-side optical device component and on the sensor-side optical device component, the convexity of one cover fits into the concavity of the

other, eliminating the chance of misalignment, thereby making it possible to perform transmission and reception of information in an optimal manner by optical means.

(0041)

(41) In the invention in Claim 41, the configuration is such that the terminals of the base device and the terminals of the optical vital sensor are in mechanical contact.

(42) In the invention in Claim 42, the configuration is such that the shape of the mutually touching terminals determines the direction in which the optical vital sensor is mounted, ensuring that it is not mounted the wrong way.

(0042)

(43) In the invention in Claim 43, the configuration is such that transmission and reception of signals between the base device and the optical vital sensor is performed using electromagnetism.

(44) In the invention in Claim 44, the configuration is such that power is supplied from the base device to the optical vital sensor using electromagnetism.

(0043)

(45) In the invention in Claim 45, if two or more sensor-side light-emitting means are provided on the sensor-side optical device component, the base-side optical device component is furnished with as many base-side light-receiving means as there are sensor-side light-emitting means.

(0044)

Consequently, by transmitting vital sign information using a plurality of sensor-side light-emitting means, it is possible to transmit efficiently. It is also possible to distinguish between the roles performed by the light-emitting means, e.g. with one means used to transmit vital sign information and another means used to transmit information used to check a checksum or the like. Furthermore, when using sensor-side light-emitting means of various kinds, such as an infrared LED and a green LED, the manner of use can be adjusted according to the properties of each respective means.

(0045)

(46) In the invention in Claim 46, a plurality of pairs of light-emitting means and light-receiving means are provided on the sensor-side optical device component and the base-side optical device component, and transmission of vital sign information is performed using the plurality of pairs of light-emitting means and light-receiving means.

(0046)

An example of how to provide a plurality of light-emitting means and light-receiving means is to provide a first light-emitting means on the optical vital sensor and a corresponding first light-receiving means on the base device, and to provide a second light-emitting means on the optical vital sensor and a corresponding second light-receiving means on the base device.

(0047)

(47) In the invention in Claim 47, a plurality of pairs of light-emitting means and light-receiving means are provided on the sensor-side optical device component and the base-side optical device component, and each of the plurality of pairs of light-emitting means and light-receiving means are used separately to perform transmission of vital sign information and transmission of check information for checking the transmitted vital sign information.

(0048)

An example of providing a plurality of light-emitting means and light-receiving means is a case in which a first light-emitting means is provided on the optical vital sensor (to transmit vital sign information) and a corresponding first light-receiving means is provided on the base device, while a second light-emitting means (to transmit checksum information or the like) is provided on the optical vital sensor and a corresponding second light-receiving means is provided on the base device.

(0049)

(48) The invention in Claim 48 is a sensor communication method for communication between the optical vital sensor and base device, wherein vital sign information is transmitted to the base-side light-receiving means using the sensor-side light-emitting means.

(0050)

(49) In the invention in Claim 49, vital sign information is transmitted from the optical vital sensor to the base device when the optical vital sensor is mounted onto the base device.

(50) In the invention in Claim 50, vital sign information is transmitted from the optical vital sensor to the base device when a

JP 2006-296564 A 11.2.2006

(11)

designated command signal (a signal requesting the transmission of vital sign information) is transmitted from the base device to the optical vital sensor.

(0051)

(51) In the invention in Claim 51, the optical vital sensor is placed in standby mode when the optical vital sensor is mounted onto the base device, and vital sign information is transmitted from the optical vital sensor to the base device when a command signal is received from the base device.

(0052)

(52) In the invention in Claim 52, in the event that the optical vital sensor has been placed in standby mode by means of the mode-switching switch, vital sign information is transmitted from the optical vital sensor to the base device when a signal requesting a command signal is transmitted from the optical vital sensor to the base device and a command signal is then received from the base device.

(0053)

(53) In the invention in Claim 53, in the event that the optical vital sensor has been placed in standby mode by means of the mode-switching switch, vital sign information is transmitted from the optical vital sensor to the base device when a command signal is received from the aforesaid base device.

(Preferred embodiments of the invention)

(0054)

Preferred embodiments of the invention (embodiment examples) will be described below together with drawings.

(Embodiment example 1)

(0055)

Below is a description of an optical vital sensor, base device, vital sign information gather system, and sensor communication method that are capable of sensing a subject's vital sign information such as pulse, and transmitting this information to a base device.

(0056)

a) First, the optical vital sensor of this embodiment example will be described.

As shown in FIG. 1, the optical vital sensor is a pulse sensor 1 that is able to sense the pulse, etc. by being attached, for example, to a person's finger or wrist.

(0057)

This pulse sensor 1 is a known optical reflective sensor consisting of a box-shaped sensor unit 3 and a flexible annular wristband 5 (connected to the sensor unit 3).

On the top surface of the sensor unit 3 is a display 7 and a control switch 9, while on the rear surface is a sensor-side (S-side) optical device component 11 for optically sensing the pulse, etc.

On either the left or right side of the sensor unit 3 (the direction perpendicular to the wristband 5) are provided a pair of S-side charging terminals 13, 15 for charging the sensor unit 3 and an S-side contact-detecting terminal 19 for sensing when the sensor unit 3 has been mounted onto the base device 17 (see FIG. 3). Note that the aforesaid control switch 9 is a switch that can be switched between three positions: power on, power off, and start pulse measurement.

(0058)

As shown in FIG. 2, the pulse sensor 1 is comprised of a pair of light-emitting elements, i.e. a green light-emitting diode (S-side green LED) 21 and an infrared light-emitting diode (S-side infrared LED) 23, a single photodiode (S-side PD) 25 that receives the reflected light from these, and an S-side lens 27.

(0059)

Among these, the basic function of the S-side green LED 21 is to sense the pulse from the light reflected off of the body (i.e. change in the amount of hemoglobin in the capillary artery), while the S-side infrared LED 23 serves to sense body motion from the change in this reflected light.

(0060)

b) Next, the base device 17 of this embodiment example will be described.

As schematically shown in FIG. 3, the base device 17 is a charger with communication functionality that is used when the pulse sensor 1 is mounted, and is comprised of a basal component 31 onto which the pulse sensor 1 is placed and a flat upright component 33 mounted vertically at an angle from the basal component 31.

(0061)

On the top surface of the basal component 31 of the base device 17, as shown in FIG. 4, are the counterparts to the charging terminals 13, 15 and S-side contact-sensing terminal 19 on the pulse sensor 1, namely base-side (B-side) charging terminals 35, 37 that serve to charge the pulse sensor 1, and a B-side contact-sensing terminal 39 that contacts the S-side contact-sensing terminal 19. Note that the B-side charging terminals 35, 37 and the B-side contact-sensing terminal 39 are impelled upwards by a spring (not shown in the drawing) enabling upward and downward movement thereof.

(0062)

To return to the aforesaid FIG. 3, a similar B-side optical device component 41 is provided corresponding to the S-side optical device component 11 of the pulse sensor 1. In short, the B-side optical device component 41 is comprised of a B-side infrared LED 43, B-side PD 45, and B-side lens 47, with the B-side PD 45 being positioned opposite the S-side infrared LED 23, and the B-side infrared LED 43 being positioned opposite the S-side PD 25.

(0063)

Furthermore, as shown in FIG. 5 (b), a groove-shaped basal fitting recess 51 is provided on the basal portion 31 of the base device 17, its shape corresponding to the base of the pulse sensor 1 so as to fit the pulse sensor 1, thereby enabling the pulse sensor 1 to be moved in the fitting direction into the basal fitting recess 51 without misalignment.

(0064)

Furthermore, as shown in FIG. 5 (a), a lateral fitting recess 53 is provided on the mounting side of the pulse sensor 1 of the upright component 33 (downward in the drawing), its shape corresponding to the external shape of the pulse sensor 1, and a central recess 55 is provided in the center of this lateral fitting recess 53, i.e. in a location corresponding to the S-side optical device component 11 and the B-side optical device component 41.

(0065)

Furthermore, as shown in FIG. 6, the wristband 5 of the pulse sensor 1 is positioned in such a way as to fit around the outside of the upright component 33 of the base device 17. If a post 57 is provided on the rear side of the upright component 33 (top of FIG. 6 (b)), the wristband 5 is positioned in such a way as to fit around the outside of the upright component 33 and the post 57. Note that the depth of the aforesaid basal fitting recess 51 should be set in such a way as to ensure that the wristband 5 does not touch the surface of the basal component 31 when the pulse sensor 1 is fitted around the outside of the upright component 33, etc.

(0066)

c) Next, the electrical structure of the vital sign information gathering system comprised of the aforesaid pulse sensor 1 and base device 17 will be described.

The vital sign information gathering system of this embodiment example is comprised of a base device 17 and a pulse sensor 1 mounted onto (placed on) the base device 17.

When the pulse sensor 1 is mounted, the S-side optical device component 11 and the B-side optical device component 41 are brought into close proximity opposite one another, by which means the S-side infrared LED 23 and the B-side PD 45 are made to face one another, and the S-side PS 25 and B-side infrared LED 43 are made to face one another. Simultaneously, the S-side contact-sensing terminal 19 and the B-side contact-sensing terminal 39 come into contact with one another. Note that the S-side charging terminals 13, 15 and B-side charging terminals 35, 37 are also brought into contact with one another.

(0067)

In this vital sign information gathering system, the pulse sensor 1 senses the pulse, etc., and outputs information about the pulse, etc. to the base device 17 by means of the S-side optical device component 11, while the base device 17 receives the information transmitted from the pulse sensor 1 by means of the B-side optical device component 41. Note that the base device 17 is connected to a PC 59, and information transmitted from the pulse sensor 1 is downloaded to the PC 59 via the base device 17. This will be explained in detail below.

(0068)

• The aforesaid pulse sensor 1 is comprised of a CPU 61 that controls the pulse sensor 1; a memory 63 that stores information on sensed pulse, etc.; the aforesaid S-side contact-sensing terminal 19; the aforesaid S-side infrared LED 23; the aforesaid S-side green LED 21; an S-side LED drive circuit 65 that drives the S-side infrared LED 23 and the S-side green LED 21; the aforesaid S-side PD 25; an S-side amplification circuit 67 that amplifies the signal input from the S-side PD 25;

an S-side comparison circuit 69 that generates a digital signal by comparing the analog signal input from the S-side amplification signal 67 with a reference voltage; and an S-side reference voltage circuit 71 that generates a reference voltage.

(0069)

The aforesaid CPU 61 performs the controls necessary to sense pulse, body motion, etc. while in measurement mode. In short, [the CPU 61] drives the S-side drive circuit 65, controls the S-side infrared LED 23 and the S-side green LED 21, performs the processing to sense pulse, body motion, etc. from the signal received by the S-side PD 25, and temporarily stores the analysis data in the memory 63. Note that the digital signal converted by the S-side comparison circuit 69 is input to the CPU 61.

(0070)

The CPU 61 also performs the controls necessary to transmit information about pulse, etc. to the base device 17 while in transmission mode. In short, [the CPU 61] drives the S-side drive circuit 65, controls the S-side infrared LED 23, and transmits an optical signal containing the information stored in the memory 63 to the base device 17.

(0071)

• The aforesaid base device 17 is comprised of a B-side contact-sensing terminal 39 that transmits a signal (contact sensed signal indicating that contact has been made) upon contacting the S-side contact-sensing terminal 19; contact sensed signal circuit 73 that generates the contact sensed signal transmitted to the B-side contact-sensing terminal 39; the aforesaid B-side PD 45; B-side amplification circuit 75 that amplifies the signal input from the B-side PD 45; B-side comparison circuit 77 that generates a digital signal by comparing the analog signal input from the B-side amplification signal 75 with a reference voltage; B-side reference voltage circuit 79 that generates a reference voltage; the aforesaid B-side infrared LED 43; B-side LED drive circuit 81 that drives the B-side infrared LED 43; and serial interface 83 that outputs the control signal of the B-side LED drive circuit 81 and inputs the signal from the B-side comparison circuit 77.

(0072)

d) Next, the controls of this embodiment example will be described.

Here, the controls performed by the pulse sensor 1 will be described based on the flowchart in FIG. 8.

(0073)

First, in step (S) 100, a determination is made as to whether or not the pulse sensor 1 and the base device 17 have been connected. In short, a determination is made as to whether or not the S-side contact-sensing terminal 19 and the B-side contact-sensing terminal 39 are in contact, and consequently a contact sensed signal has been input from the B-side contact sensing terminal 39 to the S-side contact-sensing terminal 19. In the event of a positive judgment at this point, processing proceeds to S110, whereas in the event of a negative judgment, this determination is performed again.

(0074)

In S110, because the pulse sensor 1 has been connected to the base device 17, the control mode of the CPU 61 is switched from measurement mode to transmission mode.

In the ensuing S120, in transmission mode, data stored in the memory 63, such as pulse, is transmitted to the base device 17. In short, data is downloaded, thereby concluding this process.

(0075)

In short, by means of these controls, when the pulse sensor 1 is mounted onto the base device 17, information about pulse, etc. is automatically transmitted from the pulse sensor 1 to the base device 17.

The base device 17, meanwhile, upon receiving the information transmitted from the pulse sensor 1, transmits this information to the PC 59.

(0076)

e) Thus, in this embodiment example, in the event that the pulse sensor 1 senses that the pulse sensor 1 has been mounted onto the base device 17 by reason of the fact that the B-side contact-sensing terminal 39 and the S-side contact-sensing terminal 19 are in contact, vital sign information stored in the memory 63, such as pulse and body motion, is transmitted to the base device 17 using the S-side infrared LED 23 of the pulse sensor 1 and the B-side PD 45 of the base device 17.

(0077)

As a result, there is no need to use a special wireless communication circuit or a communication cable as previously, which

JP 2006-296564 A 11.2.2006

(14)

makes it possible to transmit vital sign information to the base device 17 accurately, easily, and without malfunction. Hence, the PC 59 is able to obtain vital sign information by downloading it from the base device 17.

(EMBODIMENT EXAMPLE 2)

(0078)

Next, Embodiment Example 2 will be described, omitting aspects identical to the above-described Embodiment Example 1.

For this embodiment example, the controls differ from those of the above-described Embodiment Example 1, so the controls will be described. Note that identical hardware components are referenced using the same numbers.

(0079)

A shown in the flowchart in FIG. 9, in this embodiment example, first, in step S200, a determination is made as to whether or not the pulse sensor 1 and the base device 17 are connected. In the event of a positive result, processing proceeds to S210, whereas in the event of a negative result, this determination is repeated.

(0080)

In S210, the control mode of the CPU 61 is switched to download standby mode. This download standby mode is a mode in which [the CPU 61] waits to perform downloading until the signal to start downloading (download start command) is input.

(0081)

In the ensuing S220, a determination is made as to whether or not the download start command has been received from the base device 17. In the event of a positive result, processing proceeds to S230, whereas in the event of a negative result, this determination is repeated.

In S230, the control mode of the CPU 61 is switched to transmission mode because the download start command was received.

(0082)

In S240, data is downloaded, thereby concluding this process.

In short, by means of these controls, the mode is switched to download standby mode when the pulse sensor 1 is mounted onto the base device 17, and information, such as pulse, is transmitted from the pulse sensor 1 to the base device 17 when a download start command is input from the base device 17.

(0083)

This embodiment example provides the same effect as the above-described Embodiment Example 1.

(EMBODIMENT EXAMPLE 3)

(0084)

Next, Embodiment Example 3 will be described, omitting aspects identical to the above-described Embodiment Example 1.

For this embodiment example, the structure and controls of the pulse sensor differ from those of the above-described Embodiment Example 1, so differences in the structure and controls will be described.

(0085)

As shown in FIG. 10, the pulse sensor 91 in this embodiment example is comprised of a power switch 93 that turns power on/off, and a mode-switching switch 95 that switches the control mode between measurement mode and download standby mode.

(0086)

As shown in the flowchart in FIG. 11, first, in S300, a determination is made as to whether or not the mode-switching switch 95 is set to download standby mode. In the event of a positive result, processing proceeds to S310, whereas in the event of a negative result, processing proceeds to S320.

(0087)

In S310, because the mode-switching switch 95 is set to download standby mode, the control mode of the CPU 61 is set to download standby mode.

In contrast, in S320, the control mode is set to measurement mode.

(0088)

During the aforesaid download standby mode, as shown in the flowchart in FIG. 12, in S400, a download start request signal is transmitted from the pulse sensor 1 to the base device 17 to request a download start command.

(0089)

JP 2006-296564 A 11.2.2006

(15)

In the ensuing S410, a determination is made as to whether or not the pulse sensor 1 has received a download start command. In the event of a positive result, processing proceeds to S420, whereas in the event of a negative result, processing returns to the aforesaid S400.

In S420, since a download start command has been received, the control mode of the CPU 61 is switched to transmission mode.

(0090)

In S430, data is downloaded, thereby concluding this process.

In short, by means of these controls, if the mode-switching switch 95 of the pulse sensor 91 is operated and the mode is switched to download standby mode, a request to send a download start command is sent to the base device 17. Upon input of a download start command from the base device 17, information, such as pulse, is transmitted from the pulse sensor 91 to the base device 17.

(0091)

This embodiment example provides the same effect as the above-described Embodiment Example 1.

(EMBODIMENT EXAMPLE 4)

(0092)

Next, Embodiment Example 4 will be described, omitting aspects identical to the above-described Embodiment Example 1.

For this embodiment example, the controls differ from those of the above-described Embodiment Example 3, so the controls will be described.

(0093)

As shown in the flowchart in FIG. 13, first, in S500, a determination is made as to whether or not the mode-switching switch 95 is set to download standby mode. In the event of a positive result, processing proceeds to S510, whereas in the event of a negative result, processing proceeds to S520.

(0094)

In S510, because the mode-switching switch 95 is set to download standby mode, the control mode of the CPU 61 is switched to download standby mode.

In contrast, in S520, the control mode is switched to measurement mode.

(0095)

During the aforesaid download standby mode, as shown in the flowchart in FIG. 14, in S600, a determination is made as to whether or not a download start signal has been received from the base device 17. In the event of a positive result, processing proceeds to S610, whereas in the event of a negative result, the same determination is repeated.

(0096)

In S610, because a download start command was received, the control mode of the CPU 61 is switched to transmission mode.

In S620, data is downloaded, thereby concluding this process.

(0097)

In short, by means of these controls, if the mode-switching switch 95 of the pulse sensor 91 is operated and the mode is switched to download standby mode, upon input of a download start command from the base device 17, information, such as pulse, is transmitted from the pulse sensor 91 to the base device 17.

(0098)

This embodiment example provides the same effect as the above-described Embodiment Example 1.

(EMBODIMENT EXAMPLE 5)

(0099)

Next, Embodiment Example 5 will be described, omitting aspects identical to the above-described Embodiment Example 1.

In this embodiment example, the S-side and B-side optical device component differs from that in the above-described Embodiment Example 1.

As shown in FIG. 15, in this embodiment example, the lens 101 of the base device B-side optical device component is concave, whereas the corresponding lens 103 of the pulse sensor S-side optical device component is convex.

(0100)

In short, the concave-convex shapes of the lens 101 of the B-side optical device component and the lens 103 of the S-side optical device component are designed to fit flush against one another.

This ensures that the pulse sensor can be mounted onto the base device without misalignment. In particular, adjacently positioning the lens 101 of the B-side optical device component and the lens 103 of the S-side optical device component in the

(16)

appropriate location eliminates the effects of noise and thereby ensures good data transmission.

(EMBODIMENT EXAMPLE 6)

(0101)

Next, Embodiment Example 6 will be described, omitting aspects identical to the above-described Embodiment Example 1.

In this embodiment example, the B-side optical device component differs from that of the above-described Embodiment Example 1.

As shown in FIG. 16, in this embodiment example, a visible light-blocking film 115 is placed between the lens 113 and the B-side PD 115 of the base device B-side optical device component 111.

(0102)

This makes it possible to block noise from visible light when sending or receiving data using infrared light.

(EMBODIMENT EXAMPLE 7)

(0103)

Next, Embodiment Example 7 will be described, omitting aspects identical to the above-described Embodiment Example 1.

In this embodiment example, the S-side and B-side optical device component differs from that of the above-described Embodiment Example 1.

As shown in FIG. 17, in this embodiment example, a flat, transparent cover 123 is placed on the surface of the pulse sensor's S-side optical device component 121 (on the right in the drawing), and a lens 127 is placed between the cover 123 and the S-side infrared LED 125.

(0104)

Additionally, a flat, transparent cover 131 is placed on the surface of the base device's B-side optical device component 129 (on the left in the drawing), and a lens 135 is placed between the cover 131 and the B-side infrared LED 133.

(0105)

Although here a visible light-blocking film 139 is placed between the cover 131 and the B-side PD 137, it is acceptable to instead place the visible light-blocking film on the covers 123, 131, or to use covers 123, 131 that themselves have the ability to block visible light.

(0106)

Consequently, this makes it possible to block noise from visible light when transmitting or receiving data using infrared light. Another advantage is that, because the surface of the covers 123, 131 is flat, the surface is less prone to scratches than when the lens protrudes.

(EMBODIMENT EXAMPLE 8)

(0107)

Next, Embodiment Example 8 will be described, omitting aspects identical to the above-described Embodiment Example 1.

In this embodiment example, the S-side and B-side optical device component differs from that of the above-described Embodiment Example 1.

As shown in FIG. 18, in this embodiment example, the cover 141 of the base device's B-side optical device component is concave, and the opposing cover 143 of the pulse sensor's S-side optical device component is convex.

(0108)

In short, the concave-convex shapes of the cover 141 of the B-side optical device component and the cover 143 of the S-side optical device component are designed to fit flush against one another.

This ensures that the pulse sensor can be mounted onto the base device without misalignment. In particular, adjacently positioning the cover 141 of the B-side optical device component and the cover 143 of the S-side optical device component in the appropriate location eliminates the effects of noise and thereby ensures good data transmission.

(EMBODIMENT EXAMPLE 9)

(0109)

Next, Embodiment Example 9 will be described, omitting aspects identical to the above-described Embodiment Example 1.

In this embodiment example, the S-side and B-side optical device component differs from that of the above-described Embodiment Example 1.

As shown in FIG. 19, in this embodiment example, a pair of B-side PD 155, 157 are placed on the B-side optical device component 153 of the base device 151.

(0110)

JP 2006-296564 A 11.2.2006

(17)

In short, one B-side PD 155 is positioned opposite the S-side infrared LED 163 of the S-side optical device component 161 of the pulse sensor 159, while the other B-side PD 157 is positioned opposite the S-side green LED 165.

(0111)

Consequently, in this embodiment example, the presence of two pairs of light-emitting and light-receiving elements makes it possible to efficiently transmit information.

Note that the accuracy of data can be increased by transmitting and receiving a checksum signal using, for example, the S-side green LED 165 and the other B-side PD 157.

(EMBODIMENT EXAMPLE 10)

(0112)

Next, Embodiment Example 10 will be described, omitting aspects identical to the above-described Embodiment Example 1.

In this embodiment example, the manner in which the pulse sensor is mounted onto the base device differs from that in the above-described Embodiment Example 1.

As shown in FIG. 20, in this embodiment example, a recessed portion 173 is provided on the flat base device 171 so that the pulse sensor 175 can be placed level in this recessed portion 173.

(0113)

In this case, information is transmitted and received between a B-side optical device component 177 housed within the recessed portion 173 and an S-side optical device component 179 located on the underside of the pulse sensor 175.

(EMBODIMENT EXAMPLE 11)

(0114)

Next, Embodiment Example 11 will be described, omitting aspects identical to the above-described Embodiment Example 1.

In this embodiment example, the manner in which the pulse sensor is mounted onto the base device differs from that in the above-described Embodiment Example 1.

As shown in FIG. 21, in this embodiment example, the base device 18 is comprised of a disc-shaped basal component 183 with an angled top face and a cylindrical upright component 185 standing upright from the top of the basal component 183.

(0115)

At the base of the upright component 185 on the top face of the basal component 183, a basal fitting recess 189 is provided to fit the pulse sensor unit 187.

Furthermore, the aforesaid basal fitting recess 189 is tilted slightly towards the upright component 185, and its depth is set such that, when the wristband 191 is fitted around the upright component 185, the wristband 191 will not become kinked in the vertical direction.

(0116)

Consequently, when the wristband 191 is fitted around the upright component 185 and the pulse sensor unit 187 is fitted into the basal fitting recess 189, the S-side and B-side optical device components (not shown in the drawing) will be positioned in such a way as to maintain the proper distance at all times.

(0117)

It goes without saying that the present invention is by no means limited to the above-described embodiment examples, and may be embodied in any of various forms as long as these do not deviate from the scope of the present invention.

(1) For example, the pulse sensor may be configured to retain signals in memory after they have been obtained by measurement, and transmit this data to the base device. Additionally, the base device need not be connected to a PC as long as the base device is furnished with the functionality that would otherwise be performed by a PC.

(0118)

(2) Additionally, data may be transmitted using any kid of LED, not limited to infrared LED.

(BRIEF DESCRIPTION OF THE DRAWINGS)

(0119)

(FIG. 1) Perspective view showing the pulse sensor in Embodiment Example 1.

(FIG. 2) Diagram showing how the pulse sensor in Embodiment Example 1 measures pulse.

(FIG. 3) Diagram showing the configuration of the vital sign information gathering system in Embodiment Example 1.

(FIG. 4) Diagram showing how the terminals are connected in the vital sign information gathering system in Embodiment Example 1.

(FIG. 5) Diagram showing how the pulse sensor in Embodiment Example 1 is mounted onto the base device.

Appx03288

JP 2006-296564 A 11.2.2006

(18)

(FIG. 6) Diagram showing how the pulse sensor equipped with a band in Embodiment Example 1 is mounted onto the base device.

(FIG. 7) Block diagram showing the electrical configuration of the vital sign information gathering system in Embodiment Example 1.

(FIG. 8) Flowchart showing the processing of the pulse sensor in Embodiment Example 1.

(FIG. 9) Flowchart showing the processing of the pulse sensor in Embodiment Example 2.

(FIG. 10) Diagram showing the configuration of the pulse sensor in Embodiment Example 3.

(FIG. 11) Flowchart showing the main processing of the pulse sensor in Embodiment Example 3.

(FIG. 12) Flowchart showing the standby mode processing of the pulse sensor in Embodiment Example 3.

(FIG. 13) Flowchart showing the main processing of the pulse sensor in Embodiment Example 4.

(FIG. 14) Flowchart showing the standby mode processing of the pulse sensor in Embodiment Example 4.

(FIG. 15) Diagram showing the pulse sensor and base device optical device component in Embodiment Example 5.

(FIG. 16) Diagram showing the pulse sensor and base device optical device component in Embodiment Example 6.

(FIG. 17) Diagram showing the pulse sensor and base device optical device component in Embodiment Example 7.

(FIG. 18) Diagram showing the pulse sensor and base device optical device component in Embodiment Example 8.

(FIG. 19) Diagram showing the configuration of the vital sign information gathering system in Embodiment Example 9.

(FIG. 20) Diagram showing the configuration of the vital sign information gathering system in Embodiment Example 10.

(FIG. 21) Diagram showing the configuration of the vital sign information gathering system in Embodiment Example 11.

(DESCRIPTION OF REFERENCES)

(0120)

| | |
|---|---|
| 1, 91, 159, 175: | Pulse sensor |
| 17, 151, 171, 181: | Base device |
| 21, 165: | S-side green LED |
| 23, 125, 163: | S-side infrared LED |
| 25: | S-side PD |
| 43, 133: | B-side infrared LED |
| 45, 115, 137, 155, 157: | B-side PD |
| 11, 121, 161, 179: | S-side optical device component |
| 41, 111, 129, 153, 177: | B-side optical device component |
| 31, 183: | Basal component |
| 33, 185: | Upright component |
| 19: | S-side contact-sensing terminal |
| 39: | B-side contact-sensing terminal |

Appx03289

JP 2006-296564 A 11.2.2006

(19)

(FIG. 1)



(FIG. 3)



(FIG. 2)



(FIG. 4)



(FIG. 5)



Appx03290

JP 2006-296564 A 11.2.2006

(20)

(FIG. 6)



(FIG. 7)



(FIG. 8)

(FIG. 9)



**Appx03291**

JP 2006-296564 A 11.2.2006

(21)



(FIG. 10)

(FIG. 11)

(FIG. 12)

(FIG. 13)

(FIG. 14)

(FIG. 15)

(FIG. 16)

JP 2006-296564 A 11.2.2006

(22)

(FIG. 17)



(FIG. 18)

(a)



(b)

(c)

(FIG. 19)



(FIG. 20)



(FIG. 21)

(a)



(b)



22

**Appx03293**

JP 2006-296564 A 11.2.2006

(23)

---

Continued from the front page

(72) Inventor      TOSHIYUKI MORISHITA
                   % Denso Corporation, 1 Showa-cho 1-chome, Kariya-shi, Aichi-ken
F terms (reference) 4C017  AA09   AB02   AB08   AC26   BB12   BC11

**Appx03294**

I, Benjamin Ettinger, hereby certify that I am competent to translate from Japanese to English and that the attached translation is, to the best of my knowledge and belief, a true and accurate translation of the following documents from Japanese to English:

JP 2006-296564 ("Inokawa")"

I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true, and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code.


_____Benjamin Ettinger_____
Printed Name

_____1933 East 41st Ave #413, Vancouver, BC V5P 4Y4, Canada_____
Address

_____778-386-0558_____
Phone

Signature



US008177720B2

(12) **United States Patent**
Nanba et al.

(10) **Patent No.:** **US 8,177,720 B2**
(45) **Date of Patent:** **May 15, 2012**

(54) **APPARATUS FOR DETECTING VITAL FUNCTIONS, CONTROL UNIT AND PULSE WAVE SENSOR**

(75) Inventors: **Shinji Nanba**, Kariya (JP); **Toshiaki Shiomi**, Nagoya (JP)

(73) Assignees: **DENSO CORPORATION**, Kariya (JP); **Toshiaki Shiomi**, Nagoya (JP)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1342 days.

(21) Appl. No.: **11/802,607**

(22) Filed: **May 24, 2007**

(65) **Prior Publication Data**

US 2007/0282227 A1    Dec. 6, 2007

(30) **Foreign Application Priority Data**

May 31, 2006    (JP) ................................ 2006-152354

(51) **Int. Cl.**
*A61B 5/02* (2006.01)

(52) **U.S. Cl.** ....................................... **600/483**; 600/484

(58) **Field of Classification Search** .................. 600/483, 600/486, 500–504
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 5,005,581 A | 4/1991 | Honeyager |
| 5,704,367 A | 1/1998 | Ishikawa et al. |
| 5,899,927 A | 5/1999 | Ecker et al. |
| 6,083,157 A | 7/2000 | Noller |
| 6,605,045 B2 | 8/2003 | Ohsaki et al. |
| 6,669,632 B2 | 12/2003 | Nanba et al. |

| | | |
|---|---|---|
| 6,856,829 B2 | 2/2005 | Ohsaki et al. |
| 2002/0183627 A1 * | 12/2002 | Nishii et al. ................... 600/485 |
| 2004/0162499 A1 | 8/2004 | Nagai et al. |
| 2006/0074334 A1 | 4/2006 | Coyle |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| JP | A-7-000376 | 1/1995 |
| JP | A-8-173403 | 7/1996 |
| JP | A-9-098964 | 4/1997 |
| JP | A-2003-000552 | 1/2003 |
| JP | A-2003-038460 | 2/2003 |
| JP | A-2005-199078 | 7/2005 |

OTHER PUBLICATIONS

Office Action dated Aug. 15, 2008 from Chinese Patent Office in corresponding CN Patent Application No. 200710108768.0 (and English Translation).
Office Action mailed on Jul. 5, 2011 in the corresponding Japanese Patent application No. 2006-152354 (English translation enclosed).

* cited by examiner

*Primary Examiner* — Miranda Le
*Assistant Examiner* — Tho Tran
(74) *Attorney, Agent, or Firm* — Posz Law Group, PLC

(57) **ABSTRACT**

An apparatus for detecting vital functions has a pulse wave sensor attachable to a body and a control unit. The control unit checks if amplitude of pulse wave signals produced from the pulse wave sensor varies. The control unit further checks if a large change in the amplitude during a systolic phase of a pulse wave corresponding to the systolic phase of the heart. If a first large change in the amplitude during a diastolic phase of a pulse wave corresponding to the diastolic phase of the heart, it is highly probable that a motion artifact has occurred. Therefore, a motion artifact flag is set. Next, it is checked if the amplitude in the next diastole is changing by more than 30%. if it is presumed that the occurrence of cough is highly probable, a cough flag is set. if it is neither the motion artifact nor the cough, then a yawn flag is set.

**26 Claims, 10 Drawing Sheets**



APPLE 1010

## FIG. 1A



## FIG. 1B



## FIG. 2A



## FIG. 2B

## FIG. 3A

MOTION ARTIFACT



## FIG. 3B



FIG. 4E

FIG. 4F

FIG. 4C

FIG. 4D

FIG. 4A

FIG. 4B



FIG. 5A

FIG. 5B



FIG. 6E



FIG. 6F



FIG. 6C



FIG. 6D



FIG. 6A



FIG. 6B

Appx03318



FIG. 7A

FIG. 7B



# FIG. 9



# FIG. 10





FIG. 11

START

FORM BASE LEVEL — S300

S310
FLUCTUATION OF BASE LEVEL?
NO
YES

S320
PERIODIC FLUCTUATION?
YES
NO

SET COUGH FLAG S3 — S330

SET BLOOD VESSEL MOTION FLAG K1 — S340

SINGLE-SHOT FLUCTUATION AND WITHIN PREDETERMINED PERIOD? — S330
NO
YES

SET MOTION ARTIFACT FLAG T3 — S350

SET YAWN FLAG A3 — S360

END



FIG. 12

START

DETERMINE COMPREHENSIVELY BODY CONDITION BASED ON FLAGS — S400

CONTROL ACTUATORS BASED ON DETERMINATION RESULT — S410

END

US 8,177,720 B2

1

# APPARATUS FOR DETECTING VITAL FUNCTIONS, CONTROL UNIT AND PULSE WAVE SENSOR

## CROSS REFERENCE TO RELATED APPLICATION

This application is based on and incorporates herein by reference Japanese Patent Application No. 2006-152354 filed on May 31, 2006.

## FIELD OF THE INVENTION

This invention relates to a device for detecting vital functions, that is, biometric conditions, such as cough and yawn by using a pulse wave sensor that is easy to mount.

## BACKGROUND OF THE INVENTION

A nasal thermistor, a nasal pressure sensor, a chest-band sensor and the like are respiratory system monitors for detecting breathing (respiration), cough and yawn.

As for measuring, for example, the cough, various devices using a spiro-breathing flow meter (patent document 1), signals of the thyroid (patent document 2) and vibration of a catheter (patent document 3). These measuring devices and measuring methods are so complicated that the cough and the like cannot be easily measured in private homes or vehicles.

As simpler technologies, it is proposed to use a pattern of voice signals detected by a microphone (patent document 4) or voice signals and a sound pressure level detected by a microphone (patent document 5). The accuracy of detection is low due to noise, and it is difficult to specify the source of sound when there is a plurality of persons.

It is also proposed to use a camera image of a nose (patent document 6) or variation in a bed load (patent document 7). In case of using the image, the image is taken at a particular position imposing limitation on the position for taking a measurement. Besides, a person puts his or her hand to a mouth when coughing. Therefore, the hand becomes a blind which lowers the accuracy of detection. In case of using the bed load, the motion artifact such as body motion cannot be separated from the cough.

As a method of detecting yawn, further, it is proposed to use a camera image or voice (patent document 8). This method requires a complicated measuring device. It is also proposed to detect respiration conditions by analyzing pulse waves (patent documents 9 to 11).

[Patent document 1] JP-A-8-173403
[Patent document 2] JP-A-9-98964
[Patent document 3] JP-T-11-506380 (U.S. Pat. No. 5,899,927)
[Patent document 4] JP-A-7-376
[Patent document 5] JP-A-2003-38460
[Patent document 6] JP-A-8-257015 (U.S. Pat. No. 5,704,367)
[Patent document 7] JP-A-2003-552
[Patent document 8] JP-A-2005-199078
[Patent document 9] JP-A-2002-355227 (U.S. Pat. No. 6,669,632)
[Patent document 10] JP-A-2002-78690 (U.S. Pat. No. 6,856,829)
[Patent document 11] JP-A-2002-153432 (U.S. Pat. No. 6,856,829)

## SUMMARY OF THE INVENTION

The present invention has an object of providing an apparatus for detecting vital functions such as cough and yawn

2

based on a simple method, a control unit therefor and a device for mounting a pulse wave sensor unit.

(1) According to a first aspect of the invention, it is determined that a motion artifact has occurred when the amplitude—during a diastolic phase of a pulse wave ("on p-diastole side" for short)—corresponding to the diastolic phase of the heart has exceeded a predetermined lower-limit level that corresponds to the lowest blood pressure.

Through experiments, it was confirmed that the motion artifact has occurred if the amplitude on p-diastole side falls below the lower-limit level as shown in FIG. 3A.

Namely, the minimum blood pressure (the diastolic blood pressure) is maintained by the elasticity of blood vessels, and it does not happen that the amplitude on p-diastole side suddenly becomes lower than the lower-limit level as observed based upon the pulse wave signals. If a signal of a pulse wave lower than the diastolic blood pressure appears, therefore, it is regarded that the motion artifact has occurred. In the diagram illustrating the pulse waves, the upper side is expressed to be the side of systole and the lower side is expressed to be the side of diastole for easy comprehension relative to the blood pressure (diagram which is usually called inverted pulse waves).

As the lower-limit level for determining the intensity on p-diastole side, for example, an approximated line can be employed that is found from a plurality of peaks on p-diastole side representing the diastolic blood pressure. However, values that are increased or decreased by a predetermined percentage may be selected as the lower-limit level.

(2) According to a second aspect of the invention, a respiration waveform (respiration curve) that represents the respiration condition is found from the pulse waves. It is determined that a cough has occurred when a double triangular wave of an acute angle is detected, in which two peaks of the respiration waveforms are consecutively exceeding a predetermined level.

If a cough occurs, a double triangular wave of an acute angle lower than a predetermined level (since the thoracic pressure has a negative sign, the respiration waveforms in the graph are expressed protruding downward) is observed within a short period of time (e.g., within 1 to 2 seconds) as shown in FIG. 5B due to the motion of muscles specific to coughing. Therefore, the above conditions are used for determining the coughing. Here, the double triangular wave of an acute angle has acute angles that are formed by the lines on the outer sides of the right and left peaks.

In case the amplitude of the respiration waveform has increased by more than, for example, 30% beyond the normal amplitude, it is probable that a coughing has occurred. Therefore, there may be added another determining condition, i.e., if the amplitude is greater than a predetermined level. Further, the predetermined level (or the predetermined period) used for the determination can be set by finding an optimum value through experiment (the same holds hereinafter).

(3) According to a third aspect of the invention, it is determined that a cough has occurred when the amplitude—during a systolic phase of a pulse wave ("on p-systole side" for short)—corresponding to the systolic phase of the heart has exceeded a predetermined level (predetermined level on p-systole side) and when the amplitude on p-diastole side corresponding to the succeeding diastolic phase of the heart has exceeded a predetermined level (predetermined level on p-diastole side).

If a cough has occurred, a peak of the pulse wave signal on p-systole side once greatly rises as shown in FIG. 5A and,

12

US 8,177,720 B2

3

immediately thereafter, the peak on p-diastole side greatly falls. Therefore, this condition is employed as a condition for determining the coughing.

(4) According to a fourth aspect of the invention, it is determined that a cough has occurred when the amplitude on p-systole side corresponding to the systolic phase of the heart has increased by more than a predetermined level (beyond, for example, the normal amplitude on p-systole side) without causing the waveform of the pulse waves to be varied (distorted or broken in shape) from the waveform of ordinary pulse waves.

If the couth has occurred as shown in FIG. **5**A, the amplitude on p-systole side rises without causing the pulse waves to vary. Therefore, this condition is employed as a condition for determining the coughing.

As a method of determining a case where the waveform of the pulse wave varies from the ordinary waveform, there can be employed, for example, a method of obtaining a correlation between the waveforms of pulse waves. For example, waveforms of several pulse waves in an ordinary state free of motion artifact or coughing are averaged to obtain a representative waveform of pulse waves, which is, then, recorded, while a correlation of a waveform of a wavelength of or a plurality of wavelengths is obtained relative to the pulse wave that is to be compared. If the correlation is, for example, not larger than 0.7, it can be so determined that the waveform of the pulse wave has varied. In addition to the correlation, there can be employed the analysis of peak-to-peak pitch variation of the pulse waves or the analysis of chaos.

(5) According to a fifth aspect of the invention, it is determined that a cough has occurred when a change in the ratio (AW**2**/BW**2**) of the amplitude (AW**2**) of the base level of a pulse wave/amplitude (BW**2**) of a pulse wave is within a predetermined level (e.g., a change is within 30% of when there is no motion artifact) and when the time of change is within a predetermined period (e.g., 1 to 2 seconds corresponding to the coughing).

The probability of coughing is high if the above condition is satisfied. Therefore, this condition is employed here as a condition for determining the coughing.

(6) According to a sixth aspect of the invention, it is more reliably determined that a coughing has occurred when a motion artifact is not detected than when the motion artifact is detected while determining the occurrence of coughing based on at least one cough determining method among the above cough determining methods.

The occurrence of coughing and the intensity of coughing can be determined more accurately when a plurality of cough determining methods are used in combination than when the cough determining method of any one of the above aspects is used.

(7) According to a seventh aspect of the invention, it is determined that a yawn has occurred when the base level of a pulse wave is lowered over a predetermined period corresponding to the yawning.

If a yawning has occurred, the base level of pulse waves is mildly lowered as shown in FIG. **7**A due to the motion of muscles specific to the yawning. Therefore, the base level of pulse waves remains lowered for a predetermined period (e.g., 4 to 12 seconds). Therefore, this condition is employed as a condition for determining the yawning.

As a case where the base level is lowered for a predetermined period, there can be employed a period in which the base level is in a lowered state or a period in which the base level is in a state lower than a certain determining value (period of the sum of being lowered and elevated).

4

(8) According to an eighth aspect of the invention, it is determined that a yawn has occurred when the amplitude of pulse waves has become smaller than a predetermined level (predetermined level for determining the amplitude of pulse waves) within a period in which the base level of pulse waves is lower than a predetermined level (predetermined level for determining the base level).

When the base level of pulse waves has increased from the lowered state as shown in FIG. **7**A, the amplitude of pulse waves (whole amplitude in the up-and-down direction) decreases due to the motion of muscles specific to the yawning. Therefore, this condition is employed as a condition for determination to further improve the accuracy of determination.

(9) According to a ninth aspect of the invention, it is determined that a yawn has occurred when the amplitude on p-systole side corresponding to the systolic phase of the heart exceeds a predetermined level (predetermined level on p-systole side) but the amplitude on p-diastole side corresponding to the diastolic phase of the heart does not become smaller than a predetermined level (predetermined level on p-diastole side).

If a yawn has occurred, a peak on p-systole side slightly increases as shown in FIG. **7**A due to the motion of muscles specific to the yawning. However, a peak of the pulse wave on the side of the expansion period immediately thereafter does not become lower than the normal value (the peak, usually, increases slightly). Therefore, this condition is employed as a condition for determining the yawning.

(10) According to a tenth aspect of the invention, it is determined that a yawn has occurred when the whole amplitude of pulse waves becomes smaller than a predetermined level (predetermined level for determining the whole amplitude) after the amplitude on p-systole side corresponding to the systolic phase of the heart has exceeded a predetermined level (predetermined level for determining the amplitude on p-systole side) without causing the waveform of pulse waves detected by a pulse wave sensor to be varied from the waveform of ordinary pulse waves.

When a yawn occurs as shown in FIG. **7**A, a peak on p-systole side slightly increases and, thereafter, the amplitude of pulse waves decreases without causing the pulse waves to be varied. Therefore, this condition is employed as a condition for determining the yawning.

(11) According to an eleventh aspect of the invention, a respiration waveform representing the respiration state is found from the pulse waves. It is determined that a yawn has occurred when the amplitude of the respiration waveform is not smaller than a predetermined level (predetermined angle for determining the amplitude) and when a double triangular wave of an obtuse angle is detected in which two peaks of the respiration waveform are consecutively exceeding a predetermined level (predetermined level for determining the peak).

If a yawn has occurred as shown in, for example, FIGS. **8**A to **8**C, a double triangular wave of an obtuse angle (of larger than a predetermined amplitude) occurs, in many cases, on the respiration waveform. Therefore, this condition is employed here as a condition for determining the yawning.

Here, the double triangular wave of an obtuse angle stands for a double triangular wave in which the angle formed by lines on the outer sides of the right and left peaks is an obtuse angle.

(12) According to a twelfth aspect of the invention, it is determined that a cough has occurred when a change in the ratio (AW**2**/BW**2**) of the amplitude (AW**2**) of the base level of a pulse wave/amplitude (BW**2**) of a pulse wave is not smaller

13

US 8,177,720 B2

5

6

than a predetermined level and when the time of change is within a predetermined period corresponding to the yawning.

As shown in FIG. 7, it was clarified that the probability of yawning is high when the change of the ratio (AW2/BW2) is not smaller than a predetermined level and when the time of change is within a predetermined period (e.g., 4 to 12 seconds) corresponding to the yawning. Therefore, this condition is employed here as a condition for determining the yawning.

(13) According to a thirteenth aspect of the invention, it is more reliably determined that a yawn has occurred when a motion artifact is not detected than when the motion artifact is detected while determining the occurrence of the yawn based on at least one yawn determining method among the above yawn determining methods.

The occurrence of yawning and the intensity of yawning can be more accurately determined when a plurality of yawn determining methods are used in combination than when the yawn determining methods of any one of the above aspects is used.

(14) A fourteenth aspect of the invention exemplifies preferred methods for determining the motion artifact.

Described below is another example of methods for determining the motion artifact.

It can be determined that the motion artifact has occurred in case the waveform of the pulse waves has varied from the waveform of the ordinary pulse waves.

That is, in case the motion artifact has occurred, vary of the pulse waves is observed as shown in FIG. 3A. If such a change is detected, therefore, it can be so determined that the motion artifact has occurred. The ordinary pulse waves are pulse waves in a calm state where there is no such changes as motion artifact, cough or yawn.

A respiration waveform (respiration curve) that represents the respiration state is found from the pulse waves. It is so determined that the motion artifact has occurred if the amplitude of the respiration waveform has changed by more than a predetermined level and if the waveform of a pulse wave has varied from the waveform of the ordinary pulse waves.

That is, in case the motion artifact has occurred, a change in the amplitude of the respiration waveform is observed as shown in FIG. 3B in addition to the vary of the waveforms. In case such a change is detected, it may be so determined that the motion artifact has occurred.

Here, as described in the above patent document 9, a first variation signal representing a varying state from the pulse wave is found, a second variation signal representing a varying state of the first variation signal is found, and the respiration waveform (respiration curve) is found based on a difference between the first variation signal and the second variation signal.

As the first variation signal as shown in FIG. 2, there can be employed a first envelope that connects the peaks of waveforms of signals of pulse waves or a first amplitude ratio line that connects the points dividing the amplitudes of waveforms of signals of pulse waves by a predetermined ratio. As the second variation signal, further, there can be employed a second envelope that connects the peaks of waveforms of the first variation signals or a second amplitude ratio line that connects the points dividing the amplitudes of waveforms of the first variation signals by a predetermined ratio.

It can be determined that a motion artifact has occurred when a ratio (AW2/BW2) of the amplitude (AW2) of the base level of a pulse wave/amplitude (BW2) of a pulse wave has changed by more than a predetermined level, the change being of a nature of a single-shot and when the time of change

is outside a predetermined period (shorter than, for example, 4 seconds or longer than, for example 12 seconds) that corresponds to the yawning.

Namely, as will be described later, when the ratio (AW2/BW2) of the amplitude (AW2) of the base level of a pulse wave/amplitude (BW2) of a pulse wave has changed by more than a predetermined level, it is probable that a yawning is occurring. However, when the change is of a nature of a single-shot and the period of change is different from the period of the case of yawning, it was clarified through experiments that the probability of motion artifact is high.

Whether the change is of a nature of a single-shot can be determined based on if the change has occurred only once within a preset period (e.g., 20 seconds).

Referring to FIG. 7A, further, the amplitude (AW2) of the base level of the pulse waves stands for a width of deviation from the center of the base level while the amplitude (BW2) of the pulse waves represents the whole width in the up-and-down direction of the pulse waves. As the amplitude of the base level of the pulse waves, however, there can be employed the hole amplitude in the up-and-down direction of the base level.

When it is determined by a plurality of motion artifact-determining methods that a motion artifact has occurred, it can be more reliably determined that the motion artifact has occurred than when it is not.

That is, the accuracy of determination can be more improved when a plurality of motion artifact determinations are combined together than when each of the above motion artifact determinations is used.

As described above in detail, the apparatus for detecting the conditions of a body of the second to fourteenth aspects detects the cough or yawn by utilizing signals obtained through a pulse wave sensor, i.e., easily detects the cough or yawn (or deep respiration) in private homes or vehicle compartments based on a method simpler than the conventional methods.

In the above aspects, the pulse waves can be measured from an arm or a finger in addition to the face by using the pulse wave sensor offering a distinguished effect of cleanly taking a monitoring at a portion kept away from the cough, spit or phlegm that could become a cause of infectious disease to the respiratory systems.

On account of each time of cough or yawn can be detected, it is allowed to find the number of coughs and yawns (to render a quantitative evaluation). Based on the number theory, therefore, it is also allowed to diagnose the degree of symptom such diseases as chronic bronchitis or whooping cough, or to detect the sign of sleepiness.

(15) According to a fifteenth aspect of the invention, when the occurrence of cough or yawn is determined by the above various methods for determining the cough or yawn (inclusive of definite cough determining method definite yawn determining method), various actuators are controlled such as adjusting the temperature and blow rate of an air conditioner, offering a guide by the navigation system or varying the state of the seat and the seat belt based upon the results of determination, for example, upon the symptoms so as to relax the coughing or to promote the recovery from the sleepiness.

That is, an alarm is produced as required, or the environment is controlled being linked to the air conditioner. Further, the disease is determined based on the determined results of coughing and yawning. If it is a cold, the temperature and humidity are suitably set. If it is an allergic rhinitis, the air in the compartment may be replaced with the fresh external air or an auxiliary filter may be operated. Further, the data of the

14

US 8,177,720 B2

7

determined results may be stored to be used for controlling the health and for the diagnosis by a doctor.

(16) In a sixteenth aspect of the invention, further, if a pulse wave sensor is of an optical type, a buffer member is arranged between the pulse wave sensor and the skin so that the optical device of the skin side does not come in contact with the skin or pushes the skin with a pressure which is not larger than a predetermined level.

This restricts the pulse wave sensor from pushing the skin with an excess of pressure, and the blood circulation is not restricted. Therefore, the measurement can be taken accurately.

(17) According to a seventeenth aspect of the invention, a sponge having a rugged pattern on the skin side may be used as the preferred buffer member.

(18) In an eighteenth aspect of the invention, if the pulse wave sensor is of the optical type, an elastic member may be arranged on the pulse wave sensor on the side opposite to the skin for mounting the pulse wave sensor on the surface of the body, so that the optical device pushes the skin with a pressure which is not larger than a predetermined level.

This prevents the pulse wave sensor from pushing the skin with an excess of pressure. Therefore, an excess of load is not given to the skin, the waveforms of pulses are not distorted, and the pulse waves can be accurately measured.

(19) A nineteenth aspect of the invention uses a band (for example, a rubber material or an expansible bandage) as a preferred elastic member for fixing the pulse wave sensor to the body.

(20) A twentieth aspect of the invention uses a member (for example, a spring or the like) as a preferred elastic member for fixing the pulse wave sensor to the body.

## BRIEF DESCRIPTION OF THE DRAWINGS

The above and other objects, features and advantages of the present invention will become more apparent from the following detailed description made with reference to the accompanying drawings. In the drawings:

FIG. 1A is a schematic diagram illustrating an apparatus for detecting the conditions of a body and a mounting device therefor according to an embodiment, and FIG. 1B is an enlarged schematic view illustrating a pulse wave sensor used in the embodiment;

FIG. 2A is a graph illustrating a waveform of pulse waves, and FIG. 2B is a graph illustrating a respiration waveform;

FIG. 3A is a graph illustrating a waveform of pulse waves of when there is a motion artifact, and FIG. 3B is a graph illustrating a respiration waveform of when there is a motion artifact;

FIG. 4A is a graph illustrating a waveform of pulse waves of when there is a strong motion artifact, FIG. 4B is a graph illustrating a respiration waveform of when there is a strong motion artifact, FIG. 4C is a graph illustrating a waveform of pulse waves of when there is a motion artifact of an intermediate degree, FIG. 4D is a graph illustrating a respiration waveform of when there is a motion artifact of an intermediate degree, FIG. 4E is a graph illustrating a waveform of pulse waves of when there is a weak motion artifact, and FIG. 4F is a graph illustrating a respiration waveform of when there is a weak motion artifact;

FIG. 5A is a graph illustrating a waveform of pulse waves of when a cough has occurred, and FIG. 5B is a graph illustrating a respiration waveform of when a cough has occurred;

FIG. 6A is a graph illustrating a waveform of pulse waves of when a strong cough has occurred, FIG. 6B is a graph illustrating a respiration waveform of when a strong cough

8

has occurred, FIG. 6C is a graph illustrating a waveform of pulse waves of when a cough of an intermediate degree has occurred, FIG. 6D is a graph illustrating a respiration waveform of when a cough of an intermediate degree has occurred, FIG. 6E is a graph illustrating a waveform of pulse waves of when a weak cough has occurred, and FIG. 6F is a graph illustrating a respiration waveform of when a weak cough has occurred;

FIG. 7A is a graph illustrating a waveform of pulse waves of when a yawn has occurred, and FIG. 7B is a graph illustrating a respiration waveform of when a yawn has occurred;

FIG. 8A is a graph illustrating a waveform of pulse waves of when a strong yawn has occurred, FIG. 8B is a graph illustrating a respiration waveform of when a strong yawn has occurred, FIG. 8C is a graph illustrating a waveform of pulse waves of when a yawn of an intermediate degree has occurred, FIG. 8D is a graph illustrating a respiration waveform of when a yawn of an intermediate degree has occurred, FIG. 8E is a graph illustrating a waveform of pulse waves of when a weak yawn has occurred, and FIG. 8F is a graph illustrating a respiration waveform of when a weak yawn has occurred;

FIG. 9 is a flowchart illustrating processing for setting flags T1, S1 and A1;

FIG. 10 is a flowchart illustrating processing for setting flags T2, S2 and A2;

FIG. 11 is a flowchart illustrating processing for setting flags T3, S3 and A3; and

FIG. 12 is a flowchart illustrating control processing based on a comprehensive determination of the motion artifact, coughing and yawning.

## DESCRIPTION OF THE PREFERRED EMBODIMENTS

First, a biometric detection apparatus for detecting conditions of a body is described with reference to one embodiment shown in FIGS. 1A and 1B. The apparatus detects vital functions such as cough or yawn by using a pulse wave sensor 1. This sensor 1 is attached to a portion of a human body 100 such as a finger, a palm or a wrist, where motion is small. The apparatus further uses a control unit 3, which drives the pulse wave sensor 1 and processes the outputs from the pulse wave sensor 1.

Here, the pulse wave sensor 1 is an optical sensor of the reflection type (opto-capacitive pulse wave sensor) comprising a light-emitting element (e.g., light-emitting diode: green LED) 5, a light-receiving element (e.g., photodiode: PD) 7, and a transparent lens 9 which permits light to pass through and also efficiently receives light.

The pulse wave sensor 1 has a ring-like buffer member (e.g., a sponge having a rugged end) 11 that serves as a spacer surrounding the lens 9 on the skin side so that the lens 9 will not be pushed onto the skin 100a with an excess of pressure, and a spring 13 on the rear end side of the pulse wave sensor 1. This makes it possible to set the pressure for pushing the lens 9 onto the skin 100a to be not larger than 10 gw/cm². The pulse wave sensor 1 is fixed to the wrist or the like by using a band 15. Therefore, the spring 13 is arranged between the band 15 and the pulse wave sensor 1.

When the pulse wave sensor 1 is to be used, a driving electric power is supplied from a drive unit 17 in the control unit 3 and light is projected to the human body from the light-emitting element 5. Part of the light hits capillary vessels (capillary arteries) in the human body, is absorbed mostly by hemoglobin in the blood flowing through the capillary vessels, while rest of the light scatters repetitively and partly

US 8,177,720 B2

<table>
<tr><td>9</td><td>10</td></tr>
</table>

falls on the light-receiving element **7**. Due to the pulsation of blood at this moment, the amount of hemoglobin in the capillary vessels vary periodically like a wave and, therefore, the light absorbed by the hemoglobin varies like a wave, too.

As a result, the amount of light absorbed by the capillary vessels varies and, accordingly, the amount of light received or detected by the light-receiving element **7** varies. A change in the amount of the received light is output as pulse wave data (sensor output which is a voltage signal representing the pulse wave) to the control unit **3**.

The control unit **3** includes the drive unit **17**, a detector unit **19** that receives a sensor output, a microcomputer **21** which produces a control signal to the drive unit **17** and to an output unit **23** and receives signals from the detector unit **19** and from an input unit **25** to execute various processing, the output unit **23** that sends control signals to various actuators **27**, and the input unit **25** that receives a signal from a manual switch **29**.

The microcomputer **21** is an electronic circuit including known CPU, ROM, RAM and the like, and incorporates a program for detecting the coughing and yawning by processing pulse wave signals applied from the pulse wave sensor **1**.

The pulse wave sensor **1** may be attached to any part of the body but is desirably attached to an arm, hand, finger, forehead or foot that is less affected by the motion artifact.

Next, the principle for detecting the coughing and yawning will be described with reference to FIGS. **2A** to **8F**. In these figures, the abscissa represents the passage of time and the ordinate represents the magnitude (intensity or variation) of the signals.

Referring first to FIG. **2A**, the pulse wave sensor **1** produces pulse wave signals having peaks corresponding to the systolic phase and to the diastolic phase of the heart. Specifically, varying peaks appear in the upper side in the figure during the systolic phase of the heart, and varying peaks appear in the lower side in the figure during the diastolic phase of the heart.

During the ordinary calm state, i.e., when there is no motion artifact, cough or yawn, and there is only a very mild variation of a large period due to the motion of the blood vessels, variation of the blood pressure in the blood vessels is slow. As a result, the peaks of signals on p-diastole side do not become lower than a predetermined low-limit level LL (line corresponding to the lowest blood pressure).

As a method of setting the lower-limit level LL, there can be exemplified an approximated line found, for example, from a plurality of peaks on p-diastole side representing the lowest blood pressure.

A line connecting the centers of the upper and lower peaks of pulse wave signals is called the base level BL (index related to an average blood pressure). Further, a line connecting the peaks of signals on p-systole is called a pulse wave envelope (first envelope) A, and a line connecting the peaks of the first envelope is called a double envelope (second envelope) B. Referring to FIG. **2B**, a waveform found by subtracting the second envelope B from the first envelope A is called a respiration waveform (respiration curve). The respiration waveform is a signal corresponding to the intra-thoracic pressure.

The principle of the processing of the embodiment conducted by using the above signals is described next.

(1) Method of Detecting Motion Artifact

Referring to FIG. **3A**, when a motion artifact has occurred, the pulse wave on p-diastole side, first, so varies as to becomes lower than (fall below) the lower-limit level LL from the ordinary (calm) pulse waves, i.e., from the state of the regular sinusoidal pulse wave signals. The frequency of pulse wave signals of this period becomes smaller than the frequency of the ordinary pulse wave signals (of when there is no

motion artifact) (e.g., state of high-frequency noise) and the waveforms, in many cases, greatly vary from the sinusoidal waves.

If the signal on p-diastole side exceeds the lower-limit level LL, therefore, it can be so determined that the motion artifact has occurred. Here, if the waveform varies or the frequency of pulse wave signals becomes small, it is highly probable that the motion artifact has occurred.

Referring to FIGS. **4B**, **4D** and **4F**, further, the respiration waveform found from the peaks on p-systole differs depending upon the intensity (strength) of the motion artifact. Therefore, the intensity of motion artifact can be determined from the state of the respiration waveform. If the motion artifact is great, for example, the respiration waveform falls greatly and a curve thereof becomes sharp as shown in FIG. **4B**. If the motion artifact is medium, the respiration waveform falls greatly but a curve thereof becomes loose. If the motion artifact is small, the respiration waveform falls little.

Accordingly, the motion artifact can be accurately detected by each of the following determining methods (algorithms) or by a combination of the determining methods. The following determining methods have all been confirmed through the practically conducted experiments (the same also holds for the coughing and yawning).

In case the amplitude on p-diastole side has increased (i.e., in case the peaks of amplitude on p-diastole side have exceeded a predetermined level or have become smaller than the lower-limit level LL, it is determined that the motion artifact has occurred (motion artifact flag T**1** is set as described later).

In case the waveform of pulse waves has varied from the sinusoidal wave, it is determined that the motion artifact has occurred. Whether the waveform has varied from the sinusoidal waves can be determined based on a correlation to the waveform of the ordinary (e.g., preceding) pulse wave. For example, it can be regarded that the waveform has varied if a coefficient of the correlation is not larger than 0.7.

In case the amplitude of the respiration waveform has varied and the waveform of pulse waves has varied from the sinusoidal waves, it can be determined that the motion artifact has occurred. Here, if the waveform has varied from the sinusoidal waves can be determined based on a correlation to the waveform of the ordinary pulse waves (for example, it can be regarded that the waveform has varied if a coefficient of the correlation is not larger than 0.6).

In case there is a change in the amplitude AW**2** of the base level BL divided by the amplitude BW**2** of pulse waves (FIG. **7**), the change is a nature of a single-shot and the time of change is as short as 0 to 4 seconds or as long as 12 seconds or more, it is determined that the motion artifact has occurred (motion artifact flag T**3** is set as described later).

A change from the sinusoidal waves or a change in the amplitude can be determined from the analysis of variation in the peak-to-peak pitch or from the analysis of chaos in addition to utilizing the correlation (the same holds hereinafter).

(2) Method of Detecting Cough

Referring to FIG. **5A**, if the cough has occurred, the amount of terminal blood temporarily increases due to instantaneous contraction of muscles accompanying the coughing. The pulse wave on p-systole side, first, increases greatly from the state of ordinary pulse wave signals.

The coronary veins are compressed by the abdominal muscles that have tensed due to coughing, the blood returning to the heart instantaneously decreases. The heart blows out the blood in decreased amounts. Accordingly, the pulse wave on p-systole side immediately after the rise falls greatly in excess of the lower-limit level. The time of coughing is so

16

US 8,177,720 B2

11                                                                                  12

short that there is no change in the amplitude of the pulse wave signals, and the base level readily restores. In the case of the coughing, usually, no change is seen in the frequency and there is almost no change in the shape of the sinusoidal waves, either.

In case the cough occurs, further, a double waveform (double triangular wave) of a characteristic acute angle appears on the respiration waveform obtained from the pulse waves as shown in FIG. **5**B. A large ratio (AW**1**/BW**1**) of the longitudinal width (amplitude) AW**1** and the transverse width (period) BW**1** of the double triangular wave represents an intense coughing in which the intrathoracic pressure sharply changes within a short period of time.

What makes the double triangular wave may be determined relying, for example, upon "if the determining line is exceeded that is separated away from the ordinary line of the respiration waveform by more than a predetermined percentage".

Therefore, if the pulse wave on p-systole side, first, greatly increases (in excess of the predetermined upper-limit level) and, immediately thereafter, the pulse wave on p-diastole side exceeds the lower-limit level, it can be determined that the cough has occurred. Further, if the double triangular wave appears on the respiration waveform, it can be determined that the cough has occurred.

Referring to FIGS. **6**A to **6**F, further, the pulse wave signal and the respiration waveform differ depending upon the intensity of coughing. From the states thereof, therefore, the intensity of coughing can be checked if the coughing is intense, for example, the pulse wave signals vary greatly in the up-and-down direction as shown in FIG. **6**A, the respiration waveform falls greatly as shown in FIG. **6**B, and the ratio AW**1**/BW**1** becomes large. If the coughing is of the medium degree, further, the pulse wave signals vary up and down to a slightly large extent as shown in FIG. **6**C, the respiration waveform falls to a medium degree as shown in FIG. **6**D, and the ratio AW**1**/BW**1** is of a medium degree. Further, if the coughing is weak, the pulse wave signals vary up and down to a small degree, and the respiration waveform falls mildly.

Thus, the coughing can be accurately detected by the combination of one or two or more kinds of the following determining methods.

If the amplitude on p-systole side increases (i.e., if the peak of amplitude increases on p-systole side) and the amplitude on p-diastole side increases (i.e., if the peak of amplitude is lowered on p-diastole side), it is determined that the coughing has occurred (cough flag S**1** is set as described later).

If the amplitude on p-systole side increases (i.e., if the peaks increase on p-systole side only) without causing the waveform of pulse waves to be varied from the sinusoidal waves, it can be regarded that the cough has occurred.

If the amplitude of the respiration waveform varies (increases by 30% above the normal value) and a double waveform of an acute angle appears on the respiration waveform, it is determined that the coughing has occurred (cough flag S**2** is set as described later).

If (amplitude AW**2** of the base level/amplitude BW**2** of the pulse waves) of pulse waves varies little (decreased by 30% below the normal) and the time of change is shorter than a predetermined level (e.g., shorter than 4 seconds), it is determined that the cough has occurred.

Here, it is important that in detecting the coughing, the motion artifact is determined, too. Even in case it is determined that the cough has occurred by the above determining method, it is determined that the cough has occurred only

when it is so determined that there is no motion artifact. This is to isolate the motion artifact from the cough to render an accurate determination.

(3) Method of Detecting Yawn (Deep Respiration)

Referring to FIG. **7**A, if the yawn (or deep respiration) has occurred, the amount of terminal blood temporarily increases to some extent due to mild contraction of muscles accompanying the yawn. Therefore, the systolic pulse wave, first, increases to some extent from the ordinary state of pulse wave signals.

Thereafter, the coronary veins are compressed by the abdominal muscles that have tensed due to coughing, the blood returning to the heart gradually decreases. Therefore, the heart blows out the blood in decreased amounts for several seconds. Accordingly, the base level of the pulse wave signals gradually decreases. At this moment, the base level gradually decreases as designated at AW**2** in proportion to the intensity of yawning, and the amplitude BW**2** of the pulse waves decreases.

The reflux of blood to the heart is squeezed for several seconds due to the yawning, and about 10 seconds are needed before the pulse wave is recovered. In the case of the yawning, the sinusoidal waves of pulse wave signals do not change much, and a double triangle of an obtuse angle having a wide bottom side is seen on the respiration waveform.

It can be determined that the yawn has occurred based on a decrease in the base level of pulse wave signals, on a decrease in the respiration waveform (e.g., based on a decreased state lasting for 4 to 12 seconds) or on a decrease in the amplitude of pulse waves.

Referring to FIGS. **8**A to **8**F, further, the pulse wave signal and the respiration waveform differ depending upon the intensity of yawning. From the states thereof, therefore, the intensity of yawning can be checked if the yawning is intense, for example, the pulse wave signals and the respiration waveform fall greatly as shown in FIGS. **8**A and **8**B. Besides, the width of fall is great (4 to 12 seconds) and the amplitude of pulse wave signals becomes considerably small after the fall as shown in FIG. **8**A. If the yawning is of the intermediate degree, further, the pulse wave signals and the respiration signals fall to a medium degree as shown in FIGS. **8**C and **8**D. Besides, the width of fall is of a medium degree and the amplitude of the pulse wave signals does not change much as shown in FIG. **8**C. Further, if the yawning is weak, the pulse wave signals and respiration signals fall little or the width of fall is small as shown in FIGS. **8**E and **8**F, and the amplitude of the pulse wave signals does not change much as shown in FIG. **8**E.

Therefore, the yawning can be accurately detected by the combination of one or two or more kinds of the determining methods.

If the waveform on p-systole increases (i.e., if the peak of pulse waves during systole increases) but the peak of pulse waves on the side of the next diastole does not become smaller than that of the ordinary case, it is determined that the yawn has occurred (yawn flag A**1** is set as described later).

If the amplitude on p-systole side increases and, thereafter, if the whole amplitude BW**2** of pulse waves decreases without causing the waveform of pulse waves to vary from the sinusoidal waves, it is determined that the yarn has occurred.

If the amplitude of the respiration waveform varies and a double curve of an obtuse angle appears on the respiration waveform, it is determined that the yawn has occurred (yawn flag A**2** is set as described later).

If the ratio AW**2**/BW**2** (amplitude AW**2** of the base level divided by amplitude BW**2** of the pulse waves) of pulse waves varies greatly (larger by 30% or more above the normal) and

17

**Appx03329**

US 8,177,720 B2

13 14

the time of change is longer than a predetermined value (e.g., longer than 8 seconds), it is determined that the yawn has occurred.

It is important that in detecting the yawn, the motion artifact is determined, too. Even in case it is determined that the yawn has occurred by the above determining method, it is determined that the yawn has occurred only when it is so determined that there is no motion artifact. This is to separate the motion artifact from the yawning to render an accurate determination.

Next, processing executed by the control unit **3** based on the above principles will be described with reference to flowcharts of FIGS. **9** to **12**.

These processing employs some of the above determining methods to finally determine the occurrence of the motion artifact, coughing and yawning.

(I) Referring to FIG. **9**, it is checked at step (S) **100** if there is a change in the amplitude of pulse wave signals produced by the pulse wave sensor **1**. Specifically, it is checked if the amplitude of pulse wave signals is varying up and down by not less than 30% beyond the up-and-down amplitude of the ordinary pulse wave signals, or if the amplitude on p-systole side (or the amplitude on p-diastole side) is varying by not less than 30% beyond the amplitude of the ordinary pulse wave signals on p-systole side (or beyond the amplitude on p-diastole side). If the determination is affirmative, the routine proceeds to step **110**. If the determination is negative, the processing once ends.

That is, if the amplitude exceeds by more than 30% beyond the amplitude of the ordinary pulse wave signals, it can be presumed that motion artifact, coughing, yawning or the like, which is different from the ordinary calm state, has occurred.

At step **110**, it is checked if a large change in the amplitude detected at step **100** is on p-systole side. If the determination is affirmative, the routine proceeds to step **120**, if the determination is negative, the routine proceeds to step **130**.

When a first large change in the amplitude (peak protruding downward) is on p-diastole side, it is highly probable that the motion artifact has occurred as shown in FIG. **3**A. Therefore, at step **130**, a motion artifact flag T1 is set to represent the above fact, and the processing once ends.

If the first large change in the amplitude is on p-systole side, the probability of motion artifact is low. It is, therefore, probable that the cough or the yawn has occurred. It is checked at step **120** if the amplitude in the next diastole is varying by more than 30%. If the determination is affirmative, the routine proceeds to step **140**. If the determination is negative, the routine proceeds to step **150**.

If the amplitude in the next diastole is varying by more than 30%, as shown in FIG. **5**A, it can be presumed that the cough has occurred highly probably. That is, the pulse wave signals are, first, greatly varying on p-systole side and, immediately thereafter, are greatly varying on p-diastole side. Thus, it is presumed that the probability of cough is high. A cough flag **S1** is set at step **140** to represent the above fact, and the processing once ends.

If neither the motion artifact nor the cough is occurring, based on the elimination method, it is presumed that the above variation in the pulse wave signals at step **100** above is caused by the yawning. Therefore, a yawn flag A1 is set at step **150** to represent the above fact, and the processing once ends.

If there is a large change in the pulse wave signals, the flag of any one of the motion artifact, coughing or yawning can be set based on the state where the pulse wave signals are varying.

(II) Referring to a flowchart of FIG. **10**, a respiration waveform (respiration curve) is generated or formed at step **200** based on the pulse wave signals produced from the pulse wave sensor **1**.

At subsequent step **210**, it is checked if there is a double triangular wave on the respiration curve. Specifically, it is checked if there is a W-shaped waveform (waveform having a protrusion on the upper side) under the predetermined determining level of the respiration curve as shown in FIG. **5**B. If the determination is affirmative, the routine proceeds to step **220**. If the determination is negative, the routine proceeds to step **230**.

If there is no double triangular wave, it is presumed that there is the motion artifact and the motion artifact flag T2 is set at step **230** to once end the processing.

At step **220**, it is checked if the double triangular wave is a double triangular wave of an obtuse angle of more than a predetermined time width BW1 (e.g., 4 seconds at the predetermined determining level PDL). Namely, it is checked here if the double triangular wave has an obtuse angle by checking the predetermined width BW1. If the determination is affirmative, the routine proceeds to step **250**. If the determination is negative, the routine proceeds to step **240**.

Here, the addition of a condition "a change in the amplitude of the pulse wave curve is greater than the normal value by more than 30%" further improves the accuracy of determination.

If the double triangular wave has an acute angle as shown in FIG. **5**B, it is highly probable that the cough has occurred. Therefore, a cough flag S2 is set at step **240** to represent the above fact, and the processing once ends.

If the double triangular wave is not of an acute angle, it is highly probable that the yawn has occurred instead of the cough (without motion artifact). Therefore, a yawn flag A2 is set at step **250** to represent the above fact, and the processing once ends.

If there is a large change in the respiration curve, a flag of any one of the motion artifact, coughing or yawning is set based on the state of change in the respiration curve.

(III) Referring to a flowchart of FIG. **11**, a base level (line) BL is formed based on the pulse wave signals produced from the pulse wave sensor **1**.

At subsequent step **310**, it is checked if the base level of the pulse waves is fluctuating. Specifically, as shown in FIG. **7**A, it is checked if ration AW2/BW2 (amplitude AW2 of the base level (herein, amplitude from an average value of the base level in normal operation) divided by amplitude BW2 of each pulse wave signal) is greater than a predetermined determining value (e.g., if the change is greater than the normal value by more than 30%). If the determination is affirmative, the routine proceeds to step **320**. If the determination is negative, the routine proceeds to step **330**.

If there is no fluctuation in the base level BL, a cough flag S3 is set at step **330** presuming that the cough has occurred, and the processing once ends.

It is checked at step **320** if the base level is fluctuating periodically (at a period of, for example, 6 to 15 seconds). If the determination is affirmative, the routine proceeds to step **340**. If the determination is negative, the routine proceeds to step **330**.

If the period of fluctuation of the base level is long, it is so determined that the fluctuation is arising from the motion of blood vessels. A blood vessel motion flag K1 is set at step **340** to represent the above fact, and the processing once ends.

At step **330** it is checked if the fluctuation of the base level is of a nature of a single-shot and is within a predetermined period (e.g., 4 to 12 seconds). If the determination is affirma-

US 8,177,720 B2

15

tive, the routine proceeds to step **360**. If the determination is negative, the routine proceeds to step **350**.

If the fluctuation of the base level is of the nature of a single-shot and is within the predetermined period (e.g., 4 to 12 seconds) as shown in FIG. **7**B, it can be presumed that the yawn has occurred. Therefore, a yawn flag **A3** is set at step **360**, and the processing once ends.

If the fluctuation is not a single-shot or more than the predetermined period, a motion artifact flag **T3** is set at step **350** presuming that the motion artifact may have occurred, and the processing once ends.

The fluctuation of the base level is thus analyzed, and the flag of any one of the motion artifact, coughing or yawning is set.

(IV) Referring to a flowchart of FIG. **12**, vital function, such as respiration and pulsation is comprehensively determined based on the flags.

For example, when three kinds of motion artifact flags **T1** to **T3** are set, it can be reliably determined that the motion artifact has occurred. Further, when one or two flags are set among the three kinds of motion artifact flags **T1** to **T3**, it may be so determined that the motion artifact has occurred. The reliability of motion artifact increases with an increase in the kinds of the flags that are set. Among the three kinds of motion artifact flags **T1** to **T3**, there is a flag which highly represents the motion artifact (e.g., motion artifact flag **T1**). If this flag is set, it may be so determined that the motion artifact has occurred. Alternatively, a large threshold value may be set to the counter for the motion artifact flag that represents a high probability. The motion artifact may be determined based on a total value of the motion artifact flags counted by the counter.

What is described above holds even for the three kinds of cough flags **S1** to **S3** and yarn flags **A1** to **A3**. If the cough flag **S1** is set, it is most probable that the cough has occurred. If the yawn flag **A3** is set, it is most probable that the yawn has occurred.

Even if it is determined that the cough or the yawn has occurred based on the cough flags **S1** to **S3** or the yawn flags **A1** to **A3**, it may be often determined that the motion artifact has occurred based on the motion artifact flags **T1** to **T3**. In such a case, it is not determined that the cough or the yawn has occurred but, instead, it is determined that the motion artifact has occurred, reducing erroneous determination.

At next step **410**, actuators are controlled, such as the air conditioner, navigation system, seats, seatbelts, etc. based on the above determined results, and the processing once ends.

The following processing can be employed for controlling the actuator.

For example, disorders of respiration such as asthma and emphysema of the lungs, disorders of inspiration such as rhinitis and nasal congestion, and cold can be presumed from the frequency and intensity of coughing, number of beats, number of breaths, a curve of respiration and fluctuation in the respiration (respiration signals). The air conditioner, air cleaner, navigation system, audio equipment, seats and seat belts are adjusted depending upon the symptoms that are presumed.

Specifically, the following control operations may be executed, for example.

If the cough is detected while an alarm of ear pollen has been issued, the conditioned air in the compartment is switched to the air-recirculation mode (internal circulation mode), and an auxiliary filter such as an air-purifier is operated. If the coughing occurs more frequently than usual, it is so presumed that the person is having a slight cold, the compartment temperature and the humidity are set to be slightly

16

higher. Further, if the yawn is frequently detected, information is produced from the navigation system to stimulate the driver's brain to prevent him from becoming sleepy. If the yawn still occurs too frequently, the tension of the seat belt is varied to stimulate the body to keep the person awake.

In addition to the above results of presumption, other pulse wave data (pulse waveform, fluctuation in the pulse wave amplitude, pulse rate, variation in the interval between pulses, etc.) may be added or any other body data signals (blood pressure, electrocardiograph, electromyograph, camera image) may be added to presume the condition of the body at that moment to correct the control of air-conditioner, air-purifier, navigation system, audio equipment, seats and seat-belts.

The present invention is not limited to the above embodiments only but can be put into practice in a variety of other ways.

What is claimed is:

1. An apparatus for detecting vital functions, comprising:
   sensing means adapted for attachment to a body and produces pulse wave signals corresponding to pulse waves of the body; and
   respiration waveform calculation means for finding a respiration waveform that represents a respiration condition from the pulse waves detected by the sensing means; and
   cough determining means which determines an occurrence of a cough when formation of a double triangular wave is detected, the double triangular wave having an acute angle in which two peaks of the respiration waveform consecutively exceed a predetermined level.

2. An apparatus for detecting vital functions according to claim **1**, further comprising:
   motion artifact determining means which determines an occurrence of a motion artifact based on the pulse waves detected by the sensing means, wherein
   the cough determining means determines the occurrence of the cough when the motion artifact determining means additionally determine no occurrence of the motion artifact.

3. The apparatus according to claim **1**, wherein the sensing means includes:
   an optical device for projecting light onto a skin of the body to measure the pulse waves of the body; and
   a buffer member arranged between the optical device and the skin so that the optical device of the skin side does not come in contact with the skin or pushes the skin with a pressure which is less than a predetermined level.

4. An apparatus for detecting vital functions, comprising:
   sensing means adapted for attachment to a body and produces pulse wave signals corresponding to pulse waves of the body; and
   cough determining means which determines an occurrence of a cough when an amplitude of the pulse waves on a p-systole side corresponding to a systolic phase of a heart of the body has exceeded a predetermined level and when the amplitude of the pulse wave signals on a p-diastole side corresponding to a succeeding diastolic phase of the heart of the body has exceeded a predetermined level.

5. The apparatus according to claim **4**, wherein the sensing means includes:
   an optical device for projecting light onto a skin of the body to measure the pulse waves of the body; and
   a buffer member arranged between the optical device and the skin so that the optical device of the skin side does

Appx03331

US 8,177,720 B2

17 18

not come in contact with the skin or pushes the skin with a pressure which is less than a predetermined level.

6. The apparatus according to claim 4, further comprising:

motion artifact determining means which determines an occurrence of a motion artifact based on the pulse waves detected by the sensing means, wherein

the cough determining means determines the occurrence of the cough when the motion artifact determining means additionally determines no occurrence of the motion artifact.

7. An apparatus for detecting vital functions, comprising:

sensing means adapted for attachment to a body and produces pulse wave signals corresponding to pulse waves of the body; and

cough determining means which determines an occurrence of a cough when an amplitude of the pulse waves on a p-systole side corresponding to a systolic phase of a heart of the body has increased by more than a predetermined level without causing a waveform of the pulse waves to be varied from a waveform of ordinary pulse waves which are produced in a calm state of the body.

8. The apparatus according to claim 7, wherein the sensing means includes:

an optical device for projecting light onto a skin of the body to measure the pulse waves of the body; and

a buffer member arranged between the optical device and the skin so that the optical device of the skin side does not come in contact with the skin or pushes the skin with a pressure which is less than a predetermined level.

9. The apparatus according to claim 7, further comprising:

motion artifact determining means which determines an occurrence of a motion artifact based on the pulse waves detected by the sensing means, wherein

the cough determining means determines the occurrence of the cough when the motion artifact determining means additionally determines no occurrence of the motion artifact.

10. An apparatus for detecting vital functions, comprising:

sensing means adapted for attachment to a body and produces pulse wave signals corresponding to pulse waves of the body; and

cough determining means which determines an occurrence of a cough when a change in a ratio AW2/BW2 of an amplitude AW2 of a base level of the pulse waves divided by an amplitude BW2 of the pulse waves is within a predetermined value and within a predetermined period of time corresponding to a coughing.

11. The apparatus according to claim 10, wherein the sensing means includes:

an optical device for projecting light onto a skin of the body to measure the pulse waves of the body; and

a buffer member arranged between the optical device and the skin so that the optical device of the skin side does not come in contact with the skin or pushes the skin with a pressure which is less than a predetermined level.

12. The apparatus according to claim 10, further comprising:

motion artifact determining means which determines an occurrence of a motion artifact based on the pulse waves detected by the sensing means, wherein

the cough determining means determines the occurrence of the cough when the motion artifact determining means additionally determines no occurrence of the motion artifact.

13. An apparatus for detecting vital functions, comprising:

sensing means adapted for attachment to a body and produces pulse wave signals corresponding to pulse waves of the body; and

yawn determining means which determines an occurrence of a yawn when a base level of the pulse waves is lowered over a predetermined period corresponding to yawning.

14. The apparatus according to claim 13, wherein

the yawn determining means determines the occurrence of a yawn when an amplitude of the pulse waves has become smaller than a predetermined level within a period in which the base level of the pulse waves is lower than a predetermined level.

15. An apparatus for detecting vital functions according to claim 14, further comprising:

motion artifact checking means which determines an occurrence of a motion artifact, wherein

the yawn determining means determines the occurrence of the yawn when the motion artifact checking means additionally determines no occurrence of the motion artifact.

16. An apparatus for detecting vital functions according to claim 13, further comprising:

motion artifact checking means which determines an occurrence of a motion artifact, wherein

the yawn determining means determines the occurrence of the yawn when the motion artifact checking means additionally determines no occurrence of the motion artifact.

17. The apparatus according to claim 16, wherein

the motion artifact determining means determines an occurrence of a motion artifact when an amplitude on a p-diastole side corresponding to a diastolic phase of a heart of the body has exceeded a predetermined limit level that corresponds to a diastolic blood pressure of the body.

18. An apparatus according to claim 16 further comprising:

an actuator; and

control means which controls the actuator when the occurrence of the yawn is determined by the yawn determining means.

19. An apparatus for detecting vital functions, comprising:

sensing means adapted for attachment to a body and produces pulse wave signals corresponding to pulse waves of the body; and

yawn determining means which determines an occurrence of a yawn when an amplitude of the pulse waves on a p-systole side corresponding to a systolic phase of a heart of the body exceeds a predetermined level but when an amplitude of a succeeding pulse wave signals on a p-diastole side corresponding to a diastolic phase of the heart of the body does not become smaller than a predetermined level.

20. An apparatus for detecting vital functions according to claim 19 further comprising:

motion artifact checking means which determines an occurrence of a motion artifact, wherein

the yawn determining means determines the occurrence of the yawn when the motion artifact checking means additionally determines no occurrence of the motion artifact.

21. An apparatus for detecting vital functions, comprising:

sensing means adapted for attachment to a body and produces pulse wave signals corresponding to pulse waves of the body; and

yawn determining means which determines an occurrence of a yawn when a whole amplitude of pulse waves of a sum of amplitudes on a p-systole side and of amplitudes on a p-diastole side becomes smaller than a predetermined level after the amplitudes on p-systole side cor-

20

US 8,177,720 B2

19 20

responding to the systolic phase of a heart of the body has exceeded a predetermined level without causing the waveform of the pulse waves to be varied from the waveform of ordinary pulse waves.

**22**. An apparatus for detecting vital functions according to claim **21**, further comprising:

motion artifact checking means which determines an occurrence of a motion artifact, wherein

the yawn determining means determines the occurrence of the yawn when the motion artifact checking means additionally determines no occurrence of the motion artifact.

**23**. An apparatus for detecting vital functions, comprising:

sensing means adapted for attachment to a body and produces pulse wave signals corresponding to pulse waves of the body;

respiration waveform calculation means which finds a respiration waveform that represents a respiration condition from the pulse waves; and

yawn determining means which determines an occurrence of a yawn when the amplitude of the respiration waveform is not smaller than a predetermined level and when a double triangular wave of an obtuse angle is detected in which two peaks of the respiration waveform consecutively exceed a predetermined level.

**24**. An apparatus for detecting vital functions according to claim **23**, further comprising:

motion artifact checking means which determines an occurrence of a motion artifact, wherein

the yawn determining means determines the occurrence of the yawn when the motion artifact checking means additionally determines no occurrence of the motion artifact.

**25**. An apparatus for detecting vital functions, comprising:

sensing means adapted for attachment to a body and produces pulse wave signals corresponding to pulse waves of the body;

yawn determining means which determines an occurrence of a yawn when a change in a ratio AW**2**/BW**2** of an amplitude AW**2** of a base level of the pulse waves divided by an amplitude BW**2** of the pulse waves is not smaller than a predetermined level and within a predetermined period of time corresponding to a yawning.

**26**. An apparatus for detecting vital functions according to claim **25**, further comprising:

motion artifact checking means which determines an occurrence of a motion artifact, wherein

the yawn determining means determines the occurrence of the yawn when the motion artifact checking means additionally determines no occurrence of the motion artifact.

\* \* \* \* \*



US 20010056243A1

(19) **United States**

(12) **Patent Application Publication**    (10) Pub. No.: **US 2001/0056243 A1**
     Ohsaki et al.                          (43) **Pub. Date:        Dec. 27, 2001**

(54) **WRISTWATCH-TYPE HUMAN PULSE WAVE SENSOR ATTACHED ON BACK SIDE OF USER'S WRIST**

(76) Inventors: **Rie Ohsaki**, Anjo-city (JP); **Teiyuu Kimura**, Nagoya-city (JP); **Naoki Fukaya**, Obu-city (JP)

Correspondence Address:
**LAW OFFICE OF DAVID G POSZ**
**2000 L STREET, N.W.**
**SUITE 200**
**WASHINGTON, DC 20036 (US)**

(21) Appl. No.:    **09/852,698**

(22) Filed:        **May 11, 2001**

(30)        **Foreign Application Priority Data**

Jun. 14, 2000    (JP) ...................................... 2000-177999

**Publication Classification**

(51) Int. Cl.$^7$ ........................................ A61B 5/02
(52) U.S. Cl. .......................................... **600/503**; 600/500

(57)                **ABSTRACT**

A pulse wave sensor includes a detecting element and a sensor body. The pulse wave sensor is worn on the back side of a user's wrist corresponding to the back of the user's hand. The detecting element includes a translucent member on its top, and the translucent member has a convex surface. The detecting element is attached on the back side of the user's wrist by a dedicated belt so that the convex surface of the translucent member is in intimate contact with the surface of the user's skin. The sensor body is attached on the back side of the user's wrist by another dedicated belt so that it is arranged on the detecting element. A cushion is arranged between the sensor body and the detecting element. The pulse wave sensor can stably detect the pulse wave without being affected by the movement of the user's wrist.



APPLE 1014

Case: 22-1631    Document: 45-7    Page: 288    Filed: 07/12/2023



FIG. 1

FIG. 2



FIG. 3A

FIG. 3B

FIG. 4A

FIG. 4B

US 2001/0056243 A1

Dec. 27, 2001

1

# WRISTWATCH-TYPE HUMAN PULSE WAVE SENSOR ATTACHED ON BACK SIDE OF USER'S WRIST

## CROSS REFERENCE TO RELATED APPLICATION

[0001] This application is based on and incorporates herein by reference Japanese Patent Application No.2000-177999 filed on Jun. 14, 2000.

## BACKGROUND OF THE INVENTION

[0002] 1. Field of the Invention

[0003] The present invention relates to an optical sensor for detecting the pulse wave of a human body.

[0004] 2. Related Art

[0005] JP-A-11-70087 proposes a wristwatch-type device for detecting the pulse wave of a human body. This detecting device is worn on the user's wrist. The device includes a detecting element for detecting a pulse wave and a sensor body including a display. The detecting element is fixed on the front side of the user's wrist corresponding to the palm of the user's hand by a band attached to the sensor body. The information of pulse wave detected by the detecting element is displayed on the display of the sensor body fixed on the back side of the user's wrist.

[0006] The two bones (the radius and the ulna) pass through the front side of the user's wrist. Therefore the detecting element has a tendency to slip off the detection position of the user's wrist, since the skin surface of the front side of the user's wrist greatly moves as the user's wrist moves. Furthermore, the user feels uncomfortable since the radius and the ulna are pressed. As a result, the user further moves his/her wrist unconsciously and it becomes further difficult to detect the pulse wave stably.

## SUMMARY OF THE INVENTION

[0007] The present invention overcomes the above drawbacks, and has an object to provide a human pulse wave sensor which is capable of detecting the pulse wave of a human body stably and has high detection probability.

[0008] The pulse wave sensor according to the present invention includes a detecting element and a sensor body. The pulse wave sensor is worn on the back side of the user's wrist corresponding to the back of the user's hand for detecting the pulse wave of the user. The detecting element includes a light emitting element and a light receiving element. The sensor body is connected to the detecting element by a signal line.

[0009] Preferably, a translucent member is arranged on the light emitting element and the light receiving element. The translucent member has a convex surface. The detecting element is attached on the back side of the user's wrist by a dedicated belt so that the convex surface of the translucent member is in intimate contact with the surface of the user's skin. The light emitting element and the light receiving element are arranged in the longitudinal direction of the user's arm. The sensor body is attached on the back side of the user's wrist by a dedicated belt other than the belt of the

detecting element so that it is arranged on the detecting element. A cushion is arranged between the sensor body and the detecting element.

[0010] According to this construction, the user does not feel uncomfortable when the pulse wave sensor is worn on the user's wrist. Furthermore the detecting element is fixed on the user's wrist without slipping off the detection position of the user's wrist, even if the user is in motion. Accordingly the pulse wave sensor can stably detect the pulse wave of the user.

## BRIEF DESCRIPTION OF THE DRAWINGS

[0011] The above and other objects, features and advantages of the present invention will become more apparent from the following detailed description made with reference to the accompanying drawings. In the drawings:

[0012] FIG. 1 is a cross-sectional view of a pulse wave sensor attached on the user's wrist;

[0013] FIG. 2 is a schematic diagram of a mechanism for detecting a pulse wave;

[0014] FIGS. 3A and 3B are graphs of the pulse wave detected by a pulse wave sensor attached on the back side of the user's wrist and the pulse wave detected by a pulse wave sensor attached on the front side of the user's wrist, respectively; and

[0015] FIGS. 4A and 4B are graphs of the pulse wave detected by a pulse wave sensor including a convex detecting surface and the pulse wave detected by a pulse wave sensor including a flat detecting surface, respectively.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

[0016] Referring to FIG. 1, a pulse wave sensor 1 includes a detecting element 2 and a sensor body 3. The pulse wave sensor 1 is worn on the back side of the user's wrist 4 corresponding to the back of the user's hand in the similar manner as a wristwatch is normally worn. This sensor 1 is used for detecting the pulse wave of the user's body for a medical diagnosis, a physical check up, and the like.

[0017] Referring to FIG. 2, the detecting element 2 comprises a package 5, a light emitting element 6 (e.g., LED), a light receiving element 7 (e.g., PD), and a translucent board 8. The package 5 has an opening and includes a circuit board 9 therein. The light emitting element 6 and light receiving element 7 are included in the package 5 and arranged on the circuit board 9. The translucent board 8 is a glass board which is transparent to light, and attached to the opening of the package 5. A convex surface is formed on the top of the translucent board 8 as shown in FIG. 2.

[0018] The detecting element 2 is fixed on the user's wrist 4 by a dedicated belt 10 attached to the detecting element 2 as shown in FIG. 1. The belt 10 may be made from elastic material so that regular pressure is applied to the user's wrist 4. In this case, it is prevented that light reflected by the surface of the skin or disturbance light from the outside penetrates the translucent board 8, since the surface of the translucent board 8 is in intimate contact with the surface of the user's skin. However the user feels uncomfortable if the pressure applied to the user's wrist 4 is too high. Therefore it is desirable that the pressure applied to the user's wrist 4 is limited to 5-15 mmHg.

Appx03355

[0019]  The light emitting element **6** and the light receiving element **7** are arranged side by side as shown in **FIG. 2**. Accordingly the length of the detecting element **2** from the right side to the left side in **FIG. 2** is longer than the length from the upper side to the lower side. If the detecting element **2** is arranged so that its longitudinal direction (from the right side to the left side in **FIG. 2**) agrees with the circumferential direction of the user's wrist **4**, it has a tendency to slip off. Therefore it is desirable that the detecting element **2** is arranged so that its longitudinal direction agrees with the longitudinal direction of the user's arm. The dedicated belt **10** is attached to the detecting element **2** so that it can fix the detecting element **2** on the user's wrist **4** in this way.

[0020]  The sensor body **3** is connected to the detecting element **2** by a signal line **13**, and includes, as shown in **FIG. 2**, a drive circuit **11**, a microcomputer **12**, and a monitor display (not shown). The drive circuit **11** drives the light emitting element **6** to emit light toward the wrist **4**. The microcomputer **12** calculates the pulse rate from the reflected light received by the detecting element **2**. This reflected light varies with the user's pulsation. The monitor display shows the calculated pulse rate and the like.

[0021]  The sensor body **3** is arranged on the top of the detecting element **2**, and fixed on the user's wrist **4** by a dedicated belt **14** attached to the sensor body **3**. A cushion **15** such as a sponge or a gel is inserted between the detecting element **2** and the sensor body **3** so that the detecting element **2** does not directly contact the sensor body **3**.

[0022]  The pulse wave sensor **1** detects the pulse wave of the user's body as follows. The light emitting element **6** emits light toward the user's wrist **4**, a portion of the emitted light penetrates the capillary arteriole **16** in the inside of the user's wrist **4** and is absorbed by the haemoglobin in the blood. The rest of the emitted light is reflected and scattered by the capillary arteriole **16**, and partly reaches the light emitting element **7**. As the amount of the haemoglobin in the blood varies in waves due to the pulsation of the user's blood, the amount of the light absorbed by the haemoglobin also varies in waves. As a result, the amount of the light which is reflected by the capillary arteriole **16** and reaches the light receiving element **7** varies in waves. This variation in the amount of the light received by the light receiving element **7** is detected as the pulse wave information.

[0023]  If the detecting element **2** is arranged on the front side of the user's wrist **4**, the amount of the light received the light receiving element **7** is larger. That is, the intensity of the signal received by the light receiving element **7** is higher. However, the detecting element **2** has a tendency to slip off the detecting position of the user's wrist **4** as the user moves his/her wrist, and therefore the intensity of the light received by the light receiving element **7** largely varies depending on the shift amount of the detecting element **2**. As shown in **FIG. 3B**, in the case that the detecting element **2** is arranged on the front side of the user's wrist **4**, the pulse wave can be detected well if the user is at rest. However, when the user is in motion, the detected pulse wave is adversely affected by the movement of the user's wrist **4**.

[0024]  In contrast to this, if the detecting element **2** is arranged on the back side of the user's wrist **4**, the user will not move his/her wrist unconsciously since the radius and the ulna inside the user's wrist **4** are not pressed and

consequently the user does not feel so uncomfortable. Further, the detecting element **2** will not shift so widely even if the user's wrist moves. Therefore the detecting element **2** is stably fixed to the detecting position of the user's wrist **4**. As a result, the pulse wave is detected stably without being affected by the movement of the user's wrist **4** as shown in **FIG. 3A**.

[0025]  The detecting element **2** is arranged on the user's wrist **4** so that the convex surface of the translucent board **8** is in intimate contact with the surface of the user's skin. Thereby it is prevented that the detecting element **2** slips off the detecting position of the user's wrist **4**. If the translucent board **8** has a flat surface, the detected pulse wave is adversely affected by the movement of the user's wrist **4** as shown in **FIG. 4B**. However, in the case that the translucent board **8** has a convex surface like the present embodiment, the variation of the amount of the reflected light which is emitted from the light emitting element **6** and reaches the light receiving element **7** by being reflected by the surface of the user's skin is suppressed. It is also prevented that noise such as disturbance light from the outside penetrates the translucent board **8**. Therefore the pulse wave can be detected without being affected by the movement of the user's wrist **4** as shown in **FIG. 4A**.

[0026]  The detecting element **2** and the sensor body **3** is attached to theuser's wrist **4** by the dedicated belts**10** and **14**, respectively. That is, the detecting element **2** and the sensor body **3** are allowed to move relatively. Further the cushion **15** is arranged between the detecting element **2** and the sensor body **3**. Therefore, if force is applied to the sensor body **3** or the sensor body **3** moves, the force applied to the sensor body **3** or the movement of the sensor body **3** cannot be transmitted to the detecting element **2** easily.

[0027]  Accordingly the detecting element **2** is stably fixed to the user's wrist **4**. As a result, the pulse wave sensor can detect the pulse wave at a high S/N ratio, that is, it can provide high detection probability, not only when the user is at rest but also when the user is taking light exercise.

[0028]  Modifications

[0029]  In the above embodiment, the sensor body **3** need not include the microcomputer **12** if it includes a transmitter instead. In this case, the pulse wave information detected by the detecting element **2** is transmitted to a receiver by the transmitter. The sensor body **3** can be downsized and light in weight in this case and consequently the force applied to the sensor body **3** or the movement of the sensor body **3** cannot be transmitted to the detecting element **2** easily.

[0030]  In the above embodiment, the detecting element **2** and the sensor body **3** may be worn on the back side of the user's forearm.

What is claimed is:

1. A pulse wave sensor for detecting a pulse wave of a human body comprising:

a detecting element including a light emitting element and a light receiving element; and

a sensor body including a circuit connected to the detecting element via a signal line,

wherein the detecting element is constructed to be worn on a back side of a user's wrist or a user's forearm.

Appx03356

3

**2**. A pulse wave sensor as set forth in claim 1, wherein:

the detecting element includes a translucent member which is transparent to light and arranged on the light emitting element and the light receiving element;

the translucent member has a convex surface; and

the translucent member is arranged on the back side of the user's wrist or the user's forearm so that the convex surface of the translucent member is in intimate contact with a surface of the user's skin.

**3**. A pulse wave sensor for detecting a pulse wave of a human body comprising:

a detecting element including a light emitting element and a light receiving element; and

a sensor body including a circuit connected to the detecting element via a signal line,

wherein the detecting element is constructed to be worn on a user's wrist or a user's forearm,

the pulse wave sensor further comprising:

a first belt for fixing the detecting element to the user's wrist or the user's forearm; and

a second belt for fixing the sensor body to the user's wrist or the user's forearm.

**4**. A pulse wave sensor for detecting a pulse wave of a human body comprising:

a detecting element including a light emitting element and a light receiving element; and

a sensor body including a circuit connected to the detecting element via a signal line,

wherein the detecting element is constructed to be worn on a user's wrist or a user's forearm,

wherein the sensor body is arranged on the detecting element, and

wherein a cushion is arranged between the detecting element and the sensor body.

**5**. A pulse wave sensor for detecting a pulse wave of a human body comprising:

a detecting element including a light emitting element and a light receiving element; and

a sensor body including a circuit connected to the detecting element via a signal line,

wherein the detecting element is constructed to be worn on a user's wrist or a user's forearm,

wherein the light emitting element and the light receiving element are arranged side by side in a longitudinal direction of the user's arm.

**6**. A pulse wave sensor as set forth in claim 5, wherein:

the detecting element includes a translucent member which is transparent to light and arranged on the light emitting element and the light receiving element;

the translucent member has a convex surface; and

the translucent member is arranged on the user's wrist or the user's forearm so that the convex surface of the translucent member is in intimate contact with a surface of the user's skin.

**7**. A pulse wave sensor as set forth in claim 6 further comprising:

a first belt for fixing the detecting element to the user 's wrist or the user's forearm; and

a second belt for fixing the sensor body to the user's wrist or the user's forearm.

**8**. A pulse wave sensor as set forth in claim 7, wherein:

the sensor body is arranged on the detecting element; and

a cushion is arranged between the detecting element and the sensor body.

* * * * *

0090-6689/88/167–173/$02.00/0
MEDICAL INSTRUMENTATION
Copyright © 1988 by the Association for the Advancement of Medical Instrumentation

Vol. 22, No. 4

# Design and Evaluation of a New Reflectance Pulse Oximeter Sensor

Y. MENDELSON, PhD, J. C. KENT, MS, B. L. YOCUM, BS, AND M. J. BIRLE, BS

The design and construction of a new optical reflectance sensor suitable for noninvasive monitoring of arterial hemoglobin oxygen saturation with a pulse oximeter is described. The reflectance sensor was interfaced to a Datascope ACCUSAT pulse oximeter that was specially adapted for this study to perform as a reflectance oximeter. We evaluated the reflectance sensor in a group of 10 healthy adult volunteers. $SpO_2$ obtained from the forehead with the reflectance pulse oximeter and $SpO_2$ obtained from a finger sensor that was connected to a standard ACCUSAT transmittance pulse oximeter were compared simultaneously to arterial blood samples analyzed by an IL 282 CO-Oximeter. The equation for the best fitted linear regression line between the reflectance $SpO_2$ and $HbO_2$ values obtained from the reference IL 282 CO-Oximeter in the range between 62 and 100% was: $SpO_2$ (%) = 4.78 + 0.96 (IL); n = 110. The regression analysis revealed a high degree of correlation (r = 0.98) and a relatively small standard error of the difference (SEE = 1.82%). The mean and standard deviations for the difference between the reflectance $SpO_2$ and IL 282 measurements was 1.38 and 1.85%, respectively. This study demonstrates the ability to acquire accurate $SpO_2$ from the forehead using a reflectance sensor and a pulse oximeter.

The recent development of transmittance pulse oximeters by combining optical plethysmography with the spectrophotometric determination of hemoglobin oxygen saturation in arterial blood ($SpO_2$) has provided a widely used technique for monitoring hypoxemia.

With transmittance pulse oximeters, sensor application is limited to several peripheral locations where light can be readily transmitted and detected, such as the finger tips, ear lobes, and toes on adults, and the foot or palms on infants. Alternatively, skin reflectance oximetry could enable $SpO_2$ measurement from more centrally located parts of the body such as the forearms, chest, and forehead, which cannot be monitored using conventional transillumination techniques.

It appears that reflectance pulse oximetry may be particularly suitable for direct assessment of fetal distress resulting from hypoxia during delivery, if used in addition to monitoring fetal heart rate by a scalp ECG electrode. Another suggested application of noninvasive reflectance pulse oximetry is for monitoring $SpO_2$ in the external carotid artery through a sensor applied to the skin near the superficial temporal artery.[1]

In this article we describe the design and construction

of an optical reflectance sensor suitable for noninvasive monitoring of $SpO_2$ with a pulse oximeter. The experimental evaluation of the new sensor and verification that $SpO_2$ obtained with the reflectance sensor compare favorably with: (a) $SpO_2$ measured simultaneously by a finger sensor connected to a standard transmittance pulse oximeter, and (b) $HbO_2$ measured by the IL 282 CO-Oximeter from samples of arterial blood in a group of 10 healthy adult volunteers is presented.

## PULSE OXIMETRY

The principle of pulse oximetry was proposed by Aoyagi et al[2] and further developed by Yoshiya et al.[3] This unique approach is based on the change in light absorption by tissue. The change is caused primarily by arterial blood pulsation. The pulsating arterioles in a vascular bed, by expanding and relaxing, modulate the amount of light absorbed by the tissue and thus produce a characteristic photoplethysmographic waveform. The changes in light absorption are used to measure $SpO_2$ noninvasively.

Initial attempts to develop a noninvasive oximeter that can measure oxygen saturation by analyzing the absolute light intensity that is diffusely reflected from the skin were only partially successful, mainly because of limited accuracy associated with variations in tissue attenuation and differences in skin pigmentation. Recently, we showed that accurate $SpO_2$ measurements can be made utilizing a reflectance sensor and the concept of pulse oximetry.[4, 5] We found that $SpO_2$ can be calculated from the ratio of the reflected red and infrared photoplethysmograms based on a normalization in which the pulsatile (ac) component of the red and infrared photoplethysmograms is divided by the respective nonpulsatile (dc) component. The conversion of the red/infrared ratios to $SpO_2$ is performed by an empirical calibration of the oximeter. This process is performed by comparing the red/infrared ratios measured by the pulse oximeter with blood $HbO_2$ values obtained from an in vitro oximeter.

The excursions of photoplethysmographic signals detected by reflectance and transmittance sensors when placed on the forehead and finger, respectively, are inversely related to changes in arterial blood pulsations. Although the amplitude of the pulsatile component of the two waveforms is different, the shapes of the pho-

From the Worcester Polytechnic Institute, Biomedical Engineering Program, Worcester, MA 01609.

Address correspondence and requests for reprints to Yitzhak Mendelson, PhD, Biomedical Engineering Program, Worcester Polytechnic Institute, 100 Institute Rd., Worcester, MA 01609.

1    APPLE 1015

Appx03358

toplethysmograms are virtually identical, as illustrated in Figure 1.

## SENSOR DESIGN

The basic optical sensor of a pulse oximeter consists of a red and an infrared light emitting diode (LED) and a suitable photodetector. In a transmittance pulse oximeter sensor, the LEDs and the photodetector are mounted in opposition, whereas in a reflectance sensor, the LEDS and the photodetector are mounted side by side. The wavelength of the red LED is typically chosen from regions of the spectra where the absorption coefficient of Hb and HbO$_2$ are markedly different (*e.g.*, 660 nm). The infrared wavelength, on the other hand, is typically chosen from the spectral region where the difference in absorption coefficients of Hb and HbO$_2$ is relatively small (*e.g.*, 930 nm). The spectral response of the photodetector must overlap the emission spectra of the red and infrared LEDs.

Practically, the major limitation in reflection pulse oximetry is the comparatively low-level photoplethysmograms typically recorded from low-density, vascular areas of the skin. The feasibility of reflection pulse oximetry, therefore, is essentially dependent on the ability to design a sensor that can detect sufficiently strong reflection photoplethysmographic signals from various locations on the body.

The light from the LEDs in the reflectance sensor is diffused by the skin in all directions. This suggests that to detect most of the backscattered radiation from the skin, the photodetector must be able to detect light from an area concentric with the LEDs. The intensity of the backscattered light decreases in direct proportion to the square of the distance between the photodetector and the LEDs; thus the photodetector should be mounted close to the LEDs. We found experimentally that a separation of 4–5 mm between the LEDs and photodetector provides the best sensitivity in terms of detecting adequately large pulsatile components. We also found that when multiple photodetectors are arranged at equal distances around the LEDs, the total amount of backscattered light that can be detected by the reflectance sensor is directly proportional to the number of photodetectors.

The optical reflectance sensor used in this study consists of two red (peak emission wavelength: 660 nm) and two infrared (peak emission wavelength: 930 nm) LED chips (dimensions: 0.3 × 0.3 mm), and six silicon photodiodes (active area: 2.74 × 2.74 mm) arranged symmetrically in a hexagonal configuration as shown in Figure 2. To maximize the fraction of backscattered light collected by the sensor, the currents from all six photodiodes were summed. The LEDs and photodiode chips were mounted with conductive epoxy (Epo-tek H31, Epoxy Technology, Inc. Billerica, Massachusetts) on a ceramic substrate (dimensions: 13.2 × 13.2 × 0.25 mm) that was housed in a standard 24-pin (dimensions: 19 × 19 mm) microelectronic package (AIRPAX, Cambridge, Maryland), which is commonly used for packaging electronic circuits. The optical components were interconnected and wired to the package pins with 1-mil (0.0254-mm diameter) aluminum wires, by a conventional ultrasonic bonding technique. To minimize the amount of light transmission and reflection between the LEDs and the photodiodes within the sensor, a ring-shaped, optically opaque shield of black Delrin (Dupont, Wilmington, Delaware) was placed between the LEDs and the photodiode chips. The optical components were encapsulated inside the package using optically clear adhesive (NOA-63, Norland Products, Inc., New Brunswick, New Jersey). The microelectronic package was mounted inside a black Delrin housing (dimensions: 3.2-cm diameter × 1.5-cm high). The sensor can be attached to the skin by means of double-sided adhesive tape. The weight of the entire sensor assembly is approximately 11 g.

## SIGNAL PROCESSING

The optical reflectance sensor was interfaced to a com-



INFRARED REFLECTANCE PLETHYSMOGRAMS

2 sec

INFRARED TRANSMITTANCE PLETHYSMOGRAMS

**Figure 1.** Relative infrared reflectance and transmittance photoplethysmograms recorded from the forehead and finger, respectively.

Appx03359



**Figure 2.** Diagram (A and B) and photograph (C) of the reflectance pulse oximeter sensor.

mercially available ACCUSAT (Datascope, Paramus, New Jersey) pulse oximeter.[6] The oximeter circuitry generates separate digital pulses to energize alternately the red and infrared LEDs in the sensor. The time-multiplexed current pulses from the photodiodes, which correspond to the red and infrared light intensities reflected from the skin, are first converted by the oximeter to proportional voltage pulses. The pulses are subsequently demultiplexed into two separate channels. The red and infrared photoplethysmographic signals are then amplified and high-pass filtered to separate the ac and dc components of each photoplethysmographic waveform.

Before the study began, an ACCUSAT pulse oximeter was modified by adjusting the intensities of the red and infrared LEDs so that the dc component of each photoplethysmogram was approximately equal to the corresponding dc level obtained from transmittance photoplethysmograms as measured by a standard ACCUSAT sensor designed for a finger. The adjustment was performed while the reflectance and transmittance sensors were applied to the forehead and right index finger of a white subject breathing ambient air. No further adjustments were made throughout the study. The reflectance oximeter was adapted to provide a continuous readout of the ac and dc components of the red and infrared photoplethysmograms.

In addition to the modified ACCUSAT pulse oximeter, a second standard ACCUSAT transmittance pulse oximeter was used to measure $SpO_2$ with a finger sensor. $SpO_2$ from each of the two pulse oximeters was acquired every 2 s (0.5 Hz) using an AT&T 6300 personal computer. The conversion of the transmitted and reflected red/infrared ratios measured by each ACCUSAT pulse oximeter to $SpO_2$ was performed using the same internal calibration algorithms. The exact algorithm for calculating $SpO_2$ was unavailable.

## IN VIVO EVALUATION

The purpose of this study was to evaluate the performance of the reflectance pulse oximeter sensor during progressive steady-state hypoxia in humans and to compare the values obtained with the reflectance sensor to those from an ACCUSAT transmittance pulse oximeter and from the IL CO-Oximeter detecting the $HbO_2$ of simultaneously drawn arterial blood samples.

Tests were performed on 10 healthy, nonsmoking, adult volunteers of different ages and skin pigmentations in compliance with the University of Massachusetts Medical Center review guidelines for humans experiments. The subject distribution was: one deeply pigmented black, two subjects of lightly pigmented Oriental descent, and

Appx03360

two darkly tanned and five lightly tanned whites. Subject age ranged from 22–39 years (mean ± SD: 29.2 ± 5.6 years). Measured hematocrit was in the range of 35–44% (mean ± SD: 40 ± 2.65%). Each volunteer was informed of the complete procedure and possible risks associated with arterial cannulation and hypoxic gas breathing. Each volunteer received monetary compensation for participation in the study.

A modified Allen's test for assessing the radial and ulnar arterial blood circulation to the hand was performed on each subject prior to arterial cannulation. A Teflon cannula (22-gauge, 3.2-cm long) was inserted into the radial or ulnar artery of each subject after the subcutaneous tissue around the puncture site was anesthetized locally with a 1-ml injection of 1% lidocaine hydrochloride (Xylocaine).

All instruments warmed up for at least 30 min before the study. The transmittance sensor of the ACCUSAT pulse oximeter was attached to the index finger on the hand opposite that of the arm with the arterial cannula. The sensor of the reflectance pulse oximeter was attached to the middle of the forehead. Samples of arterial blood (approximately 1 ml/sample) were drawn into 3-ml heparinized syringes and analyzed immediately by the Instrumentation Laboratories IL 282 CO-Oximeter (Instrumentation Laboratories, Lexington, Massachusetts). Simultaneous measurements of total hemoglobin (Hb), oxyhemoglobin ($HbO_2$), carboxyhemoglobin (HbCO), and methemoglobin (Hi) were obtained from each blood sample. The arterial cannula was flushed with 0.9% normal heparinized saline solution (1000 units/250 ml) between blood samplings. Care was taken to ensure that the arterial line and the blood-sampling syringes were free of air bubbles.

A standard lead I ECG and the end-tidal $CO_2$ were continuously monitored by a Hewlett-Packard 78345A patient monitor (Hewlett-Packard, Andover, Massachusetts). Each subject was placed in the supine position. A face mask was tightly fitted over the subject's mouth and nose, and the subject was asked to breathe spontaneously different $O_2$ and $N_2$ gas mixtures. The inspired $O_2/N_2$ gas was supplied by a modified Heidbrink anesthesia machine (Ohio Medical Products, Madison, Wisconsin). The breathing circuit was equipped with a $CO_2$ scrubber (soda lime). Inspired $O_2$ concentration was adjusted between 10 and 100% and was monitored continuously with an IL 408 oxygen monitor that was inserted in the inspiratory part of the breathing circuit.



**Figure 3.** Comparison of the IL 282 CO-Oximeter (x-axis) and the red/infrared ratios measured by the reflectance pulse oximeter (y-axis) during progressive steady-state hypoxia in 10 subjects. $y = 3.51 - 0.030x$; $r = |-0.98$; SEE = 0.060; n = 110; p < 0.001. The solid line represents the best fitted linear regression line.

Appx03361



**Figure 4.** Comparison of SpO₂ measurements obtained from the reflectance pulse oximeter (y-axis) and the IL 282 CO-Oximeter (x-axis) during progressive steady-state hypoxia in 10 subjects. $y = 4.78 + 0.96x$; $r = 0.98$; SEE = 1.82; $n = 110$; $p < 0.001$. The solid line represents the best fitted linear regression line. The dashed line represents identity.

Progressive hypoxemia was gradually induced by changing the inspired fractions of $O_2$ and $N_2$. To provide a relatively uniform distribution of SpO₂ data points, samples were recorded during both desaturation and reoxygenation. Initially, the inspired $O_2$ concentration was changed in step decrements, each producing approximately a 5% decrease in SpO₂ as determined from the ACCUSAT transmittance pulse oximeter display. The inspired $O_2$ was maintained at each level until the pulse oximeter readings were stable. When the inspired $O_2$ reached 10%, corresponding to a saturation of approximately 65%, the process was reversed, and the inspired $O_2$ was increased in a similar stepwise manner to 100%. SpO₂ from the ACCUSAT and the reflectance pulse oximeters during blood sampling was acquired every 2 s (0.5Hz), using an AT&T 6300 personal computer.

None of the subjects showed ECG abnormalities before or during the study. All subjects tolerated the procedure well, without adverse reactions.

**DATA ANALYSIS**

For each step change in inspired $O_2$, readings from the ACCUSAT transmittance and reflectance pulse oximeters were averaged for 10 s before and after blood sampling and compared with the corresponding HbO₂ values measured by the IL 282 CO-Oximeter. To avoid operator biases, the data from each pulse oximeter were acquired automatically by the computer and later subjected to the same statistical tests. Averaged readings for the 10 subjects were pooled and a least-squares linear regression analysis was performed. Student's *t* test determined the significance of each correlation; $p < 0.001$ was considered significant.

The SpO₂ displayed by two-wavelength pulse oximeters account only for the presence of HbO₂ and Hb in the blood. The presence of HbCO, Hi, or any other interfering substance in the blood is not accounted for. Therefore, the term often used to represent SpO₂ measured by pulse oximeters is functional saturation, *i.e.*, HbO₂/(Hb + HbO₂). The IL 282 CO-Oximeter, on the other hand, displays the percentage of oxygenated hemoglobin expressed as a fraction of the total hemoglobin present in the blood, *i.e.*, HbO₂/(Hb + HbO₂ + HbCO + Hi). To compare SpO₂ measured by the pulse oximeters with corresponding readings from the IL 282

Appx03362

CO-Oximeter, both HbCO and Hi values from each blood sample were used to convert the IL 282 readings to functional SpO₂, according to the following relationship[7]:

$$\%SpO_2 \text{ (functional)} = (HbO_2 \times 100)/ (100 - HbCO - Hi).$$

## RESULTS

A total of 110 pairs of data points were used in the regression analysis, which gave the estimated slopes and intercepts of the regression lines. An average of 11 blood samples was collected from each subject. Each pair of data points represents a different hypoxic level. Regression analysis of the $HbO_2$ values obtained from the IL 282 CO-Oximeter (x-axis) vs the normalized red/infrared ratios (y-axis) as measured by the reflectance pulse oximeter is shown in Figure 3. The equation for the best fitted linear regression line was: $y = 3.51 - 0.030x$; $r = -0.98$; SEE = 0.060; $p < 0.001$. A comparison of SpO₂ readings from the reflectance pulse oximeter (y-axis) and the IL 282 CO-Oximeter (x-axis) is shown in Figure 4. The equation for the best fitted linear regression line was: $y = 4.78 + 0.96x$; $r = 0.98$; SEE = 1.82;

$p < 0.001$. Figure 5 shows the comparison of SpO₂ values measured by the ACCUSAT reflectance pulse oximeter (y-axis) and the ACCUSAT transmittance pulse oximeter (x-axis). The linear regression equation for this comparison is: $y = 5.85 + 0.95x$; $r = 0.98$; SEE = 2.23; $p < 0.001$. The standard deviations of the mean differences between the reflectance oximeter SpO₂ and IL 282 HbO₂ values for four different saturation ranges are summarized in Figure 6.

## DISCUSSION

Pulse oximetry has become a widely utilized medical technology, particularly in anesthesia and intensive care. Pulse oximeters offer significant monitoring advantages because of their reliability, simple operation, and the benefit of providing continuous SpO₂ monitoring.

Noninvasive monitoring of oxygen saturation based upon skin-reflectance spectrophotometry was first described by Brinkman and Zijlstra.[8] They showed that changes in oxygen saturation can be recorded noninvasively from an optical sensor attached to the forehead. The use of light reflection instead of tissue transillumi-



**Figure 5.** Comparison of SpO₂ measured by the reflectance pulse oximeter (y-axis) and the finger transmittance pulse oximeter (x-axis) during progressive steady-state hypoxia in 10 subjects. $y = 5.85 + 0.95x$; $r = 0.98$; SEE = 2.23; $n = 110$; $p < 0.001$. The solid line represents the best fitted linear regression line. The dashed line represents identity.

Appx03363



**Figure 6.** Standard deviations of the mean differences between the reflectance pulse oximeter and the IL 282 CO-Oximeter. N is the number of paired data points included in the statistical analysis.

nation was suggested to enable noninvasive monitoring from virtually any skin surface. More recently, Cohen and Wadsworth[9] and Takatani[10] attempted to develop a skin reflectance oximeter utilizing a similar spectrophotometric approach. In those three reflectance oximeters, oxygen saturation was calculated from the absolute light intensity diffusely reflected (backscattered) from the skin. Although these developments represent significant advancements in noninvasive oximetry, the major problems were limited accuracy, poor reproducibility, and difficulties in absolute calibration.

Available transmittance pulse oximeters can be used only on a few specific peripheral locations. The approach presented in this article demonstrates that $SpO_2$ can be measured from an alternate site, specifically the forehead. This technique provides a clinically acceptable alternative to presently available transmittance pulse oximeters. Although we found that reflectance photoplethysmograms can be detected from several locations on the body (*e.g.*, forearm, chest, and back), the relatively small, photoplethysmographic signals lead to practical problems when processed by the pulse oximeter. Therefore, the choice of the forehead as a site for our study was based on the fact that at this location, relatively large reflectance photoplethysmographic signals can be detected.

The relationship between the red/infrared ratios measured by the reflectance pulse oximeter and $HbO_2$ measured by the IL 282 CO-Oximeter produced a regression relationship similar in slope and intercept to that observed from transmittance pulse oximeters.[11] This suggests that $SpO_2$ monitoring from the forehead can be

performed successfully using a reflectance sensor connected to a standard transmittance pulse oximeter without significant modifications of hardware and software.

## SUMMARY

We compared simultaneous $SpO_2$ from a reflectance pulse oximeter sensor attached to the forehead and from a transmittance pulse oximeter with a sensor attached to a finger with $HbO_2$ from arterial blood samples in a group of 10 healthy adult volunteers. A high degree of correlation was found for $SpO_2$ between 62 and 100%. Relative to arterial blood samples, the SEE for the reflectance pulse oximeter was 1.82%. We conclude that in situations in which a transmittance pulse oximeter cannot be used reliably, the forehead may be considered as a suitable alternative site for monitoring $SpO_2$ with a reflectance pulse oximeter sensor.

We gratefully acknowledge the clinical assistance of Albert Shahnarian, PhD, Gary W. Welch, MD, PhD, and Robert M. Giasi, MD, Department of Anesthesiology, University of Massachusetts Medical Center, Worcester, Massachusetts. We are indebted to Paul A. Nigroni, Datascope Corporation, Paramus, New Jersey, and Kevin Hines, Semiconductor Division, Analog Devices, Wilmington, Massachusetts, for their technical assistance. Financial support for this study was provided by the Datascope Corporation.

## REFERENCES

1. Cheng EY, Hopwood M, Kay J: Pulse oximetry: Evaluation of a new sensor. Proceedings of the Twenty-second AAMI Annual Meeting, p 20, 1987
2. Aoyagi T, Kishi M, Yamaguchi K, Watanabe S: Improvement of the earpiece oximeter. Thirteenth Annual Meeting Jpn Soc Med Electronics Biomed Eng 90–91, 1974
3. Yoshiya I, Shimada Y, Tanaka K: Spectrophotometric monitoring of arterial oxygen saturation in the finger tip. Med Biol Eng Comput 18:27–32, 1980
4. Mendelson Y, Cheung PW, Neuman MR, Fleming DG, Cahn SD: Spectrophotometric investigation of pulsatile blood flow for transcutaneous reflectance oximetry. Adv Exp Med Biol 159: 93–102, 1983
5. Mendelson Y, Ochs BD: Sensor development for reflectance pulse oximetry. Proc Thirty-ninth ACEMB, p 222, 1986
6. Mendelson Y, Kent JC, Shahnarian A, Welch GW, Giasi RM: Evaluation of the Datascope ACCUSAT pulse oximeter in healthy adults. J Clin Monit 4: 59–63, 1988
7. IL-282 CO-Oximeter Operator's Manual: Lexington, Massachusetts, Instrumentation Laboratory, Inc., 1977
8. Brinkman R, Zijlstra WG: Determination and continuous registration of the percentage oxygen saturation in clinical conditions. Arch Chir Neerl 1:177–183, 1949
9. Cohen A, Wadsworth N: A light emitting diode skin reflectance oximeter. Med Biol Eng Comput 10:385–391, 1972
10. Takatani S: On the theory and development of a noninvasive tissue reflectance oximeter. PhD dissertation, Case Western Reserve Univ, Cleveland, Ohio, 1978
11. Discussion IX: *In* Payne JP, Severinghaus JW (eds): Pulse Oximetry, Springer-Verlag, 1986



US 20070145255A1

(19) **United States**

(12) **Patent Application Publication**   (10) Pub. No.: **US 2007/0145255 A1**

Nishikawa et al.                          (43) **Pub. Date:    Jun. 28, 2007**

(54) **LENS-EQUIPPED LIGHT-EMITTING DIODE DEVICE AND METHOD OF MANUFACTURING THE SAME**

(76) Inventors: **Shouichi Nishikawa**, Yokohama-shi (JP); **Tetsuro Komatsu**, Yokohama-shi (JP); **Hatsuo Takezawa**, Yokohama-shi (JP); **Yukinori Aoki**, Yokohama-shi (JP)

Correspondence Address:
**OBLON, SPIVAK, MCCLELLAND, MAIER & NEUSTADT, P.C.**
**1940 DUKE STREET**
**ALEXANDRIA, VA 22314 (US)**

(21) Appl. No.:    **11/613,503**

(22) Filed:    **Dec. 20, 2006**

(30)    **Foreign Application Priority Data**

Dec. 26, 2005    (JP) ....................................... 2005-373498

**Publication Classification**

(51) **Int. Cl.**
     *H01J   5/02*     (2006.01)
     *H01J   40/14*    (2006.01)
(52) **U.S. Cl.** ............................................................. **250/239**

(57)    **ABSTRACT**

A lens-equipped light-emitting diode device of the present invention includes a lead frame in which an electrode is formed, a light-emitting diode which is mounted on the electrode of the lead frame, an outer peripheral unit which is made of a first resin, which is provided on the lead frame, and in which a hollow portion is formed while an area including at least the light-emitting diode is exposed in the outer peripheral unit, a sealing portion which is made of a second resin filled in the lead frame of the hollow portion of the outer peripheral unit, and which seals the light-emitting diode, and a lens unit made of a third resin laminated and filled in the sealing portion.



APPLE 1023

Appx03443

Case: 22-1631    Document: 45-7    Page: 301    Filed: 07/12/2023



Case: 22-1631     Document: 45-7     Page: 302     Filed: 07/12/2023



FIG. 6

FIG. 7

FIG. 8

FIG. 9

Appx03445



FIG. 10

FIG. 11

FIG. 12

FIG. 13
(PRIOR ART)

US 2007/0145255 A1

Jun. 28, 2007

1

# LENS-EQUIPPED LIGHT-EMITTING DIODE DEVICE AND METHOD OF MANUFACTURING THE SAME

## CROSS-REFERENCE TO RELATED APPLICATIONS

[0001]  This application is based upon and claims the benefit of priority from prior Japanese Patent Application No. 2005-373498, filed Dec. 26, 2005, the entire contents of which are incorporated herein by reference.

## BACKGROUND OF THE INVENTION

[0002]  1. Field of the Invention

[0003]  The present invention relates to a lens-equipped light-emitting diode device which extracts light from a light-emitting diode through a lens and a method of manufacturing the same, and particularly to a lens-equipped light-emitting diode device which is excellent for light extraction efficiency and reliability and whose production cost can be reduced.

[0004]  2. Description of the Related Art

[0005]  FIG. 13 is a longitudinal sectional view showing a conventional lens-equipped light-emitting diode device 100. In the lens-equipped light-emitting diode device 100, a light-emitting diode element 102 is mounted through a die mounting material (not shown) on a lead frame 101 in which an electrode is formed, and an electrode of the light-emitting diode element 102 and an electrode exposed outside the lead frame are connected by a bonding wire 103.

[0006]  A sealing portion 104 made of resin is formed around the light-emitting diode element 102, and an outer peripheral unit 105 is formed outside the lead frame 101 and light-emitting diode element 102 using a white thermoplastic resin. A lens 106 is attached to upwardly collect light emitted from the light-emitting diode element, and the lens 106 is made of a transparent resin produced in a different process. In FIG. 13, the number 107 designates a bonding agent.

[0007]  Generally a transparent resin is used as the sealing portion 104. Recently, a white light-emitting diode device is proceeding toward the practical use in illumination. In this case, frequently a fluorescent material for converting blue or UV light emitted from the light-emitting diode element is mixed into the transparent resin.

[0008]  In the conventional lens-equipped light-emitting diode device, the lens 106 produced in the different process is attached to the outer peripheral unit 105 by bonding or fitting. A method of casting a thermosetting resin into the outer peripheral unit 105 is also adopted (for example, see Jpn. Pat. Appln. KOKAI Publication No. 2004-343059).

[0009]  In the conventional lens-equipped light-emitting diode device, there are the following problems. In the case where the lens 106 is attached to the outer peripheral unit 105 by bonding or fitting, sometimes a micro-gap is generated between the sealing portion 104 and lens 106, which decreases light extraction efficiency. There is also generated the problem that mechanical strength or a heat-resistant property is degraded due to poor adhesion between the lens 106 and the outer peripheral unit 105.

[0010]  On the other hand, in a production process, the following factors become an obstacle for reducing assembly cost. That is, an assembly process of attaching the lens 106 to the outer peripheral unit 105 is required, and an optical axis adjustment process is required to accurately attaching the lens 106 to the outer peripheral unit 105. In the case where the lens 106 is formed by casting, only the thermosetting resin is used. However, generally a long-time curing process is required for the casting, so that the cost reduction also becomes the problem in the casting.

## BRIEF SUMMARY OF THE INVENTION

[0011]  In view of the foregoing, an object of the invention is to provide a lens-equipped light-emitting diode which is excellent in light extraction efficiency and reliability while production cost can be reduced, and a production method thereof.

[0012]  In order to achieve the object, the lens-equipped light-emitting diode device according to the invention and the production method thereof have the following configurations.

[0013]  A lens-equipped light-emitting diode device comprises: a support member in which an electrode is formed; a light-emitting diode which is mounted on the electrode of the support member; an outer peripheral unit which is provided on the support member, a hollow portion being formed while an area including at least the light-emitting diode is exposed in the outer peripheral unit made of a first resin; a sealing portion which is made of a second resin, the support member side of the hollow portion of the outer peripheral unit being filled with the second resin to seal the light-emitting diode; and a lens unit which is made of a third resin, the lens unit being laminated on the sealing portion by integral molding.

[0014]  A method of producing a lens-equipped light-emitting diode device comprises: a process of mounting a light-emitting diode element on a support member; a first positioning process of positioning the support member in a first die; an outer peripheral unit forming process of supplying a resin into the first die to form an outer peripheral unit; a sealing process of sealing the light-emitting diode element; a second positioning process of positioning the support member in a second die; and a lens unit forming process of supplying a resin into the second die to form a lens unit.

[0015]  Additional objects and advantages of the invention will be set forth in the description which follows, and in part will be obvious from the description, or may be learned by practice of the invention. The objects and advantages of the invention may be realized and obtained by means of the instrumentalities and combinations particularly pointed out hereinafter.

## BRIEF DESCRIPTION OF THE SEVERAL VIEWS OF THE DRAWING

[0016]  The accompanying drawings, which are incorporated in and constitute a part of the specification, illustrate embodiments of the invention, and together with the general description given above and detailed description of the embodiments given below, serve to explain the principles of the invention.

[0017]   FIG. **1** is a longitudinal sectional view showing a lens-equipped light-emitting diode device according to a first embodiment of the invention;

[0018]   FIG. **2** is a longitudinal sectional view showing a process of producing the lens-equipped light-emitting diode device according to the first embodiment;

[0019]   FIG. **3** is a longitudinal sectional view showing a process of producing the lens-equipped light-emitting diode device according to the first embodiment;

[0020]   FIG. **4** is a longitudinal sectional view showing a process of producing the lens-equipped light-emitting diode device according to the first embodiment;

[0021]   FIG. **5** is a longitudinal sectional view showing a process of producing the lens-equipped light-emitting diode device according to the first embodiment;

[0022]   FIG. **6** is a longitudinal sectional view showing a process of producing the lens-equipped light-emitting diode device according to the first embodiment;

[0023]   FIG. **7** is a longitudinal sectional view showing a lens-equipped light-emitting diode device according to a second embodiment of the invention;

[0024]   FIG. **8** is a longitudinal sectional view showing a lens-equipped light-emitting diode device according to a third embodiment of the invention;

[0025]   FIG. **9** is a longitudinal sectional view showing a lens-equipped light-emitting diode device according to a fourth embodiment of the invention;

[0026]   FIG. **10** is a longitudinal sectional view showing a lens-equipped light-emitting diode device according to a fifth embodiment of the invention;

[0027]   FIG. **11** is a longitudinal sectional view showing a lens-equipped light-emitting diode device according to a sixth embodiment of the invention;

[0028]   FIG. **12** is a longitudinal sectional view showing a lens-equipped light-emitting diode device according to a seventh embodiment of the invention; and

[0029]   FIG. **13** is a longitudinal sectional view showing an example of a conventional lens-equipped light-emitting diode device.

## DETAILED DESCRIPTION OF THE INVENTION

[0030]   FIG. **1** is a longitudinal sectional view showing a lens-equipped light-emitting diode device **10** according to a first embodiment of the invention. The lens-equipped light-emitting diode device **10** includes a lead frame **20**, an outer peripheral unit **30**, a sealing portion **40**, and a lens unit **50**. The lead frame **20** is a support member in which an electrode is formed. The outer peripheral unit **30** is formed on the lead frame **20**. The sealing portion **40** is provided in the outer peripheral unit **30** and seals a light-emitting diode **22** and a bonding wire **23**. The lens unit **50** is arranged in an upper portion of the sealing portion **40**.

[0031]   Plural electrodes **21** are formed on the side of a surface **20**a of the lead frame **20**, and a light-emitting diode **22** is mounted on the electrode **21**. A bonding wire **23** is connected to one of the electrodes of the light-emitting diode

**22**, and the bonding wire **23** is connected to the electrode **21**. In FIG. **1**, the number **20**b designates a backside of the lead frame **20**.

[0032]   A white color thermoplastic resin such as PPA, PC, and epoxy resin is used as a first resin forming the outer peripheral unit **30**. A thermosetting resin or a UV curing resin, such as a transparent epoxy resin and transparent silicone, is used as a second resin forming the sealing portion **40**. In the case of the device which emits white light, sometimes a fluorescent material for wavelength conversion is mixed to the resin. The thermosetting resin such as the transparent epoxy resin and the transparent silicone or the thermoplastic resin such as PMMA, PC, and COP is used as a third resin forming the lens unit **50**.

[0033]   A method of producing the lens-equipped light-emitting diode device **10** will be described below. The lead frame **20** is prepared as shown in FIG. **2**, and the light-emitting diode element is mounted on the lead frame with a die mounting material (not shown) as shown in FIG. **3**. Then, these components are inserted in an injection molding die to form the outer peripheral unit **30** using a first white thermoplastic resin as shown in FIG. **4**.

[0034]   As shown in FIG. **5**, wire bonding is performed between the electrode of the light-emitting diode element **22** and the electrode **21** of the lead frame **20**, and the sealing portion **40** is formed around the light-emitting diode element **22** using a second sealing resin. At this point, the sealing portion **40** may be formed by the injection mold with the die or a potting method.

[0035]   These molded components are inserted in the injection molding die different from those for molding the outer peripheral unit **30** and the sealing portion **40**, and a lens unit **50** is integrally molded using a third transparent resin as shown in FIG. **6**. A LIM method is adopted in the case where the thermosetting resin is used, and the injection molding method is adopted in the case where the thermoplastic resin is used.

[0036]   In the lens-equipped light-emitting diode device **10** formed in the above-described manner, because the molding of the lens unit **50** and the attachment of the lens unit **50** to the outer peripheral unit **30** can simultaneously be performed, a process of attaching a resin lens produced by another process to the outer peripheral unit and a process of adjusting an optical axis are not required, which allows cost to be reduced in an assembly process.

[0037]   A gap generated between the lens unit **50** and the outer peripheral unit **30** and a gap generated between the lens unit **50** and the sealing portion **40** can be prevented to improve the light extraction efficiency. Furthermore, attachment strength can be enhanced because the resins are fused at a boundary surface between the lens unit **50** and the sealing portion **40**.

[0038]   Thus, the lens-equipped light-emitting diode device of the first embodiment is excellent in the light extraction efficiency and the reliability, and the production cost can be reduced.

[0039]   FIG. **7** is a longitudinal sectional view showing a lens-equipped light-emitting diode device **10**A according to a second embodiment of the invention. In FIG. **7**, the same

Appx03448

US 2007/0145255 A1                                              Jun. 28, 2007

3

components as those of FIG. **1** are designated by the same numbers, and detailed description thereof will be omitted.

[0040]   A penetration portion **51** is provided in the lens unit **50**, and the penetration portion **51** is latched in the lead frame **20** at a front-edge portion **52** of the penetration portion **51**. The penetration portion **51** penetrates the lens frame **20** to the backside **20**b where the light-emitting diode **22** is not mounted.

[0041]   In the lens-equipped light-emitting diode device **10A** of the second embodiment, the same effect as the lens-equipped light-emitting diode device **10** can also be obtained. The lens-equipped light-emitting diode device **10A** further has the following effect. In the case where the resins forming the outer peripheral unit **30** and the lens unit **50** are different from each other, it is difficult to secure adhesive strength between the outer peripheral unit **30** and the lens unit **50**. Therefore, in the integral molding with the lens unit **50**, the penetration portion **51** is formed to prevent drop-out of the lens unit **50** in such a manner that the penetration portion **51** is filled with a transparent resin to the backside **20**b of the lead frame **20**. This enables the adhesive strength to be enhanced to improve the reliability. The resin having a large shrinkage ratio and linear thermal expansion coefficient is used as the third resin forming the lens unit **51**, which allows the effect to be increased. The thermoplastic resin or the thermosetting resin can be used as the third resin.

[0042]   FIG. **8** is a longitudinal sectional view showing a lens-equipped light-emitting diode device **10B** according to a third embodiment of the invention. In FIG. **8**, the same components as those of FIG. **1** are designated by the same numbers, and detailed description thereof will be omitted.

[0043]   A penetration portion **53** is provided in the lens unit **50**, and the penetration portion **53** is latched in the lead frame **20** at a front-edge portion **54** of the penetration portion **53**. The penetration portion **53** penetrates the outer peripheral unit **30** and the lens frame **20** to the backside **20**b where the light-emitting diode **22** is not mounted.

[0044]   In the lens-equipped light-emitting diode device **10B** of the third embodiment, the same effect as the lens-equipped light-emitting diode device **10A** can also be obtained.

[0045]   FIG. **9** is a longitudinal sectional view showing a lens-equipped light-emitting diode device **10C** according to a fourth embodiment of the invention. In FIG. **9**, the same components as those of FIG. **1** are designated by the same numbers, and detailed description thereof will be omitted.

[0046]   In the fourth embodiment, a micro-rib **31** is provided in an upper edge portion of the outer peripheral unit **30**. In the lens-equipped light-emitting diode device **10C** of the fourth embodiment, the same effect as the lens-equipped light-emitting diode device **10** can also be obtained, and only the micro-rib **31** is re-melted to weld the lens unit **50** by heat of the transparent resin when the lens unit **50** is molded. At this point, the welding strength can be enhanced by utilizing the resin having a higher melting point. In this case, the thermoplastic resin is used as the first resin and the third resin.

[0047]   FIG. **10** is a longitudinal sectional view showing a lens-equipped light-emitting diode device **10D** according to a fifth embodiment of the invention. In FIG. **10**, the same components as those of FIG. **1** are designated by the same numbers, and detailed description thereof will be omitted.

[0048]   A notch portion **24** is provided in the lead frame **20**. A latch portion **55** is provided in the lens unit **50**, and a front-edge portion **56** of the latch portion **55** is engaged with the notch portion **24**. The latch portion **55** penetrates the lead frame **20**, and is extended to the backside **20**b where the light-emitting diode **22** is not mounted.

[0049]   In the lens-equipped light-emitting diode device **10D** of the fifth embodiment, the same effect as the lens-equipped light-emitting diode device **10A** can also be obtained.

[0050]   FIG. **11** is a longitudinal sectional view showing a lens-equipped light-emitting diode device **10E** according to a sixth embodiment of the invention. In FIG. **11**, the same components as those of FIG. **1** are designated by the same numbers, and detailed description thereof will be omitted.

[0051]   The lens-equipped light-emitting diode device **11E** can be applied to the case where the latch portion **55** is provided in a side face different from that of the lens-equipped light-emitting diode device **10D**. The notch portion **24** is provided in the lead frame **20**. The latch portion **55** is also provided in the lens unit **50**, and the front-edge portion **56** of the latch portion **55** is engaged with the notch portion **24**. The latch portion **55** is extended along the side face of the lead frame **20**, and the latch portion **55** is extended to the backside **20**b where the light-emitting diode **22** is not mounted.

[0052]   In the lens-equipped light-emitting diode device **10E** of the sixth embodiment, the same effect as the lens-equipped light-emitting diode device **10D** can also be obtained. In the lens-equipped light-emitting diode device **10E**, it is not necessary that the latch portion **55** penetrate the lead frame **20**.

[0053]   FIG. **12** is a longitudinal sectional view showing a lens-equipped light-emitting diode device **10F** according to a seventh embodiment of the invention. In FIG. **12**, the same components as those of FIG. **1** are designated by the same numbers, and detailed description thereof will be omitted.

[0054]   A through hole **32** is provided in the outer peripheral unit **30**. A latch portion **57** is provided in the lens unit **50** while inserted into the through hole **32**, and a front-edge portion **58** is engaged with the through hole **32**. The notch portion may be provided in place of the through hole **32**.

[0055]   In the lens-equipped light-emitting diode device **10F** of the seventh embodiment, the same effect as the lens-equipped light-emitting diode device **10A** can also be obtained.

[0056]   The structures and processes in the above embodiments are illustrated by way of example, and obviously the structures and processes may be replaced as appropriate. For example, the electrode of the light-emitting diode element **22** may be connected to the external electrode **21** not by the wire bonding but by the flip chip bonding. In the production process, the light-emitting diode element **22** may be mounted after the outer peripheral unit **30** is formed in the lead frame **20** using the white resin. The lens integral molding can also be injection-molded not on the lead frame **20** but on a support member in which the electrode is formed, e.g., a glass epoxy substrate and a ceramic substrate.

[0057]   The invention is not limited to the above embodiments, but various modifications could be made without departing from the scope of the invention. Various inventions could also be made by the appropriate combination of the plural components disclosed in the embodiments. For

4

example, some components shown in the embodiments can be eliminated from all the components. The components in the different embodiments may appropriately be combined.

[0058] Additional advantages and modifications will readily occur to those skilled in the art. Therefore, the invention in its broader aspects is not limited to the specific details and representative embodiments shown and described herein. Accordingly, various modifications may be made without departing from the spirit or scope of the general inventive concept as defined by the appended claims and their equivalents.

What is claimed is:

1. A lens-equipped light-emitting diode device comprising:

a support member in which an electrode is formed;

a light-emitting diode which is mounted on the electrode of the support member;

an outer peripheral unit which is provided on the support member, a hollow portion being formed while an area including at least the light-emitting diode is exposed in the outer peripheral unit made of a first resin;

a sealing portion which is made of a second resin, the support member side of the hollow portion of the outer peripheral unit being filled with the second resin to seal the light-emitting diode; and

a lens unit which is made of a third resin, the lens unit being laminated on the sealing portion by integral molding.

2. The lens-equipped light-emitting diode device according to claim 1, wherein the first resin is a white resin.

3. The lens-equipped light-emitting diode device according to claim 1, wherein the second resin is a transparent thermosetting resin, a transparent UV curing resin, or a material in which a fluorescent material for wavelength conversion is mixed with each of the transparent resins.

4. The lens-equipped light-emitting diode device according to claim 1, wherein the third resin is a transparent thermosetting resin or a transparent thermoplastic resin.

5. The lens-equipped light-emitting diode device according to claim 1, wherein the lens unit has an engagement portion which is engaged with the support member or the outer peripheral unit.

6. The lens-equipped light-emitting diode device according to claim 5 wherein the engagement portion has a penetration portion which is pierced to a backside from a surface on which the light-emitting diode element is mounted.

7. The lens-equipped light-emitting diode device according to claim 5, wherein the engagement portion has a penetration portion which is pierced from the outer peripheral unit to a backside of a surface of the support member on which the light-emitting diode element is mounted.

8. The lens-equipped light-emitting diode device according to claim 5, wherein the first resin and the third resin are a thermoplastic resin, and

the engagement portion has a micro projection and a fusion portion, the micro projection being formed in an upper edge portion of the outer peripheral unit, the fusion portion being generated by melting the micro projection and the lens unit.

9. The lens-equipped light-emitting diode device according to claim 5, wherein the engagement portion has a latch member which is latched in a backside of a surface of the support member on which the light-emitting diode element is mounted.

10. A method of producing a lens-equipped light-emitting diode device comprising:

mounting a light-emitting diode element on a support member;

first positioning the support member in a first die;

supplying a resin into the first die to form an outer peripheral unit;

sealing the light-emitting diode element;

second positioning the support member in a second die; and

supplying a resin into the second die to form a lens unit.

11. The method of producing a lens-equipped light-emitting diode device according to claim 10, wherein the resin supplied into the first die is a white resin.

12. The method of producing a lens-equipped light-emitting diode device according to claim 10, wherein a resin seals the light-emitting diode, and

the resin is a transparent thermosetting resin, a transparent UV curing resin, or a material in which a fluorescent material for wavelength conversion is mixed with each of the transparent resins.

13. The method of producing a lens-equipped light-emitting diode device according to claim 10, wherein the resin supplied into the second die is a transparent thermosetting resin or a transparent thermoplastic resin.

14. The method of producing a lens-equipped light-emitting diode device according to claim 10, wherein the lens unit is an engagement portion which is engaged with the support member or the outer peripheral unit.

15. The method of producing a lens-equipped light-emitting diode device according to claim 14, wherein the engagement portion has a penetration portion which is pierced to a backside from a surface on which the light-emitting diode element is mounted.

16. The method of producing a lens-equipped light-emitting diode device according to claim 14, wherein the engagement portion has a penetration portion which is pierced from the outer peripheral unit to a backside of a surface of the support member on which the light-emitting diode element is mounted.

17. The method of producing a lens-equipped light-emitting diode device according to claim 14, wherein the first resin and the third resin are a thermoplastic resin, and

the engagement portion has a micro projection and a fusion portion, the micro projection being formed in an upper edge portion of the outer peripheral unit, the fusion portion being generated by melting the micro projection and the lens unit.

18. The method of producing a lens-equipped light-emitting diode device according to claim 14, wherein the engagement portion has a latch member which is latched in a backside of a surface of the support member on which the light-emitting diode element is mounted.

* * * * *

Page 1

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

APPLE INC.,                          Case Nos.

              Petitioner,            IPR 2020-01520

                                          U.S. Patent 10,258,265

                                          IPR 2020-01537

       -against-                    U.S. Patent 10,588,553

                                          IPR 2020-01539

MASIMO CORPORATION,                  U.S. Patent 10,588,554

              Patent Owner.

VOLUME 1

VIDEO-RECORDED DEPOSITION OF

VIJAY K. MADISETTI, PH.D.

Zoom Recorded Videoconference

08/01/2021

11:01 a.m. (EDT)

REPORTED BY: AMANDA GORRONO, CLR

CLR NO. 052005-01

DIGITAL EVIDENCE GROUP

1730 M Street, NW, Suite 812

Washington, D.C. 20036

(202) 232-0646

APPLE 1041
Apple v. Masimo
IPR2020-01520

Appx04112

Page 132

1    surface.

2         Q.       Where is the center in Figure 14B?

3         A.       The center is as shown in Figure 14B.

4    It is the area that the POSA would understand the

5    light to be focused or redirected towards.

6         Q.       And is that the, is that the point

7    where the light rays 1422 meet near the component

8    1410B?

9         A.       As I said, this is a high level

10   figure and this figure is disclosing to a POSA that

11   light is being redirected towards the center, towards

12   the center.  And a POSA would understand that the

13   light is from a measurement area and it's being

14   redirected, condensed, or focused towards the center.

15   I don't have more details than that.  It is a figure

16   in combination of the specification discloses what is

17   said to a person of ordinary skill in the art.

18        Q.       And I understand that's your

19   conclusion that -- of what this figure shows in

20   combination with the specification to a POSITA or one

21   of ordinary skill in the art.  I'm trying to

22   understand your reasoning and your analysis and how

Page 133

1    you came to that conclusion, and you're repeatedly

2    providing me with the conclusion rather than

3    answering the question about the evidence.

4              Now, can I -- should we move on or

5    should we -- you know, if that's all you're going to

6    give me, we can move on?

7        A.      I disagree with --

8              MR. LARSON:  Hold on.  Objection;

9    mischaracterizes.

10             Go ahead.

11             MR. SMITH:  Okay.

12       A.      I disagree with your

13   characterization.  I have been responsive to your

14   questions.  I've identified what a POSA would

15   understand and I think we should move on.

16       Q.      I'm going to ask you one more time.

17   Where is the center in paragraph --

18             MR. SMITH:  Excuse me, strike that.

19       Q.      I'm going to ask one more time.

20   Where is the center in Figure 14B?

21       A.      A POSA would understand the center in

22   Figure 14B to be the general area at which the convex

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Patent of:     Poeze et al.
U.S. Patent No.:     10,258,265          Attorney Docket No.: 50095-00006IP1
Issue Date:          April 16, 2019
Appl. Serial No.:    16/212,440
Filing Date:         December 6, 2018
Title:               MULTI-STREAM DATA COLLECTION SYSTEM FOR
                     NONINVASIVE MEASUREMENT OF BLOOD
                     CONSTITUENTS

## SECOND DECLARATION OF DR. THOMAS W. KENNY

**Declaration**

I declare that all statements made herein on my own knowledge are true and

that all statements made on information and belief are believed to be true, and

further, that these statements were made with the knowledge that willful false

statements and the like so made are punishable under Section 1001 of Title 18 of

the United States Code.

Dated: August 20, 2021.          By: _____

                                      Thomas W. Kenny, Ph.D.

APPLE 1047
Apple v. Masimo
IPR2020-01520

1.     This Declaration further expands the conclusions that I have formed based on my analysis, in addition to those provided in my first declaration (APPLE-1003, which is incorporated herein by reference in its entirety; "Original Declaration"). Consistent with my findings provided in my Original Declaration, and based upon my knowledge and experience and my review of the prior art publications listed above, a POSITA would have found that claims 1-4, 6-14, and 16-30 ("the Challenged Claims") of the '265 patent are rendered obvious by at least the combination of as set forth in my Original Declaration.

## I.     GROUNDS 1A-1E RENDER OBVIOUS THE CHALLENGED CLAIMS

2.     As I further clarify below in response to Patent Owner's arguments, claims 1-4, 6-14, 17, 19-23, and 26-29 are rendered obvious by the combination of Aizawa and Inokawa (Ground 1A).  For additional reasons as explained below, those same claims are further rendered obvious by the combination of Aizawa, Inokawa, and Ohsaki (Ground 1B).

### A.     Inokawa's lens enhances the light-gathering ability of Aizawa

3.     As I previously explained in the Original Declaration, Inokawa *very generally* describes a "lens [that] makes it possible to increase the light-gathering ability" of a reflectance type pulse sensor, APPLE-1008, [0015], [0058], FIG. 2,

and, based on this disclosure, a POSITA would have been motivated to incorporate "an Inokawa-like lens into the cover of Aizawa to increase the light collection efficiency...." APPLE-1003, ¶¶94-99. In a significant extrapolation from the very simple and purely illustrative description in Inokawa, Patent Owner provides two incorrect arguments. First, Patent Owner claims that Inokawa's disclosure is narrowly-limited to a particular lens that somehow is only capable of operation with peripheral emitters and a central detector. Second, the Patent Owner claims that the lens of Inokawa directs all incoming light rays "to the center of the sensor" and would "direct light *away* from the *periphery*-located detectors as in Aizawa", regardless of the direction of light propagation of each ray, which is a violation of elementary laws of light propagation that would be familiar to a POSITA. POR, 15, 18. Based on these two incorrect claims, the Patent Owner insists that there would be no motivation to combine.

4.    Patent Owner's misinformed understanding of Inokawa's lens as well as lenses in general is demonstrated by their description of Inokawa's lens 27 as "focus[ing] light from LEDs (21, 23)...*to a single detector (25) in the center*" and "direct[ing] incoming light *to the centrally located detector*." POR, 13; *see also* APPLE-1042, 170:12-20 ("To be precise, my opinion is that...Inokawa's convex lens 27...would redirect light from the...measurement site towards the center.").

5.    A correct understanding of Inokawa's lens as well as of reflectance type pulse sensors in general (like those disclosed by each of Aizawa, Inokawa, and Mendelson-1988) readily exposes Patent Owner's flawed rationale.  Indeed, as I noted during deposition, a POSITA would understand that Inokawa's lens improves "light concentration at pretty much all of the locations under the curvature of the lens," as opposed to only at a single point at the center as asserted by Patent Owner.  Ex. 2006, 164:8-16.

6.    Among other things, because Inokawa is a reflectance-type pulse detector that receives diffuse, backscattered light from the measurement site, its lens cannot focus all incoming light at a single point.  Ex. 2006, 163:12-164:2 ("A lens in general, when placed in the view of a diffuse optical source, doesn't produce a single focal point.").  Indeed, as I previously explained, "light entering and returning from the tissue will follow many different random paths," and there are "variations in the path associated with the randomness of the scattering."  APPLE-1003, ¶128.  Reflectance type pulse detectors and oximeters, as in each of Aizawa, Inokawa, and Mendelson-1988, work in this manner, by detecting light that has been "partially reflected, transmitted, absorbed, and scattered by the skin and other tissues and the blood before it reaches the detector."  Ex. 2012, 86.  That is, as a POSITA would have clearly understood, light that backscatters from the measurement site after diffusing through tissue reaches the active detection area

*from various random directions and angles*. APPLE-1046, 803 ("The incident light emitted from the LED's diffuses in the skin in all directions. This is evident from the circular pattern of backscattered light surrounding the LED's"); Ex. 2012, 90 ("In a reflectance oximeter, the incident light emitted from the LEDs diffuses through the skin and the back scattered light forms a circular pattern around the LEDs"), 52 ("Light scattering causes the deviation of a light beam from its initial direction"). Therefore, a POSITA would know that there is no lens of any shape, material, or orientation that would be capable of refracting all of the light from a diffuse light source to a single focus. Further, a POSITA would know that there is no lens of any shape, material or orientation that would be capable of concentrating or condensing all of the light from a diffuse source towards any single location.

7.     As I further show using green arrows below, light emitted from Inokawa's LEDs 21, 23 is backscattered from many locations throughout the measurement site, each scattered return ray propagating towards the lens with a very wide range of positions and orientations before it can go through the lens 27:



APPLE-1008, FIG. 2 (modified/annotated)

8.      Such backscattered light cannot all be focused by Inokawa's lens—let alone by any lens—at a singular, central location (*i.e.*, detector 25) without violating the laws of physics (as well as common sense that a POSITA would possess). Further, such a lens, or any lens, is not capable of directing, concentrating, or condensing all such light towards any single location.

9.      Basic laws of refraction, expressed as Snell's law, dictate this behavior of light. APPLE-1040, 84 ("This is the very important law of refraction, the physical consequences of which have been studied…for over eighteen hundred years…[i]n English-speaking countries…[i]t is generally referred to as Snell's law); APPLE-1049, 101; Ex. 2012, 52, 86, 90. Even Dr. Madisetti does not dispute the applicability of Snell's law. *See* APPLE-1043, 80:20-82:20. For reference, Snell's law relates to the even more fundamental Fermat's principle, which states that a

path taken by a light ray between two points is one that can be traveled in the least time. *See* APPLE-1040, 87-92; APPLE-1049, 106-111. In fact, Snell's law of refraction is routinely taught in high school science classes as part of an elementary discussion of the properties of light. Further, Snell's law can be described on its own and applied without any referral to underlying references, and there is no lingering controversy about its validity or use.

10.    Indeed, according to Snell's law, which is stated in simple algebraic form and illustrated by the simple diagram below, light passing from one medium to another is refracted according to the angle of incidence and the values of the indices of refraction of each medium. A POSITA would be familiar with Snell's law from high school science demonstrations of light passing through prisms, as well as from introductory required physics courses included with their bachelor's degree programs. Dr. Madisetti admitted that he was familiar with Snell's law from his introductory physics courses. APPLE-1043, 80:20-81:1. Incidentally, while not critical to this discussion, I note that indices of refraction $n_1$ and $n_2$ must be positive for human tissue and the types of optical lenses we're dealing with in this case and that, in general $n_1 > n_2$. *See* APPLE-1040, 84; APPLE-1049, 101; APPLE-1043, 80:20-82:20.



11.     Referring now to Patent Owner's annotated version of Inokawa FIG. 2,

which I have marked further to show additional rays of light emitted from LED 21,

it is clear that the rays provided by Inokawa are, at most, only slightly refracted,

consistent with the similarity in indices of refraction between tissue and the lens

materials discussed in this case.  In the additional rays drawn in this figure, I have

followed the example provided by Inokawa and shown, at most, only slight

amounts of refraction.  From this illustration, and even if larger amounts of

refraction were present, it can be clearly seen how some of the reflected/scattered

light rays from the measurement sites (shown in red) could not possibly reach the

centrally located detector 25 of Inokawa:



POR, 16 (annotated)

12.    A similar drawing is shown below for additional light rays (again shown in red) emitted from LED 23.  In fact, if the 3-dimensional shape of this system is taken into account, it is clear that the majority of all light rays reflected/scattered from the measurement site could not be refracted towards the center:



POR 16 (annotated)

13.    For these and countless other rays that are not explicitly shown, there is simply no way for Inokawa's lens 27 to focus all light at the center of the sensor device, or even to direct, concentrate, or condense all of the light towards a central location or any single location.  A POSITA would understand that the Inokawa disclosure describes a lens that provides "improved light-gathering" without magically directing all the light to the center.

14.    Referring now to the region highlighted in purple below where various rays emitted from the LEDs are shown, only the black ray will refract toward the central detector according to Snell's law.  The red ray cannot possible refract to the same location without violating Snell's law.  There is no type of optical lens in existence that would somehow cause both of these incoming rays to refract toward the central detector.  This is obviously true because these rays enter the lens at the same point but with different angles of incidence.  Therefore, as required by the simple algebraic expression of Snell's law, these rays are refracted with different angles of refraction, and cannot possible converge at the center or at any other location anywhere.  This elementary fact would be understood by a POSITA.  This elementary fact clearly and directly contradicts the many statements made by Dr. Madisetti that the lens directs all incoming light to the center.



15.    The very simple illustrations shown above are for the simplest case of light

rays incident upon the interface between a surrounding medium and a flat plate of

some transparent material, which could be glass or acrylic or another material.  For

the case of light rays incident upon a transparent material with a curved surface,

the simple laws of refraction still determine the behavior of the light.  By way of

example, the illustration below shows three representative rays incident upon the

curved surface with three different directions and meeting the surface at three

different locations.  In each case, Snell's law determines the direction of the ray

within the transparent material, dependent only on the direction of the incident ray

and its orientation relative to a line drawn perpendicular to the surface at the

location of entry, and the indices of refraction of the surrounding medium and the

transparent material.



16.    Everything shown in this figure would be plainly understood by a POSITA, based on the understanding of Snell's law.  Indeed, this set of example rays as shown are similarly not focused to any single point.  With this simple understanding of Snell's law, a POSITA could not possibly agree with Dr. Madisetti's statement that "[t]o be precise, my opinion is that...Inokawa's convex lens 27...would redirect light from the...measurement site towards the center." APPLE-1042, 170:12-20.

17.    This basic and commonsensical understanding of Inokawa's lens stands in stark contrast to the position taken by Patent Owner's expert Dr. Madisetti, who repeatedly stated during deposition that Inokawa's lens redirects, condenses, and focus all light from the measurement site at the center.  *See* APPLE-1042, 166:12-182:3 ("My testimony...to avoid any doubt, is that a POSA viewing the teachings of Inokawa Figure 2 would understand that the convex lens 27 of Figure 2 would redirect, condense, and focus light toward the center from the measurement site.").

Simple ray tracing based on Snell's law, as seen above, incontrovertibly debunks Dr. Madisetti's simplistic claim.

18.     Indeed, far from focusing light to the center as Patent Owner contends, Inokawa's lens provides at best a slight refracting effect, such that some light rays that otherwise would have missed the detection area are instead directed toward that area as they pass through the interface provided by the lens.  This is especially true in cases like Aizawa where light detectors are arranged symmetrically about a central light source, thereby enabling backscattered light to be detected within a larger circular active detection area surrounding that source.  *See* Ex. 2012, 86, 90. The slight refracting effect is further confirmed by the fact that the index of refraction of the tissue is only slightly less than the index of refraction of typical lens materials (e.g., acrylic).  For instance, the refractive index of human skin is typically around 1.4 (APPLE-1044, 1486) while the refractive index of a typical lens/cover material for these types of applications, such as acrylic as in Aizawa, is only slightly higher at around 1.5.  APPLE-1045, 1484.  Thus, light entering the lens is only slightly refracted according to Snell's law.

19.     As I explained during my deposition, "given the arrangement of the corpuscles as the reflecting objects in the space all around underneath [Inokawa's lens]...there would be some improvement in the light concentration at pretty much all of the locations under the curvature of the lens."  Ex. 2006, 164:8-16.  As

14

explained further below, this improvement—which a POSITA would understand is what Inokawa is referring to—is based on the convex shape of the lens and application of the most basic of optical concepts, namely Snell's law. Thus, Inokawa's lens "provides an opportunity to capture some light that would otherwise not be captured." *Id.*, 204:21-205:12. In short, Inokawa's lens improves the light-gathering ability of Aizawa's sensor by allowing a larger fraction of the backscattered light to reach the areas covered by the lens. *See* Ex. 2012, 86, 90; APPLE-1046, 803.

20.    As explained in my Original Declaration, the illustrations below showing the combination of the inventions of Aizawa and Inokawa provide an example of positioning of curvature near the locations of the sensors:



Light permeable cover

APPLE-1003, ¶97

21.    In the expanded version of this same illustration as shown below, I provide dotted lines to indicate the approximate orientation of a line orthogonal to the

surface at various locations from the center to the edge.  As shown in this illustration, these orthogonal lines vary in orientation most rapidly near the edge, where the illustrated curvature of the lens surface is the greatest.   As discussed above with respect to Snell's law, and as I discussed during my deposition, a POSITA would understand that, for the case of an index of refraction in the lens that exceeds the index of refraction in the surrounding tissue, the incoming light rays are refracted in a way that deflects incoming rays somewhat towards these orthogonal lines.  *See* Ex. 2006, 166:18-170:8; APPLE-1044, 1486; APPLE-1045, 1484.  Because of the curvature of the lens, the orthogonal lines positioned at the locations of greatest curvature are more generally oriented towards the detector locations.  An elementary understanding of Snell's law, and of the lens shape provided in this illustration, would guide a POSITA to understand that a combination of the teachings of Aizawa and Inokawa as presented in my original declaration, would lead to an improvement in the light concentration at the location of the detectors.  Very simply, a POSITA familiar with Snell's law and in view of Aizawa and Inokawa would understand that the placement of the curvature in the region near the locations of the detectors would have the effect of improving the light concentration provided by the lens in these regions.



22.    The above illustrations showing light rays and refraction are offered here to explain the basic concepts that a POSITA would understand and rely on in considering the combination of Aizawa and Inokawa. As stated repeatedly in my deposition testimony, these are illustrations and not precision drawings of an optimized shape. As I described, a POSITA would appreciate that it is reasonable to consider a system with one or more LEDs at the center and detectors positioned around the perimeter. Such a POSITA would understand that nothing about the presence of the lens of Inokawa necessarily and exclusively causes all incoming light to be focused at the center. In fact, as illustrated above, a POSITA would understand that it is possible to utilize the inventions of Aizawa and Inokawa together in a way that improves the concentration of light at peripheral detectors. All such a POSITA would need is a basic understanding of Snell's law to appreciate that the shape of the lens will improve the concentration of light at the illustrated detector locations.

23.    Indeed, in a manner fully consistent with the analysis above, the only disclosure Inokawa includes about its lens—which I relied on consistently in the Original Declaration—is that its "lens makes it possible to increase the light-gathering ability of the LED." Inokawa at [0015]; APPLE-1003, ¶¶61, 96-98. This general benefit of Inokawa's lens would be applicable to all pulse measuring devices, not only those whose LEDs and sensors happen to be arranged in the exact manner as shown on FIG. 2 of Inokawa. *See* Ex. 2006, 88:21-89:1 ("The lens provides a general benefit of light concentration, not just at the center."); *id.*, 89:21-90:3 ("...one would understand that light coming in from all angles is not going to be concentrated to a single location by a convex lens. One of ordinary skill would know that.").

24.    To support the misguided notion that Inokawa's lens focuses all incoming light at the center, Patent Owner repeatedly points to FIG. 14B of the '265 patent, shown below, as allegedly showing how a convex lens focuses all light at the center:



POR, 17, 23

25.    Dr. Madisetti, when asked during deposition to justify why he believes Inokawa's lens would focus all measured light at the center, likewise pointed to FIG. 14B of the '265 patent, explaining that "Figure 14B and associated text...support my opinions."  APPLE-1042, 171:20-172:17; *see also id.*, 179:3-16, 181:11-182:3.

26.    Patent Owner and Dr. Madisetti's reliance on FIG. 14B for justification of their understanding of Inokawa is severely misplaced.  While each of Inokawa, Aizawa, and Mendelson-1988 are directed to a reflectance-type pulse sensor that detects light that has been backscattered from the measurement site, the scenario depicted in FIG. 14B shows a transmittance-type configuration where collimated or nearly-collimated light is "attenuated by body tissue," not backscattered by it.

APPLE-1001, 36:19-21.  Indeed, FIG. 14I of the '265 patent puts FIG. 14B in proper context, showing how light from the emitters is transmitted through the entire finger/tissue before being received by the detectors on the other side:



**FIG. 14I**

27.     Thus, even if the lens shown in the '265 patent is presumed to show focusing of all incoming light at the center of the sensor, this can only occur due to the collimated nature of the light coming from the emitters located on the other side of the measurement site.  *See* Ex. 2007, 287:12-289:5, 291:3-292:9.  As I explained during my deposition, backscattered light collected by a reflectance-type sensor as in Inokawa, Aizawa, and Mendelson-1988, on the other hand, would result in a "completely different situation" as each ray of this diffuse light source "will have a different path as a result of the lens."  Ex. 2007, 287:12-289:5.

28.    The light rays provided by the LEDs on one side of the finger in Figure 14I, if passing through the finger and emerging as collimated light such as shown in Figure 14B, are capable of being focused by a properly designed, oriented and positioned lens.  A POSITA would understand that this very special case is incompatible with the situation present in a reflective pulse oximeter, where light is scattered randomly by the tissue and a portion of that scattered light returns to the sensor as diffuse light which can be gathered and detected.

29.    Even for collimated light as shown in FIG. 14B of the '265 patent, the focusing of light at the center only occurs if the light beam happens to be perfectly aligned with the axis of symmetry of the lens.  *See* Ex. 2007, 298:11-299:1.  If the incoming collimated beam enters the lens at any other angle, as shown below in green, the light will focus at a diffent point:



APPLE-1040, 141 (annotated); *see also* APPLE-1049, 160

30.     In this regard, Dr. Madisetti's overly-simplistic statements ("My

testimony...to avoid any doubt, is that a POSA viewing the teachings of Inokawa

Figure 2 would understand that the convex lens 27 of Figure 2 would redirect,

condense, and focus light toward the center from the measurement site.") clearly

only apply to a very special narrow case of collimated light incident on a convex

lens along the axis of symmetry.  APPLE-1042, 166:12-182:3.  A POSITA would

understand that Dr. Madisetti's statements do not reflect the situation for diffuse

light incident on a lens-like surface such as would result from the combination of

the teachings of Aizawa and Inokawa.

31.     Patent Owner and Dr. Madisetti's repeated reliance on drawings provided in paragraphs 119-120 of my Original Declaration for justification of their understanding of Inokawa's lens is similarly misplaced.  POR, 15, 21, 22; APPLE-1041, 41:7-22, 60:7-61:6.  Far from demonstrating the false notion that a convex lens directs all light to the center, these drawings I previously provided are merely simplified diagrams included to illustrate, as per dependent claim 12, one example scenario (based on just one ray and one corpuscle) where a light permeable cover can "reduce a mean path length of light traveling to the at least four detectors." APPLE-1003, ¶¶119-120.  As previously illustrated, there are many other rays that would intersect the interface between the tissue and the lens at different locations and with different angles of incidence, and the effect of the lens on this variety of rays is not nearly as simple as the statements provided by Dr. Madisetti.  There is simply no possibility of any lens focusing incoming rays from a diffuse light source at a central location.

32.     And even if Inokawa's lens could hypothetically and magically be configured to send all reflected light to the center, which I certainly don't agree with and submit violates fundamental optical principles, Patent Owner's assertion that the lens would fail to work for a revised design with a central emitter and peripheral emitters is fundamentally flawed because of the simple principle of reversibility of light propagation.  The well-known and firmly-established optical

*principle of reversibility*, which comes from the even more fundamental Fermat's principle, APPLE-1049, 87-92, trivially dispels Patent Owner's claim that reversing the LED/detector configuration of Inokawa (as in Aizawa) by placing the detectors around centrally located LEDs would cause Inokawa's lens to send less light to the detectors, thereby rendering Inokawa's lens ineffective when applied to Aizawa. POR, 15-20. As I noted above, Fermat's principle states that a path taken by a light ray between two points is one that can be traveled in the least time. *See* APPLE-1040, 87-92; APPLE-1049, 106-111. It is one of the most fundamental concepts in optics (and physics for that matter) and readily explains the principle of reversibility. Simply put, the speed of light is independent of the direction of propagation for these simple materials, which can be represented by an index of refraction. Therefore the shortest path between two points is the same regardless of the direction traveled along the path.

33.    According to the principle of reversibility, for instance, "a ray going from P to S will trace the same route as one from S to P." APPLE-1040, 92; APPLE-1049, 110. This principle of reversibility is explicit in Snell's law, which simply relates angles of refraction to indices of refraction without any dependence on the direction that the light is travelling. So, even if a POSITA was not explicitly familiar with the description of the principle of reversibility of light paths, the very simple algebraic expression of Snell's law provides the requirement that light paths

must be reversible.  Even as Dr. Madisetti happens to be unfamiliar with the

principle of reversibility of light, it is clear from his testimony that he is familiar

with Snell's law.  Therefore he must admit that the paths of light through

transparent materials with varying indices of refraction must be reversible, as this

is a trivial consequence of the simple mathematical expression of Snell's Law as

simply and exclusively relating the angles of incidence and refraction of light rays

to the indices of refraction of the materials.  *See* APPLE-1040, 84; APPLE-1049,

101; APPLE-1043, 80:20-82:20.  The illustration below shows how this principle

of reversibility is a simple consequence of Snell's law.



34.    To illustrate the relevance of this principle, with reference to Patent Owner's

annotated version of Inokawa FIG. 2 as shown below, two example ray paths from

the LEDs (green) to the detector (red) can be seen. In this case, the rays originate

from the peripheral LEDs (green) and arrive at the central detector (red).



POR, 13, 16, 20 (annotated)

35.     Now, by flipping the LED/detector configuration, as in Aizawa, and

applying the principle of reversibility, it is readily observed that the two exemplary

paths shown above simply reverse their direction—such that any

condensing/directing/focusing benefit achieved by Inokawa's lens (blue) under the

original configuration would be identically achieved under the reversed

configuration:



POR, 13, 16, 20 (modified/annotated)

36.     Of course, as I have stated, the illustration provided by Inokawa was not

intended as a precision optical diagram. Nevertheless, within the intent of the

illustration of Inokawa, it is possible to see that it is possible to switch the locations

of the emitter and detector and that the same light paths in the opposite direction

would be present.  A POSITA would appreciate that the direction of the rays in this drawing can be reversed without any changes to the lens of Inokawa.  Therefore, it is possible to consider a switch of the locations of the detector and emitter in Inokawa.  A POSITA, considering Aizawa and Inokawa would understand that it is reasonable to use a lens-like surface from Inokawa with the emitter and detector configuration of Aizawa.

37.     When confronted with this basic principle of reversibility derived from Fermat's Principle during deposition, Dr. Madisetti refused to acknowledge it, even going so far as to express ignorance of it ("Fermat's principle, ***whatever that is***.").  APPLE-1041, 89:12-19.  Dr. Madisetti further tried to brush way the applicability of this principle as being a "new theory."  *Id.*, 84:2-85:7.  Dr. Madisetti ignores that the reversibility of the paths of light rays is an absolute requirement of the simple mathematical expression of Snell's law, with which he is familiar according to his own testimony.

38.     But far from being a new theory, this fundamental concept of the reversibility of light paths, consistent with the simple algebraic expression of Snell's law, forms the basis of all Aizawa-based combinations as I previously set forth.  *See, e.g.*, APPLE-1003, ¶55 (explaining that Aizawa would operate in the same manner even with "a centrally located detector [surrounded] by a plurality of emitters."); *see also* APPLE-1048, ¶79 ("Although Inokawa shows its two emitters

emitting light toward a centrally located detector, one of ordinary skill would have recognized that the same effect can be achieved by having the emitters located centrally instead and emitting radially outward. Indeed, ***Aizawa itself recognizes this reversibility***, stating that while the configurations depicted include a central emitter surrounded by detectors, the 'same effect can be obtained when…a plurality of light emitting diodes 21 are disposed around the photodetector 22.'").

39.     In short, further based on the principle of reversibility, which is an absolute requirement of the simple expression of Snell's law, a POSITA would have understood that both configurations of LEDs and detectors—*i.e.*, with the LED at the center as in Aizawa or with the detector at the center as in Inokawa—would benefit from the enhanced light-gathering ability of an Inokawa-like lens.

40.     During his deposition, Dr. Madisetti tried to back off Patent Owner's illogical assertion that Inokawa's lens somehow focuses all light at a central point. POR, 13, 15. More specifically, Dr. Madisetti clarified that he would prefer to say that Inokawa focuses light "towards the center" as opposed to "to the center." APPLE-1041, 135:3-11. Dr. Madisetti also clarified that "center" is not a specific point but rather a "general area." *Id.*, 133:19-135:2.

41.     Yet a convex lens's ***general*** ability to direct some diffuse light "toward" a "general area" is a concept that supports—not contradicts—my position that the addition of a convex lens allows more light to be gathered generally, including at

the non-centrally located detectors as found in Aizawa.  Inokawa at [0015];

APPLE-1003, ¶¶61, 96-98.

42.     For example, referring to a version of the modified Aizawa device (below) that is further shown with the backscattered rays from the measurement site as discussed above, it can be seen that a convex lens's ability to direct light "toward the center" would allow the detector to capture light that otherwise would have been missed by the detectors, regardless of their location within the sensor device.



43.     As further corroborated through Patent Owner's own cited reference, the condensing function performed by the lens will allow a larger fraction of light randomly backscattered from tissue to be detected within the active detection area surrounding that source.  Ex. 2012, 86, 90.

44.     Indeed, as I made clear during my deposition, "the convex shape [of Inokawa's lens] allows light that might have been just specularly reflected off of the flat plate to be captured and refracted inwards.  And in the region where there's curvature, it allows the light to be concentrated, and in this case, roughly speaking, in the neighborhood of the detectors and inwards."  Ex. 2006, 191:4-14.  That is, the addition of a convex lens allows the detectors to capture some of the reflected

light that otherwise would have missed them completely, and to provide some concentration of some of the light towards the locations of the detectors. I explained this further above in paragraphs 14-22 by showing how the convex shape of the lens directs more light to the detectors compared to a flat plate.

**B. A POSITA would have been motivated to add a second LED to Aizawa**

45.    As laid out in detail in my Original Declaration, a POSITA would have been motivated to add a second emitter operating at a different wavelength to Aizawa in order to allow for a more reliable pulse measurement that takes into account and corrects for inaccurate readings stemming from body movement. APPLE-1003, ¶¶76-79.

46.    Patent Owner, however, suggests that such motivation is flawed because "Aizawa...expressly states that it provides a "device for ***computing*** the ***amount*** of motion load from the pulse rate.'" POR, 36. But Patent Owner fails to explain how Aizawa senses and computes motion load. Indeed, Aizawa is completely silent on this point. Moreover, while Patent Owner contends that Aizawa "account[s] for" motion, Aizawa does not even say whether it uses the computed motion load to improve the detection signal. Patent Owner further fails to rebut that adding a second LED having a second wavelength, as per Inokawa, will "allow for a more reliable" reading that compensates for body motion. APPLE-1003, ¶77. Like I explained during my deposition, adding a second LED at a

different wavelength to Aizawa's single LED design would allow it to obtain a more reliable pulse measurement by allowing the system to "measur[e] pulse rate and motion load during the same time" by operating a separate LED dedicated to sensing motion. Ex. 2007, 401:11-402:4. Moreover, having two separate signals that are respectively dedicated to measuring pulse and body motion, as per Inokawa, will allow Aizawa's system to "take into account and correct for inaccurate readings related to body movement" by subtracting the "signal component corresponding to body movement [] from the pulse signal to help better isolate the desired pulse date." APPLE-1003, ¶77.

47.    By using two wavelengths, it is possible to record two independent signal waveforms at the same time from the same site. As explained above, each reflected signal includes some dependence on the physiological parameter, and on the movement of the sensor relative to the measurement site. Because it is possible to choose different wavelengths of light so as to have one signal with strongest dependence on the physiological parameter and the second signal with the strongest dependence on the movement of the sensor, the signals can be processed in a way to compensate for movement and create a more reliable measurement of the physiological parameter. The use of two or more separate wavelengths to obtain independent measures of the physiological parameter and error sources such as body movement, was well-known at the time of the invention, and it would have

been obvious for a POSITA to consider the use of a second wavelength LED to capture these benefits.

48.     Inokawa provides a second and independent motivation for adding a second LED having a different wavelength, namely the ability to "improve data transmission accuracy by using the second LED...to transmit checksum information such that 'the accuracy of data can be increased." APPLE-1008, [0111], [0044], [0048]; APPLE-1003, ¶83. The fact that "Inokawa states that it can accomplish transmission with a *single* LED" does not take away from the fact that a POSITA would nevertheless have been motivated to look to the two-LED implementation of Inokawa to further improve accuracy. POR, 38; Ex. 2007, 407:7-408:20. Despite Patent Owner's contention that I "acknowledged that POSITA wanting to maintain a wireless data transmission approach [in Aizawa] would not switch to the base station transmission approach of Inokawa," POR, 39, a full reading of transcript reveals that I was simply making it very clear that if "they've already decided not to use a base station transmission device, then they probably wouldn't switch to one." Ex. 2007, 416:5-15.

49.     Patent Owner additionally argues that "Petitioner fails to address other complications that would result from adding an extra LED to a physiological sensor," such as the potential for "thermal interference." POR, 39. But as I again explained during my deposition and reiterate here, such minor issues are "part of

what I understand someone of ordinary skill in the art would bring...to the problem and would know how to make the changes needed." Ex. 2007, 384:8-388:12.

### C. A POSITA would have been motivated to modify Aizawa in view of Ohsaki to include a convex protrusion

50.     As explained in my Original Declaration, "Ohsaki teaches that adding a convex surface...can help prevent the device from slipping on the tissue of the wearer compared to using a flat cover without such protrusion" and that "a POSITA seeking to achieve improved adhesion between the detector and the skin, as expressly recognized in Aizawa, would have been motivated and readily able to modify Aizawa's acrylic plate to have a convex shape as in Ohsaki." APPLE-1003, ¶¶141-142 (citing to APPLE-1014, [0025]; APPLE-1006, [0026], [0030]).

51.     Patent Owner, rather than attempting to directly rebut this rationale, focuses on arguments that are factually flawed and legally irrelevant. Specifically, Patent Owner contends that Ohasaki's "convex surface must have *longitudinal directionality*," and that "Ohsaki indicates that its convex surface *only prevents slipping on the backhand side* (i.e., watch-side) of the user's wrist." POR, 42. Patent Owner further asserts that the shape of Ohsaki's board must be limited to a long, narrow rectangular shape while ignoring that the specification includes no specific limitation on the shape of the board.

52.     Notably absent from the POR is how Ohsaki *actually* describes the benefits associated with its convex surface. For example, Ohsaki contrasts a "convex

detecting surface" from a "flat detecting surface," and explains that "if the translucent board 8 has a flat surface, the detected pulse wave is adversely affected by the movement of the user's wrist," but that if "the translucent board 8 has a convex surface…variation of the amount of the reflected light…that reaches the light receiving element 7 is suppressed." APPLE-1003, ¶142; APPLE-1014, ¶[0025]. But a POSITA would have understood from such teachings of Ohsaki that the advantages of a light permeable protruding convex cover could apply regardless of any alleged longitudinal directionality of Ohsaki's cover and regardless of where on the body such a convex cover was placed. *See APPLE-*1014, ¶¶[0015], [0017], [0025], FIGS. 1, 2, 4A, 4B. This is because Ohsaki was relied upon not for its exact cover configuration but rather for the rather obvious concept that a convex surface protruding into a user's skin will prevent slippage, regardless of any directionality that may or may not exist with respect to such convex surface and regardless of where on the human body it is located. *See* Ex. 2012, 91, 87; APPLE-1014, ¶¶[0015], [0017], [0025], FIGS. 1, 2, 4A, 4B. In fact, Ohsaki says nothing about the exact dimensions or even anything specific about the required shape of the board, except that it provides a convex protrusion. A POSITA would seek to combine the board of Ohsaki with Aizawa by making reasonable modifications as needed to ensure that the board of Ohsaki was compatible with the other features present in Aizawa. A POSITA would find it

obvious to consider selecting a shape for the board that is consistent with the shape of the system presented in Aizawa, and would expect that the benefits associated with the convex board of Ohsaki would be present in the combination. And adding a convex surface to Aizawa's flat plate will serve to ***improve*** its tendency to not slip off, not take away from it, since it is well understood that physically extending into the tissue and displacing the tissue with a protrusion provides an additional adhesive effect. Aizawa provides a plate that improves adhesion with the surface. Ohsaki further teaches that the convex protrusion provides "intimate contact" with the tissue, which helps prevent the detecting element from slipping off. These benefits are clearly related and complimentary, and a POSITA would appreciate that modifying the plate of Aizawa to include a convex protrusion as in Ohsaki would provide improved performance, and that these benefits can be obtained by making obvious modifications to the board in Ohsaki to accommodate the shape of Aizawa.

## II.    GROUNDS 2A-2C RENDER OBVIOUS THE CHALLENGED CLAIMS

53.    As I further clarify below in response to Patent Owner's arguments, claims 1-4, 6-14, 16-22, and 26-30 are rendered obvious by the combination of Mendelson-1988 and Inokawa (Ground 2A).

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

APPLE INC.

Petitioner,

v.

MASIMO CORPORATION,

Patent Owner.

———————

Case IPR2020-01520
U.S. Patent 10,258,265

———————

**DECLARATION OF VIJAY K. MADISETTI, PH.D.**

**MASIMO 2004**
Masimo v. Apple
IPR2020-01520

**B.**     **Ground 1A Does Not Establish Obviousness**

   **1.**     **A POSITA Would Not Have Been Motivated To Combine Inokawa's Convex Lens With Aizawa's Sensor**

      **a)**     **Dr. Kenny and Petitioner Admit That Inokawa's Convex Lens Directs Light To The Center Of The Sensor**

48.     Both Dr. Kenny and Petitioner admit that Inokawa's convex lens condenses light towards a centrally located detector—not periphery-located detectors like those used in Aizawa.

49.     When discussing claim 12 of the '265 Patent, Petitioner included the illustrations below.  Pet. 38-39.  Petitioner explained that "the lens/protrusion of Inokawa, which is used to modify Aizawa ... serves a condensing function and thus, as with any other lens, refracts light passing through it." Pet. 38.  Petitioner explained the drawing below as comparing "the length of non-refracted light (i.e., without a lens, left) bouncing off an artery with that of refracted light (i.e., with a lens, right)." Pet. 38.  Refraction is a phenomenon related to the velocity of light in different materials because the velocity of light depends on the material through which it is traveling.  Thus, the change in velocity as light moves from one material to another material may cause the light to deviate from its original direction, which is called "refraction."  I note that the illustration below shows refraction for both the flat and convex surfaces because in both instances the illustrated light ray changes direction.  Moreover, I note that, as illustrated by Petitioner, the change of direction for the light ray hitting the convex surface is

relatively more towards the center of the cover than for the flat cover. Petitioner states that the result of the greater refraction of light with the convex cover is that "the mean path length of light traveling to the at least four detectors is reduced— that is, the purple line is shorter than the redline [sic green line]." Pet. 39. Petitioner also includes a drawing superimposing the two drawings below to "clearly show[] the shortened path traveled by refracted light in the presence of a protrusion/lens, both within the tissue as well as for total path length." Pet. 39.



Petitioner's illustration of redirection of the mean path length
of light traveling to the detectors when passing
through a flat (left) and convex (right) cover (Pet. 39)



Petitioner's illustration superimposing the above refractions
when illustrating how a convex surface changes the
mean path length of incoming light (Pet. 39, 85)

-27-

50.    Dr. Kenny also included and explained the two figures above in his declaration as a way to illustrate the mean path length of light.  Ex. 1003 ¶¶119-120; *see also* Ex. 1003 ¶¶200-201.  Dr. Kenny explained that, when using a convex surface such as Inokawa's convex lens, "the incoming light is 'condensed' toward the center."  Ex. 1003 ¶119; *see also* Ex. 1003 ¶200.  Dr. Kenny goes on to explain:  "Laying these two drawings on top of each other…the shortened path length within the tissue for the purple (refracted) line can be clearly seen compared to the path length within the tissue of the green (non-refracted) line."  Ex. 1003 ¶¶120, 201.

51.    The understanding expressed by Petitioner and Dr. Kenny about condensing light is consistent with Inokawa's disclosure, which uses a convex surface as a way to increase the light gathering capability for a centrally located detector.  Ex. 1008 ¶[0058], Fig. 2.  As shown in Figure 2 (below), Inokawa illustrates how a convex surface placed between the sensor and the skin condenses incoming light towards the central detector 25.  Ex. 1008 ¶[0058], Fig. 2.  This is helpful for Inokawa's particular sensor configuration because the emitters are located on the edges of the sensor while the detector is located in the center of the sensor.  Thus, for Inokawa's particular linear arrangement of emitter-sensor-emitter, the convex shape is reported to increase the light gathering capabilities of the centrally located detector when collecting the light emitted by the periphery-

-28-

data processing and not sensor design. Training in data processing would not have prepared a POSITA for the type of design process identified by Dr. Kenny as needed to develop a working optical physiological sensor.

74. A POSITA would have understood that Inokawa's convex lens benefits Inokawa's sensor design with its center-located detector. Ex. 1008 ¶58, Fig. 2. In my opinion, a POSITA would have credited the teaching of Inokawa itself, which shows that a convex surface directs incoming light towards the center. Ex. 1008 ¶58, Fig. 2. In contrast, I do not believe a POSITA would have been motivated to go through Dr. Kenny's extensive trial and error process to try and figure out whether Inokawa's convex surface would have analogous benefits in a device with peripheral detectors and a central emitter. Instead, a POSITA would have taken Inokawa's teaching at face value, consistent with the general understanding of how light interacts with a convex surface.

75. Thus, accounting for the possibility that a POSITA with no experience in optical physiological sensor design would nonetheless understand the wide ranging considerations identified by Dr. Kenny at his deposition, it is still my opinion that Inokawa does not establish a valid motivation to combine Inokawa with Aizawa, much less a reasonable expectation of success. When addressing a reasonable expectation of success, Dr. Kenny focuses his discussion on the manufacturing of a device, and not whether the device would be able to

successfully act as a physiological monitor or sensor. See, e.g., Ex. 1003 ¶¶98-99. Whether or not "the shape of the cover can be readily modified" (Ex. 1003 ¶98), Dr. Kenny never explains why a POSITA would have expected Petitioner's proposed combination to result in a successful optical physiological sensor. The lack of analysis is particularly important because a POSITA would have expected a convex surface to decrease the optical signal at the peripheral detectors. The possibility that POSITA could manufacture a device is not evidence a POSITA would have reasonably expected the resulting device to successfully work as an optical physiological measurement device. Decreasing the amount of light reaching the detectors will decrease the signal, increase the relative amount of noise, and could thus result in a signal unusable for actually monitoring a physiological parameter.

### d) Petitioner's Obviousness Challenge Also Relies On References Not Identified As Part Of Ground 1A Without A Motivation To Combine Or Expectation Of Success

76.    I further note that the Petition, and Dr. Kenny's analysis, apparently relies heavily on references that neither the Petitioner nor Dr. Kenny identifies as part of Ground 1A. The Petition states that Ground 1A includes only two references: Aizawa and Inokawa. Pet. 2. But Dr. Kenny's analysis relies heavily on another cited reference: Nishikawa. Ex. 1003 ¶¶ 94-99.

Inokawa illustrates that LEDs with curved surfaces similar to Nishikawa's LEDs are a fraction of the size of the sensor or cover.  Ex. 1008 Fig. 2 (21, 23).  Likewise, Aizawa similarly illustrates that the LED is a much smaller part of the overall sensor.  Ex. 1006 Fig. 1; *see also* Figs. 4, 5.  Thus, given the differences between Nishikawa on the one hand and Inokawa and Aizawa on the other hand, a POSITA would not have been motivated to apply Nishikawa's lens design in a physiological sensor and would have had no expectation of success in doing so.



Comparison of Nishikawa's LED package (left) & Inokawa's sensor Fig. 2 (right)
showing scale difference (LED package highlighted in green in both)

### 2.   <u>A POSITA Would Not Have Added A Second LED To Aizawa</u>

79.   Even if a POSITA were motivated to combine Aizawa and Inokawa, the combination of Aizawa and Inokawa still would not result in the claimed invention because, in my opinion, it does not disclose all of the claim limitations.  Every claim of the '265 Patent requires (1) a plurality of emitters of different wavelengths and (2) at least four detectors on a surface.  Ex. 1001 Claims 1, 26.

Neither Aizawa nor Inokawa includes both a plurality of emitters of different wavelengths and at least four detectors. *See, e.g.*, Ex. 1006 Fig. 1 (single center-located emitter with multiple peripheral detectors); Ex. 1008 Fig. 2 (two peripheral emitters with a single center-located detector). Neither Aizawa nor Inokawa disclose or suggest the use of both multiple detectors and multiple emitters in the same sensor.

80.    Aizawa has no disclosure of a sensor with multiple detectors and multiple emitters. To the extent Dr. Kenny suggests Aizawa teaches the use of multiple detectors and multiple emitters in a single sensor, I disagree. In one of Aizawa's embodiments, multiple detectors surround a single centrally located LED. Ex. 1006 ¶[0033], Figs. 1, 2, 4, 5. In this embodiment, Aizawa teaches the number of photodetectors "disposed around the light emitting diode" can be increased or decreased. Ex. 1006 ¶[0032]. In Aizawa's other embodiment, which is not illustrated, multiple LEDs surround a single centrally located detector. See Ex. 1006 ¶[0033] ("The same effect can be obtained when the number of photodetectors 22 is 1 and a plurality of light emitting diodes 21 are disposed around the photodetector 22."). Inokawa likewise discloses an arrangement where two LEDs are used on either side of a single detector. Ex. 1008 ¶[0058], Fig. 2. Neither reference discloses a sensor with multiple emitters used with multiple detectors.

Aizawa, flank a single center-located detector. *See* Ex. 1008 ¶[0058] ("[T]he pulse sensor 1 is comprised of a pair of light-emitting elements ... [and] a single photodiode."). There is no multi-detector/multi-emitter embodiment disclosed in either Aizawa or Inokawa, and no reason why a POSITA would have been motivated by these references to change both references to use a multi-detector/multi-emitter arrangement. Dr. Kenny asserts that "it was common practice in the pulse oximeter field to centrally locate multiple emitters of different wavelengths" (Ex. 1003 ¶85); this is irrelevant to Aizawa because Aizawa is not an oxygen saturation sensor, it is a pulse wave sensor (Ex. 1006 ¶[0002]).

84.    Dr. Kenny points to two reasons why Inokawa would have motivated a POSITA to add a second LED to Aizawa. First, Dr. Kenny asserts that a POSITA would have added a second LED based on the "added ability to measure body movement." Ex. 1003 ¶77; *see also* ¶78. But Aizawa already includes this functionality, and explains that it provides a "device for computing the amount of motion load from the pulse rate." Ex. 1006 ¶ 15. There is no need for a design change when Aizawa already includes the relevant functionality.

85.    Second, Dr. Kenny asserts that adding a second LED would enable Aizawa to transmit data to a base device with a configuration like that in Inokawa. Ex. 1003 ¶81. Dr. Kenny asserts that "Aizawa contemplates uploading data from its wrist sensor to an external base device" and would have incorporated Inokawa's

base device "that both charges and receives data from the pulse sensor."  Ex. 1003 ¶81.



Dr. Kenny's Illustration of Inokawa's Base Device (Ex. 1003 ¶81)

86.    But Aizawa already includes a transmitter in its structure, so Aizawa does not need to incorporate Inokawa's base-device data transmission approach. Ex. 1006 ¶¶[0023], [0028], [0035].  Moreover, Aizawa's goal is "real-time measuring" (Ex. 1006 ¶[0004]) with the transmitter "transmitting the measured pulse rate data to a display," (Ex. 1006 ¶[0015]).  As Dr. Kenny acknowledged, Aizawa's sensor is designed for monitoring heart rate at the time of exercise.  Ex. 1003 ¶101.  Inokawa's base device, however, only transmits pulse rate data "when the pulse sensor ... is mounted onto the base device."  *See, e.g.*, Ex. 1008 Abstract. Inokawa's system thus requires the user to remove the monitoring device, thus stopping the monitoring, and attach it to a base solution before the sensor can transmit data.  Ex. 1008 Figs. 3, 8.  Transforming Aizawa into a base-device-transmitter eliminates the ability to take and display real-time measurements, one

of Aizawa's stated goals, while increasing power consumption and cost by adding an additional LED. Ex. 1008 ¶[0033].

87.     Inokawa would not have motivated a POSITA to make such a change to Aizawa. Dr. Kenny admits that Inokawa can accomplish transmission with a single LED. Ex. 1003 ¶83; *see also* Ex. 1008 ¶[0062]. Inokawa adds a second LED to provide an improvement to help address two situations, neither of which applies to Aizawa. One situation is in a mechanically connected system, where there may be a "risk of contact failure to damage or deterioration." Ex. 1008 ¶[0004]. That potential improvement is irrelevant since Aizawa's wrist-worn device (Ex. 1006 Fig. 2) uses a transmitter—not a mechanically connected cable. The second possible situation is not having to use a "dedicated wireless communication circuit...." Ex. 1008 ¶[0004]. Aizawa, however, already has a transmitter that provides real-time heart measurements to a display. Dr. Kenny's asserted motivations do not explain why a POSITA would (1) redesign a sensor by adding a second LED, (2) find it desirable to require the use of a separate base station for data transfer and charging, and (3) require the user to remove the device to transmit data when the ultimate result is to remove a transmitter circuit that was already present in Aizawa.

88.     Among other things, Dr. Kenny does not address other complications that would result from adding an extra LED to a physiological sensor. For

does not result in a sensor with both multiple emitters and at least four detectors, and Ohsaki does not fix this problem:  it has a single emitter and a single detector under a translucent board.  Ex. 1014 ¶[0017], Fig. 2.

### 2.    A POSITA Would Have Understood That Ohsaki's Board Would Not Prevent Slipping With Aizawa's Device

93.    Dr. Kenny also does not establish any benefit to introducing Ohsaki's convex board to Aizawa's device.  Dr. Kenny states that "Ohsaki teaches that adding a convex surface to its translucent board 8 (i.e., light permeable cover) can help prevent the device from slipping on the tissue of the wearer compared to using a flat cover without such a protrusion."  Ex. 1003 ¶141; *see also* ¶142 ("In other words, a POSITA seeking to achieve improved adhesion between the sensor and the skin, as expressly recognized in Aizawa, would have been motivated and readily able to modify Aizawa's acrylic plate to have a convex shape as in Ohsaki.").  But Ohsaki's disclosure indicates any benefit to its board is exceptionally limited.  First, Ohsaki indicates that the "detecting element" (2) must have longitudinal directionality, which I understand to mean it must be rectangular in shape.  Ex. 1014 ¶[0019].  Ohsaki shows the long side of the rectangle in Ohsaki Figure 2.  Ex. 1014 ¶[0019].  This long direction is pointed up and down the user's arm.  Ex. 1014 ¶[0019].  The board (8) spans most of the long direction in Ohsaki's detecting element.  Ex. 1014 Fig. 2.  Ohsaki also illustrates the short direction of the detecting element (2) (which is in the "circumferential" direction of the wrist)

in Figure 1.  Ex. 1014 ¶[0019], Fig. 1.  Figure 1 shows that in the short direction, the board is considerably narrower than the detecting element (2).  Thus, a POSITA would have understood that Ohsaki's board is long, narrow, and rectangular.  Ohsaki indicates that one must orient the sensor and the accompanying rectangular board with the longitudinal direction of the user's arm to prevent slipping.  Ex. 1014 ¶[0019].  Third, Ohsaki indicates that the convex surface only prevents slipping on the backhand side (i.e., watch-side) of the user's wrist.  Ex. 1014 ¶[0024].  Ohsaki's sensor has "a tendency to slip off" if it is on the palm side of the user's wrist.  Ex. 1014 ¶[0023], Figs. 3A-B.  As shown in Ohsaki Figure 3, a measurement using a sensor with a convex board that is taken from the "front side" (the "palm side") of the wrist has a similar amount of motion noise as a flat surface used on the backhand side of the wrist (Figure 4B), which Ohsaki deems is "adversely affected by movement."  See Ex. 1014 ¶[0025] (discussing the flat surface measurements in Figure 4B), Figs. 3A-B, 4A-B.

94.     Aizawa is different from Ohsaki on each of these issues.  First, rather than using a rectangular longitudinal directionality, Aizawa uses a circular arrangement of detectors disposed around a central emitter.  Ex. 1006 ¶¶[0009], [0027], [0036].  Aizawa distinguishes its sensor from linear sensors such as Ohsaki's sensor.  Ex. 1006 ¶¶[0009], [0027], [0036].  Second, a POSITA could not place Aizawa's circular surface with the longitudinal direction of the user's arm.

Ex. 1014 ¶[0019].  This is because its circular shape means that Aizawa's sensor points in all directions equally.  Third, Aizawa's sensor is positioned on the palm side of the wrist.  Ex. 1006 Fig. 2 (below).  Aizawa requires this positioning so that the sensor "becomes close to the artery…of the wrist."  Ex. 1006 ¶[0026]; *see also, e.g.*, Abstract, ¶¶[0002], [0009], [0027].



F I G .  2

Aizawa's sensor shown on palm side of wrist (Ex. 1006 Fig. 2)

95.  Thus, a POSITA would not have believed Ohsaki's longitudinal convex surface would benefit Aizawa's device.  Ohsaki teaches that a convex surface on the palm side of the wrist would not prevent slipping. Ex. 1014 ¶[0023], Figs. 3A-B.  This is shown in Ohsaki Figures 3B's motion signal, which illustrates that Ohsaki's sensor experiences considerable movement and slipping on the palm side (front side) of the wrist, as compared to Figure 3A's motion signal on the back side of the wrist.  Thus, a POSITA would have had no motivation to add such a surface to Aizawa's palm-side sensor.  Instead, Aizawa reports that on the palm

Appx05247

side of the wrist, a flat surface improves adhesion. Ex. 1006 ¶¶[0013], [0026], [0030], [0034]; *see also* Figs. 3A-B & ¶[0028] (illustrating Aizawa's output of photodetector). Thus a POSITA would have believed that adding Ohsaki's convex surface would have disrupted the improved adhesion properties reported for Aizawa's flat plate, in view of Ohsaki's reported slipping and noise for a convex surface positioned on the palm side (front side) of the wrist. Ex. 1014 ¶¶[0023]-[0024], Figs. 3A-B. Ohsaki's teachings are also incompatible with Aizawa's sensor positioning and design because—as discussed—Aizawa requires measurements from "the artery of a wrist." Ex. 1006 ¶¶[0002], [0009], [0026], [0027], [0036]. Wrist arteries are accessible on the palm side of the wrist—not the back. Ex. 2010 Plates 429 (showing radial and ulnar arteries in superficial layer of the anterior (palm-side) of wrist), compare Plate 427 (no arteries accessible in superficial layer of posterior (backhand side) of forearm and wrist).

**E.** **The Challenged Dependent Claims Are Nonobvious Over Ground 1B**

96. The Petition does not establish that independent claims 1 and 26 are obvious based on the proposed combination of references in Ground 1B. It also does not establish that any of the challenged dependent claims are obvious for the same reasons as for claims 1 and 26.

-60-

**Appx05248**