**[Volume VIII, Appx05295 – Appx13266]**

**Nos. 22-1631, -1632, -1633, -1634, -1635, -1636, -1637, -1638**

═══════════════════════════════════════

IN THE

# United States Court of Appeals

### FOR THE FEDERAL CIRCUIT

───────────────

MASIMO CORPORATION,

*Appellant,*

v.

APPLE INC.,

*Appellee.*

───────────────

APPEAL FROM THE PATENT TRIAL AND APPEAL BOARD
CASE NOS. IPR2020-01520, IPR2020-01521, IPR2020-01536, IPR2020-01537,
IPR2020-01538, IPR2020-01539, IPR2020-01714, IPR2020-01715

───────────────

### CORRECTED JOINT APPENDIX

Joseph R. Re, *Principal Counsel*
Stephen C. Jensen
Jarom D. Kesler
Stephen W. Larson
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
2040 Main Street, 14th Floor
Irvine, CA 92614
(949) 760-0404

Jeremiah S. Helm
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
1717 Pennsylvania Ave., N.W.
Washington, D.C. 20006
(202) 640-6400

*Attorneys for Appellant*
*Masimo Corporation*

Lauren A. Degnan, *Principal Counsel*
Christopher Dryer
W. Karl Renner
Jared Hartzman
Adi A. Williams
**FISH & RICHARDSON P.C.**
1000 Maine Ave., Suite 1000
Washington, DC 20024
Tel: (202) 783-5070

Ashley Bolt
**FISH & RICHARDSON P.C.**
1180 Peachtree Street NE,
21st Floor
Atlanta, GA 30309

*Attorneys for Appellee Apple Inc.*

July 12, 2023

**Table of Contents**

| Date | Paper No. /Ex. No. | Document | Pages |
|---|---|---|---|
| **VOLUME I** | | | |
| 2/23/2022 | 39 | Final Written Decision [IPR2020-01520] | Appx00001-Appx00106 |
| 4/11/2022 | 33 | Final Written Decision [IPR2020-01521] | Appx00107-Appx00198 |
| 2/23/2022 | 43 | Final Written Decision [IPR2020-01536] | Appx00199-Appx00276 |
| **VOLUME II** | | | |
| 2/23/2022 | 43 | Final Written Decision [IPR2020-01537] | Appx00277-Appx00358 |
| 2/23/2022 | 43 | Final Written Decision [IPR2020-01538] | Appx00359-Appx00428 |
| 2/23/2022 | 41 | Final Written Decision [IPR2020-01539] | Appx00429-Appx00514 |
| 4/6/2022 | 34 | Final Written Decision [IPR2020-01714] | Appx00515-Appx00591 |
| **VOLUME III** | | | |
| 4/6/2022 | 33 | Final Written Decision [IPR2020-01715] | Appx00592-Appx00675 |
| n/a | | U.S. Patent 10,258,265 | Appx00676-Appx00772 |
| n/a | | U.S. Patent 10,292,628 | Appx00773-Appx00870 |
| **VOLUME IV** | | | |
| n/a | | U.S. Patent 10,588,553 | Appx00871-Appx00973 |
| n/a | | U.S. Patent 10,588,554 | Appx00974-Appx01076 |
| n/a | | U.S. Patent 10,631,765 | Appx01077-Appx01179 |
| **VOLUME V** | | | |
| 5/25/2022 | 16 | Notice Forwarding Certified Lists | Appx01180-Appx01529 |

| Date | Paper No. /Ex. No. | Document | Pages |
|---|---|---|---|
| **VOLUME VI** | | | |
| 5/25/2022 | 16 | Notice Forwarding Certified Lists (Continued) | Appx01530-Appx01876 |
| **VOLUME VII** | | | |
| 8/31/2022 | 2 | Petition for *Inter Partes* Review [IPR2020-01520] | Appx01878; Appx01896-01899; Appx01921-01923; Appx01931-01934; Appx01953 |
| 5/28/2021 | 21 | Patent Owner's Response [IPR2020-01520] | Appx02191; Appx02212-02220; Appx02237 |
| 8/20/2021 | 24 | Petitioners Reply to Patent Owner's Response to Petition [IPR2020-01520] | Appx02275; Appx02306 |
| 1/6/2022 | 37 | December 7, 2021 Oral Hearing Transcript [IPR2020-01520] | Appx02449; Appx02458; Appx02498; Appx02501-02506; Appx02517; Appx02530; |
| 4/12/2022 | 40 | Patent Owner's Notice of Appeal to the U.S. Court of Appeals for the Federal Circuit [IPR2020-01520] | Appx02537-02648 |
| | Ex. 1002 | File History excerpts, U.S. Patent No. 10,258,265 | Appx02923-02932 |
| | Ex. 1003 | Declaration of Thomas W. Kenny [IPR2020-01520] | Appx03000; Appx03025-03030; Appx03040-03058; Appx03068-03071; Appx03095-03107 |
| | Ex. 1006 | Aizawa U.S. Pub. No. 2002/0188210 [IPR2020-01520] | Appx03242-03248 |
| | Ex. 1007 | Inokawa JP20060296564A [IPR2020-01520] | Appx03249-03271 |

| Date | Paper No. /Ex. No. | Document | Pages |
|---|---|---|---|
| | Ex. 1008 | Certified English Translation of Inokawa and Translators Declaration [IPR2020-01520] | Appx03272-Appx03295 |
| | Ex. 1010 | U.S. Patent No. 8,177,720 [IPR2020-01520] | Appx03313-Appx03333 |
| | Ex. 1014 | U.S. Pub. No. 2001/0056243 [IPR2020-01520] | Appx03352-03357 |
| | Ex. 1015 | Mendelson Design and Evaluation of a New Reflectance Pulse Oximeter Sensor [IPR2020-01520] | Appx03358-03364 |
| | Ex. 1023 | Nishikawa U.S. Pub. No. 2007/0145255 [IPR2020-01520] | Appx03443-03450 |
| | Ex. 1041 | Deposition Transcript of Dr. Vijay Madisetti Day 1 [IPR2020-01520] | Appx04112; Appx04243; Appx04244 |
| | Ex. 1047 | Second Declaration of Dr. Thomas W. Kenny [IPR2020-01520] | Appx04525; Appx04527-04559 |
| | Ex. 2004 | Madisetti Declaration [IPR2020-01520] | Appx05185; Appx05214-05216; Appx05233-05234; Appx05237-05238; Appx05240-05242; Appx05245-05248 |
| **VOLUME VIII** | | | |
| | Ex. 2006 | 4/22/2022 Kenny, Thomas Deposition Transcript [IPR2020-01520] | Appx05295; Appx05319; Appx05345-05346; Appx05368-05371; Appx05377-05378; Appx05380-05384; Appx05387-05388; Appx05391; Appx05394-05395; Appx05426-05428; Appx05435-05437; Appx05448; |

| Date | Paper No. /Ex. No. | Document | Pages |
|---|---|---|---|
| | | | Appx05458; Appx05473-05475; Appx05482-05486; Appx05491-05492; Appx05496-05502; Appx05551 |
| | Ex. 2007 | 4/23/2022 Kenny, Thomas Deposition Transcript [IPR2020-01520] | Appx05567; Appx05591-05592; Appx05604-05605; Appx05625-05631; Appx05635-05636; Appx05696; Appx05699 |
| | Ex. 2008 | 4/24/2021 Kenny, Thomas Deposition Transcript [IPR2020-01520] | Appx05747; Appx05776-05777; Appx05781-05783; Appx05786-05787; Appx05794-05795; Appx05803-05804; Appx05806-05807; Appx05809-05810; Appx05814-05818; Appx05841; Appx05851-05852; Appx05857; Appx05876-05877; Appx05903-05905; Appx05911-05912; Appx05960-05961; Appx05973-05975 |
| | Ex. 2009 | 4/25/2021 Kenny, Thomas Deposition Transcript [IPR2020-01520] | Appx06013; Appx06093-06098; Appx06122-06123 |
| | Ex. 2027 | 9/18/2021 Kenny, Thomas Deposition Transcript 9/18/2021[IPR2020-01520] | Appx06690; Appx06708-06711; Appx06738-06739; Appx06746; |

| Date | Paper No. /Ex. No. | Document | Pages |
|---|---|---|---|
| | | | Appx06882-06884; Appx06893-06894; Appx06902-06904; Appx06907-06908; Appx06946 |
| 9/2/2020 | 1 | Petitioner's Power of Attorney [IPR2020-01521] | Appx06952 |
| 9/2/2020 | 2 | Petition for *Inter Partes* Review [IPR2020-01521] | Appx06953; Appx06973-06974; Appx07001-07004 |
| 7/9/2021 | 15 | Patent Owner's Response [IPR2020-01521] | Appx07300; Appx07324-07325 |
| 4/12/2022 | 34 | Patent Owner's Notice of Appeal to the U.S. Court of Appeals for the Federal Circuit [IPR2020-01521] | Appx07624-07721 |
| | Ex. 1003 | Declaration of Dr. Thomas W. Kenny [IPR2020-01521] | Appx08051; Appx08080-08081; Appx08105-08106; Appx08131-08133 |
| | Ex. 1047 | Second Declaration of Dr. Thomas W. Kenny [IPR2020-01521] | Appx09183; Appx09197-09199; Appx09204-09208; Appx09216-09218 |
| | Ex. 2004 | Declaration of Vijay K. Madisetti, Ph.D. [IPR2020-01521] | Appx10322; Appx10352-10355; Appx10370-10371; Appx10374-10375; Appx10377-10379; Appx10382-10385 |
| 8/31/2020 | 3 | Petition for *Inter Partes* Review [IPR2020-01536] | Appx12444; Appx12476-12477 |
| 6/1/2021 | 24 | Patent Owner's Response [IPR2020-01536] | Appx12820; Appx12851-12854 |
| 10/5/2021 | 32 | Patent Owner's Sur-Reply to Reply [IPR2020-01536] | Appx12955; Appx12974 |

| Date | Paper No. /Ex. No. | Document | Pages |
|---|---|---|---|
| 4/12/2022 | 44 | Patent Owner's Notice of Appeal to the U.S. Court of Appeals for the Federal Circuit [IPR2020-01536] | Appx13167-13250 |
| | Ex. 1002 | File History excerpts for U.S. Patent No. 10,588,553 | Appx13259-13266 |
| **VOLUME IX** | | | |
| | Ex. 1003 | Declaration of Dr. Kenny [IPR2020-01536] | Appx15237; Appx15278-15286 |
| | Ex. 1009 | U.S. Pub. No. 2001/0056243 Ohsaki [IPR2020-01536] | Appx15568; Appx15572 |
| | Ex. 1012 | U.S. Patent No. 6,801,799 Mendelson [IPR2020-01536] | Appx15578-15593 |
| | Ex. 1017 | Mendelson Design and Evaluation of a New Reflectance Pulse Oximeter Sensor [IPR2020-01536] | Appx15638 |
| | Ex. 1018 | Mendelson Skin Reflectance Pulse Oximetry In Vivo Measurements from the Forearm and C [IPR2020-01536] | Appx15645-15647 |
| | Ex. 1019 | Webster Design of Pulse Oximeters [IPR2020-01536] | Appx15651; Appx15754-15758 |
| | Ex. 1047 | Second Declaration of Dr. Thomas W. Kenny [IPR2020-01536] | Appx17805; Appx17824-17837 |
| | Ex. 2004 | Declaration of Vijay K. Madisetti, Ph.D. [IPR2020-01536] | Appx18302; Appx18343-18355; Appx18358-18359 |
| 8/27/2021 | 27 | Petitioner's Reply to Masimo Response [IPR2020-01537] | Appx20516; Appx20526 |
| 1/16/2022 | 41 | December 7, 2021 Oral Hearing Transcript [IPR2020-01537] | Appx20696; Appx20759-20760 |
| 4/12/2022 | 44 | Patent Owner's Notice of Appeal to the U.S. Court of Appeals for the Federal Circuit [IPR2020-01537] | Appx20781-Appx20868 |
| | Ex. 1003 | Declaration of Dr. Kenny [IPR2020-01537] | Appx22855; Appx22888; |

| Date | Paper No. /Ex. No. | Document | Pages |
|---|---|---|---|
| | | | Appx22890-22906; Appx22937-22945; Appx22995-23001 |
| | Ex. 1009 | U.S. Pub. No. 2001/0056243 Ohsaki [IPR2020-01537] | Appx23194; Appx23198 |
| | Ex. 1010 | Mendelson A Wearable Reflectance Pulse Oximeter for Remote Physiological Monitoring [IPR2020-01537] | Appx23200-23203 |
| | Ex. 1047 | Second Declaration of Dr. Thomas W. Kenny [IPR2020-01537] | Appx25392; Appx25405-25409; Appx25414-25423 |
| | Ex. 2003 | Mendelson, et al., Measurement Site and Photodetector Size Considerations Jin Optimizing Power Consumption of a Wearable Reflectance Pulse Oximeter [IPR2020-01537] | Appx25906-25909 |
| | Ex. 2004 | Declaration of Vijay K. Madisetti, Ph.D. [IPR2020-01537] | Appx25910; Appx25942-25945; Appx25947 |
| 9/2/2020 | 1 | Petition for Inter Partes Review of U.S. Patent No. 10,588,554 [IPR2020-01538] | Appx27672; Appx27708 |
| 4/12/2022 | 44 | Patent Owner's Notice of Appeal to the U.S. Court of Appeals for the Federal Circuit [IPR2020-01538] | Appx28420-28495 |
| **VOLUME X** | | | |
| | Ex. 1002 | File History excerpts, U.S. Patent No. 10,588,554 [IPR2020-01538] | Appx28870-28882; Appx29716-29719 |
| | Ex. 2004 | Declaration of Vijay K. Madisetti, Ph.D. [IPR2020-01538] | Appx33048; Appx33091-33103; Appx33106-33108 |
| 4/12/2023 | 42 | Patent Owner's Notice of Appeal to the U.S. Court of Appeals for | Appx35638-35729 |

| Date | Paper No. /Ex. No. | Document | Pages |
|------|-------------------|----------|-------|
| | | the Federal Circuit [IPR2020-01539] | |
| | Ex. 1003 | Declaration of Thomas W. Kenny [IPR2020-01539] | Appx36967; Appx37008; Appx37061-37062; Appx37071; Appx37119 |
| | Ex. 1009 | U.S. Pub. No. 2001/0056243 Ohsaki [IPR2020-01539] | Appx37295; Appx37298-37299 |
| | Ex. 1017 | Mendelson, Design and Evaluation of a New Reflectance Pulse Oximeter Sensor [IPR2020-01539] | Appx37370-37371 |
| | Ex. 2004 | Madisetti Declaration [IPR2020-01539] | Appx40313; Appx40348-40351; Appx40353; Appx40395-40398 |
| 4/12/2022 | 35 | Patent Owner's Notice of Appeal to the U.S. Court of Appeals for the Federal Circuit [IPR2020-01714] | Appx42697-42779 |
| | Ex. 1002 | File History excerpts, U.S. Patent No. 10,631,765 [IPR2020-01714] | Appx42872-42880 |
| | Ex. 1004 | Declaration of Vijay K. Madisetti, Ph.D. [IPR2020-01714] | Appx47449; Appx47491-47504; Appx47507-47509 |
| 4/12/2022 | 34 | Patent Owner's Notice of Appeal to the U.S. Court of Appeals for the Federal Circuit [IPR2020-01715] | Appx50019-50108 |
| | Ex. 1003 | Declaration of Thomas W. Kenny [IPR2020-01715] | Appx50582; Appx50680-50681 |
| | Ex. 2004 | Declaration of Madisetti [IPR2020-01715] | Appx54761; Appx54796-54799; Appx54801; Appx54845-54846 |

Case: 22-1631    Document: 45-8    Page: 10    Filed: 07/12/2023

4/22/2021                Apple, Inc. v. Masimo Corp.          Thomas Kenny Jr., Ph.D.

Page 1

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

APPLE INC.,                      )
                                 )   IPR NO. 2020-1520
            Petitioner,          )   US PATENT NO: 10,258,265
                                 )
      -against-                  )   IPR NO. 2020-1537
                                 )   US PATENT NO: 10,588,553
MASIMO CORPORATION,              )
                                 )   IPR NO. 2020-1539
            Patent Owner.  )   US PATENT NO: 10,588,554
_____)


VIDEO-RECORDED DEPOSITION OF

THOMAS WILLIAM KENNY, JR. PH.D.

VOLUME 1

Zoom Recorded Videoconference

04/22/2021

9:02 a.m. (Pacific Daylight Time)



REPORTED BY:  AMANDA GORRONO, CLR

CLR NO. 052005-01




_____

DIGITAL EVIDENCE GROUP

1730 M Street, NW, Suite 812

Washington, D.C. 20036

(202) 232-0646

**MASIMO 2006**
**Masimo v. Apple**
**IPR2020-01520**

**Appx05295**

Page 25

1   ordinary skill in the art in view of Aizawa and

2   Inokawa would appreciate that there are several

3   improvements possible and that they would be

4   motivated to, to achieve those particular

5   improvements.

6               So, for example, one such improvement

7   would be to use -- to modify the light-permeable

8   cover in order to achieve an improvement in detection

9   efficiency.

10      Q.      Okay.  And you said several, "several

11  improvements possible."

12              What several improvements are you

13  referring to?

14              MR. SMITH:  Objection; form.

15      A.      So Inokawa, in Paragraph 96, Inokawa

16  teaches that the lens makes it possible to increase

17  the light-gathering ability of the LED and continue

18  describing that benefit in Paragraph 97, discussing

19  how the modified cover would allow more light to be

20  gathered and refracted towards the light receiving

21  cavities of Aizawa.

22      Q.      Anything else?

Page 51

1   reach a conclusion, if there was a solid improvement

2   provided by your design change.

3        Q.       And what, what are the challenges

4   with doing a ray trace analysis, looking at the

5   possible pathways of light through the system and

6   trying to assess how much light is able to reach a

7   detector?

8                MR. SMITH:  Objection; form.

9        A.       So there are many detailed

10  differences between what might be the ideal

11  representation of the system and the actual

12  representation, the behavior of the elements and so

13  on, within specifications.

14       Q.       I just want to make sure that, that

15  the transcript was correct here.  Did you say "so

16  there are many detail differences between what might

17  be the ideal representation of the system and the

18  actual representation, the behavior of the elements

19  and so on, within specifications."

20               Did I read that correctly?

21       A.       Let me cleanup a bit.  The drawings

22  such as here on the bottom of page 55 shows, you

Page 52

1    know, certain shapes and sizes perhaps to scale with

2    certain levels of accuracy.  If I was asked to

3    analyze the optical performance of a system like

4    this, I would need to know precisely the shapes and

5    the tolerances around those shapes, the position of

6    the elements, the detectors, the emitters and so on.

7    And there's tolerances around all of that.

8                      And then an analysis can be done.  A

9    person of ordinary skill in the art would know how to

10   represent the details and the tolerances within some

11   analytical framework and produce estimates of the

12   relative performance, with and without your

13   improvement.

14         Q.     Did you do that analysis in this

15   case?

16         A.     No.

17         Q.     Can you explain the difference

18   between the analysis you did and the analysis that

19   you just described that a person of ordinary skill in

20   the art would do to sort of examine the differences

21   between the ideal representation of a system and the

22   actual representation or behavior of the system?

Page 74

1    case provide refraction and concentration of the

2    incoming light.

3        Q.      So is it your testimony that a person

4    of ordinary skill in the art looking at the Inokawa

5    figure following Paragraph 110 would not be able to

6    determine whether it concentrates light to any

7    particular location?

8                MR. SMITH:   Objection; form.

9        A.      So we've gone around this a bit.

10   The, the way the light is concentrated depends on

11   where it's coming from and in particular

12   orientations, details of shapes, index of refraction.

13   So there's not enough information in this drawing to

14   identify a precise location or any particular

15   precision around the concentration of the light.

16               One of ordinary skill in the art

17   would understand that this general shape of a

18   lens-like feature can provide that benefit.

19       Q.      What benefit?

20       A.      The benefit of refracting and

21   concentrating the light coming in through the, the

22   lens.

Case: 22-1631    Document: 45-8    Page: 15    Filed: 07/12/2023

4/22/2021                Apple, Inc. v. Masimo Corp.        Thomas Kenny Jr., Ph.D.

Page 75

1          Q.      But without more information, a

2     person of ordinary skill in the art would not

3     understand where that light is being concentrated on

4     the -- you know, after, after it enters the lens and

5     exits the lens?

6               MR. LARSON:  Let me restate that.

7          Q.      Without more information, a person of

8     ordinary skill in the art looking at the Inokawa

9     figure you put after Paragraph 110 would not be able

10    to understand how the light is concentrated after it

11    exits the lens and --

12         A.      One of, one of ordinary skill in the

13    art would understand that the lens-like feature can

14    provide that benefit.  It would be obvious that one

15    could obtain that benefit.  And then the detailed

16    design would, would be carried out to determine the

17    precise location and maximize that benefit.  But

18    it's, it's plainly obvious that that benefit is

19    available by combining these features.

20         Q.      So in, in the figure from Inokawa

21    that you have following Paragraph 110, if you started

22    with a flat cover and I said let's change that to the

Page 76

1   convex shape shown in, shown in the picture of

2   Inokawa that you have following Paragraph 110, would

3   a person of ordinary skill in the art be able to

4   determine how light would be concentrated based on

5   that change and structure?

6                    MR. SMITH:  Objection; form.

7        A.      So the general question of if I take

8   the flat example and modify it with a lens-like

9   convex curvature without specifying the details of

10  any of it, would the person be able to tell me where

11  the concentration exactly would happen?  There's --

12  that's an insufficiently specified question.

13       Q.      What's insufficiently specified about

14  my question?

15       A.      There's a lot of things missing.  So

16  the exact dimensions of the structures that you

17  created, the index of refraction of that material

18  relative to the surrounding materials, the location

19  of the light source, in this case being the light

20  that's reflected off of the corpuscles.

21                  I can go on.  It's a -- the figure is

22  intended as illustration of the concept.  The details

Page 77

1    of a particular implementation are not represented in

2    this figure.

3         Q.      So what concept does the figure

4    represent?

5         A.      This figure shows the use of a

6    protruding convex surface to provide improvement in

7    the signal-to-noise ratio through refraction and

8    concentration of the light coming in.

9         Q.      But a person of ordinary skill in the

10   art looking at this figure would not understand how

11   changing from a flat surface to a convex shape would

12   impact the concentration of light; is that, is that

13   your testimony?

14                MR. SMITH:  Objection; form.

15        A.      I think a person of ordinary skill in

16   the art would understand that replacing a flat

17   surface with a convex surface, as illustrated in this

18   figure, has the potential of improving the

19   concentration of the light, subject to, you know,

20   further refinement of the design, which is what a

21   person of ordinary skill in the art would then

22   proceed with.

1    art, looking at Figure 2 from Inokawa, would believe

2    the lens-like feature provides the benefit of

3    increased light at the center detector, correct?

4                    MR. SMITH:  Objection; form.

5         Q.     I think I just repeated my last

6    question, which --

7         A.     I know.  Again, I feel like I'm

8    repeating all my answers.  It's -- you know, one

9    would understand that this convex lens-like shape

10   increases light-collection efficiency.  The shape

11   provides this benefit by refracting and concentrating

12   the light coming in through the acrylic plate after

13   being reflected by the light.  Yes, I think that's

14   what I've been saying.

15        Q.     Right.  The part I'm focusing on that

16   I think you agree with but you don't specify in your

17   answer is that it provides this benefit by

18   concentrating light towards the detector in the

19   center, correct?

20                   MR. SMITH:  Objection; form.

21        A.     Yeah.  Inokawa teaches that the lens

22   makes it possible to increase the light-gathering

Page 84

1    ability and particularly for -- with respect to his

2    own illustration, yes.

3         Q.    Okay.  And so a person of ordinary

4    skill in the art, looking at Figure 2 of Inokawa,

5    would believe that the lens-like feature concentrates

6    light toward, toward the center detector, correct?

7              MR. SMITH:  Objection; form.

8         A.    So I want to be careful not to make a

9    statement that's too general here, and that's, that's

10   why I'm hesitating.  They have other examples.

11             For example, Aizawa, where the

12   detectors are not in the center, they are scattered

13   around the perimeter.  I'd say for a case of this

14   particular alignment in Inokawa where the center axis

15   of the lens and the detector are aligned, that one of

16   ordinary skill in the art would understand that that

17   arrangement provides, in that particular case, the

18   described feature of increased -- let me just find

19   exactly the right point in the invention here -- you

20   know, that arrangement increases the light-gathering

21   ability.

22             So, you know, this Inokawa is an

Page 86

1          Q.        Well, we can get there in a moment.

2     But let me just ask you about Figure 2 in Inokawa.

3     And I'm not proposing that you change the lens or any

4     of the structure in any way, other than to put the

5     LED in the middle and detectors on the outside.

6                    And my question to you is:  Would a

7     person of ordinary skill in the art have understood

8     that even in that configuration the lens would still

9     concentrate light towards the center, correct?

10                    MR. SMITH:  Objection; form.

11          A.        So I think one of ordinary skill in

12     the art would understand that a lens, in general, can

13     provide concentration of light.  The locations and

14     directions of that concentration depend on the

15     details of the design of the lens, the location of

16     the sources, and the location at which you're

17     interested in the presence or absence of

18     concentration.

19                    I think one of ordinary skill in the

20     art would understand that in Inokawa the objective is

21     to concentrate light at the detector, which is in the

22     center axis of the drawing and that the lens is

Page 87

1  capable of providing that benefit.

2            If we're going to move the lenses and

3  the LEDs and detectors around and ask different

4  questions, it's -- it isn't so obvious that Inokawa

5  is specifically considering those scenarios.  It's a

6  little more hypothetical.

7       Q.    I don't think that answers my

8  question, to be quite honest with you.  My question

9  is Figure 2 in Inokawa, you testified that a person

10 of ordinary skill in the art would look at that and

11 understand that the lens combines the benefit of

12 directing light towards the center detector.  And I'm

13 asking if, if the only thing you change in Figure 2

14 of Inokawa was to put the LED in the center and the

15 detectors on the outside, wouldn't the lens still

16 concentrate light towards the center?

17            MR. SMITH:  Objection; form.

18      A.    So in that arrangement, the lens does

19 many things to different rays of light coming in from

20 different directions, different reflection spots,

21 different corpuscles for light along the axis coming

22 into the lens.  As I explained, the lens, that

Page 88

1    particular shape, one would understand that that lens

2    would provide concentration towards the center in

3    addition to effects on light rays elsewhere in the

4    system that might also include concentration at other

5    locations.

6              Q.       Let me put it this way.  Is it your

7    opinion that the convex shape would, would affect

8    light differently simply by swapping the location of

9    the detectors and LEDs?

10             MR. SMITH:  Objection; form.

11             A.       I just want to be clear that what is

12   generally understood here isn't a single simple focal

13   point of concentration.  Light coming in from

14   different directions in this case would be understood

15   by a person of ordinary skill in the art to be

16   concentrated at different locations in this, in this

17   system.  Light coming in pretty much along the normal

18   axis in the center would tend to be concentrated by

19   this particular idea of a lens towards the center,

20   underneath the lens.  But light coming in from other

21   angles could be concentrated in other locations.  The

22   lens provides a general benefit of light

Page 89

1    concentration, not just at the center.

2        Q.      So it's your opinion that a light

3    can -- sorry -- that a lens can concentrate light in

4    more than one location?

5                MR. LARSON:  Let me strike that.

6        Q.      It's your opinion that a convex lens

7    can concentrate light to more than one location?

8                MR. SMITH:  Objection; form.

9        A.      It depends on the location of the

10   light source, yes.

11       Q.      How about overall light entering the

12   lens, your -- is it your testimony that the light can

13   be concentrated at more than one location?

14       A.      I think one of ordinary skill in the

15   art understands that light entry in a lens like this

16   is not 100 percent concentrated into a single

17   location.

18       Q.      But overall light -- overall is the

19   light that enters a convex lens concentrated to one

20   particular location?

21       A.      I think I just said one would

22   understand that light coming in from all angles is

1    not going to be concentrated to a single location by

2    a convex lens.  One of ordinary skill would know

3    that.

4            Q.        And so when you use the term

5    "concentrating light," what do you mean?

6            A.        It's deflecting using refraction and,

7    and the shape of the surfaces to deflect the light to

8    concentrate it at a desired location.

9            Q.        Let me ask it this way.  In, in

10   Inokawa Figure 2, does the convex lens result in more

11   light, more light reaching the center detector as

12   compared to a flat surface or less light reaching the

13   center detector?

14               MR. SMITH:  Objection; form.

15           A.        So Inokawa teaches that the lens

16   makes it possible to increase the light-gathering

17   ability.  Incorporating a convex lens-like shape, as

18   described, increases the light-collection efficiency

19   which in turn leads to an enhanced signal-to-noise

20   ratio.  The lens shape of Inokawa provides this by

21   refracting and concentrating light coming in.

22           Q.        So earlier you were very clear that

Page 93

1  lens-like feature is capable of providing the

2  improvements in light-collection efficiency that

3  we've been discussing.

4        Q.      And so why does the convex lens-like

5  feature in Inokawa result in improved

6  light-collection efficiency in Inokawa?

7                MR. SMITH:  Objection; form.

8        A.      I think one of ordinary skill in the

9  art, looking at this system and making some

10 assumptions about the index of refraction and the

11 geometry, would indicate, would believe that, that

12 some percentage of light reflected in from some of

13 those corpuscles would be refracted towards the

14 detector and that would lead to improvement in the

15 light-collection efficiency.

16       Q.      Now, your testimony earlier about,

17 you know, examining the, the flow of light from one,

18 two, three, four, five, six, seven different

19 corpuscles, each reflecting light towards the center

20 and the particular effect a particular lens would

21 have, you don't provide any analysis like that in

22 your Declaration, do you?

**Appx05387**

Page 94

1      A.      No.  One of ordinary skill in the art

2   would understand that the general shape of a convex

3   lens provides the benefit that Inokawa describes in

4   the system that in general, there is an improvement

5   in the light-gathering efficiency that would lead to

6   an enhanced signal-to-noise ratio.

7      Q.      But doesn't that depend on where the

8   detectors are under the, under the lens?

9              MR. SMITH:  Objection; form.

10     A.      So I think one of ordinary skill in

11  the art would believe and understand that it's

12  possible to obtain those benefits and that one would

13  then do some additional work in order to optimize the

14  system, but the capability of obtaining those

15  benefits is obviously present.

16     Q.      So you testified the general shape of

17  a convex lens provides the benefit that Inokawa

18  describes and that there is an improvement in

19  light-collection efficiency.  Are there some

20  circumstances where a convex lens placed over

21  sensors -- is there, are there some situations where

22  a convex lens placed over detectors and LEDs would

Page 97

1    power consumption and other features, but one of

2    ordinary skill in the art would know how to maneuver

3    within that, within that space.

4            Q.      Okay.  But your -- just to be clear,

5    your Declarations don't discuss this process of

6    adjusting sizes and shapes and locations that you've

7    been -- that you referenced?

8                    MR. SMITH:  Objection to form.

9            A.      That's correct.  One of ordinary

10   skill in the art would know how to do that.

11           Q.      And so as I understand your

12   testimony, convex lens may concentrate light in many

13   different locations, correct?  Is that, is that your

14   testimony?

15                   MR. SMITH:  Objection; form.

16           A.      Yes, I'd say depending on the

17   location of the light, the orientation of the lens,

18   the curvature of the index, the actual location that

19   that light is deflected towards, it depends on all of

20   those things and it could be many different

21   locations.

22           Q.      And does it depend on the location of

Page 100

1    art would understand that it's within their skills

2    and within the tools available to them to obtain

3    benefits such as using refraction and concentration

4    of the light to enhance the signal-to-noise ratio of

5    the system.

6            Q.      Is it your testimony that, you know,

7    apart from extreme situations that a convex lens used

8    over detectors and LEDs is always going to improve

9    light concentration?

10                   MR. SMITH:  Objection; form.

11           A.      Sorry to refer to extreme exception

12   so that it would be plainly obvious that there would

13   be no benefit without having to do any analysis.

14   There are, there is a universe of possible designs

15   here, some of which would provide benefits and some

16   of which would not.

17           Q.      So a convex lens may provide benefits

18   in some situations and not others, depending on the

19   location of the LEDs and the detectors; is that fair?

20                   MR. SMITH:  Objection to form.

21           A.      And the shape of the lens and

22   properties of the lens and a lot of other details.

Page 101

1    As I said, there's a universe of possible design

2    choices here.  One of ordinary skill in the art would

3    have the knowledge to make good choices and then

4    follow that up with maybe some analysis or some

5    experimental optimization in order to provide the

6    benefits of, of improved pulse wave detection.

7         Q.      In your Declaration, though, you

8    don't describe any of those, any of that experimental

9    optimization or other design choices.  You take the

10   lens of Inokawa and basically put that lens onto

11   Aizawa, correct?

12             MR. SMITH:  Objection; form.

13        A.      So, no, I don't provide a sequence of

14   procedure steps for doing any sort of optimization.

15   I state plainly that a person of ordinary skill in

16   the art would find it obvious to combine these

17   elements and would know how to do so in a way that

18   obtained and provided some benefit.

19        Q.      Do you think the light-collection

20   efficiency of a system is an important consideration

21   for a person of ordinary skill in the art designing a

22   noninvasive optical sensor?

Page 132

1         A.        I think what follows in the rest of

2    that paragraph and the paragraph following that

3    indicate that what we're looking for here is a

4    transparent plastic material that is rigid and

5    provides the other optical and mechanical

6    characteristics that are important for this design of

7    this system.  Acrylic is one representative choice

8    material, but it's not necessarily the only choice

9    that one would use.

10        Q.        And in your combination, is the, is

11   the lens protrusion made of plastic at least?  Can we

12   agree on that?

13               MR. SMITH:  Objection; form.

14        A.        It could be plastic.  It could be

15   materials that you wouldn't necessary describe with

16   that word.  Could be glass.  Could machine and polish

17   a glass element.  There's other materials one could

18   use.

19        Q.        Okay.  So I just want to understand

20   your opinions when you prepared this Declaration and

21   you signed these Declarations.  Your opinion is that

22   a person of ordinary skill in the art would have been

Page 133

1   led to a lens or protrusion but it could be made of a

2   number of different materials.  Is that, is that the

3   testimony you're giving now?

4                   MR. SMITH:  Objection.

5        A.      I think one of ordinary skill in the

6   art would understand that you can obtain the benefits

7   associated with Aizawa and Inokawa with materials,

8   including acrylic and a number of other optical

9   transparent plastics.

10       Q.      So what other -- but what you just

11  said is not in your report, correct, in your

12  declaration?

13                  MR. SMITH:  Objection; form.

14       A.      So we do on Paragraph 99 describe

15  Nishikawa, another complementary reference.

16       Q.      And in that paragraph you're

17  discussing acrylic, correct?

18       A.      Acrylic is a representative

19  transparent plastic material that can be readily

20  transformed into various shapes.  I do not say it's

21  the only such material one would ever use or consider

22  using.

Page 134

1        Q.        Where do you say they were

2    representative in Paragraph 99?

3              MR. SMITH:  Objection; form.

4        Q.        You don't, you don't the word

5    "representative" in Paragraph 99.

6                  Can we agree on that?

7        A.        I think we can agree on that.

8        Q.        Okay.  What are you looking at now?

9        A.        Just looking for other places where I

10   describe the benefits of this combination, where I

11   might have made some comments about the materials.

12                 Reading in Aizawa Paragraph 13, this

13   plate is described as a plate-like member.  It

14   doesn't explicitly require the use of acrylic.

15       Q.        You're looking at Aizawa now.  My

16   question is about your Declaration, Dr. Kenny.

17       A.        I know.  This is the context for the

18   choice of materials that one of ordinary skill in the

19   art would consider for making the structure shown in

20   the figure we've been referring to on page 55.

21       Q.        So let me -- I just want to

22   understand your opinions when you wrote this and

Page 141

1          Q.        If you're asking me what I'm asking

2     about, I'm asking about your -- the basis for your

3     assertion that the modification from the figure on

4     the bottom left to the figure on the bottom right

5     would increase light-gathering ability.

6                    What, what is your basis for that

7     assertion?

8          A.        So the objective of this device is

9     for light leaving the LED to enter the tissue,

10    scatter off of some corpuscles or other blood

11    carrying members, and be reflected towards the

12    detectors and the objective is to improve the

13    light-gathering efficiency of, of that arrangement by

14    providing a convex lens where there's curvature of

15    that lens positioned over the detector between the

16    detector and where the reflection might be taking

17    place.

18                    I think one of ordinary skill in the

19    art would understand that it's possible for a design

20    of this type to provide improved light-gathering

21    efficiency.

22         Q.        You testified before that a convex

Page 142

1    lens may have many locations where there's light

2    concentration, correct?

3          A.      That's correct.

4          Q.      So where would the light collection

5    locations be in your bottom figure right?

6                  MR. SMITH:  Objection; form.

7          A.      So light reflecting off of corpuscles

8    in the tissue nearby would be reflected back into the

9    structure at many locations.

10         Q.      Can you tell me where those locations

11   are?

12         A.      Well, I'll pick one.  For example,

13   the red detector on the right is one that I'm

14   particularly interested in, in this design and

15   there's the curvature of the lens that's provided

16   over that location, would provide some enhanced

17   light-collection efficiency because of the way of --

18   the refraction would, would change the pathways of

19   the light in that region.

20         Q.      Are there any other light -- are

21   there other places where you opine that you believe

22   there would be light --

Page 143

1                        MR. LARSON:  Strike that.

2           Q.        Are there other places where light

3    collection would exist?

4           A.        Sure, yes, maybe the detector on the

5    left as well.

6           Q.        Anywhere else?

7           A.        It could be true at other locations

8    in between.

9           Q.        Can you tell me where those locations

10   are?

11          A.        At the location of the particular

12   corpuscle and the various distances and angles but

13   the, the general characteristic of a convex lens is

14   that the refraction of that lens can provide some

15   improved light-gathering efficiency.

16          Q.        Can you tell me -- apart from the

17   location of the detectors, can you tell me where

18   these other alleged light-collection efficiency

19   locations would be?

20          A.        So it depends on the location of the

21   reflected corpuscle or the corpuscle being reflected

22   from, but imagining that there are many of them

Page 154

1   increase in light concentration at the detectors

2   relative to other areas?

3               MR. SMITH:  Objection; form.

4        A.      So if my goal was to have enhanced,

5   you know, optimized light collection at a particular

6   location, I would need to know the exact location of

7   the reflecting corpuscles.  In the absence of that

8   precise knowledge, I think one of ordinary skill in

9   the art would design a lens of this general shape,

10  perhaps details as far as exact curvature and so on

11  to be worked out, but this general shape to in

12  general improve the light-collection efficiency at

13  the location of the detectors.

14       Q.      So you can't tell me looking at this

15  figure, whether the light collection -- the increase

16  in light-collection efficiency at the detectors would

17  be greater than the alleged light-collection

18  efficiency anywhere else; is that correct?

19              MR. SMITH:  Objection; form.

20       A.      It would depend on the details of the

21  radius of curvature which is shown figuratively here

22  but not in precise detail.  It would depend on some

Page 164

1    single focal point.  It produces a, a sort of

2    concentration over a region.

3           Q.      What region?

4           A.      It depends on the shape of the lens

5    and the thickness of the less and other parameters,

6    distance from the, the face of the lens to the

7    locations of the detectors.

8           Q.      How about the, the, the lens in your

9    combination, the figure at the bottom right below

10   Paragraph 97?

11          A.      Yeah, I would say there's some, given

12   the arrangement of the corpuscles as the reflecting

13   objects in the space all around underneath that lens,

14   that there would be some improvement in the light

15   concentration at pretty much all of the locations

16   under the curvature of the lens.

17          Q.      And so when you said the convex shape

18   results in a concentration over a region, your

19   opinion is that the convex shape in your combination

20   in the figure on the right below Paragraph 97 would

21   increase light concentration at all the locations

22   below the curvature of the lens; is that correct?

1        A.        -- if we go all the way to the edge

2    from like the corner at the end of the cover, for

3    example, where there's no nearby curvature to help

4    redirect the light, there would be less light there

5    and more light inwards of that.

6        Q.        Because the light is being directed

7    from an edge more towards the center, correct?

8        A.        There's a lot of different things

9    going on for different rays of light.  I'd say some

10   of the light coming to that edge has a better chance

11   of being refracted inwards because of the curvature

12   versus a flat plate.  That's not true all the way at

13   the edge but it is inwards from there.  And the

14   refraction also has the benefit of, of increasing the

15   concentration of the light.  So it's a capture and

16   refraction benefit.

17       Q.        So when it's referenced a moment ago,

18   the flat plate, your cover on the very ends is flat,

19   correct?

20       A.        In this example, yes.

21       Q.        Why did you include -- why did you

22   make the ends, the exterior of the cover flat?

Page 180

1                    MR. SMITH:  Objection; form.

2          A.        I can think of a number of reasons

3    for that.  If we look at the example provided by

4    Nishikawa, which illustrates a lens feature shaped

5    more or less of the same sort for an LED package,

6    when I read Nishikawa and look at that reference, my

7    understanding is that the design here is intended to

8    provide curvature in the lens where it can do the

9    most good and otherwise try to avoid excess use of

10   material in order to create curvature in locations

11   where it wouldn't do any good.  That's my

12   interpretation of some of what's going on in

13   Nishikawa.

14         Q.        Okay.  So if you look at Figure 6

15   from Nishikawa which is under your Paragraph 99, is

16   that what you're referring to?

17         A.        Yes.

18         Q.        One that has a similar shape to the

19   shape of your cover in the combination of

20   Aizawa-Inokawa?

21         A.        Yes.

22         Q.        Why would a person of ordinary skill

Page 181

1    in the art be motivated to include the shape Aizawa

2    as part of the -- sorry.

3                    Why would a person that's skilled in

4    the art be motivated to include the shape Nishikawa

5    as a part of your combination?

6                    MR. SMITH:  Objection; form.

7         A.        Could you repeat that?

8         Q.        Yeah.  Why would a person of ordinary

9    skill in the art be motivated to include the shape of

10   Nishikawa in your combination of Aizawa and Inokawa?

11        A.        So Nishikawa is a representative

12   example of a manufacturable molded lens with similar

13   optical and mechanical requirements plus details of

14   how to go about the manufacturing process that I

15   would regard as helping me do a good job of obtaining

16   the benefits at a modest cost.

17        Q.        And so you think a person of ordinary

18   skill in the art -- so it's your opinion that a

19   person of ordinary skill in the art would have relied

20   on --

21                  MR. LARSON:  Strike that.

22        Q.        While we're looking at Figure 6 below

Page 188

1    curvature, one can save material, and maybe have a

2    lighter weight structure and a less expensive

3    structure by simply having curvature where it's

4    useful.

5         Q.    Your curvature extends far beyond the

6    detectors, though, correct?

7         A.    This is, again, not intended as a

8    precise engineered drawing but as a representative

9    example of the kinds of shapes that one might arrive

10   at with ordinary skill in the art having viewed

11   Inokawa in view of Aizawa or vice versa, Aizawa and

12   Inokawa together and Inokawa.

13        Q.    I hear an explanation but I guess

14   first I just want a answer to my question.  Your

15   curvature on the cover as shown in the figure to the

16   right under Paragraph 97, that curvature extends far

17   beyond the detectors, correct?

18             MR. SMITH:  Objection; argumentative.

19        A.    We're talking millimeters here.  And,

20   again, I didn't intend for any precise aspect ratio

21   relationship to be represented in this figure.  This

22   is merely representative of what I think a person of

Case: 22-1631    Document: 45-8    Page: 42    Filed: 07/12/2023

4/22/2021                 Apple, Inc. v. Masimo Corp.          Thomas Kenny Jr., Ph.D.

Page 189

1   ordinary skill in the art would arrive at in the

2   context of the prior art and the problem to be

3   solved.

4        Q.      So a person of ordinary skill in the

5   art looking at Nishikawa and Inokawa and Aizawa might

6   end up with a number of different lens shapes.  Is

7   that your testimony?

8              MR. SMITH:  Objection; form.

9        A.      Within the general category of convex

10  lenses, yes.

11       Q.      Can you explain, explain to me the

12  different lens shaped that a person of skill in the

13  art might chose to use in a combination like this?

14             MR. SMITH:  Objection; form.

15       A.      So there are many subcategories of

16  the convex lens-like shape that we've represented

17  here.  One might, for example, have a spherical lens.

18  One might in a different geometry perhaps have a

19  cylindrical lens.  There's many, many shapes.

20       Q.      And how would a person of skill in

21  the art go about choosing which shape to use when

22  combining Aizawa and Inokawa?

Page 190

1        A.       So it could be done by trial and

2    error trying out different shapes, different detector

3    positions, different spacings and so on.  It could be

4    done rudimentary ray trace analysis but, again,

5    remembering that the light source is diffuse and not

6    a point source or a comminuted source.  One always

7    ends up with a situation where the light coming

8    through the lens is going to be not concentrated on a

9    signal point.  But, but still distributed because of

10   the characteristics of the incoming source.  One is

11   only attempting to obtain some benefit in the

12   light-collection efficiency so as to improve the

13   signal-to-noise ratio.

14        Q.       And so your testimony is that when

15   diffuse light goes through a convex shape, the light

16   coming through is not going to be concentrated on a

17   signal point, and I think you testified earlier that,

18   in fact, it would be concentrated on the entire

19   region beneath the convex lens; is that correct?

20             MR. SMITH:  Objection; form.

21        A.       There would be concentration across

22   that surface, I think.  If the word "concentration"

Page 191

1  implies a tight focus, that's not what I intended.  I

2  intended that there be an improvement in the

3  concentration across most -- across that surface.

4       Q.      And if the lens is not increasing the

5  total amount of light, where is that concentrated

6  light coming from?  Where would it have been in the

7  absence of a convex lens?

8       A.      So as we discussed, the convex shape

9  allows light that might have been just specularly

10  reflected off of the flat plate to be captured and

11  refracted inwards.  And in the region where there's

12  curvature, it allows the light to be concentrated,

13  and in this case, roughly speaking, in the

14  neighborhood of the detectors and inwards.

15       Q.      Why would a convex shape allow light

16  that might have been reflected off of a flat plate

17  instead be captured?

18            MR. SMITH:  Objection to form.

19       A.      The angle of incidence for a

20  particular ray coming in is different when it

21  encounters that flat plate versus a plate that has a

22  convex shape.

Page 192

1          Q.        And so the light may be more likely

2    to be reflected off the flat surface than the convex

3    shape?

4          A.        For some example of rays coming in at

5    an oblique angle, that would be true, yes.

6          Q.        And why is that?

7          A.        Well, in the extreme case imagine a

8    ray that's coming in parallel to that surface, it

9    would just slide right on by, but in case of the

10   convex lens, it encounters a protrusion which has a

11   different angle of incidence and, therefore, the, the

12   coefficient of reflection and transmission are

13   different than for the light that's just 100 percent

14   sliding along.

15                   That's the extreme case, but I, I

16   point it out just to give you an example of the

17   physics that plays up here.

18         Q.        And is it your testimony that a

19   person of ordinary skill in the art would have

20   understood that?

21         A.        That a convex lens is capable of

22   gathering light over, over a wider range of angles

Page 197

1          A.          Part of that that's inside the, the

2     lens, yes, is refracted more towards the center,

3     because the location where it strikes the surface,

4     there is a different angle of incidence because of

5     the curvature of the lens.

6          Q.          Let me ask you a little bit about

7     this claim limitation.  If you want to turn back to

8     Page 69.  You're discussing here, I think this is a

9     mean path length of light.  Do you see that?

10         A.          Uh-huh.

11         Q.          I think you said a moment ago you

12    were calculating a path length.  I guess I want to

13    ask you, how did you interpret mean path length for

14    your analysis?

15                   MR. SMITH:  Objection; form.

16         A.          So my understanding is that this is a

17    particular but representative example path, and

18    that -- you know, if I'm thinking about what goes on

19    here, the two situations will have the same path

20    length if the angle of incidence is the same, whereas

21    because of the curvature of the lens, the curvature

22    provides a higher angle of incidence for most path

Page 198

1    length.  So the refractive effect will lead to a

2    short mean of the path on average of the mean.

3        Q.       So what you're showing here is

4    that -- so when --

5                 MR. LARSON:  Sorry, strike that.

6        Q.       So what you're discussing here when

7    you say a mean path length, you're talking about the

8    path on average; is that is that fair?

9                 MR. SMITH:  Objection; form.

10       A.       So a mean path length mean the same

11   as an average patent length, yeah.

12       Q.       Is that how you're understanding it?

13       A.       My understanding, yes, would be if I

14   repeated this analysis for a multitude of path

15   lengths, I would find that the majority of them would

16   have a shorter path length.

17       Q.       If you go down to Paragraph --

18   Paragraph 119, you say, "In more detail, I noted

19   above for [1d] how the lens/protrusion of Inokawa,

20   which is used to modify Aizawa's cover, provides a

21   condensing function by refracting the light passing

22   through it."

Page 202

1    correct?

2        A.      That sentence doesn't exclude that

3    there would be light concentration taking place at

4    other locations.  It merely says that there will be

5    more light gathered and refracted towards the

6    light-receiving cavities than would have been the

7    case with a flat plate.

8        Q.      Is it your understanding that light

9    can be thought to --

10               MR. LARSON:  Strike that.

11       Q.      If the light is being refracted

12   towards the light-receiving cavities of Aizawa, isn't

13   the light being refracted away from somewhere else?

14       A.      So, you know, as we said, the lens is

15   not amplifying the light.  It's capturing and

16   redirecting the light.  It -- because of its shape is

17   able to capture more light due to the convex shape,

18   and it's able to increase the concentration of the

19   light directed towards the cavities under the regions

20   where the curvature of the lens is present.

21       Q.      Right.  And my question, though, is

22   slightly different.  I understand that you're saying

Page 203

1    that it will increase the light concentration towards

2    the detectors and the region in between the

3    detectors.  I'm asking where is that light being

4    directed away from?  If total light amount is not

5    going up and you're refracting light towards the area

6    between the detectors, including to the detectors,

7    where is that light being refracted from?

8          A.      I think if you -- again, the details

9    would depend on where the corpuscles were, and there

10   could be some variation from instance to instance.

11   But on average, if you look at where the light was

12   refracted across this surface, there would be a

13   reduction in the amount at the perimeter, and an

14   increase as you come underneath the curvature towards

15   the center.  There is a region at the perimeter where

16   there would be a decrease.  And maybe just to help

17   with this, we're looking at a 2D picture of a 3D

18   object, which artificially suppresses the amount of

19   space -- or the amount of surface at the perimeter

20   relative to the inner area.

21                    So there's a lot of area from which

22   to draw light away in towards the center.

Page 204

1          Q.        And so with the convex shape in your

2    combination, I think you testified just now that

3    there would be a reduction in the amount of light at

4    the perimeter and an increase as you come underneath

5    the curvature towards the center; is that correct?

6          A.        Maybe just to be precise, if you

7    looked across -- if you looked on the example on the

8    right and you had a way of measuring the light

9    intensity from centered all the way to edge and you

10   could do it for enough different examples of the

11   corpuscle arrangements that you could average out

12   those artifacts, you would see more light in the

13   center than at the outer edge in this example.

14         Q.        And that's because light's being

15   directed towards the center and away from the edge,

16   correct?

17         A.        Among other things, yes, that's a

18   part of why.  Also, as we've discussed, this

19   protruding lens is able to capture more light coming

20   in at a weak angle that is additive to this effect.

21         Q.        So it sounds like there's two

22   considerations here.  One is the convex lens in

Page 205

1    general would direct more light to the center; the

2    other is your testimony that a protruding lens

3    overall would capture more light.  Am I capturing

4    your testimony correctly?

5            A.        I think one of ordinary skill in the

6    art would appreciate that those are both true,

7    simultaneously, that you have the, the, the general

8    lens-like shape of the convex lens provides

9    refraction which allows additional concentration of

10   light and light-collection efficiency, and that the

11   protrusion provides an opportunity to capture some

12   light that would otherwise not be captured.

13           Q.        So just so we're clear, though, if

14   you put aside your reasoning that the protrusion

15   would otherwise provide an opportunity to capture

16   more light that otherwise would be captured, the

17   light that's being focused more towards the center is

18   being directed away from the exterior, correct?

19           A.        So the relative amounts of that -- of

20   those two effects and the relative sizes of those

21   effects, center of the edge, would depend on the

22   details of the curvature design.  You know, if we had

Page 206

1    a spherical example or this example or some other

2    examples there would be different amounts of these

3    two effects at different locations.  So it's hard to

4    give a general accurate answer.

5          Q.      Oh, and my question, to be clear, I'm

6    trying to have you focus on just one of the effects.

7    So just for the -- and, you know, you can go on and

8    provide more testimony, you can provide testimony

9    about the other fact that you sort of -- but focusing

10   just on the first effect, the fact that the convex

11   lens will direct more light toward the center means

12   that it will be directing more light away from the

13   sides, correct?

14         A.      I think one of ordinary skill in the

15   art looking at this illustration on the bottom right

16   of Page 55 would understand that both effects are

17   present, but to the extent we're focused just on the

18   refraction effect and not the light capture effect,

19   that the, the distribution of light on that surface

20   would be shifted from the edge towards the center

21   somewhat depending on the details of the shape.

22         Q.      Let me ask you about the -- this

1    other effect, then, and I guess my question would be

2    how would a person of skill in the art have balanced

3    the two effects overall what, what the impact would

4    be on where light falls in the sensor?

5                    MR. SMITH:  Objection; form.

6         A.      These are two effects combined with

7    many other effects that one of ordinary skill working

8    on this problem would be balancing the lens design

9    against all of those other considerations.  There

10   isn't a simple answer to that.

11        Q.      Okay.  And to be clear, your

12   Declarations don't discuss this effect of capturing

13   more light due to the convex shape, correct?

14                   MR. SMITH:  Objection; form.

15        A.      So it's, I think, one of the

16   characteristics of a convex lens that one of ordinary

17   skill in the art would understand, is able to capture

18   light at angles of incidence that a flat plate might

19   not capture.  That's, I think, within what a person

20   of ordinary skill in the art would know.

21        Q.      Okay.  But you didn't discuss that in

22   your Declarations; is that fair?

Page 208

1          A.        That's correct.

2          Q.        So I want to ask you a few questions

3    going back to the mean path length limitation just to

4    make sure I understand your figures.  One moment

5    here.

6                    So this is back at Paragraph 119 --

7    well, actually Paragraph 20.  I want to ask you about

8    the figure below Paragraph 120.  So is the dark blue

9    layer the cover, essentially, the flat cover?

10         A.        The intent of the figure that's right

11   at the bottom of 120 is simply to overlay the two

12   figures above Paragraph 120 to help clarify the

13   difference in the two path lights.

14         Q.        Okay.  And in both figures the dark

15   blue is a flat cover, correct?

16         A.        So in the left figure the dark blue

17   is the flat cover.  The lighter blue is reflector

18   representing the shape of the combination of the two

19   references.  And in the combined figure they are just

20   simply plates on top of each other for simplicity in

21   visualizing the length of the rays.

22         Q.        And the black rectangle is a

Page 257

1          Q.      Are you waiting for me to re-ask the

2      question?

3          A.      I'm just going back because we're

4      talking about the wall in a couple of different

5      locations in this Declaration, just making sure we're

6      referring to the same thing in the same way.  Forms a

7      wall -- all right.  Okay.  So all right.

8                  Paragraph 162 in this first sentence,

9      I understand why you're asking.  It's -- I think

10     really the root cause here is a typo and perhaps some

11     unnecessary commas.  I think one of ordinary skill

12     understands that the holder including the wall,

13     everything about the holder is, is made of an opaque

14     material.  That's clearly the intent in Aizawa.  He

15     describes rays that, that can reach the detectors if

16     they can somehow find those tapered openings, but not

17     if they pass-through any part of this holder so the

18     entire holder is opaque.

19         Q.      Are you correcting a typo?  I'm

20     sorry, go ahead.

21         A.      And including all the surfaces of the

22     holder, so I think where the last instance of the

Page 273

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

APPLE INC.,                    )
                               )    IPR NO. 2020-1520
        Petitioner,            )    US PATENT NO: 10,258,265
    -against-                  )    IPR NO. 2020-1537
                               )    US PATENT NO: 10,588,553
MASIMO CORPORATION,            )
                               )    IPR NO. 2020-1539
        Patent Owner.          )    US PATENT NO: 10,588,554
_____  )

VIDEO-RECORDED DEPOSITION OF

THOMAS WILLIAM KENNY, JR. PH.D.

VOLUME 2

Zoom Recorded Videoconference

04/23/2021

9:02 a.m. (PDT)


REPORTED BY:  AMANDA GORRONO, CLR

CLR NO. 052005-01


_____

DIGITAL EVIDENCE GROUP

1730 M Street, NW, Suite 812

Washington, D.C. 20036

(202) 232-0646

**MASIMO 2007**
**Masimo v. Apple**
**IPR2020-01520**

Appx05567

1              None of the sources you cite in your

2      Declarations discuss or explain this description that

3      you're providing regarding the impact of a convex

4      lens on diffuse light, correct?

5          A.      I think it's well known to one of

6      ordinary skill in the art that if you consider a

7      diffuse light source in a lens, you have to account

8      for all the difference rays propagating in all

9      different directions and that the effect of the lens

10     on all of that is going to be complicated.

11             Some rays will be deflected towards

12     the center; some deflected towards the edge; some

13     deflected horizontally or, you know, left and right,

14     not closer to the center or the edge.

15             It's -- you have all different angles

16     possibly coming into this lens.  So it's -- there's

17     no simple statement that one can make about the

18     effect of the lens on all of light.

19         Q.      So you're saying that it would be

20     well known in one of ordinary skill in the art, but

21     you agree with me that none of the sources you cite

22     in your Declarations discuss or provide this

Page 298

1    explanation that you're providing regarding the

2    impact of a convex lens on diffuse light, correct?

3          A.      Correct.

4                  MR. SMITH:  Objection; form.

5          A.      One of ordinary skill in the art

6    would understand that you don't have to go into

7    excessive, absolute detail on all the laws of physics

8    in these disclosures.  They assume their audience is

9    of ordinary skill and understands these things and,

10   and builds from that.

11         Q.      So you agree that as a matter of

12   basic physics, a person of ordinary skill in the art

13   would understand that collimated light that enters a

14   convex surface will be directed towards the center,

15   correct?

16         A.      If it's along -- if it's aligned down

17   the axis of the, you know, axis of symmetry of the

18   lens, as shown in Figure 14 of the '265 patent, then

19   that, that will be true.  If you bring the light in

20   from a different angle, that may not be true.  But

21   the general orientation of that figure shows the lens

22   and the light lined up in a way that would produce a

Page 310

1    a person of ordinary skill in the art would -- who

2    wants to apply the teaching of Inokawa, would

3    consider the shape of the lens, the thickness index,

4    curvature when applying Inokawa to a particular

5    sensor configuration; is that fair?

6            A.        Yeah.  So, I mean, Inokawa is

7    providing a concept of convex lens-like shape that

8    makes it possible to increase the light-gathering

9    ability.  One of ordinary skill in the art would

10   understand that, that what Inokawa provides is

11   descriptive and not precise; that one shouldn't

12   attempt to copy and paste the exact geometry of

13   Inokawa into a different system and expect it would

14   automatically be the right solution.  One of ordinary

15   skill in the art would do the work to improve the

16   design in order to improve the opportunity for

17   increased light collection efficiency.  And --

18           Q.        And so far I just want to be sure

19   we're clear, you've discussed that a person of

20   ordinary skill in the art would consider the shape of

21   the lens, its thickness index curvature, the length,

22   width and thickness of the lens.

Case: 22-1631    Document: 45-8    Page: 60    Filed: 07/12/2023

4/23/2021                    Apple, Inc. v. Masimo Corp.    Thomas Kenny, Jr. Ph.D., Vol II

Page 311

1                    Is there anything else that a person

2       of ordinary skill in the art would consider when

3       applying the teaching of Inokawa to a particular

4       device?

5            A.       Not that I can think of here.  These

6       are the routine parameters that would specify the

7       shape of a lens that can be selected in order to

8       obtain certain optical properties.  This is

9       straightforward for one of ordinary skill in the art.

10           Q.       And you agree that Inokawa doesn't

11      discuss the shape of the lens, its thickness index,

12      curvature, the length, width and thickness of the

13      lens, correct?

14           A.       I don't believe that is precisely

15      stated in Inokawa.

16                    MR. SMITH:  Objection to form.

17           Q.       And you don't discuss any of those

18      things in your Declarations, correct?

19           A.       Precise numbers for any of those

20      parameters, no.  None of those are discussed.

21                    I believe there are claims in one of

22      the specifications that describe something related to

Case: 22-1631    Document: 45-8    Page: 61    Filed: 07/12/2023

4/23/2021                    Apple, Inc. v. Masimo Corp.    Thomas Kenny, Jr. Ph.D., Vol II

Page 331

1          Q.        My question is:  Can you recall any

2     prior art reference that has a physiological sensor

3     with multiple detectors under a convex cover?

4                    Sitting here during the deposition,

5     can you recall any such reference?

6          A.        Not off the top of my head.

7          Q.        So looking, again, at your

8     combination of Aizawa and Inokawa on Page 55 of your

9     Declaration as previously marked Exhibit Apple 1003,

10    can you pull that up again?

11         A.        Page 65?

12         Q.        Yes -- or Page 55, the bottom of

13    Page 55, yeah.

14         A.        Uh-uh.  Okay.

15         Q.        In the bottom right figure, which

16    is -- the bottom right figure is your, your, your

17    combination of Aizawa and Inokawa, correct?

18         A.        That's correct.

19         Q.        In that bottom right figure, if one

20    were to move the detectors slightly toward the

21    center, would a person of ordinary skill in the art

22    expect an increase or a decrease in signal strength

Case: 22-1631    Document: 45-8    Page: 62    Filed: 07/12/2023

4/23/2021                    Apple, Inc. v. Masimo Corp.    Thomas Kenny, Jr. Ph.D., Vol II

Page 332

1    at the detectors?

2                    MR. SMITH:  Objection; form.

3        A.      So it's not obvious because part of

4    the answer depends on the depth of the likely

5    locations of the corpuscles that are going to provide

6    the diffuse reflection, and I don't have any

7    dimensions here to scale that against.  It would be a

8    judgment of sort of aspect ratio between those

9    distances and the distances here.  It could be true,

10   it might, might not be.  It would depend on the other

11   dimensions.

12       Q.      This is your figure, correct?

13       A.      Yes.

14       Q.      You created this figure?

15       A.      Yes.

16       Q.      Okay.  And your testimony is that

17   you're not able to tell me whether in the figure you

18   created the signal strength can go up or down if the

19   detectors were moved closer to the center?

20                    MR. SMITH:  Objection; form.

21       A.      That's correct.  The figure was

22   intended to illustrate the general concept of the

Page 333

1    combination of a protruding convex cover, following

2    the teachings of Aizawa and Inokawa, and that the

3    detailed implementation would be straightforward work

4    from one of ordinary skill in the art that would

5    involve the specific positioning of the elements.

6          Q.      What if the, what if the sensor was

7    placed in the same location for both series of

8    measurements, same environment, and the only change

9    was that the detectors are placed slightly towards

10   the center, would a person of ordinary skill in the

11   art expect an increase or a decrease in signal

12   strength?

13          MR. SMITH:   Objection; form.

14          A.      You know, without knowing anything in

15   a quantitative nature about the sizes of actual

16   dimensions of the objects and the expected depth in

17   the tissue where the corpuscles are likely to be

18   providing the strongest reflection, that's an un- --

19   that's an ill-posed question.

20          Q.      So you don't know the sizes of the

21   dimensions of the combination that you proposed in

22   the figure in the right-below Paragraph 97?

Page 334

1                    MR. SMITH:  Objection; argumentative.

2         A.        The figures are intended to

3    illustrate how one might combine a protruding

4    lens-like shape, convex lens-like shape with the

5    other details of Aizawa so as to improve light

6    collection efficiency, leading to enhanced

7    signal-to-noise and ultimately more reliable

8    detection that one of ordinary skill in the art would

9    take this example, these examples in these pieces of

10   prior art and apply them to specific dimensions and

11   specific details in a particular application.

12        Q.        So I think that was a yes, but just

13   to make -- let me make sure, you don't know the

14   specific dimensions of the combination that you

15   presented in the figure on the right-below

16   Paragraph 97; is that correct?

17                   MR. SMITH:  Objection; form.

18        A.        This figure takes the structure from

19   Aizawa and adds a convex lens-like shape per Inokawa

20   in a way that suggests how these would be combined so

21   as to improve performance.  I don't have the

22   dimensions from Aizawa's specification in terms of

Page 335

1    the lateral dimensions, the vertical dimensions,

2    thickness of the plate.  And without any of that

3    information, I can't answer an absolute quantitative

4    question in the context of vague input parameters.

5           Q.      And you testified you wouldn't be

6    able to -- you testified a person of ordinary skill

7    in the art would not be able to understand the impact

8    of signal strength when moving the detectors towards

9    the center for the additional reason that you don't

10   know the expected depth in the tissue where the

11   corpuscles are likely to provide reflection; is that

12   correct?

13                  MR. SMITH:  Objection; form.

14          A.      I don't think so.  I think what I

15   said is that you would need that information in order

16   to answer those questions and that one of ordinary

17   skill in the art would know how to apply that

18   information to the situation.

19          Q.      So in your combination, did you have

20   in mind any particular depth in the tissue where the

21   corpuscles are likely to provide reflection?

22                  MR. SMITH:  Objection; form.

Page 336

1          A.        So I don't state a specific depth

2     anywhere in my report, if that's a way of answering

3     your question.   These illustrations not drawn to

4     precision scale.   There's no scale bars shown here.

5     These are intended to illustrate how one of ordinary

6     skill in the art would take the teachings of Aizawa

7     and Inokawa and combine them to produce a lens-like

8     shape that is -- thereby will increase light

9     collection efficiency leading to the benefits that

10    I've stated many times.

11         Q.        What if the detectors in your

12    combination were moved far into the center, near the,

13    near to the location of the LED, would a person of,

14    person of ordinary skill in the art expect an

15    increase or a decrease in signal strength?

16                   MR. SMITH:   Objection; form.

17         A.        Again, it depends on the other

18    details of the design.   It's not an absolute yes or

19    no.   You could have it either way.   If, if these

20    things are within nanometers of each other and the

21    corpuscles are millimeters away, I don't think

22    there's a net improvement.   There's -- again, that's

Case: 22-1631    Document: 45-8    Page: 67    Filed: 07/12/2023

4/23/2021                    Apple, Inc. v. Masimo Corp.    Thomas Kenny, Jr. Ph.D., Vol II

Page 337

1    an extreme case, but you're asking me an absolute

2    yes-or-no question and I have to encompass all of the

3    cases when I answer a yes-or-no question.

4                    And what I've said over and over

5    again -- you know, I know it's not the clean, simple

6    answer, but it is, I think, the plain truth that one

7    of ordinary skill in the art would understand how to

8    combine these references to achieve the benefits of

9    increased light collection efficiency and that that

10   would include decisions about the thickness of the

11   lens, the curvature of the lens, the placement of the

12   sensors, and many other factors.

13                    It's not impossible, but it's not

14   trivial and there's no simple yes-or-no answer to

15   some of the questions you've asked me.

16        Q.        So it appears your testimony is that

17   the structure you depicted in your combination in the

18   figure on the right-hand side below Paragraph 97 is

19   not necessarily the structure a person of ordinary

20   skill in the art combining Aizawa and Inokawa would

21   come up with; is that correct?

22                    MR. SMITH:  Objection; form,

**Appx05631**

Case: 22-1631    Document: 45-8    Page: 68    Filed: 07/12/2023

4/23/2021                Apple, Inc. v. Masimo Corp.    Thomas Kenny, Jr. Ph.D., Vol II

Page 341

1          Q.        And so a person of ordinary skill in

2    the art combining the teachings of Aizawa and Inokawa

3    including a, a convex cover may end up with a

4    configuration of detectors and LEDs that's different

5    than the configuration in Aizawa; is that correct?

6                    MR. SMITH:   Objection; form.

7          A.        So Aizawa does not specify precise

8    locations.  I assume that someone building a product

9    would end up specifying precise locations.  It's hard

10   to say whether a precise location is different than

11   the absence of that.  Obviously I don't know how to

12   compare those.

13         Q.        So what I'm asking is because there

14   is a convex surface now included in Aizawa, it sounds

15   like your testimony is that a person of ordinary

16   skill in the art would need to take into account all

17   these considerations that you've been, that you've

18   been testifying to, and as a result of that, may

19   decide that it's necessary to change the

20   configuration of LEDs and detectors; is that correct?

21                   MR. SMITH:   Objection; form.

22         A.        I think one of ordinary skill in the

**Appx05635**

Page 342

1    art would combine the teachings of Aizawa and Inokawa

2    based on their understanding of the principles and

3    objectives of their process and that includes, I

4    think, certainly going from cartoons to real designs,

5    which would mean adding dimensions and real

6    specifications to these illustrations.

7         Q.    And that may result in a different

8    configuration of LEDs and detectors; is that fair,

9    than what's is shown --

10              MR. SMITH:  Objection; form.

11        Q.    And that may result in a different

12   configuration of LEDs and detectors from that shown

13   in Aizawa's figure; is that fair?

14              MR. SMITH:  Objection; form.

15        A.    Even Aizawa considers a number of

16   configurations of detectors and emitters as part of

17   the teachings.  So I think one reading Aizawa and

18   recognizing that Aizawa considers different numbers

19   of detectors and different combinations, that would

20   be within the range of applying the teachings of

21   Aizawa and Inokawa.

22        Q.    But it's possible that because of the

Page 402

1    using the alternating pulse scheme that we discussed

2    briefly a few moments ago.  That's a choice for the

3    designer, but you'll be measuring the same -- those

4    two signals during the same period of time.

5         Q.    All right.  Let me ask a different

6    question about Aizawa.  Aizawa's goal is to address

7    problems associated with realtime measurement of

8    heart rate, correct?

9              MR. SMITH:  Objection; form.

10        A.    Sure, that's somewhere in the field

11   of the invention statement.

12        Q.    Okay.  And in contrast, Inokawa's

13   data transmission approach requires the user to

14   remove the monitoring device and connect it to a base

15   station to transfer data, correct?

16              MR. LARSON:  Well, let me, let me

17   back up to Aizawa.

18        Q.    Okay.  So a person of ordinary skill

19   in the art would have understood that Aizawa's

20   wireless transmitter is used to transmit pulse rate

21   data to a display, correct?

22        A.    You're reading that from a paragraph

Case: 22-1631    Document: 45-8    Page: 71    Filed: 07/12/2023

4/23/2021                    Apple, Inc. v. Masimo Corp.    Thomas Kenny, Jr. Ph.D., Vol II

Page 405

1          A.        At that time, that's correct, yes.

2          Q.        And Inokawa's approach is one in

3    which the user would have to remove the monitoring

4    device and connect it to a base station to transfer

5    data, correct?

6                    MR. SMITH:  Objection; form.

7          A.        That's correct.

8          Q.        And so Inokawa's base station data

9    transmission approach would mean that Aizawa would no

10   longer be able to provide realtime monitoring and

11   display of heart rate, correct?

12                   MR. SMITH:  Objection; form.

13         A.        So the combination of Aizawa and

14   Inokawa doesn't explicitly require that one adopt the

15   base station and wrist sensor configuration that is

16   one of the embodiments in Inokawa.  Inokawa describes

17   optical data transmission, mentions the existence of

18   wireless data transmission and provides the use of a

19   second LED both for sensing of physiological

20   parameters and motion and also for use of that second

21   LED to support the communication of the data.

22         Q.        Let's go to Paragraph 80 of your

Case: 22-1631    Document: 45-8    Page: 72    Filed: 07/12/2023

4/24/2021                 Apple, Inc. v. Masimo Corp.          Thomas Kenny, Jr. Ph.D.

Page 1

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

APPLE INC.,                    )
                              )
          Petitioner,    )    US PATENT NO: 10,588,553
                              )    IPR NO. 2020-1536
     -against-           )
                              )    US PATENT NO: 10,588,554
MASIMO CORPORATION,      )    IPR NO. 2020-1538
                              )
          Patent Owner. )
_____)


VIDEO-RECORDED DEPOSITION OF

THOMAS WILLIAM KENNY, JR. PH.D.

VOLUME 1

Zoom Recorded Videoconference

04/24/2021

9:01 a.m. (PDT)


REPORTED BY: AMANDA GORRONO, CLR

CLR NO. 052005-01


_____

DIGITAL EVIDENCE GROUP

1730 M Street, NW, Suite 812

Washington, D.C. 20036

(202) 232-0646

**MASIMO 2008
Masimo v. Apple
IPR2020-01520**

**Appx05747**

Page 30

1    anything in these disclosures that specifies the

2    position as being necessarily around the radial edge,

3    just that they need to be out board of the emitter in

4    the center.

5        Q.      And so the combination, in the

6    combination that you propose, the detectors could be

7    anywhere from directly next to the LEDs all the way

8    out to the edge?  Or is there some additional

9    limitation?

10           MR. SMITH:  Objection; form.

11       A.      So, I think the spacing between the

12   emitters and the detectors is a variable that one

13   would choose based on one's understanding of the

14   circumstances and objectives of the sensor design.

15   One of ordinary skill in the art.

16           Again, these are illustrations not

17   detailed specified drawings where the dimensions are

18   intended as literal.  They are figurative.

19       Q.      And can you, so, one of skill in the

20   art, considering that variable n the context of this

21   combination, would end up with, with what device, is

22   my question.  Where would the radially arrayed

1    detectors?

2                    MR. SMITH:  Objection; form.

3        A.      They would be somewhere along the

4    axis between the emitter and the edge of the housing.

5        Q.      And can you tell me where along that

6    axis they would be?

7                    MR. SMITH:  Objection; form.

8        A.      Do you want an answer specifying in

9    millimeters?  Or in -- I guess I don't understand how

10   you would like me to answer that question.

11                   The position would depend on the

12   details of the other elements of the design.

13       Q.      What, what other elements of the

14   design would impact the position of the detectors and

15   your combination that you assert the result of Ohsaki

16   and Mendelson '799?

17       A.      The overall size, for example.

18       Q.      Anything else?

19       A.      The height of the housing.

20       Q.      Anything else?

21       A.      The expected depth in the tissue of

22   the corpuscles that would be the target that would

Page 35

1    testified that the decision as to where the LEDs

2    would fall within that area would depend on a lot of

3    the factors that you've mentioned previously.

4                    And so my only question and, you

5    know -- yes, no, you don't know -- my question is:  A

6    person of ordinary skill in the art that combines

7    Ohsaki and Mendelson '799 and takes into account all

8    of those factors, would that person place the

9    detectors in any particular location that you can

10   identify?  Or you're not able to do that?

11                   MR. SMITH:  Objection; form.

12        A.      They would place the detectors

13   somewhere between the outer rim of the package and

14   the, and the, and near the emitters.  It would depend

15   on all the other details as far as precise location.

16        Q.      Okay.

17        A.      They would be able to figure that out

18   based on other choices.

19        Q.      Based on the analysis that you did,

20   the information you have sitting here today, you

21   can't tell me with precision where a person of

22   ordinary skill in the art combining Mendelson '799

Page 36

1    and Ohsaki would place the detectors -- other than

2    telling me that it would be somewhere between the

3    outer rim of the package and the emitters; is that

4    fair?

5              MR. SMITH:  Objection to form.

6    Objection; form.

7        A.      I think the illustration for

8    Mendelson is clear that the detectors are going to be

9    positioned somewhere along that space, between the

10   detectors, and this Element 14 that is a vertical, a

11   shield I believe it's called.  Obviously the detector

12   won't be under the shield.  It will be outside the

13   shield.  It's clearly described in Mendelson.  And it

14   could be all the way out to the edge of the housing.

15   And the choice of that location depends on other

16   considerations.

17       Q.      Including all the factors that you

18   included earlier in your testimony?

19       A.      Including those.  Yes.  And one of

20   ordinary skill in the art would now how to consider

21   those factors and put together a precision-specific

22   design with real locations, real dimensions, and real

Page 37

1    objects.

2        Q.      Okay.  To be clear, you don't put

3    that analysis in your Declarations, correct?

4                MR. SMITH:  Objection; form.

5        A.      That's correct.  One of ordinary

6    skill in the art would understand how to take a

7    detector out of a catalog, look at its dimensions and

8    make all the judgments I described and create a

9    specific design instead of an illustration.

10       Q.      Let me ask you -- all right.

11               In your opinion, as illustrated in

12   the figure -- I think this will be a new question?

13               As illustrated in the figure, a

14   person of ordinary skill in the art combining Ohsaki

15   and Mendelson would have positioned a convex radially

16   symmetrical cover above the optical components,

17   correct?

18               And just for the record, you're

19   reviewing your Declaration, correct?

20       A.      That's correct.

21       Q.      Just let me know when your, when you

22   want me to repeat the question.

Page 40

1    choice of the convex cover to a radially symmetric

2    convex cover.

3         Q.      What about the first picture under

4    Paragraph 88 where you label a red circle that traces

5    the edge of Mendelson '799 as a convex cover?

6         A.      That is a convex cover.

7         Q.      My question is:  In this figure,

8    you're illustrating the convex cover resulting from

9    your combination of Mendelson '799 and Ohsaki as

10   having a circular structure, correct?

11               MR. SMITH:  Objection; form.

12        A.      The top -- yes, the top view of the

13   housing is circular and the convex cover is on top of

14   the housing.  I think that indicates that the cover

15   is circular.

16        Q.      Correct.  And so I'm trying to see,

17   was there an issue with my use of the term "radially

18   symmetric convex cover"?

19        A.      I'm comfortable with the word

20   "circular."  I think "radially symmetric" implies

21   additionally symmetries beyond just the outer shape

22   being circular.

Page 41

1          Q.      Can you describe to me the shape of

2    the convex cover in your combination?

3                  MR. SMITH:  Objection; form.

4          A.      It's a convex cover, the upper

5    surface is convex.

6          Q.      So we know that it's -- if you look

7    at it from the top, it's circular, correct?

8          A.      Yes.

9          Q.      Okay.  And we know that it's convex,

10   correct?

11         A.      That's correct.

12         Q.      And so is it -- are you saying that

13   it may not, it may not necessarily be symmetrically

14   convex cover?

15                 MR. SMITH:  Objection; form.

16         A.      That's what I'm saying.

17         Q.      So it could be an asymmetrical convex

18   cover?

19         A.      Or maybe not a perfect convex

20   symmetric, you know, spherically or circularly

21   symmetric shape.  It doesn't necessarily need that

22   kind of perfection.

Page 48

1    within the scope of a protruding convex cover.

2         Q.      So a person of ordinary skill in the

3    art combining Ohsaki and Mendelson '799 would address

4    a number of detailed choices regarding performance,

5    cost, size, shape and other parameters to obtain a

6    variety of structures for the convex cover; is that

7    your testimony?

8              MR. SMITH:  Objection; form.

9         A.      I don't think that's exactly what I

10   said unless you're reading it back, I think, but the

11   meaning is similar.  One of ordinary skill in the art

12   would consider the shape of the cover, along with

13   other design elements, including manufacturability

14   costs, power consumption.  I can make a long list of

15   things that would be considered in the process of

16   completing a final detailed design of, of such a

17   product.  And the protruding convex cover would be a,

18   would be part of that final product.

19        Q.      And the only thing you can tell me

20   about the three-dimensional structure of the cover

21   that would result from that process is that it would

22   be a protruding convex cover, correct?

Page 49

1                    MR. SMITH:  Objection; form.

2         A.      I don't think I need -- I don't think

3    it is necessary to add any other specific narrowing

4    description in this case.

5         Q.      And just so I'm clear, does the term

6    "protruding convex cover" specify to you any

7    three-dimensional geometry that you can explain to

8    me, beyond the use of that phrase?

9                    MR. SMITH:  Objection; form.

10        A.      I don't think it's necessary to

11   narrow that description.  I think one of ordinary

12   skill in the art might arrive at a final shape that

13   is more generic than any of the particular narrowing

14   descriptions I might apply at this time.

15                  You know, for example, you started

16   off with the term "radially symmetric" and I think I

17   was -- in this context circular, I think makes sense,

18   given the circular shape of the housing in

19   Mendelson '799, but radially symmetric is not a

20   required limitation in order to achieve the benefits

21   that one would be motivated to achieve.

22        Q.      Okay.  So the -- focusing on a

Page 57

1                 When you wrote your Declarations, did

2      you have in mind a specific three-dimensional

3      structure for the cover that is in your combination

4      of Ohsaki and Mendelson '799?

5                 MR. SMITH:  Objection; form, asked

6      and answered.

7           A.       Ohsaki provides an example of a

8      transparent protruding convex cover that is intended

9      to improve adhesion between the sensors -- between

10     the sensor and the user's tissue and to provide

11     detection efficiency and provide additional

12     protection of the elements accommodated within the

13     housing.  I think one of ordinary skill in the art

14     would understand how to design a transparent

15     protruding convex cover as described by Ohsaki so as

16     to achieve those benefits in combination with the

17     elements in Mendelson '799.

18          Q.       Well, can you answer my question now?

19     My question is:  When you wrote your Declaration --

20     the factual question, Dr. Kenny, when you wrote your

21     Declarations, did you have in mind a specific

22     three-dimensional structure for the cover that's in

1   your combination of Ohsaki and Mendelson '799?

2          A.      A specific --

3                  MR. SMITH:  Objection; form, asked

4   and answered.

5          A.      So you're talking about a specific

6   shape --

7          Q.      Yes.

8          A.      -- size, curvature, all of the

9   dimensions, something out of a lens handbook, for

10  example?  I did not.  I think one of ordinary skill

11  in the art would understand that the choices of the

12  details of the size, shape, thickness, radius,

13  curvature, other parameters, would be dependent on

14  other -- the way the element worked with the rest of

15  design and would know how to proceed forward in

16  making those determinations and choices.

17                 MR. SMITH:  Hey, Stephen, we've been

18  going for a little more than an hour.  It might be a

19  good time for a break if you come to the end of this

20  line of this questioning.

21                 MR. LARSON:  I'm not sure if there is

22  a good -- yeah, I hear you.  We'll try to take a

Case: 22-1631    Document: 45-8    Page: 84    Filed: 07/12/2023

4/24/2021                    Apple, Inc. v. Masimo Corp.              Thomas Kenny, Jr. Ph.D.

Page 60

1    Ohsaki and Mendelson '799, correct?

2         A.       That's my opinion, one of ordinary

3    skill in the art would know how to carry that out.

4         Q.       But you didn't put the, the result

5    of -- you didn't, you didn't identify a specific

6    structure that would result from that analysis in

7    your Declarations, correct?

8              MR. SMITH:  Objection; form.

9         A.       That's correct, my Declaration

10   doesn't go all the way to producing a complete final

11   design of a specific structure with dimensions and

12   parameters all chosen.  My Declaration offers the

13   opinion that one of ordinary skill in the art would

14   now how to combine the features and be motivated to

15   do so in order to improve adhesion, improve detection

16   efficiency and provide additional protection for the

17   elements accommodated within the sensor housing.

18        Q.       Now, you're -- do you consider

19   yourself a person of skill in the art?

20        A.       Yes.

21        Q.       So you could have done that analysis

22   and provided the result of that analysis in your

Appx05806

Page 61

1   Declaration, Declarations, correct?

2                   MR. SMITH:  Objection; form.

3          A.       In the context of a specific design,

4   yes.

5          Q.       Correct.

6          A.       Yes, I believe so.

7          Q.       Okay.  But you didn't believe that

8   was necessary in your Declarations?

9                   MR. SMITH:  Objection; form.

10         A.       That's correct.  I believe one of

11  ordinary skill would know how to make those

12  determinations --

13         Q.       And --

14         A.       -- depending on the circumstances.

15  In other words, going around in circles, I know.

16         Q.       Well, please let me show -- finish

17  your answer.  I thought you were done talking.

18         A.       I'm sorry.  One of ordinary skill in

19  the art would understand how to make those

20  determinations in the context of combining the

21  details of a particular design.

22                  MR. LARSON:  Okay.  Let's -- is it a

Page 63

1    to explain the cross-sectional view you had in mind

2    when you put together the second figure below

3    Paragraph 88, correct?

4         A.      That's correct.

5         Q.      Okay.  Let me ask you.  If one were

6    to draw that line between the 12:00 and 6:00

7    position, would the bottom figure look the same --

8    sorry -- would the convex cover in the bottom figure

9    look the same?

10                MR. SMITH:  Objection; form.

11        A.      So it -- not necessarily, and again,

12   I think the important point here is that the shape of

13   the convex cover shown in this illustration is not

14   intended to represent a precision design or final

15   confirmation of the exact shape.  It's illustrative.

16        Q.      So if one were to draw a line from

17   the 12:00 to the 6:00 position in the top figure

18   below Paragraph 88, what would the picture of the

19   convex cover in the bottom figure look like?

20                MR. SMITH:  Objection; form.

21        A.      It could be the same, similar, or

22   slightly different.  For example, it would need to

Case: 22-1631   Document: 45-8   Page: 87   Filed: 07/12/2023

4/24/2021                 Apple, Inc. v. Masimo Corp.           Thomas Kenny, Jr. Ph.D.

Page 64

1    have the same thickness at the center.  All these

2    cross-sections are crossing the center at, at the

3    center, so the height of the lens at the center,

4    would need to be the same.  It would need to meet the

5    housing on the perimeter, but in between the shape

6    might not be precisely the same.  I'm not making a

7    statement here about manufacturing tolerance,

8    precision, or a circular symmetry.

9         Q.     So you haven't provided an opinion

10   about what the precise shape would be in the convex

11   cover, from 12:00 to 6:00, other than that the height

12   of the lens at the center would need to be the same

13   and it would need to meet the housing on the same

14   perimeter; is that fair?

15                MR. SMITH:  Objection; argumentative,

16   form.

17        A.     So whatever angle I choose to draw

18   the line through the lens, assuming I draw the line

19   through the center, every time it would need to

20   reflect the same height at that location in order to

21   be consistent between the two drawings.  Beyond that,

22   the shape shown in the bottom half of this figure is

Page 68

1    benefits of improved adhesion, detection and

2    protection of the elements within.  And that shapes,

3    various shapes would be capable of providing that.

4    That all would be consistent with the description of

5    a convex protrusion.

6         Q.      My question was about the

7    three-dimensional structure of Ohsaki's cover,

8    correct?

9               Did you understand that?

10        A.      Yes.

11        Q.      Okay.  And I'm asking you if you can

12   provide me any more description of your understanding

13   of a three-dimensional structure of the cover in

14   Ohsaki?

15              MR. SMITH:  Objection; form.  Asked

16   and answered.

17        A.      Of the description, the description

18   provided by Ohsaki is the description I understand to

19   apply in this case.  It's a convex, it's a

20   translucent member with a convex surface.

21        Q.      Okay.  And so your understanding of

22   the description of Ohsaki that you apply to this case

Page 69

1    was that it's a convex -- sorry -- it's a translucent

2    member with a convex surface, correct?

3                    MR. SMITH:  Objection; form.

4         A.        That's what I just said.  Yes.

5         Q.        And you can't provide me any

6    additional description of the three-dimensional

7    structure you had in mind for Ohsaki's cover that you

8    applied in this case; is that correct?

9                    MR. SMITH:  Objection; form.  Asked

10   and answered.

11        A.        That's correct.  One of ordinary

12   skill in the art would provide further refinements

13   and details of a shape to be used on a specific

14   product based on their knowledge of the needs and

15   of -- based on their knowledge or as a member of one

16   of ordinary skill in the art.

17        Q.        What would a person of ordinary skill

18   in the art have understood about the

19   three-dimensional shape in Ohsaki's cover?

20        A.        That it's a translucent member with a

21   convex surface and that the intent is to improve

22   adhesion and detection and to protect the elements

Page 70

1    within the package.

2         Q.      What is a translucent member?

3              MR. SMITH:  Objection; form.

4         A.      I understand translucent in the

5    context of Ohsaki to mean -- let's see exactly where

6    he uses the phrase --

7              The translucence is the property that

8    allows the light through the emitter to propagate

9    through the member, be reflected off of some element

10   of the tissue and then be able to propagate back

11   through the member to the detector.  It allows light

12   to pass.

13        Q.      Okay.  I think you explained your

14   understanding of translucent.  What about member?

15        A.      Member is an object.

16        Q.      Do you describe any particular

17   three-dimensional shape to a member?

18              MR. SMITH:  Objection to form.

19        A.      No, it's an object.

20        Q.      Okay.  Now, Ohsaki has some

21   illustrations that are cross-sectional views of

22   Ohsaki's cover, correct?

Page 71

1          A.        That is correct.

2          Q.        Do you have an understanding of what

3    the three-dimensional structure of Ohsaki's cover is

4    based on those illustrations?

5                    MR. SMITH:  Objection; form.

6          Q.        Based on those illustrations -- yeah.

7                    Do you have an understanding of the

8    three-dimensional structure of Ohsaki's cover based

9    on those illustrations and Ohsaki as a whole?

10                   MR. SMITH:  Same objection.

11         Q.        For --

12         A.        Ohsaki does not provide a top view,

13   either in Figure 1 or Figure 2.  And there's, at

14   least to my knowledge, there's nothing in the text

15   that describes the shape from the top.

16         Q.        Okay.  So can you explain your

17   understanding in the three-dimensional structure of

18   Ohsaki's cover?

19                   MR. SMITH:  Objection; form.  Asked

20   and answered.

21         A.        So Ohsaki describes the pulse -- this

22   is Paragraph 16 in Ohsaki -- describes the pulse wave

Page 72

1    sensor as being worn on the back side of the user's

2    wrist, corresponding to the back of the user's hand

3    in a similar manner as a wristwatch is normally worn.

4           Q.       My question is focused on the cover

5    of Ohsaki, correct?  You understand that?

6           A.       Yes, I have a cross-sectional view.

7    I don't have a top view that would allow me to assert

8    that the shape was necessarily circular or square or

9    rectangular.  Ohsaki does not limit to a particular

10   shape from the top, that I'm aware of.

11          Q.       Okay.  But when you combined Ohsaki's

12   cover with Mendelson '799, did you have a particular

13   shape of Ohsaki's cover in mind?

14                   MR. SMITH:  Objection to form.

15          A.       I have the shape of the housing of

16   Mendelson in mind, which is circular, clearly

17   indicated; and that the convex cover that I would

18   arrive at, inspired by Ohsaki, would be circular in

19   order to accommodate the shape of the housing of

20   Mendelson.

21          Q.       So you used the structure of

22   Mendelson '799 to guide the shape of the cover that

Page 95

1   would provide a system that included the benefits of

2   improved adhesion and detection and protection of the

3   elements inside the, the product.

4        Q.        Does Ohsaki provide any guidance as

5   to how the board could, should or should not be

6   changed --

7                  MR. LARSON:  Let me restate that.

8        Q.        Does Ohsaki provide any guidance as

9   to how the board should or should not be changed to

10  maintain adhesion?

11       A.        So Ohsaki does not provide a

12  detailed, precise, geometrically specific description

13  of the board.  It's illustrated in Figures 1 and 2,

14  and one of ordinary skill in the art would understand

15  how to select a particular shape with a convex

16  surface so as to obtain improved adhesion and, and

17  detection.  Ohsaki does not provide a detailed

18  specification of the lens shape.

19       Q.        Where does Ohsaki provide that

20  guidance that you just described?

21                 MR. SMITH:  Objection; form.

22       A.        You're asking me where does Ohsaki

Case: 22-1631    Document: 45-8    Page: 94    Filed: 07/12/2023

4/24/2021                    Apple, Inc. v. Masimo Corp.                Thomas Kenny, Jr. Ph.D.

Page 105

1          Q.      The question is as follows:  You

2    described Paragraph 19 as describing "one portion of

3    a description of a preferred embodiment."

4                  Is there another embodiment described

5    by Ohsaki?

6                  MR. SMITH:  Objection; form.

7          A.      So I -- the summary of the invention

8    describes features and benefits of the addition of a

9    translucent member with a convex surface to an

10   element attached on the user's wrist.  The particular

11   embodiment shown in Figures 1 -- well, Figures 2 --

12   Figures 1 and 2 represent a particular example of how

13   to incorporate the invention in the context of a

14   specific watch design.

15         Q.      He only describes the structure of

16   one embodiment; is that fair?

17         A.      So --

18                 MR. SMITH:  Objection; form.

19         A.      -- very little precise description of

20   the structure of the embodiment.  It doesn't ever

21   state dimensions, thicknesses, things like that.  My

22   interpretation of this is that this particular

Page 106

1    description is an example of an embodiment that,

2    that, that Ohsaki is providing to explain the idea of

3    the benefits of a convex cover applied to the back

4    side of a watch, which would be to improve adhesion

5    and to improve detection.

6            Q.      Now, you said -- you testified that

7    one of ordinary skill in the art would consider

8    Paragraph 19 and make a decision as to how it might

9    influence their decisions in deciding a combination

10   of translucent member with a convex surface and the

11   sensor elements of Mendelson '799.

12                  How did you consider Paragraph 19 in

13   putting together a combination that you, you put

14   together in your, your Declarations?

15                  MR. SMITH:  Objection; form.

16           Q.      Do you remember?

17                  MR. SMITH:  Objection; form.

18           Q.      For the record, are you looking at

19   your Declaration?

20           A.      I'm looking at Paragraph 19.

21           Q.      Oh, okay.  You're looking at

22   Paragraph 19 of Ohsaki?

Page 111

1    ordinary skill in the art, as modifying concepts from

2    sources to build a real device.

3        Q.        Okay.  But you can't point me to

4    anything else in Ohsaki that specifically discusses

5    what the shape of the, of the board should be,

6    correct?

7        A.        There's no explicit statements --

8                MR. SMITH:  Objection; form.

9        A.        -- about the shape of the elements of

10   Ohsaki.

11               MR. SMITH:  Stephen, when you come to

12   the end of the line of questioning, we're coming up

13   on noon, Pacific, you might want to take a break.

14       Q.        So you understand that a person of

15   ordinary skill in the art is a hypothetical person,

16   it's one person, correct?

17               MR. SMITH:  Objection; form.

18   Argumentative.

19       A.        I think of my description of a person

20   of ordinary skill in the art is representing a broad

21   class of humans that can perform these tasks.  I'm

22   not thinking of a particular person that I know.  If

Page 130

1   properly, arranged on the user's wrist -- just --

2   context...

3            It's really not clear that all four

4   cases are described in rank here.  So there's two

5   orientations of the Detecting Element 2, right, and

6   there's the possibility of a convex surface or a flat

7   surface.  I think the Paragraph 25 makes it clear

8   that if the element has a flat surface, the detected

9   pulse wave is adversely affected by movement and I

10  take that to mean that would be the case regardless

11  of the orientation of the body, but I'm interpreting.

12  It's not literally stated.

13       Q.     And you can't interpret Paragraph 25

14  without also considering Paragraph 19, correct?

15       A.     Correct.  And so Paragraph 19 --

16            MR. SMITH:  Objection; form.

17       A.     -- tells me that in one orientation

18  there is a tendency to slip.  That doesn't tell me

19  whether that tendency is worse or better than the

20  case of a flat surface.

21       Q.     Yeah.  Ohsaki doesn't discuss that

22  specific question; is that true?

Case: 22-1631    Document: 45-8    Page: 98    Filed: 07/12/2023

4/24/2021                Apple, Inc. v. Masimo Corp.                Thomas Kenny, Jr. Ph.D.

Page 131

1                    MR. SMITH:  Objection; form.

2          A.       It doesn't.  So Ohsaki doesn't have

3     the additional paragraphs that might have described

4     the orientation of all of those elements in more

5     detail.  That's correct.  All -- what I know here is

6     that Ohsaki is specific about the two possible

7     orientations of the element, Number 2, the entire

8     structure.

9                    If, if one dimension is longer than

10    the other, there's then two choices and that it has

11    convex cover, a cover with a convex surface, that's

12    in contact with the skin.

13                   But, you know, from all of this, I --

14    there's nothing that tells me anything in particular

15    about the shape or dimensions of the cover, this

16    translucent convex cover.

17         Q.       At the very least, a person of skill

18    in the art would have understood that Ohsaki's convex

19    member did not prevent slipping when the sensor was

20    placed in the circumferential direction of the user's

21    wrist, correct?

22                   MR. SMITH:  Objection; argumentative,

Page 157

1   wrist, so I'm -- it doesn't say explicitly, but I'm

2   going to make that judgment.  I think one of ordinary

3   skill in the art would think Figure 4 applies to a

4   sensor mounted on the back of the wrist.

5        Q.      Okay.  So a few moments ago, before

6   we went to the break, you testified you believe the

7   performance shown in Figure 3 and 4A were comparable.

8   And my question for you is:  Does that help you

9   understand whether Figure 3A tested a device with a

10  convex surface?

11              MR. SMITH:  Objection; form.

12       Q.      Does that help you understand that

13  Figure 3A tested a sensor with a convex surface?

14              MR. SMITH:  Same objection.

15       A.      Back side of user's wrist -- I think

16  that's the most reasonable interpretation.  It's not

17  clearly stated in Paragraph 24, which describes

18  Figure 3A, but in the context of the specification, I

19  believe that the element being tested in Figure 3(a)

20  and 3B has a convex cover, and what's being

21  illustrated is that it's better to mount the sensor

22  on the back of the wrist than on the front of the

Page 158

1    wrist.

2          Q.        And looking at Figure 3B, which it

3    appears that your testimony is that you believe that

4    Figure 3(b) is showing the results of testing a

5    sensor with a convex surface on the back of the

6    wrist, correct?

7          A.        Figure 3B?

8          Q.        Yeah.

9          A.        Refers to the front side of the

10   wrist.

11         Q.        I'm sorry, yes.  Okay.

12         A.        I'm sorry, that's partially my fault

13   from taking us down this rabbit hole.  Sorry about

14   that.

15         Q.        Right.  Figure 3(b) to you appears to

16   show the testing of a sensor with the convex surface

17   on the front side of the wrist, correct?

18         A.        I think that's correct so that would

19   be the side -- as the same side of the wrist as the

20   palm of my hand.

21         Q.        Okay.  And how would you rate the

22   performance shown, shown in Figure 3(b)?

Case: 22-1631    Document: 45-8    Page: 101    Filed: 07/12/2023

4/24/2021                    Apple, Inc. v. Masimo Corp.              Thomas Kenny, Jr. Ph.D.

Page 159

1                      MR. SMITH:  Objection; form.

2         A.      It's not as good as Figure 3(a).

3         Q.      Any, and why is that?  How do you

4    reach that opinion?

5         A.      I'm comparing Figure 3(a) and 3(b)

6    and looking at the size of the signal variations,

7    noting that the vertical axes are the same in this

8    illustration.  So there's larger excursions when

9    there's motion for the case of the sensor mounted on

10   the front side of the wrist than for the back side of

11   the wrist.

12        Q.      And looking at the portion of

13   Figure 3(b) that shows the results during motion, do

14   you have an opinion of whether those results would be

15   usable results?

16                     MR. LARSON:  Let me strike that.

17                     MR. SMITH:  Objection; form.

18        Q.      Looking at the, the portion of 3(b)

19   that shows motion, do you have an assessment as to

20   whether the data being used there would be useful for

21   physiological monitoring?

22                     MR. SMITH:  Objection; form.

Case: 22-1631    Document: 45-8    Page: 102    Filed: 07/12/2023

4/24/2021                    Apple, Inc. v. Masimo Corp.                    Thomas Kenny, Jr. Ph.D.

Page 165

1    the forward-backward length is different that, that

2    this matters at all.

3                    To the extent they are similar or the

4    same, this detail becomes less important and in the

5    case of a circle, it disappears completely.

6         Q.       And why is that?

7         A.       I measure the, the length from one

8    side to another of a circle, I get the same number no

9    matter whether I measure left, right or into the page

10   and out of the page or up and down.  That's sort of

11   the definition of a circle.

12        Q.       And so why would a circle not have

13   the problems, the problem being described in

14   Paragraph 19 in Ohsaki?

15        A.       Because it doesn't have the

16   circumstances that the length of the detecting

17   element from left to right is longer than the light

18   from the upper side to the lower side.  This

19   paragraph doesn't apply to a circle.

20        Q.       Okay.  Sorry.  Do you believe a, do

21   you believe -- well, so changing to a circular

22   housing eliminates the longitudinal directionality,

Appx05911

Page 166

1    correct?

2         A.       That's -- yes, that's the definition

3    of a circle.  It's -- if we want to think about the

4    length from one side to the other of a circle, it's

5    the same in all axes.

6         Q.       Okay.  Do you think Ohsaki provides

7    guidance to a person of ordinary skill in the art as

8    to the selection of front and back wrist?

9                  MR. SMITH:  Objection; form.

10        A.       So Figure 3 in Ohsaki involved as all

11   of the other details in this specific embodiment

12   shows that the element works better on the back of

13   the wrist than the front side of the wrist with

14   respect to overcoming errors associated with motion.

15        Q.       So of these six different features

16   we've been discussing, your Declaration only

17   discusses the selection of flat versus convex from

18   Ohsaki, correct?

19                 MR. SMITH:  Objection; form.

20                 MR. LARSON:  Let me restate that.

21        Q.       So these six different features we've

22   discussed in your Declaration, only discussed the

Page 214

1          A.        I don't mean to be difficult here,

2     but I just don't think there's any reason to make any

3     relative assessments of the detector sizes in the two

4     objects and could use it as a basis for making

5     statements about the relative sizes of other features

6     in the two drawings, neither of them is intended as a

7     literal geometric representation of the structure.

8     And I think there -- it's not even apples and apples,

9     it's just two very amorphous things that were never

10    intended to be used in this way, and I don't think it

11    makes sense to compare them.

12         Q.        Do you think a person of ordinary

13    skill in the art would have understood the

14    positioning of the convex cover relative to the

15    emitter and detector could have a substantial impact

16    on the optical properties of the sensor?

17              MR. SMITH:   Objection; form.

18         A.        I think one of ordinary skill in the

19    art would understand that the relative positions of

20    the elements in an optical system would have an

21    impact on the performance of the system, yes.

22         Q.        But you've said your drawing here is

Page 215

1    not to scale and you haven't provided an analysis in

2    your Declarations of the height of your convex cover

3    over the LEDs and detectors, correct?

4                    MR. SMITH:  Objection; argumentative.

5    Form.

6           A.      I'm sorry.  I lost the last part of

7    that.  One more time.

8           Q.      In your Declarations that we're

9    focusing on at this deposition, your Declaration in

10   IPR1536 and 1538, you don't provide a description of

11   the height of the convex cover relative to the LEDs

12   and detectors in your combination of the

13   Mendelson '799 and Ohsaki, correct?

14          A.      That's correct.

15          Q.      Turn to Paragraph 132.

16          A.      Okay.

17          Q.      And you say, "From this and related

18   description one of ordinary skill would have

19   understood that the translucent board 8 that is

20   operably connected to the walls of Ohsaki's package 5

21   improves adhesion between Ohsaki sensor and the

22   user's skin, improves detection efficiency, and

Page 227

1                          MR. SMITH:  Objection; form.

2          A.       This column is specific to reflection

3     pulse oximetry.

4          Q.       So the problems we've been

5     discussing, at least Mendelson's description of them,

6     he's explaining the particular challenges in

7     reflection pulse oximetry, correct?

8                          MR. SMITH:  Objection; form.

9          Q.       Let me make my question clearer.

10                         So Mendelson '799 in Column 2,

11    beginning with Line 29 and continuing, I want to say

12    all the way through Column 3, is discussing the

13    challenges associated with reflection pulse oximetry;

14    is that fair?

15                         MR. SMITH:  Objection; form.

16         A.       Yes.  I'm sorry.  I think I said yes.

17         Q.       Okay.  So just for a clear record,

18    variations in contact pressure can cause large errors

19    in reflectance pulse oximetry?

20                         MR. SMITH:  Objection; form.

21         Q.       A person of ordinary skill in the art

22    reading Mendelson '799 would understand that

Page 228

1  variations in contact pressure could cause large

2  errors in reflectance pulse oximetry, correct?

3       A.      That's correct.

4               MR. SMITH:  Objection to form.

5  Argumentative.

6       A.      That's Lines 47 and 48 of the

7  Mendelson Specification Column 2.

8       Q.      Right.  Uh-huh.

9               And a person of ordinary skill in the

10 art reading Mendelson '799 would understand that

11 strong reflections from the bone could adversely

12 affect reflectance pulse oximetry, correct?

13              MR. SMITH:  Objection; form.

14      A.      That's correct.  From Lines 53

15 through 56.

16              MR. SMITH:  Stephen, when you get to

17 a stopping point, let's take a break.

18              MR. LARSON:  Okay.

19      Q.      You're good with the question, which

20 is fine, I was referring more to Lines 40 to 44 that

21 talks -- you see where it says "can be adversely

22 affected by a strong reflection from bone"?

Page 229

1       A.      Yes.  Thank you.  I agree.

2       Q.      I'll do one more and take a break.

3               Would you agree that -- direct you

4    down to Lines 58 to 64, specifically there is a

5    discussion of air gaps.

6       A.      Yes.

7       Q.      Okay.  Would you agree that a person

8    of skill in the art reading Mendelson '799, would

9    understand that an air gap between the sensor and

10   skin could create large errors in reflectance pulse

11   oximetry?

12              MR. SMITH:  Objection; form.

13      A.      Yes, I can agree with that.

14              MR. LARSON:  All right.  We can go

15   ahead and take a break.  To be warned, I may have a

16   few more questions about Mendelson here.  But I'm

17   happy to take a break now, if you want to.

18              MR. SMITH:  Let's go ahead and take a

19   break.

20              THE WITNESS:  Okay.

21              MR. SMITH:  Ten minutes?

22              MR. LARSON:  Ten minutes works.

Case: 22-1631    Document: 45-8    Page: 109    Filed: 07/12/2023

4/25/2021                Apple, Inc. v. Masimo Corp.    Thomas Kenny, Jr. Ph.D., Vol II

Page 267

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

APPLE INC.,                    )
                              )
         Petitioner,          )    US PATENT NO: 10,588,553
                              )    IPR NO. 2020-1536
    -against-                 )
                              )    US PATENT NO: 10,588,554
MASIMO CORPORATION,           )    IPR NO. 2020-1538
                              )
         Patent Owner. )
_____)

VIDEO-RECORDED DEPOSITION OF

THOMAS WILLIAM KENNY, JR. PH.D.

VOLUME 2

Zoom Recorded Videoconference

04/25/2021

8:59 a.m. (PDT)

REPORTED BY:  AMANDA GORRONO, CLR

CLR NO. 052005-01

_____

DIGITAL EVIDENCE GROUP

1730 M Street, NW, Suite 812

Washington, D.C. 20036

(202) 232-0646

**MASIMO 2009**
**Masimo v. Apple**
**IPR2020-01520**

Appx06013

1    the five giant boxes of paper that were printed and

2    shipped.

3         Q.      Yeah, let me -- I'll direct you to

4    previous exhibit.  Going to be referring to -- one --

5         A.      I found it in Folder 79, if that

6    helps.

7         Q.      Just to make it a cleaner -- let's

8    do, if you don't mind, Folder 43, and that's

9    previously marked Apple Exhibit 1004 in IPR1536.

10                    (Whereupon, Exhibit 1004, Curriculum

11   Vitae of Dr. Thomas W. Kenny was identified.)

12        A.      Okay.

13        Q.      Okay.  Just a moment here.  Okay.

14   Can you describe for me what background you have in

15   optics?

16        A.      So I have a bachelor's degree in

17   physics and a Ph.D. in physics.  I've worked on

18   sensors and systems, including optical systems, for

19   many years.

20        Q.      Have you, have you done any work on

21   physiological sensors?

22        A.      So there is work on pressure sensors,

Page 348

1    infrared sensors, accelerometers, temperature

2    sensors, all of which could be used for physiological

3    sensing.

4         Q.        But did the sensors you worked on --

5    were the sensors you worked on physiological sensors?

6                   MR. SMITH:  Objection; form.

7         A.        I'm not recalling anywhere we

8    specifically built a system to perform physiological

9    measurements.  It's possible I'm overlooking

10   something but it's been a long career.  Sorry.  I'm

11   not recalling any anything.

12        Q.        And the sensors you just mentioned,

13   you mentioned pressure sensors, infrared sensors,

14   accelerometers and temperature sensors, were all of

15   those optical sensors or just some of them?

16                  MR. SMITH:  Objection to form.

17        A.        Some of them were, some of them were

18   optical sensors.

19        Q.        Can you explain which, which were

20   optical?

21        A.        There were infrared sensors.  There

22   was something else briefly in my mind that I've

Page 349

1    forgotten already.  Sorry, but, yeah, the infrared

2    sensors would, I think, be included in the category

3    of optical sensors.

4          Q.      And, and can you explain to me the

5    work you did on infrared sensors?

6          A.      We developed various high performance

7    infrared sensors.  I mean, I can give you a lecture

8    on what went on.  I don't think you're interested in

9    all of that.

10                 (Simultaneous crosstalk.)

11         A.      We used micromechanical elements to

12   detect infrared signals through the absorption of the

13   infrared radiation and the effect of that absorbed

14   energy on the mechanical structures, reflections and

15   displacements in particular.

16         Q.      Is there a particular part of the CV

17   I could look to, to see your experience with regard

18   to infrared sensors?

19                 MR. SMITH:  Objection; form.

20         A.      Page 36 includes a reference to some

21   conference papers in that area.  It may be better

22   Page 13, for example.

1        Q.      Were these infrared sensors designed

2    to be used in any particular environment?

3        A.      So we were exploring the tradeoffs

4    between design and performance relative to the

5    state-of-the-art for detection of infrared radiation

6    without a cooled detector element and the context, at

7    least from the standpoint of our sponsors, was

8    thermal infrared imaging.

9        Q.      And was there some potential

10   practical application that the research was directed

11   to?

12       A.      It's fundamental work, so it would

13   have a range of applications.  But our sponsors were

14   interested in night vision.

15       Q.      And were you responsible for the

16   design of the sensors, that were the subject of that

17   work?

18               MR. SMITH:  Objection; form.

19       A.      Yes.

20       Q.      And so you designed the sensors being

21   used in those studies?

22               MR. SMITH:  Objection; asked and

Case: 22-1631    Document: 45-8    Page: 114    Filed: 07/12/2023

4/25/2021                     Apple, Inc. v. Masimo Corp.    Thomas Kenny, Jr. Ph.D., Vol II

Page 351

1   answered.

2          A.      I did, yes.

3          Q.      Can you just describe to me at a high

4   level the structure of those sensors?

5          A.      So, there was a membrane with a thin

6   absorbing film on the surface of a cavity that was

7   coupled to a displacement sensor on the opposite

8   side.  And the absorption of thermal energy from the

9   incoming infrared radiation caused heating of the

10  cavity, thermal expansion of the gas in the cavity

11  and displacement of a nearby element.

12         Q.      Did the sensors use LEDs?

13         A.      We might have performed some

14  characterization using LEDs.

15         Q.      Do you recall one way or another?

16         A.      So we used optical fibers and laser

17  light sources as part of the characterization

18  instrumentation around that work, which also included

19  lenses, optics, components, displacements, you know,

20  all of the normal things you'd find on an optical

21  table were all part of that work.

22         Q.      Okay.  But you don't recall one way

Case: 22-1631    Document: 45-8    Page: 115    Filed: 07/12/2023

4/25/2021                    Apple, Inc. v. Masimo Corp.    Thomas Kenny, Jr. Ph.D., Vol II

Page 352

1    or another whether those sensors used LEDs; is that

2    correct?

3            A.      So there were no LED --

4                    MR. SMITH:  Objection.

5            A.      There were no LEDs in the sensor.  We

6    might have had LEDs as part of the hardware and tools

7    we used to characterize the system, align the optics,

8    and prepare for the measurements.

9            Q.      Have you ever designed a

10   physiological sensor?

11                   MR. SMITH:  Objection; form.  Asked

12   and answered.

13           A.      I don't recall ever designing a

14   physiological sensor in the context of the discussion

15   we've had.

16           Q.      Have you ever designed a pulse

17   oximetry sensor?

18           A.      I have not.

19           Q.      Did you ever go through the process

20   of trying to determine the impact of a particular

21   modification on a physiological sensor?

22                   MR. SMITH:  Objection; form.

Page 376

1          A.       I do.

2                    MR. SMITH:  Objection; form.

3          Q.       Do you see how there's air gaps in

4    either side of the convex board in Ohsaki?

5                    MR. SMITH:  Objection; form.

6    Argumentative.

7          A.       So I see a gap on the -- above

8    towards the detector and emitter.  Not so obvious to

9    me what's below.

10         Q.       Do you see a small space between the

11   tissue and on either side of the convex board in

12   Figure 2?

13                   MR. SMITH:  Objection; form.

14   Argumentative.

15         A.       You're talking about the left and

16   right edges where the board is attached to Item 2

17   which I think we called the, the element?

18         Q.       Yes.

19         A.       Yes, I see those.

20         Q.       And you see the similar air gaps

21   illustrated in Figure 1 on the -- on, on each side of

22   the convex board identified with the No. 8, correct?

Case: 22-1631    Document: 45-8    Page: 117    Filed: 07/12/2023

4/25/2021                    Apple, Inc. v. Masimo Corp.    Thomas Kenny, Jr. Ph.D., Vol II

Page 377

1            MR. SMITH:  Objection; form.

2    Argumentative.

3         A.    It's a little less obvious what those

4    are in Figure 1, but I think I would agree that's a

5    reasonable interpretation.

6         Q.    Quick question about a couple other

7    spots in Ohsaki's disclosure while we're here, can

8    you go to Paragraph 6.  And it reads, "The two bones

9    (the radius and ulna) pass through the front side of

10   the user's wrist.  Therefore the detecting element

11   has a tendency to slip off the detection position of

12   the user's wrist, since the skin surface of the front

13   side of the user's wrist greatly moves as the user's

14   wrist moves.  Furthermore, the user feels

15   uncomfortable since the radius and the ulna are

16   pressed.  As a result, the user further moves his/her

17   wrist unconsciously and it becomes further difficult

18   to detect the pulse wave stably."

19            Did I read that correctly?

20        A.    I believe so.

21        Q.    Can you explain the problem that

22   Ohsaki is discussing here?

Case: 22-1631    Document: 45-8    Page: 118    Filed: 07/12/2023

9/18/2021                    Apple, Inc. v. Masimo Corp.              Thomas Kenny Jr., Ph.D.

Page 1

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

- - - - - - - - - - - - - - - - -x

APPLE, INC.,                          Case IPR2020-01520
                                      U.S. Patent 10,258,265

                    Petitioner,
                                      Case IPR2020-01539
                                      U.S. Patent 10,588,554


        -against-                     Case IPR2020-01537
                                      U.S. Patent 10,588,553

MASIMO CORPORATION,                   Case IPR2020-01536
                                      U.S. Patent 10,588,553

                    Patent Owner.
                                      Case IPR2020-01538
                                      U.S. Patent 10,588,554

- - - - - - - - - - - - - - - - -x

VIDEO-RECORDED DEPOSITION OF

THOMAS WILLIAM KENNY JR., PH.D.

Zoom Recorded Videoconference

09/18/2021

9:03 a.m. Pacific Daylight Time



REPORTED BY:  AMANDA GORRONO, CLR

CLR NO. 052005-01

_____

DIGITAL EVIDENCE GROUP

1730 M Street, NW, Suite 812

Washington, D.C. 20036

(202) 232-0646

**MASIMO 2027**
**Apple v. Masimo**
**IPR2020-01520**

Page 19

1    correct?

2          A.      That's correct.

3          Q.      The indication in this figure,

4    "Toward the center," does that indicate the

5    redirection that leads to the detector capturing

6    light that otherwise would have been missed --

7                  MR. SMITH:  Objection; form.

8          Q.      -- for a particular ray?

9                  MR. SMITH:  Same objection.

10         A.      So just again, reading from

11   Paragraph 42, the "lens' ability to direct light

12   'toward the center' would allow the detector to

13   capture light that would otherwise have been missed

14   by the detectors, regardless of their location within

15   the sensor device."

16         Q.      So there, there is some light that

17   would have been captured by the detectors that is

18   redirected and no longer hits the detectors; is that

19   correct?

20                 MR. SMITH:  Objection; form.

21         A.      So of all of the photons scattered

22   backwards from all of these sites --

Page 20

1         Q.      Correct.

2         A.         -- and interacting with this curved

3    optical surface that we're calling the lens, some of

4    those rays are diff- -- sorry -- refracted in a way

5    that directs them toward the detectors which

6    otherwise might have missed, and there would be some

7    other rays that would have hit the detectors that are

8    refracted away from the detectors; that's correct.

9         Q.      So in your analysis, did you

10   determine the relative amount of light that is

11   refracted towards the detectors that would otherwise

12   have been missed and compare it to the amount of

13   light originally going to the detector that is now

14   refracted away and misses the detector, with the

15   presence of the convex surface?

16              MR. SMITH:  Objection; form.

17        A.      In order to perform such an analysis,

18   I would need to know a full set of detailed

19   dimensions and shapes of the objects that would be

20   involved in that final design.  So there was no such

21   detailed calculation presented for this cartoon

22   representation of the combination of elements from

Page 21

1    the references.

2              What I've stated throughout the

3    earlier Declaration and throughout the earlier

4    deposition is that a person of ordinary skill in the

5    art would understand how to take advantage of the

6    detector locations and the shape of this convex

7    surface so as to obtain an improvement in the amount

8    of light arriving at the detectors.

9         Q.     The improvement in the light arriving

10   at the detectors depends on the dimensions and shapes

11   of the objects in the final design; is that correct?

12             MR. SMITH:  Objection; form.

13        A.     Yes, yes.

14        Q.     And in this Declaration, there was no

15   detailed calculation presented for dimensions and

16   shapes that establish that relatively more light

17   reaches the detectors for a convex surface than for a

18   flat or no surface; is that correct?

19             MR. SMITH:  Objection; form.

20        A.     So we could read from Paragraph 44,

21   "As I made clear during my deposition," and following

22   that is a quote, I think, from the transcript of the

Page 22

1    deposition, "'The convex shape [of Inokawa's lens]

2    allows light that might have been just specularly

3    reflected off of a flat plate to be captured and

4    refracted inwards.  And in the region where there's

5    curvature, it allows the light to be concentrated,

6    and in this case, roughly speaking, in the

7    neighborhood of the detectors and inwards.'  That is,

8    that the addition of a convex lens allows the

9    detectors to capture some of the reflected light

10   that...would have missed them completely, and to

11   provide some concentration of the light towards the

12   location of the detectors."

13            And again, as I explained in the

14   deposition and, and since then in these Declarations,

15   it's within the skill of one of ordinary skill in the

16   art to appreciate how to arrange the position of the

17   detectors and to arrange the shape of the lens so as

18   to obtain some benefit as described here.

19        Q.    Determining whether there is a

20   benefit as described in your Declaration, would have

21   required detailed calculations for dimensions, for

22   particular dimensions and shapes of that lens and

Case: 22-1631    Document: 45-8    Page: 123    Filed: 07/12/2023

9/18/2021                 Apple, Inc. v. Masimo Corp.        Thomas Kenny Jr., Ph.D.

Page 49

1          Q.      I don't think that that reference, I,

2   I may be wrong, but I don't think that reference was

3   part of these proceedings, but I want to direct you

4   to part of Mendelson 1988 which I think you've cited

5   in, in these proceedings and maybe all of the

6   proceedings we've talked about today -- we're going

7   to talk about today, okay?

8          A.      Uh-huh.

9          Q.      Page 2 of the reference in the

10  left-hand column?

11         A.      Uh-huh.

12         Q.      Final paragraph in that column?

13         A.      Uh-huh.

14         Q.      "The intensity of the backscattered

15  light decreases," do you see that sentence?

16         A.      Yes.

17         Q.      So for a sensor with a central

18  emitter and peripheral detectors, the intensity of

19  the light decreases with the square of the distance;

20  is that correct?

21         A.      That's what this reference says.

22         Q.      And is that your understanding

Case: 22-1631    Document: 45-8    Page: 124    Filed: 07/12/2023

9/18/2021                Apple, Inc. v. Masimo Corp.            Thomas Kenny Jr., Ph.D.

Page 50

1    generally of physiological sensors that use a central

2    emitter and peripheral detectors?

3            A.        I think there's other references from

4    the same authors that use the word "exponential

5    decrease or rapid decrease."  And the data I remember

6    seeing is, I think, more or less consistent with all

7    of those descriptions without precisely fitting to a

8    particular analytic dependance between distance and

9    signal.  So I think the general understanding that

10   all of these references would agree with is that

11   there is a decrease in the light as you move away

12   from the location of the emitter towards the

13   perimeter of the sensor.

14           Q.        The decrease in the backscattered

15   light, when you -- based upon this disclosure, when

16   you go from 1 millimeter to 2 millimeters, the

17   intensity will be 25 percent of what it was 1 to 2;

18   is that, is that correct?  Am I understanding that

19   correct?  If you double --

20                   MR. SMITH:  Objection; form.

21           Q.        -- if you double your distance?

22                   MR. SMITH:  Objection; form.

Page 57

1   BY MR. HELM:

2        Q.      Dr. Kenny, before the break, we were

3   talking about Mendelson 1988.  I want to go back to

4   the disclosure about the intensity of the light -- of

5   the backscattered light decreases in proportion --

6   direct proportion of the square of the distance.

7   That is Page 2 of Mendelson 1988, bottom of the first

8   column on the left.

9        A.      That's -- yes.

10       Q.      So based on that disclosure, if the

11  intensity of the light decreases with the square of

12  the distance, doubling the distance results in a

13  4-fold decrease in the amount of light; is that

14  correct?

15              MR. SMITH:  Objection; form.

16       A.      If we're considering exactly the same

17  detector just repositioned a factor or two further

18  away, then if as stated, it's -- the light decreases

19  in proportional of the square of the distance, then

20  that displacement by a factor of two in distance

21  would correspond to a factor of four reduction in the

22  signal for that detector.

Page 193

1    cells, resulting in multiple scattering.

2              Do you see that?

3        A.      I do see that.

4        Q.      So certainly, it was known at the

5    time that multiple scattering events and the

6    resulting increasing absorption was a known

7    phenomenon, correct?

8              MR. SMITH:  Objection; argumentative.

9        A.      I think that's correct.  You know,

10   just to be sure, it says "The light that is scattered

11   will likely be scattered again."  It doesn't say that

12   it's more likely to be scattered.  I may be just

13   splitting hairs here, but yeah, I think there's --

14   it's talking about light being scattered multiple

15   times on its way from the emitter back to the

16   detectors.

17       Q.      And then I think we talked earlier

18   about the shape of the cells that were, that you

19   interact with.  And you see down at the end of the

20   next paragraph, it was understood at the time that

21   the shape and orientation of red blood cells is

22   irregular, correct?

Case: 22-1631    Document: 45-8    Page: 127    Filed: 07/12/2023

9/18/2021                    Apple, Inc. v. Masimo Corp.              Thomas Kenny Jr., Ph.D.

1         A.       Yeah.  I think red blood cells are

2    commonly understood to be kind of plate-like, not,

3    not flat plates, but they're sort of -- they're kind

4    of squashed spheres, if you will.

5         Q.       Uh-huh.

6         A.       And that certainly, you know,

7    reflection and scattering off of red blood cells will

8    depend on exactly everything listed here, size,

9    shape, orientation, index of refraction, tissue

10   thickness, aperture crone of the detector and

11   everything else stated here, yes.  And in the end,

12   it's -- the statement at the end is the one that it

13   just makes it very difficult to make a, you know,

14   predictive physical quantitative model.

15        Q.       It's difficult to make a physical

16   quantitative model for the reflection or refraction

17   of light passing through the body.

18                 Is that your understanding of that

19   last sentence?

20                 MR. SMITH:  Objection; argumentative.

21        A.       I think the general understanding is

22   the light goes into the tissue and it gets scattered

Page 195

1    around in a random and complicated way and what comes

2    back is going to be a fairly broad and diffuse

3    pattern of light.  It's hard to provide a precise

4    prediction of the shape and aptitude of that.  It's,

5    it just depends on many, many factors.

6           Q.      And this discussion here on Page 52

7    of Websters, this discussion is not limited to

8    reflectance or transmission pulse oximetry, correct?

9                   MR. SMITH:  Objection; form.

10          A.      I think this general phenomena of

11   light scattering is common in both cases.  I do think

12   there is a difference, if you're, if you're shining

13   light into tissue and your detector is on the

14   opposite side of the tissue, you're probably more

15   likely to see light that is not sort of substantially

16   scattered.  The lightly scattered light is the light

17   that's likely to propagate straight through.

18   Whereas, light that's reflected backwards towards the

19   detector on the same sides as the emitter would

20   probably need to experience more scattering in order

21   to get its pathway redirected all the way backwards.

22                  I'm making general statements here,

Page 204

1    detectors in, for example, Figure 14E.

2         Q.       The description indicates that the

3    light is focused or substantially focused, correct?

4         A.       That's correct.

5         Q.       Figure 14 is not intended to show

6    solely light that's focused on a single detector,

7    correct?

8              MR. SMITH:   Objection; argumentative.

9         A.       All I can say is what it shows, so

10   Figure 14B shows rays of light coming in, being

11   refracted by the convex protruding surface and

12   converging at least schematically at a single point

13   on the detector.  I think one of ordinary skill would

14   understand there's going to be some perhaps

15   imperfections in some of the details of this

16   structure that might lead to something less than an

17   absolute precise focal point.  But it's clear from

18   what I see here, the intent is to gather collimated

19   light and, and concentrate it at the location and

20   maybe even within the area of the detectors to

21   guarantee maximum detection.

22        Q.       Figure 14B is a cartoon, correct?

Page 205

```
 1          A.       I think so, just like all the others.

 2                   MR. SMITH:  Hold on.  Objection:

 3     Form.

 4          Q.       Figure 14B is not intended to

 5     represent all possibilities for incoming light,

 6     correct?

 7                   MR. SMITH:  Objection; form.

 8          A.       I'm not sure what the illustrator had

 9     in mind here, but they made a choice to show the

10     light rays from the emitters as entirely consisting

11     of a series of parallel rays coming in.  They could

12     easily have had made those sets of rays somewhat less

13     organized, if they had chosen to do so, but this

14     figure shows what it shows.  I think one of ordinary

15     skill in the art would look at this and say you have

16     collimated light coming into a cylindrical lens and

17     being focused almost precisely to a single point.

18                   The actual detectors have a finite

19     size and shape and I think there's some other

20     language that we can go look at it if you want, but

21     there's some discussion about the vertical

22     positioning of this convex protrusion relative to the
```

Page 213

1    Paragraph 22 and the illustrations there, show how

2    one of ordinary skill in the art might design a

3    convex surface so as to improve the light gathering

4    around the perimeter from a diffuse source and, and

5    carry all of that out in the context of the

6    combination of Inokawa and Ohsaki or Aizawa.

7          Q.    Would a skilled artisan use a

8    different convex surface design to increase light

9    gathering at the center of a sensor for a diffuse

10   source?

11               MR. SMITH:  Objection; vague.

12         A.    So I think around Paragraph 22, I

13   provide an illustration of a convex surface that has

14   greater curvature at the perimeter than it has in the

15   center and that the effect of that curvature on the

16   orientation of those orthogonal axes is one that

17   would allow an increase in the number of rays coming

18   in from a diffuse source to arrive at the location of

19   the detector.

20         Q.    Inokawa's detector involves diffuse

21   light, correct?

22               MR. SMITH:  Objection; vague.

9/18/2021                Apple, Inc. v. Masimo Corp.                Thomas Kenny Jr., Ph.D.

Page 214

1        A.        Yes, it's a reflective pulse

2   oximeter.   I think one of ordinary skill would

3   understand that the illustrations in Inokawa are

4   describing diffuse light source that's providing

5   light back to the detectors.

6        Q.        If Inokawa's lens is beneficial

7   whether the detectors are in the middle or on the

8   periphery, why did you change its shape when you

9   applied it to Aizawa?

10               MR. SMITH:  Objection;

11   mischaracterizes prior testimony.

12        A.        So, again, the lens of Inokawa is

13   maybe conceptually described in only a few sentences

14   and the only characteristic that we're given of the

15   lens design is it improves the light gathering of the

16   LED, which is, I think, a way of saying that it

17   improves the overall efficiency of the system, but we

18   are not given a particular shape or a thickness or a

19   material or anything else that would allow me to make

20   a comparative statement between two designs.

21               I'm just providing in Figure 22,

22   which is a sort of cropped and expanded segment of

Page 215

1  figures provided in my earlier Declaration, showing

2  the arrangement of a curvature that I think one of

3  ordinary skill in the art would understand to be

4  beneficial if the objective is to gather more light

5  from a diffuse light source and bring it to the

6  detecting elements.

7       Q.     The figure you provided, the cropped

8  figure in your Declaration, is a different shape from

9  the cover depicted in Inokawa, correct?

10              MR. SMITH:  Objection; argumentative.

11      A.      So I didn't perform a detailed

12  analysis of the shape depicted in the cartoon

13  illustration in Inokawa, and I didn't copy and paste

14  that particular shape into the combination that I

15  think one of ordinary skill would arrive at.  I

16  believe one of ordinary skill in the art would

17  understand that Inokawa is teaching that a lens-like

18  shape can be used to improve the light gathering

19  ability of the LED and that when attempting to

20  combine a lens-like shape with a particular

21  arrangement of detectors and emitters, one would

22  consider a specific convex shape that would be likely

Page 218

1   flawed mis- -- that's a flawed understanding of the

2   physics of the system.  The light ray shown in

3   Inokawa can exist regardless of the -- whether the

4   detector and the emitter are in the center or the

5   edge.  If you swap those positions, the same exact

6   light path is possible.

7          Q.      Is it true that a different lens

8   design will benefit Inokawa's depicted configuration

9   of peripheral emitters and a central detector as

10  compared to Aizawa's configuration of a central

11  emitter and peripheral detectors?

12              MR. SMITH:  Objection; form.

13         Q.      That is true, correct?

14              MR. SMITH:  Sorry, objection; form.

15         A.      So the lens design in Inokawa is not

16  actually a lens design.  It's a -- just a cartoon

17  showing the lens.  One -- I think if one was building

18  Inokawa's device with the peripheral emitters and the

19  central detector, one would do some work to

20  understand the, the full array of light paths that

21  are likely to be present in this case and not just

22  the two illustrated arrows in the drawing.  One would

Page 219

1    then chose a particular shape which might depart from

2    the cartoon shape in order to arrive at a beneficial

3    arrangement for a particular arrangement of detectors

4    and emitters.

5              All of this would also depend on the

6    size of the detectors, the number and locations of

7    the emitters and vice versa.  I think the general

8    overarching statement is that one would tailor the

9    design of the lens to correspond to the features of

10   the specific system involved and that if you simply

11   swap emitter detector positions, there might be some

12   benefits to that, but the main point of all of this

13   discussion is that the light rays shown in Inokawa

14   can go either direction.

15        Q.    Did you do any ray tracing on your

16   combination implementing a convex surface on top of

17   Aizawa to determine whether your convex surface

18   actually focused more light on the peripheral

19   detectors?

20              MR. SMITH:  Objection; form.

21        A.    So I did not perform a detailed

22   retrace analysis of the diffuse light source applied

Page 257

1    the primary reference.  Aizawa describes the use of

2    a, of a cover to reduce slippage as well, and I think

3    beyond that, appreciating what is described primarily

4    in Ohsaki, one of ordinary skill in the art would

5    consider anatomical features, tissue thicknesses, you

6    know, local compliance, and use all of that to design

7    a particular convex protrusion that would reduce

8    slippage and, and also accommodate the features at

9    that location.

10                   MR. HELM:  Okay.  I don't think I

11   have any further questions, Dr. Kenny.

12                   So I'm done with my part, Dan.

13                   MR. SMITH:  Yeah, give me a minute.

14   Let me, let me take a look at my notes and consider

15   if we want to redirect or not.

16                   Do you want to go off the record?

17                   MR. HELM:  Sure.

18                   THE TECH:  Okay.  Going off the

19   record, the time is 5:27.

20                   AUTOMATED MESSAGE:  Recording

21   stopped.

22                   (Recess taken.)

Attorney Docket No.: 50095-0008IP1

| | |
|---|---|
| In re Patent of: | Poeze, et al. |
| U.S. Patent No.: | 10,292,628 |
| Issue Date: | May 21, 2019 |
| Appl. Serial No.: | 16/261,326 |
| Filing Date: | January 29, 2019 |
| Title: | MULTI-STREAM DATA COLLECTION SYSTEM FOR NONINVASIVE MEASUREMENT OF BLOOD CONSTITUENTS |

**Mail Stop Patent Board**
Patent Trial and Appeal Board
U.S. Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450

## <u>PETITIONER'S POWER OF ATTORNEY IN POST GRANT PROCEEDINGS BEFORE THE PATENT TRIAL AND APPEAL BOARD</u>

Petitioner, Apple Inc., hereby appoints the following practitioners as its attorneys to transact all business in the United States Patent & Trademark Office associated with any *inter partes* review, covered business method review, post grant review, or other review proceedings before the Patent Trial and Appeal Board of the above-captioned patent:

W. Karl Renner, Reg. No. 41, 265

Roberto J. Devoto, Reg. No. 55,108

Hyun Jin In, Reg. No. 70,014

and all practitioners associated with PTO Customer Number 26171.

I have the authority to execute this document on behalf of Apple Inc.

**Apple Inc.**

By: _Noreen Krall_____

Name:  Noreen Krall_____

Title:  Vice President and Chief Litigation Counsel_____

Date:   08/27/20_____

# IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Patent of:    Poeze, et al.
U.S. Patent No.:    10,292,628         Attorney Docket No.: 50095-0008IP1
Issue Date:    May 21, 2019
Appl. Serial No.:    16/261,326
Filing Date:    January 29, 2019
Title:    MULTI-STREAM DATA COLLECTION SYSTEM FOR NONIN-VASIVE MEASUREMENT OF BLOOD CONSTITUENTS

**Mail Stop Patent Board**
Patent Trial and Appeal Board
U.S. Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450

## PETITION FOR *INTER PARTES* REVIEW OF UNITED STATES PATENT NO. 10,292,628 PURSUANT TO 35 U.S.C. §§ 311–319, 37 C.F.R. § 42

Attorney Docket No. 50095-0008IP1
IPR of U.S. Patent No. 10,292,628



APPLE-1008, FIG. 2; APPLE-1003, ¶92.  Inokawa further discloses that the "lens makes it possible to increase the light-gathering ability of the LED."  APPLE-1008, [0015].  Thus, a POSITA would have sought to incorporate an Inokawa-like lens into the cover of Aizawa to increase light collection efficiency, thereby leading to an improved signal-to-noise ratio and more reliable pulse detection.  APPLE-1003, ¶93.  The lens of Inokawa provides precisely such a benefit to Aizawa's device by refracting/concentrating incoming light signals reflected by the blood. *Id*.

As illustrated below, the device resulting from the obvious combination of Aizawa and Inokawa would have replaced the flat cover (left) with a curved one as per Inokawa (right) to "increase the light-gathering ability."  APPLE-1008, [0015].

15

**Appx06973**



APPLE-1006, FIG. 1(b); APPLE-1003, ¶94.

A POSITA would have understood how to implement Inokawa's lens-shaped cover in Aizawa's device with a reasonable expectation of success, stemming from the significant overlap across the references in their teaching.  APPLE-1003, ¶95.  For example, as illustrated below, Inokawa teaches that its cover may be either flat (left) such that "the surface is less prone to scratches," Inokawa at [0106], or in the form of a lens (right) to "increase the light-gathering ability of the LED."  Inokawa at [0015].

## Claim 23

**[23]: "The noninvasive optical physiological sensor of claim 22, wherein the cover is comprised of a rigid material."**

*Supra* Ground-1A [4]; APPLE-1003, ¶137.

## Claim 24

**[24]: "The noninvasive optical physiological sensor of claim 23, wherein the at least four detectors are evenly spaced from one another."**

*Supra* Ground-1A [5]; APPLE-1003, ¶138.

## Claim 25

**[25]: "The noninvasive optical physiological sensor of claim 24, wherein the outwardly protruding surface comprises a single outwardly protruding surface configured to cover the plurality of detectors."**

*Supra* Ground-1A [6]; APPLE-1003, ¶139.

## Claim 26

**[26]: "The noninvasive optical physiological sensor of claim 25, wherein the single outwardly protruding surface comprises is convex."**

*Supra* Ground-1A [1d], [6], [15]; APPLE-1003, ¶140.

## Claim 28

**[28]: "The noninvasive optical physiological sensor of claim 26, wherein the noninvasive optical physiological sensor is configured to provide data useable for determining measurements of pulse rate."**

*Supra* Ground-1A [17]; APPLE-1003, ¶141.

    **B.**    **[GROUND-1B] – Claims 1-15, 17, 20-26, and 28 are rendered obvious by Aizawa in view of Inokawa and Ohsaki**

    **1.**    **Overview of Ohsaki**

43

Ohsaki—titled "Wristwatch-type human pulse wave sensor attached on back side of user's wrist"—is generally directed to "[a] pulse wave sensor includes a detecting element and a sensor body" where "[t]he pulse wave sensor is worn on the back side of a user's wrist." APPLE-1014, Title, Abstract; APPLE-1003, ¶¶63-64. As seen below, the pulse sensor of Ohsaki is "worn on the back side of the user's wrist 4...in the similar manner as a wristwatch is normally worn," *Id.*, [0016].



APPLE-1014, FIG. 1.

Referring to FIG. 2 below, Ohsaki can sense pulse by emitting light through a light emitting element 6 and detecting reflected light using a light receiving element 7. APPLE-1014, [0017]. Ohsaki also provides a translucent board 8 that is transparent to light and includes a convex surface "in intimate contact with the surface of the user's skin." *Id.*, [0009, [0017].

Attorney Docket No. 50095-0008IP1
IPR of U.S. Patent No. 10,292,628



APPLE-1014, FIG. 2.

## 2.    Analysis

As described above in Ground-1A and Section III.A.3(a), a POSITA would have sought to incorporate an Inokawa-like lens into the cover of Aizawa to increase the light collection efficiency. Here, Ohsaki provides an additional motivation and rationale for a POSITA to modify Aizawa to include a "light permeable cover comprising a protrusion" as per element [1d]; APPLE-1003, ¶¶142-146.

For example, Ohsaki teaches that adding a convex surface to the light permeable cover (*i.e.*, translucent board 8) can help prevent the device from slipping on the tissue when compared to a flat cover. APPLE-1014, [0025]; APPLE-1003,

45

¶144. In this context, Aizawa similarly seeks to prevent slippage between the device and the user's wrist—and pursues this objective by pressing its light permeable cover (*i.e.*, acrylic transparent plate 6) and trying to improve "adhesion between the wrist 10 and the pulse rate detector 11." APPLE-1006, [0026], [0030].

A POSITA reviewing Aizawa and Ohsaki would have recognized Ohsaki's use of a convex protrusion in its light permeable cover as a desirable configuration that would help to further prevent slippage of Aizawa's device. APPLE-1003, ¶145. Thus, a POSITA wanting to achieve improved adhesion between the detector and the skin, as expressly recognized in Aizawa, would have readily modified Aizawa's cover to have a convex protrusion as per Ohsaki. *Id.*

The resulting combination would have provided all remaining elements of claims 1-17 and 20-28 in the same manner as previously described in Ground-1A. APPPLE-1003, ¶146.

C.     **[GROUND-1C] – Claims 18, 19, 29, and 30 are rendered obvious by Aizawa in view of Inokawa, Mendelson-2006, and Beyer**

1.     **Overview of Mendelson-2006**

Mendelson-2006 is generally directed to a "wireless wearable pulse oximeter" device. APPLE-1016, 912; APPLE-1003, ¶¶68-70. Mendelson-2006's pulse

Filed: July 9, 2021

Filed on behalf of:
Patent Owner Masimo Corporation
By:    Joseph R. Re (Reg. No. 31,291)
       Stephen W. Larson (Reg. No. 69,133)
       Jarom D. Kesler (Reg. No. 57,046)
       Jacob L. Peterson (Reg. No. 65,096)
       KNOBBE, MARTENS, OLSON & BEAR, LLP
       2040 Main Street, Fourteenth Floor
       Irvine, CA 92614
       Tel.:   (949) 760-0404
       Fax:   (949) 760-9502
       E-mail:  AppleIPR2020-1521-628@knobbe.com

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

APPLE INC.

Petitioner,

v.

MASIMO CORPORATION,

Patent Owner.

———————————

Case IPR2020-01521
U.S. Patent 10,292,628

———————————

**PATENT OWNER RESPONSE**

IPR2020-01521
Apple Inc. v. Masimo Corporation



Petitioner's Proposed Combination (Pet. 16)

But neither Petitioner nor Dr. Kenny explains why a POSITA would have believed that Inokawa's convex lens, which concentrates light to a ***central*** detector, would enhance light collection in Aizawa's sensor (and the illustrated combination) with ***peripheral detectors***. *Id*. 15-16 (citing Ex. 1003 ¶¶93-94); Ex. 2004 ¶¶45-49.

**B.  Ground 1A Does Not Establish Obviousness**

  **1.  A POSITA Would Not Have Been Motivated To Combine Inokawa's Lens With Aizawa's Sensor**

  **a)  Petitioner Admits Inokawa's Lens Directs Light To The Center Of The Sensor**

Petitioner and Dr. Kenny both admit a convex cover condenses light towards the center of the sensor and away from the periphery. Petitioner admits in its Petition in IPR2020-01520 (Ex. 2019) filed against related patent U.S. Pat. No. 10,258,265 (Ex. 2025) that "the lens/protrusion of Inokawa ... serves a ***condensing function*** and thus, as with any other lens, refracts light passing through it." Ex. 2019 at 44; *see also* Ex. 2025. Petitioner illustrates this condensing function using "the drawing below which compares the length of non-refracted light ... bouncing off an artery with that of refracted light." *Id*. at 44-45. Petitioner's figure (below) illustrates a

-16-

IPR2020-01521
Apple Inc. v. Masimo Corporation

POSITA's understanding that Inokawa's convex lens, as implemented in Aizawa's sensor, would direct light toward the *center* of the sensor. *Id.*



Petitioner's Illustration of Inokawa's Light-Redirection (Ex. 2019 at 45)

Dr. Kenny similarly included the above illustration in his declaration in IPR2020-01520 (Ex. 2020) and explained that, when using a protruding surface such as Inokawa's lens, "the incoming light is 'condensed' ***toward the center***." Ex. 2020 at 69-70; Ex. 2004 ¶¶50-52. Dr. Kenny confirmed at his deposition for IPR2020-01520 that the protruding surface would result in "more light in the ***center*** than at the outer edge in this example." Ex. 2006 204:1-13. Dr. Kenny agreed "that's because light's being directed ***towards the center*** and ***away from the edge***...." Ex. 2006 204:14-20.

Petitioner's and Dr. Kenny's admissions are consistent with Inokawa's disclosure. Ex. 2004 ¶53. As shown in Figure 2 (below), Inokawa illustrates that the protruding surface condenses light towards the ***central*** detector 25. Ex. 1008 ¶[0058], Fig. 2. The protruding surface in Inokawa works with the particular

-17-

Filed: April 12, 2022

Filed on behalf of:
    Patent Owner Masimo Corporation
By:    Joseph R. Re (Reg. No. 31,291)
    Stephen C. Jensen (Reg. No. 35,556)
    Stephen W. Larson (Reg. No. 69,133)
    Jarom D. Kesler (Reg. No. 57,046)
    Jacob L. Peterson (Reg. No. 65,096)
    KNOBBE, MARTENS, OLSON & BEAR, LLP
    2040 Main Street, Fourteenth Floor
    Irvine, CA 92614
    Tel.:  (949) 760-0404
    Fax:  (949) 760-9502
    E-mail:  AppleIPR2020-1521-628@knobbe.com

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

APPLE INC.

Petitioner,

v.

MASIMO CORPORATION,

Patent Owner.

---

Case IPR2020-01521
U.S. Patent 10,292,628

---

**PATENT OWNER'S NOTICE OF APPEAL TO THE U.S. COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

Pursuant to 28 U.S.C. § 1295(a)(4)(A), 35 U.S.C. §§ 141(c), 142, and 319, 37 C.F.R. §§ 90.2(a) and 90.3, and Rule 4(a) of the Federal Rules of Appellate Procedure, Patent Owner Masimo Corporation ("Masimo") hereby appeals to the United States Court of Appeals for the Federal Circuit from the Judgement – Final Written Decision (Paper No. 33) entered on April 11, 2022 (Attachment A) and from all underlying orders, decisions, rulings, and opinions that are adverse to Masimo related thereto and included therein, including those within the Decision Granting Institution of *Inter Partes* Review, entered April 14, 2021 (Paper 7). Masimo appeals the Patent Trial and Appeal Board's determination that claims 1–30 of U.S. Patent 10,292,628 are unpatentable, and all other findings and determinations, including but not limited to claim construction, as well as all other issues decided adverse to Masimo's position or as to which Masimo is dissatisfied in IPR2020-01521 involving U.S. Patent 10,292,628.

Masimo is concurrently providing true and correct copies of this Notice of Appeal, along with the required fees, with the Director of the United States Patent and Trademark Office and the Clerk of the United States Court of Appeals for the Federal Circuit.

Respectfully submitted,

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated:  April 12, 2022          /Jarom Kesler/
_____
                                Jarom D. Kesler (Reg. No. 57,046)
                                Customer No. 64,735

                                Attorney for Patent Owner
                                Masimo Corporation

# ATTACHMENT A

Trials@uspto.gov                                      Paper 33
571-272-7822                              Date: April 11, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

APPLE INC.,
Petitioner,

v.

MASIMO CORPORATION,
Patent Owner.

———————————

IPR2020-01521
Patent 10,292,628 B1

———————————

Before JOSIAH C. COCKS, ROBERT L. KINDER, and
AMANDA F. WIEKER, *Administrative Patent Judges.*

COCKS, *Administrative Patent Judge.*

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

IPR2020-01521
Patent 10,292,628 B1

# I.  INTRODUCTION

## A.  Background

Apple Inc. ("Petitioner") filed a Petition (Paper 2, "Pet.") pursuant to 35 U.S.C. §§ 311–319 to institute an *inter partes* review of claims 1–30 ("challenged claims") of U.S. Patent No. 10,292,628 B1 (Ex. 1001, "the '628 patent").  We instituted the petitioned review (Paper 7, "Institution Decision" or "Inst. Dec.").

Masimo Corporation ("Patent Owner") filed a Patent Owner Response (Paper 15, "PO Resp.") to oppose the Petition.  Petitioner filed a Reply (Paper 17, "Pet. Reply") to the Patent Owner Response.  Patent Owner filed a Sur-reply (Paper 20, "Sur-reply") to the Reply.  We conducted an oral hearing on January 19, 2022.  A transcript has been entered into the record (Paper 32, "Tr.").

We have jurisdiction under 35 U.S.C. § 6(b)(4) and § 318(a).  This Decision is a final written decision under 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73 as to the patentability of claims 1–30 of the '628 patent.  We determine Petitioner has shown by a preponderance of the evidence that those claims are unpatentable.

## B.  Related Matters

The parties identify the following matters related to the '628 patent:

*Masimo Corporation v. Apple Inc.*, Civil Action No. 8:20-cv-00048 (C.D. Cal.) (filed Jan. 9, 2020);

*Apple Inc. v. Masimo Corporation*, IPR2020-01520 (PTAB Aug. 31, 2020) (challenging claims of U.S. Patent No. 10,258,265 B1);

IPR2020-01521
Patent 10,292,628 B1

*Apple Inc. v. Masimo Corporation*, IPR2020-01523 (PTAB
Sept. 9, 2020) (challenging claims of U.S. Patent No. 8,457,703 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01524 (PTAB Aug.
31, 2020) (challenging claims of U.S. Patent No. 10,433,776 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01526 (PTAB
Aug. 31, 2020) (challenging claims of U.S. Patent No. 6,771,994 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01536 (PTAB
Aug. 31, 2020) (challenging claims of U.S. Patent No. 10,588,553 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01537 (PTAB
Aug. 31, 2020) (challenging claims of U.S. Patent No. 10,588,553 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01538 (PTAB
Sept. 2, 2020) (challenging claims of U.S. Patent No. 10,588,554 B2); and

*Apple Inc. v. Masimo Corporation*, IPR2020-01539 (PTAB
Sept. 2, 2020) (challenging claims of U.S. Patent No. 10,588,554 B2).
Pet. 98, Paper 3, 1.

Patent Owner further identifies numerous issued and abandoned
applications that are said to claim priority to, or share a priority claim with,
the '628 patent. Paper 3, 3.

### C. The '628 Patent

The '628 patent is titled "Multi-Stream Data Collection System for
Noninvasive Measurement of Blood Constituents," and issued on May 21,
2019, from U.S. Patent Application No. 16/261,326, filed January 29, 2019.
Ex. 1001, codes (21), (22), (45), (54). The '628 patent discloses a two-part
data collection system including a noninvasive sensor that communicates
with a patient monitor. *Id.* at 2:31–33. The sensor includes a sensor
housing, an optical source, and several photodetectors, and is used to

3

IPR2020-01521
Patent 10,292,628 B1

measure a blood constituent or analyte, e.g., oxygen or glucose. *Id.* at 2:55–
3:5. The patient monitor includes a display and a network interface for
communicating with a handheld computing device. *Id.* at 2:38–40.

Figure 1 of the '628 patent is reproduced below.



Figure 1 illustrates a block diagram of data collection system 100 including
sensor 101 and monitor 109. *Id.* at 5:26–29, 11:36–37. Sensor 101 includes
optical emitter 104 and detectors 106. *Id.* at 11:48–50. Emitters 104 emit
light that is attenuated or reflected by the patient's tissue at measurement site
102. *Id.* at 13:60–64. Detectors 106 capture and measure the light
attenuated or reflected from the tissue. *Id.* In response to the measured
light, detectors 106 output detector signals 107 to monitor 109 through front-
end interface 108. *Id.* at 13:64–67, 14:16–22. Sensor 101 also may include
tissue shaper 105, which may be in the form of a convex surface that:

4

**Appx07631**

(1) reduces the thickness of the patient's measurement site; and (2) provides more surface area from which light can be detected. *Id.* at 10:51–11:3.

Monitor 109 includes signal processor 110 and user interface 112. *Id.* at 15:6–8. "[S]ignal processor 110 includes processing logic that determines measurements for desired analytes . . . based on the signals received from the detectors 106." *Id.* at 15:10–14. User interface 112 presents the measurements to a user on a display, e.g., a touch-screen display. *Id.* at 15:38–42. The monitor may be connected to storage device 114 and network interface 116. *Id.* at 15:52–16:3.

The '628 patent describes various examples of sensor devices. Figures 14D and 14F, reproduced below, illustrate sensor devices.



FIG. 14D

FIG. 14F

Figure 14D illustrates portions of a detector submount and Figure 14F illustrates portions of a detector shell. *Id.* at 6:34–37. As shown in Figure 14D, multiple detectors 1410c are located within housing 1430 and under transparent cover 1432, on which protrusion 605b (or partially cylindrical protrusion 605) is disposed. *Id.* at 36:15–35. Figure 14F illustrates a detector shell 306f including detectors 1410c on substrate 1400c.

5

*Id.* at 36:62–37:3. Substrate 1400c is enclosed by shielding enclosure 1490 and noise shield 1403, which include window 1492a and window 1492b, respectively, placed above detectors 1410c. *Id.* Alternatively, cylindrical housing 1430 may be disposed under noise shield 1403 and may enclose detectors 1410c. *Id.* at 37:34–36.

Figures 4A and 4B, reproduced below, illustrate an alternative example of a tissue contact area of a sensor device.



**FIG. 4A**        **FIG. 4B**

Figures 4A (left) and 4B (right) illustrate arrangements of protrusion 405 including measurement contact area 470. *Id.* at 23:8–14. "[M]easurement site contact area 470 can include a surface that molds body tissue of a measurement site." *Id.* "For example, the measurement site contact area 470 can be generally curved and/or convex with respect to the measurement site." *Id.* at 23:31–33. The measurement site contact area may include windows 420–423 that "mimic or approximately mimic a configuration of, or even house, a plurality of detectors." *Id.* at 23:39–53.

### D. Illustrative Claim

Of the challenged claims, claims 1, 7, and 20 are independent. Claim 1 is illustrative and is reproduced below.

1. A noninvasive optical physiological sensor comprising:

6

IPR2020-01521
Patent 10,292,628 B1

[a] a plurality of emitters configured to emit light into tissue of a user;

[b] a plurality of detectors configured to detect light that has been attenuated by tissue of the user, wherein the plurality of detectors comprises at least four detectors;

[c] a housing configured to house at least the plurality of detectors; and

[d] a light permeable cover configured to be located between tissue of the user and the plurality of detectors when the noninvasive optical physiological sensor is worn by the user, wherein the cover comprises an outwardly protruding convex surface configured to cause tissue of the user to conform to at least a portion of the outwardly protruding convex surface when the noninvasive optical physiological sensor is worn by the user and during operation of the noninvasive optical physiological sensor, and wherein the plurality of detectors are configured to receive light passed through the outwardly protruding convex surface after attenuation by tissue of the user.

Ex. 1001, 44:36–56 (bracketed identifiers [a]–[d] added). Independent claims 7 and 20 include similar limitations. *Id.* at 45:9–22; 46:12–34.

### E.  Evidence Relied Upon

Petitioner relies on the following references:

| Reference | Publication/Patent Number | Exhibit |
|---|---|---|
| Aizawa | U.S. Patent Application Publication No. 2002/0188210 A1, filed May 23, 2002, published December 12, 2002. | 1006 |
| Inokawa | Japanese Patent Application Publication No. 2006-296564 A, filed April 18, 2005, published November 2, 2006. | 1007, 1008[1] |
| Ohsaki | U.S. Patent Application Publication No. 2001/0056243 A1, filed May 11, 2001, published December 27, 2001. | 1014 |

[1] Exhibit 1008 is an English translation of Exhibit 1007.

7

IPR2020-01521
Patent 10,292,628 B1

| Reference | Publication/Patent Number | Exhibit |
|---|---|---|
| Mendelson-2006 | "A Wearable Reflectance Pulse Oximeter for Remote Physiological Monitoring," Proceedings of the 28th IEEE EMBS Annual International Conference, 912–915 (2006). | 1016 |
| Beyer | U.S. Patent No. 7,031,728 B2 issued April 18, 2006. | 1019 |
| Goldsmith | U.S. Patent Application Publication No. 2007/0093786 A1, filed July 31, 2006, published April 26, 2007. | 1027 |
| Lo | U.S. Patent Application Publication No. 2004/0138568 A1, filed June 15, 2003, published July 15, 2004. | 1028 |
| Mendelson-1988 | "Design and Evaluation of a New Reflectance Pulse Oximeter Sensor," Worcester Polytechnic Institution, Biomedical Engineering Program, Worcester, MA 01609; Association for the Advancement of Medical Instrumentation, Vol. 22, No. 4, 1988, 167–173. | 1015 |

Pet. 1–2.

Petitioner also relies on the declaration testimony of Thomas W. Kenny, Ph.D. (Exhibits 1003 and 1047). Patent Owner relies on the declaration testimony of Vijay K. Madisetti, Ph.D. (Exhibit 2004).

8

IPR2020-01521
Patent 10,292,628 B1

*F. Asserted Grounds*

We instituted an *inter partes* review based on the following grounds:

| Claim(s) Challenged | 35 U.S.C. § | References/Basis |
|---|---|---|
| 1–15, 17, 20–26, 28 | 103 | Aizawa, Inokawa |
| 1–15, 17, 20–26, 28 | 103 | Aizawa, Inokawa, Ohsaki |
| 18, 19, 29, 30 | 103 | Aizawa, Inokawa, Mendelson-2006, Beyer |
| 18, 19, 29, 30 | 103 | Aizawa, Inokawa, Goldsmith, Lo |
| 1–17, 20–28 | 103 | Mendelson-1988, Inokawa |
| 18, 19, 29, 30 | 103 | Mendelson-1988, Inokawa, Mendelson-2006, Beyer |

II.    ANALYSIS

*A. Principles of Law*

A claim is unpatentable under 35 U.S.C. § 103 if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which said subject matter pertains. *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations, including (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) objective evidence of non-obviousness.[2] *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966). When evaluating a combination of teachings, we must also "determine whether there was an apparent reason to combine the

---

[2] Patent Owner does not present objective evidence of non-obviousness.

IPR2020-01521
Patent 10,292,628 B1

known elements in the fashion claimed by the patent at issue." *KSR*, 550
U.S. at 418 (citing *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006)).
Whether a combination of prior art elements would have produced a
predictable result weighs in the ultimate determination of obviousness. *Id.* at
416–417.

In an *inter partes* review, the petitioner must show with particularity
why each challenged claim is unpatentable. *Harmonic Inc. v. Avid Tech.,
Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016); 37 C.F.R. § 42.104(b).  The
burden of persuasion never shifts to Patent Owner.  *Dynamic Drinkware,
LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015).

We analyze the challenges presented in the Petition in accordance
with the above-stated principles.

### B.  Level of Ordinary Skill in the Art

Petitioner identifies the appropriate level of skill in the art as that
possessed by a person having "a Bachelor of Science degree in an academic
discipline emphasizing the design of electrical, computer, or software
technologies, in combination with training or at least one to two years of
related work experience with capture and processing of data or information."
Pet. 3–4 (citing Ex. 1003 ¶¶ 21–22).  "Alternatively, the person could have
also had a Master of Science degree in a relevant academic discipline with
less than a year of related work experience in the same discipline." *Id.* at 4.

Patent Owner "applies Petitioner's level of skill." PO Resp. 10;
Ex. 2004 ¶¶ 36–39.  Patent Owner emphasizes that this level of skill requires
no specific education or experience "with optics or optical physiological
monitors" or "in physiology," and instead "focuses on data processing and
not sensor design."  PO Resp. 10; Ex. 2004 ¶ 37.

IPR2020-01521
Patent 10,292,628 B1

The level of ordinary skill in the art offered by Petitioner is reasonable based on the record and is agreed to by the parties. We also determine it is consistent with the '628 patent claims and the prior art of record. We adopt Petitioner's expressed level of ordinary skill in the art in this Decision.

### C.  Claim Construction

For petitions filed on or after November 13, 2018, a claim shall be construed using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. § 282(b). 37 C.F.R. § 42.100(b) (2019). Although both parties contend that no claim term requires express construction (Pet. 3; PO Resp. 10), we discern from the substance of the parties' briefing that there is a dispute that emerges for the claim term "cover."

### 1.  "cover"

Each of independent claims 1, 7, and 20 requires "a light permeable cover." Ex. 1001, 44:44, 45:18, 46: 22.

Patent Owner argues that the claimed "cover" must be construed to exclude "an optically clear adhesive/epoxy" and a "resin on a surface." PO Resp. 51–52. According to Patent Owner, "the '628 Patent distinguishes a resin on a surface from a cover, explaining: 'the cylindrical housing 1430 (and transparent cover 1432) . . . can protect the detectors 1410c and conductors 1412c *more effectively* than currently-available *resin epoxies*.'" *Id.* at 51 (quoting Ex. 1001, 36:35–45).

Patent Owner alleges that Dr. Kenny also "distinguished a sealing resin from a cover, acknowledging a 'layer of sealing resin' is 'one way to protect the components *without using a cover*.'" *Id.* at 51–52 (quoting

11

**Appx07638**

IPR2020-01521
Patent 10,292,628 B1

Ex. 2009, 395:22–396:17). Patent Owner argues that its construction is consistent with how a person of ordinary skill in the art would have understood the term based upon the state of the art at the time of filing. *Id.* at 52 (citing Ex. 1008 ¶ 103, Fig. 17; Ex. 1023 ¶ 35; Ex. 1027 ¶ 85, Fig. 9B; Ex. 2004 ¶ 114).

Petitioner replies that "there is nothing in the specification or the prosecution history [of the '628 patent] that would lead a [person of ordinary skill in the art] to conclude that 'cover' should be interpreted based on anything other than its plain meaning." Pet. Reply 28 (citing *Thorner v. Sony Computer Entertainment America LLC*, 669 F.3d 1362, 1368 (Fed. Cir. 2012)). That plain meaning, according to Petitioner, is that "a cover is merely 'something that protects, shelters, or guards.'" *Id.* (quoting Ex. 1050; citing Pet. 70–73; Ex. 1047 ¶ 56). Petitioner argues that Patent Owner's reliance on the '628 patent Specification takes certain text out of context, and when this context is considered, it is clear that "the epoxy resin to which the '628 patent compares its cover is not [an] epoxy cover . . . but rather epoxy that is applied to solder joints." *Id.* at 28 (citing Ex. 1001, 36:41–45; Ex. 1047 ¶ 58).

Petitioner also contends that Patent Owner "mischaracterizes Dr. Kenny's deposition testimony to say he agreed that 'sealing resin' is somehow distinguished from a cover." Pet. Reply 28. Rather, Petitioner contends that Dr. Kenny simply "clarified that using a sealing resin is 'a pretty common way to protect electronic components.'" *Id.* at 28–29 (citing Ex. 2009, 395:22–396:17; Ex. 1047 ¶ 57). Further according to Petitioner, "such extrinsic evidence would not justify departure from plain meaning under *Thorner*." *Id.* at 29.

12

Patent Owner maintains in response that the '628 patent Specification disclosure at issue "specifically *distinguishes* a 'resin' on a surface from a 'cover,'" and Petitioner's reading of this disclosure is not persuasive. Sur-reply 21–24.

Upon review of the foregoing, we disagree with Patent Owner's limiting construction of the term "cover" to exclude epoxy and resin. The plain and ordinary meaning of the term does not support Patent Owner's construction. A "cover" ordinarily connotes "something that protects, shelters, or guards." Ex. 1050 (*Merriam-Webster's Collegiate Dictionary*, 11th ed. (©2005)), 288. That plain and ordinary meaning is consistent with the '628 patent's description of "flex circuit cover 360, which can be made of plastic or another suitable material . . . [and] can cover and thereby protect a flex circuit (not shown)." Ex. 1001, 22:63–23:4. It also is consistent with the '628 patent's description and illustration of "transparent cover 1432" in Figure 14D, which covers and protects detectors 1410c and conductors 1412c, and which "can be fabricated from glass or plastic, *among other materials*." *See id.* at 36:27–45 (emphasis added), Figs. 14D–14E.

This is not the situation in which a special definition for a claim term has been set forth in the specification with reasonable clarity, deliberateness, and precision, so as to give notice of the inventor's own lexicography. *See Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1370 (Fed. Cir. 2005); *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994). Nor do we discern that Patent Owner "demonstrate[d] an intent to deviate from the ordinary and accustomed meaning of a claim term by including in the specification expressions of manifest exclusion or restriction, representing a

13

IPR2020-01521
Patent 10,292,628 B1

clear disavowal of claim scope." *Teleflex, Inc. v. Ficosa North America Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002).

Here, based upon our review of the intrinsic evidence, no such special definition or express disavowal of the term "cover" to exclude epoxy and resin exists. Patent Owner relies on the following description of Figure 14D in that regard:

> In certain embodiments, *the cylindrical housing 1430 (and transparent cover 1432)* forms an airtight or substantially airtight or hermetic seal with the submount 1400c. As a result, the cylindrical housing 1430 can protect the detectors 1410c and conductors 1412c from fluids and vapors that can cause corrosion. Advantageously, *in certain embodiments, the cylindrical housing 1430 can protect* the detectors 1410c and conductors 1412c *more effectively than currently-available resin epoxies*, which are sometimes applied to solder joints between conductors and detectors.

Ex. 1001, 36:36–45 (emphases added). First, the sentence cited by Patent Owner begins with the phrase "in certain embodiments," which indicates the claimed invention is open to other embodiments, so there is no lexicography or disavowal here. Second, we agree with Petitioner's reading of this sentence as distinguishing the prior art from the claimed invention based on the *location* of the material (being applied only to solder joints between conductors and detectors in the prior art, as opposed to covering the conductors and detectors in the invention) and not the *type* of material. Third, at best, the '628 patent expresses a preference for a cover to be made of glass or plastic, because such materials provide "more effective[]" protection than resin epoxies that were known to the inventors of the '628 patent when it was filed. *See id.* at 36:41–45. But even this reading recognizes that resin epoxies provide some amount of protection, albeit

14

IPR2020-01521
Patent 10,292,628 B1

perhaps a lesser amount than glass or plastic, and is not excluded from forming the material of a cover.

Dr. Kenny's deposition testimony cited by Patent Owner also does not persuade us that, in the context of the '628 patent, an epoxy or resin is excluded from the material of a cover. Dr. Kenny testifies that "a layer of sealing resin" "[c]ould" be used to protect the electronic components in a sensor (Ex. 2009, 395:22–396:8). He was then asked "So that would be one way to protect the components without using a cover, correct?" to which he answered "[t]here are many ways to protect the elements other than using a cover" and maintained his proposed combination of prior art has a "cover" to achieve purposes other than protecting electronic components. *Id.* at 396:9–17. He did not squarely testify that sealing resin could never be a cover.

Accordingly, in the context of the '628 patent, we do not construe the claimed "cover" to exclude epoxy and resin.

### 2. Other Claim Terms

Upon consideration of the entirety of the arguments and evidence presented, we conclude no further explicit construction of any claim term is needed to resolve the issues presented by the arguments and evidence of record. *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) (per curiam) (claim terms need to be construed "only to the extent necessary to resolve the controversy" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))).

15

**Appx07642**

IPR2020-01521
Patent 10,292,628 B1

### D. Obviousness over Aizawa and Inokawa

Petitioner contends that claims 1–15, 17, 20–26, and 28 of the '628
patent would have been obvious over the combined teachings of Aizawa and
Inokawa. Pet. 6–43.

### 1. Overview of Aizawa (Ex. 1006)

Aizawa is a U.S. patent application publication titled "Pulse Wave
Sensor and Pulse Rate Detector," and discloses a pulse wave sensor worn on
a user's wrist that detects light output from a light emitting diode and
reflected from a patient's artery. Ex. 1006, codes (54), (57).

Figure 1(a) of Aizawa is reproduced below.



Figure 1(a) is a plan view of a pulse wave sensor. *Id.* ¶ 23. As shown in
Figure 1(a), pulse wave sensor 2 includes light emitting diode ("LED") 21,
four photodetectors 22 symmetrically disposed around LED 21, and
holder 23 for storing LED 21 and photodetectors 22. *Id.* Aizawa discloses
that, "to further improve detection efficiency, . . . the number of the
photodetectors 22 may be increased." *Id.* ¶ 32, Fig. 4(a). "The same effect
can be obtained when the number of photodetectors 22 is 1 and a plurality of
light emitting diodes 21 are disposed around the photodetector 22." *Id.* ¶ 33.

16

IPR2020-01521
Patent 10,292,628 B1

Figure 1(b) of Aizawa is reproduced below.



Figure 1(b) is a sectional view of the pulse wave sensor. *Id.* ¶ 23. As shown in Figure 1(b), pulse wave sensor 2 includes drive detection circuit 24 for detecting a pulse wave by amplifying the outputs of photodetectors 22. *Id.* Arithmetic circuit 3 computes a pulse rate from the detected pulse wave and transmitter 4 transmits the pulse rate data to an "unshown display." *Id.* The pulse rate detector further includes outer casing 5 for storing pulse wave sensor 2, acrylic transparent plate 6 mounted to detection face 23a of holder 23, and attachment belt 7. *Id.*

Aizawa discloses that LED 21 and photodetectors 22 "are stored in cavities 23b and 23c formed in the detection face 23a" of the pulse wave sensor. *Id.* ¶ 24. Detection face 23a "is a contact side between the holder 23 and a wrist 10, respectively, at positions where the light emitting face 21s of the light emitting diode 21 and the light receiving faces 22s of the photodetectors 22 are set back from the above detection face 23a." *Id.* Aizawa discloses that "a subject carries the above pulse rate detector 1 on the inner side of his/her wrist 10 . . . in such a manner that the light emitting face 21s of the light emitting diode 21 faces down (on the wrist 10 side)." *Id.* ¶ 26. Acrylic transparent plate 6 is disposed between holder 23 and the

17

IPR2020-01521
Patent 10,292,628 B1

user's wrist 10. *Id.* ¶¶ 23, 26, 30.   Furthermore, "belt 7 is fastened such that the acrylic transparent plate 6 becomes close to the artery 11 of the wrist 10. "Since the acrylic transparent plate 6 is provided on the detection face 23a of the holder 23, adhesion between the pulse rate detector 1 and the wrist 10 can be improved, thereby further improving the detection efficiency of a pulse wave." *Id.* ¶ 30.

### 2.   *Overview of Inokawa (Ex. 1008)*

Inokawa is a Japanese published patent application titled "Optical Vital Sensor, Base Device, Vital Sign Information Gathering System, and Sensor Communication Method," and discloses a pulse sensor device that may be worn on a user's wrist.  Ex. 1008, code (54), ¶ 56.[3]

Figure 1 of Inokawa is reproduced below.



(Fɪɢ. 1)

---

[3] Exhibit 1008 is an English translation of Exhibit 1007.  In this Decision, all citations are to the English translation.

IPR2020-01521
Patent 10,292,628 B1

Figure 1 illustrates a perspective view of a pulse sensor. *Id.* ¶ 56. Pulse sensor 1 includes box-shaped sensor unit 3 and flexible annular wristband 5. *Id.* ¶ 57. Sensor unit 3 includes a top surface with display 7 and control switch 9, and a rear surface (sensor-side) with optical device component 11 for optically sensing a user's pulse. *Id.*

Figure 2 of Inokawa is reproduced below.



(FIG. 2)

Figure 2 illustrates a schematic view of the rear surface of the pulse sensor. *Id.* ¶ 58. The rear-side (sensor-side) of pulse sensor 1 includes a pair of light-emitting elements, i.e., green LED[4] 21 and infrared LED 23, as well as photodiode 25 and lens 27. *Id.* In various embodiments, Inokawa discloses that the sensor-side lens is convex. *See id.* ¶¶ 99, 107. Green LED 21 senses "the pulse from the light reflected off of the body (i.e.[,] change in the amount of hemoglobin in the capillary artery)," and infrared LED 23 senses body motion from the change in reflected light. *Id.* ¶ 59. The pulse sensor stores this information in memory. *Id.* ¶ 68. To read and store information, the pulse sensor includes a CPU that "performs the processing to sense pulse, body motion, etc. from the signal . . . and temporarily stores the analysis data in the memory." *Id.* ¶ 69.

---

[4] We understand "LED" to be an acronym for "light emitting diode."

IPR2020-01521
Patent 10,292,628 B1

Pulse sensor 1 includes lens 27, which "makes it possible to increase the light-gathering ability of the LED as well as to protect the LED or PD[5]." *Id.* ¶¶ 15, 58. Pulse sensor 1 also uses LEDs 21 and 23 to download data to a base station, as shown in Figure 3, reproduced below.



(FIG. 3)

Figure 3 illustrates a pulse sensor mounted on base station 17. *Id.* ¶¶ 60, 66. Pulse sensor 1 is depicted as mounted to base device 17, which "is a charger with communication functionality." *Id.* ¶ 60. When so mounted, sensor optical device component 11 and base optical device component 41 face each other in close proximity. *Id.* ¶ 66. In this position, pulse sensor 1 can output information to the base device through the coupled optical device components. *Id.* ¶ 67. Specifically, the pulse sensor CPU performs the controls necessary to transmit pulse information using infrared LED 23 to photodetector 45 of base device 17. *Id.* ¶¶ 67, 70, 76.

---

[5] We understand "PD" to be an acronym for "photodiode."

20

**Appx07647**

IPR2020-01521
Patent 10,292,628 B1

In an alternative embodiment, additional sensor LEDs and base photodetectors can be used to efficiently transmit data and improve accuracy. *Id.* ¶ 111.

### 3. *Claim 1*

#### i. *"A noninvasive optical physiological sensor comprising"*

The record supports Petitioner's undisputed contention that Aizawa discloses a noninvasive optical sensor.[6] Pet. 23; *see, e.g.*, Ex. 1006 ¶ 2 (disclosing "pulse wave sensor for detecting the pulse wave of a subject from light reflected from a red corpuscle in the artery of a wrist of the subject by irradiating the artery of the wrist").

#### ii. *[1a] "a plurality of emitters configured to emit light into tissue of a user;"*

*[1b] "a plurality of detectors configured to detect light that has been attenuated by tissue of the user, wherein the plurality of detectors comprises at least four detectors;"*

#### (1) *Petitioner's Undisputed Contentions*

Petitioner contends that Aizawa discloses an emitter—LED 21—and also states that, in certain embodiments, multiple LEDs may be employed. Pet. 7, 18. Patent Owner does not dispute this contention, and we agree with Petitioner. *See* Ex. 1006 ¶¶ 23 ("LED 21"), 32 ("The arrangement of the light emitting diode 21 and the photodetectors 22 is not limited to this."). For example, Aizawa explains that "[t]he same effect can be obtained when

---

[6] Whether the preamble is limiting need not be resolved, because Petitioner shows sufficiently that the recitation in the preamble is satisfied by the prior art.

Appx07648

IPR2020-01521
Patent 10,292,628 B1

the number of photodetectors 22 is 1 and a plurality of light emitting diodes 21 are disposed around the photodetector." *Id.* ¶ 33.

Petitioner also contends that Inokawa teaches a sensor with two LEDs–a green LED to sense pulse and an infrared LED to sense body motion. Pet. 10–11, 18. Petitioner further contends that when Inokawa's sensor is mounted on a base device, the infrared LED also is used to wirelessly transmit vital information to the base device. *Id.* at 21. Patent Owner does not dispute these contentions, and we agree with them. Inokawa teaches a pair of LEDs 21, 23, where "the basic function of the S-side green LED 21 is to sense the pulse from the light reflected off of the body . . . , while the S-side infrared LED 23 serves to sense body motion from the change in this reflected light." Ex. 1008 ¶¶ 58–59. Inokawa also explains that "vital sign information stored in the memory 63 [of the sensor], such as pulse and body motion, is transmitted to the base device 17 using the S-side infrared LED 23 of the pulse sensor 1 and the B-side PD 45 of the base device 17," such that "there is no need to use a special wireless communication circuit or a communication cable." *Id.* ¶¶ 76–77.

The record further supports Petitioner's undisputed contentions as to the disclosure of multiple photodetectors in Aizawa. *See* Pet. 25–26. Petitioner relies on Aizawa's disclosure of "***four photodetectors 22***" that operate to "detect light 'reflected by a red corpuscle running through the artery 11 of the wrist 10 . . . so as to detect a pulse wave.'" *Id.* (citing Ex. 1006 ¶¶ 24, 27, 29, 32, Fig. 1(a)).

### (2) Petitioner's Disputed Contentions

Petitioner points to Aizawa's disclosure of "a centrally located LED/emitter," but notes that "Aizawa never specifically identifies the use of

multiple emitters operating at different wavelengths in conjunction with multiple detectors." Pet. 18 (citing Ex. 1006 ¶¶ 23, 33). Petitioner, however, relies on Inokawa as disclosing "two different types of emitters 'such as an infrared LED or a green LED' and that 'work can be divided between the various means, with an infrared LED used to detect vital signs and transmit vital sign information, and a green LED used to detect pulse.'" *Id.* (citing Ex. 1008 ¶¶ 14, 44, 58, 59). Petitioner reasons that a person of ordinary skill in the art "would have found it obvious to incorporate the two LEDs of Inokawa into Aizawa." *Id.* at 24. Petitioner also explains that "[i]t would have been obvious to split the single LED/emitter of Aizawa into two LEDs/emitters having different wavelengths to (i) acquire body motion information for improved pulse detection and/or (ii) more reliably transmit information from the sensor to a base device with less error." *Id.* at 25 (citing Ex. 1008 ¶¶ 7, 14, 44, 48, 58, 59, 60, 62, 77). Furthermore, Petitioner expresses the following:

> The added ability to measure body movement can allow for a more reliable pulse measurement that takes into account and corrects for inaccurate readings stemming from body movement. Thus, a [person of ordinary skill in the art] would have been motivated and found it obvious to divide the single emitter of Aizawa, as shown below into two emitters operating at two difference wavelengths.



*Id.* at 19 (citing Ex. 1003 ¶¶ 75, 76).

IPR2020-01521
Patent 10,292,628 B1

Petitioner additionally contends that applying an additional emitter to Aizawa's device "merely entails the use of known solutions to improve similar systems and methods in the same way" and that Inokawa's teachings of multiple emitters "would have led to predictable results without significantly altering or hindering the functions performed by Aizawa's sensor." *Id.* at 20 (citing *KSR*, 550 U.S. at 417; Ex. 1003 ¶¶ 77–78).

As an additional and independent motivation for incorporating a second emitter in Aizawa, Petitioner contends that, although Aizawa "contemplates uploading data to a base device," it "is silent about how such transmission would be implemented." *Id.* at 20–21. According to Petitioner, however, a skilled artisan would have "recognized that incorporating Inokawa's base device and LED-based data transmissions would allow Aizawa to upload data from its sensor in a way that is wireless (thus avoiding the problems of a physical cable) and that does not require a separate RF circuit." *Id.* at 22 (citing Ex. 1003 ¶ 81). According to Dr. Kenny, one of ordinary skill in the art would have "incorporate[d] Inokawa's base device and LED-based data transmission into Aizawa's sensor to, for instance, 'make[] it possible to transmit vital sign information to the base device 17 accurately, easily, and without malfunction'" and "without having to incorporate a separate RF circuit into Aizawa's wrist sensor." Ex. 1003 ¶ 81 (citing Ex. 1008 ¶ 7). Petitioner further reasons that Inokawa's data transmission disclosure that incorporates two emitters or LEDs provides for increased accuracy of data transmission. *Id.* at 21–22 (citing Ex. 1003 ¶¶ 82, 83).

24

IPR2020-01521
Patent 10,292,628 B1

### (3) Patent Owner's Contentions

Patent Owner disputes Petitioner's contentions regarding the obviousness of modifying Aizawa to include two emitters. *See, e.g.*, PO Resp. 35–41; Sur-reply 14–17. According to Patent Owner, "[n]either Aizawa nor Inokawa discloses both a plurality of emitters and at least four detectors." PO Resp. 35 (citing Ex. 2004 ¶ 79). Patent Owner, thus, is of the view that the teachings of the noted references would not have suggested associating multiple emitters with the multiple detectors of Aizawa's sensing device.

In particular, Patent Owner first argues that neither Aizawa nor Inokawa discloses a device with both multiple detectors *and* multiple emitters in the *same* sensor, because Aizawa's embodiments have either a single emitter and multiple detectors (e.g., Ex. 1006, Fig. 1(a)) or multiple emitters and a single detector (e.g., *id.* ¶ 33), and Inokawa discloses multiple emitters and a single detector (e.g., Ex. 1008, Fig. 2). *See* PO Resp. 35–36 (citing, e.g., Ex. 1006 ¶ 33, Figs. 1, 2, 4, 5; Ex. 1008 ¶ 58, Fig. 2; Ex. 2004 ¶¶ 79–80). Patent Owner concludes, therefore, that there would have been no reason for a person of ordinary skill in the art to have added a second emitter to Aizawa, when Aizawa already discloses an embodiment with multiple LEDs, i.e., an embodiment with only a single detector. *Id.* at 36–37 (citing, e.g., Ex. 2004 ¶ 81–83).

Patent Owner also argues that the evidence does not support either of Petitioner's two proffered motivations for modifying Aizawa to include two emitters. As to the first motivation (to measure body movement using a second emitter), Patent Owner asserts that Dr. Kenny erroneously testifies that Aizawa cannot perform such measurement with its single emitter. *Id.*

IPR2020-01521
Patent 10,292,628 B1

at 37 (citing, e.g., Ex. 1006 ¶ 15; Ex. 2007, 400:7–401:10; Ex. 2004 ¶ 84).

Patent Owner argues that "Dr. Kenny incorrectly believed that Aizawa's sensor attempts to prevent motion rather than account for it" but that "Aizawa expressly states that it provides a 'device for **computing** the **amount** of motion load from the pulse rate.'"  *Id.* (citing Ex. 1006 ¶ 15; Ex. 2004 ¶ 84).

As to Petitioner's second motivation (to enable transmission of data to a base device using an optical communication link), Patent Owner argues that "Aizawa **already** includes a wireless transmitter . . . so Aizawa does not need to incorporate Inokawa's base-device [optical] data transmission arrangement."  PO Resp. 38 (citing, e.g., Ex. 1006 ¶¶ 23, 28, 35; Ex. 2004 ¶¶ 85–86).  Indeed, Patent Owner argues that "Dr. Kenny acknowledged Aizawa does not indicate there are any problems with Aizawa's form of data transmission."  *Id.* (citing Ex. 2007, 409:13–410:2).  Patent Owner further argues that "Aizawa's goal is 'real-time measuring' with the transmitter 'transmitting the measured pulse rate data to a display'" but that "Inokawa's base device, however, only transmits pulse rate data 'when the pulse sensor . . . is mounted onto the base device.'"  *Id.* at 38–39 (citing, *e.g.*, Ex. 1008, Abstract).  Patent Owner also contends that "[r]eplacing Aizawa's wireless transmission with a base-device-transmitter eliminates the ability to take and display real-time measurements, one of Aizawa's stated goals, while increasing power consumption and cost."  *Id.* at 39 (citing Ex. 2009, 381:18–382:8, 383:22–385:9, 390:5–392:3; Ex. 2004 ¶ 86).  Patent Owner insists that Inokawa does not aid Petitioner's case, because Inokawa discloses the benefits of using a second emitter in only two situations, i.e., first, to improve over a "mechanically-connected system," e.g., with a cable for

26

IPR2020-01521
Patent 10,292,628 B1

communication, and, second, to avoid use of a "dedicated wireless communication circuit," whereas "Aizawa *already* uses wireless transmission to provide real-time measurements." *Id.* at 39–40 (citing, e.g., Ex. 1008 ¶ 4; Ex. 2004 ¶ 87).

Patent Owner further contends that Petitioner and Dr. Kenny overlooked further complications that would ensue from modifying Aizawa to have two emitters. Patent Owner argues that Dr. Kenny did not address issues of thermal interference with sensor performance in adding a second LED to a physiological sensor, which would require "structural changes." PO Resp. 40–41 (citing, e.g., Ex. 1003 ¶ 76; Ex. 2004 ¶ 88; Ex. 2012, 59–60; Ex. 2007, 379:17–21, 384:16–388:16, 389:17–390:20). Patent Owner also argues that Dr. Kenny "acknowledged that changing the size of the emitter cavity could affect the optical performance of the device," but that necessary "redesign" requirements are absent from his testimony and the Petition. *Id.* at 56–57 (citing, e.g., Ex. 2007, 394:11–395:17).

### (4) *Petitioner's Reply*

As to Petitioner's first motivation, Petitioner contends that adding an additional LED enables the sensor to distinguish between blood flow and body movement, which provides a "more reliable" pulse measurement, and constitutes Petitioner's proposed improvement to Aizawa. Pet. Reply 22 (citing, e.g., Ex. 1003 ¶¶ 76; Ex. 2007, 401:11–402:4; Ex. 1047 ¶ 46). Moreover, Petitioner expresses that by using multiple LEDs at different wavelengths, "two separate signals" can be collected, which "allows noise arising from body motion to be better isolated and accounted for." *Id.* at 22–23 (citing Ex. 1047 ¶ 46–47).

27

IPR2020-01521
Patent 10,292,628 B1

As to Petitioner's second motivation, Petitioner maintains that Inokawa's use of two emitters having different wavelengths to upload data to a base device using optical communication advantageously improves the accuracy of the transmission by providing "checksum" information. *Id.* at 23 (citing, e.g., Ex. 1003 ¶ 82; Ex. 1008 ¶¶ 44, 48, 111; Ex. 2007, 407:7–408:20, 416:5–15; Ex. 1047 ¶ 48).

In connection with the "other complications" that Patent Owner alleges would result from the proposed modification, Petitioner urges that "such minor issues are 'part of what [a person of ordinary skill in the art] would bring . . . to the problem and would know how to make the changes needed.'" *Id.* at 24 (quoting Ex. 2007, 384:8–388:12; Ex. 1047 ¶ 49).

### (5) Patent Owner's Sur-reply

With respect Petitioner's first proposed motivation, Patent Owner argues that Inokawa's disclosure is as sparse as Aizawa's disclosure regarding how to use optical data to measure body movement. Sur-reply 15 (citing Ex. 1008 ¶ 59). Patent Owner also asserts that "Petitioner cites nothing in Inokawa that suggests" that Inokawa's two emitter data gathering is more reliable or otherwise superior to Aizawa's single emitter data gathering. *Id.*

Concerning Petitioner's second motivation, Patent Owner argues that the proposed modification eliminates Aizawa's ability to conduct "***real-time*** collection and display of physiological measurements—a key goal of Aizawa's system." *Id.* at 15–16.

Patent Owner also notes that Petitioner does not dispute that the proposed modification would cause problems such as "additional cost,

28

IPR2020-01521
Patent 10,292,628 B1

energy use, and thermal problems" that would ensue from using two emitters in the Aizawa device. *Id.* at 17.

### (6) Discussion

Upon review of the foregoing, we conclude that a preponderance of the evidence supports Petitioner's views that it, in light of Inokawa's teachings, it would have been obvious to replace Aizawa's single near infrared LED 21 with an infrared LED and a green LED.

First, a person of ordinary skill in the art would have had reason to make this replacement to improve the pulse measurements recorded by Aizawa's detector 1. Inokawa teaches that the infrared LED's signal can be used "to detect vital signs" such as "body motion," and the green LED's signal can be "used to detect pulse." Ex. 1008, Fig. 2, ¶¶ 14, 58–59; Ex. 1003 ¶¶ 68, 80, 83–85; Ex. 1047 ¶¶ 46–47.

Patent Owner correctly points out that Aizawa describes its single-emitter detector 1 as transmitting pulse data to "a device for computing the amount of motion load from the pulse rate." Ex. 1006 ¶¶ 15, 28, 35. But, this description is the only disclosure in Aizawa cited by Patent Owner as relating to computing a motion characteristic of the user. Further, we are unable to discern any other disclosure in Aizawa relating to motion computation, or what Aizawa proposes to do with its motion computation. *See id.* Based on the sparse nature of Aizawa's disclosure concerning motion load, it is not clear precisely what Aizawa proposes to do with the computed motion load, after it is computed. *See, e.g.*, Ex. 1047 ¶ 46 ("Aizawa does not even say whether it uses the computed motion load to improve the detection signal."). Aizawa, however, does describe the motion

IPR2020-01521
Patent 10,292,628 B1

load as being computed "from the pulse rate," rather than being an input to the pulse rate calculation.  Ex. 1006 ¶¶ 15, 35.

In a deposition for other proceedings related to this *inter partes* review (*see supra* § I.B), Dr. Kenny was asked whether it was his understanding that "Aizawa's sensor could not account for motion load?"; Dr. Kenny answered that "Aizawa's sensor attempts to prevent motion load rather than account for it."  Ex. 2007, 400:7–11 (deposition for IPR2020-01520, IPR2020-01537, and IPR2020-01539).  He explained that, because Aizawa uses only a single emitter with a single wavelength, "what [Aizawa] sees as a signal would be some mixture of pulse rate and motion load if there was no effort to prevent motion load," so Aizawa seeks to solve the problem of "prevent[ing] motion load from corrupting the pulse rate signal."  *Id.* at 400:12–401:10.  Dr. Kenny did not further explain this distinction between preventing and accounting for motion load in his deposition testimony cited by the parties as relating to this issue.  *Id.* at 400:7–402:4.  We do not rely on this distinction as a basis for our present decision, because we find no express support for it in Aizawa's disclosure (*see* Ex. 1006 ¶¶ 15, 28, 35), and it is not explained in persuasive detail by Dr. Kenny.

We nonetheless credit Dr. Kenny's declaration testimony that a person of ordinary skill in the art, upon reviewing Inokawa's disclosure of using two emitters of different wavelengths to calculate a user's pulse and motion separately, would understand that these two separate measurements would enable the device to calculate a "more reliable" pulse rate because it "allows noise arising from body motion to be better isolated and accounted for."  Ex. 1047 ¶ 47; *see* Ex. 1003 ¶¶ 76–78.  Aizawa does not disclose using the computed motion load in this fashion, so it appears that this would improve

IPR2020-01521
Patent 10,292,628 B1

upon the accuracy of Aizawa's pulse measurements, by using the computed motion load to isolate and account for noise. *See* Ex. 1006 ¶¶ 15, 28, 35.

Dr. Madisetti also offers no meaningful opposing testimony in this regard. *See, e.g.*, Ex. 2004 ¶ 84. Instead, Dr. Madisetti incorrectly reads Dr. Kenny's motivation testimony as being limited to the desirability of adding the bare ability to measure body movement to Aizawa. *See id.* Yet, Dr. Kenny further testified that it would have been beneficial to *use* the measured body movement to *improve* the pulse measurement of the device. *See* Ex. 1003 ¶¶ 76–78; Ex. 1047 ¶ 47. Dr. Madisetti does not address that testimony. *See* Ex. 2004 ¶ 84.

Thus, because Dr. Madisetti's testimony does not directly address the entirety of Dr. Kenny's testimony in this regard, Dr. Kenny's testimony stands unrebutted on this point in the record before us. Dr. Kenny's testimony also makes intuitive sense. Measuring the user's motion *separately* from the user's pulse, for example by using two interrogating emitters of two different wavelengths, would provide a reliable means of correcting the pulse data for motion artifacts by using the separately measured motion data, rather than by trying to segregate these two components in the single data stream provided by Aizawa's single emitter device. *See, e.g.*, Ex. 1047 ¶ 47. We, therefore, are persuaded by Dr. Kenny's unrebutted testimony that using two emitters of different wavelengths would improve Aizawa's device in this way.

Independently, we are also persuaded that a person of ordinary skill in the art would have been motivated to replace Aizawa's single near infrared LED 21 with an infrared LED and a green LED, to provide a reliable method of uploading pulse data stored by Aizawa's wrist-worn pulse rate detector 1

IPR2020-01521
Patent 10,292,628 B1

to another device for display to the user. Inokawa expressly touts such optically-based uploading of data from Inokawa's wrist-worn sensor 1 to Inokawa's base device 17 as a benefit of incorporating two emitters in sensor 1. *See* Ex. 1008, Figs. 3, 19, ¶¶ 3–7, 14, 76–77, 109–111. Inokawa identifies two specific benefits of this optically-based data communication means. First, the infrared LED can transmit the pulse data, and the green LED can separately transmit "checksum" information to increase the accuracy of data transmission. *Id.* at Fig. 19, ¶¶ 14, 109–111. Second, using light emitters in this fashion to perform two functions (data collection by emitting light into the user's wrist, and data transmission by emitting light to photodetectors in a base device) obviates the need for providing "a special wireless communication circuit [in the wrist-worn sensor 1] or a communication cable." *Id.* ¶¶ 3–7, 76–77.

Patent Owner correctly points out that Aizawa already has "transmitter" 4 for uploading pulse data stored by Aizawa's wrist-worn pulse rate detector 1 to another device for processing and for display to the user. Ex. 1006, Fig. 1(b), ¶¶ 15, 23, 28, 35. Nevertheless, Aizawa's Figure 1(b) illustrates transmitter 4 only as an empty box contained within outer casing 5, and Aizawa's written description does not provide further structural details concerning transmitter 4. *See id.* In particular, Aizawa does not describe exactly how transmitter 4 transmits its data to the other device. *See id.*

Patent Owner contends, and Dr. Madisetti and Dr. Kenny both testify, that Aizawa's transmitter 4 is a "wireless" transmitter. *See, e.g.*, PO Resp. 38; Ex. 2004 ¶¶ 85–87; Ex. 2007, 403:17–22, 414:19–21. They all appear to equate "wireless" communication to radio frequency

IPR2020-01521
Patent 10,292,628 B1

communication, and not to include optical communication, even though both radio frequency and optical communication do not use a wire. Based on the foregoing testimony, we assume, for this decision, that Aizawa contemplates radio frequency communication as one embodiment by which transmitter 4 may transmit data to devices other than detector 1.

Patent Owner argues, and Dr. Madisetti testifies, that Aizawa's express disclosure goes even further. They assert that Aizawa's "goal" is to measure and display pulse data *in real time during exercise*, using the wireless transmitter. *See, e.g.*, Ex. 2004 ¶¶ 86–87. We find that Aizawa does not support this assertion. Instead, Aizawa discusses prior art devices that "estimat[e] a burden on the heart of a person who takes exercise by *real-time measuring* his/her heart rate at the time of exercise" (Ex. 1006 ¶ 4 (emphasis added)), and then describes Aizawa's detector 1 as having a transmitter for transmitting the measured pulse rate data to another device for display (*id.* ¶ 15). Aizawa does not indicate when this transmission occurs. Aizawa also refers to "noise caused by the shaking of the body of the subject" as a problem to be addressed (*id.* ¶ 6), but this problem occurs regardless of whether the shaking results from exercise or the normal movement of the user's wrist over the course of the day. Thus, Aizawa does not tout, as an important feature of Aizawa's invention, the *real time display* of pulse rate data during exercise, regardless of whether the data gathered by Aizawa's wrist-worn detector 1 is transmitted wirelessly or otherwise. *Id.* ¶¶ 4, 6, 15.

No doubt, a person of ordinary skill in the art would have viewed the capability of a wrist-worn pulse detector to transmit its pulse data to another device for display in real time while the user is exercising to be a desirable

feature in some cases, even if this is not one of Aizawa's specifically stated goals. *See, e.g.*, Ex. 1003 ¶ 68 (Dr. Kenny stating: "By wirelessly transmitting the collected data wirelessly, Mendelson-2006's system provides 'numerous advantages," including the ability to determine the condition of a subject 'remotely'"); Ex. 2009, 393:6–14 (in a deposition for other related proceedings, Dr. Kenny agreeing that a person of ordinary skill in the art "would have seen the ability to wirelessly transmit collected data as an advantage"). Nonetheless, Inokawa expressly discloses that, in other cases, the benefits achieved by wireless transmission can be outweighed by obviating the need for the wrist-worn sensor to include a special wireless communication circuit. *See* Ex. 1008 ¶¶ 3–7 (discussing problems associated with wireless transmission, such as the need for a dedicated circuit, which is avoided by Inokawa's system that risks "few malfunctions" and has a "simple structure"), 76–77 ("As a result, there is no need to use a special wireless communication circuit . . . , which makes it possible to transmit vital sign information to the base device 17 accurately, easily, and without malfunction."). We therefore conclude that Petitioner's case for obviousness in this regard is supported by a preponderance of the evidence. *See, e.g.*, *In re Urbanski*, 809 F.3d 1237, 1243–44 (Fed. Cir. 2016) (persons of ordinary skill in the art may be motivated to pursue desirable properties of one prior art reference, even at the expense of foregoing a benefit taught by another prior art reference).

We disagree with Patent Owner's argument that Petitioner's case for obviousness is deficient on the basis that neither Aizawa nor Inokawa expressly discloses a wrist-worn sensor device that has *both* a plurality of emitters *and* at least four detectors, as claim 1 recites. Obviousness does not

IPR2020-01521
Patent 10,292,628 B1

require "'some motivation or suggestion to combine the prior art teachings' [to] be found in the prior art." *KSR*, 550 U.S. at 407, 415–418. Nor does it require the bodily incorporation of Inokawa's device into Aizawa's device. *See, e.g.*, *In re Keller*, 642 F.2d 413, 425 (CCPA 1981) (test for obviousness is not whether the features of one reference may be bodily incorporated into the structure of the other reference, but rather is "what the combined teachings of the references would have suggested to those of ordinary skill in the art"); *see also In re Merck & Co.*, 800 F.2d 1091, 1097 (Fed. Cir. 1986) (nonobviousness is not established by attacking references individually when unpatentability is predicated upon a combination of prior art disclosures). Instead, "[a] person of ordinary skill is also a person of ordinary creativity, not an automaton," and "in many cases a person of ordinary skill will be able to fit the teachings of multiple patents together like pieces of a puzzle." *KSR*, 550 U.S. at 420–421.

In this case, we are persuaded that a person of ordinary skill in the art would have been motivated to modify Aizawa's wrist-worn detector 1 to replace its single near infrared LED 21 with an infrared LED and a green LED, based on Inokawa, for all the reasons provided above. A person of ordinary skill in the art would additionally have known to keep all four detectors 22 that are already present in Aizawa's detector 1, so that "[e]ven when the attachment position of the sensor is dislocated, a pulse wave can be detected accurately," as disclosed by Aizawa. Ex. 1006 ¶¶ 9, 27. In short, the combination of Aizawa and Inokawa teaches that having multiple emitters is beneficial, and having multiple detectors is beneficial, for different and not inconsistent reasons.

35

IPR2020-01521
Patent 10,292,628 B1

Finally, we agree with Petitioner's position that any thermal interference and power consumption issues that may arise in Aizawa's wrist-worn pulse detector, by using two emitters instead of one emitter, are well within the capabilities of a person of ordinary skill in the art to solve. We credit Dr. Kenny's testimony in this regard. *See, e.g.*, Ex. 1003 ¶¶ 77–78; Ex. 1047 ¶ 49. Indeed, Dr. Kenny recognizes that Aizawa already discloses adding additional emitters. Ex. 1003 ¶ 77 (citing Ex. 1006 ¶ 32). Dr. Kenny further testifies that this modification "amount[s] to nothing more than the use of a known technique [i.e., Inokawa's use of two emitters in a wrist-worn pulse detector] to improve similar devices [i.e., Aizawa's wrist-worn pulse detector] in the same way, and combining prior art elements according to known methods to yield predictable results." *Id.* ¶ 78.

Patent Owner cites portions of Dr. Kenny's deposition testimony that, in Patent Owner's view, indicate Dr. Kenny fails to appreciate the significance of optical interference complications posed by adding a second emitter to Aizawa's device, and fails to explain how this would have been overcome. *See* PO Resp. 40–41 (citing Ex. 2007, 394:11–395:17). We have reviewed this deposition testimony, and we conclude that Patent Owner overstates its significance. It establishes, at most, that Dr. Kenny did not expressly address this issue in his declaration (Exhibit 1003), but Dr. Kenny's opinion is that this would have been within the capability of a person of ordinary skill in the art to resolve. Based on the evidentiary record presented to us, we agree with Dr. Kenny. For example, Inokawa discloses a wrist-worn pulse sensor 1 having two emitters 21 and 23 in close proximity to each other. *See* Ex. 1008, Figs. 1–2. An artisan must be presumed to know something about the art apart from what the relied-upon references

36

IPR2020-01521
Patent 10,292,628 B1

disclose. *See In re Jacoby*, 309 F.2d 513, 516 (CCPA 1962). Consistent with Dr. Kenny's testimony, it follows readily from the teachings of the prior art that an ordinarily skilled artisan would have reasonably understood how to implement two emitters as a part of Aizawa's sensor device, including addressing routine design considerations as a part of such implementation. *See, e.g.*, Ex. 1003 ¶¶ 77–78; Ex. 1047 ¶¶ 48–49.

Dr. Madisetti's testimony opposing Dr. Kenny's foregoing opinion is premised solely on Dr. Kenny's alleged failure to explain how issues that arise from adding a second emitter to Aizawa would have been solved. Dr. Madisetti does not provide any affirmative reason why these issues would have been difficult for a person of ordinary skill in the art to solve, in the context of Aizawa's device or wrist-worn pulse sensing devices in general. *See, e.g.*, Ex. 2004 ¶ 88.

On the record at hand, we conclude that a person of ordinary skill in the art would have had adequate reason to replace Aizawa's single near infrared LED 21 with an infrared LED and a green LED, and would have had a reasonable expectation of success in doing so.

  *iii. "[1c] a housing configured to house at least the plurality of detectors, and"*

The record supports Petitioner's undisputed contentions as to the disclosure of the above-noted housing feature in Aizawa. *See* Pet. 26. Petitioner points to Aizawa's disclosure of "a holder 23 for storing the above light emitting diode 21 and the photodetectors 22." *Id.* (quoting Ex. 1006 ¶¶ 23, 24). We are satisfied that Petitioner sufficiently accounts for the housing feature of claim 1.

37

IPR2020-01521
Patent 10,292,628 B1

   *iv.*  *"[1d] a light permeable cover configured to be located*
      *between tissue of the user and the plurality of detectors when*
      *the noninvasive optical physiological sensor is worn by the*
      *user, wherein the cover comprises an outwardly protruding*
      *convex surface configured to cause tissue of the user to*
      *conform to at least a portion of the outwardly protruding*
      *convex surface when the noninvasive optical physiological*
      *sensor is worn by the user and during operation of the*
      *noninvasive optical physiological sensor, and wherein the*
      *plurality of detectors are configured to receive light passed*
      *through the outwardly protruding convex surface after*
      *attenuation by tissue of the user."*

*(1) Petitioner's Contentions*

    The record supports Petitioner's undisputed contentions as to the
above-noted feature. *See* Pet. 14–17, 27–30. With reference to an annotated
version of Aizawa's Figure 1(b) (reproduced below), Petitioner contends
that "Aizawa teaches a light permeable cover in the form of an acrylic
transparent plate 6 (blue) that is mounted at the detection face 23a over at
least a portion of the housing to cover the at least four detectors (red)." *Id.*
at 27.



Appx07665

The figure above shows Petitioner's annotated and colorized version of
Aizawa's Figure 1(b). Petitioner contends that beyond disclosure that the
light permeable cover is an "acrylic transparent plate that helps to improve
'detection efficiency,' Aizawa does not provide much other detail, for
instance regarding its shape." *Id.* at 14 (citing Ex. 1006 ¶ 30).

Petitioner, however, reasons that one of ordinary skill in the art would
have "looked to Inokawa to enhance light collection efficiency, specifically
by modifying the light permeable cover of Aizawa to include a convex lens."
*Id.* In that regard, Petitioner points to Inokawa's Figure 2. Petitioner's
annotated and colorized version of that figure is reproduced below.



*Id.* at 15. Figure 2 above shows a version of Inokawa's Figure 2 that
emphasizes the shape of lens 27. Petitioner expresses that "Inokawa teaches
that its cover may be either flat . . . such that 'the surface is less prone to
scratches'" or may be in the form of the shape shown above to "increase the
light gathering ability of the LED." *Id.* at 15 (quoting Ex. 1008 ¶ 15); *see*

Appx07666

IPR2020-01521
Patent 10,292,628 B1

Ex. 1003 ¶¶ 92–93.  Petitioner contends that a person of ordinary skill in the art "wanting to achieve improved light collection efficiency over reduced scratch-suseptibility could have modified Aizawa's cover to have a lens shape as per Inokawa."  Pet. 17 (citing Ex. 1003 ¶ 96).  Petitioner also contends that a skilled artisan would have had a reasonable expectation of success in combining those teachings.  *Id.* (citing Ex. 1003 ¶ 96).  Petitioner adds that Aizawa's "transparent acrylic material . . . can be readily formed into a lens-like shape as in Inokawa."  *Id.* (citing Ex. 1003 ¶ 96; Ex. 1023, Fig. 6, ¶¶ 22, 32, 35).

Petitioner colorized and annotated version of Aizawa's Fig. 1(b) (reproduced below) and contends the device resulting from the obvious combination of Aizawa and Onokawa would have replaced the flat cover (left) with a curved one as per Inokawa (right) to "increase the light-gathering ability."  *Id.* at 15 (citing Ex. 1008 ¶ 15).



*Id.* at 16; *see* Ex. 1003 ¶ 94.

Further according to Petitioner: "[a person of ordinary skill in the art] would have understood how to implement Inokawa's lens-shaped cover in Aizawa's device with a reasonable expectation of success."  Pet. 15–17 (citing Ex. 1008, Figs. 16, 17, ¶¶ 15, 106); Ex. 1003 ¶ 98.  The shape of the

40

modified cover in Dr. Kenny's illustration of the proposed modification above is similar to the shape of an LED lens unit illustrated in Exhibit 1023[7] (hereafter "Nishikawa"), referenced by Petitioner and Dr. Kenny in in connection with the proposed unpatentability of claims of the '628 patent based on Aizawa and Inokawa. *Compare* Pet. 16–17 (illustrating proposed modification), *with* Ex. 1023, Fig. 6, ¶¶ 3, 22, 30, 32, 35 (illustrating lens unit 50 used with LED 22, and discussing how to make the illustrated device).

Limitation [1d] additionally reqiures that the outwardly protruding convex surface be "configured to cause tissue of the user to conform to at least a portion of the outwardly protruding convex surface."  With respect to that tissue conforming aspect, Petitioner additionally reasons that Aizawa's light permeable cover "is designed to be pressed on to the skin of the user with pressure" (Pet. 29 (citing Ex. 1001 ¶¶ 6, 26; Ex. 1003 ¶¶ 97–98)) and that implementing the convex shape of Inokawa's lens in Aizawa's light permeable cover "will cause the tissue of the user to further conform around the convex surface of the lens/protrusion when the device is pressed against the tissue" (*id.* at 29–30 (citing Ex. 1003 ¶¶ 97–98)).

### (2)  Patent Owner's Contentions

Patent Owner contends that the evidence does not support Petitioner's argument that it would have been obvious to modify Aizawa's cover to have a convex protrusion, in order to improve detection efficiency by directing incoming light to Aizawa's photodetectors 22, with a reasonable expectation of success.  PO Resp. 16–35; Sur-reply 1–14; Ex. 1004 ¶¶ 48–78.

---

[7]  US 2007/0145255 A1, published June 28, 2007.

IPR2020-01521
Patent 10,292,628 B1

According to Patent Owner, the evidence establishes that Petitioner's proposed modification would direct light *toward the center* of Aizawa's detector 1 where emitter(s) 21 are located, rather than *toward the periphery* where detectors 22 are located.  PO Resp. 16–19; Ex. 2004 ¶¶ 50–57.  Thus, Patent Owner's view is that "a [person of ordinary skill in the art] would ***not*** have expected Inokawa's convex surface to accomplish" the objective of enhancing light collection efficiency relied upon by Petitioner, because Petitioner's proposed modification instead "would direct light ***away*** from the ***periphery***-located detectors" in Aizawa, the opposite result to Petitioner's contention.  PO Resp. 19–22; Ex. 2004 ¶¶ 60–65.

In support, Patent Owner points to Inokawa's Figure 2, in which two arrows illustrate light that passes through the convex protrusion of lens 27 toward the center of Inokawa's pulse sensor 1 where detector 25 is located.  PO Resp. 14 (citing Ex. 1008 ¶ 58); Ex. 2004 ¶¶ 43–44.  Patent Owner also points to the '628 patent's Figure 14B, which illustrates several light rays 1420, 1422 passing through a partially cylindrical protrusion 605 to be centrally focused on detector(s) 1410B.  PO Resp. 18–19 (citing Ex. 1001, 36:56–57, 35:64–66; Ex. 2004 ¶¶ 55–57).  Patent Owner cites portions of Dr. Kenny's deposition testimony that, in Patent Owner's view, support Patent Owner's contentions in these regards.  *See* PO Resp. 2, 18, 19, 23 (citing Ex. 2006, 83:15–84:2, 86:19–87:1, 202:11–204:20).

Patent Owner also asserts that "Dr. Kenny admitted that the impact of Inokawa's convex lens would not be 'obvious' in the context of [the] different configuration of LEDs and detectors" presented by Aizawa.  PO Resp. 20 (citing Ex. 2006, 87:2–6).  For example, Patent Owner points out that "light reaching Aizawa's detectors must travel in an opposite

42

direction from the light in Inokawa." *Id.* at 20–22 (citing Ex. 1006, Fig. 1(b); Ex. 1008, Fig. 2); Ex. 2004 ¶¶ 61–64.  In addition, according to Patent Owner, "Petitioner's combination is particularly problematic because" Aizawa uses "small detectors [22] with small openings [of cavities 23c] surrounded by a ***large*** amount of ***opaque*** material." PO Resp. 22 (citing Ex. 1006, Fig. 1(a)); Ex. 2004 ¶ 65.  In support of its view, Patent Owner cites portions of Dr. Kenny's deposition testimony. *See* PO Resp. 22 (citing Ex. 2006, 257:11–18).

Patent Owner further argues that Dr. Kenny, during his deposition, attempted to evade the foregoing problems with his declaration testimony by "disclaim[ing] Petitioner's reasoning [for obviousness] and assert[ing] new and improper opinions" that undermine the reasoning provided in the Petition.  PO Resp. 2, 23–24 (citing Ex. 1003 ¶ 94; Ex. 2004 ¶ 66; Ex. 2006, 65:15–70:7, 108:21–109:14, 198:6–16, 202:11–204:20; Ex. 2009, 310:1– 20).  For example, Patent Owner asserts that Dr. Kenny's attempt to distinguish between the '628 patent's Figure 14B as illustrating a lens that condenses *collimated* light toward the center, and Aizawa and Inokawa in which the lens focuses *diffuse* light reflected by the user's body, is not persuasive and is not supported by record evidence.  PO Resp. 24–25 (citing Ex. 2006, 170:9–171:5; Ex. 2007, 288:13–289:5, 294:17–298:10, 298:11– 299:18, 423:7–424:18); Ex. 2004 ¶¶ 67–68.  Patent Owner also objects to Dr. Kenny's testimony that, "while a convex lens would generally direct more light to the center," it "would also capture some light that otherwise would not be captured" by Aizawa's detectors 22, as lacking evidentiary support other than in the '628 patent itself which is impermissible hindsight.  PO Resp. 25–26 (citing Ex. 1001, 7:61–63; Ex. 2004 ¶¶ 69–70; Ex. 2006,

43

204:21–206:5, 206:22–208:1; Ex. 2007, 294:17–298:10).  Patent Owner moreover asserts that "Dr. Kenny repeatedly distanced himself from his own combination" of Aizawa and Inokawa by refusing to talk about the specific shape, size, material, and dimensional tolerances of the combination, so, in Patent Owner's view, his testimony falls short because it demonstrates at most only that the references could have been combined.  *Id.* at 2–3, 26–30 (citing Ex. 1003 ¶¶ 94, 103; Ex. 2004 ¶¶ 71–72; Ex. 2006, 51:14–52:16, 75:20–77:2, 91:9–92:13, 96:20–21, 97:11–21, 100:17–101:18, 132:10–18, 154:4–7, 164:8–16, 189:11–190:3; Ex. 2007, 308:12–309:8, 310:18–311:9, 318:3–6, 324:21–325:19, 333:20–335:4).

Indeed, according to Patent Owner, because ordinary skill does not require specific education or experience with optics or optical physiological monitors (*see supra* Section II.B): "It strains credibility that a [person of ordinary skill in the art] . . . could balance all of the factors Dr. Kenny identified" as affecting the performance of a protruding convex lens in an optical physiological sensor to reach the claimed invention.  PO Resp. 30–31 (citing Ex. 2004 ¶¶ 73–75; Ex. 2006, 51:21–52:16, 93:16–94:15, 100:17–101:18; Ex. 2009, 347:14–352:18).  Patent Owner relies on Dr. Kenny's testimony as establishing the complexity of designing optical physiological sensors.  *Id.* at 3–4, 31 (citing Ex. 2006, 86:19–87:6; Ex. 2007, 331:19–332:11, 336:11–337:15).  Patent Owner concludes Petitioner has failed to establish a reasonable expectation of success in reaching the invention of claim 1 based on Aizawa and Inokawa, because Dr. Kenny's testimony on this issue "focuses almost entirely on manufacturing."  *Id.* at 31–32 (citing Ex. 1003 ¶ 96; Ex. 2004 ¶ 75).

Patent Owner moreover asserts Petitioner errs in relying on Nishikawa as supporting the unpatentability of claim 1, because Nishikawa is "not identified as part of" Ground 1A, which instead "includes only two references," Aizawa and Inokawa.  PO Resp. 32 (citing Pet. 1–2, 14; Ex. 1003 ¶¶ 91–96); *id.* at 34 (citing 35 U.S.C. § 312(a)(3); *Intelligent Bio-Systems, Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1369 (Fed. Cir. 2016)).  Patent Owner asserts Dr. Kenny "relies heavily" on Nishikawa, particularly "to inform the specific shape of the cover in his combination, which is found nowhere in Aizawa and Inokawa." *Id.* at 32 (citing Pet. 28; Ex. 2004 ¶¶ 76–77; Ex. 2006, 179:21–180:13; Ex. 2007, 364:2–13; Ex. 2008, 73:8–12).

Furthermore, in Patent Owner's view, Dr. Kenny's reliance on Nishikawa "make[s] no sense" because "Nishikawa's device is not a physiological sensor" but rather is "an encapsulated LED" that "directs ***outgoing*** light through the encapsulation material and thus focuses on the emission of light, not the detection of an optical signal." PO Resp. 34 (citing Ex. 1023, code (57), ¶¶ 3, 32, 35; Ex. 2004 ¶ 78).  Patent Owner contrasts such disclosure with Aizawa and Inokawa, both of which "detect[] ***incoming*** light that passes through the cover and reaches the detectors," and which have a "drastically" smaller scale than Nishikawa's LEDs.  *Id.* at 34–35 (citing Ex. 1008, Fig. 2; Ex. 2004 ¶ 78).

### (3)  Petitioner's Reply

In reply, Petitioner insists "Inokawa's lens enhances the light-gathering ability of Aizawa," which would have motivated an ordinarily skilled artisan "to incorporate 'an Inokawa-like lens [having a convex protrusion] into the cover of Aizawa to increase the light collection

45

efficiency.'"  Pet. Reply 2–3 (bolding omitted) (citing Pet. 14–16, 28;
Ex. 1003 ¶¶ 91–96; Ex. 1008, Fig. 2, ¶¶ 15, 58).  Petitioner dismisses Patent
Owner's and Dr. Madisetti's opposition as being "misinformed" regarding
Inokawa's lens and lenses in general, because "a [person of ordinary skill in
the art] would understand that Inokawa's lens improves 'light concentration
at pretty much all of the locations under the curvature of the lens,' as
opposed to only at a single point at the center."  *Id.* at 3–4 (quoting
Ex. 2006, 164:8–16); *id.* at 1, 3–4 (citing PO Resp. 13; Ex. 1041, 89:12–19;
Ex. 1042, 170:12–20); Ex. 1047 ¶¶ 3–5, 19–23.

For example, Petitioner contends that Patent Owner and Dr. Madisetti
"ignore[] the well-known principle of reversibility" according to Snell's
law.[8]  Pet. Reply 4–7 (underlining omitted) (citing Ex. 1043, 80:20–82:20;
Ex. 1049, 101, 106–111; Ex. 1052,[9,10] 84, 87–92); Ex. 1047 ¶¶ 31–39.
Petitioner contends that Dr. Madisetti was evasive when he was asked to
apply the reversibility principle to the combination of Aizawa and Inokawa
in this case.  Pet. Reply 6 (citing Ex. 1041, 89:12–19, 84:2–85:7).

Petitioner also asserts that Patent Owner and Dr. Madisetti overlook
the fact that light rays reflected by body tissue in the user's wrist, to be
received by detectors in either Aizawa's or Inokawa's pulse sensor, will be

---

[8]  Snell's law describes how a light ray will be refracted when passing
between two mediums having different indices of refraction.  *See* Ex. 1047
¶ 10 (describing and illustrating Snell's law).

[9]  Eugene Hecht, *Optics* (2nd ed. 1990).

[10] It is apparent that the page numbering identified by Petitioner for Exhibit
1052 refers to the documents native page numbering and not the page
numbering of the exhibit appearing at the bottom, middle of each page.  For
clarity and consistency, in this Decision, we also use the same page
numbering as Petitioner for Exhibit 1052.

IPR2020-01521
Patent 10,292,628 B1

"scattered" and "diffuse" and, therefore, will approach the detectors "from various random directions and angles." Pet. Reply 7–8 (citing Ex. 1046, 803; Ex. 2012, 52, 86, 90); *id.* at 8–10 (annotating Inokawa's Fig. 2 to illustrate the cause and nature of the back-scattering); Ex. 2020 ¶ 128; Ex. 1047 ¶¶ 6–9. This scattered and diffuse light, according to Petitioner, means that Inokawa's "lens cannot focus all incoming light at a single point" at a central location as Patent Owner would have it. Pet. Reply 8 (citing Ex. 1047 ¶ 6; Ex. 2006, 163:12–164:2). Petitioner asserts this is due to Snell's law, and provides several illustrations to illustrate why. *Id.* at 8–13 (citing Ex. 1043, 80:20–82:20; Ex. 1049, 101; Ex. 1052, 84; Ex. 1047 ¶¶ 6–18; Ex. 2012, 52, 86, 90; Ex. 2020 ¶ 128).

Due to the random nature of this scattered light, Petitioner explains that one of ordinary skill in the art would have understood that "Inokawa's lens provides at best a slight refracting effect, such that light rays that otherwise would have missed the detection area are instead directed toward that area as they pass through the interface provided by the lens." Pet. Reply 14 (citing Ex. 1047 ¶ 18). Petitioner applies this understanding to Aizawa, and contends that using a lens with a convex protrusion in Aizawa would "enable backscattered light to be detected within a circular active detection area surrounding" a central light source, thereby "allowing a larger fraction of the backscattered light to reach the areas covered by the lens" including the circular detection area. *Id.* (citing Ex. 1047 ¶ 18–22; Ex. 1046, 803; Ex. 2006, 164:8–16, 204:21–205:12; Ex. 2012, 86, 90). Dr. Kenny provides the following illustration of this alleged effect. *See* Ex. 1047 ¶ 21; Pet. Reply 14.

IPR2020-01521
Patent 10,292,628 B1



Here, Dr. Kenny has excerpted a portion of his illustration of using a lens with a convex protrusion (in blue) on top of Aizawa's pulse rate detector (with a photodetector, in red) (*see* Ex. 1003 ¶ 94), and added several dotted lines that are orthogonal to the lens surface. Pet. Reply 15–16; Ex. 1047 ¶¶ 20–22. Dr. Kenny testifies that Snell's law indicates "the incoming light rays are refracted in a way that deflects incoming rays somewhat towards these orthogonal lines," and that because "these orthogonal lines vary in orientation most rapidly near the edge, where the illustrated curvature of the lens surface is the greatest," using this lens in Aizawa "would lead to an improvement in the light concentration at the location of the detectors." Ex. 1047 ¶¶ 21–22.

Petitioner further contends that one of ordinary skill in the art, upon reading Inokawa's disclosure that its lens 27 "makes it possible to increase the light-gathering ability of the LED" in an optically-based pulse sensor device (Ex. 1008 ¶ 15), would have understood that this "general benefit" could also be achieved within the context of Aizawa's optically-based pulse sensor device, and is not limited to "the exact" structure of Inokawa's device. Pet. Reply 16 (citing Ex. 1003 ¶¶ 60, 93–95; Ex. 1047 ¶ 23; Ex. 2006, 88:21–89:1, 89:21–90:3).

IPR2020-01521
Patent 10,292,628 B1

Petitioner additionally argues that Dr. Madisetti's testimony in support of Patent Owner's position ignores the application of Snell's law to the random nature of backscattered light in the context of Aizawa's and Inokawa's pulse sensors, which measure light *reflected* (i.e., backscattered) by the user's tissue. Pet. Reply 14 (citing Ex. 1042, 166:12–182:3); Ex. 1047 ¶ 17. Petitioner similarly dismisses the applicability of Figure 14B of the '628 patent as illustrating the operation of a *transmittance*-type of sensor that measures the attenuation of collimated light transmitted through the user's body tissue, rather than the *reflectance*-type sensors of Aizawa and Inokawa. *Id*. at 18–19 (citing Ex. 1001, 35:62–64, Fig. 14I; Ex. 1047 ¶¶ 24–28; Ex. 2007, 287:12–289:5).

Petitioner further maintains that Patent Owner's argument that Petitioner's illustrations of the light-focusing properties of a convex lens discussed in the Petition filed in IPR2020-01520 (Ex. 2019, 39) and relied upon by Dr. Kenny (Ex. 2020, 119–120) does not demonstrate "that a convex lens directs all light to the center." Pet. Reply 18–19 (citing PO Resp. 16–17, 23; Ex. 1041, 41:7–22, 60:7–61:6). Petitioner contends these illustrations, instead, "are merely simplified diagrams included to illustrate . . . one example scenario (based on just one ray and one corpuscle) where a light permeable cover can 'reduce a mean path length of light traveling to the at least four detectors'" as recited in claim 12. *Id.* (citing Pet. 39; Ex. 2020 ¶¶ 119–120; Ex. 1047 ¶¶ 29–30).

### (4) Patent Owner's Sur-reply

Patent Owner submits that Petitioner's Reply improperly presents several new arguments, relying on new evidence, as compared with the Petition. *See, e.g.*, Sur-reply 3 n.3 (objecting to the illustration provided at

49

Pet. Reply 14 as being "new"); *id.* at 5 ("After recognizing the fundamental error in its proposed combination, Petitioner now attempts to rewrite its petition" concerning how a lens with a convex protrusion would focus light in Aizawa's device); *id.* at 7 ("Petitioner's new theory [concerning reversibility of light rays] is improper, denying [Patent Owner] of the opportunity to respond with expert testimony, and should be rejected."); *id.* at 10 ("Petitioner next asserts a number of other new theories found nowhere in the petition.").

Patent Owner also contends that Petitioner mischaracterizes Patent Owner's position, which is not that Inokawa's lens with a convex protrusion "direct[s] '***all***' light 'only at a ***single point*** at the center'" of the sensor as Petitioner characterizes it. Sur-reply 1–2 & n.2 (quoting Pet. Reply 3–4, and citing PO Resp. 2, 14–17, 23–25, 27 and Ex. 2027, 63:7–64:6, 94:20–96:1, 96:18–97:7). Patent Owner's position, rather, is that Inokawa's lens condenses more light (not necessarily all light) "***towards*** a more central location" (not necessarily at a single, central point) relative to Aizawa's flat cover. *Id.* at 2–3 (quoting PO Resp. 18, and citing Ex. 2004 ¶¶ 34, 44, 51, 53, 54, 57, 67).

Patent Owner moreover asserts "[t]here can be no legitimate dispute that a convex surface directs light centrally (and away from the periphery)," so Petitioner errs in its view that a [person of ordinary skill in the art] would have used a convex lens with Aizawa's detector 1 to improve its light detection efficiency, because Aizawa's photodetectors 22 are disposed at the periphery of the device. Sur-reply 3–6 (citing PO Resp. 15–18; Ex. 2006, 164:8–16, 166:10–17, 170:22–171:5; Ex. 2020 ¶¶ 119, 200; Ex. 2027, 181:9–182:5). Patent Owner contends that Petitioner's argument "that

IPR2020-01521
Patent 10,292,628 B1

Inokawa would improve light-gathering at all locations, ***regardless*** of the location of the LEDs and detectors" is belied by Dr. Kenny's testimony that "Inokawa's benefit would ***not*** be clear if Inokawa's LEDs and detectors were moved" and "confirmed that a convex surface would direct light toward the center of the underlying sensor." *Id.* at 6 (citing Pet. Reply 3–4; Ex. 2006, 86:19–87:6, 202:11–204:20).

Patent Owner argues that Petitioner's discussion of the principle of reversibility is "irrelevant" because it "assumes ideal conditions that are not present when tissue scatters and absorbs light." Sur-reply 7–8 (citing Ex. 2027, 17:12–19:2, 29:11–30:7, 31:8–32:3, 38:17–42:6, 207:9–209:21, 210:8–6). The random nature of backscattered light, in Patent Owner's view, "hardly supports Petitioner's argument that light will necessarily travel the same paths regardless of whether the LEDs and detectors are reversed," and is irrelevant to the central issue presented here of "whether a convex surface—***as compared with a flat surface***—would collect and focus additional light on Aizawa's peripherally located detectors." *Id.* at 8–9 (citing Ex. 2006, 86:19–87:6; Ex. 2027, 212:3–14).

In response to Petitioner's argument that "due to its protruded shape, Inokawa's lens 'provides an opportunity to capture some light that would otherwise not be captured'" in Aizawa (Pet. Reply 15), Patent Owner asserts that "Dr. Kenny was unable to support this new theory with any evidence." Sur-reply 11 (citing Ex. 2007, 294:17–298:10). Patent Owner further contends that Petitioner "fails to consider the greater ***decrease*** in light at the detectors due to light redirection to a ***more*** central location." *Id.* at 13 (citing Pet. Reply 20; Ex. 2027, 19:16–21:8). Patent Owner expresses that "the circle of backscattered light's intensity '***decreases*** in direct proportion

51

to the *square of the distance* between the photodetector and the LEDs,'" so "any purported signal obtained from light redirected from the sensor's *edge* would be relatively weak and fail to make up for the much greater loss of signal strength when light is redirected away from the detectors and towards a more central position." *Id.* (citing Ex. 1015, 168; Ex. 2027, 49:17–50:13, 57:10–22).

### (5) Discussion

Upon review of the foregoing, we conclude that a preponderance of the evidence supports Petitioner's view that it would have been obvious to modify Aizawa's cover 6 to include a convex lens or protrusion like that taught in Inokawa, in order to increase the amount of backscattered light that will be received by Aizawa's four peripheral detectors 22, as compared with Aizawa's existing flat cover.

It is clear that Aizawa's and Inokawa's pulse sensors both gather data by emitting light into the user's wrist tissue, and collecting light that reflects back to the sensor from within the user's tissue. *See, e.g.*, Ex. 1006, Figs. 1(b), 2 (sensor 2 has emitter 21 and four detectors 22, all facing a user's wrist 10); Ex. 1008, Figs. 1, 2 (sensor 1 has two emitters 21, 23 and one detector (photodiode 25), all facing the user's wrist when held in place by wristband 5). Dr. Kenny testifies, and Patent Owner agrees, that the reflection of this light by the user's wrist tissue randomizes the propagation direction of the reflected light rays. *See* Ex. 1003 ¶ 128; Ex. 1047 ¶¶ 6–7; Ex. 2020 ¶ 128; Sur-reply 7–8 ("Even Petitioner admits that tissue randomly scatters and absorbs light rays . . . ."). This reflection principle is illustrated by Dr. Kenny's annotations to Inokawa's Figure 2 reproduced below:

IPR2020-01521
Patent 10,292,628 B1



Here, Dr. Kenny has modified Inokawa's Figure 2 (1) by removing two black arrows, (2) by coloring Inokawa's light detector in red and Inokawa's two light emitters in green, and (3) by adding several green arrows to illustrate the various directions that light rays may be directed after impinging on and reflecting off different tissues in the user's wrist. Ex. 1047 ¶¶ 6–7.

This randomized direction of reflected light rays results in backscattered light that is diffuse, rather than collimated, in nature. Figure 4.12 of Exhibit 1052 illustrates the difference between diffuse and collimated light, and is reproduced below:



Appx07680

IPR2020-01521
Patent 10,292,628 B1

This figure provides at left a photograph and an illustration showing incoming collimated light reflecting from a smooth surface, and at right a photograph and an illustration of incoming collimated light reflecting from a rough surface. *See* Ex. 1052, 87–88. The smooth surface provides specular reflection, in which the reflected light rays are collimated like the incoming light rays. *See id.* The rough surface provides diffuse reflection, in which the reflected light rays travel in random directions. *See id.*

This diffuse nature of the light reflected from the user's wrist tissue, which both Aizawa and Inokawa aim to collect to generate pulse data, suggests that a lens might be useful to increase the amount of collected light and thereby increase the reliability of the pulse data generated using the collected light. Indeed, that is taught by Inokawa. Inokawa describes using its lens 27 to "increase the light-gathering ability" of Inokawa's light photodiode or detector 25. Ex. 1008 ¶¶ 15, 58. Although Inokawa refers to the "LED" such as emitters 21, 23 in that regard (*id.* ¶ 15), rather than photodiode 25, it is undisputed that photodiode 25 is the only component of Inokawa's sensor 1 that gathers light. Furthermore, there is also no dispute that Inokawa's lens 27 is understood to be shaped as a convex protrusion. *See, e.g.*, Ex. 1003 ¶¶ 92–93 (characterizing Inokawa as teachings a "convex protrusion that acts as a lens"); PO Resp. 1 (describing Inokawa as teaching a "convex lens"). Thus, Inokawa demonstrates that it was known in the art prior to the '628 patent to use a lens comprising a convex protrusion to focus diffuse light reflected from body tissue on to the light detecting elements of a wrist-worn pulse sensor, and to increase the light gathered by the sensor thereby improving the device's calculation of the user's pulse.

54

IPR2020-01521
Patent 10,292,628 B1

A preponderance of the evidence supports Petitioner's view that it would have been obvious for a person of ordinary skill in the art to apply Inokawa's lens technology to Aizawa's wrist-worn pulse sensor, so as to improve its light collection in a similar manner versus Aizawa's existing flat cover. That is illustrated by the following illustrations provided by Dr. Kenny:



The illustration at left modifies Aizawa's Figure 1(b) to show how Aizawa's existing flat cover may be modified to incorporate a convex protrusion (in blue) to act as a light-focusing lens, which covers Aizawa's four peripheral light detectors (two shown in red) and central light emitter (colored green). *See* Ex. 1003 ¶ 94. The illustration at right zooms in on the portion of this modification covering one of the detectors, and adds several dotted lines that are orthogonal to the lens surface. *See* Ex. 1047 ¶¶ 20–21. We are persuaded by Dr. Kenny's testimony that Snell's law indicates "the incoming light rays are refracted in a way that deflects incoming rays somewhat towards these orthogonal lines," and that because "these orthogonal lines vary in orientation most rapidly near the edge, where the illustrated curvature of the lens surface is the greatest," using the illustrated lens taught by Aizawa and Inokawa "would lead to an improvement in the light concentration at the location of the detectors." *Id.* ¶¶ 18–22 (applying Snell's law to the prior art); *id.* ¶¶ 8–17 (discussing Snell's law in the abstract).

Appx07682

IPR2020-01521
Patent 10,292,628 B1

Patent Owner correctly notes that Inokawa's single detector 25 is located in the central portion of Inokawa's sensor 1, whereas Aizawa's four detectors 22 are located more towards the periphery of Aizawa's sensor 2. *Compare* Ex. 1008, Fig. 2, *with* Ex. 1006, Figs. 1(a)–1(b). Nevertheless, Petitioner's proposed modification of Aizawa takes that circumstance into account, as can be seen by the following comparison between Inokawa's sensor and Petitioner's proposed modification of Aizawa's sensor:



The illustration at left annotates Inokawa's Figure 2 to identify the central detector in red and the lens in light blue (*see* Ex. 1003 ¶ 95), and the illustration at right annotates Petitioner's proposed modification of Aizawa to illustrate the peripheral detectors in red and the lens in light blue (*see id.* ¶ 97). As can be seen, the lenses are not identical. In Inokawa the lens's curvature is most pronounced at the center of the lens near the central detector, and in the proposed modification to Aizawa, the lens's curvature is most pronounced at the edges of the lens near the peripheral detectors. Thus, Dr. Kenny's proposed modification of Aizawa takes Inokawa's general teaching of using a convex protrusion lens to increase the amount of incoming light directed to a light detector, and applies it to the four light detectors of Aizawa. *See, e.g., id.* ¶¶ 95–97; Ex. 1047 ¶¶ 8–22.

We are cognizant of Patent Owner's contention that Petitioner's ground "improperly" relies upon a reference, Nishikawa, that was not

56

IPR2020-01521
Patent 10,292,628 B1

identified as a part of the ground of unpatentability styled as being based on
Aizawa and Inokawa. PO Resp. 32. As Patent Owner observes, Dr. Kenny
characterizes his testimony as being "inspired by" or "motivated" in part
based on Nishikawa's disclosure when it comes to the shape of a convex
lens. *See, e.g.*, PO Resp. 33–34 (citing Ex. 2006, 179:21–180:13; Ex. 2007,
364:2–13; Ex. 2008, 73:8–12). We, however, disagree with Patent Owner
that any impropriety arises from Dr. Kenny's contemplation of the teachings
of Nishikawa in connection with a convex shape of a lens for a physiological
sensor. The nature of Petitioner's and Dr. Kenny's consideration of
Nishikawa is explained in the Petition, even if Nishikawa is not listed as a
third reference in the identification of the ground. *See* Pet. 16–17
(discussing Nishikawa (Ex. 1023) and Dr. Kenny's testimony concerning
Nishikawa (Ex. 1003 ¶¶ 95, 96) in proposing the unpatentability of claims of
the '628 patent.) Indeed, it follows readily from the Petition that a skilled
artisan would have appreciated that Nishikawa's teachings provide insight as
to how "the transparent acrylic material used to make Aizawa's plate can be
readily formed into a lens-like shape as in Inokawa." Pet. 17. Nishikawa
describes how its "lens unit 50" can be a transparent resin formed in the
shape illustrated in Figure 6 by injection molding. Ex. 1023 ¶¶ 22, 32, 35.
Dr. Kenny also explains that Nishikawa's lens shape design "is intended to
provide curvature in the lens where it can do the most good and otherwise
try to avoid excess use of material in order to create curvature in locations
where it wouldn't do any good." Ex. 2006, 179:21–180:13 (emphasis
added).

Moreover, we observe that a rejection based on obviousness
"require[s] an analysis that reads the prior art in context, taking account of

IPR2020-01521
Patent 10,292,628 B1

'demands known to the design community,' 'the background knowledge possessed by a person having ordinary skill in the art,' and 'the inferences and creative steps that a person of ordinary skill in the art would employ.'" *Randall Mfg. v. Rea*, 733 F.3d 1355, 1362 (Fed. Cir. 2013) (quoting *KSR*, 550 U.S. at 418). Furthermore, record evidence can be useful to "demonstrate the knowledge and perspective one of ordinary skill in the art." *Id.; see also Ariosa Diagnostics v. Verinata Health Inc.,* 805 F.3d 1359, 1365 (Fed. Cir. 2015) ("Art can legitimately serve to document the knowledge that skill artisan would bring to bear in reading the prior art identified as producing obviousness.")

As noted above, Dr. Kenny makes clear that his view as to obviousness of the claims of the '628 patent was "inspired by" or "motivated" in part by Nishikawa's teachings as to shapes generally known to those in the art in considering manufacturing a lens. *See, e.g.*, Ex. 2007, 364:2–13; Ex. 2008, 73:12–21. We conclude that the record establishes that Nishikawa's teachings are representative of background knowledge of one of ordinary skill in the art and provide context and perspective of a skilled artisan as to the type of shapes available for the convex protruding surface disclosed in Inokawa. That Dr. Kenny considered record evidence cited in the Petition as informing his view of what a skilled artisan would understand as to known types of lens shapes as a part of the Aizawa and Inokawa ground does not establish, in our view, any impropriety as part of that ground.

Patent Owner also contends that Petitioner's modification of Aizawa "fails to consider the greater *decrease* in light at the detectors due to light redirection to a *more* central location." Sur-reply 12–13 (citing Ex. 1015,

IPR2020-01521
Patent 10,292,628 B1

168; Ex. 2027, 19:16–21:8, 49:17–50:13, 57:10–22). Dr. Kenny
acknowledges that, when a convex protrusion is added to Aizawa's flat
cover, "*some . . .* [light] rays that would have hit the detectors [using a flat
cover] are refracted away from the detectors" by the convex protrusion. *See*
Ex. 2027, 19:16–21:8 (emphasis added). Dr. Kenny also acknowledges
"there is a decrease in the light as you move away from the location of the
emitter towards the perimeter of the sensor," which is a "rapid" decrease,
perhaps "with the square of the distance" or "exponential[ly]." *Id.* at 49:1–
50:13, 57:10–22.

Dr. Kenny, nonetheless, maintains that a person of ordinary skill in
the art "would understand how to take advantage of the detector locations
and the shape of this convex surface *so as to obtain an improvement [in
Aizawa] in the amount of light arriving at the detectors*," despite the
foregoing considerations. *Id.* at 20:9–22:18 (emphasis added) (citing
Ex. 1047 ¶ 44), 213:12–19, 214:6–215:6. That testimony is persuasive. In
particular, the difference in the length traveled by the light rays depending
on whether Aizawa's wrist-worn sensor 2 uses a flat plate 6 or a convex
plate 6 is extremely small. *See, e.g.*, Ex. 1006, Fig. 1(b), ¶ 26 (dotted line
arrows show paths of light from emitter 21 to reflect off artery 11 in wrist 10
and return to detectors 22); *id.* at Fig. 2 (showing detector 1 mounted on a
user's wrist, suggesting the general scale of detector 1); Ex. 1047 ¶¶ 8–22
(discussing typical light refractions by lenses in wrist-worn pulse sensors).
Based on this scale, it is reasonable to conclude, as Dr. Kenny does, that the
central light *lost* by adding a protrusion will be outweighed by the peripheral
light *gained* by adding a protrusion, despite the greater distance traveled by

59

IPR2020-01521
Patent 10,292,628 B1

the peripheral light rays and the concomitant loss of intensity acknowledged by Dr. Kenny.

Patent Owner additionally asserts, and Dr. Madisetti testifies, that Petitioner's combination of Aizawa and Inokawa is "problematic" because it overlooks the "small" size of Aizawa's detectors 22 and the openings or cavities 23c in which they are housed. *See* PO Resp. 22 (citing Ex. 1006, Figs. 1(a)–1(b), Ex. 2004 ¶ 65; Ex. 2006, 257:11–18). Patent Owner, however, does not meaningfully articulate what significance the size of Aizawa's detector components have in the obviousness evaluation based on the teachings of the prior art.

We additionally do not agree with Patent Owner's argument that Petitioner's Reply presents new arguments and evidence that should have been first presented in the Petition. *See, e.g.*, Sur-reply 2–14. The Petition proposed a specific modification of Aizawa to include a convex protrusion in the cover, for the purpose of increasing the light gathering ability of Aizawa's device. *See, e.g.*, Pet. 13–17. Patent Owner, in its Response, then challenged that contention with several arguments that Petitioner's proposed convex protrusion would not operate in the way the Petition alleges it would operate. *See, e.g.*, PO Resp. 12–41. In its Reply, Petitioner proceeded to provide arguments and evidence attempting to rebut the contentions in the Patent Owner Response. *See* PTAB Consolidated Trial Practice Guide (Nov. 2019)[11], 73 ("A party also may submit rebuttal evidence in support of its reply."). The Reply does not change Petitioner's theory for obviousness; rather, the Reply presents more argument and evidence in support of the

---

[11] Available at https://www.uspto.gov/TrialPracticeGuideConsolidated.

IPR2020-01521
Patent 10,292,628 B1

same theory for obviousness presented in the Petition. *Compare* Pet. 13–16, *with* Reply 2–20.

Patent Owner finally argues that a conclusion of obviousness "strains credibility" because the level of ordinary skill in the art (*see supra* Section II.B) does not require specific education or experience with optics or optical physiological monitors. *See, e.g.*, PO Resp. 30–31. We disagree. Concerning motivation, an ordinarily skilled artisan would have readily appreciated from the record at hand that: (1) Aizawa's detector 1 operates by gathering light data with its photodetectors 22; (2) an optical lens would be useful to focus the light on to the photodetectors; and (3) optical lenses often are formed by providing a convex protrusion in the lens to focus light. Indeed, Inokawa discloses such utility, function, and structure as a part of its convex lens. *See, e.g.*, Ex. 1008 ¶¶ 15, 58, Fig. 2.

Concerning reasonable expectation of success in using a convex protrusion lens to increase the amount of light directed to Aizawa's photodetectors, we rely on Dr. Kenny's testimony that a person of ordinary skill in the art would have understood that a lens operates by increasing the light concentration most where the curvature of the lens is the greatest, which leads to Dr. Kenny's proposed lens for use in Aizawa. *See, e.g.*, Ex. 1003 ¶¶ 92–95; Ex. 1047 ¶¶ 8–10, 15–22; Ex. 2006, 179:21–180:13, 202:11–20. We are persuaded that a person of ordinary skill in the art would have understood this general concept of optics.

Thus, we conclude that one of ordinary skill in the art would have had adequate reason to replace Aizawa's flat cover 6 with a cover comprising a convex protrusion, to improve light detection efficiency, and would have had a reasonable expectation of success in doing so.

### v. Summary

Based on the foregoing arguments and evidence, we conclude that Petitioner has demonstrated by a preponderance of the evidence that claim 1 would have been obvious over Aizawa and Inokawa.

### 4. Claims 2–15, 17, 20–26, and 28

As with claim 1, Petitioner provides argument and evidence, including testimony from Dr. Kenny, in support of its position that claims 2–15, 17, 20–26, and 28 are unpatentable over Aizawa and Inokawa. Pet. 30–43. Claims 2–6 ultimately depend from claim 1. Claims 7 and 20 are independent claims that are similar in scope to claim 1. Claims 8–15, 21–26, and 28 ultimately depend from either claim 7 or claim 20. Patent Owner does not advance any arguments for claims 2–15, 17, 20–26, and 28 that are distinct from those provided for claim 1. For the same reasons set forth in section II.D.3 above, we find Patent Owner's arguments unavailing as to claims 2–15, 17, 20–26, and 28. We conclude that Petitioner has established by a preponderance of the evidence that claims 2–15, 17, 20–26, and 28 are also unpatentable based on Aizawa and Inokawa.

### E. Obviousness over Aizawa, Inokawa, and Ohsaki

Petitioner also contends that claims 1–15, 17, 20–26, and 28 of the '628 patent would have been obvious over the combined teachings of Aizawa, Inokawa, and Ohsaki. Pet. 43–46.

### 1. Overview of Ohsaki (Ex. 1014)

Ohsaki is a U.S. patent application publication titled "Wristwatch-type Human Pulse Wave Sensor Attached on Back Side of User's Wrist," and

IPR2020-01521
Patent 10,292,628 B1

discloses an optical sensor for detecting a pulse wave of a human body.
Ex. 1014, code (54), ¶ 3.  Figure 1 of Ohsaki is reproduced below.



Figure 1 illustrates a cross-sectional view of pulse wave sensor 1 attached on
the back side of user's wrist 4.  *Id.* ¶¶ 12, 16.  Pulse wave sensor 1 includes
detecting element 2 and sensor body 3.  *Id.* ¶ 16.

Figure 2 of Ohsaki, reproduced below, illustrates further detail of
detecting element 2.



Figure 2 illustrates a mechanism for detecting a pulse wave.  *Id.* ¶ 13.
Detecting element 2 includes package 5, light emitting element 6, light
receiving element 7, and translucent board 8.  *Id.* ¶ 17.  Light emitting

63

element 6 and light receiving element 7 are arranged on circuit board 9 inside package 5.  *Id.* ¶¶ 17, 19.

"[T]ranslucent board 8 is a glass board which is transparent to light, and attached to the opening of the package 5.  A convex surface is formed on the top of the translucent board 8."  *Id.* ¶ 17.  "[T]he convex surface of the translucent board 8 is in intimate contact with the surface of the user's skin," preventing detecting element 2 from slipping off the detecting position of the user's wrist.  *Id.* ¶ 25.  By preventing the detecting element from moving, the convex surface suppresses "variation of the amount of the reflected light which is emitted from the light emitting element 6 and reaches the light receiving element 7 by being reflected by the surface of the user's skin."  *Id.*

### 2.  *Discussion*

As noted above, we conclude that Petitioner has established that claims 1–15, 17, 20–26, and 28 would have been obvious over the combined teachings of Aizawa, and Inokawa.  Petitioner points to Ohsaki as providing "additional motivation and rationale for a [person of ordinary skill in the art] to modify Aizawa to include a 'light permeable cover comprising a protrusion' as per element [1d]."  Pet. 45 (citing Ex. 1003 ¶¶ 142–146).  In that regard, Petitioner contends that "Ohsaki teaches that adding a convex surface to the light permeable cover (i.e., translucent board 8) can help prevent the device from slipping on the tissue when compared to a flat cover."  *Id.* at 45–46 (citing Ex. 1014 ¶ 25; Ex. 1003 ¶ 144).  Petitioner also contends that a person of ordinary skill in the art "reviewing Aizawa and Ohsaki would have recognized Ohsaki's use of a convex protrusion in its

IPR2020-01521
Patent 10,292,628 B1

light permeable cover as a desirable configuration that would help to further prevent slippage of Aizawa's device." *Id.* at 46.

Patent Owner first contends that Ohsaki does not remedy the proposed deficiencies that it had argued with respect to the teachings of Aizawa and Inokawa, e.g., a sensor having multiple emitters and at least four detectors. PO Resp. 42–43. As discussed above, however, we do not agree that the teachings of the prior art are deficient as to such features.

Patent Owner also challenges Petitioner's position that a skilled artisan would have viewed Ohsaki's teachings as providing reason to implement a convex surface as a part of Aizawa's sensor device. In that regard, Patent Owner discounts Ohsaki's teachings of a convex cover as providing any slippage alleviating benefit if such a cover is implemented in Aizawa's sensor device. PO Resp. 43–45; Sur-reply 17–20.

We do not agree with Patent Owner. Patent Owner maintains that any benefits that Ohsaki attributes to a convex protrusion are realized only when a sensor and convex surface are placed on the back of the user's wrist, which is alleged to be opposite side of the wrist taught by Aizawa. Yet, we note that Petitioner does not propose bodily incorporating the references; Petitioner simply proposes adding a convex cover to Aizawa's sensor, without discussing where Aizawa's sensor is used. *See, e.g.*, Pet. 45–46. In other words, Petitioner's proposed modification does not dictate any particular placement, whether on the palm side or back side of the wrist.

To be sure, Ohsaki's Figures 3A–3B compare the performance of detecting element 2, including its translucent board 8 having a convex protrusion, and show better performance for a user in motion when the element is attached to the back side of the wrist versus the front side of the

65

IPR2020-01521
Patent 10,292,628 B1

wrist.  *See* Ex. 1014 ¶¶ 23–24, Figs. 3A–3B.  We, however, do not agree that these figures support Dr. Madisetti's conclusion that "Ohsaki indicates a convex surface only prevents slipping on the back (i.e., watch) side of the wrist in a specific orientation, but tends to slip when used in different locations or orientations" such as the palm side of the wrist—particularly in comparison to a flat surface such as Aizawa's.  *See, e.g.*, Ex. 2004 ¶¶ 93.  Instead, Ohsaki acknowledges that, even when the detecting element is located "on the front [palm] side of the user's wrist 4, *the pulse wave can be detected well* if the user is at rest."  Ex. 1014 ¶ 23 (emphasis added).  Thus, Ohsaki discloses that, in at least some circumstances, a convex surface located on the front of the user's wrist achieves benefits.  *Id.*  Notably also, the claims of the '628 patent are not limited to detection during movement or exercise.

Dr. Kenny testifies that a person of ordinary skill in the art would have understood from Ohsaki that a convex protrusion will help prevent slippage, even in the context of Aizawa's sensor.  *See* Ex. 1003 ¶¶ 144–145; Ex. 1047 ¶¶ 50–52.  In our view, Dr. Kenny's testimony is consistent with the plain disclosure of Ohsaki.  We are cognizant of Dr. Madisetti's opposing testimony.  *See, e.g.*, Ex. 2004 ¶¶ 93–95.  For instance, Dr. Madisetti testifies that: (1) Ohsaki's disclosure on this point is "exceptionally limited" (*id.* ¶ 93); (2) "a [person of ordinary skill in the art] would have believed that adding Ohsaki's protruding surface would have disrupted the improved adhesion properties reported for Aizawa's flat plate" (*id.* ¶ 95); and (3) Ohsaki's teachings are "incompatible with Aizawa's sensor" (*id.*).

IPR2020-01521
Patent 10,292,628 B1

We do not disagree with Dr. Madisetti's views as to what a skilled artisan would have gleaned from the teachings of the prior art. It is true that Aizawa's plate 6 is illustrated as having a flat surface (Ex. 1006, Fig. 1(b)), and that Aizawa states the plate "improve[s] adhesion" (*id.* ¶ 13). Aizawa further states: "the above belt 7 is fastened such that the acrylic transparent plate 6 becomes close to the artery 11 of the wrist 10," and "[t]hereby, adhesion between the wrist 10 and the pulse rate detector 1 is improved." *Id.* ¶ 26. Those disclosures, however, indicate that the improved adhesion is provided by the acrylic material of plate 6, not the shape of the surface of the plate, which is never specifically addressed. *See also id.* ¶¶ 30, 34 ("Since the acrylic transparent plate 6 is provided . . . adhesion between the pulse rate detector 1 and the wrist 10 can be improved . . . ."). Aizawa does not associate this benefit of improved adhesion with the surface shape of the plate, but rather, with the existence of an acrylic plate to begin with.

Furthermore, Ohsaki clearly teaches that the convex surface of its translucent board 8 "is in intimate contact with the surface of the user's skin" such that "it is prevented that the detecting element 2 slips off the detecting positions of the user's wrist 4." Ex. 1014 ¶ 25; *see also id.* ¶ 27 ("The detecting element 2 is stably fixed to the user's wrist 4."). We credit Dr. Kenny's testimony, over that of Dr. Madisetti, that a skilled artisan would have been motivated by such teachings to apply a cover with a convex surface to Aizawa to improve that similar device in the same way and to yield predictable results, i.e., to resist movement of the sensor on the user's wrist. *See, e.g.*, *See* Ex. 1003 ¶¶ 144 ("[a]mong other thing, Ohsaki teaches that adding a convex surface to its translucent board 8 (i.e., light permeable cover) can help prevent the device from slipping on the tissue of

67

IPR2020-01521
Patent 10,292,628 B1

the wearer compared to using a flat cover without such a protrusion" (citing Ex. 1014 ¶ 25)), 145 ("a [person of ordinary skill in the art] in possession of both Aizawa and Ohsaki would have recognized that Ohsaki's addition of a convex protrusion to its light permeable cover could be similarly implemented in Aizawa's device to help achieve the two references' shared goal of minimizing slippage" (citing Ex. 1006 ¶¶ 26, 30)); Ex. 1047 ¶¶ 50–52. We, thus, are persuaded that a person of ordinary skill in the art would have been motivated to modify Aizawa as proposed, and would have had a reasonable expectation of success in doing so. The evidence of record adequately demonstrates that a skilled artisan would have appreciated that adding a convex cover, such as that taught by Ohsaki, would have improved adhesion between a sensor, such as that of Aizawa, and a user's skin, thus aiding in the prevention of slippage of the sensor device on the user's skin.

Accordingly, we conclude that the record adequately supports Petitioner's contentions by a preponderance of the evidence that claims 1–15, 17, 20–26, and 28 would have been obvious in view of Aizawa, Inokawa, and Ohsaki.

### F.  *Obviousness over Aizawa, Inokawa, Mendelson-2006, and Beyer*

Petitioner contends that claims 18, 19, 29, and 30 are unpatentable based on Aizawa, Inokawa, Mendelson-2006, and Beyer. Pet. 46–55. Claim 18 depends from claim 7 and includes features directed to a processor that is configured to receive signals indicative of a physiological parameter of a wearer and output information of those parameters to a mobile phone. Ex. 1001, 46:1–10. Claim 19 depends from claim 18 and adds the requirement of a "touch-screen display." *Id.* at 46:10–11. Claim 29 depends from claim 20 and adds a processor features similar to that set forth in

IPR2020-01521
Patent 10,292,628 B1

claim 18. *Id.* at 47:1–5. Claim 30 depends from claim 29 and adds the feature of a touch-screen display. *Id.* at 47:6–7.

### 1. *Overview of Mendelson-2006 (Ex. 1016)*

Mendelson-2006 is a journal article titled "A Wearable Reflectance Pulse Oximeter for Remote Physiological Monitoring," and discloses a wireless wearable pulse oximeter connected to a personal digital assistant ("PDA"). Ex. 1016, 912.

Figure 1 of Mendelson-2006 is reproduced below.



Figure 1 illustrates a sensor module attached to the skin (top), and a photograph of a disassembled sensor module and receiver module (bottom). The sensor module includes an optical transducer, a stack of round printed circuit boards, and a coin cell battery. *Id.* at 913.

IPR2020-01521
Patent 10,292,628 B1

Figure 2 of Mendelson-2006 is reproduced below.



Figure 2 depicts a system block diagram of the wearable, wireless, pulse oximeter including the sensor module (top) and the receiver module (bottom). *Id.* The sensor module includes at least one light-emitting diode ("LED"), a photodetector, signal processing circuitry, an embedded microcontroller, and an RF transceiver. *Id.* at 912–913. Mendelson-2006 discloses that a concentric array of discrete photodetectors could be used to increase the amount of backscattered light detected by a reflectance type pulse oximeter sensor. *Id.* at 915. The receiver module includes an embedded microcontroller, an RF transceiver for communicating with the sensor module, and a wireless module for communicating with the PDA. *Id.* at 913.

As a PDA for use with the system, Mendelson-2006 discloses choosing "the HP iPAQ h4150 PDA because it can support both 802.11b

IPR2020-01521
Patent 10,292,628 B1

and Bluetooth™ wireless communication" and "has sufficient computational

resources." *Id.* at 914.  Mendelson-2006 further discloses that

> [t]he use of a PDA as a local terminal also provides a low-cost
> touch screen interface.  The user-friendly touch screen of the
> PDA offers additional flexibility.  It enables multiple controls to
> occupy the same physical space and the controls appear only
> when needed.  Additionally, a touch screen reduces development
> cost and time, because no external hardware is required. . . .  The
> PDA can also serve to temporarily store vital medical
> information received from the wearable unit.

*Id.*

The PDA is shown in Figure 3 of Mendelson-2006, reproduced below.



Figure 3 illustrates a sample PDA and its graphical user interface ("GUI").

*Id.*  Mendelson-2006 explains that the GUI allows the user to interact with

the wearable system.  *Id.*  "The GUI was configured to present the input and

output information to the user and allows easy activation of various

functions."  *Id.*  "The GUI also displays the subject's vital signs, activity

level, body orientation, and a scrollable PPG waveform that is transmitted by

71

IPR2020-01521
Patent 10,292,628 B1

the wearable device." *Id.* For example, the GUI displays numerical oxygen saturation ("SpO$_2$") and heart rate ("HR") values. *Id.*

### 2. Overview of Beyer (Ex. 1019)

Beyer is titled "Cellular Phone/PDA Communication System" and discloses a "cellular PDA communication system for allowing a plurality of cellular phone users to monitor each others' location and status." Ex. 1019, codes (54), (57). Beyer's Figure 1 is reproduced below:



*FIG. 1*

Figure 1 shows a plan view of "handheld cellular phone/PDA communications system" 10. *Id.* at 7:17–19. System 10 includes touch display screen 16. *Id.* at 7:27.

### 3. Discussion

With support from the testimony of Dr. Kenny, Petitioner contends that each of claims 18, 19, 29, and 30 is unpatentable based on Aizawa, Inokawa, Mendelson-2006, and Beyer. Pet. 53–55 (citing Ex. 1003 ¶¶ 68–71, 147–154; Ex. 1006, ¶¶ 215, 23, 35; Ex. 1008 ¶ 56; Ex. 1016, 912–914,

Appx07699

IPR2020-01521
Patent 10,292,628 B1

Fig. 1; Ex. 1019, 1:6–15, 3:29–33; Ex. 1003 ¶¶ 68–70, 147–154).  For instance, Petitioner applies the teachings of Mendelson-2006 and Beyer to account for the processor features required by each of claims 18 and 29 and the touch-screen display recited in claims 19 and 30.  *Id.*

Patent Owner does not separately address this ground urging only that the ground "does not fix the deficiencies" that were alleged in connection with the ground based on Aizawa and Inokawa.  PO Resp. 45.  As discussed above, we do not agree with Patent Owner as to any such deficiencies.  *See supra* § II.D.  We have reviewed the Petition and its supporting evidence and conclude that Petitioner has shown by a preponderance of the evidence that claims 18, 19, 29, and 30 are unpatentable based on Aizawa, Inokawa, Mendelson-2006, and Beyer.

### G.  Obviousness over Aizawa, Inokawa, Goldsmith, and Lo

Petitioner argues that claims 18, 19, 29, and 30 of the '628 patent would have been obvious over Aizawa, Inokawa, Goldsmith, and Lo.  Pet. 2, 57–62.  Because we have already determined that those claims are unpatentable based on Aizawa, Inokawa, Mendelson-2006, and Beyer, we need not reach this additional ground applied to those claims.  *See Boston Sci. Scimed, Inc. v. Cook Grp. Inc.*, 809 F. App'x 984, 990 (Fed. Cir. 2020) ("[T]he Board need not address issues that are not necessary to the resolution of the proceeding.").

### H.  Obviousness over Mendelson-1988 and Inokawa

Petitioner contends that claims 1–17 and 20–28 are unpatentable over Mendelson-1988 and Inokawa.  Pet. 62–87.  Patent Owner disagrees.  PO Resp. 45–59.  We conclude that a preponderance of the evidence supports

73

**Appx07700**

IPR2020-01521
Patent 10,292,628 B1

Petitioner's assertions that claims 1–17 and 20–28 are unpatentable based on Mendelson-1988 and Inokawa.

### 1. Overview of Mendelson-1988 (Ex. 1015)

Mendelson-1988 discloses a pulse oximeter, with an optical reflectance sensor suitable for noninvasive monitoring of a user's arterial hemoglobin oxygen saturation ($SpO_2$), via the user's forehead. *See* Ex. 1015, 167 (title & abstract). Figure 2 is reproduced below:



Figure 2 illustrates the sensor of Mendelson-1988, including: (A) a top view diagram; (B) a side view diagram; and (C) a photograph. *Id.* at 169.

The sensor includes two red LEDs and two infrared LEDs for emitting light into the user's tissue, and six photodiodes "arranged symmetrically in a hexagonal configuration" surrounding the four emitters, to detect light reflected back to the sensor from the user's tissue. *Id.* at 168 ("SENSOR DESIGN"). The user's "$SpO_2$ can be calculated from the ratio of the

74

IPR2020-01521
Patent 10,292,628 B1

reflected red and infrared photoplethysmograms." *Id.* at 167. "To minimize the amount of light transmission and reflection between the LEDs and the photodiodes within the sensor, a ring-shaped, optically opaque shield of black Delrin . . . was placed between the LEDs and the photodiode chips." *Id.* at 168 (col. 2). "The optical components were encapsulated inside the package using optically clear adhesive." *Id.* "The microelectronic package was mounted inside a black Delrin housing." *Id.*

### 2. Claim 1

Petitioner provides arguments and evidence, including testimony from Dr. Kenny, in support of its view that claim 1 would have been obvious over Mendelson-1988 and Inokawa. Pet. 62–72; Ex. 1003 ¶¶ 174–183. In opposition, Patent Owner provides arguments and evidence, including testimony from Dr. Madisetti. PO Resp. 45–59; Ex. 2004 ¶¶ 118–125, 201–202.

#### i. Petitioner's Contentions

Petitioner contends that Mendelson-1988's $SpO_2$ sensor discloses each and every limitation of claim 1, except that its light permeable cover (i.e., the "OPTICALLY CLEAR EPOXY" in Figure 2B) lacks the claimed "protruding convex surface." *See* Pet. 67–73; Ex. 1003 ¶¶ 171–186. Petitioner also contends Inokawa's pulse sensor 1 is a noninvasive optical measurement device having a light permeable cover (i.e., lens 27) comprising a convex protrusion arranged to cover its light detector(s) (i.e., detector 25). Pet. 70. Petitioner reasons that an ordinarily skilled artisan would have been motivated, with a reasonable expectation of success, to modify Mendelson-1988's optical $SpO_2$ sensor, in light of Inokawa's optical

IPR2020-01521
Patent 10,292,628 B1

pulse sensor, by adding a convex protrusion to Mendelson-1988's cover to improve the sensor's light detection efficiency. *Id.* at 65–67.

Dr. Kenny provides the following illustrations to portray the proposed modification of Mendelson-1988's sensor (Ex. 1003 ¶¶ 179–180):



At the left, Dr. Kenny has excerpted and annotated Mendelson-1988's Figure 2B, to identify the pre-existing cover (colored blue) which covers the light emitters and detectors. *See id.* At the right, Dr. Kenny has illustrated the device resulting from the proposed modification of the cover to have a convex protrusion (colored blue). *See id.*

Petitioner further asserts "there are two alternative ways of mapping the claimed 'light permeable cover,' or LPC, to the modified cover above." Pet. 70; Ex. 1003 ¶¶ 184–185. Dr. Kenny provides the following two illustrations, annotating Mendelson-1988's Figure 2B, to identify these alternative mappings:

76

IPR2020-01521
Patent 10,292,628 B1



APPLE-1015, FIG. 2(B)



APPLE-1015, FIG. 2(B).

Dr. Kenny's first mapping (top figure) equates the cover to the entire depth of the epoxy contained within the AIRPAX package as shown in red outline. Ex. 1003 ¶ 184. Dr. Kenny's second mapping (bottom figure) equates the cover to a partial depth of the epoxy within the package as shown in red outline. *Id.* ¶ 185 ("a [person of ordinary skill in the art] would have been able to use the top portion of the housing, as in Nishikawa, to help form the LPC portion on top of the sealing portion.")

Petitioner adds that "a [person of ordinary skill in the art] would have realized that the epoxy layer could have been given a shape that would help further advance Mendelson-1988's objective of improving detection efficiency," "requir[ing] only routine knowledge of sensor design and

77

assembly." Pet. 64, 66 (citing Ex. 1015, 168, 173); Ex. 1003 ¶¶ 176, 181–182. For example, "as demonstrated by Nishikawa, molding clear epoxy, as in Mendelson-1988, into a lens shape was well understood." Pet. 66 (citing Ex. 1023, Fig. 6, ¶¶ 22, 32, 35, 37).

### ii. Patent Owner's Contentions

Patent Owner is of the view that Petitioner has not met its burden to demonstrate the obviousness of modifying Mendelson-1988's sensor in light of Inokawa to have a convex protrusion, based on substantially the same analysis and testimony discussed above in the context of combining Aizawa and Inokawa. *See* PO Resp. 47–50; Ex. 2004 ¶¶ 104–110; *supra* Section II.D.3. For example, Mendelson-1988, like Aizawa, provides a central emitter or emitters surrounded by several detectors. *Compare* Ex. 1015, 169 (Fig. 2) (showing four central LEDs surrounded by six photodiodes), *with* Ex. 1006, Figs. 1(a)–1(b) (showing one central LED 21 surrounded by four photodetectors 22).

Patent Owner also objects to Petitioner's alternative mapping, providing for a cover with a protrusion to be found in two different ways. *See* PO Resp. 50–54; Ex. 2004 ¶¶ 113–117. This alternative mapping, in according to Patent Owner, is "ambiguous[]," and the second mapping incorporates an "arbitrary" drawn line defining the bottom of the cover in "an **undifferentiated** mass of material." PO Resp. 53–54. Patent Owner also argues that "Petitioner's inability to consistently identify a 'cover' reveals the hindsight-driven nature of its arguments." *Id.* at 53.

As with the ground based on Aizawa and Inokawa, Patent Owner here additionally is of the view that Petitioner errs in referencing Nishikawa as supporting the unpatentability of claim 1, because Nishikawa is not

IPR2020-01521
Patent 10,292,628 B1

identified as part of Ground 2A which instead "includes only two references" Mendelson-1988 and Inokawa. PO Resp. 56–57 (citing Pet. 2, 66, 71–72, 80; Ex. 2007, 364:2–13; Ex. 2008, 73:8–12; Ex. 2004 ¶¶ 122–123). Patent Owner further asserts that Petitioner's reliance on Nishikawa "makes no sense" based on substantially the same analysis and testimony discussed above in the context of combining Aizawa and Inokawa. *Id.* at 57. Patent Owner similarly takes issue with another prior art reference that is addressed to some extent by Petitioner and Dr. Kenny, namely Mendelson '799.[12] *Id.* at 57–58. Patent Owner argues that Petitioner improperly relies on both Nishikawa and Mendelson '799 "to fill missing gaps [in Mendelson-1988 and Inokawa], not as evidence of general knowledge in the art," thereby attempting to "sidestep the requirements to establish a motivation and expectation of success." *Id.* at 58 (citing Pet. 70; *K/S HIMPP v. Hear-Wear Technologies, LLC*, 751 F.3d 1362, 1366 (Fed. Cir. 2014)); Ex. 2004 ¶ 125.

With respect to claim 7, Patent Owner also contends that "Mendelson-1988 and Inokawa also fail to include a ***circular*** housing with a light permeable cover[.]" PO Resp. 54. Patent Owner characterizes the optical components of each of Mendelon-1988 and Inokawa as being square in shape, and discounts Petitioner's reasoning that one of ordinary skill in the art "would have recognized that microelectronic packaging as used in Mendelon-1988 comes in various shapes and sizes." *Id.* at 55 (quoting Pet. 80). Patent Owner further characterizes Petitioner's and Dr. Kenny's

---

[12] U.S. Patent No. 6,801,799 B2 issued October 5, 2004 (Ex. 1025) ("Mendelson '799").

testimony that "using a circular housing having a circular wall . . . was common practice" as conclusory.  *Id.* at 56 (quoting Pet. 80).

### iii. *Petitioner's Reply*

In its Reply, Petitioner provides similar analysis and testimony as that discussed above in the context of combining Aizawa and Inokawa.  *See* Pet. Reply 27 (citing Pet. 63–65; Ex. 1047 ¶ 54).  Specifically, Petitioner contends that an ordinarily skilled artisan would have been motivated, with a reasonable expectation of success, to modify Mendelson-1988 based on Inokawa's teachings to add a lens.  *Id.*  Petitioner also maintains that the Petition and Dr. Kenny's supporting testimony adequately account for the "cover" required by the claims of the '628 patent, including the "alternative mapping" configuration.  *Id.* at 28–30 (citing Pet. 71–72; Ex. 1003 ¶ 185; Ex. 1047 ¶¶ 57–60; Ex. 1009, 395:22–396:8, 396:9–17).  Petitioner additionally argues that the Petition accounts for claim 7's requirement of a circular housing based on the teachings of Mendelson-1988 and Inokawa. Pet. Reply 30–31.  Petitioner further submits that Dr. Kenny's reference to other prior art references as a part of his testimony, and specifically Nishikawa, is not improper as such reference "provides further support for the actual combination (*i.e.*, Mendelson-1988 in view of Inokawa) by demonstrating how the lens of Inokawa may be incorporated in a manufacturing context."  Pet. Reply 31–32 (citing Ex. 1003 ¶¶ 96, 182; Ex. 1047 ¶ 62; Ex. 2007, 364:2–13).

### iv. *Patent Owner's Sur-reply*

Patent Owner's Sur-reply generally reiterates its arguments challenging Petitioner's contentions as to the obviousness of modifying

80

IPR2020-01521
Patent 10,292,628 B1

Mendelon-1988's sensor to include a convex protrusion. *See* Sur-reply 21–25.

>    *v. Discussion*

Petitioner contentions that Mendelson-1988's sensor meets several limitations of claim 1 are not challenged by Patent Owner. We agree. For instance, we are persuaded by Petitioner as to the following. The sensor is a noninvasive optical measurement device adapted to be worn on a user's forehead, to provide an indication of a physiological parameter of the user (i.e., $SpO_2$).[13] *See* Ex. 1015, 167 (abstract); Pet. 67; Ex. 1003 ¶ 171. The sensor has two infrared LED chips and two red LED chips, i.e., a plurality of emitters. *See* Ex. 1015, 168 (col. 2) ("The optical reflectance sensor used in this study consists of two red (peak emission wavelength: 660 nm) and two infrared (peak emission wavelength: 930 nm) LED chips"), 169 (Fig. 2A); Pet. 67–68; Ex. 1003 ¶ 172. The sensor further includes at least four detectors (i.e., the six photodiodes) arranged on a housing's surface and spaced apart from each other, symmetrically on a circle centered on the four LEDs. *See* Ex. 1015, 168 (col. 2) (stating the six photodiodes are "arranged symmetrically in a hexagonal configuration"), 169 (Fig. 2); Pet. 75–76; Ex. 1003 ¶ 173. The six photodiodes are configured to output signals responsive to light emitted from the four emitters and attenuated by the user's body tissue, with the signals being indicative of the user's $SpO_2$. *See* Ex. 1015, 167 (col. 2) ("$SpO_2$ can be calculated from the ratio of the

---

[13] Whether the preamble is limiting need not be resolved, because the recitation in the preamble is satisfied by the prior art.

IPR2020-01521
Patent 10,292,628 B1

reflected red and infrared photoplethysmograms."); Pet. 75–76; Ex. 1003 ¶ 171.

We also find that a preponderance of the evidence establishes that the Mendelson-1988 sensor's optically clear epoxy is a light permeable cover that covers the sensor's six detectors. In particular, it is clear from Figures 2A and 2B that the epoxy extends from the top of the sensor at the dotted line in the figure, down into the well of the AIRPAX package, to cover all four LEDs and all six photodiodes disposed at the bottom of the well. *See also* Ex. 1015, 168 (col. 2) ("The optical components were encapsulated inside the package using optically clear adhesive"). Although Patent Owner disagrees, that disagreement is premised on its proposed claim construction of the term "cover" as excluding resins and epoxies. *See* PO Resp. 50–51. For reasons provided in Section III.C.1 above, we do not find that claim construction persuasive, and Patent Owner does not distinguish Mendelson-1988 from claim 1 on this basis.

We determine that Petitioner has established persuasively that Mendelson-1988's sensor teaches every limitation of claim 1, with the exception that its light permeable cover has a flat surface and, thus, does not include an "outwardly protruding convex surface." We, however, conclude that a preponderance of the evidence supports Petitioner's contention that it would have been obvious to modify the top surface of Mendelson-1988's cover to include a convex protrusion, in order to increase the amount of backscattered light that will be received by the six peripheral detectors. Our reasoning is substantially identical to the analysis provided above in connection with the ground based on Aizawa and Inokawa, with Mendelson-1988 replacing Aizawa in the combination. *See supra*

82

IPR2020-01521
Patent 10,292,628 B1

Section III.D.3.  Patent Owner does not cite, and we do not discern, any material difference between Mendelson-1988 and Aizawa that might lead to a different result here, with one possible exception.

That difference is Petitioner's alternative mapping of the claimed "cover" to Petitioner's proposed modification of Mendelson-1988's sensor. We rely on the first mapping, but not Petitioner's second mapping, to decide in Petitioner's favor.  Petitioner's first mapping is again reproduced here (Ex. 1003 ¶ 184):



APPLE-1015, FIG. 2(B)

In this modified and annotated version of Figure 2B of Mendelson-1988, Dr. Kenny identifies how Mendelson-1988's light permeable cover ("LPC") may be modified to have a protrusion, wherein the cover (which Dr. Kenny has colored blue) includes the entire depth of the optically clear epoxy contained within the AIRPAX package (as Dr. Kenny has shown in red outline).  *Id.* ¶ 140; Pet. 71.  Patent Owner objects to this mapping as ambiguous, but we determine Dr. Kenny's annotations reproduced above are sufficiently clear to establish obviousness by a preponderance of the evidence.

As with the ground based on Aizawa and Inokawa, Patent Owner argues that the ground based on Mendelson-1988 and Inokawa is flawed

83

because of the Petition's and Dr. Kenny's reference to Nishikawa. For the same reasons discussed above (*see supra* § II.D.3.iv.(5)) we find that argument unavailing.

### vi. Summary

For the foregoing reasons, we conclude that Petitioner has demonstrated by a preponderance of the evidence that claim 1 is unpatentable as having been obvious over Mendelson-1988 and Inokawa.

### 3. Claim 7

Claim 7 is similar to claim 1 but includes an additional requirement that the light permeable cover has a "circular housing including a planar surface." Ex. 1001, 45:13. Petitioner provides arguments and evidence, including testimony from Dr. Kenny, in support of the contention that independent claim 7 would have been obvious over Mendelson-1988 and Inokawa. Pet. 79–82; Ex. 1003 ¶¶ 198–205. Much of Petitioner's analysis for claim 7 applies for claim 1, which as discussed above in Section II.H.2 we find persuasive.

With respect to the "circular housing having a planar surface" requirement, Petitioner points to Mendelson's Figures 2(A) and 2(B) and contends that "Mendelson-1988 discloses that its LEDs and photodiode chips (i.e., emitters and detectors) are mounted on a ceramic substrate (***planar surface***) and housed within an AIRPAX microelectronic package (***housing***)." Pet. 79. Petitioner, however, characterizes the housing shown in those figures, specifically Figure 2(A) as "appear[ing] to have a square shape, not a circular one." *Id.* at 80. Petitioner reasons that "[a person of ordinary skill in the art] would have recognized that microelectronic

IPR2020-01521
Patent 10,292,628 B1

packaging as used in Mendelson-1988 comes in various shapes and sizes"
and "[a person of ordinary skill in the art] would have considered using a
differently shaped housing, namely a circular one, to be obvious." *Id.* (citing
Ex. 1003 ¶ 202). Petitioner also contends that employing a circular housing
was "common practice" prior to the '628 patent, and that "there was nothing
new or inventive about changing one housing shape for another. *Id.* (citing
Ex. 1003 ¶ 202). Petitioner explains that its contentions are evidenced by
another reference of record, Mendelson '799. *Id.*

Patent Owner characterizes Petitioner's proposed ground for claim 7
as "facially deficient" for several reasons: (1) "Petitioner never identifies a
motivation to pick a circular-shaped housing instead of the existing square
shape"; (2) "[a person of ordinary skill in the art] would have no particular
motivation to change the shape unless a [person of ordinary skill in the art]
perceived some benefit in doing so"; (3) "Mendelson '799 does not disclose
a cover (or even epoxy encapsulation) and thus cannot disclose a circular
housing and a cover of the circular housing, as claim 7 requires"; and (4)
"Petitioner did not include Mendelson '799 in any ground." PO Resp. 55–
56 (citing Ex. 2004 ¶¶ 120–121).

In response to Patent Owner's arguments, Petitioner replies that
"references like Mendelson [']799 have a circular wall/housing and confirm
the notion that a [person of ordinary skill in the art] would have found it to
be simply a matter of design choice to use different shapes." Pet. Reply 30–
31 (citing Ex. 1003 ¶ 201; Ex. 1025, Fig. 7, 9:34–36; Ex. 1047 ¶ 61).
Petitioner also contends "neither the '628 patent nor [Patent Owner]
provides any explanation of how the particular housing shape solves some

85

problem or presents some unexpected result." *Id.* at 31 (citing *In re Kuhle*, 526 F.2d 553, 555 (CCPA 1975)).

Patent Owner responds that "Petitioner's reply reiterates its conclusory arguments that [the proposed] change would be routine, without identifying any reason to modify the shape from square to circular." Sur-reply 24.

On the record before us, we conclude that a preponderance of the evidence supports Petitioner's contention that it would have been obvious to modify the shape of Mendelson-1988's AIRPAX package from square to circular. Petitioner's and Dr. Kenny's general assessment that a person of ordinary skill in the art would have been aware that a circular housing shape was a known option for housing of components of a physiological sensor finds support in the record. Pet. 79–80; Ex. 1003 ¶ 201. In that respect, although Mendelson '799 was not listed in the styling of the proposed grounds of unpatentability based on Mendelson-1988 and Inokawa, its teachings plainly were offered in the Petition as evidence of the background knowledge that an ordinarily skilled artisan would have brought to bear in an evaluation of the teachings Mendelson-1988 and Inokawa. Pet. 79–80. Moreover, it is clear that Patent Owner understood that the proposed ground offered in the Petition took into account the disclosure of Mendelson '799, and Patent Owner had opportunity to address that disclosure. Indeed, Patent Owner availed itself of that opportunity during trial (*see, e.g.*, PO Resp. 54–56; Sur-reply 24).

We further find unavailing Patent Owner's argument that "Mendelson '799 does not disclose a cover (or even epoxy encapsulation) and thus cannot disclose a circular housing and a cover of the circular housing, as

IPR2020-01521
Patent 10,292,628 B1

claim 7 requires." PO Resp. 56.   Figure 7 of Mendelson '799 is reproduced
below:



*Figure 7*

Figure 7 is a top view of optical sensor 10 comprising light source 12
composed of three LEDs 12A, 12B, and 12C emitting light of three different
wavelengths, and an array of six near detectors 18 and six far detectors 16
"arranged in two concentric ring-like arrangements" surrounding light
source 12.   Ex. 1025, 9:23–34.   "All these elements are accommodated in a
sensor housing 17" which, as can be seen in Figure 7, is clearly circular.   *Id.*
at 9:34–35.   Patent Owner does not articulate why the presence or absence of
a cover in Mendelson '799 somehow serves to discount Mendelson '799's
unambiguous presentation of a sensor housing having a shape recognizable
as circular.

Furthermore, one of ordinary skill in the art would have understood
that the AIRPAX package of Mendelson-1988 and the housing 17 of
Mendelson '799 are performing the same function of enclosing a central
collection of light emitters which are surrounded by an array of light

87

detectors in an optical sensor attached to a user's body. *See, e.g.*, Ex. 1015, Figs. 2A–2B; Ex. 1025, Fig. 7. The evidence of record also does not suggest that the shape of such a housing has any functional significance in the operation of the optical sensor, or that any particular known shape was preferred or restricted. Thus, the evidence suggests that a square shape and a circular shape of such as housing were known in the art to be predictable substitutes for one another, and therefore obvious variants. *See, e.g.*, *KSR*, 550 U.S. at 416 ("[W]hen a patent claims a structure already known in the prior art that is altered by the mere substitution of one element for another known in the field, the combination must do more than yield a predictable result."); *id.* at 417 ("[W]hen a patent 'simply arranges old elements with each performing the same function it had been known to perform' and yields no more than one would expect from such an arrangement, the combination is obvious." (citation omitted)).

We conclude Petitioner has demonstrated by a preponderance of the evidence that Petitioner's ground based on Mendelson-1988 and Inokawa conveys the unpatentability of claim 7.

### 4. *Claims 2–6, 8–17, and 20–28*

Petitioner provides argument and evidence, including testimony from Dr. Kenny, in support of its position that claims 2–6, 8–17, and 20–28 are unpatentable over Mendelson-1988 and Inokawa. Pet. 73–79, 82–87. Patent Owner does not advance any arguments for claims 2–6, 8–17, and 20–28, that are distinct from those provided for claims 1 and 7. *See* PO Resp. 59. For the same reasons set forth in Sections II.H.2 & 3 above, we find Patent Owner's arguments unavailing as to claims 2–6, 8–17, and 20–28. Having evaluated the Petition and its underlying supporting evidence, we conclude

IPR2020-01521
Patent 10,292,628 B1

that Petitioner has established by a preponderance of the evidence that claims 2–6, 8–17, and 20–28 are also unpatentable based on Mendelson-1988 and Inokawa.

I.   *Obviousness over Mendelson-1988, Inokawa, Mendelson-2006, and Beyer*

Petitioner contends that claims 18, 19, 29, and 30 are unpatentable based on Mendelson-1988, Inokawa, Mendelson-2006, and Beyer. Petitioner relies on Mendelson-2006 and Beyer to satisfy the processor and touch-screen display requirements set forth in those claims.  Pet. 87–93. Patent Owner does not dispute Petitioner's reliance on the teachings of Mendelson-2006 and Beyer.  Rather, Patent Owner challenges this ground for the same reasons that were advanced for the ground based on Mendelson-1988 and Inokawa.  PO Resp. 59.  As discussed above (*see supra* § II.H), we find those arguments unavailing.  Having reviewed the Petition and its underlying supporting evidence, we conclude that Petitioner has established by a preponderance of the evidence that claims 18, 19, 29, and 30 are unpatentable for obviousness based on Mendelson-1988, Inokawa, Mendelson-2006, and Beyer.

III. CONCLUSION

In summary, we determine that a preponderance of the evidence establishes claims 1–30 of the '628 patent are unpatentable, as shown in the following table:[14]

---

[14]  Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or*

IPR2020-01521
Patent 10,292,628 B1

| Claim(s) | 35 U.S.C. § | References | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1–15, 17, 20–26, 28 | 103 | Aizawa, Inokawa | 1–15, 17, 20–26, 28 | |
| 1–15, 17, 20–26, 28 | 103 | Aizawa, Inokawa, Ohsaki | 1–15, 17, 20–26, 28 | |
| 18, 19, 29, 30 | 103 | Aizawa, Inokawa, Mendelson-2006, Beyer | 18, 19, 29, 30 | |
| 18, 19, 29, 30 | 103 | Aizawa, Inokawa, Goldsmith, Lo[15] | | |
| 1–17, 20–28 | 103 | Mendelson-1988, Inokawa | 1–17, 20–28 | |
| 18, 19, 29, 30 | 103 | Mendelson-1988, Inokawa, Mendelson-2006, Beyer | 18, 19, 29, 30 | |
| **Overall Outcome** | | | 1–30 | |

*Reexamination During a Pending AIA Trial Proceeding. See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. §§ 42.8(a)(3), (b)(2).

[15] As explained above in Section II.G, because we conclude that claims 18, 19, 29, and 30 are unpatentable on other grounds, we do not reach the merits of this ground.

IPR2020-01521
Patent 10,292,628 B1

## IV. ORDER

Upon consideration of the record before us, it is:

ORDERED that claims 1–30 of the '628 patent have been shown to be unpatentable; and

FURTHER ORDERED that, because this is a final written decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

91

IPR2020-01521
Patent 10,292,628 B1

FOR PETITIONER:

W. Karl Renner
Roberto Devoto
Hyun Jin In
FISH & RICHARDSON P.C.
axf-ptab@fr.com
devoto@fr.com
in@fr.com


FOR PATENT OWNER:

Joseph R. Re
Stephen W. Larson
Jarom D. Kesler
Jacob L. Peterson
KNOBBE, MARTENS, OLSON, & BEAR, LLP
2jrr@knobbe.com
2swl@knobbe.com
2jzk@knobbe.com
2jup@knobbe.com

92

## CERTIFICATE OF SERVICE

I hereby certify that the original of this Notice of Appeal was filed via

U.S.P.S. Priority Mail Express on April 12, 2022 with the Director of the United

States Patent and Trademark Office at the address below:

Office of the Solicitor
United States Patent and Trademark Office
Mail Stop 8, Post Office Box 1450
Alexandria, VA 22313-1450

A copy of this Notice of Appeal is being filed and served on April 12, 2022 as

follows:

**To the USPTO Patent Trial and Appeal Board:**
Patent Trial and Appeal Board
Madison Building East
600 Dulany Street
Alexandria, VA 22313

(*via PTAB E2E – as authorized by the Board*)

**To the U.S. Court of Appeals for the Federal Circuit:**
Clerk of Court
U.S. Court of Appeals for the Federal Circuit
717 Madison Place, N.W.
Washington, DC 20439

(*via CM/ECF – with filing fee*)

**Counsel for Petitioner Apple, Inc.**

W. Karl Renner, Reg. No. 41,265
Roberto J. Devoto, Reg. No. 55,108
Hyun Jin In, Reg. No. 70,014
Fish & Richardson P.C.
3200 RBC Plaza

60 South Sixth Street
Minneapolis, MN 55402
Tel: 202-783-5070
Fax: 877-769-7945
IPR50095-0006IP1@fr.com
PTABInbound@fr.com
axf-ptab@fr.com
devoto@fr.com
in@fr.com

*(via email pursuant to 37 C.F.R. § 42.6(e))*


Dated:  April 12, 2022                    /Jarom D. Kesler/
                                          Jarom D. Kesler (Reg. No. 57,046)

                                          Attorney for Patent Owner
                                          Masimo Corporation

55434478



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

# NOTICE OF ALLOWANCE AND FEE(S) DUE

| | | | |
|---|---|---|---|
| 64735 | 7590 | 03/08/2019 | |

KNOBBE, MARTENS, OLSON & BEAR, LLP
MASIMO CORPORATION (MASIMO)
2040 MAIN STREET
FOURTEENTH FLOOR
IRVINE, CA 92614

| EXAMINER |
|---|
| LIU, CHU CHUAN |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3791 | |

DATE MAILED: 03/08/2019

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 16/261,326 | 01/29/2019 | Jeroen Poeze | MASCER.002C6 | 9588 |

TITLE OF INVENTION: MULTI-STREAM DATA COLLECTION SYSTEM FOR NONINVASIVE MEASUREMENT OF BLOOD CONSTITUENTS

| APPLN. TYPE | ENTITY STATUS | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|---|
| nonprovisional | UNDISCOUNTED | $1000 | $0.00 | $0.00 | $1000 | 06/10/2019 |

**THE APPLICATION IDENTIFIED ABOVE HAS BEEN EXAMINED AND IS ALLOWED FOR ISSUANCE AS A PATENT. <u>PROSECUTION ON THE MERITS IS CLOSED.</u> THIS NOTICE OF ALLOWANCE IS NOT A GRANT OF PATENT RIGHTS. THIS APPLICATION IS SUBJECT TO WITHDRAWAL FROM ISSUE AT THE INITIATIVE OF THE OFFICE OR UPON PETITION BY THE APPLICANT. SEE 37 CFR 1.313 AND MPEP 1308.**

**THE ISSUE FEE AND PUBLICATION FEE (IF REQUIRED) MUST BE PAID WITHIN <u>THREE MONTHS</u> FROM THE MAILING DATE OF THIS NOTICE OR THIS APPLICATION SHALL BE REGARDED AS ABANDONED. <u>THIS STATUTORY PERIOD CANNOT BE EXTENDED.</u> SEE 35 U.S.C. 151. THE ISSUE FEE DUE INDICATED ABOVE DOES NOT REFLECT A CREDIT FOR ANY PREVIOUSLY PAID ISSUE FEE IN THIS APPLICATION. IF AN ISSUE FEE HAS PREVIOUSLY BEEN PAID IN THIS APPLICATION (AS SHOWN ABOVE), THE RETURN OF PART B OF THIS FORM WILL BE CONSIDERED A REQUEST TO REAPPLY THE PREVIOUSLY PAID ISSUE FEE TOWARD THE ISSUE FEE NOW DUE.**

**HOW TO REPLY TO THIS NOTICE:**

I. Review the ENTITY STATUS shown above. If the ENTITY STATUS is shown as SMALL or MICRO, verify whether entitlement to that entity status still applies.

If the ENTITY STATUS is the same as shown above, pay the TOTAL FEE(S) DUE shown above.

If the ENTITY STATUS is changed from that shown above, on PART B - FEE(S) TRANSMITTAL, complete section number 5 titled "Change in Entity Status (from status indicated above)".

For purposes of this notice, small entity fees are 1/2 the amount of undiscounted fees, and micro entity fees are 1/2 the amount of small entity fees.

II. PART B - FEE(S) TRANSMITTAL, or its equivalent, must be completed and returned to the United States Patent and Trademark Office (USPTO) with your ISSUE FEE and PUBLICATION FEE (if required). If you are charging the fee(s) to your deposit account, section "4b" of Part B - Fee(s) Transmittal should be completed and an extra copy of the form should be submitted. If an equivalent of Part B is filed, a request to reapply a previously paid issue fee must be clearly made, and delays in processing may occur due to the difficulty in recognizing the paper as an equivalent of Part B.

III. All communications regarding this application must give the application number. Please direct all communications prior to issuance to Mail Stop ISSUE FEE unless advised to the contrary.

**IMPORTANT REMINDER: Maintenance fees are due in utility patents issuing on applications filed on or after Dec. 12, 1980. It is patentee's responsibility to ensure timely payment of maintenance fees when due. More information is available at www.uspto.gov/PatentMaintenanceFees.**

Page 1 of 3

PTOL-85 (Rev. 02/11)

**PART B - FEE(S) TRANSMITTAL**

Complete and send this form, together with applicable fee(s), by mail or fax, or via EFS-Web.

By mail, send to:    Mail Stop ISSUE FEE                                    By fax, send to:    (571)-273-2885
Commissioner for Patents
P.O. Box 1450
Alexandria, Virginia 22313-1450

INSTRUCTIONS: This form should be used for transmitting the ISSUE FEE and PUBLICATION FEE (if required). Blocks 1 through 5 should be completed where appropriate. All further correspondence including the Patent, advance orders and notification of maintenance fees will be mailed to the current correspondence address as indicated unless corrected below or directed otherwise in Block 1, by (a) specifying a new correspondence address; and/or (b) indicating a separate "FEE ADDRESS" for maintenance fee notifications.

CURRENT CORRESPONDENCE ADDRESS (Note: Use Block 1 for any change of address)

Note: A certificate of mailing can only be used for domestic mailings of the Fee(s) Transmittal. This certificate cannot be used for any other accompanying papers. Each additional paper, such as an assignment or formal drawing, must have its own certificate of mailing or transmission.

64735        7590        03/08/2019

KNOBBE, MARTENS, OLSON & BEAR, LLP
MASIMO CORPORATION (MASIMO)
2040 MAIN STREET
FOURTEENTH FLOOR
IRVINE, CA 92614

**Certificate of Mailing or Transmission**
I hereby certify that this Fee(s) Transmittal is being deposited with the United States Postal Service with sufficient postage for first class mail in an envelope addressed to the Mail Stop ISSUE FEE address above, or being transmitted to the USPTO via EFS-Web or by facsimile to (571) 273-2885, on the date below.

_____ (Typed or printed name)

_____ (Signature)

_____ (Date)

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 16/261,326 | 01/29/2019 | Jeroen Poeze | MASCER.002C6 | 9588 |

TITLE OF INVENTION: MULTI-STREAM DATA COLLECTION SYSTEM FOR NONINVASIVE MEASUREMENT OF BLOOD CONSTITUENTS

| APPLN. TYPE | ENTITY STATUS | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|---|
| nonprovisional | UNDISCOUNTED | $1000 | $0.00 | $0.00 | $1000 | 06/10/2019 |

| EXAMINER | ART UNIT | CLASS-SUBCLASS |
|---|---|---|
| LIU, CHU CHUAN | 3791 | 600-310000 |

1. Change of correspondence address or indication of "Fee Address" (37 CFR 1.363).

☐ Change of correspondence address (or Change of Correspondence Address form PTO/SB/122) attached.

☐ "Fee Address" indication (or "Fee Address" Indication form PTO/SB/47; Rev 03-09 or more recent) attached. **Use of a Customer Number is required.**

2. For printing on the patent front page, list
(1) The names of up to 3 registered patent attorneys or agents OR, alternatively,
(2) The name of a single firm (having as a member a registered attorney or agent) and the names of up to 2 registered patent attorneys or agents. If no name is listed, no name will be printed.

1 _____

2 _____

3 _____

3. ASSIGNEE NAME AND RESIDENCE DATA TO BE PRINTED ON THE PATENT (print or type)

PLEASE NOTE: Unless an assignee is identified below, no assignee data will appear on the patent. If an assignee is identified below, the document must have been previously recorded, or filed for recordation, as set forth in 37 CFR 3.11 and 37 CFR 3.81(a). Completion of this form is NOT a substitute for filing an assignment.

(A) NAME OF ASSIGNEE                                    (B) RESIDENCE: (CITY and STATE or COUNTRY)

Please check the appropriate assignee category or categories (will not be printed on the patent) : ☐ Individual ☐ Corporation or other private group entity ☐ Government

4a. Fees submitted: ☐ Issue Fee ☐ Publication Fee (if required) ☐ Advance Order - # of Copies _____

4b. Method of Payment: *(Please first reapply any previously paid fee shown above)*

☐ Electronic Payment via EFS-Web ☐ Enclosed check ☐ Non-electronic payment by credit card (Attach form PTO-2038)

☐ The Director is hereby authorized to charge the required fee(s), any deficiency, or credit any overpayment to Deposit Account No. _____

5. **Change in Entity Status** (from status indicated above)

☐ Applicant certifying micro entity status. See 37 CFR 1.29

☐ Applicant asserting small entity status. See 37 CFR 1.27

☐ Applicant changing to regular undiscounted fee status.

NOTE: Absent a valid certification of Micro Entity Status (see forms PTO/SB/15A and 15B), issue fee payment in the micro entity amount will not be accepted at the risk of application abandonment.
NOTE: If the application was previously under micro entity status, checking this box will be taken to be a notification of loss of entitlement to micro entity status.
NOTE: Checking this box will be taken to be a notification of loss of entitlement to small or micro entity status, as applicable.

NOTE: This form must be signed in accordance with 37 CFR 1.31 and 1.33. See 37 CFR 1.4 for signature requirements and certifications.

Authorized Signature _____    Date _____

Typed or printed name _____    Registration No. _____

PTOL-85 Part B (08-18) Approved for use through 01/31/2020    OMB 0651-0033    U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE

**Appx07972**



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 16/261,326 | 01/29/2019 | Jeroen Poeze | MASCER.002C6 | 9588 |

| | | EXAMINER |
|---|---|---|
| 64735 | 7590 | 03/08/2019 | LIU, CHU CHUAN |

KNOBBE, MARTENS, OLSON & BEAR, LLP
MASIMO CORPORATION (MASIMO)
2040 MAIN STREET
FOURTEENTH FLOOR
IRVINE, CA 92614

| ART UNIT | PAPER NUMBER |
|---|---|
| 3791 | |

DATE MAILED: 03/08/2019

### Determination of Patent Term Adjustment under 35 U.S.C. 154 (b)
(Applications filed on or after May 29, 2000)

The Office has discontinued providing a Patent Term Adjustment (PTA) calculation with the Notice of Allowance.

Section 1(h)(2) of the AIA Technical Corrections Act amended 35 U.S.C. 154(b)(3)(B)(i) to eliminate the requirement that the Office provide a patent term adjustment determination with the notice of allowance. See Revisions to Patent Term Adjustment, 78 Fed. Reg. 19416, 19417 (Apr. 1, 2013). Therefore, the Office is no longer providing an initial patent term adjustment determination with the notice of allowance. The Office will continue to provide a patent term adjustment determination with the Issue Notification Letter that is mailed to applicant approximately three weeks prior to the issue date of the patent, and will include the patent term adjustment on the patent. Any request for reconsideration of the patent term adjustment determination (or reinstatement of patent term adjustment) should follow the process outlined in 37 CFR 1.705.

Any questions regarding the Patent Term Extension or Adjustment determination should be directed to the Office of Patent Legal Administration at (571)-272-7702. Questions relating to issue and publication fee payments should be directed to the Customer Service Center of the Office of Patent Publication at 1-(888)-786-0101 or (571)-272-4200.

PTOL-85 (Rev. 02/11)

## OMB Clearance and PRA Burden Statement for PTOL-85 Part B

The Paperwork Reduction Act (PRA) of 1995 requires Federal agencies to obtain Office of Management and Budget approval before requesting most types of information from the public. When OMB approves an agency request to collect information from the public, OMB (i) provides a valid OMB Control Number and expiration date for the agency to display on the instrument that will be used to collect the information and (ii) requires the agency to inform the public about the OMB Control Number's legal significance in accordance with 5 CFR 1320.5(b).

The information collected by PTOL-85 Part B is required by 37 CFR 1.311. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 30 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, Virginia 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, Virginia 22313-1450. Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

## Privacy Act Statement

**The Privacy Act of 1974 (P.L. 93-579)** requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b) (2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether disclosure of these records is required by the Freedom of Information Act.
2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.
3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.
4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).
5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.
6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).
7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.
8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspection or an issued patent.
9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

| *Notice of Allowability* | **Application No.**<br>16/261,326 | **Applicant(s)**<br>Poeze et al. |
|---|---|---|
| | **Examiner**<br>CHU CHUAN LIU | **Art Unit**<br>3791 | **AIA (FITF) Status**<br>No |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address--*

All claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application. If not included herewith (or previously mailed), a Notice of Allowance (PTOL-85) or other appropriate communication will be mailed in due course. **THIS NOTICE OF ALLOWABILITY IS NOT A GRANT OF PATENT RIGHTS.** This application is subject to withdrawal from issue at the initiative of the Office or upon petition by the applicant. See 37 CFR 1.313 and MPEP 1308.

1. ☑ This communication is responsive to the preliminary amendments filed on 01/30/2019.

     ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.

2. ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.

3. ☑ The allowed claim(s) is/are 2-31 . As a result of the allowed claim(s), you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see http://www.uspto.gov/patents/init_events/pph/index.jsp or send an inquiry to **PPHfeedback@uspto.gov**.

4. ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

     **Certified copies:**

     a) ☐All    b) ☐ Some    *c) ☐ None of the:

         1. ☐ Certified copies of the priority documents have been received.

         2. ☐ Certified copies of the priority documents have been received in Application No. _____ .

         3. ☐ Copies of the certified copies of the priority documents have been received in this national stage application from the International Bureau (PCT Rule 17.2(a)).

     * Certified copies not received: _____ .

Applicant has THREE MONTHS FROM THE "MAILING DATE" of this communication to file areply complying with the requirements noted below. Failure to timely comply will result in ABANDONMENT of this application. **THIS THREE-MONTH PERIOD IS NOT EXTENDABLE.**

5. ☐ CORRECTED DRAWINGS (as "replacement sheets") must be submitted.

     ☐ including changes required by the attached Examiner's Amendment / Comment or in the Office action of Paper No./Mail Date _____ .

     **Identifying indicia such as the application number (see 37 CFR 1.84(c)) should be written on the drawings in the front (not the back) of each sheet. Replacement sheet(s) should be labeled as such in the header according to 37 CFR 1.121(d).**

6. ☐ DEPOSIT OF and/or INFORMATION about the deposit of BIOLOGICAL MATERIAL must be submitted. Note the attached Examiner's comment regarding REQUIREMENT FOR THE DEPOSIT OF BIOLOGICAL MATERIAL.

**Attachment(s)**

1. ☑ Notice of References Cited (PTO-892)

2. ☑ Information Disclosure Statements (PTO/SB/08), Paper No./Mail Date 02/01/2019.

3. ☐ Examiner's Comment Regarding Requirement for Deposit of Biological Material _____ .

4. ☐ Interview Summary (PTO-413), Paper No./Mail Date. _____ .

5. ☑ Examiner's Amendment/Comment

6. ☑ Examiner's Statement of Reasons for Allowance

7. ☐ Other _____ .

| /CHU CHUAN LIU/<br>Examiner, Art Unit 3791 | /ERIC F WINAKUR/<br>Primary Examiner, Art Unit 3791 |
|---|---|

U.S. Patent and Trademark Office
PTOL-37 (Rev. 08-13)          **Notice of Allowability**          Part of Paper No./Mail Date 20190227

Application/Control Number: 16/261,326                                    Page 2
Art Unit: 3791

## EXAMINER'S AMENDMENT

1.      An examiner's amendment to the record appears below. Should the changes

and/or additions be unacceptable to applicant, an amendment may be filed as provided

by 37 CFR 1.312. To ensure consideration of such an amendment, it MUST be

submitted no later than the payment of the issue fee.


        Authorization for this examiner's amendment was given in an interview with Scott

Cromar on 02/21/2019 and 02/26/2019. During the interview, proposed claim

amendments were discussed with respect to Chaiken (USPN 6,223,063). Amendments

were made to better define over the art.


        The application has been amended as follows:


Claim 2.        A noninvasive optical physiological sensor comprising:

        a plurality of emitters configured to emit light into tissue of a user;

        a plurality of detectors configured to detect light that has been attenuated

by tissue of the user, wherein the plurality of detectors comprise at least four

detectors;

        a housing configured to house at least the plurality of detectors; and

        a light permeable cover configured to be located between tissue of the

user and the plurality of detectors when the noninvasive optical physiological

sensor is worn by the user, wherein the cover comprises an outwardly protruding

convex surface configured to cause tissue of the user to conform to at least a

portion of the outwardly protruding convex surface when the noninvasive optical

physiological sensor is worn by the user and during operation of the noninvasive

optical physiological sensor, and wherein ~~the light permeable cover covers~~ the

plurality of detectors <u>are configured to receive light passed through the outwardly</u>

<u>protruding convex surface after attenuation by tissue of the user</u>.


Claim 8.          An optical physiological measurement device comprising:

              a plurality of emitters configured to emit light into tissue of a user;

              a circular housing including a planar surface;

              at least four detectors arranged on the planar surface of the circular

housing, wherein the four detectors are arranged in a[[n]] ~~offset~~ grid pattern; and

              a light permeable cover of the circular housing, ~~wherein the light~~

~~permeable cover covers the at least four detectors, and~~ wherein at least a portion

of the cover ~~protrudes from the housing~~ <u>comprises a protruding surface that is</u>

<u>arranged to allow passage of light to the at least four detectors after attenuation</u>

<u>by tissue of the user</u>.


Claim 9.       The optical physiological measurement device of Claim 8, wherein

the cover is configured to cause tissue of the user to conform to at least a portion

of [[a]] <u>the protruding </u>surface of the cover when the optical physiological

measurement device is worn by the user.


Claim 10.       The optical physiological measurement device of Claim 9, wherein

the four detectors are arranged in [[a]] <u>the </u>grid pattern such that a first detector

and a second detector are arranged across from each other on opposite sides of

a central point along a first axis, and a third detector and a fourth detector are

arranged across from each other on opposite sides of the central point along a

second axis which is perpendicular to the first axis.


Claim 15.     The optical physiological measurement device of Claim 14, wherein

the protruding surface of the cover comprises a single surface of the cover that

covers the at least four detectors.


Claim 21.     A noninvasive optical physiological sensor comprising:

        a plurality of emitters configured to emit light into tissue of a user;

        a plurality of detectors configured to detect light that has been attenuated

by tissue of the user, wherein the plurality of detectors comprise at least four

detectors;

        a housing configured to house at least the plurality of detectors; and

        a light permeable cover configured to be located between tissue of the

user and the plurality of detectors, and cover the plurality of detectors, when the

noninvasive optical physiological sensor is worn by the user, wherein the cover

comprises an outwardly protruding surface configured to cause tissue of the user

to conform to at least a portion of the outwardly protruding surface when the

noninvasive optical physiological sensor is worn by the user and during operation

of the noninvasive optical physiological sensor, and wherein the outwardly

protruding surface is further configured to allow passage of light to the plurality of

detectors after attenuation by tissue of the user.

2.      The following is an examiner's statement of reasons for allowance: The Terminal

Disclaimers of USPN 8,437,825 and copending applications Nos. 16/212,537 and

16/212440 are approved on 02/26/2019 to resolve the double patenting issues. Wong et

al. (USPN 5,601,079) teaches a noninvasive optical physiological measurement device

(Figs. 4-8 and associated descriptions) comprises a plurality of emitters of different

wavelengths; a housing having a surface and a circular wall protruding from the surface;

a plurality of detectors arranged on the surface and spaced apart from each other (see

Figs. 4-8 and associated descriptions). Schulz et al. (USPN 7,341,559 - applicant cited)

teaches an pulse oximeter (Fig. 19B and associated descriptions) comprises a plurality

of emitters of different wavelengths; a detector; a housing having a surface and a

circular wall protruding from the surface; a light permeable cover arranged above at

least a portion of the housing, the light permeable cover comprising a protrusion

arranged to cover the detector (see Fig. 19B and associated descriptions). Chaiken et

al. (USPN 6,223,063 - applicant cited) teaches an optical physiological measurement

device (Figs. 1-3 and associated descriptions) comprises a plurality of emitters of

different wavelengths; four detectors arranged on the surface and spaced apart from

each other; a plurality of lenses each covers/ in optical communication with a respective

detector (see Figs. 1 -3 and associated descriptions). The prior art of record does not

teach or suggest "a light permeable cover configured to be located between tissue of

the user and the plurality of detectors... wherein the cover comprises an outwardly

Application/Control Number: 16/261,326                                    Page 6
Art Unit: 3791

protruding surface… and wherein the outwardly protruding surface is further configured

to allow passage of light to the plurality of detectors/ at least four detectors after

attenuation by tissue of the user" and "the plurality of detectors are configured to receive

light passed through the outwardly protruding convex surface after attenuation by tissue

of the user", in combination with the other claimed elements/ steps.


        Any comments considered necessary by applicant must be submitted no later

than the payment of the issue fee and, to avoid processing delays, should preferably

accompany the issue fee.  Such submissions should be clearly labeled "Comments on

Statement of Reasons for Allowance."

        Any inquiry concerning this communication or earlier communications from the

examiner should be directed to CHU CHUAN LIU whose telephone number is (571)270-

5507.  The examiner can normally be reached on M-Th (8am-6pm).

        Examiner interviews are available via telephone, in-person, and video

conferencing using a USPTO supplied web-based collaboration tool. To schedule an

interview, applicant is encouraged to use the USPTO Automated Interview Request

(AIR) at http://www.uspto.gov/interviewpractice.

        If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, Jacqueline Cheng can be reached on (571) 272-5596.  The fax phone

number for the organization where this application or proceeding is assigned is 571-

273-8300.

        Information regarding the status of an application may be obtained from the

Patent Application Information Retrieval (PAIR) system.  Status information for

Application/Control Number: 16/261,326                                                    Page 7
Art Unit: 3791

published applications may be obtained from either Private PAIR or Public PAIR.

Status information for unpublished applications is available through Private PAIR only.

For more information about the PAIR system, see http://pair-direct.uspto.gov. Should

you have questions on access to the Private PAIR system, contact the Electronic

Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a

USPTO Customer Service Representative or access to the automated information

system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.


/ERIC F WINAKUR/
Primary Examiner, Art Unit 3791


/CHU CHUAN LIU/
Examiner, Art Unit 3791

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Patent of:  Poeze et al.
U.S. Patent No.:  10,292,628          Attorney Docket No.: 50095-0008IP1
Issue Date:  May 21, 2019
Appl. Serial No.:  16/261,326
Filing Date:  January 29, 2019
Title:  MULTI-STREAM DATA COLLECTION SYSTEM FOR NONINVASIVE MEASUREMENT OF BLOOD CONSTITUENTS

## DECLARATION OF DR. THOMAS W. KENNY

**Declaration**

I declare that all statements made herein on my own knowledge are true and that all statements made on information and belief are believed to be true, and further, that these statements were made with the knowledge that willful false statements and the like so made are punishable under Section 1001 of Title 18 of the United States Code.

By: _____

Thomas W. Kenny, Ph.D.

1

APPLE 1003



APPLE-1008, FIG. 2

60.    Similar to the '628 patent's light permeable cover, Inokawa also teaches a lens 27 that can be "placed on the surface of the sensor-side light-emitting means" to "make[] it possible to increase the light-gathering ability of the LED as well as to protect the LED or PD." *Id.*, [0015], [0058].  As I will further explain below in my analysis of claim 1, this lens corresponds well, both structurally and functionally, to the light permeable cover comprising a protrusion as claimed in the '628 patent. *Id.*

30



APPLE-1008, FIG. 2

61.     Lastly, Inokawa teaches the use of a base device in conjunction with its sensor.  For example, as shown below, Inokawa teaches that its wrist sensor (colored red) may be mounted onto a base device (colored blue blue) that serves as a "charger with communication functionality."  *Id.*, [0060].



APPLE-1008, FIG. 3

31

modification to succeed given the high degree of overlap between the two references.  For example, as shown below, Inokawa teaches that its light permeable cover can be flat (left) so that "the surface is less prone to scratches," or alternatively be in the form of a lens (right) to "increase the light-gathering ability of the LED."  APPLE-1008, [0015], [0016].  That is, depending on the desired objective of the user (*e.g.*, less scratches or improved light-gathering), the shape of the cover can be readily modified.  Moreover, by choosing the material of the protrusion to be scratch-resistant, such as glass, it would have been obvious for a POSITA to achieve both benefits at once.



APPLE-1008, FIG. 17 (left), FIG. 16 (right)

96.    A POSITA would have further recognized that the acrylic material used to make Aizawa's acrylic transparent plate 6 can be easily formed to include a lens.

55

*See* APPLE-1009 at 3:46-51, FIG. 1; APPLE-1023, FIG. 6, [0022], [0032], [0035].

Indeed, many prior art references of this period, such as Nishikawa (shown below)

demonstrate exactly how such a lens shape may be incorporated into a molded

cover.  APPLE-1023, FIG. 6, [0022], [0032], [0035].  In other words, a POSITA

would have known that acrylic is a transparent material that can be readily

transformed into various shapes, including a lens shape, as needed due to its easy

molding properties.  *Id.*  Thus, a POSITA preferring improved light collection

efficiency over reduced susceptibility to scratches could have been able to easily

modify Aizawa's cover to have a lens shape as per Inokawa.  *Id.*  Indeed, only a

routine knowledge of sensor design and assembly, which were well within the skill

of a POSITA, would be required to perform such modifications.  Thus, to achieve

the goal of improving light collection efficiency, which both Aizawa and Inokawa

share, a POSITA would have been able to, with a reasonable expectation of

success, modify Aizawa's light permeable cover to have a lens shape as taught by

Inokawa.



56

142.   As I explained above in ¶¶ 90-98 with respect to element [1d], a POSITA would have been motivated to incorporate a lens-like protrusion of Inokawa into the cover of Aizawa to increase the light collection efficiency.

143.   Ohsaki (APPLE-1014), which I briefly described above in ¶¶ 63-64, provides an alternative/additional rationale for why a POSITA would have modified the flat shape of Aizawa's acrylic plate into a "light permeable cover comprising a protrusion" as per element [1d].

144.   Among other things, Ohsaki teaches that adding a convex surface to its translucent board 8 (*i.e.*, light permeable cover) can help prevent the device from slipping on the tissue of the wearer compared to using a flat cover without such a protrusion.  APPLE-1014, [0025].



FIG. 2

APPLE-1014, FIG. 2

145.    Minimizing slippage between a user-worn sensor device and the tissue of the

user was indeed a well-known objective in such devices.  For example, Aizawa

teaches using its acrylic transparent plate 6 (*i.e.*, light permeable cover) to improve

"adhesion between the wrist 10 and the pulse rate detector 11."  APPLE-1006,

[0026], [0030].  While Aizawa doesn't discuss whether the shape of its acrylic

plate could be modified to achieve this objective, a POSITA in possession of both

Aizawa and Ohsaki would have recognized that Ohsaki's addition of a convex

protrusion to its light permeable cover could be similarly implemented in Aizawa's

device to help achieve the two references' shared goal of minimizing slippage.  *Id.*

In other words, a POSITA seeking to achieve improved adhesion between the

detector and the skin, as expressly recognized in Aizawa, would have been

motivated and readily able to modify Aizawa's acrylic plate to have a convex

shape as in Ohsaki.  This would have allowed Aizawa's sensor device to remain

better adhered to the skin and thereby increase its light-collecting efficiency.

APPLE-1006, [0026], [0030]; APPLE-1014, [0025].  Additionally, a POSITA

would have appreciated that the lens/protrusion in the Aizawa-Inokawa

combination as detailed above in ¶¶ 89-98 would have provided a similar anti-

slippage advantage due to the lens's convex shape, thereby providing an additional

82

motivation for a POSITA to make the above-noted modification of Aizawa in view of Inokawa's lens.

146.   The resulting Aizawa-Inokawa-Ohsaki combination satisfies all remaining elements of claims 1-15, 17, 20-26, and 28 in the same manner as previously described in Ground 1A, which is herein incorporated by reference.

## X.     GROUND 1C –Claims 18, 29, 29, and 30 Are Rendered Obvious by Aizawa in view of Inokawa, Mendelson-2006, and Beyer, Jr.

### A.     Claim 18

**[18a] The optical physiological measurement device of claim 7 further comprising: a processor configured to: receive one or more signals from the at least four detectors, the one or more signals indicative of a physiological parameter of a wearer of the optical physiological measurement device; and**

**[18b] output information indicative of measurements of the physiological parameter to a mobile phone.**

147.   As an initial matter, I note that Aizawa teaches uploading data to an external display/device but is silent about how such data transmission would actually be implemented, instead leaving implementation details to the POSITA.  APPLE-1006, [0015], [0023], [0035].  In other words, Aizawa does not disclose a specific monitoring device, mobile or otherwise, that can display the measured physiological data to the user, but a POSITA would have nonetheless recognized that different types of monitoring devices, including those that are mobile, could be

83

# IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Patent of:     Poeze et al.

U.S. Patent No.:     10,292,628          Attorney Docket No.: 50095-00008IP1

Issue Date:          May 21, 2019

Appl. Serial No.:    16/261,326

Filing Date:         January 29, 2019

Title:               MULTI-STREAM DATA COLLECTION SYSTEM FOR
                     NONINVASIVE MEASUREMENT OF BLOOD
                     CONSTITUENTS

## SECOND DECLARATION OF DR. THOMAS W. KENNY

**Declaration**

I declare that all statements made herein on my own knowledge are true and

that all statements made on information and belief are believed to be true, and

further, that these statements were made with the knowledge that willful false

statements and the like so made are punishable under Section 1001 of Title 18 of

the United States Code.


Dated: September 29, 2021          By: _____

                                        Thomas W. Kenny, Ph.D.

APPLE 1047
Apple v. Masimo
IPR2020-01521

19.     As I explained during my deposition, "given the arrangement of the corpuscles as the reflecting objects in the space all around underneath [Inokawa's lens]...there would be some improvement in the light concentration at pretty much all of the locations under the curvature of the lens." Ex. 2006, 164:8-16.  As explained further below, this improvement—which a POSITA would understand is what Inokawa is referring to—is based on the convex shape of the lens and application of the most basic of optical concepts, namely Snell's law.  Thus, Inokawa's lens "provides an opportunity to capture some light that would otherwise not be captured." *Id.*, 204:21-205:12.  In short, Inokawa's lens improves the light-gathering ability of Aizawa's sensor by allowing a larger fraction of the backscattered light to reach the areas covered by the lens.  *See* Ex. 2012, 86, 90; APPLE-1046, 803.

20.     As explained in my Original Declaration, the illustrations below showing the combination of the inventions of Aizawa and Inokawa provide an example of positioning of curvature near the locations of the sensors:



Light permeable cover

APPLE-1003, ¶94

21.    In the expanded version of this same illustration as shown below, I provide dotted lines to indicate the approximate orientation of a line orthogonal to the surface at various locations from the center to the edge.  As shown in this illustration, these orthogonal lines vary in orientation most rapidly near the edge, where the illustrated curvature of the lens surface is the greatest.   As discussed above with respect to Snell's law, and as I discussed during my deposition, a POSITA would understand that, for the case of an index of refraction in the lens that exceeds the index of refraction in the surrounding tissue, the incoming light rays are refracted in a way that deflects incoming rays somewhat towards these orthogonal lines.  *See* Ex. 2006, 166:18-170:8; APPLE-1044, 1486; APPLE-1045, 1484.  Because of the curvature of the lens, the orthogonal lines positioned at the locations of greatest curvature are more generally oriented towards the detector locations.  An elementary understanding of Snell's law, and of the lens shape

provided in this illustration, would guide a POSITA to understand that a combination of the teachings of Aizawa and Inokawa as presented in my original declaration, would lead to an improvement in the light concentration at the location of the detectors.  Very simply, a POSITA familiar with Snell's law and in view of Aizawa and Inokawa would understand that the placement of the curvature in the region near the locations of the detectors would have the effect of improving the light concentration provided by the lens in these regions compared to the case of not having such curvature (*i.e.*, using a flat plate).



22.    The above illustrations showing light rays and refraction are offered here to explain the basic concepts that a POSITA would understand and rely on in considering the combination of Aizawa and Inokawa.  As stated repeatedly in my deposition testimony, these are illustrations and not precision drawings of an optimized shape.  As I described, a POSITA would appreciate that it is reasonable to consider a system with one or more LEDs at the center and detectors positioned

the axis of symmetry.  APPLE-1042, 166:12-182:3; APPLE-1041, 40:4-11.  A POSITA would understand that Dr. Madisetti's statements do not reflect the situation for diffuse light incident on a lens-like surface such as would result from the combination of the teachings of Aizawa and Inokawa.

30.    Patent Owner and Dr. Madisetti's reliance on drawings provided in paragraphs 119-120 of my Original Declaration filed in IPR2020-01520 for justification of their understanding of Inokawa's lens is similarly misplaced.  POR, 16, 17, 23; APPLE-1041, 41:7-22, 60:7-61:6.  Far from demonstrating the false notion that a convex lens directs all light to the center, these drawings I previously provided are merely simplified diagrams included to illustrate, as per dependent claim 12, one example scenario (based on just one ray and one corpuscle) where a light permeable cover can "reduce a mean path length of light traveling to the at least four detectors."  Ex. 2020, ¶¶119-120.  As previously illustrated, there are many other rays that would intersect the interface between the tissue and the lens at different locations and with different angles of incidence, and the effect of the lens on this variety of rays is not nearly as simple as the statements provided by Dr. Madisetti.  There is simply no possibility of any lens focusing all incoming rays from a diffuse light source toward a central location.

31.    And even if Inokawa's lens could hypothetically and magically be configured to send all reflected light toward the center, which I certainly don't

agree with and submit violates fundamental optical principles, Patent Owner's assertion that the lens would fail to work for a revised design with a central emitter and peripheral emitters is fundamentally flawed because of the simple principle of reversibility of light propagation. The well-known and firmly-established optical ***principle of reversibility***, which comes from the even more fundamental Fermat's principle, APPLE-1049, 87-92, trivially dispels Patent Owner's claim that reversing the LED/detector configuration of Inokawa (as in Aizawa) by placing the detectors around centrally located LEDs would necessarily cause Inokawa's lens to send less light to the detectors, thereby rendering Inokawa's lens ineffective when applied to Aizawa. POR, 15-20. As I noted above, Fermat's principle states that a path taken by a light ray between two points is one that can be traveled in the least time. *See* APPLE-1052, 87-92; APPLE-1049, 106-111. It is one of the most fundamental concepts in optics (and physics for that matter) and readily explains the principle of reversibility. Simply put, the speed of light is independent of the direction of propagation for these simple materials, which can be represented by an index of refraction. Therefore the shortest path between two points is the same regardless of the direction traveled along the path.

32. According to the principle of reversibility, for instance, "a ray going from P to S will trace the same route as one from S to P." APPLE-1052, 92; APPLE-1049, 110. This principle of reversibility is explicit in Snell's law, which simply

relates angles of refraction to indices of refraction without any dependence on the direction that the light is travelling.  So, even if a POSITA was not explicitly familiar with the description of the principle of reversibility of light paths, the very simple algebraic expression of Snell's law provides the requirement that light paths must be reversible.  Even as Dr. Madisetti happens to be unfamiliar with the principle of reversibility of light, it is clear from his testimony that he is familiar with Snell's law.  Therefore he must admit that the paths of light through transparent materials with varying indices of refraction must be reversible, as this is a trivial consequence of the simple mathematical expression of Snell's Law as simply and exclusively relating the angles of incidence and refraction of light rays to the indices of refraction of the materials.  *See* APPLE-1052, 84; APPLE-1049, 101; APPLE-1043, 80:20-82:20.  The illustration below shows how this principle of reversibility is a simple consequence of Snell's law.



33.   To illustrate the relevance of this principle, with reference to Patent Owner's annotated version of Inokawa FIG. 2 as shown below, two example ray paths from the LEDs (green) to the detector (red) can be seen.  In this case, the rays originate from the peripheral LEDs (green) and arrive at the central detector (red).



POR, 14, 18, 21 (annotated)

34.   Now, by flipping the LED/detector configuration, as in Aizawa, and applying the principle of reversibility, it is readily observed that the two exemplary paths shown above simply reverse their direction—such that any condensing/directing/focusing benefit achieved by Inokawa's lens (blue) under the

original configuration would be similarly achieved under the reversed

configuration (assuming that other factors are kept constant for ease of

comparison):



POR, 13, 16, 20 (modified/annotated)

35.    Of course, as I have stated, the illustration provided by Inokawa was not

intended as a precision optical diagram.  Nevertheless, within the intent of the

illustration of Inokawa, it is possible to see that it is possible to switch the locations

of the emitter and detector and that the same light paths in the opposite direction

would be present.  A POSITA would appreciate that the direction of the rays in this

drawing can be reversed without any changes to the lens of Inokawa.  Therefore, it

is possible to consider a switch of the locations of the detector and emitter in

Inokawa.  A POSITA, considering Aizawa and Inokawa would understand that it is

reasonable to use a lens-like surface from Inokawa with the emitter and detector

configuration of Aizawa.

36.    When confronted with this basic principle of reversibility derived from

Fermat's Principle during deposition, Dr. Madisetti refused to acknowledge it,

even going so far as to express ignorance of it ("Fermat's principle, ***whatever that***

50.   As explained in my Original Declaration, "Ohsaki teaches that adding a convex surface...can help prevent the device from slipping on the tissue of the wearer compared to using a flat cover without such protrusion" and that "a POSITA seeking to achieve improved adhesion between the detector and the skin, as expressly recognized in Aizawa, would have been motivated and readily able to modify Aizawa's acrylic plate to have a convex shape as in Ohsaki." APPLE-1003, ¶¶144-145 (citing to APPLE-1014, [0025]; APPLE-1006, [0026], [0030]).

51.   Patent Owner, rather than attempting to directly rebut this rationale, focuses on arguments that are factually flawed and legally irrelevant. Specifically, Patent Owner contends that Ohsaki's "convex surface must have *longitudinal directionality*," and that "Ohsaki indicates that its convex surface *only prevents slipping on the backhand side* (i.e., watch-side) of the user's wrist." POR, 43. Patent Owner further asserts that the shape of Ohsaki's board must be limited to a long, narrow rectangular shape while ignoring that the specification includes no specific limitation on the shape of the board.

52.   Notably absent from the POR is how Ohsaki *actually* describes the benefits associated with its convex surface. For example, Ohsaki contrasts a "convex detecting surface" from a "flat detecting surface," and explains that "if the translucent board 8 has a flat surface, the detected pulse wave is adversely affected by the movement of the user's wrist," but that if "the translucent board 8 has a

convex surface…variation of the amount of the reflected light…that reaches the light receiving element 7 is suppressed." APPLE-1003, ¶145; APPLE-1014, ¶[0025].  But a POSITA would have understood from such teachings of Ohsaki that the advantages of a light permeable protruding convex cover could apply regardless of any alleged longitudinal directionality of Ohsaki's cover and regardless of where on the body such a convex cover was placed.  *See APPLE*-1014, ¶¶[0015], [0017], [0025], FIGS. 1, 2, 4A, 4B.  This is because Ohsaki was relied upon not for its exact cover configuration but rather for the rather obvious concept that a convex surface protruding into a user's skin will prevent slippage, regardless of any directionality that may or may not exist with respect to such convex surface and regardless of where on the human body it is located.  *See* Ex. 2012, 91, 87; APPLE-1014, ¶¶[0015], [0017], [0025], FIGS. 1, 2, 4A, 4B.  In fact, Ohsaki says nothing about the exact dimensions or even anything specific about the required shape of the board, except that it provides a convex protrusion.  A POSITA would seek to combine the board of Ohsaki with Aizawa by making reasonable modifications as needed to ensure that the board of Ohsaki was compatible with the other features present in Aizawa.  A POSITA would find it obvious to consider selecting a shape for the board that is consistent with the shape of the system presented in Aizawa, and would expect that the benefits associated with the convex board of Ohsaki would be present in the combination.  And adding

a convex surface to Aizawa's flat plate will serve to *improve* its tendency to not slip off, not take away from it, since it is well understood that physically extending into the tissue and displacing the tissue with a protrusion provides an additional adhesive effect. Aizawa provides a plate that improves adhesion with the surface. Ohsaki further teaches that the convex protrusion provides "intimate contact" with the tissue, which helps prevent the detecting element from slipping off. These benefits are clearly related and complimentary, and a POSITA would appreciate that modifying the plate of Aizawa to include a convex protrusion as in Ohsaki would provide improved performance, and that these benefits can be obtained by making obvious modifications to the board in Ohsaki to accommodate the shape of Aizawa.

## II.    GROUNDS 2A-2B RENDER OBVIOUS THE CHALLENGED CLAIMS

53.    As I further clarify below in response to Patent Owner's arguments, claims 1-17 and 20-28 are rendered obvious by the combination of Mendelson-1988 and Inokawa (Ground 2A).

### A.    A POSITA would have been motivated to modify Mendelson-1988 in view of Inokawa to add a lens

54.    Similar to their rebuttal of the Aizawa-based grounds, Patent Owner contends that (1) "Inokawa's convex lens focused light on a *centrally located*

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

APPLE INC.

Petitioner,

v.

MASIMO CORPORATION,

Patent Owner.

———————————

Case IPR2020-01521
U.S. Patent 10,292,628

———————————

**DECLARATION OF VIJAY K. MADISETTI, PH.D.**

**MASIMO 2004
Apple v. Masimo
IPR2020-01521**

include a lens/protrusion (right) as per Inokawa in order to 'increase the light-gathering ability.'" Ex. 1003 ¶94 (quoting from Inokawa, Ex. 1008 ¶15).

## B.    Ground 1A Does Not Establish Obviousness

### 1.    A POSITA Would Not Have Been Motivated To Combine Inokawa's Convex Lens With Aizawa's Sensor

#### a)    Dr. Kenny and Petitioner Admit That Inokawa's Convex Lens Directs Light To The Center Of The Sensor

50.    Both Dr. Kenny and Petitioner agree that Inokawa's convex lens condenses light towards a centrally located detector—not periphery-located detectors like those used in Aizawa, as demonstrated by their submissions in an IPR (IPR2020-01520 (Ex. 2019; Ex. 2020)) of related patent U.S. Pat. No. 10,258,265 (Ex. 2025). U.S. Pat. No. 10,258,265 and the '628 Patent share a common specification. U.S. Pat. No. 10,258,265 is at least a continuation of U.S. Patent App. No. 14/981290. The '628 Patent is at least a continuation of U.S. Patent App. No. 16/212537, which is at least a continuation of U.S. Patent App. No. 14/981290.

51.    Petitioner included the illustrations below in its Petition in IPR2020-01520 when discussing claim 12 of U.S. Pat. No. 10,258,265. Ex. 2019 at 45. Petitioner explained that "the lens/protrusion of Inokawa, which is used to modify Aizawa ... serves a condensing function and thus, as with any other lens, refracts light passing through it." Ex. 2019 at 44. Petitioner explained the drawing below as comparing "the length of non-refracted light (i.e., without a lens, left) bouncing

off an artery with that of refracted light (i.e., with a lens, right)." Ex. 2019 at 44-45. Refraction is a phenomenon related to the velocity of light in different materials because the velocity of light depends on the material through which it is traveling. Thus, the change in velocity as light moves from one material to another material may cause the light to deviate from its original direction, which is called "refraction." I note that the illustration below shows refraction for both the flat and convex surfaces because in both instances the illustrated light ray changes direction. Moreover, I note that, as illustrated by Petitioner, the change of direction for the light ray hitting the convex surface is relatively more towards the center of the cover than for the flat cover. Petitioner states that the result of the greater refraction of light with the convex cover with a protruding surface is that "the mean path length of light traveling to the at least four detectors is reduced—that is, the purple line is shorter than the redline [sic green line]." Ex. 2019 at 45. Petitioner also includes a drawing superimposing the two drawings below to "clearly show[] the shortened path traveled by refracted light in the presence of a protrusion/lens, both within the tissue as well as for total path length." Ex. 2019 at 45.



From A Related IPR (Ex. 2019):
Petitioner's illustration of redirection of the mean path length
of light traveling to the detectors when passing
through a flat (left) and convex (right) cover (Ex. 2019 at 45)



From A Related IPR (Ex. 2019):
Petitioner's illustration superimposing the above refractions
when illustrating how a convex surface a protruding surface changes the
mean path length of incoming light (Ex. 2019 at 45, 91)

52.    Dr. Kenny also included and explained the two figures above in his declaration in IPR2020-01520 (Ex. 2020) as a way to illustrate the mean path length of light.   Ex. 2020 at 69-70.   Dr. Kenny explained that, when using a protruding surface such as Inokawa's convex lens, "the incoming light is 'condensed' toward the center."   Ex. 2020 at 69-70.   Dr. Kenny goes on to explain: "Laying these two drawings on top of each other…the shortened path length within

the tissue for the purple (refracted) line can be clearly seen compared to the path length within the tissue of the green (non-refracted) line." Ex. 2020 at 70-71.

53.     The understanding expressed by Petitioner and Dr. Kenny about condensing light is consistent with Inokawa's disclosure, which uses a convex surface as a way to increase the light gathering capability for a centrally located detector.  Ex. 1008 ¶[0058], Fig. 2.  As shown in Figure 2 (below), Inokawa illustrates how a protruding surface placed between the sensor and the skin condenses incoming light towards the central detector 25.  Ex. 1008 ¶[0058], Fig. 2.  This is helpful for Inokawa's particular sensor configuration because the emitters are located on the edges of the sensor while the detector is located in the center of the sensor.  Thus, for Inokawa's particular linear arrangement of emitter-sensor-emitter, the protruding shape is reported to increase the light gathering capabilities of the centrally located detector when collecting the light emitted by the periphery-located LEDs and reflected by the measurement site.  Ex. 1008 ¶[0058], Fig. 2.  Inokawa illustrates this by using arrows that illustrate the general path of light from emitters, to the measurement site, and then back towards the central detector.

requires no coursework, training or experience in physiology; and (3) focuses on data processing and not sensor design. Training in data processing would not have prepared a POSITA for the type of design process identified by Dr. Kenny as needed to develop a working optical physiological sensor.

74.    A POSITA would have understood that Inokawa's convex lens benefits Inokawa's sensor design with its center-located detector. Ex. 1008 ¶58, Fig. 2. In my opinion, a POSITA would have credited the teaching of Inokawa itself, which shows that a protruding surface directs incoming light towards the center. Ex. 1008 ¶58, Fig. 2. In contrast, I do not believe a POSITA would have been motivated to go through Dr. Kenny's extensive trial and error process to try and figure out whether Inokawa's protruding surface would have analogous benefits in a device with peripheral detectors and a central emitter. Instead, a POSITA would have taken Inokawa's teaching at face value, consistent with the general understanding of how light interacts with a protruding surface.

75.    Thus, accounting for the possibility that a POSITA with no experience in optical physiological sensor design would nonetheless understand the wide ranging considerations identified by Dr. Kenny at his deposition in related IPRs, it is still my opinion that Inokawa does not establish a valid motivation to combine Inokawa with Aizawa, much less a reasonable expectation of success. When addressing a reasonable expectation of success, Dr. Kenny focuses his discussion

on the manufacturing of a device, and not whether the device would be able to successfully act as a physiological monitor or sensor.  See, e.g., Ex. 1003 ¶¶95-96. Whether or not "the shape of the cover can be readily modified" (Ex. 1003 ¶95), Dr. Kenny never explains why a POSITA would have expected Petitioner's proposed combination to result in a successful optical physiological sensor.  The lack of analysis is particularly important because a POSITA would have expected a protruding surface to decrease the optical signal at the peripheral detectors.  The possibility that POSITA could manufacture a device is not evidence a POSITA would have reasonably expected the resulting device to successfully work as an optical physiological measurement device.  Decreasing the amount of light reaching the detectors will decrease the signal, increase the relative amount of noise, and could thus result in a signal unusable for actually monitoring a physiological parameter.

### d)    Petitioner's Obviousness Challenge Also Relies On References Not Identified As Part Of Ground 1A Without A Motivation To Combine Or Expectation Of Success

76.    I further note that the Petition, and Dr. Kenny's analysis, apparently relies heavily on references that neither the Petitioner nor Dr. Kenny identifies as part of Ground 1A.  The Petition states that Ground 1A includes only two references:  Aizawa and Inokawa.  Pet. 1.  But Dr. Kenny's analysis relies heavily on another cited reference: Nishikawa.  Ex. 1003 ¶¶91-96.

illustrates that LEDs with curved surfaces similar to Nishikawa's LEDs are a fraction of the size of the sensor or cover.  Ex. 1008 Fig. 2 (21, 23).  Likewise, Aizawa similarly illustrates that the LED is a much smaller part of the overall sensor.  Ex. 1006 Fig. 1; *see also* Figs. 4, 5.  Thus, given the differences between Nishikawa on the one hand and Inokawa and Aizawa on the other hand, a POSITA would not have been motivated to apply Nishikawa's lens design in a physiological sensor and would have had no expectation of success in doing so.



Comparison of Nishikawa's LED package (left) & Inokawa's sensor Fig. 2 (right) showing scale difference (LED package highlighted in green in both)

### 2.    **A POSITA Would Not Have Added A Second Emitter (LED) To Aizawa**

79.    Even if a POSITA were motivated to combine Aizawa and Inokawa, the combination of Aizawa and Inokawa still would not result in the claimed invention because, in my opinion, it does not disclose all of the claim limitations. Every claim of the '628 Patent requires (1) a plurality of emitters and (2) at least four detectors.  Ex. 1001 Claims 1, 7, 20.  Neither Aizawa nor Inokawa includes

-49-

both a plurality of emitters and at least four detectors. *See, e.g.*, Ex. 1006 Fig. 1 (single center-located emitter with multiple peripheral detectors); Ex. 1008 Fig. 2 (two peripheral emitters with a single center-located detector). Neither Aizawa nor Inokawa disclose or suggest the use of both multiple detectors and multiple emitters in the same sensor.

80.     Aizawa has no disclosure of a sensor with multiple detectors and multiple emitters. To the extent Dr. Kenny suggests Aizawa teaches the use of multiple detectors and multiple emitters in a single sensor, I disagree. In one of Aizawa's embodiments, multiple detectors surround a single centrally located LED. Ex. 1006 ¶[0033], Figs. 1, 2, 4, 5. In this embodiment, Aizawa teaches the number of photodetectors "disposed around the light emitting diode" can be increased or decreased. Ex. 1006 ¶[0032]. In Aizawa's other embodiment, which is not illustrated, multiple LEDs surround a single centrally located detector. *See* Ex. 1006 ¶[0033] ("The same effect can be obtained when the number of photodetectors 22 is 1 and a plurality of light emitting diodes 21 are disposed around the photodetector 22."). Inokawa likewise discloses an arrangement where two LEDs are used on either side of a single detector. Ex. 1008 ¶[0058], Fig. 2. Neither reference discloses a sensor with multiple emitters used with multiple detectors.

Inokawa, like Aizawa, flank a single center-located detector. *See* Ex. 1008 ¶[0058] ("[T]he pulse sensor 1 is comprised of a pair of light-emitting elements ... [and] a single photodiode."). There is no multi-detector/multi-emitter embodiment disclosed in either Aizawa or Inokawa, and no reason why a POSITA would have been motivated by these references to change both references to use a multi-detector/multi-emitter arrangement. Dr. Kenny asserts that "it was common practice in the pulse oximeter field to centrally locate multiple emitters of different wavelengths" (Ex. 1003 ¶84); this is irrelevant to Aizawa because Aizawa is not an oxygen saturation sensor, it is a pulse wave sensor (Ex. 1006 ¶[0002]).

84.   Dr. Kenny points to two reasons why Inokawa would have motivated a POSITA to add a second LED to Aizawa. First, Dr. Kenny asserts that a POSITA would have added a second LED based on the "added ability to measure body movement." Ex. 1003 ¶76; *see also* ¶77. But Aizawa already includes this functionality, and explains that it provides a "device for computing the amount of motion load from the pulse rate." Ex. 1006 ¶[0015]. There is no need for a design change when Aizawa already includes the relevant functionality.

85.   Second, Dr. Kenny asserts that adding a second LED would enable Aizawa to transmit data to a base device with a configuration like that in Inokawa. Ex. 1003 ¶80. Dr. Kenny asserts that "Aizawa contemplates uploading data from its wrist sensor to an external base device" and would have incorporated Inokawa's

-52-

base device "that both charges and receives data from the pulse sensor." Ex. 1003 ¶80.



Dr. Kenny's Illustration of Inokawa's Base Device (Ex. 1003 ¶80)

86.    But Aizawa already includes a transmitter in its structure, so Aizawa does not need to incorporate Inokawa's base-device data transmission approach. Ex. 1006 ¶¶[0023], [0028], [0035].  Moreover, Aizawa's goal is "real-time measuring" (Ex. 1006 ¶[0004]) with the transmitter "transmitting the measured pulse rate data to a display," (Ex. 1006 ¶[0015]).  As Dr. Kenny acknowledged, Aizawa's sensor is designed for monitoring heart rate at the time of exercise.  Ex. 1003 ¶162.  Inokawa's base device, however, only transmits pulse rate data "when the pulse sensor ... is mounted onto the base device." *See, e.g.*, Ex. 1008 Abstract. Inokawa's system thus requires the user to remove the monitoring device, thus stopping the monitoring, and attach it to a base solution before the sensor can transmit data.  Ex. 1008 Figs. 3, 8.  Transforming Aizawa into a base-device-transmitter eliminates the ability to take and display real-time measurements, one

-53-

of Aizawa's stated goals, while increasing power consumption and cost by adding an additional LED.  Ex. 1008 ¶[0033].

87.    Inokawa would not have motivated a POSITA to make such a change to Aizawa.  Dr. Kenny admits that Inokawa can accomplish transmission with a single LED.  Ex. 1003 ¶82; *see also* Ex. 1008 ¶[0062].  Inokawa adds a second LED to provide an improvement to help address two situations, neither of which applies to Aizawa.  One situation is in a mechanically connected system, where there may be a "risk of contact failure to damage or deterioration."  Ex. 1008 ¶[0004].  That potential improvement is irrelevant since Aizawa's wrist-worn device (Ex. 1006 Fig. 2) uses a transmitter—not a mechanically connected cable.  The second possible situation is not having to use a "dedicated wireless communication circuit…."  Ex. 1008 ¶[0004].  Aizawa, however, already has a transmitter that provides real-time heart measurements to a display.  Dr. Kenny's asserted motivations do not explain why a POSITA would (1) redesign a sensor by adding a second LED, (2) find it desirable to require the use of a separate base station for data transfer and charging, and (3) require the user to remove the device to transmit data when the ultimate result is to remove a transmitter circuit that was already present in Aizawa.

88.    Among other things, Dr. Kenny does not address other complications that would result from adding an extra LED to a physiological sensor.  For

-54-

does not result in a sensor with both multiple emitters and at least four detectors, and Ohsaki does not fix this problem: it has a single emitter and a single detector under a translucent board. Ex. 1014 ¶[0017], Fig. 2.

## 2. A POSITA Would Have Understood That Ohsaki's Board Would Not Prevent Slipping With Aizawa's Device

93.    Dr. Kenny also does not establish any benefit to introducing Ohsaki's convex board to Aizawa's device. Dr. Kenny states that "Ohsaki teaches that adding a convex surface to its translucent board 8 (i.e., light permeable cover) can help prevent the device from slipping on the tissue of the wearer compared to using a flat cover without such a protrusion." Ex. 1003 ¶144; *see also* ¶145 ("In other words, a POSITA seeking to achieve improved adhesion between the detector and the skin, as expressly recognized in Aizawa, would have been motivated and readily able to modify Aizawa's acrylic plate to have a convex shape as in Ohsaki."). But Ohsaki's disclosure indicates any benefit to its board is exceptionally limited. First, Ohsaki indicates that the "detecting element" (2) must have longitudinal directionality, which I understand to mean it must be rectangular in shape. Ex. 1014 ¶[0019]. Ohsaki shows the long side of the rectangle in Ohsaki Figure 2. Ex. 1014 ¶[0019]. This long direction is pointed up and down the user's arm. Ex. 1014 ¶[0019]. The board (8) spans most of the long direction in Ohsaki's detecting element. Ex. 1014 Fig. 2. Ohsaki also illustrates the short direction of the detecting element (2) (which is in the "circumferential" direction of the wrist)

-57-

in Figure 1. Ex. 1014 ¶[0019], Fig. 1. Figure 1 shows that in the short direction, the board is considerably narrower than the detecting element (2). Thus, a POSITA would have understood that Ohsaki's board is long, narrow, and rectangular. Ohsaki indicates that one must orient the sensor and the accompanying rectangular board with the longitudinal direction of the user's arm to prevent slipping. Ex. 1014 ¶[0019]. Third, Ohsaki indicates that the protruding surface only prevents slipping on the backhand side (i.e., watch-side) of the user's wrist. Ex. 1014 ¶[0024]. Ohsaki's sensor has "a tendency to slip off" if it is on the palm side of the user's wrist. Ex. 1014 ¶[0023], Figs. 3A-3B. As shown in Ohsaki Figure 3B, a measurement using a sensor with a convex board that is taken from the "front side" (the "palm side") of the wrist has a similar amount of motion noise as a flat surface used on the backhand side of the wrist (Figure 4B), which Ohsaki deems is "adversely affected by movement." See Ex. 1014 ¶[0025] (discussing the flat surface measurements in Figure 4B), Figs. 3A-3B, 4A-4B.

94.    Aizawa is different from Ohsaki on each of these issues. First, rather than using a rectangular longitudinal directionality, Aizawa uses a circular arrangement of detectors disposed around a central emitter. Ex. 1006 ¶¶[0009], [0027], [0036]. Aizawa distinguishes its sensor from linear sensors such as Ohsaki's sensor. Ex. 1006 ¶¶[0009], [0027], [0036]. Second, a POSITA could not place Aizawa's circular surface with the longitudinal direction of the user's arm.

-58-

Ex. 1014 ¶[0019]. This is because its circular shape means that Aizawa's sensor points in all directions equally. Third, Aizawa's sensor is positioned on the palm side of the wrist. Ex. 1006 Fig. 2 (below). Aizawa requires this positioning so that the sensor "becomes close to the artery…of the wrist." Ex. 1006 ¶[0026]; *see also, e.g.*, Abstract, ¶¶[0002], [0009], [0027].



FIG. 2

Aizawa's sensor shown on palm side of wrist (Ex. 1006 Fig. 2)

95. Thus, a POSITA would not have believed Ohsaki's longitudinal protruding surface would benefit Aizawa's device. Ohsaki teaches that a protruding surface on the palm side of the wrist would not prevent slipping. Ex. 1014 ¶[0023], Figs. 3A-3B. This is shown in Ohsaki Figures 3B's motion signal, which illustrates that Ohsaki's sensor experiences considerable movement and slipping on the palm side (front side) of the wrist, as compared to Figure 3A's motion signal on the back side of the wrist. Thus, a POSITA would have had no motivation to add such a protruding surface to Aizawa's palm-side sensor. Instead,

Aizawa reports that on the palm side of the wrist, a flat surface improves adhesion. Ex. 1006 ¶¶[0013], [0026], [0030], [0034]; *see also* Figs. 3A-3B, ¶[0028] (illustrating Aizawa's output of photodetector).  Thus a POSITA would have believed that adding Ohsaki's protruding surface would have disrupted the improved adhesion properties reported for Aizawa's flat plate, in view of Ohsaki's reported slipping and noise for a protruding surface positioned on the palm side (front side) of the wrist.  Ex. 1014 ¶¶[0023]-[0024], Figs. 3A-3B.  Ohsaki's teachings are also incompatible with Aizawa's sensor positioning and design because—as discussed—Aizawa requires measurements from "the artery of a wrist." Ex. 1006 ¶¶[0002], [0009], [0026], [0027], [0036].  Wrist arteries are near the surface on the palm side of the wrist.  Ex. 2010 at 44 (Plate 429) (showing radial and ulnar arteries in superficial layer of the anterior (palm side) of wrist), compare at 71 (Plate 456) (showing arteries on palm side of upper limb).

**E.    The Challenged Dependent Claims Are Nonobvious Over Ground 1B**

96.    The Petition does not establish that independent claims 1, 7, and 20 are obvious based on the proposed combination of references in Ground 1B.  It also does not establish that any of the challenged dependent claims are obvious for the same reasons as for claims 1, 7, and 20.

Appx10385

# IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Patent of:    Jeroen Poeze et al.
U.S. Patent No.:   10,588,553      Attorney Docket No.:  50095-0012IP1
Issue Date:        March 17, 2020
Appl. Serial No.:   16/534,949
Filing Date:       August 7, 2019
Title:             MULTI-STREAM DATA COLLECTION SYSTEM FOR
NONINVASIVE MEASUREMENT OF BLOOD CONSTITU-
ENTS

**Mail Stop Patent Board**
Patent Trial and Appeal Board
U.S. Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450

## PETITION FOR *INTER PARTES* REVIEW OF UNITED STATES PATENT NO. 10,588,553 PURSUANT TO 35 U.S.C. §§ 311–319, 37 C.F.R. § 42

Attorney Docket No. 50095-0012IP1
IPR of U.S. Patent No. 10,588,553

elements according to known methods to yield predictable results—improved

adhesion of the sensor to the user's skin, and improved signal strength. *KSR v.*

*Teleflex*, 550 U.S. 398, 417 (2007); APPLE-1003, ¶[0090]. Furthermore, the el-

ements of the Mendelson-Ohsaki sensor would each perform functions they had

been known to perform prior to the combination—Ohsaki's translucent board 8

would simply be placed over the components accommodated within Mendelson

'799's sensor housing 17, and would perform the same function as taught by

Ohsaki. APPLE-1003, ¶¶[0081]-[0090]; APPLE-1012, Abstract, 9:22-10:30,

FIG. 7; APPLE-1009, Abstract, ¶¶[0015], [0017], [0025], FIGS. 1, 2, 4A, 4B.

**(b)**   ***Strap configured to facilitate attachment of part of the physiological***

***monitoring device to a user's arm***

As explained above with respect to Section IV.B.1, Mendelson '799 depicts

and describes "a pulse oximeter 20 utilizing … sensor 10." APPLE-1012, Ab-

stract, 9:22-10:30, FIGS. 7, 8.

As Mendelson '799 acknowledges, "reflection-mode or backscatter type

pulse oximetry…allows for measuring SaO2 from multiple convenient locations on

the body (e.g. the head, torso, or upper limbs)," and several references that are

mentioned within Mendelson '799 depict and describe pulse oximetry devices in

Attorney Docket No. 50095-0012IP1
IPR of U.S. Patent No. 10,588,553

which at least part of the device is configured to be strapped to the arm of a user.
APPLE-1012, 2:14-27, 4:13-22; APPLE-1018, 1-3, FIG. 2.

Similarly, and as shown in Ohsaki's FIG. 1 (reproduced below), Ohsaki explains that the detecting element of its "wristwatch-type human pulse wave sensor" "is attached on the back side of the user's wrist by a dedicated belt [10] so that the convex surface of the translucent member is in intimate contact with the surface of the user's skin."  APPLE-1009, ¶¶[0009], [0018], FIG. 1.



APPLE-1009, FIG. 1 (annotated)

As Ohsaki explains, [t]he detecting element 2 is fixed on the user's wrist 4 by a dedicated belt 10," which "may be made from elastic material so that regular pressure is applied to the user's wrist," which is said to prevent "disturbance light from the outside" from penetrating translucent board 8.  APPLE-1009, ¶[0018].

28

Filed: June 1, 2021

Filed on behalf of:
  Patent Owner Masimo Corporation
By:  Joseph R. Re (Reg. No. 31,291)
  Stephen W. Larson (Reg. No. 69,133)
  Jarom D. Kesler (Reg. No. 57,046)
  Jacob L. Peterson (Reg. No. 65,096)
  William R. Zimmerman (admitted *pro hac vice*)
  Jeremiah S. Helm, Ph.D. (admitted *pro hac vice*)
  KNOBBE, MARTENS, OLSON & BEAR, LLP
  2040 Main Street, Fourteenth Floor
  Irvine, CA 92614
  Tel.:  (949) 760-0404
  Fax:  (949) 760-9502
  E-mail:  AppleIPR2020-1536-553@knobbe.com

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

APPLE INC.

Petitioner,

v.

MASIMO CORPORATION,

Patent Owner.

———————————

Case IPR2020-01536
U.S. Patent 10,588,553

———————————

**PATENT OWNER RESPONSE**

IPR2020-01536
Apple Inc. v. Masimo Corporation



Mendelson '799 Fig. 7 (color added to illustrate "longitudinal" cover)

Indeed, Ohsaki illustrates the differential pressure created by its convex board.

Figures 1 and 2 show that the center of the board exerts the greatest pressure, and

pushes into the skin causing distention.  As shown below, the edges of Ohsaki's

board do not even contact the skin, and thus exert relatively less pressure.



Ohsaki Figs. 1 (left) and 2 (right) (partial view, annotation of air gaps added)

Mendelson '799 expressly warns that "mechanical pressure exerted by the sensor on

the skin" causes large and uncontrollable changes.  Ex. 1012 3:15-31.  Mendelson

-24-

'799 explains that an asymmetric arrangement would result in "uncontrollable physiological and physical parameters" and "large errors in the oxygen saturation readings." *Id.* 3:44-52. Such a cover may also create air gaps over some sensors, but not others. Ex. 2004 ¶¶60-61.

Ohsaki's **rectangular** board would also result in a substantially different optical environment for Mendelson '799's various detectors based on the redirection of light away from some detectors and towards others. Ex. 2004 ¶62. Mendelson '799 explains the importance of **radial symmetry** in an oxygen saturation sensor: "a **radially-symmetric** photodetector array can help to maximize the detection of backscattered light from the skin." Ex. 1012 4:59-65. Mendelson '799's radial array of detectors captures reflected light from all around the centrally located emitter. In contrast, adding Ohsaki's **rectangular** board to Mendelson '799's oxygen saturation sensor would eliminate the **radially** symmetric environment and undermine the reason for Mendelson '799's use of multiple detectors arrayed in a ring pattern. *Id.* 7:25-37. The resulting structure's rectangular board would create a variable physiological environment with different detectors at different distances from the skin—the very situation Mendelson '799 tries to avoid. *See id.* 12:1-16, 12:62-13:7. Indeed, a longitudinal shape might cover some detectors completely and leave other detectors mostly uncovered. Ex. 2004 ¶62.

IPR2020-01536
Apple Inc. v. Masimo Corporation

**2.** **A POSITA Would Have Understood That Ohsaki's Required Measurement Location Would Result In Weak Signals For Mendelson '799's Oxygen Saturation Measurements**

In addition to creating mechanical and optical problems, a POSITA would also have believed that Petitioner's combination would decrease signal strength—the opposite of Petitioner's alleged motivation of "improved signal strength." (Pet. 26-27). To achieve any of Ohsaki's benefits, its sensor must be used at a *specific* measurement location: the *backhand side of the wrist*. Ex. 1009 ¶[0024]; *see also id.* ¶¶[0008], [0016], Title, Abstract (wristwatch sensor worn on backside of wrist); *see also id.* ¶[0030] (wristwatch sensor worn on back of forearm). Ohsaki's measurement location would have dissuaded a POSITA from modifying Mendelson '799's *pulse oximeter* based on Ohsaki. At the time, a POSITA would have believed that the backhand side of the wrist was an unsuitable location for pulse oximetry. Ex. 2004 ¶63.

Indeed, the Mendelson '799 inventor previously *tried* to obtain usable signals for oxygen saturation measurements from the back of the wrist. *See, e.g.*, Ex. 2003 at 3-4. Mendelson reported that he "had to apply a *considerable* amount of external pressure on the sensor" to even *discern* any signal whatsoever. *See id.* Both Ohsaki and Mendelson '799 warn against using too much pressure when taking measurements. *See* Ex. 1012 2:47-53 ("Similarly, variations in contact pressure between the sensor and the skin can cause larger errors…since some of the blood

IPR2020-01536
Apple Inc. v. Masimo Corporation

near the superficial layers of the skin may be normally displaced away from the sensor housing towards deeper subcutaneous structures."), 3:27-31 ("It is also well known for example that changes in the ratio of blood to bloodless tissue volumes may occur…through mechanical pressure exerted by the sensor on the skin."); Ex. 1009 ¶[0018] ("the user feels uncomfortable if the pressure applied to the user's wrist…is too high"); Ex. 2004 ¶64.

Dr. Kenny admitted that Mendelson's prior work reported that signals from the wrist were much weaker and much noisier than signals from other body locations. Ex. 2008 249:10-16. Dr. Kenny acknowledged that Mendelson concluded that it is much easier to monitor the strong signals from the forehead than the weak signals from the wrist. *Id*. 255:12-21.

Even as late as 2013, Mendelson was the advisor for research that reported "there is **little** supporting evidence that [reflectance-based pulse oximetry] can accurately collect measurements from the chest and wrist." Ex. 2015 at 3 (Abstract); *see also id.* at 4 (thanking Mendelson for advising on project); Ex. 2014 at 1 (listing submission date of April 24, 2013 and Mendelson as advisor). Mendelson's group ultimately obtained oxygen saturation signals from a sensor located on the ***palm-side*** of the wrist, "over the radial artery." *Id*. at 99; Ex. 2004 ¶65.

Other groups likewise reported that oxygen saturation sensors would work only if measurements were taken from the ***palm side*** of the wrist, close to the

Filed: October 5, 2021

Filed on behalf of:
    Patent Owner Masimo Corporation
By:    Joseph R. Re (Reg. No. 31,291)
    Stephen W. Larson (Reg. No. 69,133)
    Jarom D. Kesler (Reg. No. 57,046)
    Jacob L. Peterson (Reg. No. 65,096)
    William R. Zimmerman (admitted *pro hac vice*)
    Jeremiah S. Helm, Ph.D. (admitted *pro hac vice*)
    KNOBBE, MARTENS, OLSON & BEAR, LLP
    2040 Main Street, Fourteenth Floor
    Irvine, CA 92614
    Tel.:  (949) 760-0404
    Fax:  (949) 760-9502
    E-mail:  AppleIPR2020-1536-553@knobbe.com

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

APPLE INC.

Petitioner,

v.

MASIMO CORPORATION,

Patent Owner.

———————————

Case IPR2020-01536
U.S. Patent 10,588,553

———————————

**PATENT OWNER'S SUR-REPLY TO REPLY**

Petitioner acknowledges the difficulty of performing pulse oximetry on the watch-side, but argues that difficulty would have made a POSITA even *more* motivated to use Ohsaki's convex cover. Reply 11. But Petitioner never explains why a POSITA would have been *motivated*—contrary to conventional wisdom—to use Mendelson '799's oximeter on the *back side* of the wrist in the first place. POR 26-31. A POSITA would have believed that oximetry measurements at that location, far from the wrist's arteries, would be weak, noisy, and require considerable pressure even to *discern* a signal. *Id*. Ohsaki's design helps reduce movement-related artifacts, but Ohsaki does not purport to improve a weak and barely discernable signal. *Compare* Ex. 1009 Fig. 4A *with* Fig. 4B. Weak signal would be a significant issue because, as discussed below, Petitioner's proposed combination erroneously places a convex surface over an oximeter with detectors at the oximeter's *periphery*. POR 31-36.

Petitioner asserts a POSITA would have "understood from Ohsaki that…a light permeable convex cover would have prevented slippage of Mendelson-'799's sensor when placed, for example, on *either* side of a user's wrist or forearm." Reply 12. But Ohsaki states the opposite—that a convex surface "has a tendency to slip" on the wrist's palm-side. Ex. 1009 ¶[0023], Figs. 3A-3B (illustrating slipping on the wrist's palm-side). Furthermore, another of Petitioner's cited references confirms that a *flat* surface—not a convex surface—improves adhesion on the palm side of

Filed: April 12, 2022

Filed on behalf of:
  Patent Owner Masimo Corporation
By:   Joseph R. Re (Reg. No. 31,291)
  Stephen C. Jensen (Reg. No. 35,556)
  Jarom D. Kesler (Reg. No. 57,046)
  Stephen W. Larson (Reg. No. 69,133)
  Jacob L. Peterson (Reg. No. 65,096)
  William R. Zimmerman (admitted *pro hac vice*)
  Jeremiah S. Helm, Ph.D. (admitted *pro hac vice*)
  KNOBBE, MARTENS, OLSON & BEAR, LLP
  2040 Main Street, Fourteenth Floor
  Irvine, CA 92614
  Tel.:  (949) 760-0404
  Fax:  (949) 760-9502
  E-mail:  AppleIPR2020-1536-553@knobbe.com

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

APPLE INC.

Petitioner,

v.

MASIMO CORPORATION,

Patent Owner.

---

Case IPR2020-01536
U.S. Patent 10,588,553

---

**PATENT OWNER'S NOTICE OF APPEAL TO THE U.S. COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

Pursuant to 28 U.S.C. § 1295(a)(4)(A), 35 U.S.C. §§ 141(c), 142, and 319, 37 C.F.R. §§ 90.2(a) and 90.3, and Rule 4(a) of the Federal Rules of Appellate Procedure, Patent Owner Masimo Corporation ("Masimo") hereby appeals to the United States Court of Appeals for the Federal Circuit from the Judgement – Final Written Decision (Paper No. 43) entered on February 23, 2022 (Attachment A) and from all underlying orders, decisions, rulings, and opinions that are adverse to Masimo related thereto and included therein, including those within the Decision Granting Institution of *Inter Partes* Review, entered March 2, 2021 (Paper 9). Masimo appeals the Patent Trial and Appeal Board's determination that claims 1–29 of U.S. Patent 10,588,553 are unpatentable, and all other findings and determinations, including but not limited to claim construction, as well as all other issues decided adverse to Masimo's position or as to which Masimo is dissatisfied in IPR2020-01536 involving U.S. Patent 10,588,553.

Masimo is concurrently providing true and correct copies of this Notice of Appeal, along with the required fees, with the Director of the United States Patent and Trademark Office and the Clerk of the United States Court of Appeals for the Federal Circuit.

Respectfully submitted,

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated:  April 12, 2022       /Jarom Kesler/
                             Jarom D. Kesler (Reg. No. 57,046)
                             Customer No. 64,735

                             Attorney for Patent Owner
                             Masimo Corporation

# ATTACHMENT A

Trials@uspto.gov                                                Paper 43
571-272-7822                                    Date: February 23, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

APPLE INC.,
Petitioner,

v.

MASIMO CORPORATION,
Patent Owner.

———————————

IPR2020-01536
Patent 10,588,553 B2

———————————

Before GEORGE R. HOSKINS, ROBERT L. KINDER, and
AMANDA F. WIEKER, *Administrative Patent Judges.*

KINDER, *Administrative Patent Judge.*

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

IPR2020-01536
Patent 10,588,553 B2

## I.    INTRODUCTION

### A.    Background

Apple Inc. ("Petitioner") filed a Petition requesting an *inter partes* review of claims 1–29 ("challenged claims") of U.S. Patent No. 10,588,553 B2 (Ex. 1001, "the '553 patent").  Paper 3 ("Pet.").  Masimo Corporation ("Patent Owner") waived filing a Preliminary Response.  Paper 8.

On March 2, 2021, we instituted trial.  Paper 9 ("Inst. Dec." or "Decision to Institute").  Patent Owner filed a Response.  Paper 24 ("PO Resp.").  Petitioner filed a Reply.  Paper 27 ("Pet. Reply").  Patent Owner filed a Sur-reply.  Paper 32 ("Sur-reply").  An oral argument was held on December 7, 2021, and a transcript was entered into the record.  Paper 42 ("Tr.").

We have jurisdiction to conduct this *inter partes* review under 35 U.S.C. § 6.  This Final Written Decision is issued pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73.  For the reasons discussed herein, we determine that Petitioner has shown, by a preponderance of the evidence, that all challenged claims (claims 1–29) of the '553 patent are unpatentable.

### B.    Related Matters

The parties identify the following matters related to the '553 patent:

*Masimo Corporation v. Apple Inc.*, Civil Action No. 8:20-cv-00048 (C.D. Cal.) (filed Jan. 9, 2020);

*Apple Inc. v. Masimo Corporation*, IPR2020-01537 (PTAB Aug. 31, 2020) (also challenging claims 1–29 of the '553 patent);

*Apple Inc. v. Masimo Corporation*, IPR2020-01520 (PTAB Aug. 31, 2020) (challenging claims of U.S. Patent No. 10,258,265 B1);

2

IPR2020-01536
Patent 10,588,553 B2

*Apple Inc. v. Masimo Corporation*, IPR2020-01521 (PTAB Sept. 2, 2020) (challenging claims of U.S. Patent No. 10,292,628 B1);

*Apple Inc. v. Masimo Corporation*, IPR2020-01523 (PTAB Sept. 9, 2020) (challenging claims of U.S. Patent No. 8,457,703 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01524 (PTAB Aug. 31, 2020) (challenging claims of U.S. Patent No. 10,433,776 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01526 (PTAB Aug. 31, 2020) (challenging claims of U.S. Patent No. 6,771,994 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01538 (PTAB Sept. 2, 2020) (challenging claims of U.S. Patent No. 10,588,554 B2); and

*Apple Inc. v. Masimo Corporation*, IPR2020-01539 (PTAB Sept. 2, 2020) (challenging claims of U.S. Patent No. 10,588,554 B2).

Pet. 3–4; Paper 5, 3.

Patent Owner further identifies certain pending patent applications, as well as other issued and abandoned applications, that claim priority to, or share a priority claim with, the '553 patent.  Paper 5, 1–2.

## C.    *The '553 Patent*

The '553 patent is titled "Multi-Stream Data Collection System for Noninvasive Measurement of Blood Constituents," and issued on March 17, 2020, from U.S. Patent Application No. 16/534,949, filed August 7, 2019. Ex. 1001, codes (21), (22), (45), (54).  The '553 patent claims priority through a series of continuation and continuation-in-part applications to Provisional Application Nos. 61/078,228 and 61/078,207, both filed July 3, 2008.  *Id.* at codes (60), (63).

The '553 patent relates to noninvasive methods and devices for measuring various blood constituents or analytes.  *Id*. at code (57).  The '553

3

IPR2020-01536
Patent 10,588,553 B2

patent discloses a two-part data collection system including a noninvasive sensor that communicates with a patient monitor. *Id.* at 2:38–40. The sensor includes a sensor housing, an optical source, and several photodetectors, and is used to measure a blood constituent or analyte, e.g., oxygen or glucose. *Id.* at 2:29–35, 64–65. The patient monitor includes a display and a network interface for communicating with a handheld computing device. *Id.* at 2:45–48.

Figure 1 of the '553 patent is reproduced below.



Figure 1 illustrates a block diagram of data collection system 100 including sensor 101 and monitor 109. *Id.* at 11:47–58. Sensor 101 includes optical emitter 104 and detectors 106. *Id.* at 11:59–63. Emitters 104 emit light that is attenuated or reflected by the patient's tissue at measurement site 102. *Id.* at 14:3–7. Detectors 106 capture and measure the light attenuated or reflected from the tissue. *Id.* In response to the measured light,

4

IPR2020-01536
Patent 10,588,553 B2

detectors 106 output detector signals 107 to monitor 109 through front-end interface 108 and detectors 106 can be implemented using photodiodes. *Id.* at 14:7–10, 26–32. Sensor 101 also may include tissue shaper 105, which may be in the form of a convex surface that: (1) reduces the thickness of the patient's measurement site; and (2) provides more surface area from which light can be detected. *Id.* at 11:2–14.

Monitor 109 includes signal processor 110 and user interface 112. *Id.* at 15:16–18. "[S]ignal processor 110 includes processing logic that determines measurements for desired analytes . . . based on the signals received from the detectors." *Id.* at 15:21–24. User interface 112 presents the measurements to a user on a display, e.g., a touch-screen display. *Id.* at 15:46–56. The monitor may be connected to storage device 114 and network interface 116. *Id.* at 15:60–16:11.

The '553 patent describes various examples of sensor devices. Figures 14D and 14F, reproduced below, illustrate sensor devices.



FIG. 14D                    FIG. 14F

Figure 14D (left) illustrates portions of a detector submount and Figure 14F (right) illustrates portions of a detector shell. *Id.* at 6:44–47. As shown in

5

Figure 14D, multiple detectors 1410c are located within housing 1430 and under transparent cover 1432, on which protrusion 605b (or partially cylindrical protrusion 605) is disposed. *Id.* at 35:36–39, 36:30–37. Figure 14F illustrates a detector shell 306f including detectors 1410c on substrate 1400c. *Id.* at 37:9–25. Substrate 1400c is enclosed by shielding enclosure 1490 and noise shield 1403, which include window 1492a and window 1492b, respectively, placed above detectors 1410c. *Id.* Alternatively, cylindrical housing 1430 may be disposed under noise shield 1403 and may enclose detectors 1410c. *Id.* at 37:47–48.

Figures 4A and 4B, reproduced below, illustrate an alternative example of a tissue contact area of a sensor device.



FIG. 4A            FIG. 4B

Figures 4A and 4B illustrate arrangements of protrusion 405 including measurement contact area 470. *Id.* at 23:18–24. "[M]easurement site contact area 470 can include a surface that molds body tissue of a measurement site." *Id.* "For example, . . . measurement site contact area 470 can be generally curved and/or convex with respect to the measurement site." *Id.* at 23:39–43. The measurement site contact area may include windows 420–423 that "mimic or approximately mimic a configuration of, or even house, a plurality of detectors." *Id.* at 23:49–63.

6

IPR2020-01536
Patent 10,588,553 B2

###### D.    Illustrative Claim

Of the challenged claims, claims 1, 10, and 20 are independent.

Claim 1 is illustrative and is reproduced below.

> 1. A noninvasive optical physiological sensor comprising:
>
> > [a] a plurality of emitters configured to emit light into tissue of a user;
> >
> > [b] at least four detectors, wherein at least one of the at least four detectors is configured to detect light that has been attenuated by tissue of the user, and wherein the at least four detectors are arranged on a substrate;
> >
> > [c] a wall configured to circumscribe at least the at least four detectors; and
> >
> > [d] a cover configured to be located between tissue of the user and the at least four detectors when the noninvasive optical physiological sensor is worn by the user, wherein the cover comprises a single protruding convex surface operable to conform tissue of the user to at least a portion of the single protruding convex surface when the noninvasive optical physiological sensor is worn by the user, and wherein the wall operably connects to the substrate and the cover.

Ex. 1001, 44:50–67 (bracketed identifiers a–d added).  Independent claims 10 and 20 include limitations substantially similar to limitations [a]–[d] of claim 1.  *Id.* at 45:35–47, 46:22–46.

###### E.    Applied References

Petitioner relies upon the following references:

Mendelson, U.S. Patent No. 6,801,799 B2, filed February 6, 2003, issued October 5, 2004 (Ex. 1012, "Mendelson-799");

Ohsaki et al., U.S. Patent Application Publication No. 2001/0056243 A1, filed May 11, 2001, published December 27, 2001 (Ex. 1009, "Ohsaki");

IPR2020-01536
Patent 10,588,553 B2

Schulz et al., U.S. Patent Application Publication No. 2004/0054291 A1, filed July 31, 2003, published March 18, 2004 (Ex. 1013, "Schulz");

Griffin et al., U.S. Patent No. 7,658,613 B1, filed January 16, 2007, issued February 9, 2010 (Ex. 1014, "Griffin"); and

Y. Mendelson et al., "A Wearable Reflectance Pulse Oximeter for Remote Physiological Monitoring," Proceedings of the 28th IEEE EMBS Annual International Conference, 912–915 (2006) (Ex. 1010, "Mendelson-2006").

Pet. 9.

Petitioner also submits, *inter alia*, the Declaration of Thomas W. Kenny, Ph.D. (Ex. 1003), as well as a Second Declaration of Dr. Kenny (Ex. 1047). Patent Owner relies, *inter alia*, on the Declaration of Vijay K. Madisetti, Ph.D. (Ex. 2004). The parties rely on numerous other exhibits and cross examination testimony as discussed below.

## F.    *Asserted Grounds*

Petitioner asserts that claims 1–29 are unpatentable based upon the following grounds:

| Claim(s) Challenged | 35 U.S.C. § | References/Basis |
|---|---|---|
| 1–3, 5, 6, 9–18, 20–24, 29 | 103 | Mendelson-799, Ohsaki |
| 4, 18, 24 | 103 | Mendelson-799, Ohsaki, Schulz |
| 25 | 103 | Mendelson-799, Ohsaki, Griffin |
| 7, 19 | 103 | Mendelson-799, Ohsaki, Mendelson-2006 |
| 8, 26–28 | 103 | Mendelson-799, Ohsaki, Mendelson-2006, Griffin |

8

IPR2020-01536
Patent 10,588,553 B2

## II.    DISCUSSION

### A.    Claim Construction

For petitions filed on or after November 13, 2018, a claim shall be construed using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. § 282(b).  37 C.F.R. § 42.100(b) (2019).  Petitioner submits that no claim term requires express construction.  Pet. 7–8.  Patent Owner submits that claim terms should be given their ordinary and customary meaning, consistent with the Specification.  PO Resp. 7.

Based on our analysis of the issues in dispute, we agree that no claim terms require express construction.  *Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017).

### B.    Principles of Law

A claim is unpatentable under 35 U.S.C. § 103 if "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."  *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007).  The question of obviousness is resolved on the basis of underlying factual determinations, including (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) objective evidence of non-obviousness.[1]  *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).  When

---

[1]  Based on the final record, neither party introduced objective evidence of non-obviousness.

IPR2020-01536
Patent 10,588,553 B2

evaluating a combination of teachings, we must also "determine whether
there was an apparent reason to combine the known elements in the fashion
claimed by the patent at issue." *KSR*, 550 U.S. at 418 (citing *In re Kahn*,
441 F.3d 977, 988 (Fed. Cir. 2006)). Whether a combination of prior art
elements would have produced a predictable result weighs in the ultimate
determination of obviousness. *Id.* at 416–417.

In an *inter partes* review, the petitioner must show with particularity
why each challenged claim is unpatentable. *Harmonic Inc. v. Avid Tech.,
Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016); 37 C.F.R. § 42.104(b). The
burden of persuasion never shifts to Patent Owner. *Dynamic Drinkware,
LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015).

We analyze the challenges presented in the Petition in accordance
with the above-stated principles.

## C.    *Level of Ordinary Skill in the Art*

Petitioner identifies the appropriate level of skill in the art as that
possessed by a person "hav[ing] a Bachelor of Science degree in an
academic discipline emphasizing the design of electrical, computer, or
software technologies, in combination with training or at least one to two
years of related work experience with capture and processing of data or
information." Pet. 7 (citing Ex. 1003 ¶¶ 1–18, 20–21). "Alternatively, the
person could have also had a Master of Science degree in a relevant
academic discipline with less than a year of related work experience in the
same discipline." *Id.*

Patent Owner makes several observations regarding Petitioner's
identified level of skill in the art but, "[f]or this proceeding, [Patent Owner]
nonetheless applies Petitioner's asserted level of skill." PO Resp. 8.

10

IPR2020-01536
Patent 10,588,553 B2

We adopt Petitioner's assessment as set forth above, which is consistent with the level of skill reflected in the Specification and prior art.

### D.     Obviousness over the Combined Teachings of Mendelson-799 and Ohsaki

Petitioner contends that claims 1–3, 5, 6, 9–18, 20–24, and 29 of the '553 patent would have been obvious over the combined teachings of Mendelson-799 and Ohsaki.  Pet. 10–62.  Patent Owner disagrees and presents several arguments, including that the combination of Ohsaki and Mendelson-799 discloses "two different physiological monitor designs, with distinct shapes, features, and detector and emitter configurations."  PO Resp. 9, 9–42; *see also generally* Sur-reply.

Based on our review of the parties' arguments and the cited evidence of record, we determine that Petitioner has met its burden of showing by a preponderance of the evidence that claims 1–3, 5, 6, 9–18, 20–24, and 29 are unpatentable.

### 1.     Overview of Mendelson-799 (Ex. 1012)

Mendelson-799 is titled "Pulse Oximeter and Method of Operation," and discloses a sensor for non-invasive measurement of a blood parameter, which includes a sensor housing, a radiation source, and a detector. Ex. 1012, codes (54), (57).

11

IPR2020-01536
Patent 10,588,553 B2

Figure 7 of Mendelson-799 is reproduced below.



*Figure 7*

Figure 7 illustrates optical sensor 10 with light source 12, which includes three closely spaced light emitting elements 12a, 12b, 12c. *Id.* at 9:22–28. Optical sensor 10 includes an array of discrete detectors, i.e., "far" detectors 16 and "near" detectors 18, "arranged in two concentric ring-like arrangements . . . surrounding the light emitting elements." *Id.* at 9:29–34. "[L]ight shield 14 is positioned between the photodiodes and the light emitting elements, and prevents direct optical coupling between them, thereby maximizing the fraction of backscattered light passing through the arterially perfused vascular tissue in the detected light." *Id.* at 9:35–40. Sensor housing 17 accommodates the light source, light shield, and detectors. *Id.* at 9:34–35.

Appx13182

IPR2020-01536
Patent 10,588,553 B2

Figure 8 of Mendelson-799 is reproduced below.



*Figure 8*

Figure 8 illustrates a block diagram of pulse oximeter 20 using sensor 10.
*Id.* at 10:16–17.  Pulse oximeter 20 includes control unit 21, with electronic
block 22 connectable to sensor 10, microprocessor 24, and display 26, which
presents measurement results.  *Id.* at 10:17–22.  "The measured data (i.e.,
electrical output of the sensor 10 indicative of the detected light) is directly
processed in the block 22, and the converted signal is further processed by
the microprocessor 24."  *Id.* at 10:22–25.

## 2.    *Overview of Ohsaki (Ex. 1009)*

Ohsaki is titled "Wristwatch-type Human Pulse Wave Sensor
Attached on Back Side of User's Wrist," and discloses an optical sensor for
detecting a pulse wave of a human body.  Ex. 1009, code (54), ¶ 3.

13

**Appx13183**

IPR2020-01536
Patent 10,588,553 B2

Figure 1 of Ohsaki is reproduced below.



Figure 1 illustrates a cross-sectional view of pulse wave sensor 1 attached on the back side of user's wrist 4. *Id.* ¶¶ 12, 16. Pulse wave sensor 1 includes detecting element 2 and sensor body 3. *Id.* ¶ 16.

Figure 2 of Ohsaki, reproduced below, illustrates further detail of detecting element 2.



Figure 2 illustrates a mechanism for detecting a pulse wave. *Id.* ¶ 13. Detecting element 2 includes package 5, light emitting element 6, light

receiving element 7, and translucent board 8. *Id.* ¶ 17. Light emitting element 6 and light receiving element 7 are arranged on circuit board 9 inside package 5. *Id.* ¶¶ 17, 19.

"[T]ranslucent board 8 is a glass board which is transparent to light, and attached to the opening of the package 5. A convex surface is formed on the top of the translucent board 8." *Id.* ¶ 17. "[T]he convex surface of the translucent board 8 is in intimate contact with the surface of the user's skin," preventing detecting element 2 from slipping off the detecting position of the user's wrist. *Id.* ¶ 25. By preventing the detecting element from moving, the convex surface suppresses "variation of the amount of the reflected light which is emitted from the light emitting element 6 and reaches the light receiving element 7 by being reflected by the surface of the user's skin." *Id.* Additionally, the convex surface prevents penetration by "noise such as disturbance light from the outside." *Id.*

Sensor body 3 is connected to detecting element 2 by signal line 13. *Id.* ¶ 20. Signal line 13 connects detecting element 2 to drive circuit 11, microcomputer 12, and a monitor display (not shown). *Id.* Drive circuit 11 drives light emitting element 6 to emit light toward wrist 4. *Id.* Detecting element 2 receives reflected light which is used by microcomputer 12 to calculate pulse rate. *Id.* "The monitor display shows the calculated pulse rate." *Id.*

### 3.    *Independent Claim 1*

Petitioner contends that claim 1 would have been obvious over the combined teachings of Mendelson-799 and Ohsaki. Pet. 10–42. Patent Owner presents several arguments, as examined below, as to why all claims in this ground would not have been obvious. *See* PO Resp. 9–43. Below,

IPR2020-01536
Patent 10,588,553 B2

we set forth how the limitations not disputed by Patent Owner are taught by the combination of references as argued by Petitioner.  For those limitations and reasons for combining the references that are disputed, we first examine each of the parties' contentions and then provide our analysis.

### i. "A noninvasive optical physiological sensor comprising"

Based on the final record, the cited evidence supports Petitioner's undisputed contention that the combination of Mendelson-799 and Ohsaki satisfies the subject matter of the preamble.[2]  Pet. 30–31; *see, e.g.*, Ex. 1012, code (57) ("A sensor for use in an optical measurement device and a method for non-invasive measurement of a blood parameter."), 4:13–22, 7:25–8:41, 9:22–10:30, Fig. 7 (sensor device), Fig. 8; Ex. 1009, code (57), ¶¶ 3, 8, 15–17, 20, 25, Figs. 1, 2, 4A, 4B; Ex. 1003 ¶¶ 55–69, 78–98, 99–103.

### ii. "[a] a plurality of emitters configured to emit light into tissue of a user"

The cited evidence supports Petitioner's undisputed contention that Mendelson-799 discloses light emitting elements 12a, 12b, and 12c that emit light into a user's tissue.  Pet. 31–33; *see, e.g.*, Ex. 1012, 9:22–40 ("The sensor 10 comprises . . . light source 12 composed of three closely spaced light emitting elements (e.g., LEDs or laser sources) 12a, 12b and 12c generating light of three different wavelengths."), Fig. 7 (LEDs or laser sources 12a, 12b and 12c); *see also id.* at 9:42–10:15 (noting that "[t]he actual numbers of wavelengths used as a light source and the number of

---

[2] Whether the preamble is limiting need not be resolved, because Petitioner shows persuasively on the final record that the recitation in the preamble is satisfied by the prior art.

photodetectors in each ring are not limited and depend only on the electronic circuitry inside the oximeter").  Further, Dr. Kenny persuasively testifies that "[f]rom this and related description, one of ordinary skill would have understood that Mendelson '799 discloses a plurality of emitters configured to emit light into tissue of a user."  Ex. 1003 ¶ 106; *see also id.* ¶¶ 55–69, 78–98, 104–107.

> iii. *"[b] at least four detectors, wherein at least one of the at least four detectors is configured to detect light that has been attenuated by tissue of the user, and wherein the at least four detectors are arranged on a substrate;"*

Based on the final record, the cited evidence supports Petitioner's undisputed contentions regarding this limitation.  Pet. 33–36.  Specifically, Petitioner contends that Mendelson-799 discloses twelve photodetectors located within a sensor housing.  Pet. 33; *see, e.g.*, Ex. 1012, 9:22–48 ("The sensor 10 comprises . . . an array of discrete detectors (e.g., photodiodes)."), Fig. 7 (depicting rings of six far detectors 16 and six near detectors 18).  Petitioner further contends that "each of the twelve discrete photodiodes included in the detector assembly illustrated in Mendelson '799's FIG. 7 (reproduced below) are 'adapted to detect reflected radiation . . . and to generate respective signals' that 'are used to determine the parameter of the blood.'"  Pet. 33 (quoting Ex. 1012, code (57), 9:22–48).  Petitioner provides an annotated and modified view of Mendelson-799's Figure 7, as well as an added sectional view, both of which are reproduced below.  Pet. 34; *see also id.* at 38 (similar figures with slightly different annotations).

IPR2020-01536
Patent 10,588,553 B2



Petitioner's modified and added figures depict the sensor of Mendelson-799 with "Far Detector 16" (illustrated in light blue) and "Near Detector 18" (illustrated in dark blue).[3]  *Id.* at 34.

Petitioner next relies on Figure 3 of Mendelson-799, reproduced below, which depicts traditional reflection-mode or backscatter type pulse oximetry sensors.

---

[3] Petitioner's annotated figures also include an added opaque wall and an added top cover as discussed *infra*.

**Appx13188**

IPR2020-01536
Patent 10,588,553 B2



Figure 3 of Mendelson-799 depicts the relative disposition of light source and detector in reflection-mode or backscatter type pulse oximetry. Ex. 1012, 8:26–28. According to Petitioner, the sensor shown in Figure 3 features LEDs and a photodetector that are mounted side-by-side next to each other on the same planar substrate, which allows for measuring $SaO_2$ from multiple convenient locations on the body. Pet. 34–35 (citing Ex. 1012 2:14–28, Fig. 3; Ex. 1003 ¶¶ 110–111 ("[A]lthough the sensor depicted in Mendelson '799's FIG. 7 features two concentric rings of discrete photodetectors that are arranged in a radially-symmetric manner about central light emitting elements, the photodetectors and the light emitting elements are arranged on the same planar substrate.").

Appx13189

IPR2020-01536
Patent 10,588,553 B2

We find Petitioner's contentions for these limitations are persuasive, including by the testimony of Dr. Kenny. *See, e.g.*, Ex. 1003 ¶¶ 108–113.

> iv. *"[c] a wall configured to circumscribe at least the at least four detectors; and"*
>
> *"[d] a cover configured to be located between tissue of the user and the at least four detectors when the noninvasive optical physiological sensor is worn by the user, wherein the cover comprises a single protruding convex surface operable to conform tissue of the user to at least a portion of the single protruding convex surface when the noninvasive optical physiological sensor is worn by the user, and wherein the wall operably connects to the substrate and the cover."*

<u>Petitioner's Undisputed Contentions</u>

Petitioner explains that Mendelson-799 does not disclose a cover located between the user's tissue and the at least four detectors, as claimed. Pet. 21–22. Patent Owner does not dispute this contention, and we agree that Mendelson-799 is not shown to include a cover. *See generally* Ex. 1012.

Petitioner contends that although Mendelson-799 does not disclose a cover as claimed, Ohsaki teaches a wrist-worn sensor "that includes a light permeable convex cover—'translucent board 8'— . . . where the cover comprises a single protruding convex surface operable to conform [to] tissue of the user." Pet. 22; *see, e.g.*, Ex. 1009 ¶¶ 16 ("worn on the back side of the user's wrist"), 17 ("convex surface"), Figs. 1–2 (depicting translucent board 8 between tissue and detector); Ex. 1003 ¶ 83. Petitioner also contends that Ohsaki's Figure 2 depicts the user's tissue conforming to the shape of the

convex surface of the cover.  Pet. 23–26, 39–41; *see, e.g.*, Ex. 1003 ¶¶ 55–69, 78–98, 127–136.

Patent Owner does not dispute this contention, and we agree with Petitioner.  Ohsaki discloses that sensor 1 is "worn on the back side of the user's wrist" and includes translucent board 8, with a single convex surface formed on the top of the board, to be placed against a user's tissue.  Ex. 1009 ¶¶ 16, 17, Figs. 1–2 (depicting translucent board 8 between tissue and detector).  As shown in Ohsaki's Figure 2, the convex surface of board 8 is operably connected to the walls of sensor package 5 that houses the sensor components, including circuit board 9, light emitting element 6 (e.g., LED), and light receiving element 7.  *Id.* ¶ 17 ("The translucent board 8 is . . . attached to the opening of the package 5."), Fig. 2.  As depicted in Ohsaki's Figure 2, the user's tissue 4 is shown to conform to the shape of the protruding convex surface when the sensor is worn by the user.  Ex. 1009 ¶ 17 ("The translucent board 8 is a glass board."), Fig. 2.

<u>Petitioner's Disputed Contentions</u>

Petitioner contends that Mendelson-799 discloses sensor housing 17 that encircles detectors 16 and 18.  Pet. 36–37; *see, e.g.*, Ex. 1012, 9:23–40 ("All these elements are accommodated in a sensor housing 17."), Fig. 7 (housing 17).  Petitioner further contends that a person of ordinary skill in the art would have found it obvious "to connect, to the illustrated portion of sensor housing 17, an opaque wall configured to circumscribe the array of discrete detectors included in detector rings 16 and 18" to shield the detectors from ambient light and to protect from external forces.  Pet. 37–38; *see, e.g.*, Ex. 1003 ¶¶ 55–69, 78–98, 114–126.

IPR2020-01536
Patent 10,588,553 B2

As shown below, Petitioner alleges that it would have been obvious to connect, to the illustrated portion of sensor housing 17, an opaque wall configured to circumscribe the array of discrete detectors included in detector rings 16 and 18.  Pet. 37–38.  Petitioner relies on Ohsaki's disclosure of a sensor including package 5 having a wall that surrounds light emitting element 6 and light receiving element 7.  *Id.*; *see, e.g.*, Ex. 1009 ¶ 17, Fig. 2 (detector 7 surrounded by wall of package 5); Ex. 1003 ¶¶ 115–125.



Above, Petitioner depicts Mendelson-799's Figure 7 and its modified sectional view with several annotations and modifications.  Pet. 38; Ex. 1019, Fig. 7.  Petitioner's modified and added figures depict the sensor of Mendelson-799 with an added opaque wall (illustrated in green) connected to the planar substrate (also illustrated in green) of housing 17 and

**Appx13192**

IPR2020-01536
Patent 10,588,553 B2

encircling the sensor components, as Petitioner contends would have been obvious to a person of ordinary skill in the art.  Pet. 37–39, 26.

Petitioner further contends that a person of ordinary skill in the art "would have recognized that a light permeable cover with a protruding convex surface," such as that taught by Ohsaki, "would improve adhesion between the sensor and the user's tissue, improve detection efficiency, and protect the elements within sensor housing 17."  Pet. 21–22 (citing, e.g., Ex. 1003 ¶ 81; Ex. 1009 ¶¶ 15, 17, 25), 29–30.  Petitioner contends that Ohsaki's convex surface is in intimate contact with the user's tissue, which prevents slippage of the sensor and increases signal strength because "variation of the amount of the reflected light . . . that reaches the light receiving element 7 is suppressed" and "disturbance light from the outside" is prevented from penetrating board 8, as compared to a sensor with a flat surface.  *Id.* at 23–24 (quoting Ex. 1009 ¶ 25).  Dr. Kenny likewise testifies that a person of ordinary skill in the art "would have recognized that a light permeable cover with a protruding convex surface would improve adhesion between the sensor and the user's tissue, improve detection efficiency, and protect the elements within sensor housing 17."  Ex. 1003 ¶ 81 (citing Ex. 1009 ¶¶ 15, 17, 25, Figs. 1, 2, 4A, 4B); Pet. 21–22.

Accordingly, Petitioner contends that, to achieve these benefits, a person of ordinary skill in the art "would have added a transparent convex cover to [Mendelson-799's] sensor 10, the cover being located between tissue of the user and the array of detectors 16 and 18 when worn," and would have "configured Mendelson-799's circumscribing wall to operably connect" to the convex and rigid cover.  Pet. 25–26, 40–41; *see, e.g.*, Ex. 1003 ¶¶ 55–69, 78–98, 127–136.

23

IPR2020-01536
Patent 10,588,553 B2

Petitioner contends these modifications would have been "nothing more than the use of a known technique to improve similar devices in the same way, and combining prior art elements according to known methods to yield predictable results—improved adhesion of the sensor to the user's skin, and improved signal strength," where "the elements of the resulting sensor would each perform functions they had been known to perform prior to the combination." Pet. 29 (citing, e.g., Ex. 1003 ¶¶ 91–98).

To illustrate its proposed modification, the Petition includes an annotated and modified view of Mendelson-799's Figure 7, as well as an added sectional view, both of which are reproduced below. Pet. 30; *see also id.* at 41 (same).



Petitioner's modified and added figures depict the sensor of Mendelson-799 with an added convex cover (illustrated in red) connected to the opaque wall

IPR2020-01536
Patent 10,588,553 B2

(illustrated in green) that Petitioner contends would have been obvious to a person of ordinary skill in the art.  Pet. 41.

Patent Owner's Contentions

Patent Owner contends that the proposed combination adds features not found in the cited references, with no motivation or explanations for why a person of ordinary skill in the art would have added these features.  PO Resp. 12.  Patent Owner contends that the depiction of a cover spanning the entire space above the substrate lacks support.  Patent Owner notes that Ohsaki places its translucent board in an opening within the top of the package.  *Id.* at 13 (citing Ex. 1009, Fig. 2).  Patent Owner further contends that the proposed combination includes a wall with notches for the cover, as depicted below in Patent Owner's annotated figure, yet neither Mendelson-799 nor Ohsaki include a notched wall feature.  *Id.* (citing Ex. 2004 ¶¶ 46–47; Ex. 2008, 205:21–208:19).  Patent Owner provides an annotated figure, reproduced below.



Patent Owner's annotated figure adds purple circles around "Notches" to Petitioner's already annotated figure depicting the proposed combination of a cover, as suggested by Ohsaki, with Mendelson-799's sensor.  PO Resp. 13 (original figure at Pet. 38).  Patent Owner alleges that the addition of a notch is significant and would impact performance because "the notch insets the cover into the wall, which changes the cover's height relative to

IPR2020-01536
Patent 10,588,553 B2

the underlying optical components," and "[t]he notch also uses a light shield shorter than the surrounding wall." *Id.* at 13–14 (Ex. 2004 ¶¶ 46–47).

Patent Owner makes several arguments as to how modifying Ohsaki's rectangular board would eliminate the advantages Ohsaki teaches. PO Resp. 17. First, Patent Owner argues that the proposed modification "changes Ohsaki's structure and eliminates the longitudinal shape that gives Ohsaki's translucent board the ability to fit within the user's anatomy and prevent slipping." *Id.* This argument is premised on Patent Owner's contention that Ohsaki's convex cover must be rectangular, with the cover's long direction aligned with the length of the user's forearm, to avoid interacting with bones in the wrist and forearm. *Id.* at 17–19 (citing, e.g., Ex. 2004 ¶¶ 51–54; Ex. 1009 ¶¶ 6, 19, 23, 24); *see also* Sur-reply 3–8. According to Patent Owner, Ohsaki teaches that "aligning the sensor's longitudinal direction with the ***circumferential*** direction of the user's arm undesirably results in 'a tendency [for Ohsaki's sensor] to slip off.'" *Id.* at 19–20 (citing Ex. 1009 ¶ 19), 20–22; *see also* Sur-reply 4 ("Petitioner never explained how or why a POSITA would change Ohsaki's ***longitudinal*** board into a ***circular*** cover. That change would eliminate the longitudinal shape that Ohsaki indicates prevents slipping.").

Thus, Patent Owner contends that Petitioner's proposed modification would "chang[e] Ohsaki's rectangular board into a ***circular*** shape," which "would eliminate the advantages discussed above" because it "cannot be placed in ***any longitudinal*** direction and thus cannot coincide with the longitudinal direction of the user's wrist." PO Resp. 20 (citing Ex. 2004 ¶¶ 50–57). Patent Owner presents annotated Figures depicting what it

26

IPR2020-01536
Patent 10,588,553 B2

contends is Ohsaki's disclosed sensor placement as compared to that of the proposed modification, reproduced below.



Patent Owner's annotated Figure on the left depicts a rectangular sensor placed between a user's radius and ulna, while Patent Owner's annotated Figure on the right depicts a circular sensor placed across a user's radius and ulna. PO Resp. 21. Based on these annotations, Patent Owner argues that the proposed "circular shape would press on the user's arm in all directions and thus cannot avoid the undesirable interaction with the user's bone structure," such that a skilled artisan "would have understood such a change would eliminate Ohsaki's benefit of preventing slipping." *Id.* at 21–22 (citing, e.g., Ex. 2004 ¶¶ 54–57). Similarly, Patent Owner contends that "adding Ohsaki's ***rectangular*** board to Mendelson '799's oxygen saturation sensor would eliminate the ***radially*** symmetric environment and undermine the reason for Mendelson '799's use of multiple detectors arrayed in a ring pattern." *Id.* at 25 (citing Ex. 1012, 7:25–37).

 Second, Patent Owner argues that Ohsaki requires its sensor be placed on the back of the user's wrist to achieve any benefits, but that such a location would have been unsuitable for Mendelson-799's sensor, and would

27

IPR2020-01536
Patent 10,588,553 B2

result in weak sensor signals.  PO Resp. 26.  Relying on other publications by the named inventor on Mendelon-799, Patent Owner alleges that sensor signals were difficult or impossible to discern from the wrist, even with considerable pressure.  *Id.* (citing Ex. 2003, 3–4); *see also id.* at 26–27 (citing Ex. 2015, 3, 4; Ex. 2014, 1, 99; Ex. 2004 ¶ 65).  Patent Owner contends that Dr. Kenny admitted during cross examination that signals from the wrist are weaker and noisier than signals from other locations.  *Id.* at 27 (citing Ex. 2008, 249:10–16, 255:12–21); *see also id.* at 27–30 (citing Ex. 2017, 2; Ex. 2018, 4 ("reflected red and infrared pulses can only be used for specific areas, such as a radial artery; thus, most areas of the wrist are not available for monitoring"); Ex. 2010, 44, 71; Ex. 2016, 2, 3).

Third, Patent Owner argues that a person of ordinary skill in the art would not have placed Ohsaki's convex cover over Mendelson-799's peripheral detectors because the convex cover would condense light toward the center and away from the detectors, which would decrease signal strength.  PO Resp. 31–34 (citing, *e.g.*, Ex. 2004 ¶¶ 71–75).  Patent Owner relies on Figure 14B of the '553 patent, which Patent Owner contends supports its position.  *Id.* at 32–33 (citing Ex. 1001, 36:3–6, 36:13–15).

IPR2020-01536
Patent 10,588,553 B2



Patent Owner's annotated Figure 14B of the '553 patent adds highlighting to show direction of the light. PO Resp. 33. According to Patent Owner, the convex shape directs light from the periphery toward the center. *Id.* at 32; *see also* Sur-reply 16 ("Petitioner and Dr. Kenny both admitted a convex cover condenses light towards the sensor's center and away from the sensor's periphery.").

Patent Owner also contends that Dr. Kenny admits as much, fails to account for the impact of the proposed modification on light collection, and fails to propose a specific three-dimensional structure to embody the proposed modification. PO Resp. 32–37 (citing, e.g., Ex. 2004, 71–72; Ex. 2006, 204:14–20; Ex. 2008, 36:19–37:1, 57:19–58:16, 63:5–64:8, 170:12–171:1, 173:8–15). Patent Owner argues that "[d]espite testifying that all the design details would be critical in assessing the impact on optics, neither Petitioner nor Dr. Kenny provide ***any analysis*** of the impact of Petitioner's modifications on light collection by the detectors," and "Petitioner's failure to address optics is particularly glaring because the

IPR2020-01536
Patent 10,588,553 B2

invention is a noninvasive ***optical*** physiological sensor (claim 1) or

measuring device (claim 20)." PO Resp. 35.

Fourth, Patent Owner argues that Ohsaki's rectangular cover creates

air gaps at its peripheral edges, as shown in Ohsaki's Figure 1, which

Mendelson-799 cautions against as potentially causing "specular reflection."

PO Resp. 36–37 (citing, e.g., Ex. 1012, 2:58–64; Ex. 2004 ¶ 76). Patent

Owner, relying on the testimony of Dr. Madisetti, contends that a person of

ordinary skill in the art "would have understood that air gaps near the

detectors on the peripheral edge of Mendelson '799's more complicated

oximeter sensor would create significant noise." *Id.* at 38 (citing Ex. 2004

¶ 79 ("peripheral air gaps would be positioned near or over Mendelson

'799's peripheral detectors leading to inconsistent measurements")).

Accordingly, Patent Owner argues that a person of ordinary skill in the art

would not have modified Mendelson-799's structure to add Ohsaki's air

gaps. *Id.* at 37–38 (citing Ex. 2004 ¶¶ 77–79).

Fifth, Patent Owner argues that "a convex cover is just one of many

different alternatives for protecting the components of a sensor" including,

e.g., resin or encapsulation. PO Resp. 38–40. Concerning possible

alternatives, Patent Owner contends that a person of ordinary skill in the art

"would have understood that a flat cover would provide ***better protection***

than a convex surface because, as Petitioner's cited art teaches, it would be

less prone to scratches." *Id.* at 39–40 (citing Ex. 1008 ¶ 106).

Patent Owner further argues that "Petitioner fails to provide evidence

that its combination, with its many flaws, would reasonably be expected to

successfully result in an effective noninvasive optical physiological sensor

or measurement device." PO Resp. 40. Patent Owner relies on testimony

IPR2020-01536
Patent 10,588,553 B2

that the design analysis required to create a functional optical physiological sensor would be complex and involve trial and error. *Id.* Yet, even with such a design, "Dr. Kenny admitted he did *no* analysis to see what impact his proposed changes would have on the operability of his proposed combination, nor could he explain what effect any changes to the sensors would ultimately have on the operability of his proposed combination." *Id.*

Petitioner's Reply

In its Reply, Petitioner reiterates that "Ohsaki would have motivated one of ordinary skill to add a light permeable protruding convex cover to Mendelson '799's sensor, to [1] improve adhesion between the sensor and the user's tissue, to [2] improve detection efficiency, and to [3] provide additional protection to the elements accommodated within sensor housing 17." Pet. Reply 1 (quoting Ex. 1003 ¶ 87). Examining Patent Owner's arguments related to shape, structure, and location of sensors, Petitioner notes that Ohsaki does not limit its benefits to a rectangular pulse rate sensor applied to a particular body location. *Id.* at 2. Instead, Petitioner argues that Ohsaki attributes the reduction of slippage afforded by use of a translucent board, and related improvements in signal quality, to the convex surface of the translucent board being in intimate contact with the surface of a user's skin. *Id.* (citing Ex. 1003 ¶ 84; Ex. 1009 ¶¶ 15, 17–18, 25, Figs. 1, 2, 4A, 4B).

Concerning Patent Owner's first and second arguments (longitudinal shape and sensor placed on the back of the user's wrist), Petitioner responds that Ohsaki does not disclose the shape of its protrusion, other than its convexity as shown in Figures 1 and 2, nor does Ohsaki require a rectangular shape or placement on the back of the wrist in order to achieve

31

IPR2020-01536
Patent 10,588,553 B2

the disclosed benefits.  Pet. Reply 6–12 (citing, e.g., Ex. 1047 ¶¶ 21–30).

Moreover, Petitioner asserts that "even if Ohsaki's translucent board 8 were

somehow understood to be rectangular, obviousness does not require 'bodily

incorporation' of features from one reference into another"; rather, a person

of ordinary skill in the art "would have been fully capable of attaching a

light permeable protruding convex cover to Me[nd]elson-799's housing to

obtain the benefits attributed to such a cover by Ohsaki."  *Id.* at 10 (citing,

e.g., Ex. 1047 ¶ 26).  Similarly, regarding the location of the sensor,

Petitioner asserts,

> [E]ven if a [person of ordinary skill in the art] would have
> somehow misunderstood Ohsaki's sensor as limited to placement
> on the backside of the wrist, and even if the difficulty that [Patent
> Owner] alleges with respect to obtaining pulse oximetry
> measurements from that location were true, that ***would have
> further motivated*** the [person of ordinary skill in the art] to
> implement a light permeable convex cover in Mendelson-799's
> sensor, to improve detection efficiency.

*Id.* at 11 (citing, e.g., Ex. 1047 ¶ 28).

Concerning Patent Owner's third argument, Petitioner responds that

adding a convex cover to Mendelson-799's sensor would not decrease signal

strength but, instead, "would improve Mendelson-799's signal-to-noise ratio

by causing more light backscattered from tissue to strike Mendelson-799's

detectors than would have absent the cover" because such a cover improves

light concentration across the entire lens and does not direct it only towards

the center.  *Id.* at 13–17 (citing, e.g., Ex. 1047 ¶¶ 31–47).

Petitioner dismisses Patent Owner's reliance on Figure 14B of the

'553 patent because it "is not an accurate representation of light that has

been reflected from a tissue measurement site.  For example, the light rays

(1420) shown in FIG. 14B are collimated (i.e., travelling paths parallel to

32

**Appx13202**

one another), and each light ray's path is perpendicular to the detecting surface." Pet. Reply 14–15 (citing, e.g., Ex. 1047 ¶¶ 32–34). Moreover, Petitioner argues that, even when collimated, light will focus at the center only if the light beam happens to be perfectly aligned with the axis of symmetry of the lens and, when entering at any other angle, will focus at a different point. *Id.* at 15 (citing, e.g., Ex. 1047 ¶ 34).

According to Petitioner, Patent Owner's and Dr. Madisetti's position regarding convergence toward the center does not apply to diffuse light, which reaches the detectors from various random angles and directions after having been reflected by tissue. *Id.* at 15–16 (citing, e.g., Ex. 1047 ¶¶ 36–37). As a result, Petitioner contends Ohsaki's cover would have provided a refracting effect such that light rays that would have missed the detectors absent a cover are instead directed to that area as they pass through the cover. *Id.* at 16–17 (citing Ex. 1047 ¶¶ 37–39). Dr. Kenny testifies how the light that backscatters from the measurement site after diffusing through tissue reaches the circular active detection area of Mendelson-799's detectors and further applies principles of Snell's law to explain the effects of the convex board on the propagation of light rays from a diffuse source. Ex. 1047 ¶ 37, 39–43. Petitioner thus contends that "overall, more of the partially reflected, transmitted, absorbed, and ultimately back scattered light strikes the detectors than otherwise would have absent the cover." Pet. Reply 17–18 (citing Ex. 1047 ¶¶ 45–47).

Concerning Patent Owner's fourth argument, Petitioner responds that a skilled artisan would have known to avoid air gaps in the proposed combination. *Id.* at 18 (citing, e.g., Ex. 1047 ¶¶ 48–49). Further, Petitioner

IPR2020-01536
Patent 10,588,553 B2

contends that "some minor air gaps" would not obviate the motivation to combine even if they remained. *Id.* at 19.

Concerning Patent Owner's fifth argument, Petitioner responds that even if a flat surface might be less prone to scratching, that possible disadvantage would have been weighed against the "multiple advantages of a convex cover," and would not negate a motivation to combine. *Id.* at 19–20 (citing, e.g., Ex. 1047 ¶ 52).

Patent Owner's Sur-reply

Concerning Patent Owner's first and second arguments, Patent Owner reiterates its position that Ohsaki's purported benefits attach only to a sensor with a rectangular convex surface that is located on the back of the wrist, and that "even small changes in sensor orientation or measurement location result in slippage." Sur-reply 3–14, 8.

Concerning Patent Owner's third argument, Patent Owner argues that Dr. Kenny and Petitioner have not overcome their admissions that a convex lens directs light toward the center. *Id.* at 15–16 (citing, e.g., Ex. 2004 ¶¶ 71–72).

Patent Owner also asserts that Petitioner mischaracterizes Patent Owner's position, which is not that a convex cover focuses "***all*** light" to a single point at the center of the sensor. *Id.* at 17. Patent Owner instead states that, "[l]ight entering the convex surface from ***all*** angles would, on ***average***, result in ***more light directed towards the center*** and ***less light at the periphery***—as compared to a flat surface—and therefore less light at the peripherally located detectors." *Id.* (citing Ex. 2004 ¶¶ 70–75).

Finally, Patent Owner argues that Petitioner's Reply arguments are overly complex and instead a person of ordinary skill in the art "would have

understood and applied the straightforward understanding that a convex surface condenses light toward the center." *Id.* at 19–20.

Concerning Patent Owner's fourth argument, Patent Owner argues that "Petitioner does not dispute that . . . air gaps would dissuade a [person of ordinary skill in the art] from modifying Mendelson[-]799." *Id.* at 20–21.

Concerning Patent Owner's fifth argument, Patent Owner argues that Petitioner does not dispute Patent Owner's position that a flat cover would be less prone to scratches and offers "***no*** plausible advantages for its asserted combination." *Id.* at 22–23. Moreover, Patent Owner argues that "the risk of scratches is not merely a disadvantage—it directly undermines Petitioner's motivation to add a convex cover to provide 'additional ***protection*.'" *Id.* at 23.

Analysis

We have considered the parties' arguments and cited evidence, and we are persuaded by Petitioner's contentions. As shown in Petitioner's modified figures below, the wall of the combined sensor surrounds the sensor components and is operably connected to the convex cover on the top and is operably connected to the planar substrate on the bottom, as claimed.



Petitioner's annotated Figure 7 from Mendelson-799 shows the proposed combination with a convex cover (red), and opaque wall and planar substrate (green). Pet. Reply 5; *see also* Ex. 1003 ¶ 88 ("[O]ne of ordinary skill would have configured Mendelson 799's circumscribing wall to operably

IPR2020-01536
Patent 10,588,553 B2

connect, on one side, to the planar substrate on which detectors 16 and 18 are arranged and, on an opposite side, to the convex cover."). We credit Dr. Kenny's testimony that a person of ordinary skill in the art would have been motivated to configure the wall, substrate and convex cover such that the circumscribing wall operably connects, on one side, to the planar substrate on which detectors 16 and 18 are arranged and, on an opposite side, to the convex cover. *See id.*

Moreover, as discussed more below, Petitioner's proposed modifications to Mendelson-799 are *not* premised upon bodily incorporating Ohsaki's cover directly with Mendelson-799's sensor. *See In re Nievelt*, 482 F.2d 965, 968 (CCPA 1973) ("Combining the teachings of references does not involve an ability to combine their specific structures."). To the contrary, Petitioner proposes incorporating Ohsaki's *teaching* of a cover with a convex surface, not the precise cover and structure disclosed by Ohsaki. *In re Keller*, 642 F.2d 413, 425 (CCPA 1981) ("[T]he test is what the combined teachings of those references would have suggested to those of ordinary skill in the art."). If Ohsaki's teaching is implemented in a manner that varies from the precise implementation of such a cover in Ohsaki, e.g., with a larger span or with notches, this is not a material deviation from Ohsaki's express teachings of using a cover with a convex surface to achieve specific benefits, e.g., improved adhesion and signal strength. Ex. 1009 ¶ 25; *see supra* § II.D.5.vi; *see Lear Siegler, Inc. v. Aeroquip Corp.*, 733 F.2d 881, 889 (Fed. Cir. 1984) (explaining that a person of ordinary skill is not "compelled to adopt every single aspect of [a reference] without the exercise of independent judgment"). As explained by Dr. Kenny, a person of ordinary skill in the art "would have found it obvious to add notches to

36

IPR2020-01536
Patent 10,588,553 B2

improve the reliability of the connection between the convex cover and housing." Ex. 1047 ¶ 55 (citing Ex. 2008, 208:1–5, 206:20–207:4). Based on the final record, Petitioner's stated reasoning for the proposed modifications are sufficiently supported, including by the testimony of Dr. Kenny. *See, e.g.*, Ex. 1003 ¶¶ 55–69, 78–98, 127–136.

As noted above, Petitioner provides three rationales to support its contention that a person of ordinary skill in the art would have provided "a light permeable cover with a protruding convex surface," such as that taught by Ohsaki, to Mendelson-799's sensor: (1) to "improve adhesion between the sensor and the user's tissue," (2) to "improve detection efficiency," and (3) to "protect the elements within sensor housing 17." Pet. 25 (citing, e.g., Ex. 1003 ¶ 87; Ex. 1009 ¶¶ 15, 17, 25). As further examined below, we determine all three rationales are supported by the evidence, and further that any single rationale standing alone would have been sufficient to establish a basis for the person of ordinary skill in the art to combine the references as proposed.

Rationales 1 and 2

The evidence of record persuades us that adding a convex cover, such as that taught by Ohsaki, would have improved adhesion between the sensor and the user's skin, which would have increased the signal strength of the sensor. Ohsaki teaches as much:

> [T]he convex surface of the translucent board 8 is in intimate contact with the surface of the user's skin. Thereby *it is prevented that the detecting element 2 slips off* the detecting position of the user's wrist 4. If the translucent board 8 has a flat surface, the detected pulse wave is adversely affected by the movement of the user's wrist 4 as shown in Fig. 4B. However, in the case that the translucent board 8 has a convex surface like the present embodiment, the *variation of the amount of the*

37

**Appx13207**

IPR2020-01536
Patent 10,588,553 B2

> *reflected light which is emitted from the light emitting element 6
> and reaches the light receiving element 7 by being reflected by
> the surface of the user's skin is suppressed. It is also prevented
> that noise such as disturbance light from the outside penetrates
> the translucent board 8.* Therefore the pulse wave can be
> detected without being affected by the movement of the user's
> wrist 4 as shown in FIG. 4A.

Ex. 1009 ¶ 25 (emphases added); *see also id.* ¶ 27 ("stably fixed").

We credit Dr. Kenny's testimony that a person of ordinary skill in the
art would have been motivated by such teachings to apply a cover with a
convex surface to Mendelson-799 to improve that similar device in the same
way and to yield predictable results, i.e., to resist movement of the sensor on
the user's wrist. *See, e.g.*, Ex. 1003 ¶ 84 ("[T]his contact between the
convex surface and the user's skin is said to prevent slippage, which
increases the strength of the signals obtainable by Ohsaki's sensor."). We
also credit Dr. Kenny's testimony that, in light of these teachings, a person
of ordinary skill in the art would have made such a modification to improve
the pulse sensor's ability to emit light into, and detect light reflected from,
the user's wrist, to generate an improved pulse signal. Ex. 1003 ¶¶ 83–87;
Ex. 1047 ¶ 17.

Indeed, Ohsaki expressly compares the performance of a wrist-worn
pulse wave sensor depending on whether translucent board 8 is convex or
flat, and concludes the convex surface results in improved performance over
the flat surface, especially when the user is moving. Ex. 1009, Figs. 4A–4B,
¶¶ 15, 25 (stating that with "a flat surface, the detected pulse wave is
adversely affected by the movement of the user's wrist 4," and with "a
convex surface like the present embodiment, the variation of the amount of
the reflected light" collected by the sensor "is suppressed"). Ohsaki also

38

**Appx13208**

states that, with a convex surface, "[i]t is also prevented that noise such as disturbance light from the outside penetrates the translucent board 8." *Id.* ¶ 25.

We also credit Dr. Kenny's testimony that the proposed modification would have been within the level of ordinary skill in the art. For example, Dr. Kenny testifies:

> The above-described modification would require only routine knowledge of sensor design and assembly. . . . Indeed, the modification would have amounted to nothing more than the use of a known technique to improve similar devices in the same way, and combining prior art elements according to known methods to yield predictable results—improved adhesion of the sensor to the user's skin, and improved signal strength.

> Furthermore, the elements of the resulting sensor would each perform functions they had been known to perform prior to the combination—Ohsaki's translucent board 8 would simply be placed over the components accommodated within Mendelson '799's sensor housing 17, and would perform the same function as taught by Ohsaki.

Ex. 1003 ¶¶ 97–98; *see also id.* ¶¶ 88–90. In light of Ohsaki's express disclosure of the benefits of a convex cover, we credit Dr. Kenny's testimony that a person of ordinary skill in the art would have been motivated to modify Mendelson-799 as proposed, and would have had a reasonable expectation of success in doing so.

We next address Patent Owner's first through fourth arguments, each of which implicates Petitioner's first and second asserted rationales of improved adhesion and detection efficiency.

Patent Owner's first argument is premised on the notion that Ohsaki's benefits only can be realized with a rectangular convex surface, because such a shape is required to avoid interacting with bones on the back of the

user's forearm. PO Resp. 17–25. We disagree. Ohsaki does not disclose the shape of its convex cover, much less require it be rectangular. In fact, Ohsaki is silent as to the shape of the convex surface. Ohsaki discloses that sensor 1 includes detecting element 2, which includes package 5 within which the sensor components are located. Ex. 1009 ¶ 17. Ohsaki's convex surface is located on board 8, which is "attached to the opening of the package 5." *Id.* Ohsaki provides no further discussion regarding the shape of board 8 or its convex surface.

We disagree with Patent Owner's suggestion that the shape of the convex surface can be inferred to be rectangular from Ohsaki's Figures 1 and 2. PO Resp. 17–21. Ohsaki does not indicate that these figures are drawn to scale, or reflect precise dimensions or shapes of the convex surface. *See, e.g.*, Ex. 1009 ¶ 13 ("schematic diagram"); *see also* Pet. Reply 9; *Hockerson-Halberstadt, Inc. v. Avia Group Int'l*, 222 F.3d 951, 956 (Fed. Cir. 2000) ("[I]t is well established that patent drawings do not define the precise proportions of the elements and may not be relied on to show particular sizes if the specification is completely silent on the issue.").

To be clear, Ohsaki describes the shape of *detecting element 2* as rectangular: "[T]he length of the detecting element 6 from the right side to the left side in FIG. 2 is longer than the length from the upper side to the lower side." Ex. 1009 ¶ 19. Ohsaki also describes that detecting element 2 is aligned longitudinally with the user's forearm: "[I]t is desirable that the detecting element 2 is arranged so that its longitudinal direction agrees with the longitudinal direction of the user's arm," to avoid slipping off. *Id.*; *see also id.* ¶ 9 ("The light emitting element and the light receiving element are arranged in the longitudinal direction of the user's arm.").

40

IPR2020-01536
Patent 10,588,553 B2

In light of this disclosed rectangular shape of detecting element 2, it is certainly possible that Ohsaki's convex surface may be similarly shaped. But, it may not be. Contrary to Patent Owner's argument, Ohsaki neither describes nor requires detecting element 2 to have the same shape as the convex surface of board 8. *Accord* Pet. Reply 7–8 (noting also that Ohsaki's board 8 "is not coextensive with the entire tissue-facing side of detecting element 2"). We have considered the cited testimony of both Dr. Kenny and Dr. Madisetti on this point. Ex. 1047 ¶¶ 21–24; Ex. 2004 ¶¶ 38–42 (relying on Ohsaki's Figures 1–2 to support his opinion that the convex surface is rectangular). Dr. Madisetti's reliance on the dimensions of Ohsaki's figures is unpersuasive. *Hockerson-Halberstadt*, 222 F.3d at 956. We credit Dr. Kenny, who testifies that Ohsaki does not describe its convex surface as rectangular, because this testimony is most consistent with Ohsaki's disclosure.

Further, Patent Owner suggests that the convex surface *must be* rectangular, in order to avoid interacting with bones in the user's forearm. Sur-reply 6 ("intended placement take advantage of the forearm/wrist area's particular bone structure to prevent slipping"), 9 ("[A] POSITA would have understood Ohsaki's convex board must also have a longitudinal shape oriented up-and-down the watch-side of the user's wrist/forearm."). Although Ohsaki recognizes that interaction with these bones can cause slippage problems, *see* Ex. 1009 ¶¶ 6, 19, we do not agree that the *only way* to avoid these bones is by aligning a rectangular cover with the longitudinal direction of the user's forearm. For example, in the annotated Figures provided by Patent Owner, *see* PO Resp. 20–21, we discern that the circular sensor that purports to depict the proposed modification would *also* avoid

the bones in the forearm if it were slightly smaller. Patent Owner provides no persuasive explanation to justify the dimensions it provides in this annotated figure, or to demonstrate that such a large circular sensor would have been required. Indeed, we discern that it would have been within the level of skill of an ordinary artisan to appropriately size a modified sensor to avoid these well-known anatomical obstacles. "A person of ordinary skill is also a person of ordinary creativity, not an automaton." *KSR Int'l Co.*, 550 U.S. at 421. After all, an artisan must be presumed to know something about the art apart from what the references disclose. *See In re Jacoby*, 309 F.2d 513, 516 (CCPA 1962).

Finally, we do not agree with Patent Owner's position that Ohsaki's advantages apply only to rectangular convex surfaces. As discussed, Patent Owner has not shown that Ohsaki's convex surface is rectangular at all. Moreover, even if Ohsaki's convex surface is rectangular, when discussing the benefits associated with a convex cover, Ohsaki does not limit those benefits to a cover of any particular shape. Instead, Ohsaki explains that "detecting element 2 is arranged on the user's wrist 4 so that the convex surface of the translucent board 8 is in intimate contact with the surface of the user's skin. Thereby it is prevented that the detecting element 2 slips off the detecting position of the user's wrist 4." Ex. 1009 ¶ 25; Ex. 1047 ¶ 15 ("Ohsaki nowhere describes its benefits as being limited to a rectangular pulse rate sensor applied to a particular body location. . . . Instead . . . Ohsaki attributes the reduction of slippage afforded by use of translucent board 8" to the convex surface being in intimate contact with the skin.). Thus, we agree with Petitioner that Ohsaki's teaching of a convex surface would have motivated a person of ordinary skill in the art to add such a

surface to Mendelson-799's circular-shaped sensor, to improve adhesion as taught by Ohsaki. *See, e.g.*, Pet. 21–25. Nothing in Ohsaki's disclosure limits such a benefit to a specific shape of the convex surface. Ex. 1047 ¶¶ 11–12.

Moreover, Ohsaki contrasts its convex surface with a flat surface and notes that,

> in the case that the translucent board 8 has a convex surface . . . the variation of the amount of the reflected light which is emitted from the light emitting element 6 and reaches the light receiving element 7 by being reflected by the surface of the user's skin is suppressed. It is also prevented that noise such as disturbance light from the outside penetrates the translucent board 8. Therefore the pulse wave can be detected without being affected by the movement of the user's wrist 4 as shown in FIG. 4A.

Ex. 1009 ¶ 25; Ex. 1047 ¶ 17. Thus, we agree with Petitioner that Ohsaki's teaching of a convex surface would have motivated a person of ordinary skill in the art to add such a surface to Mendelson-799's sensor, to improve signal strength, as taught by Ohsaki. *See, e.g.*, Pet. 23–27. Again, nothing in Ohsaki's disclosure limits such a benefit to the shape of the convex surface. Ex. 1047 ¶¶ 15–17.

Accordingly, we do not agree that Ohsaki's disclosed advantages attach only to a rectangular convex surface, or would have been inapplicable to the proposed combination of Mendelson-799 and Ohsaki.[4]

---

[4] Patent Owner also argues that, to the extent contended by Petitioner, it would not have been obvious to place a rectangular cover on top of Mendelson-799's sensor. PO Resp. 29–31. We do not understand Petitioner to have made any such contention and, accordingly, do not address this argument. *See, e.g.*, Pet. 31 (depicting circular convex surface over circular sensor).

IPR2020-01536
Patent 10,588,553 B2

We have considered Patent Owner's second argument, that Ohsaki's benefits are realized only when the sensor and convex surface are placed on the back of the user's wrist, which is an unsuitable location for Mendelson-799's sensor.  PO Resp. 26–30.  We do not agree.  As an initial matter, Petitioner does not propose bodily incorporating the references; Petitioner simply proposes adding a convex cover to Mendelson-799's sensor, without discussing where Mendelson-799's sensor is used.  *See, e.g.*, Pet. 25–26.  In other words, Petitioner's proposed modification does not dictate any particular placement.  Moreover, Mendelson-799 states that its sensor "allows for measuring $SaO_2$ from multiple convenient locations on the body (e.g. the head, torso, or upper limbs)."  Ex. 1012, 2:17–19; *see also* Ex. 1019, 104[5] ("The idea of using skin reflectance spectrophotometry marked a significant advancement in the noninvasive monitoring of $SaO_2$ from virtually any point on the skin surface.").  Thus, we do not agree that Mendelson-799 discourages or disparages use on the back of the wrist, or suggests that an unacceptably weak signal would be obtained from another location.

Notwithstanding the foregoing, and assuming for sake of argument that a person of ordinary skill in the art would have expected a weaker signal if Mendelson-799's sensor was used on the back of the wrist, that alone does not nullify the proposed combination.  "[A] given course of action often has simultaneous advantages and disadvantages, and this does not necessarily obviate motivation to combine."  *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1165 (Fed. Cir. 2006) (citation omitted).  Indeed, we discern that, in such a location that results in decreased signal quality, a person of ordinary

---

[5] Citation to Petitioner's added page numbering.

IPR2020-01536
Patent 10,588,553 B2

skill in the art would have been further motivated to improve signal quality, e.g., by employing Ohsaki's convex surface. *See, e.g.*, Ex. 1047 ¶¶ 27–30; Ex. 1009 ¶ 25 ("[I]n the case that the translucent board 8 has a convex surface like the present embodiment, the variation of the amount of the reflected light which is emitted from the light emitting element 6 and reaches the light receiving element 7 by being reflected by the surface of the user's skin is suppressed. It is also prevented that noise such as disturbance light from the outside penetrates the translucent board 8.").

We have considered Patent Owner's third argument that a convex cover would condense light away from Mendelson-799's peripheral detectors, which Patent Owner alleges would decrease signal strength. PO Resp. 31–36. We disagree. There appears to be no dispute that when emitted light that passes through user tissue, the light is diffused and scattered as it travels. *See, e.g.*, Pet. Reply 13–18; Tr. 27:18–28:3 (Petitioner's counsel agreeing that "the incoming light from a detection standpoint is going to be coming from all sorts of different directions because of the randomness caused by the back scattering"), 65:23–66:13 (Patent Owner's counsel agreeing that light does not simply enter tissue and come back out "like it came out on a mirror"); Ex. 1041, 35:19–37:18 (Patent Owner's declarant describing light scattering as it travels through tissue, e.g., reflecting off blood, tissue, or other material); Ex. 1043, 28:2–10 (Patent Owner's declarant agreeing that reflecting light can be a signal for the '553 patent's sensor), 61:20–62:4 (explaining that "a light in this context, light emitted from the LEDs is diffused through the skin in that particular context, whatever that is."). The light thus travels at random angles and directions, and no longer travels in a collimated and perpendicular manner.

45

IPR2020-01536
Patent 10,588,553 B2

Dr. Kenny testifies that Mendelson-799 and Ohsaki detect light that has been partially reflected, transmitted, absorbed, and scattered by the skin and other tissues and the blood before it reaches the detector. Ex. 1047 ¶ 36. Dr. Kenny further opines that, "the POSITA would have understood that Mendelson-799's sensor, which includes multiple photodiodes placed symmetrically with respect to a central light source, offers the advantage of *enabling a large fraction of light randomly backscattered from tissue to be detected within the circular active detection area surrounding that source*," thus increasing the light-gathering ability of Mendelson-799's sensor. *Id.* ¶ 43 (emphasis added); *see also id.* ¶ 44 ("Ohsaki's cover provides a refracting effect, such that light rays that otherwise would have missed the detection area are instead directed toward that area as they pass through the interface provided by the cover.").

By contrast Dr. Madisetti testifies that "a convex surface condenses light away from the periphery and towards the sensor's center." Ex. 2004 ¶ 73. We have considered this testimony; however, Dr. Madisetti's opinions largely are premised upon the behavior of collimated and perpendicular light as depicted in Figure 14B of the challenged patent. *See id.* Dr. Madisetti does not persuasively explain how light would behave when approaching the sensor from various angles, as it would after being reflected by tissue. *Id.* ¶¶ 71–75. In other words, even if Patent Owner is correct that the '553 patent's Figure 14B depicts light condensing toward the center, this is not dispositive to the proposed modification, because light passing through a user's tissue is scattered and random, and is not collimated and perpendicular as shown in Figure 14B. Ex. 1001, Fig. 14B.

IPR2020-01536
Patent 10,588,553 B2

Patent Owner and Dr. Madisetti argue that "Petitioner and Dr. Kenny both previously admitted that a convex cover condenses light towards the center of the sensor and away from the periphery in a different petition filed against a related patent," i.e., in IPR2020-01520. PO Resp. 31–32; Ex. 2004 ¶¶ 71–72 (citing Ex. 2019, 45; Ex. 2020 ¶¶ 69–70). The cited portions of the Petition and Dr. Kenny's declaration from IPR2020-01520 discuss a decrease in the "mean path length" of a ray of light when it travels through a convex lens rather than through a flat surface. *See, e.g.*, Ex. 2020 ¶¶ 118–120. We do not agree that this discussion is inconsistent with Dr. Kenny's testimony here that, where light is reflected to the detectors at various random angles and directions, more light will reach Mendelson-799's symmetrically disposed detectors when travelling through the convex surface than would be reached without such a surface, because light that might have otherwise missed the detectors now will be captured. Ex. 1047 ¶¶ 43–45. We do not discern that the convergence of a single ray of light toward the center, as discussed in IPR2020-01520, speaks to the aggregate effect on *all* light that travels through the convex surface. Patent Owner suggests that this prior discussion means that all light is always directed toward the center regardless of where or how the light approaches the convex surface (PO Resp. 31–33), however, we do not understand Dr. Kenny's testimony to support such a position.

In its Sur-reply, Patent Owner argues that it "never argued that all incoming light condenses to a ***single point***," or "that ***all*** light would be focused at the center." Sur-reply 16–17. Be that as it may, neither Patent Owner nor Dr. Madisetti sufficiently addresses the diffuse nature of the light at issue here, which reflects from user tissue and scatters. Patent Owner

47

IPR2020-01536
Patent 10,588,553 B2

attempts to do so in its Sur-reply, stating that "light entering the convex surface from all angles would, on average, result in more light directed towards the center and less light at the periphery—as compared to a flat surface—and therefore less light at the peripherally located detectors." *Id.* at 17 (emphases omitted). However, as support, Patent Owner identifies only the same portions of Dr. Madisetti's declaration discussed above, which fail to address diffuse or scattered light. Ex. 2004 ¶¶ 70–75. Accordingly, considering all evidence of record, we credit the testimony of Dr. Kenny.[6]

With respect to Patent Owner's fourth argument, we do not agree that a person of ordinary skill in the art would have been discouraged from modifying Mendelson-799 as proposed, due to the potential for air gaps to form at the peripheral edges of the convex surface. PO Resp. 36–38. Patent Owner misstates the proposed modification. Petitioner does not propose "modif[ying] Mendelson[-]799's structure to add Ohsaki's air gaps." *See* PO Resp. 37. Petitioner proposes modifying Mendelson-799 only to include a cover with a convex surface; Petitioner does not propose including any air gaps that may be present in Ohsaki. *See, e.g.*, Pet. 41. Moreover, even if Ohsaki's Figure 1 depicts small air gaps adjacent the convex surface, Ohsaki nonetheless discloses that the convex surface is in "intimate contact" with the user's skin. Ex. 1009 ¶ 25; *see also Hockerson-Halberstadt*, 222 F.3d at 956. In view of such a teaching, we agree with Petitioner that it would have

---

[6] Moreover, we disagree with Patent Owner's argument that Petitioner's Reply arguments are overly complex and instead a person of ordinary skill in the art "would have understood and applied the straightforward understanding that a convex surface condenses light toward the center." Sur-reply 19–20. As noted above, this "straightforward understanding" lacks sufficient support, in the context of diffuse light.

IPR2020-01536
Patent 10,588,553 B2

been within the skill of a person of ordinary skill in the art, who "is also a person of ordinary creativity, not an automaton," to minimize any such air gap that may be present when including a cover with a convex surface in Mendelson-799's sensor. Indeed, a purpose of Petitioner's proposed modification is to increase signal strength. *See, e.g.*, Pet. 24–25. We discern that it would have been within the capability of an ordinarily skilled artisan to eliminate any air gap that would have decreased signal strength or quality. Ex. 1047 ¶ 48.

<u>Rationale 3</u>

Petitioner further contends that a person of ordinary skill in the art "would have recognized that a light permeable cover with a protruding convex surface," such as that taught by Ohsaki, would "protect the elements within sensor housing 17" of Mendelson-799. Pet. 21–22. We are persuaded that adding a convex cover, such as that taught by Ohsaki, would protect the sensor's internal components. Mendelson-799 is not shown to include a cover over its emitters 12a–c or detectors 16, 18. *See, e.g.*, Ex. 1012, Fig. 7. By contrast, Ohsaki discloses that translucent board 8 with its convex surface covers its emitter and detector. As such, we credit Dr. Kenny's testimony that a person of ordinary skill in the art would have been motivated to add a transparent convex cover to Mendelson-799 to "provide additional protection to the elements accommodated within sensor housing 17." Ex. 1003 ¶ 87.

We disagree with Patent Owner's fifth argument that a person of ordinary skill in the art would not have modified Mendelson-799 as proposed because a convex cover would be prone to scratches and because other alternatives existed. PO Resp. 38–49. Patent Owner's counsel did not

49

IPR2020-01536
Patent 10,588,553 B2

dispute, during the oral hearing, that a convex cover would indeed serve to protect the internal sensor components in Mendelson-799, as Petitioner proposes. Tr. 64:6–65:5 (but noting that a flat cover would also protect, and would be less prone to scratches). Even if a convex cover seated against the skin may be more prone to scratches than a flat cover, this is just one of numerous tradeoffs that a person of ordinary skill in the art would consider, in determining whether the benefits of increased adhesion, signal strength, and protection outweigh the potential for a scratched cover. *Medichem*, 437 F.3d at 1165. We do not agree that the possibility of scratches alone would have dissuaded a person of ordinary skill in the art from the proposed modification, to achieve the benefits identified by Petitioner.

For the foregoing reasons, we are persuaded by Petitioner's contentions.

### *v. Summary*

For the foregoing reasons, we determine that Petitioner has met its burden of demonstrating by a preponderance of the evidence that claim 1 would have been obvious over the cited combination of references.

### 4.    *Independent claims 10 and 20*

Independent claims 10 and 20 consist of limitations that are substantially similar to elements [a]–[d] of claim 1. *Compare* Ex. 1001, 44:50–67, *with id.* at 45:35–47 *and id.* at 46:22–46. In asserting that claims 10 and 20 also would have been obvious over the combined teachings of Mendelson-799 and Ohsaki, Petitioner refers to the same arguments presented as to claim 1. *See* Pet. 45–50, 55–60.

50

Patent Owner does not separately address independent claims 10 and 20. *See generally* PO Resp.

We have examined the scope of claims 10 and 20 as well as Petitioner's unrebutted contentions concerning these two claims. Claim 10 is generally broader in scope than claim 1, but otherwise claims the same elements in the same configurations as examined above. *See* Pet. 45–50. One distinction is that "at least four detectors" must be "operably arranged on the planar surface of the substrate *in a pattern*." Ex. 1001, 45:35–47. Petitioner establishes how "the Mendelson-Ohsaki combination would have included twelve discrete detectors that are operably arranged on the planar surface of the sensor's substrate in a radially symmetric pattern around central light source 12." Pet. 49.

Claim 20 is also very similar to claim 1. *See id.* at 55–60. Claim 20 additionally requires "positioning the at least four detectors within *one or more spaces* formed by at least the substrate." Ex. 1001, 46:44–46. Petitioner also establishes how "the discrete detectors included within detectors 16 and 18 would have been positioned within spaces formed by the substrate, wall, and cover." Pet. 60 (citing Ex. 1003 ¶¶ 199–200).

Based on Petitioner's analysis and supporting testimony of Dr. Kenny, and for the same reasons discussed above, we are persuaded that Petitioner's cited evidence and reasoning demonstrates by a preponderance of the evidence that claims 10 and 20 would have been obvious over Mendelson-799 and Ohsaki. *See supra*.

### 5.    *Dependent claim 2*

Dependent claim 2 depends from independent claim 1 and further recites: "The noninvasive optical physiological sensor of claim 1, wherein

IPR2020-01536
Patent 10,588,553 B2

the wall operably connects to the substrate on one side and operably connects to the cover on an opposite side." Ex. 1001, 45:1–3.

Petitioner primarily relies on its analysis of claim 1, citing to argument and evidence demonstrating how a person of ordinary skill in the art would understand that "the wall operably connects to the substrate on one side and operably connects to the cover on an opposite side," as claimed. Pet. 42 (citing Ex. 1003 ¶¶ 55–69, 78–138; Ex. 1012, code (57), 4:13–22, 7:25–8:13, 8:37–41, 9:22–10:30, Figs. 7, 8; Ex. 1009 ¶¶ 15, 17, 25, Figs. 1, 2, 4A, 4B).

Patent Owner argues that "Petitioner provides no independent analysis for this claim and instead refers back to analyses of claim 1." PO Resp. 41. Patent Owner also argues that, in the annotated figures, Petitioner relies on "a combination with cover and wall features that are unsupported and unexplained," and that Petitioner does not have support for placing a cover spanning the entire space above the substrate and for providing notches. *Id.* at 41–43.

We have addressed Patent Owner's concerns in our analysis above. As shown in the Petitioner's modified figures (*see* Pet. 41), the wall of the combined sensor surrounds the sensor components and is operably connected to the convex cover on the top and is operably connected to the planar substrate on the bottom, as claimed. Moreover, as discussed above regarding claim 1, Petitioner's proposed modifications to Mendelson-799 is not premised upon bodily incorporating Ohsaki's cover directly with Mendelson-799's sensor. *See In re Nievelt*, 482 F.2d 965, 968 (CCPA 1973) ("Combining the teachings of references does not involve an ability to combine their specific structures.").

IPR2020-01536
Patent 10,588,553 B2

To the contrary, Petitioner proposes incorporating Ohsaki's teaching of a cover with a convex surface, not the precise cover and structure disclosed by Ohsaki. Ex. 1003 ¶ 88 ("And, consistent with Ohsaki's configuration, one of ordinary skill would have configured Mendelson '799's circumscribing wall to operably connect, on one side, to the planar substrate on which detectors 16 and 18 are arranged and, on an opposite side, to the convex cover."); *see also* Ex. 1012, code (57), 9:22–10:30, Fig. 7; Ex. 1009 ¶ 17, Fig. 2; *see also* Ex. 1047 ¶ 11 ("one of ordinary skill in the art would arrange for a convex cover based on the teaching of Ohsaki that was the right size to fit with the housing of Mendelson '799"). If Ohsaki's teaching is implemented in a manner that varies from the precise implementation of such a cover in Ohsaki, e.g., with a larger span or with notches, this is not a material deviation from Ohsaki's express teachings of using a cover with a convex surface to achieve specific benefits, e.g., improved adhesion and signal strength. Ex. 1009 ¶ 25; *see supra*; *see Lear Siegler, Inc. v. Aeroquip Corp.*, 733 F.2d 881, 889 (Fed. Cir. 1984) (explaining that a person of ordinary skill is not "compelled to adopt every single aspect of [a reference] without the exercise of independent judgment").

Accordingly, for the foregoing reasons, we determine that Petitioner has met its burden of demonstrating by a preponderance of the evidence that claim 2 would have been obvious over the cited combination of references.

6.    *Dependent claims 3, 5, 6, 9, 11–18, 21–24, 29*

Petitioner also contends that claims 3, 5, 6, 9, 11–18, 21–24, and 29 would have been obvious based on the same combination of prior art addressed above. These challenged claims all depend directly or indirectly

53

**Appx13223**

from independent claim 1, 10, or 20. Petitioner identifies teachings in the prior art references that teach or suggest the limitations of these claims, and provides persuasive reasoning as to why the claimed subject matter would have been obvious to one of ordinary skill in the art. Pet. 29–62. Petitioner also supports its contentions for these claims with the testimony of Dr. Kenny. Ex. 1003 ¶¶ 139–211.

Patent Owner does not present any arguments for these claims other than those we have already considered with respect to independent claim 1. PO Resp. 41 ("The Petition fails to establish that independent claims 1, 10, and 20 are obvious over the cited references of Ground 1 and therefore fails to establish obviousness of any of the challenged dependent claims."); *see supra*.

We have considered the evidence and arguments of record and determine that Petitioner has demonstrated by a preponderance of the evidence that claims 3, 5, 6, 9, 11–18, 21–24, and 29 would have been obvious over the combined teachings of Mendelson-799 and Ohsaki, for the reasons discussed in the Petition and as supported by the testimony of Dr. Kenny.

### 7.     Conclusion

For the foregoing reasons, we determine that Petitioner has met its burden of demonstrating by a preponderance of the evidence that claims 1–3, 5, 6, 9–18, 20–24, and 29 would have been obvious over the cited combination of references.

IPR2020-01536
Patent 10,588,553 B2

> ### E.     Obviousness over the Combined Teachings of
> ### Mendelson-799, Ohsaki, and Schulz

Petitioner contends that claims 4, 18, and 24 of the '553 patent would have been obvious over the combined teachings of Mendelson-799, Ohsaki, and Schulz.  Pet. 62–74.  Patent Owner disagrees and presents several arguments, including that "a POSITA would not have been motivated to combine Schulz with Mendelson '799 and Ohsaki."  PO Resp. 43, 43–45; *see also generally* Sur-reply.

Based on our review of the parties' arguments and the cited evidence of record, we determine that Petitioner has met its burden of showing by a preponderance of evidence that claims 4, 18, and 24 are unpatentable.

> ### 1.     Overview of Schulz (Ex. 1013)

Schulz is a U.S. patent application publication titled "Pulse Oximetry Ear Sensor," and discloses an ear sensor assembly including an emitter pad and a detector pad.  Ex. 1013, codes (54), (57).

Figure 19C of Schulz is reproduced below.

55

IPR2020-01536
Patent 10,588,553 B2



Figure 19C illustrates an exploded top perspective view of an ear sensor clip. *Id.* ¶ 31. Each sensor clip 1900 includes "opposingly positioned housings 1902 and 1903 that house one or more sensor optical components." *Id.* ¶ 65. Each housing includes respective inward facing shells 1905 and 1906.[7] *Id.* ¶ 65. "[I]nward facing shells 1905 and 1906 further include windows 1919 and 1924 that provide an aperture for transmission of optical energy to or from a tissue site. Translucent silicone material covers windows 1919 and 1924 providing lenses 1920 and 1921." *Id.* ¶ 67.

A "thin sheet of opaque material is located beneath window 1919 or 1924, and a window in the opaque material provides an aperture for transmission of optical energy to or from the tissue site." *Id.* ¶ 73. "The opaque material blocks light, and the window in the opaque material can be

---

[7] Figure 19C appears to label inward facing shell 1906 as 1916. *See id.* at Fig. 19B.

sized as needed to block the proper amount of light from entering the aperture to, for example, avoid saturation of the light detector." *Id.*

### 2. *Dependent Claims 4, 18, and 24*

Claim 4 requires "an opaque layer blocking light other than at one or more openings that allow light to pass through to at least one of the at least four detectors." Ex. 1001, 45:7–11. Claims 18 and 24 similarly require "one or more openings that allow light to pass through to the at least four detectors." *Id.* at 46:7–10, 60–63.

Petitioner's Disputed Contentions

Petitioner identifies teachings in the prior art references that teach the limitations of each of dependent claims 4, 18, and 24, and provides persuasive reasoning as to why the claimed subject matter would have been obvious to one of ordinary skill in the art. Pet. 65–74. More specifically, Petitioner contends that a person of ordinary skill in the art would have combined Mendelson-'799 and Ohsaki with Schulz to obtain additional benefits. *Id.* at 65. Petitioner contends "a POSITA would have recognized that the Mendelson-Ohsaki opaque wall would partially shield the detectors from ambient light, but would have understood from Schulz that additional measures could be taken to guard against saturation." *Id.* (citing Ex. 1019, 79, 86, 94). Petitioner relies on Schulz's sensor featuring a thin sheet of opaque material placed inside the sensor's housing beneath a lens with "a window in the opaque material provid[ing] an aperture for transmission of optical energy to or from the tissue site," as well as the sizeable opaque material blocking light from entering the aperture to avoid saturation of the light detector. *Id.* at 66 (quoting Ex. 1013 ¶ 73, Figs. 19A–19C).

57

Petitioner contends that a person of ordinary skill in the art would have been motivated to add a layer of opaque material to the Mendelson-Ohsaki sensor, and to size windows in the opaque material as appropriate, to avoid saturation of each of the sensor's detectors. *Id.* (citing Ex. 1003 ¶¶ 215–216; Ex. 1013 ¶ 73, Figs. 19A–19C). Petitioner argues that based upon the knowledge a person of skill in the art would possess, and based on Schulz's description, "Schulz's opaque layer limits errors by decreasing the angle of incidence to the photodiode to that enabled by the window included within the layer, and by otherwise preventing ambient light from reaching the photodiode." *Id.* at 67. Petitioner similarly argues that a person of ordinary skill in the art would have applied Schulz's teachings to pulse oximetry sensors featuring multiple photodiodes so that errors could be limited using an opaque layer with multiple windows, the windows being configured to decrease the angles of incidence to the photodiodes. *Id.* Relying on the annotated Figure 7 of Mendelson-'799 below, Petitioner argues that "Schulz would have motivated a POSITA to modify the Mendelson-Ohsaki combination to include an opaque layer that would have blocked light other than at windows corresponding to the sensor's photodiodes." *Id.* at 69.

IPR2020-01536
Patent 10,588,553 B2



Petitioner's annotated Figure 7 of Mendelson-799 and added sectional view depicting an additional "Opaque Layer" (illustrated in green) having windows.  Pet. 70.  According to Petitioner, "the Mendelson-Ohsaki-Schulz combination improves upon the Mendelson-Ohsaki combination by adding a well-known component, an opaque layer that blocks light other than at windows corresponding to the detectors, in order to 'avoid saturation' of the detectors."  Pet. 70–71 (citing Ex. 1003 ¶ 222; Ex. 1013 ¶ 73).  Thus, Petitioner concludes that "the Mendelson-Ohsaki-Schulz combination would have included an opaque layer blocking light other than at one or more openings that allow light to pass through to the twelve detectors."  Pet. 71 (citing Ex. 1003 ¶¶ 55–72, 78–136, 213–222).

Patent Owner's Arguments

Patent Owner, relying on the testimony of Dr. Madisetti, argues that "a POSITA would *not* have been motivated to combine Schulz with Mendelson '799 and Ohsaki."  PO Resp. 44 (citing Ex. 2004 ¶¶ 89–93).  Patent Owner first argues aspects of Schulz individually.  For example, Patent Owner argues that Schulz is directed to an ear sensor, but the

IPR2020-01536
Patent 10,588,553 B2

Mendelson-Ohsaki combination is not, and Mendelson-799 contrasts its reflectance sensor with transmission sensors attached on an earlobe. PO Resp. 44 (citing, e.g., Ex. 2004 ¶ 90). Patent Owner next contends that "there is no evidence over-saturation was a problem for the detectors in either Mendelson '799 or Ohsaki." *Id.*

Patent Owner further argues that a person of ordinary skill in the art would not have been motivated to modify Mendelson-799 as proposed because adding an opaque layer would *decrease* signal strength, especially for a reflectance pulse oximeter like Mendelson-799, which Patent Owner alleges has a weak signal already. PO Resp. 44–45 (citing, e.g., Ex. 2004 ¶¶ 91–93); Sur-reply 25–26. According to Patent Owner, a person of ordinary skill in the art would not have been motivated to add features that make an already weak signal even weaker, especially at "Petitioner's proposed wrist-worn sensor—a location where a POSITA would expect weak and noisy signals." Sur-reply 25–26. Further, "[n]othing in Schulz would have motivated a POSITA to add windows to Mendelson '799's sensor to block ambient light," whereas "other cited Mendelson references similarly place the sensor inside an opaque cover that would likewise suppress ambient light," according to Patent Owner. *Id.* at 26. Finally, Patent Owner asserts that a person of ordinary skill in the art would have expected the windows in Petitioner's proposed combination to prevent the necessary angular reflected light from reaching Mendelson-799's detectors, thereby making an already weak signal even weaker. PO Resp. 44–45 (citing Ex. 2004 ¶¶ 91–92).

IPR2020-01536
Patent 10,588,553 B2

Analysis

We have considered the parties' arguments and cited evidence, and we are persuaded by Petitioner's contentions. As discussed above, Schulz explicitly teaches that its opaque material and window "blocks light" and "avoid[s] saturation of the light detector." Ex. 1013 ¶ 73. Petitioner cites persuasive and well-supported evidence, including the testimony of its declarant, that a person of ordinary skill in the art would have been motivated to add such an arrangement to the sensor of Mendelson-799 to achieve this same disclosed benefit, i.e., to avoid saturation of Mendelson's detectors. *See, e.g.*, Ex. 1003 ¶¶ 215–216. For example, Dr. Kenny's testimony regarding the ability of an opaque material with windows to avoid saturation is supported by Schulz and by the Webster textbook, which discusses the importance of minimizing "light other than the optical signals of interest." *Id.* ¶ 217 (citing Ex. 1019, 76). We are persuaded by Petitioner's contentions and Dr. Kenny's testimony.

We do not agree with Patent Owner's argument that this modification would *decrease* signal strength. PO Resp. 44–45. We discern that Petitioner's proposed modification would not alter the signal of interest, i.e., the optical signal that passes from the emitter, through the user's tissue, and to the photodetectors. Rather, the cited evidence of record supports Petitioner's contention that the proposed modification would have blocked light *other than* that from the signal of interest, i.e., the emitter. *See, e.g.*, Ex. 1003 ¶ 221 ("Schulz would have motivated one of ordinary skill to modify the Mendelson-Ohsaki combination to include an opaque layer that would have blocked light other than at windows corresponding to the sensor's photodiodes."); Ex. 1013 ¶ 73 ("The opaque material blocks light,

and the window in the opaque material can be sized as needed to block the proper amount of light from entering the aperture to, for example, avoid saturation of the light detector."); *see also* Pet. Reply 24–26.  Thus, we do not agree that the proposed modification would have decreased signal strength.

We have considered Patent Owner's similar argument that the proposed windows would have prevented certain angular reflected light from reaching Mendelson-799's detectors, thereby making an already weak signal even weaker.  Sur-reply 27 (citing, e.g., Ex. 2004 ¶¶ 91–92).  We do not find any support for this argument in Schulz.  To the contrary, Schulz explains that "the window in the opaque material can be sized as needed to block the proper amount of light from entering the aperture to, for example, avoid saturation of the light detector."  Ex. 1013 ¶ 73.  Contrary to Patent Owner's argument, Schulz simply states that its window is sized to control the amount of light *that enters the aperture*; Schulz does not state where light comes from, or that it only controls against light from the emitter.

We also do not agree with Patent Owner's argument that Petitioner has not shown that saturation was a problem for Mendelson-799's sensor. PO Resp. 44.  Mendelson-799 need not identify a problem with saturation in order to be improved by the proposed modification.  Indeed, Petitioner "does not need to show that there was a known problem with the prior art system." *Unwired Planet, LLC v. Google Inc.*, 841 F.3d 995, 1002–03 (Fed. Cir. 2016); *see also Sci. Plastic Prods., Inc. v. Biotage AB*, 766 F.3d 1355, 1359–61 (Fed. Cir. 2014); *Hologic, Inc. v. Minerva Surgical, Inc.*, 764 F. App'x 873, 880 (Fed. Cir. 2019).  As expressly recognized in *KSR*, *any* art-recognized need or problem can provide a reason for combining claim

elements. *KSR*, 550 U.S. at 416. Here, Petitioner provides sufficient evidence to demonstrate that saturation was a known problem (*see, e.g.*, Ex. 1003 ¶¶ 216–220; Ex. 1019, 79; Ex. 1023, 11–12;[8] Ex. 1047 ¶¶ 63, 64) and that Schulz provided a readily-applicable technique to solve it (Ex. 1013 ¶ 73).

We also do not agree with Patent Owner's argument that Schulz and Mendelson-799 are incompatible because they obtain measurements at different locations. Mendelson-799 explains that its sensor type can be used in "multiple convenient locations on the body," and does not exclude use on a patient's ear or elsewhere. Ex. 1012, 2:15–21; *see also* Ex. 1019, 104 ("The idea of using skin reflectance spectrophotometry marked a significant advancement in the noninvasive monitoring of $SaO_2$ from virtually any point on the skin surface."). Moreover, the proposed modification does not seek to bodily incorporate the references, one with the other. Rather, Petitioner clearly proposes modifying Mendelson-799 to include an opaque material with windows, as taught by Schulz, but plainly does not propose incorporating any other aspect of Schulz, such as its measurement location. *See* Pet. 47–49; *see also In re Nievelt*, 482 F.2d 965, 968 (CCPA 1973) ("Combining the teachings of references does not involve an ability to combine their specific structures.").

---

[8] It is of no moment that this evidence is not identified as part of the asserted ground. PO Resp. 45. This evidence is cited by Dr. Kenny as support for his testimony, consistent with our rules. 37 C.F.R. § 42.65(a) ("Expert testimony that does not disclose the underlying facts or data on which the opinion is based is entitled to little or no weight.").

IPR2020-01536
Patent 10,588,553 B2

### F.    Obviousness over the Combined Teachings of Mendelson-799, Ohsaki, and Griffin

Petitioner contends that claim 25 of the '553 patent would have been obvious over the combined teachings of Mendelson-799, Ohsaki, and Griffin.  Pet. 74–79.  Patent Owner disagrees and offers several reasons why a person of ordinary skill in the art would not have been motivated to combine Mendelson-799 and Ohsaki with Griffin.  PO Resp. 46–47.

Based on our review of the parties' arguments and the cited evidence of record, we determine that Petitioner has met its burden of showing by a preponderance of evidence that claim 25 is unpatentable.

### 1.    Overview of Griffin (Ex. 1014)

Griffin is titled "Magnetic Connector" and it relates to a connector that "uses complimentary magnetic arrays and mating surfaces on its plug and receptacle," as shown in Figures 1(a) and 1(b) reproduced below. Ex. 1014, codes (54), (57).



Figures 1(a) and 1(b) of Griffin show complimentary magnetic arrays and mating surfaces. Figures 1(a) and 1(b) also depict an electrical magnetic connector featuring "a plug having a plug magnet and plug face and a receptacle having a receptacle magnet and receptacle face." *Id.* at 1:54–2:18, 3:26–61, Figs. 1(a)–1(c).

Griffin's connection mechanism addresses problems that arise when, for example, "connectors are sometimes inadvertently decoupled," which can "result in a broken connector or even damage to the connected electronic device." *Id.* at 1:29–42. Griffins' plug and receptacle magnets allow for a quick and safe decouple when a sudden force is applied without resulting in any damage to the connector or the associated electronic device. *Id.* at 3:48–53, 5:26–38.

## 2.    *Dependent claim 25*

Dependent claim 25 further requires: "a magnet configured to be used as a connecting mechanism." Ex. 1001, 4:64–67.

<u>Undisputed Contentions</u>

Griffin's teaching of a magnet configured to be used as a connecting mechanism is not disputed by Patent Owner. *See* PO Resp. 46 ("Griffin is a plug that 'uses complementary magnetic arrays and mating surfaces . . . to facilitate connection and disconnection of the ***connector***.'" (citing Ex. 1014, code (57)); Ex. 1003 ¶¶ 73–74.

<u>Petitioner's Disputed Contentions</u>

Petitioner proposes that a person of ordinary skill in the art would have been motivated to combine Mendelson-799 and Ohsaki with Griffin to obtain certain benefits. Pet. 77 (citing Ex. 1003 ¶¶ 246–247). Mendelson-799 identifies pulse oximeter 20 including "a control unit 21, which is

IPR2020-01536
Patent 10,588,553 B2

composed of an electronic block 22 including A/D and D/A converters connectable to the sensor 10." Pet. 76 (quoting Ex. 1012, 10:16–22). Petitioner contends that "Mendelson-799 does not explicitly describe the mechanism for connecting sensor 10 and electronic block 22 as a magnet but, in view of Griffin's disclosure, a POSITA would have found it obvious to implement that connection with a magnet configured to be used as a connecting mechanism." Pet. 77 (citing Ex. 1003 ¶ 248).

Petitioner contends that it was well known by the critical date that electrical connectors relying on a mechanical or friction fit to couple a plug to a receptacle were sometimes subject to inadvertent decoupling, and that such decoupling could result in broken connectors and devices. *Id.* (citing Ex. 1003 ¶ 249; Ex. 1014, 1:29–50). As such, Petitioner argues that a person of ordinary skill in the art would have understood that this problem could be solved with Griffin's magnetic connector, and integrating it into the Mendelson-799 and Ohsaki combination would have avoided problems that might arise from a sudden or forceful decoupling of the connection between sensor 10 and electronic block 22. Pet. 77–78 (citing Ex. 1003 ¶ 249; Ex. 1014, 1:54–2:18, 3:26–61, 5:26–38, Figs. 1(a)–1(c)).

<u>Patent Owner's Arguments</u>

Patent Owner contends that "[c]laim 25 is not obvious because a POSITA would not have been motivated to combine Griffin with Mendelson '799 and Ohsaki." PO Resp. 46 (citing Ex. 2004 ¶¶ 94–95). Patent Owner argues that Griffin uses magnetic arrays for connection to address the problem of inadvertently decoupled connectors, yet Petitioner's proposed combination of Mendelson-799 and Ohsaki would be a self-contained device attached to the user's wrist with a belt. *Id.* Thus, according to Patent

IPR2020-01536
Patent 10,588,553 B2

Owner, the person of ordinary skill in the art would not have been motivated to make the combination because "[t]he device has ***no*** attached cables that could be inadvertently decoupled," and "Petitioner never explains why a POSITA would have looked to Griffin to address decoupling issues when the combination of Mendelson '799 and Ohsaki has no cables to decouple." *Id.* (citing Ex. 2004 ¶ 95). Patent Owner contends that "Petitioner's combination has neither the need nor the opportunity for Griffin's magnetic connections to attached cables." Sur-reply 28.

<u>Analysis</u>

Petitioner has persuasively established why a person of ordinary skill in the art would have been motivated to modify the Mendelson-Ohsaki sensor such that the mechanism for connecting sensor 10 and electronic block 22 is implemented using a magnet, as taught by Griffin. *See* Pet. 76–78. Patent Owner's argument is premised on the proposed device always being "self-contained," and such a device never having the need to integrate a magnetic connector to avoid problems that might arise from a forceful decoupling. We disagree.

Patent Owner bases its argument on Ohsaki's device allegedly including "a display and electrical connections ***within the sensor body itself***." PO Resp. 46. Petitioner's description of the proposed combination, however, explains that Mendelson-799's pulse oximeter 20 includes "control unit 21, which is composed of an electronic block 22 including A/D and D/A converters connectable to the sensor 10." Pet. 76 (quoting Ex. 1012, 10:16–22). We agree with Petitioner that control unit 21 and sensor 10 would have been connected such that a person of ordinary skill in the art would have

67

been motivated to integrate Griffin's magnetic connection to avoid forceful decoupling.  Pet. Reply 28 (citing e.g., Ex. 1003, 246–251).

Based on our review of the parties' arguments and the cited evidence of record, we determine that Petitioner has met its burden of showing by a preponderance of evidence that claim 25 is unpatentable.

### G.    Obviousness over the Combined Teachings of Mendelson-799, Ohsaki, and Mendelson-2006

Petitioner contends that claims 7 and 19 of the '553 patent would have been obvious over the combined teachings of Mendelson-799, Ohsaki, and Mendelson-2006.  Pet. 79–96.  Patent Owner disagrees and presents several arguments against the proposed combination.  PO Resp. 47–50.

Based on our review of the parties' arguments and the cited evidence of record, we determine that Petitioner has met its burden of showing by a preponderance of evidence that claims 7 and 19 are unpatentable.

### 1.    Overview of Mendelson-2006 (Ex. 1010)

Mendelson-2006 is a journal article titled "A Wearable Reflectance Pulse Oximeter for Remote Physiological Monitoring," and discloses a wireless wearable pulse oximeter connected to a personal digital assistant ("PDA").  Ex. 1010, 1.[9]

---

[9] Petitioner cites to the page numbers added to Exhibit 1010, rather than the native page numbering that accompanies the article.  We follow Petitioner's numbering scheme.

IPR2020-01536
Patent 10,588,553 B2

Figure 1 of Mendelson-2006 is reproduced below.



Figure 1 illustrates a sensor module attached to the skin (top), and a photograph of a disassembled sensor module and receiver module (bottom). The sensor module includes an optical transducer, a stack of round printed circuit boards, and a coin cell battery. *Id.* at 2.

Figure 2 of Mendelson-2006 is reproduced below.



Figure 2 depicts a system block diagram of the wearable, wireless, pulse oximeter including the sensor module (top) and the receiver module (bottom). *Id.* The sensor module includes at least one light-emitting diode

69

IPR2020-01536
Patent 10,588,553 B2

("LED"), a photodetector, signal processing circuitry, an embedded microcontroller, and an RF transceiver. *Id.* at 1–2. Mendelson-2006 discloses that a concentric array of discrete photodetectors could be used to increase the amount of backscattered light detected by a reflectance type pulse oximeter sensor. *Id.* at 4. The receiver module includes an embedded microcontroller, an RF transceiver for communicating with the sensor module, and a wireless module for communicating with the PDA. *Id.* at 2.

As a PDA for use with the system, Mendelson-2006 discloses "the HP iPAQ h4150 PDA because it can support both 802.11b and Bluetooth™ wireless communication" and "has sufficient computational resources." *Id.* at 3. Mendelson-2006 further discloses that

> [t]he use of a PDA as a local terminal also provides a low-cost touch screen interface. The user-friendly touch screen of the PDA offers additional flexibility. It enables multiple controls to occupy the same physical space and the controls appear only when needed. Additionally, a touch screen reduces development cost and time, because no external hardware is required. . . . The PDA can also serve to temporarily store vital medical information received from the wearable unit.

*Id.*

The PDA is shown in Figure 3 of Mendelson-2006, reproduced below.



Figure 3 illustrates a sample PDA and its graphical user interface ("GUI"). *Id.* Mendelson-2006 explains that the GUI allows the user to interact with the wearable system. *Id.* "The GUI was configured to present the input and

70

output information to the user and allows easy activation of various functions." *Id.* "The GUI also displays the subject's vital signs, activity level, body orientation, and a scrollable PPG waveform that is transmitted by the wearable device." *Id.* For example, the GUI displays numerical oxygen saturation ("SpO$_2$") and heart rate ("HR") values. *Id.*

### 2.    *Dependent claims 7 and 19*

Dependent claims 7 and 19 further require "a touch screen display," as well as "one or more processors" configured to receive data or signals from the four detectors, among other limitations. Ex. 1001, 45:18–28, 46:11–21.

<u>Petitioner's Contentions</u>

Petitioner first notes that the Mendelson-799 and Ohsaki combination would have included an optical sensor 10 for use in the proposed optical measurement device to measure a blood parameter. Pet. 81. Petitioner relies on the control unit of Mendelson-799 with electronic block 22 connectable to sensor 10, microprocessor 24 for analyzing measured data, and display 26 for presenting measurement results. Pet. 83. Petitioner contends that Mendelson-799 "describes a physiological monitoring device that includes both noninvasive optical physiological sensor 10 and pulse oximeter 20 with display 26 that is configured to utilize sensor 10." Pet. 83–84.

Petitioner observes that Mendelson-799 does not explicitly describe pulse oximeter 20's display 26 as a touch-screen display, but Petitioner contends that a person of ordinary skill in the art would have found it obvious to implement display 26 as a touch-screen display in light of the teachings of Mendelson-2006. Petitioner relies on the advantages of integrating a touch screen display described in Mendelson-2006, such as providing a low-cost touch screen interface and a simple GUI that presents

input and output information to the user to allow easy activation of various functions. Pet. 85. "To enable easy activation of various functions through a user-friendly interface similar to that described by Mendelson 2006, a POSITA would have found it obvious to implement pulse oximeter 20's display 26 as a touch-screen display." Pet. 86 (citing Ex. 1003 ¶¶ 265–268).

Petitioner next argues that a person of ordinary skill in the art would have found it obvious to enable Mendelson-799 and Ohsaki's sensor and pulse oximeter to communicate wirelessly with a PDA featuring a touch-screen display or mobile phone functionality in view of the teachings of the Mendelson-2006 disclosure. Pet. 86 (citing Ex. 1003 ¶ 269). Petitioner notes that at the time of invention, physiological sensor devices commonly communicated wirelessly with handheld computing devices. *Id.* Petitioner notes that Mendelson-2006's sensor module includes an "optical reflectance transducer" for measuring photoplethysmographic (PPG) signals, and the receiver module includes "an embedded microcontroller." Pet. 87 (quoting Ex. 1010, 1–2). Next, Petitioner shows how signals acquired by the Sensor Module of Mendelson-2006 are received by the embedded microcontroller which synchronously converts the corresponding output to various signals that are filtered by software to compute arterial oxygen saturation ($SpO_2$) and heart rate (HR) based on the relative amplitude and frequency content of the reflected PPG signals. *Id.* Petitioner relies on Mendelson-2006's disclosure of transmitting information acquired by the Sensor Module wirelessly via an RF link over a short range to a body-worn Receiver Module and data processed by the receiver module is transmitted wirelessly to a PDA. Pet. 88 (citing Ex. 1010, 2, Fig. 2). Petitioner contends that Mendelson-2006's PDA is a simple low-cost GUI that presents input and

output information to the user, which allows "easy activation of various functions" and a person of ordinary skill in the art would have recognized the benefit of adding these features into the Mendelson-799 and Ohsaki system. Pet. 88–89, 90 ("POSITA would have been motivated to wirelessly transmit information or data acquired or processed by sensor 10 and pulse oximeter 20 to a PDA featuring a touch-screen display and/or mobile phone functionality").

<u>Patent Owner Contentions</u>

Patent Owner, relying on the testimony of Dr. Madisetti, contends that a person of ordinary skill in the art "would have been led away from Petitioner's proposed combination as a whole" after reviewing the complete disclosure of Mendelson-2006. PO Resp. 48 (citing Ex. 2004 ¶¶ 96–102).

First, Patent Owner argues that Mendelson-2006's sensor uses a single detector ring and not multiple detectors as claimed. *Id.* (citing Ex. 1010, 1, 4). Further, the single photodetector ring increases the amount of backscattered light captured and also reduces power consumption, according to Patent Owner, such that a person of ordinary skill in the art "would have recognized that a single photodetector ring reduces power consumption because it maximizes the amount of light detected by eliminating the space between the individual detectors of Mendelson '799." *Id.*

Second, Mendelson-2006's device positions the sensor on the user's forehead and Patent Owner contends that this sensor would not be used on the back of the wrist due to signal strength and power concerns. *Id.* According to Patent Owner, "the resulting wrist-worn device would have low signal strength, would experience power management issues and

73

IPR2020-01536
Patent 10,588,553 B2

accordingly would be unsuitable for the wireless device discussed in Mendelson 2006." *Id.* at 49 (citing Ex. 2004 ¶ 100).

Third, and lastly, Patent Owner contends that "Mendelson 2006 further undermines a POSITA's motivation to add a protrusion based on Ohsaki," because "Ohsaki's board only prevents slipping due to movement if the sensor is positioned on the ***backside of the wrist***," and "the sensor should be placed on the ***forehead***, as Mendelson 2006 teaches." *Id.*

Analysis

We are persuaded that Petitioner's stated reasoning for the proposed modification is sufficiently supported, including by the testimony of Dr. Kenny. *See, e.g.*, Ex. 1003 ¶¶ 261–307. Petitioner relies on Mendelson-2006 for teachings regarding wireless communications with a handheld device and a touch screen display. Pet. 79–96. Patent Owner's arguments do not pertain to the modifications proposed and, as such, are misplaced. *See* Pet. Reply 28 ("Mendelson-Ohsaki sensor is modified based on the teachings of Mendelson-2006 to (1) include a 'touch-screen display,' and (2) 'wirelessly transmit information . . . acquired or processed by sensor 10 and pulse oximeter 20 to a PDA'") (quoting Pet. 81–90); Ex. 1047 ¶ 72. The number of detectors in the sensor of Mendelson-2006 and where it is positioned on the user's body are not persuasive to whether a person of ordinary skill in the art would have been motivated to "implement display 26" of Mendelson-799 "as a touch-screen display," and to enable wireless transmission to a PDA. *See* Ex. 1047 ¶¶ 72–73.

Petitioner has persuasively established "why, in view of Mendelson-2006's disclosure, a POSITA would have found it obvious (1) 'to implement display 26 as a touch-screen display' (*see* Petition, 84–86), and (2) 'to

74

IPR2020-01536
Patent 10,588,553 B2

enable Mendelson-Ohsaki's sensor 10 and pulse oximeter 20 to communicate wirelessly with a PDA' (*see* Petition, 86–91)."  Pet. Reply 29. We find Petitioner's reasons for the proposed combination persuasive, including the motivations to perform the modifications described in the Petition.  *See* Pet. 84–86 (discussion of touch-screen display), 86–91 (discussion of wireless communication).

### H.     Obviousness over the Combined Teachings of Mendelson-799, Ohsaki, Mendelson-2006, and Griffin

Petitioner contends that claims 8 and 26–28 of the '553 patent would have been obvious over the combined teachings of Mendelson-799, Ohsaki, Mendelson-2006, and Griffin.  Pet. 97–100.  Petitioner challenges claims 8 and 26–28, which include the magnetic connection limitation (discussed above) or the touch-screen display or mobile phone limitation (separately discussed above).  We are persuaded by Dr. Kenny's testimony as to each limitation of these claims and the basis for combining the references as proposed.  Ex. 1003 ¶¶ 310–323.

Patent Owner contends that this ground "fails for the same reasons as" as the prior two grounds discussed above.  PO Resp. 50 ("a POSITA would not have been motivated to add Griffin to Mendelson '799 and Ohsaki because there are no external connections in the resulting combination" and "a POSITA reviewing Mendelson 2006 would not have been motivated to arrive at the claimed combination").  Thus, Patent Owner does not present any arguments for these claims other than those we have already considered above.

IPR2020-01536
Patent 10,588,553 B2

Based on our review of the parties' arguments and the cited evidence of record, we determine that Petitioner has met its burden of showing by a preponderance of evidence that claims 8 and 26–28 are unpatentable.

## III.    CONCLUSION

In summary:[10]

| Claim(s) Challenged | 35 U.S.C. § | References/Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1–3, 5, 6, 9–18, 20–24, 29 | 103 | Mendelson-799, Ohsaki | 1–3, 5, 6, 9–18, 20–24, 29 | |
| 4, 18, 24 | 103 | Mendelson-799, Ohsaki, Schulz | 4, 18, 24 | |
| 25 | 103 | Mendelson-799, Ohsaki, Griffin | 25 | |
| 7, 19 | 103 | Mendelson-799, Ohsaki, Mendelson-2006 | 7, 19 | |
| 8, 26–28 | 103 | Mendelson-799, Ohsaki, Mendelson-2006, Griffin | 8, 26–28 | |
| **Overall Outcome** | | | 1–29 | |

---

[10] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding*. *See* 84 Fed. Reg. 16654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

76

IPR2020-01536
Patent 10,588,553 B2

## IV.    ORDER

Upon consideration of the record before us, it is:

ORDERED that claims 1–29 of the '553 patent have been shown to be unpatentable;

FURTHER ORDERED that, because this is a final written decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2020-01536
Patent 10,588,553 B2


PETITIONER:

Walter Renner
Roberto Devoto
Hyun Jin In
FISH & RICHARDSON P.C.
axf-ptab@fr.com
devoto@fr.com
in@fr.com

PATENT OWNER:

Joseph Re
Stephen Larson
Jarom Kesler
Jacob Peterson
KNOBBE, MARTENS, OLSON & BEAR, LLP
2jrr@knobbe.com
2swl@knobbe.com
2jzk@knobbe.com
2jup@knobbe.com

## CERTIFICATE OF SERVICE

I hereby certify that the original of this Notice of Appeal was filed via

U.S.P.S. Priority Mail Express on April 12, 2022 with the Director of the United

States Patent and Trademark Office at the address below:

Office of the Solicitor
United States Patent and Trademark Office
Mail Stop 8, Post Office Box 1450
Alexandria, VA 22313-1450

A copy of this Notice of Appeal is being filed and served on April 12, 2022 as

follows:

**To the USPTO Patent Trial and Appeal Board:**
Patent Trial and Appeal Board
Madison Building East
600 Dulany Street
Alexandria, VA 22313

(*via PTAB E2E – as authorized by the Board*)

**To the U.S. Court of Appeals for the Federal Circuit:**
Clerk of Court
U.S. Court of Appeals for the Federal Circuit
717 Madison Place, N.W.
Washington, DC 20439

(*via CM/ECF – with filing fee*)

**Counsel for Petitioner Apple, Inc.**

W. Karl Renner
Andrew B. Patrick
Fish & Richardson P.C.
3200 RBC Plaza
60 South Sixth Street

Minneapolis, MN 55402
IPR50095-0012IP1@fr.com
PTABInbound@fr.com
axf-ptab@fr.com
patrick@fr.com

(*via email pursuant to 37 C.F.R. § 42.6(e)*)

Dated:  April 12, 2022              /Jarom Kesler/
                                    Jarom D. Kesler (Reg. No. 57,046)

                                    Attorney for Patent Owner
                                    Masimo Corporation

55312975



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

# NOTICE OF ALLOWANCE AND FEE(S) DUE

64735    7590    01/29/2020

KNOBBE, MARTENS, OLSON & BEAR, LLP
MASIMO CORPORATION (MASIMO)
2040 MAIN STREET
FOURTEENTH FLOOR
IRVINE, CA 92614

| EXAMINER |
| --- |
| LIU, CHU CHUAN |

| ART UNIT | PAPER NUMBER |
| --- | --- |
| 3791 | |

DATE MAILED: 01/29/2020

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
| --- | --- | --- | --- | --- |
| 16/534,949 | 08/07/2019 | Jeroen Poeze | MASCER.002C11 | 9944 |

TITLE OF INVENTION: MULTI-STREAM DATA COLLECTION SYSTEM FOR NONINVASIVE MEASUREMENT OF BLOOD CONSTITUENTS

| APPLN. TYPE | ENTITY STATUS | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
| --- | --- | --- | --- | --- | --- | --- |
| nonprovisional | UNDISCOUNTED | $1000 | $0.00 | $1000.00 | $0 | 04/29/2020 |

**THE APPLICATION IDENTIFIED ABOVE HAS BEEN EXAMINED AND IS ALLOWED FOR ISSUANCE AS A PATENT. PROSECUTION ON THE MERITS IS CLOSED. THIS NOTICE OF ALLOWANCE IS NOT A GRANT OF PATENT RIGHTS. THIS APPLICATION IS SUBJECT TO WITHDRAWAL FROM ISSUE AT THE INITIATIVE OF THE OFFICE OR UPON PETITION BY THE APPLICANT. SEE 37 CFR 1.313 AND MPEP 1308.**

**THE ISSUE FEE AND PUBLICATION FEE (IF REQUIRED) MUST BE PAID WITHIN THREE MONTHS FROM THE MAILING DATE OF THIS NOTICE OR THIS APPLICATION SHALL BE REGARDED AS ABANDONED. THIS STATUTORY PERIOD CANNOT BE EXTENDED. SEE 35 U.S.C. 151. THE ISSUE FEE DUE INDICATED ABOVE DOES NOT REFLECT A CREDIT FOR ANY PREVIOUSLY PAID ISSUE FEE IN THIS APPLICATION. IF AN ISSUE FEE HAS PREVIOUSLY BEEN PAID IN THIS APPLICATION (AS SHOWN ABOVE), THE RETURN OF PART B OF THIS FORM WILL BE CONSIDERED A REQUEST TO REAPPLY THE PREVIOUSLY PAID ISSUE FEE TOWARD THE ISSUE FEE NOW DUE.**

**HOW TO REPLY TO THIS NOTICE:**

I. Review the ENTITY STATUS shown above. If the ENTITY STATUS is shown as SMALL or MICRO, verify whether entitlement to that entity status still applies.

If the ENTITY STATUS is the same as shown above, pay the TOTAL FEE(S) DUE shown above.

If the ENTITY STATUS is changed from that shown above, on PART B - FEE(S) TRANSMITTAL, complete section number 5 titled "Change in Entity Status (from status indicated above)".

For purposes of this notice, small entity fees are 1/2 the amount of undiscounted fees, and micro entity fees are 1/2 the amount of small entity fees.

II. PART B - FEE(S) TRANSMITTAL, or its equivalent, must be completed and returned to the United States Patent and Trademark Office (USPTO) with your ISSUE FEE and PUBLICATION FEE (if required). If you are charging the fee(s) to your deposit account, section "4b" of Part B - Fee(s) Transmittal should be completed and an extra copy of the form should be submitted. If an equivalent of Part B is filed, a request to reapply a previously paid issue fee must be clearly made, and delays in processing may occur due to the difficulty in recognizing the paper as an equivalent of Part B.

III. All communications regarding this application must give the application number. Please direct all communications prior to issuance to Mail Stop ISSUE FEE unless advised to the contrary.

**IMPORTANT REMINDER: Maintenance fees are due in utility patents issuing on applications filed on or after Dec. 12, 1980. It is patentee's responsibility to ensure timely payment of maintenance fees when due. More information is available at www.uspto.gov/PatentMaintenanceFees.**

Page 1 of 3

PTOL-85 (Rev. 02/11)

Appx13259

**PART B - FEE(S) TRANSMITTAL**

Complete and send this form, together with applicable fee(s), by mail or fax, or via EFS-Web.

| By mail, send to: | Mail Stop ISSUE FEE | By fax, send to: | (571)-273-2885 |
|---|---|---|---|
| | Commissioner for Patents | | |
| | P.O. Box 1450 | | |
| | Alexandria, Virginia 22313-1450 | | |

INSTRUCTIONS: This form should be used for transmitting the ISSUE FEE and PUBLICATION FEE (if required). Blocks 1 through 5 should be completed where appropriate. All further correspondence including the Patent, advance orders and notification of maintenance fees will be mailed to the current correspondence address as indicated unless corrected below or directed otherwise in Block 1, by (a) specifying a new correspondence address; and/or (b) indicating a separate "FEE ADDRESS" for maintenance fee notifications.

CURRENT CORRESPONDENCE ADDRESS (Note: Use Block 1 for any change of address)

64735        7590        01/29/2020

KNOBBE, MARTENS, OLSON & BEAR, LLP
MASIMO CORPORATION (MASIMO)
2040 MAIN STREET
FOURTEENTH FLOOR
IRVINE, CA 92614

Note: A certificate of mailing can only be used for domestic mailings of the Fee(s) Transmittal. This certificate cannot be used for any other accompanying papers. Each additional paper, such as an assignment or formal drawing, must have its own certificate of mailing or transmission.

**Certificate of Mailing or Transmission**

I hereby certify that this Fee(s) Transmittal is being deposited with the United States Postal Service with sufficient postage for first class mail in an envelope addressed to the Mail Stop ISSUE FEE address above, or being transmitted to the USPTO via EFS-Web or by facsimile to (571) 273-2885, on the date below.

_____ (Typed or printed name)

_____ (Signature)

_____ (Date)

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 16/534,949 | 08/07/2019 | Jeroen Poeze | MASCER.002C11 | 9944 |

TITLE OF INVENTION: MULTI-STREAM DATA COLLECTION SYSTEM FOR NONINVASIVE MEASUREMENT OF BLOOD CONSTITUENTS

| APPLN. TYPE | ENTITY STATUS | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|---|
| nonprovisional | UNDISCOUNTED | $1000 | $0.00 | $1000.00 | $0 | 04/29/2020 |

| EXAMINER | ART UNIT | CLASS-SUBCLASS |
|---|---|---|
| LIU, CHU CHUAN | 3791 | 600-323000 |

1. Change of correspondence address or indication of "Fee Address" (37 CFR 1.363).

☐ Change of correspondence address (or Change of Correspondence Address form PTO/SB/122) attached.

☐ "Fee Address" indication (or "Fee Address" Indication form PTO/SB/47; Rev 03-09 or more recent) attached. **Use of a Customer Number is required.**

2. For printing on the patent front page, list
(1) The names of up to 3 registered patent attorneys or agents OR, alternatively,
(2) The name of a single firm (having as a member a registered attorney or agent) and the names of up to 2 registered patent attorneys or agents. If no name is listed, no name will be printed.

1 _____

2 _____

3 _____

3. ASSIGNEE NAME AND RESIDENCE DATA TO BE PRINTED ON THE PATENT (print or type)

PLEASE NOTE: Unless an assignee is identified below, no assignee data will appear on the patent. If an assignee is identified below, the document must have been previously recorded, or filed for recordation, as set forth in 37 CFR 3.11 and 37 CFR 3.81(a). Completion of this form is NOT a substitute for filing an assignment.

(A) NAME OF ASSIGNEE                    (B) RESIDENCE: (CITY and STATE or COUNTRY)

Please check the appropriate assignee category or categories (will not be printed on the patent) : ☐ Individual ☐ Corporation or other private group entity ☐ Government

4a. Fees submitted: ☐ Issue Fee ☐ Publication Fee (if required) ☐ Advance Order - # of Copies _____

4b. Method of Payment: *(Please first reapply any previously paid fee shown above)*

☐ Electronic Payment via EFS-Web   ☐ Enclosed check   ☐ Non-electronic payment by credit card (Attach form PTO-2038)

☐ The Director is hereby authorized to charge the required fee(s), any deficiency, or credit any overpayment to Deposit Account No. _____

5. **Change in Entity Status** (from status indicated above)

☐ Applicant certifying micro entity status. See 37 CFR 1.29

☐ Applicant asserting small entity status. See 37 CFR 1.27

☐ Applicant changing to regular undiscounted fee status.

NOTE: Absent a valid certification of Micro Entity Status (see forms PTO/SB/15A and 15B), issue fee payment in the micro entity amount will not be accepted at the risk of application abandonment. NOTE: If the application was previously under micro entity status, checking this box will be taken to be a notification of loss of entitlement to micro entity status. NOTE: Checking this box will be taken to be a notification of loss of entitlement to small or micro entity status, as applicable.

NOTE: This form must be signed in accordance with 37 CFR 1.31 and 1.33. See 37 CFR 1.4 for signature requirements and certifications.

Authorized Signature _____  Date _____

Typed or printed name _____  Registration No. _____

Page 2 of 3

PTOL-85 Part B (08-18) Approved for use through 01/31/2020        OMB 0651-0033        U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 16/534,949 | 08/07/2019 | Jeroen Poeze | MASCER.002C11 | 9944 |

64735    7590    01/29/2020

KNOBBE, MARTENS, OLSON & BEAR, LLP
MASIMO CORPORATION (MASIMO)
2040 MAIN STREET
FOURTEENTH FLOOR
IRVINE, CA 92614

| EXAMINER |
|---|
| LIU, CHU CHUAN |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3791 | |

DATE MAILED: 01/29/2020

## Determination of Patent Term Adjustment under 35 U.S.C. 154 (b)
(Applications filed on or after May 29, 2000)

The Office has discontinued providing a Patent Term Adjustment (PTA) calculation with the Notice of Allowance.

Section 1(h)(2) of the AIA Technical Corrections Act amended 35 U.S.C. 154(b)(3)(B)(i) to eliminate the requirement that the Office provide a patent term adjustment determination with the notice of allowance. See Revisions to Patent Term Adjustment, 78 Fed. Reg. 19416, 19417 (Apr. 1, 2013). Therefore, the Office is no longer providing an initial patent term adjustment determination with the notice of allowance. The Office will continue to provide a patent term adjustment determination with the Issue Notification Letter that is mailed to applicant approximately three weeks prior to the issue date of the patent, and will include the patent term adjustment on the patent. Any request for reconsideration of the patent term adjustment determination (or reinstatement of patent term adjustment) should follow the process outlined in 37 CFR 1.705.

Any questions regarding the Patent Term Extension or Adjustment determination should be directed to the Office of Patent Legal Administration at (571)-272-7702. Questions relating to issue and publication fee payments should be directed to the Customer Service Center of the Office of Patent Publication at 1-(888)-786-0101 or (571)-272-4200.

PTOL-85 (Rev. 02/11)

## OMB Clearance and PRA Burden Statement for PTOL-85 Part B

The Paperwork Reduction Act (PRA) of 1995 requires Federal agencies to obtain Office of Management and Budget approval before requesting most types of information from the public. When OMB approves an agency request to collect information from the public, OMB (i) provides a valid OMB Control Number and expiration date for the agency to display on the instrument that will be used to collect the information and (ii) requires the agency to inform the public about the OMB Control Number's legal significance in accordance with 5 CFR 1320.5(b).

The information collected by PTOL-85 Part B is required by 37 CFR 1.311. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 30 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, Virginia 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, Virginia 22313-1450. Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

## Privacy Act Statement

**The Privacy Act of 1974 (P.L. 93-579)** requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b) (2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether disclosure of these records is required by the Freedom of Information Act.

2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.

3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.

4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).

5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.

6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).

7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.

8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspection or an issued patent.

9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

**Appx13262**

| *Notice of Allowability* | **Application No.**<br>16/534,949 | **Applicant(s)**<br>Poeze et al. | |
|---|---|---|---|
| | **Examiner**<br>CHU CHUAN LIU | **Art Unit**<br>3791 | **AIA (FITF) Status**<br>No |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address--*

All claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application. If not included herewith (or previously mailed), a Notice of Allowance (PTOL-85) or other appropriate communication will be mailed in due course. **THIS NOTICE OF ALLOWABILITY IS NOT A GRANT OF PATENT RIGHTS.** This application is subject to withdrawal from issue at the initiative of the Office or upon petition by the applicant. See 37 CFR 1.313 and MPEP 1308.

1. ☑ This communication is responsive to <u>the supplemental amendment filed on 12/23/2019.</u>
   - ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.

2. ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.

3. ☑ The allowed claim(s) is/are <u>See Continuation Sheet</u>. As a result of the allowed claim(s), you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see **http://www.uspto.gov/patents/init_events/pph/index.jsp** or send an inquiry to **PPHfeedback@uspto.gov.**

4. ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
   **Certified copies:**
   a) ☐ All    b) ☐ Some    *c) ☐ None of the:
   - 1. ☐ Certified copies of the priority documents have been received.
   - 2. ☐ Certified copies of the priority documents have been received in Application No. _____ .
   - 3. ☐ Copies of the certified copies of the priority documents have been received in this national stage application from the International Bureau (PCT Rule 17.2(a)).

   * Certified copies not received: _____ .

   Applicant has THREE MONTHS FROM THE "MAILING DATE" of this communication to file a reply complying with the requirements noted below. Failure to timely comply will result in ABANDONMENT of this application.
   **THIS THREE-MONTH PERIOD IS NOT EXTENDABLE.**

5. ☐ CORRECTED DRAWINGS (as "replacement sheets") must be submitted.
   - ☐ including changes required by the attached Examiner's Amendment / Comment or in the Office action of Paper No./Mail Date _____ .
   **Identifying indicia such as the application number (see 37 CFR 1.84(c)) should be written on the drawings in the front (not the back) of each sheet. Replacement sheet(s) should be labeled as such in the header according to 37 CFR 1.121(d).**

6. ☐ DEPOSIT OF and/or INFORMATION about the deposit of BIOLOGICAL MATERIAL must be submitted. Note the attached Examiner's comment regarding REQUIREMENT FOR THE DEPOSIT OF BIOLOGICAL MATERIAL.

**Attachment(s)**
1. ☐ Notice of References Cited (PTO-892)
2. ☑ Information Disclosure Statements (PTO/SB/08), Paper No./Mail Date <u>See Continuation Sheet.</u>
3. ☐ Examiner's Comment Regarding Requirement for Deposit of Biological Material _____ .
4. ☐ Interview Summary (PTO-413), Paper No./Mail Date _____ .

5. ☐ Examiner's Amendment/Comment
6. ☑ Examiner's Statement of Reasons for Allowance
7. ☐ Other _____ .

| /CHU CHUAN LIU/<br>Examiner, Art Unit 3791 | /ERIC F WINAKUR/<br>Primary Examiner, Art Unit 3791 |
|---|---|

**Continuation Sheet (PTOL-37)**                                                      **Application No. 16/534,949**

Continuation of 3. The allowed claim(s) is/are: 2,4-8,10-20 and 22-33

Continuation of Attachment(s) 2. Information Disclosure Statements (PTO/SB/08), Paper No./Mail Date: 12/11/2019, 12/12/2019, 12/27/2019, and 01/10/2020

Application/Control Number:16/534,949                                              Page2
Art Unit:3791

### *Allowable Subject Matter*

1.      Claims 2, 4-8, 10-20, and 22-33 allowed.


2.      The following is an examiner's statement of reasons for allowance: The IDS filed

on 12/11/2019, 12/12/2019, 12/27/2019, and 01/10/2020 have been considered. The

claims remain allowable for the reasons of record. Signed copies of the 1449 are

attached for completeness of Applicant's records.


        Any comments considered necessary by applicant must be submitted no later

than the payment of the issue fee and, to avoid processing delays, should preferably

accompany the issue fee.  Such submissions should be clearly labeled "Comments on

Statement of Reasons for Allowance."


3.      Any inquiry concerning this communication or earlier communications from the

examiner should be directed to CHU CHUAN LIU whose telephone number is (571)270-

5507.  The examiner can normally be reached on M-Th (8am-6pm).

        Examiner interviews are available via telephone, in-person, and video

conferencing using a USPTO supplied web-based collaboration tool. To schedule an

interview, applicant is encouraged to use the USPTO Automated Interview Request

(AIR) at http://www.uspto.gov/interviewpractice.

        If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, Jacqueline Cheng can be reached on (571) 272-5596.  The fax phone

Application/Control Number:16/534,949                                    Page3
Art Unit:3791

number for the organization where this application or proceeding is assigned is 571-273-8300.

    Information regarding the status of an application may be obtained from the Patent Application Information Retrieval (PAIR) system.  Status information for published applications may be obtained from either Private PAIR or Public PAIR. Status information for unpublished applications is available through Private PAIR only. For more information about the PAIR system, see http://pair-direct.uspto.gov. Should you have questions on access to the Private PAIR system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a USPTO Customer Service Representative or access to the automated information system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.


/ERIC F WINAKUR/
Primary Examiner, Art Unit 3791


/CHU CHUAN LIU/
Examiner, Art Unit 3791