**[Volume IX, Appx15237 – Appx28495]**

**Nos. 22-1631, -1632, -1633, -1634, -1635, -1636, -1637, -1638**

IN THE

# United States Court of Appeals

### FOR THE FEDERAL CIRCUIT

---

MASIMO CORPORATION,

*Appellant,*

v.

APPLE INC.,

*Appellee.*

---

APPEAL FROM THE PATENT TRIAL AND APPEAL BOARD
CASE NOS. IPR2020-01520, IPR2020-01521, IPR2020-01536, IPR2020-01537, IPR2020-01538, IPR2020-01539, IPR2020-01714, IPR2020-01715

---

### CORRECTED JOINT APPENDIX

Joseph R. Re, *Principal Counsel*
Stephen C. Jensen
Jarom D. Kesler
Stephen W. Larson
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
2040 Main Street, 14th Floor
Irvine, CA 92614
(949) 760-0404

Jeremiah S. Helm
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
1717 Pennsylvania Ave., N.W.
Washington, D.C. 20006
(202) 640-6400

*Attorneys for Appellant*
*Masimo Corporation*

Lauren A. Degnan, *Principal Counsel*
Christopher Dryer
W. Karl Renner
Jared Hartzman
Adi A. Williams
**FISH & RICHARDSON P.C.**
1000 Maine Ave., Suite 1000
Washington, DC 20024
Tel: (202) 783-5070

Ashley Bolt
**FISH & RICHARDSON P.C.**
1180 Peachtree Street NE,
21st Floor
Atlanta, GA 30309

*Attorneys for Appellee Apple Inc.*

July 12, 2023

**Table of Contents**

| Date | Paper No. /Ex. No. | Document | Pages |
|---|---|---|---|
| **VOLUME I** | | | |
| 2/23/2022 | 39 | Final Written Decision [IPR2020-01520] | Appx00001-Appx00106 |
| 4/11/2022 | 33 | Final Written Decision [IPR2020-01521] | Appx00107-Appx00198 |
| 2/23/2022 | 43 | Final Written Decision [IPR2020-01536] | Appx00199-Appx00276 |
| **VOLUME II** | | | |
| 2/23/2022 | 43 | Final Written Decision [IPR2020-01537] | Appx00277-Appx00358 |
| 2/23/2022 | 43 | Final Written Decision [IPR2020-01538] | Appx00359-Appx00428 |
| 2/23/2022 | 41 | Final Written Decision [IPR2020-01539] | Appx00429-Appx00514 |
| 4/6/2022 | 34 | Final Written Decision [IPR2020-01714] | Appx00515-Appx00591 |
| **VOLUME III** | | | |
| 4/6/2022 | 33 | Final Written Decision [IPR2020-01715] | Appx00592-Appx00675 |
| n/a | | U.S. Patent 10,258,265 | Appx00676-Appx00772 |
| n/a | | U.S. Patent 10,292,628 | Appx00773-Appx00870 |
| **VOLUME IV** | | | |
| n/a | | U.S. Patent 10,588,553 | Appx00871-Appx00973 |
| n/a | | U.S. Patent 10,588,554 | Appx00974-Appx01076 |
| n/a | | U.S. Patent 10,631,765 | Appx01077-Appx01179 |
| **VOLUME V** | | | |
| 5/25/2022 | 16 | Notice Forwarding Certified Lists | Appx01180-Appx01529 |

| Date | Paper No. /Ex. No. | Document | Pages |
|---|---|---|---|
| **VOLUME VI** | | | |
| 5/25/2022 | 16 | Notice Forwarding Certified Lists (Continued) | Appx01530-Appx01876 |
| **VOLUME VII** | | | |
| 8/31/2022 | 2 | Petition for *Inter Partes* Review [IPR2020-01520] | Appx01878; Appx01896-01899; Appx01921-01923; Appx01931-01934; Appx01953 |
| 5/28/2021 | 21 | Patent Owner's Response [IPR2020-01520] | Appx02191; Appx02212-02220; Appx02237 |
| 8/20/2021 | 24 | Petitioners Reply to Patent Owner's Response to Petition [IPR2020-01520] | Appx02275; Appx02306 |
| 1/6/2022 | 37 | December 7, 2021 Oral Hearing Transcript [IPR2020-01520] | Appx02449; Appx02458; Appx02498; Appx02501-02506; Appx02517; Appx02530; |
| 4/12/2022 | 40 | Patent Owner's Notice of Appeal to the U.S. Court of Appeals for the Federal Circuit [IPR2020-01520] | Appx02537-02648 |
| | Ex. 1002 | File History excerpts, U.S. Patent No. 10,258,265 | Appx02923-02932 |
| | Ex. 1003 | Declaration of Thomas W. Kenny [IPR2020-01520] | Appx03000; Appx03025-03030; Appx03040-03058; Appx03068-03071; Appx03095-03107 |
| | Ex. 1006 | Aizawa U.S. Pub. No. 2002/0188210 [IPR2020-01520] | Appx03242-03248 |
| | Ex. 1007 | Inokawa JP20060296564A [IPR2020-01520] | Appx03249-03271 |

| Date | Paper No. /Ex. No. | Document | Pages |
|------|------|------|------|
| | Ex. 1008 | Certified English Translation of Inokawa and Translators Declaration [IPR2020-01520] | Appx03272-Appx03295 |
| | Ex. 1010 | U.S. Patent No. 8,177,720 [IPR2020-01520] | Appx03313-Appx03333 |
| | Ex. 1014 | U.S. Pub. No. 2001/0056243 [IPR2020-01520] | Appx03352-03357 |
| | Ex. 1015 | Mendelson Design and Evaluation of a New Reflectance Pulse Oximeter Sensor [IPR2020-01520] | Appx03358-03364 |
| | Ex. 1023 | Nishikawa U.S. Pub. No. 2007/0145255 [IPR2020-01520] | Appx03443-03450 |
| | Ex. 1041 | Deposition Transcript of Dr. Vijay Madisetti Day 1 [IPR2020-01520] | Appx04112; Appx04243; Appx04244 |
| | Ex. 1047 | Second Declaration of Dr. Thomas W. Kenny [IPR2020-01520] | Appx04525; Appx04527-04559 |
| | Ex. 2004 | Madisetti Declaration [IPR2020-01520] | Appx05185; Appx05214-05216; Appx05233-05234; Appx05237-05238; Appx05240-05242; Appx05245-05248 |
| **VOLUME VIII** | | | |
| | Ex. 2006 | 4/22/2022 Kenny, Thomas Deposition Transcript [IPR2020-01520] | Appx05295; Appx05319; Appx05345-05346; Appx05368-05371; Appx05377-05378; Appx05380-05384; Appx05387-05388; Appx05391; Appx05394-05395; Appx05426-05428; Appx05435-05437; Appx05448; |

| Date | Paper No. /Ex. No. | Document | Pages |
|---|---|---|---|
| | | | Appx05458; Appx05473-05475; Appx05482-05486; Appx05491-05492; Appx05496-05502; Appx05551 |
| | Ex. 2007 | 4/23/2022 Kenny, Thomas Deposition Transcript [IPR2020-01520] | Appx05567; Appx05591-05592; Appx05604-05605; Appx05625-05631; Appx05635-05636; Appx05696; Appx05699 |
| | Ex. 2008 | 4/24/2021 Kenny, Thomas Deposition Transcript [IPR2020-01520] | Appx05747; Appx05776-05777; Appx05781-05783; Appx05786-05787; Appx05794-05795; Appx05803-05804; Appx05806-05807; Appx05809-05810; Appx05814-05818; Appx05841; Appx05851-05852; Appx05857; Appx05876-05877; Appx05903-05905; Appx05911-05912; Appx05960-05961; Appx05973-05975 |
| | Ex. 2009 | 4/25/2021 Kenny, Thomas Deposition Transcript [IPR2020-01520] | Appx06013; Appx06093-06098; Appx06122-06123 |
| | Ex. 2027 | 9/18/2021 Kenny, Thomas Deposition Transcript 9/18/2021[IPR2020-01520] | Appx06690; Appx06708-06711; Appx06738-06739; Appx06746; |

| Date | Paper No. /Ex. No. | Document | Pages |
|---|---|---|---|
| | | | Appx06882-06884; Appx06893-06894; Appx06902-06904; Appx06907-06908; Appx06946 |
| 9/2/2020 | 1 | Petitioner's Power of Attorney [IPR2020-01521] | Appx06952 |
| 9/2/2020 | 2 | Petition for *Inter Partes* Review [IPR2020-01521] | Appx06953; Appx06973-06974; Appx07001-07004 |
| 7/9/2021 | 15 | Patent Owner's Response [IPR2020-01521] | Appx07300; Appx07324-07325 |
| 4/12/2022 | 34 | Patent Owner's Notice of Appeal to the U.S. Court of Appeals for the Federal Circuit [IPR2020-01521] | Appx07624-07721 |
| | Ex. 1003 | Declaration of Dr. Thomas W. Kenny [IPR2020-01521] | Appx08051; Appx08080-08081; Appx08105-08106; Appx08131-08133 |
| | Ex. 1047 | Second Declaration of Dr. Thomas W. Kenny [IPR2020-01521] | Appx09183; Appx09197-09199; Appx09204-09208; Appx09216-09218 |
| | Ex. 2004 | Declaration of Vijay K. Madisetti, Ph.D. [IPR2020-01521] | Appx10322; Appx10352-10355; Appx10370-10371; Appx10374-10375; Appx10377-10379; Appx10382-10385 |
| 8/31/2020 | 3 | Petition for *Inter Partes* Review [IPR2020-01536] | Appx12444; Appx12476-12477 |
| 6/1/2021 | 24 | Patent Owner's Response [IPR2020-01536] | Appx12820; Appx12851-12854 |
| 10/5/2021 | 32 | Patent Owner's Sur-Reply to Reply [IPR2020-01536] | Appx12955; Appx12974 |

| Date | Paper No. /Ex. No. | Document | Pages |
|---|---|---|---|
| 4/12/2022 | 44 | Patent Owner's Notice of Appeal to the U.S. Court of Appeals for the Federal Circuit [IPR2020-01536] | Appx13167-13250 |
| | Ex. 1002 | File History excerpts for U.S. Patent No. 10,588,553 | Appx13259-13266 |
| **VOLUME IX** | | | |
| | Ex. 1003 | Declaration of Dr. Kenny [IPR2020-01536] | Appx15237; Appx15278-15286 |
| | Ex. 1009 | U.S. Pub. No. 2001/0056243 Ohsaki [IPR2020-01536] | Appx15568; Appx15572 |
| | Ex. 1012 | U.S. Patent No. 6,801,799 Mendelson [IPR2020-01536] | Appx15578-15593 |
| | Ex. 1017 | Mendelson Design and Evaluation of a New Reflectance Pulse Oximeter Sensor [IPR2020-01536] | Appx15638 |
| | Ex. 1018 | Mendelson Skin Reflectance Pulse Oximetry In Vivo Measurements from the Forearm and C [IPR2020-01536] | Appx15645-15647 |
| | Ex. 1019 | Webster Design of Pulse Oximeters [IPR2020-01536] | Appx15651; Appx15754-15758 |
| | Ex. 1047 | Second Declaration of Dr. Thomas W. Kenny [IPR2020-01536] | Appx17805; Appx17824-17837 |
| | Ex. 2004 | Declaration of Vijay K. Madisetti, Ph.D. [IPR2020-01536] | Appx18302; Appx18343-18355; Appx18358-18359 |
| 8/27/2021 | 27 | Petitioner's Reply to Masimo Response [IPR2020-01537] | Appx20516; Appx20526 |
| 1/16/2022 | 41 | December 7, 2021 Oral Hearing Transcript [IPR2020-01537] | Appx20696; Appx20759-20760 |
| 4/12/2022 | 44 | Patent Owner's Notice of Appeal to the U.S. Court of Appeals for the Federal Circuit [IPR2020-01537] | Appx20781-Appx20868 |
| | Ex. 1003 | Declaration of Dr. Kenny [IPR2020-01537] | Appx22855; Appx22888; |

| Date | Paper No. /Ex. No. | Document | Pages |
|---|---|---|---|
| | | | Appx22890-22906; Appx22937-22945; Appx22995-23001 |
| | Ex. 1009 | U.S. Pub. No. 2001/0056243 Ohsaki [IPR2020-01537] | Appx23194; Appx23198 |
| | Ex. 1010 | Mendelson A Wearable Reflectance Pulse Oximeter for Remote Physiological Monitoring [IPR2020-01537] | Appx23200-23203 |
| | Ex. 1047 | Second Declaration of Dr. Thomas W. Kenny [IPR2020-01537] | Appx25392; Appx25405-25409; Appx25414-25423 |
| | Ex. 2003 | Mendelson, et al., Measurement Site and Photodetector Size Considerations Jin Optimizing Power Consumption of a Wearable Reflectance Pulse Oximeter [IPR2020-01537] | Appx25906-25909 |
| | Ex. 2004 | Declaration of Vijay K. Madisetti, Ph.D. [IPR2020-01537] | Appx25910; Appx25942-25945; Appx25947 |
| 9/2/2020 | 1 | Petition for Inter Partes Review of U.S. Patent No. 10,588,554 [IPR2020-01538] | Appx27672; Appx27708 |
| 4/12/2022 | 44 | Patent Owner's Notice of Appeal to the U.S. Court of Appeals for the Federal Circuit [IPR2020-01538] | Appx28420-28495 |
| **VOLUME X** | | | |
| | Ex. 1002 | File History excerpts, U.S. Patent No. 10,588,554 [IPR2020-01538] | Appx28870-28882; Appx29716-29719 |
| | Ex. 2004 | Declaration of Vijay K. Madisetti, Ph.D. [IPR2020-01538] | Appx33048; Appx33091-33103; Appx33106-33108 |
| 4/12/2023 | 42 | Patent Owner's Notice of Appeal to the U.S. Court of Appeals for | Appx35638-35729 |

| Date | Paper No. /Ex. No. | Document | Pages |
|---|---|---|---|
| | | the Federal Circuit [IPR2020-01539] | |
| | Ex. 1003 | Declaration of Thomas W. Kenny [IPR2020-01539] | Appx36967; Appx37008; Appx37061-37062; Appx37071; Appx37119 |
| | Ex. 1009 | U.S. Pub. No. 2001/0056243 Ohsaki [IPR2020-01539] | Appx37295; Appx37298-37299 |
| | Ex. 1017 | Mendelson, Design and Evaluation of a New Reflectance Pulse Oximeter Sensor [IPR2020-01539] | Appx37370-37371 |
| | Ex. 2004 | Madisetti Declaration [IPR2020-01539] | Appx40313; Appx40348-40351; Appx40353; Appx40395-40398 |
| 4/12/2022 | 35 | Patent Owner's Notice of Appeal to the U.S. Court of Appeals for the Federal Circuit [IPR2020-01714] | Appx42697-42779 |
| | Ex. 1002 | File History excerpts, U.S. Patent No. 10,631,765 [IPR2020-01714] | Appx42872-42880 |
| | Ex. 1004 | Declaration of Vijay K. Madisetti, Ph.D. [IPR2020-01714] | Appx47449; Appx47491-47504; Appx47507-47509 |
| 4/12/2022 | 34 | Patent Owner's Notice of Appeal to the U.S. Court of Appeals for the Federal Circuit [IPR2020-01715] | Appx50019-50108 |
| | Ex. 1003 | Declaration of Thomas W. Kenny [IPR2020-01715] | Appx50582; Appx50680-50681 |
| | Ex. 2004 | Declaration of Madisetti [IPR2020-01715] | Appx54761; Appx54796-54799; Appx54801; Appx54845-54846 |

# IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Patent of:  Jeroen Poeze et al.
U.S. Patent No.:  10,588,553    Attorney Docket No.: 50095-00012IP1
Issue Date:  March 17, 2020
Appl. Serial No.:  16,534,949
Filing Date:  August 7, 2019
Title:  MULTI-STREAM DATA COLLECTION SYSTEM FOR NONINVASIVE MEASUREMENT OF BLOOD CONSTITUENTS

## DECLARATION OF DR. THOMAS W. KENNY

**Declaration**

I declare that all statements made herein on my own knowledge are true and that all statements made on information and belief are believed to be true, and further, that these statements were made with the knowledge that willful false statements and the like so made are punishable under Section 1001 of Title 18 of the United States Code.

By: _____

Thomas W. Kenny, Ph.D.



Fig. 3. Sample PDA Graphical User Interface (GUI).

APPLE-1010, FIG. 3

## VII.   GROUND 1 – Claims 1-3, 5, 6, 9-18, 20-24, and 29 are Rendered Obvious by Mendelson '799 and Ohsaki

### A.   Combination of Mendelson '799 and Ohsaki

78.   As I have explained above with respect to Section VI.A, Mendelson '799 discloses a "sensor for use in an optical measurement device" featuring a sensor housing 17 that accommodates a "light source 12 composed of three closely spaced light emitting elements (e.g., LEDs or laser sources)," an "array of discrete detectors (e.g., photodiodes)" including a "'far' detector 16 and a 'near' detector 18," and a "light shield 14" that is positioned between the photodiodes and the light emitting elements." *Id.*, APPLE-1012, Title, Abstract, 9:22-40, 10:16-37, FIGS. 7, 8.

41

79.    Further, to the extent that Mendelson '799 does not explicitly disclose sensor housing 17 as including an opaque wall that circumscribes the accommodated components, one of ordinary skill would have found it obvious to connect, to the portion of sensor housing 17 illustrated in Mendelson '799's FIG. 7 (reproduced below), an opaque wall configured to circumscribe the array of discrete detectors included in detector rings 16 and 18. *Id.*, 9:24-40, FIG. 7.



APPLE-1012, FIG. 7 (annotated, with additional section view)

80.    As detailed below, one of ordinary skill would have been motivated to combine Mendelson '799 and Ohsaki (hereinafter "Mendelson-Ohsaki combination" or "Mendelson-Ohsaki") to obtain additional benefits.

1.    *Light permeable cover comprising a protruding convex surface*

81.    Mendelson '799 does not describe a cover configured to be located between user tissue and the components accommodated within sensor housing 17 when the sensor is worn, but one of ordinary skill would have recognized that a light permeable cover with a protruding convex surface would improve adhesion between the sensor and the user's tissue, improve detection efficiency, and protect the elements within sensor housing 17.  APPLE-1009, ¶¶[0015], [0017], [0025], FIGS. 1, 2, 4A, 4B; *see also* APPLE-1008, ¶¶14-15, FIG. 1 (depicting a convex lens that enhances signal strength and protects a LED and photodetector); APPLE-1024, ¶¶[0033], [0035], FIG. 6 (depicting an LED featuring a convex lens).

82.    Indeed, by the Critical Date, noninvasive optical physiological sensors commonly employed covers.  *See, e.g.,* APPLE-1009, ¶¶[0015], [0017], [0025], FIGS. 1, 2, 4A, 4B; APPLE-1006, ¶¶[0012], [0013], [0023], [0024], [0030], FIGS. 1(a), 1(b) (depicting a wrist-worn "pulse wave sensor" including a transparent cover located between photodetectors and the user's skin, the cover being said to improve adhesion, "thereby further improving … detection efficiency"); APPLE-1008, ¶¶14-15, FIG. 1.

83.    For example, and as described above in Section VI.B, Ohsaki discloses a wrist-worn "pulse wave sensor" that includes a light permeable convex cover – "translucent board 8" – that is configured to be located between user tissue and a

43

detector when the sensor is worn, where the cover comprises a single protruding convex surface operable to conform tissue of the user, and where a wall operably connects to a substrate and to the cover. *See* APPLE-1009, ¶¶ [0015], [0017], [0025], FIGS. 1, 2, 4A, 4B.

84.    In more detail, and as shown in Ohsaki's FIG. 2 (reproduced below), translucent board 8 is "attached to the opening of the package 5" and is arranged such that, when the sensor is worn "on the user's wrist … the convex surface of the translucent board … is in intimate contact with the surface of the user's skin"; this contact between the convex surface and the user's skin is said to prevent slippage, which increases the strength of the signals obtainable by Ohsaki's sensor. APPLE-1009, ¶¶ [0015], [0017], [0025], FIGS. 1, 2, 4A, 4B.



APPLE-1009, FIG. 2 (annotated)

44

85.    As Ohsaki explains with reference to FIGS. 4A and 4B (reproduced below), "if the translucent board 8 has a flat surface, the detected pulse wave is adversely affected by the movement of the user's wrist as shown in FIG. 4B," but that if "the translucent board 8 has a convex surface … variation of the amount of the reflected light … that reaches the light receiving element 7 is suppressed." *Id.*, ¶[0025]. The convex surface is also said to prevent "disturbance light from the outside" from penetrating translucent board 8. *Id.*, ¶[0025].  Thus, when a convex cover is used, "the pulse wave can be detected without being affected by the movement of the user's wrist 4 as shown in FIG. 4A." *Id.*



APPLE-1009, FIGS. 4A, 4B

45

86.    From this and related description, one of ordinary skill would have understood that the translucent board 8 that is operably connected to the walls of Ohsaki's package 5 improves adhesion between Ohsaki's sensor and the user's skin, improves detection efficiency, and provides protection to the elements accommodated within package 5.

87.    Accordingly, Ohsaki would have motivated one of ordinary skill to add a light permeable protruding convex cover to Mendelson '799's sensor, to improve adhesion between the sensor and the user's tissue, to improve detection efficiency, and to provide additional protection to the elements accommodated within sensor housing 17.  APPLE-1009, ¶¶[0015], [0017], [0025], FIGS. 1, 2, 4A, 4B.

88.    In more detail, and as shown below in the section view of the Mendelson-Ohsaki sensor, one of ordinary skill would have added a transparent convex cover to sensor 10, the cover being located between tissue of the user and the array of detectors 16 and 18 when worn.  APPLE-1012, Abstract, 9:22-10:30, FIG. 8; APPLE-1009, ¶¶[0015], [0017], [0025], FIGS. 1, 2, 4A, 4B; *see also* APPLE-1008, ¶¶14-15, FIG. 1.  To obtain the advantages described by Ohsaki, one of ordinary skill would have configured the cover to be sufficiently rigid to conform tissue of the user to at least a portion of the cover's surface when worn.  APPLE-1009, ¶[0025]; *see also* APPLE-1009, ¶[0030], FIG. 1(b).  And, consistent with Ohsaki's configuration, one of ordinary skill would have configured Mendelson

46

'799's circumscribing wall to operably connect, on one side, to the planar substrate on which detectors 16 and 18 are arranged and, on an opposite side, to the convex cover. APPLE-1012, Abstract, 9:22-10:30, FIG. 7; APPLE-1009, ¶[0017], FIG. 2.



APPLE-1012, FIG. 7 (annotated, with additional section view)

89.    One of ordinary skill would have further recognized that the material used to make Ohsaki's translucent board could be, for example, a translucent plastic material that can be easily formed to include a convex protrusion. APPLE-1006, 3:46-41, FIG. 1; APPLE-1026, ¶¶[0022], [0032], [0035], FIG. 6. Indeed, many

47

prior art references of this period, such as Nishikawa (shown below) demonstrate exactly how such a convex shape may be incorporated into a molded cover. APPLE-1026, ¶¶[0022], [0032], [0035], FIG. 6. In other words, one of ordinary skill would have known that plastic is a transparent material that can be readily transformed into various shapes, including a lens shape, as needed due to its easy molding properties. Thus, one of ordinary skill preferring improved adhesion to a user's tissue and the ability to detect a pulse wave "without being affected by the movement of the user's wrist" (APPLE-1009, ¶[0025]) could have been able to incorporate a cover having a lens shape as per Ohsaki. Indeed, only a routine knowledge of sensor design and assembly, which were well within the abilities of one of ordinary skill in the art, would be required to perform such modifications. Thus, to achieve the goal of improved adhesion and detection, one of ordinary skill would have been able to, with a reasonable expectation of success, incorporate a convex protrusion as taught by Ohsaki.

90.    Indeed, the modification would have amounted to nothing more than the use of a known technique to improve similar devices in the same way, and combining prior art elements according to known methods to yield predictable results—improved adhesion of the sensor to the user's skin, and improved signal strength. *KSR v. Teleflex*, 550 U.S. 398, 417 (2007). Furthermore, the elements of the Mendelson-Ohsaki sensor would each perform functions they had been known to

48

**Appx15285**

perform prior to the combination—Ohsaki's translucent board 8 would simply be placed over the components accommodated within Mendelson '799's sensor housing 17, and would perform the same function as taught by Ohsaki. APPLE-1012, Abstract, 9:22-10:30, FIG. 7; APPLE-1009, Abstract, ¶¶[0015], [0017], [0025], FIGS. 1, 2, 4A, 4B.

> 2. _Strap configured to facilitate attachment of part of the physiological monitoring device to a user's arm_

91.    As explained above with respect to Section VI.A, Mendelson '799 depicts and describes "a pulse oximeter 20 utilizing … sensor 10." APPLE-1012, Abstract, 9:22-10:30, FIGS. 7, 8.

92.    As Mendelson '799 acknowledges, "reflection-mode or backscatter type pulse oximetry … allows for measuring SaO2 from multiple convenient locations on the body (e.g. the head, torso, or upper limbs)," and several references that are mentioned within Mendelson '799 depict and describe pulse oximetry devices in which at least part of the device is configured to be strapped to the arm of a user. APPLE-1012, 2:14-27, 4:13-22; APPLE-1018, 1, 2, FIG. 2.

93.    Yitzhak Mendelson's 1991 paper "Skin Reflectance Pulse Oximetry: In Vivo Measurements from the Forearm and Calf," for example, describes reflectance pulse oximeter sensors that "were attached to the ventral side of the forearm," and explains that "[i]n cases where an abundance of hair prevented



US 20010056243A1

(19) **United States**

(12) **Patent Application Publication** (10) Pub. No.: **US 2001/0056243 A1**
Ohsaki et al. (43) **Pub. Date:** **Dec. 27, 2001**

(54) **WRISTWATCH-TYPE HUMAN PULSE WAVE SENSOR ATTACHED ON BACK SIDE OF USER'S WRIST**

(76) Inventors: **Rie Ohsaki**, Anjo-city (JP); **Teiyuu Kimura**, Nagoya-city (JP); **Naoki Fukaya**, Obu-city (JP)

Correspondence Address:
**LAW OFFICE OF DAVID G POSZ**
**2000 L STREET, N.W.**
**SUITE 200**
**WASHINGTON, DC 20036 (US)**

(21) Appl. No.: **09/852,698**

(22) Filed: **May 11, 2001**

(30) **Foreign Application Priority Data**

Jun. 14, 2000 (JP) ...................................... 2000-177999

**Publication Classification**

(51) Int. Cl.$^7$ ...................................... A61B 5/02
(52) U.S. Cl. ...................................... 600/503; 600/500

(57) **ABSTRACT**

A pulse wave sensor includes a detecting element and a sensor body. The pulse wave sensor is worn on the back side of a user's wrist corresponding to the back of the user's hand. The detecting element includes a translucent member on its top, and the translucent member has a convex surface. The detecting element is attached on the back side of the user's wrist by a dedicated belt so that the convex surface of the translucent member is in intimate contact with the surface of the user's skin. The sensor body is attached on the back side of the user's wrist by another dedicated belt so that it is arranged on the detecting element. A cushion is arranged between the sensor body and the detecting element. The pulse wave sensor can stably detect the pulse wave without being affected by the movement of the user's wrist.



APPLE 1009

US 2001/0056243 A1

Dec. 27, 2001

2

[0019]   The light emitting element **6** and the light receiving element **7** are arranged side by side as shown in **FIG. 2**. Accordingly the length of the detecting element **2** from the right side to the left side in **FIG. 2** is longer than the length from the upper side to the lower side. If the detecting element **2** is arranged so that its longitudinal direction (from the right side to the left side in **FIG. 2**) agrees with the circumferential direction of the user's wrist **4**, it has a tendency to slip off. Therefore it is desirable that the detecting element **2** is arranged so that its longitudinal direction agrees with the longitudinal direction of the user's arm. The dedicated belt **10** is attached to the detecting element **2** so that it can fix the detecting element **2** on the user's wrist **4** in this way.

[0020]   The sensor body **3** is connected to the detecting element **2** by a signal line **13**, and includes, as shown in **FIG. 2**, a drive circuit **11**, a microcomputer **12**, and a monitor display (not shown). The drive circuit **11** drives the light emitting element **6** to emit light toward the wrist **4**. The microcomputer **12** calculates the pulse rate from the reflected light received by the detecting element **2**. This reflected light varies with the user's pulsation. The monitor display shows the calculated pulse rate and the like.

[0021]   The sensor body **3** is arranged on the top of the detecting element **2**, and fixed on the user's wrist **4** by a dedicated belt **14** attached to the sensor body **3**. A cushion **15** such as a sponge or a gel is inserted between the detecting element **2** and the sensor body **3** so that the detecting element **2** does not directly contact the sensor body **3**.

[0022]   The pulse wave sensor **1** detects the pulse wave of the user's body as follows. The light emitting element **6** emits light toward the user's wrist **4**, a portion of the emitted light penetrates the capillary arteriole **16** in the inside of the user's wrist **4** and is absorbed by the haemoglobin in the blood. The rest of the emitted light is reflected and scattered by the capillary arteriole **16**, and partly reaches the light emitting element **7**. As the amount of the haemoglobin in the blood varies in waves due to the pulsation of the user's blood, the amount of the light absorbed by the haemoglobin also varies in waves. As a result, the amount of the light which is reflected by the capillary arteriole **16** and reaches the light receiving element **7** varies in waves. This variation in the amount of the light received by the light receiving element **7** is detected as the pulse wave information.

[0023]   If the detecting element **2** is arranged on the front side of the user's wrist **4**, the amount of the light received the light receiving element **7** is larger. That is, the intensity of the signal received by the light receiving element **7** is higher. However, the detecting element **2** has a tendency to slip off the detecting position of the user's wrist **4** as the user moves his/her wrist, and therefore the intensity of the light received by the light receiving element **7** largely varies depending on the shift amount of the detecting element **2**. As shown in **FIG. 3B**, in the case that the detecting element **2** is arranged on the front side of the user's wrist **4**, the pulse wave can be detected well if the user is at rest. However, when the user is in motion, the detected pulse wave is adversely affected by the movement of the user's wrist **4**.

[0024]   In contrast to this, if the detecting element **2** is arranged on the back side of the user's wrist **4**, the user will not move his/her wrist unconsciously since the radius and the ulna inside the user's wrist **4** are not pressed and

consequently the user does not feel so uncomfortable. Further, the detecting element **2** will not shift so widely even if the user's wrist moves. Therefore the detecting element **2** is stably fixed to the detecting position of the user's wrist **4**. As a result, the pulse wave is detected stably without being affected by the movement of the user's wrist **4** as shown in **FIG. 3A**.

[0025]   The detecting element **2** is arranged on the user's wrist **4** so that the convex surface of the translucent board **8** is in intimate contact with the surface of the user's skin. Thereby it is prevented that the detecting element **2** slips off the detecting position of the user's wrist **4**. If the translucent board **8** has a flat surface, the detected pulse wave is adversely affected by the movement of the user's wrist **4** as shown in **FIG. 4B**. However, in the case that the translucent board **8** has a convex surface like the present embodiment, the variation of the amount of the reflected light which is emitted from the light emitting element **6** and reaches the light receiving element **7** by being reflected by the surface of the user's skin is suppressed. It is also prevented that noise such as disturbance light from the outside penetrates the translucent board **8**. Therefore the pulse wave can be detected without being affected by the movement of the user's wrist **4** as shown in **FIG. 4A**.

[0026]   The detecting element **2** and the sensor body **3** is attached to theuser's wrist **4** by the dedicated belts **10** and **14**, respectively. That is, the detecting element **2** and the sensor body **3** are allowed to move relatively. Further the cushion **15** is arranged between the detecting element **2** and the sensor body **3**. Therefore, if force is applied to the sensor body **3** or the sensor body **3** moves, the force applied to the sensor body **3** or the movement of the sensor body **3** cannot be transmitted to the detecting element **2** easily.

[0027]   Accordingly the detecting element **2** is stably fixed to the user's wrist **4**. As a result, the pulse wave sensor can detect the pulse wave at a high S/N ratio, that is, it can provide high detection probability, not only when the user is at rest but also when the user is taking light exercise.

[0028]   Modifications

[0029]   In the above embodiment, the sensor body **3** need not include the microcomputer **12** if it includes a transmitter instead. In this case, the pulse wave information detected by the detecting element **2** is transmitted to a receiver by the transmitter. The sensor body **3** can be downsized and light in weight in this case and consequently the force applied to the sensor body **3** or the movement of the sensor body **3** cannot be transmitted to the detecting element **2** easily.

[0030]   In the above embodiment, the detecting element **2** and the sensor body **3** may be worn on the back side of the user's forearm.

What is claimed is:

  1. A pulse wave sensor for detecting a pulse wave of a human body comprising:

  a detecting element including a light emitting element and a light receiving element; and

  a sensor body including a circuit connected to the detecting element via a signal line,

  wherein the detecting element is constructed to be worn on a back side of a user's wrist or a user's forearm.

5

US006801799B2

(12) **United States Patent**    (10) **Patent No.:**    **US 6,801,799 B2**

Mendelson    (45) **Date of Patent:**    **Oct. 5, 2004**

(54) **PULSE OXIMETER AND METHOD OF OPERATION**

(75) Inventor: **Yitzhak Mendelson**, Worcester, MA (US)

(73) Assignee: **Cybro Medical, Ltd.**, Haifa (IL)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **10/360,666**

(22) Filed: **Feb. 6, 2003**

(65) **Prior Publication Data**

US 2003/0144584 A1 Jul. 31, 2003

**Related U.S. Application Data**

(62) Division of application No. 09/939,391, filed on Aug. 24, 2001, now abandoned.

(30) **Foreign Application Priority Data**

Oct. 5, 2000  (IL) ................................................ 138884

(51) **Int. Cl.**$^7$ ................................................ **A61B 5/00**
(52) **U.S. Cl.** ........................ **600/330**; 600/322; 600/336
(58) **Field of Search** ................................ 600/310, 322, 600/323, 330, 336

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 3,638,640 A | 2/1972 | Shaw |
| 3,799,672 A | 3/1974 | Vurek .......................... 356/41 |
| 3,847,483 A | 11/1974 | Shaw .......................... 356/41 |
| 3,998,550 A | 12/1976 | Konishi et al. ............... 356/39 |
| 4,086,915 A | 5/1978 | Kofsky et al. |
| 4,167,331 A | 9/1979 | Nielsen ....................... 356/39 |
| 4,266,554 A | 5/1981 | Hamaguri |
| 4,357,105 A | 11/1982 | Loretz ......................... 356/40 |
| 4,407,290 A | 10/1983 | Wilber |
| 4,446,871 A | 5/1984 | Imura |
| 4,714,341 A | 12/1987 | Hamaguri et al. ............ 356/41 |

| | | |
|---|---|---|
| 4,740,080 A | 4/1988 | Donohue et al. .......... 356/326 |
| 4,773,422 A | 9/1988 | Isaacson et al. |
| 4,796,636 A | 1/1989 | Branstetter et al. |
| 4,802,486 A | 2/1989 | Goodman et al. |
| 4,819,649 A | 4/1989 | Rogers et al. |
| 4,819,752 A | 4/1989 | Zelin |
| 4,854,699 A | 8/1989 | Edgar, Jr. ................... 356/41 |
| 4,859,057 A | 8/1989 | Taylor et al. ............... 356/41 |
| 4,867,557 A | 9/1989 | Takatani et al. ............. 356/41 |
| 4,892,101 A | 1/1990 | Cheung et al. |
| 4,928,692 A | 5/1990 | Goodman et al. |
| 4,934,372 A | 6/1990 | Corenman et al. |
| 4,960,126 A | 10/1990 | Conlon |
| 5,190,038 A | 3/1993 | Polson et al. |
| 5,224,478 A | 7/1993 | Sakai et al. |
| 5,348,004 A | 9/1994 | Hollub |
| 5,349,519 A | 9/1994 | Kaestle .................. 364/413.09 |

(List continued on next page.)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| WO | WO9403102 | 2/1994 |
| WO | WO0154573 | 8/2001 |
| WO | WO0184107 | 11/2001 |

OTHER PUBLICATIONS

*"Reflecance Pulse Oximetry at the Forehead of Newborns: The Influence of Varying Pressure on the Probe"*; A. Carin M. Dassel, MD, et el.; Dept of Obstetrics and Gynecology, Univ. Hospital Groningen, Groningen; Journal of Clinical Monitoring 12: pp. 421–428, 1996.

(List continued on next page.)

*Primary Examiner*—Eric F. Winakur
(74) *Attorney, Agent, or Firm*—Howard & Howard

(57) **ABSTRACT**

A sensor for use in an optical measurement device and a method for non-invasive measurement of a blood parameter. The sensor includes sensor housing, a source of radiation coupled to the housing, and a detector assembly coupled to the housing. The source of radiation is adapted to emit radiation at predetermined frequencies. The detector assembly is adapted to detect reflected radiation at least one predetermined frequency and to generate respective signals. The signals are used to determine the parameter of the blood.

**5 Claims, 6 Drawing Sheets**



APPLE 1012

Appx15578

**US 6,801,799 B2**

Page 2

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,355,880 | A | 10/1994 | Thomas et al. |
| 5,398,680 | A | 3/1995 | Polson et al. |
| 5,413,100 | A | 5/1995 | Barthelemy et al. |
| 5,421,329 | A | 6/1995 | Casciani et al. |
| 5,482,036 | A | 1/1996 | Diab et al. |
| 5,490,505 | A | 2/1996 | Diab et al. |
| 5,490,506 | A | 2/1996 | Takatani et al. |
| 5,494,032 | A | * 2/1996 | Robinson et al. .......... 600/323 |
| 5,517,988 | A | 5/1996 | Gerhard |
| 5,533,507 | A | 7/1996 | Potratz |
| 5,632,272 | A | 5/1997 | Diab et al. |
| 5,645,060 | A | 7/1997 | Yorkey |
| 5,685,299 | A | 11/1997 | Diab et al. |
| 5,758,644 | A | 6/1998 | Diab et al. |
| 5,769,785 | A | 6/1998 | Diab et al. .................. 600/364 |
| 5,782,237 | A | 7/1998 | Casciani et al. |
| 5,823,950 | A | 10/1998 | Diab et al. .................. 600/310 |
| 5,842,981 | A | 12/1998 | Larsen et al. ............... 600/323 |
| 5,853,364 | A | 12/1998 | Baker, Jr. et al. .......... 600/500 |
| 5,919,134 | A | 7/1999 | Diab ........................... 600/323 |
| 5,995,856 | A | 11/1999 | Mannheimer et al. ...... 600/322 |
| 6,011,986 | A | 1/2000 | Diab et al. .................. 600/323 |
| 6,031,603 | A | 2/2000 | Fine et al. ................... 356/41 |
| 6,036,642 | A | 3/2000 | Diab et al. .................. 600/364 |
| 6,067,462 | A | 5/2000 | Diab et al. .................. 600/310 |
| 6,081,735 | A | 6/2000 | Diab et al. .................. 600/310 |
| 6,083,172 | A | 7/2000 | Baker, Jr. et al. .......... 600/500 |

### OTHER PUBLICATIONS

"*Reflectance Pulse Oximetry—Principles and Obstetric Application in the Zurich System*"; Voker Konig, Renate Huch, and Albert Huch; Perinatal Physiology Research Dept., Dept. of Obstetrics, Computing 14: pp. 403–412, 1998.

"*Effect of location of the sensor on reflectance pulse oximetry*"; A.C. M. Dassel, Research Fellow et al. British Journal of Obstetrics and Gynecology; Aug. 1997, vol. 104, pp. 910–916.

"*Design and Evaluation of a New Reflectance Pulse Oximeter Sensor*"; Y. Mendelson, PhD, et al.; Worcester Polytechnic Institute, Biomedical Engineering Program, Worcester, MA 01609; Association for the Advancement of Medical Instrumentation, vol. 22, No. 4, 1988; pp. 167–173.

"*Skin Reflectance Pulse Oximetry: In Vivo Measurements from the Forearm and Calf*"; Y. Mednelson, PhD and M.J. McGinn, MSc; Dept. of Biomedical Engineering, Worcester Polytechnic Institute, Worcester, MA 01609; Journal of Clinical Monitoring, vol. 7, No. 1, 1991; pp. 7–12.

"*Experimental and Clinical Evaluation of a Noninvasive Reflectance Pulse Oximeter Sensor*"; Setsuo Takatani, PhD, et al.; Dept. of Surgery, Baylor College of Medicine, One Baylor Plaza, Houston, TX 77030; Journal of Clinical Monitoring, vol. 8, No. 4, Oct. 1992; pp. 257–266.

"*Wavelength Selection for Low–Saturation Pulse Oximetry*"; Paul D. Mannheimer, et al.; IEEE Transactions on Biomedical Engineering, vol. 44, No. 3, Mar. 1997; pp. 148–158.

"*Noninvasive Pulse Oximetry Utilizing Skin Reflectance Photoplethysmography*"; Yitzhak Mendelson and Burt D. Ochs; IEEE Transactions on Biomedical Engineering, vol. 35, No. 10, Oct. 1988; pp. 798–805.

"*Physio–optical considerations in the design of fetal pulse oximetry sensors*"; P.D. Mannheimer, M.E. Fein and J.R. Casciani; European Journal of Obstetrics & Gynecology and Reproductive Biology 72 Suppl. 1 (1997) S9–S19.

"*Fetal pulse oximetry: influence of tissue blood content and hemoglobin concentration in a new in–vitro model*"; Thomas Edrich, Gerhard Rall, Reinhold Knitza; European Journal if Obstetrics & Gynecology and Reproductive Biology 72 Suppl. 1 (1997) S29–S34.

* cited by examiner



*Figure 1*



*Figure 2*



## Figure 3



## Figure 4



REFLECTION SENSOR

*Figure 5A*



REFLECTION SENSOR

*Figure 5B*



$S_PO_2$

R/IR

*Figure 6*



*Figure 7*



*Figure 8*



*Figure 9*



*Figure 10A*



*Figure 10B*



*Figure 10C*

1

# PULSE OXIMETER AND METHOD OF OPERATION

This application is a divisional application of U.S. patent application Ser. No. 09/939,391 filed Aug. 24, 2001, now abandoned.

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

This invention is generally in the field of pulse oximetry, and relates to a sensor for use in a pulse oximeter, and a method for the pulse oximeter operation.

### 2. Background of the Invention

Oximetry is based on spectrophotometric measurements of changes in the color of blood, enabling the non-invasive determination of oxygen saturation in the patient's blood. Generally, oximetry is based on the fact that the optical property of blood in the visible (between 500 and 700 nm) and near-infrared (between 700 and 1000 nm) spectra depends strongly on the amount of oxygen in blood.

Referring to FIG. 1, there is illustrated a hemoglobin spectra measured by oximetry based techniques. Graphs G1 and G2 correspond, respectively, to reduced hemoglobin, or deoxyhemoglobin (Hb), and oxygenated hemoglobin, or oxyhemoglobin ($HbO_2$), spectra. As shown, deoxyhemoglobin (Hb) has a higher optical extinction (i.e., absorbs more light) in the red region of spectrum around 660 nm, as compared to that of oxyhemoglobin ($HbO_2$). On the other hand, in the near-infrared region of the spectrum around 940 nm, the optical absorption by deoxyhemoglobin (Hb) is lower than the optical absorption of oxyhemoglobin ($HbO_2$).

Prior art non-invasive optical sensors for measuring arterial oxyhemoglobin saturation ($SaO_2$) by a pulse oximeter (termed $SpO_2$) are typically comprised of a pair of small and inexpensive light emitting diodes (LEDs), and a single highly sensitive silicon photodetector. A red (R) LED centered on a peak emission wavelength around 660 nm and an infrared (IR) LED centered on a peak emission wavelength around 940 nm are used as light sources.

Pulse oximetry relies on the detection of a photoplethysmographic signal caused by variations in the quantity of arterial blood associated with periodic contraction and relaxation of a patient's heart. The magnitude of this signal depends on the amount of blood ejected from the heart into the peripheral vascular bed with each systolic cycle, the optical absorption of the blood, absorption by skin and tissue components, and the specific wavelengths that are used to illuminate the tissue. $SaO_2$ is determined by computing the relative magnitudes of the R and IR photoplethysmograms. Electronic circuits inside the pulse oximeter separate the R and IR photoplethysmograms into their respective pulsatile (AC) and non-pulsatile (DC) signal components. An algorithm inside the pulse oximeter performs a mathematical normalization by which the time-varying AC signal at each wavelength is divided by the corresponding time-invariant DC component which results mainly from the light absorbed and scattered by the bloodless tissue, residual arterial blood when the heart is in diastole, venous blood and skin pigmentation.

Since it is assumed that the AC portion results only from the arterial blood component, this scaling process provides a normalized R/IR ratio (i.e., the ratio of AC/DC values corresponding to R- and IR-spectrum wavelengths, respectively), which is highly dependent on $SaO_2$, but is largely independent of the volume of arterial blood entering

2

the tissue during systole, skin pigmentation, skin thickness and vascular structure. Hence, the instrument does not need to be re-calibrated for measurements on different patients. Typical calibration of a pulse oximeter is illustrated in FIG. 2 by presenting the empirical relationship between $SaO_2$ and the normalized R/IR ratio, which is programmed by the pulse oximeters' manufacturers.

Pulse oximeters are of two kinds operating, respectively, in transmission and reflection modes. In transmission-mode pulse oximetry, an optical sensor for measuring $SaO_2$ is usually attached across a fingertip, foot or earlobe, such that the tissue is sandwiched between the light source and the photodetector.

In reflection-mode or backscatter type pulse oximetry, as shown in FIG. 3, the LEDs and photodetector are both mounted side-by-side next to each other on the same planar substrate. This arrangement allows for measuring $SaO_2$ from multiple convenient locations on the body (e.g. the head, torso, or upper limbs), where conventional transmission-mode measurements are not feasible. For this reason, non-invasive reflectance pulse oximetry has recently become an important new clinical technique with potential benefits in fetal and neonatal monitoring. Using reflectance oximetry to monitor $SaO_2$ in the fetus during labor, where the only accessible location is the fetal scalp or checks, or on the chest in infants with low peripheral perfusion, provides several more convenient locations for sensor attachment.

Reflection pulse oximetry, while being based on similar spectrophotometric principles as the transmission one, is more challenging to perform and has unique problems that can not always be solved by solutions suitable for solving the problems associated with the transmission-mode pulse oximetry. Generally, comparing transmission and reflection pulse oximetry, the problems associated with reflection pulse oximetry consist of the following:

In reflection pulse oximetry, the pulsatile AC signals are generally very small and, depending on sensor configuration and placement, have larger DC components as compared to those of transmission pulse oximetry. As illustrated in FIG. 4, in addition to the optical absorption and reflection due to blood, the DC signal of the R and IR photoplethysmograms in reflection pulse oximetry can be adversely affected by strong reflections from a bone. This problem becomes more apparent when applying measurements at such body locations as the forehead and the scalp, or when the sensor is mounted on the chest over the ribcage. Similarly, variations in contact pressure between the sensor and the skin can cause larger errors in reflection pulse oximetry (as compared to transmission pulse oximetry) since some of the blood near the superficial layers of the skin may be normally displaced away from the sensor housing towards deeper subcutaneous structures. Consequently, the highly reflective bloodless tissue compartment near the surface of the skin can cause large errors even at body locations where the bone is located too far away to influence the incident light generated by the sensor.

Another problem with currently available reflectance sensors is the potential for specular reflection caused by the superficial layers of the skin, when an air gap exists between the sensor and the skin, or by direct shunting of light between the LEDs and the photodetector through a thin layer of fluid which may be due to excessive sweating or from amniotic fluid present during delivery.

It is important to keep in mind the two fundamental assumptions underlying the conventional dual-wavelength pulse oximetry, which are as follows:

US 6,801,799 B2

3

(1) the path of light rays with different illuminating wavelengths in tissue are substantially equal and, therefore, cancel each other; and (2) each light source illuminates the same pulsatile change in arterial blood volume.

Furthermore, the correlation between optical measurements and tissue absorptions in pulse oximetry are based on the fundamental assumption that light propagation is determined primarily by absorbable due to Lambent-Beer's law neglecting multiple scattering effects in biological tissues. In practice, however, the optical paths of different wavelengths in biological tissues is known to vary more in reflectance oximetry compared to transmission oximetry, since it strongly depends on the light scattering properties of the illuminated tissue and sensor mounting.

Several human validation studies, backed by animal investigations, have suggested that uncontrollable physiological and physical parameters can cause large variations in the calibration curve of reflectance pulse oximeters primarily at low oxygen saturation values below 70%. It was observed that the accuracy of pulse oximeters in clinical use might be adversely affected by a number of physiological parameters when measurements are made from sensors attached to the forehead, chest, or the buttock area. While the exact sources of these variations are not fully understood, it is generally believed that there are a few physiological and anatomical factors that may be the major source of these errors. It is also well known for example that changes in the ratio of blood to bloodless tissue volumes may occur through venous congestion, vasoconstriction/vasodilatation, or through mechanical pressure exerted by the sensor on the skin.

Additionally, the empirically derived calibration curve of a pulse oximeter can be altered by the effects of contact pressure exerted by the probe on the skin. This is associated with the following. The light paths in reflectance oximetry are not well defined (as compared to transmission oximetry), and thus may differ between the red and infrared wavelengths. Furthermore, the forehead and scalp areas consist of a relatively thin subcutaneous layer with the cranium bone underneath, while the tissue of other anatomical structures, such as the buttock and limbs, consists of a much thicker layer of skin and subcutaneous tissues without a nearby bony support that acts as a strong light reflector.

Several in vivo and in vitro studies have confirmed that uncontrollable physiological and physical parameters (e.g., different amounts of contact pressure applied by the sensor on the skin, variation in the ratio of bloodless tissue-to-blood content, or site-to-site variations) can often cause large errors in the oxygen saturation readings of a pulse oximeter, which are normally derived based on a single internally-programmed calibration curve. The relevant in vivo studies are disclosed in the following publications:

1. Dassel, et al., "Effect of location of the sensor on reflectance pulse oximetry", British Journal of Obstetrics and Gynecology, vol. 104, pp. 910–916, (1997);

2. Dassel, et al., "Reflectance pulse oximetry at the forehead of newborns: The influence of varying pressure on the probe", Journal of Clinical Monitoring, vol. 12, pp. 421–428, (1996).

The relevant in vitro studies are disclosed, for example in the following publication:

3. Edrich et al., "Fetal pulse oximetry: influence of tissue blood content and hemoglobin concentration in a new in-vitro model", European Journal of Obstetrics and Gynecology and Reproductive Biology, vol. 72, suppl. 1, pp. S29–S34, (1997).

4

Improved sensors for application in dual-wavelength reflectance pulse oximetry have been developed. As disclosed in the following publication: Mendelson, et al., "Noninvasive pulse oximetry utilizing skin reflectance photoplethysmography", IEEE Transactions on Biomedical Engineering, vol. 35, no. 10, pp. 798–805 (1988), the total amount of backscattered light that can be detected by a reflectance sensor is directly proportional to the number of photodetectors placed around the LEDs. Additional improvements in signal-to-noise ratio were achieved by increasing the active area of the photodetector and optimizing the separation distance between the light sources and photodetectors.

Another approach is based on the use of a sensor having six photodiodes arranged symmetrically around the LEDs that is disclosed in the following publications:

4. Mendelson, et al., "Design and evaluation of a new reflectance pulse oximeter sensor", Medical Instrumentation, vol. 22, no. 4, pp. 167–173 (1988); and

5. Mendelson, et al., "Skin reflectance pulse oximetry: in vivo measurements from the forearm and calf", Journal of Clinical Monitoring, vol. 7, pp. 7–12, (1991).

According to this approach, in order to maximize the fraction of backscattered light collected by the sensor, the currents from all six photodiodes are summed electronically by internal circuitry in the pulse oximeter. This configuration essentially creates a large area photodetector made of six discrete photodiodes connected in parallel to produce a single current that is proportional to the amount of light backscattered from the skin. Several studies showed that this sensor configuration could be used successfully to accurately measure SaO$_2$ from the forehead, forearm and the calf on humans. However, this sensor requires a means for heating the skin in order to increase local blood flow, which has practical limitations since it could cause skin burns.

Yet another prototype reflectance sensor is based on eight dual-wavelength LEDs and a single photodiode, and is disclosed in the following publication: Takatani et al., "Experimental and clinical evaluation of a noninvasive reflectance pulse oximeter sensor", Journal of Clinical Monitoring, vol. 8, pp. 257–266 (1992). Here, four R and four IR LEDs are spaced at 90-degree intervals around the substrate and at an equal radial distance from the photodiode.

A similar sensor configuration based on six photodetectors mounted in the center of the sensor around the LEDs is disclosed in the following publication: Konig, et al., "Reflectance pulse oximetry—principles and obstetric application in the Zurich system", Journal of Clinical Monitoring, vol. 14, pp. 403–412 (1998).

According to the techniques disclosed in all of the above publications, only LEDs of two wavelengths, R and IR, are used as light sources, and the computation of SaO$_2$ is based on reflection photoplethysmograms measured by a single photodetector, regardless of whether one or multiple photodiodes chips are used to construct the sensor. This is because of the fact that the individual signals from the photodetector elements are all summed together electronically inside the pulse oximeter. Furthermore, while a radially-symmetric photodetector array can help to maximize the detection of backscattered light from the skin and minimize differences from local tissue inhomogeneity, human and animal studies confirmed that this configuration can not completely eliminate errors caused by pressure differences and site-to-site variations.

The use of a nominal dual-wavelength pair of 735/890 nm was suggested as providing the best choice for optimizing

5

6

accuracy, as well as sensitivity in dual-wavelength reflectance pulse oximetry, in U.S. Pat. Nos. 5,782,237 and 5,421,329. This approach minimizes the effects of tissue heterogeneity and enables to obtain a balance in path length changes arising from perturbations in tissue absorbance. This is disclosed in the following publications:

6. Mannheimer et al., "Physio-optical considerations in the design of fetal pulse oximetry sensors", European Journal of Obstetrics and Gynecology and Reproductive Biology, vol. 72, suppl. 1, pp. S9–S19, (1997); and

7. Mannheimer et al., "Wavelength selection for low-saturation pulse oximetry", IEEE Transactions on Biomedical Engineering, vol. 44, no. 3, pp. 48–158 (1997)].

However, replacing the conventional R wavelength at 660 nm, which coincides with the region of the spectrum where the difference between the extinction coefficient of Hb and $HbO_2$ is maximal, with a wavelength emitting at 735 nm, not only lowers considerably the overall sensitivity of a pulse oximeter, but does not completely eliminate errors due to sensor placement and varying contact pressures.

Pulse oximeter probes of a type comprising three or more LEDs for filtering noise and monitoring other functions, such as carboxyhemoglobin or various indicator dyes injected into the blood stream, have been developed and are disclosed, for example, in WO 00/32099 and U.S. Pat. No. 5,842,981. The techniques disclosed in these publications are aimed at providing an improved method for direct digital signal formation from input signals produced by the sensor and for filtering noise.

None of the above prior art techniques provides a solution to overcome the most essential limitation in reflectance pulse oximetry, which requires the automatic correction of the internal calibration curve from which accurate and reproducible oxygen saturation values are derived, despite variations in contact pressure or site-to-site tissue heterogeneity.

In practice, most sensors used in reflection pulse oximetry rely on closely spaced LED wavelengths in order to minimize the differences in the optical path lengths of the different wavelengths. Nevertheless, within the wavelength range required for oximetry, even closely spaced LEDs with closely spaced wavelengths mounted on the same substrate can lead to large random error in the final determination of $SaO_2$.

## SUMMARY OF THE INVENTION AND ADVANTAGES

The object of the invention is to provide a novel sensor design and method that functions to correct the calibration relationship of a reflectance pulse oximeter, and reduce measurement inaccuracies in general. Another object of the invention is to provide a novel sensor and method that functions to correct the calibration relationship of a reflectance pulse oximeter, and reduce measurement inaccuracies in the lower range of oxygen saturation values (typically below 70%), which is the predominant range in neonatal and fetal applications.

Yet another object of the present invention is to provide automatic correction of the internal calibration curve from which oxygen saturation is derived inside the oximeter in situations where variations in contact pressure or site-to-site tissue heterogeneity may cause large measurement inaccuracies.

Another object of the invention is to eliminate or reduce the effect of variations in the calibration of a reflectance

pulse oximeter between subjects, since perturbations caused by contact pressure remain one of the major sources of errors in reflectance pulse oximetry. In fetal pulse oximetry, there are additional factors, which must be properly compensated for in order to produce an accurate and reliable measurement of oxygen saturation. For example, the fetal head is usually the presenting part, and is a rather easily accessible location for application of reflectance pulse oximetry. However, uterine contractions can cause large and unpredictable variations in the pressure exerted on the head and by the sensor on the skin, which can lead to large errors in the measurement of oxygen saturation by a dual-wavelength reflectance pulse oximeter. Another object of the invention is to provide accurate measurement of oxygen saturation in the fetus during delivery.

The basis for the errors in the oxygen saturation readings of a dual-wavelength pulse oximeter is the fact that, in practical situations, the reflectance sensor applications affect the distribution of blood in the superficial layers of the skin. This is different from an ideal situation, when a reflectance sensor measures light backscattered from a homogenous mixture of blood and bloodless tissue components. Therefore, the R and IR DC signals practically measured by photodetectors contain a relatively larger proportion of light absorbed by and reflected from the bloodless tissue compartments. In these uncontrollable practical situations, the changes caused are normally not compensated for automatically by calculating the normalized R/IR ratio since the AC portions of each photoplethysmogram, and the corresponding DC components, are affected differently by pressure or site-to-site variations. Furthermore, these changes depend not only on wavelength, but depend also on the sensor geometry, and thus cannot be eliminated completely by computing the normalized R/IR ratio, as is typically the case in dual-wavelength pulse oximeters.

The inventor has found that the net result of this nonlinear effect is to cause large variations in the slope of the calibration curves. Consequently, if these variations are not compensated automatically, they will cause large errors in the final computation of $SpO_2$, particularly at low oxygen saturation levels normally found in fetal applications.

Another object of the present invention is to compensate for these variations and to provide accurate measurement of oxygen saturation. The invention consists of, in addition to two measurement sessions typically carried out in pulse oximetry based on measurements with two wavelengths centered with the peak emission values of 660 nm (red spectrum) and 940 nm±20 nm (IR spectrum), one additional measurement session is carried out with an additional wavelength. At least one additional wavelength is preferably chosen to be substantially in the IR region of the electromagnetic spectrum, i.e., in the NIR-IR spectrum (having the peak emission value above 700 nm). In a preferred embodiment the use of at least three wavelengths enables the calculation of an at least one additional ratio formed by the combination of the two IR wavelengths, which is mostly dependent on changes in contact pressure or site-to-site variations. In a preferred embodiment, slight dependence of the ratio on variations in arterial oxygen saturation that may occur, is easily minimized or eliminated completely, by the proper selection and matching of the peak emission wavelengths and spectral characteristics of the at least two IR-light sources.

Preferably, the selection of the IR wavelengths is based on certain criteria. The IR wavelengths are selected to coincide with the region of the optical absorption curve where $HbO_2$ absorbs slightly more light than Hb. The IR wavelengths are

7

8

in the spectral regions where the extinction coefficients of both Hb and $HbO_2$ are nearly equal and remain relatively constant as a function of wavelength, respectively.

In a preferred embodiment, tracking changes in the ratio formed by the two IR wavelengths, in real-time, permits automatic correction of errors in the normalized ratio obtained from the R-wavelength and each of the IR-wavelengths. The term "ratio" signifies the ratio of two values of AC/DC corresponding to two different wavelengths. This is similar to adding another equation to solve a problem with at least three unknowns (i.e., the relative concentrations of $HbO_2$ and Hb, which are used to calculate $SaO_2$, and the unknown variable fraction of blood-to-tissue volumes that effects the accurate determination of $SaO_2$), which otherwise must rely on only two equations in the case of only two wavelengths used in conventional dual-wavelength pulse oximetry. In a preferred embodiment, a third wavelength provides the added ability to compute $SaO_2$ based on the ratio formed from the R-wavelength and either of the IR-wavelengths. In a preferred embodiment, changes in these ratios are tracked and compared in real-time to determine which ratio produces a more stable or less noisy signal. That ratio is used predominantly for calculating $SaO_2$.

The present invention utilizes collection of light reflected from the measurement location at different detection locations arranged along a closed path around light emitting elements, which can be LEDs or laser sources. Preferably, these detection locations are arranged in two concentric rings, the so-called "near" and "far" rings, around the light emitting elements. This arrangement enables optimal positioning of the detectors for high quality measurements, and enables discrimination between photodetectors receiving "good" information (i.e., AC and DC values which would result in accurate calculations of $SpO_2$) and "bad" information (i.e., AC and DC values which would result in inaccurate calculations of $SpO_2$).

There is thus provided according to one aspect of the present invention, a sensor for use in an optical measurement device for non-invasive measurements of blood parameters, the sensor comprising:

(1) a light source for illuminating a measurement location with incident light of at least three wavelengths, the first wavelength lying in a red (R) spectrum, and the at least second and third wavelengths lying substantially in the infrared (IR) spectrum; and

(2) a detector assembly for detecting light returned from the illuminated location, the detector assembly being arranged so as to define a plurality of detection locations along at least one closed path around the light source.

The term "closed path" used herein signifies a closed curve, like a ring, ellipse, or polygon, and the like.

The detector assembly is comprised of at least one array of discrete detectors (e.g., photodiodes) accommodated along at least one closed path, or at least one continuous photodetector defining the closed path.

The term "substantially IR spectrum" used herein signifies a spectrum range including near infrared and infrared regions.

According to another aspect of the present invention, there is provided a pulse oximeter utilizing a sensor constructed as defined above, and a control unit for operating the sensor and analyzing data generated thereby.

According to yet another aspect of the present invention, there is provided a method for non-invasive determination of a blood parameter, the method comprising the steps of:

illuminating a measurement location with at least three different wavelengths $\lambda 1$, $\lambda 2$ and $\lambda 3$, the first wavelength $\lambda 1$ lying in a red (R) spectrum, and the at least second and at least third wavelengths $\lambda 2$ and $\lambda 3$ lying substantially in the infrared (IR) spectrum;

detecting light returned from the measurement location at different detection locations and generating data indicative of the detected light, wherein said different detection locations are arranged so as to define at least one closed path around the measurement location; and

analyzing the generated data and determining the blood parameter.

## BRIEF DESCRIPTION OF THE DRAWINGS

Other advantages of the present invention will be readily appreciated as the same becomes better understood by reference to the following detailed description when considered in connection with the accompanying drawings wherein:

FIG. 1 illustrates hemoglobin spectra as measured by oximetry based techniques;

FIG. 2 illustrates a calibration curve used in pulse oximetry as typically programmed by the pulse oximeters manufacturers;

FIG. 3 illustrates the relative disposition of light source and detector in reflection-mode or backscatter type pulse oximetry;

FIG. 4 illustrates light propagation in reflection pulse oximetry;

FIGS. 5A and 5B illustrate a pulse oximeter reflectance sensor operating under ideal and practical conditions, respectively;

FIG. 6 illustrates variations of the slopes of calibration curves in reflectance pulse oximetry measurements;

FIG. 7 illustrates an optical sensor according to the invention;

FIG. 8 is a block diagram of the main components of a pulse oximeter utilizing the sensor of FIG. 7;

FIG. 9 is a flow chart of a selection process used in the signal processing technique according to the invention; and

FIGS. 10A to 10C are flow charts of three main steps, respectively, of the signal processing method according to the invention.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

Referring to the Figures, wherein like numerals indicate like or corresponding parts throughout the several views, FIGS. 1 and 2 illustrate typical hemoglobin spectra and calibrations curve utilized in the pulse oximetry measurements.

The present invention provides a sensor for use in a reflection-mode or backscatter type pulse oximeter. The relative disposition of light source and detector in the reflection-mode pulse oximeter are illustrated in FIG. 3.

FIG. 4 shows light propagation in the reflection-mode pulse oximeter where, in addition to the optical absorption and reflection due to blood, the DC signal of the R and IR photoplethysmograms can be adversely affected by strong reflections from the bone.

FIGS. 5A and 5B illustrate a pulse oximeter reflectance sensor operating under, respectively, ideal and practical conditions. Referring now to FIG. 5A, it is shown that, under

9

ideal conditions, reflectance sensor measures light backscattered from a homogenous mixture of blood and bloodless tissue components. Accordingly, the normalized R/IR ratio in dual-wavelength reflection type pulse oximeters, which relies on proportional changes in the AC and DC components in the photoplethysmograms, only reflect changes in arterial oxygen saturation.

Referring now to FIG. 5B, in practical situations, the sensor applications affect the distribution of blood in the superficial layers of the skin. Accordingly, the R and IR DC signals measured by photodetectors contain a relatively larger proportion of light absorbed by and reflected from the bloodless tissue compartments. As such, the changes in DC signals depend not only on wavelength but also sensor geometry and thus cannot be eliminated completely by computing the normalized R/IR ratio, as is typically the case in dual-wavelength pulse oximeters. The result is large variations in the slope of the calibration curves, as illustrated in FIG. 6. Referring now to FIG. 6, graphs C1, C2 and C3 show three calibration curves, presenting the variation of the slope for oxygen saturation values between 50% and 100%.

Referring now to FIG. 7, there is illustrated an optical sensor 10 designed according to the invention aimed at minimizing some of the measurement inaccuracies in a reflectance pulse oximeter. The sensor 10 comprises such main constructional parts as a light source 12 composed of three closely spaced light emitting elements (e.g., LEDs or laser sources) 12a, 12b and 12c generating light of three different wavelengths, respectively; an array of discrete detectors (e.g., photodiodes), a "far" detector 16 and a "near" detector 18, arranged in two concentric ring-like arrangements (constituting closed paths) surrounding the light emitting elements; and a light shield 14. In the present example, six photodiodes form each ring. All these elements are accommodated in a sensor housing 17. The light shield 14 is positioned between the photodiodes and the light emitting elements, and prevents direct optical coupling between them, thereby maximizing the fraction of backscattered light passing through the arterially perfused vascular tissue in the detected light.

It should be noted that more than three wavelengths can be utilized in the sensor. The actual numbers of wavelengths used as a light source and the number of photodetectors in each ring are not limited and depend only on the electronic circuitry inside the oximeter. The array of discrete photodiodes can be replaced by one or more continuous photodetector rings.

In addition to the R and IR light emitting elements 12a and 12b as used in the conventional pulse oximeter sensors, the sensor 10 incorporates the third, reference, light emitting element 12c, which emits light in the NIR-IR spectrum. Wavelength λ1 and λ2 of the R and IR light emitting elements 12a and 12b are centered, respectively, around the peak emission values of 660 nm and 940 nm, and wavelength λ3 of the third light emitting element 12c has the peak emission value above 700 nm (typically ranging between 800 nm and 900 nm). In the description below, the light emitting elements 12b and 12c are referred to as two IR light emitting elements, and wavelengths λ2 and λ3 are referred to as two IR wavelengths.

During the operation of the sensor 10, different light emitting elements are selectively operated for illuminating a measurement location (not shown) with different wavelengths. Each of the photodetectors detects reflected light of different wavelengths and generates data indicative of the intensity I of the detected light of different wavelengths.

10

It should be noted that the sensor can be of a compact design utilizing an integrated circuit manufactured by CMOS technology. This technique is disclosed in a co-pending application assigned to the assignee of the present application. According to this technique, the sensor comprises a package including the light source, a block of two tubular optical waveguides of different diameters concentrically dislocated one inside the other and surrounding the light source, and an integrated circuit plate comprising two ring-like areas of photodiodes positioned concentrically one inside the other. The integrated circuit is also provided with a plurality of printed contact areas and electric conductors intended for mounting the light source thereon, controlling the light source, and transmitting electric signals produced by the photodiodes areas for further processing.

FIG. 8 illustrates a block diagram of a pulse oximeter 20 utilizing the above-described sensor 10. The pulse oximeter typically includes a control unit 21, which is composed of an electronic block 22 including A/D and D/A converters connectable to the sensor 10, a microprocessor 24 for analyzing measured data, and a display 26 for presenting measurement results. The measured data (i.e., electrical output of the sensor 10 indicative of the detected light) is directly processed in the block 22, and the converted signal is further processed by the microprocessor 24. The microprocessor 24 is operated by a suitable software model for analyzing the measured data and utilizing reference data (i.e., calibration curve stored in a memory) to compute the oxygen saturation value, which is then presented on the display 26. The analysis of the measured data utilizes the determination of AC- and DC-components in the detected light for each wavelength, λ1, λ2, and λ3, respectively, i.e., $I_1^{(AC)}$, $I_1^{(DC)}$, $I_2^{(AC)}$, $I_2^{(DC)}$, $I_3^{(AC)}$, and $I_3^{(DC)}$, and the calculation of AC/DC ratio for each wavelength, namely, $W_1 = I_1^{(AC)}/I_1^{(DC)}$, $W_2 = I_2^{(AC)}/I_2^{(DC)}$, and $W_3 = I_3^{(AC)}/I_3^{(DC)}$, as will be described more specifically further below with reference to FIGS. 9 and 10A–10C.

The pulse oximeter 20 with the sensor arrangement shown in FIG. 7 provides the following three possible ratio values: $W_1/W_2$, $W_1/W_3$ and $W_2/W_3$. It should be noted that $W_1/W_2$ and $W_1/W_3$ are the ratios that typically have the highest sensitivity to oxygen saturation. This is due to the fact that λ1 is chosen in the red region of the electromagnetic spectrum, where the changes in the absorption between Hb and HbO₂ are the largest, as described above with reference to FIG. 1. Therefore, in principle, the absorption ratios formed by either wavelength pair λ1 and λ2 or wavelength pair λ1 and λ3 can be used to compute the value of SaO₂.

The inventor conducted extensive human and animal studies, and confirmed that either of the two ratios $W_1/W_2$ and $W_1/W_3$ can be affected not only by changes in arterial oxygen saturation, but also by sensor placement and by the amount of pressure applied by the sensor on the skin. Any calculation of SaO₂ based on either of the two ratios $W_1/W_2$ and $W_1/W_3$ alone (as normally done in commercially available dual-wavelength pulse oximeters) could result in significant errors. Furthermore, since at least two wavelengths are necessary for the calculation of arterial oxygen saturation, it is not feasible to self-correct the calibration curve for variations due to contact pressure or site-to-site variations utilizing the same two wavelengths used already to compute SaO₂.

The inventor has found that the third ratio $W_2/W_3$ formed by the combination of the two IR wavelengths is mostly dependent on changes in contact pressure or site-to-site variations. Furthermore, this ratio can depend, but to a much lesser degree, on variations in arterial oxygen saturation.

13

US 6,801,799 B2

11

The dependency on arterial oxygen saturation, however, is easily minimized or eliminated completely, for example by selection and matching of the peak emission wavelengths and spectral characteristics of the two IR light emitting elements **12**b and **12**c.

Generally, the two IR wavelengths λ**2** and λ**3** are selected to coincide with the region of the optical absorption curve where HbO$_2$ absorbs slightly more light than Hb, but in the spectral region, respectively, where the extinction coefficients of both Hb and HbO$_2$ are nearly equal and remain relatively constant as a function of wavelength. For example, at 940 nm and 880 nm, the optical extinction coefficients of Hb and HbO$_2$ are approximately equal to 0.29 and 0.21, respectively. Therefore, ideally, the ratio of **W2/W3** should be close to 1, except for situations when the AC/DC signals measured from λ**2** and λ**3** are affected unequally causing the ratio **W2/W3** to deviate from 1.

Fortunately, variations in the ratio **W2/W3** mimic changes in the ratios W$_1$/W$_2$ and W$_1$/W$_3$ since these ratios are all affected by similar variations in sensor positioning or other uncontrollable factors that normally can cause large errors in the calibration curve from which oxygen saturation is typically derived. Thus, by tracking in real-time changes in the ratio formed by wavelengths λ**2** and λ**3**, it is possible to automatically correct for errors in the normalized ratios obtained from wavelengths λ**1** and λ**2**, or from λ**1** and λ**3**.

The use of an additional third wavelength in the sensor serves another important function (not available in conventional dual-wavelength pulse oximeters), which is associated with the following. Reflectance pulse oximeters have to be capable of detecting and relying on the processing of relatively low quality photoplethysmographic signals. Accordingly, electronic or optical noise can cause large inaccuracies in the final computation of SaO$_2$. Although the amount of electronic or optical noise pickup from the sensor can be minimized to some extent, it is impossible to render the signals measured by the pulse oximeter completely noise free. Therefore, pulse oximeters rely on the assumption that any noise picked up during the measurement would be cancelled by calculating the ratio between the R- and IR-light intensities measured by the photodetector. Practically, however, the amount of noise that is superimposed on the R- and IR-photoplethysmograms cannot be cancelled by calculating the ratio and, thus, can lead to significant errors in the final computation of SaO$_2$ which, in dual-wavelength pulse oximeters, is based only on the ratio between two wavelengths.

By utilizing a third wavelength, the invention has the added ability to compute SaO$_2$ based on the ratio formed from either W$_1$/W$_2$ or W$_1$/W$_3$. An algorithm utilized in the pulse oximeter according to the invention has the ability to track and compare in real-time changes between W$_1$/W$_2$ and W$_1$/W$_3$to determine which ratio produces a more stable or less noisy signal and selectively choose the best ratio for calculating SaO$_2$.

The method according to the invention utilizes the so-called "selection process" as part of the signal processing technique based on the measured data obtained with the multiple photodetectors. The main steps of the selection process are shown in FIG. **9** in a self-explanatory manner. Here, the symbol i corresponds to a single photodetector element in the array of multiple discrete photodetector elements, the term "1st" signifies the last photodetector element in the array, and the term "DATA" signify three ratios (AC/DC) computed separately for each of the three wavelengths, namely, W$_1$, W$_2$ and W$_3$.

12

The selection process is associated with the following: Practically, each time one of the light emitting elements is in its operative position (i.e., switched on), all of the photodetectors in the sensor receiving backscattered light from the skin. However, the intensity of the backscattered light measured by each photodetector may be different from that measured by the other photodetectors, depending on the anatomical structures underneath the sensor and its orientation relative to these structures.

Thus, the selection process is used to discriminate between photodetectors receiving "good" signals (i.e., "good" signal meaning that the calculation of SpO$_2$ from the pulsating portion of the electro-optic signal (AC) and the constant portion (DC) would result in accurate value) and "bad" signals (i.e., having AC and DC values which would result in inaccurate calculations of SpO$_2$). Accordingly, each data point (i.e., ratio W$_{1i}$, W$_{2i}$ or W$_{3i}$ detected at the corresponding i$^{th}$ detector) is either accepted, if it meets a certain criteria based for example on a certain ratio of AC to DC values (e.g., such that the intensity of AC signal is about 0.05–2.0% of the intensity of DC signal), or rejected. All of the accepted data points (data from accepted detection locations) are then used to calculate the ratios W$_1$/W$_2$, W$_1$/W$_3$ and W$_2$/W$_3$, and to calculate the SpO$_2$ value, in conjunction with the signal processing technique, as will be described further below with reference to FIGS. **10A–10C**.

Besides the use of the third IR-wavelength to compensate for changes in the internal calibration curve of the pulse oximeter, the pulse oximeter utilizing the sensor according to the invention provides a unique new method to compensate for errors due to sensor positioning and pressure variability. This method is based on multiple photodetector elements, instead of the conventional approach that relies on a single photodetector.

While optical sensors with multiple photodetectors for application in reflectance pulse oximetry have been described before, their main limitation relates to the way the information derived from these photodetectors is processed. Although the primary purpose of utilizing multiple photodetectors is to collect a larger portion of the backscattered light from the skin, practically, summing the individual intensities of each photodetector and using the resulting value to compute SaO$_2$ can introduce large errors into the calculations. These errors can be caused, for example, by situations where the sensor is placed over inhomogeneous tissue structures such as when the sensor is mounted on the chest. The case may be such that, when using a continuous photodetector ring to collect the backscattered light, a portion of the photodetector ring lies over a rib, which acts as a strongly reflecting structure that contributes to a strong DC component, and the remaining part of the photodetector is positioned over the intercostals space, where the DC signal is much smaller. In this case, the final calculation of SaO$_2$ would be inaccurate, if the current produced by this photodetector is used indiscriminately to compute the DC value before the final computation of SaO$_2$ is performed. Therefore, in addition to automatically correcting errors in the calibration curve as outlined above using three different LEDs (one R and two different IR wavelengths), the sensor **10** has the optional ability to track automatically and compare changes in the R/IR ratios obtained from each of the discrete photodiodes individually. For example, if some of either the near or the far photodetectors in the two concentrically arranged arrays detect larger than normal DC signals during the operation of one of the photodiodes compared to the other photodiodes in the sensor, it could be indicative of one of the following situations: the sensor is positioned

14

US 6,801,799 B2

13                                                          14

unevenly, the sensor is partially covering a bony structure, or uneven pressure is exerted by the sensor on the skin causing partial skin "blanching" and therefore the blood-to-bloodless tissue ratio might be too high to allow accurate determination of SaO₂. If such a situation is detected, the oximeter has the ability to selectively disregard the readings obtained from the corresponding photodetectors. Otherwise, if the DC and AC signals measured from each photodetector in the array are similar in magnitude, which is an indication that the sensor is positioned over a homogeneous area on the skin, the final computation of SaO₂ can be based on equal contributions from every photodetector in the array.

Turning now to FIGS. **10**A, **10**B and **10**C, there are illustrated three main steps of the signal processing technique utilized in the present invention Here, $TH_1$ and $TH_2$ are two different threshold values (determined experimentally) related respectively to $W_2/W_3$ and $(W_1/W_2 - W_1/W_3)$.

During step **1** (FIG. **10**A), measured data generated by the "near" and "far" photodetectors indicative of the detected (backscattered) light of wavelength $\lambda 2$ and $\lambda 3$ is analyzed to calculate the two ratios $W_2/W_3$ (far and near). If one of the calculated ratios (far or near) is not in the range of $1 \pm TH_1$ ($TH_1$ is for example 0.1), then this data point is rejected from the SpO₂ calculation, but if both of them are not in the mentioned range, a corresponding alarm is generated indicative of that the sensor position should be adjusted. Only if there are calculated ratios which are in the range of $1 \pm TH1$, they are accepted and the process (data analysis) proceeds by performing step **2**.

Step **2** (FIG. **10**B) consists of determining whether the quality of each photoplethysmogram is acceptable or not. The quality determination is based on the relative magnitude of each AC component compared to its corresponding DC component. If the quality is not acceptable (e.g., the signal shape detected by any detector varies within a time frame of the measurement session, which may for example be 3.5 sec), the data point is rejected and a corresponding alarm signal is generated. If the AC/DC ratio of $W_1$, $W_2$ and $W_3$ are within an acceptable range, the respective data point is accepted, and the process proceeds through performing step **3**.

In step **3** (FIG. **10**C), the measured data is analyzed to calculate ratios $W_1/W_2$ and $W_1/W_3$ from data generated by far and near photodetectors, and to calculate the differences $(W_1/W_2 - W_1/W_3)$.

In a perfect situation, $W_1/W_2$ (far) is very close to $W_1/W_3$ (far), and $W_1/W_2$ (near) is very close to $W_1/W_3$ (near). In a practical situation, this condition is not precisely satisfied, but all the ratios are close to each other if the measurement situation is "good".

Then, the calculated differences are analyzed to determine the values (corresponding to far and near photodetectors) that are accepted and to use them in the SpO₂ calculation. For each detector that satisfied the condition $ABS(W_1/W_2 - W_1/W_3) < TH_2$, where ABS signifies the absolute value, its respective data point is accepted and used to calculate the oxygen saturation value that will be displayed. If the condition is not satisfied, the data point is rejected. If all data points are rejected, another measurement session is carried out.

It should be noted that, although the steps **1–3** above are exemplified with respect to signal detection by both near and far photodetectors, each of these steps can be implemented by utilizing only one array of detection locations along the closed path. The provision of two such arrays, however, provides higher accuracy of measurements.

ELEMENT LIST
**10** optical sensor
**12** light source
**12***a* LED
**12***b* LED
**12***c* LED
**13** detector assembly
**14** light shield
**15** array of detectors
**16** far detector
**17** sensor housing
**18** near detector
**20** pulse oximeter
**21** control unit
**22** electronic block
**24** microprocessor
**26** display

What is claimed is:

1. A method for non-invasive determination of a blood parameter, the method comprising the steps of:

(i) illuminating a measurement location with at least three different wavelents, a first wavelength $\lambda 1$ lying in a red (R) spectrum, and at least second and third wavelengths $\lambda 2$ and $\lambda 3$ lying substantially in the infrared (IR) spectrum;

(ii) detecting light returned from the measurement location at different detection locations and generating data indicative of the detected light for the different detection locations, wherein said different detection locations are arranged so as to define at least one closed path around the measurement location; and

(iii) analyzing the generated data and determining the blood parameter.

2. The method according to claim **1**, wherein the analysis of the generated data comprises the steps of:

calculating data indicative of an AC/DC ratio in the light detected at each of the detection locations for the at least three wavelengths;

analyzing the calculated data and determining accepted detection locations to select corresponding AC/DC ratios for each of the at least three wavelengths, $\lambda 1$, $\lambda 2$ and $\lambda 3$; and

utilizing the selected ratios for determining the blood parameter.

3. The method according to claim **2**, wherein the determination of the blood parameter comprises the steps of:

calculating values of the ratio $W_2/W_3$ for the accepted detection locations in at least one closed path;

analyzing each of the calculated values to determine whether it satisfies a first predetermined condition, so as to generate a signal indicative of that a sensor position is to be adjusted, if the condition is not satisfied;

if the condition is satisfied, determining whether the quality of a photoplethysmogram is acceptable;

if the quality is acceptable, analyzing the selected ratios for calculating ratios $W_1/W_2$ and $W_1/W_3$ from the data detected in at least one closed path, and calculating the differences $ABS (W_1/W_2 - W_1/W_3)$; and,

analyzing the calculated differences for determining whether each of the differences satisfies a second predetermined condition for determining the blood parameter if the condition is satisfied.

4. The method according to claim **3**, wherein said first predetermined condition consists of that the calculated value

15

US 6,801,799 B2

15

of W2/W3 is inside a predetermined range around the value one, said predeteonined range being defined by the first threshold value, and the second predetermined condition consists of that the calculated difference ABS (W1/W2−W1/W3) is less than certain, second threshold value.

**5**. A method for non-invasive determination of a blood parameter, the method comprising the steps of:

illuminating a measurement location with at least three different wavelengths, a first wavelength $\lambda 1$ lying in a red (R) spectrum, and at least second and third wavelengths $\lambda 2$ and $\lambda 3$ lying substantially in the infrared (IR) spectrum;

16

detecting light returned from the measurement location at different detection locations and generating data indicative of the detected light for the different detection locations, wherein said different detection locations are arranged so as to define at least one closed path around the measurement location;

calculating data indicative of an AC/DC ratio in the light detected at each of the detection locations for the at least three wavelengths; and,

analyzing the calculated data and determining the blood parameter.

\* \* \* \* \*

Appx15593

0090-6689/88/167–173/$02.00/0
MEDICAL INSTRUMENTATION
Copyright © 1988 by the Association for the Advancement of Medical Instrumentation

Vol. 22, No. 4

# Design and Evaluation of a New Reflectance Pulse Oximeter Sensor

Y. MENDELSON, PhD, J. C. KENT, MS, B. L. YOCUM, BS, AND M. J. BIRLE, BS

The design and construction of a new optical reflectance sensor suitable for noninvasive monitoring of arterial hemoglobin oxygen saturation with a pulse oximeter is described. The reflectance sensor was interfaced to a Datascope ACCUSAT pulse oximeter that was specially adapted for this study to perform as a reflectance oximeter. We evaluated the reflectance sensor in a group of 10 healthy adult volunteers. $SpO_2$ obtained from the forehead with the reflectance pulse oximeter and $SpO_2$ obtained from a finger sensor that was connected to a standard ACCUSAT transmittance pulse oximeter were compared simultaneously to arterial blood samples analyzed by an IL 282 CO-Oximeter. The equation for the best fitted linear regression line between the reflectance $SpO_2$ and $HbO_2$ values obtained from the reference IL 282 CO-Oximeter in the range between 62 and 100% was: $SpO_2$ (%) = 4.78 + 0.96 (IL); n = 110. The regression analysis revealed a high degree of correlation (r = 0.98) and a relatively small standard error of the estimate (SEE = 1.82%). The mean and standard deviations for the difference between the reflectance $SpO_2$ and IL 282 measurements was 1.38 and 1.85%, respectively. This study demonstrates the ability to accurate $SpO_2$ from the forehead using a reflectance sensor and a pulse oximeter.

The recent development of transmittance pulse oximeters by combining optical plethysmography with the spectrophotometric determination of hemoglobin oxygen saturation in arterial blood ($SpO_2$) has provided a widely used technique for monitoring hypoxemia.

With transmittance pulse oximeters, sensor application is limited to several peripheral locations where light can be readily transmitted and detected, such as the finger tips, ear lobes, and toes on adults, and the foot or palms on infants. Alternatively, skin reflectance oximetry could enable $SpO_2$ measurement from more centrally located parts of the body such as the forearms, chest, and forehead, which cannot be monitored using conventional transillumination techniques.

It appears that reflectance pulse oximetry may be particularly suitable for direct assessment of fetal distress resulting from hypoxia during delivery, if used in addition to monitoring fetal heart rate by a scalp ECG electrode. Another suggested application of noninvasive reflectance pulse oximetry is for monitoring $SpO_2$ in the external carotid artery through a sensor applied to the skin near the superficial temporal artery.[1]

In this article we describe the design and construction

From the Worcester Polytechnic Institute, Biomedical Engineering Program, Worcester, MA 01609.

Address correspondence and requests for reprints to Yitzhak Mendelson, PhD, Biomedical Engineering Program, Worcester Polytechnic Institute, 100 Institute Rd., Worcester, MA 01609.

of an optical reflectance sensor suitable for noninvasive monitoring of $SpO_2$ with a pulse oximeter. The experimental evaluation of the new sensor and verification that $SpO_2$ obtained with the reflectance sensor compare favorably with: (a) $SpO_2$ measured simultaneously by a finger sensor connected to a standard transmittance pulse oximeter, and (b) $HbO_2$ measured by the IL 282 CO-Oximeter from samples of arterial blood in a group of 10 healthy adult volunteers is presented.

## PULSE OXIMETRY

The principle of pulse oximetry was proposed by Aoyagi et al[2] and further developed by Yoshiya et al.[3] This unique approach is based on the change in light absorption by tissue. The change is caused primarily by arterial blood pulsation. The pulsating arterioles in a vascular bed, by expanding and relaxing, modulate the amount of light absorbed by the tissue and thus produce a characteristic photoplethysmographic waveform. The changes in light absorption are used to measure $SpO_2$ noninvasively.

Initial attempts to develop a noninvasive oximeter that can measure oxygen saturation by analyzing the absolute light intensity that is diffusely reflected from the skin were only partially successful, mainly because of limited accuracy associated with variations in tissue attenuation and differences in skin pigmentation. Recently, we showed that accurate $SpO_2$ measurements can be made utilizing a reflectance sensor and the concept of pulse oximetry.[4, 5] We found that $SpO_2$ can be calculated from the ratio of the reflected red and infrared photoplethysmograms based on a normalization in which the pulsatile (ac) component of the red and infrared photoplethysmograms is divided by the respective nonpulsatile (dc) component. The conversion of the red/infrared ratios to $SpO_2$ is performed by an empirical calibration of the oximeter. This process is performed by comparing the red/infrared ratios measured by the pulse oximeter with blood $HbO_2$ values obtained from an in vitro oximeter.

The excursions of photoplethysmographic signals detected by reflectance and transmittance sensors when placed on the forehead and finger, respectively, are inversely related to changes in arterial blood pulsations. Although the amplitude of the pulsatile component of the two waveforms is different, the shapes of the pho-

1

APPLE 1017

**Appx15638**

# SKIN REFLECTANCE PULSE OXIMETRY: IN VIVO MEASUREMENTS FROM THE FOREARM AND CALF

*Y. Mendelson, PhD, and M. J. McGinn, MSc*

Mendelson Y, McGinn MJ. Skin reflectance pulse oximetry: in vivo measurements from the forearm and calf.

J Clin Monit 1991;7:7–12

**ABSTRACT.** This study describes the results from a series of human experiments demonstrating the ability to measure arterial hemoglobin oxygen saturation ($SaO_2$) from the forearm and calf using a reflectance pulse oximeter sensor. A special optical reflectance sensor that includes a heating element was interfaced to a temperature controller and a commercial Datascope ACCUSAT pulse oximeter that was adapted for this study to perform as a reflectance pulse oximeter. The reflectance pulse oximeter sensor was evaluated in a group of 10 healthy adult volunteers during steady-state hypoxia. Hypoxia was induced by gradually lowering the inspired fraction of oxygen in the breathing gas mixture from 100 to 12%. Simultaneous $SaO_2$ measurements obtained from the forearm and calf with two identical reflectance pulse oximeters were compared with $SaO_2$ values measured by a finger sensor that was interfaced to a standard Datascope ACCUSAT transmittance pulse oximeter. The equations for the best-fitted linear regression lines between the percent reflectance, $SpO_2(r)$, and transmittance, $SpO_2(t)$, values in the range between 73 and 100% were $SpO_2(r) = -7.06 + 1.09\ SpO_2(t)$ for the forearm ($n = 91$, $r = 0.95$) and $SpO_2(r) = 7.78 + 0.93\ SpO_2(t)$ for the calf ($n = 93$, $r = 0.88$). The regression analysis of the forearm data revealed a mean $\pm$ SD error of $2.47 \pm 1.66\%$ ($SaO_2 = 90$–$100\%$), $2.35 \pm 2.45\%$ ($SaO_2 = 80$–$89\%$), and $2.42 \pm 1.20\%$ ($SaO_2 = 70$–$79\%$). The corresponding regression analysis of the calf data revealed a mean $\pm$ SD error of $3.36 \pm 3.06\%$ ($SaO_2 = 90$–$100\%$), $3.45 \pm 4.12\%$ ($SaO_2 = 80$–$89\%$), and $2.97 \pm 2.75\%$ ($SaO_2 = 70$–$79\%$). This preliminary study demonstrated the feasibility of measuring $SaO_2$ from the forearm and calf in healthy subjects with a heated skin reflectance sensor and a pulse oximeter.

**KEY WORDS.** Blood gas analyses. Monitoring: oxygen. Measurement techniques: pulse oximetry; optical plethysmography; reflectance oximetry. Equipment: pulse oximeters.

Transmittance pulse oximetry has become a widely used technique for noninvasively monitoring changes in arterial hemoglobin oxygen saturation ($SaO_2$). The technique is based on the spectrophotometric analysis of the optical absorption properties of blood combined with the principle of photoplethysmography.

In transmittance pulse oximetry, which is based on tissue transillumination, sensor application in adults is limited to several specific locations on the body, such as the finger tips, ear lobes, and toes. In infants, additional monitoring sites such as the palms and the feet have been used.

Recently, a new reflectance pulse oximeter has been introduced into the market. The oximeter, which is manufactured by Ciba-Corning (Ciba Corning Diagnostics, Medfield, MA), uses a special optical reflectance sensor for specific application to the forehead. Among the advantages of this technique, as advertised by the

From the Department of Biomedical Engineering, Worcester Polytechnic Institute, 100 Institute Rd, Worcester, MA 01609.

Received Sep 18, 1989, and in revised form Jan 11, 1990. Accepted for publication Jan 17, 1990.

Address correspondence to Dr Mendelson.

APPLE 1018

**Appx15645**

8  *Journal of Clinical Monitoring Vol 7 No 1 January 1991*

company, are better reliability in critical care situations such as peripheral circulatory shutdown, less interference from ambient light, and better accuracy because measurement from the forehead is relatively unsusceptible to motion artifacts.

Currently, there are no commercially available reflectance pulse oximeters for monitoring $SaO_2$ from locations other than the forehead. Therefore, the objective of this work was to investigate the feasibility of monitoring $SaO_2$ with a skin reflectance pulse oximeter from two alternative and convenient locations on the body: the ventral side of the forearm and the dorsal side of the calf. Besides extending the clinical application of pulse oximetry, it appears also that reflectance pulse oximetry from peripheral tissues may have potential advantage in the assessment of local blood oxygenation after skin transplantation and regeneration following microvascular surgery.

In this article, we describe preliminary in vivo evaluation of a new optical reflectance sensor for noninvasive monitoring of $SaO_2$ with a modified commercial transmittance pulse oximeter. We present the experimental evaluation of this sensor in a group of 10 healthy adult volunteers and compare $SaO_2$ measured with the reflectance pulse oximeter sensor, $SpO_2(r)$, with $SaO_2$ measured noninvasively from the finger by a standard transmittance pulse oximeter sensor, $SpO_2(t)$.

## REFLECTANCE PULSE OXIMETRY

The principle of reflectance, or backscatter, pulse oximetry is generally similar to that of transmittance pulse oximetry. Both techniques are based on the change in light absorption of tissue caused by the pulsating arterial blood during the cardiac cycle. The pulsating arterioles in the vascular bed, by expanding and relaxing, modulate the amount of light absorbed by the tissue. This rhythmic change produces characteristic photoplethysmographic waveforms, two of which are used to measure $SaO_2$ noninvasively.

Recently, we showed that accurate noninvasive measurements of $SaO_2$ from the forehead can be made with an unheated reflectance pulse oximeter sensor [1]. The major practical limitation of reflectance pulse oximetry is the comparatively low-level photoplethysmograms recorded from low-density vascular areas of the skin. Therefore, the feasibility of reflectance pulse oximetry depends on the ability to design an optical reflectance sensor that can reliably detect sufficiently strong reflectance photoplethysmograms from various locations on the skin.

In order to partially overcome this limitation, we have developed an optical reflectance sensor that in-



*Fig 1. (A) Frontal and (B) side views of the heated skin reflectance pulse oximeter sensor. See text for explanation. R & IR LEDs = red and infrared light-emitting diodes.*

cludes an array of six identical photodetectors arranged symmetrically in a hexagonal configuration surrounding two pairs of red (peak emission wavelength, 660 nm) and infrared (peak emission wavelength, 930 nm) light-emitting diodes (LEDs) [1]. In another related study, we showed that by locally heating the skin under the sensor to a temperature above 40°C, it is possible to achieve a four- to fivefold increase in the magnitude of the pulsatile component detected from the forearm, and thus significantly improve the detection reliability of the reflectance photoplethysmograms [2]. The new optical reflectance sensor designed for this study combines the two features described above.

## SENSOR DESIGN

The temperature-controlled optical reflectance sensor used in this study is shown in Figure 1. The major feature of the optical layout design is the multiple photodiode array, which is arranged concentric with the LEDs. This arrangement maximizes the amount of backscattered light that is detected by the sensor. The technical details related to the design and geometric

**Appx15646**

configuration of the optical components were described recently by Mendelson et al [1].

The heater consists of a ring-shaped (dimensions: 30-mm outside diameter; 15-mm inside diameter) thermofoil resistive heating element (Ocean State Thermotics, Smithfield, RI). The thermofoil heater was mounted between the surface of the optically clear epoxy, which was used to seal the optical components of the reflectance sensor, and a thin (0.005 mm) matching brass ring, which facilitates better thermal conduction to the skin. A miniature (dimensions: 2 × 5 × 1 mm) solid-state temperature transducer (AD 590, Analog Devices, Wilmington, MA) was mounted on the outer surface of the brass ring with the thermally sensitive surface facing the skin. The entire sensor assembly was potted in room-temperature vulcanizing silicone rubber to minimize heat losses to the surrounding environment. The assembled sensor weighs approximately 65 g. The sensor measures approximately 38 mm in diameter and is 15 mm thick. The heater assembly was separately interfaced to a temperature controller that was used to vary the temperature of the skin between 35 and 45°C in 1 ± 0.1°C steps.

## SUBJECTS AND METHODS

### Data Acquisition

Each of the two heated optical reflectance sensors were separately interfaced to a temperature controller and a commercially available ACCUSAT (Datascope Corp, Paramus, NJ) pulse oximeter [3].

Two of the three ACCUSAT pulse oximeters were modified to function as reflectance pulse oximeters. The modification, which was described in a separate study [1], included the adjustment of the red and infrared LED intensities in the reflectance sensors so that the reflectance photoplethysmograms were approximately equal to transmittance photoplethysmograms measured by a standard transmittance sensor from an average size adult finger tip.

The third ACCUSAT transmittance pulse oximeter was used as a reference to measure $SpO_2(t)$ from the finger tip. The specified accuracy of this transmittance pulse oximeter is ±2.0% and ±4.0% for $SaO_2$ values ranging between 70 and 100% and 60 and 70%, respectively [3]. The three pulse oximeters were adapted to provide continuous digital readouts of the AC and DC components of the red and infrared photoplethysmograms.

Readings from each of the three pulse oximeters were acquired every 2 seconds through a standard RS-232C serial port interface using an AT&T 6300 personal computer. The conversions of the reflectance red/infrared (R/IR) ratios measured by the two reflectance pulse oximeters to $SpO_2(r)$ were performed by using the calibration algorithm obtained in a previous calibration study in which measurements were made with a similar nonheated sensor from the forehead [1].

### In Vivo Study

The ability to measure $SpO_2(r)$ from the forearm and calf was investigated in vivo during progressive steady-state hypoxia in humans.

Measurements were acquired from 10 healthy nonsmoking male adult volunteers of different ages and skin pigmentations. The study was performed in compliance with the University of Massachusetts Medical Center's review guidelines on human experimentation. Each volunteer was informed of the complete procedure as well as the possible risks associated with breathing hypoxic gas levels. Each volunteer received monetary compensation for participation in this study. The subject distribution included 1 East Indian, 3 Asians, and 2 darkly tanned and 4 lightly tanned Caucasians. Their ages ranged from 22 to 37 years old (mean ± SD, 27.5 ± 4.9 years). Measured blood hematocrits were in the range of 40 to 50.5% (mean ± SD, 45.7 ± 3.2%).

All instruments were allowed to warm up for at least 30 minutes before the study. The transmittance sensor of the pulse oximeter was attached to the index finger. The reflectance sensors were attached to the ventral side of the forearm and the dorsal side of the calf by using a double-sided transparent adhesive ring. In cases where an abundance of hair prevented intimate contact between the sensors and the skin, the contact was improved by loosely wrapping the sensor and the limb with an elastic strap. The temperature of each reflectance sensor was set to 40°C and remained unchanged throughout the entire study.

A standard lead-I electrocardiogram and end-tidal carbon dioxide levels were continuously monitored by a Hewlett-Packard 78345A patient monitor (Hewlett-Packard, Andover, MA). Each subject was placed in a supine position. A face mask was tightly fitted over the subject's nose and mouth, and the subject was instructed to breathe spontaneously while we administered different gas mixtures of nitrogen and oxygen. The inspired gas mixture was supplied by a modified Heidbrink anesthesia machine (Ohio Medical Products, Madison, WI). The breathing circuit of the anesthesia machine was equipped with a carbon dioxide scrubber (soda lime). The inspired oxygen concentration was adjusted between 12 and 100% and was monitored continuously

**Appx15647**



APPLE 1019

Appx15651

moment and therefore do not absorb infrared radiation (Primiano 1997). Thus differences in the amount of light absorbed by the blood at two different wavelengths can be used to indicate arterial oxygen saturation.



**Figure 7.1** Probe using transmittance principle. Light from two LEDs passes alternately through the tissue of the finger and is detected by the photodiode.

### 7.1.2 Sensor placement

In transmission probes, as the photodiode has to detect the light transmitted through the tissue, the detector is placed in line with the LEDs so that the maximum amount of the transmitted light is detected. The photodiode should be placed as close as possible to the skin without exerting force on the tissue. The amount of force applied by reusable probes is much larger than the amount of force applied by disposable probes. The force applied also depends on the materials used to manufacture a particular probe and also on the company which produces the probes, e.g., Nellcor clip type probes exert less pressure than Ohmeda clip type probes. If the force exerted by the probe is significant, the blood under the tissue, where the probe is placed, may clot due to external pressure applied. And if we increase the distance between the LEDs and the photodiode (optical path length increases), the amount of detected light decreases as seen from Beer's law (section 4.1).

Thus we should place the LEDs and photodiode facing each other. Normally transmission probes are placed on the patient's finger, toe, ear or nose. In a clip type probe, the distance between the LEDs and the photodiode can be as much as 12 mm (without requiring much pressure).

## 7.2 REFLECTANCE PROBES

To measure arterial oxygen saturation, when pulse oximeters with transmission probes cannot be used, pulse oximeters with reflectance probes are used to monitor $S_aO_2$ based on the intensity of reflected light. The idea of using light reflection instead of light transmission in clinical oximetry was first described by Brinkman and Zijlstra (1949). They showed that $S_aO_2$ can be monitored by measuring the amount of light reflected (back scattered) from the tissue. The idea of using skin reflectance spectrophotometry marked a significant advancement in the noninvasive monitoring of $S_aO_2$ from virtually any point on the skin surface.

88    *Design of pulse oximeters*

Even though it was a major advancement, difficulties in absolute calibration and limited accuracy were the major problems with early reflectance pulse oximeters.

### 7.2.1 Principle

The intensity of the back scattered light from the skin depends not only on the optical absorption spectrum of the blood but also on the structure and pigmentation of the skin.

$S_aO_2$ is measured by analyzing the pulsatile components of the detected red and infrared plethysmograms which make use of reflected light intensities. The light from the LEDs enters the tissue, is scattered by both the moving red blood cells and the nonmoving tissue, and a part of this back scattered light is detected by the photodiode. The output of the photodiode is processed by the pulse oximeter, and measures the $S_aO_2$ of the pulsatile blood.

### 7.2.2 Sensor placement

In reflectance pulse oximetry, the LEDs and the photodiode are placed on the same side of the skin surface as shown in figure 7.2. Normally the reflectance probe is placed on the forehead or temple, but is not restricted to only those two places. Reflectance probes can be used to measure arterial oxygen saturation at virtually any place on the human body where the probe can be placed.



**Figure 7.2** Reflectance probe. The light is transmitted into the tissue, travels through the tissue, and is detected at the photodiode.

*7.2.2.1 Optimum distance between LEDs and photodiode.* One of the major design considerations required in designing a reflectance pulse oximeter sensor is determining the optimum separation distance between the LEDs and the photodiode. This distance should be such that plethysmograms with both maximum and minimum pulsatile components can be detected. These pulsatile components depend not only on the amount of arterial blood in the illuminated tissue, but also on the systolic blood pulse in the peripheral vascular bed.

There are two techniques that can enhance the quality of the plethysmogram. One way is to use a large LED driving current, which determines the effective penetration depth of the incident light, which increases light intensity. So for a given LED/photodiode separation, using higher levels of incident light, we can illuminate a larger pulsatile vascular bed. As a result the reflected plethysmograms will contain a larger AC component. But, in practice, the LED driving current is limited by the manufacturer to a specified maximum power dissipation. The other way is to place the photodiode close to the LEDs. If we place the photodiode too close to the LEDs, the photodiode will be saturated as a result of the large DC component obtained by the multiple scattering of the

incident photons by the blood-free stratum corneum and epidermal layers in the skin.

For a constant LED intensity the light intensity detected by the photodiode decreases roughly exponentially as the radial distance between the LEDs and the photodiode is increased and the same applies to the AC and DC components of the reflected plethysmograms as shown in figure 7.3. Figure 7.4 shows the effect of LED/photodiode separation on the relative pulse amplitude of the red and infrared plethysmograms. This is expected as the probability of the number of photons reaching the photodiode is decreased with the increase in separation.



**Figure 7.3** Effect of LED/photodiode separation on the DC (□) and AC (○) components of the reflected infrared plethysmograms. Measurements were performed at a skin temperature of 43 °C (adapted from Mendelson and Ochs 1988).



**Figure 7.4** Effect of LED/photodiode separation on the relative pulse amplitude of the red (+) and infrared(·) plethysmograms. The driving currents of the red(o) and infrared(*) LEDs required to maintain a constant DC reflectance from the skin are shown for comparison (adapted from Mendelson and Ochs 1988).

90    *Design of pulse oximeters*

Thus the selection of a particular separation distance involves a trade-off. We can achieve larger plethysmograms by placing the photodiode farther apart from the LEDs but we need higher LED driving currents to overcome absorption due to increased optical path length.

### 7.2.3 Effect of multiple photodiode arrangement

In a reflectance oximeter, the incident light emitted from the LEDs diffuses through the skin and the back scattered light forms a circular pattern around the LEDs. Thus if we use multiple photodiodes placed symmetrically with respect to the emitter instead of a single photodiode, a large fraction of back scattered light can be detected and therefore larger plethysmograms can be obtained.

To demonstrate this, Mendelson and Ochs (1988) used three photodiodes mounted symmetrically with respect to the red and infrared LEDs; this enabled them to triple the total active area of the photodiode and thus collect a greater fraction of the back scattered light from the skin. The same result can be obtained using a photodiode with three times the area.

### 7.2.4 Effect of skin temperature

Mendelson and Ochs (1988) studied the effect of skin temperature on the quality of signals detected by the photodiode. In their experiment, the LED/photodiode separation was kept constant and after attaching the reflectance sensor to the forearm, they increased the skin temperature to 45 °C in 1 °C step increments.

Figure 7.5 and figure 7.6 show that by increasing the skin temperature from 34 °C to 45 °C, they were able to obtain a five-fold increase in the pulse amplitude.



**Figure 7.5** Effect of skin temperature on the mean pulse amplitude (+) and the corresponding decrease in the coefficient of variation (*) of the infrared plethysmograms. Each pulse amplitude was normalized to a constant separation of 4 mm (adapted from Mendelson and Ochs 1988).



**Figure 7.6** Simultaneous recording of the infrared and red plethysmograms from the forearm at different skin temperatures (from Mendelson and Ochs 1988).

### 7.2.5 Advantages and disadvantages of reflectance probes over transmittance probes

The basic advantage of transmittance probes over reflectance probes is the intensity of the light detected by the photodiode. As the amount of light passing through thin tissue is greater than the amount of light reflected and as the light passing through the tissue is concentrated in a particular area, the intensity of detected light is larger for transmittance probes. The major disadvantage of the transmittance probes is that the sensor application is limited to peripheral parts of the body such as the finger tips, toes, ear and nose in the adults or on the foot or palms in the infant. Reflectance probes can be placed on virtually any place on the body where we can expect light reflection due to tissue.

### 7.3 MRI PROBES

When a pulse oximeter with either transmission or reflection probes is used in the presence of magnetic resonance imaging (MRI), it may give erroneous readings. This is due to the very high magnetic field strengths involved in MRI which makes the use of conventional electronic monitoring equipment difficult. This is due to the radio frequency magnetic pulses generated in the magnetic field. Also if there is any metal connection to the skin of the patient, this could lead to burns.

In order to solve the problems involving MRI, the manufacturers have developed special pulse oximeters for use with MRI scanners. The MR-compatible sensor of Magnetic Resonance Equipment Corporation uses low attenuation optical filter bundles. The complete pulse oximeter unit is kept beyond the field of influence of the magnetic field from MRI and the light from the LEDs is transmitted through the optical fibers and the transmitted/reflected light is brought through the optical fibers to the photodiode. The LEDs, photodiode, and all the electronic equipment required are kept in a main unit

# IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Patent of:    Jeroen Poeze et al.
U.S. Patent No.:    10,588,553        Attorney Docket No.: 50095-0012IP1
Issue Date:        March 17, 2020
Appl. Serial No.:    16/534,949
Filing Date:        August 7, 2019
Title:            MULTI-STREAM DATA COLLECTION SYSTEM FOR
                NONINVASIVE MEASUREMENT OF BLOOD
                CONSTITUENTS

## SECOND DECLARATION OF DR. THOMAS W. KENNY

I hereby declare that all statements made of my own knowledge are true and

that all statements made on information and belief are believed to be true.  I further

declare that these statements were made with the knowledge that willful false

statements and the like so made are punishable by fine or imprisonment, or both,

under Section 1001 of the Title 18 of the United States Code.


Dated: <u>August 24, 2021</u>    By: _____

                        Thomas W. Kenny, Ph.D.

APPLE 1047
Apple v. Masimo
IPR2020-01536



APPLE-1009, FIGS. 4A, 4B.

30.    In my opinion, a POSITA would have understood that reflectance pulse oximetry sensors like Mendelson-799's can be placed "on virtually any place on the body where we can expect light reflection due to tissue," and would have further understood from Ohsaki that, by promoting "intimate contact with the surface of the user's skin," a light permeable convex cover would provide reduced slippage of Mendelson-799's sensor when placed on either side of, for example, a user's wrist or forearm, with associated improvements in signal quality.  APPLE-1019, 91; APPLE-1009, [0015], [0017], [0025], FIGS. 4A, 4B, Claims 4-8.

### C.    Adding a convex cover to Mendelson-799 as taught by Ohsaki enhances the sensor's light-gathering ability

31.    In defiance of fundamental principles of elementary optics, and relying on incorrect oversimplifications of the optical capabilities of convex elements, Masimo argues that a POSITA would not have combined Mendelson-799 and Ohsaki as proposed because the combined sensor "would direct light away from the detectors." *See, e.g.,* POR, 31.  As explained in more detail below, a POSITA would have understood that the opposite is true: that Ohsaki's cover would improve Mendelson-799's signal-to-noise ratio by causing more light backscattered from tissue to strike Mendelson-799's detectors than would have absent the cover.  APPLE-1019, 52, 86, 90; APPLE-1040,[1] 84, 87-92, 135-141; APPLE-1046, 803-805; APPLE-1012, FIG. 7.

### 1.    Patent Owner ignores the behavior of scattered light in relation to reflectance-type pulse sensors and oximeters.

32.    Masimo relies heavily on FIG. 14B from the '553 patent (reproduced below) to support its contention that a convex cover would direct light to a point in the center of the combined sensor:

_____



APPLE-1001, FIG. 14B (as annotated at POR, 33)

33.    Masimo and Dr. Madisetti treat this figure as an illustration of the behavior of all convex surfaces with respect to all types of light, and conclude that "a convex surface condenses light away from the periphery and towards the sensor's center" as shown in FIG. 14B.  POR, 32.

34.    But FIG. 14B depicts a very special case of the claimed convex cover – a specialty convex lens specifically designed to focus collimated light arriving along the axis of symmetry to a single point at the bottom surface.  The ability of this very specific convex lens to bring all incoming light to a focus is a unique outcome

which a POSITA would know is not a general characteristic of all convex surfaces, because of the dependence of the light propagation on the orientation of the incoming collimated light, the radius of curvature or general shape of the surface, the index of refraction of the material and the distance to the intended focal point – without careful selection and control of all these parameters the convex surface is incapable of producing the intended focus.  More importantly, figure 14B is not an accurate representation of light that has been reflected from a tissue measurement site.  The light rays (1420) shown in FIG. 14B are collimated (i.e., travelling paths parallel to one another), and each light ray's path is perpendicular to the detecting surface.

Even for the collimated light shown in FIG. 14B, the focusing of light at the center only occurs if the light beam happens to be perfectly aligned with the axis of symmetry of the lens.  *See* Ex. 2007, 298:11-299:1.  If the collimated light enters the lens at any other angle, as shown below, the light will focus at a different point:



APPLE-1040, 141 (annotated)

35.   In contrast with the characteristics of the incident light in the example shown

in Figure 14B, light scattered and reflected back to the sensors in a reflective

optical physiological monitor is NOT collimated.  A POSITA would understand

that the light exits the LED and cover in a diverging pattern, as needed to

effectively illuminate the tissue throughout the measurement site.  Light is

scattered and reflected from locations throughout the measurement site in a way

that produces light rays from all locations and with all angles.  Some of this light

returns to intersect the surface of the convex cover, all with a broad range of

incident directions in all three dimensions of the true system.

**Appx17828**

36.     The detector(s) of reflectance type pulse detectors and oximeters (like the devices disclosed by Mendelson-799 and Ohsaki) detect light that has been "partially reflected, transmitted, absorbed, and scattered by the skin and other tissues and the blood before it reaches the detector."  APPLE-1019, 86; *see also* 44 ("Pulse oximeters determine the oxygen saturation of arterial blood by measuring the light absorbance of living tissue at two different wavelengths and using the arterial pulsation to differentiate between absorbance of arterial blood and other absorbers"), 36 (describing FIG. 3.10: "On the left is a transmission pulse oximeter measuring the transmission of light by two LEDs through the finger of a patient. On the right is a reflectance pulse oximeter measuring the amount of light reflected back to the probe.  Both types use the same technology differing only in positioning of the probes and calibration").

37.     In my opinion, as a POSITA would have understood from Mendelson-799's FIG. 7, the light that backscatters from the measurement site after diffusing through tissue reaches the circular active detection area provided by Mendelson-799's detectors from various random directions and angles, as opposed to all light entering from the same direction and at the same angle as shown in FIG. 14B. APPLE-1019, 52, 86, 90 ("In a reflectance oximeter, the incident light emitted from the LEDs diffuses through the skin and the back scattered light forms a

circular pattern around the LEDs"), 52 ("Light scattering causes the deviation of a light beam from its initial direction").

38.    Moreover, Masimo ignores basic principles of optics in asserting that a convex cover would have focused or directed all of the light to the center of Mendelson-799's sensor. *See* POR, 31-36.

39.    Basic laws of refraction, expressed as Snell's law, dictate the behavior of light propagation through materials such as tissue and transparent materials such as glass, where the optical properties of the materials can be represented with an index of refraction.  APPLE-1040, 84 ("This is the very important law of refraction, the physical consequences of which have been studied…for over eighteen hundred years…[i]n English-speaking countries…[i]t is generally referred to as Snell's law); APPLE-1049, 101; Ex. 2012, 52, 86, 90.  Even Dr. Madisetti does not dispute the applicability of Snell's law.  *See* APPLE-1043, 80:20-82:20. For reference, Snell's law relates to the even more fundamental Fermat's principle, which states that a path taken by a light ray between two points is one that can be traveled in the least time.  *See* APPLE-1040, 87-92; APPLE-1049, 106-111. Further, Snell's law can be described on its own and applied without any referral to underlying references, and there is no lingering controversy about its validity or use.

40.    Indeed, according to Snell's law, which is stated in simple algebraic form and illustrated by the simple diagram below, light passing from one medium to another is refracted according to the angle of incidence and the values of the indices of refraction of each medium.    APPLE-1040, 84; APPLE-1049, 101; APPLE-1043, 80:20-82:20; APPLE-1047, ¶10.  A POSITA would have been familiar with Snell's law from, for example, high school science demonstrations of light passing through prisms, as well as from introductory required physics courses included with their bachelor's degree programs.  Dr. Madisetti admitted that he was familiar with Snell's law from his introductory physics courses.  APPLE-1043, 80:20-81:1.  Incidentally, while not critical to this discussion, I note that indices of refraction $n_1$ and $n_2$ must be positive for human tissue and the types of optical lenses we're dealing with in this case and that, in general $n_1 > n_2$.  *See* APPLE-1040, 84; APPLE-1049, 101; APPLE-1043, 80:20-82:20.



41.    By way of example, the illustration below shows three representative rays reflected from locations in the measurement site, as they arrive at the surface of the convex cover with three different directions and meeting the surface at three different locations.  In each case, Snell's law determines the direction of the ray within the transparent material, dependent only on the direction of the incident ray and its orientation relative to a line drawn perpendicular to the surface at the location of entry, and the indices of refraction of the surrounding medium and the transparent material.



42.    Everything shown in this figure would have been plainly understood by a POSITA, based on the understanding of Snell's law.  This basic and commonsensical understanding of the effect of the convex board on the propagation of representative light rays from a diffuse source stands in stark contrast to the position taken by Masimo.  Simple ray tracing based on Snell's law, as seen above, incontrovertibly debunks Masimo's simplistic and flawed belief that

"a convex surface condenses light away from the periphery and towards the sensor's center" as shown in FIG. 14B.  POR, 32.

43.    Indeed, the POSITA would have understood that Mendelson-799's sensor, which includes multiple photodiodes placed symmetrically with respect to a central light source, offers the advantage of enabling a large fraction of light randomly backscattered from tissue to be detected within the circular active detection area surrounding that source.  APPLE-1019, 86, 90 ("if we use multiple photodiodes placed symmetrically with respect to the emitter instead of a single photodiode, a large fraction of back scattered light can be detected "); APPLE-1042, 803-805; APPLE-1012, FIG. 7.

44.    Further, far from *focusing* light *to* the center as Patent Owner contends, a POSITA would have understood that Ohsaki's cover provides a refracting effect, such that some light rays that otherwise would have missed the detection area are instead directed toward that area as they pass through the interface provided by the cover.  APPLE-1019, 52 ("Light scattering causes the deviation of a light beam from its initial direction.  It occurs when light is refracted by an object of a size similar to the magnitude of the wavelength of the light and a change in the index of refraction at the interface of this object); APPLE-1007, [0015] (explaining that a "lens makes it possible to increase…light-gathering ability"); APPLE-1040, 87-92, 135-141; APPLE-1041, 60:7-61:6, 70:8-18 (Dr. Madisetti: "a lens...would

condense incoming light onto the detectors, thus increasing the signal to noise ratio as well as the signal strength per area of the detectors (since each detector area will receive more incoming light signals)").

45.    Moreover, a cover like Ohsaki's would have been understood to increase Mendelson-799's light-gathering ability by causing some light to refract towards the circular active detection area as it crosses the interface provided by the cover, rather than being reflected off of a flat interface between tissue and board. Additionally, the intimate contact between tissue and board provided by the convex shape reduces air gaps and therefore reduces the amount of light lost to reflection from air gaps.  Therefore, *more* of the partially reflected, transmitted, absorbed, and ultimately back scattered light strikes the detectors than otherwise would have absent the convex cover.  APPLE-1040, 84 ("This is the very important law of refraction, the physical consequences of which have been studied … for over eighteen hundred years … [i]n English-speaking countries … [i]t is generally referred to as Snell's law); APPLE-1019, 52, 86, 90.

46.    In fact, during his deposition, Dr. Madisetti contrasted the phrase "to the center" from "towards the center," and explained his view that a convex cover would redirect light "toward the center," which he further clarified to be "a general area."  APPLE-1041, 133:19-135:11.

47.    In this regard, Masimo's overly-simplistic statements ("a convex surface condenses light away from the periphery and towards the sensor's center" as shown in FIG. 14B  POR, 32) only apply to the very special case of collimated light incident on a convex lens along the axis of symmetry, and are irrelevant for the case of diffuse light returning to the convex surface from a broad detection region near the sensor.  A POSITA would have understood that these statements do not reflect the behavior of diffuse light incident on a convex surface, such as the light incident on the convex cover of the combined sensor of Mendelson-799 and Ohsaki.  Indeed, contrary to Masimo's position, a POSITA would have appreciated that the benefits associated with a light permeable convex cover when applied to Mendelson-799's system would have included improved light gathering ability. APPLE-1019, 52; APPLE-1007, [0015]; APPLE-1040, 87-92, 135-141; APPLE-1041, 60:7-61:6, 70:8-18.

### 2.    A POSITA would have implemented the sensor resulting from the combination of Mendelson-799 and Ohsaki to prevent air gaps between the skin and the detectors

48.    Masimo argues that "Petitioner's attempt to add Ohsaki's rectangular board to Mendelson '799's sensor also contradicts Mendelson '799's warning against 'the potential for specular reflection…when an *air gap* exists between the sensor and the skin."  POR, 36.  Masimo contends that "a POSITA would have understood that air gaps near the detectors on the peripheral edge of

Mendelson '799's more complicated oximeter sensor would create significant noise." *Id*., 38. But this argument ignores Ohsaki's teachings that "the convex surface of the translucent member ***is in intimate contact*** with the surface of the user's skin," and thereby improves adhesion of the sensor to the skin. APPLE-1009, [0025]. In fact, Masimo infers the presence of these alleged "air gaps" entirely based on two un-labeled portions of FIG. 1 from Ohsaki. *See* POR, 37.

49.     Dr. Madisetti and I have repeatedly indicated that a POSITA would not have interpreted figures from the references at issue as precise representations of the concepts described. *See*, *e.g.*, Ex. 2006, 73:19-21 (Dr. Kenny: "this figure in [the patent document reference] is not intended as a precision engineering drawing of a[n] optimized system"); APPLE-1041, 79:19-80:2 (Dr. Madisetti: "I believe that to a POSA, these figures are not detailed optical diagrams").

50.     Even assuming for the sake of argument alone that the introduction of air gaps could arise through the incorporation of a light permeable convex cover into Mendelson-799's sensor, in my opinion, it would have been well within a POSITA's capability to apply "inferences and creative steps" when adapting Ohsaki's teachings to obviate such air gaps. *KSR Intern. Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007). Moreover, the very teachings of Mendelson-799 cited by

the POR would have motivated the POSITA to adapt Ohsaki's teachings in that manner.  APPLE-1012, 2:58-61; Ex. 2008, 229-7-13.[2]

51.    Finally, even if some minor air gaps would have remained, it is well established that "[a] given course of action often has simultaneous advantages and disadvantages, and this does not necessarily obviate motivation to combine." *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1165 (Fed. Cir. 2006); *see alsoWinner Int'l Royalty Corp. v. Wang*, 202 F.3d 1340, 1349, n. 8 (Fed. Cir. 2000).

### D.    A POSITA would have found the advantages of using a convex cover to outweigh the slight possibility of scratching the cover

52.    Masimo claims that "a POSITA would not have been motivated to combine Ohsaki's convex board with Mendelson '799's sensor" because "a POSITA would have understood that a flat cover would provide better protection than a convex surface because, as a Petitioner's cited art teaches, it would be less prone to scratches."  POR, 39-40.  Even assuming this to be true, it is my understanding that one possible disadvantage that competes with the known advantages of applying Ohsaki's teachings to Mendelson-799's sensor would not have negated a

---

[2] And Mendelson-799's discussion of reducing variations in contact pressure would have provided further motivation.  APPLE-1012, 5:60-63.

UNITED STATES PATENT AND TRADEMARK OFFICE

—————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

—————————

APPLE INC.

Petitioner,

v.

MASIMO CORPORATION,

Patent Owner.

—————————

Case IPR2020-01536
U.S. Patent 10,588,553

—————————

**DECLARATION OF VIJAY K. MADISETTI, PH.D.**

**MASIMO 2004
Masimo v. Apple
IPR2020-01536**

the detectors of Mendelson '799, performing the same function as taught by Ohsaki." Ex. 1003 ¶134. Dr. Kenny also illustrates the combination as a circular housing and circular board. Ex. 1003 ¶133.

59. To the extent Dr. Kenny makes a new argument that contends that a POSITA would "simply place" Ohsaki's rectangular board onto Mendelson '799's circular sensor, I disagree. Dr. Kenny provides no illustration, explanation, or evidence for a combination that uses a long rectangular board, as in Ohsaki, in conjunction with a circular sensor, as in Mendelson '799. But even assuming that a POSITA could design a longitudinal structure that covers all of Mendelson '799's circularly arranged detectors and still avoids the user's physiology (e.g., the radius and ulna), placing Ohsaki's rectangular board onto Mendelson '799's circular sensor would result in asymmetrical pressure because the convex shape would press into the user's body more in some places and less in others. Such differences in pressure at different locations under the convex board would cause an uneven distortion of the ratio of blood to bloodless tissue volumes above different detectors, which Mendelson '799 explains can lead to large errors. Ex. 1012 2:47-57; *see also* 3:27-31 ("changes in the ratio of blood to bloodless tissue volumes…through mechanical pressure exerted by the sensor on the skin"), 3:45-52 ("uncontrollable physiological and physical parameters (e.g., different amounts of contact pressure applied by the sensor on the skin…) can often cause large errors in the oxygen

-38-

saturation readings of a pulse oximeter."). As shown in the figure below, the pressure exerted on the skin by a rectangular cover would be greater along the area where the rectangular convex protrusion presses into the skin (in yellow), and less in other areas where the surface does not press into the skin or does not press into the skin as deeply.



One alteration of Mendelson's Fig. 7 to superimpose a longitudinal structure such as Ohsaki's board onto the circular sensor which will result in many different optical and physiological problems such as air gaps, asymmetric environment, and pressure differences (color added to illustrate how a rectangular "longitudinal" convex protrusion might be positioned on the sensor)

60.     In fact, Ohsaki illustrates that its convex board creates a differential pressure environment, as shown in both Figures 1 and 2. Ex. 1009 Figs. 1, 2. As shown in Ohsaki, Figures 1 and 2 both show the center of the board exerts the greatest pressure, and pushes into the skin causing distention. This results in air gaps on either side of the board, and a difference in pressure between the region of

-39-

the sensor that distends the skin relatively more (in the middle) versus at the edges, which a POSITA would have been worried would result in the displacement of blood, as warned by Mendelson '799. Ex. 1012 2:47-57. Ohsaki's board does not even contact the skin at its edges, and thus exerts relatively less pressure at those locations.



Magnified partial view of Ohsaki Figs. 1 (left) and 2 (right) with red circles annotating air gaps formed by Ohsaki's convex board

61.    Mendelson '799 also warns that "mechanical pressure exerted by the sensor on the skin" causes large and uncontrollable changes. Ex. 1012 3:15-31. Mendelson '799 explains that creating an asymmetric arrangement, such as would be expected from introducing a rectangular board onto a circular sensor, would result in "uncontrollable physiological and physical parameters" and "large errors in the oxygen saturation readings." Ex. 1012 3:44-52. Such a cover may also create air gaps over some sensors (on the edge of the convex surface), but not others (directly under the peak of the convex surface). But this creates a substantial problem for Mendelson '799's sensor, which uses it symmetrical circular

arrangement of detectors to try and address the problem of different contact pressure between different users or uses of the device. *See, e.g.*, Ex. 1012 5:60-65. Petitioner's proposed modification makes the problem much worse by creating differences in contact pressure for the different detectors on Mendelson '799's monitor, thereby eliminating the symmetry Mendelson '799 relies on to help identify and filter out aberrant measurements. *See, e.g.*, Ex. 1012 12:35-13:11.

62.    Adding additional errors, Ohsaki's rectangular board would also create a substantially different optical environment for Mendelson '799's various detectors based on the redirection of light away from some detectors and towards others.   Indeed, Mendelson '799 explains that for an oxygen saturation sensor, radial symmetry is important: "a radially-symmetric photodetector array can help to maximize the detection of backscattered light from the skin."   Ex. 1012 4:59-65. Mendelson '799's radial array of detectors captures reflected light from all around the centrally located emitter.   A POSITA would appreciate that adding Ohsaki's rectangular board to the oxygen saturation sensor of Mendelson '799 eliminates Mendelson '799's radially symmetric environment and adversely impacts the approach in Mendelson '799 that uses multiple detectors arrayed in a ring pattern. Ex. 1012 7:25-37.   For example, as discussed further below, a POSITA would have believed that a convex surface directs light to a more central location relative to a flat surface.   *See* Section VII.D (below).   Thus, some detectors would receive

relatively more concentrated light than other detectors, which disrupts the symmetry of the measurements. Applying Ohsaki's rectangular board to Mendelson '799's circular structure would create a variable physiological and optical environment with different detectors at different distances from the skin—which is the situation Mendelson '799 tries to avoid. *See* Ex. 1012 12:1-16, 12:62-13:7. This undermines Mendelson '799's symmetrically arrayed detector strategy. As shown above, a longitudinal shape might cover some detectors completely and leave other detectors mostly uncovered.

### C. **A POSITA Would Have Understood That Ohsaki's Required Measurement Location Would Result In Weak Signals For Mendelson '799's Oxygen Saturation Measurements**

63.     In addition to the mechanical, optical, and physiological problems discussed above, a POSITA would also have believed that Dr. Kenny's combination would decrease signal strength, which is the opposite of Dr. Kenny's stated motivation of "improved signal strength." Ex. 1003 ¶¶90, 97; *see also* ¶¶128-29, 132 (motivated to "improve detection efficiency"). As discussed above, to get any benefit from the convex board, Ohsaki's sensor must be used on the backhand side of the wrist. Ex. 1009 ¶¶[0023]-[0024], Fig. 3, [0008], [0016], Title, Abstract (wristwatch sensor worn on backside of wrist), ¶[0030] (wristwatch sensor worn on back of forearm); *see also* Sections VII.A.1, VII.A.2, VII.B.1 (above). Ohsaki's measurement location, however, would have dissuaded a POSITA from modifying

-42-

Mendelson '799's oximeter based on Ohsaki. As discussed below, at the time, a POSITA would have believed that the backhand side of the wrist's poor optical signal strength made it an unsuitable location for Mendelson '799's circular pulse oximeter. Thus, a POSITA seeking to improve Mendelson '799's pulse oximeter would not have been motivated to use a rectangular board that must be positioned on the backhand side of the wrist.

64.    The inventor of Mendelson '799 previously tried to obtain usable signals for oxygen saturation measurements from the back of the wrist. *See, e.g.*, Ex. 2003 at 3-4. Mendelson reported that he "had to apply a considerable amount of external pressure on the sensor" to even discern any signal whatsoever, which does not even establish that Mendelson's sensor could calculate an accurate oxygen saturation value. Ex. 2003 at 3-4. Both Ohsaki and Mendelson '799 warn against using too much pressure when taking measurements. *See* Ex. 1012 2:47-53 ("Similarly, variations in contact pressure between the sensor and the skin can cause larger errors…since some of the blood near the superficial layers of the skin may be normally displaced away from the sensor housing towards deeper subcutaneous structures."), 3:27-31 ("It is also well known for example that changes in the ratio of blood to bloodless tissue volumes may occur…through mechanical pressure exerted by the sensor on the skin."); Ex. 1009 ¶[0018] ("the user feels uncomfortable if the pressure applied to the user's wrist…is too high"). Thus, for a

circular oximeter like that disclosed in Mendelson '799, a POSITA would have believed the back of the wrist was an unsuitable measurement location due to weak signals.

65.    Years after Mendelson's initial work and filing of the patent application that issued as Mendelson '799, Mendelson was the advisor for research that reported that "there is little supporting evidence that [reflectance-based pulse oximetry] can accurately collect measurements from the chest and wrist."  Ex. 2015 at 3 (Abstract); *see also id.* at 4 (thanking Mendelson for advising on project); Ex. 2014 (Worcester Polytechnic Institute webpage showing submission date of "2013-04-24" and Mendelson as the advisor).  Mendelson's group ultimately obtained usable signals from a sensor located on the palm-side of the wrist, "over the radial artery."  Ex. 2015 at 99.

66.    Other research groups in the field also reported that oxygen saturation sensors (which monitor oxygen saturation using both red and infrared signals) would work only if measurements were taken from the palm side of the wrist, close to the oxygen-rich arterial blood.  *See* Ex. 2017 at 2 ("Measuring PPG on the wrist is difficult."; "PPG signal[s are] greatly distorted depending on applied pressure….[I]t was verified that proper location of the sensors and pressure on the skin surface are important element[s for] stable PPG measurement."  The "sensor attachment on the wrist is affected by radius bone structure and radial artery

location"); Ex. 2018 at 4 ("reflected red and infrared pulses can only be used for specific areas, such as a radial artery; thus, most areas of the wrist are not available for monitoring").  As shown in the figure below, and consistent with the discussed art, the radial and ulnar arteries are located near the surface (superficial layer) on the palm side of wrist.  Ex. 2010 at 44 (Plate 429) (showing radial and ulnar arteries in superficial layer of the anterior (palm-side) of wrist); *see also* 71 (Plate 456) (showing arteries on palm-side of upper limb).



Superficial layer of palm side (anterior) forearm and wrist, showing that the radial
and ulnar arteries are close to the surface
(partial view) Ex. 2010 at 44 (Plate 429), annotated

67.    In contrast, as shown in the figure below, the radial and ulnar arteries are not near the surface of the wrist and forearm's back side.



Superficial layer of back side (posterior) of forearm and wrist
(partial view) Ex. 2010 at 42 (Plate 427)

68.    In fact, even as late as 2016, researchers in the field recognized that "monitoring SpO2 at the wrist using the reflective mode presents challenges with regard to clinical use," and reported a general consensus that "the reflected red and infrared pulses can only be used for specific areas, such as a radial artery; thus, most areas of the wrist are not available for monitoring." Ex. 2018 at 4.

69.    Dr. Kenny relies on "several references that are mentioned within Mendelson '799" that he states "describe pulse oximetry devices in which at least part of the device is configured to be strapped to the arm of a user."  Ex. 1003 ¶92 (citing Ex. 1012); *see also* ¶96.  But these references are not discussed in any detail in Mendelson '799 and provide no motivation to measure oxygen saturation from the backside of the wrist where Ohsaki's board addresses slipping.  Dr. Kenny also cites Mendelson-1991 (Exhibit 1018; *see* Ex. 1003 ¶¶92-93, 96), which investigated whether measurements could be taken from "the ventral side of the forearm."  Ex. 1018 at 2.  But the forearm's ventral side (*i.e.,* the forearm's palm-side) is the opposite side of the arm from where Ohsaki requires use of its rectangular board.  Ex. 1009 ¶[0024].  As Ohsaki explains, its board is ineffective on the palm side of the user's wrist.  Ex. 1009 ¶[0023]; *see also* Fig. 3.  In contrast to other sensor locations, such as the forehead or finger, the wrist provides a weaker optical signal, and also has a much more complicated structure with a wide range of different bones, tendons, and musculature.

## D.    A POSITA Would Not Have Been Motivated To Reduce Optical Signal By Adding A Convex Lens To Mendelson '799's Sensor

70.    A POSITA would further not have been motivated to make Dr. Kenny's proposed combination because it places a convex cover over a circular array of peripheral detectors surrounding centrally located LEDs.  As discussed below, a POSITA would have understood that such a combination would direct

-47-

light away from the detectors and thus decrease light collection and optical signal strength—not increase it as Dr. Kenny asserts.

### 1.   A POSITA Would Have Understood That A Convex Cover Directs Light To The Center Of The Sensor And Away From The Periphery

71.    Petitioner and Dr. Kenny both previously admitted that a convex cover condenses light towards the center of the sensor and away from the periphery in a different petition filed against a related patent.  In the Petition in IPR2020-01520 (Ex. 2019), Petitioner explained that a convex cover redirects incoming light towards the center, by relying upon the figure shown below:



Petitioner's illustration from a related IPR showing that light hitting a convex surface is directed more centrally than light hitting a flat surface
(Ex. 2019 at 45)

72.    Further, in his declaration in IPR2020-01520 (Ex. 2020), Dr. Kenny confirmed that when using a convex surface as a lens, "the incoming light is 'condensed' toward the center."  *See, e.g.*, Ex. 2020 at 69-70 (¶119).  Dr. Kenny

likewise provides the same illustration showing that a convex surface redirects incoming light towards a more central location, as compared to a flat surface. *See, e.g.*, Ex. 2020 at 69-70 (¶118-120).

73.     The '553 Patent also illustrates a POSITA's understanding that a convex surface condenses light away from the periphery and towards the sensor's center.  Figure 14B (below) "illustrates how light from emitters (not shown) can be focused by the protrusion 605 onto detectors."  Ex. 1001 36:3-6.  "When the light rays 1420 enter the protrusion 605, the protrusion 605 acts as a lens to refract the rays into rays 1422."  Ex. 1001 36:13-15.  As shown by the '553 Patent, the convex shape directs light from the periphery toward the center.  Ex. 1001 Fig. 14B.



Illustration from the '553 Patent at issue, showing that light hitting a convex surface is directed towards the center
'553 Patent (Ex. 1001) Fig. 14B (highlighting added to show direction of light)

74.    Dr. Kenny asserts that this combination would have resulted in "predictable results" including "improved signal strength." Ex. 1003 ¶¶90, 97. But, as illustrated below, Dr. Kenny's illustration shows that the combination has a center-located light source (purple) and peripherally located detectors (light blue and dark blue) under the convex cover (red):



Dr. Kenny's Illustration (¶133, partial view)

75.    A POSITA would have believed that Ohsaki's convex surface—like the surfaces discussed by Dr. Kenny and Petitioner in the related IPR—would likewise condense light passing through it to a center location, compared to a flat surface. Because of this redirection of light to a more central location relative to a flat surface, a POSITA would have believed that adding Ohsaki's convex surface to Mendelson '799's sensor would direct relatively more light away from the peripheral detectors and thus decrease the optical signal strength, as compared to a flat surface. Dr. Kenny does not address the change in optical signal resulting from the addition of a convex surface to Mendelson '799's circular ring of peripherally arrayed detectors.

sensor would create significant noise due to the difference in structure and the more complicated combination of multiple detectors with multiple emitters. Ex. 1012 Fig. 7, 2:58-64. In particular, peripheral air gaps would be positioned near or over Mendelson '799's peripheral detectors leading to inconsistent measurements. A POSITA would not have been motivated to add Ohsaki's convex surface to Mendelson '799's circular sensor because the peripheral detectors would be next to the air gaps.

### 3. A POSITA Would Not Have Selected A Convex Cover To Protect The Optical Elements

80. Dr. Kenny also asserts that a POSITA would have been motivated to combine Ohsaki and Mendelson '799 because a convex cover would have protected the optical components. But a convex cover is just one of many different alternatives for protecting the components of a sensor. For example, the optical elements could be protected by a layer of sealing resin. Indeed, other Mendelson references upon which Dr. Kenny relies use the encapsulation approach to protect the optical components, resulting in a flat surface of epoxy and no protrusion. Pet. ¶120 (illustrating Ex. 1017 Fig. 2), ¶121 (illustrating Ex. 1018 Fig. 1); Ex. 1017 Fig. 2 (flat layer of optically clear epoxy); Ex. 1018 Fig. 1 (flat layer of optically clear epoxy). Both of these references illustrate a device with a flat surface of encapsulating epoxy, and an optical shield between the emitters and detectors that goes to the top of the epoxy. *See* Ex. 1017 at 2-3, Fig. 2; Ex. 1018 Fig. 1.

-53-

81.   A POSITA would have understood that a flat cover would provide better protection than a convex surface because it would be less prone to scratches. Ex. 1008 ¶[0106].  In fact, one of Dr. Kenny's cited references, Aizawa, teaches that a flat acrylic plate improves adhesion and detection efficiency for measurements taken from the palm-side of the wrist, next to the artery.  *See* Ex. 1006 ¶[0013] ("[A] transparent plate-like member…makes it possible to improve adhesion between the sensor and the wrist and thereby further improve the detection efficiency of pulse waves."); *see also* ¶¶[0026], [0030], [0034]; Ex. 1003 ¶129 (citing Ex. 1006 as evidence of a cover).  As discussed above, a POSITA would have viewed the palm side of the wrist (as well as other locations such as the forehead (Ex. 1017; *see also* Ex. 1018 at 1-2)) as a better location for optical measurements than the back side of the wrist.  *See* Section VII.C (above). Moreover, unlike Aizawa's flat plate that improves adhesion to the palm side of the wrist, Ohsaki's convex board tends to slip off from the palm side of the wrist.  Ex. 1009 ¶[0023].  There would have been no reason for a POSITA to select a convex surface from the many other options, which provide similar or better protection without the complications and concerns arising from the convex shape.  Indeed, a POSITA would have believed a flat surface would have had advantages compared to Ohsaki's board including better adhesion on the palm side of the wrist, and less prone to scratches.

Case No. IPR2020-01537
Attorney Docket: 50095-0012IP2

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

APPLE INC.

Petitioner,

v.

MASIMO CORPORATION,

Masimo.

_____

Case IPR2020-01537
U.S. Patent 10,588,553

_____

**PETITIONER'S REPLY TO MASIMO RESPONSE**

1

Case No. IPR2020-01537
Attorney Docket: 50095-0012IP2

modifying Aizawa's cover to feature a convex detecting surface.[2]  APPLE-1047,

¶13; *KSR Intern. Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007); *see also* APPLE-

1008, ¶¶14-15, FIG. 1; APPLE-1024, [0012], [0024], [0033], [0035], FIG. 6.  The

following annotated FIG. 1(b) from Aizawa shows the results of the proposed

combination:



APPLE-1006, FIG. 1(b)(annotated).

---

[2] Notably, Ohsaki nowhere depicts or describes its cover as rectangular.  APPLE-

1047, ¶14; APPLE-1009, [0001]-[0030]; FIGS. 1, 2, 3A, 3B, 4A, 4B.  Even if

Ohsaki's cover were understood to be rectangular, "[t]he test for obviousness is not

whether the features of a secondary reference may be bodily incorporated into the

structure of the primary reference…." *Allied Erecting v. Genesis Attachments*, 825

F.3d 1373, 1381 (Fed. Cir. 2016).

Trials@uspto.gov                                          Paper # 41
571-272-7822                                          Entered: 1/06/2022

UNITED STATES PATENT AND TRADEMARK OFFICE

————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————

APPLE INC.,
Petitioner,

v.

MASIMO CORPORATION,
Patent Owner.

————————

IPR2020-01520 (Patent 10,258,265 B1)
IPR2020-01536 (Patent 10,588,553 B2)
IPR2020-01537 (Patent 10,588,553 B2)
IPR2020-01538 (Patent 10,588,554 B2)
IPR2020-01539 (Patent 10,588,554 B2)

————————

Record of Oral Hearing
Held: December 7, 2021

————————

Before GEORGE R. HOSKINS, ROBERT L. KINDER, and
AMANDA F. WIEKER, *Administrative Patent Judges.*

IPR2020-01520 (Patent 10,258,265 B1)
IPR2020-01536 (Patent 10,588,553 B2)
IPR2020-01537 (Patent 10,588,553 B2)
IPR2020-01538 (Patent 10,588,554 B2)
IPR2020-01539 (Patent 10,588,554 B2)

1    the scratching, what Inokawa teaches you is that scratching is a negative for

2    a convex surface, right?  But if you put a flat surface on it it better protects

3    from the scratching and scratching --

4        JUDGE WIEKER:  I understand your --

5        MR. JENSEN:  -- (indiscernible.)

6        JUDGE WIEKER:  -- I understand your point there but let me ask my

7    question slightly differently.  Do you dispute that a convex cover would

8    protect the internal sensor components?

9        MR. JENSEN:  Okay.  In terms of just would it provide any

10   protection to it in a thing.  I think that there is -- what I would say is there is

11   no protective benefit from it being curved versus it being flat; right?

12       JUDGE WIEKER:  I understand that.

13       MR. JENSEN:  The curved ones, and what Inokawa teaches is that

14   curved is worse in protecting than it is, sorry, yes the curved is worse and it

15   doesn't identify by the way any trade-offs for going to that flat surface.  It

16   doesn't say hey, you're going to lose any benefit of that -- in fact it puts the

17   lens under the flat surface in its instance and it puts that lens over the LED

18   and remember the Examiners talked about understanding individual lens

19   being over photodetectors; right?  And Inokawa teaches that it protects -- so

20   a cover, I mean a plate, an encapsulation, there's all sorts of things that have

21   been shown in the references we've looked at which make it so the LEDs

22   themselves aren't exposed and the photodetectors aren't simply exposed.

23   However, what Inokawa teaches us is if that's your goal, which Petitioners

64

IPR2020-01520 (Patent 10,258,265 B1)
IPR2020-01536 (Patent 10,588,553 B2)
IPR2020-01537 (Patent 10,588,553 B2)
IPR2020-01538 (Patent 10,588,554 B2)
IPR2020-01539 (Patent 10,588,554 B2)

1   have said is one of the motivations, doing that with a curved surface is the

2   bad solution; right?  It's the worst solution.  Make it flat and you will protect

3   it better.  So my position the curved one is less, it provides less protection

4   because it is more likely to scratch.  Does that I think answer your question?

5       JUDGE WIEKER:  I understand your position.  Thanks.

6       MR. JENSEN:  Okay.  All right.  By the way, so I couldn't find any

7   discussion that it provides an improvement, that this lens provides an

8   improvement to measurement, the physiological measurement.  There is

9   precious little about physiological measurement.  There is a lot of discussion

10  about a communication system and using these lenses to talk between the

11  base station and the sensor.  But if you move the plate, and it doesn't talk

12  about any trade-off, when you go to a flat surface it doesn't suggest hey, so

13  there's not this broad teaching that Petitioner would have us believe.

14  There's a broad teaching that you're going to get a benefit from a curved

15  surface.  That's not Inokawa and they didn't point to any evidence that it's

16  there.

17      Inokawa teaches also that this advantage of a wireless system, they

18  want to combine that with other references that want it to be wireless.

19  Mendelson, you know, one of them wants it to be in the field with helmets.

20  One of them, Aizawa, wants it to be wireless during exercise.  Inokawa

21  teaches there's a disadvantage to having a wireless communication system.

22  I think it's important to put those into context.

23      So only briefly before I sit down and reserve the rest of my time, I just

Filed: April 12, 2022

Filed on behalf of:
  Patent Owner Masimo Corporation
By:   Joseph R. Re (Reg. No. 31,291)
      Stephen C. Jensen (Reg. No. 35,556)
      Jarom D. Kesler (Reg. No. 57,046)
      Stephen W. Larson (Reg. No. 69,133)
      Jacob L. Peterson (Reg. No. 65,096)
      William R. Zimmerman (admitted *pro hac vice*)
      Jeremiah S. Helm, Ph.D. (admitted *pro hac vice*)
      KNOBBE, MARTENS, OLSON & BEAR, LLP
      2040 Main Street, Fourteenth Floor
      Irvine, CA 92614
      Tel.:   (949) 760-0404
      Fax:   (949) 760-9502
      E-mail:  AppleIPR2020-1537-553@knobbe.com

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

APPLE INC.

Petitioner,

v.

MASIMO CORPORATION,

Patent Owner.

---

Case IPR2020-01537
U.S. Patent 10,588,553

---

# PATENT OWNER'S NOTICE OF APPEAL TO THE U.S. COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Pursuant to 28 U.S.C. § 1295(a)(4)(A), 35 U.S.C. §§ 141(c), 142, and 319, 37 C.F.R. §§ 90.2(a) and 90.3, and Rule 4(a) of the Federal Rules of Appellate Procedure, Patent Owner Masimo Corporation ("Masimo") hereby appeals to the United States Court of Appeals for the Federal Circuit from the Judgement – Final Written Decision (Paper No. 43) entered on February 23, 2022 (Attachment A) and from all underlying orders, decisions, rulings, and opinions that are adverse to Masimo related thereto and included therein, including those within the Decision Granting Institution of *Inter Partes* Review, entered March 2, 2021 (Paper 9). Masimo appeals the Patent Trial and Appeal Board's determination that claims 1–29 of U.S. Patent 10,588,553 are unpatentable, and all other findings and determinations, including but not limited to claim construction, as well as all other issues decided adverse to Masimo's position or as to which Masimo is dissatisfied in IPR2020-01537 involving U.S. Patent 10,588,553.

Masimo is concurrently providing true and correct copies of this Notice of Appeal, along with the required fees, with the Director of the United States Patent and Trademark Office and the Clerk of the United States Court of Appeals for the Federal Circuit.

Respectfully submitted,

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated:  April 12, 2022        /Jarom Kesler/
                              Jarom D. Kesler (Reg. No. 57,046)
                              Customer No. 64,735

                              Attorney for Patent Owner
                              Masimo Corporation

-2-

# ATTACHMENT A

Trials@uspto.gov                                    Paper 43
571-272-7822                              Date: February 23, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

APPLE INC.,

Petitioner,

v.

MASIMO CORPORATION,

Patent Owner.

_____

IPR2020-01537

Patent 10,588,553 B2

_____

Before GEORGE R. HOSKINS, ROBERT L. KINDER, and
AMANDA F. WIEKER, *Administrative Patent Judges.*

KINDER, *Administrative Patent Judge.*

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

IPR2020-01537
Patent 10,588,553 B2

# I.    INTRODUCTION

## A.  Background

Apple Inc. ("Petitioner") filed a Petition requesting an *inter partes* review of claims 1–29 ("challenged claims") of U.S. Patent No. 10,588,553 B2 (Ex. 1001, "the '553 patent").  Paper 3 ("Pet.").  Masimo Corporation ("Patent Owner") waived filing a Preliminary Response.  Paper 8.  We instituted an *inter partes* review of all challenged claims 1–29 on all asserted grounds of unpatentability, pursuant to 35 U.S.C. § 314.  Paper 9 ("Inst. Dec.").

After institution, Patent Owner filed a Response (Paper 24, "PO Resp.") to the Petition, Petitioner filed a Reply (Paper 27, "Pet. Reply"), and Patent Owner filed a Sur-reply (Paper 31, "Sur-reply").[1]  An oral hearing was held on December 7, 2021, and a transcript of the hearing is included in the record.  Paper 41 ("Tr.").

We issue this Final Written Decision pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73.  For the reasons set forth below, Petitioner has met its burden of showing, by a preponderance of the evidence, that challenged claims 1–29 of the '553 patent are unpatentable.

## B.  Related Proceedings

*Masimo Corporation v. Apple Inc.*, Civil Action No. 8:20-cv-00048 (C.D. Cal.) (filed Jan. 9, 2020);

*Apple Inc. v. Masimo Corporation*, IPR2020-01536 (PTAB Aug. 31, 2020) (challenging claims 1–29 of the '553 patent);

---

[1] After the Sur-reply was filed, we authorized Petitioner to file an Identification of Testimony.  Paper 37.

IPR2020-01537
Patent 10,588,553 B2

*Apple Inc. v. Masimo Corporation*, IPR2020-01520 (PTAB Aug. 31, 2020) (challenging claims of U.S. Patent No. 10,258,265 B1);

*Apple Inc. v. Masimo Corporation*, IPR2020-01521 (PTAB Sept. 2, 2020) (challenging claims of U.S. Patent No. 10,292,628 B1);

*Apple Inc. v. Masimo Corporation*, IPR2020-01523 (PTAB Sept. 9, 2020) (challenging claims of U.S. Patent No. 8,457,703 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01524 (PTAB Aug. 31, 2020) (challenging claims of U.S. Patent No. 10,433,776 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01526 (PTAB Aug. 31, 2020) (challenging claims of U.S. Patent No. 6,771,994 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01538 (PTAB Sept. 2, 2020) (challenging claims of U.S. Patent No. 10,588,554 B2); and

*Apple Inc. v. Masimo Corporation*, IPR2020-01539 (PTAB Sept. 2, 2020) (challenging claims of U.S. Patent No. 10,588,554 B2).

Pet. 3; Paper 5, 3.

Patent Owner further identifies certain pending patent applications, as well as other issued and abandoned applications, that claim priority to, or share a priority claim with, the '553 patent. Paper 5, 1–2.

### C. The '553 Patent

The '553 patent is titled "Multi-Stream Data Collection System for Noninvasive Measurement of Blood Constituents," and issued on March 17, 2020, from U.S. Patent Application No. 16/534,949, filed August 7, 2019. Ex. 1001, codes (21), (22), (45), (54). The '553 patent claims priority through a series of continuation and continuation-in-part applications to Provisional Application Nos. 61/078,228 and 61/078,207, both filed July 3, 2008. *Id.* at codes (60), (63).

IPR2020-01537
Patent 10,588,553 B2

The '553 patent relates to noninvasive methods and devices for measuring various blood constituents or analytes. *Id*. at code (57). The '553 patent discloses a two-part data collection system including a noninvasive sensor that communicates with a patient monitor. *Id.* at 2:38–40. The sensor includes a sensor housing, an optical source, and several photodetectors, and is used to measure a blood constituent or analyte, e.g., oxygen or glucose. *Id.* at 2:29–35, 2:64–65. The patient monitor includes a display and a network interface for communicating with a handheld computing device. *Id.* at 2:45–48.

Figure 1 of the '553 patent is reproduced below.



Figure 1 illustrates a block diagram of data collection system 100 including sensor 101 and monitor 109. *Id.* at 11:47–58. Sensor 101 includes optical emitter 104 and detectors 106. *Id.* at 11:59–63. Emitters 104 emit light that is attenuated or reflected by the patient's tissue at measurement site 102. *Id.*

4

IPR2020-01537
Patent 10,588,553 B2

at 14:3–7. Detectors 106 capture and measure the light attenuated or reflected from the tissue. *Id.* In response to the measured light, detectors 106 output detector signals 107 to monitor 109 through front-end interface 108 and detectors 106 can be implemented using photodiodes. *Id.* at 14:7–10, 14:26–32. Sensor 101 also may include tissue shaper 105, which may be in the form of a convex surface that: (1) reduces the thickness of the patient's measurement site; and (2) provides more surface area from which light can be detected. *Id.* at 11:2–14.

Monitor 109 includes signal processor 110 and user interface 112. *Id.* at 15:16–18. "[S]ignal processor 110 includes processing logic that determines measurements for desired analytes . . . based on the signals received from the detectors." *Id.* at 15:21–24. User interface 112 presents the measurements to a user on a display, e.g., a touch-screen display. *Id.* at 15:46–56. The monitor may be connected to storage device 114 and network interface 116. *Id.* at 15:60–16:11.

The '553 patent describes various examples of sensor devices. Figures 14D and 14F, reproduced below, illustrate sensor devices.



FIG. 14D                    FIG. 14F

5

Figure 14D (left) illustrates portions of a detector submount and Figure 14F (right) illustrates portions of a detector shell. *Id.* at 6:44–47. As shown in Figure 14D, multiple detectors 1410c are located within housing 1430 and under transparent cover 1432, on which protrusion 605b (or partially cylindrical protrusion 605) is disposed. *Id.* at 35:36–39, 36:30–37. Figure 14F illustrates a detector shell 306f including detectors 1410c on substrate 1400c. *Id.* at 37:9–25. Substrate 1400c is enclosed by shielding enclosure 1490 and noise shield 1403, which include window 1492a and window 1492b, respectively, placed above detectors 1410c. *Id.* Alternatively, cylindrical housing 1430 may be disposed under noise shield 1403 and may enclose detectors 1410c. *Id.* at 37:47–49.

     Figures 4A and 4B, reproduced below, illustrate an alternative example of a tissue contact area of a sensor device.



FIG. 4A          FIG. 4B

Figures 4A and 4B illustrate arrangements of protrusion 405 including measurement contact area 470. *Id.* at 23:18–24. "[M]easurement site contact area 470 can include a surface that molds body tissue of a measurement site." *Id.* "For example, . . . measurement site contact area 470 can be generally curved and/or convex with respect to the measurement site." *Id.* at 23:39–43. The measurement site contact area may include

6

IPR2020-01537
Patent 10,588,553 B2

windows 420–423 that "mimic or approximately mimic a configuration of, or even house, a plurality of detectors." *Id.* at 23:49–63.

### D. Illustrative Claim

Of the challenged claims, claims 1, 10, and 20 are independent. Claim 1 is illustrative and is reproduced below.

> 1. A noninvasive optical physiological sensor comprising:
>
> > [a] a plurality of emitters configured to emit light into tissue of a user;
> >
> > [b] at least four detectors, wherein at least one of the at least four detectors is configured to detect light that has been attenuated by tissue of the user, and wherein the at least four detectors are arranged on a substrate;
> >
> > [c] a wall configured to circumscribe at least the at least four detectors; and
> >
> > [d] a cover configured to be located between tissue of the user and the at least four detectors when the noninvasive optical physiological sensor is worn by the user, wherein the cover comprises a single protruding convex surface operable to conform tissue of the user to at least a portion of the single protruding convex surface when the noninvasive optical physiological sensor is worn by the user, and wherein the wall operably connects to the substrate and the cover.

Ex. 1001, 44:50–67 (bracketed identifiers a–d added). Independent claims 10 and 20 include limitations substantially similar to limitations [a]–[d] of claim 1. *Id.* at 45:35–47, 46:22–46.

7

IPR2020-01537
Patent 10,588,553 B2

### E. Applied References

Petitioner relies upon the following references:

Aizawa, U.S. Patent Application Publication No. 2002/0188210 A1, filed May 23, 2002, published December 12, 2002 (Ex. 1006, "Aizawa");

Inokawa et al., Japanese Patent Application Publication No. 2006-296564 A, filed April 18, 2005, published November 2, 2006 (Ex. 1007, "Inokawa");[2]

Ohsaki et al., U.S. Patent Application Publication No. 2001/0056243 A1, filed May 11, 2001, published December 27, 2001 (Ex. 1009, "Ohsaki");

Y. Mendelson et al., "A Wearable Reflectance Pulse Oximeter for Remote Physiological Monitoring," Proceedings of the 28th IEEE EMBS Annual International Conference, 912–915 (2006) (Ex. 1010, "Mendelson-2006"); and

Sherman, U.S. Patent No. 4,941,236, filed July 6, 1989, issued July 17, 1990 (Ex. 1011, "Sherman").

Pet. 9.

Petitioner also submits, *inter alia*, a Declaration of Dr. Thomas W. Kenny, Ph.D. (Ex. 1003) and a Second Declaration of Dr. Kenny (Ex. 1047). Patent Owner submits, *inter alia*, the Declaration of Dr. Vijay K. Madisetti (Ex. 2004). The parties also provide deposition testimony from Dr. Kenny and Dr. Madisetti, including from this proceeding and others. Exs. 1041–1043, 2006–2009, 2027.

---

[2] Petitioner relies on a certified English translation of Inokawa (Ex. 1008). Ex. 1008, 24. In this Decision, we also refer to the translation.

Appx20792

IPR2020-01537
Patent 10,588,553 B2

### F. Asserted Grounds of Unpatentability

We instituted an *inter partes* review based on the following grounds.
Inst. Dec. 9, 27.

| Claims Challenged | 35 U.S.C. § | References/Basis |
|---|---|---|
| 1–6, 9–18, 20–24, 29 | 103 | Aizawa, Inokawa, Ohsaki |
| 7, 19 | 103 | Aizawa, Inokawa, Ohsaki, Mendelson-2006 |
| 8, 25–28 | 103 | Aizawa, Inokawa, Ohsaki, Mendelson-2006, Sherman |

## II.    DISCUSSION

### A. Claim Construction

For petitions filed on or after November 13, 2018, a claim shall be
construed using the same claim construction standard that would be used to
construe the claim in a civil action under 35 U.S.C. § 282(b).  37 C.F.R.
§ 42.100(b) (2019).  Petitioner submits that no claim term requires express
construction.  Pet. 7.  Patent Owner submits that claim terms should be given
their ordinary and customary meaning, consistent with the Specification.  PO
Resp. 8.

We agree that no claim terms require express construction.  *Nidec
Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017
(Fed. Cir. 2017).

### B. Principles of Law

A claim is unpatentable under 35 U.S.C. § 103(a) if "the differences
between the subject matter sought to be patented and the prior art are such
that the subject matter as a whole would have been obvious at the time the
invention was made to a person having ordinary skill in the art to which said

9

IPR2020-01537
Patent 10,588,553 B2

subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations, including (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) objective evidence of nonobviousness.[3] *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966). When evaluating a combination of teachings, we must also "determine whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue." *KSR*, 550 U.S. at 418 (citing *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006)). Whether a combination of elements would have produced a predictable result weighs in the ultimate determination of obviousness. *Id.* at 416–417.

In an *inter partes* review, the petitioner must show with particularity why each challenged claim is unpatentable. *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016); 37 C.F.R. § 42.104(b). The burden of persuasion never shifts to Patent Owner. *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015). To prevail, Petitioner must support its challenge by a preponderance of the evidence. 35 U.S.C. § 316(e); 37 C.F.R. § 42.1(d).

We analyze the challenges presented in the Petition in accordance with the above-stated principles.

### C. Level of Ordinary Skill in the Art

Petitioner identifies the appropriate level of skill in the art as that possessed by a person having "a Bachelor of Science degree in an academic

---

[3] The parties have not presented objective evidence of non-obviousness.

10

IPR2020-01537
Patent 10,588,553 B2

discipline emphasizing the design of electrical, computer, or software technologies, in combination with training or at least one to two years of related work experience with capture and processing of data or information." Pet. 7 (citing Ex. 1003 ¶¶ 1–18, 20–21). "Additional education in a relevant field or industry experience may compensate for one of the other aspects of the . . . characteristics stated above." *Id.*

Patent Owner makes several observations regarding Petitioner's identified level of skill in the art but, "[f]or this proceeding, [Patent Owner] nonetheless applies Petitioner's asserted level of skill." PO Resp. 8–9.

We adopt Petitioner's assessment as set forth above, which appears consistent with the level of skill reflected in the Specification and prior art.

### D. Obviousness over the Combined Teachings of Aizawa, Inokawa, and Ohsaki

Petitioner contends that claims 1–6, 9–18, 20–24, and 29 of the '553 patent would have been obvious over the combined teachings of Aizawa, Inokawa, and Ohsaki. Pet. 9–74; *see also* Pet. Reply 1–29. Patent Owner disagrees. PO Resp. 10–54; *see also* Sur-reply 1–24.

Based on our review of the parties' arguments and the cited evidence of record, we determine that Petitioner has met its burden of showing by a preponderance of the evidence that claims 1–6, 9–18, 20–24, and 29 are unpatentable.

### 1. Overview of Aizawa (Ex. 1006)

Aizawa is a U.S. patent application publication titled "Pulse Wave Sensor and Pulse Rate Detector," and discloses a pulse wave sensor that detects light output from a light emitting diode and reflected from a patient's artery. Ex. 1006, codes (54), (57).

11

IPR2020-01537
Patent 10,588,553 B2

Figure 1(a) of Aizawa is reproduced below.



Figure 1(a) is a plan view of a pulse wave sensor. *Id.* ¶ 23. As shown in Figure 1(a), pulse wave sensor 2 includes light emitting diode ("LED") 21, four photodetectors 22 symmetrically disposed around LED 21, and holder 23 for storing LED 21 and photodetectors 22. *Id.* Aizawa discloses that, "to further improve detection efficiency, . . . the number of the photodetectors 22 may be increased." *Id.* ¶ 32, Fig. 4(a). "The same effect can be obtained when the number of photodetectors 22 is 1 and a plurality of light emitting diodes 21 are disposed around the photodetector 22." *Id.* ¶ 33.

Figure 1(b) of Aizawa is reproduced below.



12

IPR2020-01537
Patent 10,588,553 B2

Figure 1(b) is a sectional view of the pulse wave sensor. *Id.* ¶ 23. As shown in Figure 1(b), pulse wave sensor 2 includes drive detection circuit 24 for detecting a pulse wave by amplifying the outputs of photodetectors 22. *Id.* Arithmetic circuit 3 computes a pulse rate from the detected pulse wave and transmitter 4 transmits the pulse rate data to an "unshown display." *Id.* The pulse rate detector further includes outer casing 5 for storing pulse wave sensor 2, acrylic transparent plate 6 mounted to detection face 23a of holder 23, and attachment belt 7. *Id.*

Aizawa discloses that LED 21 and photodetectors 22 "are stored in cavities 23b and 23c formed in the detection face 23a" of the pulse wave sensor. *Id.* ¶ 24. Detection face 23a "is a contact side between the holder 23 and a wrist 10, respectively, at positions where the light emitting face 21s of the light emitting diode 21 and the light receiving faces 22s of the photodetectors 22 are set back from the above detection face 23a." *Id.* Aizawa discloses that "a subject carries the above pulse rate detector 1 on the inner side of his/her wrist 10 . . . in such a manner that the light emitting face 21s of the light emitting diode 21 faces down (on the wrist 10 side)." *Id.* ¶ 26. Furthermore, "the above belt 7 is fastened such that the acrylic transparent plate 6 becomes close to the artery 11 of the wrist 10. Thereby, adhesion between the wrist 10 and the pulse rate detector 1 is improved." *Id.* ¶¶ 26, 34.

### 2. Overview of Inokawa (Exs. 1007, 1008)

Inokawa is a Japanese published patent application titled "Optical Vital Sensor, Base Device, Vital Sign Information Gathering System, and Sensor Communication Method," and discloses a pulse sensor device. Ex. 1008 ¶ 6.

13

IPR2020-01537
Patent 10,588,553 B2

Figure 1 of Inokawa is reproduced below.



(FIG. 1)

Figure 1 illustrates a schematic view of a pulse sensor. *Id.* ¶ 56. Pulse sensor 1 includes box-shaped sensor unit 3 and flexible annular wristband 5. *Id.* ¶ 57. Sensor unit 3 includes a top surface with display 7 and control switch 9, and a rear surface (sensor-side) with optical device component 11 for optically sensing a user's pulse. *Id.*

Figure 2 of Inokawa is reproduced below.



(FIG. 2)

Figure 2 illustrates a schematic view of the rear surface of the pulse sensor. *Id.* ¶ 58. The rear-side (sensor-side) of pulse sensor 1 includes a pair of

14

IPR2020-01537
Patent 10,588,553 B2

light-emitting elements, i.e., green LED 21 and infrared LED 23, as well as photodiode 25 and lens 27. *Id.* In various embodiments, Inokawa discloses that the sensor-side lens is convex. *See id.* ¶¶ 99, 107. Green LED 21 is used to sense "the pulse from the light reflected off of the body (i.e.[,] change in the amount of hemoglobin in the capillary artery)," and infrared LED 23 is used to sense body motion from the change in reflected light. *Id.* ¶ 59. The pulse sensor stores this information in memory. *Id.* ¶ 68. To read and store information, the pulse sensor includes a CPU that "performs the processing to sense pulse, body motion, etc. from the signal . . . and temporarily stores the analysis data in the memory." *Id.* ¶ 69.

Figure 3 of Inokawa is reproduced below.



Figure 3 illustrates a schematic view of a pulse sensor mounted to a base device. *Id.* ¶ 60. Pulse sensor 1 is depicted as mounted to base device 17, which "is a charger with communication functionality." *Id.* When so mounted, sensor optical device component 11 and base optical device

15

IPR2020-01537
Patent 10,588,553 B2

component 41 face each other in close proximity. *Id.* ¶ 66. In this position, pulse sensor 1 can output information to the base device through the coupled optical device components. *Id.* ¶ 67. Specifically, the pulse sensor CPU performs the controls necessary to transmit pulse information using infrared LED 23 to photodetector 45 of base device 17. *Id.* ¶¶ 67, 70, 76. In an alternative embodiment, additional sensor LEDs and base photodetectors can be used to efficiently transmit data and improve accuracy. *Id.* ¶ 111.

### 3. Overview of Ohsaki (Ex. 1009)

Ohsaki is a U.S. patent application publication titled "Wristwatch-type Human Pulse Wave Sensor Attached on Back Side of User's Wrist," and discloses an optical sensor for detecting a pulse wave of a human body. Ex. 1009, code (54), ¶ 3. Figure 1 of Ohsaki is reproduced below.



Figure 1 illustrates a cross-sectional view of pulse wave sensor 1 attached on the back side of user's wrist 4. *Id.* ¶¶ 12, 16. Pulse wave sensor 1 includes detecting element 2 and sensor body 3. *Id.* ¶ 16.

16

IPR2020-01537
Patent 10,588,553 B2

Figure 2 of Ohsaki, reproduced below, illustrates further detail of detecting element 2.



**FIG. 2**

Figure 2 illustrates a mechanism for detecting a pulse wave. *Id.* ¶ 13. Detecting element 2 includes package 5, light emitting element 6, light receiving element 7, and translucent board 8. *Id.* ¶ 17. Light emitting element 6 and light receiving element 7 are arranged on circuit board 9 inside package 5. *Id.* ¶¶ 17, 19.

"[T]ranslucent board 8 is a glass board which is transparent to light, and attached to the opening of the package 5. A convex surface is formed on the top of the translucent board 8." *Id.* ¶ 17. "[T]he convex surface of the translucent board 8 is in intimate contact with the surface of the user's skin," preventing detecting element 2 from slipping off the detecting position of the user's wrist. *Id.* ¶ 25. By preventing the detecting element from moving, the convex surface suppresses "variation of the amount of the reflected light which is emitted from the light emitting element 6 and reaches the light receiving element 7 by being reflected by the surface of the user's skin." *Id.* Additionally, the convex surface prevents penetration by "noise such as disturbance light from the outside." *Id.*

17

Sensor body 3 is connected to detecting element 2 by signal line 13. *Id.* ¶ 20. Signal line 13 connects detecting element 2 to drive circuit 11, microcomputer 12, and a monitor display (not shown). *Id.* Drive circuit 11 drives light emitting element 6 to emit light toward wrist 4. *Id.* Detecting element 2 receives reflected light which is used by microcomputer 12 to calculate pulse rate. *Id.* "The monitor display shows the calculated pulse rate." *Id.*

### 4. *Independent Claim 1*

Petitioner contends that claim 1 would have been obvious over the combined teachings of Aizawa, Inokawa, and Ohsaki. Pet. 16–45. Below, we set forth how the combination of prior art references teaches or suggests the claim limitations that are not disputed by the parties. For those limitations and reasons for combining the references that are disputed, we examine each of the parties' contentions and then provide our analysis.

### i. *"A noninvasive optical physiological sensor comprising:"*

The cited evidence supports Petitioner's undisputed contention that Aizawa satisfies the subject matter of the preamble.[4] Pet. 32; *see, e.g.*, Ex. 1006 ¶ 2, code (57) ("pulse wave sensor for detecting a pulse wave by detecting light output from a light emitting diode and reflected from the artery of a wrist of a subject"), Fig. 2 (depicting structure of optical pulse wave sensor); *see also* Ex. 1003 ¶¶ 95–99.

---

[4] Whether the preamble is limiting need not be resolved because Petitioner shows sufficiently that the preamble's subject matter is satisfied by the art.

IPR2020-01537
Patent 10,588,553 B2

ii.    *"[a] a plurality of emitters configured to emit light into tissue of a user"*
Petitioner's Undisputed Contentions

Petitioner contends that Aizawa discloses an emitter—LED 21—and also states that, in certain embodiments, multiple LEDs may be employed. Pet. 16, 33. Patent Owner does not dispute this contention, and we agree. *See* Ex. 1006 ¶¶ 23 ("LED 21"), 32 ("The arrangement of the light emitting diode 21 and the photodetectors 22 is not limited to this."). For example, Aizawa explains that "[t]he same effect can be obtained when the number of photodetectors 22 is 1 and a plurality of light emitting diodes 21 are disposed around the photodetector." *Id.* ¶ 33.

Petitioner also contends that Inokawa teaches a sensor with two LEDs–a green LED to sense pulse and an infrared LED to sense body motion. Pet. 18, 34. Petitioner also contends that when Inokawa's sensor is mounted on a base device, the infrared LED also is used to wirelessly transmit vital sign information to the base device. *Id.* at 18, 21, 34. Patent Owner does not dispute these contentions, and we agree with Petitioner. Inokawa teaches a pair of LEDs 21, 23, where "the basic function of the S-side green LED 21 is to sense the pulse from the light reflected off of the body . . ., while the S-side infrared LED 23 serves to sense body motion from the change in this reflected light." Ex. 1008 ¶¶ 58–59. Inokawa also explains that "vital sign information stored in the memory 63 [of the sensor], such as pulse and body motion, is transmitted to the base device 17 using the S-side infrared LED 23 of the pulse sensor 1 and the B-side PD 45 of the base device 17," such that "there is no need to use a special wireless communication circuit or a communication cable." *Id.* ¶¶ 76–77.

19

IPR2020-01537
Patent 10,588,553 B2

Petitioner's Disputed Contentions

Moreover, Petitioner contends that a person of ordinary skill in the art would have been motivated to modify Aizawa to "include an additional LED as taught by Inokawa to improve the detected pulse wave by distinguishing between blood flow detection and body movement." Pet. 17, 18–24, 33–34; Ex. 1003 ¶¶ 69, 108. Petitioner contends that "Aizawa-Inokawa would have utilized two LEDs that emit two different wavelengths," such that "Aizawa's sensor would have been improved through the implementation of a separate LED to account for motion load." Pet. 20. According to Dr. Kenny, "one of ordinary skill would have recognized that this would improve Aizawa's sensor by enabling it to account for motion load through use of the second LED, by detecting and recording body motion in addition to blood flow." Ex. 1003 ¶¶ 76, 110.

As a second and independent motivation, Petitioner contends that such a modification also would have provided "additional functionality, including that of [a] wireless communication [method]," which would have "eliminat[ed] problems associated with a physical cable, and that does not require a separate RF circuit, as taught by Inokawa." Pet. 21–24. Petitioner contends that although Aizawa discloses data transmission, Aizawa "is silent about how such transmission would be implemented." Pet. 23. According to Petitioner, a skilled artisan would have recognized that Aizawa's LED could have been used for wireless data communication with a personal computer to eliminate problems associated with a physical cable, and, as taught by Inokawa, without requiring a separate RF circuit, which "would result in enhanced accuracy of the transmitted information." Pet. 23–24 (citing Ex. 1003 ¶¶ 68–83). According to Dr. Kenny, "as one of ordinary

20

IPR2020-01537
Patent 10,588,553 B2

skill would have recognized, the LEDs provided on the sensor can be used not only to detect pulse rate, but also to 'accurately, easily, and without malfunction' transmit sensed data to a base station." Ex. 1003 ¶¶ 112, 78.

To illustrate its proposed modification, Petitioner includes annotated and modified views of Aizawa's Figures 1(a) and 1(b), reproduced below. Pet. 19–20; *see also id.* at 33–34 (similar figures); Ex. 1003 ¶ 75.



Petitioner's annotated and modified figures depict the sensor of Aizawa with an added "LED B" (illustrated in light purple), as Petitioner contends would have been rendered obvious by Inokawa. Pet. 19–20, 23–24, 33–35; *see also* Ex. 1003 ¶¶ 72–83, 109–119.

Patent Owner's Arguments

Patent Owner disputes Petitioner's contentions regarding the obviousness of modifying Aizawa to include two emitters. *See* PO Resp. 48–54; Sur-reply 24–26.

21

IPR2020-01537
Patent 10,588,553 B2

First, Patent Owner argues that neither Aizawa nor Inokawa discloses a device with both multiple detectors *and* multiple emitters in the *same* sensor, because Aizawa's embodiments have either a single emitter and multiple detectors (e.g., Ex. 1006, Fig. 1(a)) or multiple emitters and a single detector (e.g., *id.* ¶ 33), and Inokawa discloses multiple emitters and a single detector (e.g., Ex. 1008, Fig. 2). *See* PO Resp. 48–49 (citing, e.g., Ex. 1006 ¶ 33, Figs. 1, 2, 4, 5; Ex. 1008 ¶ 58, Fig. 2; Ex. 2004 ¶¶ 100–102). Patent Owner concludes, therefore, that a person of ordinary skill in the art would not have added a second emitter to Aizawa, when Aizawa already discloses an embodiment with multiple LEDs, i.e., an embodiment with only a single detector. PO Resp. 49 (citing, e.g., Ex. 2004 ¶ 103).

Second, Patent Owner argues that the evidence does not support either of Petitioner's two proffered motivations for modifying Aizawa to include two emitters. *Id.* As to the first motivation (to measure body movement using a second emitter), Patent Owner asserts that Dr. Kenny erroneously testifies that Aizawa cannot do this with its single emitter. *Id.* at 49–50 (citing, e.g., Ex. 1006 ¶ 15; Ex. 2007, 400:7–401:10; Ex. 2004 ¶ 104). Patent Owner argues that "Dr. Kenny incorrectly believed Aizawa's sensor attempts to prevent motion rather than account for it," yet, "Aizawa expressly states that it already provides a 'device for computing the amount of motion load from the pulse rate' based on its measured data." *Id.* at 50 (quoting Ex. 1006 ¶ 15) (emphasis omitted). Thus, Patent Owner contends that the proposed motivation would not realize an improvement over Aizawa alone. *Id.*; Ex. 2004 ¶ 84.

As to Petitioner's second motivation (to enable transmission of data to a base device using an optical communication link), Patent Owner argues

that "Aizawa *already* includes a wireless transmitter . . . so Aizawa does not
need to incorporate Inokawa's base-device [optical] data transmission
arrangement." PO Resp. 51 (citing, e.g., Ex. 1006 ¶¶ 23, 28, 35; Ex. 2004
¶¶ 105–106). Indeed, Patent Owner argues "Dr. Kenny acknowledged
Aizawa does not indicate there are any problems with Aizawa's form of data
transmission." *Id.* (citing Ex. 2007, 409:13–410:2). Patent Owner further
argues that "Aizawa's goal is 'real-time measuring' with the transmitter
'transmitting the measured pulse rate data to a display'" but that "Inokawa's
data transfer approach does not allow real-time display of measurements."
*Id.* (citing, e.g., Ex. 1006 ¶¶ 4, 15; Ex. 1008 ¶¶ 70, 74; Ex. 2004 ¶ 107).
Patent Owner contends that "[t]ransforming Aizawa's sensor to employ a
base-device transmitter eliminates the ability to take and display real-time
measurements, one of Aizawa's stated goals, while increasing power
consumption and cost." *Id.* at 51–52.

Patent Owner insists Inokawa does not aid Petitioner's case, because
Inokawa discloses the benefits of using a second emitter in only two
situations, i.e., first, to avoid the risk of contact failure in a "cable"
communication and, second, to avoid use of a "dedicated wireless
communication circuit," whereas "Aizawa *already* incorporates a transmitter
into its design." *Id.* at 52 (citing, e.g., Ex. 1008 ¶ 4; Ex. 1006 ¶¶ 16, 23, 28;
Ex. 2004 ¶ 108).

Third, Patent Owner accuses Petitioner and Dr. Kenny of overlooking
further complications that would ensue from modifying Aizawa to have two
emitters. *Id.* at 53. Patent Owner argues that Dr. Kenny overlooked how
placing "two LEDs in close proximity may cause thermal interference that
could create significant issues for sensor performance," and would require

IPR2020-01537
Patent 10,588,553 B2

"structural changes" to Aizawa's configuration. *Id.* (citing, e.g., Ex. 2004 ¶¶ 109–110; Ex. 1019, 59–60; Ex. 2007, 379:17–21, 384:16–388:16). Patent Owner also argues that "Petitioner widened Aizawa's emitter cavity to accommodate the extra LED with no [] explanation or recognition of this change," which could impact optical performance of the device. *Id.* at 53–54 (citing, e.g., Ex. 2004 ¶¶ 109–111).

<u>Petitioner's Reply</u>

Petitioner reiterates that a person of ordinary skill in the art would have "added a second emitter to Aizawa operating at a different wavelength from the first, 'to improve the detected pulse wave by distinguishing between blood flow detection and body movement.'" Pet. Reply 29. Petitioner asserts that Aizawa "is silent on whether it uses the computed motion load to improve the detection signal" and thereby provide a "more reliable" pulse reading, which is Petitioner's asserted improvement to Aizawa. *Id.* at 29–30 (citing, e.g., Ex. 1003 ¶¶ 80, 113; Ex. 2007, 401:11–402:4; Ex. 1047 ¶ 60). Moreover, Petitioner contends that "[b]ecause different wavelengths have different sensitivities to pulse and body motion, collecting two separate signals allows noise arising from body motion to be better isolated and accounted for." *Id.* at 30 (citing Ex. 1047 ¶ 60).

Concerning Petitioner's second motivation (improving data transmission accuracy), Petitioner maintains that Inokawa's use of two emitters having different wavelengths to upload data to a base station using optical communication advantageously improves the accuracy of the transmission by providing checksum information. *Id.* (citing, e.g., Ex. 1003 ¶ 80; Ex. 2007, 407:7–408:20, 416:5–15; Ex. 1047 ¶¶ 61–62).

24

Appx20808

IPR2020-01537
Patent 10,588,553 B2

As to the "other complications" that Patent Owner alleges would result from the proposed modification, Petitioner asserts "such minor issues are 'part of what [a person of ordinary skill in the art] would bring . . . to the problem and would know how to make the changes needed.'" Pet. Reply 30–31 (quoting Ex. 2007, 384:8–388:12) (citing Ex. 1047 ¶ 63).

Patent Owner's Sur-reply

Concerning Petitioner's first motivation, Patent Owner argues that Inokawa's disclosure is just as sparse as Aizawa's disclosure regarding how to use optical data to measure body movement. Sur-reply 24 (citing Ex. 1008 ¶ 59). Patent Owner also asserts that "Petitioner cites nothing in Inokawa that suggests" that Inokawa's two emitter data gathering is more reliable or otherwise superior to Aizawa's single emitter data gathering. *Id.* at 24–25.

Concerning Petitioner's second motivation, Patent Owner argues that the proposed modification eliminates Aizawa's ability to conduct "***real-time*** collection and display of physiological measurements—a key goal of Aizawa's system." *Id.* at 25.

Patent Owner also faults Petitioner for not specifying how a person of ordinary skill in the art would have solved the alleged "additional costs, energy use, and thermal problems" that would ensue from using two emitters in the Aizawa device. *Id.*

Analysis

Upon review of the foregoing, we conclude a preponderance of the evidence supports Petitioner's contention that a person of ordinary skill in

25

the art would have been motivated to replace Aizawa's single near infrared LED 21 with an infrared LED and a green LED, in light of Inokawa.

First, a person of ordinary skill in the art would have been motivated to make this replacement to improve the pulse measurements recorded by Aizawa's detector 1. Inokawa teaches that the infrared LED's signal can be used "to detect vital signs" such as "body motion," and the green LED's signal can be "used to detect pulse." Ex. 1008, Fig. 2, ¶¶ 14, 58–59; Ex. 1003 ¶¶ 72–83, 109–119; Ex. 1047 ¶¶ 60–63.

Patent Owner correctly points out that Aizawa describes its single-emitter detector 1 as transmitting its pulse data to "a device for computing the amount of motion load from the pulse rate." Ex. 1006 ¶¶ 15, 28, 35. But, this description is the only disclosure in Aizawa cited by Patent Owner as relating to computing a motion characteristic of the user. Further, we are unable to discern any other disclosure in Aizawa relating to motion computation, or what Aizawa proposes to do with its motion computation. *See id.* Based on the sparse nature of Aizawa's disclosure concerning motion load, it is not clear exactly what Aizawa proposes to do with the computed motion load, after it is computed. *See, e.g.*, Ex. 1047 ¶ 60 ("Aizawa is silent on whether it uses the computed motion load to improve the detection signal."). Aizawa does, however, describe the motion load as being computed "from the pulse rate," rather than being an input to the pulse rate calculation. Ex. 1006 ¶¶ 15, 35.

Dr. Kenny, when asked whether it was his understanding that "Aizawa's sensor could not account for motion load?", answered that "Aizawa's sensor attempts to prevent motion load rather than account for it." Ex. 2007, 400:7–11. He explained that, because Aizawa uses only a single

26

emitter with a single wavelength, "what [Aizawa] sees as a signal would be some mixture of pulse rate and motion load if there was no effort to prevent motion load," so Aizawa seeks to solve the problem of "prevent[ing] motion load from corrupting the pulse rate signal." *Id.* at 400:12–401:10. Dr. Kenny did not further explain this distinction between preventing and accounting for motion load in his deposition testimony cited by the parties as relating to this issue. *Id.* at 400:7–402:4. We do not rely on this distinction as a basis for our present decision, because we find no express support for it in Aizawa's disclosure (*see* Ex. 1006 ¶¶ 15, 28, 35), and it is not explained in persuasive detail by Dr. Kenny.

We nonetheless credit Dr. Kenny's declaration testimony that a person of ordinary skill in the art, upon reviewing Inokawa's disclosure of using two emitters of different wavelengths to calculate a user's pulse and motion separately, would understand that these two separate measurements would enable the device to calculate a "more reliable" pulse rate because it "will allow noise arising from body motion to be better isolated and accounted for." Ex. 1047 ¶ 60; Ex. 1003 ¶¶ 110, 111. Aizawa does not disclose using the computed motion load in this fashion, so it appears that this would improve upon the accuracy of Aizawa's pulse measurements, by using the computed motion load to isolate and account for noise. *See* Ex. 1006 ¶¶ 15, 28, 35.

Dr. Madisetti also offers no meaningful opposing testimony in this regard. *See, e.g.*, Ex. 2004 ¶ 104. Instead, Dr. Madisetti incorrectly reads Dr. Kenny's motivation testimony as being limited to the desirability of adding the bare ability to measure body movement to Aizawa. *See id.* In fact, Dr. Kenny further testified that it would have been beneficial to *use* the

27

IPR2020-01537
Patent 10,588,553 B2

measured body movement to *improve* the pulse measurement of the device. *See* Ex. 1003 ¶¶ 69, 74; Ex. 1047 ¶ 60. Dr. Madisetti does not persuasively address the testimony supporting the Petition. *See* Ex. 2004 ¶ 104.

Thus, because Dr. Madisetti's testimony sets up a straw man to attack, rather than directly addressing the entirety of Dr. Kenny's testimony in this regard, Dr. Kenny's testimony stands unrebutted in the record before us. Dr. Kenny's testimony also makes intuitive sense that measuring the user's motion *separately* from the user's pulse, for example by using two interrogating emitters of two different wavelengths, would provide a reliable means of correcting the pulse data for motion artifacts by using the separately measured motion data, rather than by trying to segregate these two components in the single data stream provided by Aizawa's single emitter device. *See, e.g.*, Ex. 1047 ¶ 60. We, therefore, are persuaded by Dr. Kenny's unrebutted testimony that using two emitters of different wavelengths would improve Aizawa's device in this way.

Further, and independently, a person of ordinary skill in the art would have been motivated to replace Aizawa's single near infrared LED 21 with an infrared LED and a green LED, to provide a reliable method of uploading pulse data stored by Aizawa's wrist-worn pulse rate detector 1 to another device for display to the user. *See* Ex. 1003 ¶ 78. Inokawa expressly touts such optically-based uploading of data from Inokawa's wrist-worn sensor 1 to Inokawa's base device 17 as a benefit of incorporating two emitters in sensor 1. *See* Ex. 1008, Figs. 3, 19, ¶¶ 3–7, 14, 76–77, 109–111. Inokawa identifies two specific benefits of this optically-based data communication means. First, the infrared LED can transmit the pulse data, and the green LED can separately transmit "checksum" information to increase the

28

IPR2020-01537
Patent 10,588,553 B2

accuracy of data transmission. *Id.* at Fig. 19, ¶¶ 14, 109–111. Second, using light emitters in this fashion to perform two functions (data collection by emitting light into the user's wrist, and data transmission by emitting light to photodetectors in a base device) obviates the need for providing "a special wireless communication circuit [in the wrist-worn sensor 1] or a communication cable." *Id.* ¶¶ 3–7, 76–77; Ex. 1003 ¶ 78.

Patent Owner correctly points out that Aizawa already has a "transmitter" 4 for uploading pulse data stored by Aizawa's wrist-worn pulse rate detector 1 to another device for processing and for display to the user. Ex. 1006, Fig. 1(b), ¶¶ 15, 23, 28, 35. However, Aizawa's Figure 1(b) illustrates transmitter 4 only as an empty box contained within outer casing 5, and Aizawa's written description does not provide further structural details concerning transmitter 4. *See id.* In particular, Aizawa does not describe exactly how transmitter 4 transmits its data to the other device. *See id.*

Patent Owner contends, and Dr. Madisetti and Dr. Kenny both testify, that Aizawa's transmitter 4 is a "wireless" transmitter. *See, e.g.*, PO Resp. 51; Ex. 2004 ¶¶ 105–106, 112; Ex. 2007, 403:17–22, 414:19–21. They all appear to equate "wireless" communication to radio frequency communication, and not to include optical communication, even though both radio frequency and optical communication do not use a wire. Petitioner disagrees that Aizawa discloses any specific form of data transmission, including wireless transmission. *See* Tr. 71:5–72:3 ("[T]he transmitter disclosure in Aizawa, they don't say its's a wireless transmitter. That was a conjuration by [Patent Owner]. They don't specify whether it's a wired or wireless."). We assume, for this decision, that Aizawa expressly

29

IPR2020-01537
Patent 10,588,553 B2

contemplates radio frequency communication as one embodiment by which transmitter 4 may transmit data to devices other than detector 1.

Patent Owner argues, and Dr. Madisetti testifies, that Aizawa's express disclosure goes even further. They assert Aizawa's "goal" is to measure and display pulse data *in real time during exercise*, using the wireless transmitter. *See, e.g.*, Ex. 2004 ¶¶ 106–108, 111. We find that Aizawa does not support this assertion. Instead, Aizawa discusses prior art devices that "estimat[e] a burden on the heart of a person who takes exercise by *real-time measuring* his/her heart rate at the time of exercise" (Ex. 1006 ¶ 4 (emphasis added)), and then describes Aizawa's detector 1 as having a transmitter for transmitting the measured pulse rate data to another device for display (*id.* ¶ 15). Aizawa does not indicate when this transmission occurs. Aizawa also refers to "noise caused by the shaking of the body of the subject" as a problem to be addressed (*id.* ¶ 6), but this problem occurs regardless of whether the shaking results from exercise or the normal movement of the user's wrist over the course of the day. Thus, Aizawa does not tout, as an important feature of Aizawa's invention, the *real time display* of pulse rate data during exercise, regardless of whether the data gathered by Aizawa's wrist-worn detector 1 is transmitted wirelessly or otherwise. *Id.* ¶¶ 4, 6, 15.

No doubt, a person of ordinary skill in the art would have viewed the capability of a wrist-worn pulse detector to transmit its pulse data to another device for display in real time while the user is exercising to be a desirable feature in some cases, even if this is not one of Aizawa's specifically stated goals. *See, e.g.*, Ex. 1003 ¶ 64 (Dr. Kenny stating: "By wirelessly transmitting the collected data wirelessly, Mendelson 2006's system

30

IPR2020-01537
Patent 10,588,553 B2

provides 'numerous advantages,' . . . ."); Ex. 2009, 393:6–14 (Dr. Kenny
agreeing that a person of ordinary skill in the art "would have seen the
ability to wirelessly transmit collected data as an advantage").  Nonetheless,
Inokawa expressly discloses that, in other cases, the benefits achieved by
wireless transmission can be outweighed by obviating the need for the
wrist-worn sensor to include a special wireless communication circuit.  *See*
Ex. 1008 ¶¶ 3–7 (discussing problems associated with wireless transmission,
such as the need for a dedicated circuit, which is avoided by Inokawa's
system that risks "few malfunctions" and has a "simple structure"), 76–77
("As a result, there is no need to use a special wireless communication
circuit . . ., which makes it possible to transmit vital sign information to the
base device 17 accurately, easily, and without malfunction.").  We therefore
conclude that Petitioner's case for obviousness in this regard is supported by
a preponderance of the evidence.  *See, e.g.*, *In re Urbanski*, 809 F.3d 1237,
1243–44 (Fed. Cir. 2016) (persons of ordinary skill in the art may be
motivated to pursue desirable properties of one prior art reference, even at
the expense of foregoing a benefit taught by another prior art reference).

We are not persuaded by Patent Owner's argument that Petitioner's
case for obviousness is deficient on the basis that neither Aizawa nor
Inokawa expressly discloses a wrist-worn sensor device that has *both* a
plurality of emitters *and* at least four detectors, as claim 1 recites.
Obviousness does not require "'some motivation or suggestion to combine
the prior art teachings' [to] be found in the prior art." *KSR*, 550 U.S. at 407,
415–418.  Nor does it require the bodily incorporation of Inokawa's device
into Aizawa's device.  *See, e.g.*, *In re Keller*, 642 F.2d 413, 425
(CCPA 1981) (test for obviousness is not whether the features of one

31

reference may be bodily incorporated into the structure of the other reference, but rather is "what the combined teachings of the references would have suggested to those of ordinary skill in the art"); *see also In re Merck & Co.*, 800 F.2d 1091, 1097 (Fed. Cir. 1986) (nonobviousness is not established by attacking references individually when unpatentability is predicated upon a combination of prior art disclosures). Instead, "[a] person of ordinary skill is also a person of ordinary creativity, not an automaton," and "in many cases a person of ordinary skill will be able to fit the teachings of multiple patents together like pieces of a puzzle." *KSR*, 550 U.S. at 420–421.

In this case, a person of ordinary skill in the art would have been motivated to modify Aizawa's wrist-worn detector 1 to replace its single near infrared LED 21 with an infrared LED and a green LED, based on Inokawa, for all the reasons provided above. A person of ordinary skill in the art would additionally have known to keep all four detectors 22 that are already present in Aizawa's detector 1, so that "[e]ven when the attachment position of the sensor is dislocated, a pulse wave can be detected accurately," as disclosed by Aizawa. Ex. 1006 ¶¶ 9, 27. In short, the combination of Aizawa and Inokawa teaches that having multiple emitters is beneficial, and having multiple detectors is beneficial, for different and not inconsistent reasons.

Finally, we agree with Petitioner's position that any thermal interference and power consumption issues that may arise in Aizawa's wrist-worn pulse detector, by using two emitters instead of one emitter, are well within the capabilities of a POSITA to solve. We credit Dr. Kenny's testimony in this regard. *See* Ex. 1047 ¶ 63; Ex. 2007, 384:8–388:12. For

IPR2020-01537
Patent 10,588,553 B2

example, Dr. Kenny acknowledges that Aizawa already discloses adding additional emitters. Ex. 1003 ¶ 79 (citing Ex. 1006 ¶ 33). Dr. Kenny further testifies that this modification "amount[s] to nothing more than the use of a known technique [(i.e., Inokawa's use of two emitters in a wrist-worn pulse detector)] to improve similar devices [(i.e., Aizawa's wrist-worn pulse detector)] in the same way and combining prior art elements according to known methods to yield predictable results." *Id.* ¶¶ 77 ("Furthermore, one of ordinary skill would have readily understood how to select different photodiodes with different sensitivities to detect the different wavelengths of light emitted by the two LEDs."), 111.

Patent Owner cites several portions of Dr. Kenny's deposition testimony that, in Patent Owner's view, indicate Dr. Kenny fails to appreciate the significance of the thermal effects, optical interference complications, and power consumption needs, that are posed by adding a second emitter to Aizawa's device, and fails to explain how these issues would have been overcome. *See* PO Resp. 51–54 (citing Ex. 2007, 379:17–21, 384:8–388:16, 394:11–395:22, 405:2–7, 409:13–410:2; Ex. 2009, 381:18–382:8, 383:22–385:9, 390:5–392:3). We have reviewed this deposition testimony, and we conclude Patent Owner overstates its significance. It establishes, at most, that Dr. Kenny did not expressly address these issues in his declaration (Exhibit 1003), but Dr. Kenny's opinion is that these issues would have been within the capability of a person of ordinary skill in the art to resolve. Based on the evidentiary record presented to us, we agree with Dr. Kenny. For example, Inokawa discloses a wrist-worn pulse sensor 1 having two emitters 21 and 23 in close proximity to each other. *See* Ex. 1008, Figs. 1–2. An artisan must be presumed to

33

IPR2020-01537
Patent 10,588,553 B2

know something about the art apart from what the relied-upon references disclose. *See In re Jacoby*, 309 F.2d 513, 516 (CCPA 1962).

Dr. Madisetti's testimony opposing Dr. Kenny's foregoing opinion is premised solely on Dr. Kenny's alleged failure to explain how the issues that arise from adding a second emitter to Aizawa would have been solved; Dr. Madisetti does not provide any affirmative reason why these issues would have been difficult for a person of ordinary skill in the art to solve, in the context of Aizawa's device or wrist-worn pulse sensing devices in general. *See* Ex. 2004 ¶¶ 109, 110.

Thus, we conclude a person of ordinary skill in the art would have been motivated to replace Aizawa's single near infrared LED 21 with an infrared LED and a green LED, and would have had a reasonable expectation of success in doing so.

iii. *"[b] at least four detectors, wherein at least one of the at least four detectors is configured to detect light that has been attenuated by tissue of the user, and wherein the at least four detectors are arranged on a substrate;"*

The cited evidence supports Petitioner's contention that Aizawa discloses at least four detectors, each stored in a separate cavity 23c, and configured to detect light output from a light emitting diode and reflected from the artery of a wrist. Pet. 19, 34–40; *see, e.g.*, Ex. 1006 ¶¶ 9, 23 ("four phototransistors 22"), 24 ("stored in cavities" and "set back from . . . detection face 23a"), Figs. 1(a)–1(b); Ex. 1003 ¶¶ 55–63, 68–94. Petitioner demonstrates how the claim requirement of detectors configured to detect light that has been attenuated by tissue is met by Aizawa's teaching of near infrared radiation output toward the wrist from the light emitting diode being reflected by a red corpuscle running through the artery of the wrist resulting

34

IPR2020-01537
Patent 10,588,553 B2

in reflected light being detected by the plurality of photodetectors so as to detect a pulse wave. Pet. 35 (quoting Ex. 1006 ¶ 27). As depicted below in annotated Figure 1(a) of Aizawa, "at least four photodetectors are 'disposed symmetrically' within holder 23 and used 'to detect the pulse wave of the wrist,' although the 'arrangement of the light emitting diode 21 and the photodetectors 22 is not limited to this.'" Pet. 36 (quoting Ex. 1006 ¶ 32).



Annotated Figure 1(a) of Aizawa depicts four photodetectors 22, identified by blue arrows.

Relying on the testimony of Dr. Kenny, Petitioner contends that a person of ordinary skill in the art "would have found it obvious that Aizawa's photodetectors are arranged on a substrate because photodetectors 22 are disposed on a surface of holder 23 and are further connected, through the surface of holder 23, to drive detection circuit 24." Pet. 38 (citing Ex. 1003 ¶ 125). According to Dr. Kenny, the person of ordinary skill in the art would have understood that the surface of holder 23 acts as a substrate through which at least four photodetectors 22 and drive detection circuit 24 are connected and on which they are arranged because it

35

Appx20819

IPR2020-01537
Patent 10,588,553 B2

reduces the manufacturing complexity and footprint of the device as compared to using wires. Ex. 1003 ¶¶ 125–126.

To the extent Patent Owner's contentions related to the combinability of the references touch on this particular limitation, we address those arguments in full below.

### iv.   "[1c] a wall configured to circumscribe at least the at least four detectors"

The cited evidence supports Petitioner's undisputed contention that Aizawa discloses holder 23, which is a wall that surrounds detectors 22, as well as other elements. Pet. 40–43; *see, e.g.*, Ex. 1006 ¶ 23 ("holder 23 for storing . . . light emitting diode 21 and the photodetectors 22"), Figs. 1(a), 1(b); Ex. 1003 ¶¶ 130–139. Thus, Petitioner has demonstrated how the asserted prior art discloses a wall configured to circumscribe at least the at least four detectors.

### v.   "[d] a cover configured to be located between tissue of the user and the at least four detectors when the noninvasive optical physiological sensor is worn by the user, wherein the cover comprises a single protruding convex surface operable to conform tissue of the user to at least a portion of the single protruding convex surface when the noninvasive optical physiological sensor is worn by the user, and wherein the wall operably connects to the substrate and the cover."

Petitioner's Undisputed Contentions

Petitioner contends that Aizawa discloses a cover, i.e., an "acrylic transparent plate positioned between the photodetectors and the wrist," to improve adhesion between the sensor and the subject's wrist. Pet. 12 (citing Ex. 1006 ¶ 34). Patent Owner does not dispute this contention, and we agree with Petitioner. Aizawa discloses that "acrylic transparent plate 6 is provided on the detection face 23a of the holder 23 to improve adhesion to

36

IPR2020-01537
Patent 10,588,553 B2

the wrist 10." Ex. 1006 ¶ 34, Fig. 1(b) (depicting transparent plate 6 between sensor 2 and wrist 10).

Petitioner also contends that Ohsaki teaches a wrist-worn sensor that includes a "translucent board" having a convex surface that contacts the user's skin. Pet. 15, 24. Patent Owner does not dispute this contention, and we agree with Petitioner. Ohsaki discloses that sensor 1 includes detecting element 2 and sensor body 3, and is "worn on the back side of the user's wrist." Ex. 1009 ¶ 16. Ohsaki discloses that detecting element 2 includes package 5 and "translucent board 8[,which] is a glass board which is transparent to light, and [is] attached to the opening of the package 5. A convex surface is formed on the top of the translucent board 8." *Id.* ¶ 17. As seen in Ohsaki's Figure 2, translucent board 8 has a single protruding convex surface, which is placed between a user's tissue and a light receiving element (e.g., photodetector) 7 when the sensor is worn. *Id.* at Fig. 2. As also seen in Figure 2, the board 8 is operably connected to the walls of sensor package 5. *Id.* ¶ 17 ("The translucent board 8 is . . . attached to the opening of the package 5."), Fig. 2.

Petitioner also contends that Ohsaki's Figure 2 depicts the user's tissue conforming to the shape of the convex surface of the cover. Pet. 13 ("The lens is sufficiently rigid to make the tissue conform to the convex surface of the lens."), 44–45. Patent Owner does not dispute this contention, and we agree with Petitioner. Ohsaki's Figure 2 depicts the user's tissue 4 conforming to the shape of the protruding convex surface when the sensor is worn by the user. Ex. 1009 ¶ 17 ("The translucent board 8 is a glass board."), Fig. 2.

37

**Appx20821**

Petitioner's Disputed Contentions

Petitioner further contends that a person of ordinary skill in the art
"would have found it obvious to modify the sensor's flat cover [in Aizawa]
. . . to include a lens/protrusion . . . similar to Ohsaki's translucent board 8,
so as to [1] improve adhesion between the user's wrist and the sensor's
surface, [2] improve detection efficiency, and [3] protect the elements within
sensor housing." Pet. 27–28 (citing, e.g., Ex. 1003 ¶¶ 86–88; Ex. 1009
¶ 25). Petitioner contends that Ohsaki's convex surface is in "intimate
contact" with the user's tissue, which prevents slippage of the sensor and
increases signal strength because "variation of the amount of the reflected
light . . . that reaches the light receiving element 7 is suppressed" and
because "disturbance light from the outside" is prevented from penetrating
board 8, as compared to a sensor with a flat surface. *Id.* at 25–26 (citing,
e.g., Ex. 1003 ¶ 85; quoting Ex. 1009 ¶¶ 15, 17, 25, Figs. 1, 2, 4A, 4B).
Accordingly, Petitioner contends that a person of ordinary skill in the art
would have modified Aizawa's sensor to include a cover with a single
convex protrusion, as taught by Ohsaki, that "is located between the user
tissue and the detectors 22 when the sensor is worn by the user." Pet. 44–45
(citing, e.g., Ex. 1003 ¶¶ 55–63, 144).

Petitioner contends this modification would have been "nothing more
than the use of a known technique to improve similar devices in the same
way," i.e., "simply improving Aizawa-Inokawa's transparent plate 6 that has
a flat surface to improve adhesion to a subject's skin and reduce variation in
the signals detected by the sensor." Pet. 28 (citing Ex. 1003 ¶¶ 84–91).
Further according to Petitioner, "the elements of the combined system would
each perform similar functions they had been known to perform prior to the

IPR2020-01537
Patent 10,588,553 B2

combination—Aizawa-Inokawa's transparent plate 6 would remain in the same position, performing the same function, but with a convex surface as taught by Ohsaki." *Id.* (citing Ex. 1003 ¶¶ 84–91).

To illustrate its proposed modification, Petitioner includes two annotated versions of Aizawa's Figure 1(b), both of which are reproduced below. Pet. 27–28 (citing Ex. 1003 ¶¶ 84–91).



Petitioner's annotated figure on the left depicts Aizawa's sensor, modified to include LED B and with a flat "light permeable cover" (illustrated with blue outline); Petitioner's annotated figure on the right depicts Aizawa's sensor, again modified to include LED B and with a convex "light permeable cover" (illustrated with blue outline).

Patent Owner's Arguments

Patent Owner argues that a person of ordinary skill in the art would not have been motivated to modify Aizawa's sensor to include Ohsaki's convex cover. PO Resp. 17–48; Sur-reply 3–23.

First, Patent Owner argues "Ohsaki's rectangular board would be incompatible with Aizawa's circular sensor arrangement" and that the proposed modification "changes Ohsaki's structure and eliminates the longitudinal shape that gives Ohsaki's translucent board the ability to

39

IPR2020-01537
Patent 10,588,553 B2

prevent slipping." PO Resp. 18–19 (emphases omitted). This argument is premised on Patent Owner's contention that Ohsaki's convex cover must be rectangular, with the cover's long direction aligned with the length of the user's forearm, to avoid interacting with bones in the wrist and forearm. *Id.* at 20–23 (citing, e.g., Ex. 2004 ¶¶ 52–55; Ex. 1009 ¶¶ 6, 19, 23, 24); *see also* Sur-reply 3–10. According to Patent Owner, Ohsaki teaches that "aligning the sensor's longitudinal direction with the circumferential direction of the user's wrist undesirably results in 'a tendency [for Ohsaki's sensor] to slip off.'" PO Resp. 21 (emphasis omitted) (alteration in original) (citing Ex. 1009 ¶ 19).

Thus, Patent Owner contends that Petitioner's proposed modification would "chang[e] Ohsaki's rectangular board into a circular shape," which "would eliminate the advantages discussed above" because it "cannot be placed in any longitudinal direction and thus could not coincide with the longitudinal direction of the user's wrist." *Id.* at 21–22 (emphases omitted) (citing Ex. 2004 ¶¶ 55–57). Patent Owner presents annotated Figures depicting what it contends is Ohsaki's disclosed sensor placement as compared to that of the proposed modification, reproduced below.



40

IPR2020-01537
Patent 10,588,553 B2

Patent Owner's annotated Figure on the left depicts a rectangular sensor placed between a user's radius and ulna, while Patent Owner's annotated Figure on the right depicts a circular sensor placed across a user's radius and ulna. Based on these annotations, Patent Owner argues that the proposed "circular shape would press on the user's arm in all directions and thus would not avoid the undesirable interaction with the user's bone structure," such that a skilled artisan "would have understood that any such change would eliminate Ohsaki's benefit of preventing slipping." PO Resp. 23–25 (citing, e.g., Ex. 2004 ¶¶ 56–57, 59–61).

Second, Patent Owner argues that Ohsaki requires its sensor be placed on the back of the user's wrist to achieve any benefits, but that such a location would have been unsuitable for Aizawa's sensor. PO Resp. 27–28. Specifically, Patent Owner argues that Aizawa's sensor must be worn on the palm side of the wrist, close to radial and ulnar arteries, which is the side opposite from where Ohsaki's sensor is worn. *Id.* at 28–29 (citing, e.g., Ex. 1006 ¶¶ 2, 7, 9, 26, 27, 36; Ex. 2004 ¶¶ 66–70). According to Patent Owner, Ohsaki teaches that the sensor's convex surface has a tendency to slip when placed on the palm side of the wrist, i.e., in the location taught by Aizawa. *Id.* at 33–36 (citing, e.g., Ex. 1009 ¶¶ 19, 23, 24; Ex. 2004 ¶¶ 74–80). Thus, Patent Owner argues that a person of ordinary skill in the art "would not have been motivated to use Ohsaki's longitudinal board— designed to be worn on the back side of a user's wrist—with Aizawa's palm-side sensor." *Id.* at 36 (emphases omitted). Similarly, Patent Owner argues that Aizawa teaches away from the proposed modification because Aizawa teaches that its flat acrylic plate improves adhesion on the palm side of the

41

wrist, while Ohsaki teaches that its convex board "has a tendency to slip" on the palm side of the wrist. *Id.* at 37–39 (citing, e.g., Ex. 2004 ¶¶ 82–84).

Third, Patent Owner argues that a person of ordinary skill in the art would not have placed Ohsaki's convex cover over Aizawa's peripheral detectors because the convex cover would condense light toward the center and away from Aizawa's detectors, which would decrease optical signal strength. PO Resp. 39–46 (citing, e.g., Ex. 2004 ¶¶ 85–97). Patent Owner also contends that Petitioner and Dr. Kenny admitted as much in a related proceeding. *Id.* at 40–41 (citing, e.g., Ex. 2019, 45; Ex. 2020, 69–70). Patent Owner also relies on Figure 14B of the '553 patent to support its position. *Id.* at 44–45 (citing Ex. 1001, 36:3–6, 36:13–15). Additionally, Patent Owner argues that its position is also supported by Inokawa, which also uses a convex lens to direct light toward the center but, in Inokawa's structure, the light is directed from peripheral emitters toward a central detector. *Id.* at 45–46 (citing, e.g., Ex. 1008 ¶¶ 15, 58). In light of the foregoing, Patent Owner argues that a person of ordinary skill in the art would have understood that the proposed modification would have decreased signal strength by directing light away from Aizawa's peripheral detectors. *Id.*

Fourth and finally, Patent Owner argues that a person of ordinary skill in the art "would have understood that Aizawa's flat plate would provide better protection than a convex surface" because it "would be less prone to scratches." *Id.* at 47–48 (citing Ex. 1008 ¶ 106; Ex. 2004 ¶ 98).

<u>Petitioner's Reply</u>

Concerning Patent Owner's first and second arguments, Petitioner responds that Ohsaki does not disclose the shape of its protrusion, other than

42

IPR2020-01537
Patent 10,588,553 B2

its convexity as shown in Figures 1 and 2, nor does Ohsaki require a rectangular shape or placement on the back of the wrist in order to achieve the disclosed benefits. Pet. Reply 8–9, 13–20 (citing, e.g., Ex. 1047 ¶¶ 16–28). Moreover, Petitioner asserts that "even if Ohsaki's translucent board 8 were somehow understood to be rectangular, obviousness does not require 'bodily incorporation' of features from one reference into another"; rather, a person of ordinary skill in the art "would have been fully capable of modifying Aizawa to feature a light permeable protruding convex cover to obtain the benefits" taught by Ohsaki. *Id.* at 15–16 (citing, e.g., Ex. 1047 ¶ 21). Similarly, regarding the location of the sensor, Petitioner asserts,

> [E]ven assuming for the sake of argument that a POSITA would have understood Aizawa's sensor as being limited to placement on the palm side of the wrist, and would have understood Ohsaki's sensor's "tendency to slip" when arranged on the front side as informing consideration of Ohsaki's teachings with respect to Aizawa, that would have further motivated the [person of ordinary skill in the art] to implement a light permeable convex cover in Aizawa's sensor, to improve detection efficiency of that sensor when placed on the palm side.

*Id.* at 17–18 (citing, e.g., Ex. 1047 ¶ 25). In other words, Ohsaki's disclosure that a convex surface suppresses variation in reflected light would have motivated an artisan to add such a surface to Aizawa to improve detection efficiency of that sensor when placed on the palm side. *Id.* at 18.

Concerning Patent Owner's third argument, Petitioner responds that adding a convex cover to Aizawa's sensor would not decrease signal strength but, instead, "would improve Aizawa's signal-to-noise ratio by causing more light backscattered from tissue to strike Aizawa's photodetectors than would have with a flat cover" because such a cover

43

IPR2020-01537
Patent 10,588,553 B2

improves light concentration across the entire lens and does not direct it only towards the center. *Id.* at 20–28 (citing, e.g., Ex. 1047 ¶¶ 29–57).

Petitioner asserts that Patent Owner and Dr. Madisetti "ignore[] the well-known principle of reversibility," by which "a ray going from P to S will trace the same route as one from S to P." Pet. Reply 20–22 (quoting Ex. 1040, 92; citing, e.g., Ex. 1040, 87–92; Ex. 1049, 106–111; Ex. 1047 ¶ 33). When applied to Aizawa's sensor, Petitioner contends that any condensing benefit achieved by a convex cover would thus direct emitted light toward Aizawa's peripheral detectors. *Id.* at 21–22 (citing, e.g., Ex. 1047 ¶¶ 32–38). Although Dr. Madisetti "refused to acknowledge this basic principle of reversibility during deposition," Petitioner contends this core concept of reversibility is applied in Aizawa. *Id.* at 22 (citing, e.g., Ex. 1041, 89:12–19; Ex. 1003 ¶¶ 83, 79; Ex. 1047 ¶ 32, 36–37).

Petitioner also asserts that Patent Owner and Dr. Madisetti overlook the fact that light rays reflected by body tissue will be scattered and diffuse and will approach the detectors "from various random directions and angles." Pet. Reply 23–25 (citing, e.g., Ex. 1019, 52, 86, 90; Ex. 1042, 803; Ex. 1047 ¶¶ 39–40; Ex. 2006, 163:12–164:2). This scattered and diffuse light, according to Petitioner, means that Ohsaki's convex cover cannot "focus all light at the center of the sensor device," as Patent Owner argues. *Id.* at 24. Instead, due to the random nature of this scattered light, Petitioner asserts that a person of ordinary skill in the art would have understood that "Ohsaki's convex cover provides at best a slight refracting effect, such that light rays that otherwise would have missed the detection area are instead directed toward that area as they pass through the interface provided by the cover." *Id.* at 25 (citing, e.g., Ex. 1047 ¶¶ 46–48). Petitioner applies this

44

IPR2020-01537
Patent 10,588,553 B2

understanding to Aizawa, and asserts that using a cover with a convex
protrusion in Aizawa would "enable backscattered light to be detected
within a circular active detection area surrounding" a central light source,
thereby "allow[ing] a larger fraction of light randomly backscattered from
tissue to be detected within the active detection area surrounding [the light]
source." *Id.* at 25–27 (citing, e.g., Ex. 1019, 86, 90; Ex. 1047 ¶¶ 41–48).

Petitioner relies upon the following illustration of this alleged effect.
Pet. Reply 28 (citing Ex. 1047 ¶ 55).



The above illustration depicts backscattered light with Aizawa's sensor
reflecting off user tissue in various directions, such that it impinges upon the
peripheral detectors from various random angles and directions. *Id.*
According to Petitioner, this "allow[s] the detector to capture light that
otherwise would have been missed by the detectors, regardless of their
location within the sensor device." *Id.*

Petitioner also dismisses Patent Owner's reliance on Figure 14B of the
'553 patent because it "is not an accurate representation of light that has
been reflected from a tissue measurement site. For example, the light
rays (1420) shown in FIG. 14B are collimated (i.e., travelling paths parallel
to one another), and each light ray's path is perpendicular to the detecting
surface." Pet. Reply 26 (citing, e.g., Ex. 1047 ¶¶ 49–51).

Concerning Patent Owner's fourth argument, Petitioner responds that
even if a flat surface might be less prone to scratching, that possible

45

IPR2020-01537
Patent 10,588,553 B2

disadvantage would have been weighed against the "known advantages of applying Ohsaki's teachings," and would not negate a motivation to combine. *Id.* at 28–29 (citing, e.g., Ex. 1047 ¶ 58).

Patent Owner's Sur-reply

Concerning Patent Owner's first and second arguments, Patent Owner reiterates its position that Ohsaki's purported benefits attach only to a sensor with a rectangular convex surface that is located on the back of the wrist, and that "even small changes in sensor orientation or measurement location result in slippage." Sur-reply 3–14, 8.

Concerning Patent Owner's third argument (that the convex cover would condense light toward the center and away from Aizawa's detectors), Patent Owner asserts that Petitioner's Reply improperly presents several new arguments, relying on new evidence, as compared with the Petition. *Id.* at 16 (regarding reversibility), 16–20. Patent Owner argues that Dr. Kenny and Petitioner have not overcome their admissions that a convex lens directs light toward the center. *Id.* at 14–16, 19. Moreover, Patent Owner argues that Petitioner's discussion of the principle of reversibility is "irrelevant" because it "assumes conditions that are not present when tissue scatters and absorbs light." *Id.* at 16–17. The random nature of backscattered light, in Patent Owner's view, "hardly supports Petitioner's argument that light will necessarily travel the same paths regardless of whether the LEDs and detectors are reversed," and is irrelevant to the central issue presented here of "whether changing Aizawa's flat surface to a convex surface results in more light on Aizawa's peripherally located detectors." *Id.* at 18.

Patent Owner also asserts that Petitioner mischaracterizes Patent Owner's position, which is not that Ohsaki's cover with a convex protrusion

46

IPR2020-01537
Patent 10,588,553 B2

"focuses *all* light to a single point" at the center of the sensor as Petitioner characterizes it. Sur-reply 19. Patent Owner's position, rather, is that Petitioner has not shown that a person of ordinary skill in the art "would have been motivated to change Aizawa's flat surface to a convex surface to improve signal strength." *Id.* at 19. In Patent Owner's view, by arguing that the convex cover provides only a "slight refracting effect," Petitioner undermines its contention that providing such a cover would have improved detection efficiency. *Id.*

Patent Owner also argues that Petitioner's contention that a convex cover allows more light collection generally is a new theory not supported by Dr. Kenny's original declaration. *Id.* at 20. Moreover, Patent Owner argues that Petitioner's theory is "unavailing because it fails to consider the greater decrease in light at the detectors due to light redirection to a more central location." *Id.* at 21. According to Patent Owner, any light redirected from the sensor's edge could not make up for the loss of signal strength from light redirected away from the detectors and toward the center. *Id.*

Concerning Patent Owner's fourth argument, Patent Owner argues that Petitioner does not dispute Patent Owner's position that a flat cover would be less prone to scratches and offers "*no* plausible advantages for its asserted combination." *Id.* at 23. Moreover, Patent Owner argues that the risk of scratches undermines Petitioner's argument of adding a convex cover to protect the elements within the sensor housing. *Id.*

Analysis

As noted above, Petitioner provides three rationales to support its contention that a person of ordinary skill in the art would have provided "a light permeable cover with a protruding convex surface," such as that taught

47

**Appx20831**

by Ohsaki, to Aizawa's sensor: (1) to improve adhesion between the sensor and the user's tissue, (2) to improve detection efficiency, and (3) to protect the elements within the sensor housing. Pet. 36–37 (citing, e.g., Ex. 1003 ¶¶ 94–97; Ex. 1009 ¶ 25). As further examined below, we determine all three rationales are supported by the evidence, and further that any single rationale standing alone would have been sufficient to establish a basis for the person of ordinary skill in the art to combine the references as proposed.

<u>Rationales 1 and 2</u>

The evidence of record persuades us that adding a convex cover, such as that taught by Ohsaki, would have improved adhesion between the sensor and the user's skin, which would have increased the signal strength of the sensor. Ohsaki teaches as much:

> [T]he convex surface of the translucent board 8 is in intimate contact with the surface of the user's skin. Thereby *it is prevented that the detecting element 2 slips off* the detecting position of the user's wrist 4. If the translucent board 8 has a flat surface, the detected pulse wave is adversely affected by the movement of the user's wrist 4 as shown in Fig. 4B. However, in the case that the translucent board 8 has a convex surface like the present embodiment, the *variation of the amount of the reflected light which is emitted from the light emitting element 6 and reaches the light receiving element 7 by being reflected by the surface of the user's skin is suppressed. It is also prevented that noise such as disturbance light from the outside penetrates the translucent board 8.* Therefore the pulse wave can be detected without being affected by the movement of the user's wrist 4 as shown in FIG. 4A.

Ex. 1009 ¶ 25 (emphasis added); *see also id.* ¶ 27 ("detecting element 2 is stably fixed").

We credit Dr. Kenny's testimony that a person of ordinary skill in the art would have been motivated by such teachings to apply a cover with a

convex surface to Aizawa to improve that similar device in the same way and to yield predictable results, i.e., to resist movement of the sensor on the user's wrist and to suppress variation. *See, e.g.*, Ex. 1003 ¶¶ 85 ("[T]his contact between the convex surface and the user's skin is said to prevent slippage, which increases the strength of the signals obtainable by Ohsaki's sensor."), 87, 152 ("[O]ne of ordinary skill would have understood that this adjustment would improve adhesion to the user's skin and reduce variation in the signals detected by the sensor."). We find persuasive Dr. Kenny's explanation that the person of ordinary skill in the art "would have understood that a protruding convex cover would reduce the adverse effects of user movement on signals obtainable by the photodetectors within Aizawa's sensor, which like Ohsaki's light receiving elements, detect light reflected from user tissue." Ex. 1047 ¶ 12.

Indeed, Ohsaki expressly compares the performance of a wrist-worn pulse wave sensor depending on whether translucent board 8 is convex or flat, and concludes the convex surface results in improved performance over the flat surface, especially when the user is moving. Ex. 1009, Figs. 4A–4B, ¶¶ 15, 25 (stating that with "a flat surface, the detected pulse wave is adversely affected by the movement of the user's wrist 4," and with "a convex surface like the present embodiment, the variation of the amount of the reflected light" collected by the sensor "is suppressed"). Ohsaki also states that, with a convex surface, "[i]t is also prevented that noise such as disturbance light from the outside penetrates the translucent board 8." *Id.* ¶ 25.

49

IPR2020-01537
Patent 10,588,553 B2

We also credit Dr. Kenny's testimony that the proposed modification would have been within the skill level of an ordinary artisan. For example, Dr. Kenny testifies:

> One of ordinary skill would have combined the teachings of Aizawa-Inokawa and Ohsaki as doing so would have amounted to nothing more than the use of a known technique to improve similar devices in the same way. One of ordinary skill would have recognized that incorporating Ohsaki's convex surface is simply improving Aizawa-Inokawa's transparent plate 6 that has a flat surface to improve adhesion to a subject's skin and reduce variation in the signals detected by the sensor. [Ex. 1009 ¶ 25]. Furthermore, the elements of the combined system would each perform similar functions they had been known to perform prior to the combination—Aizawa-Inokawa's transparent plate 6 would remain in the same position, performing the same function, but with a convex surface as taught by Ohsaki.

Ex. 1003 ¶ 91; *see also id.* ¶¶ 77–91. In light of Ohsaki's express disclosure of the benefits of a convex cover, we credit Dr. Kenny's testimony that a person of ordinary skill in the art would have been motivated to modify Aizawa as proposed, and would have had a reasonable expectation of success in doing so.

We next address Patent Owner's first through third arguments, each of which implicates Petitioner's first and second asserted rationales of improved adhesion and detection efficiency.

Patent Owner's first argument is premised on the notion that Ohsaki's benefits only can be realized with a rectangular convex surface, because such a shape is required to avoid interacting with bones on the back of the user's forearm. PO Resp. 19–27. We disagree. Ohsaki does not disclose the shape of its convex cover, much less require it be rectangular. In fact,

50

IPR2020-01537
Patent 10,588,553 B2

Ohsaki is silent as to the shape of the convex surface. Ohsaki discloses that sensor 1 includes detecting element 2, which includes package 5 within which the sensor components are located. Ex. 1009 ¶ 17. Ohsaki's convex surface is located on board 8, which is "attached to the opening of the package 5." *Id.* Ohsaki provides no further discussion regarding the shape of board 8 or its convex protrusion.

We disagree with Patent Owner's suggestion that the shape of the convex surface can be inferred to be rectangular from Ohsaki's Figures 1 and 2. PO Resp. 14–16. Ohsaki does not indicate that these figures are drawn to scale, or reflect precise dimensions or shapes of the convex surface. *See, e.g.*, Ex. 1009 ¶ 13 ("schematic diagram"); *see also* Pet. Reply 13–15; *Hockerson-Halberstadt, Inc. v. Avia Group Int'l*, 222 F.3d 951, 956 (Fed. Cir. 2000) ("[I]t is well established that patent drawings do not define the precise proportions of the elements and may not be relied on to show particular sizes if the specification is completely silent on the issue.").

To be clear, Ohsaki describes the shape of *detecting element 2* as rectangular: "[T]he length of the detecting element from the right side to the left side in FIG. 2 is longer than the length from the upper side to the lower side." Ex. 1009 ¶ 19. Ohsaki also describes that detecting element 2 is aligned longitudinally with the user's forearm: "[I]t is desirable that the detecting element 2 is arranged so that its longitudinal direction agrees with the longitudinal direction of the user's arm," to avoid slipping off. *Id.*; *see also id.* ¶ 9 ("The light emitting element and the light receiving element are arranged in the longitudinal direction of the user's arm.").

51

IPR2020-01537
Patent 10,588,553 B2

In light of this disclosed rectangular shape of detecting element 2, it is certainly possible that Ohsaki's convex surface may be similarly shaped. But, it may not be. Contrary to Patent Owner's argument, Ohsaki neither describes nor requires detecting element 2 to have the same shape as the convex surface of board 8. *Accord* Pet. Reply. 13–16 (noting also that Ohsaki's board 8 "is not coextensive with the entire tissue-facing side of detecting element 2"). We have considered the testimony of both Dr. Kenny and Dr. Madisetti on this point. Ex. 1047 ¶¶ 10–11, 14, 16–21; Ex. 2004 ¶¶ 39–42 (relying on Ohsaki's Figures 1–2 to support his opinion that the convex surface is rectangular). Dr. Madisetti's reliance on the dimensions of Ohsaki's figures is unpersuasive. *Hockerson-Halberstadt*, 222 F.3d at 956. We credit Dr. Kenny's testimony that Ohsaki does not describe its convex surface as rectangular, because this testimony is most consistent with Ohsaki's disclosure.

Further, Patent Owner suggests that the convex surface *must be* rectangular, in order to avoid interacting with bones in the user's forearm. PO Resp. 21–23; Sur-reply 9 ("[A] POSITA would have understood Ohsaki's convex board must also have a longitudinal shape oriented up-and-down the watch-side of the user's wrist/forearm."). Although Ohsaki recognizes that interaction with these bones can cause problems, *see* Ex. 1009 ¶¶ 6, 19, we do not agree that the *only way* to avoid these bones is by aligning a rectangular cover with the longitudinal direction of the user's forearm. For example, in the annotated Figures provided by Patent Owner, *see* PO Resp. 22, we discern that the circular sensor that purports to depict the proposed modification would *also* avoid the bones in the forearm if it were slightly smaller. Patent Owner provides no persuasive explanation to

52

justify the dimensions it provides in this annotated figure, or to demonstrate that such a large sensor would have been required. Indeed, we discern that it would have been within the level of skill of an ordinary artisan to appropriately size a modified sensor to avoid these well-known anatomical obstacles. "A person of ordinary skill is also a person of ordinary creativity, not an automaton." *KSR*, 550 U.S. at 421. After all, an artisan must be presumed to know something about the art apart from what the references disclose. *See In re Jacoby*, 309 F.2d 513, 516 (CCPA 1962).

Finally, we do not agree with Patent Owner's position that Ohsaki's advantages apply only to rectangular convex surfaces. As discussed, Patent Owner has not shown that Ohsaki's convex surface is rectangular at all. Moreover, even if Ohsaki's convex surface is rectangular, when discussing the benefits associated with a convex cover, Ohsaki does not limit those benefits to a cover of any particular shape. Instead, Ohsaki explains that "detecting element 2 is arranged on the user's wrist 4 so that the convex surface of the translucent board 8 is in intimate contact with the surface of the user's skin. Thereby it is prevented that the detecting element 2 slips off the detecting position of the user's wrist 4." Ex. 1009 ¶ 25; Ex. 1047 ¶ 10. Thus, we agree with Petitioner that Ohsaki's teaching of a convex surface would have motivated a person of ordinary skill in the art to add such a surface to Aizawa's circular-shaped sensor, to improve adhesion as taught by Ohsaki. *See, e.g.*, Pet. 24–25. Nothing in Ohsaki's disclosure limits such a benefit to a specific shape of the convex surface. Ex. 1047 ¶¶ 10–11, 14–21.

Moreover, Ohsaki contrasts the ability to properly receive reflected light with a convex surface as compared to a flat surface and notes that,

53

in the case that the translucent board 8 has a convex surface . . . the variation of the amount of the reflected light which is emitted from the light emitting element 6 and reaches the light receiving element 7 by being reflected by the surface of the user's skin is suppressed. It is also prevented that noise such as disturbance light from the outside penetrates the translucent board 8. Therefore the pulse wave can be detected without being affected by the movement of the user's wrist 4 as shown in FIG. 4A.

Ex. 1009 ¶ 25; Ex. 1047 ¶ 11. Again, we agree with Petitioner that Ohsaki's teaching of a convex surface would have motivated a person of ordinary skill in the art to add such a surface to Aizawa's sensor, to improve signal strength, as taught by Ohsaki. *See, e.g.*, Pet. 24–27. Again, nothing in Ohsaki's disclosure limits such a benefit to the shape of the convex surface. Ex. 1047 ¶¶ 10–12, 13, 16–21.

Accordingly, we do not agree that Ohsaki's disclosed advantages attach only to a rectangular convex surface, or would have been inapplicable to the proposed combination of Aizawa and Ohsaki.

We have considered Patent Owner's second argument, that Ohsaki's benefits are realized only when the sensor and convex surface are placed on the back of the user's wrist, which is the opposite side of the wrist taught by Aizawa. PO Resp. 27–36. We do not agree. As an initial matter, Petitioner does not propose bodily incorporating the references; Petitioner simply proposes adding a convex cover to Aizawa's sensor, without discussing where Aizawa's sensor is used. *See, e.g.*, Pet. 28. In other words, Petitioner's proposed modification does not dictate any particular placement, whether on the palm side or back side of the wrist.

To be sure, Ohsaki's Figures 3A–3B compare the performance of detecting element 2, including its translucent board 8 having a convex

IPR2020-01537
Patent 10,588,553 B2

protrusion, and show better performance when the element is attached to the back side of the wrist versus the front side of the wrist, when the user is in motion. *See* Ex. 1009 ¶¶ 23–24, Figs. 3A–3B. However, we do not agree that these figures support Dr. Madisetti's conclusion that "Ohsaki indicates a convex surface only prevents slipping on the back (i.e., watch) side of the wrist in a specific orientation, but tends to slip when used in different locations or orientations" such as the palm side of the wrist—particularly in comparison to a flat surface such as Aizawa's. Ex. 2004 ¶¶ 66, 75. Instead, Ohsaki acknowledges that, even when the detecting element is located "on the front [palm] side of the user's wrist 4, *the pulse wave can be detected well* if the user is at rest." Ex. 1009 ¶ 23 (emphasis added). Thus, Ohsaki discloses that, in at least some circumstances, a convex surface located on the front of the user's wrist achieves benefits. *Id.* Notably, Ohsaki's claims are not limited to detection during movement or exercise.

We credit, instead, Dr. Kenny's testimony that a person of ordinary skill in the art would have understood from Ohsaki that a convex protrusion will help prevent slippage, even in the context of Aizawa's sensor. *See* Ex. 1047 ¶¶ 10, 15, 22–28, 73. This is because the convex protrusion "promot[es] 'intimate contact with the surface of the user's skin,'" which "would have increased adhesion and reduced slippage of Aizawa's sensor when placed on the palm side of a user's wrist, with associated improvements in signal quality." *Id.* ¶¶ 27, 28 ("additional adhesive effect").

Dr. Madisetti testifies that

[b]ased on Aizawa's teaching that a flat acrylic plate improves adhesion on the palm side of the wrist, and Ohsaki's teaching that a convex surface tends to slip on the palm side of the wrist, a

55

> [person of ordinary skill in the art] would have come to the
> opposite conclusion from Dr. Kenny: that modifying Aizawa's
> flat adhesive plate "to include a lens/protrusion . . . similar to
> Ohsaki's translucent board' would not 'improve adhesion.'"

Ex. 2004 ¶ 84; *see also id.* ¶ 82. We disagree with this reading of Aizawa.
It is true that Aizawa's plate 6 is illustrated as having a flat surface
(Ex. 1006, Fig. 1(b)), and that Aizawa states the plate "improve[s] adhesion"
(*id.* ¶ 13). Aizawa further states: "the above belt 7 is fastened such that the
acrylic transparent plate 6 becomes close to the artery 11 of the wrist 10,"
and "[t]hereby, adhesion between the wrist 10 and the pulse rate detector 1 is
improved." *Id.* ¶ 26. These disclosures, however, indicate the improved
adhesion is provided by the acrylic material of plate 6, not the shape of the
surface of the plate, which is never specifically addressed. *See also id.*
¶¶ 30, 34 ("Since the acrylic transparent plate 6 is provided . . . adhesion
between the pulse rate detector 1 and the wrist 10 can be improved . . . .").
Aizawa does not associate this benefit of improved adhesion with the surface
shape of the plate, but rather, with the existence of an acrylic plate to begin
with. Thus, there is no teaching away from using a convex surface to
improve the adhesion of Aizawa's detector to the user's wrist.

We have considered Patent Owner's third argument that a convex
cover would condense light away from Aizawa's peripheral detectors, which
Patent Owner alleges would decrease signal strength. PO Resp. 39–46. We
disagree.

There appears to be no dispute that when emitted light passes through
user tissue, the light diffuses and scatters as it travels. *See, e.g.*, Pet.
Reply 22–26; Tr. 27:18–28:4 (Petitioner's counsel agreeing that "the
incoming light from a detection standpoint is going to be coming from all

IPR2020-01537
Patent 10,588,553 B2

sorts of different directions because of the randomness caused by the back scattering"), 65:23–66:16 (Patent Owner's counsel agreeing that light does not simply enter tissue and come back out "like it came out on a mirror"); Ex. 1041, 35:19–37:18 (Patent Owner's declarant describing light scattering as it travels through tissue, e.g., reflecting off blood, tissue, or other material); Ex. 1043, 28:2–10 (Patent Owner's declarant agreeing that reflecting light can be a signal for the '553 patent's sensor), 61:20–62:4 (explaining that "a light in this context, light emitted from the LEDs is diffused through the skin in that particular context, whatever that is"); Ex. 1047 ¶ 36.

The light thus travels at random angles and directions, and no longer travels in a collimated and perpendicular manner. Exhibit 1040,[5] Figure 4.12, illustrates the difference between diffuse and collimated light, and is reproduced below:

---

[5]  Eugene Hecht, *Optics* (2nd ed. 1990).

57

IPR2020-01537
Patent 10,588,553 B2



This figure provides at left a photograph and an illustration showing incoming collimated light reflecting from a smooth surface, and at right a photograph and an illustration of incoming collimated light reflecting from a rough surface. *See* Ex. 1040, 87–88 (original page numbers). The smooth surface provides specular reflection, in which the reflected light rays are collimated like the incoming light rays. *See id.* The rough surface provides diffuse reflection, in which the reflected light rays travel in random directions. *See id.*; *see also* Ex. 1047 ¶ 51 ("A [person of ordinary skill in the art] would have understood . . . the light that backscatters from the measurement site after diffusing through tissue reaches the circular active detection area provided by Aizawa's detectors from various random directions and angles.").

Dr. Kenny testifies that Aizawa "detect[s] light that has been 'partially reflected, transmitted, absorbed, and scattered by the skin and other tissues

and the blood before it reaches the detector.'" Ex. 1047 ¶ 51 (quoting Ex. 1019, 86). Dr. Kenny further opines that a convex cover, when added to Aizawa's sensor with multiple detectors symmetrically arranged about a central light source, allows light rays that otherwise would have missed the detection area to instead be directed toward that area as they pass through the interface provided by the cover, thus increasing the light-gathering ability of Aizawa's sensor. *Id.* ¶¶ 46–48.

By contrast Dr. Madisetti testifies that "a convex surface condenses light passing through it towards the center of the sensor and away from the periphery." Ex. 2004 ¶ 86; *see also id.* ¶¶ 85, 89. We have considered this testimony, however, Dr. Madisetti's opinions largely are premised upon the behavior of collimated and perpendicular light as depicted in Figure 14B of the challenged patent. *See id.* ¶ 88. Dr. Madisetti does not explain how light would behave when approaching the sensor from various angles, as it would after being reflected by tissue. *Id.* ¶¶ 86–89; *see also id.* ¶¶ 90–97 (addressing motivation and also failing to discuss diffuse, scattered light). In other words, even if Patent Owner is correct that the '553 patent's Figure 14B depicts light condensing toward the center, this is not dispositive to the proposed modification, because light reflected by a user's tissue is scattered and random, and is not collimated and perpendicular as shown in Figure 14B. Ex. 1001, Fig. 14B.

Patent Owner and Dr. Madisetti argue that "Petitioner and Dr. Kenny both admit that a convex cover condenses light towards the center of the sensor and away from the periphery," in a different petition filed against a related patent, i.e., in IPR2020-01520. PO Resp. 40–42; Ex. 2004 ¶¶ 86–87. The cited portions of the Petition and Dr. Kenny's declaration from

59

IPR2020-01537
Patent 10,588,553 B2

IPR2020-01520 discuss a decrease in the "mean path length" of a ray of light when it travels through a convex lens rather than through a flat surface. *See, e.g.*, Ex. 2020 ¶¶ 118–120. We do not agree that this discussion is inconsistent with Dr. Kenny's testimony here that, where light is reflected to the detectors at various random angles and directions, more light will reach Aizawa's symmetrically disposed detectors when travelling through the convex surface than would be reached without such a surface, because light that might have otherwise missed the detectors now will be captured. *See, e.g.*, Ex. 1047 ¶¶ 29, 30, 56, 57 ("the addition of a convex cover allows the detectors to capture some of the reflected light that otherwise would have missed them completely"). We do not discern that the convergence of a single ray of light toward the center, as discussed in IPR2020-01520, speaks to the aggregate effect on *all* light that travels through the convex surface.

We additionally do not agree with Patent Owner's argument that Petitioner's Reply presents new arguments and evidence that should have been first presented in the Petition, to afford Patent Owner an adequate opportunity to respond. *See* Sur-reply 16–19. The Petition proposed a specific modification of Aizawa to include a convex protrusion in the cover, for the purpose of increasing the light gathering ability of Aizawa's device. *See* Pet. 24–28. The Patent Owner Response then challenged that contention, with several arguments that Petitioner's proposed convex protrusion would not operate in the way the Petition alleges it would operate. *See* PO Resp. 39–47. This opened the door for Petitioner to provide, in the Reply, arguments and evidence attempting to rebut the contentions in the Patent Owner Response. *See* PTAB Consolidated Trial Practice Guide

60

IPR2020-01537
Patent 10,588,553 B2

(Nov. 2019) ("Consolidated Guide"),[6] 73 ("A party also may submit rebuttal evidence in support of its reply.").  This is what Petitioner did here.  The Reply does not change Petitioner's theory for obviousness; rather, the Reply presents more argument and evidence in support of the same theory for obviousness presented in the Petition.  *Compare* Pet. 24–28, *with* Pet. Reply 20–27.

Rationale 3

Petitioner further contends that a person of ordinary skill in the art would have recognized that a cover with a protruding convex surface, such as that taught by Ohsaki, would "protect the elements within the sensor housing" of Aizawa.  Pet. 44–45.  We are persuaded that adding a convex cover, such as that taught by Ohsaki, would also protect the sensor's internal components in a manner similar to Aizawa's flat acrylic plate.  Ex. 1003 ¶ 87; *see also* Ex. 1008 ¶ 15 (noting that a cover "protect[s] the LED or PD").

We disagree with Patent Owner's fourth argument that a person of ordinary skill in the art would not have modified Aizawa as proposed because a convex cover would be prone to scratches and because other alternatives existed.  Patent Owner's counsel did not dispute, during the oral hearing, that a convex cover would indeed serve to protect the internal sensor components in Aizawa, as Petitioner proposes.  Tr. 64:6–65:5 (but noting that a flat cover would also protect, and would be less prone to scratches).  Even if a convex cover seated against the skin may be more prone to scratches than Aizawa's flat cover, this is one of numerous

---

[6]  Available at https://www.uspto.gov/TrialPracticeGuideConsolidated.

61

IPR2020-01537
Patent 10,588,553 B2

tradeoffs that a person of ordinary skill in the art would consider, in determining whether the benefits of increased adhesion, signal strength, and protection outweigh the potential for a scratched cover. *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1165 (Fed. Cir. 2006). The totality of the final record does not support that the possibility of scratches alone would have dissuaded a person of ordinary skill in the art from the proposed modification, to achieve the benefits identified by Petitioner.

For the foregoing reasons, we are persuaded by Petitioner's contentions.

### *vi.    Summary*

For the foregoing reasons, we determine that Petitioner has met its burden of demonstrating by a preponderance of the evidence that claim 1 would have been obvious over the cited combination of references.

### *5.    Independent Claims 10 and 20*

Independent claims 10 and 20 consists of limitations that are substantially similar to elements [a]–[d] of claim 1. *Compare* Ex. 1001, 44:50–44:67, *with id.* at 45:35–47, 46:22–46. In asserting that claims 10 and 20 also would have been obvious over the combined teachings of Aizawa, Inokawa, and Ohsaki, Petitioner refers to the same arguments presented as to claim 1, except for a few unique limitations. *See* Pet. 56–62, 57 (providing explanation for how the art teaches the "planar surface" required by claim 10), 69–72 (describing how the art teaches "positioning the photodetectors 22 within a space formed by the substrate, the wall, and the cover" required by claim 20).

Patent Owner relies on the same arguments discussed above regarding claim 1. PO Resp. 10–55.

62

IPR2020-01537
Patent 10,588,553 B2

For the same reasons discussed above, and for the reasons provided by Petitioner for the unique limitations, we determine that Petitioner has met its burden of demonstrating by a preponderance of the evidence that claims 10 and 20 would have been obvious over the cited combination of references.

### 6. Dependent Claims 2–6, 9, 11–18, 21–24, and 29

Petitioner also contends that claims 2–6, 9, 11–18, 21–24, and 29 would have been obvious based on the same combination of prior art addressed above. These challenged claims all depend directly or indirectly from independent claim 1, 10, or 20. Petitioner identifies teachings in the prior art references that teach the limitations of these claims, and provides persuasive reasoning as to why the claimed subject matter would have been obvious to one of ordinary skill in the art. Pet. 46–55, 62–68, 72–74. Petitioner also supports its contentions for these claims with the testimony of Dr. Kenny. Ex. 1003 ¶¶ 153–175, 195–223, 240–252.

Patent Owner does not present any arguments for these claims other than those we have already considered with respect to independent claim 1. PO Resp. 54–55 ("[T]he Petition fails to establish that independent claims 1, 10, and 20 are obvious over the cited references of Ground 1 and therefore fails to establish obviousness of any of the challenged dependent claims.").

We have considered the evidence and arguments of record and determine that Petitioner has demonstrated by a preponderance of the evidence that claims 2–6, 9, 11–18, 21–24, and 29 would have been obvious over the combined teachings of Aizawa, Inokawa, and Ohsaki for the reasons discussed in the Petition and as supported by the testimony of Dr. Kenny.

63

IPR2020-01537
Patent 10,588,553 B2

### 7. Conclusion

For the foregoing reasons, we determine that Petitioner has met its burden of demonstrating by a preponderance of the evidence that claims 1–6, 9–18, 20–24, and 29 would have been obvious over the cited combination of references.

### E. Obviousness over the Combined Teachings of Aizawa, Inokawa, Ohsaki, and Mendelson-2006

Petitioner contends that claims 7 and 19 of the '553 patent would have been obvious over the combined teachings of Aizawa, Inokawa, Ohsaki, and Mendelson-2006. Pet. 75–94; *see also* Pet. Reply 31–34. Patent Owner disagrees. PO Resp. 55–58; *see also* Sur-reply 26–27.

Based on our review of the parties' arguments and the cited evidence of record, we determine that Petitioner has met its burden of showing by a preponderance of the evidence that claims 7 and 19 are unpatentable.

### 1. Mendelson-2006 (Ex. 1010)

Mendelson-2006 is a journal article titled "A Wearable Reflectance Pulse Oximeter for Remote Physiological Monitoring," and discloses a wireless wearable pulse oximeter connected to a personal digital assistant ("PDA"). Ex. 1010, 1.[7]

Figure 1 of Mendelson-2006 is reproduced below.

_____

[7] Petitioner cites to the page numbers added to Exhibit 1010, rather than the native page numbering that accompanies the article. *See, e.g.*, Pet. 75. We follow Petitioner's numbering scheme.

Appx20848

IPR2020-01537
Patent 10,588,553 B2



Figure 1 illustrates a sensor module attached to the skin (top), and a photograph of a disassembled sensor module and receiver module (bottom). The sensor module includes an optical transducer, a stack of round printed circuit boards, and a coin cell battery. *Id.* at 2.

Figure 2 of Mendelson-2006 is reproduced below.



Figure 2 depicts a system block diagram of the wearable, wireless, pulse oximeter including the sensor module (top) and the receiver module (bottom). *Id.* The sensor module includes at least one light-emitting diode

65

IPR2020-01537
Patent 10,588,553 B2

("LED"), a photodetector, signal processing circuitry, an embedded microcontroller, and an RF transceiver. *Id.* at 1–2. Mendelson-2006 discloses that a concentric array of discrete photodetectors could be used to increase the amount of backscattered light detected by a reflectance type pulse oximeter sensor. *Id.* at 4. The receiver module includes an embedded microcontroller, an RF transceiver for communicating with the sensor module, and a wireless module for communicating with the PDA. *Id.* at 2.

As a PDA for use with the system, Mendelson-2006 discloses "the HP iPAQ h4150 PDA because it can support both 802.11b and Bluetooth™ wireless communication" and "has sufficient computational resources." *Id.* at 3. Mendelson-2006 further discloses that

> [t]he use of a PDA as a local terminal also provides a low-cost touch screen interface. The user-friendly touch screen of the PDA offers additional flexibility. It enables multiple controls to occupy the same physical space and the controls appear only when needed. Additionally, a touch screen reduces development cost and time, because no external hardware is required . . . . The PDA can also serve to temporarily store vital medical information received from the wearable unit.

*Id.*

The PDA is shown in Figure 3 of Mendelson-2006, reproduced below.



Figure 3 illustrates a sample PDA and its graphical user interface ("GUI"). *Id.* Mendelson-2006 explains that the GUI allows the user to interact with

66

the wearable system. *Id.* "The GUI was configured to present the input and output information to the user and allows easy activation of various functions." *Id.* "The GUI also displays the subject's vital signs, activity level, body orientation, and a scrollable PPG waveform that is transmitted by the wearable device." *Id.* For example, the GUI displays numerical oxygen saturation ("SpO$_2$") and heart rate ("HR") values. *Id.*

### 2. Dependent Claims 7 and 19

Claims 7 and 19 additionally require "one or more processors configured to" receive either data or one or more signals from the detectors and output physiological measurement information to "a touchscreen display or mobile phone." Ex. 1001, 45:17–28, 46:11–21. Petitioner contends that it would have been obvious for a person of ordinary skill in the art to have modified the sensor system of Aizawa-Inokawa-Ohsaki to integrate processors and a touchscreen display as taught by Mendelson-2006. Pet. 77–94.

Petitioner's Contentions

Petitioner notes that Aizawa's pulse rate detector is communicably connected to and transmits pulse wave data to a display designed for displaying pulse rate data. Pet. 77 (citing Ex. 1006 ¶¶ 15, 23, 28). Petitioner contends that although the display is not depicted, a person of ordinary skill in the art would have found it obvious to implement the display as a touch-screen display. *Id.* Relying on Dr. Kenny, Petitioner argues that "physiological monitoring devices commonly employed touch-screen displays" as of 2008. *Id.* (citing Ex. 1003 ¶ 255). Petitioner relies on Mendelson-2006's pulse oximetry system that includes a sensor module that

67

transmits signals wirelessly to a PDA through a receiver module. Pet. 77–78 (citing Ex. 1010, 2–4, Figs. 1–3). Petitioner reasons that a person of ordinary skill in the art would have been motivated to look to Mendelson-2006 for details regarding data transmission and display using the Aizawa-Inokawa-Ohsaki sensor. Pet. 78–79 (citing Ex. 1003 ¶ 258). Petitioner argues that signals acquired by Mendelson-2006's sensor module are received by the embedded microcontroller where software filters the signals to compute oxygen saturation and heart rate. *Id.* Mendelson-2006 teaches that information acquired by the sensor module is transmitted wirelessly via an RF link over to a body-worn receiver module, and Petitioner relies on the data processed by the receiver module as being "transmitted wirelessly to a PDA." Pet. 79 (quoting Ex. 1010, 2).

According to Petitioner, a person of ordinary skill in the art would have enabled transfer of information pertaining to physiological and wellness parameters through wireless communication with the handheld PDA taught by Mendelson-2006 to enhance a provider's ability "to extend more effective medical care, thereby saving the lives of critically injured persons." Pet. 80 (citing Ex. 1010, 2; Ex. 1003 ¶ 261). Petitioner contends that a person of ordinary skill in the art "would have been motivated to implement Aizawa's pulse wave sensor as part of a physiological measurement system including a handheld computing device, and to enable a physiological sensor device including sensor 1 to communicate wirelessly with the handheld computing device." Pet. 81 (citing e.g., Ex. 1003 ¶ 262). Petitioner touts many advantages of the combination that a person of ordinary skill in the art would have recognized, including the benefit of incorporating Mendelson-2006's disclosure of a PDA with a touch-screen

68

IPR2020-01537
Patent 10,588,553 B2

display and "simple GUI" to present "information to the user" and provide "easy activation of various functions," into the Aizawa-Inokawa-Ohsaki sensor. Pet. 82 (citing Ex. 1010, 4).

Petitioner identifies teachings in the prior art references that teach or suggest the limitations of each of dependent claims 7 and 19, as well as the claims as a whole. Pet. 83–94. Petitioner also supports its contentions for these claims with the testimony of Dr. Kenny. Ex. 1003 ¶¶ 263–297.

Patent Owner's Contentions

Patent Owner disputes Petitioner's contentions. Patent Owner argues that Petitioner's proposed combination is rooted in hindsight and results in a more complicated system. PO Resp. 55–57. Patent Owner contends that "Petitioner's addition of Mendelson-2006's wireless approach makes no sense given that—as discussed above—Petitioner's combination already replaced Aizawa's wireless transmitter with Inokawa's base station approach." *Id.* at 56–57 (citing Ex. 2004 ¶ 119). Patent Owner characterizes Petitioner's combination as requiring a person of ordinary skill in the art to:

> (1) eliminate Aizawa's existing transmitter so the resulting device will not require "a separate RF circuit" (Pet. 24); (2) change Aizawa's structure to add a second LED to transmit data using a base station, which would also require that a user remove the sensor before any data transfer can occur and thus eliminate the ability to display data in real-time (Pet. 22-24); and then (3) add back in a separate communications circuit based on Mendelson-2006 to send data to a PDA with a touch screen display (Pet. 78-81, 85-86), thereby restoring the real-time display functionality original[ly] included in Aizawa's sensor.

*Id.* at 57 (citing, e.g., Ex. 2004 ¶¶ 119–120). Patent Owner further argues that such a modification eliminates the desired real-time monitoring

69

IPR2020-01537
Patent 10,588,553 B2

employed by Mendelson-2006. *Id.* (citing Ex. 2004 ¶¶ 113, 115).[8]  As argued by Patent Owner, a person of ordinary skill in the art looking to integrate a touch-screen display with Aizawa "would not bother with Inokawa's base station approach when Mendelson 2006 uses the same type of dedicated transmission circuit already present in Aizawa."  Sur-reply 27.

Analysis

As discussed above, we determine that Petitioner demonstrates sufficiently that a person of ordinary skill in the art would have been motivated to modify Aizawa to include an additional LED to, *inter alia*, allow for wireless transmission of sensed pulse rate and motion data to a base device.  Although Aizawa discloses transmission of data for display (Ex. 1006 ¶¶ 15, 35), Aizawa is silent as to how the data is transmitted or displayed.  In light of the combination with Inokawa, therefore, Aizawa's multiple LEDs would have allowed wireless transmission of data to a base device.  *See, e.g.*, Ex. 1008 ¶ 76 ("[V]ital sign information stored in the memory 63, such as pulse and body motion, is transmitted to the base device 17 using the S-side infrared LED 23 of the pulse sensor 1 and the B-side PD 45 of the base device 17.").  Inokawa further discloses that the base device, once it receives information from the sensor, "transmits this information to the PC 59."  *Id.* ¶ 75; *see also id.* ¶¶ 67, 77.

With this backdrop, we are persuaded by Petitioner's contention that a person of ordinary skill in the art would have been motivated to implement

---

[8] We do not address Patent Owner's argument that Mendelson-2006 does not disclose a "multi-emitter/multi-detector sensor" because Mendelson-2006 is not relied upon for such limitations.  PO Resp. 56.

70

the physiological sensor device resulting from the combined teachings of Aizawa, Inokawa, and Ohsaki as part of a physiological measurement system that includes a touchscreen display or mobile phone as further taught by Mendelson-2006. Indeed, Aizawa and Inokawa already teach the desirability of transmitting sensed data to, e.g., a computer or a display, although neither discloses further detail. *See, e.g.*, Ex. 1006, 15; Ex. 1008 ¶ 75; *see also* Ex. 1047 ¶ 66 (Aizawa "is silent about how such transmission would be implemented."). In light of these teachings, we credit Dr. Kenny's testimony that transmitting sensed data wirelessly to a handheld computing device, as taught by Mendelson-2006, would have achieved the identified benefits of, e.g., providing a low-cost display with a simple user interface and easy activation of functions (Ex. 1003 ¶¶ 66, 257) and the ability to provide more effective medical care when the handheld device is carried by first responders (*id.* ¶ 261). *See, e.g.*, *id.* ¶¶ 253–264; Ex. 1047 ¶¶ 64–70. We are also persuaded that this would have been within the skill level of an ordinary artisan and would have achieved predictable results. Ex. 1003 ¶ 280 ("would have led to predictable results without altering or hindering the functions performed by the sensor," including "implement[ing] the well-known technique of connecting a physiological sensor to a handheld device to cause Aizawa-Inokawa-Ohsaki's sensor to include such features to achieve the predictable benefits offered by Mendelson 2006").

We do not agree with Patent Owner's characterization of the proposed combination. Petitioner does not propose "(1) eliminat[ing] Aizawa's existing transmitter . . . (2) chang[ing] Aizawa's structure to add a second LED to transmit data using a base station . . .; and then (3) add[ing] back in a separate communications circuit to the base station." PO Resp. 57. As

71

discussed above, Petitioner proposes that the system suggested by, *inter alia*, Aizawa and Inokawa—which includes a sensor in communication with a base device, and which contemplates additional communication from the base device to a PC—further includes a handheld computing device in wireless communication with that system. In other words, Petitioner's proposed combination effectively replaces or supplements Inokawa's PC 59 with a PDA, such as that taught by Mendelson-2006. Thus, in Petitioner's proposed combination, physiological data is sensed by Aizawa's sensor, transmitted to a base device through an additional LED, as taught by Inokawa, and further transmitted to, *inter alia*, a PDA, as taught by Mendelson-2006. *See, e.g.*, Pet. 77–83. Indeed, both Aizawa and Inokawa expressly contemplate transmission to an additional computing device (*see, e.g.*, Ex. 1006, 15; Ex. 1008 ¶ 75); Petitioner's proposed modification merely states that such transmission occurs wirelessly to a handheld device. The record supports this contention.

We have considered Dr. Madisetti's testimony, but it is based on the same mischaracterization put forth by Patent Owner. Ex. 2004 ¶¶ 118–120 (mischaracterizing the combination). Notwithstanding this misrepresentation of the proposed modification, Dr. Madisetti does not dispute Dr. Kenny's testimony that wireless transmission to a handheld computing device would have achieved the identified benefits, such as a low-cost device that improves medical care. *See id.* As such, we credit Dr. Kenny's unrebutted testimony.

Patent Owner and Dr. Madisetti further criticize the combination, asserting that Mendelson-2006's wireless transmission exists to allow real-time monitoring, which is impossible where a sensor must be mounted on a

72

base device to transfer information through LEDs.  *Id.* ¶ 119; *see also* PO
Resp. 56–57.  However, the lack of real-time measurement and transmission
is simply one consideration among many.  As noted in Inokawa, real-time
wireless communication has its drawbacks.  Ex. 1008 ¶ 5.  We discern that a
skilled artisan would have weighed these competing interests.  "[A] given
course of action often has simultaneous advantages and disadvantages, and
this does not necessarily obviate motivation to combine." *Medichem*, 437
F.3d at 1165 (citation omitted).

Further, as to the limitations of claims 7 and 19, the cited evidence
supports Petitioner's contention that Mendelson-2006 describes wirelessly
transmitting vital physiological information acquired from a sensor to a
PDA, which receives it.  Pet. 85–88; *see, e.g.*, Ex. 1010, 1, 2 ("The PDA can
monitor multiple wearable pulse oximeters simultaneously and allows
medics to collect vital physiological information to enhance their ability to
extend more effective care to those with the most urgent needs."), 3
(explaining that the PDA "has sufficient computational resources for the
intended application" and "can also serve to temporarily store vital medical
information received from the wearable unit"), 3 ("The [PDA's graphical
user interface] also displays the subject's vital signs, activity level, body
orientation, and a scrollable PPG waveform that is transmitted by the
wearable device."), Fig. 3 (displaying $SpO_2$ and HR data); Ex. 1003 ¶¶ 179–
180.  As discussed above, Petitioner's proposed combination involves
transmission of sensed data from Aizawa's physiological sensor to a base
device, as taught by Inokawa, and further wireless transmission of that data
from the base device to a handheld computing device, such as a PDA.

73

Claim 19 requires the "output of information indicative of measurements of the physiological parameter to" the touch-screen display or mobile phone. Ex. 1001, 46:19–21. The cited evidence further supports Petitioner's contention that Mendelson-2006 describes a PDA with a touchscreen display configured to display indicia responsive to measurements of, e.g., $SpO_2$ and HR. Pet. 85–88, 93; Ex. 1003 ¶ 297; *see, e.g.*, Ex. 1010, 3 ("The use of a PDA . . . also provides a low-cost touch screen interface.").

### 3. Conclusion

For the foregoing reasons, we determine that Petitioner has met its burden of demonstrating by a preponderance of the evidence that claims 7 and 19 would have been obvious over the cited combination of references.

### F. Obviousness over the Combined Teachings of Aizawa, Inokawa, Ohsaki, Mendelson-2006, and Sherman

Petitioner contends that claims 8 and 25–28 of the '553 patent would have been obvious over the combined teachings of Aizawa, Inokawa, Ohsaki, Mendelson-2006, and Sherman. Pet. 94–101; *see also* Pet. Reply 35–38. Patent Owner disagrees. PO Resp. 55–58; *see also* Sur-reply 27–29.

Based on our review of the parties' arguments and the cited evidence of record, we determine that Petitioner has met its burden of showing by a preponderance of the evidence that claims 8 and 25–28 are unpatentable.

### 1. Sherman (Exhibit 1011)

Sherman is a patent titled "Magnetic Clasp for Wristwatch Strap," and it relates to use of magnetizable material embedded in thermoplastic material with rows of alternating magnetic poles. Ex. 1011, codes (54), (57). Sherman discloses a magnetic fastening mechanism for "wrist instruments,"

74

IPR2020-01537
Patent 10,588,553 B2

such as wristwatches. *Id.* at 1:4–10. Sherman's system provides "an improved clasp for a flexible strap which eliminates buckles or other types of protruding mechanisms" and is "secured, yet easy to engage when desired." *Id.* at 2:1–11. As shown below in Figure 2 of Sherman, the mechanism includes a pair of flexible strap ends having "permanently magnetizable material" of opposite polarities in addition to "mutually nesting uniformly spaced protuberances and indentations." *Id.* at 2:43–62, Fig. 2.



Figure 2 of Sherman depicts an end elevational view showing the wristwatch and strap with transverse ridges 4a and 5a incorporating magnetic securing materials. *Id.*

### 2. *Dependent Claims 8 and 25–28*

Claims 8 and 25–28 add only one substantive common feature not addressed previously and that is "a magnet configured to be used as a connecting mechanism." Ex. 1001, 45:29–32 (claim 8), 46:66–67 (claim 25), 47:1–19 (claims 26–28 depending from claim 25). Petitioner contends that it would have been obvious for a person of ordinary skill in the art to have modified the sensor system of Aizawa-Inokawa-Ohsaki-

75

IPR2020-01537
Patent 10,588,553 B2

Mendelson-2006 to integrate a magnetic connection as taught by Sherman.
Pet. 94–100.

Petitioner's Contentions

Petitioner contends that "[t]he Aizawa-Inokawa-Ohsaki-Mendelson-2006 sensor does not describe the mechanism for closing the attachment strap 7 that fastens the sensor onto the subject's wrist, but a POSITA would have been motivated to look to other wearable, and specifically wrist worn, devices such as Sherman, for details regarding a mechanism for fastening the sensor to the subject's wrist." Pet. 96 (citing Ex. 1003 ¶ 300). Petitioner contends a person of ordinary skill in the art would have been motivated to add Sherman's magnetic connection in order to be more visually appealing, prevent corners from catching upon clothing, and to prevent broken connectors or accidental snagging. Pet. 96 (citing Ex. 1011, 1:11–24; Ex. 1003 ¶ 301).

Patent Owner's Contentions

Patent Owner disputes Petitioner's contentions. Patent Owner argues that Petitioner's proposed combination relies on Sherman solely for its alleged disclosure of a magnetic connector, but Ohsaki already includes a series of dedicated belts designed to exert a specific pressure on the user's wrist. PO Resp. 57 (citing Ex. 1009 ¶18). Patent Owner alleges that a person of ordinary skill in the art would have understood that any advantage from Ohsaki's convex board would also require Ohsaki's specific attachment arrangement, which includes belts and a cushion to prevent movement, yet, Petitioner does not explain how Sherman would have allowed consistent attachment pressure for its sensor as required by Ohsaki.

76

**Appx20860**

IPR2020-01537
Patent 10,588,553 B2

*Id.* at 57–58 (citing Ex. 1009 ¶ 18); *see also* Sur-reply 28 ("But Ohsaki teaches a specialized attachment mechanism having specific features to 'stably fix[]' the detecting element to the wrist and improve signal-to-noise."). Thus, Patent Owner contends that the person of ordinary skill in the art would not have been motivated to incorporate Sherman's magnetic attachment mechanism into Petitioner's proposed combination. *Id.* at 58 (citing Ex. 2004 ¶ 122); *see also* Sur-reply 28 ("Aizawa's silence about what strap to use for its *flat* sensor is irrelevant," because Ohsaki's arrangement stably fixes a convex surface.).

Analysis

　　We are persuaded by Petitioner's evidence and argument that a person of ordinary skill in the art would have been motivated to combine Sherman's teaching of a magnetic connection in the existing combination of references. We find persuasive Dr. Kenny's testimony that a person of ordinary skill in the art would have understood from Ohsaki itself that a cushion designed to exert a specific pressure is not required to obtain the benefits described in relation to Ohsaki's board. Ex. 1047 ¶¶ 71–72 (noting that "Ohsaki's independent claims 1, 3, and 5 do not recite a cushion") (citing Ex. 1009, claims 1–3, 5–7). Further, we are persuaded by Dr. Kenny's testimony that a person of ordinary skill in the art "would have understood that a cover with a convex protrusion would have provided the benefits taught by Ohsaki with any suitable strap, and in considering Ohsaki's teachings in relation to Aizawa, would have found it obvious to employ Sherman's magnetic connector." *Id.* ¶ 72. In light of the totality of the record, including Dr. Kenny's testimony, we determine that a person of ordinary skill in the art would have been motivated to employ Sherman's magnetic connector

77

IPR2020-01537
Patent 10,588,553 B2

because the pressure range required for Ohsaki's benefits could be achieved by any number of connection fastening mechanisms. *See id.*

Further, Patent Owner's arguments do not persuasively address Petitioner's proposed combination. *See* Pet. 24–28, 94–98. Ohsaki was relied upon for its teaching that a convex surface protruding into a user's skin will, *inter alia*, prevent slippage. *See id.*; *see also* Ex. 1047 ¶ 73; Ex. 1009, 25, Figs. 4A, 4B. As discussed above, we found persuasive Dr. Kenny's testimony that a person of ordinary skill in the art would have had reason, in view of that teaching, to modify the Aizawa's sensor's flat cover to include a protrusion, so as to improve adhesion between the user's wrist and the sensor's surface, improve detection efficiency, and protect the elements within the sensor housing. *See* Ex. 1003 ¶¶ 84–91. The resulting sensor features Aizawa's cover modified in view of Ohsaki, not Ohsaki's translucent board. Ex. 1047 ¶ 73 ("the resulting sensor features Aizawa's cover modified in view of Ohsaki, not Ohsaki's translucent board 8"). Likewise, Patent Owner does not effectively rebut Dr. Kenny's testimony that a person of ordinary skill in the art would have integrated a magnetic connector in the combination of references in view of Sherman for reasons related to engagement and user comfort. *See* PO Resp. 57–58; Ex. 1047 ¶¶ 73, 74 ("obvious in view of Sherman's teachings to incorporate a magnetic connector, both for ease of engagement and user comfort"); Ex. 1003 ¶¶ 300–303.

78

IPR2020-01537
Patent 10,588,553 B2

### *3. Conclusion*

For the foregoing reasons, we determine that Petitioner has met its burden of demonstrating by a preponderance of the evidence that claims 8 and 25–28 would have been obvious over the cited combination of references.

Appx20863

IPR2020-01537
Patent 10,588,553 B2

## III.    CONCLUSION

In summary:[9]

| Claims | 35 U.S.C. § | Reference(s)/ Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1–6, 9–18, 20–24, 29 | 103 | Aizawa, Inokawa, Ohsaki | 1–6, 9–18, 20–24, 29 | |
| 7, 19 | 103 | Aizawa, Inokawa, Ohsaki, Mendelson-2006 | 7, 19 | |
| 8, 25–28 | 103 | Aizawa, Inokawa, Ohsaki, Mendelson-2006, Sherman | 8, 25–28 | |
| **Overall Outcome** | | | 1–29 | |

---

[9] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding*. *See* 84 Fed. Reg. 16654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

80

IPR2020-01537
Patent 10,588,553 B2

## IV.    ORDER

Upon consideration of the record before us, it is:

ORDERED that claims 1–29 of the '553 patent have been shown to be unpatentable;

FURTHER ORDERED that, because this is a final written decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

81

IPR2020-01537
Patent 10,588,553 B2

PETITIONER:

Walter Renner
Roberto Devoto
Hyun Jin In
FISH & RICHARDSON P.C.
axf-ptab@fr.com
devoto@fr.com
in@fr.com

PATENT OWNER:

Joseph Re
Stephen Larson
Jarom Kesler
Jacob Peterson
KNOBBE, MARTENS, OLSON & BEAR, LLP
2jrr@knobbe.com
2swl@knobbe.com
2jzk@knobbe.com
2jup@knobbe.com

82

# CERTIFICATE OF SERVICE

I hereby certify that the original of this Notice of Appeal was filed via

U.S.P.S. Priority Mail Express on April 12, 2022 with the Director of the United

States Patent and Trademark Office at the address below:

Office of the Solicitor
United States Patent and Trademark Office
Mail Stop 8, Post Office Box 1450
Alexandria, VA 22313-1450

A copy of this Notice of Appeal is being filed and served on April 12, 2022 as

follows:

**To the USPTO Patent Trial and Appeal Board:**
Patent Trial and Appeal Board
Madison Building East
600 Dulany Street
Alexandria, VA 22313

(*via PTAB E2E – as authorized by the Board*)

**To the U.S. Court of Appeals for the Federal Circuit:**
Clerk of Court
U.S. Court of Appeals for the Federal Circuit
717 Madison Place, N.W.
Washington, DC 20439

(*via CM/ECF – with filing fee*)

**Counsel for Petitioner Apple, Inc.**
W. Karl Renner, Reg. No. 41,265
Andrew B. Patrick, Reg. No. 63,471
Fish & Richardson P.C.
3200 RBC Plaza
60 South Sixth Street
Minneapolis, MN 55402

IPR50095-0012IP2@fr.com
PTABInbound@fr.com
axf-ptab@fr.com
patrick@fr.com

(*via email pursuant to 37 C.F.R. § 42.6(e)*)

Dated:  April 12, 2022

/Jarom Kesler/
Jarom D. Kesler (Reg. No. 57,046)

Attorney for Patent Owner
Masimo Corporation

55313696

# IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Patent of:     Jeroen Poeze et al.
U.S. Patent No.:     10,588,553          Attorney Docket No.: 50095-00012IP2
Issue Date:          March 17, 2020
Appl. Serial No.:    16,534,949
Filing Date:         August 7, 2019
Title:               MULTI-STREAM DATA COLLECTION SYSTEM FOR
                     NONINVASIVE MEASUREMENT OF BLOOD
                     CONSTITUENTS

## DECLARATION OF DR. THOMAS W. KENNY

**Declaration**

I declare that all statements made herein on my own knowledge are true and that all statements made on information and belief are believed to be true, and further, that these statements were made with the knowledge that willful false statements and the like so made are punishable under Section 1001 of Title 18 of the United States Code.

By: _____

Thomas W. Kenny, Ph.D.

APPLE 1003

APPLE-1010, FIG. 1 (left) and FIG. 2 (right)

66. The PDA is a handheld device that provides a "touch screen" interface and a simple graphical user interface (GUI) "configured to present the input and output information to the user and allow[ for] easy activation of various functions." APPLE-1010, FIG. 3 (reproduced below); *see also* APPLE-1021, Cover, xvii-xviii, 10-12, 17, 63, 363; APPLE-1022, 4-11, 30-31.



Fig. 3. Sample PDA Graphical User Interface (GUI).

APPLE-1010, FIG. 3

### E. Overview of Sherman

67. Sherman discloses a magnetic fastening mechanism for "wrist instruments," such as wristwatches. APPLE-1011, 1:4-10. Sherman's system provides "an improved clasp for a flexible strap which eliminates buckles or other types of

33

Appx22888

## VII.    GROUND 1 – Claims 1-6, 9-18, 20-24, 29 are Rendered Obvious by Aizawa, Inokawa, and Ohsaki

### A.    Combination of Aizawa, Inokawa, and Ohsaki

#### 1.    *Plurality of emitters*

68.    As I have described in Section VI.A, Aizawa discloses a pulse wave sensor in which multiple detectors are disposed around a centrally located LED/emitter. APPLE-1006, ¶[0023].  Aizawa explains that "[t]he arrangement of the light emitting diode 21 and the photodetectors 22 is not limited" to that shown or described in connection with any particular embodiment.  APPLE-1006, ¶[0032]. Although Aizawa emphasizes the desirability of disposing photodetectors "on a circle concentric to" a light source, so as to enable accurate pulse wave detection "even when the attachment position of the pulse rate detector 1 is dislocated," Aizawa describes alternative arrangements in which "a plurality of light emitting diodes 21" are employed.  *Id.*, ¶¶[0032]-[0033].

69.    One of ordinary skill would have combined the teachings of Aizawa and Inokawa such that Aizawa's pulse wave sensor would be modified to include an additional LED as taught by Inokawa to improve the detected pulse wave by distinguishing between blood flow detection and body movement.  APPLE-1008, ¶(0059) (describing the use of the "S-side green LED 21…to sense the pulse from the light reflected off of the body (i.e. change in the amount of hemoglobin in the capillary artery), while the S-side infrared LED 23 serves to sense body motion

35

Appx22890

from the change in this reflected light"); APPLE-1006, ¶[0006] (recognizing the problem of weak signals from a wearable sensor because the sensor "detects the motion of a red corpuscle…and is easily affected by noise caused by the shaking of the body of the subject), ¶[0028] (describing a device for "computing the amount of motion load" such that the motion can be compensated for).

70.    Inokawa, for example, is directed to a wearable optical sensing system that gathers "various kinds of vital sign information such as pulse." APPLE-1008, ¶(0001). Inokawa's physiological sensor device includes a sensor and a base station. *Id*., ¶¶[0055]-[0066]. The sensor includes a "pair of light-emitting elements," the reflected light of which is used to "sense the pulse" of the subject by detecting "change in the amount of hemoglobin in the capillary artery" and to sense "body motion," and further includes a "single photodiode" that "receives the reflected light" from the light-emitting elements. *Id*., ¶¶[0058]-[0059]; FIG. 2. A convex lens is placed between the photodiode and the subject's skin; the lens is sufficiently rigid to make the tissue conform to the convex surface of the lens. *Id*., ¶[0058].

36

(FIG. 2)



APPLE-1008, FIG. 2

71.    The base station is "a charger with communication functionality that is used when the pulse sensor…is mounted." *Id.*, ¶[0060]; FIG. 3.  When the sensor is mounted onto the base station, "vital sign information…such as pulse and body motion, is transmitted to the base device…using the…infrared LED."  *Id.*, ¶[0076]. This enables the sensor component to transmit collected data to a computer through the base station, using an optical communications interface implemented through Inokawa's infrared LED.  *Id.*, ¶¶[0002], [0003], [0067], [0074]-[0077].

37

(FIG. 3)    Pulse Sensor 1



Base Device 17

APPLE-1008, FIG. 3

72.    In addition to enabling optical communication, the use of multiple LEDs

emitting light at different wavelengths—e.g. infrared and green LEDs—enables

Inokawa's sensor to detect body motion.  APPLE-1008, ¶[0014].  As Inokawa

explains, "when using sensor-side light-emitting means of various kinds…the

manner of use can be adjusted according to the properties of each respective

means" such that "work can be divided between the various means, with an

38

39

infrared LED used to **detect vital signs** and **transmit** vital sign information, and a green LED used to **detect pulse**." APPLE-1008, ¶¶[0014], [0040].

73.    More specifically, and as shown in Inokawa's FIG. 2, Inokawa's pulse sensor includes "a green light-emitting diode (S-side green LED) 21 and an infrared light-emitting diode (S-side infrared LED) 23, [and] a single photodiode (S-side PD) 25 that receives the reflected light from these." *Id.*, ¶[0058]. The green LED senses "the pulse from the light reflected off of the body (i.e. change in the amount of hemoglobin in the capillary artery)" and the infrared LED senses "body motion from the change in this reflected light." *Id.*, ¶[0059].

(Fig. 2)



APPLE-1008, FIG. 2 (annotated)

74.    To obtain the advantages described by Inokawa (e.g., to improve the detected pulse wave by enabling the sensor to distinguish between blood flow

39

detection and body movement, in addition to enabling wireless communication between the sensor and a base station), one of ordinary skill would have been motivated to configure Aizawa's pulse wave sensor to include at least two LEDs. APPLE-1008, ¶¶[0058]-[0059]; APPLE-1008, ¶¶[0006], [0028].

75.    As I illustrate below, the Aizawa-Inokawa sensor would have featured two LEDs in place of Aizawa's LED 21.



APPLE-1006, FIGS. 1(a) (top, annotated) and 1(b) (bottom, annotated)

40

41

**Appx22895**

76.    Aizawa-Inokawa would utilize two LEDs that emit two different wavelengths.  LED 21 in the implementation shown in Aizawa's FIG. 1(b) would simply be replaced with two LEDs.  In this manner, Aizawa's sensor would have been improved through the implementation of a separate LED to account for motion load which the system records and accounts for.  APPLE-1006, ¶¶[0006], [0028], [0035].

77.    One of ordinary skill would have combined the teachings of Aizawa and Inokawa as doing so would have amounted to nothing more than the use of a known technique to improve similar devices in the same way and combining prior art elements according to known methods to yield predictable results.  *KSR v. Teleflex*, 550 U.S. 398, 417 (2007).  Here, one of ordinary skill would have understood the combination to be nothing more than improving Aizawa's pulse wave sensor that uses a single LED with the use of a known technique disclosed by Inokawa to detect and record body motion in addition to blood flow.  Furthermore, one of ordinary skill would have understood that the elements of the combined system would each perform similar functions they had been known to perform prior to the combination.  For instance, in Aizawa-Inokawa, Aizawa's photodetectors would still detect light emitted by the LEDs and reflected by the subject's wrist, and Inokawa's two LEDs would still be used to emit light at different wavelengths.  Furthermore, one of ordinary skill would have readily

41

**Appx22896**

understood how to select different photodiodes with different sensitivities to detect the different wavelengths of light emitted by the two LEDs.

78.    One of ordinary skill would have looked to Inokawa's disclosure of two LEDs emitting light of different wavelengths, in part, because it provides additional functionality, including that of wireless communication with a base station. *Id.* Inokawa's base device 17 receives, for example, "pulse and body motion" data through "the S-side infrared LED 23 of the pulse sensor 1 and the B-side PD 45 of the base device 17." *Id.*, ¶(0076). "As a result, there is no need to use a special wireless communication circuit or a communication cable as previously, which makes it possible to transmit vital sign information to the base device 17 accurately, easily, and without malfunction." *Id.*, ¶[0077]. In other words, the LEDs provided on the sensor can be used not only to detect pulse rate but also to "accurately, easily, and without malfunction" transmit the sensed data to a base station.

79.    Although Inokawa shows its two emitters emitting light toward a centrally located detector, a POSITA would have recognized that the same effect can be achieved by having the emitters located centrally instead and emitting radially outward. Indeed, Aizawa itself recognizes this reversibility, stating that while the configurations depicted include a central emitter surrounded by detectors, the

42

"same effect can be obtained when…a plurality of light emitting diodes 21 are disposed around the photodetector 22."  APPLE-1006, ¶[0033].

80.     With reference to FIG. 19 below, Inokawa further teaches that the use of two LEDs instead of one further helps improve data transmission accuracy by using the second LED to transmit checksum information.  For example, Inokawa describes that "the presence of two pairs of light-emitting and light-receiving elements makes it possible to efficiently transmit information," including increasing the "**accuracy of data**…by transmitting and receiving a **checksum signal** using, for example, the S-side green LED 165 and the other B-side PD 157."  APPLE-1008, ¶¶[0111], [0044], [0048].



APPLE-1008, FIG. 19 (annotated)

43

Appx22898

81.    Intrinsic and extrinsic records confirm that one of ordinary skill would have naturally looked to another wearable physiological sensor, as disclosed in Inokawa, for transmission details.  Aizawa's device contemplates uploading data to a base device butt is silent about how such transmission would be implemented.  APPLE-1006, ¶[0023] (describing its "transmitter for transmitting the above pulse rate data to an unshown display"), ¶[0028] (describing that the transmitter also transmits data to "a device for computing the amount of motion load").  One of ordinary skill would have recognized that the LED of Aizawa could be used for data communication to a computing device for further analysis in a way that is wireless, eliminating problems associated with a physical cable, and that does not require a separate RF circuit, as taught by Inokawa.  APPLE-1008, ¶¶[0003] ("technology is also known that will transmit data wirelessly from a sensor that has obtained vital sign information to a base station that gathers this information"), [0067] ("base device 17 receives the information transmitted from the pulse sensor 1 by means of the B-side optical device component 41.  Note that the base device 17 is connected to a PC 59, and information transmitted from the pulse sensor 1 is downloaded to the PC 59 via the base device 17"), [0075] ("the base device 17, meanwhile, upon receiving the information transmitted from the pulse sensor 1, transmits this information to the PC 59.").

44

Appx22899

82.     One of ordinary skill would have further recognized that the use of two distinct LEDs to perform such communication would result in enhanced accuracy of the transmitted information.

83.     Although Inokawa shows its two emitters emitting light toward a centrally located detector, one of ordinary skill would have recognized that the same effect can be achieved by having the emitters located centrally instead and emitting radially outward.  Indeed, Aizawa itself recognizes this reversibility, stating that while the configurations depicted include a central emitter surrounded by detectors, the "same effect can be obtained when…a plurality of light emitting diodes 21 are disposed around the photodetector 22."  APPLE-1006, ¶[0033].

2.     *Convex surface*

84.     Additionally, one of ordinary skill would have combined the teachings of Aizawa-Inokawa with the teachings of Ohsaki such that the cover of Aizawa-Inokawa's wrist-worn sensor would include a convex surface, improving adhesion between a subject's wrist and a surface of the sensor.  APPLE-1009, ¶[0025] (the convex surface prevents slippage of the detecting element from its position on the subject's wrist, and the convex nature of the surface suppresses the "variation of the amount of the reflected light" that reaches the detecting element).

85.     In more detail, Ohsaki describes a "detecting element" that includes "a package 5, a light emitting element 6 (e.g., LED), a light receiving element 7 (e.g.,

45

PD), and a translucent board 8." APPLE-1009, ¶[0017]. "The package 5 has an opening and includes a" substrate in the form of "circuit board 9," on which light emitting element 6 and light receiving element 7 are arranged. *Id.*. As shown in Ohsaki's FIG. 2, translucent board 8 is arranged such that, when the sensor is worn "on the user's wrist … the convex surface of the translucent board … is in intimate contact with the surface of the user's skin"; this contact between the convex surface and the user's skin is said to prevent slippage, which increases the strength of the signals obtainable by Ohsaki's sensor. APPLE-1009, ¶¶[0015], [0017], [0025], FIGS. 1, 2, 4A, 4B.



APPLE-1009, FIG. 2 (annotated)

46

86.    Ohsaki explains that "if the translucent board 8 has a flat surface, the

detected pulse wave is adversely affected by the movement of the user's wrist as

shown in FIG. 4B," but that if "the translucent board 8 has a convex

surface…variation of the amount of the reflected light…that reaches the light

receiving element 7 is suppressed."  APPLE-1009, [0025].  The convex surface is

also said to prevent "disturbance light from the outside" from penetrating

translucent board 8.  *Id.*  Thus, when a convex cover is used, "the pulse wave can

be detected without being affected by the movement of the user's wrist 4 as shown

in FIG. 4A."  *Id.*



APPLE-1009, FIGS. 4A, 4B

47

48

87.    As shown below, one of ordinary skill would have found it obvious to modify the sensor's flat cover (left) to include a lens/protrusion (right), similar to Ohsaki's translucent board 8, so as to improve adhesion between the user's wrist and the sensor's surface, improve detection efficiency, and protect the elements within the sensor housing.  APPLE-1009, ¶[0025] (explaining that the convex surface of translucent board 8 prevents slippage of a detecting element from its position on the wrist, and suppresses the "variation of the amount of the reflected light" that reaches the detecting element); APPLE-1024, ¶¶[0033], [0035], FIG. 6 (depicting an LED featuring a convex lens).

88.    Indeed, by positioning a lens above the optical components of Aizawa, as shown below, the modified cover will allow more light to be gathered and refracted toward the light receiving cavities of Aizawa, thereby further increasing the light-gathering ability of Aizawa beyond what is achieved through the tapered cavities.  APPLE-1006, ¶¶[0012], [0024].



APPLE-1006, FIG. 1(b) (annotated)

48

89.    Furthermore, one of ordinary skill would have understood how to incorporate the shape of Ohsaki's cover into Aizawa's cover, and further would have expected such a modification to succeed given the high degree of overlap between the two references. For example, as discussed above, Ohsaki teaches that its light permeable cover can be flat or alternatively be in the shape of a convex lens to prevent "disturbance light from the outside" from penetrating translucent board 8. *Id*. Thus, when a convex cover is used, "the pulse wave can be detected without being affected by the movement of the user's wrist 4 as shown in FIG. 4A." *Id*. That is, depending on the desired objective of the user (e.g., simplicity or reduced variation in the amount of reflected light reaching the detector and improved adhesion to the user's wrist), the shape of the cover can be readily modified.

90.    One of ordinary skill would have further recognized that the acrylic material used to make Aizawa's "acrylic transparent plate 6" can be easily formed to include a convex protrusion. APPLE-1006, 3:46-41, FIG. 1; APPLE-1026, ¶¶[0022], [0032], [0035], FIG. 6. Indeed, many prior art references of this period, such as Nishikawa (shown below) demonstrate exactly how such a convex shape may be incorporated into a molded cover. APPLE-1026, ¶¶[0022], [0032], [0035], FIG. 6. In other words, one of ordinary skill would have known that acrylic is a transparent material that can be readily transformed into various shapes, including

49

a lens shape, as needed due to its easy molding properties. Thus, one of ordinary skill preferring improved adhesion to a user's tissue and the ability to detect a pulse wave "without being affected by the movement of the user's wrist" (APPLE-1009, ¶[0025]) could have been able to easily modify Aizawa's cover to have a lens shape as per Ohsaki. Indeed, only a routine knowledge of sensor design and assembly, which were well within the abilities of one of ordinary skill in the art, would be required to perform such modifications. Thus, to achieve the goal of improved adhesion and detection, one of ordinary skill would have been able to, with a reasonable expectation of success, modify Aizawa's light permeable cover to have a convex protrusion as taught by Ohsaki.

91.    One of ordinary skill would have combined the teachings of Aizawa-Inokawa and Ohsaki as doing so would have amounted to nothing more than the use of a known technique to improve similar devices in the same way. One of ordinary skill would have recognized that incorporating Ohsaki's convex surface is simply improving Aizawa-Inokawa's transparent plate 6 that has a flat surface to improve adhesion to a subject's skin and reduce variation in the signals detected by the sensor. *Id.* Furthermore, the elements of the combined system would each perform similar functions they had been known to perform prior to the combination—Aizawa-Inokawa's transparent plate 6 would remain in the same

50

**Appx22905**

position, performing the same function, but with a convex surface as taught by Ohsaki. *Id.*

### 3. *Substrate*

92.     One of ordinary skill would have found it obvious that Aizawa's photodetectors are arranged on a substrate.  For example, one of ordinary skill would have understood that Aizawa's photodetectors are secured to the sensor device, provided with power by a power source (also not shown), and can receive signals from and transmit signals to other portions of the device, such as drive detection circuit 24, through such a structure.  One of ordinary skill would have understood that the substrate provides physical support and electrical connectivity and is connected to the holder 23.  Indeed, one of ordinary skill would have found it obvious to use such a substrate because it provides a simpler manufacturing process and more compact design than using and routing wires would allow.  As shown in FIG. 1(b), Aizawa illustrates a substrate, but does not label or describe such a structure.

51

138.    Thus, the noninvasive optical physiological sensor resulting from the

teachings of Aizawa, Inokawa, and Ohsaki would have included a wall configured

to circumscribe at least the at least four detectors.  APPLE-1006, Abstract,

¶¶[0002], [0005], [0008]-[0016], [0018], [0023]-[0024], [0026]-[0029], [0032]-

[0033], FIGS. 1(a), 1(b), 2, 3, 4(a); APPLE-1009, ¶[0017], FIG. 2; see also

APPLE-1013, ¶[0040] (describing a "raised wall 650 defining a component cavity

652 configured to accept and retain…a detector assembly"), FIGS. 6A-B.

139.    Accordingly, [1c] would have been obvious over Aizawa in view of

Inokawa and Ohsaki.

**[1d] a cover configured to be located between tissue of the user and the at least
four detectors when the noninvasive optical physiological sensor is worn by
the user, wherein the cover comprises a single protruding convex surface
operable to conform tissue of the user to at least a portion of the single
protruding convex surface when the noninvasive optical physiological sensor
is worn by the user, and wherein the wall operably connects to the substrate
and the cover.**

140.    As I have explained with reference to [1pre]-[1c], the noninvasive optical

physiological sensor resulting from the teachings of Aizawa, Inokawa, and Ohsaki

would have included a holder 23 that is configured to circumscribe the plurality of

light emitting diodes and to the photodetectors 22 in addition to other structural

elements.  APPLE-1006, Abstract, ¶¶[0002], [0005], [0008]-[0016], [0018],

[0023]-[0024], [0026]-[0029], [0032]-[0033], FIGS. 1(a), 1(b), 2, 3, 4(a); APPLE-

1008, ¶¶[0001], [0006]-[0007], [0014], [0040], [0055]-[0067], [0074]-[0077],

FIGS. 2, 3, 19; APPLE-1009, ¶[0017], FIG. 2.

141.    Aizawa further discloses "an acrylic transparent plate 6" that "becomes close

to the artery 11 of the wrist 10" of a user when Aizawa's sensor is worn, improving

"adhesion between the wrist 10 and the pulse rate detector 1."  APPLE-1006,

¶[0026].



APPLE-1006, FIG. 1(b) (annotated)

142.    In more detail, Aizawa discloses that acrylic transparent plate 6 is "mounted

to the detection face 23a of the holder 23," such that it is located between tissue of

the user and the plurality of detectors when the sensor is worn by the user, and

such that the detectors receive light that passes through the plate after attenuation

by the user's tissue.  *Id*., ¶[0023].  Because the acrylic transparent plate 6 is

"provided **on the detection face 23a of the holder 23**, adhesion between the pulse

83

rate detector 1 and the wrist 10 can be improved, thereby further improving the detection efficiency of a pulse wave." APPLE-1006, ¶[0030]. One of ordinary skill would have understood this placement of the transparent plate 6 to render obvious a cover that is operably connected to the wall, or holder 23 of Aizawa, and that is configured to be located between the tissue of the user and the at least four detectors.

143. Moreover, as illustrated in Aizawa's FIG. 1(b) (reproduced below), acrylic transparent plate 6 is a single piece of material and holder 23 connects the surface on which detectors 22 are arranged to acrylic transparent plate 6.



APPLE-1006, FIG. 1(b) (annotated)

144. In the combination, the cover with a convex surface (outlined in blue in FIG. 1(b) above) is located between the user tissue and the detectors 22 when the sensor

84

is worn by the user. APPLE-1006, ¶[0023]; APPLE-1003, ¶***. Moreover, the surface of the user tissue conforms to the single protruding convex surface when the sensor is worn by the user. APPLE-1003, ¶***. In particular, one of ordinary skill would have understood that, because Aizawa's attachment belt 7 is wrapped around the user's wrist, acrylic transparent plate 6 would have been pressed against the user's skin. And because glass is a rigid material, acrylic transparent plate 6 would have necessarily caused tissue of the user to conform to at least a portion of transparent glass when the sensor is worn by the user during its operation.

145. From this and related description, one of ordinary skill would have understood that the transparent plate 6 that is operably connected to the opaque walls of Aizawa's holder 23 improves adhesion between Aizawa's sensor and the user's wrist, improves detection efficiency, and provides further protection to the elements stored within holder 23's cavities.

146. One of ordinary skill would have understood FIG. 1(b) to clearly illustrate that the wall (outlined in green) portion of the holder 23 extends from the substrate to the convex plate 6 and connects the substrate to the convex plate 6. APPLE-1003, ¶***; *see also infra* claim [2]. Furthermore, a POSITA would have understood that the convex plate 6 is a cover that covers "the detection face 23a of the holder 23" so that adhesion with the user tissue is improved. APPLE-1006, ¶¶[0026], [0030], [0034]

85

147.    To the extent that acrylic transparent plate 6 does not include a "single protruding convex" surface, one of ordinary skill would have found it obvious to modify acrylic transparent plate 6 in view of Ohsaki.  More specifically,  one of ordinary skill would have found it obvious to modify the sensor's plate 6 to include a convex surface, similar to Ohsaki's translucent board 8, so as to improve adhesion between the user's wrist and the sensor's surface.  APPLE-1009, ¶[0025] (explaining that the convex surface of translucent board 8 prevents slippage of a detecting element from its position on the wrist, and suppresses the "variation of the amount of the reflected light" that reaches the detecting element); *see also* APPLE-1024, ¶¶[0033], [0035], FIG. 6 (depicting an LED featuring a convex lens).

148.    In more detail, Ohsaki describes a "detecting element" that includes "a package 5, a light emitting element 6 (e.g., LED), a light receiving element 7 (e.g., PD), and a translucent board 8."  APPLE-1009, ¶[0017].  "The package 5 has an opening and includes a" substrate in the form of "circuit board 9," on which light emitting element 6 and light receiving element 7 are arranged.  *Id.*.  As shown in Ohsaki's FIG. 2 (reproduced below), translucent board 8 is arranged such that, when the sensor is worn "on the user's wrist … the convex surface of the translucent board … is in intimate contact with the surface of the user's skin"; this contact between the convex surface and the user's skin is said to prevent slippage,

86

Appx22941

which increases the strength of the signals obtainable by Ohsaki's sensor.  APPLE-1009, ¶¶[0015], [0017], [0025], FIGS. 1, 2, 4A, 4B.



APPLE-1009, FIG. 2 (annotated)

149.   Ohsaki explains that "if the translucent board 8 has a flat surface, the detected pulse wave is adversely affected by the movement of the user's wrist as shown in FIG. 4B," but that if "the translucent board 8 has a convex surface … variation of the amount of the reflected light … that reaches the light receiving element 7 is suppressed."  APPLE-1009, ¶[0025].  The convex surface is also said to prevent "disturbance light from the outside" from penetrating translucent board

87

8. *Id*. Thus, when a convex cover is used, "the pulse wave can be detected without being affected by the movement of the user's wrist 4 as shown in FIG. 4A." *Id*.



APPLE-1009, FIGS. 4A, 4B

150. From this and related description, one of ordinary skill would have understood that the translucent board 8 that is operably connected to the walls of Ohsaki's package 5 improves adhesion between Ohsaki's sensor and the user's wrist, improves detection efficiency, and provides protection to the elements accommodated within package 5.

88

**Appx22943**

151.   As shown below, it would have been obvious to one of ordinary skill to modify Aizawa's wrist-worn sensor to incorporate the shape of Ohsaki's translucent board 8.



APPLE-1006, FIG. 1(b) (annotated)

152.   Such a modification would have amounted to nothing more than the use of a known technique to improve similar devices in the same way, and combining prior art elements according to known methods to yield predictable results.  *KSR v. Teleflex*, 550 U.S. 398, 417 (2007).  Indeed, the modification involves nothing more than adjusting transparent plate 6's shape to include a convex surface similar to that disclosed by Ohsaki, and one of ordinary skill would have understood that this adjustment would improve adhesion to the user's skin and reduce variation in the signals detected by the sensor.  *Id*.  Furthermore, the elements of the combined

89

system would each perform similar functions they had been known to perform

prior to the combination—Aizawa's transparent plate 6 would remain in the same

position, performing the same function, but with a convex surface as taught by

Ohsaki.  *Id.*  Accordingly, [1d] would have been obvious over Aizawa in view of

Inokawa and Ohsaki.  APPLE-1006, Abstract, ¶¶[0002], [0005], [0008]-[0016],

[0023]-[0024], [0027]-[0030], [0032]-[0033], FIGS. 1, 2, 3, 4(a); APPLE-1009,

¶¶[0015], [0017], [0025], FIGS. 1, 2, 4A, 4B.

### C.    Claim 2

**[2] The noninvasive optical physiological sensor of claim 1, wherein the wall
operably connects to the substrate on one side and operably connects to the
cover on an opposite side.**

153.    As I have explained with reference to [1pre]-[1d], the sensor resulting from

the combination of teachings of Aizawa, Inokawa, and Ohsaki includes a wall that

circumscribes the photodetectors and operably connects to the substrate on one

side and operably connects to the cover on an opposite side.  APPLE-1006,

Abstract, ¶¶[0002], [0005], [0008]-[0016], [0018], [0023]-[0024], [0026]-[0029],

[0032]-[0033], FIGS. 1(a), 1(b), 2, 3, 4(a); APPLE-1009, ¶¶[0015], [0017], [0025],

FIGS. 1, 2, 4A, 4B.

154.    For example, as shown in FIG. 1(b) of Aizawa, reproduced below, Aizawa,

as modified in view of the knowledge of one of ordinary skill or Ohsaki's

disclosure teaches a wall that circumscribes the photodetectors 22 and operably

90

Appx22945

subject"—this light emitted by the light emitting diode is necessarily attenuated by the tissue of the subject); *see also* APPLE-1006, ¶[0027].

252. Accordingly, [29] would have been obvious over Aizawa in view of Inokawa and Ohsaki.

## VIII. GROUND 2 – Claims 7 and 19 are obvious over Aizawa, Inokawa, Ohsaki, and Mendelson 2006

### A. Combination of Aizawa, Inokawa, Ohsaki, and Mendelson 2006

253. Aizawa's pulse rate detector is communicably connected to and transmits "pulse wave data to an unshown display." APPLE-1006, ¶[0023]. This display is "for displaying the…pulse rate data." *Id*., ¶[0028].

254. Although Aizawa does not depict or describe the display for its pulse wave sensor 2, one of ordinary skill would have found it obvious to implement display 26 as a touch-screen display. *Id*., ¶¶[0015], [0023], [0028], [0035]; APPLE-1010, 1-4, FIG. 3.

255. Indeed, by the '553 patent's 2008 Critical Date, physiological monitoring devices commonly employed touch-screen displays. Yitzhak Mendelson's 2006 paper "A Wearable Reflectance Pulse Oximeter for Remote Physiological Monitoring," for example, describes a "body-worn" pulse oximetry system that includes a sensor module, a receiver module, and a PDA. APPLE-1010, 3.

140

256.    As discussed above in Section VI.D, which I incorporate here, Mendelson-2006's system includes a sensor module that transmits signals wirelessly to a PDA through a receiver module.  *Id.*, 2, FIGS. 1-3.

257.    The PDA is said to "provide[] a low-cost touch screen interface." *Id.*, 3-4; *see also* APPLE-1020, 1-4 (depicting and describing the touch-screen display included within the HP iPAQ h4150 Pocket PC PDA utilized in Mendelson-2006's system); APPLE-1021, Cover, xvii-xviii, 10-12, 17, 63, 363; APPLE-1022, 4-11, 30-3.  In more detail, and as shown in Mendelson-2006's FIG. 3 (reproduced below), the PDA's "simple GUI" is "configured to present … input and output information to the user" and to allow "easy activation of various functions." APPLE-1010, 4.

258.    One of ordinary skill would have been motivated to look to other physiological sensor systems, such as Mendelson-2006, for details regarding data transmission and display of the data collected using the Aizawa-Inokawa-Ohsaki sensor.

259.    In more detail, and as shown in Mendelson-2006's FIG. 2, the sensor module includes an "optical reflectance transducer" for measuring photoplethysmographic (PPG) signals and a "PCB antenna" for wireless communication, and the receiver module includes "an embedded microcontroller" and a corresponding "PCB antenna." *Id.*, 1-2.  "Signals acquired by the Sensor

141

Module are received by the embedded microcontroller which synchronously converts the corresponding PD output to R and IR PPG signals," and "[d]edicated software is used to filter the signals and compute [arterial oxygen saturation ($SpO_2$)] and [heart rate (HR)] based on the relative amplitude and frequency content of the reflected PPG signals." *Id.*



APPLE-1010, FIG. 2 (annotated)

260.   "[I]nformation acquired by the Sensor Module is transmitted wirelessly via an RF link over a short range to a body-worn Receiver Module," and data processed by the receiver module is "transmitted wirelessly to a PDA." *Id.*, 2, FIG. 2. Mendelson-2006's system uses "the HP iPAQ h4150 PDA because it can

142

Appx22997

support both 802.11b and Bluetooth[TM] wireless communication." *Id.*, 3. The PDA

is used "as a local terminal," and it "also provides a low-cost touch screen

interface." *Id.*; *see also* APPLE-1020, 1-4 (depicting and describing the HP iPAQ

h4150 Pocket PC PDA utilized in Mendelson-2006's system); *see also* APPLE-

1021, Cover, xvii-xviii, 10-12, 17, 63, 73-101, 176, 190-193, 363; APPLE-1022, 4-

11, 30-31, 56-67, 72-92, 284-297.

261. Wireless communication with the handheld PDA is, moreover, said to

enable transfer of information pertaining to physiological and wellness parameters

such as "$SpO_2$, HR, body acceleration, and posture information" to the PDA; and,

when the PDA is "carried by medics or first responders," this information is said to

enhance their ability "to extend more effective medical care, thereby saving the

lives of critically injured persons." *Id.*

143



APPLE-1010, FIG. 3 (left) and APPLE-1020, 1 (right)

262.  To obtain these and other advantages described by Mendelson-2006, one of ordinary skill would have been motivated to implement Aizawa's pulse wave sensor as part of a physiological measurement system including a handheld computing device, and to enable a physiological sensor device including sensor 1 to communicate wirelessly with the handheld computing device.  APPLE-1006, Abstract ("a pulse wave sensor for detecting a pulse wave by detecting light output from a light emitting diode and reflected from the artery of a wrist of a subject "), ¶¶[0002], [0005], [0008]-[0016], [0023] (describing transmitting "pulse rate data to

144

an unshown display"), [0024], [0027]-[0030], [0032]-[0033], FIGS. 1, 2, 3, 4(a); APPLE-1010, 1-4, FIG. 3; *see also* APPLE-1020, 1-4.

263.    Indeed, by the Critical Date, physiological monitoring devices commonly included touch-screen displays configured to provide user interfaces.  APPLE-1009, 1-4, FIG. 3; APPLE-1024, Abstract, ¶¶[0026], [0044], FIGS. 1-6.  One of ordinary skill would have recognized that applying Mendelson-2006's teachings to the Aizawa-Inokawa-Ohsaki sensor would have led to predictable results without altering or hindering the functions performed by the sensor.  In fact, one of ordinary skill would have been motivated to implement the well-known technique of connecting a physiological sensor to a handheld device to cause Aizawa-Inokawa-Ohsaki's sensor to include such features to achieve the predictable benefits offered by Mendelson-2006's description of the same.  *Id*.  For example, one of ordinary skill would have incorporated Mendelson-2006's disclosure of a PDA with a touch-screen display and "simple GUI" to present "information to the user" and provide "easy activation of various functions."  APPLE-1010, 4.  Indeed, one of ordinary skill would have had a reasonable expectation of success in making this modification, and would have reasonably expected to reap benefits of displaying a measured waveform representative of a patient's pulse.  *Id*.

264.    For at least these reasons, one of ordinary skill would have found it obvious to implement Aizawa's unshown display as a PDA featuring a touch-screen display

and/or mobile phone functionality[2] using either or both of 802.11b and Bluetooth™.  APPLE-1006, ¶[0015], [0023], [0028], [0035]; *see also* APPLE-1020, 1-4; APPLE-1009, ¶[0020]; APPLE-1012, Abstract, 8:37-41, 9:22-10:30, FIGS. 7, 8; APPLE-1010, 1-4, FIGS. 1-3; APPLE-1020, 1-4.

### B.    Claim 7

**[7pre] A physiological monitoring device comprising:**

265.    As I have explained with reference to [1pre]-[1d], Aizawa discloses an optical physiological measurement sensor.  APPLE-1006, Abstract ("a pulse wave sensor for detecting a pulse wave by detecting light output from a light emitting diode and reflected from the artery of a wrist of a subject "), [0002], [0005], [0008]-[0016], [0023]-[0024], [0027]-[0030], [0032]-[0033], FIGS. 1, 2, 3, 4(a); APPLE-1009, [0015], [0017], [0025], FIGS. 1, 2, 4A, 4B.

---

[2] Mendelson-2006 does not explicitly disclose its PDA to be a mobile phone.  Yet it was well-known before the Critical Date that a PDA device was often paired with cellular communication technology to provide a combined PDA/phone device that acts a mobile phone.  APPLE-1025, Title ("Cellular Phone/PDA Communication System"), Abstract, 1:6-15, 7:6-10:11 (describing "a small handheld cellular phone/PDA communications system" featuring "an LCD display 16 that is also a touch screen system"), FIGS. 1-3.

146



US 20010056243A1

(19) **United States**

(12) **Patent Application Publication** (10) Pub. No.: **US 2001/0056243 A1**

Ohsaki et al. (43) **Pub. Date:** **Dec. 27, 2001**

(54) **WRISTWATCH-TYPE HUMAN PULSE WAVE SENSOR ATTACHED ON BACK SIDE OF USER'S WRIST**

(76) Inventors: **Rie Ohsaki**, Anjo-city (JP); **Teiyuu Kimura**, Nagoya-city (JP); **Naoki Fukaya**, Obu-city (JP)

Correspondence Address:
**LAW OFFICE OF DAVID G POSZ**
**2000 L STREET, N.W.**
**SUITE 200**
**WASHINGTON, DC 20036 (US)**

(21) Appl. No.: **09/852,698**

(22) Filed: **May 11, 2001**

(30) **Foreign Application Priority Data**

Jun. 14, 2000    (JP) ..................................... 2000-177999

**Publication Classification**

(51) Int. Cl.$^7$ ...................................... A61B 5/02
(52) U.S. Cl. ......................................... 600/503; 600/500

(57) **ABSTRACT**

A pulse wave sensor includes a detecting element and a sensor body. The pulse wave sensor is worn on the back side of a user's wrist corresponding to the back of the user's hand. The detecting element includes a translucent member on its top, and the translucent member has a convex surface. The detecting element is attached on the back side of the user's wrist by a dedicated belt so that the convex surface of the translucent member is in intimate contact with the surface of the user's skin. The sensor body is attached on the back side of the user's wrist by another dedicated belt so that it is arranged on the detecting element. A cushion is arranged between the sensor body and the detecting element. The pulse wave sensor can stably detect the pulse wave without being affected by the movement of the user's wrist.



APPLE 1009

**[0019]** The light emitting element **6** and the light receiving element **7** are arranged side by side as shown in **FIG. 2**. Accordingly the length of the detecting element **2** from the right side to the left side in **FIG. 2** is longer than the length from the upper side to the lower side. If the detecting element **2** is arranged so that its longitudinal direction (from the right side to the left side in **FIG. 2**) agrees with the circumferential direction of the user's wrist **4**, it has a tendency to slip off. Therefore it is desirable that the detecting element **2** is arranged so that its longitudinal direction agrees with the longitudinal direction of the user's arm. The dedicated belt **10** is attached to the detecting element **2** so that it can fix the detecting element **2** on the user's wrist **4** in this way.

**[0020]** The sensor body **3** is connected to the detecting element **2** by a signal line **13**, and includes, as shown in **FIG. 2**, a drive circuit **11**, a microcomputer **12**, and a monitor display (not shown). The drive circuit **11** drives the light emitting element **6** to emit light toward the wrist **4**. The microcomputer **12** calculates the pulse rate from the reflected light received by the detecting element **2**. This reflected light varies with the user's pulsation. The monitor display shows the calculated pulse rate and the like.

**[0021]** The sensor body **3** is arranged on the top of the detecting element **2**, and fixed on the user's wrist **4** by a dedicated belt **14** attached to the sensor body **3**. A cushion **15** such as a sponge or a gel is inserted between the detecting element **2** and the sensor body **3** so that the detecting element **2** does not directly contact the sensor body **3**.

**[0022]** The pulse wave sensor **1** detects the pulse wave of the user's body as follows. The light emitting element **6** emits light toward the user's wrist **4**, a portion of the emitted light penetrates the capillary arteriole **16** in the inside of the user's wrist **4** and is absorbed by the haemoglobin in the blood. The rest of the emitted light is reflected and scattered by the capillary arteriole **16**, and partly reaches the light emitting element **7**. As the amount of the haemoglobin in the blood varies in waves due to the pulsation of the user's blood, the amount of the light absorbed by the haemoglobin also varies in waves. As a result, the amount of the light which is reflected by the capillary arteriole **16** and reaches the light receiving element **7** varies in waves. This variation in the amount of the light received by the light receiving element **7** is detected as the pulse wave information.

**[0023]** If the detecting element **2** is arranged on the front side of the user's wrist **4**, the amount of the light received the light receiving element **7** is larger. That is, the intensity of the signal received by the light receiving element **7** is higher. However, the detecting element **2** has a tendency to slip off the detecting position of the user's wrist **4** as the user moves his/her wrist, and therefore the intensity of the light received by the light receiving element **7** largely varies depending on the shift amount of the detecting element **2**. As shown in **FIG. 3B**, in the case that the detecting element **2** is arranged on the front side of the user's wrist **4**, the pulse wave can be detected well if the user is at rest. However, when the user is in motion, the detected pulse wave is adversely affected by the movement of the user's wrist **4**.

**[0024]** In contrast to this, if the detecting element **2** is arranged on the back side of the user's wrist **4**, the user will not move his/her wrist unconsciously since the radius and the ulna inside the user's wrist **4** are not pressed and

consequently the user does not feel so uncomfortable. Further, the detecting element **2** will not shift so widely even if the user's wrist moves. Therefore the detecting element **2** is stably fixed to the detecting position of the user's wrist **4**. As a result, the pulse wave is detected stably without being affected by the movement of the user's wrist **4** as shown in **FIG. 3A**.

**[0025]** The detecting element **2** is arranged on the user's wrist **4** so that the convex surface of the translucent board **8** is in intimate contact with the surface of the user's skin. Thereby it is prevented that the detecting element **2** slips off the detecting position of the user's wrist **4**. If the translucent board **8** has a flat surface, the detected pulse wave is adversely affected by the movement of the user's wrist **4** as shown in **FIG. 4B**. However, in the case that the translucent board **8** has a convex surface like the present embodiment, the variation of the amount of the reflected light which is emitted from the light emitting element **6** and reaches the light receiving element **7** by being reflected by the surface of the user's skin is suppressed. It is also prevented that noise such as disturbance light from the outside penetrates the translucent board **8**. Therefore the pulse wave can be detected without being affected by the movement of the user's wrist **4** as shown in **FIG. 4A**.

**[0026]** The detecting element **2** and the sensor body **3** is attached to the user's wrist **4** by the dedicated belts **10** and **14**, respectively. That is, the detecting element **2** and the sensor body **3** are allowed to move relatively. Further the cushion **15** is arranged between the detecting element **2** and the sensor body **3**. Therefore, if force is applied to the sensor body **3** or the sensor body **3** moves, the force applied to the sensor body **3** or the movement of the sensor body **3** cannot be transmitted to the detecting element **2** easily.

**[0027]** Accordingly the detecting element **2** is stably fixed to the user's wrist **4**. As a result, the pulse wave sensor can detect the pulse wave at a high S/N ratio, that is, it can provide high detection probability, not only when the user is at rest but also when the user is taking light exercise.

**[0028]** Modifications

**[0029]** In the above embodiment, the sensor body **3** need not include the microcomputer **12** if it includes a transmitter instead. In this case, the pulse wave information detected by the detecting element **2** is transmitted to a receiver by the transmitter. The sensor body **3** can be downsized and light in weight in this case and consequently the force applied to the sensor body **3** or the movement of the sensor body **3** cannot be transmitted to the detecting element **2** easily.

**[0030]** In the above embodiment, the detecting element **2** and the sensor body **3** may be worn on the back side of the user's forearm.

What is claimed is:

1. A pulse wave sensor for detecting a pulse wave of a human body comprising:

a detecting element including a light emitting element and a light receiving element; and

a sensor body including a circuit connected to the detecting element via a signal line,

wherein the detecting element is constructed to be worn on a back side of a user's wrist or a user's forearm.

Proceedings of the 28th IEEE
EMBS Annual International Conference
New York City, USA, Aug 30-Sept 3, 2006

ThB14.4

# A Wearable Reflectance Pulse Oximeter for Remote Physiological Monitoring

Y. Mendelson*, *Member, IEEE,* R. J. Duckworth, *Member, IEEE,* and G. Comtois, *Student Member, IEEE*

*Abstract*—To save life, casualty care requires that trauma injuries are accurately and expeditiously assessed in the field. This paper describes the initial bench testing of a wireless wearable pulse oximeter developed based on a small forehead mounted sensor. The battery operated device employs a lightweight optical reflectance sensor and incorporates an annular photodetector to reduce power consumption. The system also has short range wireless communication capabilities to transfer arterial oxygen saturation (SpO₂), heart rate (HR), body acceleration, and posture information to a PDA. It has the potential for use in combat casualty care, such as for remote triage, and by first responders, such as firefighters.

## I. Introduction

STEADY advances in noninvasive physiological sensing, hardware miniaturization, and wireless communication are leading to the development of new wearable technologies that have broad and important implications for civilian and military applications [1]-[2]. For example, the emerging development of compact, low-power, small-size, light- weight, and unobtrusive wearable devices may facilitate remote noninvasive monitoring of vital signs from soldiers during training exercises and combat. Telemetry of physiological information via a short-range wirelessly-linked personal area network can also be useful for firefighters, hazardous material workers, mountain climbers, or emergency first-responders operating in harsh and hazardous environments. The primary goals of such a wireless mobile platform would be to keep track of an injured person's vital signs, thus readily allowing the telemetry of physiological information to medical providers, and support emergency responders in making critical and often life saving decisions in order to expedite rescue operations. Having wearable physiological monitoring could offer far-forward medics numerous advantages, including the ability to determine a casualty's condition remotely without exposing the first

responders to increased risks, quickly identifying the severity of injuries especially when the injured are greatly dispersed over large geographical terrains and often out-of-site, and continuously tracking the injured condition until they arrive safely at a medical care facility.

Several technical challenges must be overcome to address the unmet demand for long-term continuous physiological monitoring in the field. In order to design more compact sensors and improved wearable instrumentation, perhaps the most critical challenges are to develop more power efficient and low-weight devices. To become effective, these technologies must also be robust, comfortable to wear, and cost-effective. Additionally, before wearable devices can be used effectively in the field, they must become unobtrusive and should not hinder a person's mobility. Employing commercial off-the-shelf (COTS) solutions, for example finger pulse oximeters to monitor blood oxygenation and heart rate, or standard adhesive-type disposable electrodes for ECG monitoring, is not practical for many field applications because they limit mobility and can interfere with normal tasks.

A potentially attractive approach to aid emergency medical teams in remote triage operations is the use of a wearable pulse oximeter to wirelessly transmit heart rate (HR) and arterial oxygen saturation (SpO₂) to a remote location. Pulse oximetry is a widely accepted method that is used for noninvasive monitoring of SpO₂ and HR. The method is based on spectrophotometric measurements of changes in the optical absorption of deoxyhemoglobin (Hb) and oxyhemoglobin (HbO₂). Noninvasive spectrophotometric measurements of SpO₂ are performed in the visible (600-700nm) and near-infrared (700-1000nm) spectral regions. Pulse oximetry also relies on the detection of photoplethysmographic (PPG) signals produced by variations in the quantity of arterial blood that is associated with periodic contractions and relaxations of the heart. Measurements can be performed in either transmission or reflection modes. In transmission pulse oximetry, the sensor can be attached across a fingertip, foot, or earlobe. In this configuration, the light emitting diodes (LEDs) and photodetector (PD) in the sensor are placed on opposite sides of a peripheral pulsating vascular bed. Alternatively, in reflection pulse oximetry, the LEDs and PD are both mounted side-by-side on the same planar substrate to enable readings from multiple body locations where trans-illumination measurements are not feasible. Clinically, forehead reflection pulse oximetry has been used as an alternative approach to conventional transmission-based

Manuscript received April 3, 2006. This work is supported by the U.S. Army Medical Research and Material Command under Contract No. DAMD17-03-2-0006. The views, opinions and/or findings are those of the author and should not be construed as an official Department of the Army position, policy, or decision, unless so designated by other documentation.

*Corresponding author – Y. Mendelson is a Professor in the Department of Biomedical Engineering, Worcester Polytechnic Institute, Worcester, MA 01609 USA (phone: 508-831-5103; fax: 508-831-5541; e-mail: ym@wpi.edu).

R. J. Duckworth is a Professor in the Department of Electrical and Computer Engineering, Worcester Polytechnic Institute, Worcester, MA 01609 USA (rjduck@ece.wpi.edu).

G. Comtois is a M. S. student in the Department of Biomedical Engineering, Worcester Polytechnic Institute, Worcester, MA 01609 USA (comtoisg@wpi.edu).

1-4244-0033-3/06/$20.00 ©2006 IEEE.    912

APPLE 1010

oximetry when peripheral circulation to the extremities is compromised.

Pulse oximetry was initially intended for in-hospital use on patients undergoing or recovering from surgery. During the past few years, several companies have developed smaller pulse oximeters, some including data transmission via telemetry, to further expand the applications of pulse oximetry. For example, battery-operated pulse oximeters are now attached to patients during emergency transport as they are being moved from a remote location to a hospital, or between hospital wards. Some companies are also offering smaller units with improved electronic filtering of noisy PPG signals.

Several reports described the development of a wireless pulse oximeter that may be suitable for remote physiological monitoring [3]-[4]. Despite the steady progress in miniaturization of pulse oximeters over the years, to date, the most significant limitation is battery longevity and lack of telemetric communication. In this paper, we describe a prototype forehead-based reflectance pulse oximeter suitable for remote triage applications.

## II.  System Architecture

The prototype system, depicted in Fig. 1, consists of a body-worn pulse oximeter that receives and processes the PPG signals measured by a small ($\phi$ = 22mm) and lightweight (4.5g) optical reflectance transducer. The system





Fig. 1.  (Top) Attachment of Sensor Module to the skin; (Bottom) photograph of the Receiver Module (left) and Sensor Module (right).

consists of three units: A Sensor Module, consisting of the optical transducer, a stack of round PCBs, and a coin-cell battery. The information acquired by the Sensor Module is transmitted wirelessly via an RF link over a short range to a body-worn Receiver Module. The data processed by the Receiver Module can be transmitted wirelessly to a PDA. The PDA can monitor multiple wearable pulse oximeters simultaneously and allows medics to collect vital physiological information to enhance their ability to extend more effective care to those with the most urgent needs. The

system can be programmed to alert on alarm conditions, such as sudden trauma, or physiological values out of their normal range. It also has the potential for use in combat casualty care, such as for remote triage, and for use by first responders, such as firefighters.

Key features of this system are small-size, robustness, and low-power consumption, which are essential attributes of wearable physiological devices, especially for military applications. The system block diagram (Fig. 2), is described in more detail below.





Fig. 2. System block diagram of the wearable, wireless, pulse oximeter. Sensor Module (top), Receiver Module (bottom).

*Sensor Module*: The Sensor Module contains analog signal processing circuitry, ADC, an embedded microcontroller, and a RF transceiver. The unit is small enough so the entire module can be integrated into a headband or a helmet. The unit is powered by a CR2032 type coin cell battery with 220mAh capacity, providing at least 5 days of operation.

*Receiver Module*: The Receiver Module contains an embedded microcontroller, RF transceiver for communicating with the Sensor Module, and a Universal Asynchronous Receive Transmit (UART) for connection to a PC. Signals acquired by the Sensor Module are received by the embedded microcontroller which synchronously converts the corresponding PD output to R and IR PPG signals. Dedicated software is used to filter the signals and compute $SpO_2$ and HR based on the relative amplitude and frequency content of the reflected PPG signals. A tri-axis MEMS accelerometer detects changes in body activity, and the information obtained through the tilt sensing property of the accelerometer is used to determine the orientation of the person wearing the device.

To facilitate bi-directional wireless communications between the Receiver Module and a PDA, we used the DPAC Airborne™ LAN node module (DPAC Technologies, Garden Grove, CA). The DPAC module operates at a frequency of 2.4GHz, is 802.11b wireless compliant, and has a relatively small (1.6 × 1.17 × 0.46 inches) footprint. The wireless module runs off a 3.7VDC and includes a built-in

TCP/IP stack, a radio, a base-band processor, an application processor, and software for a "drop-in" WiFi application. It has the advantage of being a plug-and-play device that does not require any programming and can connect with other devices through a standard UART.

*PDA*: The PDA was selected based on size, weight, and power consumption. Furthermore, the ability to carry the user interface with the medic also allows for greater flexibility during deployment. We chose the HP iPAQ h4150 PDA because it can support both 802.11b and Bluetooth™ wireless communication. It contains a modest amount of storage and has sufficient computational resources for the intended application. The use of a PDA as a local terminal also provides a low-cost touch screen interface. The user-friendly touch screen of the PDA offers additional flexibility. It enables multiple controls to occupy the same physical space and the controls appear only when needed. Additionally, a touch screen reduces development cost and time, because no external hardware is required. The data from the wireless-enabled PDA can also be downloaded or streamed to a remote base station via Bluetooth or other wireless communication protocols. The PDA can also serve to temporarily store vital medical information received from the wearable unit.

A dedicated National Instruments LabVIEW program was developed to control all interactions between the PDA and the wearable unit via a graphical user interface (GUI). One part of the LabVIEW software is used to control the flow of information through the 802.11b radio system on the PDA. A number of LabVIEW VIs programs are used to establish a connection, exchange data, and close the connection between the wearable pulse oximeter and the PDA. The LabVIEW program interacts with the Windows CE™ drivers of the PDA's wireless system. The PDA has special drivers provided by the manufacturer that are used by Windows CE™ to interface with the 802.11b radio hardware. The LabVIEW program interacts with Windows CE™ on a higher level and allows Windows CE™ to handle the drivers and the direct control of the radio hardware.

The user interacts with the wearable system using a simple GUI, as depicted in Fig. 3.



Fig. 3. Sample PDA Graphical User Interface (GUI).

The GUI was configured to present the input and output information to the user and allows easy activation of various functions. In cases of multiple wearable devices, it also allows the user to select which individual to monitor prior to initiating the wireless connection. Once a specific wearable unit is selected, the user connects to the remote device via the System Control panel that manages the connection and sensor control buttons. The GUI also displays the subject's vital signs, activity level, body orientation, and a scrollable PPG waveform that is transmitted by the wearable device.

The stream of data received from the wearable unit is distributed to various locations on the PDA's graphical display. The most prominent portion of the GUI display is the scrolling PPG waveform, shown in Fig. 3. Numerical $SpO_2$ and HR values are displayed is separate indicator windows. A separate tri-color indicator is used to annotate the subject's activity level measured by the wearable accelerometer. This activity level was color coded using green, yellow, or red to indicate low or no activity, moderate activity, or high activity, respectively. In addition, the subject's orientation is represented by a blue indicator that changes orientation according to body posture. Alarm limits could be set to give off a warning sign if the physiological information exceeds preset safety limits.

One of the unique features of this PDA-based wireless system architecture is the flexibility to operate in a free roaming mode. In this ad-hoc configuration, the system's integrity depends only on the distance between each node. This allows the PDA to communicate with a remote unit that is beyond the PDA's wireless range. The ad-hoc network would therefore allow medical personnel to quickly distribute sensors to multiple causalities and begin immediate triage, thereby substantially simplifying and reducing deployment time.

*Power Management*: Several features were incorporated into the design in order to minimize the power consumption of the wearable system. The most stringent consideration was the total operating power required by the Sensor Module, which has to drive the R and IR LEDs, process the data, and transmit this information wirelessly to the Receive Module. To keep the overall size of the Sensor Module as small as, it was designed to run on a watch style coin-cell battery.

It should be noted that low power management without compromising signal quality is an essential requirement in optimizing the design of wearable pulse oximeter. Commercially available transducers used with transmission and reflection pulse oximeters employ high brightness LEDs and a small PD element, typically with an active area ranging between 12 to 15mm$^2$. One approach to lowering the power consumption of a wireless pulse oximeter, which is dominated by the current required to drive the LEDs, is to reduce the LED duty cycle. Alternatively, minimizing the drive currents supplied to the R and IR LEDs can also achieve a significant reduction in power consumption. However, with reduced current drive, there can be a direct impact on the quality of the detected PPGs. Furthermore, since most of the light emitted from the LEDs is diffused by the skin and subcutaneous tissues, in a predominantly forward-scattering direction, only a small fraction of the incident light is normally backscattered from the skin. In

addition, the backscattered light intensity is distributed over a region that is concentric with respect to the LEDs. Consequently, the performance of reflectance pulse oximetry using a small PD area is significantly degraded. To overcome this limitation, we showed that a concentric array of either discrete PDs, or an annularly-shaped PD ring, could be used to increase the amount of backscattered light detected by a reflectance type pulse oximeter sensor [5]-[7].

Besides a low-power consuming sensor, afforded by lowering the driving currents of the LEDs, a low duty cycle was employed to achieve a balance between low power consumption and adequate performance. In the event that continuous monitoring is not required, more power can be conserved by placing the device in an ultra low-power standby mode. In this mode, the radio is normally turned off and is only enabled for a periodic beacon to maintain network association. Moreover, a decision to activate the wearable pulse oximeter can be made automatically in the event of a patient alarm, or based on the activity level and posture information derived from the on-board accelerometer. The wireless pulse oximeter can also be activated or deactivated remotely by a medic as needed, thereby further minimizing power consumption.

### III. In Vivo Evaluations

Initial laboratory evaluations of the wearable pulse oximeter included simultaneous HR and $SpO_2$ measurements. The Sensor Module was positioned on the forehead using an elastic headband. Baseline recordings were made while the subject was resting comfortably and breathing at a normal tidal rate. Two intermittent recordings were also acquired while the subject held his breath for about 30 seconds. Fig. 4 displays about 4 minutes of $SpO_2$ and HR recordings acquired simultaneously by the sensor.



Fig. 4. Typical HR (solid line) and $SpO_2$ (dashed line) recording of two voluntary hypoxic episodes.

The pronounced drops in $SpO_2$ and corresponding increases in HR values coincide with the hypoxic events associated with the two breath holding episodes.

### IV. Discussion

The emerging development of compact, low power, small size, light weight, and unobtrusive wearable devices can facilitate remote noninvasive monitoring of vital

physiological signs. Wireless physiological information can be useful to monitor soldiers during training exercises and combat missions, and help emergency first-responders operating in harsh and hazardous environments. Similarly, wearable physiological devices could become critical in helping to save lives following a civilian mass casualty. The primary goal of such a wireless mobile platform would be to keep track of an injured person's vital signs via a short-range wirelessly-linked personal area network, thus readily allowing RF telemetry of vital physiological information to command units and remote off-site base stations for continuous real-time monitoring by medical experts.

The preliminary bench testing plotted in Fig. 4 showed that the $SpO_2$ and HR readings are within an acceptable clinical range. Similarly, the transient changes measured during the two breath holding maneuvers confirmed that the response time of the custom pulse oximeter is adequate for detecting hypoxic episodes.

### V. Conclusion

A wireless, wearable, reflectance pulse oximeter has been developed based on a small forehead-mounted sensor. The battery-operated device employs a lightweight optical reflectance sensor and incorporates an annular photodetector to reduce power consumption. The system has short range wireless communication capabilities to transfer $SpO_2$, HR, body acceleration, and posture information to a PDA carried by medics or first responders. The information could enhance the ability of first responders to extend more effective medical care, thereby saving the lives of critically injured persons.

### Acknowledgment

The authors would like to acknowledge the financial support provided by the U.S. Army Medical Research and Material Command referenced.

### References

[1] G. S. F. Ling, B. K. Day, P. Rhee, and J. M. Ecklund, "In search of technological solutions to battlefield management of combat casualties," *SPIE Conference on Battlefield Biomedical Technologies*, SPIE vol. 3712, Apr. 1999.

[2] D. Malan, T. Fulford-Jones, M. Welsh, and S. Moulton, "CodeBlue: An ad-hoc sensor network infrastructure for emergency medical care," *International Workshop on Wearable and Implantable Body Sensor Networks*, 2004.

[3] U. Anliker et al., "AMON: A wearable multiparameter medical monitoring and alert system," *IEEE Trans. on Information Technology in Biomedicine*, 8(4), 2004.

[4] Y. Mendelson and V. Floroff, "A PDA based *ad-hoc* mobile wireless pulse oximeter," *Proc. IASTED International Conference Telehealth 2005*, Banff, Canada, 2005.

[5] Y. Mendelson and C. J. Pujary, "Minimization of LED power consumption in the design of a wearable pulse oximeter," *IASTED International Conference BioMED 2003*, Salzburg, Austria, 2003.

[6] Y. Mendelson and C. J. Pujary, "Measurement site and photodetector size considerations in optimizing power consumption of a wearable reflectance pulse oximeter," *Proc. of the 25th Annual International IEEE/EMBS Conference*, Cancun, Mexico, 2003.

[7] P. Branche and Y. Mendelson, "Signal quality and power consumption of a new prototype reflectance pulse oximeter sensor," *Proc. of the 31th Annual Northeast Bioengineering Conference*, Hoboken, NJ, 2005.

# IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Patent of:    Jeroen Poeze et al.
U.S. Patent No.:    10,588,553      Attorney Docket No.: 50095-0012IP2
Issue Date:    March 17, 2020
Appl. Serial No.:    16/534,949
Filing Date:    August 7, 2019
Title:    MULTI-STREAM DATA COLLECTION SYSTEM FOR NONINVASIVE MEASUREMENT OF BLOOD CONSTITUENTS

## <u>SECOND DECLARATION OF DR. THOMAS W. KENNY</u>

I hereby declare that all statements made of my own knowledge are true and that all statements made on information and belief are believed to be true. I further declare that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of the Title 18 of the United States Code.

Dated: <u>Aug 27, 2021.</u>    By: _____

                                      Thomas W. Kenny, Ph.D.

APPLE 1047
Apple v. Masimo
IPR2020-01537

Kenny: "this figure in [the patent document reference] is not intended as a precision engineering drawing of a[n] optimized system"); APPLE-1041, 79:19-80:2 (Dr. Madisetti: "I believe that to a POSA, these figures are not detailed optical diagrams").

21.    In addition, even if Ohsaki's translucent board 8 were somehow understood to be rectangular, I have been informed that obviousness does not require "bodily incorporation" of features from one reference into another, and that a POSITA is "a person of ordinary creativity, not an automaton." *Facebook, Inc. v. Windy City Innovations, LLC,* 953 F.3d 1313, 1333 (Fed. Cir. 2020); *KSR Intern. Co. v. Teleflex Inc.,* 550 U.S. 398, 418 (2007).  In my opinion, a POSITA would have been fully capable of modifying Aizawa to feature a light permeable protruding convex cover to obtain the benefits attributed to such a cover by Ohsaki.

### B.    A POSITA would have recognized the benefits of Ohsaki's teachings when applied to Aizawa's sensor.

22.    Masimo contends that "Ohsaki indicates that its sensor's convex board ***only*** improves adhesion when used on the ***back*** (i.e., watch) side of the wrist," that "Aizawa ***requires*** its sensor be positioned on the palm side of the wrist," and concludes that "[a] POSITA seeking to improve adhesion of Aizawa's sensor would not incorporate a feature that only improves adhesion at a different and unsuitable measurement location."  POR, 27-28.  But Ohsaki does not describe that its sensor can ***only*** be used at a backside of the wrist.  Instead, at most, Ohsaki

describes such an arrangement with respect to a preferred embodiment.  APPLE-1009, [0019] ("it is desirable that the detecting element 2 is arranged so that its longitudinal direction agrees with the longitudinal direction of the user's arm").

23.    Indeed, Ohsaki's claim language reinforces that Ohsaki's description would not have been understood as so limited.  For example, although Ohsaki's independent claim 1 states that "the detecting element is constructed to be worn on a back side of a user's wrist *or a user's forearm*."  *See also* APPLE-1009, Claim 2.  However, Ohsaki's independent claims 3, 4 and 5 each state that "the detecting element is constructed to be worn on a user's wrist or a user's forearm," *without even mentioning a backside* of the wrist or forearm.  Dependent claims 6, 7 and 8 are also not limited to the backside of the wrist.  *See also* APPLE-1009, Claims 4-8.  A POSITA would have understood this claim language to directly contradict Masimo's assertion that "[t]o achieve any of Ohsaki's benefits, its sensor must be used at a specific measurement location: the backhand side of the wrist." POR, 26.  Indeed, from this and related description, a POSITA would have understood that Ohsaki's benefits are provided when the sensor is placed, for example, on either side of the user's wrist or forearm.  APPLE-1009, ¶[0025], FIGS. 4A, 4B.

24.    Section B.2 of the POR presents several arguments with respect to Ground 1 that are premised on Ohsaki *requiring* the detecting element to be worn on a back

side of a user's wrist or a user's forearm. *See* POR, 27-39. Because Ohsaki requires no such location for the translucent board 8, these arguments fail.

25.    Moreover, even assuming for the sake of argument alone that a POSITA would have understood Aizawa's sensor as being limited to placement on the palm side of the wrist, and would have understood Ohsaki's sensor's "tendency to slip" when arranged on the front side as informing consideration of Ohsaki's teachings with respect to Aizawa, that *would have further motivated* the POSITA to implement a light permeable convex cover in Aizawa's sensor, to improve detection efficiency of that sensor when placed on the palm side. POR, 33-36; APPLE-1009, ¶¶[0015], [0017], [0023], [0025], FIGS. 1, 2, 3A, 3B, 4A, 4B.

26.    When describing advantages associated with its translucent board, Ohsaki explains with reference to FIGS. 4A and 4B (reproduced below) that "if the translucent board 8 has a flat surface, the detected pulse wave is adversely affected by the movement of the user's wrist," but that if the board "has a convex surface…variation of the amount of the reflected light…that reaches the light receiving element 7 is suppressed." APPLE-1003, ¶¶86, 149; APPLE-1009, ¶¶[0015], [0017], [0025].



APPLE-1009, FIGS. 4A, 4B.

27.    In my opinion, contrary to Masimo's contentions, a POSITA would not have understood these benefits of a convex surface over a flat surface to be limited to one side or the other of the user's wrist.[2]  Rather, a POSITA would have understood that, by promoting "intimate contact with the surface of the user's

---

[2] Indeed, from Ohsaki's explanation of FIGS. 3A and 3B, the POSITA would have understood that the problem of the "detected pulse wave [being] adversely affected by the movement of the user's wrist," the very problem that Ohsaki seeks to alleviate through a convex detecting surface, is present with respect to *both* sides of the wrist.  APPLE-1009, [0023]-[0025].

skin," a light permeable convex cover would have increased adhesion and reduced slippage of Aizawa's sensor when placed on the palm side of a user's wrist, with associated improvements in signal quality. APPLE-1009, ¶¶[0015], [0017], [0025]; FIGS. 1, 2, 4A, 4B, Claims 3-8; *see also* APPLE-1019, 87, 91. Indeed, a POSITA would have recognized that modifying Aizawa's flat plate to feature a convex protruding surface, as taught by Ohsaki, is not only consistent with Aizawa's stated goal of "improv[ing] adhesion between the sensor and the wrist" to "thereby further improve the detection efficiency," but would have furthered that goal. APPLE-1006, [0013], [0026], [0030], [0034].

28.    In my opinion, a POSITA would have understood that adding a convex surface to Aizawa's flat plate would provide an additional adhesive effect that would reduce the tendency of that plate to slip.

### C.    Modifying Aizawa's sensor to include a convex cover as taught by Ohsaki enhances the sensor's light-gathering ability.

29.    Masimo argues that the combined sensor "would direct light away from the detectors and thus decrease light collection and optical signal strength—not increase signal strength as Petitioner incorrectly asserts." *See, e.g.,* POR, 39-40. As explained below, a POSITA would have understood the opposite to be true: that a cover featuring a convex protrusion would improve Aizawa's signal-to-noise ratio by causing more light backscattered from tissue to strike Aizawa's

### ii. *Masimo ignores the behavior of scattered light in a reflectance-type pulse sensor*

39. Because Aizawa-Inokawa is a reflectance-type pulse detector that receives diffuse, backscattered light from the measurement site, its cover/lens cannot focus all incoming light at a single point. APPLE-1047, ***; Ex. 2006, 163:12-164:2 ("A lens in general…doesn't produce a single focal point."). Indeed, reflectance-type sensors work in this manner by detecting light that has been "partially reflected, transmitted, absorbed, and scattered by the skin and other tissues and the blood before it reaches the detector." Ex. 1019, 86. A POSITA would have understood that light backscatters from the measurement site after diffusing through tissue reaches the active detection area from various random directions and angles. APPLE-1042, 803 ("The incident light emitted from the LED's diffuses in the skin in all directions. This is evident from the circular pattern of backscattered light surrounding the LED's"); Ex. 1019, 90 ("In a reflectance oximeter, the incident light emitted from the LEDs diffuses through the skin and the back scattered light forms a circular pattern around the LEDs"), 52 ("Light scattering causes the deviation of a light beam from its initial direction."), 52.

40. For example, referring to Masimo's annotated version of Inokawa FIG. 2, which I have further modified below to show additional rays of light emitted from LED 21, it is clearly seen how some of the reflected/scattered light from the

measurement site (shown in red) does not reach the centrally located detector 25 of

Inokawa:



POR, 16 (showing APPLE-1008, FIG. 2).

41.    In my opinion, for these and countless other rays that are not shown, there is

simply no way for a cover to focus all light at the center of the sensor device.

42.    Basic laws of refraction, namely Snell's law, dictate the behavior of light

passing from the tissue into the lens.  APPLE-1040, 84 ("This is the very important

law of refraction, the physical consequences of which have been studied…for over

eighteen hundred years."); APPLE-1049, 101; Ex. 1019, 52, 86, 90.  Even Dr.

Madisetti agrees that Snell's law should apply.  *See* APPLE-1043, 80:20-82:20.

43.    Indeed, the type of refraction that would require all scattered light to

somehow bend back toward and focus at the centrally located detector is physically

impossible since all rays must follow Snell's law:



APPLE-1040, 84; APPLE-1049, 101; APPLE-1043, 80:20-82:20.

44.    I have also provided an illustrative example below to clearly show how Snell's law determines the direction of the backscattered ray within the convex cover, thus providing a stark contrast to Masimo's assertions that all such rays must be redirected toward a central detector:



45.    This basic understanding of a convex cover (e.g., lens) stands in stark contrast to the position taken by Dr. Madisetti, who repeatedly and incontrovertibly

stated during deposition that Inokawa's lens redirects, condenses, and focus all light from the measurement site at the center. *See* APPLE-1042, 166:12-182:3 ("My testimony...to avoid any doubt, is that a POSA viewing the teachings of Inokawa Figure 2 would understand that the convex lens 27 of Figure 2 would redirect, condense, and focus light toward the center from the measurement site."). Snell's law handily debunks this theory.

46.    Far from *focusing* light to the center as Masimo contends, Ohsaki's convex cover provides at best a slight refracting effect, such that some light rays that otherwise would have missed the detection area are instead directed toward that area as they pass through the interface provided by the cover.  This is especially the case in configurations like Aizawa's where light detectors are arranged symmetrically about a central light source, so as to enable backscattered light to be detected within a circular active detection area surrounding that source.  Ex. 1019, 86, 90.  The slight refracting effect is further confirmed by the similar indices of refraction between human tissue and a typical cover material (e.g., acrylic). APPLE-1044, 1486; APPLE-1045, 1484.

47.    As I clarified during my deposition, "given the arrangement of the corpuscles as the reflecting objects in the space all around underneath [a convex lens]...there would be some improvement in the light concentration at pretty much all of the locations under the curvature of the lens."  Ex. 2006, 164:8-16.

Moreover, due to its protruded shape, as convex cover "provides an opportunity to capture some light that would otherwise not be captured." *Id.*, 204:21-205:12.  In short, a convex cover improves the light-gathering ability of Aizawa's sensor by allowing a larger fraction of the backscattered light to reach the areas covered by the lens.  Ex. 2012, 86, 90; APPLE-1046, 803.

48.    In the annotated illustration below, I have added dotted lines to indicate the approximate orientation of a line orthogonal to the surface at various locations from the center to the edge.  A POSITA would have understood that the incoming light rays are refracted in a way that refracts incoming rays toward these orthogonal lines:



That is, due to the curvature of the convex lens, more light is directed toward the detectors compared to a flat plate with no curvature.  *Id.*

49.    To support the misguided notion that a convex cover focuses all incoming light at the center, Masimo relies heavily on FIG. 14B from the '553 patent

(reproduced below) to support its contention that a convex cover would direct light to a point in the center of the combined sensor:



APPLE-1001, FIG. 14B (as annotated at POR, 41)

50.    Masimo and Dr. Madisetti treat this figure as an illustration of the behavior of all convex surfaces with respect to all types of light, and conclude that "a convex surface condenses light away from the periphery and towards the sensor's center" as shown in FIG. 14B.  POR, 41.

51.    But, in my opinion, FIG. 14B is not an accurate representation of light that has been reflected from a tissue measurement site.  For example, the light rays

(1420) shown in FIG. 14B are collimated (i.e., travelling paths parallel to one another), and each light ray's path is perpendicular to the detecting surface. By contrast, the detector(s) of reflectance type pulse detectors (like the devices disclosed by Aizawa, Inokawa, and Ohsaki) detect light that has been "partially reflected, transmitted, absorbed, and scattered by the skin and other tissues and the blood before it reaches the detector." APPLE-1019, 86. A POSITA would have understood from Aizawa's FIG. 1(a), the light that backscatters from the measurement site after diffusing through tissue reaches the circular active detection area provided by Aizawa's detectors from various random directions and angles, as opposed to all light entering from the same direction and at the same angle as shown in FIG. 14B. APPLE-1019, 52, 86, 90.

52.    A better representation of the light scattered from the measurement site is shown below, in which light rays scattered from many locations throughout the measurement site are directed towards the sensor with a range of initial locations and directions. The wide range of positions and angles represented by this scattered light from the measurement site is obviously far from collimated, and cannot be focused by any lens. A POSITA would understand that the general effect of a lens on this kind of diffuse light pattern cannot be simply described as condensing, converging or focusing, as asserted by POR through their expert. This

representation is more consistent with the light from a reflective pulse oximeter, and is plainly distinct from the collimated light illustrated in figure 14b:



53.    Indeed, the POSITA would have understood that Aizawa's sensor, which includes multiple photodiodes placed symmetrically with respect to a central light source, offers the advantage of enabling a large fraction of light randomly backscattered from tissue to be detected within the circular active detection area surrounding that source.  APPLE-1019, 86, 90; APPLE-1046, 803-805; *see also* APPLE-1012, FIG. 7.

**2.  A POSITA would have been motivated by a convex cover's ability to direct light "towards the center."**

54.    A convex cover's ***general*** ability to direct light "toward" a "general area" is a concept that supports position that the addition of a convex cover allows more light to be gathered generally, including at the non-centrally located detectors as found in Aizawa.  APPLE-1008, [0015].  Indeed, even Dr. Madisetti appeared to back away from Masimo's illogical suggestion that a convex cover somehow focuses all light at a central point, POR, 13, clarifying that Inokawa focuses light "towards" a "general area," rather than a specific point.  APPLE-1041, 133:19-135:3-11.

55.    Referring to my illustration below providing a version of the modified Aizawa device further annotated with the backscattered rays from the measurement site as discussed above, it can be seen that a convex covers's ability to direct light "toward the center" would allow the detector to capture light that otherwise would have been missed by the detectors, regardless of their location within the sensor device:



56.    The condensing function performed by the cover will allow a larger fraction of light randomly backscattered from tissue to be detected within the active detection area surrounding that source.  APPLE-1019, 86, 90.

57.    As I previously stated, "the convex shape [of a cover/lens] allows light that might have been just specularly reflected off of the flat plate to be captured and refracted inwards.  And in the region where there's curvature, it allows the light to be concentrated, and in this case...in the neighborhood of the detectors and inwards." Ex. 2006, 191:4-14.  That is, the addition of a convex cover allows the detectors to capture some of the reflected light that otherwise would have missed them completely.

**D.    A POSITA would have been motivated to select a convex cover to protect the optical elements.**

58.    Masimo contends that "a POSITA would have understood that Aizawa's flat plate would provide better protection than a convex surface" and be "less prone to scratches."  POR, 47-48.  Even assuming this to be true, it is my understanding that one possible disadvantage that competes with the known advantages of applying Ohsaki's teachings to Aizawa's sensor would not have negated a POSITA's motivation to combine.  *In re Fulton,* 391 F.3d 1195, 73 USPQ2d 1141 (Fed. Cir. 2004).  Moreover, in my opinion, a POSITA would have understood the *multiple* advantages of a convex cover described in the Petition to outweigh any possibility of scratching.

**E.    A POSITA would have been motivated to add a second emitter to Aizawa.**

Proceedings of the 25th Annual International Conference of the IEEE EMBS
Cancun, Mexico • September 17-21, 2003

# Measurement Site and Photodetector Size Considerations in Optimizing Power Consumption of a Wearable Reflectance Pulse Oximeter

Y. Mendelson, Ph.D., C. Pujary, B.E.
Department of Biomedical Engineering, and Bioengineering Institute
Worcester Polytechnic Institute, Worcester, MA 01609, USA

*Abstract—* Site selection and power consumption play a crucial role in optimizing the design of a wearable pulse oximeter for long-term telemedicine application. In this study we investigated the potential power saving in the design of a reflectance pulse oximeter taking into consideration measurement site and sensor configuration. *In-vivo* experiments suggest that battery longevity could be extended considerably by employing a wide annularly shaped photodetector ring configuration and performing SpO2 measurements from the forehead region.

*Keywords–* pulse oximeter, wearable sensors, telemedicine

## I. INTRODUCTION

Noninvasive pulse oximetry is a widely accepted method for monitoring arterial hemoglobin oxygen saturation ($SpO_2$). Oxygen saturation is an important physiological variable since insufficient oxygen supply to vital organs can quickly lead to irreversible brain damage or result in death.

Pulse oximetry is based on spectrophotometric measurements of changes in blood color. The method relies on the detection of a photoplethysmographic (PPG) signal produced by variations in the quantity of arterial blood associated with periodic cardiac contraction and relaxation.

Pulse oximeter sensors are comprised of light emitting diodes (LEDs) and a silicon photodetector (PD). Typically, a red (R) LED with a peak emission wavelength around 660 nm, and an infrared (IR) LED with a peak emission wavelength around 940 nm are used as light sources. $SpO_2$ values are derived based on an empirically calibrated function by which the time-varying (AC) signal component of the PPG at each wavelength is divided by the corresponding time-invariant (DC) component which is due to light absorption and scattering by bloodless tissue, residual arterial blood volume during diastole, and non-pulsatile venous blood.

$SpO_2$ measurements can be performed in either transmission or reflection modes. In transmission mode, the sensor is usually attached across a fingertip or earlobe such that the LEDs and PD are placed on opposite sides of a pulsating vascular bed. Alternatively, in reflection pulse oximetry, the LEDs and PD are both mounted side-by-side facing the same side of the vascular bed. This configuration enables measurements from multiple locations on the body where transmission measurements are not feasible.

Backscattered light intensity can vary significantly between different anatomical locations. For example, optical reflectance from the forehead region is typically strong because of the relatively thin skin covering the skull combined with a higher density of blood vessels. On the contrary, other anatomical locations, such as the limbs or torso, have a much lower density of blood vessels and, in addition, lack a dominant skeletal structure in close proximity to the skin that helps to reflect some of the incident light. Therefore, the AC components of the reflected PPGs from these body locations are considerably smaller. Consequently, it is more difficult to perform accurate pulse oximetry measurement from these body locations without enhancing cutaneous circulation using artificial vasodilatation.

Sensors used with commercial transmission or reflection pulse oximeters employ a single PD element, typically with an active area of about 12-15mm². Normally, a relatively small PD chip is adequate for measuring strong transmission PPGs since most of the light emitted from the LEDs is diffused by the skin and subcutaneous tissues predominantly in a forward-scattering direction. However, in reflection mode, only a small fraction of the incident light is backscattered by the subcutaneous layers. Additionally, the backscattered light intensity reaching the skin surface is normally distributed over a relatively large area surrounding the LEDs. Hence, the design of a reflectance-mode pulse oximeter depends on the ability to fabricate a sensor that has improved sensitivity and can detect sufficiently strong PPGs from various locations on the body combined with sophisticated digital signal algorithms to process the relatively weak and often noisy signals.

To improve the accuracy and reliability of reflection pulse oximeters, several sensor designs have been described based on a radial arrangement of discrete PDs or LEDs. For example, Mendelson *et al* [1]-[2] and Konig *et al* [3] addressed the aspect of unfavorable SNR by developing a reflectance sensor prototype consisting of multiple discrete PDs mounted symmetrically around a pair of R and IR LEDs. Takatani *et al* [4]-[5] described a different sensor configuration based on 10 LEDs arranged symmetrically around a single PD chip.

The U.S. military has long been interested in combining noninvasive physiological sensors with wireless communication and global positioning to monitor soldier's vital signs in real-time. Similarly, remote monitoring of a person's health status who is located in a dangerous environment, such as mountain climbers or divers, could be beneficial. However, to gain better acceptability and address the unmet demand for long term continuous monitoring, several technical issues must be solved in order to design more compact sensors and instrumentation that are power

0-7803-7789-3/03/$17.00 ©2003 IEEE

Authorized licensed use limited to: Kansas State University. Downloaded on July 11,2020 at 15:02:02 UTC from IEEE Xplore. Restrictions apply.

MASIMO 2003
Masimo v. Apple
IPR2020-01537

Appx25906

efficient, low-weight, reliable and comfortable to wear before they could be used routinely in remote monitoring applications. For instance, real-time continuous physiological monitoring from soldiers during combat using existing pulse oximeters is unsuitable because commercial oximeters involve unwieldy wires connected to the sensor, and sensor attachment to a fingertip restrains normal activity. Therefore, there is a need to develop a battery-efficient pulse oximeter that could monitor oxygen saturation and heart rate noninvasively from other locations on the body besides the fingertips.

To meet future needs, low power management without compromising signal quality becomes a key requirement in optimizing the design of a wearable pulse oximeter. However, high brightness LEDs commonly used in pulse oximeters requires relatively high current pulses, typically in the range between 100-200mA. Thus, minimizing the drive currents supplied to the LEDs would contribute considerably toward the overall power saving in the design of a more efficient pulse oximeter, particularly in wearable wireless applications. In previous studies we showed that the driving currents supplied to the LEDs in a reflection and transmission pulse oximeter sensors could be lowered significantly without compromising the quality of the PPGs by increasing the overall size of the PD [6]-[8]. Hence, by maximizing the light collected by the sensor, a very low power-consuming sensor could be developed, thereby extending the overall battery life of a pulse oximeter intended for telemedicine applications. In this paper we investigate the power savings achieved by widening the overall active area of the PD and comparing the LEDs driving currents required to produce acceptable PPG signals from the wrist and forehead regions as two examples of convenient body locations for monitoring SpO$_2$ utilizing a prototype reflectance pulse oximeter.

## II. METHODOLOGY

### A. Experimental setup

To study the potential power savings, we constructed a prototype reflectance sensor comprising twelve identical Silicon PD chips (active chip area: 2mm x 3mm) and a pair of R and IR LEDs. As shown schematically in Fig. 1, six PDs were positioned in a close inner-ring configuration at a radial distance of 6.0mm from the LEDs. The second set of six PDs spaced equally along an outer-ring, separated from the LEDs by a radius of 10.0mm. Each cluster of six PDs were wired in parallel and connected through a central hub to the common summing input of a current-to-voltage converter. The analog signals from the common current-to-voltage converter were subsequently separated into AC and DC components by signal conditioning circuitry. The analog signal components were then digitized at a 50Hz rate for 30 seconds intervals using a National Instruments DAQ card installed in a PC under the control of a virtual instrument implemented using LabVIEW 6.0 software.



Fig. 1.   Prototype reflectance sensor configuration showing the relative positions of the rectangular-shaped PDs and the LEDs.

### B. In Vivo Experiments

A series of *in vivo* experiments were performed to quantify and compare the PPG magnitudes measured by the two sets of six PDs. The prototype sensor was mounted on the dorsal side of the wrist or center of the forehead below the hairline. These representative regions were selected as two target locations for the development of a wearable telesensor because they provide a flat surface for mounting a reflectance sensor which for example could be incorporated into a wrist watch device or attached to a soldier's helmet without using a double-sided adhesive tape. After the sensor was securely attached, the minimum peak currents flowing through each LED was adjusted while the output of the amplifier was monitored continuously to assure that distinguishable and stable PPGs were observed from each set of PDs and the electronics were not saturated.

Two sets of measurements were acquired from each body location. In the first set of experiments we kept the currents supplied to the LEDs at a constant level and the magnitude of the PPGs measured from each set of six PDs were compared. To estimate the minimum peak currents required to drive the LEDs for the near and far-positioned PDs, we performed a second series of measurements where the driving currents were adjusted until the amplitude of the respective PPG reached approximately a constant amplitude.

## III. RESULTS

Typical examples of reflected PPG signals measured by the inner set of six PDs from the forehead and wrist for a constant peak LED current (R: 8.5mA, IR: 4.2mA) are plotted respectively in Fig. 2.

The relative RMS amplitudes of the PPG signals measured by the six near (N) and far (F) PDs, and the combination of all 12 PDs (N+F) are plotted in Fig. 3(a) and 3(b) for a peak R LED drive current of 8.5mA and a peak IR LED drive current of 4.2mA, respectively. Analysis of the data revealed that there is a considerable difference between the signals measured by each set of PDs and amplitude of the respective PPG signals depends on measurement site.

3017

Authorized licensed use limited to: Kansas State University. Downloaded on July 11,2020 at 15:02:02 UTC from IEEE Xplore.  Restrictions apply.

Appx25907



**Fig. 2.** Raw PPG signals measured from the forehead (*a* and *b*) and wrist (*c* and *d*) for constant LED driving currents.





**Fig. 3.** PPG signal amplitudes measured by the near (N), far (F) and combination (N+F) PDs from the wrist and forehead for constant R and IR LED drive currents corresponding to 8.5mA (*a*) and 4.2mA (*b*), respectively.

Fig. 4 compares the relative peak LED currents required to maintain a constant AC RMS amplitude of approximately 0.840(±0.017)V for the N, F and (N+F) PDs measured from the forehead.



**Fig. 4.** Relative LED peak driving currents required to maintain a constant PPG amplitude of 0.840V RMS for the near (N), far (F) and combination (N+F) PD configurations. Measurements were obtained from the forehead.

## IV. DISCUSSION

The successful design of a practical wearable pulse oximeter presents several unique challenges. In addition to user acceptability, the other most important issues are sensor placement and power consumption. For example, utilizing disposable tape or a reusable spring-loaded device for attachment of pulse oximeter sensors, as commonly practiced in clinical medicine, poses significant limitations, especially in ambulatory applications.

Several studies have shown that oximetry readings may vary significantly according to sensor location. For example, tissue blood volume varies in different parts of the body depending on the number and arrangement of blood vessels near the surface of the skin. Other factors, such as sensor-to-skin contact, can influence the distribution of blood close to the skin surface and consequently can cause erroneous readings. Therefore, to ensure consistent performance, it is important to pay close attention to the design of optical sensors used in reflectance pulse oximetry and the selection of suitable sites for sensor attachment.

The current consumed by the LEDs in a battery powered pulse oximeter is inversely proportional to the battery life. Hence, minimizing the current required to drive the LEDs is a critical design consideration, particularly in optimizing the overall power consumption of a wearable pulse oximeter. However, reduced LED driving currents directly impacts the incident light intensity and, therefore, could lead to deterioration in the quality of the measured PPGs. Consequently, lower LED drive currents could result in unreliable and inaccurate reading by a pulse oximeter.

From the data presented in Fig. 2, it is evident that the amplitude and quality of the recorded PPGs vary significantly between the forehead and the wrist. We also observed that using relatively low peak LED driving currents, we had to apply a considerable amount of external pressure on the sensor in order to measure discernable PPG

3018

Authorized licensed use limited to: Kansas State University. Downloaded on July 11,2020 at 15:02:02 UTC from IEEE Xplore. Restrictions apply.

3

Appx25908

signals from the wrist. In contrast, using minimal contact pressure and similar LED driving currents produced significantly larger and less noisy PPG signals from the forehead. These noticeable differences are due to the lower density of superficial blood vessels on the arms compared to the highly vascular forehead skin combined with a strong light reflection from the forehead bone. Additionally, during conditions of peripheral vasoconstriction, a sensor placed on the forehead can maintain stronger PPGs longer compared to a finger sensor [9].

Despite the noticeable differences between the PPG signals measured from the wrist and forehead, the data plotted in Fig. 3 also revealed that considerable stronger PPGs could be obtained by widening the active area of the PD which helps to collect a bigger proportion of backscattered light intensity. The additional increase, however, depends on the area and relative position of the PD with respect to the LEDs. For example, utilizing the outer-ring configuration, the overall increase in the average amplitudes of the R and IR PPGs measured from the forehead region was 23% and 40%, respectively. Similarly, the same increase in PD area produced an increase in the PPG signals measured from the wrist, but with a proportional higher increase of 42% and 73%.

The data presented in Fig. 4 confirmed that in order to produce constant PPG amplitudes, significantly higher currents are required to drive the LEDs when backscattered light is measured by the outer PD set compared to the inner set. This observation was expected since the backscattered light intensity measured is inversely related to the separation distance between the PD and the LEDs [10]. In comparing the three different PD configurations, we found that by combining both PD sets to simulate a single large PD area, it is possible to further reduce the driving currents of the LEDs without compromising the amplitude or quality of the detected PPGs.

Lastly, we used the LED peak driving currents plotted in Fig. 4 to estimate the expected battery life of a typical 220mAh Lithium coin size battery assuming that a similar battery is used to power the optical components of a wearable pulse oximeter. Table 1 summarizes the estimated battery life for the different PD configurations tested in this study. The calculations are based on LEDs pulsed continuously at a typical duty cycle of approximately 1.5%.

**Table 1.** Comparison of estimated battery life for different PD configurations. Values based on forehead measurements for a typical 220mAhr coin size battery.

| PD CONFIGURATION | BATTERY LIFE [Days] |
|---|---|
| Near | 45.8 |
| Far | 20.3 |
| Near+Far | 52.5 |

Note that the estimated values given in Table 1 are very conservative since they rely only on the power consumed by the LEDs without taking into consideration the additional power demand imposed by other components of a wearable pulse oximeter. Nevertheless, the considerable differences in the estimated power consumptions clearly points out the practical advantage gained by using a reflection sensor comprising a large ring-shaped PD area to perform SpO₂ measurements from the forehead region.

## V. CONCLUSION

Site selection and LED driving currents are critical design consideration in optimizing the overall power consumption of a wearable battery-operated reflectance pulse oximeter. In this study we investigated the potential power saving in a ring-shaped sensor configuration comprising two sets of photodetectors arranged in a concentric ring configuration. *In-vivo* experiments revealed that battery longevity could be extended considerably by employing a wide annular PD and limiting SpO₂ measurements to the forehead region.

## ACKNOWLEDGMENT

We gratefully acknowledge the support by the Department of Defense under Cooperative Agreement DAMD17-03-2-0006.

## REFERENCES

[1] Y. Mendelson, J.C. Kent, B.L. Yocum and M.J. Birle, "Design and Evaluation of new reflectance pulse oximeter sensor," *Medical Instrumentation*, Vol. 22, no. 4, pp. 167-173, Aug. 1988.
[2] Y. Mendelson, M.J. McGinn, "Skin reflectance pulse oximetry: *in vivo* measurements from the forearm and calf," *Journal of Clinical Monitoring*, Vol. 37(1), pp. 7-12, 1991.
[3] V. Konig, R. Huch, A. Huch, "Reflectance pulse oximetry – principles and obstetric application in the Zurich system," *Journal of Clinical Monitoring*, Vol. 14, pp. 403-412, 1998.
[4] S. Takatani, C. Davies, N. Sakakibara, et al, "Experimental and clinical evaluation of a noninvasive reflectance pulse oximeter sensor," *Journal. Clinical Monitoring*, 8(4), pp. 257-266, 1992.
[5] M. Nogawa, C.T. Ching, T. Ida, K. Itakura, S. Takatani, "A new hybrid reflectance optical pulse oximetry sensor for lower oxygen saturation measurement and for broader clinical application," in *Proc SPIE*, Vol. 2976, pp. 78-87, 1997.
[6] C. Pujary, M. Savage, Y. Mendelson, "Photodetector size considerations in the design of a noninvasive reflectance pulse oximeter for telemedicine applications," in *Proc. IEEE 29th Annu. Northeast Bioengineering Conf.*, Newark, USA, 2003.
[7] M. Savage, C. Pujary, Y. Mendelson, "Optimizing power consumption in the design of a wearable wireless telesensor: Comparison of pulse oximeter modes," in *Proc. IEEE 29th Annu. Northeast Bioengineering Conf.*, Newark, USA, 2003.
[8] Y. Mendelson, C. Pujary, M. Savage, "Minimization of LED power consumption in the design of a wearable pulse oximeter," in *Proc. International Association of Science and Technology for Development, International Conf. BioMED 2003*, Salzburg, Austria, June 25-27, 2003.
[9] D.E. Bebout, P.D. Mannheimer, C.C. Wun, "Site-dependent differences in the time to detect changes in saturation during low perfusion," *Critical Care Medicine*, Vol. 29, no. 12, p. A115, 2001.
[10] Y. Mendelson, B.D. Ochs, "Noninvasive pulse oximetry utilizing skin reflectance photoplethysmography," *IEEE Trans Biomed. Eng.*, Vol. 35, no. 10, pp. 798-805, Oct 1988.

3019

Authorized licensed use limited to: Kansas State University. Downloaded on July 11,2020 at 15:02:02 UTC from IEEE Xplore. Restrictions apply.

4

Appx25909

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

APPLE INC.

Petitioner,

v.

MASIMO CORPORATION,

Patent Owner.

———————

Case IPR2020-01537
U.S. Patent 10,588,553

———————

**DECLARATION OF VIJAY K. MADISETTI, PH.D.**

**MASIMO 2004**
**Masimo v. Apple**
**IPR2020-01537**





Dr. Kenny's illustration of the combination of Aizawa, Ohsaki, and Inokawa (Ex. 1003 ¶143)

Dr. Kenny's illustration of Aizawa's circular sensor (Ex. 1003 ¶133)

53.    Dr. Kenny asserts that a POSITA would have been motivated to add Ohsaki's rectangular board to Aizawa's circular sensor to improve adhesion. Ex. 1003 ¶87; *see also, e.g.*, ¶¶89-91, 145-147, 152. As an initial point, Ohsaki does not specifically discuss improving adhesion, and instead refers to a particular configuration that prevents slipping and various other configurations that have a tendency to slip. Ex. 1009 ¶¶[0006], [0010], [0019], [0023], [0025]. Dr. Kenny equates Ohaski's disclosure of a convex surface that prevents slippage with "improving adhesion." Ex. 1003 ¶84 (citing Ex. 1009 ¶[0025]). But Dr. Kenny's proposed modification eliminates the longitudinal shape that Ohsaki identifies as an important part of reducing slipping. Ex. 1009 ¶[0019].

54.    Ohsaki places its linear, longitudinal sensor on the backhand side of a user's wrist to avoid interacting with bones in the wrist. *See* Ex. 1009 ¶[0006] (discussing need to avoid pressing on "two bones (the radius and the ulna)"), ¶[0024] ("the radius and the ulna inside the user's wrist 4 are not pressed"); *see*

-30-

*also*, *e.g.*, ¶¶[0023]-[0024], Abstract, Title, Fig. 1 (Ohsaki device worn on back side of wrist). As illustrated below (left), the forearm bones (the radius and ulna) on the arm's backhand (or watch) side create a longitudinal opening at the junction between the wrist and forearm with no muscle insertions. Ex. 2010 at 49 (Plate 434). The radius and ulna, against which Ohsaki warns against pressing (Ex. 1009 ¶¶[0006], [0024]), are on either side of this longitudinal opening.



Anatomical drawing of the back side (posterior) of the hand, wrist, and forearm
(partial view from Ex. 2010 at 49 (Plate 434))
Left: Conceptual view of how a rectangular sensor that is positioned in
longitudinal direction on the wrist/forearm can avoid the radius and ulna
Right: Conceptual view of how the same rectangular sensor placed in the
circumferential direction on wrist/forearm interacts with the radius and ulna

55. Ohsaki indicates that its sensor's longitudinal direction needs to be aligned with the longitudinal direction of the longitudinal opening of the user's arm to prevent slipping. Ex. 1009 ¶[0019]. If the sensor's longitudinal direction is aligned with the circumferential direction of the user's wrist, the undesirable result is "a tendency [for Ohsaki's sensor] to slip off." Ex. 1009 ¶[0019]. As illustrated

-31-

above (right), a rectangular structure like Ohsaki's sensor and board that is aligned with the circumferential direction of the user's wrist undesirably interacts with the radius and ulna, which Osaki warns against.  Ex. 1009 ¶¶[0006], [0024].  In contrast, a rectangular structure aligned with the longitudinal direction of the user's wrist can avoid pressing against the radius and ulna.

56.    Thus, a POSITA would have understood that changing the shape of Ohsaki's rectangular board to circular would not preserve its ability to prevent slipping.  Instead, if Ohsaki's rectangular board were changed into a circular shape, a POSITA would have believed it would have resulted in slipping, and thus eliminated the advantage of Ohsaki's board.  This is because a circular shape extends equally in all directions, including in the circumferential direction of the user's wrist, which Ohsaki explains results in slipping.  Ex. 1009 ¶[0019].  As a result, a circular shape cannot be placed in a longitudinal direction and thus cannot align with the longitudinal direction of the user's wrist, as taught by Ohsaki.  As illustrated below, unlike a longitudinal sensor, a symmetrical circular shape (with a diameter equal to the long side of the rectangle, below left) would not fit within the user's anatomy in a way that it could avoid undesirably pressing against the user's radius and ulna, which Ohsaki cautioned against.

-32-



Anatomical drawing of the back side (posterior) of the hand, wrist, and forearm
(partial view from Ex. 2010 at 49 (Plate 434))
Left:  Conceptual view of how a rectangular sensor that is positioned in
longitudinal direction on the wrist/forearm can avoid the radius and ulna
Right:  Conceptual view of how a circular sensor with the same diameter as the
length of the rectangular board interacts with the radius and ulna

57.     Because a symmetrical circular shape will press on the user's arm in all directions, it will interact with the user's bone structure.  Ohsaki teaches that such interactions with the user's anatomy are undesirable and result in slipping.  Ex. 1009 ¶¶[0006], [0023]-[0024].

58.     Dr. Kenny did not discuss Ohsaki's disclosure that when Ohsaki's rectangular sensor was placed in one orientation (up-and-down the arm), it helped prevent slipping.  Ex. 1009 ¶[0019].  Dr. Kenny also did not discuss Ohsaki's explanation that rotating the sensor 90 degrees, such that the long direction points in the circumferential direction of the user's wrist, the sensor "has a tendency to slip." Ex. 1009 ¶[0019].

-33-

¶¶[0016], [0024]; *see also* ¶[0030] (single sentence identifying back side of user's forearm, which is connected to the wrist).

60.     As a result, a POSITA would not have been motivated to eliminate the longitudinal shape that Ohsaki asserts helps prevent slipping.  Ex. 1009 ¶[0019].  Indeed, Ohsaki underscores the unsuitability of the proposed combination, explaining that many sensor positions and orientations are ineffective.  Ex. 1009 ¶¶[0019], [0023]-[0024].  Beyond the illustrated longitudinal shape (Ex. 1009 ¶[0019], Figs. 1-2) Ohsaki has no details or explanation that a POSITA could use to implement its board into other devices, other shapes, or other measurement locations.  Ohsaki indicates that only one shape (rectangular), one position (back side of the wrist, discussed further below), and one orientation (up-and-down the arm) prevent slipping.  Ex. 1009 ¶¶[0019], [0023]-[0025].  Ohsaki emphasizes that its benefit occurs only when the sensor has a longitudinal shape and is on the wrist's back side, in the anatomically appropriate orientation.  Ex. 1009 ¶¶[0019], [0023]-[0024].

61.     Thus, in my opinion, a POSITA would not have been motivated to change the shape of Ohsaki's rectangular board to combine it with Aizawa's circular sensor because a POSITA would have understood that changing Ohsaki's rectangular board into a circular shape would eliminate Ohsaki's benefit of preventing slipping.

-35-

# IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Patent of:    Jeroen Poeze et al.

U.S. Patent No.:    10,588,554      Attorney Docket No.: 50095-0013IP1

Issue Date:    March 17, 2020

Appl. Serial No.:    16/544,713

Filing Date:    August 19, 2019

Title:    MULTI-STREAM DATA COLLECTION SYSTEM FOR NONINVASIVE MEASUREMENT OF BLOOD CONSTITU-ENTS

**Mail Stop Patent Board**

Patent Trial and Appeal Board

U.S. Patent and Trademark Office

P.O. Box 1450

Alexandria, VA 22313-1450

## PETITION FOR *INTER PARTES* REVIEW OF UNITED STATES PATENT NO. 10,588,554 PURSUANT TO 35 U.S.C. §§ 311–319, 37 C.F.R. § 42

methods to yield predictable results—improved adhesion of the sensor to the user's skin, and improved signal strength. *KSR v. Teleflex*, 550 U.S. 398, 417 (2007); APPLE-1003, ¶[0092]. Furthermore, the elements of the resulting sensor would each perform functions they had been known to perform prior to the combination—a cover would simply be placed over the components accommodated within Mendelson-799's sensor housing 17, and would perform the same function as taught by Ohsaki. APPLE-1003, ¶¶[0084]-[0092]; APPLE-1012, Abstract, 9:22-10:30, FIG. 7; APPLE-1009, Abstract, ¶¶[0015], [0017], [0025], FIGS. 1, 2, 4A, 4B.

### (b)    *Opaque layer with windows corresponding to detectors*

A POSITA would have recognized that an opaque circumscribing wall would partially shield Mendelson-799's detectors from ambient light, but would have understood from Schulz that additional measures could be taken to guard against saturation. APPLE-1019, 79, 86, 94.

As discussed above (Section IV.B.3), Schulz describes a sensor featuring "a thin sheet of opaque material" placed inside the sensor's housing beneath a lens, with "a window in the opaque material provid[ing] an aperture for transmission of optical energy to or from the tissue site." APPLE-1013, ¶[0073]. The opaque material blocks light, "and the window in the opaque material can be sized as needed

32

Filed: April 12, 2022

Filed on behalf of:
    Patent Owner Masimo Corporation
By:   Joseph R. Re (Reg. No. 31,291)
    Stephen C. Jensen (Reg. No. 35,556)
    Jarom D. Kesler (Reg. No. 57,046)
    Stephen W. Larson (Reg. No. 69,133)
    Jacob L. Peterson (Reg. No. 65,096)
    William R. Zimmerman (admitted *pro hac vice*)
    Jeremiah S. Helm, Ph.D. (admitted *pro hac vice*)
    KNOBBE, MARTENS, OLSON & BEAR, LLP
    2040 Main Street, Fourteenth Floor
    Irvine, CA 92614
    Tel.:  (949) 760-0404
    Fax:  (949) 760-9502
    E-mail:  AppleIPR2020-1538-554@knobbe.com

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

APPLE INC.

Petitioner,

v.

MASIMO CORPORATION,

Patent Owner.

———————

Case IPR2020-01538
U.S. Patent 10,588,554

———————

**PATENT OWNER'S NOTICE OF APPEAL TO THE U.S. COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

Pursuant to 28 U.S.C. § 1295(a)(4)(A), 35 U.S.C. §§ 141(c), 142, and 319, 37 C.F.R. §§ 90.2(a) and 90.3, and Rule 4(a) of the Federal Rules of Appellate Procedure, Patent Owner Masimo Corporation ("Masimo") hereby appeals to the United States Court of Appeals for the Federal Circuit from the Judgement – Final Written Decision (Paper No. 43) entered on February 23, 2022 (Attachment A) and from all underlying orders, decisions, rulings, and opinions that are adverse to Masimo related thereto and included therein, including those within the Decision Granting Institution of *Inter Partes* Review, entered March 2, 2021 (Paper 8). Masimo appeals the Patent Trial and Appeal Board's determination that claims 1–7 and 20–28 of U.S. Patent 10,588,554 are unpatentable, and all other findings and determinations, including but not limited to claim construction, as well as all other issues decided adverse to Masimo's position or as to which Masimo is dissatisfied in IPR2020-01538 involving U.S. Patent 10,588,554.

Masimo is concurrently providing true and correct copies of this Notice of Appeal, along with the required fees, with the Director of the United States Patent and Trademark Office and the Clerk of the United States Court of Appeals for the Federal Circuit.

Respectfully submitted,

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated:  April 12, 2022      /Jarom Kesler/
                            Jarom D. Kesler (Reg. No. 57,046)
                            Customer No. 64,735

                            Attorney for Patent Owner
                            Masimo Corporation

# ATTACHMENT A

Trials@uspto.gov                                                    Paper 43
571-272-7822                                        Entered: February 23, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

APPLE INC.,

Petitioner,

v.

MASIMO CORPORATION,

Patent Owner.

_____

IPR2020-01538
Patent 10,588,554 B2

_____

Before GEORGE R. HOSKINS, ROBERT L. KINDER, and
AMANDA F. WIEKER, *Administrative Patent Judges.*

WIEKER, *Administrative Patent Judge.*

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

## I.    INTRODUCTION

### *A.  Background*

Apple Inc. ("Petitioner") filed a Petition requesting an *inter partes* review of claims 1–7 and 20–28 ("challenged claims") of U.S. Patent No. 10,588,554 B2 (Ex. 1001, "the '554 patent").  Paper 3 ("Pet.").  Masimo Corporation ("Patent Owner") waived filing a Preliminary Response.  Paper 7.  We instituted an *inter partes* review of all challenged claims 1–7 and 20–28 on the sole asserted ground of unpatentability, pursuant to 35 U.S.C. § 314.  Paper 8 ("Inst. Dec.").

After institution, Patent Owner filed a Response (Paper 23, "PO Resp.") to the Petition, Petitioner filed a Reply (Paper 27, "Pet. Reply"), and Patent Owner filed a Sur-reply (Paper 32, "PO Sur-reply").[1]  An oral hearing was held on December 7, 2021, and a transcript of the hearing is included in the record.  Paper 42 ("Tr.").

We issue this Final Written Decision pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73.  For the reasons set forth below, Petitioner has met its burden of showing, by a preponderance of the evidence, that challenged claims 1–7 and 20–28 of the '554 patent are unpatentable.

### *B.  Related Proceedings*

The parties identify the following matters related to the '554 patent:

*Masimo Corporation v. Apple Inc.*, Civil Action No. 8:20-cv-00048 (C.D. Cal.) (filed Jan. 9, 2020);

---

[1] After the Sur-reply was filed, we authorized Petitioner to file an Identification of Testimony.  Paper 38.

IPR2020-01538
Patent 10,588,554 B2

*Apple Inc. v. Masimo Corporation*, IPR2020-01539 (PTAB Sept. 2, 2020) (also challenging claims 1–28 of the '554 patent);

*Apple Inc. v. Masimo Corporation*, IPR2020-01520 (PTAB Aug. 31, 2020) (challenging claims of U.S. Patent No. 10,258,265 B1);

*Apple Inc. v. Masimo Corporation*, IPR2020-01521 (PTAB Sept. 2, 2020) (challenging claims of U.S. Patent No. 10,292,628 B1);

*Apple Inc. v. Masimo Corporation*, IPR2020-01523 (PTAB Sept. 9, 2020) (challenging claims of U.S. Patent No. 8,457,703 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01524 (PTAB Aug. 31, 2020) (challenging claims of U.S. Patent No. 10,433,776 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01526 (PTAB Aug. 31, 2020) (challenging claims of U.S. Patent No. 6,771,994 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01536 (PTAB Aug. 31, 2020) (challenging claims of U.S. Patent No. 10,588,553 B2); and

*Apple Inc. v. Masimo Corporation*, IPR2020-01537 (PTAB Aug. 31, 2020) (challenging claims of U.S. Patent No. 10,588,553 B2).

Pet. 3–4; Paper 5, 1–3.

Patent Owner further identifies the following pending patent applications, among other issued and abandoned applications, that claim priority to, or share a priority claim with, the '554 patent:

U.S. Patent Application No. 16/834,538;

U.S. Patent Application No. 16/449,143; and

U.S. Patent Application No. 16/805,605.

Paper 5, 1–2.

3

### *C. The '554 Patent*

The '554 patent is titled "Multi-Stream Data Collection System for Noninvasive Measurement of Blood Constituents," and issued on March 17, 2020, from U.S. Patent Application No. 16/544,713, filed August 19, 2019. Ex. 1001, codes (21), (22), (45), (54). The '554 patent claims priority through a series of continuation and continuation-in-part applications to Provisional Application Nos. 61/078,228 and 61/078,207, both filed July 3, 2008. *Id.* at codes (60), (63).

The '554 patent discloses a two-part data collection system including a noninvasive sensor that communicates with a patient monitor. *Id.* at 2:38–40. The sensor includes a sensor housing, an optical source, and several photodetectors, and is used to measure a blood constituent or analyte, e.g., oxygen or glucose. *Id.* at 2:29–35, 64–65. The patient monitor includes a display and a network interface for communicating with a handheld computing device. *Id.* at 2:45–48.

Figure 1 of the '554 patent is reproduced below.



**FIG. 1**

4

Figure 1 illustrates a block diagram of data collection system 100 including sensor 101 and monitor 109. *Id.* at 11:47–58. Sensor 101 includes optical emitter 104 and detectors 106. *Id.* at 11:59–63. Emitters 104 emit light that is attenuated or reflected by the patient's tissue at measurement site 102. *Id.* at 14:3–7. Detectors 106 capture and measure the light attenuated or reflected from the tissue. *Id.* In response to the measured light, detectors 106 output detector signals 107 to monitor 109 through front-end interface 108. *Id.* at 14:7–10, 26–32. Sensor 101 also may include tissue shaper 105, which may be in the form of a convex surface that: (1) reduces the thickness of the patient's measurement site; and (2) provides more surface area from which light can be detected. *Id.* at 11:2–14.

Monitor 109 includes signal processor 110 and user interface 112. *Id.* at 15:16–18. "[S]ignal processor 110 includes processing logic that determines measurements for desired analytes . . . based on the signals received from the detectors." *Id.* at 15:21–24. User interface 112 presents the measurements to a user on a display, e.g., a touch-screen display. *Id.* at 15:46–56. The monitor may be connected to storage device 114 and network interface 116. *Id.* at 15:60–16:11.

The '554 patent describes various examples of sensor devices. Figures 14D and 14F, reproduced below, illustrate detector portions of sensor devices.

5

IPR2020-01538
Patent 10,588,554 B2



**FIG. 14D**

FIG. 14F

Figure 14D illustrates portions of a detector submount and Figure 14F illustrates portions of a detector shell. *Id.* at 6:44–47. As shown in Figure 14D, multiple detectors 1410c are located within housing 1430 and under transparent cover 1432, on which protrusion 605b (or partially cylindrical protrusion 605) is disposed. *Id.* at 35:36–39, 36:30–37. Figure 14F illustrates a detector shell 306f including detectors 1410c on substrate 1400c. *Id.* at 37:9–17. Substrate 1400c is enclosed by shielding enclosure 1490 and noise shield 1403, which include window 1492a and window 1492b, respectively, placed above detectors 1410c. *Id.* Alternatively, cylindrical housing 1430 may be disposed under noise shield 1403 and may enclose detectors 1410c. *Id.* at 37:47–48.

Figures 4A and 4B, reproduced below, illustrate an alternative example of a tissue contact area of a sensor device.

6

IPR2020-01538
Patent 10,588,554 B2



**FIG. 4A**                    **FIG. 4B**

Figures 4A and 4B illustrate arrangements of protrusion 405 including measurement contact area 470. *Id.* at 23:18–24. "[M]easurement site contact area 470 can include a surface that molds body tissue of a measurement site." *Id.* "For example, . . . measurement site contact area 470 can be generally curved and/or convex with respect to the measurement site." *Id.* at 23:39–43. The measurement site contact area may include windows 420–423 that "mimic or approximately mimic a configuration of, or even house, a plurality of detectors." *Id.* at 23:49–63.

### D. Illustrative Claim

Of the challenged claims, claims 1 and 20 are independent. Claim 1 is illustrative and is reproduced below.

1. A physiological measurement system comprising:

[a] a physiological sensor device comprising:

> [b] a plurality of emitters configured to emit light into tissue of a user;

> [c] at least four detectors, wherein each of the at least four detectors has a corresponding window that allows light to pass through to the detector;

> [d] a wall that surrounds at least the at least four detectors; and

7

[e] a cover that operably connects to the wall and that is configured to be located between tissue of the user and the at least four detectors when the physiological sensor device is worn by the user, wherein:

[f] the cover comprises a single protruding convex surface, and

[g] at least a portion of the cover is sufficiently rigid to cause tissue of the user to conform to at least a portion of a shape of the single protruding convex surface when the physiological sensor device is worn by the user; and

[h] a handheld computing device in wireless communication with the physiological sensor device, wherein the handheld computing device comprises:

[i] one or more processors configured to wirelessly receive one or more signals from the physiological sensor device, the one or more signals responsive to at least a physiological parameter of the user;

[j] a touch-screen display configured to provide a user interface,

wherein:

[k] the user interface is configured to display indicia responsive to measurements of the physiological parameter, and

[l] an orientation of the user interface is configurable responsive to a user input; and

[m] a storage device configured to at least temporarily store at least the measurements of the physiological parameter.

Ex. 1001, 44:51–45:21 (bracketed identifiers a–m added).  Independent claim 20 includes limitations substantially similar to limitations [a]–[h] of claim 1. *Id.* at 46:31–52.

8

IPR2020-01538
Patent 10,588,554 B2

## E.  Applied References

Petitioner relies upon the following references:

> Mendelson, U.S. Patent No. 6,801,799 B2, filed February 6, 2003, issued October 5, 2004 (Ex. 1012, "Mendelson-799");

> Ohsaki et al., U.S. Patent Application Publication No. 2001/0056243 A1, filed May 11, 2001, published December 27, 2001 (Ex. 1009, "Ohsaki");

> Schulz et al., U.S. Patent Application Publication No. 2004/0054291 A1, filed July 31, 2003, published March 18, 2004 (Ex. 1013, "Schulz"); and

> Y. Mendelson et al., "A Wearable Reflectance Pulse Oximeter for Remote Physiological Monitoring," Proceedings of the 28th IEEE EMBS Annual International Conference, 912–915 (2006) (Ex. 1010, "Mendelson-2006").

Pet. 12.

Petitioner also submits, *inter alia*, the Declaration of Thomas W. Kenny, Ph.D. (Ex. 1003) and the Second Declaration of Dr. Thomas W. Kenny (Ex. 1047).  Patent Owner submits, *inter alia*, the Declaration of Dr. Vijay K. Madisetti (Ex. 2004).  The parties also provide deposition testimony from Dr. Kenny and Dr. Madisetti, including from this proceeding and others.  *See* Exs. 1041–1043, 2006–2009, 2027.

## F.  Asserted Ground of Unpatentability

We instituted an *inter partes* review based on the following ground. Inst. Dec. 9, 32.

| Claims Challenged | 35 U.S.C. § | References/Basis |
|---|---|---|
| 1–7, 20–28 | 103 | Mendelson-799, Ohsaki, Schulz, Mendelson-2006 |

9

**Appx28432**

## II.   DISCUSSION

### A.  Claim Construction

For petitions filed on or after November 13, 2018, a claim shall be construed using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. § 282(b).  37 C.F.R. § 42.100(b) (2019).  Petitioner submits that no claim term requires express construction.  Pet. 11.  Patent Owner submits that claim terms should be given their ordinary and customary meaning, consistent with the Specification.  PO Resp. 9–10.

We agree that no claim terms require express construction.  *Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co. Ltd.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017).

### B.  Principles of Law

A claim is unpatentable under 35 U.S.C. § 103(a) if "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."  *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007).  The question of obviousness is resolved on the basis of underlying factual determinations, including (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) objective evidence of nonobviousness.[2]  *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966). When evaluating a combination of teachings, we must also "determine

---

[2] Patent Owner has not presented objective evidence of non-obviousness.

10

whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue." *KSR*, 550 U.S. at 418 (citing *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006)). Whether a combination of elements would have produced a predictable result weighs in the ultimate determination of obviousness. *Id.* at 416–417.

In an *inter partes* review, the petitioner must show with particularity why each challenged claim is unpatentable. *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016); 37 C.F.R. § 42.104(b). The burden of persuasion never shifts to Patent Owner. *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015). To prevail, Petitioner must support its challenge by a preponderance of the evidence. 35 U.S.C. § 316(e); 37 C.F.R. § 42.1(d).

We analyze the challenges presented in the Petition in accordance with the above-stated principles.

### C. Level of Ordinary Skill in the Art

Petitioner identifies the appropriate level of skill in the art as that possessed by a person "having a Bachelor of Science degree in an academic discipline emphasizing the design of electrical, computer, or software technologies, in combination with training or at least one to two years of related work experience with capture and processing of data or information." Pet. 10–11 (citing Ex. 1003 ¶¶ 1–18, 20–21). "Alternatively, the person could have also had a Master of Science degree in a relevant academic discipline with less than a year of related work experience in the same discipline." *Id.* at 11.

Patent Owner makes several observations regarding Petitioner's identified level of skill in the art but, "[f]or purposes of this proceeding,

11

IPR2020-01538
Patent 10,588,554 B2

[Patent Owner] nonetheless applies Petitioner's asserted level of skill." PO Resp. 10.

We adopt Petitioner's assessment as set forth above, which appears consistent with the level of skill reflected in the Specification and prior art.

*D. Obviousness over the Combined Teachings of*
*Mendelson-799, Ohsaki, Schulz, and Mendelson-2006*

Petitioner contends that claims 1–7 and 20–28 of the '554 patent would have been obvious over the combined teachings of Mendelson-799, Ohsaki, Schulz, and Mendelson-2006. Pet. 43–96; *see also generally* Pet. Reply. Patent Owner disagrees. PO Resp. 12–63; *see also generally* PO Sur-reply.

Based on our review of the parties' arguments and the cited evidence of record, we determine that Petitioner has met its burden of showing by a preponderance of the evidence that claims 1–7 and 20–28 are unpatentable.

*1. Overview of Mendelson-799 (Ex. 1012)*

Mendelson-799 is a U.S. patent titled "Pulse Oximeter and Method of Operation," and discloses a sensor for non-invasive measurement of a blood parameter, which includes a sensor housing, a radiation source, and a detector. Ex. 1012, codes (54), (57).

Figure 7 of Mendelson-799 is reproduced below.

12

IPR2020-01538
Patent 10,588,554 B2



*Figure 7*

Figure 7 illustrates optical sensor 10 with light source 12, which includes three closely spaced light emitting elements 12a, 12b, 12c. *Id.* at 9:22–28. Optical sensor 10 includes an array of discrete detectors, i.e., "far" detectors 16 and "near" detectors 18, "arranged in two concentric ring-like arrangements . . . surrounding the light emitting elements." *Id.* at 9:29–34. "[L]ight shield 14 is positioned between the photodiodes and the light emitting elements, and prevents direct optical coupling between them, thereby maximizing the fraction of backscattered light passing through the arterially perfused vascular tissue in the detected light." *Id.* at 9:35–40. Sensor housing 17 accommodates the light source, light shield, and detectors. *Id.* at 9:34–35.

13

Figure 8 of Mendelson-799 is reproduced below.



Figure 8

Figure 8 illustrates a block diagram of pulse oximeter 20 using sensor 10.
*Id.* at 10:16–17.  Pulse oximeter 20 includes control unit 21, with electronic
block 22 connectable to sensor 10, microprocessor 24, and display 26, which
presents measurement results.  *Id.* at 10:17–22.  "The measured data (i.e.,
electrical output of the sensor 10 indicative of the detected light) is directly
processed in the block 22, and the converted signal 25 is further processed
by the microprocessor 24."  *Id.* at 10:22–25.

### 2.  Overview of Ohsaki (Ex. 1009)

Ohsaki is a U.S. patent application publication titled "Wristwatch-type
Human Pulse Wave Sensor Attached on Back Side of User's Wrist," and
discloses an optical sensor for detecting a pulse wave of a human body.
Ex. 1009, code (54), ¶ 3.

14

IPR2020-01538
Patent 10,588,554 B2

Figure 1 of Ohsaki is reproduced below.



Figure 1 illustrates a cross-sectional view of pulse wave sensor 1 attached on the back side of user's wrist 4. *Id.* ¶¶ 12, 16. Pulse wave sensor 1 includes detecting element 2 and sensor body 3. *Id.* ¶ 16.

Figure 2 of Ohsaki, reproduced below, illustrates further detail of detecting element 2.



15

IPR2020-01538
Patent 10,588,554 B2

Figure 2 illustrates a mechanism for detecting a pulse wave. *Id.* ¶ 13.
Detecting element 2 includes package 5, light emitting element 6, light
receiving element 7, and translucent board 8. *Id.* ¶ 17. Light emitting
element 6 and light receiving element 7 are arranged on circuit board 9
inside package 5. *Id.* ¶¶ 17, 19.

"[T]ranslucent board 8 is a glass board which is transparent to light,
and attached to the opening of the package 5. A convex surface is formed
on the top of the translucent board 8." *Id.* ¶ 17. "[T]he convex surface of
the translucent board 8 is in intimate contact with the surface of the user's
skin," preventing detecting element 2 from slipping off the detecting
position of the user's wrist. *Id.* ¶ 25. By preventing the detecting element
from moving, the convex surface suppresses "variation of the amount of the
reflected light which is emitted from the light emitting element 6 and
reaches the light receiving element 7 by being reflected by the surface of the
user's skin." *Id.* Additionally, the convex surface prevents penetration by
"noise such as disturbance light from the outside." *Id.*

Sensor body 3 is connected to detecting element 2 by signal line 13.
*Id.* ¶ 20. Signal line 13 connects detecting element 2 to drive circuit 11,
microcomputer 12, and a monitor display (not shown). *Id.* Drive circuit 11
drives light emitting element 6 to emit light toward wrist 4. *Id.* Detecting
element 2 receives reflected light which is used by microcomputer 12 to
calculate pulse rate. *Id.* "The monitor display shows the calculated pulse
rate." *Id.*

16

**Appx28439**

IPR2020-01538
Patent 10,588,554 B2

### 3. Overview of Schulz (Ex. 1013)

Schulz is a U.S. patent application publication titled "Pulse Oximetry Ear Sensor," and discloses an ear sensor assembly including an emitter pad and a detector pad. Ex. 1013, codes (54), (57).

Figure 19C of Schulz is reproduced below.



Figure 19C illustrates an exploded top perspective view of an ear sensor clip. *Id.* ¶ 31. Each sensor clip 1900 includes "opposingly positioned housings 1902 and 1903 that house one or more sensor optical components." *Id.* ¶ 65. Each housing includes respective inward facing shells 1905 and 1906.[3] *Id.* ¶ 65. "[I]nward facing shells 1905 and 1906 further include windows 1919 and 1924 that provide an aperture for transmission of optical

---

[3] Figure 19C appears to label inward facing shell 1906 as 1916. *See id.* at Fig. 19B.

IPR2020-01538
Patent 10,588,554 B2

energy to or from a tissue site.  Translucent silicone material covers windows 1919 and 1924 providing lenses 1920 and 1921." *Id.* ¶ 67.

A "thin sheet of opaque material is located beneath window 1919 or 1924, and a window in the opaque material provides an aperture for transmission of optical energy to or from the tissue site." *Id.* ¶ 73.  "The opaque material blocks light, and the window in the opaque material can be sized as needed to block the proper amount of light from entering the aperture to, for example, avoid saturation of the light detector." *Id.*

### 4. Mendelson-2006 (Ex. 1010)

Mendelson-2006 is a journal article titled "A Wearable Reflectance Pulse Oximeter for Remote Physiological Monitoring," and discloses a wireless wearable pulse oximeter connected to a personal digital assistant ("PDA").  Ex. 1010, 1.[4]

Figure 1 of Mendelson-2006 is reproduced below.



---

[4] Petitioner cites to the page numbers added to Exhibit 1010, rather than the native page numbering that accompanies the article.  *See, e.g.*, Pet. 23–25. We follow Petitioner's numbering scheme.

IPR2020-01538
Patent 10,588,554 B2

Figure 1 illustrates a sensor module attached to the skin (top), and a photograph of a disassembled sensor module and receiver module (bottom). The sensor module includes an optical transducer, a stack of round printed circuit boards, and a coin cell battery. *Id.* at 2.

Figure 2 of Mendelson-2006 is reproduced below.



Figure 2 depicts a system block diagram of the wearable, wireless, pulse oximeter including the sensor module (top) and the receiver module (bottom). *Id.* The sensor module includes at least one light-emitting diode ("LED"), a photodetector, signal processing circuitry, an embedded microcontroller, and an RF transceiver. *Id.* at 1–2. Mendelson-2006 discloses that a concentric array of discrete photodetectors could be used to increase the amount of backscattered light detected by a reflectance type pulse oximeter sensor. *Id.* at 4. The receiver module includes an embedded

19

IPR2020-01538
Patent 10,588,554 B2

microcontroller, an RF transceiver for communicating with the sensor
module, and a wireless module for communicating with the PDA. *Id.* at 2.

As a PDA for use with the system, Mendelson-2006 discloses "the HP
iPAQ h4150 PDA because it can support both 802.11b and Bluetooth™
wireless communication" and "has sufficient computational resources." *Id.*
at 3. Mendelson-2006 further discloses that

> [t]he use of a PDA as a local terminal also provides a low-cost
> touch screen interface. The user-friendly touch screen of the
> PDA offers additional flexibility. It enables multiple controls to
> occupy the same physical space and the controls appear only
> when needed. Additionally, a touch screen reduces development
> cost and time, because no external hardware is required. . . . The
> PDA can also serve to temporarily store vital medical
> information received from the wearable unit.

*Id.*

The PDA is shown in Figure 3 of Mendelson-2006, reproduced below.



Figure 3 illustrates a sample PDA and its graphical user interface ("GUI").
*Id.* Mendelson-2006 explains that the GUI allows the user to interact with
the wearable system. *Id.* "The GUI was configured to present the input and
output information to the user and allows easy activation of various
functions." *Id.* "The GUI also displays the subject's vital signs, activity

20

level, body orientation, and a scrollable PPG waveform that is transmitted by the wearable device." *Id.* For example, the GUI displays numerical oxygen saturation ("SpO$_2$") and heart rate ("HR") values. *Id.*

### 5. *Independent Claim 1*

Petitioner contends that claim 1 would have been obvious over the combined teachings of Mendelson-799, Ohsaki, Schulz, and Mendelson-2006. Pet. 43–69. Below, we set forth how the combination of prior art references teaches or suggests the claim limitations that are not disputed by the parties. For those limitations and reasons for combining the references that are disputed, we examine each of the parties' contentions and then provide our analysis.

#### i. *"A physiological measurement system comprising"*

The cited evidence supports Petitioner's undisputed contention that the combination of Mendelson-799, Ohsaki, Schulz, and Mendelson-2006 satisfies the subject matter of the preamble.[5] Pet. 43–45; *see, e.g.*, Ex. 1012, code (57), 7:25–8:13, 8:37–41, 9:22–40, 10:16–22, Fig. 7 (sensor device), 8; Ex. 1010, 1–4, Fig. 3 (handheld computing device); Ex. 1003 ¶¶ 102–115.

#### ii. *"[a] a physiological sensor device comprising"*

The cited evidence supports Petitioner's undisputed contention that Mendelson-799 discloses a physiological sensor device including sensor 10 and pulse oximeter 20. Pet. 46; *see, e.g.*, Ex. 1012, code (57) ("A sensor for use in an optical measurement device."), 9:22–40 (describing sensor 10), 10:16–30 (describing pulse oximeter 20, including sensor 10), Figs. 7–8.

---

[5] Whether the preamble is limiting need not be resolved because Petitioner shows sufficiently that the preamble's subject matter is satisfied by the art.

IPR2020-01538
Patent 10,588,554 B2

*iii. "[b] a plurality of emitters configured to emit light into tissue of a user"*

The cited evidence supports Petitioner's undisputed contention that Mendelson-799 discloses a plurality of light emitting elements 12a–c that emit light into a user's tissue. Pet. 46–47; *see, e.g.*, Ex. 1012, 9:22–40 ("The sensor 10 comprises . . . light source 12 composed of three closely spaced light emitting elements (e.g., LEDs or laser sources) 12a, 12b and 12c generating light of three different wavelengths."), Fig. 7.

*iv. "[c] at least four detectors,*
*wherein each of the at least four detectors has a corresponding window*
*that allows light to pass through to the detector"*

Petitioner's Undisputed Contentions

Petitioner contends that Mendelson-799 discloses twelve photodetectors located within a sensor housing. Pet. 48. Patent Owner does not dispute this contention, and we agree with Petitioner. Mendelson-799 discloses that "sensor 10 comprises . . . an array of discrete detectors (e.g., photodiodes)," including six far detectors 16 and six near detectors 18. *See, e.g.*, Ex. 1012, 9:22–40, Fig. 7.

Petitioner does not contend that Mendelson-799 discloses the claimed windows. Rather, Petitioner contends that Schulz teaches "a sensor featuring 'a thin sheet of opaque material' placed inside the sensor's housing . . . with 'a window in the opaque material provid[ing] an aperture for transmission of optical energy to or from the tissue site," wherein the opaque material blocks light and avoids saturation of the sensor's detectors. Pet. 32 (quoting Ex. 1013 ¶ 73). Patent Owner does not dispute this contention, and we agree with Petitioner. Schulz discloses that a "thin sheet of opaque material" can be placed between the optical components of the sensor and

22

**Appx28445**

IPR2020-01538
Patent 10,588,554 B2

the sensor's housing.  Ex. 1013 ¶ 73.  Schulz explains that the opaque material includes a window that allows for transmission of optical energy to the detector.  *Id.*  According to Schulz, the "opaque material blocks light, and the window in the opaque material can be sized as needed to block the proper amount of light from entering the aperture to, for example, avoid saturation of the light detector."  *Id.*

Petitioner's Disputed Contentions

Petitioner further contends that a person of ordinary skill in the art would have been motivated "to add a layer of opaque material" to Mendelson-799's sensor, as taught by Schulz, "and to size windows in the opaque material as appropriate to avoid saturation of each of the sensor's detectors."  Pet. 33 (citing, e.g., Ex. 1003 ¶¶ 93–101), 49 (citing, e.g., Ex. 1003 ¶¶ 122–131).  According to Petitioner, errors are reduced by minimizing the amount of ambient light that reaches the detectors, for example, by decreasing the angle of incidence to the detectors.  *Id.* at 33 (citing Ex. 1019, 76, 79–80, 94).  Petitioner contends that a person of ordinary skill in the art would have understood that "Schulz's opaque layer limits errors by decreasing the angle of incidence to the photodiode to that enabled by the window included within the layer, and by otherwise preventing ambient light from reaching the photodiode."  *Id.* at 34 (citing, e.g., Ex. 1003 ¶¶ 93–97).  Petitioner also contends that a skilled artisan would have recognized that, when applying Schulz's teachings to a sensor with multiple detectors, multiple windows would have been employed.  *Id.* at 34 (citing, e.g., Ex. 1003 ¶ 98).

To illustrate its proposed modification, Petitioner includes an annotated and modified view of Mendelson-799's Figure 7, as well as an

23

IPR2020-01538
Patent 10,588,554 B2

added sectional view, both of which are reproduced below.  Pet. 36; *see also id.* at 49 (similar figures with slightly different annotations); Ex. 1003 ¶100.



Petitioner's modified figure and added sectional view depict the sensor of Mendelson-799 with an added opaque layer (illustrated in green) having windows, as Petitioner contends would have been rendered obvious by Schulz.[6]  Pet. 49.

<u>Patent Owner's Arguments</u>

Patent Owner argues that a person of ordinary skill in the art would not have been motivated to modify Mendelson-799 as proposed because adding an opaque layer would *decrease* signal strength, especially for a reflectance pulse oximeter like Mendelson-799, which Patent Owner alleges has a weak signal already.  PO Resp. 47–48 (citing, e.g., Ex. 2004 ¶¶ 83–84); PO Sur-reply 23–24.  According to Patent Owner, Schulz uses the

---

[6] Petitioner's annotated figures also include an added opaque wall and an added top cover as discussed *infra* at Sections II.D.5.v and II.D.5.vi.

window in the opaque material only to reduce "desired" light to a "proper" level, i.e., only to reduce the light generated by the emitter that passes through the user's tissue before reaching the detector, but the window in the opaque material does not reduce *ambient* light.  PO Resp. 50 ("Schulz uses a separate cover—not the window [in the opaque material]—to block ambient light.") (citing Ex. 1013 ¶ 41); PO Sur-reply 21–23 (citing, e.g., Ex. 2004 ¶¶ 83–88).  Thus, according to Patent Owner, use of a windowed opaque material in Mendelson-799's sensor would make its weak signal even weaker by limiting the light from the emitter.  PO Sur-reply 23.  Patent Owner argues that decreasing signal strength in this way would have been inconsistent with Petitioner's additional modification to add a convex cover to the sensor of Mendelson-799, to *increase* signal strength.  PO Resp. 47–48; PO Sur-reply 26; *see infra* § II.D.5.vi.

Moreover, Patent Owner argues that the motivation put forth by Petitioner—to avoid saturation—is not shown to have been a problem for the sensor of Mendelson-799.  PO Resp. 47.  Patent Owner also argues that there were "easier approaches for addressing saturation of the detectors," such as "adjusting gain or LED brightness."  *Id.* at 48.

Patent Owner also argues aspects of Schulz individually.  For example, Patent Owner argues that Schulz is directed to an ear sensor, and that there are physiological differences in measurement locations that are not accounted for by Petitioner.  PO Resp. 49 (citing, e.g., Ex. 2004 ¶ 85).  Additionally, Patent Owner argues that Schulz discloses only a single window, not multiple windows as claimed.  *Id.*; PO Sur-reply 26.

Finally, Patent Owner criticizes Petitioner's reliance on additional evidence that does not form part of the asserted ground. *Id.* at 51–52 (citing, e.g., Ex. 1019; Ex. 1023; Ex. 2004 ¶¶ 89–91).

<u>Analysis</u>

We have considered the parties' arguments and cited evidence, and we are persuaded by Petitioner's contentions. As discussed above, Schulz explicitly teaches that its opaque material and window "blocks light" and "avoid[s] saturation of the light detector." Ex. 1013 ¶ 73. Petitioner cites persuasive and well-supported evidence, including the testimony of its declarant, that a person of ordinary skill in the art would have been motivated to add such an arrangement to the sensor of Mendelson-799 to achieve this same disclosed benefit, i.e., to avoid saturation of Mendelson's detectors. *See, e.g.*, Ex. 1003 ¶¶ 95–96. For example, Dr. Kenny's testimony regarding the ability of an opaque material with windows to avoid saturation is supported by Schulz and by the Webster textbook, which discusses the importance of minimizing "light other than the optical signals of interest." *Id.* ¶ 96 (citing Ex. 1019, 76). We are persuaded by Petitioner's contentions and Dr. Kenny's testimony.

We do not agree with Patent Owner's argument that this modification would *decrease* signal strength. PO Resp. 47–48. We discern that Petitioner's proposed modification would not alter the signal of interest, i.e., the optical signal that passes from the emitter, through the user's tissue, and to the photodetectors. Rather, the cited evidence of record supports Petitioner's contention that the proposed modification would have blocked light *other than* that from the signal of interest, i.e., that the modification would have block light *other than* that from the emitter. *See, e.g.*, Ex. 1003

26

IPR2020-01538
Patent 10,588,554 B2

¶ 100 ("Schulz would have motivated one of ordinary skill to modify the sensor . . . to further include an opaque layer that would have *blocked light other than at windows corresponding to the sensor's photodiodes*.") (emphasis added); Ex. 1013 ¶ 73 ("The opaque material blocks light, and the window in the opaque material can be sized as needed to block the proper amount of light from entering the aperture to, for example, avoid saturation of the light detector."); *see also* Pet. Reply 21–22. Thus, we do not agree that the proposed modification would have decreased signal strength.

We have considered Patent Owner's argument that Schulz uses the opaque material to reduce only "desired" light to a "proper" level, i.e., to reduce light from the emitter that passes through the user's tissue, to avoid saturation. PO Resp. 50; PO Sur-reply 22–23 (citing, e.g., Ex. 2004 ¶¶ 83–88). We do not find any support for this argument in Schulz. To the contrary, Schulz explains that "the window in the opaque material can be sized as needed to block the proper amount of light from entering the aperture to, for example, avoid saturation of the light detector." Ex. 1013 ¶ 73. Contrary to Patent Owner's argument, Schulz simply states that its window is sized to control the amount of light *that enters the aperture*; Schulz does not state where that light comes from, or that it only controls against light from the emitter. Patent Owner identifies no basis in Schulz's disclosure to conclude that Schulz's emitter operates at a level that would saturate the detector, absent the addition of an opaque material. *See also* Pet. Reply 25–26. Likewise, we do not find any support for this argument in the cited portions of Dr. Madisetti's declaration. *See, e.g.*, Ex. 2004 ¶ 88 (concluding, without persuasive explanation, that Schulz's window blocks

light only from the emitter, not ambient light); *but see, e.g.*, Ex. 1043, 28:11–18 (agreeing that ambient light is an example of interfering noise).

We also do not agree with Patent Owner's argument that Petitioner has not shown that saturation was a problem for Mendelson-799's sensor. PO Resp. 47. Mendelson-799 need not identify a problem with saturation in order to be improved by the proposed modification. Indeed, Petitioner "does not need to show that there was a known problem with the prior art system." *Unwired Planet, LLC v. Google Inc.*, 841 F.3d 995, 1002–03 (Fed. Cir. 2016); *see also Sci. Plastic Prods., Inc. v. Biotage AB*, 766 F.3d 1355, 1359–61 (Fed. Cir. 2014); *Hologic, Inc. v. Minerva Surgical, Inc.*, 764 F. App'x 873, 880 (Fed. Cir. 2019). As expressly recognized in *KSR*, *any* art-recognized need or problem can provide a reason for combining claim elements. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 416 (2007). Here, Petitioner provides sufficient evidence to demonstrate that saturation was a known problem (*see, e.g.*, Ex. 1003 ¶ 96; Ex. 1019, 79;[7] Ex. 1047 ¶ 47) and that Schulz provided a readily-applicable technique to solve it (Ex. 1013 ¶ 73). That "easier approaches" may have existed, *see* PO Resp. 48, does not teach away from the approach explicitly taught by Schulz.

We also do not agree with Patent Owner's argument that Schulz and Mendelson-799 are incompatible because they obtain measurements at different locations. Mendelson-799 explains that its sensor type can be used in "multiple convenient locations on the body," and does not exclude use on

---

[7] It is of no moment that this evidence is not identified as part of the asserted ground. PO Resp. 51–52. This evidence is cited by Dr. Kenny as support for his testimony, consistent with our rules. 37 C.F.R. § 42.65(a) ("Expert testimony that does not disclose the underlying facts or data on which the opinion is based is entitled to little or no weight.").

a patient's ear or elsewhere.  Ex. 1012, 2:15–21; *contra* PO Resp. 49; *see also* Ex. 1019, 104 ("The idea of using skin reflectance spectrophotometry marked a significant advancement in the noninvasive monitoring of $S_aO_2$ from virtually any point on the skin surface.").  Moreover, the proposed modification does not seek to bodily incorporate the references, one with the other.  Rather, Petitioner clearly proposes modifying Mendelson-799 to include an opaque material with windows, as taught by Schulz, but plainly does not propose incorporating any other aspect of Schulz, such as its measurement location.  *See* Pet. 47–49; *see also In re Nievelt*, 482 F.2d 965, 968 (CCPA 1973) ("Combining the teachings of references does not involve an ability to combine their specific structures.").

We have considered the remainder of Patent Owner's arguments, but we do not agree with them.  For example, it is irrelevant that Schulz teaches only a single window, because Petitioner provides persuasive testimony to show that a skilled artisan would have implemented a window for *each detector* in Mendelson-799's sensor.  PO Resp. 49; Ex. 1003 ¶¶ 98–100.  It is likewise irrelevant that Schulz discloses an additional "separate cover . . . to block ambient light," because the presence of a separate cover does not change the fact that Schulz explicitly teaches using its windowed opaque material to avoid detector saturation.  *See* Ex. 1013 ¶ 73; *contra* PO Resp. 50; PO Sur-reply 21–22.

For the foregoing reasons, we are persuaded by Petitioner's contentions.

    *v.  "[d] a wall that surrounds at least the at least the four detectors"*

The cited evidence supports Petitioner's undisputed contentions regarding this limitation.  Pet. 50–53.  Specifically, Petitioner contends that

IPR2020-01538
Patent 10,588,554 B2

Mendelson-799 discloses sensor housing 17 that encircles detectors 16, 18, as shown below in Petitioner's annotated and modified view of Mendelson-799's Figure 7. *Id.* at 50–51; *see, e.g.*, Ex. 1012, 9:23–40 ("All these elements are accommodated in a sensor housing 17."), Fig. 7.



Petitioner's modified figure depicts the sensor of Mendelson-799 with sensor housing 17 identified in green and encircling the detectors.

Petitioner acknowledges that Mendelson-799 does not depict a side view of the sensor and thus, to the extent Mendelson-799 does not explicitly teach that housing 17 includes an opaque wall that surrounds the detectors, a person of ordinary skill in the art would have found it obvious "to connect, to the illustrated portion of sensor housing 17, an opaque wall configured to circumscribe the array of discrete detectors," to shield the detectors from ambient light and to protect from external forces. Pet. 14–15, 24–25, 50–52; *see, e.g.*, Ex. 1003 ¶¶ 63, 69, 82, 134.

Petitioner contends this is consistent with the purpose of Mendelson-799's light shield 14, which prevents the emitters' light from reaching the detectors directly (Pet. 15 (citing Ex. 1012, 9:35–40)), as well as other prior art references cited in Mendelson-799 (*id.* at 15–17 (citing Exs. 1017,

30

IPR2020-01538
Patent 10,588,554 B2

1018)).  *See, e.g.*, Ex. 1003 ¶¶ 64–68, 135–139.  For example, Petitioner states that Ohsaki discloses that sensor package 5 includes a wall that surrounds light emitting element 6 and light receiving element 7.  Pet. 52; *see, e.g.*, Ex. 1009 ¶ 17, Fig. 2; Ex. 1003 ¶¶ 140–141.

To illustrate its proposed modification, Petitioner includes an annotated and modified view of Mendelson-799's Figure 7, as well as an added sectional view, both of which are reproduced below.  Pet. 18; *see also id.* at 26 (same), 52 (similar figures with slightly different annotations).



Petitioner's modified and added figures depict the sensor of Mendelson-799 with an added opaque wall (illustrated in green) connected to the planar substrate of housing 17 and encircling the sensor components, as Petitioner contends would have been obvious to a person of ordinary skill in the art. *Id.* at 18, 50–51; Ex. 1003 ¶¶ 82, 142–143.

Patent Owner does not dispute Petitioner's contentions regarding this limitation.  *See generally* PO Resp.; PO Sur-reply.

31

IPR2020-01538
Patent 10,588,554 B2

Petitioner's stated reasoning for the proposed modification is
sufficiently supported, including by the unrebutted testimony of Dr. Kenny,
who testifies that such a wall would "shield the detectors from ambient light,
and protect the detectors from external forces." Ex. 1003 ¶ 136; *see also*
Ex. 1003 ¶¶ 63–71, 82, 132–144.

> vi. "*[e–g] a cover that operably connects to the wall and that is configured
> to be located between tissue of the user and the at least four detectors
> when the physiological sensor device is worn by the user, wherein: the
> cover comprises a single protruding convex surface, and at least a
> portion of the cover is sufficiently rigid to cause tissue of the user to
> conform to at least a portion of a shape of the single protruding convex
> surface when the physiological sensor device is worn by the user*"

Petitioner's Undisputed Contentions

Petitioner contends that Mendelson-799 does not disclose a cover
located between the user's tissue and the four detectors, as claimed. Pet. 26–
27. Patent Owner does not dispute this contention, and we agree that
Mendelson-799 is not shown to include a cover. *See generally* Ex. 1012.

Petitioner relies upon Ohsaki for the recited cover, and contends that:

> Ohsaki discloses a wrist-worn "pulse wave sensor" that includes
> a light permeable convex cover—"translucent board 8"—that is
> configured to be located between user tissue and a detector when
> the sensor is worn, where the cover comprises a single protruding
> convex surface operable to conform [to] tissue of the user, and
> where a wall operably connects to a substrate and to the cover.

Pet. 27–28, 53–55 (citing, e.g., Ex. 1009 ¶¶ 15, 17, 25; Ex. 1003 ¶ 86).
Patent Owner does not dispute this contention, and we agree with Petitioner.
Ohsaki discloses that sensor 1 is "worn on the back side of the user's wrist"
and includes translucent board 8, with a single convex surface formed on the
top of the board, to be placed against a user's tissue. Ex. 1009 ¶¶ 16, 17,

32

Figs. 1–2 (depicting translucent board 8 between tissue and detector).  As shown in Ohsaki's Figure 2, the board 8 is operably connected to the walls of sensor package 5 that houses the sensor components, including circuit board 9, light emitting element 6 (e.g., LED), and light receiving element 7. *Id.* ¶ 17 ("The translucent board 8 is . . . attached to the opening of the package 5."), Fig. 2.

Petitioner also contends that the user's tissue conforms to the shape of the convex surface, such that a person of ordinary skill in the art would have understood the convex surface to be "sufficiently rigid." Pet. 55–57.  Patent Owner does not dispute this contention, and we agree with Petitioner.  As depicted in Ohsaki's Figure 2, the user's tissue 4 is shown to conform to the shape of the protruding convex surface when the sensor is worn by the user. Ex. 1009 ¶ 17 ("The translucent board 8 is a glass board."), Fig. 2; *see, e.g.*, Ex. 1003 ¶ 160 (testifying as to the convex surface's rigidity).

Petitioner's Disputed Contentions

Petitioner further contends that a person of ordinary skill in the art "would have recognized that a light permeable cover with a protruding convex surface," such as that taught by Ohsaki, "would improve adhesion between the sensor and the user's tissue, improve detection efficiency, and protect the elements within sensor housing 17." Pet. 26 (citing, e.g., Ex. 1003 ¶ 84; Ex. 1009 ¶¶ 15, 17, 25), 29–30.  Petitioner contends that Ohsaki's convex surface is in intimate contact with the user's tissue, which prevents slippage of the sensor and increases signal strength because "variation of the amount of the reflected light . . . that reaches the light receiving element 7 is suppressed" and "disturbance light from the outside"

33

is prevented from penetrating board 8, as compared to a sensor with a flat surface. *Id.* at 28–29 (citing, e.g., Ex. 1003 ¶ 87; quoting Ex. 1009 ¶ 25).

Accordingly, Petitioner contends that, to achieve these identified benefits, a person of ordinary skill in the art "would have added a transparent convex cover to [Mendelson-799's] sensor 10, the cover being located between tissue of the user and the array of detectors 16 and 18 when worn." Pet. 30 (citing, e.g., Ex. 1003 ¶ 91; Ex. 1009 ¶¶ 15, 17, 25). Petitioner also contends that an ordinarily skilled artisan would have "configured the cover to be sufficiently rigid to conform tissue of the user to at least a portion of the cover's surface when worn." *Id.* (citing, e.g., Ex. 1009 ¶ 30). Additionally, Petitioner contends the skilled artisan would have "configured Mendelson-799's circumscribing wall to operably connect" to the sensor's planar substrate and to the convex cover. Pet. 30–31; *see also id.* at 53–57 (citing, e.g., Ex. 1003 ¶ 91).

Petitioner contends these modifications would have been "nothing more than the use of a known technique to improve similar devices in the same way, and combining prior art elements according to known methods to yield predictable results—improved adhesion of the sensor to the user's skin, and improved signal strength," where "the elements of the resulting sensor would each perform functions they had been known to perform prior to the combination—a cover would simply be placed over the components accommodated within Mendelson-799's sensor housing 17, and would perform the same function as taught by Ohsaki." *Id.* at 31–32 (citing, e.g., Ex. 1003 ¶¶ 84–92).

To illustrate its proposed modification, Petitioner includes an annotated and modified view of Mendelson-799's Figure 7, as well as an

34

IPR2020-01538
Patent 10,588,554 B2

added sectional view, both of which are reproduced below.  Pet. 31 (citing Ex. 1003 ¶¶ 84–92); *see also id.* at 54 (same).



Petitioner's modified and added figures depict the sensor of Mendelson-799 with an added convex cover (illustrated in red) connected to the wall of Mendelson-799's sensor (illustrated in green, *see supra* § II.D.5.v).  Pet. 30–31, 54–55; *see, e.g.*, Ex. 1003 ¶¶ 153–154.

Patent Owner's Arguments

Patent Owner argues that a person of ordinary skill in the art would not have been motivated to modify Mendelson-799's sensor to include Ohsaki's convex cover.  PO Resp. 23–47; PO Sur-Reply 2–21.

First, Patent Owner argues that the proposed modification "changes Ohsaki's structure and eliminates the longitudinal shape that gives Ohsaki's translucent board the ability to fit within the user's anatomy and prevent slipping."  PO Resp. 23.  This argument is premised on Patent Owner's

35

IPR2020-01538
Patent 10,588,554 B2

contention that Ohsaki's convex cover must be rectangular, with the cover's long direction aligned with the length of the user's forearm, to avoid interacting with bones in the wrist and forearm. *Id.* at 24–25 (citing, e.g., Ex. 2004 ¶¶ 51–54; Ex. 1009 ¶¶ 6, 19, 23, 24); *see also* PO Sur-reply 2–10. According to Patent Owner, Ohsaki teaches that "aligning the sensor's longitudinal direction with the circumferential direction of the user's arm undesirably results in 'a tendency [for Ohsaki's sensor] to slip off.'" PO Resp. 25–26 (citing Ex. 1009 ¶ 19), 27–28.

Thus, Patent Owner contends that Petitioner's proposed modification would "chang[e] Ohsaki's rectangular board into a circular shape," which "would eliminate the advantages discussed above" because it "cannot be placed in any longitudinal direction and thus cannot coincide with the longitudinal direction of the user's wrist." *Id.* at 26 (citing Ex. 2004 ¶¶ 55–56). Patent Owner presents annotated Figures depicting what it contends is Ohsaki's disclosed sensor placement as compared to that of the proposed modification, reproduced below.



Patent Owner's annotated Figure on the left depicts a rectangular sensor placed between a user's radius and ulna, while Patent Owner's annotated

36

Figure on the right depicts a circular sensor placed across a user's radius and ulna. Based on these annotations, Patent Owner argues that the proposed "circular shape would press on the user's arm in all directions and thus cannot avoid the undesirable interaction with the user's bone structure," such that a skilled artisan "would have understood such a change would eliminate Ohsaki's benefit of preventing slipping." *Id.* at 27–28 (citing, e.g., Ex. 2004 ¶¶ 55–58).

Second, Patent Owner argues that Ohsaki requires its sensor be placed on the back of the user's wrist to achieve any benefits, but that such a location would have been unsuitable for Mendelson-799's sensor, and would result in weak sensor signals. PO Resp. 32. Relying on other publications by the named inventor on Mendelson-799, Patent Owner alleges that sensor signals were difficult or impossible to discern from the wrist, even with considerable pressure. *Id.* (citing Ex. 2003, 3–4); *see also id.* at 33–34 (citing Ex. 2015, 3, 4; Ex. 2014, 1, 99). Patent Owner contends that Dr. Kenny admitted that signals from the wrist are weaker and noisier than from other locations. *Id.* at 33 (citing Ex. 2008, 249:10–16, 255:12–21); *see also id.* at 34–37 (citing Ex. 2017, 2; Ex. 2018, 4; Ex. 2010, 44, 71; Ex. 2016, 2, 3).

Third, Patent Owner argues that a person of ordinary skill in the art would not have placed Ohsaki's convex cover over Mendelson-799's peripheral detectors because the convex cover would condense light toward the center and away from the detectors, which would decrease signal strength. PO Resp. 38–43 (citing, e.g., Ex. 2004 ¶¶ 71–76). Patent Owner also contends that Petitioner and Dr. Kenny admit as much, fail to account for the impact of the proposed modification on light collection, and fail to

propose a specific three-dimensional structure to embody the proposed modification. *Id.* at 38–43 (citing, e.g., Ex. 2020, 69–70; Ex. 2006, 204:14–20; Ex. 2008, 36:19–37:1, 57:19–58:16, 63:5–64:8, 170:12–171:1, 173:8–15). Patent Owner relies on Figure 14B of the '554 patent, which Patent Owner contends supports its position. *Id.* at 39–40 (citing Ex. 1001, 36:3–6, 36:13–15).

Fourth, Patent Owner argues that Ohsaki's rectangular cover creates air gaps at its peripheral edges, as shown in Ohsaki's Figure 1, which Mendelson-799 cautions against as potentially causing "specular reflection." PO Resp. 43–44 (citing, e.g., Ex. 1012, 2:58–64). Accordingly, Patent Owner argues that a person of ordinary skill in the art "would not have modified Mendelson[-]799's structure to add Ohsaki's air gaps." *Id.* at 44 (citing Ex. 2004 ¶¶ 77–78).

Fifth, Patent Owner argues that "a convex cover is just one of many different alternatives for protecting the components of a sensor" including, e.g., resin or encapsulation. PO Resp. 45–46. Concerning possible alternatives, Patent Owner contends that a person of ordinary skill in the art "would have understood that a flat cover would provide better protection than a convex surface because—as Petitioner's cited art teaches—a flat cover would be less prone to scratches." *Id.* at 46–47 (citing Ex. 1008 ¶ 106).

Petitioner's Reply

Concerning Patent Owner's first and second arguments, Petitioner responds that Ohsaki does not disclose the shape of its protrusion, other than its convexity as shown in Figures 1 and 2, nor does Ohsaki require a rectangular shape or placement on the back of the wrist in order to achieve

the disclosed benefits.  Pet. Reply 7–12 (citing, e.g., Ex. 1047 ¶¶ 17–30).

Moreover, Petitioner asserts that "even if Ohsaki's translucent board 8 were somehow understood to be rectangular, obviousness does not require 'bodily incorporation' of features from one reference into another"; rather, a person of ordinary skill in the art "would have been fully capable of attaching a light permeable protruding convex cover to Me[nd]elson-799's housing to obtain the benefits attributed to such a cover by Ohsaki." *Id.* at 10 (citing, e.g., Ex. 1047 ¶ 23).  Similarly, regarding the location of the sensor, Petitioner asserts,

> [E]ven if a [person of ordinary skill in the art] would have somehow misunderstood Ohsaki's sensor as limited to placement on the backside of the wrist, and even if the difficulty that [Patent Owner] alleges with respect to obtaining pulse oximetry measurements from that location were true, that would have further motivated the [person of ordinary skill in the art] to implement a light permeable convex cover in Mendelson-799's sensor, to improve detection efficiency.

*Id.* at 11 (citing, e.g., Ex. 1047 ¶ 26).

Concerning Patent Owner's third argument, Petitioner responds that adding a convex cover to Mendelson-799's sensor would not decrease signal strength but, instead, "would improve Mendelson-799's signal-to-noise ratio by causing more light backscattered from tissue to strike Mendelson-799's detectors than would have absent the cover" because such a cover improves light concentration across the entire lens and does not direct it only towards the center.  *Id.* at 13–17 (citing, e.g., Ex. 1047 ¶¶ 31–45).

Petitioner dismisses Patent Owner's reliance on Figure 14B of the '554 patent because it "is not an accurate representation of light that has been reflected from a tissue measurement site.  For example, the light rays

39

(1420) shown in FIG. 14B are collimated (i.e., travelling paths parallel to one another), and each light ray's path is perpendicular to the detecting surface." Pet. Reply 13–14 (citing, e.g., Ex. 1047 ¶¶ 32–34). Moreover, Petitioner argues that, even when collimated, light will focus at the center "only if the light beam happens to be perfectly aligned with the axis of symmetry of the lens" and, when entering at any other angle, will focus at a different point. *Id.* at 15 (citing, e.g., Ex. 1047 ¶ 35).

According to Petitioner, Patent Owner's and Dr. Madisetti's position regarding convergence toward the center does not apply to diffuse light, which reaches the detectors from various random angles and directions after having been reflected by tissue. *Id.* at 15–16 (citing, e.g., Ex. 1047 ¶ 36). As a result, Petitioner contends Ohsaki's cover would have provided a refracting effect such that light rays that would have missed the detectors absent a cover are instead directed to that area as they pass through the cover. *Id.* at 16–17 (citing Ex. 1047 ¶¶ 37–39). Petitioner thus contends that "overall, more of the partially reflected, transmitted, absorbed, and ultimately back scattered light strikes the detectors than otherwise would have absent the cover." *Id.* at 17 (citing Ex. 1047 ¶¶ 32–40).

Concerning Patent Owner's fourth argument, Petitioner responds that a skilled artisan would have known to avoid air gaps in the proposed combination. *Id.* at 18 (citing, e.g., Ex. 1047 ¶¶ 41–43).

Concerning Patent Owner's fifth argument, Petitioner responds that even if a flat surface might be less prone to scratching, that possible disadvantage would have been weighed against the "multiple advantages of a convex cover," and would not negate a motivation to combine. *Id.* at 19 (citing, e.g., Ex. 1047 ¶ 45).

IPR2020-01538
Patent 10,588,554 B2

Patent Owner's Sur-reply

Concerning Patent Owner's first and second arguments, Patent Owner reiterates its position that Ohsaki's purported benefits attach only to a sensor with a rectangular convex surface that is located on the back of the wrist, and that "even small changes in sensor orientation or measurement location result in slippage." PO Sur-reply 3–14, 7.

Concerning Patent Owner's third argument, Patent Owner argues that Dr. Kenny and Petitioner have not overcome their admissions that a convex lens directs light toward the center. *Id.* at 15–16 (citing, e.g., Ex. 2004 ¶¶ 72–76).

Patent Owner also asserts that Petitioner mischaracterizes Patent Owner's position, which is not that a convex cover focuses "*all* light" to a single point at the center of the sensor. *Id.* at 16. Patent Owner instead states that, "[l]ight entering the convex surface from all angles would, on average, result in more light directed towards the center and less light at the periphery—as compared to a flat surface—and therefore less light at the peripherally located detectors." *Id.* at 17 (citing Ex. 2004 ¶¶ 71–75).

Finally, Patent Owner argues that Petitioner's Reply arguments are overly complex and instead a person of ordinary skill in the art "would have understood and applied the straightforward understanding that a convex surface condenses light toward the center." *Id.* at 18–19.

Concerning Patent Owner's fourth argument, Patent Owner argues that "Petitioner does not dispute that . . . air gaps would dissuade a [person of ordinary skill in the art] from modifying Mendelson[-]799." *Id.* at 19.

Appx28464

Concerning Patent Owner's fifth argument, Patent Owner argues that Petitioner does not dispute Patent Owner's position that a flat cover would be less prone to scratches and offers "***no*** plausible advantages for its asserted combination." *Id.* at 22.  Moreover, Patent Owner argues that "the risk of scratches is not merely a disadvantage—it directly undermines Petitioner's motivation to add a convex cover to 'protect the elements within the sensor housing.'" *Id.*

Analysis

As noted above, Petitioner provides three rationales to support its contention that a person of ordinary skill in the art would have provided "a light permeable cover with a protruding convex surface," such as that taught by Ohsaki, to Mendelson-799's sensor: (1) to "improve adhesion between the sensor and the user's tissue," (2) to "improve detection efficiency," and (3) to "protect the elements within sensor housing 17."  Pet. 26 (citing, e.g., Ex. 1003 ¶ 84; Ex. 1009 ¶¶ 15, 17, 25), 29–30.  We conclude all three rationales are supported by the evidence, as follows.

Rationales 1 and 2

The evidence of record persuades us that a person of ordinary skill in the art would have been motivated to add a convex cover, such as that taught by Ohsaki, to improve adhesion between the sensor and the user's skin, which would have increased the signal strength of the sensor.  Ohsaki teaches as much:

> [T]he convex surface of the translucent board 8 is in intimate contact with the surface of the user's skin.  Thereby *it is prevented that the detecting element 2 slips off* the detecting position of the user's wrist 4.  If the translucent board 8 has a flat surface, the detected pulse wave is adversely affected by the

42

> movement of the user's wrist 4 as shown in Fig. 4B. However, in the case that the translucent board 8 has a convex surface like the present embodiment, the *variation of the amount of the reflected light which is emitted from the light emitting element 6 and reaches the light receiving element 7 by being reflected by the surface of the user's skin is suppressed. It is also prevented that noise such as disturbance light from the outside penetrates the translucent board 8.* Therefore the pulse wave can be detected without being affected by the movement of the user's wrist 4 as shown in FIG. 4A.

Ex. 1009 ¶ 25 (emphasis added); *see also id.* ¶ 27 ("stably fixed").

We credit Dr. Kenny's testimony that a person of ordinary skill in the art would have been motivated by such teachings to apply a cover with a convex surface to Mendelson-799 to improve that similar device in the same way and to yield predictable results, i.e., to resist movement of the sensor on the user's wrist. *See, e.g.*, Ex. 1003 ¶ 87 ("[T]his contact between the convex surface and the user's skin is said to prevent slippage, which increases the strength of the signals obtainable by Ohsaki's sensor."). We also credit Dr. Kenny's testimony that, in light of these teachings, a person of ordinary skill in the art would have made such a modification to improve the pulse sensor's ability to emit light into, and detect light reflected from, the user's wrist, to generate an improved pulse signal. Ex. 1003 ¶¶ 88–89, 149–150; Ex. 1047 ¶ 12.

Indeed, Ohsaki expressly compares the performance of a wrist-worn pulse wave sensor depending on whether translucent board 8 is convex or flat, and concludes the convex surface results in improved performance over the flat surface, especially when the user is moving. Ex. 1009, Figs. 4A–4B, ¶¶ 15, 25 (stating that with "a flat surface, the detected pulse wave is adversely affected by the movement of the user's wrist 4," and with "a

43

convex surface like the present embodiment, the variation of the amount of

the reflected light" collected by the sensor "is suppressed").  Ohsaki also

states that, with a convex surface, "[i]t is also prevented that noise such as

disturbance light from the outside penetrates the translucent board 8."  *Id.*

¶ 25.

We also credit Dr. Kenny's testimony that the proposed modification

would have been within the level of ordinary skill in the art.  For example,

Dr. Kenny testifies:

> The above-described modification would require only
> routine knowledge of sensor design and assembly, which were
> well within the skill of one of ordinary skill prior to the Critical
> Date.  Indeed, the modification would have amounted to nothing
> more than the use of a known technique to improve similar
> devices in the same way, and combining prior art elements
> according to known methods to yield predictable results—
> improved adhesion of the sensor to the user's skin, and improved
> signal strength.  Furthermore, the elements of the resulting sensor
> would each perform functions they had been known to perform
> prior to the combination—Ohsaki's translucent board 8 would
> simply be placed over the components accommodated within
> Mendelson '799's sensor housing 17, and would perform the
> same function as taught by Ohsaki.

Ex. 1003 ¶ 92; *see also id.* ¶¶ 88–92, 154.  In light of Ohsaki's express

disclosure of the benefits of a convex cover, we credit Dr. Kenny's

testimony that a person of ordinary skill in the art would have been

motivated to modify Mendelson-799 as proposed, and would have had a

reasonable expectation of success in doing so.

We next address Patent Owner's first through fourth arguments, each

of which implicates Petitioner's first and second asserted rationales of

improved adhesion and detection efficiency.

IPR2020-01538
Patent 10,588,554 B2

Patent Owner's first argument is premised on the notion that Ohsaki's benefits only can be realized with a rectangular convex surface, because such a shape is required to avoid interacting with bones on the back of the user's forearm. PO Resp. 23–28. We disagree. Ohsaki does not disclose the shape of its convex cover, much less require it be rectangular. In fact, Ohsaki is silent as to the shape of the convex surface. Ohsaki discloses that sensor 1 includes detecting element 2, which includes package 5 within which the sensor components are located. *Id.* ¶ 17. Ohsaki's convex surface is located on board 8, which is "attached to the opening of the package 5." *Id.* Ohsaki provides no further discussion regarding the shape of board 8 or its convex surface.

We disagree with Patent Owner's suggestion that the shape of the convex surface can be inferred to be rectangular from Ohsaki's Figures 1 and 2. PO Resp. 17–18. Ohsaki does not indicate that these figures are drawn to scale, or reflect precise dimensions or shapes of the convex surface. *See, e.g.*, Ex. 1009 ¶ 13 ("schematic diagram"); *see also* Pet. Reply 9; *Hockerson-Halberstadt, Inc. v. Avia Group Int'l*, 222 F.3d 951, 956 (Fed. Cir. 2000) ("[I]t is well established that patent drawings do not define the precise proportions of the elements and may not be relied on to show particular sizes if the specification is completely silent on the issue.").

To be clear, Ohsaki describes the shape of *detecting element 2* as rectangular: "[T]he length of the detecting element from the right side to the left side in FIG. 2 is longer than the length from the upper side to the lower side." *Id.* ¶ 19. Ohsaki also describes that detecting element 2 is aligned longitudinally with the user's forearm: "[I]t is desirable that the detecting element 2 is arranged so that its longitudinal direction agrees with the

45

**Appx28468**

longitudinal direction of the user's arm," to avoid slipping off. *Id.*; *see also id.* ¶ 9 ("The light emitting element and the light receiving element are arranged in the longitudinal direction of the user's arm.").

In light of this disclosed rectangular shape of detecting element 2, it is certainly possible that Ohsaki's convex surface may be similarly shaped. But, it may not be. Contrary to Patent Owner's argument, Ohsaki neither describes nor requires detecting element 2 to have the same shape as the convex surface of board 8. *Accord* Pet. Reply. 7–8 (noting also that Ohsaki's board 8 "is not coextensive with the entire tissue-facing side of detecting element 2"). We have considered the cited testimony of both Dr. Kenny and Dr. Madisetti on this point. Ex. 1047 ¶¶ 10–12, 12 n.2, 17–23; Ex. 2004 ¶¶ 38–41 (relying on Ohsaki's Figures 1–2 to support his opinion that the convex surface is rectangular). Dr. Madisetti's reliance on the dimensions of Ohsaki's figures is unpersuasive. *Hockerson-Halberstadt*, 222 F.3d at 956. We credit Dr. Kenny's testimony that Ohsaki does not describe its convex surface as rectangular, because this testimony is most consistent with Ohsaki's disclosure.

Further, Patent Owner suggests that the convex surface *must be* rectangular, in order to avoid interacting with bones in the user's forearm. PO Resp. 28; PO Sur-Reply 9 ("[A] POSITA would have understood Ohsaki's convex board must also have a longitudinal shape oriented up-and-down the watch-side of the user's wrist/forearm."). Although Ohsaki recognizes that interaction with these bones can cause slippage problems, *see* Ex. 1009 ¶¶ 6, 19, we do not agree that the *only way* to avoid these bones is by aligning a rectangular cover with the longitudinal direction of the user's forearm. For example, in the annotated Figures provided by Patent

46

IPR2020-01538
Patent 10,588,554 B2

Owner, *see* PO Resp. 27–28, we discern that the circular sensor that purports to depict the proposed modification would *also* avoid the bones in the forearm if it were slightly smaller. Patent Owner provides no persuasive explanation to justify the dimensions it provides in this annotated figure, or to demonstrate that such a large sensor would have been required. Indeed, we discern that it would have been within the level of skill of an ordinary artisan to appropriately size a modified sensor to avoid these well-known anatomical obstacles. "A person of ordinary skill is also a person of ordinary creativity, not an automaton." *KSR*, 550 U.S. at 421. After all, an artisan must be presumed to know something about the art apart from what the references disclose. *See In re Jacoby*, 309 F.2d 513, 516 (CCPA 1962).

Finally, we do not agree with Patent Owner's position that Ohsaki's advantages apply only to rectangular convex surfaces. As discussed, Patent Owner has not shown that Ohsaki's convex surface is rectangular at all. Moreover, even if Ohsaki's convex surface is rectangular, when discussing the benefits associated with a convex cover, Ohsaki does not limit those benefits to a cover of any particular shape. Instead, Ohsaki explains that "detecting element 2 is arranged on the user's wrist 4 so that the convex surface of the translucent board 8 is in intimate contact with the surface of the user's skin. Thereby it is prevented that the detecting element 2 slips off the detecting position of the user's wrist 4." Ex. 1009 ¶ 25; Ex. 1047 ¶ 10. Thus, we agree with Petitioner that Ohsaki's teaching of a convex surface would have motivated a person of ordinary skill in the art to add such a surface to Mendelson-799's circular-shaped sensor, to improve adhesion as taught by Ohsaki. *See, e.g.*, Pet. 26–28. Nothing in Ohsaki's disclosure

47

IPR2020-01538
Patent 10,588,554 B2

limits such a benefit to a specific shape of the convex surface. Ex. 1047
¶¶ 11–12.

Moreover, Ohsaki contrasts its convex surface with a flat surface and
notes that,

> in the case that the translucent board 8 has a convex surface . . .
> the variation of the amount of the reflected light which is emitted
> from the light emitting element 6 and reaches the light receiving
> element 7 by being reflected by the surface of the user's skin is
> suppressed. It is also prevented that noise such as disturbance
> light from the outside penetrates the translucent board 8.
> Therefore the pulse wave can be detected without being affected
> by the movement of the user's wrist 4 as shown in FIG. 4A.

Ex. 1009 ¶ 25; Ex. 1047 ¶ 11. Thus, we agree with Petitioner that Ohsaki's
teaching of a convex surface would have motivated a person of ordinary
skill in the art to add such a surface to Mendelson-799's sensor, to improve
signal strength, as taught by Ohsaki. *See, e.g.*, Pet. 26–28. Again, nothing
in Ohsaki's disclosure limits such a benefit to the shape of the convex
surface. Ex. 1047 ¶¶ 11–12.

Accordingly, we do not agree that Ohsaki's disclosed advantages
attach only to a rectangular convex surface, or would have been inapplicable
to the proposed combination of Mendelson-799 and Ohsaki.[8]

We have considered Patent Owner's second argument, that Ohsaki's
benefits are realized only when the sensor and convex surface are placed on

---

[8] Patent Owner also argues that, to the extent contended by Petitioner, it
would not have been obvious to place a rectangular cover on top of
Mendelson-799's sensor. PO Resp. 29–31. We do not understand Petitioner
to have made any such contention and, accordingly, do not address this
argument. *See, e.g.*, Pet. 31, 54 (depicting circular convex surface over
circular sensor).

the back of the user's wrist, which is an unsuitable location for Mendelson-799's sensor. PO Resp. 32–38. We do not agree. As an initial matter, Petitioner does not propose bodily incorporating the references; Petitioner simply proposes adding a convex cover to Mendelson-799's sensor, without discussing where Mendelson-799's sensor is used. *See, e.g.*, Pet. 30. In other words, Petitioner's proposed modification does not dictate any particular placement. Moreover, Mendelson-799 states that its sensor "allows for measuring $SaO_2$ from multiple convenient locations on the body (e.g. the head, torso, or upper limbs)." Ex. 1012, 2:17–19; *see also* Ex. 1019, 104 ("The idea of using skin reflectance spectrophotometry marked a significant advancement in the noninvasive monitoring of $S_aO_2$ from virtually any point on the skin surface."). Thus, we do not agree that Mendelson-799 discourages or disparages use on the back of the wrist.

Notwithstanding the foregoing, and assuming for sake of argument that Patent Owner is correct that a person of ordinary skill in the art would have expected a weaker signal from Mendelson-799's sensor if placed on the wrist, *see* PO Resp. 32, that alone does not nullify the proposed combination. "[A] given course of action often has simultaneous advantages and disadvantages, and this does not necessarily obviate motivation to combine." *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1165 (Fed. Cir. 2006) (citation omitted). Indeed, we discern that, if Mendelson-799's sensor was placed at a location that results in decreased signal quality, a person of ordinary skill in the art would have been further motivated to act to improve signal quality, e.g., by employing Ohsaki's convex surface. *See, e.g.*, Ex. 1047 ¶¶ 27–30; Ex. 1009 ("[I]n the case that the translucent board 8 has a convex surface like the present embodiment, the variation of the amount of

the reflected light which is emitted from the light emitting element 6 and reaches the light receiving element 7 by being reflected by the surface of the user's skin is suppressed.  It is also prevented that noise such as disturbance light from the outside penetrates the translucent board 8.").

We have considered Patent Owner's third argument that a convex cover would condense light away from Mendelson-799's peripheral detectors, which Patent Owner alleges would decrease signal strength.  PO Resp. 38–43.  We disagree.  There appears to be no dispute that when emitted light that passes through user tissue, the light is diffused and scattered as it travels.  *See, e.g.*, Pet. Reply 13–17; Tr. 27:18–28:3 (Petitioner's counsel agreeing that "the incoming light from a detection standpoint is going to be coming from all sorts of different directions because of the randomness caused by the back scattering"), 65:23–66:13 (Patent Owner's counsel agreeing that light does not simply enter tissue and come back out "like it came out on a mirror"); Ex. 1041, 35:19–37:18 (Patent Owner's declarant describing light scattering as it travels through tissue, e.g., reflecting off blood, tissue, or other material); Ex. 1043, 28:2–10 (Patent Owner's declarant agreeing that reflecting light can be a signal for the '554 patent's sensor), 61:20–62:4 (explaining that "a light in this context, light emitted from the LEDs is diffused through the skin in that particular context, whatever that is.").  The light thus travels at random angles and directions, and no longer travels in a collimated and perpendicular manner.

Dr. Kenny testifies that Mendelson-799 and Ohsaki "detect light that has been 'partially reflected, transmitted, absorbed, and scattered by the skin and other tissues and the blood before it reaches the detector." Ex. 1047 ¶ 37.  Dr. Kenny further opines that, "the POSITA would have understood

IPR2020-01538
Patent 10,588,554 B2

that Mendelson-799's sensor, which includes multiple photodiodes placed symmetrically with respect to a central light source, offers the advantage of *enabling a large fraction of light randomly backscattered from tissue to be detected within the circular active detection area surrounding that source*," thus increasing the light-gathering ability of Mendelson-799's sensor. *Id.* ¶ 38 (emphasis added); *see also id.* ¶ 39 ("Ohsaki's cover provides a refracting effect, such that light rays that otherwise would have missed the detection area are instead directed toward that area as they pass through the interface provided by the cover.").

By contrast Dr. Madisetti testifies that "a convex surface condenses light away from the periphery and towards the sensor's center." Ex. 2004 ¶ 74. We have considered this testimony; however, Dr. Madisetti's opinions largely are premised upon the behavior of collimated and perpendicular light as depicted in Figure 14B of the challenged patent. *See id.* Dr. Madisetti does not explain how light would behave when approaching the sensor from various angles, as it would after being reflected by tissue. *Id.* ¶¶ 72–76. In other words, even if Patent Owner is correct that the '554 patent's Figure 14B depicts light condensing toward the center, this is not dispositive to the proposed modification, because light passing through a user's tissue is scattered and random, and is not collimated and perpendicular as shown in Figure 14B. Ex. 1001, Fig. 14B.

Patent Owner and Dr. Madisetti argue that "Petitioner and Dr. Kenny both previously admitted that a convex cover condenses light towards the center of the sensor and away from the periphery in a different petition filed against a related patent," i.e., in IPR2020-01520. PO Resp. 38–39; Ex. 2004 ¶¶ 72–73 (citing Ex. 2019, 45; Ex. 2020 ¶¶ 118–120). The cited portions of

51

IPR2020-01538
Patent 10,588,554 B2

the Petition and Dr. Kenny's declaration from IPR2020-01520 discuss a decrease in the "mean path length" of a ray of light when it travels through a convex lens rather than through a flat surface. *See, e.g.*, Ex. 2020 ¶¶ 118–120. We do not agree that this discussion is inconsistent with Dr. Kenny's testimony here that, where light is reflected to the detectors at various random angles and directions, more light will reach Mendelson-799's symmetrically disposed detectors when travelling through the convex surface than would be reached without such a surface, because light that might have otherwise missed the detectors now will be captured. Ex. 1047 ¶¶ 37–40. We do not discern that the convergence of a single ray of light toward the center, as discussed in IPR2020-01520, speaks to the aggregate effect on *all* light that travels through the convex surface. Patent Owner suggests that this prior discussion means that all light is always directed toward the center regardless of where or how the light approaches the convex surface, however, we do not understand Dr. Kenny's testimony to support such a position. PO Resp. 38–39.

In its Sur-reply, Patent Owner argues that it "never argued that *all* light focuses at the center." PO Sur-reply 15–16. Be that as it may, neither Patent Owner nor Dr. Madisetti sufficiently address the diffuse nature of the light at issue here, which reflects from user tissue and scatters. Patent Owner attempts to do so in its Sur-reply, stating that "light entering the convex surface from all angles would, on average, result in more light directed towards the center and less light at the periphery—as compared to a flat surface—and therefore less light at the peripherally located detectors." *Id.* at 17. However, as support, Patent Owner identifies only the same portions of Dr. Madisetti's declaration discussed above, which fail to

52

address diffuse or scattered light. Ex. 2004 ¶¶ 71–75. Accordingly, considering all evidence of record, we credit the testimony of Dr. Kenny.[9]

With respect to Patent Owner's fourth argument, we do not agree that a person of ordinary skill in the art would have been discouraged from modifying Mendelson-799 as proposed, due to the potential for air gaps to form at the peripheral edges of the convex surface. PO Resp. 43–45. Patent Owner misstates the proposed modification. Petitioner does not propose "modif[ying] Mendelson[-]799's structure to add Ohsaki's air gaps." *Contra* PO Resp. 44. Petitioner proposes modifying Mendelson-799 only to include a cover with a convex surface; Petitioner does not propose including any air gaps that may be present in Ohsaki. *See, e.g.*, Pet. 53. Moreover, even if Ohsaki's Figure 1 depicts small air gaps adjacent the convex surface, Ohsaki nonetheless discloses that the convex surface is in "intimate contact" with the user's skin. Ex. 1009 ¶ 25; *see also Hockerson-Halberstadt*, 222 F.3d at 956. In view of such a teaching, we agree with Petitioner that it would have been within the skill of a person of ordinary skill in the art, who "is also a person of ordinary creativity, not an automaton," to minimize any such air gap that may be present when including a cover with a convex surface in Mendelson-799's sensor. Indeed, a purpose of Petitioner's proposed modification is to increase signal strength. *See, e.g.*, Pet. 27. We discern that it would have been within the capability of an ordinarily skilled

---

[9] Moreover, we disagree with Patent Owner's argument that Petitioner's Reply arguments are overly complex and instead a person of ordinary skill in the art "would have understood and applied the straightforward understanding that a convex surface condenses light toward the center." PO Sur-reply 18–19. As noted above, this "straightforward understanding" lacks sufficient support, in the context of diffuse light.

IPR2020-01538
Patent 10,588,554 B2

artisan to eliminate any air gap that would have decreased signal strength or quality. Ex. 1047 ¶ 43.

Rationale 3

Petitioner further contends that a person of ordinary skill in the art "would have recognized that a light permeable cover with a protruding convex surface," such as that taught by Ohsaki, would "protect the elements within sensor housing 17" of Mendelson-799. Pet. 26. We are persuaded that adding a convex cover, such as that taught by Ohsaki, would protect the sensor's internal components. Mendelson-799 is not shown to include a cover over its emitters 12a–c or detectors 16, 18. *See, e.g.*, Ex. 1012, Fig. 7. By contrast, Ohsaki discloses that translucent board 8 with its convex surface covers its emitter and detector. As such, we credit Dr. Kenny's testimony that a person of ordinary skill in the art would have been motivated to add a transparent convex cover to Mendelson-799 to "provide additional protection to the elements accommodated within sensor housing 17." Ex. 1003 ¶ 150; *see also* Ex. 1008 ¶ 15 (noting that a cover "protect[s] the LED or PD").

We disagree with Patent Owner's fifth argument that a person of ordinary skill in the art would not have modified Mendelson-799 as proposed because a convex cover would be prone to scratches and because other alternatives existed. PO Resp. 45–47. Patent Owner's counsel did not dispute, during the oral hearing, that a convex cover would indeed serve to protect the internal sensor components in Mendelson-799, as Petitioner proposes. Tr. 64:6–65:5 (but noting that a flat cover would also protect, and would be less prone to scratches). That a convex cover may be more prone to scratches than a flat cover is one of numerous tradeoffs that a person of

54

ordinary skill in the art would consider, in determining whether the benefits of increased adhesion, signal strength, and protection outweigh the potential for a scratched cover. *Medichem*, 437 F.3d at 1165. The record does not support that the possibility of scratches alone would have dissuaded a person of ordinary skill in the art from the proposed modification, to achieve the benefits identified by Petitioner.

For the foregoing reasons, we are persuaded by Petitioner's contentions.

> vii. *"[h] a handheld computing device in wireless communication with the physiological sensor device, wherein the handheld computing device comprises"*

Petitioner's Undisputed Contentions

Petitioner relies upon the teachings of Mendelson-799, Ohsaki, and Schulz, as discussed above, in further combination with Mendelson-2006 for the remainder of the claim limitations. Specifically, Petitioner contends that although Mendelson-799 does not explicitly disclose wireless communication from its sensor to a handheld computing device, its sensor is "for use in an optical measurement device" as part of "a method for non-invasive measurement of a blood parameter." Pet. 37, 43, 57. Patent Owner does not dispute this contention, and we agree with Petitioner. *See, e.g.*, Ex. 1012, code (57) ("A sensor for use in an optical measurement device and a method for non-invasive measurement of a blood parameter.").

Petitioner also contends that Mendelson-2006 discloses a body-worn pulse oximetry system including a sensor module, a receiver module, and a PDA. Pet. 40, 59. Petitioner contends that data processed by the receiver module is transmitted to the PDA and identifies several advantages of

wireless communication noted in Mendelson-2006, including more effective medical care. Pet. 59–60. Patent Owner does not dispute this contention, and we agree with Petitioner. *See, e.g.* Ex. 1010, 1–2 (describing system), 3 ("The stream of data received from the wearable unit is distributed to various locations on the PDA's graphical display."), 4 (explaining that wireless communication results in "more effective medical care"); Fig. 1 (sensor attached to skin), Fig. 3 (PDA).

Petitioner's Disputed Contentions

Petitioner further contends a person of ordinary skill in the art would have found it obvious to enable the sensor of the combination of Mendelson-799, Ohsaki, and Schulz to communicate wirelessly with a handheld computing device such as the PDA of Mendelson-2006, to transfer sensor data and provide more effective care. Pet. 39, 42–43, 57, 60–61; *see, e.g.*, Ex. 1003 ¶¶ 104, 109, 165, 171–175.

Patent Owner's Arguments

Patent Owner presents several arguments directed to Mendelson-2006, including that Mendelson-2006 discloses a single detector (PO Resp. 52), and that Mendelson-2006's sensor is used on the forehead (*id.* at 53). Patent Owner argues that Mendelson-2006 thus confirms that a person of ordinary skill in the art would not have combined Mendelson-799 with Ohsaki or Schulz due to signal strength issues raised by various locations where a sensor might be attached to the user's body. *Id.* at 53–55.

Analysis

We are persuaded that Petitioner's stated reasoning for the proposed modification is sufficiently supported, including by the unrebutted testimony

56

of Dr. Kenny. *See, e.g.*, Ex. 1003 ¶¶ 102–109, 162–176. For example, we credit Dr. Kenny's testimony that a person of ordinary skill in the art would have been motivated to implement Mendelson-799 as part of a physiological measurement system including a handheld communication device in wireless communication, in order to enable transfer of information and improve medical care. *Id.* ¶¶ 170–171.

Moreover, we disagree with Patent Owner's arguments. First, we are persuaded by Petitioner's contentions regarding Mendelson-799, Ohsaki, and Schulz, for the reasons discussed above, and we do not discern that the teachings of Mendelson-2006 undercut those contentions in any manner. Second, Petitioner relies on Mendelson-2006 for teachings regarding wireless communications with a handheld device. Pet. 57–69. Patent Owner's arguments do not pertain to the modification actually proposed and, as such, are misplaced.

    viii.    *"[i] one or more processors configured to wirelessly receive one or more signals from the physiological sensor device, the one or more signals responsive to at least a physiological parameter of the user"*

The cited evidence supports Petitioner's contention that Mendelson-2006 describes wirelessly transmitting vital physiological information acquired from the sensor to the PDA, which receives it. Pet. 62–63; *see, e.g.*, Ex. 1010, 1, 2 ("The information acquired by the Sensor Module is transmitted wirelessly via an RF link over a short range to a body-worn Receiver Module. The data processed by the Receiver Module can be transmitted wirelessly to a PDA."), 3 (explaining that the PDA "has sufficient computational resources for the intended application" and "can also serve to temporarily store vital medical information received from the

wearable unit"), Fig. 3 (displaying SpO$_2$ and HR data); Ex. 1003 ¶¶ 179–180.

Petitioner further contends that, in light of these teachings, a person of ordinary skill in the art "would have found it obvious to configure a processor of the PDA to wirelessly receive signals from the physiological sensor device, the signals being responsive to physiological parameters of the user." Pet. 63; *see, e.g.*, Ex. 1003 ¶ 181

Petitioner's stated reasoning for the proposed modification is sufficiently supported, including by the unrebutted testimony of Dr. Kenny. Ex. 1003 ¶¶ 177–182. Patent Owner does not present any argument against this limitation, apart from the arguments already addressed in Section II.D.5.vii.

*ix. "[j]–[l] a touch-screen display configured to provide a user interface, wherein: the user interface is configured to display indicia responsive to measurements of the physiological parameter, and an orientation of the user interface is configurable responsive to a user input"*

The cited evidence supports Petitioner's contention that Mendelson-2006 describes a PDA with a touchscreen display configured to display indicia responsive to measurements of, e.g., SpO$_2$ and HR. Pet. 64–65; *see, e.g.*, Ex. 1010, 3 ("The use of a PDA . . . also provides a low-cost touch screen interface.").

Petitioner acknowledges that "Mendelson-2006 does not explicitly state that an orientation of the GUI provided by the PDA is configurable responsive to a user input." Pet. 66. However, Petitioner contends that a person of ordinary skill in the art would have understood that "the LabVIEW software that was used 'to control all interactions between the PDA and the wearable unit via [t]he graphical user interface' included the option to

configure an orientation of a user interface," e.g. by setting the report orientation to portrait or landscape view. *Id.* (alteration in original); *see, e.g.*, Ex. 1003 ¶¶ 187–188; Ex. 1027, 186 ("Set the report orientation—portrait or landscape.").

Petitioner further contends that, in light of these teachings, a person of ordinary skill in the art "would have found it obvious to make an orientation of the PDA's user interface configurable responsive to a user input, for the sake of user convenience." Pet. 67; *see, e.g.*, Ex. 1003 ¶¶ 189–190.

Petitioner's stated reasoning for the proposed modification is sufficiently supported, including by the unrebutted testimony of Dr. Kenny, who testifies that the proposed modification would have allowed for easy activation of various functions. *See, e.g.*, Ex. 1003 ¶¶ 183–191. Patent Owner does not present any argument against this limitation, apart from the arguments already addressed in Section II.D.5.vii.

x. *"[m] a storage device configured to at least temporarily store at least the measurements of the physiological parameter"*

The cited evidence supports Petitioner's contention that Mendelson-2006 teaches that the PDA is configured to store vital medical information received from the wearable pulse oximeter, and that an ordinarily skilled artisan "would have understood that the vital medical information would have included measurements of the physiological parameters obtained by the physiological sensor device (e.g., $SpO_2$ and HR)." Pet. 68; Ex. 1010, 3 ("The PDA can also serve to temporarily store vital medical information received from the wearable unit."); Ex. 1003 ¶ 194.

Petitioner further contends that, in light of these teachings, a person of ordinary skill in the art "would have found it obvious to configure a storage

59

device of the PDA to at least temporarily store measurements of physiological parameters (e.g., SpO$_2$ and HR)." Pet. 68; *see, e.g.*, Ex. 1003 ¶ 193.

Petitioner's stated reasoning for the proposed modification is sufficiently supported, including by the unrebutted testimony of Dr. Kenny. *See, e.g.*, Ex. 1003 ¶¶ 192–194. Patent Owner does not present any argument against this limitation, apart from the arguments already addressed in Section II.D.5.vii.

### *xi. Reasonable Expectation of Success*

Patent Owner argues that Petitioner has failed to demonstrate a reasonable expectation of success because Dr. Kenny did not perform a design analysis to create a functional sensor. PO Resp. 55. We disagree. As discussed in detail above, each of Petitioner's proposed modifications to Mendelson-799—whether to include an opaque material with windows, as taught by Schulz; or to include a cover with a convex surface, as taught by Ohsaki; or to communicate with a handheld computing device, as taught by Mendelson-2006—is rooted in explicit teachings of the prior art, and is supported by persuasive declarant testimony.

We credit Dr. Kenny's testimony that, for each proposed modification, the combined prior art teachings would have been applied as known, to achieve predictable results. *See, e.g.*, Ex. 1003 ¶¶ 92 (applying Ohsaki's teachings would have been "nothing more than the use of a known technique to improve similar devices in the same way, and combining prior art elements according to known methods to yield predictable results— improved adhesion of the sensor to the user's skin, and improved signal strength"), 101 (applying Schulz's teachings would have been "nothing

60

more than the use of a known technique to improve similar devices in the same way, and combining prior art elements according to known methods to yield predictable results," i.e. to "avoid saturation"), 173 ("applying Mendelson[-]2006's teachings . . . would have led to predictable results without altering or hindering the functions performed by that device. In fact, one of ordinary skill would have been motivated to implement the well-known technique of wirelessly transmitting data . . . to a handheld computing device"). For similar reasons discussed above with respect to each proposed modification, we conclude that that a skilled artisan would have had a reasonable expectation of success. *See supra* § II.D.5.iv, vi, vii–x; *see also* Ex. 1003 ¶¶ 81–195.

### xii.Summary

For the foregoing reasons, we determine that Petitioner has met its burden of demonstrating by a preponderance of the evidence that claim 1 would have been obvious over the cited combination of references.

### 6. Independent Claim 20

Independent claim 20 consists of limitations that are substantially similar to elements [a]–[h] of claim 1. *Compare* Ex. 1001, 44:51–45:21, *with id.* at 46:31–52 (reciting that the "convex surface," as opposed to "the cover," is "sufficiently rigid"; omitting details of the "handheld computing device"). In asserting that claim 20 also would have been obvious over the combined teachings of Mendelson-799, Ohsaki, Schulz, and Mendelson-2006, Petitioner refers to the same arguments presented as to claim 1. *See* Pet. 79–82. Patent Owner relies on the same arguments discussed above regarding claim 1. PO Resp. 12–63.

IPR2020-01538
Patent 10,588,554 B2

For the same reasons discussed above, we determine that Petitioner has met its burden of demonstrating by a preponderance of the evidence that claim 20 would have been obvious over the cited combination of references. *See supra* § II.D.5.

### 7.  Dependent Claims 6 and 25

Dependent claim 6 ultimately depends from independent claim 1 and further recites, "the wall surrounds at least the at least four detectors on the first surface, the wall operably connects to the substrate on one side of the wall, and the wall operably connects to the cover on an opposing side of the wall." Ex. 1001, 45:40–47.  Likewise, dependent claim 25 ultimately depends from independent claim 20 and further recites "a substrate having a first surface, wherein the at least four detectors are arranged on the first surface, and wherein the wall surrounds at least the at least four detectors on the first surface, wherein: the wall operably connects to the substrate on one side of the wall, and the wall operably connects to the cover on an opposing side of the wall." *Id.* at 47:15–48:6.

Petitioner contends that the sensor rendered obvious by the combined teachings of Mendelson-799, Ohsaki, Schulz, and Mendelson-2006 "would have included a wall surrounding the photodiodes included in far detector 16 and near detector 18, the wall being operably connected on one side to the planar substrate on which the detectors are arranged, and on an opposing side to a cover," as shown in Petitioner's annotated and modified view of Mendelson-799's Figure 7, as well as an added sectional view, both of which are reproduced below. Pet. 76–77 (citing, e.g., Pet. § IV.B.6.1[d]; Ex. 1003 ¶¶ 132–144, 211–212); *see also id.* at 89–90 (similar discussion regarding claim 25) (citing, e.g., Ex. 1003 ¶¶ 257–29).

62

IPR2020-01538
Patent 10,588,554 B2



Petitioner's annotated and modified figures depict the sensor of Mendelson-799 with an added opaque wall illustrated in green and encircling the sensor components, and operably connected to the convex cover (illustrated in red) on the top and operably connected to the planar substrate of sensor housing 17 (illustrated in green) on the bottom.

Patent Owner argues that "Petitioner provides no independent analysis" for these claims and instead refers back to analyses of claims 1 and 20. PO Resp. 57. Patent Owner also argues that, in the annotated figures, Petitioner includes features not shown in the cited references, e.g., "a cover . . . spanning the entire space above the substrate" and a wall with "notches for the convex cover." *Id.* at 58. Patent Owner argues that "Petitioner cannot satisfy" the claims "by making unexplained changes to the cited art." *Id.* at 59. Moreover, Patent Owner argues that neither Ohsaki nor Mendelson-799 disclose a wall as claimed. *Id.*

As shown in the modified figures above, the wall of the combined sensor surrounds the sensor components and is operably connected to the

convex cover on the top and is operably connected to the planar substrate on the bottom, as claimed.  Moreover, as discussed above regarding claim 1, Petitioner's proposed modifications to Mendelson-799 are *not* premised upon bodily incorporating Ohsaki's cover directly with Mendelson-799's sensor.  *See In re Nievelt*, 482 F.2d 965, 968 (CCPA 1973) ("Combining the teachings of references does not involve an ability to combine their specific structures.").  To the contrary, Petitioner proposes incorporating Ohsaki's *teaching* of a cover with a convex surface, not the precise cover and structure disclosed by Ohsaki.  *In re Keller*, 642 F.2d 413, 425 (CCPA 1981) ("[T]he test is what the combined teachings of those references would have suggested to those of ordinary skill in the art.").  If Ohsaki's teaching is implemented in a manner that varies from the precise implementation of such a cover in Ohsaki, e.g., with a larger span or with notches, this is not a material deviation from Ohsaki's express teachings of using a cover with a convex surface to achieve specific benefits, e.g., improved adhesion and signal strength.  Ex. 1009 ¶ 25; *see supra* § II.D.5.vi; *see Lear Siegler, Inc. v. Aeroquip Corp.*, 733 F.2d 881, 889 (Fed. Cir. 1984) (explaining that a person of ordinary skill is not "compelled to adopt every single aspect of [a reference] without the exercise of independent judgment").

Accordingly, for the foregoing reasons, we determine that Petitioner has met its burden of demonstrating by a preponderance of the evidence that claims 6 and 25 would have been obvious over the cited combination of references.

### 8. *Dependent Claim 28*

Dependent claim 28 ultimately depends from independent claim 20 and further recites "the single protruding convex surface protrudes a height greater than 2 millimeters and less than 3 millimeters." Ex. 1001, 48:16–18.

Petitioner reiterates that the sensor rendered obvious by the combined teachings of Mendelson-799, Ohsaki, Schulz, and Mendelson-2006 would have included a cover with a single protruding convex surface, *see supra* § II.D.5.vi, and further contends that a person of ordinary skill in the art "would have found it obvious that a device designed to fit on a user's wrist would be on the order of millimeters," consistent with Ohsaki's disclosure that the device is in "intimate contact" with the user's skin. Pet. 94–95 (citing, e.g., Ex. 1003 ¶ 269). Petitioner also contends that an ordinarily skilled artisan would have taken user comfort into account when establishing the dimensions of the device's convex cover. *Id.* at 96. With these considerations in mind, Petitioner contends that, "in order to provide a comfortable cover featuring a protruding convex surface that prevents slippage, the surface should protrude a height greater than 2 millimeters and less than 3 millimeters," because "there would have been a finite range of possible protruding heights, and it would have been obvious to select a protruding height that would have been comfortable to the user." *Id.* (citing, e.g., Ex. 1003 ¶¶ 267–271).

Patent Owner argues that none of the cited references disclose the claimed height range and that Petitioner relies on hindsight reconstruction. PO Resp. 60–62 (citing, e.g., Ex. 2004 ¶¶ 104–105). Patent Owner also characterizes Dr. Kenny's testimony as conclusory and unsupported. *Id.* at 62.

IPR2020-01538
Patent 10,588,554 B2

Petitioner is correct that, "[w]hen there are a finite number of identified, predictable solutions, a person of ordinary skill in the art has good reason to pursue the known options within his or her technical grasp. If this leads to the anticipated success, it is likely the product . . . of ordinary skill and common sense." *KSR*, 550 U.S. at 398. Petitioner has shown sufficiently that only a finite number of solutions existed with respect to the height of a convex protrusion on a tissue-facing sensor, which would have met the art-recognized goals of both (1) intimate contact between the sensor's surface and the user and (2) user comfort. *See, e.g.*, Ex. 1009 ¶¶ 6, 25. Bearing in mind these considerations, we credit Dr. Kenny's testimony that it would have been obvious, "in order to provide a comfortable cover featuring a protruding convex surface that prevents slippage, [that] the surface should protrude a height greater than 2 millimeters and less than 3 millimeters." Ex. 1003 ¶ 270.

We have considered Patent Owner's argument, and Dr. Madisetti's cited testimony. However, it is not dispositive that none of Mendelson-799, Ohsaki, Schulz, or Mendelson-2006 teach the claimed range. PO Resp. 60; Ex. 2004 ¶¶ 105–107. Petitioner relies upon the knowledge, ability, and creativity of a person of ordinary skill in the art, not the teachings of a specific reference. Notably, Dr. Madisetti does not dispute Dr. Kenny's position that there were a finite number of options available for the height of the convex surface. Ex. 2004 ¶¶ 104–107. Therefore, we do not agree that Petitioner's contentions are rooted in impermissible hindsight. *See, e.g.*, *In re McLaughlin*, 443 F.2d 1392, 1395 (CCPA 1971) ("Any judgment on obviousness is in a sense necessarily a reconstruction based upon hindsight reasoning, but so long as it takes into account only knowledge which was

66

within the level of ordinary skill at the time the claimed invention was made and does not include knowledge gleaned only from applicant's disclosure, such a reconstruction is proper.").

Accordingly, for the foregoing reasons, we determine that Petitioner has met its burden of demonstrating by a preponderance of the evidence that claim 28 would have been obvious over the cited combination of references.

### 9. Dependent Claims 2–5, 7, 21–24, 26, and 27

Petitioner also contends that claims 2–5, 7, 21–24, 26, and 27 would have been obvious based on the same combination of prior art addressed above. These challenged claims all depend directly or indirectly from independent claim 1 or 20. Petitioner identifies teachings in the prior art references that teach or suggest the limitations of these claims, and provides persuasive reasoning as to why the claimed subject matter would have been obvious to one of ordinary skill in the art. Pet. 69–79, 82–96. Petitioner also supports its contentions for these claims with the testimony of Dr. Kenny. Ex. 1003 ¶¶ 196–210, 213–215, 237–256, 260–266.

Patent Owner does not present any arguments for these claims other than those we have already considered with respect to independent claims 1 and 20. PO Resp. 56 ("The Petition fails to establish that independent claims 1 and 20 are obvious over the cited references of Ground 1 and therefore fails to establish obviousness of any of the challenged dependent claims."); *see supra* § II.D.5.

We have considered the evidence and arguments of record and determine that Petitioner has demonstrated by a preponderance of the evidence that claims 2–5, 7, 21–24, 26, and 27 would have been obvious over the combined teachings of Mendelson-799, Ohsaki, Schulz, and

IPR2020-01538
Patent 10,588,554 B2

Mendelson-2006, for the reasons discussed in the Petition and as supported by the testimony of Dr. Kenny.

### 10. Conclusion

For the foregoing reasons, we determine that Petitioner has met its burden of demonstrating by a preponderance of the evidence that claims 1–7 and 20–28 would have been obvious over the cited combination of references.

### III.    CONCLUSION

In summary:[10]

| Claims | 35 U.S.C. § | Reference(s)/ Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1–7, 20–28 | 103 | Mendelson-799, Ohsaki, Schulz, and Mendelson-2006 | 1–7, 20–28 | |
| **Overall Outcome** | | | 1–7, 20–28 | |

---

[10] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding. See* 84 Fed. Reg. 16654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

68

IPR2020-01538
Patent 10,588,554 B2

## IV.    ORDER

Upon consideration of the record before us, it is:

ORDERED that claims 1–7 and 20–28 of the '554 patent have been shown to be unpatentable;

FURTHER ORDERED that, because this is a final written decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2020-01538
Patent 10,588,554 B2

PETITIONER:

Walter Renner
Andrew Patrick
FISH & RICHARDSON P.C.
Axf-ptab@fr.com
patrick@fr.com

PATENT OWNER:

Joseph Re
Stephen Larson
Jarom Kesler
Jacob Peterson
KNOBBE, MARTENS, OLSON, & BEAR, LLP
2jrr@knobbe.com
2swl@knobbe.com
2jzk@knobbe.com
2jup@knobbe.com

70

## CERTIFICATE OF SERVICE

I hereby certify that the original of this Notice of Appeal was filed via U.S.P.S. Priority Mail Express on April 12, 2022 with the Director of the United States Patent and Trademark Office at the address below:

Office of the Solicitor
United States Patent and Trademark Office
Mail Stop 8, Post Office Box 1450
Alexandria, VA 22313-1450

A copy of this Notice of Appeal is being filed and served on April 12, 2022 as follows:

**To the USPTO Patent Trial and Appeal Board:**
Patent Trial and Appeal Board
Madison Building East
600 Dulany Street
Alexandria, VA 22313

(*via PTAB E2E – as authorized by the Board*)

**To the U.S. Court of Appeals for the Federal Circuit:**
Clerk of Court
U.S. Court of Appeals for the Federal Circuit
717 Madison Place, N.W.
Washington, DC 20439

(*via CM/ECF – with filing fee*)

**Counsel for Petitioner Apple, Inc.**
W. Karl Renner, Reg. No. 41,265
Andrew B. Patrick, Reg. No. 63,471
Fish & Richardson P.C.
3200 RBC Plaza
60 South Sixth Street
Minneapolis, MN 55402

IPR50095-0013IP1@fr.com
PTABInbound@fr.com;
axf-ptab@fr.com;
patrick@fr.com

(*via email pursuant to 37 C.F.R. § 42.6(e)*)


Dated:  April 12, 2022                    /Jarom Kesler/
                                          Jarom D. Kesler (Reg. No. 57,046)

                                          Attorney for Patent Owner
                                          Masimo Corporation

55313792