**[Volume X, Appx28870 – Appx54846]**

**Nos. 22-1631, -1632, -1633, -1634, -1635, -1636, -1637, -1638**

IN THE

# United States Court of Appeals

**FOR THE FEDERAL CIRCUIT**

———————————

MASIMO CORPORATION,

*Appellant,*

v.

APPLE INC.,

*Appellee.*

APPEAL FROM THE PATENT TRIAL AND APPEAL BOARD
CASE NOS. IPR2020-01520, IPR2020-01521, IPR2020-01536, IPR2020-01537,
IPR2020-01538, IPR2020-01539, IPR2020-01714, IPR2020-01715

## CORRECTED JOINT APPENDIX

Joseph R. Re, *Principal Counsel*
Stephen C. Jensen
Jarom D. Kesler
Stephen W. Larson
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
2040 Main Street, 14th Floor
Irvine, CA 92614
(949) 760-0404

Jeremiah S. Helm
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
1717 Pennsylvania Ave., N.W.
Washington, D.C. 20006
(202) 640-6400

*Attorneys for Appellant*
*Masimo Corporation*

Lauren A. Degnan, *Principal Counsel*
Christopher Dryer
W. Karl Renner
Jared Hartzman
Adi A. Williams
**FISH & RICHARDSON P.C.**
1000 Maine Ave., Suite 1000
Washington, DC 20024
Tel: (202) 783-5070

Ashley Bolt
**FISH & RICHARDSON P.C.**
1180 Peachtree Street NE,
21st Floor
Atlanta, GA 30309

*Attorneys for Appellee Apple Inc.*

July 12, 2023

**Table of Contents**

| Date | Paper No. /Ex. No. | Document | Pages |
|---|---|---|---|
| **VOLUME I** | | | |
| 2/23/2022 | 39 | Final Written Decision [IPR2020-01520] | Appx00001-Appx00106 |
| 4/11/2022 | 33 | Final Written Decision [IPR2020-01521] | Appx00107-Appx00198 |
| 2/23/2022 | 43 | Final Written Decision [IPR2020-01536] | Appx00199-Appx00276 |
| **VOLUME II** | | | |
| 2/23/2022 | 43 | Final Written Decision [IPR2020-01537] | Appx00277-Appx00358 |
| 2/23/2022 | 43 | Final Written Decision [IPR2020-01538] | Appx00359-Appx00428 |
| 2/23/2022 | 41 | Final Written Decision [IPR2020-01539] | Appx00429-Appx00514 |
| 4/6/2022 | 34 | Final Written Decision [IPR2020-01714] | Appx00515-Appx00591 |
| **VOLUME III** | | | |
| 4/6/2022 | 33 | Final Written Decision [IPR2020-01715] | Appx00592-Appx00675 |
| n/a | | U.S. Patent 10,258,265 | Appx00676-Appx00772 |
| n/a | | U.S. Patent 10,292,628 | Appx00773-Appx00870 |
| **VOLUME IV** | | | |
| n/a | | U.S. Patent 10,588,553 | Appx00871-Appx00973 |
| n/a | | U.S. Patent 10,588,554 | Appx00974-Appx01076 |
| n/a | | U.S. Patent 10,631,765 | Appx01077-Appx01179 |
| **VOLUME V** | | | |
| 5/25/2022 | 16 | Notice Forwarding Certified Lists | Appx01180-Appx01529 |

| Date | Paper No. /Ex. No. | Document | Pages |
|---|---|---|---|
| **VOLUME VI** | | | |
| 5/25/2022 | 16 | Notice Forwarding Certified Lists (Continued) | Appx01530-Appx01876 |
| **VOLUME VII** | | | |
| 8/31/2022 | 2 | Petition for *Inter Partes* Review [IPR2020-01520] | Appx01878; Appx01896-01899; Appx01921-01923; Appx01931-01934; Appx01953 |
| 5/28/2021 | 21 | Patent Owner's Response [IPR2020-01520] | Appx02191; Appx02212-02220; Appx02237 |
| 8/20/2021 | 24 | Petitioners Reply to Patent Owner's Response to Petition [IPR2020-01520] | Appx02275; Appx02306 |
| 1/6/2022 | 37 | December 7, 2021 Oral Hearing Transcript [IPR2020-01520] | Appx02449; Appx02458; Appx02498; Appx02501-02506; Appx02517; Appx02530; |
| 4/12/2022 | 40 | Patent Owner's Notice of Appeal to the U.S. Court of Appeals for the Federal Circuit [IPR2020-01520] | Appx02537-02648 |
| | Ex. 1002 | File History excerpts, U.S. Patent No. 10,258,265 | Appx02923-02932 |
| | Ex. 1003 | Declaration of Thomas W. Kenny [IPR2020-01520] | Appx03000; Appx03025-03030; Appx03040-03058; Appx03068-03071; Appx03095-03107 |
| | Ex. 1006 | Aizawa U.S. Pub. No. 2002/0188210 [IPR2020-01520] | Appx03242-03248 |
| | Ex. 1007 | Inokawa JP20060296564A [IPR2020-01520] | Appx03249-03271 |

| Date | Paper No. /Ex. No. | Document | Pages |
|---|---|---|---|
| | Ex. 1008 | Certified English Translation of Inokawa and Translators Declaration [IPR2020-01520] | Appx03272-Appx03295 |
| | Ex. 1010 | U.S. Patent No. 8,177,720 [IPR2020-01520] | Appx03313-Appx03333 |
| | Ex. 1014 | U.S. Pub. No. 2001/0056243 [IPR2020-01520] | Appx03352-03357 |
| | Ex. 1015 | Mendelson Design and Evaluation of a New Reflectance Pulse Oximeter Sensor [IPR2020-01520] | Appx03358-03364 |
| | Ex. 1023 | Nishikawa U.S. Pub. No. 2007/0145255 [IPR2020-01520] | Appx03443-03450 |
| | Ex. 1041 | Deposition Transcript of Dr. Vijay Madisetti Day 1 [IPR2020-01520] | Appx04112; Appx04243; Appx04244 |
| | Ex. 1047 | Second Declaration of Dr. Thomas W. Kenny [IPR2020-01520] | Appx04525; Appx04527-04559 |
| | Ex. 2004 | Madisetti Declaration [IPR2020-01520] | Appx05185; Appx05214-05216; Appx05233-05234; Appx05237-05238; Appx05240-05242; Appx05245-05248 |
| **VOLUME VIII** | | | |
| | Ex. 2006 | 4/22/2022 Kenny, Thomas Deposition Transcript [IPR2020-01520] | Appx05295; Appx05319; Appx05345-05346; Appx05368-05371; Appx05377-05378; Appx05380-05384; Appx05387-05388; Appx05391; Appx05394-05395; Appx05426-05428; Appx05435-05437; Appx05448; |

| Date | Paper No. /Ex. No. | Document | Pages |
|---|---|---|---|
| | | | Appx05458; Appx05473-05475; Appx05482-05486; Appx05491-05492; Appx05496-05502; Appx05551 |
| | Ex. 2007 | 4/23/2022 Kenny, Thomas Deposition Transcript [IPR2020-01520] | Appx05567; Appx05591-05592; Appx05604-05605; Appx05625-05631; Appx05635-05636; Appx05696; Appx05699 |
| | Ex. 2008 | 4/24/2021 Kenny, Thomas Deposition Transcript [IPR2020-01520] | Appx05747; Appx05776-05777; Appx05781-05783; Appx05786-05787; Appx05794-05795; Appx05803-05804; Appx05806-05807; Appx05809-05810; Appx05814-05818; Appx05841; Appx05851-05852; Appx05857; Appx05876-05877; Appx05903-05905; Appx05911-05912; Appx05960-05961; Appx05973-05975 |
| | Ex. 2009 | 4/25/2021 Kenny, Thomas Deposition Transcript [IPR2020-01520] | Appx06013; Appx06093-06098; Appx06122-06123 |
| | Ex. 2027 | 9/18/2021 Kenny, Thomas Deposition Transcript 9/18/2021[IPR2020-01520] | Appx06690; Appx06708-06711; Appx06738-06739; Appx06746; |

| Date | Paper No. /Ex. No. | Document | Pages |
|---|---|---|---|
| | | | Appx06882-06884; Appx06893-06894; Appx06902-06904; Appx06907-06908; Appx06946 |
| 9/2/2020 | 1 | Petitioner's Power of Attorney [IPR2020-01521] | Appx06952 |
| 9/2/2020 | 2 | Petition for *Inter Partes* Review [IPR2020-01521] | Appx06953; Appx06973-06974; Appx07001-07004 |
| 7/9/2021 | 15 | Patent Owner's Response [IPR2020-01521] | Appx07300; Appx07324-07325 |
| 4/12/2022 | 34 | Patent Owner's Notice of Appeal to the U.S. Court of Appeals for the Federal Circuit [IPR2020-01521] | Appx07624-07721 |
| | Ex. 1003 | Declaration of Dr. Thomas W. Kenny [IPR2020-01521] | Appx08051; Appx08080-08081; Appx08105-08106; Appx08131-08133 |
| | Ex. 1047 | Second Declaration of Dr. Thomas W. Kenny [IPR2020-01521] | Appx09183; Appx09197-09199; Appx09204-09208; Appx09216-09218 |
| | Ex. 2004 | Declaration of Vijay K. Madisetti, Ph.D. [IPR2020-01521] | Appx10322; Appx10352-10355; Appx10370-10371; Appx10374-10375; Appx10377-10379; Appx10382-10385 |
| 8/31/2020 | 3 | Petition for *Inter Partes* Review [IPR2020-01536] | Appx12444; Appx12476-12477 |
| 6/1/2021 | 24 | Patent Owner's Response [IPR2020-01536] | Appx12820; Appx12851-12854 |
| 10/5/2021 | 32 | Patent Owner's Sur-Reply to Reply [IPR2020-01536] | Appx12955; Appx12974 |

| Date | Paper No. /Ex. No. | Document | Pages |
|---|---|---|---|
| 4/12/2022 | 44 | Patent Owner's Notice of Appeal to the U.S. Court of Appeals for the Federal Circuit [IPR2020-01536] | Appx13167-13250 |
| | Ex. 1002 | File History excerpts for U.S. Patent No. 10,588,553 | Appx13259-13266 |
| **VOLUME IX** | | | |
| | Ex. 1003 | Declaration of Dr. Kenny [IPR2020-01536] | Appx15237; Appx15278-15286 |
| | Ex. 1009 | U.S. Pub. No. 2001/0056243 Ohsaki [IPR2020-01536] | Appx15568; Appx15572 |
| | Ex. 1012 | U.S. Patent No. 6,801,799 Mendelson [IPR2020-01536] | Appx15578-15593 |
| | Ex. 1017 | Mendelson Design and Evaluation of a New Reflectance Pulse Oximeter Sensor [IPR2020-01536] | Appx15638 |
| | Ex. 1018 | Mendelson Skin Reflectance Pulse Oximetry In Vivo Measurements from the Forearm and C [IPR2020-01536] | Appx15645-15647 |
| | Ex. 1019 | Webster Design of Pulse Oximeters [IPR2020-01536] | Appx15651; Appx15754-15758 |
| | Ex. 1047 | Second Declaration of Dr. Thomas W. Kenny [IPR2020-01536] | Appx17805; Appx17824-17837 |
| | Ex. 2004 | Declaration of Vijay K. Madisetti, Ph.D. [IPR2020-01536] | Appx18302; Appx18343-18355; Appx18358-18359 |
| 8/27/2021 | 27 | Petitioner's Reply to Masimo Response [IPR2020-01537] | Appx20516; Appx20526 |
| 1/16/2022 | 41 | December 7, 2021 Oral Hearing Transcript [IPR2020-01537] | Appx20696; Appx20759-20760 |
| 4/12/2022 | 44 | Patent Owner's Notice of Appeal to the U.S. Court of Appeals for the Federal Circuit [IPR2020-01537] | Appx20781-Appx20868 |
| | Ex. 1003 | Declaration of Dr. Kenny [IPR2020-01537] | Appx22855; Appx22888; |

| Date | Paper No. /Ex. No. | Document | Pages |
|---|---|---|---|
| | | | Appx22890-22906; Appx22937-22945; Appx22995-23001 |
| | Ex. 1009 | U.S. Pub. No. 2001/0056243 Ohsaki [IPR2020-01537] | Appx23194; Appx23198 |
| | Ex. 1010 | Mendelson A Wearable Reflectance Pulse Oximeter for Remote Physiological Monitoring [IPR2020-01537] | Appx23200-23203 |
| | Ex. 1047 | Second Declaration of Dr. Thomas W. Kenny [IPR2020-01537] | Appx25392; Appx25405-25409; Appx25414-25423 |
| | Ex. 2003 | Mendelson, et al., Measurement Site and Photodetector Size Considerations Jin Optimizing Power Consumption of a Wearable Reflectance Pulse Oximeter [IPR2020-01537] | Appx25906-25909 |
| | Ex. 2004 | Declaration of Vijay K. Madisetti, Ph.D. [IPR2020-01537] | Appx25910; Appx25942-25945; Appx25947 |
| 9/2/2020 | 1 | Petition for Inter Partes Review of U.S. Patent No. 10,588,554 [IPR2020-01538] | Appx27672; Appx27708 |
| 4/12/2022 | 44 | Patent Owner's Notice of Appeal to the U.S. Court of Appeals for the Federal Circuit [IPR2020-01538] | Appx28420-28495 |
| **VOLUME X** | | | |
| | Ex. 1002 | File History excerpts, U.S. Patent No. 10,588,554 [IPR2020-01538] | Appx28870-28882; Appx29716-29719 |
| | Ex. 2004 | Declaration of Vijay K. Madisetti, Ph.D. [IPR2020-01538] | Appx33048; Appx33091-33103; Appx33106-33108 |
| 4/12/2023 | 42 | Patent Owner's Notice of Appeal to the U.S. Court of Appeals for | Appx35638-35729 |

| Date | Paper No. /Ex. No. | Document | Pages |
|---|---|---|---|
| | | the Federal Circuit [IPR2020-01539] | |
| | Ex. 1003 | Declaration of Thomas W. Kenny [IPR2020-01539] | Appx36967; Appx37008; Appx37061-37062; Appx37071; Appx37119 |
| | Ex. 1009 | U.S. Pub. No. 2001/0056243 Ohsaki [IPR2020-01539] | Appx37295; Appx37298-37299 |
| | Ex. 1017 | Mendelson, Design and Evaluation of a New Reflectance Pulse Oximeter Sensor [IPR2020-01539] | Appx37370-37371 |
| | Ex. 2004 | Madisetti Declaration [IPR2020-01539] | Appx40313; Appx40348-40351; Appx40353; Appx40395-40398 |
| 4/12/2022 | 35 | Patent Owner's Notice of Appeal to the U.S. Court of Appeals for the Federal Circuit [IPR2020-01714] | Appx42697-42779 |
| | Ex. 1002 | File History excerpts, U.S. Patent No. 10,631,765 [IPR2020-01714] | Appx42872-42880 |
| | Ex. 1004 | Declaration of Vijay K. Madisetti, Ph.D. [IPR2020-01714] | Appx47449; Appx47491-47504; Appx47507-47509 |
| 4/12/2022 | 34 | Patent Owner's Notice of Appeal to the U.S. Court of Appeals for the Federal Circuit [IPR2020-01715] | Appx50019-50108 |
| | Ex. 1003 | Declaration of Thomas W. Kenny [IPR2020-01715] | Appx50582; Appx50680-50681 |
| | Ex. 2004 | Declaration of Madisetti [IPR2020-01715] | Appx54761; Appx54796-54799; Appx54801; Appx54845-54846 |



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

# NOTICE OF ALLOWANCE AND FEE(S) DUE

| 64735 | 7590 | 10/23/2019 |
| --- | --- | --- |

KNOBBE, MARTENS, OLSON & BEAR, LLP
MASIMO CORPORATION (MASIMO)
2040 MAIN STREET
FOURTEENTH FLOOR
IRVINE, CA 92614

| EXAMINER |
| --- |
| LIU, CHU CHUAN |

| ART UNIT | PAPER NUMBER |
| --- | --- |
| 3791 | |

DATE MAILED: 10/23/2019

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
| --- | --- | --- | --- | --- |
| 16/544,713 | 08/19/2019 | Jeroen Poeze | MASCER.002C13 | 9381 |

TITLE OF INVENTION: MULTI-STREAM DATA COLLECTION SYSTEM FOR NONINVASIVE MEASUREMENT OF BLOOD CONSTITUENTS

| APPLN. TYPE | ENTITY STATUS | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
| --- | --- | --- | --- | --- | --- | --- |
| nonprovisional | UNDISCOUNTED | $1000 | $0.00 | $0.00 | $1000 | 01/23/2020 |

**THE APPLICATION IDENTIFIED ABOVE HAS BEEN EXAMINED AND IS ALLOWED FOR ISSUANCE AS A PATENT. <u>PROSECUTION ON THE MERITS IS CLOSED.</u> THIS NOTICE OF ALLOWANCE IS NOT A GRANT OF PATENT RIGHTS. THIS APPLICATION IS SUBJECT TO WITHDRAWAL FROM ISSUE AT THE INITIATIVE OF THE OFFICE OR UPON PETITION BY THE APPLICANT. SEE 37 CFR 1.313 AND MPEP 1308.**

**THE ISSUE FEE AND PUBLICATION FEE (IF REQUIRED) MUST BE PAID WITHIN <u>THREE MONTHS</u> FROM THE MAILING DATE OF THIS NOTICE OR THIS APPLICATION SHALL BE REGARDED AS ABANDONED. <u>THIS STATUTORY PERIOD CANNOT BE EXTENDED.</u> SEE 35 U.S.C. 151. THE ISSUE FEE DUE INDICATED ABOVE DOES NOT REFLECT A CREDIT FOR ANY PREVIOUSLY PAID ISSUE FEE IN THIS APPLICATION. IF AN ISSUE FEE HAS PREVIOUSLY BEEN PAID IN THIS APPLICATION (AS SHOWN ABOVE), THE RETURN OF PART B OF THIS FORM WILL BE CONSIDERED A REQUEST TO REAPPLY THE PREVIOUSLY PAID ISSUE FEE TOWARD THE ISSUE FEE NOW DUE.**

**HOW TO REPLY TO THIS NOTICE:**

I. Review the ENTITY STATUS shown above. If the ENTITY STATUS is shown as SMALL or MICRO, verify whether entitlement to that entity status still applies.

If the ENTITY STATUS is the same as shown above, pay the TOTAL FEE(S) DUE shown above.

If the ENTITY STATUS is changed from that shown above, on PART B - FEE(S) TRANSMITTAL, complete section number 5 titled "Change in Entity Status (from status indicated above)".

For purposes of this notice, small entity fees are 1/2 the amount of undiscounted fees, and micro entity fees are 1/2 the amount of small entity fees.

II. PART B - FEE(S) TRANSMITTAL, or its equivalent, must be completed and returned to the United States Patent and Trademark Office (USPTO) with your ISSUE FEE and PUBLICATION FEE (if required). If you are charging the fee(s) to your deposit account, section "4b" of Part B - Fee(s) Transmittal should be completed and an extra copy of the form should be submitted. If an equivalent of Part B is filed, a request to reapply a previously paid issue fee must be clearly made, and delays in processing may occur due to the difficulty in recognizing the paper as an equivalent of Part B.

III. All communications regarding this application must give the application number. Please direct all communications prior to issuance to Mail Stop ISSUE FEE unless advised to the contrary.

**IMPORTANT REMINDER: Maintenance fees are due in utility patents issuing on applications filed on or after Dec. 12, 1980. It is patentee's responsibility to ensure timely payment of maintenance fees when due. More information is available at www.uspto.gov/PatentMaintenanceFees.**

Page 1 of 3

PTOL-85 (Rev. 02/11)

**PART B - FEE(S) TRANSMITTAL**

Complete and send this form, together with applicable fee(s), by mail or fax, or via EFS-Web.

By mail, send to:      Mail Stop ISSUE FEE
                       Commissioner for Patents
                       P.O. Box 1450
                       Alexandria, Virginia 22313-1450

By fax, send to:      (571)-273-2885

INSTRUCTIONS: This form should be used for transmitting the ISSUE FEE and PUBLICATION FEE (if required). Blocks 1 through 5 should be completed where appropriate. All further correspondence including the Patent, advance orders and notification of maintenance fees will be mailed to the current correspondence address as indicated unless corrected below or directed otherwise in Block 1, by (a) specifying a new correspondence address; and/or (b) indicating a separate "FEE ADDRESS" for maintenance fee notifications.

CURRENT CORRESPONDENCE ADDRESS (Note: Use Block 1 for any change of address)

64735      7590      10/23/2019

KNOBBE, MARTENS, OLSON & BEAR, LLP
MASIMO CORPORATION (MASIMO)
2040 MAIN STREET
FOURTEENTH FLOOR
IRVINE, CA 92614

Note: A certificate of mailing can only be used for domestic mailings of the Fee(s) Transmittal. This certificate cannot be used for any other accompanying papers. Each additional paper, such as an assignment or formal drawing, must have its own certificate of mailing or transmission.

**Certificate of Mailing or Transmission**
I hereby certify that this Fee(s) Transmittal is being deposited with the United States Postal Service with sufficient postage for first class mail in an envelope addressed to the Mail Stop ISSUE FEE address above, or being transmitted to the USPTO via EFS-Web or by facsimile to (571) 273-2885, on the date below.

_____ (Typed or printed name)

_____ (Signature)

_____ (Date)

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 16/544,713 | 08/19/2019 | Jeroen Poeze | MASCER.002C13 | 9381 |

TITLE OF INVENTION: MULTI-STREAM DATA COLLECTION SYSTEM FOR NONINVASIVE MEASUREMENT OF BLOOD CONSTITUENTS

| APPLN. TYPE | ENTITY STATUS | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|---|
| nonprovisional | UNDISCOUNTED | $1000 | $0.00 | $0.00 | $1000 | 01/23/2020 |

| EXAMINER | ART UNIT | CLASS-SUBCLASS |
|---|---|---|
| LIU, CHU CHUAN | 3791 | 600-310000 |

1. Change of correspondence address or indication of "Fee Address" (37 CFR 1.363).

☐ Change of correspondence address (or Change of Correspondence Address form PTO/SB/122) attached.

☐ "Fee Address" indication (or "Fee Address" Indication form PTO/SB/47; Rev 03-09 or more recent) attached. **Use of a Customer Number is required.**

2. For printing on the patent front page, list
(1) The names of up to 3 registered patent attorneys or agents OR, alternatively,
(2) The name of a single firm (having as a member a registered attorney or agent) and the names of up to 2 registered patent attorneys or agents. If no name is listed, no name will be printed.

1 _____

2 _____

3 _____

3. ASSIGNEE NAME AND RESIDENCE DATA TO BE PRINTED ON THE PATENT (print or type)

PLEASE NOTE: Unless an assignee is identified below, no assignee data will appear on the patent. If an assignee is identified below, the document must have been previously recorded, or filed for recordation, as set forth in 37 CFR 3.11 and 37 CFR 3.81(a). Completion of this form is NOT a substitute for filing an assignment.

(A) NAME OF ASSIGNEE                    (B) RESIDENCE: (CITY and STATE or COUNTRY)

Please check the appropriate assignee category or categories (will not be printed on the patent) : ☐ Individual ☐ Corporation or other private group entity ☐ Government

4a. Fees submitted: ☐Issue Fee ☐Publication Fee (if required) ☐Advance Order - # of Copies _____

4b. Method of Payment: *(Please first reapply any previously paid fee shown above)*

☐ Electronic Payment via EFS-Web     ☐ Enclosed check     ☐ Non-electronic payment by credit card (Attach form PTO-2038)

☐ The Director is hereby authorized to charge the required fee(s), any deficiency, or credit any overpayment to Deposit Account No. _____

5. **Change in Entity Status** (from status indicated above)

☐ Applicant certifying micro entity status. See 37 CFR 1.29

☐ Applicant asserting small entity status. See 37 CFR 1.27

☐ Applicant changing to regular undiscounted fee status.

NOTE: Absent a valid certification of Micro Entity Status (see forms PTO/SB/15A and 15B), issue fee payment in the micro entity amount will not be accepted at the risk of application abandonment.
NOTE: If the application was previously under micro entity status, checking this box will be taken to be a notification of loss of entitlement to micro entity status.
NOTE: Checking this box will be taken to be a notification of loss of entitlement to small or micro entity status, as applicable.

NOTE: This form must be signed in accordance with 37 CFR 1.31 and 1.33. See 37 CFR 1.4 for signature requirements and certifications.

Authorized Signature _____        Date _____

Typed or printed name _____        Registration No. _____

Page 2 of 3
PTOL-85 Part B (08-18) Approved for use through 01/31/2020        OMB 0651-0033        U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE

Appx28871



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 16/544,713 | 08/19/2019 | Jeroen Poeze | MASCER.002C13 | 9381 |

| | | | EXAMINER |
|---|---|---|---|
| 64735 | 7590 | 10/23/2019 | LIU, CHU CHUAN |

KNOBBE, MARTENS, OLSON & BEAR, LLP
MASIMO CORPORATION (MASIMO)
2040 MAIN STREET
FOURTEENTH FLOOR
IRVINE, CA 92614

| ART UNIT | PAPER NUMBER |
|---|---|
| 3791 | |

DATE MAILED: 10/23/2019

## Determination of Patent Term Adjustment under 35 U.S.C. 154 (b)
(Applications filed on or after May 29, 2000)

The Office has discontinued providing a Patent Term Adjustment (PTA) calculation with the Notice of Allowance.

Section 1(h)(2) of the AIA Technical Corrections Act amended 35 U.S.C. 154(b)(3)(B)(i) to eliminate the requirement that the Office provide a patent term adjustment determination with the notice of allowance. See Revisions to Patent Term Adjustment, 78 Fed. Reg. 19416, 19417 (Apr. 1, 2013). Therefore, the Office is no longer providing an initial patent term adjustment determination with the notice of allowance. The Office will continue to provide a patent term adjustment determination with the Issue Notification Letter that is mailed to applicant approximately three weeks prior to the issue date of the patent, and will include the patent term adjustment on the patent. Any request for reconsideration of the patent term adjustment determination (or reinstatement of patent term adjustment) should follow the process outlined in 37 CFR 1.705.

Any questions regarding the Patent Term Extension or Adjustment determination should be directed to the Office of Patent Legal Administration at (571)-272-7702. Questions relating to issue and publication fee payments should be directed to the Customer Service Center of the Office of Patent Publication at 1-(888)-786-0101 or (571)-272-4200.

PTOL-85 (Rev. 02/11)

**OMB Clearance and PRA Burden Statement for PTOL-85 Part B**

The Paperwork Reduction Act (PRA) of 1995 requires Federal agencies to obtain Office of Management and Budget approval before requesting most types of information from the public. When OMB approves an agency request to collect information from the public, OMB (i) provides a valid OMB Control Number and expiration date for the agency to display on the instrument that will be used to collect the information and (ii) requires the agency to inform the public about the OMB Control Number's legal significance in accordance with 5 CFR 1320.5(b).

The information collected by PTOL-85 Part B is required by 37 CFR 1.311. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 30 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, Virginia 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, Virginia 22313-1450. Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

**Privacy Act Statement**

**The Privacy Act of 1974 (P.L. 93-579)** requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b) (2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether disclosure of these records is required by the Freedom of Information Act.

2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.

3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.

4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).

5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.

6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).

7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.

8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspection or an issued patent.

9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

| *Notice of Allowability* | Application No. 16/544,713 | Applicant(s) Poeze et al. | |
|---|---|---|---|
| | Examiner CHU CHUAN LIU | Art Unit 3791 | AIA (FITF) Status No |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address--*

All claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application. If not included herewith (or previously mailed), a Notice of Allowance (PTOL-85) or other appropriate communication will be mailed in due course. **THIS NOTICE OF ALLOWABILITY IS NOT A GRANT OF PATENT RIGHTS.** This application is subject to withdrawal from issue at the initiative of the Office or upon petition by the applicant. See 37 CFR 1.313 and MPEP 1308.

1. ☑ This communication is responsive to <u>the response filed on 10/07/2019.</u>
   - ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.

2. ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.

3. ☑ The allowed claim(s) is/are <u>2,4-25 and 27-31</u> . As a result of the allowed claim(s), you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information , please see **http://www.uspto.gov/patents/init_events/pph/index.jsp** or send an inquiry to **PPHfeedback@uspto.gov.**

4. ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
   **Certified copies:**
   - a) ☐All    b) ☐ Some    *c) ☐ None of the:
     1. ☐ Certified copies of the priority documents have been received.
     2. ☐ Certified copies of the priority documents have been received in Application No. _____ .
     3. ☐ Copies of the certified copies of the priority documents have been received in this national stage application from the International Bureau (PCT Rule 17.2(a)).
   * Certified copies not received: _____ .

   Applicant has THREE MONTHS FROM THE "MAILING DATE" of this communication to file a reply complying with the requirements noted below. Failure to timely comply will result in ABANDONMENT of this application. **THIS THREE-MONTH PERIOD IS NOT EXTENDABLE.**

5. ☐ CORRECTED DRAWINGS (as "replacement sheets") must be submitted.
   - ☐ including changes required by the attached Examiner's Amendment / Comment or in the Office action of Paper No./Mail Date _____ .
   **Identifying indicia such as the application number (see 37 CFR 1.84(c)) should be written on the drawings in the front (not the back) of each sheet. Replacement sheet(s) should be labeled as such in the header according to 37 CFR 1.121(d).**

6. ☐ DEPOSIT OF and/or INFORMATION about the deposit of BIOLOGICAL MATERIAL must be submitted. Note the attached Examiner's comment regarding REQUIREMENT FOR THE DEPOSIT OF BIOLOGICAL MATERIAL.

**Attachment(s)**
1. ☐ Notice of References Cited (PTO-892)
2. ☑ Information Disclosure Statements (PTO/SB/08), Paper No./Mail Date <u>10/08/2019.</u>
3. ☐ Examiner's Comment Regarding Requirement for Deposit of Biological Material _____.
4. ☐ Interview Summary (PTO-413), Paper No./Mail Date. _____.
5. ☑ Examiner's Amendment/Comment
6. ☑ Examiner's Statement of Reasons for Allowance
7. ☐ Other _____.

| /ERIC F WINAKUR/ Primary Examiner, Art Unit 3791 | /CHU CHUAN LIU/ Examiner, Art Unit 3791 |
|---|---|

## EXAMINER'S AMENDMENT

1.      An examiner's amendment to the record appears below. Should the changes and/or additions be unacceptable to applicant, an amendment may be filed as provided by 37 CFR 1.312. To ensure consideration of such an amendment, it MUST be submitted no later than the payment of the issue fee.


        Authorization for this examiner's amendment was given in an interview with Scott Cromar on 10/16/2019. Amendments were made to better define over the art.


        The application has been amended as follows:


Claim 2.        A physiological measurement system comprising:

        a physiological sensor device comprising:

                a plurality of emitters configured to emit light into tissue of a user;

                at least four detectors, wherein each of the at least four detectors has a corresponding window that allows light to pass through to the detector;

                a wall that surrounds at least the at least four detectors; and

                a cover that operably connects to the wall and that is configured to be located between tissue of the user and the at least four detectors when the physiological sensor device is worn by the user, wherein:

                        the cover comprises a single protruding convex surface, and

                        at least a portion of the cover is sufficiently rigid to cause

                        tissue of the user to conform to at least a portion of a shape of the

single protruding convex surface when the physiological sensor

device is worn by the user; and

a handheld computing device in wireless communication with the

physiological sensor device, wherein the handheld computing device comprises:

one or more processors configured to wirelessly receive one or

more signals from the physiological sensor device, the one or more

signals responsive to at least a physiological parameter of the user;

a touch-screen display configured to provide a user interface,

wherein:

the user interface is configured to display indicia responsive

to measurements of the physiological parameter, and

an orientation of the user interface is configurable

responsive to a user input; and

a storage device configured to at least temporarily store at least the

measurements of the physiological parameter.


Claim 3 was canceled.


Claim 4.      The physiological measurement system of Claim [[3]]2, wherein the

at least four detectors comprise at least eight detectors.


Claim 22.      A physiological measurement system comprising:

a physiological sensor device comprising:

a plurality of emitters configured to emit light into tissue of a user;

at least four detectors, wherein each of the at least four detectors

has a corresponding window that allows light to pass through to the

detector;

a wall that surrounds at least the at least four detectors; and

a tissue shaper that operably connects to the wall and that is

configured to be located between tissue of the user and the at least four

detectors when the physiological sensor device is worn by the user,

wherein:

the tissue shaper comprises a single protruding convex

surface, and

at least a portion of the tissue shaper is sufficiently rigid to

cause tissue of the user to conform to at least a portion of a shape

of the single protruding convex surface when the physiological

sensor device is worn by the user; and

a handheld computing device in wireless communication with the

physiological sensor device.


Claim 26 was canceled.

Claim 27.    The physiological measurement system of Claim [[26]]25, wherein the physiological sensor device further comprises:

an at least partially opaque layer blocking one or more optical paths to the at least four detectors, wherein the at least partially opaque layer comprises the windows that allow light to pass through to the corresponding detectors.


2.    The following is an examiner's statement of reasons for allowance: The terminal disclaimer for co-pending applications 16/534,956, 16/534,949 and 16/541,987 and patent Nos. 10,258,265, 10,258,266, 10,299,708, 10,292,628, 10,376,190, and 10,376,191 was approved on 10/07/2019 for resolving potential double patenting issues.

With regard to the prior art, Chaiken et al. (USPN 6,223,063 – applicant cited) teaches a physiological measurement device (Fig. 1), the physiological measurement device comprising: an emitter configured to emit light into tissue of a user (element 130 and finger, Figs. 1-2); at least four detectors (elements 160, Fig. 1) wherein each of the at least four detectors has a corresponding window that allows light to pass through to the detector (elements 150, Fig. 1); a cover is configured to be located between tissue of the user and the plurality of detectors (element 110, Fig. 1); the cover comprises multiple protruding convex surfaces (elements 150, Fig. 1), and at least a portion of the cover is sufficiently rigid to cause tissue of the user to conform to at least a portion of a shape of the single protruding convex surface when the physiological sensor device is worn by the user (element 110 with protruding elements 150, Fig. 1). Cook et al. (USPGPUB 2002/0111546 – applicant cited) teaches a physiological measurement

Application/Control Number: 16/544,713                                    Page 6
Art Unit: 3791

device (Fig. 7), the physiological measurement device comprising: a plurality of emitters

configured to emit light into tissue of a user (element 702, Fig. 7; [0085]); a wall (the

side wall(s) of the tubular section(s) connected to the base where the CCD is disposed

on, Fig. 7) surrounds a plurality of detectors (CCD 760, Fig. 7); at least four detectors

arranged in a grid pattern on the base (CCD 760, Fig. 7; pixels, [0099]); and a cover

(window 724, Fig. 7) connects the wall and configured to be located between a tissue

and the detectors (Fig. 7) and a computer for image correction, scene segmentation,

and blood characteristic analysis ([0044]). Kimura et al. (USPN 6,353,750 – applicant

cited) teaches a physiological measurement device (Fig. 27), the physiological

measurement device comprising: a plurality of emitters configured to emit light into

tissue of a user (elements 11, Fig. 27); at least four detectors positioned on a detector

assembly (a lens with a CCD, a line sensor or a photodiode array of element 12, Fig.

27); a wall that surrounds the at least four detectors (element 151, Fig. 27); and a cover

connects the wall and configured to be located between a tissue and the detectors

(element 170 connects to element 150, Fig. 27); the cover comprises a single protruding

convex surface (element 170, Fig. 27) and at least a portion of the cover is sufficiently

rigid to cause tissue of the user to conform to at least a portion of a shape of the single

protruding convex surface when the physiological measurement device is worn by the

use (light-transmitting plate 170 made of acrylic resin, Fig. 27 and associated

descriptions) and a personal computer (elements 2, Figs. 1 and 2). However, the prior

art of record does not teach or suggest "at least four detectors, wherein each of the at

least four detectors has a corresponding window that allows light to pass through to the

detector; a wall that surrounds at least the at least four detectors; and a cover that

operably connects to the wall and that is configured to be located between tissue of the user and the at least four detectors when the physiological sensor device is worn by the user, wherein: the cover comprises a single protruding convex surface; and a handheld computing device in wireless communication with the physiological sensor device, wherein the handheld computing device comprises: one or more processors configured to wirelessly receive one or more signals from the physiological sensor device, the one or more signals responsive to at least a physiological parameter of the user; a touch-screen display configured to provide a user interface, wherein: the user interface is configured to display indicia responsive to measurements of the physiological parameter, and an orientation of the user interface is configurable responsive to a user input" and "at least four detectors, wherein each of the at least four detectors has a corresponding window that allows light to pass through to the detector; a wall that surrounds at least the at least four detectors; and a tissue shaper that operably connects to the wall and that is configured to be located between tissue of the user and the at least four detectors when the physiological sensor device is worn by the user, wherein: the tissue shaper comprises a single protruding convex surface; and a handheld computing device in wireless communication with the physiological sensor device", in combination with the other claimed elements/ steps.

Any comments considered necessary by applicant must be submitted no later than the payment of the issue fee and, to avoid processing delays, should preferably accompany the issue fee. Such submissions should be clearly labeled "Comments on Statement of Reasons for Allowance."

Application/Control Number: 16/544,713                                                    Page 8
Art Unit: 3791

Any inquiry concerning this communication or earlier communications from the examiner should be directed to CHU CHUAN LIU whose telephone number is (571)270-5507. The examiner can normally be reached on M-Th (8am-6pm).

Examiner interviews are available via telephone, in-person, and video conferencing using a USPTO supplied web-based collaboration tool. To schedule an interview, applicant is encouraged to use the USPTO Automated Interview Request (AIR) at http://www.uspto.gov/interviewpractice.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Jacqueline Cheng can be reached on (571) 272-5596. The fax phone number for the organization where this application or proceeding is assigned is 571-273-8300.

Information regarding the status of an application may be obtained from the Patent Application Information Retrieval (PAIR) system. Status information for published applications may be obtained from either Private PAIR or Public PAIR. Status information for unpublished applications is available through Private PAIR only. For more information about the PAIR system, see http://pair-direct.uspto.gov. Should you have questions on access to the Private PAIR system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a

Appx28881

Application/Control Number: 16/544,713                                    Page 9
Art Unit: 3791

USPTO Customer Service Representative or access to the automated information

system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.


/ERIC F WINAKUR/
Primary Examiner, Art Unit 3791


/CHU CHUAN LIU/
Examiner, Art Unit 3791



### UNITED STATES PATENT AND TRADEMARK OFFICE

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 16/544,713 | 08/19/2019 | Jeroen Poeze | MASCER.002C13 | 9381 |

64735        7590        02/12/2020

KNOBBE, MARTENS, OLSON & BEAR, LLP
MASIMO CORPORATION (MASIMO)
2040 MAIN STREET
FOURTEENTH FLOOR
IRVINE, CA 92614

| EXAMINER |
|---|
| LIU, CHU CHUAN |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3791 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 02/12/2020 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

efiling@knobbe.com
jayna.cartee@knobbe.com

PTOL-90A (Rev. 04/07)

**Appx29716**

| *Supplemental*<br>*Notice of Allowability* | **Application No.**<br>16/544,713 | **Applicant(s)**<br>Poeze et al. |
|---|---|---|
| | **Examiner**<br>CHU CHUAN LIU | **Art Unit**<br>3791    **AIA (FITF) Status**<br>No |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address--*

All claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application. If not included herewith (or previously mailed), a Notice of Allowance (PTOL-85) or other appropriate communication will be mailed in due course. **THIS NOTICE OF ALLOWABILITY IS NOT A GRANT OF PATENT RIGHTS.** This application is subject to withdrawal from issue at the initiative of the Office or upon petition by the applicant. See 37 CFR 1.313 and MPEP 1308.

1. ☑ This communication is responsive to the IDS filed on 01/10/2020.
   - ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.

2. ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.

3. ☑ The allowed claim(s) is/are 2,4-25 and 27-31 . As a result of the allowed claim(s), you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information , please see **http://www.uspto.gov/patents/init_events/pph/index.jsp** or send an inquiry to **PPHfeedback@uspto.gov**.

4. ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

   **Certified copies:**

   a) ☐ All    b) ☐ Some    *c) ☐ None of the:
   1. ☐ Certified copies of the priority documents have been received.
   2. ☐ Certified copies of the priority documents have been received in Application No. _____ .
   3. ☐ Copies of the certified copies of the priority documents have been received in this national stage application from the International Bureau (PCT Rule 17.2(a)).

   * Certified copies not received: _____ .

   Applicant has THREE MONTHS FROM THE "MAILING DATE" of this communication to file a reply complying with the requirements noted below. Failure to timely comply will result in ABANDONMENT of this application. **THIS THREE-MONTH PERIOD IS NOT EXTENDABLE.**

5. ☐ CORRECTED DRAWINGS (as "replacement sheets") must be submitted.
   - ☐ including changes required by the attached Examiner's Amendment / Comment or in the Office action of Paper No./Mail Date _____ .

   **Identifying indicia such as the application number (see 37 CFR 1.84(c)) should be written on the drawings in the front (not the back) of each sheet. Replacement sheet(s) should be labeled as such in the header according to 37 CFR 1.121(d).**

6. ☐ DEPOSIT OF and/or INFORMATION about the deposit of BIOLOGICAL MATERIAL must be submitted. Note the attached Examiner's comment regarding REQUIREMENT FOR THE DEPOSIT OF BIOLOGICAL MATERIAL.

**Attachment(s)**

1. ☐ Notice of References Cited (PTO-892)
2. ☑ Information Disclosure Statements (PTO/SB/08), Paper No./Mail Date 01/10/2020.
3. ☐ Examiner's Comment Regarding Requirement for Deposit of Biological Material _____ .
4. ☐ Interview Summary (PTO-413), Paper No./Mail Date. _____ .
5. ☐ Examiner's Amendment/Comment
6. ☑ Examiner's Statement of Reasons for Allowance
7. ☐ Other _____ .

| /ERIC F WINAKUR/<br>Primary Examiner, Art Unit 3791 | /CHU CHUAN LIU/<br>Examiner, Art Unit 3791 |
|---|---|

Application/Control Number: 16/544,713                                      Page 2
Art Unit: 3791

### *Allowable Subject Matter*

1.      Claims 2, 4-25 and 27-31 are allowed.


2.      The following is an examiner's statement of reasons for allowance: The IDS filed on 01/10/2020 has been considered. The claims remain allowable for the reasons of record. A signed copy of the 1449 is attached for completeness of Applicant's records.


Any comments considered necessary by applicant must be submitted no later than the payment of the issue fee and, to avoid processing delays, should preferably accompany the issue fee.  Such submissions should be clearly labeled "Comments on Statement of Reasons for Allowance."


3.      Any inquiry concerning this communication or earlier communications from the examiner should be directed to CHU CHUAN LIU whose telephone number is (571)270-5507.  The examiner can normally be reached on M-Th (8am-6pm).

Examiner interviews are available via telephone, in-person, and video conferencing using a USPTO supplied web-based collaboration tool. To schedule an interview, applicant is encouraged to use the USPTO Automated Interview Request (AIR) at http://www.uspto.gov/interviewpractice.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Jacqueline Cheng can be reached on (571) 272-5596.  The fax phone number for the organization where this application or proceeding is assigned is 571-273-8300.

Application/Control Number: 16/544,713                                        Page 3
Art Unit: 3791

Information regarding the status of an application may be obtained from the

Patent Application Information Retrieval (PAIR) system.  Status information for

published applications may be obtained from either Private PAIR or Public PAIR.

Status information for unpublished applications is available through Private PAIR only.

For more information about the PAIR system, see http://pair-direct.uspto.gov. Should

you have questions on access to the Private PAIR system, contact the Electronic

Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a

USPTO Customer Service Representative or access to the automated information

system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.


/ERIC F WINAKUR/
Primary Examiner, Art Unit 3791


/CHU CHUAN LIU/
Examiner, Art Unit 3791

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

APPLE INC.

Petitioner,

v.

MASIMO CORPORATION,

Patent Owner.

———————

Case IPR2020-01538
U.S. Patent 10,588,554

———————

**DECLARATION OF VIJAY K. MADISETTI, PH.D.**

**MASIMO 2004
Masimo v. Apple
IPR2020-01538**

board 8 would simply be placed over the detectors of Mendelson '799, performing the same function as taught by Ohsaki." Ex. 1003 ¶¶92, 154. Dr. Kenny also illustrates the combination as a circular housing and circular board. Ex. 1003 ¶91.

60.    To the extent Dr. Kenny makes a new argument that contends that a POSITA would "simply place" Ohsaki's rectangular board onto Mendelson '799's circular sensor, I disagree. Dr. Kenny provides no illustration, explanation, or evidence for a combination that uses a long rectangular board, as in Ohsaki, in conjunction with a circular sensor, as in Mendelson '799. But even assuming that a POSITA could design a longitudinal structure that covers all of Mendelson '799's circularly arranged detectors and still avoids the user's physiology (e.g., the radius and ulna), placing Ohsaki's rectangular board onto Mendelson '799's circular sensor would result in asymmetrical pressure because the convex shape would press into the user's body more in some places and less in others. Such differences in pressure at different locations under the convex board would cause an uneven distortion of the ratio of blood to bloodless tissue volumes above different detectors, which Mendelson '799 explains can lead to large errors. Ex. 1012 2:47-57; *see also* 3:27-31 ("changes in the ratio of blood to bloodless tissue volumes…through mechanical pressure exerted by the sensor on the skin"), 3:45-52 ("uncontrollable physiological and physical parameters (e.g., different amounts of contact pressure applied by the sensor on the skin…) can often cause large errors in the oxygen

-40-

saturation readings of a pulse oximeter."). As shown in the figure below, the pressure exerted on the skin by a rectangular cover would be greater along the area where the rectangular convex protrusion presses into the skin (in yellow), and less in other areas where the surface does not press into the skin or does not press into the skin as deeply.



One alteration of Mendelson '799's Fig. 7 to superimpose a longitudinal structure such as Ohsaki's board onto the circular sensor which will result in many different optical and physiological problems such as air gaps, asymmetric environment, and pressure differences (color added to illustrate how a rectangular "longitudinal" convex protrusion might be positioned on the sensor)

61. In fact, Ohsaki illustrates that its convex board creates a differential pressure environment, as shown in both Figures 1 and 2. Ex. 1009 Figs. 1, 2. As shown in Ohsaki, Figures 1 and 2 both show the center of the board exerts the greatest pressure, and pushes into the skin causing distention. This results in air gaps on either side of the board, and a difference in pressure between the region of

-41-

the sensor that distends the skin relatively more (in the middle) versus at the edges, which a POSITA would have been worried would result in the displacement of blood, as warned by Mendelson '799. Ex. 1012 2:47-57. Ohsaki's board does not even contact the skin at its edges, and thus exerts relatively less pressure at those locations.



Magnified partial view of Ohsaki Figs. 1 (left) and 2 (right) with red circles annotating air gaps formed by Ohsaki's convex board

62.    Mendelson '799 also warns that "mechanical pressure exerted by the sensor on the skin" causes large and uncontrollable changes. Ex. 1012 3:15-31. Mendelson '799 explains that creating an asymmetric arrangement, such as would be expected from introducing a rectangular board onto a circular sensor, would result in "uncontrollable physiological and physical parameters" and "large errors in the oxygen saturation readings." Ex. 1012 3:44-52. Such a cover may also create air gaps over some detectors (on the edge of the convex surface), but not others (directly under the peak of the convex surface). But this creates a substantial problem for Mendelson '799's sensor, which uses it symmetrical circular

-42-

arrangement of detectors to try and address the problem of different contact pressure between different users or uses of the device. *See, e.g.*, Ex. 1012 5:60-65. The proposed modification makes the problem much worse by creating differences in contact pressure for the different detectors on Mendelson '799's sensor, thereby eliminating the symmetry Mendelson '799 relies on to help identify and filter out aberrant measurements. *See, e.g.*, Ex. 1012 12:35-13:11.

63.    Adding additional errors, Ohsaki's rectangular board would also create a substantially different optical environment for Mendelson '799's various detectors based on the redirection of light away from some detectors and towards others. Indeed, Mendelson '799 explains that for an oxygen saturation sensor, radial symmetry is important: "a radially-symmetric photodetector array can help to maximize the detection of backscattered light from the skin." Ex. 1012 4:59-65. Mendelson '799's radial array of detectors captures reflected light from all around the centrally located emitter. A POSITA would appreciate that adding Ohsaki's rectangular board to the oxygen saturation sensor of Mendelson '799 eliminates Mendelson '799's radially symmetric environment and adversely impacts the approach in Mendelson '799 that uses multiple detectors arrayed in a ring pattern. Ex. 1012 7:25-37. For example, as discussed further below, a POSITA would have believed that a convex surface directs light to a more central location relative to a flat surface. *See* Section VII.D.1 (below). Thus, some detectors would receive

relatively more concentrated light than other detectors, which disrupts the symmetry of the measurements. Applying Ohsaki's rectangular board to Mendelson '799's circular structure would create a variable physiological and optical environment with different detectors at different distances from the skin—which is the situation Mendelson '799 tries to avoid. *See* Ex. 1012 12:1-16, 12:62-13:7. This undermines Mendelson '799's symmetrically arrayed detector strategy. As shown above, a longitudinal shape might cover some detectors completely and leave other detectors mostly uncovered.

### C. A POSITA Would Have Understood That Ohsaki's Required Measurement Location Would Result In Weak Signals For Mendelson '799's Oxygen Saturation Measurements

64.     In addition to the mechanical, optical, and physiological problems discussed above, a POSITA would also have believed that Dr. Kenny's combination would decrease signal strength, which is the opposite of Dr. Kenny's stated "predictable result[]" of "improved signal strength." Ex. 1003 ¶92; *see also* ¶¶90, 128, 146, 150, 220 (motivated to "improve detection efficiency"). As discussed above, to get any benefit from the convex board, Ohsaki's sensor must be used on the backhand side of the wrist. Ex. 1009 ¶¶[0023]-[0024], Figs. 3A-3B, [0008], [0016], Title, Abstract (wristwatch sensor worn on backside of wrist), ¶[0030] (wristwatch sensor worn on back of forearm); *see also* Sections VII.A.1, VII.A.2, VII.B (above). Ohsaki's measurement location, however, would have dissuaded a

POSITA from modifying Mendelson '799's oximeter based on Ohsaki. As discussed below, at the time, a POSITA would have believed that the backhand side of the wrist's poor optical signal strength made it an unsuitable location for Mendelson '799's circular pulse oximeter. Thus, a POSITA seeking to improve Mendelson '799's pulse oximeter would not have been motivated to use a rectangular board that must be positioned on the backhand side of the wrist.

65.     The inventor of Mendelson '799 previously tried to obtain usable signals for oxygen saturation measurements from the back side of the wrist. *See, e.g.*, Ex. 2003 at 3-4. Mendelson reported that he "had to apply a considerable amount of external pressure on the sensor" to even discern any signal whatsoever, which does not even establish that Mendelson's sensor could calculate an accurate oxygen saturation value. Ex. 2003 at 3-4. Both Ohsaki and Mendelson '799 warn against using too much pressure when taking measurements. *See* Ex. 1012 2:47-53 ("Similarly, variations in contact pressure between the sensor and the skin can cause larger errors…since some of the blood near the superficial layers of the skin may be normally displaced away from the sensor housing towards deeper subcutaneous structures."), 3:27-31 ("It is also well known for example that changes in the ratio of blood to bloodless tissue volumes may occur…through mechanical pressure exerted by the sensor on the skin."); Ex. 1009 ¶[0018] ("the user feels uncomfortable if the pressure applied to the user's wrist…is too high"). Thus, for a

-45-

circular oximeter like that disclosed in Mendelson '799, a POSITA would have believed the back side of the wrist was an unsuitable measurement location due to weak signals.    Indeed, as evidenced by Mendelson 2006, Mendelson pursued development of a forehead sensor, not a wrist sensor.  Ex. 1010 at Abstract.

66.    Years after Mendelson's initial work and filing of the patent application that issued as Mendelson '799, Mendelson was the advisor for research that reported that "there is little supporting evidence that [reflectance-based pulse oximetry] can accurately collect measurements from the chest and wrist."  Ex. 2015 at 3 (Abstract); *see also id.* at 4 (thanking Mendelson for advising on project); Ex. 2014 (Worcester Polytechnic Institute webpage showing submission date of "2013-04-24" and Mendelson as the advisor).  Mendelson's group ultimately obtained usable signals from a sensor located on the palm-side of the wrist, "over the radial artery." Ex. 2015 at 99.

67.    Other research groups in the field also reported that oxygen saturation sensors (which monitor oxygen saturation using both red and infrared signals) would work only if measurements were taken from the palm side of the wrist, close to the oxygen-rich arterial blood.  *See* Ex. 2017 at 2-3 ("Measuring PPG on the wrist is difficult."; "PPG signal[s are] greatly distorted depending on applied pressure….[I]t was verified that proper location of the sensors and pressure on the skin surface are important element[s for] stable PPG measurement."  The "sensor

attachment on the wrist is affected by radius bone structure and radial artery location"); Ex. 2018 at 4 ("reflected red and infrared pulses can only be used for specific areas, such as a radial artery; thus, most areas of the wrist are not available for monitoring").  As shown in the figure below, and consistent with the discussed art, the radial and ulnar arteries are located near the surface (superficial layer) on the palm side of wrist.  Ex. 2010 at 44 (Plate 429) (showing radial and ulnar arteries in superficial layer of the anterior (palm-side) of wrist); *see also* 71 (Plate 456) (showing arteries on palm-side of upper limb).



Superficial layer of palm side (anterior) forearm and wrist, showing that the radial and ulnar arteries are close to the surface
(partial view) Ex. 2010 at 44 (Plate 429), annotated

68.    In contrast, as shown in the figure below, the radial and ulnar arteries are not near the surface of the wrist and forearm's back side.



Superficial layer of back side (posterior) of forearm and wrist
(partial view) Ex. 2010 at 42 (Plate 427)

69.    In fact, even as late as 2016, researchers in the field recognized that "monitoring SpO2 at the wrist using the reflective mode presents challenges with regard to clinical use," and reported a general consensus that "the reflected red and infrared pulses can only be used for specific areas, such as a radial artery; thus, most areas of the wrist are not available for monitoring." Ex. 2018 at 4.

70.    Dr. Kenny relies on "several references that are mentioned within Mendelson '799." Ex. 1003 ¶¶66-69 (citing Ex. 1012 and discussing Ex. 1017 and Ex. 1018). These references also confirm that a POSITA would not have used a circular oxygen saturation sensor on the back side of the wrist. For example, the circular sensor used in Mendelson 1988 (Ex. 1017), like the sensor in Mendelson 2006 (Ex. 1010), took measurements from the forehead. Ex. 1017 at 1; Ex. 1010 at 1. Mendelson 1991 (Ex. 1018) considered whether measurements could be taken from "the ventral side of the forearm." Ex. 1018 at 2. The ventral side of the forearm (i.e., the forearm's palm-side) is the opposite side of the arm from where Ohsaki requires use of its rectangular board. Ex. 1009 ¶[0024]. As Ohsaki explains, its board is not effective for preventing slipping on the palm side of the user's wrist. Ex. 1009 ¶[0023]; *see also* Figs. 3A-3B. In contrast to other sensor locations, such as the forehead or finger, the wrist provides a weaker optical signal, and also has a much more complicated structure with a wide range of different bones, tendons, and musculature.

## D.    A POSITA Would Not Have Been Motivated To Adversely Impact The Optical Signal By Adding A Convex Lens To Mendelson '799's Sensor

71.    A POSITA would further not have been motivated to make Dr. Kenny's proposed combination because it places a convex cover over a circular array of peripheral detectors surrounding centrally located LEDs. As discussed below, a POSITA would have understood that such a combination would direct

-49-

light away from the detectors and thus decrease light collection and optical signal strength—not increase it as Dr. Kenny asserts.

### 1. A POSITA Would Have Understood That A Convex Cover Directs Light To The Center Of The Sensor And Away From The Periphery

72. Petitioner and Dr. Kenny both previously admitted that a convex cover condenses light towards the center of the sensor and away from the periphery in a different petition filed against a related patent. In the Petition in IPR2020-01520 (Ex. 2019), Petitioner explained that a convex cover redirects incoming light towards the center, by relying upon the figure shown below:



Petitioner's illustration from a related IPR showing that light hitting a convex surface is directed more centrally than light hitting a flat surface
(Ex. 2019 at 45)

73. Further, in his declaration in IPR2020-01520 (Ex. 2020), Dr. Kenny confirmed that when using a convex surface as a lens, "the incoming light is 'condensed' toward the center." *See, e.g.*, Ex. 2020 at 69-70 (¶119). Dr. Kenny

-50-

likewise provides the same illustration showing that a convex surface redirects incoming light towards a more central location, as compared to a flat surface. *See, e.g.*, Ex. 2020 at 69-70 (¶¶118-120).

74.    The '554 Patent also illustrates a POSITA's understanding that a convex surface condenses light away from the periphery and towards the sensor's center.  Figure 14B (below) "illustrates how light from emitters (not shown) can be focused by the protrusion 605 onto detectors."  Ex. 1001 36:3-6.  "When the light rays 1420 enter the protrusion 605, the protrusion 605 acts as a lens to refract the rays into rays 1422."  Ex. 1001 36:13-15.  As shown by the '554 Patent, the convex shape directs light from the periphery toward the center.  Ex. 1001 Fig. 14B.



Illustration from the '554 Patent at issue, showing that light hitting a convex surface is directed towards the center
'554 Patent (Ex. 1001) Fig. 14B (highlighting added to show direction of light)

Appx33102

75.    Dr. Kenny asserts that this combination would have resulted in "predictable results" including "improved signal strength." Ex. 1003 ¶92; *see also* ¶87 (discussing Ohsaki and stating that preventing "slippage…increases the strength of the signals"). But, as illustrated below, Dr. Kenny's illustration shows that the combination has a center-located light source (purple) and peripherally located detectors (light blue and dark blue) under the convex cover (red):



Dr. Kenny's Illustration (Ex. 1003 ¶91, partial view)

76.    A POSITA would have believed that Ohsaki's convex surface—like the surfaces discussed by Dr. Kenny and Petitioner in the related IPR—would likewise condense light passing through it to a center location, compared to a flat surface. Because of this redirection of light to a more central location relative to a flat surface, a POSITA would have believed that adding Ohsaki's convex surface to Mendelson '799's sensor would direct relatively more light away from the peripheral detectors and thus decrease the optical signal strength, as compared to a flat surface. Dr. Kenny does not address the change in optical signal resulting from the addition of a convex surface to Mendelson '799's circular ring of peripherally arrayed detectors.

80.    While air gaps may or may not have impacted Ohsaki's much simpler pulse rate linear sensor, a POSITA would have understood that air gaps near the detectors on the peripheral edge of Mendelson '799's more complicated oximeter sensor would create significant noise due to the difference in structure and the more complicated combination of multiple detectors with multiple emitters.  Ex. 1012 Fig. 7, 2:58-64.  In particular, peripheral air gaps would be positioned near or over Mendelson '799's peripheral detectors leading to inconsistent measurements.  A POSITA would not have been motivated to add Ohsaki's convex surface to Mendelson '799's circular sensor because the peripheral detectors would be next to the air gaps.

### 3.    A POSITA Would Not Have Selected A Convex Cover To Protect The Optical Elements

81.    Dr. Kenny also asserts that a POSITA would have been motivated to combine Ohsaki and Mendelson '799 because a convex cover would have protected the optical components.  Ex. 1003 ¶84.  But a convex cover is just one of many different alternatives for protecting the components of a sensor.  For example, the optical elements could be protected by an encapsulation layer of sealing resin.  Indeed, other Mendelson references upon which Dr. Kenny relies use the encapsulation approach to protect the optical components, resulting in a flat surface of epoxy and no protrusion.  Ex. 1003 ¶¶67 (illustrating Ex. 1017 Fig. 2), 68 (illustrating Ex. 1018 Fig. 1); Ex. 1017 Fig. 2 (flat layer of optically clear epoxy);

Ex. 1018 Fig. 1 (flat layer of optically clear epoxy). Both of these references illustrate a device with a flat surface of encapsulating epoxy, and an optical shield between the emitters and detectors that goes to the top of the epoxy. *See* Ex. 1017 at 2-3, Fig. 2; Ex. 1018 Fig. 1.

82.    A POSITA would have understood that a flat cover would provide better protection than a convex surface because it would be less prone to scratches. Ex. 1008 ¶[0106]. In fact, one of Dr. Kenny's cited references, Aizawa, teaches that a flat acrylic plate improves adhesion and detection efficiency for measurements taken from the palm-side of the wrist, next to the artery. *See* Ex. 1006 ¶[0013] ("[A] transparent plate-like member…makes it possible to improve adhesion between the sensor and the wrist and thereby further improve the detection efficiency of pulse waves."); *see also* ¶¶[0026], [0030], [0034]; Ex. 1003 ¶85 (citing Ex. 1006 as evidence of a cover). As discussed above, a POSITA would have viewed the palm side of the wrist (as well as other locations such as the forehead (Ex. 1017; *see also* Ex. 1018 at 1-2)) as a better location for optical measurements than the back side of the wrist. *See* Section VII.C (above). Moreover, unlike Aizawa's flat plate that improves adhesion to the palm side of the wrist, Ohsaki's convex board tends to slip off from the palm side of the wrist. Ex. 1009 ¶[0023]. There would have been no reason for a POSITA to select a convex surface from the many other options, which provide similar or better protection

without the complications and concerns arising from the convex shape. Indeed, a POSITA would have believed a flat surface would have had advantages compared to Ohsaki's board including better adhesion on the palm side of the wrist, and less prone to scratches.

### E.    A POSITA Would Not Have Decreased Signal Strength By Adding A Window Taught By Schulz

83.    Dr. Kenny admits that the combination of Ohsaki and Mendelson '799 does not include "each of the at least four detectors has a corresponding window that allows light to pass through to the detector," and therefore requires further modification. Ex. 1003 ¶¶95, 100-101, 124. As I explain above (Sections VII.B-D), a POSITA would not have been motivated to combine Ohsaki and Mendelson '799. Dr. Kenny nevertheless asserts that a POSITA, after deciding to combine Ohsaki and Mendelson '799, would look to Schulz to decrease the optical signal strength by including windows that reduce the amount of incoming light. Ex. 1003 ¶¶93-101. Dr. Kenny's sole motivation for combining Schulz with Ohsaki and Mendelson '799 (as well as with Mendelson 2006, which is discussed further below, Section VII.F) is "to guard against saturation." Ex. 1003 ¶¶93, 101, 127; *see generally* ¶¶93-95. There is no evidence, however, that saturation of the detector(s) was a problem for the sensors in either Ohsaki or Mendelson '799. A POSITA would have understood saturation of the detector(s) to be a problem associated with a strong signal rather than a weak signal.

-57-

Filed: April 12, 2022

Filed on behalf of:
    Patent Owner Masimo Corporation
By:   Joseph R. Re (Reg. No. 31,291)
      Stephen C. Jensen (Reg. No. 35,556)
      Jarom D. Kesler (Reg. No. 57,046)
      Stephen W. Larson (Reg. No. 69,133)
      Jacob L. Peterson (Reg. No. 65,096)
      William R. Zimmerman (admitted *pro hac vice*)
      Jeremiah S. Helm, Ph.D. (admitted *pro hac vice*)
      KNOBBE, MARTENS, OLSON & BEAR, LLP
      2040 Main Street, Fourteenth Floor
      Irvine, CA 92614
      Tel.:  (949) 760-0404
      Fax:  (949) 760-9502
      E-mail:  AppleIPR2020-1539-554@knobbe.com

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

APPLE INC.

Petitioner,

v.

MASIMO CORPORATION,

Patent Owner.

---

Case IPR2020-01539
U.S. Patent 10,588,554

---

**PATENT OWNER'S NOTICE OF APPEAL TO THE U.S. COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

Pursuant to 28 U.S.C. § 1295(a)(4)(A), 35 U.S.C. §§ 141(c), 142, and 319, 37 C.F.R. §§ 90.2(a) and 90.3, and Rule 4(a) of the Federal Rules of Appellate Procedure, Patent Owner Masimo Corporation ("Masimo") hereby appeals to the United States Court of Appeals for the Federal Circuit from the Judgement – Final Written Decision (Paper No. 41) entered on February 23, 2022 (Attachment A) and from all underlying orders, decisions, rulings, and opinions that are adverse to Masimo related thereto and included therein, including those within the Decision Granting Institution of *Inter Partes* Review, entered March 2, 2021 (Paper 8). Masimo appeals the Patent Trial and Appeal Board's determination that claims 1–12 and 14–28 of U.S. Patent 10,588,554 are unpatentable, and all other findings and determinations, including but not limited to claim construction, as well as all other issues decided adverse to Masimo's position or as to which Masimo is dissatisfied in IPR2020-01539 involving U.S. Patent 10,588,554.

Masimo is concurrently providing true and correct copies of this Notice of Appeal, along with the required fees, with the Director of the United States Patent and Trademark Office and the Clerk of the United States Court of Appeals for the Federal Circuit.

Respectfully submitted,

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated:  April 12, 2022          /Jarom Kesler/
                                Jarom D. Kesler (Reg. No. 57,046)
                                Customer No. 64,735

                                Attorney for Patent Owner
                                Masimo Corporation

# ATTACHMENT A

Trials@uspto.gov                                         Paper 41
571-272-7822                              Entered: February 23, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

APPLE INC.,

Petitioner,

v.

MASIMO CORPORATION,

Patent Owner.

_____

IPR2020-01539
Patent 10,588,554 B2

_____

Before GEORGE R. HOSKINS, ROBERT L. KINDER, and
AMANDA F. WIEKER, *Administrative Patent Judges.*

WIEKER, *Administrative Patent Judge.*

JUDGMENT
Final Written Decision
Determining Some Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

IPR2020-01539
Patent 10,588,554 B2

# I.    INTRODUCTION

## A. Background

Apple Inc. ("Petitioner") filed a Petition requesting an *inter partes* review of claims 1–28 ("challenged claims") of U.S. Patent No. 10,588,554 B2 (Ex. 1001, "the '554 patent").  Paper 3 ("Pet.").  Masimo Corporation ("Patent Owner") waived filing a Preliminary Response.  Paper 7.  We instituted an *inter partes* review of all challenged claims 1–28 on all asserted grounds of unpatentability, pursuant to 35 U.S.C. § 314.  Paper 8 ("Inst. Dec.").

After institution, Patent Owner filed a Response (Paper 23, "PO Resp.") to the Petition, Petitioner filed a Reply (Paper 26, "Pet. Reply"), and Patent Owner filed a Sur-reply (Paper 30, "PO Sur-reply").[1]  An oral hearing was held on December 7, 2021, and a transcript of the hearing is included in the record.  Paper 40 ("Tr.").

We issue this Final Written Decision pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73.  For the reasons set forth below, Petitioner has met its burden of showing, by a preponderance of the evidence, that challenged claims 1–12 and 14–28 of the '554 patent are unpatentable.  However, Petitioner has not met its burden of showing, by a preponderance of the evidence, that challenged claim 13 is unpatentable.

---

[1] After the Sur-reply was filed, we authorized Petitioner to file an Identification of Testimony.  Paper 36.

IPR2020-01539
Patent 10,588,554 B2

### B. Related Proceedings

The parties identify the following matters related to the '554 patent:

*Masimo Corporation v. Apple Inc.*, Civil Action No. 8:20-cv-00048 (C.D. Cal.) (filed Jan. 9, 2020);

*Apple Inc. v. Masimo Corporation*, IPR2020-01538 (PTAB Sept. 2, 2020) (also challenging claims 1–7 and 20–28 of the '554 patent);

*Apple Inc. v. Masimo Corporation*, IPR2020-01520 (PTAB Aug. 31, 2020) (challenging claims of U.S. Patent No. 10,258,265 B1);

*Apple Inc. v. Masimo Corporation*, IPR2020-01521 (PTAB Sept. 2, 2020) (challenging claims of U.S. Patent No. 10,292,628 B1);

*Apple Inc. v. Masimo Corporation*, IPR2020-01523 (PTAB Sept. 9, 2020) (challenging claims of U.S. Patent No. 8,457,703 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01524 (PTAB Aug. 31, 2020) (challenging claims of U.S. Patent No. 10,433,776 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01526 (PTAB Aug. 31, 2020) (challenging claims of U.S. Patent No. 6,771,994 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01536 (PTAB Aug. 31, 2020) (challenging claims of U.S. Patent No. 10,588,553 B2); and

*Apple Inc. v. Masimo Corporation*, IPR2020-01537 (PTAB Aug. 31, 2020) (challenging claims of U.S. Patent No. 10,588,553 B2).

Pet. 3–4; Paper 5, 1–3.

Patent Owner further identifies the following pending patent applications, among other issued and abandoned applications, that claim priority to, or share a priority claim with, the '554 patent:

U.S. Patent Application No. 16/834,538;

U.S. Patent Application No. 16/449,143; and

IPR2020-01539
Patent 10,588,554 B2

U.S. Patent Application No. 16/805,605.

Paper 5, 1–2.

### C. The '554 Patent

The '554 patent is titled "Multi-Stream Data Collection System for Noninvasive Measurement of Blood Constituents," and issued on March 17, 2020, from U.S. Patent Application No. 16/544,713, filed August 19, 2019. Ex. 1001, codes (21), (22), (45), (54). The '554 patent claims priority through a series of continuation and continuation-in-part applications to Provisional Application Nos. 61/078,228 and 61/078,207, both filed July 3, 2008. *Id.* at codes (60), (63).

The '554 patent discloses a two-part data collection system including a noninvasive sensor that communicates with a patient monitor. *Id.* at 2:38–40. The sensor includes a sensor housing, an optical source, and several photodetectors, and is used to measure a blood constituent or analyte, e.g., oxygen or glucose. *Id.* at 2:29–35, 64–65. The patient monitor includes a display and a network interface for communicating with a handheld computing device. *Id.* at 2:45–48.

4

IPR2020-01539
Patent 10,588,554 B2

Figure 1 of the '554 patent is reproduced below.



**FIG. 1**

Figure 1 illustrates a block diagram of data collection system 100 including sensor 101 and monitor 109. *Id.* at 11:47–58. Sensor 101 includes optical emitter 104 and detectors 106. *Id.* at 11:59–63. Emitters 104 emit light that is attenuated or reflected by the patient's tissue at measurement site 102. *Id.* at 14:3–7. Detectors 106 capture and measure the light attenuated or reflected from the tissue. *Id.* In response to the measured light, detectors 106 output detector signals 107 to monitor 109 through front-end interface 108. *Id.* at 14:7–10, 26–32. Sensor 101 also may include tissue shaper 105, which may be in the form of a convex surface that: (1) reduces the thickness of the patient's measurement site; and (2) provides more surface area from which light can be detected. *Id.* at 11:2–14.

Monitor 109 includes signal processor 110 and user interface 112. *Id.* at 15:16–18. "[S]ignal processor 110 includes processing logic that determines measurements for desired analytes . . . based on the signals received from the detectors." *Id.* at 15:21–24. User interface 112 presents

5

the measurements to a user on a display, e.g., a touch-screen display. *Id.* at 15:46–56. The monitor may be connected to storage device 114 and network interface 116. *Id.* at 15:60–16:11.

The '554 patent describes various examples of sensor devices. Figures 14D and 14F, reproduced below, illustrate detector portions of sensor devices.



**FIG. 14D**

**FIG. 14F**

Figure 14D illustrates portions of a detector submount and Figure 14F illustrates portions of a detector shell. *Id.* at 6:44–47. As shown in Figure 14D, multiple detectors 1410c are located within housing 1430 and under transparent cover 1432, on which protrusion 605b (or partially cylindrical protrusion 605) is disposed. *Id.* at 35:36–39, 36:30–37. Figure 14F illustrates a detector shell 306f including detectors 1410c on substrate 1400c. *Id.* at 37:9–17. Substrate 1400c is enclosed by shielding enclosure 1490 and noise shield 1403, which include window 1492a and window 1492b, respectively, placed above detectors 1410c. *Id.* Alternatively, cylindrical housing 1430 may be disposed under noise shield 1403 and may enclose detectors 1410c. *Id.* at 37:47–48.

6

Figures 4A and 4B, reproduced below, illustrate an alternative example of a tissue contact area of a sensor device.



Figures 4A and 4B illustrate arrangements of protrusion 405 including measurement contact area 470. *Id.* at 23:18–24. "[M]easurement site contact area 470 can include a surface that molds body tissue of a measurement site." *Id.* "For example, . . . measurement site contact area 470 can be generally curved and/or convex with respect to the measurement site." *Id.* at 23:39–43. The measurement site contact area may include windows 420–423 that "mimic or approximately mimic a configuration of, or even house, a plurality of detectors." *Id.* at 23:49–63.

### D. *Illustrative Claim*

Of the challenged claims, claims 1 and 20 are independent. Claim 1 is illustrative and is reproduced below.

1. A physiological measurement system comprising:

[a] a physiological sensor device comprising:

    [b] a plurality of emitters configured to emit light into tissue of a user;

    [c] at least four detectors, wherein each of the at least four detectors has a corresponding window that allows light to pass through to the detector;

7

[d] a wall that surrounds at least the at least four detectors; and

[e] a cover that operably connects to the wall and that is configured to be located between tissue of the user and the at least four detectors when the physiological sensor device is worn by the user, wherein:

[f] the cover comprises a single protruding convex surface, and

[g] at least a portion of the cover is sufficiently rigid to cause tissue of the user to conform to at least a portion of a shape of the single protruding convex surface when the physiological sensor device is worn by the user; and

[h] a handheld computing device in wireless communication with the physiological sensor device, wherein the handheld computing device comprises:

[i] one or more processors configured to wirelessly receive one or more signals from the physiological sensor device, the one or more signals responsive to at least a physiological parameter of the user;

[j] a touch-screen display configured to provide a user interface,

wherein:

[k] the user interface is configured to display indicia responsive to measurements of the physiological parameter, and

[l] an orientation of the user interface is configurable responsive to a user input; and

[m] a storage device configured to at least temporarily store at least the measurements of the physiological parameter.

8

IPR2020-01539
Patent 10,588,554 B2

Ex. 1001, 44:51–45:21 (bracketed identifiers a–m added). Independent claim 20 includes limitations substantially similar to limitations [a]–[h] of claim 1. *Id.* at 46:31–52.

### E.  Applied References

Petitioner relies upon the following references:

> Aizawa, U.S. Patent Application Publication No. 2002/0188210 A1, filed May 23, 2002, published December 12, 2002 (Ex. 1006, "Aizawa");

> Inokawa et al., Japanese Patent Application Publication No. 2006-296564 A, filed April 18, 2005, published November 2, 2006 (Ex. 1007, "Inokawa");[2]

> Ohsaki et al., U.S. Patent Application Publication No. 2001/0056243 A1, filed May 11, 2001, published December 27, 2001 (Ex. 1009, "Ohsaki");

> Y. Mendelson et al., "A Wearable Reflectance Pulse Oximeter for Remote Physiological Monitoring," Proceedings of the 28th IEEE EMBS Annual International Conference, 912–915 (2006) (Ex. 1010, "Mendelson-2006"); and

> Bergey, U.S. Patent No. 3,789,601, filed July 15, 1971, issued February 5, 1974 (Ex. 1016, "Bergey").

Pet. 12.

Petitioner also submits, *inter alia*, a Declaration of Dr. Thomas W. Kenny, Ph.D. (Ex. 1003) and a Second Declaration of Dr. Kenny (Ex. 1047). Patent Owner submits, *inter alia*, the Declaration of Dr. Vijay K. Madisetti (Ex. 2004). The parties also provide deposition testimony from Dr. Kenny and Dr. Madisetti, including from this proceeding and others. Exs. 1041–1043, 2006–2009, 2027.

---

[2] Petitioner relies on a certified English translation of Inokawa (Ex. 1008). Ex. 1008, 24. In this Decision, we also refer to the translation.

IPR2020-01539
Patent 10,588,554 B2

### F.  Asserted Grounds of Unpatentability

We instituted an *inter partes* review based on the following grounds.
Inst. Dec. 9, 32.

| Claims Challenged | 35 U.S.C. § | References/Basis |
|---|---|---|
| 1–7, 20–28 | 103 | Aizawa, Inokawa, Ohsaki, Mendelson-2006 |
| 8–19 | 103 | Aizawa, Inokawa, Ohsaki, Mendelson-2006, Bergey |

## II.    DISCUSSION

### A.  Claim Construction

For petitions filed on or after November 13, 2018, a claim shall be
construed using the same claim construction standard that would be used to
construe the claim in a civil action under 35 U.S.C. § 282(b).  37 C.F.R.
§ 42.100(b) (2019).  Petitioner submits that no claim term requires express
construction.  Pet. 11.  Patent Owner submits that claim terms should be
given their ordinary and customary meaning, consistent with the
Specification.  PO Resp. 9.

We agree that no claim terms require express construction.  *Nidec
Motor Corp. v. Zhongshan Broad Ocean Motor Co. Ltd.*, 868 F.3d 1013,
1017 (Fed. Cir. 2017).

### B.  Principles of Law

A claim is unpatentable under 35 U.S.C. § 103(a) if "the differences
between the subject matter sought to be patented and the prior art are such
that the subject matter as a whole would have been obvious at the time the
invention was made to a person having ordinary skill in the art to which said
subject matter pertains."  *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406

10

(2007). The question of obviousness is resolved on the basis of underlying factual determinations, including (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) objective evidence of nonobviousness.[3] *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966). When evaluating a combination of teachings, we must also "determine whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue." *KSR*, 550 U.S. at 418 (citing *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006)). Whether a combination of elements would have produced a predictable result weighs in the ultimate determination of obviousness. *Id.* at 416–417.

In an *inter partes* review, the petitioner must show with particularity why each challenged claim is unpatentable. *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016); 37 C.F.R. § 42.104(b). The burden of persuasion never shifts to Patent Owner. *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015). To prevail, Petitioner must support its challenge by a preponderance of the evidence. 35 U.S.C. § 316(e); 37 C.F.R. § 42.1(d).

We analyze the challenges presented in the Petition in accordance with the above-stated principles.

### C. Level of Ordinary Skill in the Art

Petitioner identifies the appropriate level of skill in the art as that possessed by a person having "a Bachelor of Science degree in an academic discipline emphasizing the design of electrical, computer, or software

---

[3] Patent Owner has not presented objective evidence of non-obviousness.

technologies, in combination with training or at least one to two years of related work experience with capture and processing of data or information." Pet. 10 (citing Ex. 1003 ¶¶ 1–18, 20–21). "Additional education in a relevant field or industry experience may compensate for one of the other aspects of the . . . characteristics stated above." *Id.* at 11.

Patent Owner makes several observations regarding Petitioner's identified level of skill in the art but, "[f]or this proceeding, [Patent Owner] nonetheless applies Petitioner's asserted level of skill." PO Resp. 10.

We adopt Petitioner's assessment as set forth above, which appears consistent with the level of skill reflected in the Specification and prior art.

### D. Obviousness over the Combined Teachings of Aizawa, Inokawa, Ohsaki, and Mendelson-2006

Petitioner contends that claims 1–7 and 20–28 of the '554 patent would have been obvious over the combined teachings of Aizawa, Inokawa, Ohsaki, and Mendelson-2006. Pet. 41–87; *see also* Pet. Reply 1–36. Patent Owner disagrees. PO Resp. 11–67; *see also* PO Sur-reply 1–27.

Based on our review of the parties' arguments and the cited evidence of record, we determine that Petitioner has met its burden of showing by a preponderance of the evidence that claims 1–7 and 20–28 are unpatentable.

### 1. Overview of Aizawa (Ex. 1006)

Aizawa is a U.S. patent application publication titled "Pulse Wave Sensor and Pulse Rate Detector," and discloses a pulse wave sensor that detects light output from a light emitting diode and reflected from a patient's artery. Ex. 1006, codes (54), (57).

12

IPR2020-01539
Patent 10,588,554 B2

Figure 1(a) of Aizawa is reproduced below.



Figure 1(a) is a plan view of a pulse wave sensor. *Id.* ¶ 23. As shown in
Figure 1(a), pulse wave sensor 2 includes light emitting diode ("LED") 21,
four photodetectors 22 symmetrically disposed around LED 21, and
holder 23 for storing LED 21 and photodetectors 22. *Id.* Aizawa discloses
that, "to further improve detection efficiency, . . . the number of the
photodetectors 22 may be increased." *Id.* ¶ 32, Fig. 4(a). "The same effect
can be obtained when the number of photodetectors 22 is 1 and a plurality of
light emitting diodes 21 are disposed around the photodetector 22." *Id.* ¶ 33.

Figure 1(b) of Aizawa is reproduced below.



Figure 1(b) is a sectional view of the pulse wave sensor. *Id.* ¶ 23. As shown in Figure 1(b), pulse wave sensor 2 includes drive detection circuit 24 for detecting a pulse wave by amplifying the outputs of photodetectors 22. *Id.* ¶ 23. Arithmetic circuit 3 computes a pulse rate from the detected pulse wave and transmitter 4 transmits the pulse rate data to an "unshown display." *Id.* The pulse rate detector further includes outer casing 5 for storing pulse wave sensor 2, acrylic transparent plate 6 mounted to detection face 23a of holder 23, and attachment belt 7. *Id.*

Aizawa discloses that LED 21 and photodetectors 22 "are stored in cavities 23b and 23c formed in the detection face 23a" of the pulse wave sensor. *Id.* ¶ 24. Detection face 23a "is a contact side between the holder 23 and a wrist 10, respectively, at positions where the light emitting face 21s of the light emitting diode 21 and the light receiving faces 22s of the photodetectors 22 are set back from the above detection face 23a." *Id.* ¶ 24. Aizawa discloses that "a subject carries the above pulse rate detector 1 on the inner side of his/her wrist 10 . . . in such a manner that the light emitting face 21s of the light emitting diode 21 faces down (on the wrist 10 side)." *Id.* ¶ 26. Furthermore, "the above belt 7 is fastened such that the acrylic transparent plate 6 becomes close to the artery 11 of the wrist 10. Thereby, adhesion between the wrist 10 and the pulse rate detector 1 is improved." *Id.* ¶¶ 26, 34.

### 2. Overview of Inokawa (Ex. 1007)

Inokawa is a Japanese published patent application titled "Optical Vital Sensor, Base Device, Vital Sign Information Gathering System, and Sensor Communication Method," and discloses a pulse sensor device. Ex. 1008 code (57), ¶ 6.

14

IPR2020-01539
Patent 10,588,554 B2

Figure 1 of Inokawa is reproduced below.



Figure 1 illustrates a schematic view of a pulse sensor. *Id.* ¶ 56. Pulse sensor 1 includes box-shaped sensor unit 3 and flexible annular wristband 5. *Id.* ¶ 57. Sensor unit 3 includes a top surface with display 7 and control switch 9, and a rear surface (sensor-side) with optical device component 11 for optically sensing a user's pulse. *Id.*

Figure 2 of Inokawa is reproduced below.



Figure 2 illustrates a schematic view of the rear surface of the pulse sensor. *Id.* ¶ 58. The rear-side (sensor-side) of pulse sensor 1 includes a pair of

15

IPR2020-01539
Patent 10,588,554 B2

light-emitting elements, i.e., green LED 21 and infrared LED 23, as well as photodiode 25 and lens 27. *Id.* In various embodiments, Inokawa discloses that the sensor-side lens is convex. *See id.* ¶¶ 99, 107. Green LED 21 is used to sense "the pulse from the light reflected off of the body (i.e.[,] change in the amount of hemoglobin in the capillary artery)," and infrared LED 23 is used to sense body motion from the change in reflected light. *Id.* ¶ 59. The pulse sensor stores this information in memory. *Id.* ¶ 68. To read and store information, the pulse sensor includes a CPU that "performs the processing to sense pulse, body motion, etc. from the signal . . . and temporarily stores the analysis data in the memory." *Id.* ¶ 69.

Figure 3 of Inokawa is reproduced below.



Figure 3 illustrates a schematic view of a pulse sensor mounted to a base device. *Id.* ¶ 60. Pulse sensor 1 is depicted as mounted to base device 17, which "is a charger with communication functionality." *Id.* When so mounted, sensor optical device component 11 and base optical device

16

component 41 face each other in close proximity. *Id.* ¶ 66. In this position, pulse sensor 1 can output information to the base device through the coupled optical device components. *Id.* ¶ 67. Specifically, the pulse sensor CPU performs the controls necessary to transmit pulse information using infrared LED 23 to photodetector 45 of base device 17. *Id.* ¶¶ 67, 70, 76. In an alternative embodiment, additional sensor LEDs and base photodetectors can be used to efficiently transmit data and improve accuracy. *Id.* ¶ 111.

### 3. Overview of Ohsaki (Ex. 1009)

Ohsaki is a U.S. patent application publication titled "Wristwatch-type Human Pulse Wave Sensor Attached on Back Side of User's Wrist," and discloses an optical sensor for detecting a pulse wave of a human body. Ex. 1009, code (54), ¶ 3. Figure 1 of Ohsaki is reproduced below.



Figure 1 illustrates a cross-sectional view of pulse wave sensor 1 attached on the back side of user's wrist 4. *Id.* ¶¶ 12, 16. Pulse wave sensor 1 includes detecting element 2 and sensor body 3. *Id.* ¶ 16.

17

**Appx35658**

IPR2020-01539
Patent 10,588,554 B2

Figure 2 of Ohsaki, reproduced below, illustrates further detail of detecting element 2.



Figure 2 illustrates a mechanism for detecting a pulse wave. *Id.* ¶ 13. Detecting element 2 includes package 5, light emitting element 6, light receiving element 7, and translucent board 8. *Id.* ¶ 17. Light emitting element 6 and light receiving element 7 are arranged on circuit board 9 inside package 5. *Id.* ¶¶ 17, 19.

"[T]ranslucent board 8 is a glass board which is transparent to light, and attached to the opening of the package 5. A convex surface is formed on the top of the translucent board 8." *Id.* ¶ 17. "[T]he convex surface of the translucent board 8 is in intimate contact with the surface of the user's skin," preventing detecting element 2 from slipping off the detecting position of the user's wrist. *Id.* ¶ 25. By preventing the detecting element from moving, the convex surface suppresses "variation of the amount of the reflected light which is emitted from the light emitting element 6 and reaches the light receiving element 7 by being reflected by the surface of the

18

IPR2020-01539
Patent 10,588,554 B2

user's skin." *Id.* Additionally, the convex surface prevents penetration by "noise such as disturbance light from the outside." *Id.*

Sensor body 3 is connected to detecting element 2 by signal line 13. *Id.* ¶ 20. Signal line 13 connects detecting element 2 to drive circuit 11, microcomputer 12, and a monitor display (not shown). *Id.* Drive circuit 11 drives light emitting element 6 to emit light toward wrist 4. *Id.* Detecting element 2 receives reflected light which is used by microcomputer 12 to calculate pulse rate. *Id.* "The monitor display shows the calculated pulse rate." *Id.*

### 4. Mendelson-2006 (Ex. 1010)

Mendelson-2006 is a journal article titled "A Wearable Reflectance Pulse Oximeter for Remote Physiological Monitoring," and discloses a wireless wearable pulse oximeter connected to a personal digital assistant ("PDA"). Ex. 1010, 1.[4]

Figure 1 of Mendelson-2006 is reproduced below.



---

[4] Petitioner cites to the page numbers added to Exhibit 1010, rather than the native page numbering that accompanies the article. *See, e.g.*, Pet. 20–22. We follow Petitioner's numbering scheme.

IPR2020-01539
Patent 10,588,554 B2

Figure 1 illustrates a sensor module attached to the skin (top), and a photograph of a disassembled sensor module and receiver module (bottom). The sensor module includes an optical transducer, a stack of round printed circuit boards, and a coin cell battery. *Id.* at 2.

Figure 2 of Mendelson-2006 is reproduced below.



Figure 2 depicts a system block diagram of the wearable, wireless, pulse oximeter including the sensor module (top) and the receiver module (bottom). *Id.* The sensor module includes at least one light-emitting diode ("LED"), a photodetector, signal processing circuitry, an embedded microcontroller, and an RF transceiver. *Id.* at 1–2. Mendelson-2006 discloses that a concentric array of discrete photodetectors could be used to increase the amount of backscattered light detected by a reflectance type pulse oximeter sensor. *Id.* at 4. The receiver module includes an embedded

20

**Appx35661**

IPR2020-01539
Patent 10,588,554 B2

microcontroller, an RF transceiver for communicating with the sensor module, and a wireless module for communicating with the PDA. *Id.* at 2.

As a PDA for use with the system, Mendelson-2006 discloses "the HP iPAQ h4150 PDA because it can support both 802.11b and Bluetooth™ wireless communication" and "has sufficient computational resources." *Id.* at 3. Mendelson-2006 further discloses that

> [t]he use of a PDA as a local terminal also provides a low-cost touch screen interface. The user-friendly touch screen of the PDA offers additional flexibility. It enables multiple controls to occupy the same physical space and the controls appear only when needed. Additionally, a touch screen reduces development cost and time, because no external hardware is required. . . . The PDA can also serve to temporarily store vital medical information received from the wearable unit.

*Id.*

The PDA is shown in Figure 3 of Mendelson-2006, reproduced below.



Figure 3 illustrates a sample PDA and its graphical user interface ("GUI"). *Id.* Mendelson-2006 explains that the GUI allows the user to interact with the wearable system. *Id.* "The GUI was configured to present the input and

21

**Appx35662**

output information to the user and allows easy activation of various functions." *Id.* "The GUI also displays the subject's vital signs, activity level, body orientation, and a scrollable PPG waveform that is transmitted by the wearable device." *Id.* For example, the GUI displays numerical oxygen saturation ("SpO$_2$") and heart rate ("HR") values. *Id.*

### 5. *Independent Claim 1*

Petitioner contends that claim 1 would have been obvious over the combined teachings of Aizawa, Inokawa, Ohsaki, and Mendelson-2006. Pet. 41–65. Below, we set forth how the combination of prior art references teaches or suggests the claim limitations that are not disputed by the parties. For those limitations and reasons for combining the references that are disputed, we examine each of the parties' contentions and then provide our analysis.

### i. *"A physiological measurement system comprising"*

The cited evidence supports Petitioner's undisputed contention that Aizawa satisfies the subject matter of the preamble.[5] Pet. 41; *see, e.g.*, Ex. 1006 ¶ 2 ("The present invention relates to a pulse wave sensor for detecting the pulse wave of a subject.").

### ii. *"[a] a physiological sensor device comprising"*

The cited evidence supports Petitioner's undisputed contention that Aizawa discloses a physiological sensor device including a pulse rate detector. Pet. 41–43; *see, e.g.*, Ex. 1006 ¶ 23 (pulse wave sensor 2), Figs. 1(a)–(b).

---

[5] Whether the preamble is limiting need not be resolved because Petitioner shows sufficiently that the preamble's subject matter is satisfied by the art.

IPR2020-01539
Patent 10,588,554 B2

iii.    *"[b] a plurality of emitters configured to emit light into tissue of a user"*
<u>Petitioner's Undisputed Contentions</u>

Petitioner contends that Aizawa discloses an emitter—LED 21—and also states that, in certain embodiments, multiple LEDs may be employed. Pet. 13, 22. Patent Owner does not dispute this contention, and we agree with Petitioner. *See* Ex. 1006 ¶¶ 23 ("LED 21"), 32 ("The arrangement of the light emitting diode 21 and the photodetectors 22 is not limited to this."). For example, Aizawa explains that "[t]he same effect can be obtained when the number of photodetectors 22 is 1 and a plurality of light emitting diodes 21 are disposed around the photodetector." *Id.* ¶ 33.

Petitioner also contends that Inokawa teaches a sensor with two LEDs–a green LED to sense pulse and an infrared LED to sense body motion. Pet. 16, 23. Petitioner also contends that when Inokawa's sensor is mounted on a base device, the infrared LED also is used to wirelessly transmit vital information to the base device. *Id.* at 17–18, 23–24. Patent Owner does not dispute these contentions, and we agree. Inokawa teaches a pair of LEDs 21, 23, where "the basic function of the S-side green LED 21 is to sense the pulse from the light reflected off of the body . . ., while the S-side infrared LED 23 serves to sense body motion from the change in this reflected light." Ex. 1008 ¶¶ 58–59. Inokawa also explains that "vital sign information stored in the memory 63 [of the sensor], such as pulse and body motion, is transmitted to the base device 17 using the S-side infrared LED 23 of the pulse sensor 1 and the B-side PD 45 of the base device 17," such that "there is no need to use a special wireless communication circuit or a communication cable." *Id.* ¶¶ 76–77.

23

IPR2020-01539
Patent 10,588,554 B2

Petitioner's Disputed Contentions

Moreover, Petitioner contends that a person of ordinary skill in the art would have been motivated to modify Aizawa "to include an additional LED as taught by Inokawa to improve the detected pulse wave by distinguishing between blood flow detection and body movement." Pet. 23–24, 26, 43–45. According to Dr. Kenny, "one of ordinary skill would have recognized that this would improve Aizawa's sensor by enabling it to account for motion load through use of the second LED, by detecting and recording body motion in addition to blood flow." Ex. 1003 ¶ 120 (cited at Pet. 43).

As a second and independent motivation, Petitioner also contends that such a modification also would have provided "additional functionality, including that of a wireless communication method," which would have "eliminate[d] problems associated with a physical cable, and, as taught by Inokawa, without requiring a separate RF circuit." Pet. 23–24. Petitioner contends that although Aizawa discloses data transmission, Aizawa "is silent about how such transmission would be implemented." *Id.* at 24. According to Petitioner, a skilled artisan "would have recognized that Aizawa's LED could have been used for wireless data communication with a personal computer to eliminate problems associated with a physical cable, and, as taught by Inokawa, without requiring a separate RF," which "would result in enhanced accuracy of the transmitted information." *Id.* According to Dr. Kenny, "as one of ordinary skill would have recognized, the LEDs provided on the sensor can be used not only to detect pulse rate, but also to 'accurately, easily, and without malfunction' transmit sensed data to a base station." Ex. 1003 ¶ 122.

24

IPR2020-01539
Patent 10,588,554 B2

To illustrate its proposed modification, Petitioner includes annotated and modified views of Aizawa's Figures 1(a) and 1(b), reproduced below. Pet. 25; *see also id.* at 44 (similar figures); Ex. 1003 ¶ 76.



Petitioner's annotated and modified figures depict the sensor of Aizawa with an added "LED B" (illustrated in light purple), as Petitioner contends would have been rendered obvious by Inokawa. *Id.* at 26–27, 44–45; *see also* Ex. 1003 ¶¶ 71–79, 110–129.

Patent Owner's Arguments

Patent Owner disputes Petitioner's contentions regarding the obviousness of modifying Aizawa to include two emitters. *See* PO Resp. 51–58; Sur-reply 23–25.

25

IPR2020-01539
Patent 10,588,554 B2

First, Patent Owner argues that neither Aizawa nor Inokawa discloses a device with both multiple detectors *and* multiple emitters in the *same* sensor, because Aizawa's embodiments have either a single emitter and multiple detectors (e.g., Ex. 1006, Fig. 1(a)) or multiple emitters and a single detector (e.g., *id.* ¶ 33), and Inokawa discloses multiple emitters and a single detector (e.g., Ex. 1008, Fig. 2). *See* PO Resp. 51–52 (citing, e.g., Ex. 1006 ¶ 33, Figs. 1, 2, 4, 5; Ex. 1008 ¶ 58, Fig. 2; Ex. 2004 ¶¶ 100–102). Patent Owner concludes, therefore, that a person of ordinary skill in the art would not have added a second emitter to Aizawa, when Aizawa already discloses an embodiment with multiple LEDs, i.e., an embodiment with only a single detector. PO Resp. 52 (citing, e.g., Ex. 2004 ¶ 103). Patent Owner argues that Dr. Kenny's testimony in this regard "conflicts with the references themselves" and so "is not credible." PO Resp. 35–36 (citing Ex. 1003 ¶¶ 55, 77).

Second, Patent Owner argues that the evidence does not support either of Petitioner's two proffered motivations for modifying Aizawa to include two emitters. As to the first motivation (to measure body movement using a second emitter), Patent Owner asserts that Dr. Kenny erroneously testifies that Aizawa cannot do this with its single emitter. PO Resp. 53 (citing, e.g., Ex. 1006 ¶ 15; Ex. 2007, 400:7–401:10; Ex. 2004 ¶ 104). Patent Owner argues that "Petitioner admits that Aizawa's sensor 'already records and accounts for' motion load." PO Resp. 53 (citing, e.g., Pet. 26; Ex. 1006 ¶ 15; PO Resp. 36; Ex. 2004 ¶ 84). Thus, Patent Owner contends that the proposed motivation would not realize an improvement over Aizawa alone. *Id.*

26

IPR2020-01539
Patent 10,588,554 B2

As to Petitioner's second motivation (to enable transmission of data to a base device using an optical communication link), Patent Owner argues that "Aizawa *already* includes a wireless transmitter . . . so Aizawa does not need to incorporate Inokawa's base device [optical] data transmission arrangement." PO Resp. 54 (citing, e.g., Ex. 1006 ¶¶ 23, 28, 35; Ex. 2004 ¶¶ 105–106). Indeed, Patent Owner argues "Dr. Kenny acknowledged Aizawa identifies no problems with Aizawa's form of data transmission." *Id.* at 55 (citing Ex. 2007, 409:13–410:2). Patent Owner further argues that "Aizawa's goal is 'real-time measuring' with the transmitter 'transmitting the measured pulse rate data to a display'" but that "Inokawa's data transfer approach does *not* allow real-time display of measurements." *Id.* at 55 (citing, e.g., Ex. 1006 ¶¶ 4, 15; Ex. 1008 ¶¶ 70, 74; Ex. 2004 ¶ 107). Patent Owner insists Inokawa does not aid Petitioner's case, because Inokawa discloses the benefits of using a second emitter in only two situations, i.e., first, to improve over a "cable" communication and, second, to avoid use of a "dedicated wireless communication circuit," whereas "Aizawa *already* incorporates a transmitter into its design." *Id.* at 56 (citing, e.g., Ex. 1008 ¶ 4; Ex. 1006 ¶¶ 23, 28; Ex. 2004 ¶ 108).

Third, Patent Owner accuses Petitioner and Dr. Kenny of overlooking further complications that would ensue from modifying Aizawa to have two emitters. Patent Owner argues that Dr. Kenny overlooked how placing "two LEDs in close proximity may cause thermal interference that could create significant issues for sensor performance," and would require "structural changes" to Aizawa's configuration. PO Resp. 57 (citing, e.g., Ex. 2004 ¶¶ 109–110; Ex. 1019, 59–60). Patent Owner also argues that "Petitioner widened Aizawa's emitter cavity to accommodate the extra LED with *no*

27

explanation or recognition of this change," which could impact optical performance of the device. *Id.* at 57–58 (citing, e.g., Ex. 2004 ¶¶ 109–111).

<u>Petitioner's Reply</u>

Concerning Petitioner's first motivation, Petitioner asserts that Aizawa "is silent on whether it uses the computed motion load to improve the detection signal" and thereby provide a "more reliable" pulse reading, which is Petitioner's asserted improvement to Aizawa. Pet. Reply 28–29 (citing, e.g., Ex. 1003 ¶¶ 61–63, 71–72; Ex. 2007, 401:11–402:4; Ex. 1047 ¶ 51). Moreover, Petitioner contends that by using multiple LEDs at different wavelengths, "two separate signals [can] be collected[, which] allows noise arising from body motion to be better isolated and accounted for." *Id.* at 29 (citing Ex. 1047 ¶ 51).

Concerning Petitioner's second motivation, Petitioner maintains that Inokawa's use of two emitters having different wavelengths to upload data to a base device using optical communication advantageously improves the accuracy of the transmission by providing checksum information. Pet. Reply 22–23 (citing, e.g., Ex. 1003 ¶ 123; Ex. 2007, 407:7–408:20, 416:5–15; Ex. 1047 ¶ 52).

As to the "other complications" that Patent Owner alleges would result from the proposed modification, Petitioner asserts "such minor issues are 'part of what [a person of ordinary skill in the art] would bring . . . to the problem and would know how to make the changes needed.'" Pet. Reply 29–30 (quoting Ex. 2007, 384:8–388:12; Ex. 1047 ¶ 53).

IPR2020-01539
Patent 10,588,554 B2

Patent Owner's Sur-reply

Concerning Petitioner's first motivation, Patent Owner argues that Inokawa's disclosure is just as sparse as Aizawa's disclosure regarding how to use optical data to measure body movement.  Sur-reply 23 (citing Ex. 1008 ¶ 59).  Patent Owner also asserts that "Petitioner cites nothing in Inokawa that suggests" that Inokawa's two emitter data gathering is more reliable or otherwise superior to Aizawa's single emitter data gathering.  *Id.* at 23–24.

Concerning Petitioner's second motivation, Patent Owner argues that the proposed modification eliminates Aizawa's ability to conduct "real-time collection and display of physiological measurements—a key goal of Aizawa's system."  *Id.* at 24.

Patent Owner also faults Petitioner for not specifying how a person of ordinary skill in the art would have solved the alleged "additional cost, energy use, and thermal problems" that would ensue from using two emitters in the Aizawa device.  *Id.* at 24–25.

Analysis

Upon review of the foregoing, we conclude a preponderance of the evidence supports Petitioner's contention that it would have been obvious to replace Aizawa's single near infrared LED 21 with an infrared LED and a green LED, in light of Inokawa.

First, a person of ordinary skill in the art would have been motivated to make this replacement to improve the pulse measurements recorded by Aizawa's detector 1.  Inokawa teaches that the infrared LED's signal can be used "to detect vital signs" such as "body motion," and the green LED's

29

IPR2020-01539
Patent 10,588,554 B2

signal can be "used to detect pulse." Ex. 1008, Fig. 2, ¶¶ 14, 58–59;
Ex. 1003 ¶¶ 64, 72, 75–78; Ex. 1047 ¶¶ 50–51.

Patent Owner correctly points out that Aizawa describes its
single-emitter detector 1 as transmitting its pulse data to "a device for
computing the amount of motion load from the pulse rate." Ex. 1006 ¶¶ 15,
28, 35. But, this description is the only disclosure in Aizawa cited by Patent
Owner as relating to computing a motion characteristic of the user. Further,
we are unable to discern any other disclosure in Aizawa relating to motion
computation, or what Aizawa proposes to do with its motion computation.
*See id.* Based on the sparse nature of Aizawa's disclosure concerning
motion load, it is not clear exactly what Aizawa proposes to do with the
computed motion load, after it is computed. *See, e.g.*, Ex. 1047 ¶ 51
("Aizawa is silent on whether it uses the computed motion load to improve
the detection signal."). Aizawa does, however, describe the motion load as
being computed "from the pulse rate," rather than being an input to the pulse
rate calculation. Ex. 1006 ¶¶ 15, 35.

Dr. Kenny, when asked whether it was his understanding that
"Aizawa's sensor could not account for motion load?", answered that
"Aizawa's sensor attempts to prevent motion load rather than account for it."
Ex. 2007, 400:7–11. He explained that, because Aizawa uses only a single
emitter with a single wavelength, "what [Aizawa] sees as a signal would be
some mixture of pulse rate and motion load if there was no effort to prevent
motion load," so Aizawa seeks to solve the problem of "prevent[ing] motion
load from corrupting the pulse rate signal." *Id.* at 400:12–401:10.
Dr. Kenny did not further explain this distinction between preventing and
accounting for motion load in his deposition testimony cited by the parties as

relating to this issue. *Id.* at 400:7–402:4. We do not rely on this distinction as a basis for our present decision, because we find no express support for it in Aizawa's disclosure (*see* Ex. 1006 ¶¶ 15, 28, 35), and it is not explained in persuasive detail by Dr. Kenny.

We nonetheless credit Dr. Kenny's declaration testimony that a person of ordinary skill in the art, upon reviewing Inokawa's disclosure of using two emitters of different wavelengths to calculate a user's pulse and motion separately, would understand that these two separate measurements would enable the device to calculate a "more reliable" pulse rate because it "allows noise arising from body motion to be better isolated and accounted for." Ex. 1047 ¶ 51; *see also* Ex. 1003 ¶¶ 73, 77, 122–123, 126. Aizawa does not disclose using the computed motion load in this fashion, so it appears that this would improve upon the accuracy of Aizawa's pulse measurements, by using the computed motion load to isolate and account for noise. *See* Ex. 1006 ¶¶ 15, 28, 35.

Dr. Madisetti also offers no meaningful opposing testimony in this regard. *See, e.g.*, Ex. 2004 ¶ 104. Instead, Dr. Madisetti incorrectly reads Dr. Kenny's motivation testimony as being limited to the desirability of adding the bare ability to measure body movement to Aizawa. *See id.* In fact, Dr. Kenny further testified that it would have been beneficial to *use* the measured body movement to *improve* the pulse measurement of the device. *See* Ex. 1003 ¶ 120; Ex. 1047 ¶ 51. Dr. Madisetti does not address that testimony. *See* Ex. 2004 ¶ 104.

Thus, because Dr. Madisetti's testimony sets up a straw man to attack, rather than directly addressing the entirety of Dr. Kenny's testimony in this regard, Dr. Kenny's testimony stands unrebutted in the record before us.

IPR2020-01539
Patent 10,588,554 B2

Dr. Kenny's testimony also makes intuitive sense that measuring the user's motion *separately* from the user's pulse, for example by using two interrogating emitters of two different wavelengths, would provide a reliable means of correcting the pulse data for motion artifacts by using the separately measured motion data, rather than by trying to segregate these two components in the single data stream provided by Aizawa's single emitter device. *See, e.g.*, Ex. 1047 ¶ 51. We, therefore, are persuaded by Dr. Kenny's unrebutted testimony that using two emitters of different wavelengths would improve Aizawa's device in this way.

Independently, we are also persuaded that a person of ordinary skill in the art would have been motivated to replace Aizawa's single near infrared LED 21 with an infrared LED and a green LED, to provide a reliable method of uploading pulse data stored by Aizawa's wrist-worn pulse rate detector 1 to another device for display to the user. Inokawa expressly touts such optically-based uploading of data from Inokawa's wrist-worn sensor 1 to Inokawa's base device 17 as a benefit of incorporating two emitters in sensor 1. *See* Ex. 1008, Figs. 3, 19, ¶¶ 3–7, 14, 76–77, 109–111. Inokawa identifies two specific benefits of this optically-based data communication means. First, the infrared LED can transmit the pulse data, and the green LED can separately transmit "checksum" information to increase the accuracy of data transmission. *Id.* at Fig. 19, ¶¶ 14, 109–111. Second, using light emitters in this fashion to perform two functions (data collection by emitting light into the user's wrist, and data transmission by emitting light to photodetectors in a base device) obviates the need for providing "a special wireless communication circuit [in the wrist-worn sensor 1] or a communication cable." *Id.* ¶¶ 3–7, 76–77.

32

IPR2020-01539
Patent 10,588,554 B2

Patent Owner correctly points out that Aizawa already has a "transmitter" 4 for uploading pulse data stored by Aizawa's wrist-worn pulse rate detector 1 to another device for processing and for display to the user. Ex. 1006, Fig. 1(b), ¶¶ 15, 23, 28, 35. However, Aizawa's Figure 1(b) illustrates transmitter 4 only as an empty box contained within outer casing 5, and Aizawa's written description does not provide further structural details concerning transmitter 4. *See id.* In particular, Aizawa does not describe exactly how transmitter 4 transmits its data to the other device. *See id.*

Patent Owner contends, and Dr. Madisetti and Dr. Kenny both testify, that Aizawa's transmitter 4 is a "wireless" transmitter. *See, e.g.*, PO Resp. 54; Ex. 2004 ¶¶ 49, 105–106, 112; Ex. 2007, 403:17–22, 414:19–21. They all appear to equate "wireless" communication to radio frequency communication, and not to include optical communication, even though both radio frequency and optical communication do not use a wire. Petitioner disagrees that Aizawa discloses any specific form of data transmission, including wireless transmission. *See* Tr. 71:5–72:3 ("[T]he transmitter disclosure in Aizawa, they don't say its's a wireless transmitter. That was a conjuration by [Patent Owner]. They don't specify whether it's a wired or wireless."). We assume, for this decision, that Aizawa expressly contemplates radio frequency communication as one embodiment by which transmitter 4 may transmit data to devices other than detector 1.

Patent Owner argues, and Dr. Madisetti testifies, that Aizawa's express disclosure goes even further. They assert Aizawa's "goal" is to measure and display pulse data *in real time during exercise*, using the wireless transmitter. *See, e.g.*, Ex. 2004 ¶¶ 106–108, 111. We find that

33

Aizawa does not support this assertion.  Instead, Aizawa discusses prior art devices that "estimat[e] a burden on the heart of a person who takes exercise by *real-time measuring* his/her heart rate at the time of exercise" (Ex. 1006 ¶ 4 (emphasis added)), and then describes Aizawa's detector 1 as having a transmitter for transmitting the measured pulse rate data to another device for display (*id.* ¶ 15).  Aizawa does not indicate when this transmission occurs.  Aizawa also refers to "noise caused by the shaking of the body of the subject" as a problem to be addressed (*id.* ¶ 6), but this problem occurs regardless of whether the shaking results from exercise or the normal movement of the user's wrist over the course of the day.  Thus, Aizawa does not tout, as an important feature of Aizawa's invention, the *real time display* of pulse rate data during exercise, regardless of whether the data gathered by Aizawa's wrist-worn detector 1 is transmitted wirelessly or otherwise.  *Id.* ¶¶ 4, 6, 15.

    No doubt, a person of ordinary skill in the art would have viewed the capability of a wrist-worn pulse detector to transmit its pulse data to another device for display in real time while the user is exercising to be a desirable feature in some cases, even if this is not one of Aizawa's specifically stated goals.  *See, e.g.*, Ex. 1003 ¶ 67 (Dr. Kenny stating: "By wirelessly transmitting the collected data wirelessly, Mendelson 2006's system provides 'numerous advantages,' . . . ."); Ex. 2009, 393:6–14 (Dr. Kenny agreeing that a person of ordinary skill in the art "would have seen the ability to wirelessly transmit collected data as an advantage").  Nonetheless, Inokawa expressly discloses that, in other cases, the benefits achieved by wireless transmission can be outweighed by obviating the need for the wrist-worn sensor to include a special wireless communication circuit.  *See*

34

IPR2020-01539
Patent 10,588,554 B2

Ex. 1008 ¶¶ 3–7 (discussing problems associated with wireless transmission, such as the need for a dedicated circuit, which is avoided by Inokawa's system that risks "few malfunctions" and has a "simple structure"), 76–77 ("As a result, there is no need to use a special wireless communication circuit . . ., which makes it possible to transmit vital sign information to the base device 17 accurately, easily, and without malfunction.").  We therefore conclude that Petitioner's case for obviousness in this regard is supported by a preponderance of the evidence.  *See, e.g.*, *In re Urbanski*, 809 F.3d 1237, 1243–44 (Fed. Cir. 2016) (persons of ordinary skill in the art may be motivated to pursue desirable properties of one prior art reference, even at the expense of foregoing a benefit taught by another prior art reference).

We disagree with Patent Owner's argument that Petitioner's case for obviousness is deficient on the basis that neither Aizawa nor Inokawa expressly discloses a wrist-worn sensor device that has *both* a plurality of emitters *and* at least four detectors, as claim 1 recites.  Obviousness does not require "'some motivation or suggestion to combine the prior art teachings' [to] be found in the prior art."  *KSR*, 550 U.S. at 407, 415–418.  Nor does it require the bodily incorporation of Inokawa's device into Aizawa's device.  *See, e.g.*, *In re Keller*, 642 F.2d 413, 425 (CCPA 1981) (test for obviousness is not whether the features of one reference may be bodily incorporated into the structure of the other reference, but rather is "what the combined teachings of the references would have suggested to those of ordinary skill in the art"); *see also In re Merck & Co.*, 800 F.2d 1091, 1097 (Fed. Cir. 1986) (nonobviousness is not established by attacking references individually when unpatentability is predicated upon a combination of prior art disclosures).  Instead, "[a] person of ordinary skill is also a person of

35

ordinary creativity, not an automaton," and "in many cases a person of ordinary skill will be able to fit the teachings of multiple patents together like pieces of a puzzle." *KSR*, 550 U.S. at 420–421.

In this case, we are persuaded that a person of ordinary skill in the art would have been motivated to modify Aizawa's wrist-worn detector 1 to replace its single near infrared LED 21 with an infrared LED and a green LED, based on Inokawa, for all the reasons provided above. A person of ordinary skill in the art would additionally have known to keep all four detectors 22 that are already present in Aizawa's detector 1, so that "[e]ven when the attachment position of the sensor is dislocated, a pulse wave can be detected accurately," as disclosed by Aizawa. Ex. 1006 ¶¶ 9, 27. In short, the combination of Aizawa and Inokawa teaches that having multiple emitters is beneficial, and having multiple detectors is beneficial, for different and not inconsistent reasons.

Finally, we agree with Petitioner's position that any thermal interference and power consumption issues that may arise in Aizawa's wrist-worn pulse detector, by using two emitters instead of one emitter, are well within the capabilities of POSITA to solve. We credit Dr. Kenny's testimony in this regard. *See* Ex. 1003 ¶¶ 78–79, 121; Ex. 1047 ¶ 53. For example, Dr. Kenny acknowledges that Aizawa already discloses adding additional emitters. Ex. 1003 ¶ 71 (citing Ex. 1006 ¶¶ 32–33). Dr. Kenny further testifies that this modification "amount[s] to nothing more than the use of a known technique [i.e., Inokawa's use of two emitters in a wrist-worn pulse detector] to improve similar devices [i.e., Aizawa's wrist-worn pulse detector] in the same way, and combining prior art elements according to known methods to yield predictable results." *Id.*

IPR2020-01539
Patent 10,588,554 B2

¶¶ 78 ("Furthermore, one of ordinary skill would have readily understood how to select different photodiodes with different sensitivities to detect the different wavelengths of light emitted by the two LEDs."), 121.

Patent Owner cites several portions of Dr. Kenny's deposition testimony that, in Patent Owner's view, indicate Dr. Kenny fails to appreciate the significance of the thermal effects, optical interference complications, and power consumption needs, that are posed by adding a second emitter to Aizawa's device, and fails to explain how these issues would have been overcome. *See* PO Resp. 55, 57–58 (citing Ex. 2007, 379:17–21, 384:8–388:16, 394:11–395:22, 405:2–11, 409:13–410:2; Ex. 2009, 381:18–382:8, 383:22–385:9, 390:5–392:3). We have reviewed this deposition testimony, and we conclude Patent Owner overstates its significance. It establishes, at most, that Dr. Kenny did not expressly address these issues in his declaration (Exhibit 1003), but Dr. Kenny's opinion is that these issues would have been within the capability of a person of ordinary skill in the art to resolve. Based on the evidentiary record presented to us, we agree with Dr. Kenny. For example, Inokawa discloses a wrist-worn pulse sensor 1 having two emitters 21 and 23 in close proximity to each other. *See* Ex. 1008, Figs. 1–2. An artisan must be presumed to know something about the art apart from what the relied-upon references disclose. *See In re Jacoby*, 309 F.2d 513, 516 (CCPA 1962).

Dr. Madisetti's testimony opposing Dr. Kenny's foregoing opinion is premised solely on Dr. Kenny's alleged failure to explain how the issues that arise from adding a second emitter to Aizawa would have been solved; Dr. Madisetti does not provide any affirmative reason why these issues would have been difficult for a person of ordinary skill in the art to solve, in

37

IPR2020-01539
Patent 10,588,554 B2

the context of Aizawa's device or wrist-worn pulse sensing devices in general.  *See* Ex. 2004 ¶ 109.

Thus, we conclude a person of ordinary skill in the art would have been motivated to replace Aizawa's single near infrared LED 21 with an infrared LED and a green LED, and would have had a reasonable expectation of success in doing so.

iv.     *"[c] at least four detectors, wherein each of the at least four detectors has a corresponding window that allows light to pass through to the detector"*

The cited evidence supports Petitioner's undisputed contention that Aizawa discloses at least four detectors, each stored in a separate cavity 23c, which would have been understood to be "openings or windows that mirror specific detector placement layouts."  Pet. 45, 49–51; *see, e.g.*, Ex. 1006 ¶¶ 23 ("four phototransistors 22"), 24 ("stored in cavities" and "set back from . . . detection face 23a"), Figs. 1(a)–1(b); Ex. 1003 ¶¶ 138–143.

v.     *"[d] a wall that surrounds at least the at least four detectors"*

The cited evidence supports Petitioner's undisputed contention that Aizawa discloses holder 23, which is a wall that surrounds detectors 22, as well as other elements.  Pet. 51–52; *see, e.g.*, Ex. 1006 ¶ 23 ("holder 23 for storing . . . light emitting diode 21 and the photodetectors 22"), Fig. 1(b).

38

IPR2020-01539
Patent 10,588,554 B2

vi.    *"[e–g] a cover that operably connects to the wall and that is configured
to be located between tissue of the user and the at least four detectors
when the physiological sensor device is worn by the user, wherein: the
cover comprises a single protruding convex surface, and at least a
portion of the cover is sufficiently rigid to cause tissue of the user to
conform to at least a portion of a shape of the single protruding convex
surface when the physiological sensor device is worn by the user"*

Petitioner's Undisputed Contentions

Petitioner contends that Aizawa discloses a cover, i.e., an "acrylic
transparent plate positioned between the photodetectors and the wrist," to
improve adhesion between the sensor and the subject's wrist.  Pet. 15.
Patent Owner does not dispute this contention, and we agree with Petitioner.
Aizawa discloses that "acrylic transparent plate 6 is provided on the
detection face 23a of the holder 23 to improve adhesion to the wrist 10."
Ex. 1006 ¶ 34, Fig. 1(b) (depicting transparent plate 6 between sensor 2 and
wrist 10).

Petitioner also contends that Ohsaki teaches a wrist-worn sensor that
includes a "translucent board" having a convex surface that contacts the
user's skin.  Pet. 19, 34.  Patent Owner does not dispute this contention, and
we agree with Petitioner.  Ohsaki discloses that sensor 1 includes detecting
element 2 and sensor body 3, and is "worn on the back side of the user's
wrist."  Ex. 1009 ¶ 16.  Ohsaki discloses that detecting element 2 includes
package 5 and "translucent board 8[,which] is a glass board which is
transparent to light, [and is] attached to the opening of the package 5.  A
convex surface is formed on the top of the translucent board 8."  *Id.* ¶ 17.
As seen in Ohsaki's Figure 2, translucent board 8 has a single protruding
convex surface, which is placed between a user's tissue and a light receiving
element (e.g., photodetector) 7 when the sensor is worn.  *Id.* at Fig. 2.  As

39

also seen in Figure 2, the board 8 is operably connected to the walls of sensor package 5. *Id.* ¶ 17 ("The translucent board 8 is . . . attached to the opening of the package 5."), Fig. 2.

Petitioner also contends that Ohsaki's Figure 2 depicts the user's tissue conforming to the shape of the convex surface of the cover, such that the convex surface would have been understood to be "sufficiently rigid." Pet. 56. Patent Owner does not dispute this contention, and we agree with Petitioner. Ohsaki's Figure 2 depicts the user's tissue 4 conforming to the shape of the protruding convex surface when the sensor is worn by the user. Ex. 1009 ¶ 17 ("The translucent board 8 is a glass board."), Fig. 2; *see, e.g.*, Ex. 1003 ¶¶ 160 (testifying as to the convex surface's rigidity), 164.

<u>Petitioner's Disputed Contentions</u>

Petitioner further contends that a person of ordinary skill in the art "would have found it obvious to modify the sensor's flat cover [in Aizawa] . . . to include a lens/protrusion . . . similar to Ohsaki's translucent board 8, so as to [1] improve adhesion between the user's wrist and the sensor's surface, [2] improve detection efficiency, and [3] protect the elements within sensor housing." Pet. 36–37 (citing, e.g., Ex. 1003 ¶¶ 94–97; Ex. 1009 ¶¶ 25), 53–54 (citing, e.g., Ex. 1003 ¶¶ 71–102). Petitioner contends that Ohsaki's convex surface is in "intimate contact" with the user's tissue, which prevents slippage of the sensor and increases signal strength because "variation of the amount of the reflected light . . . that reaches the light receiving element 7 is suppressed" and because "disturbance light from the outside" is prevented from penetrating board 8, as compared to a sensor with a flat surface. *Id.* at 34–36 (citing, e.g., Ex. 1003 ¶ 95; quoting Ex. 1009 ¶ 25).

40

Accordingly, Petitioner contends that a person of ordinary skill in the art would have modified Aizawa's sensor to include a cover with a single convex protrusion, as taught by Ohsaki, "that operably connects to the wall and that is configured to be located between tissue of the user and the at least four detectors when the sensor is worn by the user." Pet. 36–37 (citing, e.g., Ex. 1003 ¶¶ 94–97), 53–54 (citing, e.g., Ex. 1003 ¶¶ 147–153). Petitioner also contends that an ordinarily skilled artisan would have configured the cover to be "sufficiently rigid to cause tissue of the user to conform to the shape of the surface when worn by the user." *Id.* at 56 (citing, e.g., Ex. 1003 ¶¶ 61–69, 71–161).

Petitioner contends this modification would have been "nothing more than the use of a known technique to improve similar devices in the same way," i.e., "simply improving Aizawa-Inokawa's transparent plate 6 that has a flat surface to improve adhesion to a subject's skin and reduce variation in the signals detected by the sensor." Pet. 37 (citing Ex. 1003 ¶ 98). Further according to Petitioner, "the elements of the combined system would each perform functions they had been known to perform prior to the combination—Aizawa-Inokawa's transparent plate 6 would remain in the same position, performing the same function, but with a convex surface as taught by Ohsaki." *Id.* at 37–38 (citing, e.g., Ex. 1003 ¶¶ 94–99), 53–54 (citing Ex. 1003 ¶¶ 71–102).

To illustrate its proposed modification, Petitioner includes two annotated versions of Aizawa's Figure 1(b), both of which are reproduced below. Pet. 36–37 (citing Ex. 1003 ¶¶ 94–97), 53–54.

41

IPR2020-01539
Patent 10,588,554 B2



Petitioner's annotated figure on the left depicts Aizawa's sensor, modified to include LED B (*see supra* Section II.D.5.iii) and with a flat "light permeable cover" (illustrated with blue outline); Petitioner's annotated figure on the right depicts Aizawa's sensor, again modified to include LED B (*see supra* Section II.D.5.iii) and with a convex "light permeable cover" (illustrated with yellow shading and green outline).

Patent Owner's Arguments

Patent Owner argues that a person of ordinary skill in the art would not have been motivated to modify Aizawa's sensor to include Ohsaki's convex cover.  PO Resp. 20–51; PO Sur-Reply 3–22.

First, Patent Owner argues that the proposed modification "changes Ohsaki's structure and eliminates the longitudinal shape that gives Ohsaki's translucent board the ability to prevent slipping."  PO Resp. 21.  This argument is premised on Patent Owner's contention that Ohsaki's convex cover must be rectangular, with the cover's long direction aligned with the length of the user's forearm, to avoid interacting with bones in the wrist and forearm.  *Id.* at 22–24 (citing, e.g., Ex. 2004 ¶¶ 52–54; Ex. 1009 ¶¶ 6, 19, 23, 24); *see also* PO Sur-reply 3–10.  According to Patent Owner, Ohsaki teaches that "aligning the sensor's longitudinal direction with the

42

circumferential direction of the user's arm undesirably results in 'a tendency [for Ohsaki's sensor] to slip off.'"  PO Resp. 23–24 (citing Ex. 1009 ¶ 19).

Thus, Patent Owner contends that Petitioner's proposed modification would "chang[e] Ohsaki's rectangular board into a circular shape," which "would eliminate the advantages discussed above" because it "cannot be placed in *any longitudinal* direction and thus cannot coincide with the longitudinal direction of the user's wrist."  *Id.* at 24 (citing Ex. 2004 ¶¶ 55–57).  Patent Owner presents annotated Figures depicting what it contends is Ohsaki's disclosed sensor placement as compared to that of the proposed modification, reproduced below.



Patent Owner's annotated Figure on the left depicts a rectangular sensor placed between a user's radius and ulna, while Patent Owner's annotated Figure on the right depicts a circular sensor placed across a user's radius and ulna.  Based on these annotations, Patent Owner argues that the proposed "circular shape would press on the user's arm in all directions and thus cannot avoid the undesirable interaction with the user's bone structure," such that a skilled artisan "would have understood such a change would eliminate

IPR2020-01539
Patent 10,588,554 B2

Ohsaki's benefit of preventing slipping." *Id.* at 25 (citing, e.g., Ex. 2004 ¶¶ 54–61).

Second, Patent Owner argues that Ohsaki requires its sensor be placed on the back of the user's wrist to achieve any benefits, but that such a location would have been unsuitable for Aizawa's sensor. PO Resp. 30. Specifically, Patent Owner argues that Aizawa's sensor must be worn on the palm side of the wrist, close to radial and ulnar arteries, which is the side opposite from where Ohsaki's sensor is worn. *Id.* at 30–35 (citing, e.g., Ex. 1006 ¶¶ 2, 7, 9, 26, 27, 36; Ex. 2004 ¶¶ 66–70). According to Patent Owner, Ohsaki teaches that the sensor's convex surface has a tendency to slip when placed on the palm side of the wrist, i.e., in the location taught by Aizawa. *Id.* at 36–38 (citing, e.g., Ex. 1009 ¶¶ 19, 23, 24; Ex. 2004 ¶¶ 74–80). Thus, Patent Owner argues that a person of ordinary skill in the art "would not have been motivated to use Ohsaki's longitudinal board— designed to be worn on the ***back side*** of a user's wrist—with Aizawa's ***palm-side*** sensor." *Id.* at 39. Similarly, Patent Owner argues that Aizawa teaches away from the proposed modification because Aizawa teaches that its flat acrylic plate improves adhesion on the palm side of the wrist, while Ohsaki teaches that its convex board "has a tendency to slip" on the palm side of the wrist. *Id.* at 39–41 (citing, e.g., Ex. 2004 ¶¶ 82–84).

Third, Patent Owner argues that a person of ordinary skill in the art would not have placed Ohsaki's convex cover over Aizawa's peripheral detectors because the convex cover would condense light toward the center and away from Aizawa's detectors, which would decrease signal strength. PO Resp. 42–48 (citing, e.g., Ex. 2004 ¶¶ 85–97). Patent Owner also contends that Petitioner and Dr. Kenny admitted as much in a related

44

IPR2020-01539
Patent 10,588,554 B2

proceeding. *Id.* at 43–44 (citing, e.g., Ex. 2019, 45; Ex. 2020, 69–70). Patent Owner also relies on Figure 14B of the '554 patent to support its position. *Id.* at 44–45 (citing Ex. 1001, 36:3–6, 36:13–15). Additionally, Patent Owner argues that its position is also supported by Inokawa, which also uses a convex lens to direct light toward the center but, in Inokawa's structure, the light is directed from peripheral emitters toward a central detector. *Id.* at 48–50 (citing, e.g., Ex. 1008 ¶¶ 15, 58). In light of the foregoing, Patent Owner argues that a person of ordinary skill in the art would have understood that the proposed modification would have decreased signal strength by directing light away from Aizawa's peripheral detectors. *Id.* at 45–48.

Fourth and finally, Patent Owner argues that a person of ordinary skill in the art "would have understood that Aizawa's ***flat*** plate would provide better protection than a convex surface" because it "would be less prone to scratches." *Id.* at 50–51 (citing Ex. 1008 ¶ 106).

Petitioner's Reply

Concerning Patent Owner's first and second arguments, Petitioner responds that Ohsaki does not disclose the shape of its protrusion, other than its convexity as shown in Figures 1 and 2, nor does Ohsaki require a rectangular shape or placement on the back of the wrist in order to achieve the disclosed benefits. Pet. Reply 13–19 (citing, e.g., Ex. 1047 ¶¶ 16–27). Moreover, Petitioner asserts that "even if Ohsaki's translucent board 8 were somehow understood to be rectangular, obviousness does not require 'bodily incorporation' of features from one reference into another"; rather, a person of ordinary skill in the art "would have been fully capable of modifying Aizawa to feature a light permeable protruding convex cover to obtain the

45

IPR2020-01539
Patent 10,588,554 B2

benefits" taught by Ohsaki. *Id.* at 15–16 (citing, e.g., Ex. 1047 ¶ 21).

Similarly, regarding the location of the sensor, Petitioner asserts,

> [E]ven assuming for the sake of argument that a POSITA would
> have understood Aizawa's sensor as being limited to placement
> on the palm side of the wrist, and would have understood
> Ohsaki's sensor's "tendency to slip" when arranged on the front
> side as informing consideration of Ohsaki's teachings with
> respect to Aizawa, that ***would have further motivated*** the [person
> of ordinary skill in the art] to implement a light permeable
> convex cover in Aizawa's sensor, to improve detection
> efficiency of that sensor when placed on the palm side.

*Id.* at 17 (citing, e.g., Ex. 1047 ¶ 25). In other words, Ohsaki's disclosure
that a convex surface suppresses variation in reflected light would have
motivated an artisan to add such a surface to Aizawa to improve detection
efficiency of that sensor when placed on the palm side. *Id.* at 18.

Concerning Patent Owner's third argument, Petitioner responds that
adding a convex cover to Aizawa's sensor would not decrease signal
strength but, instead, "would improve Aizawa's signal-to-noise ratio by
causing more light backscattered from tissue to strike Aizawa's
photodetectors than would have with a flat cover" because such a cover
improves light concentration across the entire lens and does not direct it only
towards the center. *Id.* at 20–28 (citing, e.g., Ex. 1047 ¶¶ 29–45).

Petitioner asserts that Patent Owner and Dr. Madisetti "ignore[] the
well-known principle of reversibility," by which "a ray going from P to S
will trace the same route as one from S to P." Pet. Reply 20–22 (quoting
Ex. 1040, 92; citing, e.g., Ex. 1040, 87–92; Ex. 1049, 106–111; Ex. 1047
¶ 31). When applied to Aizawa's sensor, Petitioner contends that any
condensing benefit achieved by a convex cover would thus direct emitted
light toward Aizawa's peripheral detectors. *Id.* at 21–22 (citing, e.g.,

46

Ex. 1047 ¶¶ 31–35).  Although Dr. Madisetti "refused to acknowledge this basic principle of reversibility during deposition," Petitioner contends it is applied in Aizawa.  *Id.* at 22 (citing, e.g., Ex. 1041, 89:12–19; Ex. 1003 ¶ 127 (citing Ex. 1006 ¶ 33); Ex. 1047 ¶ 34).

Petitioner also asserts that Patent Owner and Dr. Madisetti overlook the fact that light rays reflected by body tissue will be scattered and diffuse and will approach the detectors "from various random directions and angles."  Pet. Reply 22–24 (citing, e.g., Ex. 1019, 52, 86, 90; Ex. 1042, 803; Ex. 1047 ¶¶ 36–41; Ex. 2006, 163:12–164:2).  This scattered and diffuse light, according to Petitioner, means that Ohsaki's convex cover cannot "focus all light at the center of the sensor device," as Patent Owner argues.  *Id.* at 23.  Instead, due to the random nature of this scattered light, Petitioner asserts that a person of ordinary skill in the art would have understood that "Ohsaki's convex cover provides at best a slight refracting effect, such that light rays that otherwise would have missed the detection area are instead directed toward that area as they pass through the interface provided by the cover."  *Id.* at 24 (citing, e.g., Ex. 1047 ¶ 42).  Petitioner applies this understanding to Aizawa, and asserts that using a cover with a convex protrusion in Aizawa would "enable backscattered light to be detected within a circular active detection area surrounding" a central light source, thereby "allow[ing] a larger fraction of light randomly backscattered from tissue to be detected within the active detection area surrounding [the light] source."  *Id.* at 24–27 (citing, e.g., Ex. 1019, 86, 90; Ex. 1047 ¶¶ 42–48).

Petitioner relies upon the following illustration of this alleged effect.  Pet. Reply 27 (citing Ex. 1047 ¶ 47).

IPR2020-01539
Patent 10,588,554 B2



The above illustration depicts backscattered light reflecting off user tissue in various directions, such that it impinges upon the peripheral detectors from various random angles and directions. *Id.* According to Petitioner, this "allow[s] the detector to capture light that otherwise would have been missed by the detectors, regardless of their location within the sensor device." *Id.*

Finally, Petitioner dismisses Patent Owner's reliance on Figure 14B of the '554 patent because it "is not an accurate representation of light that has been reflected from a tissue measurement site. For example, the light rays (1420) shown in FIG. 14B are collimated (i.e., travelling paths parallel to one another), and each light ray's path is perpendicular to the detecting surface." Pet. Reply 26 (citing, e.g., Ex. 1047 ¶ 45).

Concerning Patent Owner's fourth argument, Petitioner responds that even if a flat surface might be less prone to scratching, that possible disadvantage would have been weighed against the "known advantages of applying Ohsaki's teachings," and would not negate a motivation to combine. *Id.* at 28 (citing, e.g., Ex. 1047 ¶ 49).

<u>Patent Owner's Sur-reply</u>

Concerning Patent Owner's first and second arguments, Patent Owner reiterates its position that Ohsaki's purported benefits attach only to a sensor with a rectangular convex surface that is located on the back of the wrist,

48

**Appx35689**

IPR2020-01539
Patent 10,588,554 B2

and that "even small changes in sensor orientation or measurement location result in slippage." PO Sur-reply 3–14, 7.

Concerning Patent Owner's third argument, Patent Owner asserts that Petitioner's Reply improperly presents several new arguments, relying on new evidence, as compared with the Petition. *Id.* at 16 (regarding reversibility), 18–22.

Patent Owner argues that Dr. Kenny and Petitioner have not overcome their admissions that a convex lens directs light toward the center. *Id.* at 14–16, 19. Moreover, Patent Owner argues that Petitioner's discussion of the principle of reversibility is "irrelevant" because it "assumes conditions that are not present when tissue scatters and absorbs light." *Id.* at 16. The random nature of backscattered light, in Patent Owner's view, "hardly supports Petitioner's argument that light will necessarily travel the same paths regardless of whether the LEDs and detectors are reversed," and is irrelevant to the central issue presented here of "whether changing Aizawa's flat surface to a convex surface results in more light on Aizawa's peripherally located detectors." *Id.* at 16–17.

Patent Owner also asserts that Petitioner mischaracterizes Patent Owner's position, which is not that Ohsaki's cover with a convex protrusion "focuses *all* light to a single point" at the center of the sensor as Petitioner characterizes it. PO Sur-reply 18–19. Patent Owner's position, rather, is that Petitioner has not shown that a person of ordinary skill in the art "would have been motivated to change Aizawa's flat surface to a convex surface to improve signal strength." *Id.* at 19. In Patent Owner's view, by arguing that the convex cover provides only a "slight refracting effect," Petitioner

49

undermines its contention that providing such a cover would have improved detection efficiency. *Id.*

Patent Owner also argues that Petitioner's contention that a convex cover allows more light collection generally is a new theory not supported by Dr. Kenny's original declaration. *Id.* at 20. Moreover, Patent Owner argues that "Petitioner's theory is unavailing because it fails to consider the greater ***decrease*** in light at the detectors due to light redirection to a ***more*** central location." *Id.* at 20–21. According to Patent Owner, any light redirected from the sensor's edge could not make up for the loss of signal strength from light redirected away from the detectors and toward the center. *Id.* at 21.

Concerning Patent Owner's fourth argument, Patent Owner argues that Petitioner does not dispute Patent Owner's position that a flat cover would be less prone to scratches and offers "***no*** plausible advantages for its asserted combination." *Id.* at 22. Moreover, Patent Owner argues that "the risk of scratches is not merely a disadvantage—it directly undermines Petitioner's motivation to add a convex cover to 'protect the elements within the sensor housing.'" *Id.*

Analysis

As noted above, Petitioner provides three rationales to support its contention that a person of ordinary skill in the art would have provided "a light permeable cover with a protruding convex surface," such as that taught by Ohsaki, to Aizawa's sensor: (1) to improve adhesion between the sensor and the user's tissue, (2) to improve detection efficiency, and (3) to protect the elements within the sensor housing. Pet. 36–37 (citing, e.g., Ex. 1003

IPR2020-01539
Patent 10,588,554 B2

¶¶ 94–97; Ex. 1009 ¶¶ 25). We conclude all three rationales are supported by the evidence, as follows.

Rationales 1 and 2

The evidence of record persuades us that adding a convex cover, such as that taught by Ohsaki, would have improved adhesion between the sensor and the user's skin, which would have increased the signal strength of the sensor. Ohsaki teaches as much:

> [T]he convex surface of the translucent board 8 is in intimate contact with the surface of the user's skin. Thereby *it is prevented that the detecting element 2 slips off* the detecting position of the user's wrist 4. If the translucent board 8 has a flat surface, the detected pulse wave is adversely affected by the movement of the user's wrist 4 as shown in Fig. 4B. However, in the case that the translucent board 8 has a convex surface like the present embodiment, the *variation of the amount of the reflected light which is emitted from the light emitting element 6 and reaches the light receiving element 7 by being reflected by the surface of the user's skin is suppressed. It is also prevented that noise such as disturbance light from the outside penetrates the translucent board 8.* Therefore the pulse wave can be detected without being affected by the movement of the user's wrist 4 as shown in FIG. 4A.

Ex. 1009 ¶ 25 (emphases added); *see also id.* ¶ 27 ("stably fixed").

We credit Dr. Kenny's testimony that a person of ordinary skill in the art would have been motivated by such teachings to apply a cover with a convex surface to Aizawa to improve that similar device in the same way and to yield predictable results, i.e., to resist movement of the sensor on the user's wrist. *See, e.g.*, Ex. 1003 ¶¶ 95 ("[T]his contact between the convex surface and the user's skin is said to prevent slippage, which increases the strength of the signals obtainable by Ohsaki's sensor."), 97. We also credit Dr. Kenny's testimony that, in light of these teachings, a person of ordinary

51

**Appx35692**

skill in the art would have made such a modification to improve the pulse sensor's ability to emit light into, and detect light reflected from, the user's wrist, to generate an improved pulse signal. Ex. 1003 ¶¶ 95, 97, 155; Ex. 1047 ¶¶ 12–13.

Indeed, Ohsaki expressly compares the performance of a wrist-worn pulse wave sensor depending on whether translucent board 8 is convex or flat, and concludes the convex surface results in improved performance over the flat surface, especially when the user is moving. Ex. 1009, Figs. 4A–4B, ¶¶ 15, 25 (stating that with "a flat surface, the detected pulse wave is adversely affected by the movement of the user's wrist 4," and with "a convex surface like the present embodiment, the variation of the amount of the reflected light" collected by the sensor "is suppressed"). Ohsaki also states that, with a convex surface, "[i]t is also prevented that noise such as disturbance light from the outside penetrates the translucent board 8." *Id.* ¶ 25.

We also credit Dr. Kenny's testimony that the proposed modification would have been within the skill level of an ordinary artisan. For example, Dr. Kenny testifies:

> One of ordinary skill would have combined the teachings of Aizawa-Inokawa and Ohsaki as doing so would have amounted to nothing more than the use of a known technique to improve similar devices in the same way. One of ordinary skill would have recognized that incorporating Ohsaki's convex surface is simply improving Aizawa-Inokawa's transparent plate 6 that has a flat surface to improve adhesion to a subject's skin and reduce variation in the signals detected by the sensor. Furthermore, the elements of the combined system would each perform similar functions they had been known to perform prior to the combination—Aizawa-Inokawa's transparent plate 6

IPR2020-01539
Patent 10,588,554 B2

> would remain in the same position, performing the same
> function, but with a convex surface as taught by Ohsaki.

Ex. 1003 ¶ 98; *see also id.* ¶¶ 84–99, 155, 160.  In light of Ohsaki's express

disclosure of the benefits of a convex cover, we credit Dr. Kenny's testimony

that a person of ordinary skill in the art would have been motivated to modify

Aizawa as proposed, and would have had a reasonable expectation of success

in doing so.

We next address Patent Owner's first through third arguments, each of

which implicates Petitioner's first and second asserted rationales of

improved adhesion and detection efficiency.

Patent Owner's first argument is premised on the notion that Ohsaki's

benefits only can be realized with a rectangular convex surface, because

such a shape is required to avoid interacting with bones on the back of the

user's forearm.  PO Resp. 20–27.  We disagree.  Ohsaki does not disclose

the shape of its convex cover, much less require it be rectangular.  In fact,

Ohsaki is silent as to the shape of the convex surface.  Ohsaki discloses that

sensor 1 includes detecting element 2, which includes package 5 within

which the sensor components are located.  Ex. 1009 ¶ 17.  Ohsaki's convex

surface is located on board 8, which is "attached to the opening of the

package 5."  *Id.*  Ohsaki provides no further discussion regarding the shape

of board 8 or its convex protrusion.

We disagree with Patent Owner's suggestion that the shape of the

convex surface can be inferred to be rectangular from Ohsaki's Figures 1

and 2.  PO Resp. 16–17.  Ohsaki does not indicate that these figures are

drawn to scale, or reflect precise dimensions or shapes of the convex

surface.  *See, e.g.*, Ex. 1009 ¶ 13 ("schematic diagram"); *see also* Pet.

IPR2020-01539
Patent 10,588,554 B2

Reply 14–15; *Hockerson-Halberstadt, Inc. v. Avia Group Int'l*, 222 F.3d 951, 956 (Fed. Cir. 2000) ("[I]t is well established that patent drawings do not define the precise proportions of the elements and may not be relied on to show particular sizes if the specification is completely silent on the issue.").

To be clear, Ohsaki describes the shape of *detecting element 2* as rectangular: "[T]he length of the detecting element from the right side to the left side in FIG. 2 is longer than the length from the upper side to the lower side." Ex. 1009 ¶ 19. Ohsaki also describes that detecting element 2 is aligned longitudinally with the user's forearm: "[I]t is desirable that the detecting element 2 is arranged so that its longitudinal direction agrees with the longitudinal direction of the user's arm," to avoid slipping off. *Id.*; *see also id.* ¶ 9 ("The light emitting element and the light receiving element are arranged in the longitudinal direction of the user's arm.").

In light of this disclosed rectangular shape of detecting element 2, it is certainly possible that Ohsaki's convex surface may be similarly shaped. But, it may not be. Contrary to Patent Owner's argument, Ohsaki neither describes nor requires detecting element 2 to have the same shape as the convex surface of board 8. *Accord* Pet. Reply. 13–16 (noting also that Ohsaki's board 8 "is not coextensive with the entire tissue-facing side of detecting element 2"). We have considered the testimony of both Dr. Kenny and Dr. Madisetti on this point. Ex. 1047 ¶¶ 10–11, 14, 16–21; Ex. 2004 ¶¶ 36–41 (relying on Ohsaki's Figures 1–2 to support his opinion that the convex surface is rectangular). Dr. Madisetti's reliance on the dimensions of Ohsaki's figures is unpersuasive. *Hockerson-Halberstadt*, 222 F.3d at 956. We credit Dr. Kenny's testimony that Ohsaki does not describe its convex

54

surface as rectangular, because this testimony is most consistent with
Ohsaki's disclosure.

Further, Patent Owner suggests that the convex surface *must be*
rectangular, in order to avoid interacting with bones in the user's forearm.
PO Resp. 22–23; PO Sur-Reply 9 ("[A] POSITA would have understood
Ohsaki's convex board must ***also*** have a longitudinal shape oriented up-and-
down the watch-side of the user's wrist/forearm.").  Although Ohsaki
recognizes that interaction with these bones can cause problems, (*see*
Ex. 1009 ¶¶ 6, 19), we do not agree that the *only way* to avoid these bones is
by aligning a rectangular cover with the longitudinal direction of the user's
forearm.  For example, in the annotated Figures provided by Patent Owner,
*see* PO Resp. 23, we discern that the circular sensor that purports to depict
the proposed modification would *also* avoid the bones in the forearm if it
were slightly smaller.  Patent Owner provides no persuasive explanation to
justify the dimensions it provides in this annotated figure, or to demonstrate
that such a large sensor would have been required.  Indeed, we discern that it
would have been within the level of skill of an ordinary artisan to
appropriately size a modified sensor to avoid these well-known anatomical
obstacles.  "A person of ordinary skill is also a person of ordinary creativity,
not an automaton." *KSR*, 550 U.S. at 421.  After all, an artisan must be
presumed to know something about the art apart from what the references
disclose. *See In re Jacoby*, 309 F.2d 513, 516 (CCPA 1962).

Finally, we do not agree with Patent Owner's position that Ohsaki's
advantages apply only to rectangular convex surfaces.  As discussed, Patent
Owner has not shown that Ohsaki's convex surface is rectangular at all.
Moreover, even if Ohsaki's convex surface is rectangular, when discussing

the benefits associated with a convex cover, Ohsaki does not limit those benefits to a cover of any particular shape.  Instead, Ohsaki explains that "detecting element 2 is arranged on the user's wrist 4 so that the convex surface of the translucent board 8 is in intimate contact with the surface of the user's skin.  Thereby it is prevented that the detecting element 2 slips off the detecting position of the user's wrist 4."  Ex. 1009 ¶ 25; Ex. 1047 ¶ 10.  Thus, we agree with Petitioner that Ohsaki's teaching of a convex surface would have motivated a person of ordinary skill in the art to add such a surface to Aizawa's circular-shaped sensor, to improve adhesion as taught by Ohsaki.  *See, e.g.*, Pet. 34–35.  Nothing in Ohsaki's disclosure limits such a benefit to a specific shape of the convex surface.  Ex. 1047 ¶¶ 10, 14, 16–21

Moreover, Ohsaki contrasts the ability to properly receive reflected light with a convex surface as compared to a flat surface and notes that,

> in the case that the translucent board 8 has a convex surface . . . the variation of the amount of the reflected light which is emitted from the light emitting element 6 and reaches the light receiving element 7 by being reflected by the surface of the user's skin is suppressed.  It is also prevented that noise such as disturbance light from the outside penetrates the translucent board 8.  Therefore the pulse wave can be detected without being affected by the movement of the user's wrist 4 as shown in FIG. 4A.

Ex. 1009 ¶ 25; Ex. 1047 ¶ 11.  Again, we agree with Petitioner that Ohsaki's teaching of a convex surface would have motivated a person of ordinary skill in the art to add such a surface to Aizawa's sensor, to improve signal strength, as taught by Ohsaki.  *See, e.g.*, Pet. 34–37.  Again, nothing in Ohsaki's disclosure limits such a benefit to the shape of the convex surface.  Ex. 1047 ¶¶ 10, 12, 13, 16–21.

Accordingly, we do not agree that Ohsaki's disclosed advantages attach only to a rectangular convex surface, or would have been inapplicable to the proposed combination of Aizawa and Ohsaki.[6]

We have considered Patent Owner's second argument, that Ohsaki's benefits are realized only when the sensor and convex surface are placed on the back of the user's wrist, which is the opposite side of the wrist taught by Aizawa. PO Resp. 30–39. We do not agree. As an initial matter, Petitioner does not propose bodily incorporating the references; Petitioner simply proposes adding a convex cover to Aizawa's sensor, without discussing where Aizawa's sensor is used. *See, e.g.*, Pet. 34. In other words, Petitioner's proposed modification does not dictate any particular placement, whether on the palm side or back side of the wrist.

To be sure, Ohsaki's Figures 3A–3B compare the performance of detecting element 2, including its translucent board 8 having a convex protrusion, and show better performance when the element is attached to the back side of the wrist versus the front side of the wrist, when the user is in motion. *See* Ex. 1009 ¶¶ 23–24, Figs. 3A–3B. However, we do not agree that these figures support Dr. Madisetti's conclusion that "Ohsaki indicates a convex surface only prevents slipping on the back (i.e., watch) side of the wrist in a specific orientation, but tends to slip when used in different locations or orientations" such as the palm side of the wrist—particularly in

---

[6] Patent Owner also argues that, to the extent contended by Petitioner, it would not have been obvious to place a rectangular cover on top of Aizawa's sensor. PO Resp. 27–30. We do not understand Petitioner to have made any such contention and, accordingly, do not address this argument. *See, e.g.*, Pet. 37 (depicting Aizawa's circular sensor with an added convex cover).

comparison to a flat surface such as Aizawa's. Ex. 2004 ¶¶ 66, 75. Instead, Ohsaki acknowledges that, even when the detecting element is located "on the front [palm] side of the user's wrist 4, *the pulse wave can be detected well* if the user is at rest." Ex. 1009 ¶ 23 (emphasis added). Thus, Ohsaki discloses that, in at least some circumstances, a convex surface located on the front of the user's wrist achieves benefits. *Id.* Notably, the claims are not limited to detection during movement or exercise.

We credit, instead, Dr. Kenny's testimony that a person of ordinary skill in the art would have understood from Ohsaki that a convex protrusion will help prevent slippage, even in the context of Aizawa's sensor. *See* Ex. 1047 ¶¶ 15, 22–28. This is because the convex protrusion "promot[es] 'intimate contact with the surface of the user's skin,'" which "would have increased adhesion and reduced slippage of Aizawa's sensor when placed on the palm side of a user's wrist, with associated improvements in signal quality." *Id.* ¶¶ 27, 28 ("additional adhesive effect").

Dr. Madisetti testifies that "[b]ased on Aizawa's teaching that a flat acrylic plate improves adhesion on the palm side of the wrist, and Ohsaki's teaching that a convex surface tends to slip on the palm side of the wrist, a [person of ordinary skill in the art] would have come to the opposite conclusion from Dr. Kenny: that modifying Aizawa's flat adhesive plate 'to include a lens/protrusion . . . similar to Ohsaki's translucent board' would not 'improve adhesion.'" Ex. 2004 ¶ 84; *see also id.* ¶ 82. We disagree with this reading of Aizawa. It is true that Aizawa's plate 6 is illustrated as having a flat surface (Ex. 1006, Fig. 1(b)), and that Aizawa states the plate "improve[s] adhesion" (*id.* ¶ 13). Aizawa further states: "the above belt 7 is fastened such that the acrylic transparent plate 6 becomes close to the

artery 11 of the wrist 10," and "[t]hereby, adhesion between the wrist 10 and the pulse rate detector 1 is improved." *Id.* ¶ 26. These disclosures, however, indicate the improved adhesion is provided by the acrylic material of plate 6, not the shape of the surface of the plate, which is never specifically addressed. *See also id.* ¶¶ 30, 34 ("Since the acrylic transparent plate 6 is provided . . . adhesion between the pulse rate detector 1 and the wrist 10 can be improved . . . ."). Aizawa does not associate this benefit of improved adhesion with the surface shape of the plate, but rather, with the existence of an acrylic plate to begin with. Thus, there is no teaching away from using a convex surface to improve the adhesion of Aizawa's detector to the user's wrist.

We have considered Patent Owner's third argument that a convex cover would condense light away from Aizawa's peripheral detectors, which Patent Owner alleges would decrease signal strength. PO Resp. 42–50. We disagree.

There appears to be no dispute that when emitted light passes through user tissue, the light diffuses and scatters as it travels. *See, e.g.*, Pet. Reply 22–26; Tr. 27:18–28:4 (Petitioner's counsel agreeing that "the incoming light from a detection standpoint is going to be coming from all sorts of different directions because of the randomness caused by the back scattering"), 65:23–66:16 (Patent Owner's counsel agreeing that light does not simply enter tissue and come back out "like it came out on a mirror"); Ex. 1041, 35:19–37:18 (Patent Owner's declarant describing light scattering as it travels through tissue, e.g., reflecting off blood, tissue, or other material); Ex. 1043, 28:2–10 (Patent Owner's declarant agreeing that reflecting light can be a signal for the '554 patent's sensor), 61:20–62:4

59

IPR2020-01539
Patent 10,588,554 B2

(explaining that "a light in this context, light emitted from the LEDs is diffused through the skin in that particular context, whatever that is"); Ex. 1047 ¶ 36.

The light thus travels at random angles and directions, and no longer travels in a collimated and perpendicular manner. Exhibit 1040,[7] Figure 4.12, illustrates the difference between diffuse and collimated light, and is reproduced below:



This figure provides at left a photograph and an illustration showing incoming collimated light reflecting from a smooth surface, and at right a photograph and an illustration of incoming collimated light reflecting from a rough surface. *See* Ex. 1040, 87–88 (original page numbers). The smooth surface provides specular reflection, in which the reflected light rays are collimated like the incoming light rays. *See id.* The rough surface provides

---

[7] Eugene Hecht, *Optics* (2nd ed. 1990).

diffuse reflection, in which the reflected light rays travel in random directions.  *See id.*; *see also* Ex. 1047 ¶ 36 ("A [person of ordinary skill in the art] would have understood that light that backscatters from the measurement site (after diffusing through tissue) reaches the active detection area from many random directions and angles.").

Dr. Kenny testifies that Aizawa "detect[s] light that has been 'partially reflected, transmitted, absorbed, and scattered by the skin and other tissues and the blood before it reaches the detector.'"  Ex. 1047 ¶ 36 (quoting Ex. 1019, 36).  Dr. Kenny further opines that a convex cover, when added to Aizawa's sensor with multiple detectors symmetrically arranged about a central light source, "allows light rays that otherwise would have missed the detection area to instead be directed toward that area as they pass through the interface provided by the cover," thus increasing the light-gathering ability of Aizawa's sensor.  *Id.* ¶ 42; *see also id.* ¶ 46.

By contrast Dr. Madisetti testifies that "a convex surface condenses light passing through it towards the center of the sensor and away from the periphery."  Ex. 2004 ¶ 86; *see also id.* ¶¶ 85, 89.  We have considered this testimony, however, Dr. Madisetti's opinions largely are premised upon the behavior of collimated and perpendicular light as depicted in Figure 14B of the challenged patent.  *See id.* ¶ 88.  Dr. Madisetti does not explain how light would behave when approaching the sensor from various angles, as it would after being reflected by tissue.  *Id.* ¶¶ 86–89; *see also id.* ¶¶ 90–97 (addressing motivation and also failing to discuss diffuse, scattered light).  In other words, even if Patent Owner is correct that the '554 patent's Figure 14B depicts light condensing toward the center, this is not dispositive to the proposed modification, because light reflected by a user's tissue is

61

IPR2020-01539
Patent 10,588,554 B2

scattered and random, and is not collimated and perpendicular as shown in Figure 14B.  Ex. 1001, Fig. 14B.

Patent Owner and Dr. Madisetti argue that "Petitioner and Dr. Kenny both [previously admitted] that a convex cover condenses light towards the center of the sensor and away from the periphery," in a different petition filed against a related patent, i.e., in IPR2020-01520.  PO Resp. 43–45; Ex. 2004 ¶ 86.  The cited portions of the Petition and Dr. Kenny's declaration from IPR2020-01520 discuss a decrease in the "mean path length" of a ray of light when it travels through a convex lens rather than through a flat surface.  *See, e.g.*, Ex. 2020 ¶¶ 118–120.  We do not agree that this discussion is inconsistent with Dr. Kenny's testimony here that, where light is reflected to the detectors at various random angles and directions, more light will reach Aizawa's symmetrically disposed detectors when travelling through the convex surface than would be reached without such a surface, because light that might have otherwise missed the detectors now will be captured.  *See, e.g.*, Ex. 1047 ¶¶ 29–30, 36.  We do not discern that the convergence of a single ray of light toward the center, as discussed in IPR2020-01520, speaks to the aggregate effect on *all* light that travels through the convex surface.

We additionally do not agree with Patent Owner's argument that Petitioner's Reply presents new arguments and evidence that should have been first presented in the Petition, to afford Patent Owner an adequate opportunity to respond.  The Petition proposed a specific modification of Aizawa to include a convex protrusion in the cover, for the purpose of increasing the light gathering ability of Aizawa's device.  *See* Pet. 34–38.  The Patent Owner Response then challenged that contention, with several

arguments that Petitioner's proposed convex protrusion would not operate in the way the Petition alleges it would operate. *See* PO Resp. 42–50. This opened the door for Petitioner to provide, in the Reply, arguments and evidence attempting to rebut the contentions in the Patent Owner Response. *See* PTAB Consolidated Trial Practice Guide (Nov. 2019) ("Consolidated Guide"),[8] 73 ("A party also may submit rebuttal evidence in support of its reply."). This is what Petitioner did here. The Reply does not change Petitioner's theory for obviousness; rather, the Reply presents more argument and evidence in support of the same theory for obviousness presented in the Petition. *Compare* Pet. 34–38, *with* Reply 20–27.

> ### Rationale 3

Petitioner further contends that a person of ordinary skill in the art would have recognized that a cover with a protruding convex surface, such as that taught by Ohsaki, would "protect the elements within the sensor housing" of Aizawa. Pet. 36–37. We are persuaded that adding a convex cover, such as that taught by Ohsaki, would also protect the sensor's internal components in a manner similar to Aizawa's flat acrylic plate. Ex. 1003 ¶ 97; *see also* Ex. 1008 ¶ 15 (noting that a cover "protect[s] the LED or PD").

We disagree with Patent Owner's fourth argument that a person of ordinary skill in the art would not have modified Aizawa as proposed because a convex cover would be prone to scratches and because other alternatives existed. Patent Owner's counsel did not dispute, during the oral hearing, that a convex cover would indeed serve to protect the internal

---

[8] Available at https://www.uspto.gov/TrialPracticeGuideConsolidated.

sensor components in Aizawa, as Petitioner proposes. Tr. 64:6–65:5 (but noting that a flat cover would also protect and would be less prone to scratches). That a convex cover may be more prone to scratches than Aizawa's flat cover is one of numerous tradeoffs that a person of ordinary skill in the art would consider in determining whether the benefits of increased adhesion, signal strength, and protection outweigh the potential for a scratched cover. *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1165 (Fed. Cir. 2006). The record does not support that the possibility of scratches alone would have dissuaded a person of ordinary skill in the art from the proposed modification, to achieve the benefits identified by Petitioner.

For the foregoing reasons, we are persuaded by Petitioner's contentions.

vii.    *"[h] a handheld computing device in wireless communication with the physiological sensor device, wherein the handheld computing device comprises"*

Petitioner's Contentions

Petitioner contends that the combination of, *inter alia*, Aizawa and Inokawa teaches a sensor device that is in wireless communication with a base device through its LEDs, wherein that base device is connected further to a PC. Pet. 27, 56–57; *see, e.g.*, Ex. 1006 ¶ 15 ("a transmitter for transmitting the measured pulse rate data to a display for displaying the pulse rate data"); Ex. 1008 ¶¶ 75 (explaining that sensed physiological information is transmitted from the sensor to the base device, when mounted, and further that "[t]he base device 17 . . . transmits this information to the PC 59"), 76, 77.

IPR2020-01539
Patent 10,588,554 B2

Petitioner also contends that Mendelson-2006 discloses a body-worn pulse oximetry system including a sensor module, a receiver module, and a PDA. Pet. 29, 58–59; *see, e.g.*, Ex. 1010, 1–2 (describing system), Fig. 1 (sensor attached to skin), Fig. 3 (PDA). Petitioner contends that signals acquired by the sensor are received and processed by the receiver module, and then wirelessly transmitted to the PDA. Pet. 30; Ex. 1010, 2. Petitioner contends that wireless transmission to a PDA, as discussed in Mendelson-2006, provides advantages such as offering "a low-cost touch screen interface," and "more effective medical care." Pet. 30–31; Ex. 1010, 3–4.

Petitioner contends that a person of ordinary skill in the art "would have also found it obvious to implement the physiological sensor device resulting from the combined teachings of Aizawa, Inokawa, and Ohsaki as part of a physiological measurement system including a handheld computing device, and to enable the physiological sensor device to communicate wirelessly with the handheld computing device," to obtain the advantages taught by Mendelson-2006. Pet. 28, 31–32, 33, 58; Ex. 1003 ¶¶ 80–83, 89–91; *see also* Pet. 43 n.4.

Patent Owner's Arguments

Patent Owner disputes Petitioner's contentions. Patent Owner argues that Petitioner's proposed combination is rooted in hindsight and results in a more complicated system. PO Resp. 59, 60. Specifically, Patent Owner characterizes Petitioner's combination as

> (1) eliminat[ing] Aizawa's existing transmitter so the resulting device will not require "a separate RF circuit"; (2) chang[ing] Aizawa's structure to add a second LED to transmit data using a base station, which would also require that a user remove the sensor before any data transfer can occur and thus eliminate the

65

> ability to display data in real-time; and then (3) add[ing] back in
> a separate communications circuit to the base station based on
> Mendelson 2006 so that the base station can send data to a PDA
> with a touch screen display.

*Id.* at 59–60 (citing, e.g., Ex. 2004 ¶ 114), 61.  Patent Owner further argues

that such a modification eliminates the desired real-time monitoring

employed by Mendelson-2006.  *Id.* (citing Ex. 2004 ¶¶ 113, 115).[9]

Analysis

As discussed above in Section II.D.5.iii, we determine that Petitioner

demonstrated sufficiently that a person of ordinary skill in the art would

have found it obvious to modify Aizawa to include an additional LED to,

*inter alia*, allow for wireless transmission of sensed pulse rate and motion

data to a base device.  We further noted that although Aizawa discloses

transmission of data for display (Ex. 1006 ¶¶ 15, 35), Aizawa is silent as to

how the data is transmitted or displayed.  In light of the combination with

Inokawa, therefore, Aizawa's multiple LEDs would have allowed wireless

transmission of data to a base device.  *See, e.g.*, Ex. 1008 ¶ 76 ("[V]ital sign

information stored in the memory 63, such as pulse and body motion, is

transmitted to the base device 17 using the S-side infrared LED 23 of the

pulse sensor 1 and the B-side PD 45 of the base device 17.").

Inokawa further discloses that the base device, once it receives

information from the sensor, "transmits this information to the PC 59."  *Id.*

¶ 75; *see also id.* ¶¶ 67, 77.  As described by Dr. Kenny, "the physiological

---

[9] We do not address Patent Owner's argument that Mendelson-2006 does not
disclose a "multi-emitter/multi-detector sensor" because Mendelson-2006 is
not relied upon for such limitations.  *See supra* § II.D.iii, iv.

sensor device's sensor component transmits physiological measurement data to an included base station via an optical communications interface, and the physiological sensor device's base station transmits signals responsive to a physiological parameter to a computer, via a network interface." Ex. 1003 ¶ 81.

With this backdrop, we are persuaded by Petitioner's contention that it would have been obvious to implement the physiological sensor device resulting from the combined teachings of Aizawa, Inokawa, and Ohsaki as part of a physiological measurement system that includes a handheld computing device. Indeed, Aizawa and Inokawa already teach the desirability of transmitting sensed data to, e.g., a computer or a display, although neither discloses further detail. *See, e.g.*, Ex. 1006, 15; Ex. 1008 ¶ 75; *see also* Ex. 1047 ¶ 56 (Aizawa is silent). In light of these teachings, we credit Dr. Kenny's testimony that transmitting sensed data wirelessly to a handheld computing device, as taught by Mendelson-2006, would have achieved the identified benefits of, e.g., providing a low-cost display with a simple user interface and easy activation of functions (Ex. 1003 ¶ 86) and the ability to provide more effective medical care when the handheld device is carried by first responders (*id.* ¶ 90). *See, e.g.*, *id.* ¶¶ 82–87, 91–93; Ex. 1047 ¶¶ 59–60. We are also persuaded that this would have been within the skill level of an ordinary artisan and would have achieved predictable results. *Id.* ¶ 92.

We do not agree with Patent Owner's characterization of the proposed combination. Petitioner does not propose "(1) eliminat[ing] Aizawa's existing transmitter . . . (2) chang[ing] Aizawa's structure to add a second LED to transmit data using a base station . . .; and then (3) add[ing] back in a

separate communications circuit to the base station." *Contra* PO Resp. 59–60; Ex. 1047 ¶ 58.  As discussed above, Petitioner proposes that the system suggested by, *inter alia*, Aizawa and Inokawa—which includes a sensor in communication with a base device, and which contemplates additional communication from the base device to a PC—further includes a handheld computing device in wireless communication with that system.  In other words, Petitioner's proposed combination effectively replaces or supplements Inokawa's PC 59 with a PDA, such as that taught by Mendelson-2006.  Thus, in Petitioner's proposed combination, physiological data is sensed by Aizawa's sensor, transmitted to a base device through an additional LED, as taught by Inokawa, and further transmitted to, *inter alia*, a PDA, as taught by Mendelson-2006.  *See, e.g.*, Pet. 27–34; *see also id.* at 43 n.4 (describing the proposed combination as, *inter alia*, adding "Inokawa's base station to Aizawa's physiological sensor device such that the sensor device includes a sensor and a base station with which the sensor communicates and through which the sensor communicates with a handheld device").  Indeed, both Aizawa and Inokawa expressly contemplate transmission to an additional computing device (*see, e.g.*, Ex. 1006, 15; Ex. 1008 ¶ 75); Petitioner's proposed modification merely states that such transmission occurs wirelessly to a handheld device.  The record supports this contention.

We have considered Dr. Madisetti's testimony, but it is based on the same mischaracterization put forth by Patent Owner.  Ex. 2004 ¶¶ 112 (mischaracterizing the combination), 114 (same).  Notwithstanding this misrepresentation of the proposed modification, Dr. Madisetti does not dispute Dr. Kenny's testimony that wireless transmission to a handheld

computing device would have achieved the identified benefits, such as a low-cost device that improves medical care. *See id.* ¶¶ 112–118. As such, we credit Dr. Kenny's unrebutted testimony.

Patent Owner and Dr. Madisetti further criticize the combination, asserting that Mendelson-2006's wireless transmission exists to allow real-time monitoring, which is impossible where a sensor must be mounted on a base device to transfer information through LEDs. *Id.* ¶ 113; *see also* PO Resp. 59. However, as discussed in Section II.D.iii above, the lack of real-time measurement and transmission is simply one consideration among many. As noted in Inokawa, real-time wireless communication has its drawbacks. Ex. 1008 ¶ 5. We discern that a skilled artisan would have weighed these competing interests. "[A] given course of action often has simultaneous advantages and disadvantages, and this does not necessarily obviate motivation to combine." *Medichem*, 437 F.3d at 1165 (citation omitted).

viii.  *"[i] one or more processors configured to wirelessly receive one or more signals from the physiological sensor device, the one or more signals responsive to at least a physiological parameter of the user"*

The cited evidence supports Petitioner's contention that Mendelson-2006 describes wirelessly transmitting vital physiological information acquired from a sensor to a PDA, which receives it. Pet. 59–61; *see, e.g.*, Ex. 1010, 1, 2 ("The PDA can monitor multiple wearable pulse oximeters simultaneously and allows medics to collect vital physiological information to enhance their ability to extend more effective care to those with the most urgent needs."), 3 (explaining that the PDA "has sufficient computational resources for the intended application" and "can also serve to temporarily store vital medical information received from the wearable unit"), 3 ("The

69

[PDA's graphical user interface] also displays the subject's vital signs, activity level, body orientation, and a scrollable PPG waveform that is transmitted by the wearable device."), Fig. 3 (displaying $SpO_2$ and HR data); Ex. 1003 ¶¶ 179–180.

As discussed above, Petitioner's proposed combination involves transmission of sensed data from Aizawa's physiological sensor to a base device, as taught by Inokawa, and further wireless transmission of that data from the base device to a handheld computing device, such as a PDA. *See supra* §§ II.D.5.iii (transmission to base device accomplished with an additional LED, as taught by Inokawa), II.D.5.vii (further transmission from base device to, e.g., a PC and/or PDA, as taught by Mendelson-2006, and contemplated by Aizawa and Inokawa). In light of these teachings, we are persuaded by Petitioner's contention that a person of ordinary skill in the art "would have found it obvious to configure a processor of the PDA to wirelessly receive signals from the physiological sensor device" taught by the combination of, *inter alia*, Aizawa, Inokawa, and Mendelson-2006, wherein "the signals [are] responsive to physiological parameters of the user." Pet. 60–61; *see, e.g.*, Ex. 1003 ¶ 185.

Petitioner's stated reasoning for the proposed modification is sufficiently supported, including by the unrebutted testimony of Dr. Kenny. Ex. 1003 ¶¶ 181–186. Patent Owner does not present any argument against this limitation, apart from the arguments already addressed in Section II.D.5.vii.

70

**Appx35711**

IPR2020-01539
Patent 10,588,554 B2

ix.    *"[j]–[l] a touch-screen display configured to provide a user interface,
wherein: the user interface is configured to display indicia responsive to
measurements of the physiological parameter, and an orientation of the
user interface is configurable responsive to a user input"*

The cited evidence supports Petitioner's contention that Mendelson-
2006 describes a PDA with a touchscreen display configured to display
indicia responsive to measurements of, e.g., $SpO_2$ and HR.  Pet. 61–62; *see,
e.g.*, Ex. 1010, 3 ("The use of a PDA . . . also provides a low-cost touch
screen interface.").

Petitioner acknowledges that "Mendelson-2006 does not explicitly
state that an orientation of the GUI provided by the PDA is configurable
responsive to a user input."  Pet. 63.  However, Petitioner contends that a
person of ordinary skill in the art would have understood that "the LabVIEW
software that was used 'to control all interactions between the PDA and the
wearable unit via [t]he graphical user interface' included the option to
configure an orientation of a user interface," e.g., by setting the report
orientation to portrait or landscape view.  *Id.* (alteration in original); *see,
e.g.*, Ex. 1003 ¶¶ 191–192; Ex. 1027, 186 ("Set the report orientation—
portrait or landscape.").

Petitioner further contends that, in light of these teachings, a person of
ordinary skill in the art "would have found it obvious to make an orientation
of the PDA's user interface configurable responsive to a user input, for the
sake of user convenience."  Pet. 64; *see, e.g.*, Ex. 1003 ¶ 193.

Petitioner's stated reasoning for the proposed modification is
sufficiently supported, including by the unrebutted testimony of Dr. Kenny.
*See, e.g.*, Ex. 1003 ¶¶ 187–195.  Patent Owner does not present any

71

**Appx35712**

argument against this limitation, apart from the arguments already addressed in Section II.D.5.vii.

    x.    *"[m] a storage device configured to at least temporarily store at least the measurements of the physiological parameter."*

    The cited evidence supports Petitioner's contention that Mendelson-2006 teaches that the PDA is configured to store vital medical information received from the wearable pulse oximeter, and that an ordinarily skilled artisan "would have understood that the vital medical information would have included measurements of the physiological parameters obtained by the physiological sensor device (e.g., SpO$_2$ and HR)." Pet. 65; Ex. 1010, 3 ("The PDA can also serve to temporarily store vital medical information received from the wearable unit."); Ex. 1003 ¶ 198. Thus, Petitioner contends that a person of ordinary skill in the art "would have configured a storage device of the PDA to at least temporarily store measurements of physiological parameters (e.g., SpO$_2$ and HR)." Pet. 64–65; *see, e.g.*, Ex. 1003 ¶ 197.

    Petitioner's stated reasoning for the proposed modification is sufficiently supported, including by the unrebutted testimony of Dr. Kenny. *See, e.g.*, Ex. 1003 ¶¶ 196–199. Patent Owner does not present any argument against this limitation, apart from the arguments already addressed in Section II.D.5.vii.

    xi.    *Reasonable Expectation of Success*

    Patent Owner argues that Petitioner has failed to demonstrate a reasonable expectation of success because Dr. Kenny did not perform a design analysis to create a functional sensor. PO Resp. 62–63. We disagree. As discussed in detail above, each of Petitioner's proposed modifications to

Aizawa—whether to include a second emitter, as taught by Inokawa; or to include a cover with a convex surface, as taught by Ohsaki; or to communicate with a handheld computing device, as taught by Mendelson-2006—is rooted in explicit teachings of the prior art, and is supported by persuasive declarant testimony.

We credit Dr. Kenny's testimony that, for each proposed modification, the combined prior art teachings would have been applied as known, to achieve predictable results. *See, e.g.*, Ex. 1003 ¶¶ 78 (applying Inokawa's teachings would have been "nothing more than improving Aizawa's pulse wave sensor that uses a single LED with the use of a known technique disclosed by Inokawa to detect and record body motion in addition to blood flow"), 160 (applying Ohsaki's teachings would have been "nothing more than adjusting transparent plate 6's shape to include a convex protrusion/lens surface similar to that disclosed by Ohsaki, and one of ordinary skill would have understood that this adjustment would improve adhesion to the user's skin and reduce variation in the signals detected by the sensor"), 178 ("applying Mendelson[-]2006's teachings . . . would have led to predictable results without altering or hindering the functions performed by the physiological sensor device. In fact, one of ordinary skill would have been motivated to implement the well-known technique of wirelessly transmitting data . . . to a handheld computing device"). For similar reasons discussed above with respect to each proposed modification, we conclude that that a skilled artisan would have had a reasonable expectation of success. *See supra* § II.D.5.iii, vi, vii–x; *see also* Ex. 1003 ¶¶ 71–199.

*xii.    Summary*

For the foregoing reasons, we determine that Petitioner has met its burden of demonstrating by a preponderance of the evidence that claim 1 would have been obvious over the cited combination of references.

### 6.  Independent Claim 20

Independent claim 20 consists of limitations that are substantially similar to elements [a]–[h] of claim 1.  *Compare* Ex. 1001, 44:51–45:21, *with id.* at 46:31–52 (reciting that the "convex surface," as opposed to "the cover," is "sufficiently rigid"; omitting details of the "handheld computing device").  In asserting that claim 20 also would have been obvious over the combined teachings of Aizawa, Inokawa, Ohsaki, and Mendelson-2006, Petitioner refers to the same arguments presented as to claim 1.  *See* Pet. 76–78.  Patent Owner relies on the same arguments discussed above regarding claim 1.  PO Resp. 11–63.

For the same reasons discussed above, we determine that Petitioner has met its burden of demonstrating by a preponderance of the evidence that claim 20 would have been obvious over the cited combination of references. *See supra* § II.D.5.

### 7.  Dependent Claim 28

Dependent claim 28 ultimately depends from independent claim 20 and further recites "the single protruding convex surface protrudes a height greater than 2 millimeters and less than 3 millimeters." Ex. 1001, 48:16–18.

Petitioner reiterates that the sensor rendered obvious by the combined teachings of Aizawa, Inokawa, Ohsaki, and Mendelson-2006 would have included a cover with a single protruding convex surface, *see supra* § II.D.5.vi, and further contends that a person of ordinary skill in the art

74

IPR2020-01539
Patent 10,588,554 B2

"would have found it obvious that a device designed to fit on a user's wrist
would be on the order of millimeters," consistent with Ohsaki's disclosure
that the device is in "intimate contact" with the user's skin.  Pet. 85–86
(citing, e.g., Ex. 1003 ¶ 275).  Petitioner also contends that an ordinarily
skilled artisan would have taken user comfort into account when establishing
the dimensions of the device's convex cover.  *Id.* at 86–87.  With these
considerations in mind, Petitioner contends that, "in order to provide a
comfortable cover featuring a protruding convex surface that prevents
slippage, the surface should protrude a height greater than 2 millimeters and
less than 3 millimeters," because "there would have been a finite range of
possible protruding heights, and it would have been obvious to select a
protruding height that would have been comfortable to the user."  *Id.* (citing,
e.g., Ex. 1003 ¶¶ 273–277).

Patent Owner argues that none of the cited references disclose the
claimed height range and that Petitioner relies on hindsight reconstruction.
PO Resp. 64–66 (citing, e.g., Ex. 2004 ¶¶ 121–124).  Patent Owner also
characterizes Dr. Kenny's testimony as conclusory and unsupported.  *Id.* at
66–67.

Petitioner is correct that, "[w]hen there are a finite number of
identified, predictable solutions, a person of ordinary skill in the art has good
reason to pursue the known options within his or her technical grasp.  If this
leads to the anticipated success, it is likely the product . . . of ordinary skill
and common sense."  *KSR*, 550 U.S. at 398.  Petitioner has shown
sufficiently that only a finite number of solutions existed with respect to the
height of a convex protrusion on a tissue-facing sensor, which would have
met the art-recognized goals of both (1) intimate contact between the

sensor's surface and the user and (2) user comfort. *See, e.g.*, Ex. 1009 ¶¶ 6, 25. Bearing in mind these considerations, we credit Dr. Kenny's testimony that it would have been obvious, "in order to provide a comfortable cover featuring a protruding convex surface that prevents slippage, [that] the surface should protrude a height greater than 2 millimeters and less than 3 millimeters." Ex. 1003 ¶ 276.

We have considered Patent Owner's argument, and Dr. Madisetti's cited testimony. However, it is not dispositive that none of Aizawa, Inokawa, Ohsaki, or Mendelson-2006 teach the claimed range. PO Resp. 64–66; Ex. 2004 ¶¶ 105–107. Petitioner relies upon the knowledge, ability, and creativity of a person of ordinary skill in the art, not the teachings of a specific reference. Notably, Dr. Madisetti does not dispute Dr. Kenny's position that there were a finite number of options available for the height of the convex surface. Ex. 2004 ¶¶ 121–124. Therefore, we do not agree that Petitioner's contentions are rooted in impermissible hindsight. *See, e.g.*, *In re McLaughlin*, 443 F.2d 1392, 1395 (CCPA 1971) ("Any judgment on obviousness is in a sense necessarily a reconstruction based upon hindsight reasoning, but so long as it takes into account only knowledge which was within the level of ordinary skill at the time the claimed invention was made and does not include knowledge gleaned only from applicant's disclosure, such a reconstruction is proper.").

Accordingly, for the foregoing reasons, we determine that Petitioner has met its burden of demonstrating by a preponderance of the evidence that claim 28 would have been obvious over the cited combination of references.

### 8. Dependent Claims 2–7 and 21–27

Petitioner also contends that claims 2–7 and 21–27 would have been obvious based on the same combination of prior art addressed above. These challenged claims all depend directly or indirectly from independent claim 1 or 20. Petitioner identifies teachings in the prior art references that teach or suggest the limitations of these claims, and provides persuasive reasoning as to why the claimed subject matter would have been obvious to one of ordinary skill in the art. Pet. 65–75, 78–87. Petitioner also supports its contentions for these claims with the testimony of Dr. Kenny. Ex. 1003 ¶¶ 200–230, 245–277.

Patent Owner does not present any arguments for these claims other than those we have already considered with respect to independent claims 1 and 20. PO Resp. 63–64 ("[T]he Petition fails to establish that independent claims 1 and 20 are obvious in view of the cited references of Ground 1 and therefore fails to establish obviousness of any of the challenged dependent claims."); *see supra* § II.D.5.

We have considered the evidence and arguments of record and determine that Petitioner has demonstrated by a preponderance of the evidence that claims 2–7 and 21–27 would have been obvious over the combined teachings of Aizawa, Inokawa, Ohsaki, and Mendelson-2006, for the reasons discussed in the Petition and as supported by the testimony of Dr. Kenny.

### 9. Conclusion

For the foregoing reasons, we determine that Petitioner has met its burden of demonstrating by a preponderance of the evidence that claims 1–7

and 20–28 would have been obvious over the cited combination of references.

### E. Obviousness over the Combined Teachings of Aizawa, Inokawa, Ohsaki, Mendelson-2006, and Bergey

Petitioner contends that claims 8–19 of the '554 patent would have been obvious over the combined teachings of Aizawa, Inokawa, Ohsaki, Mendelson-2006, and Bergey. Pet. 87–98; *see also* Pet. Reply 36–38. Patent Owner disagrees. PO Resp. 67–69; *see also* PO Sur-reply 27–29.

Based on our review of the parties' arguments and the cited evidence of record, we determine that Petitioner has met its burden of showing by a preponderance of the evidence that claims 8–12 and 14–19 are unpatentable, but has not met its burden with respect to claim 13.

### 1. Overview of Bergey (Ex. 1016)

Bergey is a U.S. patent titled "Solid State Watch with Magnetic Setting," and discloses a watch in which the electronics are "hermetically sealed in the watch case to be free of dust and moisture." Ex. 1016, code (57). Moreover, the electronic components are "resiliently mounted for improved shock resistance." *Id.*

### 2. Dependent Claims 8–10, 12, 14–16, 18, and 19

Petitioner contends that it would have been obvious to have modified the sensor of Aizawa-Inokawa-Ohsaki-Mendelson-2006 to hermetically seal the sensor components within the substrate, wall, and cover, so as to obtain advantages disclosed by Bergey, e.g., to protect the electronics and prevent condensation within the case. Pet. 88–89 (citing Ex. 1003 ¶¶ 278–281; Ex. 1016, code (57), 2:56–67, 8:48–9:34).

IPR2020-01539
Patent 10,588,554 B2

Petitioner identifies teachings in the prior art references that teach or suggest the limitations of each of dependent claims 8–10, 12, 14–16, 18, and 19, and provides persuasive reasoning as to why the claimed subject matter would have been obvious to one of ordinary skill in the art. Pet. 89–97. Petitioner also supports its contentions for these claims with the testimony of Dr. Kenny. Ex. 1003 ¶¶ 282–291, 294–298, 302–312, 315–316.

Patent Owner does not present any arguments for these claims other than those we have already considered with respect to independent claims 1 and 20. PO Resp. 63–64 ("[T]he Petition fails to establish that independent claims 1 and 20 are obvious in view of the cited references of Ground 1 and therefore fails to establish obviousness of any of the challenged dependent claims."); *see supra* § II.D.5.

We have considered the evidence and arguments of record and determine that Petitioner has demonstrated by a preponderance of the evidence that claims 8–10, 12, 14–16, 18, and 19 would have been obvious over the combined teachings of Aizawa, Inokawa, Ohsaki, Mendelson-2006, and Bergey for the reasons discussed in the Petition and as supported by the testimony of Dr. Kenny.

### 3. Dependent Claims 11 and 17

Dependent claim 11 ultimately depends from independent claim 1 and further recites "the single protruding convex surface protrudes a height between 1 millimeter and 3 millimeters." Ex. 1001, 45:65–67. Dependent claim 17 also ultimately depends from independent claim 1 and further recites "the single protruding convex surface protrudes a height greater than 2 millimeters and less than 3 millimeters." *Id.* at 46:23–25.

79

**Appx35720**

With respect to claims 11 and 17, both Petitioner and Patent Owner refer to their positions advanced with respect to claim 28, addressed in Section II.D.7 above. Pet. 91 (citing, e.g., Ex. 1003 ¶¶ 61–102, 273–277, 278–293), 96 (citing, e.g., Ex. 1003 ¶¶ 61–199, 273–277, 292–293, 313–314); PO Resp. 67–68, 69 (citing Ex. 2004 ¶¶ 126–129).

For the same reasons discussed above in Section II.D.7, we determine that Petitioner has met its burden of demonstrating by a preponderance of the evidence that claims 11 and 17 would have been obvious over the cited combination of references.

### 4. Dependent Claim 13

Dependent claim 13 ultimately depends from independent claim 1 and further recites "the displayed indicia are further responsive to temperature." Ex. 1001, 46:4–6; *see also id.* 45:14–16 (claim 1 reciting, "the user interface is configured to display indicia responsive to measurements of the physiological parameter").

Petitioner contends that, as discussed above in Section II.D.5, the combined sensor "would have included a touch-screen display that provides a GUI including display indicia that are response [sic] to a user input." Pet. 92. Petitioner further contends,

> Consistent with Mendelson-2006's description of the PDA's "simple GUI" being configured to allow for "easy activation of various functions," a [person of ordinary skill in the art] would have found it obvious to make an orientation of the PDA's user interface configurable responsive to temperature, for the sake of user convenience. A POSITA would have understood that a display indicia that changes when the temperature reaches a threshold value is responsive to temperature. Thus, a POSITA would have found it obvious that a system resulting from the combination of Aizawa, Inokawa, Ohsaki, Mendelson-2006, and

80

> Bergey would have allowed an orientation of the user interface
> to be further responsive to temperature.

*Id.* at 93 (citing Ex. 1003 ¶¶ 299–301; Ex. 1010, 3; Ex. 1020, 2, 6).

Patent Owner disputes Petitioner's contention, arguing that "Petitioner fails to identify any mention of temperature in Ohsaki, Aizawa, Inokawa, Mendelson 2006, or Bergey, let alone display indicia responsive to temperature." PO Resp. 68. Patent Owner also argues that the cited portion of Exhibit 1020 likewise fails to mention temperature, and while an uncited portion mentions "operating temperature" and "storage temperature," they are not relied upon or explained. *Id.*

On Reply, Petitioner contends that Dr. Kenny's cited testimony described the "LabView program, which includes a user interface configured to indicate when a temperature exceeds a threshold. . . . Thus, the Petition provides clear evidence that it was well known to display indicia that are responsive to temperature, and relates the same to Mendelson-2006's description of the PDA's user interface." Pet. Reply 37–38 (citing, *inter alia*, Ex. 1003 ¶ 300; Ex. 1027, 46; Ex. 1047 ¶¶ 66–67).

In its Sur-Reply, Patent Owner argues that reliance on the LabView manual provided as Exhibit 1027 is untimely, as it was not cited in the Petition or in Dr. Kenny's Declaration. PO Sur-reply 28–29. Moreover, Patent Owner argues that Petitioner still fails to explain why a person of ordinary skill in the art "would have added indicia responsive to ***temperature*** to Aizawa's ***pulse*** wave sensor based on LabVIEW's discussion of 'monitoring the temperature of an ***experiment***.'" *Id.* at 29 (citing Ex. 1027, 46). Further, Patent Owner argues that "Petitioner abandons its original argument" regarding the "***orientation*** of the user

interface" being "responsive to temperature," and now on Reply argues that it is the "***display indicia*** that are responsive to temperature." *Id.* (citing Pet. 93; Reply 37–38).

We agree with Patent Owner. The Petition contends it would have been obvious "to make an orientation of the PDA's user interface configurable responsive to temperature, for the sake of user convenience." However, none of the cited evidence supports this contention. Pet. 93; Ex. 1003 ¶¶ 299–301; Ex. 1010, 3; Ex. 1020, 2, 6.

Specifically, Dr. Kenny's declaration discusses the LabVIEW program and contends that it "included features that indicated 'when the temperature goes above a certain level,'" and concluded that "[o]ne of ordinary skill would have understood that a display indicia that changes when the temperature reaches a threshold value is responsive to temperature." Ex. 1003 ¶ 300. However, while the citation to Mendelson-2006 (Ex. 1010, 3) references LabVIEW, it does not discuss temperature, or display indicia responsive to temperature. Likewise, the cited portions of the HP iPAQ Specifications (Ex. 1020, 2, 6) also fail to discuss temperature or display indicia responsive to temperature. As such, Dr. Kenny's initial testimony lacks any supporting evidence.

On Reply, Petitioner cites a LabVIEW User Manual (Ex. 1027), which states that a warning light may activate to indicate when the temperature of an experiment exceeds a certain level. *Id.* at 46. We agree with Patent Owner that this evidence should have been cited in the Petition. As discussed above, the Petition lacks any supporting evidence to support the contention of obviousness. Petitioner cannot provide such evidence on Reply when it should have been offered in the Petition.

82

IPR2020-01539
Patent 10,588,554 B2

### *5. Conclusion*

For the foregoing reasons, we determine that Petitioner has met its burden of demonstrating by a preponderance of the evidence that claims 8–12 and 14–19 would have been obvious over the cited combination of references, but has not met its burden with respect to claim 13.

IPR2020-01539
Patent 10,588,554 B2

### III.    CONCLUSION

In summary:[10]

| Claims | 35 U.S.C. § | Reference(s)/ Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1–7, 20–28 | 103 | Aizawa, Inokawa, Ohsaki, Mendelson-2006 | 1–7, 20–28 | |
| 8–19 | 103 | Aizawa, Inokawa, Ohsaki, Mendelson-2006, Bergey | 8–12, 14–19 | 13 |
| **Overall Outcome** | | | 1–12, 14–28 | 13 |

### IV.    ORDER

Upon consideration of the record before us, it is:

ORDERED that claims 1–12 and 14–28 of the '554 patent have been

shown to be unpatentable;

---

[10] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding*. *See* 84 Fed. Reg. 16654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

84

IPR2020-01539
Patent 10,588,554 B2

FURTHER ORDERED that claim 13 of the '554 patent has not been shown to be unpatentable;

FURTHER ORDERED that, because this is a final written decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2020-01539
Patent 10,588,554 B2

PETITIONER:

Walter Renner
Andrew Patrick
FISH & RICHARDSON P.C.
Axf-ptab@fr.com
patrick@fr.com

PATENT OWNER:

Joseph Re
Stephen Larson
Jarom Kesler
Jacob Peterson
KNOBBE, MARTENS, OLSON, & BEAR LLP
2jrr@knobbe.com
2swl@knobbe.com
2jzk@knobbe.com
jup@knobbe.com

# CERTIFICATE OF SERVICE

I hereby certify that the original of this Notice of Appeal was filed via U.S.P.S. Priority Mail Express on April 12, 2022 with the Director of the United States Patent and Trademark Office at the address below:

Office of the Solicitor
United States Patent and Trademark Office
Mail Stop 8, Post Office Box 1450
Alexandria, VA 22313-1450

A copy of this Notice of Appeal is being filed and served on April 12, 2022 as follows:

**To the USPTO Patent Trial and Appeal Board:**
Patent Trial and Appeal Board
Madison Building East
600 Dulany Street
Alexandria, VA 22313

(*via PTAB E2E – as authorized by the Board*)

**To the U.S. Court of Appeals for the Federal Circuit:**
Clerk of Court
U.S. Court of Appeals for the Federal Circuit
717 Madison Place, N.W.
Washington, DC 20439

(*via CM/ECF – with filing fee*)

**Counsel for Petitioner Apple, Inc.**
W. Karl Renner, Reg. No. 41,265
Andrew B. Patrick, Reg. No. 63,471
Fish & Richardson P.C.
3200 RBC Plaza
60 South Sixth Street
Minneapolis, MN 55402

IPR50095-0013IP2@fr.com
PTABInbound@fr.com
axf-ptab@fr.com
patrick@fr.com

*(via email pursuant to 37 C.F.R. § 42.6(e))*

Dated:  April 12, 2022                    /Jarom Kesler/
                                          Jarom D. Kesler (Reg. No. 57,046)
                                          Attorney for Patent Owner
                                          Masimo Corporation

55313855

# IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | |
|---|---|---|
| In re Patent of: | Jeroen Poeze et al. | |
| U.S. Patent No.: | 10,588,554 | Attorney Docket No.: 50095-00013IP2 |
| Issue Date: | March 17, 2020 | |
| Appl. Serial No.: | 16,544,713 | |
| Filing Date: | August 19, 2019 | |
| Title: | MULTI-STREAM DATA COLLECTION SYSTEM FOR NONINVASIVE MEASUREMENT OF BLOOD CONSTITUENTS | |

## DECLARATION OF DR. THOMAS W. KENNY

**Declaration**

I declare that all statements made herein on my own knowledge are true and that all statements made on information and belief are believed to be true, and further, that these statements were made with the knowledge that willful false statements and the like so made are punishable under Section 1001 of Title 18 of the United States Code.

By: _____

Thomas W. Kenny, Ph.D.

APPLE 1003

77.    Aizawa-Inokawa would utilize two LEDs that emit two different wavelengths.  Aizawa's LED 21 would simply be replaced with two LEDs.  In this manner, Aizawa's sensor is improved through the implementation of a separate LED to account for motion load which the system already records and accounts for.  APPLE-1006, ¶¶[0006], [0028], [0035].

78.    One of ordinary skill would have combined the teachings of Aizawa and Inokawa as doing so would have amounted to nothing more than the use of a known technique to improve similar devices in the same way and combining prior art elements according to known methods to yield predictable results.  *KSR v. Teleflex*, 550 U.S. 398, 417 (2007).  Here, the combination is nothing more than improving Aizawa's pulse wave sensor that uses a single LED with the use of a known technique disclosed by Inokawa to detect and record body motion in addition to blood flow.  Furthermore, the elements of the combined system would each perform similar functions they had been known to perform prior to the combination.  *Id*.  For instance, in Aizawa-Inokawa, Aizawa's photodetectors would still detect light emitted by the LEDs and reflected by the subject's wrist, and Inokawa's two LEDs would still be used to emit light at different wavelengths.  *Id*.  Furthermore, one of ordinary skill would have readily understood how to select different photodiodes with different sensitivities to detect the different wavelengths of light emitted by the two LEDs.  *Id*.

41

159.   As shown below, it would have been obvious to one of ordinary skill to modify Aizawa's wrist-worn sensor to incorporate the shape of Ohsaki's translucent board 8.



APPLE-1006, FIG. 2 (annotated)

160.   Such a modification would have amounted to nothing more than the use of a known technique to improve similar devices in the same way, and combining prior art elements according to known methods to yield predictable results.  Indeed, the modification involves nothing more than adjusting transparent plate 6's shape to include a convex protrusion/lens surface similar to that disclosed by Ohsaki, and one of ordinary skill would have understood that this adjustment would improve adhesion to the user's skin and reduce variation in the signals detected by the sensor.  *Id*.  Furthermore, the elements of the combined system would each

94

perform similar functions they had been known to perform prior to the combination—Aizawa's transparent plate 6 would remain in the same position, performing the same function, but with a convex/lens protrusion as taught by Ohsaki. *Id*.

161.   Accordingly, [1f] would have been obvious over Aizawa in view of Inokawa, Ohsaki, and Mendelson 2006.  APPLE-1006, Abstract, ¶¶[0002], [0005], [0008]-[0016], [0023]-[0024], [0027]-[0030], [0032]-[0033], FIGS. 1, 2, 3, 4(a); APPLE-1009, ¶¶[0015], [0017], [0025], FIGS. 1, 2, 4A, 4B.

**[1g] at least a portion of the cover is sufficiently rigid to cause tissue of the user to conform to at least a portion of a shape of the single protruding convex surface when the physiological sensor device is worn by the user; and**

162.   As explained above with respect to [1pre]-[1f] the sensor resulting from the combination of the teachings of Aizawa, Inokawa, Ohsaki, and Mendelson 2006 would have included a transparent protruding convex cover operable to conform tissue of the user to at least a portion of the cover's single protruding convex surface when worn by the user.  APPLE-1006, Abstract, ¶¶[0002], [0005], [0008]-[0016], [0023]-[0024], [0027]-[0030], [0032]-[0033], FIGS. 1, 2, 3, 4(a); APPLE-1009, Abstract, ¶¶[0015], [0017], [0025], FIGS. 1, 2, 4A, 4B.

163.   In more detail, as shown in Aizawa's FIG. 2 (reproduced below), and as described by Ohsaki, the convex surface of the modified cover would have been in **intimate contact** with the surface of the user's skin when worn, such that slippage

177.   One of ordinary skill would, for example, have found it obvious to wirelessly transmit information or data acquired or processed by the physiological sensor device's base station to a PDA such as the HP iPAQ h4150, using either or both of 802.11b and Bluetooth™.  APPLE-1006, ¶¶[0002], [0003], [0067], [0074]-[0077]; APPLE-1010, 1-4, FIGS. 1-3; APPLE-1020, 1-4.

178.   One of ordinary skill would have recognized that applying Mendelson 2006's teachings in this manner would have led to predictable results without altering or hindering the functions performed by the physiological sensor device. In fact, one of ordinary skill would have been motivated to implement the well-known technique of wirelessly transmitting data from Aizawa-Inokawa-Ohsaki's physiological sensor device to a handheld computing device such as the HP iPAQ h4150 to achieve the predictable benefits described by Mendelson 2006.  *Id*.

179.   One of ordinary skill would, for example, have been motivated by Mendelson 2006's disclosure of a wireless transmission method and PDA with a touch-screen display that provides a "simple GUI" to present "information to the user" and provide "easy activation of various functions."  *Id*., 4.  Indeed, one of ordinary skill would have had a reasonable expectation of success in making this modification, and would have reasonably expected to reap benefits of displaying a measured waveform representative of a patient's arterial pulse.  *Id*.

275.   In incorporating Ohsaki's teachings, one of ordinary skill would have found it obvious that a device designed to fit on a user's wrist would be on the order of millimeters.  Additionally, one of ordinary skill would have taken the user's comfort into consideration—Ohsaki's convex cover, for example, is said to solve the problem of "the user feel[ing] uncomfortable" due to pressure from the device and belt on the user's limbs.  APPLE-1009, ¶[0006]; *see also* APPLE-1010, 2 (describing its "optical reflectance transducer" as "small (∅ = 22mm)"); *see also* APPLE-1017, 2 (describing a "standard 24-pin (dimensions: 19 x 19 mm) microeletronic package" for its sensor).

276.   One of ordinary skill would have found it obvious that in order to provide a comfortable cover featuring a protruding convex surface that prevents slippage, the surface should protrude a height greater than 2 millimeters and less than 3 millimeters.  Indeed, there would have been a finite range of possible protruding heights, and it would have been obvious to select a protruding height that would have been comfortable to the user.

277.   Accordingly, [28] would have been obvious over Aizawa in view of Inokawa, Ohsaki, and Mendelson 2006.

## VIII.  GROUND 2 – Claims 8-19 are Rendered Obvious by Aizawa, Inokawa, Ohsaki, Mendelson 2006, and Bergey

### A.    Combination of Aizawa, Inokawa, Ohsaki, Mendelson 2006, and Bergey



US 20010056243A1

(19) **United States**

(12) **Patent Application Publication** (10) Pub. No.: **US 2001/0056243 A1**

Ohsaki et al. (43) **Pub. Date:** **Dec. 27, 2001**

(54) **WRISTWATCH-TYPE HUMAN PULSE WAVE SENSOR ATTACHED ON BACK SIDE OF USER'S WRIST**

(76) Inventors: **Rie Ohsaki**, Anjo-city (JP); **Teiyuu Kimura**, Nagoya-city (JP); **Naoki Fukaya**, Obu-city (JP)

Correspondence Address:
**LAW OFFICE OF DAVID G POSZ**
**2000 L STREET, N.W.**
**SUITE 200**
**WASHINGTON, DC 20036 (US)**

(21) Appl. No.: **09/852,698**

(22) Filed: **May 11, 2001**

(30) **Foreign Application Priority Data**

Jun. 14, 2000    (JP) ...................................... 2000-177999

**Publication Classification**

(51) Int. Cl.$^7$ ...................................... A61B 5/02
(52) U.S. Cl. .......................................... 600/503; 600/500

(57) **ABSTRACT**

A pulse wave sensor includes a detecting element and a sensor body. The pulse wave sensor is worn on the back side of a user's wrist corresponding to the back of the user's hand. The detecting element includes a translucent member on its top, and the translucent member has a convex surface. The detecting element is attached on the back side of the user's wrist by a dedicated belt so that the convex surface of the translucent member is in intimate contact with the surface of the user's skin. The sensor body is attached on the back side of the user's wrist by another dedicated belt so that it is arranged on the detecting element. A cushion is arranged between the sensor body and the detecting element. The pulse wave sensor can stably detect the pulse wave without being affected by the movement of the user's wrist.



APPLE 1009

# WRISTWATCH-TYPE HUMAN PULSE WAVE SENSOR ATTACHED ON BACK SIDE OF USER'S WRIST

## CROSS REFERENCE TO RELATED APPLICATION

[0001] This application is based on and incorporates herein by reference Japanese Patent Application No.2000-177999 filed on Jun. 14, 2000.

## BACKGROUND OF THE INVENTION

[0002] 1. Field of the Invention

[0003] The present invention relates to an optical sensor for detecting the pulse wave of a human body.

[0004] 2. Related Art

[0005] JP-A-11-70087 proposes a wristwatch-type device for detecting the pulse wave of a human body. This detecting device is worn on the user's wrist. The device includes a detecting element for detecting a pulse wave and a sensor body including a display. The detecting element is fixed on the front side of the user's wrist corresponding to the palm of the user's hand by a band attached to the sensor body. The information of pulse wave detected by the detecting element is displayed on the display of the sensor body fixed on the back side of the user's wrist.

[0006] The two bones (the radius and the ulna) pass through the front side of the user's wrist. Therefore the detecting element has a tendency to slip off the detection position of the user's wrist, since the skin surface of the front side of the user's wrist greatly moves as the user's wrist moves. Furthermore, the user feels uncomfortable since the radius and the ulna are pressed. As a result, the user further moves his/her wrist unconsciously and it becomes further difficult to detect the pulse wave stably.

## SUMMARY OF THE INVENTION

[0007] The present invention overcomes the above drawbacks, and has an object to provide a human pulse wave sensor which is capable of detecting the pulse wave of a human body stably and has high detection probability.

[0008] The pulse wave sensor according to the present invention includes a detecting element and a sensor body. The pulse wave sensor is worn on the back side of the user's wrist corresponding to the back of the user's hand for detecting the pulse wave of the user. The detecting element includes a light emitting element and a light receiving element. The sensor body is connected to the detecting element by a signal line.

[0009] Preferably, a translucent member is arranged on the light emitting element and the light receiving element. The translucent member has a convex surface. The detecting element is attached on the back side of the user's wrist by a dedicated belt so that the convex surface of the translucent member is in intimate contact with the surface of the user's skin. The light emitting element and the light receiving element are arranged in the longitudinal direction of the user's arm. The sensor body is attached on the back side of the user's wrist by a dedicated belt other than the belt of the

detecting element so that it is arranged on the detecting element. A cushion is arranged between the sensor body and the detecting element.

[0010] According to this construction, the user does not feel uncomfortable when the pulse wave sensor is worn on the user's wrist. Furthermore the detecting element is fixed on the user's wrist without slipping off the detection position of the user's wrist, even if the user is in motion. Accordingly the pulse wave sensor can stably detect the pulse wave of the user.

## BRIEF DESCRIPTION OF THE DRAWINGS

[0011] The above and other objects, features and advantages of the present invention will become more apparent from the following detailed description made with reference to the accompanying drawings. In the drawings:

[0012] FIG. 1 is a cross-sectional view of a pulse wave sensor attached on the user's wrist;

[0013] FIG. 2 is a schematic diagram of a mechanism for detecting a pulse wave;

[0014] FIGS. 3A and 3B are graphs of the pulse wave detected by a pulse wave sensor attached on the back side of the user's wrist and the pulse wave detected by a pulse wave sensor attached on the front side of the user's wrist, respectively; and

[0015] FIGS. 4A and 4B are graphs of the pulse wave detected by a pulse wave sensor including a convex detecting surface and the pulse wave detected by a pulse wave sensor including a flat detecting surface, respectively.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

[0016] Referring to FIG. 1, a pulse wave sensor 1 includes a detecting element 2 and a sensor body 3. The pulse wave sensor 1 is worn on the back side of the user's wrist 4 corresponding to the back of the user's hand in the similar manner as a wristwatch is normally worn. This sensor 1 is used for detecting the pulse wave of the user's body for a medical diagnosis, a physical check up, and the like.

[0017] Referring to FIG. 2, the detecting element 2 comprises a package 5, a light emitting element 6 (e.g., LED), a light receiving element 7 (e.g., PD), and a translucent board 8. The package 5 has an opening and includes a circuit board 9 therein. The light emitting element 6 and light receiving element 7 are included in the package 5 and arranged on the circuit board 9. The translucent board 8 is a glass board which is transparent to light, and attached to the opening of the package 5. A convex surface is formed on the top of the translucent board 8 as shown in FIG. 2.

[0018] The detecting element 2 is fixed on the user's wrist 4 by a dedicated belt 10 attached to the detecting element 2 as shown in FIG. 1. The belt 10 may be made from elastic material so that regular pressure is applied to the user's wrist 4. In this case, it is prevented that light reflected by the surface of the skin or disturbance light from the outside penetrates the translucent board 8, since the surface of the translucent board 8 is in intimate contact with the surface of the user's skin. However the user feels uncomfortable if the pressure applied to the user's wrist 4 is too high. Therefore it is desirable that the pressure applied to the user's wrist 4 is limited to 5-15 mmHg.

US 2001/0056243 A1
Dec. 27, 2001

2

**[0019]** The light emitting element **6** and the light receiving element **7** are arranged side by side as shown in **FIG. 2**. Accordingly the length of the detecting element **2** from the right side to the left side in **FIG. 2** is longer than the length from the upper side to the lower side. If the detecting element **2** is arranged so that its longitudinal direction (from the right side to the left side in **FIG. 2**) agrees with the circumferential direction of the user's wrist **4**, it has a tendency to slip off. Therefore it is desirable that the detecting element **2** is arranged so that its longitudinal direction agrees with the longitudinal direction of the user's arm. The dedicated belt **10** is attached to the detecting element **2** so that it can fix the detecting element **2** on the user's wrist **4** in this way.

**[0020]** The sensor body **3** is connected to the detecting element **2** by a signal line **13**, and includes, as shown in **FIG. 2**, a drive circuit **11**, a microcomputer **12**, and a monitor display (not shown). The drive circuit **11** drives the light emitting element **6** to emit light toward the wrist **4**. The microcomputer **12** calculates the pulse rate from the reflected light received by the detecting element **2**. This reflected light varies with the user's pulsation. The monitor display shows the calculated pulse rate and the like.

**[0021]** The sensor body **3** is arranged on the top of the detecting element **2**, and fixed on the user's wrist **4** by a dedicated belt **14** attached to the sensor body **3**. A cushion **15** such as a sponge or a gel is inserted between the detecting element **2** and the sensor body **3** so that the detecting element **2** does not directly contact the sensor body **3**.

**[0022]** The pulse wave sensor **1** detects the pulse wave of the user's body as follows. The light emitting element **6** emits light toward the user's wrist **4**, a portion of the emitted light penetrates the capillary arteriole **16** in the inside of the user's wrist **4** and is absorbed by the haemoglobin in the blood. The rest of the emitted light is reflected and scattered by the capillary arteriole **16**, and partly reaches the light emitting element **7**. As the amount of the haemoglobin in the blood varies in waves due to the pulsation of the user's blood, the amount of the light absorbed by the haemoglobin also varies in waves. As a result, the amount of the light which is reflected by the capillary arteriole **16** and reaches the light receiving element **7** varies in waves. This variation in the amount of the light received by the light receiving element **7** is detected as the pulse wave information.

**[0023]** If the detecting element **2** is arranged on the front side of the user's wrist **4**, the amount of the light received the light receiving element **7** is larger. That is, the intensity of the signal received by the light receiving element **7** is higher. However, the detecting element **2** has a tendency to slip off the detecting position of the user's wrist **4** as the user moves his/her wrist, and therefore the intensity of the light received by the light receiving element **7** largely varies depending on the shift amount of the detecting element **2**. As shown in **FIG. 3B**, in the case that the detecting element **2** is arranged on the front side of the user's wrist **4**, the pulse wave can be detected well if the user is at rest. However, when the user is in motion, the detected pulse wave is adversely affected by the movement of the user's wrist **4**.

**[0024]** In contrast to this, if the detecting element **2** is arranged on the back side of the user's wrist **4**, the user will not move his/her wrist unconsciously since the radius and the ulna inside the user's wrist **4** are not pressed and

consequently the user does not feel so uncomfortable. Further, the detecting element **2** will not shift so widely even if the user's wrist moves. Therefore the detecting element **2** is stably fixed to the detecting position of the user's wrist **4**. As a result, the pulse wave is detected stably without being affected by the movement of the user's wrist **4** as shown in **FIG. 3A**.

**[0025]** The detecting element **2** is arranged on the user's wrist **4** so that the convex surface of the translucent board **8** is in intimate contact with the surface of the user's skin. Thereby it is prevented that the detecting element **2** slips off the detecting position of the user's wrist **4**. If the translucent board **8** has a flat surface, the detected pulse wave is adversely affected by the movement of the user's wrist **4** as shown in **FIG. 4B**. However, in the case that the translucent board **8** has a convex surface like the present embodiment, the variation of the amount of the reflected light which is emitted from the light emitting element **6** and reaches the light receiving element **7** by being reflected by the surface of the user's skin is suppressed. It is also prevented that noise such as disturbance light from the outside penetrates the translucent board **8**. Therefore the pulse wave can be detected without being affected by the movement of the user's wrist **4** as shown in **FIG. 4A**.

**[0026]** The detecting element **2** and the sensor body **3** is attached to theuser's wrist **4** by the dedicated belts**10** and **14**, respectively. That is, the detecting element **2** and the sensor body **3** are allowed to move relatively. Further the cushion **15** is arranged between the detecting element **2** and the sensor body **3**. Therefore, if force is applied to the sensor body **3** or the sensor body **3** moves, the force applied to the sensor body **3** or the movement of the sensor body **3** cannot be transmitted to the detecting element **2** easily.

**[0027]** Accordingly the detecting element **2** is stably fixed to the user's wrist **4**. As a result, the pulse wave sensor can detect the pulse wave at a high S/N ratio, that is, it can provide high detection probability, not only when the user is at rest but also when the user is taking light exercise.

**[0028]** Modifications

**[0029]** In the above embodiment, the sensor body **3** need not include the microcomputer **12** if it includes a transmitter instead. In this case, the pulse wave information detected by the detecting element **2** is transmitted to a receiver by the transmitter. The sensor body **3** can be downsized and light in weight in this case and consequently the force applied to the sensor body **3** or the movement of the sensor body **3** cannot be transmitted to the detecting element **2** easily.

**[0030]** In the above embodiment, the detecting element **2** and the sensor body **3** may be worn on the back side of the user's forearm.

What is claimed is:

1. A pulse wave sensor for detecting a pulse wave of a human body comprising:

a detecting element including a light emitting element and a light receiving element; and

a sensor body including a circuit connected to the detecting element via a signal line,

wherein the detecting element is constructed to be worn on a back side of a user's wrist or a user's forearm.

5

0090-6689/88/167–173/$02.00/0
MEDICAL INSTRUMENTATION
Copyright © 1988 by the Association for the Advancement of Medical Instrumentation

Vol. 22, No. 4

# Design and Evaluation of a New Reflectance Pulse Oximeter Sensor

Y. MENDELSON, PhD, J. C. KENT, MS, B. L. YOCUM, BS, AND M. J. BIRLE, BS

The design and construction of a new optical reflectance sensor suitable for noninvasive monitoring of arterial hemoglobin oxygen saturation with a pulse oximeter is described. The reflectance sensor was interfaced to a Datascope ACCUSAT pulse oximeter that was specially adapted for this study to perform as a reflectance oximeter. We evaluated the reflectance sensor in a group of 10 healthy adult volunteers. $SpO_2$ obtained from the forehead with the reflectance pulse oximeter and $SpO_2$ obtained from a finger sensor that was connected to a standard ACCUSAT transmittance pulse oximeter were compared simultaneously to arterial blood samples analyzed by an IL 282 CO-Oximeter. The equation for the best fitted linear regression line between the reflectance $SpO_2$ and $HbO_2$ values obtained from the reference IL 282 CO-Oximeter in the range between 62 and 100% was: $SpO_2$ (%) = 4.78 + 0.96 (IL); n = 110. The regression analysis revealed a high degree of correlation (r = 0.98) and a relatively small standard error of the estimate (SEE = 1.82%). The mean and standard deviations for the difference between the reflectance $SpO_2$ and IL 282 measurements was 1.38 and 1.85%, respectively. This study demonstrates the ability to acquire accurate $SpO_2$ from the forehead using a reflectance sensor and a pulse oximeter.

The recent development of transmittance pulse oximeters by combining optical plethysmography with the spectrophotometric determination of hemoglobin oxygen saturation in arterial blood ($SpO_2$) has provided a widely used technique for monitoring hypoxemia.

With transmittance pulse oximeters, sensor application is limited to several peripheral locations where light can be readily transmitted and detected, such as the finger tips, ear lobes, and toes on adults, and the foot or palms on infants. Alternatively, skin reflectance oximetry could enable $SpO_2$ measurement from more centrally located parts of the body such as the forearms, chest, and forehead, which cannot be monitored using conventional transillumination techniques.

It appears that reflectance pulse oximetry may be particularly suitable for direct assessment of fetal distress resulting from hypoxia during delivery, if used in addition to monitoring fetal heart rate by a scalp ECG electrode. Another suggested application of noninvasive reflectance pulse oximetry is for monitoring $SpO_2$ in the external carotid artery through a sensor applied to the skin near the superficial temporal artery.[1]

In this article we describe the design and construction

of an optical reflectance sensor suitable for noninvasive monitoring of $SpO_2$ with a pulse oximeter. The experimental evaluation of the new sensor and verification that $SpO_2$ obtained with the reflectance sensor compare favorably with: (a) $SpO_2$ measured simultaneously by a finger sensor connected to a standard transmittance pulse oximeter, and (b) $HbO_2$ measured by the IL 282 CO-Oximeter from samples of arterial blood in a group of 10 healthy adult volunteers is presented.

## PULSE OXIMETRY

The principle of pulse oximetry was proposed by Aoyagi et al[2] and further developed by Yoshiya et al.[3] This unique approach is based on the change in light absorption by tissue. The change is caused primarily by arterial blood pulsation. The pulsating arterioles in a vascular bed, by expanding and relaxing, modulate the amount of light absorbed by the tissue and thus produce a characteristic photoplethysmographic waveform. The changes in light absorption are used to measure $SpO_2$ noninvasively.

Initial attempts to develop a noninvasive oximeter that can measure oxygen saturation by analyzing the absolute light intensity that is diffusely reflected from the skin were only partially successful, mainly because of limited accuracy associated with variations in tissue attenuation and differences in skin pigmentation. Recently, we showed that accurate $SpO_2$ measurements can be made utilizing a reflectance sensor and the concept of pulse oximetry.[4, 5] We found that $SpO_2$ can be calculated from the ratio of the reflected red and infrared photoplethysmograms based on a normalization in which the pulsatile (ac) component of the red and infrared photoplethysmograms is divided by the respective nonpulsatile (dc) component. The conversion of the red/infrared ratios to $SpO_2$ is performed by an empirical calibration of the oximeter. This process is performed by comparing the red/infrared ratios measured by the pulse oximeter with blood $HbO_2$ values obtained from an in vitro oximeter.

The excursions of photoplethysmographic signals detected by reflectance and transmittance sensors when placed on the forehead and finger, respectively, are inversely related to changes in arterial blood pulsations. Although the amplitude of the pulsatile component of the two waveforms is different, the shapes of the pho-

From the Worcester Polytechnic Institute, Biomedical Engineering Program, Worcester, MA 01609.

Address correspondence and requests for reprints to Yitzhak Mendelson, PhD, Biomedical Engineering Program, Worcester Polytechnic Institute, 100 Institute Rd., Worcester, MA 01609.

1

APPLE 1017

Appx37370

toplethysmograms are virtually identical, as illustrated in Figure 1.

## SENSOR DESIGN

The basic optical sensor of a pulse oximeter consists of a red and an infrared light emitting diode (LED) and a suitable photodetector. In a transmittance pulse oximeter sensor, the LEDs and the photodetector are mounted in opposition, whereas in a reflectance sensor, the LEDS and the photodetector are mounted side by side. The wavelength of the red LED is typically chosen from regions of the spectra where the absorption coefficient of Hb and HbO₂ are markedly different (*e.g.*, 660 nm). The infrared wavelength, on the other hand, is typically chosen from the spectral region where the difference in absorption coefficients of Hb and HbO₂ is relatively small (*e.g.*, 930 nm). The spectral response of the photodetector must overlap the emission spectra of the red and infrared LEDs.

Practically, the major limitation in reflection pulse oximetry is the comparatively low-level photoplethysmograms typically recorded from low-density, vascular areas of the skin. The feasibility of reflection pulse oximetry, therefore, is essentially dependent on the ability to design a sensor that can detect sufficiently strong reflection photoplethysmographic signals from various locations on the body.

The light from the LEDs in the reflectance sensor is diffused by the skin in all directions. This suggests that to detect most of the backscattered radiation from the skin, the photodetector must be able to detect light from an area concentric with the LEDs. The intensity of the backscattered light decreases in direct proportion to the square of the distance between the photodetector and the LEDs; thus the photodetector should be mounted close to the LEDs. We found experimentally that a separation of 4–5 mm between the LEDs and photodetector provides the best sensitivity in terms of detecting adequately large pulsatile components. We also found that when multiple photodetectors are arranged at equal distances around the LEDs, the total amount of backscattered light that can be detected by the reflectance sensor is directly proportional to the number of photodetectors.

The optical reflectance sensor used in this study consists of two red (peak emission wavelength: 660 nm) and two infrared (peak emission wavelength: 930 nm) LED chips (dimensions: 0.3 × 0.3 mm), and six silicon photodiodes (active area: 2.74 × 2.74 mm) arranged symmetrically in a hexagonal configuration as shown in Figure 2. To maximize the fraction of backscattered light collected by the sensor, the currents from all six photodiodes were summed. The LEDs and photodiode chips were mounted with conductive epoxy (Epo-tek H31, Epoxy Technology, Inc. Billerica, Massachusetts) on a ceramic substrate (dimensions: 13.2 × 13.2 × 0.25 mm) that was housed in a standard 24-pin (dimensions: 19 × 19 mm) microelectronic package (AIRPAX, Cambridge, Maryland), which is commonly used for packaging electronic circuits. The optical components were interconnected and wired to the package pins with 1-mil (0.0254-mm diameter) aluminum wires, by a conventional ultrasonic bonding technique. To minimize the amount of light transmission and reflection between the LEDs and the photodiodes within the sensor, a ring-shaped, optically opaque shield of black Delrin (Dupont, Wilmington, Delaware) was placed between the LEDs and the photodiode chips. The optical components were encapsulated inside the package using optically clear adhesive (NOA-63, Norland Products, Inc., New Brunswick, New Jersey). The microelectronic package was mounted inside a black Delrin housing (dimensions: 3.2-cm diameter × 1.5-cm high). The sensor can be attached to the skin by means of double-sided adhesive tape. The weight of the entire sensor assembly is approximately 11 g.

## SIGNAL PROCESSING

The optical reflectance sensor was interfaced to a com-



INFRARED REFLECTANCE PLETHYSMOGRAMS

2 sec

INFRARED TRANSMITTANCE PLETHYSMOGRAMS

**Figure 1.** Relative infrared reflectance and transmittance photoplethysmograms recorded from the forehead and finger, respectively.

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

APPLE INC.

Petitioner,

v.

MASIMO CORPORATION,

Patent Owner.

———————

Case IPR2020-01539
U.S. Patent 10,588,554

———————

**DECLARATION OF VIJAY K. MADISETTI, PH.D.**

**MASIMO 2004**
**Masimo v. Apple**
**IPR2020-01539**

configuration that prevents slipping and various other configurations that have a tendency to slip. Ex. 1009 ¶¶[0006], [0010], [0019], [0023], [0025]. Dr. Kenny equates Ohaski's disclosure of a convex surface that prevents slippage with "improving adhesion." Ex. 1003 ¶94 (citing Ex. 1009 ¶[0025]). But Dr. Kenny's proposed modification eliminates the longitudinal shape that Ohsaki identifies as an important part of reducing slipping. Ex. 1009 ¶[0019].

54.    Ohsaki places its linear, longitudinal sensor on the backhand side of a user's wrist to avoid interacting with bones in the wrist. *See* Ex. 1009 ¶[0006] (discussing need to avoid pressing on "two bones (the radius and the ulna)"), ¶[0024] ("the radius and the ulna inside the user's wrist 4 are not pressed"); *see also*, *e.g.*, ¶¶[0023]-[0024], Abstract, Title, Fig. 1 (Ohsaki device worn on back side of wrist). As illustrated below (left), the forearm bones (the radius and ulna) on the arm's backhand (or watch) side create a longitudinal opening at the junction between the wrist and forearm with no muscle insertions. Ex. 2010 at 49 (Plate 434). The radius and ulna, against which Ohsaki warns against pressing (Ex. 1009 ¶¶[0006], [0024]), are on either side of this longitudinal opening.



Anatomical drawing of the back side (posterior) of the hand, wrist, and forearm
(partial view from Ex. 2010 at 49 (Plate 434))
Left:  Conceptual view of how a rectangular sensor that is positioned in
longitudinal direction on the wrist/forearm can avoid the radius and ulna
Right:  Conceptual view of how the same rectangular sensor placed in the
circumferential direction on wrist/forearm interacts with the radius and ulna

55.    Ohsaki indicates that its sensor's longitudinal direction needs to be
aligned with the longitudinal direction of the longitudinal opening of the user's arm
to prevent slipping.  Ex. 1009 ¶[0019].  If the sensor's longitudinal direction is
aligned with the circumferential direction of the user's wrist, the undesirable result
is "a tendency [for Ohsaki's sensor] to slip off."  Ex. 1009 ¶[0019].  As illustrated
above (right), a rectangular structure like Ohsaki's sensor and board that is aligned
with the circumferential direction of the user's wrist undesirably interacts with the
radius and ulna, which Osaki warns against.  Ex. 1009 ¶¶[0006], [0024].  In
contrast, a rectangular structure aligned with the longitudinal direction of the user's
wrist can avoid pressing against the radius and ulna.

-33-

56.    Thus, a POSITA would have understood that changing the shape of Ohsaki's rectangular board to circular would not preserve its ability to prevent slipping.  Instead, if Ohsaki's rectangular board were changed into a circular shape, a POSITA would have believed it would have resulted in slipping, and thus eliminated the advantage of Ohsaki's board.  This is because a circular shape extends equally in all directions, including in the circumferential direction of the user's wrist, which Ohsaki explains results in slipping.  Ex. 1009 ¶[0019].  As a result, a circular shape cannot be placed in a longitudinal direction and thus cannot align with the longitudinal direction of the user's wrist, as taught by Ohsaki.  As illustrated below, unlike a longitudinal sensor, a symmetrical circular shape (with a diameter equal to the long side of the rectangle, below left) would not fit within the user's anatomy in a way that it could avoid undesirably pressing against the user's radius and ulna, which Ohsaki cautioned against.

-34-

Ohsaki's Longitudinal Teachings        Dr. Kenny's Proposed Combination



Anatomical drawing of the back side (posterior) of the hand, wrist, and forearm
(partial view from Ex. 2010 at 49 (Plate 434))
Left:  Conceptual view of how a rectangular sensor that is positioned in
longitudinal direction on the wrist/forearm can avoid the radius and ulna
Right:  Conceptual view of how a circular sensor with the same diameter as the
length of the rectangular board interacts with the radius and ulna

57.    Because a symmetrical circular shape will press on the user's arm in

all directions, it will interact with the user's bone structure.  Ohsaki teaches that

such interactions with the user's anatomy are undesirable and result in slipping.  Ex.

1009 ¶¶[0006], [0023]-[0024].

58.    Dr. Kenny did not discuss Ohsaki's disclosure that when Ohsaki's

rectangular sensor was placed in one orientation (up-and-down the arm), it helped

prevent slipping.  Ex. 1009 ¶[0019].  Dr. Kenny also did not discuss Ohsaki's

explanation that rotating the sensor 90 degrees, such that the long direction points in

the circumferential direction of the user's wrist, the sensor "has a tendency to slip."

Ex. 1009 ¶[0019].

-35-

[0024]; *see also* ¶[0030] (single sentence identifying back side of user's forearm, which is connected to the wrist).

60.    As a result, a POSITA would not have been motivated to eliminate the longitudinal shape that Ohsaki asserts helps prevent slipping. Ex. 1009 ¶[0019]. Indeed, Ohsaki underscores the unsuitability of the proposed combination, explaining that many sensor positions and orientations are ineffective. Ex. 1009 ¶¶[0019], [0023]-[0024]. Beyond the illustrated longitudinal shape (Ex. 1009 ¶[0019], Figs. 1-2) Ohsaki has no details or explanation that a POSITA could use to implement its board into other devices, other shapes, or other measurement locations. Ohsaki indicates that only one shape (rectangular), one position (back side of the wrist, discussed further below), and one orientation (up-and-down the arm) prevent slipping. Ex. 1009 ¶¶[0019], [0023]-[0025]. Ohsaki emphasizes that its benefit occurs only when the sensor has a longitudinal shape and is on the wrist's back side, in the anatomically appropriate orientation. Ex. 1009 ¶¶[0019], [0023]-[0024].

61.    A POSITA would not have been motivated to change the shape of Ohsaki's rectangular board to combine it with Aizawa's circular sensor because a POSITA would have understood that changing Ohsaki's rectangular board into a circular shape would eliminate Ohsaki's benefit of preventing slipping.

-37-

The possibility that the proposed modification could be manufactured (Ex. 1003 ¶¶92, 179) does not demonstrate that the resulting device would successfully function.

**F.    The Challenged Dependent Claims Are Nonobvious Over Ground 1**

**1.    The Challenged Dependent Claims Are Nonobvious For The Same Reason As The Independent Claims**

120.    As discussed above, in my opinion claims 1 and 20 would not have been obvious over the cited references of Ground 1.  In addition, in my opinion, the dependent claims would be nonobvious for at least the same reasons.  *See* Sections VII.A-C, above.

**2.    Claim 28**

121.    Claim 28 ultimately depends from claim 20 and includes the additional limitation:  "wherein the single protruding convex surface protrudes a height greater than 2 millimeters and less than 3 millimeters."  The '554 Patent discloses, among other things, particular example convex shapes that improve signal strength.  Ex. 1001 20:14-30.  The '554 Patent explains:  "For example, in one embodiment, a convex bump of about 1 mm to about 3 mm in height and about 10 mm$^2$ to about 60 mm$^2$ was found to help signal strength by about an order of magnitude versus other shapes."  Ex. 1001 20:18-22.  Thus, as explained in the '554 Patent, an appropriately sized protrusion can dramatically increase the accuracy of the measurements.  Ex. 1001 20:14-30.

-79-

122.    Dr. Kenny does not point to any corresponding teaching in Aizawa, Ohsaki, Inokawa, or Mendelson 2006 for a specific protrusion height of greater than 2 millimeters and less than 3 millimeters.  Ex. 1003 ¶¶273-277.  Instead, Dr. Kenny asserts that when "incorporating Ohsaki's teachings, one of ordinary skill would have found it obvious that a device designed to fit on a user's wrist would be on the order of millimeters," and "there would have been a finite range of possible protruding heights, and it would have been obvious to select a protruding height that would have been comfortable to the user."  Ex. 1003 ¶¶275-276.  But Dr. Kenny's cited references in Ground 1 do not teach or suggest a protrusion with a height greater than 2 millimeters and less than 3 millimeters would have been beneficial in terms of enhancing signal strength or user comfort.

123.    Dr. Kenny cites alleged disclosures of sensor sizes in two references, Mendelson 2006 (Ex. 1010) and Mendelson-1988 (Ex. 1017).  Ex. 1003 ¶275.  But neither Mendelson 2006 nor Mendelson-1988 disclose a cover, and therefore do not disclose a cover with a protrusion.  Ex. 1010 Fig. 1 (no view of cover); Ex. 1017 Fig. 2 (showing flat layer of epoxy encapsulating optical components).  The flat surface of encapsulating epoxy used with Mendelson-1988's sensor would not have informed or motivated a POSITA to include a cover, and likewise would not have motivated a POSITA to include a cover with a convex protrusion of a particular height.

124.    Dr. Kenny appears to have selected Mendelson 2006 and Mendelson-1988 because the references discuss a similar size (22 mm diameter and 19x19 mm square), which Dr. Kenny argues would also be used with a wrist-worn device.  Ex. 1003 ¶275.  Both Mendelson 2006 and Mendelson-1988, however, are forehead sensors, not wrist sensors.  Ex. 1010 Abstract ("wireless wearable pulse oximeter developed based on a small forehead mounted sensor"); Ex. 1017 at 1 ("$SpO_2$ obtained from the forehead….").  I further note that other references use different sized sensors.  For example, Mendelson-1991 uses an assembled sensor that "measures approximately 38 mm in diameter and is 15 mm thick."  Ex. 2022 at 3.  Dr. Kenny does not explain why a POSITA would have been motivated to select one sensor size over another, or to select one protrusion height as opposed to any other.  Dr. Kenny suggests that "a height greater than 2 millimeters and less than 3 millimeters" would "prevent[] slippage" and "provide a comfortable cover…."  Ex. 1003 ¶276.  But that disclosure is not in any of the references which are part of Ground 1.  In fact, as discussed above (Sections VII.A.1, VII.A.2, VII.B), Ohsaki explains that its sensor's width and length (including the board) are important, but does not say anything about the height of the convex surface of the board.  *See* Ex. 1009 ¶[0019] ("the length of the detecting element 2 from the right side to the left side in FIG. 2 is longer than the length from the upper side to the lower side").  In my opinion, a POSITA would not have found it obvious to include a cover with a

single protruding convex surface "wherein the single protruding convex surface protrudes a height greater than 2 millimeters and less than 3 millimeters" based on the cited references of Ground 1.

## VIII.  GROUND 2 FAILS FOR AT LEAST THE SAME REASONS AS GROUND 1

125.     Ground 2 is a five-reference combination that adds Bergey (Ex. 1016) to the combination of Ohsaki, Aizawa, Inokawa, and Mendelson 2006.  Ex. 1003 ¶¶278-320.  Ground 2 only challenges dependent claims 8-19. Pet. 11-12; Ex. 1003 ¶¶278-320.  Dr. Kenny adds Bergy to Ohsaki, Aizawa, Inokawa, and Mendelson 2006 because those references do not disclose that the substrate, wall, and cover hermetically seal the at least four detectors.  Ex. 1003 ¶278.  Bergey's disclosure, which is related to a wristwatch, does not fix the deficiencies identified for Ground 1.  As a result, in my opinion, the challenged claims of Ground 2 are nonobvious for the same reasons discussed above for Ground 1.   In addition, certain dependent claims discussed below are nonobvious for additional reasons.

### A.     Claim 11

126.     Claim 11 adds the limitation that "the single protruding convex surface protrudes a height between 2 millimeter and 3 millimeters."  Ex. 1001 Claim 11.  Dr. Kenny provides no independent analysis for this claim and instead refers back to his prior arguments for claim 28.  Ex. 1003 ¶¶292-293.  In my

Filed April 12, 2022

On behalf of:
  Patent Owner Masimo Corporation
By:  Jarom D. Kesler (Reg. No. 57,046)
  Stephen W. Larson (Reg. No. 69,133)
  Stephen C. Jensen (Reg. No. 35,556)
  Joseph R. Re (Reg. No. 31,291)
  Jacob L. Peterson (Reg. No. 65,096)
  KNOBBE, MARTENS, OLSON & BEAR, LLP
  2040 Main Street, 14th Floor
  Irvine, CA 92614
  Tel.:  (949) 760-0404
  Fax:   (949) 760-9502
  Email:  AppleIPR2020-1714-765@knobbe.com

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

APPLE INC.

Petitioner,

v.

MASIMO CORPORATION,

Patent Owner.

———————

IPR2020-01714
U.S. Patent 10,631,765

———————

**PATENT OWNER'S NOTICE OF APPEAL TO
THE U.S. COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

Pursuant to 28 U.S.C. § 1295(a)(4)(A), 35 U.S.C. §§ 141(c), 142, and 319, 37 C.F.R. §§ 90.2(a) and 90.3, and Rule 4(a) of the Federal Rules of Appellate Procedure, Patent Owner Masimo Corporation ("Masimo") hereby appeals to the United States Court of Appeals for the Federal Circuit from the Judgement – Final Written Decision (Paper 34) entered on April 6, 2022 (Attachment A) and from all underlying orders, decisions, rulings, and opinions that are adverse to Masimo related thereto and included therein, including those within the Decision Granting Institution of *Inter Partes* Review, entered April 13, 2021 (Paper 8). Masimo appeals the Patent Trial and Appeal Board's determination that claims 1-29 of U.S. Patent 10,631,765 are unpatentable, and all other findings and determinations, including but not limited to claim construction, as well as all other issues decided adverse to Masimo's position or as to which Masimo is dissatisfied in IPR2020-01714 involving U.S. Patent 10,631,765.

Masimo is concurrently providing true and correct copies of this Notice of Appeal, along with the required fees, with the Director of the United States Patent and Trademark Office and the Clerk of the United States Court of Appeals for the Federal Circuit.

Respectfully submitted,

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated:  April 12, 2022

/Jarom Kesler/
Jarom D. Kesler (Reg. No. 57,046)

Attorney for Patent Owner
Masimo Corporation

# ATTACHMENT A

Trials@uspto.gov                                    Paper 34
571-272-7822                                Date: April 6, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

APPLE INC.,
Petitioner,

v.

MASIMO CORPORATION,
Patent Owner.

———————————

IPR2020-01714
Patent 10,631,765 B1

———————————

Before JOSIAH C. COCKS, ROBERT L. KINDER, and
AMANDA F. WIEKER, *Administrative Patent Judges*.

WIEKER, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

IPR2020-01714
Patent 10,631,765 B1

# I.  INTRODUCTION

## A.  Background

Apple Inc. ("Petitioner") filed a Petition requesting an *inter partes* review of claims 1–29 ("challenged claims") of U.S. Patent No. 10,631,765 B1 (Ex. 1001, "the '765 patent").  Paper 2 ("Pet.").  Masimo Corporation ("Patent Owner") waived filing a preliminary response.  Paper 7 ("PO Waiver").  We instituted an *inter partes* review of all challenged claims 1–29 on all grounds of unpatentability, pursuant to 35 U.S.C. § 314.  Paper 8 ("Inst. Dec.").

After institution, Patent Owner filed a Response (Paper 16, "PO Resp.") to the Petition, Petitioner filed a Reply (Paper 20, "Pet. Reply"), and Patent Owner filed a Sur-reply (Paper 25, "PO Sur-reply").  An oral hearing was held on January 19, 2022, and a transcript of the hearing is included in the record.  Paper 33 ("Tr.").

We issue this Final Written Decision pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73.  For the reasons set forth below, Petitioner has met its burden of showing, by a preponderance of the evidence, that challenged claims 1–29 of the '765 patent are unpatentable.

## B.  Related Matters

The parties identify the following matters related to the '765 patent:

*Masimo Corporation v. Apple Inc.*, Civil Action No. 8:20-cv-00048 (C.D. Cal.) (filed Jan. 9, 2020);

*Apple Inc. v. Masimo Corporation*, IPR2020-01715 (PTAB Sept. 30, 2020) (challenging claims 1–29 of the '765 patent);

*Apple Inc. v. Masimo Corporation*, IPR2020-01520 (PTAB Aug. 31, 2020) (challenging claims of U.S. Patent No. 10,258,265 B1);

2

IPR2020-01714
Patent 10,631,765 B1

*Apple Inc. v. Masimo Corporation*, IPR2020-01521 (PTAB Sept. 2, 2020) (challenging claims of U.S. Patent No. 10,292,628 B1);

*Apple Inc. v. Masimo Corporation*, IPR2020-01523 (PTAB Sept. 9, 2020) (challenging claims of U.S. Patent No. 8,457,703 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01524 (PTAB Aug. 31, 2020) (challenging claims of U.S. Patent No. 10,433,776 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01526 (PTAB Aug. 31, 2020) (challenging claims of U.S. Patent No. 6,771,994 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01536 (PTAB Aug. 31, 2020) (challenging claims of U.S. Patent No. 10,588,553 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01537 (PTAB Aug. 31, 2020) (challenging claims of U.S. Patent No. 10,588,553 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01538 (PTAB Sept. 2, 2020) (challenging claims of U.S. Patent No. 10,588,554 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01539 (PTAB Sept. 2, 2020) (challenging claims of U.S. Patent No. 10,588,554 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01713 (PTAB Sept. 30, 2020) (challenging claims of U.S. Patent No. 10,624,564 B1);

*Apple Inc. v. Masimo Corporation*, IPR2020-01716 (PTAB Sept. 2, 2020) (challenging claims of U.S. Patent No. 10,702,194 B1);

*Apple Inc. v. Masimo Corporation*, IPR2020-01722 (PTAB Oct. 2, 2020) (challenging claims of U.S. Patent No. 10,470,695 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01723 (PTAB Oct. 2, 2020) (challenging claims of U.S. Patent No. 10,470,695 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01733 (PTAB Sept. 30, 2020) (challenging claims of U.S. Patent No. 10,702,195 B1); and

IPR2020-01714
Patent 10,631,765 B1

*Apple Inc. v. Masimo Corporation*, IPR2020-01737 (PTAB Sept. 30, 2020) (challenging claims of U.S. Patent No. 10,709,366 B1). Pet. 4–5; Paper 5, 1–4.

Patent Owner further identifies the following pending patent applications, among other issued and abandoned applications, that claim priority to, or share a priority claim with, the '765 patent:

U.S. Patent Application No. 16/834,538;

U.S. Patent Application No. 16/449,143; and

U.S. Patent Application No. 16/805,605.

Paper 5, 1–2.

## C. The '765 Patent

The '765 patent is titled "Multi-Stream Data Collection System for Noninvasive Measurement of Blood Constituents," and issued on April 28, 2020, from U.S. Patent Application No. 16/725,478, filed December 23, 2019. Ex. 1001, codes (21), (22), (45), (54). The '765 patent claims priority through a series of continuation and continuation-in-part applications to Provisional Application Nos. 61/078,228 and 61/078,207, both filed July 3, 2008. *Id.* at codes (60), (63).

The '765 patent discloses a two-part data collection system including a noninvasive sensor that communicates with a patient monitor. *Id.* at 2:38–40. The sensor includes a sensor housing, an optical source, and several photodetectors, and is used to measure a blood constituent or analyte, e.g., oxygen or glucose. *Id.* at 2:29–35, 64–65. The patient monitor includes a display and a network interface for communicating with a handheld computing device. *Id.* at 2:45–48.

4

**Appx42704**

IPR2020-01714
Patent 10,631,765 B1

Figure 1 of the '765 patent is reproduced below.



Figure 1 illustrates a block diagram of data collection system 100 including
sensor 101 and monitor 109. *Id.* at 11:47–58. Sensor 101 includes optical
emitter 104 and detectors 106. *Id.* at 11:59–63. Emitters 104 emit light that
is attenuated or reflected by the patient's tissue at measurement site 102. *Id.*
at 14:3–7. Detectors 106 capture and measure the light attenuated or
reflected from the tissue. *Id.* In response to the measured light,
detectors 106 output detector signals 107 to monitor 109 through front-end
interface 108. *Id.* at 14:7–10, 26–32. Sensor 101 also may include tissue
shaper 105, which may be in the form of a convex surface that: (1) reduces
the thickness of the patient's measurement site; and (2) provides more
surface area from which light can be detected. *Id.* at 11:2–14.

Monitor 109 includes signal processor 110 and user interface 112. *Id.*
at 15:16–18. "[S]ignal processor 110 includes processing logic that
determines measurements for desired analytes . . . based on the signals

5

received from the detectors." *Id.* at 15:21–24. User interface 112 presents the measurements to a user on a display, e.g., a touch-screen display. *Id.* at 15:46–56. The monitor may be connected to storage device 114 and network interface 116. *Id.* at 15:60–16:11.

The '765 patent describes various examples of sensor devices. Figures 14D and 14F, reproduced below, illustrate detector portions of sensor devices.



FIG. 14D                    FIG. 14F

Figure 14D illustrates portions of a detector submount and Figure 14F illustrates portions of a detector shell. *Id.* at 6:44–47. As shown in Figure 14D, multiple detectors 1410c are located within housing 1430 and under transparent cover 1432, on which protrusion 605b (or partially cylindrical protrusion 605) is disposed. *Id.* at 35:36–39, 36:30–37. Figure 14F illustrates a detector shell 306f including detectors 1410c on substrate 1400c. *Id.* at 37:9–17. Substrate 1400c is enclosed by shielding enclosure 1490 and noise shield 1403, which include window 1492a and window 1492a, respectively, placed above detectors 1410c. *Id.* Alternatively, cylindrical housing 1430 may be disposed under noise shield 1403 and may enclose detectors 1410c. *Id.* at 37:47–48.

6

IPR2020-01714
Patent 10,631,765 B1

Figures 4A and 4B, reproduced below, illustrate an alternative example of a tissue contact area of a sensor device.



FIG. 4A          FIG. 4B

Figures 4A and 4B illustrate arrangements of protrusion 405 including measurement contact area 470. *Id.* at 23:18–24. "[M]easurement site contact area 470 can include a surface that molds body tissue of a measurement site." *Id.* "For example, . . . measurement site contact area 470 can be generally curved and/or convex with respect to the measurement site." *Id.* at 23:39–43. The measurement site contact area may include windows 420–423 that "mimic or approximately mimic a configuration of, or even house, a plurality of detectors." *Id.* at 23:49–63.

*D. Illustrative Claim*

Of the challenged claims, claims 1 and 21 are independent. Claim 1 is illustrative and is reproduced below.

1. A physiological measurement system comprising:

[a] a physiological sensor device comprising:

  [b] one or more emitters configured to emit light into tissue of a user;

  [c] at least four detectors, wherein each of the at least four detectors has a corresponding window that allows light to pass through to the detector;

7

**Appx42707**

IPR2020-01714
Patent 10,631,765 B1

[d] a wall that surrounds at least the at least four detectors; and

[e] a cover comprising a protruding convex surface, wherein the protruding convex surface is above all of the at least four detectors, wherein at least a portion of the protruding convex surface is rigid, and wherein the cover operably connects to the wall; and

[f] a handheld computing device in wireless communication with the physiological sensor device, wherein the handheld computing device comprises:

[g] one or more processors configured to wirelessly receive one or more signals from the physiological sensor device, the one or more signals responsive to at least a physiological parameter of the user;

[h] a touch-screen display configured to provide a user interface, wherein:

[i] the user interface is configured to display indicia responsive to measurements of the physiological parameter, and

[j] an orientation of the user interface is configurable responsive to a user input; and

[k] a storage device configured to at least temporarily store at least the measurements of the physiological parameter.

Ex. 1001, 44:51–15 (bracketed identifiers a–k added). Independent claim 21 includes limitations substantially similar to limitations [a]–[f] of claim 1. *Id.* at 46:31–49.

### E. Applied References

Petitioner relies upon the following references:

Bergey, U.S. Patent No. 3,789,601, filed July 15, 1971, issued February 5, 1974 (Ex. 1016, "Bergey);

8

IPR2020-01714
Patent 10,631,765 B1

Mendelson, U.S. Patent No. 6,801,799 B2, filed February 6, 2003, issued October 5, 2004 (Ex. 1012, "Mendelson-799");

Ohsaki et al., U.S. Patent Application Publication No. 2001/0056243 A1, filed May 11, 2001, published December 27, 2001 (Ex. 1009, "Ohsaki");

Aizawa, U.S. Patent Application Publication No. 2002/0188210 A1, filed May 23, 2002, published December 12, 2002 (Ex. 1006, "Aizawa");

Schulz et al., U.S. Patent Application Publication No. 2004/0054291 A1, filed July 31, 2003, published March 18, 2004 (Ex. 1013, "Schulz");

Goldsmith et al., U.S. Patent Application Publication No. 2007/0093786 A1, filed July 31, 2006, published April 26, 2007 (Ex. 1011, "Goldsmith"); and

Y. Mendelson et al., "A Wearable Reflectance Pulse Oximeter for Remote Physiological Monitoring," Proceedings of the 28th IEEE EMBS Annual International Conference, 912–915 (2006) (Ex. 1010, "Mendelson-2006").

Pet. 11.

Petitioner also submits, *inter alia*, the Declaration of Thomas W. Kenny, Ph.D. (Ex. 1003), and the Second Declaration of Thomas W. Kenny (Ex. 1047). Patent Owner submits, *inter alia*, the Declaration of Vijay K. Madisetti, Ph.D. (Ex. 2004). The parties also provide deposition testimony from Dr. Kenny and Dr. Madisetti, including from this proceeding and others. *See* Exs. 1052–1054, 2006–2009, 2027.

9

**Appx42709**

IPR2020-01714
Patent 10,631,765 B1

*F. Asserted Grounds of Unpatentability*

We instituted an *inter partes* review based on the following grounds.

Inst. Dec. 10, 34.

| Claim(s) Challenged | 35 U.S.C. § | References/Basis |
|---|---|---|
| 1–8, 10–13, 15–16, 20–29 | 103 | Mendelson-799, Ohsaki, Schulz, Mendelson-2006 |
| 9 | 103 | Mendelson-799, Ohsaki, Schulz, Mendelson-2006, Bergey |
| 14 | 103 | Mendelson-799, Ohsaki, Schulz, Mendelson-2006, Goldsmith |
| 17–19 | 103 | Mendelson-799, Ohsaki, Schulz, Mendelson-2006, Aizawa |

II.    DISCUSSION

*A. Claim Construction*

For petitions filed on or after November 13, 2018, a claim shall be construed using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. § 282(b).  37 C.F.R. § 42.100(b) (2019).  Petitioner submits that no claim term requires express construction.  Pet. 9–10.  Patent Owner submits that claim terms should be given their ordinary and customary meaning, consistent with the Specification.  PO Resp. 10–11.

We agree that no claim terms require express construction.  *Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co. Ltd.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017).

10

IPR2020-01714
Patent 10,631,765 B1

### B. Principles of Law

A claim is unpatentable under 35 U.S.C. § 103(a) if "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations, including (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) objective evidence of nonobviousness.[1] *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966). When evaluating a combination of teachings, we must also "determine whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue." *KSR*, 550 U.S. at 418 (citing *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006)). Whether a combination of elements would have produced a predictable result weighs in the ultimate determination of obviousness. *Id.* at 416–417.

In an *inter partes* review, the petitioner must show with particularity why each challenged claim is unpatentable. *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016); 37 C.F.R. § 42.104(b). The burden of persuasion never shifts to Patent Owner. *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015). To prevail, Petitioner must support its challenge by a preponderance of the evidence. 35 U.S.C. § 316(e); 37 C.F.R. § 42.1(d).

---

[1] Patent Owner has not presented objective evidence of non-obviousness.

IPR2020-01714
Patent 10,631,765 B1

We analyze the challenges presented in the Petition in accordance with the above-stated principles.

### C. Level of Ordinary Skill in the Art

Petitioner identifies the appropriate level of skill in the art as that possessed by a person with "a Bachelor of Science degree in an academic discipline emphasizing the design of electrical, computer, or software technologies, in combination with training or at least one to two years of related work experience with capture and processing of data or information." Pet. 9 (citing Ex. 1003 ¶¶ 20–21). "Alternatively, the person could have also had a Master of Science degree in a relevant academic discipline with less than a year of related work experience in the same discipline." *Id.*

Patent Owner makes several observations regarding Petitioner's identified level of skill in the art but, "[f]or this proceeding, [Patent Owner] nonetheless applies Petitioner's asserted level of skill." PO Resp. 10 (citing Ex. 2004 ¶¶ 32–35).

We adopt Petitioner's assessment as set forth above, which appears consistent with the level of skill reflected in the Specification and prior art.

### D. Obviousness over the Combined Teachings of Mendelson-799, Ohsaki, Schulz, and Mendelson-2006

Petitioner contends that claims 1–8, 10–13, 15, 16, and 20–29 of the '765 patent would have been obvious over the combined teachings of Mendelson-799, Ohsaki, Schulz, and Mendelson-2006. Pet. 11–87; *see also generally* Pet. Reply. Patent Owner disagrees. PO Resp. 12–62; *see also generally* PO Sur-reply.

Based on our review of the parties' arguments and the cited evidence of record, we determine that Petitioner has met its burden of showing by a

12

**Appx42712**

IPR2020-01714
Patent 10,631,765 B1

preponderance of evidence that claims 1–8, 10–13, 15, 16, and 20–29 are unpatentable.

### 1. Overview of Mendelson-799 (Ex. 1012)

Mendelson-799 is a U.S. patent titled "Pulse Oximeter and Method of Operation," and discloses a sensor for non-invasive measurement of a blood parameter, which includes a sensor housing, a radiation source, and a detector. Ex. 1012, codes (54), (57).

Figure 7 of Mendelson-799 is reproduced below.



*Figure 7*

Figure 7 illustrates optical sensor 10 with light source 12, which includes three closely spaced light emitting elements 12a, 12b, 12c. *Id.* at 9:22–28. Optical sensor 10 includes an array of discrete detectors, i.e., "far" detectors 16 and "near" detectors 18, "arranged in two concentric ring-like arrangements . . . surrounding the light emitting elements." *Id.* at 9:29–34. "[L]ight shield 14 is positioned between the photodiodes and the light emitting elements, and prevents direct optical coupling between them, thereby maximizing the fraction of backscattered light passing through the arterially perfused vascular tissue in the detected light." *Id.* at 9:35–40.

13

IPR2020-01714
Patent 10,631,765 B1

Sensor housing 17 accommodates the light source, light shield, and detectors. *Id.* at 9:34–35.

Figure 8 of Mendelson-799 is reproduced below.



*Figure 8*

Figure 8 illustrates a block diagram of pulse oximeter 20 using sensor 10. *Id.* at 10:16–17. Pulse oximeter 20 includes control unit 21, with electronic block 22 connectable to sensor 10, microprocessor 24, and display 26, which presents measurement results. *Id.* at 10:17–22. "The measured data (i.e., electrical output of the sensor 10 indicative of the detected light) is directly processed in the block 22, and the converted signal 25 is further processed by the microprocessor 24." *Id.* at 10:22–25.

### 2. Overview of Ohsaki (Ex. 1009)

Ohsaki is a U.S. patent application publication titled "Wristwatch-type Human Pulse Wave Sensor Attached on Back Side of User's Wrist," and discloses an optical sensor for detecting a pulse wave of a human body. Ex. 1009, code (54), ¶ 3.

14

IPR2020-01714
Patent 10,631,765 B1

Figure 1 of Ohsaki is reproduced below.



Figure 1 illustrates a cross-sectional view of pulse wave sensor 1 attached on the back side of user's wrist 4. *Id.* ¶¶ 12, 16. Pulse wave sensor 1 includes detecting element 2 and sensor body 3. *Id.* ¶ 16.

Figure 2 of Ohsaki, reproduced below, illustrates further detail of detecting element 2.



15

IPR2020-01714
Patent 10,631,765 B1

Figure 2 illustrates a mechanism for detecting a pulse wave. *Id.* ¶ 13. Detecting element 2 includes package 5, light emitting element 6, light receiving element 7, and translucent board 8. *Id.* ¶ 17. Light emitting element 6 and light receiving element 7 are arranged on circuit board 9 inside package 5. *Id.* ¶¶ 17, 19.

"[T]ranslucent board 8 is a glass board which is transparent to light, and attached to the opening of the package 5. A convex surface is formed on the top of the translucent board 8." *Id.* ¶ 17. "[T]he convex surface of the translucent board 8 is in intimate contact with the surface of the user's skin," preventing detecting element 2 from slipping off the detecting position of the user's wrist. *Id.* ¶ 25. By preventing the detecting element from moving, the convex surface suppresses "variation of the amount of the reflected light which is emitted from the light emitting element 6 and reaches the light receiving element 7 by being reflected by the surface of the user's skin." *Id.* Additionally, the convex surface prevents penetration by "noise such as disturbance light from the outside." *Id.*

Sensor body 3 is connected to detecting element 2 by signal line 13. *Id.* ¶ 20. Signal line 13 connects detecting element 2 to drive circuit 11, microcomputer 12, and a monitor display (not shown). *Id.* Drive circuit 11 drives light emitting element 6 to emit light toward wrist 4. *Id.* Detecting element 2 receives reflected light which is used by microcomputer 12 to calculate pulse rate. *Id.* "The monitor display shows the calculated pulse rate." *Id.*

16

**Appx42716**

IPR2020-01714
Patent 10,631,765 B1

### 3. Overview of Schulz (Ex. 1013)

Schulz is a U.S. patent application publication titled "Pulse Oximetry Ear Sensor," and discloses an ear sensor assembly including an emitter pad and a detector pad. Ex. 1013, codes (54), (57).

Figure 19C of Schulz is reproduced below.



Figure 19C illustrates an exploded top perspective view of an ear sensor clip. *Id.* ¶ 31. Each sensor clip 1900 includes "opposingly positioned housings 1902 and 1903 that house one or more sensor optical components." *Id.* ¶ 65. Each housing includes respective inward facing shells 1905 and 1906.[2] *Id.* ¶ 65. "[I]nward facing shells 1905 and 1906 further include windows 1919 and 1924 that provide an aperture for transmission of optical

---

[2] Figure 19C appears to label inward facing shell 1906 as 1916. *See id.* at Fig. 19B.

IPR2020-01714
Patent 10,631,765 B1

energy to or from a tissue site. Translucent silicone material covers windows 1919 and 1924 providing lenses 1920 and 1921." *Id.* ¶ 67. A "thin sheet of opaque material is located beneath window 1919 or 1924, and a window in the opaque material provides an aperture for transmission of optical energy to or from the tissue site." *Id.* ¶ 73. "The opaque material blocks light, and the window in the opaque material can be sized as needed to block the proper amount of light from entering the aperture to, for example, avoid saturation of the light detector." *Id.*

### 4. Mendelson-2006 (Ex. 1010)

Mendelson-2006 is a journal article titled "A Wearable Reflectance Pulse Oximeter for Remote Physiological Monitoring," and discloses a wireless wearable pulse oximeter connected to a personal digital assistant ("PDA"). Ex. 1010, 1.[3]

Figure 1 of Mendelson-2006 is reproduced below.



---

[3] Petitioner cites to the page numbers added to Exhibit 1010, rather than the native page numbering that accompanies the article. *See, e.g.*, Pet. 23–25. We follow Petitioner's numbering scheme.

Figure 1 illustrates a sensor module attached to the skin (top), and a photograph of a disassembled sensor module and receiver module (bottom). The sensor module includes an optical transducer, a stack of round printed circuit boards, and a coin cell battery. *Id.* at 2.

Figure 2 of Mendelson-2006 is reproduced below.



Figure 2 depicts a system block diagram of the wearable, wireless, pulse oximeter including the sensor module (top) and the receiver module (bottom). *Id.* The sensor module includes at least one light-emitting diode ("LED"), a photodetector, signal processing circuitry, an embedded microcontroller, and an RF transceiver. *Id.* at 1–2. Mendelson-2006 discloses that a concentric array of discrete photodetectors could be used to increase the amount of backscattered light detected by a reflectance type pulse oximeter sensor. *Id.* at 4. The receiver module includes an embedded

19

IPR2020-01714
Patent 10,631,765 B1

microcontroller, an RF transceiver for communicating with the sensor module, and a wireless module for communicating with the PDA. *Id.* at 2.

As a PDA for use with the system, Mendelson-2006 discloses "the HP iPAQ h4150 PDA because it can support both 802.11b and Bluetooth™ wireless communication" and "has sufficient computational resources." *Id.* at 3. Mendelson-2006 further discloses that

> [t]he use of a PDA as a local terminal also provides a low-cost touch screen interface. The user-friendly touch screen of the PDA offers additional flexibility. It enables multiple controls to occupy the same physical space and the controls appear only when needed. Additionally, a touch screen reduces development cost and time, because no external hardware is required. . . . The PDA can also serve to temporarily store vital medical information received from the wearable unit.

*Id.*

The PDA is shown in Figure 3 of Mendelson-2006, reproduced below.



Figure 3 illustrates a sample PDA and its graphical user interface ("GUI"). *Id.* Mendelson-2006 explains that the GUI allows the user to interact with the wearable system. *Id.* "The GUI was configured to present the input and output information to the user and allows easy activation of various functions." *Id.* "The GUI also displays the subject's vital signs, activity

20

**Appx42720**

IPR2020-01714
Patent 10,631,765 B1

level, body orientation, and a scrollable PPG waveform that is transmitted by the wearable device." *Id.* For example, the GUI displays numerical oxygen saturation ("SpO$_2$") and heart rate ("HR") values. *Id.*

### 5. Independent Claim 1

Petitioner contends that claim 1 would have been obvious over the combined teachings of Mendelson-799, Ohsaki, Schulz, and Mendelson-2006. Pet. 11–61. Below, we set forth how the combination of prior art references teaches or suggests the claim limitations that are not disputed by the parties. For those limitations and reasons for combining the references that are disputed, we examine each of the parties' contentions and then provide our analysis.

### i. *"A physiological measurement system comprising"*

The cited evidence supports Petitioner's undisputed contention that the combination of Mendelson-799, Ohsaki, Schulz, and Mendelson-2006 satisfies the subject matter of the preamble.[4] Pet. 40–42; *see, e.g.*, Ex. 1012, code (57), 8:37–41, 9:22–40, 10:15–22, Fig. 7 (sensor device), 8 (pulse oximeter); Ex. 1010, 1–4, Fig. 3 (handheld computing device); Ex. 1003 ¶¶ 89–118, 121–122.

### ii. *"[a] a physiological sensor device comprising"*

The cited evidence supports Petitioner's undisputed contention that Mendelson-799 discloses a physiological sensor device including sensor 10 and pulse oximeter 20. Pet. 42; *see, e.g.*, Ex. 1012, code (57) ("A sensor for

---

[4] Whether the preamble is limiting need not be resolved because Petitioner shows sufficiently that the preamble's subject matter is satisfied by the art.

use in an optical measurement device."), 9:22–40 (describing sensor 10), 10:16–30 (describing pulse oximeter 20, including sensor 10), Figs. 7–8.

### iii. "[b] one or more emitters configured to emit light into tissue of a user"

The cited evidence supports Petitioner's undisputed contention that Mendelson-799 discloses one or more light emitting elements 12a–c that emit light into a user's tissue. Pet. 43–44; *see, e.g.*, Ex. 1012, 9:22–40 ("The sensor 10 comprises . . . light source 12 composed of three closely spaced light emitting elements (e.g., LEDs or laser sources) 12a, 12b and 12c generating light of three different wavelengths."), Fig. 7.

### iv. "[c] at least four detectors,
### wherein each of the at least four detectors has a corresponding window that allows light to pass through to the detector"

Petitioner's Undisputed Contentions

Petitioner contends that Mendelson-799 discloses twelve photodetectors located within a sensor housing. Pet. 44–45. Patent Owner does not dispute this contention, and we agree with Petitioner. Mendelson-799 discloses that "sensor 10 comprises . . . an array of discrete detectors (e.g., photodiodes)," including six far detectors 16 and six near detectors 18. *See, e.g.*, Ex. 1012, 9:22–40, Fig. 7.

Petitioner does not contend that Mendelson-799 discloses the claimed windows. Rather, Petitioner contends that Schulz teaches "a sensor featuring 'a thin sheet of opaque material' placed inside the sensor's housing . . . with 'a window in the opaque material provid[ing] an aperture for transmission of optical energy to or from the tissue site,'" wherein the opaque material blocks light and avoids saturation of the sensor's detectors.

Pet. 30.  Patent Owner does not dispute this contention, and we agree with Petitioner.  Schulz discloses that a "thin sheet of opaque material" can be placed between the optical components of the sensor and the sensor's housing.  Ex. 1013 ¶ 73.  Schulz explains that the opaque material includes a window that allows for transmission of optical energy to the detector.  *Id.*  According to Schulz, the "opaque material blocks light, and the window in the opaque material can be sized as needed to block the proper amount of light from entering the aperture to, for example, avoid saturation of the light detector."  *Id.*

Petitioner's Disputed Contentions

Petitioner further contends that a person of ordinary skill in the art would have been motivated "to add a layer of opaque material" to Mendelson-799's sensor, as taught by Schulz, "and to size windows in the opaque material as appropriate to avoid saturation of each of the sensor's detectors."  Pet. 30 (citing, e.g., Ex. 1003 ¶¶ 103–109), 45–46 (citing, e.g., Ex. 1003 ¶¶ 89–109).  According to Petitioner, errors are reduced by minimizing the amount of ambient light that reaches the detectors, for example, by decreasing the angle of incidence to the detectors.  *Id.* at 31 (citing Ex. 1019, 76, 79–80, 94).  Petitioner contends that a person of ordinary skill in the art would have understood that "Schulz's opaque layer limits errors by decreasing the angle of incidence to the photodiode to that enabled by the window included within the layer, and by otherwise preventing ambient light from reaching the photodiode."  *Id.* (citing, e.g., Ex. 1003 ¶¶ 104–105).  Petitioner also contends that a skilled artisan would have recognized that, when applying Schulz's teachings to a sensor with

IPR2020-01714
Patent 10,631,765 B1

multiple detectors, multiple windows would have been employed. *Id.* at 31–32 (citing, e.g., Ex. 1003 ¶¶ 106–109).

To illustrate its proposed modification, Petitioner includes an annotated and modified view of Mendelson-799's Figure 7, as well as an added sectional view, both of which are reproduced below. Pet. 34; *see also id.* at 46 (similar figures with slightly different annotations); Ex. 1003 ¶¶ 108–109.



Petitioner's modified figure and added sectional view depict the sensor of Mendelson-799 with an added opaque layer (illustrated in green) having windows, as Petitioner contends would have been rendered obvious by Schulz.[5] Pet. 34, 46.

---

[5] Petitioner's annotated figures also include an added opaque wall and an added top cover as discussed *infra* at Sections II.D.5.v and II.D.5.vi.

IPR2020-01714
Patent 10,631,765 B1

Patent Owner's Arguments

Patent Owner argues that a person of ordinary skill in the art would not have been motivated to modify Mendelson-799 as proposed because adding an opaque layer would *decrease* signal strength, especially for a reflectance pulse oximeter like Mendelson-799, which Patent Owner alleges has a weak signal already.  PO Resp. 47–48 (citing, e.g., Ex. 2004 ¶¶ 83–84); PO Sur-reply 22–24.  According to Patent Owner, Schulz uses the window in the opaque material only to reduce "desired" light to a "proper" level, i.e., only to reduce the light generated by the emitter that passes through the user's tissue before reaching the detector, but the window in the opaque material does not reduce *ambient* light.  PO Resp. 50 ("Schulz uses a separate cover—not the window [in the opaque material]—to block ambient light.") (citing Ex. 1013 ¶ 41); PO Sur-reply 22–23 (citing, e.g., Ex. 2004 ¶¶ 83–88).  Thus, according to Patent Owner, use of a windowed opaque material in Mendelson-799's sensor would make its weak signal even weaker by limiting the light from the emitter.  PO Sur-reply 24.  Patent Owner argues that decreasing signal strength in this way would have been inconsistent with Petitioner's additional modification to add a convex cover to the sensor of Mendelson-799, to *increase* signal strength.  PO Resp. 47–48; PO Sur-reply 26; *see infra* § II.D.5.vi.

Moreover, Patent Owner argues that the motivation put forth by Petitioner—to avoid saturation—is not shown to have been a problem for the sensor of Mendelson-799.  PO Resp. 47.  Patent Owner also argues that there were "easier approaches for addressing saturation of the detectors," such as "adjusting gain or LED brightness."  *Id.* at 48.

25

Patent Owner also argues aspects of Schulz individually.  For example, Patent Owner argues that Schulz is directed to an ear sensor, and that there are physiological differences in measurement locations that are not accounted for by Petitioner.  PO Resp. 48–49 (citing, e.g., Ex. 2004 ¶ 85).  Additionally, Patent Owner argues that Schulz discloses only a single window, not multiple windows as claimed.  *Id.* at 49; PO Sur-reply 26–27.

Finally, Patent Owner criticizes Petitioner's reliance on additional evidence that does not form part of the asserted ground.  *Id.* at 51 (citing, e.g., Ex. 1019; Ex. 1023; Ex. 2004 ¶¶ 89–92).

<u>Analysis</u>

We have considered the parties' arguments and cited evidence, and we are persuaded by Petitioner's contentions.  As discussed above, Schulz explicitly teaches that its opaque material and window "blocks light" and "avoid[s] saturation of the light detector."  Ex. 1013 ¶ 73.  Petitioner cites persuasive and well-supported evidence, including the testimony of its declarant, that a person of ordinary skill in the art would have been motivated to add such an arrangement to the sensor of Mendelson-799 to achieve this same disclosed benefit, i.e., to avoid saturation of Mendelson-799's detectors.  *See, e.g.*, Ex. 1003 ¶¶ 101–109.  For example, Dr. Kenny's testimony regarding the ability of an opaque material with windows to avoid saturation is supported by Schulz and by the Webster textbook, which discusses the importance of minimizing "light other than the optical signals of interest."  *Id.* ¶ 104 (citing Ex. 1019, 76).  We are persuaded by Petitioner's contentions and Dr. Kenny's testimony.

We do not agree with Patent Owner's argument that this modification would *decrease* signal strength.  PO Resp. 47–48.  We discern that

Petitioner's proposed modification would not alter the signal of interest, i.e., the optical signal that passes from the emitter, through the user's tissue, and to the photodetectors. Rather, the cited evidence supports Petitioner's contention that the proposed modification would have blocked light *other than* that from the signal of interest, i.e., that the modification would have block light *other than* that from the emitter. *See, e.g.*, Ex. 1003 ¶ 108 ("Schulz would have motivated one of ordinary skill to modify the sensor . . . to further include an opaque layer that would have *blocked light other than at windows corresponding to the sensor's photodiodes*.") (emphasis added); Ex. 1013 ¶ 73 ("The opaque material blocks light, and the window in the opaque material can be sized as needed to block the proper amount of light from entering the aperture to, for example, avoid saturation of the light detector."); *see also* Pet. Reply 22–23 ("By blocking noise while allowing signal to reach the detectors, the features of Schulz lead to increased signal-to-noise ratio at the detectors, rather than leading to a 'weaker signal' as Masimo alleges."). Thus, we do not agree that the proposed modification would have decreased signal strength.

We have considered Patent Owner's argument that Schulz uses the opaque material to reduce only "desired" light to a "proper" level, i.e., to reduce light from the emitter that passes through the user's tissue, to avoid saturation. PO Resp. 50; PO Sur-reply 22–23 (citing, e.g., Ex. 2004 ¶¶ 83–88). We do not find any support for this argument in Schulz. To the contrary, Schulz explains that "the window in the opaque material can be sized as needed to block the proper amount of light from entering the aperture to, for example, avoid saturation of the light detector." Ex. 1013 ¶ 73. Contrary to Patent Owner's argument, Schulz simply states that its

IPR2020-01714
Patent 10,631,765 B1

window is sized to control the amount of light *that enters the aperture*;
Schulz does not state where that light comes from, or that it only controls
against light from the emitter. Patent Owner identifies no basis in Schulz's
disclosure to conclude that Schulz's emitter operates at a level that would
saturate the detector, absent the addition of an opaque material. Likewise,
we do not find any support for this argument in the cited portions of
Dr. Madisetti's declaration. *See, e.g.*, Ex. 2004 ¶ 88 (concluding, without
persuasive explanation, that Schulz's window blocks light only from the
emitter, not ambient light).

We also do not agree with Patent Owner's argument that Petitioner
has not shown that saturation was a problem for Mendelson-799's sensor.
PO Resp. 47. Mendelson-799 need not identify a problem with saturation in
order to be improved by the proposed modification. Indeed, Petitioner "does
not need to show that there was a known problem with the prior art system."
*Unwired Planet, LLC v. Google Inc.*, 841 F.3d 995, 1002–03 (Fed. Cir.
2016); *see also Sci. Plastic Prods., Inc. v. Biotage AB*, 766 F.3d 1355, 1359–
61 (Fed. Cir. 2014); *Hologic, Inc. v. Minerva Surgical, Inc.*, 764 F. App'x
873, 880 (Fed. Cir. 2019). As expressly recognized in *KSR*, any art-
recognized need or problem can provide a reason for combining claim
elements. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 416 (2007). Here,
Petitioner provides sufficient evidence to demonstrate that saturation was a
known problem (*see, e.g.*, Ex. 1003 ¶¶ 104, 109; Ex. 1019, 79;[6] Ex. 1047

---

[6] It is of no moment that this evidence is not identified as part of the asserted
ground. PO Resp. 51. This evidence is cited by Dr. Kenny as support for
his testimony, consistent with our rules. 37 C.F.R. § 42.65(a) ("Expert
testimony that does not disclose the underlying facts or data on which the
opinion is based is entitled to little or no weight.").

28

**Appx42728**

¶¶ 51–52) and that Schulz provided a readily-applicable technique to solve it (Ex. 1013 ¶ 73). That "easier approaches" may have existed, *see* PO Resp. 48, does not teach away from the approach explicitly taught by Schulz.

We also do not agree with Patent Owner's argument that Schulz and Mendelson-799 are incompatible because they obtain measurements at different locations. Mendelson-799 explains that its sensor type can be used in "multiple convenient locations on the body," and does not exclude use on a patient's ear or elsewhere. Ex. 1012, 2:15–21; *contra* PO Resp. 48– 49; *see also* Ex. 1019, 104 ("The idea of using skin reflectance spectrophotometry marked a significant advancement in the noninvasive monitoring of $S_aO_2$ from virtually any point on the skin surface."). Moreover, the proposed modification does not seek to bodily incorporate the references, one with the other. Rather, Petitioner clearly proposes modifying Mendelson-799 to include an opaque material with windows, as taught by Schulz, but plainly does not propose incorporating any other aspect of Schulz, such as its measurement location. *See* Pet. 30–34; *see also In re Nievelt*, 482 F.2d 965, 968 (CCPA 1973) ("Combining the teachings of references does not involve an ability to combine their specific structures.").

We have considered the remainder of Patent Owner's arguments, but we do not agree with them. For example, it is irrelevant that Schulz teaches only a single window, because Petitioner provides persuasive testimony to show that a skilled artisan would have implemented a window for *each detector* in Mendelson-799's sensor. PO Resp. 49; Ex. 1003 ¶¶ 106–108. It is likewise irrelevant that Schulz discloses an additional "separate cover . . . to block ambient light," because the presence of a separate cover does not

IPR2020-01714
Patent 10,631,765 B1

change the fact that Schulz explicitly teaches using its windowed opaque material to avoid detector saturation. *See* Ex. 1013 ¶ 73; *contra* PO Resp. 50; PO Sur-reply 22–23.

      For the foregoing reasons, we are persuaded by Petitioner's contentions.

      *v.  "[d] a wall that surrounds at least the at least the four detectors"*

      The cited evidence supports Petitioner's undisputed contentions regarding this limitation. Pet. 23–24, 47–48. Specifically, Petitioner contends that Mendelson-799 discloses sensor housing 17 that accommodates detectors 16, 18, as shown below in Petitioner's annotated and modified view of Mendelson-799's Figure 7. *Id.* at 23–24; *see, e.g.*, Ex. 1012, 9:22–40 ("All these elements are accommodated in a sensor housing 17."), Fig. 7.



Petitioner's modified figure depicts the sensor of Mendelson-799 with sensor housing 17 identified in green and encircling the detectors. Pet. 24; *see also id.* at 47.

      Petitioner acknowledges that Mendelson-799 does not depict a side view of the sensor and thus, to the extent Mendelson-799 does not explicitly

30

teach that housing 17 includes an opaque wall that surrounds the detectors, a person of ordinary skill in the art would have found it obvious "to connect, to the portion of sensor housing 17, an opaque wall that surrounds the array of discrete detectors . . . both to shield the detectors from ambient light, and protect the detectors from external forces."  Pet. 12–13; *see also id.* at 23–24; *see, e.g.*, Ex. 1003 ¶¶ 62–72, 89–117.

Petitioner provides an added sectional view of this proposed modification, shown below.



Petitioner's added figure depicts a side view of the sensor of Mendelson-799 with an opaque wall identified in green and encircling the detectors.  Pet. 24; *see also id.* at 47.

Patent Owner does not dispute Petitioner's contentions regarding this limitation.  *See generally* PO Resp.; PO Sur-reply.

Petitioner's stated reasoning for the proposed modification is sufficiently supported, including by the unrebutted testimony of Dr. Kenny, who testifies that such a wall would "shield the detectors from ambient light, and protect the detectors from external forces."  Ex. 1003 ¶ 64; *see also* Ex. 1003 ¶¶ 63–72, 89–91, 132–136.

IPR2020-01714
Patent 10,631,765 B1

> vi. "[e] cover comprising a protruding convex surface, wherein the
> protruding convex surface is above all of the at least four detectors,
> wherein at least a portion of the protruding convex surface is rigid, and
> wherein the cover operably connects to the wall;"

<u>Petitioner's Undisputed Contentions</u>

Petitioner contends that Mendelson-799 does not disclose a cover above the four detectors, as claimed. Pet. 24–25. Patent Owner does not dispute this contention, and we agree that Mendelson-799 is not shown to include a cover. *See generally* Ex. 1012.

Petitioner relies upon Ohsaki for the recited cover, and contends that:

> Ohsaki discloses a wrist-worn "pulse wave sensor" that includes a light permeable convex cover—"translucent board 8"—that is configured to be located between user tissue and a detector when the sensor is worn, where the cover comprises a protruding convex surface operable to conform [to] tissue of the user, and where a wall operably connects to a substrate and to the cover.

Pet. 25 (citing, e.g., Ex. 1009 ¶¶ 15, 17, 25; Ex. 1003 ¶¶ 73–75, 94). Patent Owner does not dispute this contention, and we agree with Petitioner. Ohsaki discloses that sensor 1 is "worn on the back side of the user's wrist" and includes translucent board 8, with a convex surface formed on the top of the board, to be placed against a user's tissue. Ex. 1009 ¶¶ 16, 17, Figs. 1–2 (depicting translucent board 8 above detector). As shown in Ohsaki's Figure 2, the board 8 is operably connected to the walls of sensor package 5 that houses the sensor components, including circuit board 9, light emitting element 6 (e.g., LED), and light receiving element 7. *Id.* ¶ 17 ("The translucent board 8 is . . . attached to the opening of the package 5."), Fig. 2.

Petitioner also contends that a person of ordinary skill in the art would have understood the convex surface to be "rigid." Pet. 22, 50–51. Patent

32

Owner does not dispute this contention, and we agree with Petitioner. As depicted in Ohsaki's Figure 2, the user's tissue 4 is shown to conform to the shape of the protruding convex surface when the sensor is worn by the user. Ex. 1009 ¶ 17 ("The translucent board 8 is a glass board."), Fig. 2; *see, e.g.*, Ex. 1003 ¶¶ 99, 141 (testifying as to the convex surface's rigidity).

Petitioner's Disputed Contentions

Petitioner further contends that a person of ordinary skill in the art "would have recognized that a light permeable cover with a protruding convex surface," such as that taught by Ohsaki, "would improve adhesion between the sensor and the user's tissue, improve detection efficiency, and protect the elements within sensor housing 17." Pet. 25 (citing, e.g., Ex. 1003 ¶ 92; Ex. 1009 ¶¶ 15, 17, 25), 27–28. Petitioner contends that Ohsaki's convex surface is in intimate contact with the user's tissue, which prevents slippage of the sensor and increases signal strength because "variation of the amount of the reflected light . . . that reaches the light receiving element 7 is suppressed." *Id.* at 25–26 (citing, e.g., Ex. 1003 ¶ 95; quoting Ex. 1009 ¶ 25).

Accordingly, Petitioner contends that, to achieve these identified benefits, a person of ordinary skill in the art would have added a light permeable convex cover to Mendelson-799's sensor, the cover being located "over the array of detectors 16 and 18" when worn. Pet. 27–28 (citing, e.g., Ex. 1003 ¶¶ 98–99; Ex. 1009 ¶¶ 15, 17, 25), 48 (citing, e.g., Ex. 1003 ¶¶ 73–75, 89–100, 137). Petitioner also contends that an ordinarily skilled artisan would have configured the cover to be "rigid to conform tissue of the user to at least a portion of the cover's surface when worn." *Id.* at 28 (citing, e.g., Ex. 1003 ¶ 99), 49–50 (citing, e.g., Ex. 1003 ¶¶ 73–75, 89–100, 140–141).

33

IPR2020-01714
Patent 10,631,765 B1

Additionally, Petitioner contends the skilled artisan would have "configured a circumscribing wall in Mendelson-799's sensor to operably connect" to the sensor's planar substrate and to the convex cover. Pet. 28 (citing, e.g., Ex. 1003 ¶ 99), 49–50 (citing, e.g., Ex. 1003 ¶¶ 73–75, 89–100, 140–141).

Petitioner contends these modifications would have been "nothing more than the use of a known technique to improve similar devices in the same way, and combining prior art elements according to known methods to yield predictable results—improved adhesion of the sensor to the user's skin, and improved signal strength." *Id.* at 29 (citing, e.g., Ex. 1003 ¶¶ 62–75, 100).

To illustrate its proposed modification, Petitioner includes an annotated and modified view of Mendelson-799's Figure 7, as well as an added sectional view, both of which are reproduced below. Pet. 29 (citing Ex. 1003 ¶¶ 99–100), 49 (citing Ex. 1003 ¶¶ 73–75, 89–100, 137–138).



34

Petitioner's modified and added figures depict the sensor of Mendelson-799 with an added convex cover (illustrated in red) connected to the wall of Mendelson-799's sensor (illustrated in green, *see supra* § II.D.5.v).  Pet. 29.

Patent Owner's Arguments

Patent Owner argues that a person of ordinary skill in the art would not have been motivated to modify Mendelson-799's sensor to include Ohsaki's convex cover.  PO Resp. 22–47; PO Sur-Reply 2–21.

First, Patent Owner argues that the proposed modification "changes Ohsaki's structure and eliminates the longitudinal shape that gives Ohsaki's translucent board the ability to fit within the user's anatomy and prevent slipping."  PO Resp. 23.  This argument is premised on Patent Owner's contention that Ohsaki's convex cover must be rectangular, with the cover's long direction aligned with the length of the user's forearm, to avoid interacting with bones in the wrist and forearm.  *Id.* at 24–25 (citing, e.g., Ex. 2004 ¶¶ 51–54; Ex. 1009 ¶¶ 6, 19, 23, 24); PO Sur-reply 2–10.  According to Patent Owner, Ohsaki teaches that "aligning the sensor's longitudinal direction with the ***circumferential*** direction of the user's arm undesirably results in 'a tendency [for Ohsaki's sensor] to slip off.'"  PO Resp. 25–26 (citing Ex. 1009 ¶ 19), 27–28.

Thus, Patent Owner contends that Petitioner's proposed modification would "chang[e] Ohsaki's rectangular board into a ***circular*** shape," which "would eliminate the advantages discussed above" because it "cannot be placed in ***any longitudinal*** direction and thus cannot coincide with the longitudinal direction of the user's wrist."  *Id.* at 26 (citing Ex. 2004 ¶¶ 55–56).  Patent Owner presents annotated Figures depicting what it contends is

35

IPR2020-01714
Patent 10,631,765 B1

Ohsaki's disclosed sensor placement as compared to that of the proposed modification, reproduced below.



Patent Owner's annotated Figure on the left depicts a rectangular sensor placed between a user's radius and ulna, while Patent Owner's annotated Figure on the right depicts a circular sensor placed across a user's radius and ulna. PO Resp. 27. Based on these annotations, Patent Owner argues that the proposed "circular shape would press on the user's arm in all directions and thus cannot avoid the undesirable interaction with the user's bone structure," such that a skilled artisan "would have understood such a change would eliminate Ohsaki's benefit of preventing slipping." *Id.* at 27–28 (citing, e.g., Ex. 2004 ¶¶ 55–58).

Second, Patent Owner argues that Ohsaki requires its sensor be placed on the back of the user's wrist to achieve any benefits, but that such a location would have been unsuitable for Mendelson-799's sensor, and would result in weak sensor signals. PO Resp. 32. Relying on other publications by the named inventor on Mendelson-799, Patent Owner alleges that sensor signals were difficult or impossible to discern from the wrist, even with considerable pressure. *Id.* at 32 (citing Ex. 2003, 3–4), 33–34 (citing

Ex. 2015, 3, 4; Ex. 2014, 1, 99).  Patent Owner contends that Dr. Kenny admitted that signals from the wrist are weaker and noisier than from other locations.  *Id.* at 33 (citing Ex. 2008, 249:10–16, 255:12–21), 34–37 (citing Ex. 2017, 2; Ex. 2018, 4; Ex. 2010, 44, 71; Ex. 2016, 2, 3).

Third, Patent Owner argues that a person of ordinary skill in the art would not have placed Ohsaki's convex cover over Mendelson-799's peripheral detectors because the convex cover would condense light toward the center and away from the detectors, which would decrease signal strength.  PO Resp. 38–43 (citing, e.g., Ex. 2004 ¶¶ 71–76).  Patent Owner also contends that Petitioner and Dr. Kenny admit as much, fail to account for the impact of the proposed modification on light collection, and fail to propose a specific three-dimensional structure to embody the proposed modification.  *Id.* (citing, e.g., Ex. 2020, 69–70; Ex. 2006, 204:14–20; Ex. 2008, 36:19–37:1, 57:19–58:16, 63:5–64:8, 170:12–171:1, 173:8–15).  Patent Owner relies on Figure 14B of the '765 patent, which Patent Owner contends supports its position.  *Id.* at 39–40 (citing Ex. 1001, 36:3–6, 36:13–15).

Fourth, Patent Owner argues that Ohsaki's rectangular cover creates air gaps at its peripheral edges, as shown in Ohsaki's Figure 1, which Mendelson-799 cautions against as potentially causing "specular reflection."  PO Resp. 43–44 (citing, e.g., Ex. 1012, 2:58–64).  Accordingly, Patent Owner argues that a person of ordinary skill in the art "would not have modified Mendelson[-]799's structure to add Ohsaki's air gaps."  *Id.* at 44–45 (citing Ex. 2004 ¶¶ 77–80).

Fifth, Patent Owner argues that "a convex cover is just one of many different alternatives for protecting the components of a sensor" including,

e.g., resin or encapsulation. PO Resp. 45–46. Concerning possible alternatives, Patent Owner contends that a person of ordinary skill in the art "would have understood that a flat cover would provide ***better protection*** than a convex surface because—as Petitioner's cited art teaches—a flat cover would be less prone to scratches." *Id.* at 46–47 (citing Ex. 1008 ¶ 106; Ex. 2004 ¶¶ 81–82).

<u>Petitioner's Reply</u>

Concerning Patent Owner's first and second arguments, Petitioner responds that Ohsaki does not disclose the shape of its protrusion, other than its convexity as shown in Figures 1 and 2, nor does Ohsaki require a rectangular shape or placement on the back of the wrist in order to achieve the disclosed benefits. Pet. Reply 7–14 (citing, e.g., Ex. 1047 ¶¶ 17–28). Moreover, Petitioner asserts that "even if Ohsaki's translucent board 8 were somehow understood to be rectangular, obviousness does not require 'bodily incorporation' of features from one reference into another"; rather, a person of ordinary skill in the art "would have been fully capable of attaching a light permeable protruding convex cover to Me[nd]elson-799's housing to obtain the benefits attributed to such a cover by Ohsaki." *Id.* at 10–11 (citing, e.g., Ex. 1047 ¶ 23). Similarly, regarding the location of the sensor, Petitioner asserts,

> [E]ven if a [person of ordinary skill in the art] would have somehow misunderstood Ohsaki's sensor as limited to placement on the backside of the wrist, and even if the difficulty that [Patent Owner] alleges with respect to obtaining pulse oximetry measurements from that location were true, that ***would have further motivated*** the [person of ordinary skill in the art] to implement a light permeable convex cover in Mendelson-799's sensor, to improve detection efficiency.

*Id.* at 12 (citing, e.g., Ex. 1047 ¶ 26).

Concerning Patent Owner's third argument, Petitioner responds that adding a convex cover to Mendelson-799's sensor would not decrease signal strength but, instead, "would improve Mendelson-799's signal-to-noise ratio by causing more light backscattered from tissue to strike Mendelson-799's detectors than would have absent the cover" because such a cover improves light concentration across the entire lens and does not direct it only towards the center. *Id.* at 14–18 (citing, e.g., Ex. 1047 ¶¶ 29–44).

Petitioner dismisses Patent Owner's reliance on Figure 14B of the '765 patent because it "is not an accurate representation of light that has been reflected from a tissue measurement site. The light rays (1420) shown in FIG. 14B are collimated (i.e., travelling paths parallel to one another), and each light ray's path is perpendicular to the detecting surface." Pet. Reply 16 (citing, e.g., Ex. 1047 ¶¶ 30–35). Moreover, Petitioner argues that, "Dr. Madisetti's overly-simplistic statements only apply to a special narrow case of collimated light incident on a convex lens along the axis of symmetry." *Id.* at 16 (citing, e.g., Ex. 1047 ¶ 36).

According to Petitioner, Patent Owner's and Dr. Madisetti's argument regarding convergence toward the center does not apply to diffuse light, which reaches the detectors from various random angles and directions after having been reflected by tissue. *Id.* at 16–17 (citing, e.g., Ex. 1047 ¶¶ 37–38). As a result, Petitioner contends Ohsaki's cover would have provided a refracting effect such that light rays that would have missed the detectors absent a cover are instead directed to that area as they pass through the cover. *Id.* at 17 (citing Ex. 1047 ¶¶ 38–39). Petitioner thus contends that "overall, more of the partially reflected, transmitted, absorbed, and

IPR2020-01714
Patent 10,631,765 B1

ultimately back scattered light strikes the detectors than otherwise would have absent the cover." *Id.* at 17–18 (citing Ex. 1047 ¶¶ 40).

Concerning Patent Owner's fourth argument, Petitioner responds that a skilled artisan would have known to avoid air gaps in the proposed combination. *Id.* at 19–20 (citing, e.g., Ex. 1047 ¶¶ 45–48).

Concerning Patent Owner's fifth argument, Petitioner responds that even if a flat surface might be less prone to scratching, that possible disadvantage would have been weighed against the "***multiple*** advantages of a convex cover," and would not negate a motivation to combine. *Id.* at 20 (citing, e.g., Ex. 1047 ¶ 49).

<u>Patent Owner's Sur-reply</u>

Concerning Patent Owner's first and second arguments, Patent Owner reiterates its position that Ohsaki's purported benefits attach only to a sensor with a rectangular convex surface that is located on the back of the wrist, and that "even small changes in its sensor orientation or body location result in 'a tendency to slip.'" PO Sur-reply 2–15, 6.

Concerning Patent Owner's third argument, Patent Owner argues that Dr. Kenny and Petitioner have not overcome their admissions that a convex lens directs light toward the center. *Id.* at 15–16 (citing, e.g., Ex. 2004 ¶¶ 72–76).

Patent Owner also asserts that Petitioner mischaracterizes Patent Owner's position, which is not that a convex cover focuses "all light" to a single point at the center of the sensor. *Id.* at 17. Patent Owner instead states that, "a convex surface would direct relatively more light towards the center and away from Mendelson '799's peripheral detectors" and that "any signal strength from light redirected from the edge would be weak and fail to

40

**Appx42740**

compensate for the much stronger lost signal strength from light directed towards the center." *Id.* at 17, 18.

Finally, Patent Owner argues that Petitioner's Reply arguments are overly complex and instead a person of ordinary skill in the art "would have understood and applied the straightforward understanding that a convex surface condenses light toward the center." *Id.* at 19.

Concerning Patent Owner's fourth argument, Patent Owner argues that "Petitioner does not dispute [that] air gaps would dissuade a [person of ordinary skill in the art] from modifying Mendelson[-]799." *Id.* at 19–21.

Concerning Patent Owner's fifth argument, Patent Owner argues that Petitioner does not dispute Patent Owner's position that a flat cover would be less prone to scratches and offers "***no*** plausible advantages for its asserted combination." *Id.* at 21. Moreover, Patent Owner argues that "the risk of scratches directly undermines Petitioner's argument that a [person of ordinary skill in the art] would have included a convex cover instead of a flat surface to provide 'additional protection.'" *Id.*

Analysis

As noted above, Petitioner provides three rationales to support its contention that a person of ordinary skill in the art would have provided "a light permeable cover with a protruding convex surface," such as that taught by Ohsaki, to Mendelson-799's sensor: (1) to "improve adhesion between the sensor and the user's tissue," (2) to "improve detection efficiency," and (3) to "protect the elements within sensor housing 17." Pet. 25 (citing, e.g., Ex. 1003 ¶ 92; Ex. 1009 ¶¶ 15, 17, 25), 27–28. We conclude all three rationales are supported by the evidence, as follows.

41

<u>Rationales 1 and 2</u>

The evidence of record persuades us that a person of ordinary skill in the art would have been motivated to add a convex cover, such as that taught by Ohsaki, to improve adhesion between the sensor and the user's skin, which would have increased the signal strength of the sensor. Ohsaki teaches as much:

> [T]he convex surface of the translucent board 8 is in intimate contact with the surface of the user's skin. Thereby *it is prevented that the detecting element 2 slips off* the detecting position of the user's wrist 4. If the translucent board 8 has a flat surface, the detected pulse wave is adversely affected by the movement of the user's wrist 4 as shown in Fig. 4B. However, in the case that the translucent board 8 has a convex surface like the present embodiment, the *variation of the amount of the reflected light which is emitted from the light emitting element 6 and reaches the light receiving element 7 by being reflected by the surface of the user's skin is suppressed. It is also prevented that noise such as disturbance light from the outside penetrates the translucent board 8*. Therefore, the pulse wave can be detected without being affected by the movement of the user's wrist 4 as shown in FIG. 4A.

Ex. 1009 ¶ 25 (emphases added); *see also id.* ¶ 27 ("stably fixed").

We credit Dr. Kenny's testimony that a person of ordinary skill in the art would have been motivated by such teachings to apply a cover with a convex surface to Mendelson-799 to improve that similar device in the same way and to yield predictable results, i.e., to resist movement of the sensor on the user's wrist. *See, e.g.*, Ex. 1003 ¶ 95 ("[T]his contact [between the convex surface and the user's skin] prevents slippage, which increases the strength of the signals obtainable by Ohsaki's sensor."). We also credit Dr. Kenny's testimony that, in light of these teachings, a person of ordinary skill in the art would have made such a modification to improve the pulse

sensor's ability to emit light into, and detect light reflected from, the user's wrist, to generate an improved pulse signal. Ex. 1003 ¶¶ 95–98; Ex. 1047 ¶¶ 10, 12.

Indeed, Ohsaki expressly compares the performance of a wrist-worn pulse wave sensor depending on whether translucent board 8 is convex or flat, and concludes the convex surface results in improved performance over the flat surface, especially when the user is moving. Ex. 1009, Figs. 4A–4B, ¶¶ 15, 25 (stating that with "a flat surface, the detected pulse wave is adversely affected by the movement of the user's wrist 4," and with "a convex surface like the present embodiment, the variation of the amount of the reflected light" collected by the sensor "is suppressed"). Ohsaki also states that, with a convex surface, "[i]t is also prevented that noise such as disturbance light from the outside penetrates the translucent board 8." *Id.* ¶ 25.

We also credit Dr. Kenny's testimony that the proposed modification would have been within the level of ordinary skill in the art. For example, Dr. Kenny testifies:

> The above-described modification would require only routine knowledge of sensor design and assembly, which were well within the skill of one of ordinary skill prior to the Critical Date. Indeed, the modification would have amounted to nothing more than the use of a known technique to improve similar devices in the same way, and combining prior art elements according to known methods to yield predictable results—improved adhesion of the sensor to the user's skin, and improved signal strength. Furthermore, the elements of the resulting sensor would each perform functions they had been known to perform prior to the combination—a cover would simply be placed over the components (e.g., detectors) accommodated within

43

> Mendelson-799's sensor housing 17, and would perform the
> same function as taught by Ohsaki.

Ex. 1003 ¶ 100. In light of Ohsaki's express disclosure of the benefits of a
convex cover, we credit Dr. Kenny's testimony that a person of ordinary
skill in the art would have been motivated to modify Mendelson-799 as
proposed, and would have had a reasonable expectation of success in doing
so.

We next address Patent Owner's first through fourth arguments, each
of which implicates Petitioner's first and second asserted rationales of
improved adhesion and detection efficiency.

Patent Owner's first argument is premised on the notion that Ohsaki's
benefits only can be realized with a rectangular convex surface, because
such a shape is required to avoid interacting with bones on the back of the
user's forearm. PO Resp. 23–31. We disagree. Ohsaki does not disclose
the shape of its convex cover, much less require it be rectangular. In fact,
Ohsaki is silent as to the shape of the convex surface. Ohsaki discloses that
sensor 1 includes detecting element 2, which includes package 5 within
which the sensor components are located. Ex. 1009 ¶ 17. Ohsaki's convex
surface is located on board 8, which is "attached to the opening of the
package 5." *Id.* Ohsaki provides no further discussion regarding the shape
of board 8 or its convex surface.

We disagree with Patent Owner's suggestion that the shape of the
convex surface can be inferred to be rectangular from Ohsaki's Figures 1
and 2. PO Resp. 13, 17–18. Ohsaki does not indicate that these figures are
drawn to scale, or reflect precise dimensions or shapes of the convex
surface. *See, e.g.*, Ex. 1009 ¶ 13 ("schematic diagram"); Pet. Reply 9–10;

44

*Hockerson-Halberstadt, Inc. v. Avia Group Int'l*, 222 F.3d 951, 956 (Fed. Cir. 2000) ("[I]t is well established that patent drawings do not define the precise proportions of the elements and may not be relied on to show particular sizes if the specification is completely silent on the issue.").

To be clear, Ohsaki describes the shape of *detecting element 2* as rectangular: "[T]he length of the detecting element from the right side to the left side in FIG. 2 is longer than the length from the upper side to the lower side." Ex. 1009 ¶ 19. Ohsaki also describes that detecting element 2 is aligned longitudinally with the user's forearm: "[I]t is desirable that the detecting element 2 is arranged so that its longitudinal direction agrees with the longitudinal direction of the user's arm," to avoid slipping off. *Id.*; *see also id.* ¶ 9 ("The light emitting element and the light receiving element are arranged in the longitudinal direction of the user's arm.").

In light of this disclosed rectangular shape of detecting element 2, it is certainly possible that Ohsaki's convex surface may be similarly shaped. But, it may not be. Contrary to Patent Owner's argument, Ohsaki neither describes nor requires detecting element 2 to have the same shape as the convex surface of board 8. *Accord* Pet. Reply. 7–8 (noting also that Ohsaki's board 8 "is not coextensive with the entire tissue-facing side of detecting element 2"). We have considered the cited testimony of both Dr. Kenny and Dr. Madisetti on this point. Ex. 1047 ¶¶ 10–12, 12 n.2, 17–23; Ex. 2004 ¶¶ 37–41 (relying on Ohsaki's Figures 1–2 to support his opinion that the convex surface is rectangular). Dr. Madisetti's reliance on the dimensions of Ohsaki's figures is unpersuasive. *Hockerson-Halberstadt*, 222 F.3d at 956. We credit Dr. Kenny's testimony that Ohsaki does not

45

describe its convex surface as rectangular, because this testimony is most consistent with Ohsaki's disclosure.

Further, Patent Owner suggests that the convex surface *must be* rectangular, in order to avoid interacting with bones in the user's forearm. PO Resp. 27–28; PO Sur-Reply 10 ("[A] POSITA would have understood Ohsaki's convex board must also have a longitudinal shape oriented up-and-down the watch-side of the user's wrist/forearm.").  Although Ohsaki recognizes that interaction with these bones can cause slippage problems, *see* Ex. 1009 ¶¶ 6, 19, we do not agree that the *only way* to avoid these bones is by aligning a rectangular cover with the longitudinal direction of the user's forearm.  For example, in the annotated Figures provided by Patent Owner, *see* PO Resp. 27, we discern that the circular sensor that purports to depict the proposed modification would *also* avoid the bones in the forearm if it were slightly smaller.  Patent Owner provides no persuasive explanation to justify the dimensions it provides in this annotated figure, or to demonstrate that such a large sensor would have been required.  Indeed, we discern that it would have been within the level of skill of an ordinary artisan to appropriately size a modified sensor to avoid these well-known anatomical obstacles.  "A person of ordinary skill is also a person of ordinary creativity, not an automaton." *KSR*, 550 U.S. at 421.  After all, an artisan must be presumed to know something about the art apart from what the references disclose. *See In re Jacoby*, 309 F.2d 513, 516 (CCPA 1962).

Finally, we do not agree with Patent Owner's position that Ohsaki's advantages apply only to rectangular convex surfaces.  As discussed, Patent Owner has not shown that Ohsaki's convex surface is rectangular at all. Moreover, even if Ohsaki's convex surface is rectangular, when discussing

46

the benefits associated with a convex cover, Ohsaki does not limit those benefits to a cover of any particular shape. Instead, Ohsaki explains that "detecting element 2 is arranged on the user's wrist 4 so that the convex surface of the translucent board 8 is in intimate contact with the surface of the user's skin. Thereby it is prevented that the detecting element 2 slips off the detecting position of the user's wrist 4." Ex. 1009 ¶ 25; Ex. 1047 ¶ 10. Thus, we agree with Petitioner that Ohsaki's teaching of a convex surface would have motivated a person of ordinary skill in the art to add such a surface to Mendelson-799's circular-shaped sensor, to improve adhesion as taught by Ohsaki. *See, e.g.*, Pet. 24–25, 27–28. Nothing in Ohsaki's disclosure limits such a benefit to a specific shape of the convex surface. Ex. 1047 ¶¶ 11–12.

Moreover, Ohsaki contrasts its convex surface with a flat surface and notes that,

> in the case that the translucent board 8 has a convex surface . . . the variation of the amount of the reflected light which is emitted from the light emitting element 6 and reaches the light receiving element 7 by being reflected by the surface of the user's skin is suppressed. It is also prevented that noise such as disturbance light from the outside penetrates the translucent board 8. Therefore, the pulse wave can be detected without being affected by the movement of the user's wrist 4 as shown in FIG. 4A.

Ex. 1009 ¶ 25; Ex. 1047 ¶ 11. Thus, we agree with Petitioner that Ohsaki's teaching of a convex surface would have motivated a person of ordinary skill in the art to add such a surface to Mendelson-799's sensor, to improve signal strength, as taught by Ohsaki. *See, e.g.*, Pet. 24–25, 27–28. Again, nothing in Ohsaki's disclosure limits such a benefit to the shape of the convex surface. Ex. 1047 ¶¶ 11–12.

47

Accordingly, we do not agree that Ohsaki's disclosed advantages attach only to a rectangular convex surface, or would have been inapplicable to the proposed combination of Mendelson-799 and Ohsaki.[7]

We have considered Patent Owner's second argument, that Ohsaki's benefits are realized only when the sensor and convex surface are placed on the back of the user's wrist, which is an unsuitable location for Mendelson-799's sensor.  PO Resp. 32–38.  We do not agree.  As an initial matter, Petitioner does not propose bodily incorporating the references; Petitioner simply proposes adding a convex cover to Mendelson-799's sensor, without discussing where Mendelson-799's sensor is used.  *See, e.g.*, Pet. 27–28.  In other words, Petitioner's proposed modification does not dictate any particular placement.  Moreover, Mendelson-799 states that its sensor "allows for measuring $SaO_2$ from multiple convenient locations on the body (e.g. the head, torso, or upper limbs)."  Ex. 1012, 2:17–19; *see also* Ex. 1019, 104 ("The idea of using skin reflectance spectrophotometry marked a significant advancement in the noninvasive monitoring of $S_aO_2$ from virtually any point on the skin surface.").  Thus, we do not agree that Mendelson-799 discourages or disparages use on the back of the wrist.

Notwithstanding the foregoing, and assuming for sake of argument that Patent Owner is correct that a person of ordinary skill in the art would have expected a weaker signal from Mendelson-799's sensor if placed on the wrist, *see* PO Resp. 32, that alone does not nullify the proposed

---

[7] Patent Owner also argues that it would not have been obvious to place a rectangular cover on top of Mendelson-799's sensor.  PO Resp. 29–31.  We do not understand Petitioner to have made any such contention and, accordingly, do not address this argument.  *See, e.g.*, Pet. 29, 49 (depicting circular convex surface over circular sensor).

combination. "[A] given course of action often has simultaneous advantages and disadvantages, and this does not necessarily obviate motivation to combine." *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1165 (Fed. Cir. 2006) (citation omitted). Indeed, we discern that, if Mendelson-799's sensor was placed at a location that results in decreased signal quality, a person of ordinary skill in the art would have been further motivated to act to improve signal quality, e.g., by employing Ohsaki's convex surface. *See, e.g.*, Ex. 1047 ¶¶ 26–28; Ex. 1009 ("[I]n the case that the translucent board 8 has a convex surface like the present embodiment, the variation of the amount of the reflected light which is emitted from the light emitting element 6 and reaches the light receiving element 7 by being reflected by the surface of the user's skin is suppressed. It is also prevented that noise such as disturbance light from the outside penetrates the translucent board 8.").

We have considered Patent Owner's third argument that a convex cover would condense light away from Mendelson-799's peripheral detectors, which Patent Owner alleges would decrease signal strength. PO Resp. 38–43. We disagree. There appears to be no dispute that when emitted light passes through user tissue, the light is diffused and scattered as it travels. *See, e.g.*, Pet. Reply 16–17; Tr. 33:13–34:7 (Patent Owner's counsel agreeing that "when [light] goes into the tissue you get the diffusion and that is random scattering"); Ex. 1052, 35:19–37:18 (Patent Owner's declarant describing light scattering as it travels through tissue, e.g., reflecting off blood, tissue, or other material); Ex. 1054, 28:2–10 (Patent Owner's declarant agreeing that reflected light can be a signal to a sensor), 61:20–62:4 (explaining that "a light in this context, light emitted from the LEDs is diffused through the skin in that particular context, whatever that

49

is."). The light thus travels at random angles and directions, and no longer travels in a collimated and perpendicular manner.

Dr. Kenny testifies that Mendelson-799 and Ohsaki "detect light that has been 'partially reflected, transmitted, absorbed, and scattered by the skin and other tissues and the blood before it reaches the detector." Ex. 1047 ¶ 37. Dr. Kenny further opines that, "the POSITA would have understood that Mendelson-799's sensor, which includes multiple photodiodes placed symmetrically with respect to a central light source, offers the advantage of *enabling a large fraction of light randomly backscattered from tissue to be detected within the circular active detection area surrounding that source*," thus increasing the light-gathering ability of Mendelson-799's sensor. *Id.* ¶ 38 (emphasis added); *see also id.* ¶ 39 ("Ohsaki's cover provides a slight refracting effect, such that light rays that otherwise would have missed the detection area are instead directed toward that area as they pass through the interface provided by the cover.").

By contrast Dr. Madisetti testifies that "a convex surface condenses light away from the periphery and towards the sensor's center." Ex. 2004 ¶ 74. We have considered this testimony; however, Dr. Madisetti's opinions largely are premised upon the behavior of collimated and perpendicular light as depicted in Figure 14B of the challenged patent. *See id.* Dr. Madisetti does not explain how light would behave when approaching the sensor from various angles, as it would after being reflected by tissue. *Id.* ¶¶ 72–76. In other words, even if Patent Owner is correct that the '765 patent's Figure 14B depicts light condensing toward the center, this is not dispositive to the proposed modification, because light passing through a user's tissue is

IPR2020-01714
Patent 10,631,765 B1

scattered and random, and is not collimated and perpendicular as shown in Figure 14B. Ex. 1001, Fig. 14B.

Patent Owner and Dr. Madisetti argue that "Petitioner and Dr. Kenny both previously admitted that a convex cover condenses light towards the center of the sensor and away from the periphery in a different petition filed against a related patent," i.e., in IPR2020-01520. PO Resp. 38–39; Ex. 2004 ¶¶ 72–73 (citing Ex. 2019, 45; Ex. 2020 ¶¶ 118–120). The cited portions of the Petition and Dr. Kenny's declaration from IPR2020-01520 discuss a decrease in the "mean path length" of a ray of light when it travels through a convex lens rather than through a flat surface. *See, e.g.*, Ex. 2020 ¶¶ 118–120. We do not agree that this discussion is inconsistent with Dr. Kenny's testimony here that, where light is reflected to the detectors at various random angles and directions, more light will reach Mendelson-799's symmetrically disposed detectors when travelling through the convex surface than would be reached without such a surface, because light that might have otherwise missed the detectors now will be captured. Ex. 1047 ¶¶ 37–40. We do not discern that the convergence of a single ray of light toward the center, as discussed in IPR2020-01520, speaks to the aggregate effect on *all* light that travels through the convex surface. Patent Owner suggests that this prior discussion means that all light is always directed toward the center regardless of where or how the light approaches the convex surface, however, we do not understand Dr. Kenny's testimony to support such a position. PO Resp. 38–39.

In its Sur-reply, Patent Owner argues that it "never argued all incoming light condenses to a ***single point***." PO Sur-reply 17. Be that as it may, neither Patent Owner nor Dr. Madisetti sufficiently address the diffuse

51

nature of the light at issue here, which reflects from user tissue and scatters. Ex. 2004 ¶¶ 71–75. Accordingly, considering all evidence of record, we credit the testimony of Dr. Kenny.[8]

With respect to Patent Owner's fourth argument, we do not agree that a person of ordinary skill in the art would have been discouraged from modifying Mendelson-799 as proposed, due to the potential for air gaps to form at the peripheral edges of the convex surface. PO Resp. 43–45. Patent Owner misstates the proposed modification. Petitioner does not propose "modif[ying] Mendelson[-]799's structure to add Ohsaki's air gaps." *Contra* PO Resp. 44. Petitioner proposes modifying Mendelson-799 only to include a cover with a convex surface; Petitioner does not propose including any air gaps that may be present in Ohsaki. *See, e.g.*, Pet. 48. Moreover, even if Ohsaki's Figure 1 depicts small air gaps adjacent the convex surface, Ohsaki nonetheless discloses that the convex surface is in "intimate contact" with the user's skin. Ex. 1009 ¶ 25; *Hockerson-Halberstadt*, 222 F.3d at 956. In view of such a teaching, we agree with Petitioner that it would have been within the skill of a person of ordinary skill in the art, who "is also a person of ordinary creativity, not an automaton," to minimize any such air gap that may be present when including a cover with a convex surface in Mendelson-799's sensor. *KSR*, 550 U.S. at 421. Indeed, a purpose of Petitioner's proposed modification is to increase signal strength. *See, e.g.*,

---

[8] Moreover, we disagree with Patent Owner's argument that Petitioner's Reply arguments are overly complex and instead a person of ordinary skill in the art "would have understood and applied the straightforward understanding that a convex surface condenses light toward the center." PO Sur-reply 19. As noted above, Patent Owner's "straightforward understanding" lacks sufficient support, in the context of diffuse light.

Appx42752

Pet. 26. We discern that it would have been within the capability of an ordinarily skilled artisan to eliminate any air gap that would have decreased signal strength or quality. Ex. 1047 ¶ 47.

Rationale 3

Petitioner further contends that a person of ordinary skill in the art "would have recognized that a light permeable cover with a protruding convex surface," such as that taught by Ohsaki, would "protect the elements within sensor housing 17" of Mendelson-799. Pet. 25. We are persuaded that adding a convex cover, such as that taught by Ohsaki, would protect the sensor's internal components. Mendelson-799 is not shown to include a cover over its emitters 12a–c or detectors 16, 18. *See, e.g.*, Ex. 1012, Fig. 7. By contrast, Ohsaki discloses that translucent board 8 with its convex surface covers its emitter and detector. As such, we credit Dr. Kenny's testimony that a person of ordinary skill in the art would have been motivated to add a transparent convex cover to Mendelson-799 to "provide additional protection to the elements accommodated within sensor housing 17." Ex. 1003 ¶ 98; *see also* Ex. 1008 ¶ 15 (noting that a cover "protect[s] the LED or PD").

We disagree with Patent Owner's fifth argument that a person of ordinary skill in the art would not have modified Mendelson-799 as proposed because a convex cover would be prone to scratches and because other alternatives existed. PO Resp. 45–47. Indeed, we discern that a convex cover would indeed serve to protect internal sensor components better than Mendelson-799, which lacks a cover entirely. That a convex cover may be more prone to scratches than a flat cover is one of numerous tradeoffs that a person of ordinary skill in the art would consider, in

determining whether the benefits of increased adhesion, signal strength, and protection outweigh the potential for a scratched cover. *Medichem*, 437 F.3d at 1165. The record does not support the premise that the possibility of scratches alone would have dissuaded a person of ordinary skill in the art from the proposed modification, to achieve the benefits identified by Petitioner.

For the foregoing reasons, we are persuaded by Petitioner's contentions.

### vii. "[f] a handheld computing device in wireless communication with the physiological sensor device, wherein the handheld computing device comprises"

Petitioner's Undisputed Contentions

Petitioner relies upon the teachings of Mendelson-799, Ohsaki, and Schulz, as discussed above, in further combination with Mendelson-2006 for the remainder of the claim limitations [f–k]. Specifically, Petitioner contends that although Mendelson-799 does not explicitly disclose wireless communication from its sensor to a handheld computing device, its sensor is "for use in an optical measurement device" as part of "a method for non-invasive measurement of a blood parameter." Pet. 35–36. Patent Owner does not dispute this contention and we agree with Petitioner. *See, e.g.*, Ex. 1012, code (57) ("A sensor for use in an optical measurement device and a method for non-invasive measurement of a blood parameter.").

Petitioner also contends that Mendelson-2006 discloses a body-worn pulse oximetry system including a sensor module, a receiver module, and a PDA. Pet. 37. Petitioner contends that data processed by the receiver module is transmitted to the PDA and identifies several advantages of

IPR2020-01714
Patent 10,631,765 B1

wireless communication noted in Mendelson-2006, including more effective medical care. *Id.* at 37–40. Patent Owner does not dispute this contention and we agree with Petitioner. *See, e.g.* Ex. 1010, 1–2 (describing system), 3 ("The stream of data received from the wearable unit is distributed to various locations on the PDA's graphical display."), 4 (explaining that wireless communication results in "more effective medical care"); Fig. 1 (sensor attached to skin), Fig. 3 (PDA).

Petitioner's Disputed Contentions

Petitioner further contends a person of ordinary skill in the art would have found it obvious to enable the sensor of the combination of Mendelson-799, Ohsaki, and Schulz to communicate wirelessly with a handheld computing device such as the PDA of Mendelson-2006, to transfer sensor data and provide more effective care. Pet. 36, 51, 55; *see, e.g.*, Ex. 1003 ¶¶ 110–117, 145–151.

Patent Owner's Arguments

Patent Owner presents several arguments directed to Mendelson-2006, including that Mendelson-2006 discloses a single detector (PO Resp. 52), and that Mendelson-2006's sensor is used on the forehead (*id.* at 53). Patent Owner argues that Mendelson-2006 thus confirms that a person of ordinary skill in the art would not have combined Mendelson-799 with Ohsaki or Schulz due to signal strength issues raised by various locations where a sensor might be attached to the user's body. *Id.* at 53–55.

Analysis

We are persuaded that Petitioner's stated reasoning for the proposed modification is sufficiently supported, including by the testimony of

55

**Appx42755**

Dr. Kenny. *See, e.g.*, Ex. 1003 ¶¶ 110–117, 145–151. For example, we credit Dr. Kenny's testimony that a person of ordinary skill in the art would have been motivated to implement Mendelson-799 as part of a physiological measurement system including a handheld communication device in wireless communication, in order to enable transfer of information and improve medical care. *Id.* ¶¶ 116–117.

Moreover, we disagree with Patent Owner's arguments. First, we are persuaded by Petitioner's contentions regarding Mendelson-799, Ohsaki, and Schulz, for the reasons discussed above, and we do not discern that the teachings of Mendelson-2006 undercut those contentions in any manner. Second, Petitioner relies on Mendelson-2006 for teachings regarding wireless communications with a handheld device. Pet. 51–55. Patent Owner's arguments do not pertain to the modification actually proposed, i.e., to enable wireless communication and, as such, are misplaced. Dr. Madisetti's testimony likewise fails to address substantively the modification actually proposed, i.e., wireless communications to a handheld computing device. Ex. 2004 ¶¶ 93–96.

> viii. *"[g] one or more processors configured to wirelessly receive one or more signals from the physiological sensor device, the one or more signals responsive to at least a physiological parameter of the user"*

The cited evidence supports Petitioner's contention that Mendelson-2006 describes wirelessly transmitting vital physiological information acquired from the sensor to the PDA, which receives it. Pet. 56–57; *see, e.g.*, Ex. 1010, 1, 2 ("The information acquired by the Sensor Module is transmitted wirelessly via an RF link over a short range to a body-worn Receiver Module. The data processed by the Receiver Module can be

transmitted wirelessly to a PDA."), 3 (explaining that the PDA "has sufficient computational resources for the intended application" and "can also serve to temporarily store vital medical information received from the wearable unit"), Fig. 3 (displaying $SpO_2$ and HR data); Ex. 1003 ¶¶ 110–117, 152.

Petitioner further contends that, in light of these teachings, a person of ordinary skill in the art "would have found configured a processor of the PDA to receive signals wirelessly from the physiological sensor device, the signals being responsive to physiological parameters of the user." Pet. 56; *see, e.g.*, Ex. 1003 ¶ 153.

Petitioner's stated reasoning for the proposed modification is sufficiently supported, including by the unrebutted testimony of Dr. Kenny. Ex. 1003 ¶¶ 152–156. Patent Owner does not present any argument against this limitation, apart from the arguments already addressed in Section II.D.5.vii.

> ix. *"[h]–[j] a touch-screen display configured to provide a user interface, wherein: the user interface is configured to display indicia responsive to measurements of the physiological parameter, and an orientation of the user interface is configurable responsive to a user input"*

The cited evidence supports Petitioner's contention that Mendelson-2006 describes a PDA with a touchscreen display configured to display indicia responsive to measurements of, e.g., $SpO_2$ and HR. Pet. 57–60; *see, e.g.*, Ex. 1010, 3 ("The use of a PDA . . . also provides a low-cost touch screen interface.").

Petitioner acknowledges that "Mendelson-2006 does not explicitly state that an orientation of the GUI provided by the PDA is configurable

57

responsive to a user input." Pet. 59. However, Petitioner contends that a person of ordinary skill in the art would have understood that "the LabVIEW software that was used 'to control all interactions between the PDA and the wearable unit via [t]he graphical user interface' included the option to configure an orientation of a user interface," e.g. by setting the report orientation to portrait or landscape view. *Id.* at 59–60 (alteration in original); *see, e.g.*, Ex. 1003 ¶¶ 161–162; Ex. 1027, 186 ("Set the report orientation—portrait or landscape.").

Petitioner further contends that, in light of these teachings, a person of ordinary skill in the art "would have found it obvious to make an orientation of the PDA's user interface configurable responsive to a user input, for the sake of user convenience." Pet. 60; *see, e.g.*, Ex. 1003 ¶ 163.

Petitioner's stated reasoning for the proposed modification is sufficiently supported, including by the unrebutted testimony of Dr. Kenny, who testifies that the proposed modification would have allowed for easy activation of various functions. *See, e.g.*, Ex. 1003 ¶¶ 157–163. Patent Owner does not present any argument against this limitation, apart from the arguments already addressed in Section II.D.5.vii.

x. *"[k] a storage device configured to at least temporarily store at least the measurements of the physiological parameter"*

The cited evidence supports Petitioner's contention that Mendelson-2006 teaches that the PDA is configured to store vital medical information received from the wearable pulse oximeter, and that an ordinarily skilled artisan "would have understood that the vital medical information would have included measurements of the physiological parameters obtained by the physiological sensor device (e.g., $SpO_2$ and HR)." Pet. 60–61; Ex. 1010, 3

58

("The PDA can also serve to temporarily store vital medical information received from the wearable unit."); Ex. 1003 ¶ 166.

Petitioner further contends that, in light of these teachings, a person of ordinary skill in the art "would have found it obvious to configure a storage device of the PDA to at least temporarily store measurements of physiological parameters (e.g., $SpO_2$ and HR)."  Pet. 61; *see, e.g.*, Ex. 1003 ¶ 166.

Petitioner's stated reasoning for the proposed modification is sufficiently supported, including by the unrebutted testimony of Dr. Kenny. *See, e.g.*, Ex. 1003 ¶¶ 165–168.  Patent Owner does not present any argument against this limitation, apart from the arguments already addressed in Section II.D.5.vii.

### xi. Reasonable Expectation of Success

Patent Owner argues that Petitioner has failed to demonstrate a reasonable expectation of success because Dr. Kenny did not perform a design analysis to create a functional sensor.  PO Resp. 55–56.  We disagree. As discussed in detail above, each of Petitioner's proposed modifications to Mendelson-799—whether to include an opaque material with windows, as taught by Schulz; or to include a cover with a convex surface, as taught by Ohsaki; or to communicate with a handheld computing device, as taught by Mendelson-2006—is rooted in explicit teachings of the prior art, and is supported by persuasive declarant testimony.

We credit Dr. Kenny's testimony that, for each proposed modification, the combined prior art teachings would have been applied as known, to achieve predictable results.  *See, e.g.*, Ex. 1003 ¶¶ 100 (applying

59

IPR2020-01714
Patent 10,631,765 B1

Ohsaki's teachings would have been "nothing more than the use of a known technique to improve similar devices in the same way, and combining prior art elements according to known methods to yield predictable results—improved adhesion of the sensor to the user's skin, and improved signal strength"), 109 (applying Schulz's teachings would have been "nothing more than the use of a known technique to improve similar devices in the same way, and combining prior art elements according to known methods to yield predictable results," i.e. to "avoid saturation"), 117 ("To obtain these and other advantages described by Mendelson-2006, a POSITA would have been motivated to wirelessly transmit information or data acquired or processed by sensor 10 and pulse oximeter 20 to a PDA".). For similar reasons discussed above with respect to each proposed modification, we conclude that that a skilled artisan would have had a reasonable expectation of success. *See supra* § II.D.5.iv, vi, vii; Ex. 1003 ¶¶ 89–168.

*xii. Summary*

For the foregoing reasons, we determine that Petitioner has met its burden of demonstrating by a preponderance of the evidence that claim 1 would have been obvious over the cited combination of references.

*6. Independent Claim 21*

Independent claim 21 consists of limitations that are substantially similar to elements [a]–[f] of claim 1. *Compare* Ex. 1001, 44:51–45:15, *with id.* at 46:31–49 (reciting that the convex surface is "located between tissue of the user and all of the at least four detectors," instead of "above all of the at least four detectors" as in claim 1; omitting details of the "handheld computing device"). In asserting that claim 21 also would have been

60

obvious over the combined teachings of Mendelson-799, Ohsaki, Schulz, and Mendelson-2006, Petitioner refers to the same arguments presented as to claim 1. *See* Pet. 81–83; Ex. 1003 ¶¶ 206–212. Patent Owner relies on the same arguments discussed above regarding claim 1. PO Resp. 12–56.

For the same reasons discussed above, we determine that Petitioner has met its burden of demonstrating by a preponderance of the evidence that claim 21 would have been obvious over the cited combination of references. *See supra* § II.D.5.

### 7. *Dependent Claims 7 and 26*

Dependent claim 7 ultimately depends from independent claim 1 and further recites, "the wall surrounds at least the at least four detectors on the first surface, the wall operably connects to the substrate on one side of the wall, and the wall operably connects to the cover on an opposing side of the wall." Ex. 1001, 45:40–47. Likewise, dependent claim 26 ultimately depends from independent claim 21 and further recites "the wall surrounds at least the at least four detectors on the first surface, wherein: the wall operably connects to the substrate on one side of the wall, and the wall operably connects to the cover on an opposing side of the wall." *Id.* at 47:12–48:5.

Petitioner contends that the sensor rendered obvious by the combined teachings of Mendelson-799, Ohsaki, Schulz, and Mendelson-2006 "would have included a wall surrounding the photodetectors, the wall being operably connected on one side to the substrate on which the detectors are arranged, and on an opposing side to a cover," as shown in Petitioner's annotated and modified view of Mendelson-799's Figure 7, as well as an added sectional view, both of which are reproduced below. Pet. 68–70 (citing, e.g., Ex. 1003

61

IPR2020-01714
Patent 10,631,765 B1

¶¶ 62–72, 89–100, 181); *see also id.* at 86 (regarding claim 26) (citing, e.g., Ex. 1003 ¶¶ 177–180, 221).



Petitioner's annotated and modified figures depict the sensor of Mendelson-799 with an added opaque wall illustrated in green and encircling the sensor components, and operably connected to the convex cover (illustrated in red) on the top and operably connected to the planar substrate of sensor housing 17 (illustrated in green) on the bottom.

Patent Owner argues that "Petitioner provides no independent analysis" for these claims and instead refers back to analyses of claims 1 and 21. PO Resp. 57. Patent Owner also argues that, in the annotated figures, Petitioner includes features not shown in the cited references, e.g., "a cover . . . spanning the entire space above the substrate" and a wall with "notches for the convex cover." *Id.* Patent Owner argues that "Petitioner cannot satisfy" the claims "by making unexplained changes to the cited art." *Id.* at

58. Moreover, Patent Owner argues that neither Ohsaki nor Mendelson-799 disclose a wall as claimed. *Id.*

As shown in the modified figures above, the wall of the combined sensor surrounds the sensor components and is operably connected to the convex cover on the top and is operably connected to the planar substrate on the bottom, as claimed. Moreover, as discussed above regarding claim 1, Petitioner's proposed modifications to Mendelson-799 are *not* premised upon bodily incorporating Ohsaki's cover directly with Mendelson-799's sensor. *See In re Nievelt*, 482 F.2d 965, 968 (CCPA 1973) ("Combining the teachings of references does not involve an ability to combine their specific structures."). To the contrary, Petitioner proposes incorporating Ohsaki's *teaching* of a cover with a convex surface, not the precise cover and structure disclosed by Ohsaki. *In re Keller*, 642 F.2d 413, 425 (CCPA 1981) ("[T]he test is what the combined teachings of those references would have suggested to those of ordinary skill in the art."). If Ohsaki's teaching is implemented in a manner that varies from the precise implementation of such a cover in Ohsaki, e.g., with a larger span or with notches, this is not a material deviation from Ohsaki's express teachings of using a cover with a convex surface to achieve specific benefits, e.g., improved adhesion and signal strength. Ex. 1009 ¶ 25; *see supra* § II.D.5.vi; *see Lear Siegler, Inc. v. Aeroquip Corp.*, 733 F.2d 881, 889 (Fed. Cir. 1984) (explaining that a person of ordinary skill is not "compelled to adopt every single aspect of [a reference] without the exercise of independent judgment").

Accordingly, for the foregoing reasons, we determine that Petitioner has met its burden of demonstrating by a preponderance of the evidence that

claims 7 and 26 would have been obvious over the cited combination of references.

### 8. *Dependent Claim 29*

Dependent claim 29 ultimately depends from independent claim 21 and further recites "the protruding convex surface protrudes a height greater than 2 millimeters and less than 3 millimeters." Ex. 1001, 48:14–16.

Petitioner contends that the sensor rendered obvious by the combined teachings of Mendelson-799, Ohsaki, Schulz, and Mendelson-2006 would have included a cover with a protruding convex surface. *See supra* § II.D.5.vi. With respect to claim 29, Petitioner incorporates its contentions regarding, *inter alia*, claims 12 and 18. Pet. 87 (incorporating, e.g., *id.* at 74–76); Ex. 1003 ¶¶ 89–100, 192–196, 224. In discussing claim 12, Petitioner contends that a person of ordinary skill in the art "would have found it obvious that a device designed to fit on a user's wrist would be on the order of millimeters," consistent with Ohsaki's disclosure that the device is in "intimate contact" with the user's skin. Pet. 75–76 (citing, e.g., Ex. 1003 ¶ 194). Petitioner also contends that an ordinarily skilled artisan would have taken user comfort into account when establishing the dimensions of the device's convex cover. *Id.* at 76. With these considerations in mind, Petitioner contends that, "in order to provide a comfortable cover featuring a protruding convex surface that prevents slippage, the surface should protrude a height between 1 millimeter and 3 millimeters," because "there would have been a finite range of possible protruding heights, and it would have been obvious to select a protruding height that would have been comfortable to the user." *Id.* (citing, e.g., Ex. 1003 ¶¶ 192–196).

64

IPR2020-01714
Patent 10,631,765 B1

Patent Owner argues that none of the cited references discloses the claimed height range and that Petitioner relies on hindsight reconstruction. PO Resp. 60–62 (citing, e.g., Ex. 2004 ¶¶ 104–107). Patent Owner also characterizes Dr. Kenny's testimony as conclusory and unsupported. *Id.* at 62.

Petitioner is correct that, "[w]hen there are a finite number of identified, predictable solutions, a person of ordinary skill in the art has good reason to pursue the known options within his or her technical grasp. If this leads to the anticipated success, it is likely the product . . . of ordinary skill and common sense." *KSR*, 550 U.S. at 398. Petitioner has shown sufficiently that only a finite number of solutions existed with respect to the height of a convex protrusion on a tissue-facing sensor, which would have met the art-recognized goals of both (1) intimate contact between the sensor's surface and the user and (2) user comfort. *See, e.g.*, Ex. 1009 ¶¶ 6, 25. Bearing in mind these considerations, we credit Dr. Kenny's testimony that it would have been obvious, "in order to provide a comfortable cover featuring a protruding convex surface that prevents slippage, [that] the surface should protrude a height between 1 millimeter and 3 millimeters," which includes the claimed range of 2 to 3 millimeters. Ex. 1003 ¶ 195; Ex. 1047 ¶ 74. Further, the record does not support that any new and unexpected results were achieved at the claimed height greater than 2 millimeters and less than 3 millimeters.

We have considered Patent Owner's argument, and Dr. Madisetti's cited testimony. However, it is not dispositive that none of Mendelson-799, Ohsaki, Schulz, or Mendelson-2006 teach the claimed range. PO Resp. 60; Ex. 2004 ¶¶ 105. Petitioner relies upon the knowledge, ability, and

creativity of a person of ordinary skill in the art, not the teachings of a specific reference. Notably, Dr. Madisetti does not dispute Dr. Kenny's position that there were a finite number of options available for the height of the convex surface. Ex. 2004 ¶¶ 104–107. Therefore, we do not agree that Petitioner's contentions are rooted in impermissible hindsight. *See, e.g.*, *In re McLaughlin*, 443 F.2d 1392, 1395 (CCPA 1971) ("Any judgment on obviousness is in a sense necessarily a reconstruction based upon hindsight reasoning, but so long as it takes into account only knowledge which was within the level of ordinary skill at the time the claimed invention was made and does not include knowledge gleaned only from applicant's disclosure, such a reconstruction is proper.").

Accordingly, for the foregoing reasons, we determine that Petitioner has met its burden of demonstrating by a preponderance of the evidence that claim 29 would have been obvious over the cited combination of references.

### 9. Dependent Claims 2–6, 8, 10–13, 15, 16, 20, 22–25, 27, and 28

Petitioner also contends that claims 2–6, 8, 10–13, 15, 16, 20, 22–25, 27, and 28 would have been obvious based on the same combination of prior art addressed above. These challenged claims all depend directly or indirectly from independent claim 1 or 21. Petitioner identifies teachings in the prior art references that teach or suggest the limitations of these claims, and provides persuasive reasoning as to why the claimed subject matter would have been obvious to one of ordinary skill in the art. Pet. 62–81, 83–87. Petitioner also supports its contentions for these claims with the testimony of Dr. Kenny. Ex. 1003 ¶¶ 169–205, 213–224.

Patent Owner does not present any arguments for these claims other than those we have already considered with respect to independent claims 1

IPR2020-01714
Patent 10,631,765 B1

and 21.  PO Resp. 56 ("The Petition fails to establish that independent claims 1 and 21 are obvious over the cited references of Ground 1 and therefore fails to establish obviousness of any of the challenged dependent claims."); *see supra* § II.D.5.

We have considered the evidence and arguments of record and determine that Petitioner has demonstrated by a preponderance of the evidence that claims 2–6, 8, 10–13, 15, 16, 20, 22–25, 27, and 28 would have been obvious over the combined teachings of Mendelson-799, Ohsaki, Schulz, and Mendelson-2006, for the reasons discussed in the Petition and as supported by the testimony of Dr. Kenny.

### *10.Summary*

For the foregoing reasons, we determine that Petitioner has met its burden of demonstrating by a preponderance of the evidence that claims 1–8, 10–13, 15, 16, and 20–29 would have been obvious over the cited combination of references.

### *E. Obviousness over the Combined Teachings of Mendelson-799, Ohsaki, Schulz, Mendelson-2006, and Bergey*

Petitioner contends that claim 9 would have been obvious over the combined teachings of Mendelson-799, Ohsaki, Schulz, Mendelson-2006, and Bergey.  Pet. 88–90.

### *1. Overview of Bergey (Ex. 1016)*

Bergey is a U.S. patent titled "Solid State Watch with Magnetic Setting," and discloses a watch in which the electronics are "hermetically sealed in the watch case to be free of dust and moisture."  Ex. 1016,

code (57).  Moreover, the electronic components are "resiliently mounted for improved shock resistance."  *Id.*

Petitioner contends that it would have been obvious to have modified the sensor of Aizawa-Inokawa-Ohsaki-Mendelson-2006 to hermetically seal the sensor components within the substrate, wall, and cover, so as to obtain advantages disclosed by Bergey, e.g., to protect the electronics and prevent condensation within the case.  Pet. 88–89 (citing Ex. 1003 ¶¶ 82–83, 225–228; Ex. 1016, code (57), 2:56–67, 8:48–9:34).

### 2. Analysis

Petitioner also contends that claim 9 would have been obvious over the combined teachings of Mendelson-799, Ohsaki, Schulz, Mendelson-2006, and Bergey.  Pet. 88–90.  Claim 9 depends indirectly from independent claim 1.  Petitioner identifies teachings in the prior art references that teach or suggest the limitations of this claim, and provides persuasive reasoning as to why the claimed subject matter would have been obvious to one of ordinary skill in the art.  *Id.*  Petitioner also supports its contentions for this claim with the testimony of Dr. Kenny.  Ex. 1003 ¶¶ 82–83, 225–228.

Patent Owner does not present any argument for this claim other than those we have already considered with respect to independent claim 1.  PO Resp. 63 ("Bergey's alleged disclosure of a hermetically sealed watch does not fix the deficiencies identified for Ground 1.");  *see supra* § II.D.

We have considered the evidence and arguments of record, including those directed to claim 1 and addressed above, and we determine that Petitioner has demonstrated by a preponderance of the evidence that claim 9 would have been obvious over the combined teachings of Mendelson-799,

Ohsaki, Schulz, Mendelson-2006, and Bergey for the reasons discussed in the Petition and as supported by the testimony of Dr. Kenny. *See, e.g.*, Ex. 1016, 8:48–9:34; Ex. 1003 ¶¶ 225–228.

### F. Obviousness over the Combined Teachings of Mendelson-799, Ohsaki, Schulz, Mendelson-2006, and Goldsmith

Dependent claim 14 ultimately depends from independent claim 1 and further recites, "the displayed indicia are further responsive to temperature." Ex. 1001, 46:4–6. Petitioner contends that claim 14 would have been obvious over the combined teachings of Mendelson-799, Ohsaki, Schulz, Mendelson-2006, and Goldsmith. Pet. 90–94.

### 1. Overview of Goldsmith (Ex. 1011)

Goldsmith is a U.S. patent application publication titled "Watch Controller for a Medical Device," and discloses a watch controller device that communicates with an infusion device to "provid[e] convenient monitoring and control of the infusion pump device." Ex. 1011, codes (54), (57).

Goldsmith's Figure 9A and 9B are reproduced below.



FIG. 9A        FIG 9B

69

IPR2020-01714
Patent 10,631,765 B1

Figure 9A and Figure 9A are respective front and rear views of a combined watch and controller device. *Id.* ¶¶ 30–31.  As shown in Figure 9A, watch controller 900 includes housing 905, transparent member 950, display 910, input devices 925a–c, scroll wheel 930, and wrist band 940. *Id.* ¶¶ 85–86.  Figure 9B shows rear-side cover 960, and a rear view of housing 905, scroll wheel 930, and wrist band 940. *Id.*

Goldsmith discloses the watch controller may interact with one or more devices, such as infusion pumps or analyte monitors. *Id.* ¶ 85; *see also id.* ¶ 88 ("The analyte sensing device 1060 may be adapted to receive data from a sensor, such as a transcutaneous sensor.").  Display 910 "may display at least a portion of whatever information and/or graph is being displayed on the infusion device display or on the analyte monitor display," such as, e.g., levels of glucose. *Id.* ¶ 86.  The display is customizable in a variety of configurations including user-customizable backgrounds, languages, sounds, font (including font size), and wall papers. *Id.* ¶¶ 102, 104.  Additionally, the watch controller may communicate with a remote station, e.g., a computer, to allow data downloading. *Id.* ¶ 89 (including wireless).  The remote station may also include a cellular telephone to be "used as a conduit for remote monitoring and programming." *Id.*

### 2. Analysis

Petitioner contends that claim 14 would have been obvious over the combined teachings of Mendelson-799, Ohsaki, Schulz, Mendelson-2006, and Goldsmith.  Pet. 90–94.  Claim 14 depends indirectly from independent claim 1.  Petitioner identifies teachings in the prior art references that teach or suggest the limitations of this claim, and provides persuasive reasoning as to why the claimed subject matter would have been obvious to one of

70

ordinary skill in the art. *Id.* Petitioner also supports its contentions for this claim with the testimony of Dr. Kenny. Ex. 1003 ¶¶ 84–85, 229–233.

Patent Owner does not present any argument for this claim other than those we have already considered with respect to independent claim 1. PO Resp. 63 ("Goldsmith's alleged disclosure of a temperature-responsive display does not fix the deficiencies identified for Ground 1."); *see supra* § II.D.

We have considered the evidence and arguments of record, including those directed to claim 1 and addressed above, and we determine that Petitioner has demonstrated by a preponderance of the evidence that claim 14 would have been obvious over the combined teachings of Mendelson-799, Ohsaki, Schulz, Mendelson-2006, and Goldsmith for the reasons discussed in the Petition and as supported by the testimony of Dr. Kenny. *See, e.g.*, Ex. 1011 ¶¶ 11, 87, 95, 102; Ex. 1003 ¶¶ 229–233.

### G. Obviousness over the Combined Teachings of Mendelson-799, Ohsaki, Schulz, Mendelson-2006, and Aizawa

Petitioner contends that claims 17–19 would have been obvious over the combined teachings of Mendelson-799, Ohsaki, Schulz, Mendelson-2006, and Aizawa. Pet.

### 1. Overview of Aizawa (Ex. 1006)

Aizawa is a U.S. patent application publication titled "Pulse Wave Sensor and Pulse Rate Detector," and discloses a pulse wave sensor that detects light output from a light emitting diode and reflected from a patient's artery. Ex. 1006, codes (54), (57).

71

IPR2020-01714
Patent 10,631,765 B1

Figure 1(a) of Aizawa is reproduced below.



Figure 1(a) is a plan view of a pulse wave sensor. *Id.* ¶ 23. As shown in
Figure 1(a), pulse wave sensor 2 includes light emitting diode ("LED") 21,
four photodetectors 22 symmetrically disposed around LED 21, and
holder 23 for storing LED 21 and photodetectors 22. *Id.* Aizawa discloses
that, "to further improve detection efficiency, . . . the number of the
photodetectors 22 may be increased." *Id.* ¶ 32, Fig. 4(a). "The same effect
can be obtained when the number of photodetectors 22 is 1 and a plurality of
light emitting diodes 21 are disposed around the photodetector 22." *Id.* ¶ 33.

Figure 1(b) of Aizawa is reproduced below.



Figure 1(b) is a sectional view of the pulse wave sensor. *Id.* ¶ 23. As shown in Figure 1(b), pulse wave sensor 2 includes drive detection circuit 24 for detecting a pulse wave by amplifying the outputs of photodetectors 22. *Id.* ¶ 23. Arithmetic circuit 3 computes a pulse rate from the detected pulse wave and transmitter 4 transmits the pulse rate data to an "unshown display." *Id.* The pulse rate detector further includes outer casing 5 for storing pulse wave sensor 2, acrylic transparent plate 6 mounted to detection face 23a of holder 23, and attachment belt 7. *Id.* ¶ 23.

Aizawa discloses that LED 21 and photodetectors 22 "are stored in cavities 23b and 23c formed in the detection face 23a" of the pulse wave sensor. *Id.* ¶ 24. Detection face 23a "is a contact side between the holder 23 and a wrist 10, respectively, at positions where the light emitting face 21s of the light emitting diode 21 and the light receiving faces 22s of the photodetectors 22 are set back from the above detection face 23a." *Id.* ¶ 24. Aizawa discloses that "a subject carries the above pulse rate detector 1 on the inner side of his/her wrist 10 . . . in such a manner that the light emitting face 21s of the light emitting diode 21 faces down (on the wrist 10 side)." *Id.* ¶ 26. Furthermore, "the above belt 7 is fastened such that the acrylic transparent plate 6 becomes close to the artery 11 of the wrist 10. Thereby, adhesion between the wrist 10 and the pulse rate detector 1 is improved." *Id.* ¶¶ 26, 34.

### 2. *Analysis of Claims 17 and 19*

Claims 17 and 19 depend indirectly from independent claim 1. Petitioner identifies teachings in the prior art references that teach or suggest the limitations of this claim, and provides persuasive reasoning as to why the claimed subject matter would have been obvious to one of ordinary skill in

73

the art.  Pet.  Petitioner also supports its contentions for this claim with the testimony of Dr. Kenny.  Ex. 1003 ¶¶ 86–88, 234–241.

Patent Owner does not present any substantive argument for these claims other than those we have already considered with respect to independent claim 1.  PO Resp. 63–64 ("Aizawa's alleged disclosure of a detector orientation does not fix the deficiencies identified for Ground 1."); *see supra* § II.D.

We have considered the evidence and arguments of record, including those directed to claim 1 and addressed above, and we determine that Petitioner has demonstrated by a preponderance of the evidence that claims 17 and 19 would have been obvious over the combined teachings of Mendelson-799, Ohsaki, Schulz, Mendelson-2006, and Aizawa for the reasons discussed in the Petition and as supported by the testimony of Dr. Kenny.  *See, e.g.*, Ex. 1006 ¶¶ 23, 32, Figs. 1(a), 4(a), 7; Ex. 1003 ¶¶ 234–241.

### 3.  Analysis of Claim 18

Claim 18 depends indirectly from independent claim 1 and further recites that the "convex surface protrudes a height greater than 2 millimeters and less than 3 millimeters," as also recited in claim 29, discussed above. Petitioner incorporates its contentions regarding, *inter alia*, claim 12. Pet. 99–100 (citing, e.g., Ex. 1003 ¶¶ 89–100, 192–196, 234–240).

Patent Owner does not present any argument for this claim other than those we have already considered with respect to independent claim 1 and dependent claim 29.  PO Resp. 63–64.

We have considered the evidence and arguments of record, including those directed to claims 1 and 29 addressed above, and we determine that

IPR2020-01714
Patent 10,631,765 B1

Petitioner has demonstrated by a preponderance of the evidence that claim 18 would have been obvious over the combined teachings of Mendelson-799, Ohsaki, Schulz, Mendelson-2006, and Aizawa for the reasons discussed in the Petition and as supported by the testimony of Dr. Kenny. *See, e.g.*, Ex. 1003 ¶¶ 192–196, 240; *see supra* § II.D.8.

### III.    CONCLUSION

In summary:[9]

| Claims | 35 U.S.C. § | Reference(s)/ Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1–8, 10–13, 15–16, 20–29 | 103 | Mendelson-799, Ohsaki, Schulz, Mendelson-2006 | 1–8, 10–13, 15–16, 20–29 | |
| 9 | 103 | Mendelson-799, Ohsaki, Schulz, Mendelson-2006, Bergey | 9 | |
| 14 | 103 | Mendelson-799, Ohsaki, Schulz, Mendelson- | 14 | |

---

[9] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding*. *See* 84 Fed. Reg. 16654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

IPR2020-01714
Patent 10,631,765 B1

| | | 2006, Goldsmith | | |
|---|---|---|---|---|
| 17–19 | 103 | Mendelson-799, Ohsaki, Schulz, Mendelson-2006, Aizawa | 17–19 | |
| **Overall Outcome** | | | 1–29 | |

## IV.    ORDER

Upon consideration of the record before us, it is:

ORDERED that claims 1–29 of the '765 patent have been shown to be unpatentable; and

FURTHER ORDERED that, because this is a final written decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2020-01714
Patent 10,631,765 B1

PETITIONER:

Walter Renner
Andrew Patrick
Usman Khan
Grace Kim
FISH & RICHARDSON P.C.
Axf-ptab@fr.com
patrick@fr.com
khan@fr.com
gkim@fr.com


PATENT OWNER:

Joseph Re
Stephen Larson
Jarom Kesler
Jack Peterson
Stephen Jensen
KNOBBE, MARTENS, OLSON, & BEAR, LLP
2jrr@knobbe.com
2swl@knobbe.com
2jzk@knobbe.com
2jup@knobbe.com
2scj@knobbe.com

77

# CERTIFICATE OF SERVICE

I hereby certify that the original of this Notice of Appeal was filed via U.S.P.S. Priority Mail Express on April 12, 2022 with the Director of the United States Patent and Trademark Office at the address below:

Office of the Solicitor
United States Patent and Trademark Office
Mail Stop 8, Post Office Box 1450
Alexandria, Virginia 22313-1450

A copy of this Notice of Appeal is being filed and served on April 12, 2022 as follows:

**To the USPTO Patent Trial and Appeal Board:**
Patent Trial and Appeal Board
Madison Building East
600 Dulany Street
Alexandria, VA 22313

(*via PTAB E2E – as authorized by the Board*)

**To the U.S. Court of Appeals for the Federal Circuit:**
Clerk of Court
U.S. Court of Appeals for the Federal Circuit
717 Madison Place, N.W.
Washington, DC 20439

(*via CM/ECF – with filing fee*)

**Counsel for Petitioner Apple, Inc.**
W. Karl Renner
Andrew B. Patrick
patrick@fr.com
Usman A. Khan
khan@fr.com
Grace J. Kim

gkim@fr.com
Daniel D. Smith
Roberto J. Devoto
Fish & Richardson P.C.
3200 RBC Plaza
60 South Sixth Street
Minneapolis, MN 55402
IPR50095-0024IP1@fr.com
PTABInbound@fr.com
Axf-ptab@fr.com


(*via email pursuant to 37 C.F.R. § 42.6(e)*)


Dated:  April 12, 2022                    /Jarom Kesler/
                                          Jarom D. Kesler (Reg. No. 57,046)

                                          Attorney for Patent Owner
                                          Masimo Corporation

55433730



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

# NOTICE OF ALLOWANCE AND FEE(S) DUE

| 64735    7590    02/28/2020 |
|---|
| KNOBBE, MARTENS, OLSON & BEAR, LLP |
| MASIMO CORPORATION (MASIMO) |
| 2040 MAIN STREET |
| FOURTEENTH FLOOR |
| IRVINE, CA 92614 |

| EXAMINER |
|---|
| LIU, CHU CHUAN |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3791 | |

DATE MAILED: 02/28/2020

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 16/725,478 | 12/23/2019 | Jeroen Poeze | MASCER.002C16 | 9249 |

TITLE OF INVENTION: MULTI-STREAM DATA COLLECTION SYSTEM FOR NONINVASIVE MEASUREMENT OF BLOOD CONSTITUENTS

| APPLN. TYPE | ENTITY STATUS | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|---|
| nonprovisional | UNDISCOUNTED | $1000 | $0.00 | $0.00 | $1000 | 05/28/2020 |

**THE APPLICATION IDENTIFIED ABOVE HAS BEEN EXAMINED AND IS ALLOWED FOR ISSUANCE AS A PATENT. PROSECUTION ON THE MERITS IS CLOSED.  THIS NOTICE OF ALLOWANCE IS NOT A GRANT OF PATENT RIGHTS. THIS APPLICATION IS SUBJECT TO WITHDRAWAL FROM ISSUE AT THE INITIATIVE OF THE OFFICE OR UPON PETITION BY THE APPLICANT.  SEE 37 CFR 1.313 AND MPEP 1308.**

**THE ISSUE FEE AND PUBLICATION FEE (IF REQUIRED) MUST BE PAID WITHIN THREE MONTHS FROM THE MAILING DATE OF THIS NOTICE OR THIS APPLICATION SHALL BE REGARDED AS ABANDONED.  THIS STATUTORY PERIOD CANNOT BE EXTENDED.  SEE 35 U.S.C. 151.  THE ISSUE FEE DUE INDICATED ABOVE DOES NOT REFLECT A CREDIT FOR ANY PREVIOUSLY PAID ISSUE FEE IN THIS APPLICATION.  IF AN ISSUE FEE HAS PREVIOUSLY BEEN PAID IN THIS APPLICATION (AS SHOWN ABOVE), THE RETURN OF PART B OF THIS FORM WILL BE CONSIDERED A REQUEST TO REAPPLY THE PREVIOUSLY PAID ISSUE FEE TOWARD THE ISSUE FEE NOW DUE.**

**HOW TO REPLY TO THIS NOTICE:**

I. Review the ENTITY STATUS shown above. If the ENTITY STATUS is shown as SMALL or MICRO, verify whether entitlement to that entity status still applies.

If the ENTITY STATUS is the same as shown above, pay the TOTAL FEE(S) DUE shown above.

If the ENTITY STATUS is changed from that shown above, on PART B - FEE(S) TRANSMITTAL, complete section number 5 titled "Change in Entity Status (from status indicated above)".

For purposes of this notice, small entity fees are 1/2 the amount of undiscounted fees, and micro entity fees are 1/2 the amount of small entity fees.

II. PART B - FEE(S) TRANSMITTAL, or its equivalent, must be completed and returned to the United States Patent and Trademark Office (USPTO) with your ISSUE FEE and PUBLICATION FEE (if required). If you are charging the fee(s) to your deposit account, section "4b" of Part B - Fee(s) Transmittal should be completed and an extra copy of the form should be submitted. If an equivalent of Part B is filed, a request to reapply a previously paid issue fee must be clearly made, and delays in processing may occur due to the difficulty in recognizing the paper as an equivalent of Part B.

III. All communications regarding this application must give the application number. Please direct all communications prior to issuance to Mail Stop ISSUE FEE unless advised to the contrary.

**IMPORTANT REMINDER: Maintenance fees are due in utility patents issuing on applications filed on or after Dec. 12, 1980. It is patentee's responsibility to ensure timely payment of maintenance fees when due. More information is available at www.uspto.gov/PatentMaintenanceFees.**

Page 1 of 3

PTOL-85 (Rev. 02/11)

Appx42872

## PART B - FEE(S) TRANSMITTAL

Complete and send this form, together with applicable fee(s), by mail or fax, or via EFS-Web.

| By mail, send to: | Mail Stop ISSUE FEE | By fax, send to: | (571)-273-2885 |
|---|---|---|---|
| | Commissioner for Patents | | |
| | P.O. Box 1450 | | |
| | Alexandria, Virginia 22313-1450 | | |

INSTRUCTIONS: This form should be used for transmitting the ISSUE FEE and PUBLICATION FEE (if required). Blocks 1 through 5 should be completed where appropriate. All further correspondence including the Patent, advance orders and notification of maintenance fees will be mailed to the current correspondence address as indicated unless corrected below or directed otherwise in Block 1, by (a) specifying a new correspondence address; and/or (b) indicating a separate "FEE ADDRESS" for maintenance fee notifications.

CURRENT CORRESPONDENCE ADDRESS (Note: Use Block 1 for any change of address)

64735        7590        02/28/2020

KNOBBE, MARTENS, OLSON & BEAR, LLP
MASIMO CORPORATION (MASIMO)
2040 MAIN STREET
FOURTEENTH FLOOR
IRVINE, CA 92614

Note: A certificate of mailing can only be used for domestic mailings of the Fee(s) Transmittal. This certificate cannot be used for any other accompanying papers. Each additional paper, such as an assignment or formal drawing, must have its own certificate of mailing or transmission.

**Certificate of Mailing or Transmission**

I hereby certify that this Fee(s) Transmittal is being deposited with the United States Postal Service with sufficient postage for first class mail in an envelope addressed to the Mail Stop ISSUE FEE address above, or being transmitted to the USPTO via EFS-Web or by facsimile to (571) 273-2885, on the date below.

_____ (Typed or printed name)

_____ (Signature)

_____ (Date)

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 16/725,478 | 12/23/2019 | Jeroen Poeze | MASCER.002C16 | 9249 |

TITLE OF INVENTION: MULTI-STREAM DATA COLLECTION SYSTEM FOR NONINVASIVE MEASUREMENT OF BLOOD CONSTITUENTS

| APPLN. TYPE | ENTITY STATUS | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|---|
| nonprovisional | UNDISCOUNTED | $1000 | $0.00 | $0.00 | $1000 | 05/28/2020 |

| EXAMINER | ART UNIT | CLASS-SUBCLASS |
|---|---|---|
| LIU, CHU CHUAN | 3791 | 600-310000 |

1. Change of correspondence address or indication of "Fee Address" (37 CFR 1.363).

☐ Change of correspondence address (or Change of Correspondence Address form PTO/SB/122) attached.

☐ "Fee Address" indication (or "Fee Address" Indication form PTO/SB/47; Rev 03-09 or more recent) attached. **Use of a Customer Number is required.**

2. For printing on the patent front page, list
(1) The names of up to 3 registered patent attorneys or agents OR, alternatively,
(2) The name of a single firm (having as a member a registered attorney or agent) and the names of up to 2 registered patent attorneys or agents. If no name is listed, no name will be printed.

1 _____

2 _____

3 _____

3. ASSIGNEE NAME AND RESIDENCE DATA TO BE PRINTED ON THE PATENT (print or type)

PLEASE NOTE: Unless an assignee is identified below, no assignee data will appear on the patent. If an assignee is identified below, the document must have been previously recorded, or filed for recordation, as set forth in 37 CFR 3.11 and 37 CFR 3.81(a). Completion of this form is NOT a substitute for filing an assignment.

(A) NAME OF ASSIGNEE        (B) RESIDENCE: (CITY and STATE or COUNTRY)

Please check the appropriate assignee category or categories (will not be printed on the patent) : ☐ Individual ☐ Corporation or other private group entity ☐ Government

4a. Fees submitted: ☐ Issue Fee  ☐ Publication Fee (if required)  ☐ Advance Order - # of Copies _____

4b. Method of Payment: *(Please first reapply any previously paid fee shown above)*

☐ Electronic Payment via EFS-Web   ☐ Enclosed check   ☐ Non-electronic payment by credit card (Attach form PTO-2038)

☐ The Director is hereby authorized to charge the required fee(s), any deficiency, or credit any overpayment to Deposit Account No. _____

5. **Change in Entity Status** (from status indicated above)

☐ Applicant certifying micro entity status. See 37 CFR 1.29

☐ Applicant asserting small entity status. See 37 CFR 1.27

☐ Applicant changing to regular undiscounted fee status.

NOTE: Absent a valid certification of Micro Entity Status (see forms PTO/SB/15A and 15B), issue fee payment in the micro entity amount will not be accepted at the risk of application abandonment.
NOTE: If the application was previously under micro entity status, checking this box will be taken to be a notification of loss of entitlement to micro entity status.
NOTE: Checking this box will be taken to be a notification of loss of entitlement to small or micro entity status, as applicable.

NOTE: This form must be signed in accordance with 37 CFR 1.31 and 1.33. See 37 CFR 1.4 for signature requirements and certifications.

Authorized Signature _____        Date _____

Typed or printed name _____        Registration No. _____

Page 2 of 3

PTOL-85 Part B (08-18) Approved for use through 01/31/2020        OMB 0651-0033        U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE

Appx42873



### UNITED STATES PATENT AND TRADEMARK OFFICE

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 16/725,478 | 12/23/2019 | Jeroen Poeze | MASCER.002C16 | 9249 |

| | | |
|---|---|---|
| 64735    7590    02/28/2020 | **EXAMINER** | |
| KNOBBE, MARTENS, OLSON & BEAR, LLP | LIU, CHU CHUAN | |
| MASIMO CORPORATION (MASIMO) | | |
| 2040 MAIN STREET | ART UNIT | PAPER NUMBER |
| FOURTEENTH FLOOR | 3791 | |
| IRVINE, CA 92614 | | |

DATE MAILED: 02/28/2020

## Determination of Patent Term Adjustment under 35 U.S.C. 154 (b)
### (Applications filed on or after May 29, 2000)

The Office has discontinued providing a Patent Term Adjustment (PTA) calculation with the Notice of Allowance.

Section 1(h)(2) of the AIA Technical Corrections Act amended 35 U.S.C. 154(b)(3)(B)(i) to eliminate the requirement that the Office provide a patent term adjustment determination with the notice of allowance. See Revisions to Patent Term Adjustment, 78 Fed. Reg. 19416, 19417 (Apr. 1, 2013). Therefore, the Office is no longer providing an initial patent term adjustment determination with the notice of allowance. The Office will continue to provide a patent term adjustment determination with the Issue Notification Letter that is mailed to applicant approximately three weeks prior to the issue date of the patent, and will include the patent term adjustment on the patent. Any request for reconsideration of the patent term adjustment determination (or reinstatement of patent term adjustment) should follow the process outlined in 37 CFR 1.705.

Any questions regarding the Patent Term Extension or Adjustment determination should be directed to the Office of Patent Legal Administration at (571)-272-7702. Questions relating to issue and publication fee payments should be directed to the Customer Service Center of the Office of Patent Publication at 1-(888)-786-0101 or (571)-272-4200.

Page 3 of 3

PTOL-85 (Rev. 02/11)

## OMB Clearance and PRA Burden Statement for PTOL-85 Part B

The Paperwork Reduction Act (PRA) of 1995 requires Federal agencies to obtain Office of Management and Budget approval before requesting most types of information from the public. When OMB approves an agency request to collect information from the public, OMB (i) provides a valid OMB Control Number and expiration date for the agency to display on the instrument that will be used to collect the information and (ii) requires the agency to inform the public about the OMB Control Number's legal significance in accordance with 5 CFR 1320.5(b).

The information collected by PTOL-85 Part B is required by 37 CFR 1.311. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 30 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, Virginia 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, Virginia 22313-1450. Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

## Privacy Act Statement

**The Privacy Act of 1974 (P.L. 93-579)** requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b) (2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether disclosure of these records is required by the Freedom of Information Act.
2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.
3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.
4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).
5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.
6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).
7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.
8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspection or an issued patent.
9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

**Appx42875**

| *Notice of Allowability* | Application No. 16/725,478 | Applicant(s) Poeze et al. | |
|---|---|---|---|
| | Examiner CHU CHUAN LIU | Art Unit 3791 | AIA (FITF) Status No |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address--*

All claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application. If not included herewith (or previously mailed), a Notice of Allowance (PTOL-85) or other appropriate communication will be mailed in due course. **THIS NOTICE OF ALLOWABILITY IS NOT A GRANT OF PATENT RIGHTS.** This application is subject to withdrawal from issue at the initiative of the Office or upon petition by the applicant. See 37 CFR 1.313 and MPEP 1308.

1. ☑ This communication is responsive to <u>preliminary amendments filed on 12/26/2019</u>.

   ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.

2. ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.

3. ☑ The allowed claim(s) is/are <u>2-30</u>. As a result of the allowed claim(s), you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see **http://www.uspto.gov/patents/init_events/pph/index.jsp** or send an inquiry to **PPHfeedback@uspto.gov**.

4. ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

   **Certified copies:**

   a) ☐ All     b) ☐ Some     *c) ☐ None of the:

   　1. ☐ Certified copies of the priority documents have been received.

   　2. ☐ Certified copies of the priority documents have been received in Application No. _____.

   　3. ☐ Copies of the certified copies of the priority documents have been received in this national stage application from the International Bureau (PCT Rule 17.2(a)).

   * Certified copies not received: _____.

   Applicant has THREE MONTHS FROM THE "MAILING DATE" of this communication to file a reply complying with the requirements noted below. Failure to timely comply will result in ABANDONMENT of this application. **THIS THREE-MONTH PERIOD IS NOT EXTENDABLE.**

5. ☐ CORRECTED DRAWINGS (as "replacement sheets") must be submitted.

   ☐ including changes required by the attached Examiner's Amendment / Comment or in the Office action of Paper No./Mail Date _____.

   **Identifying indicia such as the application number (see 37 CFR 1.84(c)) should be written on the drawings in the front (not the back) of each sheet. Replacement sheet(s) should be labeled as such in the header according to 37 CFR 1.121(d).**

6. ☐ DEPOSIT OF and/or INFORMATION about the deposit of BIOLOGICAL MATERIAL must be submitted. Note the attached Examiner's comment regarding REQUIREMENT FOR THE DEPOSIT OF BIOLOGICAL MATERIAL.

**Attachment(s)**

1. ☐ Notice of References Cited (PTO-892)
2. ☑ Information Disclosure Statements (PTO/SB/08), Paper No./Mail Date <u>12/27/2019; 01/10/2020</u>.
3. ☐ Examiner's Comment Regarding Requirement for Deposit of Biological Material _____.
4. ☐ Interview Summary (PTO-413), Paper No./Mail Date. _____.
5. ☐ Examiner's Amendment/Comment
6. ☑ Examiner's Statement of Reasons for Allowance
7. ☐ Other _____.

| /CHU CHUAN LIU/ Examiner, Art Unit 3791 | /ERIC F WINAKUR/ Primary Examiner, Art Unit 3791 |
|---|---|

Application/Control Number: 16/725,478                                    Page 2
Art Unit: 3791

### *Allowable Subject Matter*

1.      Claims 2-30 are allowed.


2.      The following is an examiner's statement of reasons for allowance: The terminal

disclaimer for co-pending applications 16/534,956, 16/544,755, 16/544,713, 16/541,987,

16/534,949, and 16/594,980 and patent Nos. 10,292,628, 10,299,708, 10,258,266,

10,258,265, 10,376,191, and 10,376,190 was approved on 12/27/2019 for resolving

potential double patenting issues.

        With regard to the prior art, Chaiken et al. (USPN 6,223,063 - applicant cited)

teaches a physiological measurement device (Fig. 1), the physiological measurement

device comprising: an emitter configured to emit light into tissue of a user (element 130

and finger, Figs. 1-2); four detectors (elements 160, Fig. 1); a cover comprising

protruding convex surfaces (element 110 with four protrusions 150, Fig. 1); a plurality of

windows, wherein each of the at least four detectors has a corresponding window of the

plurality of windows that allows light to pass through to the detector (protrusions 150,

Fig. 1). Cook et al. (USPGPUB 2002/0111546 - applicant cited) teaches a physiological

measurement device (Fig. 7), the physiological measurement device comprising: a

plurality of emitters configured to emit light into tissue of a user (element 702, Fig. 7;

[0085]); a wall (the side wall(s) of the tubular section(s) connected to the base where

the CCD is disposed on, Fig. 7) surrounds at least four detectors (CCD 760, Fig. 7;

pixels, [0099]) with pixels; and a cover (window 724, Fig. 7) connects to the wall (Fig. 7)

and a computer for image correction, scene segmentation, and blood characteristic

analysis ([0044]). Kimura et al. (USPN 6,353,750 - applicant cited) teaches a

physiological measurement device (Fig. 27), the physiological measurement device

comprising: one or more emitters configured to emit light into tissue of a user (elements

11, Fig. 27); at least four detectors positioned on a detector assembly (a lens with a

CCD, a line sensor or a photodiode array of element 12, Fig. 27); a wall that is operably

connected to the assembly (element 171, Fig. 27. It appears that the wall is connected

to the top portion, e.g. lens of the assembly but not a substrate of the CCD/detector

array); and a cover connects the wall (element 170, Fig. 27); the cover comprises a

protruding convex surface (element 170, Fig. 27) and at least a portion of the cover is

rigid (light-transmitting plate 170 made of acrylic resin, Fig. 27 and associated

descriptions) and a personal computer (elements 2, Figs. 1 and 2).

However, the prior art of record does not teach or suggest "each of the at least

four detectors has a corresponding window that allows light to pass through to the

detector; a wall that surrounds at least the at least four detectors; and a cover

comprising a protruding convex surface, wherein the protruding convex surface is above

all of the at least four detectors, wherein at least a portion of the protruding convex

surface is rigid, and wherein the cover operably connects to the wall; and a handheld

computing device in wireless communication with the physiological sensor device,

wherein the handheld computing device comprises: one or more processors configured

to wirelessly receive one or more signals from the physiological sensor device, the one

or more signals responsive to at least a physiological parameter of the user; a touch-

screen display configured to provide a user interface, wherein: the user interface is

configured to display indicia responsive to measurements of the physiological

parameter, and an orientation of the user interface is configurable responsive to a user

Application/Control Number: 16/725,478                                    Page 4
Art Unit: 3791

input; and a storage device configured to at least temporarily store at least the

measurements of the physiological parameter" and "at least four detectors, wherein

each of the at least four detectors has a corresponding window that allows light to pass

through to the detector; a wall that surrounds at least the at least four detectors; and a

cover comprising a protruding convex surface, wherein the protruding convex surface is

positioned such that the protruding convex surface is located between tissue of the user

and all of the at least four detectors when the physiological sensor device is worn by the

user, wherein at least a portion of the   protruding convex surface is rigid, and wherein

the cover operably connects to the wall; and a handheld computing device in wireless

communication with the physiological sensor device", in combination with the other

claimed elements/ steps.

Any comments considered necessary by applicant must be submitted no later

than the payment of the issue fee and, to avoid processing delays, should preferably

accompany the issue fee.  Such submissions should be clearly labeled "Comments on

Statement of Reasons for Allowance."


3.      Any inquiry concerning this communication or earlier communications from the

examiner should be directed to CHU CHUAN LIU whose telephone number is (571)270-

5507.  The examiner can normally be reached on M-Th (8am-6pm).

Examiner interviews are available via telephone, in-person, and video

conferencing using a USPTO supplied web-based collaboration tool. To schedule an

interview, applicant is encouraged to use the USPTO Automated Interview Request

(AIR) at http://www.uspto.gov/interviewpractice.

Application/Control Number: 16/725,478                                    Page 5
Art Unit: 3791

  If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, Jacqueline Cheng can be reached on (571) 272-5596.  The fax phone

number for the organization where this application or proceeding is assigned is 571-

273-8300.

  Information regarding the status of an application may be obtained from the

Patent Application Information Retrieval (PAIR) system.  Status information for

published applications may be obtained from either Private PAIR or Public PAIR.

Status information for unpublished applications is available through Private PAIR only.

For more information about the PAIR system, see http://pair-direct.uspto.gov. Should

you have questions on access to the Private PAIR system, contact the Electronic

Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a

USPTO Customer Service Representative or access to the automated information

system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.


/ERIC F WINAKUR/
Primary Examiner, Art Unit 3791


/CHU CHUAN LIU/
Examiner, Art Unit 3791

**Appx42880**

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

APPLE INC.

Petitioner,

v.

MASIMO CORPORATION,

Patent Owner.

———————————

Case IPR2020-01714
U.S. Patent 10,631,765

———————————

**DECLARATION OF VIJAY K. MADISETTI, PH.D.**

Masimo Ex. 2004
Apple v. Masimo
IPR2020-01714

prevents slipping.   Ex. 1009 ¶¶[0019], [0023]-[0025].   Ohsaki indicates to a POSITA that its benefit occurs only when the sensor has a longitudinal shape and is on the wrist's backside, in an anatomically appropriate orientation (e.g., not in the circumferential direction).  Ex. 1009 ¶¶[0019], [0023]-[0024].  Thus, in my opinion, a POSITA would not have been motivated to change the shape of Ohsaki's board to combine it with Mendelson '799's circular sensor.  Instead, a POSITA would have believed that changing the shape of Ohsaki's board from rectangular to circular would eliminate Ohsaki's benefit of preventing slipping.

### 2. **A POSITA Would Not Have Been Motivated To Add A Rectangular Board To Mendelson '799's Circular Sensor**

59.    As discussed above, Petitioner and Dr. Kenny are not clear about the result of the proposed combination.  *See* Section VII.A.4 (above).   Petitioner illustrates the proposed combination (Pet. 29) with a circular cover over all of Mendelson '799's sensor's optical components.  But Petitioner relies on Dr. Kenny, who asserts that "a cover would simply be placed over the components (e.g., detectors) accommodated within Mendelson-799's sensor housing 17, and would perform the same function as taught by Ohsaki."  Ex. 1003 ¶100; Pet. 29 (citing, e.g., Ex. 1003 ¶100).   Dr. Kenny also illustrates the combination as a circular housing and circular board.  Ex. 1003 ¶99.

60.    To the extent Dr. Kenny makes a new argument that contends that a POSITA would "simply place" Ohsaki's rectangular board onto Mendelson '799's

circular sensor, I disagree.   Dr. Kenny provides no illustration, explanation, or evidence for a combination that uses a long rectangular board, as in Ohsaki, in conjunction with a circular sensor, as in Mendelson '799.   But even assuming that a POSITA could design a longitudinal structure that covers all of Mendelson '799's circularly arranged detectors and still avoids the user's physiology (e.g., the radius and ulna), placing Ohsaki's rectangular board onto Mendelson '799's circular sensor would result in asymmetrical pressure because the convex shape would press into the user's body more in some places and less in others.   Such differences in pressure at different locations under the convex board would cause an uneven distortion of the ratio of blood to bloodless tissue volumes above different detectors, which Mendelson '799 explains can lead to large errors.   Ex. 1012 2:47-57; *see also* 3:27-31 ("changes in the ratio of blood to bloodless tissue volumes…through mechanical pressure exerted by the sensor on the skin"), 3:45-52 ("uncontrollable physiological and physical parameters (e.g., different amounts of contact pressure applied by the sensor on the skin…) can often cause large errors in the oxygen saturation readings of a pulse oximeter.").   As shown in the figure below, the pressure exerted on the skin by a rectangular cover would be greater along the area where the rectangular convex protrusion presses into the skin (in yellow), and less in other areas where the surface does not press into the skin or does not press into the skin as deeply.

-40-



One alteration of Mendelson '799's Fig. 7 to superimpose a longitudinal structure such as Ohsaki's board onto the circular sensor which will result in many different optical and physiological problems such as air gaps, asymmetric environment, and pressure differences (color added to illustrate how a rectangular "longitudinal" convex protrusion might be positioned on the sensor)

61.     In fact, Ohsaki illustrates that its convex board creates a differential pressure environment, as shown in both Figures 1 and 2. Ex. 1009 Figs. 1, 2. As shown in Ohsaki, Figures 1 and 2 both show the center of the board exerts the greatest pressure, and pushes into the skin causing distention. This results in air gaps on either side of the board, and a difference in pressure between the region of the sensor that distends the skin relatively more (in the middle) versus at the edges, which a POSITA would have been worried would result in the displacement of blood, as warned by Mendelson '799. Ex. 1012 2:47-57. Ohsaki's board does not even contact the skin at its edges, and thus exerts relatively less pressure at those locations.



Magnified partial view of Ohsaki Figs. 1 (left) and 2 (right) with red circles
annotating air gaps formed by Ohsaki's convex board

62.     Mendelson '799 also warns that "mechanical pressure exerted by the
sensor on the skin" causes large and uncontrollable changes.  Ex. 1012 3:15-31.
Mendelson '799 explains that creating an asymmetric arrangement, such as would
be expected from introducing a rectangular board onto a circular sensor, would
result in "uncontrollable physiological and physical parameters" and "large errors in
the oxygen saturation readings."  Ex. 1012 3:44-52.  Such a cover may also create
air gaps over some detectors (on the edge of the convex surface), but not others
(directly under the peak of the convex surface).   But this creates a substantial
problem for Mendelson '799's sensor, which uses it symmetrical circular
arrangement of detectors to try and address the problem of different contact
pressure between different users or uses of the device.  *See, e.g.*, Ex. 1012 5:60-65.
The proposed modification makes the problem much worse by creating differences
in contact pressure for the different detectors on Mendelson '799's sensor, thereby

eliminating the symmetry Mendelson '799 relies on to help identify and filter out aberrant measurements. *See, e.g.*, Ex. 1012 12:35-13:11.

63.    Adding additional errors, Ohsaki's rectangular board would also create a substantially different optical environment for Mendelson '799's various detectors based on the redirection of light away from some detectors and towards others. Indeed, Mendelson '799 explains that for an oxygen saturation sensor, radial symmetry is important: "a radially-symmetric photodetector array can help to maximize the detection of backscattered light from the skin." Ex. 1012 4:59-65. Mendelson '799's radial array of detectors captures reflected light from all around the centrally located emitter. A POSITA would appreciate that adding Ohsaki's rectangular board to the oxygen saturation sensor of Mendelson '799 eliminates Mendelson '799's radially symmetric environment and adversely impacts the approach in Mendelson '799 that uses multiple detectors arrayed in a ring pattern. Ex. 1012 7:25-37. For example, as discussed further below, a POSITA would have believed that a convex surface directs light to a more central location relative to a flat surface. *See* Section VII.D.1 (below). Thus, some detectors would receive relatively more concentrated light than other detectors, which disrupts the symmetry of the measurements. Applying Ohsaki's rectangular board to Mendelson '799's circular structure would create a variable physiological and optical environment with different detectors at different distances from the skin—which is the situation

Mendelson '799 tries to avoid. *See* Ex. 1012 12:1-16, 12:62-13:7. This undermines Mendelson '799's symmetrically arrayed detector strategy. As shown above, a longitudinal shape might cover some detectors completely and leave other detectors mostly uncovered.

**C.** **A POSITA Would Have Understood That Ohsaki's Required Measurement Location Would Result In Weak Signals For Mendelson '799's Oxygen Saturation Measurements**

64.     In addition to the mechanical, optical, and physiological problems discussed above, a POSITA would also have believed that Dr. Kenny's combination would decrease signal strength, which is the opposite of Dr. Kenny's stated "predictable result[]" of "improved signal strength." Ex. 1003 ¶100; *see also* ¶¶92, 97, 98 (motivated to "improve detection efficiency"). As discussed above, to get any benefit from the convex board, Ohsaki's sensor must be used on the backhand side of the wrist. Ex. 1009 ¶¶[0023]-[0024], Figs. 3A-3B, [0008], [0016], Title, Abstract (wristwatch sensor worn on backside of wrist), ¶[0030] (wristwatch sensor worn on back of forearm); *see also* Sections VII.A.1, VII.A.2, VII.B (above). Ohsaki's measurement location, however, would have dissuaded a POSITA from modifying Mendelson '799's oximeter based on Ohsaki. As discussed below, at the time, a POSITA would have believed that the backhand side of the wrist's poor optical signal strength made it an unsuitable location for Mendelson '799's circular pulse oximeter. Thus, a POSITA seeking to improve Mendelson '799's pulse

-44-

oximeter would not have been motivated to use a rectangular board that must be positioned on the backhand side of the wrist.

65.    The inventor of Mendelson '799 previously tried to obtain usable signals for oxygen saturation measurements from the back side of the wrist. *See, e.g.*, Ex. 2003 at 3-4.  Mendelson reported that he "had to apply a considerable amount of external pressure on the sensor" to even discern any signal whatsoever, which does not even establish that Mendelson's sensor could calculate an accurate oxygen saturation value.  Ex. 2003 at 3-4.  Both Ohsaki and Mendelson '799 warn against using too much pressure when taking measurements.  *See* Ex. 1012 2:47-53 ("Similarly, variations in contact pressure between the sensor and the skin can cause larger errors…since some of the blood near the superficial layers of the skin may be normally displaced away from the sensor housing towards deeper subcutaneous structures."), 3:27-31 ("It is also well known for example that changes in the ratio of blood to bloodless tissue volumes may occur…through mechanical pressure exerted by the sensor on the skin."); Ex. 1009 ¶[0018] ("the user feels uncomfortable if the pressure applied to the user's wrist…is too high").  Thus, for a circular oximeter like that disclosed in Mendelson '799, a POSITA would have believed the back side of the wrist was an unsuitable measurement location due to weak signals.  Indeed, as evidenced by Mendelson 2006, Mendelson pursued development of a forehead sensor, not a wrist sensor.  Ex. 1010 at Abstract.

-45-

66.    Years after Mendelson's initial work and filing of the patent application that issued as Mendelson '799, Mendelson was the advisor for research that reported that "there is little supporting evidence that [reflectance-based pulse oximetry] can accurately collect measurements from the chest and wrist." Ex. 2015 at 3 (Abstract); *see also* at 4 (thanking Mendelson for advising on project); Ex. 2014 (Worcester Polytechnic Institute webpage showing submission date of "2013-04-24" and Mendelson as the advisor). Mendelson's group ultimately obtained usable signals from a sensor located on the palm-side of the wrist, "over the radial artery." Ex. 2015 at 99.

67.    Other research groups in the field also reported that oxygen saturation sensors (which monitor oxygen saturation using both red and infrared signals) would work only if measurements were taken from the palm side of the wrist, close to the oxygen-rich arterial blood. *See* Ex. 2017 at 2-3 ("Measuring PPG on the wrist is difficult."; "PPG signal[s are] greatly distorted depending on applied pressure….[I]t was verified that proper location of the sensors and pressure on the [ ] skin surface are important element[s for] stable PPG measurement." The "sensor attachment on the wrist is affected by radius bone structure and radial artery location"); Ex. 2018 at 4 ("reflected red and infrared pulses can only be used for specific areas, such as a radial artery; thus, most areas of the wrist are not available for monitoring"). As shown in the figure below, and consistent with the discussed

art, the radial and ulnar arteries are located near the surface (superficial layer) on the palm side of wrist. Ex. 2010 at 44 (Plate 429) (showing radial and ulnar arteries in superficial layer of the anterior (palm-side) of wrist); *see also* 71 (Plate 456) (showing arteries on palm-side of upper limb).



Superficial layer of palm side (anterior) forearm and wrist, showing that the radial
and ulnar arteries are close to the surface
(partial view) Ex. 2010 at 44 (Plate 429), annotated

68. In contrast, as shown in the figure below, the radial and ulnar arteries are not near the surface of the wrist and forearm's back side.



Superficial layer of back side (posterior) of forearm and wrist
(partial view) Ex. 2010 at 42 (Plate 427)

69.    In fact, even as late as 2016, researchers in the field recognized that "monitoring SpO2 at the wrist using the reflective mode presents challenges with regard to clinical use," and reported a general consensus that "the reflected red and infrared pulses can only be used for specific areas, such as a radial artery; thus, most areas of the wrist are not available for monitoring." Ex. 2018 at 4.

70.    Dr. Kenny relies on "several references that are mentioned within Mendelson '799." Ex. 1003 ¶¶67-70 (citing Ex. 1012 and discussing Ex. 1017 and Ex. 1018). These references also confirm that a POSITA would not have used a

circular oxygen saturation sensor on the back side of the wrist. For example, the circular sensor used in Mendelson 1988 (Ex. 1017), like the sensor in Mendelson 2006 (Ex. 1010), took measurements from the forehead. Ex. 1017 at 1; Ex. 1010 at 1. Mendelson 1991 (Ex. 1018) considered whether measurements could be taken from "the ventral side of the forearm." Ex. 1018 at 2. The ventral side of the forearm (i.e., the forearm's palm-side) is the opposite side of the arm from where Ohsaki requires use of its rectangular board. Ex. 1009 ¶[0024]. As Ohsaki explains, its board is not effective for preventing slipping on the palm side of the user's wrist. Ex. 1009 ¶[0023]; *see also* Figs. 3A-3B. In contrast to other sensor locations, such as the forehead or finger, the wrist provides a weaker optical signal, and also has a much more complicated structure with a wide range of different bones, tendons, and musculature.

### D.    **A POSITA Would Not Have Been Motivated To Adversely Impact The Optical Signal By Adding A Convex Lens To Mendelson '799's Sensor**

71. A POSITA would further not have been motivated to make Dr. Kenny's proposed combination because it places a convex cover over a circular array of peripheral detectors surrounding centrally located LEDs. As discussed below, a POSITA would have understood that such a combination would direct light away from the detectors and thus decrease light collection and optical signal strength—not increase it as Dr. Kenny asserts.

Appx47501

### 1.    A POSITA Would Have Understood That A Convex Cover Directs Light To The Center Of The Sensor And Away From The Periphery

72.    Petitioner and Dr. Kenny both previously admitted that a convex cover condenses light towards the center of the sensor and away from the periphery in a different petition filed against a related patent.  In the Petition in IPR2020-01520 (Ex. 2019), Petitioner explained that a convex cover redirects incoming light towards the center, by relying upon the figure shown below:



Petitioner's illustration from a related IPR showing that light hitting a convex surface is directed more centrally than light hitting a flat surface
(Ex. 2019 at 45)

73.    Further, in his declaration in IPR2020-01520 (Ex. 2020), Dr. Kenny confirmed that when using a convex surface as a lens, "the incoming light is 'condensed' toward the center."  *See, e.g.*, Ex. 2020 at 69-70 (¶119).  Dr. Kenny likewise provides the same illustration showing that a convex surface redirects

incoming light towards a more central location, as compared to a flat surface. *See, e.g.*, Ex. 2020 at 69-70 (¶¶118-120).

74.    The '765 Patent also illustrates a POSITA's understanding that a convex surface condenses light away from the periphery and towards the sensor's center.  Figure 14B (below) "illustrates how light from emitters (not shown) can be focused by the protrusion 605 onto detectors."  Ex. 1001 36:3-6.  "When the light rays 1420 enter the protrusion 605, the protrusion 605 acts as a lens to refract the rays into rays 1422."  Ex. 1001 36:13-15.  As shown by the '765 Patent, the convex shape directs light from the periphery toward the center.  Ex. 1001 Fig. 14B.



Illustration from the '765 Patent at issue, showing that light hitting a convex surface is directed towards the center
'765 Patent (Ex. 1001) Fig. 14B (highlighting added to show direction of light)

75.    Dr. Kenny asserts that this combination would have resulted in "predictable results" including "improved signal strength."  Ex. 1003 ¶100; *see also*

-51-

¶¶75, 95 (discussing Ohsaki and stating that preventing "slippage…increases the strength of the signals").  But, as illustrated below, Dr. Kenny's illustration shows that the combination has a center-located light source (purple) and peripherally located detectors (light blue and dark blue) under the convex cover (red):



Dr. Kenny's Illustration (Ex. 1003 ¶99, partial view)

76.    A POSITA would have believed that Ohsaki's convex surface—like the surfaces discussed by Dr. Kenny and Petitioner in the related IPR—would likewise condense light passing through it to a center location, compared to a flat surface.  Because of this redirection of light to a more central location relative to a flat surface, a POSITA would have believed that adding Ohsaki's convex surface to Mendelson '799's sensor would direct relatively more light away from the peripheral detectors and thus decrease the optical signal strength, as compared to a flat surface.  Dr. Kenny does not address the change in optical signal resulting from the addition of a convex surface to Mendelson '799's circular ring of peripherally arrayed detectors.

80.    While air gaps may or may not have impacted Ohsaki's much simpler pulse rate linear sensor, a POSITA would have understood that air gaps near the detectors on the peripheral edge of Mendelson '799's more complicated oximeter sensor would create significant noise due to the difference in structure and the more complicated combination of multiple detectors with multiple emitters.  Ex. 1012 Fig. 7, 2:58-64.  In particular, peripheral air gaps would be positioned near or over Mendelson '799's peripheral detectors leading to inconsistent measurements.  A POSITA would not have been motivated to add Ohsaki's convex surface to Mendelson '799's circular sensor because the peripheral detectors would be next to the air gaps.

### 3.    A POSITA Would Not Have Selected A Convex Cover To Protect The Optical Elements

81.    Dr. Kenny also asserts that a POSITA would have been motivated to combine Ohsaki and Mendelson '799 because a convex cover would have protected the optical components.  Ex. 1003 ¶92.  But a convex cover is just one of many different alternatives for protecting the components of a sensor.  For example, the optical elements could be protected by an encapsulation layer of sealing resin. Indeed, other Mendelson references upon which Dr. Kenny relies use the encapsulation approach to protect the optical components, resulting in a flat surface of epoxy and no protrusion.  Ex. 1003 ¶¶68 (illustrating Ex. 1017 Fig. 2), 69 (illustrating Ex. 1018 Fig. 1); Ex. 1017 Fig. 2 (flat layer of optically clear epoxy);

Ex. 1018 Fig. 1 (flat layer of optically clear epoxy). Both of these references illustrate a device with a flat surface of encapsulating epoxy, and an optical shield between the emitters and detectors that goes to the top of the epoxy. *See* Ex. 1017 at 2-3, Fig. 2; Ex. 1018 Fig. 1.

82. A POSITA would have understood that a flat cover would provide better protection than a convex surface because it would be less prone to scratches. Ex. 1008 ¶[0106]. In fact, one of Dr. Kenny's cited references, Aizawa, teaches that a flat acrylic plate improves adhesion and detection efficiency for measurements taken from the palm-side of the wrist, next to the artery. *See* Ex. 1006 ¶[0013] ("[A] transparent plate-like member…makes it possible to improve adhesion between the sensor and the wrist and thereby further improve the detection efficiency of pulse waves."); *see also* ¶¶[0026], [0030], [0034]; Ex. 1003 ¶93 (citing Ex. 1006 as evidence of a cover). As discussed above, a POSITA would have viewed the palm side of the wrist (as well as other locations such as the forehead (Ex. 1017; *see also* Ex. 1018 at 1-2)) as a better location for optical measurements than the back side of the wrist. *See* Section VII.C (above). Moreover, unlike Aizawa's flat plate that improves adhesion to the palm side of the wrist, Ohsaki's convex board tends to slip off from the palm side of the wrist. Ex. 1009 ¶[0023]. There would have been no reason for a POSITA to select a convex surface from the many other options, which provide similar or better protection

without the complications and concerns arising from the convex shape.  Indeed, a POSITA would have believed a flat surface would have had advantages compared to Ohsaki's board including better adhesion on the palm side of the wrist, and less prone to scratches.

### E.    A POSITA Would Not Have Decreased Signal Strength By Adding A Window Taught By Schulz

83.    Dr. Kenny admits that the combination of Ohsaki and Mendelson '799 does not include "each of the at least four detectors has a corresponding window that allows light to pass through to the detector," and therefore requires further modification.  Ex. 1003 ¶¶101-109.  As I explain above (Sections VII.B-D), a POSITA would not have been motivated to combine Ohsaki and Mendelson '799. Dr. Kenny nevertheless asserts that a POSITA, after deciding to combine Ohsaki and Mendelson '799, would look to Schulz to decrease the optical signal strength by including windows that reduce the amount of incoming light.  Ex. 1003 ¶¶101-109.    Dr. Kenny's sole motivation for combining Schulz with Ohsaki and Mendelson '799 (as well as with Mendelson 2006, which is discussed further below, Section VII.F) is "to guard against saturation."  Ex. 1003 ¶¶78, 101, 109; *see generally* ¶¶101-105.    There is no evidence, however, that saturation of the detector(s) was a problem for the sensors in either Ohsaki or Mendelson '799.  A POSITA would have understood saturation of the detector(s) to be a problem associated with a strong signal rather than a weak signal.

Filed April 12, 2022

On behalf of:
    Patent Owner Masimo Corporation
By:  Jarom D. Kesler (Reg. No. 57,046)
    Stephen W. Larson (Reg. No. 69,133)
    Stephen C. Jensen (Reg. No. 35,556)
    Joseph R. Re (Reg. No. 31,291)
    Jacob L. Peterson (Reg. No. 65,096)
    KNOBBE, MARTENS, OLSON & BEAR, LLP
    2040 Main Street, 14th Floor
    Irvine, CA 92614
    Tel.:  (949) 760-0404
    Fax:   (949) 760-9502
    Email:  AppleIPR2020-1715-765@knobbe.com

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

APPLE INC.

Petitioner,

v.

MASIMO CORPORATION,

Patent Owner.

———————

IPR2020-01715
U.S. Patent 10,631,765

———————

**PATENT OWNER'S NOTICE OF APPEAL TO
THE U.S. COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

Pursuant to 28 U.S.C. § 1295(a)(4)(A), 35 U.S.C. §§ 141(c), 142, and 319, 37 C.F.R. §§ 90.2(a) and 90.3, and Rule 4(a) of the Federal Rules of Appellate Procedure, Patent Owner Masimo Corporation ("Masimo") hereby appeals to the United States Court of Appeals for the Federal Circuit from the Judgement – Final Written Decision (Paper 33) entered on April 6, 2022 (Attachment A) and from all underlying orders, decisions, rulings, and opinions that are adverse to Masimo related thereto and included therein, including those within the Decision Granting Institution of *Inter Partes* Review, entered April 13, 2021 (Paper 8). Masimo appeals the Patent Trial and Appeal Board's determination that claims 1-29 of U.S. Patent 10,631,765 are unpatentable, and all other findings and determinations, including but not limited to claim construction, as well as all other issues decided adverse to Masimo's position or as to which Masimo is dissatisfied in IPR2020-01715 involving U.S. Patent 10,631,765.

Masimo is concurrently providing true and correct copies of this Notice of Appeal, along with the required fees, with the Director of the United States Patent and Trademark Office and the Clerk of the United States Court of Appeals for the Federal Circuit.

Respectfully submitted,

Knobbe, Martens, Olson & Bear, LLP

Dated:  April 12, 2022

/Jarom Kesler/

Jarom D. Kesler (Reg. No. 57,046)

Attorney for Patent Owner
Masimo Corporation

# ATTACHMENT A

Trials@uspto.gov                                    Paper 33
571-272-7822                              Date: April 6, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————

APPLE INC.,
Petitioner,

v.

MASIMO CORPORATION,
Patent Owner.

————————

IPR2020-01715
Patent 10,631,765 B1

————————

Before JOSIAH C. COCKS, ROBERT L. KINDER, and
AMANDA F. WIEKER, *Administrative Patent Judges*.

WIEKER, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

IPR2020-01715
Patent 10,631,765 B1

# I.    INTRODUCTION

## A.  Background

Apple Inc. ("Petitioner") filed a Petition requesting an *inter partes* review of claims 1–29 ("challenged claims") of U.S. Patent No. 10,631,765 B1 (Ex. 1001, "the '765 patent").  Paper 3 ("Pet.").  Masimo Corporation ("Patent Owner") waived filing a preliminary response.  Paper 7 ("PO Waiver").  We instituted an *inter partes* review of all challenged claims 1–29 on all grounds of unpatentability, pursuant to 35 U.S.C. § 314.  Paper 8 ("Inst. Dec.").

After institution, Patent Owner filed a Response (Paper 17, "PO Resp.") to the Petition, Petitioner filed a Reply (Paper 21, "Pet. Reply"), and Patent Owner filed a Sur-reply (Paper 26, "PO Sur-reply").  An oral hearing was held on January 19, 2022, and a transcript of the hearing is included in the record.  Paper 32 ("Tr.").

We issue this Final Written Decision pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73.  For the reasons set forth below, Petitioner has met its burden of showing, by a preponderance of the evidence, that challenged claims 1–29 of the '765 patent are unpatentable.

## B.  Related Matters

The parties identify the following matters related to the '765 patent:

*Masimo Corporation v. Apple Inc.*, Civil Action No. 8:20-cv-00048 (C.D. Cal.) (filed Jan. 9, 2020);

*Apple Inc. v. Masimo Corporation*, IPR2020-01714 (PTAB Sept. 30, 2020) (challenging claims 1–29 of the '765 patent);

2

IPR2020-01715
Patent 10,631,765 B1

*Apple Inc. v. Masimo Corporation*, IPR2020-01520 (PTAB Aug. 31, 2020) (challenging claims of U.S. Patent No. 10,258,265 B1);

*Apple Inc. v. Masimo Corporation*, IPR2020-01521 (PTAB Sept. 2, 2020) (challenging claims of U.S. Patent No. 10,292,628 B1);

*Apple Inc. v. Masimo Corporation*, IPR2020-01523 (PTAB Sept. 9, 2020) (challenging claims of U.S. Patent No. 8,457,703 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01524 (PTAB Aug. 31, 2020) (challenging claims of U.S. Patent No. 10,433,776 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01526 (PTAB Aug. 31, 2020) (challenging claims of U.S. Patent No. 6,771,994 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01536 (PTAB Aug. 31, 2020) (challenging claims of U.S. Patent No. 10,588,553 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01537 (PTAB Aug. 31, 2020) (challenging claims of U.S. Patent No. 10,588,553 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01538 (PTAB Sept. 2, 2020) (challenging claims of U.S. Patent No. 10,588,554 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01539 (PTAB Sept. 2, 2020) (challenging claims of U.S. Patent No. 10,588,554 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01713 (PTAB Sept. 30, 2020) (challenging claims of U.S. Patent No. 10,624,564 B1);

*Apple Inc. v. Masimo Corporation*, IPR2020-01716 (PTAB Sept. 2, 2020) (challenging claims of U.S. Patent No. 10,702,194 B1);

*Apple Inc. v. Masimo Corporation*, IPR2020-01722 (PTAB Oct. 2, 2020) (challenging claims of U.S. Patent No. 10,470,695 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01723 (PTAB Oct. 2, 2020) (challenging claims of U.S. Patent No. 10,470,695 B2);

IPR2020-01715
Patent 10,631,765 B1

*Apple Inc. v. Masimo Corporation*, IPR2020-01733 (PTAB Sept. 30, 2020) (challenging claims of U.S. Patent No. 10,702,195 B1); and

*Apple Inc. v. Masimo Corporation*, IPR2020-01737 (PTAB Sept. 30, 2020) (challenging claims of U.S. Patent No. 10,709,366 B1).

Pet. 3–4; Paper 5, 1–4.

Patent Owner further identifies the following pending patent applications, among other issued and abandoned applications, that claim priority to, or share a priority claim with, the '765 patent:

U.S. Patent Application No. 16/834,538;

U.S. Patent Application No. 16/449,143; and

U.S. Patent Application No. 16/805,605.

Paper 5, 1–2.

### C. The '765 Patent

The '765 patent is titled "Multi-Stream Data Collection System for Noninvasive Measurement of Blood Constituents," and issued on April 28, 2020, from U.S. Patent Application No. 16/725,478, filed December 23, 2019. Ex. 1001, codes (21), (22), (45), (54). The '765 patent claims priority through a series of continuation and continuation-in-part applications to Provisional Application Nos. 61/078,228 and 61/078,207, both filed July 3, 2008. *Id.* at codes (60), (63).

The '765 patent discloses a two-part data collection system including a noninvasive sensor that communicates with a patient monitor. *Id.* at 2:38–40. The sensor includes a sensor housing, an optical source, and several photodetectors, and is used to measure a blood constituent or analyte, e.g., oxygen or glucose. *Id.* at 2:29–35, 64–65. The patient monitor includes a

IPR2020-01715
Patent 10,631,765 B1

display and a network interface for communicating with a handheld
computing device.  *Id.* at 2:45–48.

Figure 1 of the '765 patent is reproduced below.



**FIG. 1**

Figure 1 illustrates a block diagram of data collection system 100 including
sensor 101 and monitor 109.  *Id.* at 11:47–58.  Sensor 101 includes optical
emitter 104 and detectors 106.  *Id.* at 11:59–63.  Emitters 104 emit light that
is attenuated or reflected by the patient's tissue at measurement site 102.  *Id.*
at 14:3–7.  Detectors 106 capture and measure the light attenuated or
reflected from the tissue.  *Id.*  In response to the measured light,
detectors 106 output detector signals 107 to monitor 109 through front-end
interface 108.  *Id.* at 14:7–10, 26–32.  Sensor 101 also may include tissue
shaper 105, which may be in the form of a convex surface that: (1) reduces
the thickness of the patient's measurement site; and (2) provides more
surface area from which light can be detected.  *Id.* at 11:2–14.

5

IPR2020-01715
Patent 10,631,765 B1

Monitor 109 includes signal processor 110 and user interface 112. *Id.* at 15:16–18. "[S]ignal processor 110 includes processing logic that determines measurements for desired analytes . . . based on the signals received from the detectors." *Id.* at 15:21–24. User interface 112 presents the measurements to a user on a display, e.g., a touch-screen display. *Id.* at 15:46–56. The monitor may be connected to storage device 114 and network interface 116. *Id.* at 15:60–16:11.

The '765 patent describes various examples of sensor devices. Figures 14D and 14F, reproduced below, illustrate detector portions of sensor devices.



**FIG. 14D**

**FIG. 14F**

Figure 14D illustrates portions of a detector submount and Figure 14F illustrates portions of a detector shell. *Id.* at 6:44–47. As shown in Figure 14D, multiple detectors 1410c are located within housing 1430 and under transparent cover 1432, on which protrusion 605b (or partially cylindrical protrusion 605) is disposed. *Id.* at 35:36–39, 36:30–37. Figure 14F illustrates a detector shell 306f including detectors 1410c on substrate 1400c. *Id.* at 37:9–17. Substrate 1400c is enclosed by shielding

6

enclosure 1490 and noise shield 1403, which include window 1492a and window 1492a, respectively, placed above detectors 1410c. *Id.* Alternatively, cylindrical housing 1430 may be disposed under noise shield 1403 and may enclose detectors 1410c. *Id.* at 37:47–48.

Figures 4A and 4B, reproduced below, illustrate an alternative example of a tissue contact area of a sensor device.



FIG. 4A                FIG. 4B

Figures 4A and 4B illustrate arrangements of protrusion 405 including measurement contact area 470. *Id.* at 23:18–24. "[M]easurement site contact area 470 can include a surface that molds body tissue of a measurement site." *Id.* "For example, . . . measurement site contact area 470 can be generally curved and/or convex with respect to the measurement site." *Id.* at 23:39–43. The measurement site contact area may include windows 420–423 that "mimic or approximately mimic a configuration of, or even house, a plurality of detectors." *Id.* at 23:49–63.

### D. Illustrative Claim

Of the challenged claims, claims 1 and 21 are independent. Claim 1 is illustrative and is reproduced below.

1. A physiological measurement system comprising:

[a] a physiological sensor device comprising:

7

IPR2020-01715
Patent 10,631,765 B1

[b] one or more emitters configured to emit light into tissue of a user;

[c] at least four detectors, wherein each of the at least four detectors has a corresponding window that allows light to pass through to the detector;

[d] a wall that surrounds at least the at least four detectors; and

[e] a cover comprising a protruding convex surface, wherein the protruding convex surface is above all of the at least four detectors, wherein at least a portion of the protruding convex surface is rigid, and wherein the cover operably connects to the wall; and

[f] a handheld computing device in wireless communication with the physiological sensor device, wherein the handheld computing device comprises:

[g] one or more processors configured to wirelessly receive one or more signals from the physiological sensor device, the one or more signals responsive to at least a physiological parameter of the user;

[h] a touch-screen display configured to provide a user interface, wherein:

[i] the user interface is configured to display indicia responsive to measurements of the physiological parameter, and

[j] an orientation of the user interface is configurable responsive to a user input; and

[k] a storage device configured to at least temporarily store at least the measurements of the physiological parameter.

Ex. 1001, 44:51–45:15 (bracketed identifiers a–k added).  Independent claim 21 includes limitations substantially similar to limitations [a]–[f] of claim 1. *Id.* at 46:31–49.

IPR2020-01715
Patent 10,631,765 B1

### *E. Applied References*

Petitioner relies upon the following references:

Bergey, U.S. Patent No. 3,789,601, filed July 15, 1971, issued February 5, 1974 (Ex. 1016, "Bergey");

Ohsaki et al., U.S. Patent Application Publication No. 2001/0056243 A1, filed May 11, 2001, published December 27, 2001 (Ex. 1009, "Ohsaki");

Aizawa, U.S. Patent Application Publication No. 2002/0188210 A1, filed May 23, 2002, published December 12, 2002 (Ex. 1006, "Aizawa");

Inokawa et al., Japanese Patent Application Publication No. 2006-296564 A, filed April 18, 2005, published November 2, 2006 (Ex. 1007, "Inokawa");[1] and

Y. Mendelson et al., "A Wearable Reflectance Pulse Oximeter for Remote Physiological Monitoring," Proceedings of the 28th IEEE EMBS Annual International Conference, 912–915 (2006) (Ex. 1010, "Mendelson-2006").

Pet. 10.

Petitioner also submits, *inter alia*, the Declaration of Thomas W. Kenny, Ph.D. (Ex. 1003), and the Second Declaration of Thomas W. Kenny (Ex. 1047). Patent Owner submits, *inter alia*, the Declaration of Vijay K. Madisetti, Ph.D. (Ex. 2004). The parties also provide deposition testimony from Dr. Kenny and Dr. Madisetti, including from this proceeding and others. *See* Exs. 1052–1054, 2006–2009, 2027.

---

[1] Petitioner relies on a certified English translation of Inokawa (Ex. 1008). In this Decision, we also refer to the translation.

9

IPR2020-01715
Patent 10,631,765 B1

### F. Asserted Grounds of Unpatentability

We instituted an *inter partes* review based on the following grounds.

| Claim(s) Challenged | 35 U.S.C. § | References/Basis |
|---|---|---|
| 1–8, 10–13, 15–29 | 103 | Aizawa, Inokawa, Ohsaki, Mendelson-2006 |
| 9 | 103 | Aizawa, Inokawa, Ohsaki, Mendelson-2006, Bergey |
| 14 | 103 | Aizawa, Inokawa, Ohsaki, Mendelson-2006, Goldsmith |

## II.    DISCUSSION

### A. Claim Construction

For petitions filed on or after November 13, 2018, a claim shall be construed using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. § 282(b).  37 C.F.R. § 42.100(b) (2019).  Petitioner submits that no claim term requires express construction.  Pet. 9.  Patent Owner submits that claim terms should be given their ordinary and customary meaning, consistent with the Specification.  PO Resp. 9.

We agree that no claim terms require express construction.  *Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co. Ltd.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017).

### B. Principles of Law

A claim is unpatentable under 35 U.S.C. § 103(a) if "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406

10

**Appx50032**

(2007). The question of obviousness is resolved on the basis of underlying factual determinations, including (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) objective evidence of nonobviousness.[2] *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966). When evaluating a combination of teachings, we must also "determine whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue." *KSR*, 550 U.S. at 418 (citing *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006)). Whether a combination of elements would have produced a predictable result weighs in the ultimate determination of obviousness. *Id.* at 416–417.

In an *inter partes* review, the petitioner must show with particularity why each challenged claim is unpatentable. *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016); 37 C.F.R. § 42.104(b). The burden of persuasion never shifts to Patent Owner. *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015). To prevail, Petitioner must support its challenge by a preponderance of the evidence. 35 U.S.C. § 316(e); 37 C.F.R. § 42.1(d).

We analyze the challenges presented in the Petition in accordance with the above-stated principles.

## C. Level of Ordinary Skill in the Art

Petitioner identifies the appropriate level of skill in the art as that possessed by a person with "a Bachelor of Science degree in an academic discipline emphasizing the design of electrical, computer, or software

---

[2] Patent Owner has not presented objective evidence of non-obviousness.

technologies, in combination with training or at least one to two years of related work experience with capture and processing of data or information." Pet. 9 (citing Ex. 1003 ¶¶ 20–21). "Alternatively, the person could have also had a Master of Science degree in a relevant academic discipline with less than a year of related work experience in the same discipline." *Id.*

Patent Owner makes several observations regarding Petitioner's identified level of skill in the art but, "[f]or this proceeding, [Patent Owner] nonetheless applies Petitioner's asserted level of skill." PO Resp. 9–10 (citing Ex. 2004 ¶¶ 32–35).

We adopt Petitioner's assessment as set forth above, which appears consistent with the level of skill reflected in the Specification and prior art.

### D. Obviousness over the Combined Teachings of Aizawa, Inokawa, Ohsaki, and Mendelson-2006

Petitioner contends that claims 1–8, 10–13, and 15–29 of the '765 patent would have been obvious over the combined teachings of Aizawa, Inokawa, Ohsaki, and Mendelson-2006. Pet. 11–93; *see generally* Pet. Reply. Patent Owner disagrees. PO Resp. 11–66; *see generally* PO Sur-reply.

Based on our review of the parties' arguments and the cited evidence of record, we determine that Petitioner has met its burden of showing by a preponderance of evidence that claims 1–8, 10–13, and 15–29 are unpatentable.

### 1. Overview of Aizawa (Ex. 1006)

Aizawa is a U.S. patent application publication titled "Pulse Wave Sensor and Pulse Rate Detector," and discloses a pulse wave sensor that

IPR2020-01715
Patent 10,631,765 B1

detects light output from a light emitting diode and reflected from a patient's artery. Ex. 1006, codes (54), (57).

Figure 1(a) of Aizawa is reproduced below.



Figure 1(a) is a plan view of a pulse wave sensor. *Id.* ¶ 23. As shown in Figure 1(a), pulse wave sensor 2 includes light emitting diode ("LED") 21, four photodetectors 22 symmetrically disposed around LED 21, and holder 23 for storing LED 21 and photodetectors 22. *Id.* Aizawa discloses that, "to further improve detection efficiency, . . . the number of the photodetectors 22 may be increased." *Id.* ¶ 32, Fig. 4(a). "The same effect can be obtained when the number of photodetectors 22 is 1 and a plurality of light emitting diodes 21 are disposed around the photodetector 22." *Id.* ¶ 33.

13

IPR2020-01715
Patent 10,631,765 B1

Figure 1(b) of Aizawa is reproduced below.



Figure 1(b) is a sectional view of the pulse wave sensor. *Id.* ¶ 23. As shown in Figure 1(b), pulse wave sensor 2 includes drive detection circuit 24 for detecting a pulse wave by amplifying the outputs of photodetectors 22. *Id.* ¶ 23. Arithmetic circuit 3 computes a pulse rate from the detected pulse wave and transmitter 4 transmits the pulse rate data to an "unshown display." *Id.* The pulse rate detector further includes outer casing 5 for storing pulse wave sensor 2, acrylic transparent plate 6 mounted to detection face 23a of holder 23, and attachment belt 7. *Id.* ¶ 23.

Aizawa discloses that LED 21 and photodetectors 22 "are stored in cavities 23b and 23c formed in the detection face 23a" of the pulse wave sensor. *Id.* ¶ 24. Detection face 23a "is a contact side between the holder 23 and a wrist 10, respectively, at positions where the light emitting face 21s of the light emitting diode 21 and the light receiving faces 22s of the photodetectors 22 are set back from the above detection face 23a." *Id.* ¶ 24. Aizawa discloses that "a subject carries the above pulse rate detector 1 on the inner side of his/her wrist 10 . . . in such a manner that the light emitting face 21s of the light emitting diode 21 faces down (on the wrist 10 side)."

14

IPR2020-01715
Patent 10,631,765 B1

*Id.* ¶ 26.  Furthermore, "the above belt 7 is fastened such that the acrylic transparent plate 6 becomes close to the artery 11 of the wrist 10.  Thereby, adhesion between the wrist 10 and the pulse rate detector 1 is improved." *Id.* ¶¶ 26, 34.

### 2.  *Overview of Inokawa (Ex. 1007)*

Inokawa is a Japanese published patent application titled "Optical Vital Sensor, Base Device, Vital Sign Information Gathering System, and Sensor Communication Method," and discloses a pulse sensor device. Ex. 1008 ¶ 6.

Figure 1 of Inokawa is reproduced below.



Figure 1 illustrates a schematic view of a pulse sensor.  *Id.* ¶ 56.  Pulse sensor 1 includes box-shaped sensor unit 3 and flexible annular wristband 5. *Id.* ¶ 57.  Sensor unit 3 includes a top surface with display 7 and control switch 9, and a rear surface (sensor-side) with optical device component 11 for optically sensing a user's pulse.  *Id.*

15

IPR2020-01715
Patent 10,631,765 B1

Figure 2 of Inokawa is reproduced below.



Figure 2 illustrates a schematic view of the rear surface of the pulse sensor. *Id.* ¶ 58. The rear-side (sensor-side) of pulse sensor 1 includes a pair of light-emitting elements, i.e., green LED 21 and infrared LED 23, as well as photodiode 25 and lens 27. *Id.* In various embodiments, Inokawa discloses that the sensor-side lens is convex. *See id.* ¶¶ 99, 107. Green LED 21 is used to sense "the pulse from the light reflected off of the body (i.e.[,] change in the amount of hemoglobin in the capillary artery)," and infrared LED 23 is used to sense body motion from the change in reflected light. *Id.* ¶ 59. The pulse sensor stores this information in memory. *Id.* ¶ 68. To read and store information, the pulse sensor includes a CPU that "performs the processing to sense pulse, body motion, etc. from the signal . . . and temporarily stores the analysis data in the memory." *Id.* ¶ 69.

16

IPR2020-01715
Patent 10,631,765 B1

Figure 3 of Inokawa is reproduced below.



(FIG. 3)

Figure 3 illustrates a schematic view of a pulse sensor mounted to a base device. *Id.* ¶ 60. Pulse sensor 1 is depicted as mounted to base device 17, which "is a charger with communication functionality." *Id.* When so mounted, sensor optical device component 11 and base optical device component 41 face each other in close proximity. *Id.* ¶ 66. In this position, pulse sensor 1 can output information to the base device through the coupled optical device components. *Id.* ¶ 67. Specifically, the pulse sensor CPU performs the controls necessary to transmit pulse information using infrared LED 23 to photodetector 45 of base device 17. *Id.* ¶¶ 67, 70, 76. In an alternative embodiment, additional sensor LEDs and base photodetectors can be used to efficiently transmit data and improve accuracy. *Id.* ¶ 111.

### 3. Overview of Ohsaki (Ex. 1009)

Ohsaki is a U.S. patent application publication titled "Wristwatch-type Human Pulse Wave Sensor Attached on Back Side of User's Wrist," and

17

IPR2020-01715
Patent 10,631,765 B1

discloses an optical sensor for detecting a pulse wave of a human body. Ex. 1009, code (54), ¶ 3. Figure 1 of Ohsaki is reproduced below.



Figure 1 illustrates a cross-sectional view of pulse wave sensor 1 attached on the back side of user's wrist 4. *Id.* ¶¶ 12, 16. Pulse wave sensor 1 includes detecting element 2 and sensor body 3. *Id.* ¶ 16.

Figure 2 of Ohsaki, reproduced below, illustrates further detail of detecting element 2.



18

**Appx50040**

IPR2020-01715
Patent 10,631,765 B1

Figure 2 illustrates a mechanism for detecting a pulse wave. *Id.* ¶ 13. Detecting element 2 includes package 5, light emitting element 6, light receiving element 7, and translucent board 8. *Id.* ¶ 17. Light emitting element 6 and light receiving element 7 are arranged on circuit board 9 inside package 5. *Id.* ¶¶ 17, 19.

"[T]ranslucent board 8 is a glass board which is transparent to light, and attached to the opening of the package 5. A convex surface is formed on the top of the translucent board 8." *Id.* ¶ 17. "[T]he convex surface of the translucent board 8 is in intimate contact with the surface of the user's skin," preventing detecting element 2 from slipping off the detecting position of the user's wrist. *Id.* ¶ 25. By preventing the detecting element from moving, the convex surface suppresses "variation of the amount of the reflected light which is emitted from the light emitting element 6 and reaches the light receiving element 7 by being reflected by the surface of the user's skin." *Id.* Additionally, the convex surface prevents penetration by "noise such as disturbance light from the outside." *Id.*

Sensor body 3 is connected to detecting element 2 by signal line 13. *Id.* ¶ 20. Signal line 13 connects detecting element 2 to drive circuit 11, microcomputer 12, and a monitor display (not shown). *Id.* Drive circuit 11 drives light emitting element 6 to emit light toward wrist 4. *Id.* Detecting element 2 receives reflected light which is used by microcomputer 12 to calculate pulse rate. *Id.* "The monitor display shows the calculated pulse rate." *Id.*

### 4. *Mendelson-2006 (Ex. 1010)*

Mendelson-2006 is a journal article titled "A Wearable Reflectance Pulse Oximeter for Remote Physiological Monitoring," and discloses a

19

IPR2020-01715
Patent 10,631,765 B1

wireless wearable pulse oximeter connected to a personal digital assistant ("PDA"). Ex. 1010, 1.[3]

Figure 1 of Mendelson-2006 is reproduced below.



Figure 1 illustrates a sensor module attached to the skin (top), and a photograph of a disassembled sensor module and receiver module (bottom). The sensor module includes an optical transducer, a stack of round printed circuit boards, and a coin cell battery. *Id.* at 2.

_____

[3] Petitioner cites to the page numbers added to Exhibit 1010, rather than the native page numbering that accompanies the article. *See, e.g.*, Pet. 20–22. We follow Petitioner's numbering scheme.

Appx50042

IPR2020-01715
Patent 10,631,765 B1

Figure 2 of Mendelson-2006 is reproduced below.



Figure 2 depicts a system block diagram of the wearable, wireless, pulse oximeter including the sensor module (top) and the receiver module (bottom). *Id.* The sensor module includes at least one light-emitting diode ("LED"), a photodetector, signal processing circuitry, an embedded microcontroller, and an RF transceiver. *Id.* at 1–2. Mendelson-2006 discloses that a concentric array of discrete photodetectors could be used to increase the amount of backscattered light detected by a reflectance type pulse oximeter sensor. *Id.* at 4. The receiver module includes an embedded microcontroller, an RF transceiver for communicating with the sensor module, and a wireless module for communicating with the PDA. *Id.* at 2.

As a PDA for use with the system, Mendelson-2006 discloses "the HP iPAQ h4150 PDA because it can support both 802.11b and Bluetooth™ wireless communication" and "has sufficient computational resources." *Id.* at 3. Mendelson-2006 further discloses that

21

IPR2020-01715
Patent 10,631,765 B1

> [t]he use of a PDA as a local terminal also provides a low-cost touch screen interface. The user-friendly touch screen of the PDA offers additional flexibility. It enables multiple controls to occupy the same physical space and the controls appear only when needed. Additionally, a touch screen reduces development cost and time, because no external hardware is required. . . . The PDA can also serve to temporarily store vital medical information received from the wearable unit.

*Id.*

The PDA is shown in Figure 3 of Mendelson-2006, reproduced below.



Figure 3 illustrates a sample PDA and its graphical user interface ("GUI"). *Id.* Mendelson-2006 explains that the GUI allows the user to interact with the wearable system. *Id.* "The GUI was configured to present the input and output information to the user and allows easy activation of various functions." *Id.* "The GUI also displays the subject's vital signs, activity level, body orientation, and a scrollable PPG waveform that is transmitted by the wearable device." *Id.* For example, the GUI displays numerical oxygen saturation ("SpO$_2$") and heart rate ("HR") values. *Id.*

22

### 5. Independent Claim 1

Petitioner contends that claim 1 would have been obvious over the combined teachings of Aizawa, Inokawa, Ohsaki, and Mendelson-2006. Pet. 11–62. Below, we set forth how the combination of prior art references teaches or suggests the claim limitations that are not disputed by the parties. For those limitations and reasons for combining the references that are disputed, we examine each of the parties' contentions and then provide our analysis.

### i. "A physiological measurement system comprising"

The cited evidence supports Petitioner's undisputed contention that Aizawa satisfies the subject matter of the preamble.[4] Pet. 38; *see, e.g.*, Ex. 1006 ¶ 2 ("The present invention relates to a pulse wave sensor for detecting the pulse wave of a subject.").

### ii. "[a] a physiological sensor device comprising"

The cited evidence supports Petitioner's undisputed contention that Aizawa discloses a physiological sensor device including a pulse rate detector. Pet. 38–41; *see, e.g.*, Ex. 1006 ¶ 23 (pulse wave sensor 2), Figs. 1(a)–(b).

---

[4] Whether the preamble is limiting need not be resolved because Petitioner shows sufficiently that the preamble's subject matter is satisfied by the art.

IPR2020-01715
Patent 10,631,765 B1

   *iii. "[b] one or more emitters configured to emit light into tissue of a user"*

<u>Petitioner's Undisputed Contentions</u>

     Petitioner contends that Aizawa discloses one emitter—LED 21—and also states that, in certain embodiments, multiple LEDs may be employed. Pet. 11, 20–21. Patent Owner does not dispute this contention, and we agree with Petitioner that Aizawa discloses "one or more emitters" as claimed. *See* Ex. 1006 ¶¶ 23 ("LED 21"), 32 ("The arrangement of the light emitting diode 21 and the photodetectors 22 is not limited to this."). For example, Aizawa explains that "[t]he same effect can be obtained when the number of photodetectors 22 is 1 and a plurality of light emitting diodes 21 are disposed around the photodetector." *Id.* ¶ 33.

     Petitioner also contends that Inokawa teaches a sensor with two LEDs–a green LED to sense pulse and an infrared LED to sense body motion. Pet. 14, 20. Petitioner also contends that when Inokawa's sensor is mounted on a base device, the infrared LED also is used to wirelessly transmit vital information to the base device. *Id.* at 14–15, 20–21. Patent Owner does not dispute these contentions, and we agree with Petitioner. Inokawa teaches a pair of LEDs 21, 23, where "the basic function of the S-side green LED 21 is to sense the pulse from the light reflected off of the body . . ., while the S-side infrared LED 23 serves to sense body motion from the change in this reflected light." Ex. 1008 ¶¶ 58–59. Inokawa also explains that "vital sign information stored in the memory 63 [of the sensor], such as pulse and body motion, is transmitted to the base device 17 using the S-side infrared LED 23 of the pulse sensor 1 and the B-side PD 45 of the base device 17," such that "there is no need to use a special wireless communication circuit or a communication cable." *Id.* ¶¶ 76–77.

24

Petitioner's Disputed Contentions

Moreover, Petitioner contends that a person of ordinary skill in the art would have been motivated to modify Aizawa "to include an additional LED as taught by Inokawa to improve the detected pulse wave by distinguishing between blood flow detection and body movement." Pet. 20, 42–43. According to Dr. Kenny, "[i]n this manner, Aizawa's sensor is improved by using a separate LED to account for motion load that the system already records and accounts for." Ex. 1003 ¶ 85.

As a second and independent motivation, Petitioner also contends that such a modification also would have provided "additional functionality, including that of a wireless communication method," which would have "eliminate[d] problems associated with a physical cable, and, as taught by Inokawa, without requiring a separate RF circuit." Pet. 20–21. Petitioner contends that although Aizawa discloses data transmission, Aizawa "is silent about how such transmission would be implemented." *Id.* at 21. According to Petitioner, a skilled artisan "would have recognized that Aizawa's LED could have been used for wireless data communication with a personal computer to eliminate problems associated with a physical cable, and, as taught by Inokawa, without requiring a separate RF," which "would result in enhanced accuracy of the transmitted information." *Id.* According to Dr. Kenny, "the LEDs provided on the sensor can be used not only to detect pulse rate but also to 'accurately, easily, and without malfunction' transmit sensed data to a base station." Ex. 1003 ¶ 81.

To illustrate its proposed modification, Petitioner includes annotated and modified views of Aizawa's Figures 1(a) and 1(b), reproduced below. Pet. 22; *see also id.* at 42 (similar figures); Ex. 1003 ¶ 84.

25

IPR2020-01715
Patent 10,631,765 B1



Petitioner's annotated and modified figures depict the sensor of Aizawa with an added "LED B" (illustrated in light purple), as Petitioner contends would have been rendered obvious by Inokawa. *Id.* at 22, 42; Ex. 1003 ¶¶ 79–87, 109–110.

Patent Owner's Arguments

Patent Owner disputes Petitioner's contentions regarding the obviousness of modifying Aizawa to include two emitters. *See* PO Resp. 50–57; Sur-reply 23–25.

First, Patent Owner argues that neither Aizawa nor Inokawa discloses a device with both multiple detectors *and* multiple emitters in the *same* sensor, because Aizawa's embodiments have either a single emitter and multiple detectors (e.g., Ex. 1006, Fig. 1(a)) or multiple emitters and a single

26

**Appx50048**

detector (e.g., *id.* ¶ 33), and Inokawa discloses multiple emitters and a single detector (e.g., Ex. 1008, Fig. 2). *See* PO Resp. 50–51 (citing, e.g., Ex. 1006 ¶ 33, Figs. 1, 2, 4, 5; Ex. 1008 ¶ 58, Fig. 2; Ex. 2004 ¶¶ 100–102). Patent Owner concludes, therefore, that there would have been no reason for a person of ordinary skill in the art to add a second emitter to Aizawa, when Aizawa already discloses an embodiment with multiple LEDs, i.e., an embodiment with only a single detector. PO Resp. 51 (citing, e.g., Ex. 2004 ¶ 103).

Second, Patent Owner argues that the evidence does not support either of Petitioner's two proffered motivations for modifying Aizawa to include two emitters. As to the first motivation (to measure body movement using a second emitter), Patent Owner asserts that Dr. Kenny erroneously testifies that Aizawa cannot do this with its single emitter. PO Resp. 51–52 (citing, e.g., Ex. 1006 ¶ 15; Ex. 2007, 400:7–401:10; Ex. 2004 ¶ 104). Patent Owner argues that "Petitioner admits that Aizawa's sensor 'already records and accounts for' motion load." *Id.* at 52 (citing, e.g., Pet. 20, 23; Ex. 1006 ¶ 28). Thus, Patent Owner contends that the proposed motivation would not realize an improvement over Aizawa alone. *Id.*

As to Petitioner's second motivation (to enable transmission of data to a base device using an optical communication link), Patent Owner argues that "Aizawa *already* includes a wireless transmitter . . . so Aizawa does not need to incorporate Inokawa's base-device [optical] data transmission arrangement." PO Resp. 53 (citing, e.g., Ex. 1006 ¶¶ 23, 28, 35; Ex. 2004 ¶¶ 105–106). Indeed, Patent Owner argues "Dr. Kenny acknowledged Aizawa identifies no problems with Aizawa's form of data transmission." *Id.* (citing Ex. 2007, 409:13–410:2). Patent Owner further argues that

27

IPR2020-01715
Patent 10,631,765 B1

"Aizawa's goal is 'real-time measuring' with the transmitter 'transmitting the measured pulse rate data to a display'" but that "Inokawa's data transfer approach does ***not*** allow real-time display of measurements." *Id.* at 53–54 (citing, e.g., Ex. 1006 ¶¶ 4, 15; Ex. 1008 ¶¶ 70, 74; Ex. 2004 ¶ 107). Patent Owner insists Inokawa does not aid Petitioner's case, because Inokawa discloses the benefits of using a second emitter in only two situations, i.e., first, to improve over a "mechanically-connected system," e.g., with a cable for communication, and, second, to avoid use of a "dedicated wireless communication circuit," whereas "Aizawa ***already*** incorporates a transmitter into its design." *Id.* at 54–55 (citing, e.g., Ex. 1008 ¶ 4; Ex. 1006 ¶¶ 16, 23, 28, 35; Ex. 2004 ¶ 108).

Third, Patent Owner accuses Petitioner and Dr. Kenny of overlooking further complications that would ensue from modifying Aizawa to have two emitters. Patent Owner argues that Dr. Kenny overlooked how placing "two LEDs in close proximity may cause thermal interference that could create significant issues for sensor performance," and would require "structural changes" to Aizawa's configuration. PO Resp. 56 (citing, e.g., Ex. 2004 ¶¶ 109–110; Ex. 1019, 76–77). Patent Owner also argues that "Petitioner widened Aizawa's emitter cavity to accommodate the extra LED with ***no*** explanation or recognition of this change," which could impact optical performance of the device. *Id.* at 56–57 (citing, e.g., Ex. 2004 ¶¶ 109–111).

<u>Petitioner's Reply</u>

Concerning Petitioner's first motivation, Petitioner asserts that adding an additional LED enables the sensor to distinguish between blood flow and body movement, which provides a "more reliable" pulse measurement, which is Petitioner's asserted improvement to Aizawa. Pet. Reply 34

28

(citing, e.g., Ex. 1003 ¶¶ 79–86; Ex. 2007, 401:11–402:4; Ex. 1047 ¶ 70). Moreover, Petitioner contends that by using multiple LEDs at different wavelengths, "two separate signals" can be collected, which "allows noise arising from body motion to be better isolated and accounted for." *Id.* (citing Ex. 1047 ¶ 70).

Concerning Petitioner's second motivation, Petitioner maintains that Inokawa's use of two emitters having different wavelengths to upload data to a base device using optical communication advantageously improves the accuracy of the transmission by providing checksum information. *Id.* at 34–35 (citing, e.g., Ex. 1003 ¶ 70; Ex. 1008 ¶ 111; Ex. 2007, 407:7–408:20, 416:5–15; Ex. 1047 ¶ 71).

As to the "other complications" that Patent Owner alleges would result from the proposed modification, Petitioner asserts "such issues are 'part of what [a person of ordinary skill in the art] would bring . . . to the problem and would know how to make the changes needed.'" *Id.* at 35 (quoting Ex. 2007, 384:8–388:12; Ex. 1047 ¶ 72).

Patent Owner's Sur-reply

Concerning Petitioner's first motivation, Patent Owner argues that Inokawa's disclosure is just as sparse as Aizawa's disclosure regarding how to use optical data to measure body movement. Sur-reply 24 (citing Ex. 1008 ¶ 59). Patent Owner also asserts that "Petitioner cites nothing in Inokawa that suggests" that Inokawa's two emitter data gathering is more reliable or otherwise superior to Aizawa's single emitter data gathering. *Id.*

Concerning Petitioner's second motivation, Patent Owner argues that the proposed modification eliminates Aizawa's ability to conduct "***real-time***

collection and display of physiological measurements—a key goal of
Aizawa's system." *Id.* at 24–25.

Patent Owner also notes that Petitioner does not dispute that the
proposed modification would cause problems such as "additional cost,
energy use, and thermal problems" that would ensue from using two emitters
in the Aizawa device. *Id.*

Analysis

Upon review of the foregoing, we conclude a preponderance of the
evidence supports Petitioner's contention that it would have been obvious to
replace Aizawa's single near infrared LED 21 with an infrared LED and a
green LED, in light of Inokawa.

First, a person of ordinary skill in the art would have been motivated
to make this replacement to improve the pulse measurements recorded by
Aizawa's detector 1. Inokawa teaches that the infrared LED's signal can be
used "to detect vital signs" such as "body motion," and the green LED's
signal can be "used to detect pulse." Ex. 1008, Fig. 2, ¶¶ 14, 58–59;
Ex. 1003 ¶¶ 68, 80, 83–85; Ex. 1047 ¶¶ 69–70.

Patent Owner correctly points out that Aizawa describes its
single-emitter detector 1 as transmitting its pulse data to "a device for
computing the amount of motion load from the pulse rate." Ex. 1006 ¶¶ 15,
28, 35. But, this description is the only disclosure in Aizawa cited by Patent
Owner as relating to computing a motion characteristic of the user. Further,
we are unable to discern any other disclosure in Aizawa relating to motion
computation, or what Aizawa proposes to do with its motion computation.
*See id.* Based on the sparse nature of Aizawa's disclosure concerning
motion load, it is not clear exactly what Aizawa proposes to do with the

30

computed motion load, after it is computed. *See, e.g.*, Ex. 1047 ¶ 70 ("Aizawa is silent on whether it uses the computed motion load to improve the detection signal."). Aizawa does, however, describe the motion load as being computed "from the pulse rate," rather than being an input to the pulse rate calculation. Ex. 1006 ¶¶ 15, 35.

In a deposition for other proceedings related to this *inter partes* review, *see supra* § I.B, Dr. Kenny was asked whether it was his understanding that "Aizawa's sensor could not account for motion load?"; Dr. Kenny answered that "Aizawa's sensor attempts to prevent motion load rather than account for it." Ex. 2007, 400:7–11 (deposition for IPR2020-01520, IPR2020-01537, and IPR2020-01539). He explained that, because Aizawa uses only a single emitter with a single wavelength, "what [Aizawa] sees as a signal would be some mixture of pulse rate and motion load if there was no effort to prevent motion load," so Aizawa seeks to solve the problem of "prevent[ing] motion load from corrupting the pulse rate signal." *Id.* at 400:12–401:10. Dr. Kenny did not further explain this distinction between preventing and accounting for motion load in his deposition testimony cited by the parties as relating to this issue. *Id.* at 400:7–402:4. We do not rely on this distinction as a basis for our present decision, because we find no express support for it in Aizawa's disclosure (*see* Ex. 1006 ¶¶ 15, 28, 35), and it is not explained in persuasive detail by Dr. Kenny.

We nonetheless credit Dr. Kenny's declaration testimony that a person of ordinary skill in the art, upon reviewing Inokawa's disclosure of using two emitters of different wavelengths to calculate a user's pulse and motion separately, would understand that these two separate measurements would enable the device to calculate a "more reliable" pulse rate because it "allows

noise arising from body motion to be better isolated and accounted for."
Ex. 1047 ¶ 70; Ex. 1003 ¶¶ 80, 83, 85, 109–110.  Aizawa does not disclose
using the computed motion load in this fashion, so it appears that this would
improve upon the accuracy of Aizawa's pulse measurements, by using the
computed motion load to isolate and account for noise.  *See* Ex. 1006 ¶¶ 15,
28, 35.

Dr. Madisetti also offers no meaningful opposing testimony in this
regard.  *See, e.g.*, Ex. 2004 ¶ 104.  Instead, Dr. Madisetti incorrectly reads
Dr. Kenny's motivation testimony as being limited to the desirability of
adding the bare ability to measure body movement to Aizawa.  *See id.*  In
fact, Dr. Kenny further testified that it would have been beneficial to *use* the
measured body movement to *improve* the pulse measurement of the device.
*See* Ex. 1003 ¶¶ 80, 83, 85; Ex. 1047 ¶ 70.  Dr. Madisetti does not address
that testimony.  *See* Ex. 2004 ¶ 104.

Thus, because Dr. Madisetti's testimony sets up a straw man to attack,
rather than directly addressing the entirety of Dr. Kenny's testimony in this
regard, Dr. Kenny's testimony stands unrebutted in the record before us.
Dr. Kenny's testimony also makes intuitive sense that measuring the user's
motion *separately* from the user's pulse, for example by using two
interrogating emitters of two different wavelengths, would provide a reliable
means of correcting the pulse data for motion artifacts by using the
separately measured motion data, rather than by trying to segregate these
two components in the single data stream provided by Aizawa's single
emitter device.  *See, e.g.*, Ex. 1047 ¶ 70.  We, therefore, are persuaded by
Dr. Kenny's unrebutted testimony that using two emitters of different
wavelengths would improve Aizawa's device in this way.

Independently, we are also persuaded that a person of ordinary skill in the art would have been motivated to replace Aizawa's single near infrared LED 21 with an infrared LED and a green LED, to provide a reliable method of uploading pulse data stored by Aizawa's wrist-worn pulse rate detector 1 to another device for display to the user. Inokawa expressly touts such optically-based uploading of data from Inokawa's wrist-worn sensor 1 to Inokawa's base device 17 as a benefit of incorporating two emitters in sensor 1. *See* Ex. 1008, Figs. 3, 19, ¶¶ 3–7, 14, 76–77, 109–111. Inokawa identifies two specific benefits of this optically-based data communication means. First, the infrared LED can transmit the pulse data, and the green LED can separately transmit "checksum" information to increase the accuracy of data transmission. *Id.* at Fig. 19, ¶¶ 14, 109–111. Second, using light emitters in this fashion to perform two functions (data collection by emitting light into the user's wrist, and data transmission by emitting light to photodetectors in a base device) obviates the need for providing "a special wireless communication circuit [in the wrist-worn sensor 1] or a communication cable." *Id.* ¶¶ 3–7, 76–77.

Patent Owner correctly points out that Aizawa already has a "transmitter" 4 for uploading pulse data stored by Aizawa's wrist-worn pulse rate detector 1 to another device for processing and for display to the user. Ex. 1006, Fig. 1(b), ¶¶ 15, 23, 28, 35. However, Aizawa's Figure 1(b) illustrates transmitter 4 only as an empty box contained within outer casing 5, and Aizawa's written description does not provide further structural details concerning transmitter 4. *See id.* In particular, Aizawa does not describe exactly how transmitter 4 transmits its data to the other device. *See id.*

33

Patent Owner contends, and Dr. Madisetti and Dr. Kenny both testify, that Aizawa's transmitter 4 is a "wireless" transmitter. *See, e.g.*, PO Resp. 53; Ex. 2004 ¶¶ 49, 105–106, 112; Ex. 2007, 403:17–22, 414:19–21. They all appear to equate "wireless" communication to radio frequency communication, and not to include optical communication, even though both radio frequency and optical communication do not use a wire. Based on the foregoing testimony, we assume, for this decision, that Aizawa contemplates radio frequency communication as one embodiment by which transmitter 4 may transmit data to devices other than detector 1.

Patent Owner argues, and Dr. Madisetti testifies, that Aizawa's express disclosure goes even further. They assert Aizawa's "goal" is to measure and display pulse data *in real time during exercise*, using the wireless transmitter. *See, e.g.*, Ex. 2004 ¶¶ 106–108, 111. We find that Aizawa does not support this assertion. Instead, Aizawa discusses prior art devices that "estimat[e] a burden on the heart of a person who takes exercise by *real-time measuring* his/her heart rate at the time of exercise" (Ex. 1006 ¶ 4 (emphasis added)), and then describes Aizawa's detector 1 as having a transmitter for transmitting the measured pulse rate data to another device for display (*id.* ¶ 15). Aizawa does not indicate when this transmission occurs. Aizawa also refers to "noise caused by the shaking of the body of the subject" as a problem to be addressed (*id.* ¶ 6), but this problem occurs regardless of whether the shaking results from exercise or the normal movement of the user's wrist over the course of the day. Thus, Aizawa does not tout, as an important feature of Aizawa's invention, the *real time display* of pulse rate data during exercise, regardless of whether the data gathered by

Aizawa's wrist-worn detector 1 is transmitted wirelessly or otherwise.  *Id.*
¶¶ 4, 6, 15.

No doubt, a person of ordinary skill in the art would have viewed the
capability of a wrist-worn pulse detector to transmit its pulse data to another
device for display in real time while the user is exercising to be a desirable
feature in some cases, even if this is not one of Aizawa's specifically stated
goals.  *See, e.g.*, Ex. 1003 ¶ 72 (Dr. Kenny stating: "By wirelessly
transmitting the collected data, the condition of a subject can be determined
'remotely' . . . ."); Ex. 2009, 393:6–14 (in a deposition for other related
proceedings, Dr. Kenny agreeing that a person of ordinary skill in the art
"would have seen the ability to wirelessly transmit collected data as an
advantage").  Nonetheless, Inokawa expressly discloses that, in other cases,
the benefits achieved by wireless transmission can be outweighed by
obviating the need for the wrist-worn sensor to include a special wireless
communication circuit.  *See* Ex. 1008 ¶¶ 3–7 (discussing problems
associated with wireless transmission, such as the need for a dedicated
circuit, which is avoided by Inokawa's system that risks "few malfunctions"
and has a "simple structure"), 76–77 ("As a result, there is no need to use a
special wireless communication circuit . . ., which makes it possible to
transmit vital sign information to the base device 17 accurately, easily, and
without malfunction.").  We therefore conclude that Petitioner's case for
obviousness in this regard is supported by a preponderance of the evidence.
*See, e.g.*, *In re Urbanski*, 809 F.3d 1237, 1243–44 (Fed. Cir. 2016) (persons
of ordinary skill in the art may be motivated to pursue desirable properties of
one prior art reference, even at the expense of foregoing a benefit taught by
another prior art reference).

IPR2020-01715
Patent 10,631,765 B1

We disagree with Patent Owner's argument that Petitioner's case for obviousness is deficient on the basis that neither Aizawa nor Inokawa expressly discloses a wrist-worn sensor device that has *both* a plurality of emitters *and* at least four detectors, as claim 1 recites.  Obviousness does not require "'some motivation or suggestion to combine the prior art teachings' [to] be found in the prior art." *KSR*, 550 U.S. at 407, 415–418.  Nor does it require the bodily incorporation of Inokawa's device into Aizawa's device. *See, e.g.*, *In re Keller*, 642 F.2d 413, 425 (CCPA 1981) (test for obviousness is not whether the features of one reference may be bodily incorporated into the structure of the other reference, but rather is "what the combined teachings of the references would have suggested to those of ordinary skill in the art"); *see also In re Merck & Co.*, 800 F.2d 1091, 1097 (Fed. Cir. 1986) (nonobviousness is not established by attacking references individually when unpatentability is predicated upon a combination of prior art disclosures).  Instead, "[a] person of ordinary skill is also a person of ordinary creativity, not an automaton," and "in many cases a person of ordinary skill will be able to fit the teachings of multiple patents together like pieces of a puzzle." *KSR*, 550 U.S. at 420–421.

In this case, we are persuaded that a person of ordinary skill in the art would have been motivated to modify Aizawa's wrist-worn detector 1 to replace its single near infrared LED 21 with an infrared LED and a green LED, based on Inokawa, for all the reasons provided above.  A person of ordinary skill in the art would additionally have known to keep all four detectors 22 that are already present in Aizawa's detector 1, so that "[e]ven when the attachment position of the sensor is dislocated, a pulse wave can be detected accurately," as disclosed by Aizawa.  Ex. 1006 ¶¶ 9, 27.  In short,

36

the combination of Aizawa and Inokawa teaches that having multiple emitters is beneficial, and having multiple detectors is beneficial, for different and not inconsistent reasons.

Finally, we agree with Petitioner's position that any thermal interference and power consumption issues that may arise in Aizawa's wrist-worn pulse detector, by using two emitters instead of one emitter, are well within the capabilities of a person of ordinary skill in the art to solve. We credit Dr. Kenny's testimony in this regard. *See* Ex. 1003 ¶ 86; Ex. 1047 ¶ 72. For example, Dr. Kenny acknowledges that Aizawa already discloses adding additional emitters. Ex. 1003 ¶ 79 (citing Ex. 1006 ¶¶ 32–33). Dr. Kenny further testifies that this modification "amount[s] to nothing more than the use of a known technique [i.e., Inokawa's use of two emitters in a wrist-worn pulse detector] to improve similar devices [i.e., Aizawa's wrist-worn pulse detector] in the same way and combining prior art elements according to known methods to yield predictable results." *Id.* ¶ 86.

Patent Owner cites portions of Dr. Kenny's deposition testimony that, in Patent Owner's view, indicate Dr. Kenny fails to appreciate the significance of optical interference complications posed by adding a second emitter to Aizawa's device, and fails to explain how this would have been overcome. *See* PO Resp. 56–57 (citing Ex. 2007, 394:11–395:17). We have reviewed this deposition testimony, and we conclude Patent Owner overstates its significance. It establishes, at most, that Dr. Kenny did not expressly address this issue in his declaration (Exhibit 1003), but Dr. Kenny's opinion is that this would have been within the capability of a person of ordinary skill in the art to resolve. Based on the evidentiary record presented to us, we agree with Dr. Kenny. For example, Inokawa discloses a

37

IPR2020-01715
Patent 10,631,765 B1

wrist-worn pulse sensor 1 having two emitters 21 and 23 in close proximity to each other.  *See* Ex. 1008, Figs. 1–2.  An artisan must be presumed to know something about the art apart from what the relied-upon references disclose.  *See In re Jacoby*, 309 F.2d 513, 516 (CCPA 1962).

Dr. Madisetti's testimony opposing Dr. Kenny's foregoing opinion is premised solely on Dr. Kenny's alleged failure to explain how issues that arise from adding a second emitter to Aizawa would have been solved; Dr. Madisetti does not provide any affirmative reason why these issues would have been difficult for a person of ordinary skill in the art to solve, in the context of Aizawa's device or wrist-worn pulse sensing devices in general.  *See* Ex. 2004 ¶ 109.

Thus, we conclude a person of ordinary skill in the art would have been motivated to replace Aizawa's single near infrared LED 21 with an infrared LED and a green LED, and would have had a reasonable expectation of success in doing so.

### iv.  *"[c] at least four detectors, wherein each of the at least four detectors has a corresponding window that allows light to pass through to the detector"*

The cited evidence supports Petitioner's undisputed contention that Aizawa discloses at least four detectors, each stored in a separate cavity 23c, which would have been understood to be "openings or windows that mirror specific detector placement layouts."  Pet. 48, 43–49; *see, e.g.*, Ex. 1006 ¶¶ 23 ("four phototransistors 22"), 24 ("stored in cavities" and "set back from . . . detection face 23a"), Figs. 1(a)–1(b); Ex. 1003 ¶¶ 111–119.

38

**Appx50060**

*v.  "[d] a wall that surrounds at least the at least the four detectors"*

The cited evidence supports Petitioner's undisputed contention that Aizawa discloses holder 23, which is a wall that surrounds detectors 22, as well as other elements.  Pet. 50–51; *see, e.g.*, Ex. 1006 ¶ 23 ("holder 23 for storing . . . light emitting diode 21 and the photodetectors 22"), Fig. 1(b).

*vi.  "[e] cover comprising a protruding convex surface, wherein the protruding convex surface is above all of the at least four detectors, wherein at least a portion of the protruding convex surface is rigid, and wherein the cover operably connects to the wall;"*

Petitioner's Undisputed Contentions

Petitioner contends that Aizawa discloses a cover, i.e., "an acrylic transparent plate positioned between the photodetectors and the wrist," to improve adhesion between the sensor and the subject's wrist.  Pet. 13.  Patent Owner does not dispute this contention, and we agree with Petitioner.  Aizawa discloses that "acrylic transparent plate 6 is provided on the detection face 23a of the holder 23 to improve adhesion to the wrist 10."  Ex. 1006 ¶ 34, Fig. 1(b) (depicting transparent plate 6 between sensor 2 and wrist 10).

Petitioner also contends that Ohsaki teaches a wrist-worn sensor that includes a "translucent board" having a convex surface that contacts the user's skin.  Pet. 16, 31.  Patent Owner does not dispute this contention, and we agree with Petitioner.  Ohsaki discloses that sensor 1 includes detecting element 2 and sensor body 3, and is "worn on the back side of the user's wrist."  Ex. 1009 ¶ 16.  Ohsaki discloses that detecting element 2 includes package 5 and "translucent board 8[,which] is a glass board which is transparent to light, [and is] attached to the opening of the package 5.  A

39

IPR2020-01715
Patent 10,631,765 B1

convex surface is formed on the top of the translucent board 8." *Id.* ¶ 17. As seen in Ohsaki's Figure 2, translucent board 8 has a protruding convex surface, and is located above all of the detectors. *Id.* at Fig. 2. As also seen in Figure 2, the cover is operably connected to the walls of sensor package 5. *Id.* ¶ 17 ("The translucent board 8 is . . . attached to the opening of the package 5."), Fig. 2.

Petitioner also contends that Ohsaki's Figure 2 depicts the user's tissue conforming to the shape of the convex surface of the cover, such that the convex surface would have been "rigid." Pet. 53. Patent Owner does not dispute this contention, and we agree with Petitioner. Ohsaki's Figure 2 depicts the user's tissue 4 conforming to the shape of the protruding convex surface when the sensor is worn by the user. Ex. 1009 ¶ 17 ("The translucent board 8 is a glass board."), Fig. 2; *see, e.g.*, Ex. 1003 ¶ 124.

Petitioner's Disputed Contentions

Petitioner further contends that a person of ordinary skill in the art would have found it obvious "to modify the sensor's flat cover [in Aizawa] . . . to include a lens/protrusion . . . similar to Ohsaki's translucent board 8, so as to [1] improve adhesion between the user's wrist and the sensor's surface, [2] improve detection efficiency, and [3] protect the elements within sensor housing." Pet. 33, 52 (citing, e.g., Ex. 1003 ¶¶ 25, 100–101; Ex. 1006 ¶¶ 2, 5, 8–16, 23–24, 27–29, 32–33). Petitioner contends that Ohsaki's convex surface is in "intimate contact" with the user's tissue, which prevents slippage of the sensor and increases signal strength because "variation of the amount of the reflected light . . . that reaches the light receiving element 7 is suppressed" and because "disturbance light from the outside" is prevented from penetrating board 8, as compared to a sensor with

40

a flat surface. *Id.* at 31–32 (citing, e.g., Ex. 1003 ¶ 99; quoting Ex. 1009 ¶ 25). Petitioner also contends that, in the combination, the protruding convex surface would have been rigid, and the cover would have operably connected to the wall, as taught by Ohsaki. Pet. 52–53.

Petitioner contends this modification would have been "nothing more than the use of a known technique to improve similar devices in the same way," i.e., "simply improving Aizawa-Inokawa's transparent plate 6 that has a flat surface to improve adhesion to a subject's skin and reduce variation in the signals detected by the sensor." Pet. 34 (citing Ex. 1003 ¶ 102). Further according to Petitioner, "the elements of the combined system would each perform functions they had been known to perform prior to the combination—Aizawa-Inokawa's transparent plate 6 would remain in the same position, performing the same function, but with a convex surface as taught by Ohsaki." *Id.* at 34–35.

To illustrate its proposed modification, Petitioner includes two annotated versions of Aizawa's Figure 1(b), both of which are reproduced below. Pet. 34.



Petitioner's annotated figure on the left depicts Aizawa's sensor, modified to include LED B (*see supra* Section II.D.5.iii) and with a flat "light permeable cover" (illustrated with blue outline); Petitioner's annotated figure on the

right depicts Aizawa's sensor, again modified to include LED B (*see supra* Section II.D.5.iii) and with a convex "light permeable cover" (also illustrated with blue outline).

Patent Owner's Arguments

Patent Owner argues that a person of ordinary skill in the art would not have been motivated to modify Aizawa's sensor to include Ohsaki's convex cover.  PO Resp. 19–50; PO Sur-reply 3–23.

First, Patent Owner argues that the proposed modification "fundamentally changes Ohsaki's structure and eliminates the longitudinal shape that gives Ohsaki's translucent board the ability to prevent slipping." PO Resp. 20.  This argument is premised on Patent Owner's contention that Ohsaki's convex cover must be rectangular, with the cover's long direction aligned with the length of the user's forearm, to avoid interacting with bones in the wrist and forearm.  *Id.* at 22–24 (citing, e.g., Ex. 2004 ¶¶ 52–57; Ex. 1009 ¶¶ 6, 19, 23, 24); PO Sur-reply 3–11.  According to Patent Owner, Ohsaki teaches that "aligning the sensor's longitudinal direction with the circumferential direction of the user's arm undesirably results in 'a tendency [for Ohsaki's sensor] to slip off.'"  PO Resp. 22–23 (citing Ex. 1009 ¶ 19).

Thus, Patent Owner contends that Petitioner's proposed modification would "chang[e] Ohsaki's rectangular board into a circular shape," which "would eliminate the advantages discussed above" because it "cannot be placed in *any longitudinal* direction and thus cannot coincide with the longitudinal direction of the user's wrist."  *Id.* at 23 (citing Ex. 2004 ¶¶ 56–57).  Patent Owner presents annotated Figures depicting what it contends is Ohsaki's disclosed sensor placement as compared to that of the proposed modification, reproduced below.  *Id.* at 24.



Patent Owner's annotated Figure on the left depicts a rectangular sensor placed between a user's radius and ulna, while Patent Owner's annotated Figure on the right depicts a circular sensor placed across a user's radius and ulna. Based on these annotations, Patent Owner argues that the proposed "circular shape would press on the user's arm in all directions and thus cannot avoid the undesirable interaction with the user's bone structure," such that a skilled artisan "would have understood such a change would eliminate Ohsaki's benefit of preventing slipping." *Id.* (citing, e.g., Ex. 2004 ¶¶ 56–57).

Second, Patent Owner argues that Ohsaki requires its sensor be placed on the back of the user's wrist to achieve any benefits, but that such a location would have been unsuitable for Aizawa's sensor. PO Resp. 29–30. Specifically, Patent Owner argues that Aizawa's sensor must be worn on the palm side of the wrist, close to radial and ulnar arteries, which is the side opposite from where Ohsaki's sensor is worn. *Id.* at 29–34 (citing, e.g., Ex. 2004 ¶¶ 66–73). According to Patent Owner, Ohsaki teaches that the sensor's convex surface has a tendency to slip when placed on the palm side of the wrist, i.e., in the location taught by Aizawa. *Id.* at 35–38 (citing, e.g.,

Ex. 1009 ¶¶ 19, 23, 24; Ex. 2004 ¶¶ 74–80). Thus, Patent Owner argues that a person of ordinary skill in the art "would not have been motivated to use Ohsaki's longitudinal board—designed to be worn on the ***back side*** of a user's wrist—with Aizawa's ***palm-side*** sensor." *Id.* at 38. Similarly, Patent Owner argues that Aizawa teaches away from the proposed modification because Aizawa teaches that its flat acrylic plate improves adhesion on the palm side of the wrist, while Ohsaki teaches that its convex board "has a tendency to slip" on the palm side of the wrist. *Id.* at 39–41 (citing, e.g., Ex. 2004 ¶¶ 82–84).

Third, Patent Owner argues that a person of ordinary skill in the art would not have placed Ohsaki's convex cover over Aizawa's peripheral detectors because the convex cover would condense light toward the center and away from Aizawa's detectors, which would decrease signal strength. PO Resp. 41–48 (citing, e.g., Ex. 2004 ¶¶ 85–97). Patent Owner also contends that Petitioner and Dr. Kenny admitted as much in a related proceeding. *Id.* at 42–43 (citing, e.g., Ex. 2019, 45; Ex. 2020, 69–70). Patent Owner also relies on Figure 14B of the '765 patent to support its position. *Id.* at 43 (citing Ex. 1001, 36:3–6, 36:13–15). Additionally, Patent Owner argues that its position is also supported by Inokawa, which also uses a convex lens to direct light toward the center but, in Inokawa's structure, the light is directed from peripheral emitters toward a central detector. *Id.* at 47–48 (citing, e.g., Ex. 1008 ¶¶ 15, 58). In light of the foregoing, Patent Owner argues that a person of ordinary skill in the art would have understood that the proposed modification would have decreased signal strength by directing light away from Aizawa's peripheral detectors. *Id.* at 45–48.

Fourth and finally, Patent Owner argues that a person of ordinary skill in the art "would have understood that Aizawa's *flat* plate would provide better protection than a convex surface" because it "would be less prone to scratches." *Id.* at 49–50 (citing Ex. 1008 ¶ 106).

Petitioner's Reply

Concerning Patent Owner's first and second arguments, Petitioner responds that Ohsaki does not disclose the shape of its protrusion, other than its convexity as shown in Figures 1 and 2, nor does Ohsaki require a rectangular shape or placement on the back of the wrist in order to achieve the disclosed benefits. Pet. Reply 13–21 (citing, e.g., Ex. 1047 ¶¶ 16–33). Moreover, Petitioner asserts that "even if Ohsaki's translucent board 8 were somehow understood to be rectangular, obviousness does not require 'bodily incorporation' of features from one reference into another"; rather, a person of ordinary skill in the art "would have been fully capable of modifying Aizawa to feature a light permeable protruding convex cover to obtain the benefits" taught by Ohsaki. *Id.* at 17 (citing, e.g., Ex. 1047 ¶ 26). Similarly, regarding the location of the sensor, Petitioner asserts,

> [E]ven assuming for the sake of argument that a [person of ordinary skill in the art] would have understood Aizawa's sensor as being limited to placement on the backside of the wrist, and would have understood Ohsaki's sensor's "tendency to slip" when arranged on the front side as informing consideration of Ohsaki's teachings with respect to Aizawa, that *would have further motivated* the [person of ordinary skill in the art] to implement a light permeable convex cover in Aizawa's sensor, to improve detection efficiency of that sensor when placed on the palm side.

*Id.* at 19 (citing, e.g., Ex. 1047 ¶ 30). In other words, Ohsaki's disclosure that a convex surface suppresses variation in reflected light would have

motivated an artisan to add such a surface to Aizawa to improve detection efficiency of that sensor when placed on the palm side. *Id.* at 20–21.

Concerning Patent Owner's third argument, Petitioner responds that adding a convex cover to Aizawa's sensor would not decrease signal strength but, instead, "would improve Aizawa's signal-to-noise ratio by causing more light backscattered from tissue to strike Aizawa's photodetectors than would have with a flat cover" because such a cover improves light concentration across the entire lens and does not direct it only towards the center. *Id.* at 21–28 (citing, e.g., Ex. 1047 ¶¶ 34–58).

Petitioner asserts that Patent Owner and Dr. Madisetti "ignore[] the well-known ***principle of reversibility***," by which "a ray going from P to S will trace the same route as one from S to P." Pet. Reply 23 (quoting Ex. 1051, 92; citing, e.g., Ex. 1051, 87–92; Ex. 1049, 106–111; Ex. 1047 ¶ 38). When applied to Aizawa's sensor, Petitioner contends that any condensing benefit achieved by a convex cover would thus direct emitted light toward Aizawa's peripheral detectors. *Id.* at 24–26 (citing, e.g., Ex. 1047 ¶¶ 40–49). Although Dr. Madisetti "refused to acknowledge" "this basic principle of reversibility during deposition," Petitioner contends it is applied in Aizawa. *Id.* at 25 (citing, e.g., Ex. 1052, 89:12–19; Ex. 1003 ¶ 127 (citing Ex. 1006 ¶ 33); Ex. 1047 ¶ 34).

Petitioner also asserts that Patent Owner and Dr. Madisetti overlook the fact that light rays reflected by body tissue will be scattered and diffuse and will approach the detectors "from various random directions and angles." Pet. Reply 26–28 (citing, e.g., Ex. 1019, 52, 86, 90; Ex. 1053, 803; Ex. 1047 ¶¶ 50–56; Ex. 2006, 163:12–164:2). This scattered and diffuse light, according to Petitioner, means that Ohsaki's convex cover cannot

"focus all light at the center of the sensor device," as Patent Owner argues. *Id.* at 27. Instead, due to the random nature of this scattered light, Petitioner asserts that a person of ordinary skill in the art would have understood that "Ohsaki's convex cover provides a slight refracting effect, such that light rays that otherwise would have missed the detection area are instead directed toward that area as they pass through the interface provided by the cover." *Id.* at 28 (citing, e.g., Ex. 1047 ¶¶ 55–56). Petitioner applies this understanding to Aizawa, and asserts that using a cover with a convex protrusion in Aizawa would "enable backscattered light to be detected within a circular active detection area surrounding" a central light source. *Id.* at 28 (citing, e.g., Ex. 1047 ¶ 56).

Petitioner relies upon the following illustration of this alleged effect. Pet. Reply 30–31 (citing Ex. 1047 ¶¶ 62–67).



The above illustration depicts backscattered light reflecting off user tissue in various directions, such that it impinges upon the peripheral detectors from various random angles and directions. *Id.* According to Petitioner, "light rays that otherwise would have missed the active detection area are instead directed toward that area as they pass through the interface provided by the convex cover." *Id.* at 31.

Finally, Petitioner dismisses Patent Owner's reliance on Figure 14B of the '765 patent because it "is not an accurate representation of light that has been reflected from a tissue measurement site. For example, the light

rays (1420) shown in FIG. 14B are collimated (i.e., travelling paths parallel to one another), and each light ray's path is perpendicular to the detecting surface."  Pet. Reply 28–29 (citing, e.g., Ex. 1047 ¶¶ 57–60).

Concerning Patent Owner's fourth argument, Petitioner responds that even if a flat surface might be less prone to scratching, that possible disadvantage would have been weighed against the "known advantages of applying Ohsaki's teachings," and would not negate a motivation to combine.  *Id.* at 33 (citing, e.g., Ex. 1047 ¶ 68).  Moreover, Petitioner argues that "by choosing a suitable material of the protrusion to be scratch-resistant, it would have been obvious for a [person of ordinary skill in the art] to achieve both benefits of light gathering and scratch-resistance."  *Id.*

Patent Owner's Sur-reply

Concerning Patent Owner's first and second arguments, Patent Owner reiterates its position that Ohsaki's purported benefits attach only to a sensor with a rectangular convex surface that is located on the back of the wrist, and that "even small changes in its sensor's orientation or body location result in 'a tendency to slip.'"  PO Sur-reply 3–14, 6.

Concerning Patent Owner's third argument, Patent Owner asserts that Petitioner's Reply improperly presents several new theories as compared with the Petition.  *Id.* at 16 (regarding reversibility), 19 (regarding refraction).

Patent Owner argues that Dr. Kenny and Petitioner have not overcome their admissions that a convex lens directs light toward the center.  *Id.* at 15.  Moreover, Patent Owner argues that Petitioner's discussion of the principle of reversibility is "irrelevant" because "Petitioner never explains how the principle of reversibility could apply to such 'random' scattered and

absorbed light" as is present when light interacts with user tissue. *Id.* at 16–17. The random nature of backscattered light, in Patent Owner's view, "hardly supports Petitioner's argument that light will necessarily travel the same paths regardless of whether the LEDs and detectors are reversed," and is irrelevant to the central issue presented here of "whether changing Aizawa's flat surface to a convex surface results in more light on Aizawa's peripherally located detectors." *Id.* at 17–18.

Patent Owner also asserts that Petitioner mischaracterizes Patent Owner's position, which is not that a cover with a convex protrusion "focuses *all* light to a single point" at the center of the sensor as Petitioner characterizes it. PO Sur-reply 19. Patent Owner's position, rather, is that Petitioner has not shown that a person of ordinary skill in the art "would have been motivated to change Aizawa's flat surface to a convex surface to improve signal strength." *Id.* In Patent Owner's view, by arguing that the convex cover provides only a "slight refracting effect," Petitioner undermines its contention that providing such a cover would have improved detection efficiency. *Id.* at 19–20.

Moreover, Patent Owner argues that Petitioner's theory regarding the "slight refracting effect" of a convex protrusion is "unavailing because it fails to consider the greater *decrease* in light at the detectors due to light redirection to a *more* central location." *Id.* at 20. According to Patent Owner, any light redirected from the sensor's edge could not make up for the loss of signal strength from light redirected away from the detectors and toward the center. *Id.*

Concerning Patent Owner's fourth argument, Patent Owner argues that Petitioner does not dispute Patent Owner's position that a flat cover

49

would be less prone to scratches and offers "*no* plausible advantages for its asserted combination." *Id.* at 23. Moreover, Patent Owner argues that "the risk of scratches undermines Petitioner's argument that a [person of ordinary skill in the art] would have been motivated to add a convex cover to 'protect the elements within the sensor housing.'" *Id.*

Analysis

As noted above, Petitioner provides three rationales to support its contention that a person of ordinary skill in the art would have provided "a light permeable cover with a protruding convex surface," such as that taught by Ohsaki, to Aizawa's sensor: (1) to improve adhesion between the sensor and the user's tissue, (2) to improve detection efficiency, and (3) to protect the elements within the sensor housing. Pet. 33. We conclude all three rationales are supported by the evidence, as follows.

Rationales 1 and 2

The evidence of record persuades us that adding a convex cover, such as that taught by Ohsaki, would have improved adhesion between the sensor and the user's skin, which would have increased the signal strength of the sensor. Ohsaki teaches as much:

> [T]he convex surface of the translucent board 8 is in intimate contact with the surface of the user's skin. Thereby *it is prevented that the detecting element 2 slips off* the detecting position of the user's wrist 4. If the translucent board 8 has a flat surface, the detected pulse wave is adversely affected by the movement of the user's wrist 4 as shown in Fig. 4B. However, in the case that the translucent board 8 has a convex surface like the present embodiment, the *variation of the amount of the reflected light which is emitted from the light emitting element 6 and reaches the light receiving element 7 by being reflected by the surface of the user's skin is suppressed. It is also prevented*

50

> *that noise such as disturbance light from the outside penetrates the translucent board 8.*  Therefore the pulse wave can be detected without being affected by the movement of the user's wrist 4 as shown in FIG. 4A.

Ex. 1009 ¶ 25 (emphases added); *see also id.* ¶ 27 ("stably fixed").

We credit Dr. Kenny's testimony that a person of ordinary skill in the art would have been motivated by such teachings to apply a cover with a convex surface to Aizawa to improve that similar device in the same way and to yield predictable results, i.e., to resist movement of the sensor on the user's wrist.  *See, e.g.*, Ex. 1003 ¶¶ 99 ("[T]his contact between the convex surface and the user's skin is said to prevent slippage, which increases the strength of the signals obtainable by Ohsaki's sensor."), 101–102.  We also credit Dr. Kenny's testimony that, in light of these teachings, a person of ordinary skill in the art would have made such a modification to improve the pulse sensor's ability to emit light into, and detect light reflected from, the user's wrist, to generate an improved pulse signal.  Ex. 1003 ¶¶ 71, 98, 100; Ex. 1047 ¶¶ 7, 14.

Indeed, Ohsaki expressly compares the performance of a wrist-worn pulse wave sensor depending on whether translucent board 8 is convex or flat, and concludes the convex surface results in improved performance over the flat surface, especially when the user is moving.  Ex. 1009, Figs. 4A–4B, ¶¶ 15, 25 (stating that with "a flat surface, the detected pulse wave is adversely affected by the movement of the user's wrist 4," and with "a convex surface like the present embodiment, the variation of the amount of the reflected light" collected by the sensor "is suppressed").  Ohsaki also states that, with a convex surface, "[i]t is also prevented that noise such as

disturbance light from the outside penetrates the translucent board 8." *Id.*
¶ 25.

We also credit Dr. Kenny's testimony that the proposed modification would have been within the skill level of an ordinary artisan. For example, Dr. Kenny testifies:

> [A person of ordinary skill in the art] would have combined the teachings of Aizawa-Inokawa and Ohsaki as doing so would have amounted to nothing more than the use of a known technique to improve similar devices in the same way. [One of ordinary skill] would have recognized that incorporating Ohsaki's convex surface is simply improving Aizawa-Inokawa's transparent plate 6 that has a flat surface to improve adhesion to a subject's skin and reduce variation in the signals detected by the sensor. Furthermore, the elements of the combined system would each perform similar functions they had been known to perform prior to the combination—Aizawa-Inokawa's transparent plate 6 would remain in the same position, performing the same function, but with a convex surface as taught by Ohsaki.

Ex. 1003 ¶ 102. In light of Ohsaki's express disclosure of the benefits of a convex cover, we credit Dr. Kenny's testimony that a person of ordinary skill in the art would have been motivated to modify Aizawa as proposed, and would have had a reasonable expectation of success in doing so.

We next address Patent Owner's first through third arguments, each of which implicates Petitioner's first and second asserted rationales of improved adhesion and detection efficiency.

Patent Owner's first argument is premised on the notion that Ohsaki's benefits only can be realized with a rectangular convex surface, because such a shape is required to avoid interacting with bones on the back of the user's forearm. PO Resp. 20–28. We disagree. Ohsaki does not disclose

the shape of its convex cover, much less require it be rectangular. In fact, Ohsaki is silent as to the shape of the convex surface. Ohsaki discloses that sensor 1 includes detecting element 2, which includes package 5 within which the sensor components are located. Ex. 1009 ¶ 17. Ohsaki's convex surface is located on board 8, which is "attached to the opening of the package 5." *Id.* Ohsaki provides no further discussion regarding the shape of board 8 or its convex protrusion.

We disagree with Patent Owner's suggestion that the shape of the convex surface can be inferred to be rectangular from Ohsaki's Figures 1 and 2. PO Resp. 15–17. Ohsaki does not indicate that these figures are drawn to scale, or reflect precise dimensions or shapes of the convex surface. *See, e.g.*, Ex. 1009 ¶ 13 ("schematic diagram"); Pet. Reply 16–17; *Hockerson-Halberstadt, Inc. v. Avia Group Int'l*, 222 F.3d 951, 956 (Fed. Cir. 2000) ("[I]t is well established that patent drawings do not define the precise proportions of the elements and may not be relied on to show particular sizes if the specification is completely silent on the issue.").

To be clear, Ohsaki describes the shape of *detecting element 2* as rectangular: "[T]he length of the detecting element from the right side to the left side in FIG. 2 is longer than the length from the upper side to the lower side." Ex. 1009 ¶ 19. Ohsaki also describes that detecting element 2 is aligned longitudinally with the user's forearm: "[I]t is desirable that the detecting element 2 is arranged so that its longitudinal direction agrees with the longitudinal direction of the user's arm," to avoid slipping off. *Id.*; *see also id.* ¶ 9 ("The light emitting element and the light receiving element are arranged in the longitudinal direction of the user's arm.").

53

In light of this disclosed rectangular shape of detecting element 2, it is certainly possible that Ohsaki's convex surface may be similarly shaped. But, it may not be. Contrary to Patent Owner's argument, Ohsaki neither describes nor requires detecting element 2 to have the same shape as the convex surface of board 8. *Accord* Pet. Reply. 14 (noting also that Ohsaki's board 8 "is not coextensive with the entire tissue-facing side of detecting element 2"). We have considered the testimony of both Dr. Kenny and Dr. Madisetti on this point. Ex. 1047 ¶¶ 10, 13, 19–26; Ex. 2004 ¶¶ 37–41 (relying on Ohsaki's Figures 1–2 to support the opinion that the convex surface is rectangular). Dr. Madisetti's reliance on the dimensions of Ohsaki's figures is unpersuasive. *Hockerson-Halberstadt*, 222 F.3d at 956. We credit Dr. Kenny's testimony that Ohsaki does not describe its convex surface as rectangular, because this testimony is most consistent with Ohsaki's disclosure.

Further, Patent Owner suggests that the convex surface *must be* rectangular, in order to avoid interacting with bones in the user's forearm. PO Resp. 21–23; PO Sur-reply 10 ("[A person of ordinary skill in the art] would have understood Ohsaki's convex board must ***also*** have a longitudinal shape oriented up-and-down the watch-side of the user's wrist/forearm."). Although Ohsaki recognizes that interaction with these bones can cause problems, (*see* Ex. 1009 ¶¶ 6, 19), we do not agree that the *only way* to avoid these bones is by aligning a rectangular cover with the longitudinal direction of the user's forearm. For example, in the annotated Figures provided by Patent Owner, *see* PO Resp. 24, we discern that the circular sensor that purports to depict the proposed modification would *also* avoid the bones in the forearm if it were slightly smaller. Patent Owner provides no persuasive

54

explanation to justify the dimensions it provides in this annotated figure, or to demonstrate that such a large sensor would have been required. Indeed, we discern that it would have been within the level of skill of an ordinary artisan to appropriately size a modified sensor to avoid these well-known anatomical obstacles. "A person of ordinary skill is also a person of ordinary creativity, not an automaton." *KSR*, 550 U.S. at 421. After all, an artisan must be presumed to know something about the art apart from what the references disclose. *See In re Jacoby*, 309 F.2d at 516.

Finally, we do not agree with Patent Owner's position that Ohsaki's advantages apply only to rectangular convex surfaces. As discussed, Patent Owner has not shown that Ohsaki's convex surface is rectangular at all. Moreover, even if Ohsaki's convex surface is rectangular, when discussing the benefits associated with a convex cover, Ohsaki does not limit those benefits to a cover of any particular shape. Instead, Ohsaki explains that "detecting element 2 is arranged on the user's wrist 4 so that the convex surface of the translucent board 8 is in intimate contact with the surface of the user's skin. Thereby it is prevented that the detecting element 2 slips off the detecting position of the user's wrist 4." Ex. 1009 ¶ 25; Ex. 1047 ¶¶ 12–13. Thus, we agree with Petitioner that Ohsaki's teaching of a convex surface would have motivated a person of ordinary skill in the art to add such a surface to Aizawa's circular-shaped sensor, to improve adhesion as taught by Ohsaki. Nothing in Ohsaki's disclosure limits such a benefit to a specific shape of the convex surface. Ex. 1047 ¶¶ 10, 12–14, 19–26.

Moreover, Ohsaki contrasts the ability to properly receive reflected light with a convex surface as compared to a flat surface and notes that,

> in the case that the translucent board 8 has a convex surface . . .
> the variation of the amount of the reflected light which is emitted
> from the light emitting element 6 and reaches the light receiving
> element 7 by being reflected by the surface of the user's skin is
> suppressed.  It is also prevented that noise such as disturbance
> light from the outside penetrates the translucent board 8.
> Therefore the pulse wave can be detected without being affected
> by the movement of the user's wrist 4 as shown in FIG. 4A.

Ex. 1009 ¶ 25; Ex. 1047 ¶ 13.  Again, we agree with Petitioner that Ohsaki's
teaching of a convex surface would have motivated a person of ordinary
skill in the art to add such a surface to Aizawa's sensor, to improve signal
strength, as taught by Ohsaki.  Again, nothing in Ohsaki's disclosure limits
such a benefit to the shape of the convex surface.  Ex. 1047 ¶¶ 13, 19–26.
Accordingly, we do not agree that Ohsaki's disclosed advantages attach only
to a rectangular convex surface, or would have been inapplicable to the
proposed combination of Aizawa and Ohsaki.[5]

   We have considered Patent Owner's second argument, that Ohsaki's
benefits are realized only when the sensor and convex surface are placed on
the back of the user's wrist, which is the opposite side of the wrist taught by
Aizawa.  PO Resp. 28–41.  We do not agree.  As an initial matter, Petitioner
does not propose bodily incorporating the references; Petitioner simply
proposes adding a convex cover to Aizawa's sensor, without discussing
where Aizawa's sensor is used.  *See, e.g.*, Pet. 31.  In other words,

---

[5] Patent Owner also argues that, to the extent contended by Petitioner, it
would not have been obvious to place a rectangular cover on top of
Aizawa's sensor.  PO Resp. 26–28.  We do not understand Petitioner to have
made any such contention and, accordingly, do not address this argument.
*See, e.g.*, Pet. 31–35.

Petitioner's proposed modification does not dictate any particular placement, whether on the palm side or back side of the wrist.

To be sure, Ohsaki's Figures 3A–3B compare the performance of detecting element 2, including its translucent board 8 having a convex protrusion, and show better performance when the element is attached to the back side of the wrist versus the front side of the wrist, when the user is in motion. *See* Ex. 1009 ¶¶ 23–24, Figs. 3A–3B. However, we do not agree that these figures support Dr. Madisetti's conclusion that "Ohsaki indicates a convex surface only prevents slipping on the back (i.e., watch) side of the wrist in a specific orientation, but tends to slip when used in different locations or orientations" such as the palm side of the wrist—particularly in comparison to a flat surface such as Aizawa's. Ex. 2004 ¶¶ 66, 75. Instead, Ohsaki acknowledges that, even when the detecting element is located "on the front [palm] side of the user's wrist 4, *the pulse wave can be detected well* if the user is at rest." Ex. 1009 ¶ 23 (emphasis added). Thus, Ohsaki discloses that, in at least some circumstances, a convex surface located on the front of the user's wrist achieves benefits. *Id.* Notably, the claims are not limited to detection during movement or exercise.

We credit, instead, Dr. Kenny's testimony that a person of ordinary skill in the art would have understood from Ohsaki that a convex protrusion will help prevent slippage, even in the context of Aizawa's sensor. *See* Ex. 1047 ¶¶ 11, 14, 16, 27–33. This is because the convex protrusion is in "intimate contact with the surface of the user's skin," *id.* ¶ 12, which "would have provided improved adhesion as described by Ohsaki in a sensor placed, e.g., on the palm side of the wrist, or other locations on the body." *Id.* ¶¶ 16, 28.

IPR2020-01715
Patent 10,631,765 B1

Dr. Madisetti testifies that "[b]ased on Aizawa's teaching that a flat acrylic plate improves adhesion on the palm side of the wrist, and Ohsaki's teaching that a convex surface tends to slip on the palm side of the wrist, a [person of ordinary skill in the art] would have come to the opposite conclusion from Dr. Kenny: that modifying Aizawa's flat adhesive plate 'to include a lens/protrusion . . . similar to Ohsaki's translucent board' would not 'improve adhesion.'" Ex. 2004 ¶¶ 84, 82.  We disagree with this reading of Aizawa.  It is true that Aizawa's plate 6 is illustrated as having a flat surface (Ex. 1006, Fig. 1(b)), and that Aizawa states the plate "improve[s] adhesion" (*id.* ¶ 13).  Aizawa further states: "the above belt 7 is fastened such that the acrylic transparent plate 6 becomes close to the artery 11 of the wrist 10," and "[t]hereby, adhesion between the wrist 10 and the pulse rate detector 1 is improved." *Id.* ¶ 26.  These disclosures, however, indicate the improved adhesion is provided by the acrylic material of plate 6, not the shape of the surface of the plate, which is never specifically addressed. *Id.* ¶¶ 30, 34 ("Since the acrylic transparent plate 6 is provided . . . adhesion between the pulse rate detector 1 and the wrist 10 can be improved . . . .").  Aizawa does not associate this benefit of improved adhesion with the surface shape of the plate, but rather, with the existence of an acrylic plate to begin with.  Thus, there is no teaching away from using a convex surface to improve the adhesion of Aizawa's detector to the user's wrist.

We have considered Patent Owner's third argument that a convex cover would condense light away from Aizawa's peripheral detectors, which Patent Owner alleges would decrease signal strength.  PO Resp. 41–48.  We disagree.

IPR2020-01715
Patent 10,631,765 B1

There appears to be no dispute that when emitted light passes through user tissue, the light diffuses and scatters as it travels. *See, e.g.*, Pet. Reply 26 ("[R]eflectance-type sensors detect light that has been 'partially reflected, transmitted, absorbed, and scattered by the skin and other tissues and the blood before it reaches the detector.' Thus, a [person of ordinary skill in the art] would have understood that light reaches the active detection area from various random directions and angles.") (quoting Ex. 1019, 86); PO Sur-reply 16 ("Even Petitioner admits, however, that tissue randomly scatters and absorbs light rays."), Tr. 33:13–34:7 (Patent Owner's counsel stating that "when [light] goes into the tissue you get the diffusion and that is random scattering, correct").

The light thus travels at random angles and directions, and no longer travels in a collimated and perpendicular manner. Exhibit 1050,[6] Figure 4.12, illustrates the difference between diffuse and collimated light, and is reproduced below:



---

[6] Eugene Hecht, *Optics* (2nd ed. 1990).

59

IPR2020-01715
Patent 10,631,765 B1

This figure provides at left a photograph and an illustration showing incoming collimated light reflecting from a smooth surface, and at right a photograph and an illustration of incoming collimated light reflecting from a rough surface. *See* Ex. 1050, 87–88 (original page numbers). The smooth surface provides specular reflection, in which the reflected light rays are collimated like the incoming light rays. *See id.* The rough surface provides diffuse reflection, in which the reflected light rays travel in random directions. *See id.*; *see also* Ex. 1047 ¶¶ 42–43 (discussing Ex. 1050, Figure 4.12), 50 ("A [person of ordinary skill in the art] would have understood that light that backscatters from the measurement site (after diffusing through tissue) reaches the active detection area from many random directions and angles.").

Dr. Kenny testifies that Aizawa's sensor "detect[s] light that has been 'partially reflected, transmitted, absorbed, and scattered by the skin and other tissues and the blood before it reaches the detector.'" Ex. 1047 ¶ 50 (quoting Ex. 1019, 86). Dr. Kenny further opines that a convex cover, when added to Aizawa's sensor with multiple detectors symmetrically arranged about a central light source, "allows light rays that otherwise would have missed the detection area to instead be directed toward that area as they pass through the interface provided by the cover," thus increasing the light-gathering ability of Aizawa's sensor. *Id.* ¶¶ 56, 62.

By contrast Dr. Madisetti testifies that "a convex 'lens/protrusion' would direct light away from the detectors and thus result in decreased light collection and optical signal strength at the peripheral detectors" because it condenses light towards the center of the sensor and away from the peripheral detectors. Ex. 2004 ¶¶ 85–86, 89. We have considered this

60

testimony, however, Dr. Madisetti's opinions largely are premised upon the behavior of collimated and perpendicular light as depicted in Figure 14B of the challenged patent. *See id.* ¶ 88. Dr. Madisetti does not explain how light would behave when approaching the sensor from various angles, as it would after being reflected by tissue. *Id.* ¶¶ 86–89; *see also id.* ¶¶ 90–97 (addressing motivation and also failing to discuss diffuse, scattered light). In other words, even if Patent Owner is correct that the '765 patent's Figure 14B depicts light condensing toward the center, this is not dispositive to the proposed modification, because light reflected by a user's tissue is scattered and random, and is not collimated and perpendicular as shown in Figure 14B. Ex. 1001, Fig. 14B.

Patent Owner and Dr. Madisetti argue that "Petitioner and Dr. Kenny both [previously admitted] that a convex cover condenses light towards the center of the sensor and away from the periphery," in a different petition filed against a related patent, i.e., in IPR2020-01520. PO Resp. 42–44; Ex. 2004 ¶ 86. The cited portions of the Petition and Dr. Kenny's declaration from IPR2020-01520 discuss a decrease in the "mean path length" of a ray of light when it travels through a convex lens rather than through a flat surface. *See, e.g.*, Ex. 2020 ¶¶ 118–120. We do not agree that this discussion is inconsistent with Dr. Kenny's testimony here that, where light is reflected to the detectors at various random angles and directions, more light will reach Aizawa's symmetrically disposed detectors when travelling through the convex surface than would be reached without such a surface, because light that might have otherwise missed the detectors now will be captured. *See, e.g.*, Ex. 1047 ¶¶ 34, 37, 56; *see generally id.* ¶¶ 34–67. We do not discern that the convergence of a single ray of light toward

IPR2020-01715
Patent 10,631,765 B1

the center, as discussed in IPR2020-01520, speaks to the aggregate effect on *all* light that travels through the convex surface.

We additionally do not agree with Patent Owner's argument that Petitioner's Reply presents new theories that should have been first presented in the Petition, to afford Patent Owner an adequate opportunity to respond. The Petition proposed a specific modification of Aizawa to include a convex protrusion in the cover, for the purpose of, *inter alia*, increasing the light gathering ability of Aizawa's device. *See* Pet. 31–35. Patent Owner's Response then challenged that contention, with several arguments that Petitioner's proposed convex protrusion would not operate in the way the Petition alleges it would operate. *See* PO Resp. 41–48. This opened the door for Petitioner to provide, in the Reply, arguments and evidence attempting to rebut the contentions in the Patent Owner Response. *See* PTAB Consolidated Trial Practice Guide (Nov. 2019) ("Consolidated Guide"),[7] 73 ("A party also may submit rebuttal evidence in support of its reply."). This is what Petitioner did here. The Reply does not change Petitioner's theory for obviousness; rather, the Reply presents more argument and evidence in support of the same theory for obviousness presented in the Petition. *Compare* Pet. 31–35, *with* Reply 21–32.

Rationale 3

Petitioner further contends that a person of ordinary skill in the art would have recognized that a cover with a protruding convex surface, such as that taught by Ohsaki, would "protect the elements within the sensor housing" of Aizawa. Pet. 33. We are persuaded that adding a convex cover,

---

[7]  Available at https://www.uspto.gov/TrialPracticeGuideConsolidated.

IPR2020-01715
Patent 10,631,765 B1

such as that taught by Ohsaki, would also protect the sensor's internal components in a manner similar to Aizawa's flat acrylic plate. Ex. 1003 ¶ 101; *see also* Ex. 1008 ¶ 15 (noting that a cover "protect[s] the LED or PD").

We disagree with Patent Owner's fourth argument that a person of ordinary skill in the art would not have modified Aizawa as proposed because a convex cover would be prone to scratches and because other alternatives existed. Patent Owner does not explain how the potential presence of scratches on a convex cover would preclude that cover's ability to, nonetheless, protect the internal sensor components in Aizawa, as Petitioner proposes. That a convex cover may be more prone to scratches than Aizawa's flat cover is one of numerous tradeoffs that a person of ordinary skill in the art would consider in determining whether the benefits of increased adhesion, signal strength, and protection outweigh the potential for a scratched cover. *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1165 (Fed. Cir. 2006). Moreover, as Petitioner notes, and Patent Owner does not dispute, a scratch resistant material could be employed in fabricating the cover. Pet. Reply 33; PO Sur-reply 23. The record does not support the premise that the possibility of scratches alone would have dissuaded a person of ordinary skill in the art from the proposed modification, to achieve the benefits identified by Petitioner.

For the foregoing reasons, we are persuaded by Petitioner's contentions.

**Appx50085**

IPR2020-01715
Patent 10,631,765 B1

*vii. "[f] a handheld computing device in wireless communication with the physiological sensor device, wherein the handheld computing device comprises"*

<u>Petitioner's Contentions</u>

Petitioner contends that the combination of, *inter alia*, Aizawa and Inokawa teaches a sensor device that is in wireless communication with a base device through its LEDs, wherein that base device is connected further to a PC.  Pet. 24, 54; *see, e.g.*, Ex. 1006 ¶ 15 ("a transmitter for transmitting the measured pulse rate data to a display for displaying the pulse rate data"); Ex. 1008 ¶¶ 75 (sensed physiological information is transmitted from the sensor to the base device and, further, "[t]he base device 17 . . . transmits this information to the PC 59"), 76, 77.

Petitioner also contends that Mendelson-2006 discloses a body-worn pulse oximetry system including a sensor module, a receiver module, and a PDA.  Pet. 26; *see, e.g.*, Ex. 1010, 1–2 (describing system), Fig. 1 (sensor attached to skin), Fig. 3 (PDA).  Petitioner contends that signals are wirelessly transmitted to the PDA through a receiver module.  Pet. 26–28; Ex. 1010, 2.  Petitioner contends that wireless transmission to a PDA, as discussed in Mendelson-2006, provides advantages such as offering "a low-cost touch screen interface," and "more effective medical care."  Pet. 27–28; Ex. 1010, 3–4.

Petitioner contends that a person of ordinary skill in the art "would have also found it obvious to implement the physiological sensor device resulting from the combined teachings of Aizawa, Inokawa, and Ohsaki as part of a physiological measurement system including a handheld computing device, and to enable the physiological sensor device to communicate

64

IPR2020-01715
Patent 10,631,765 B1

wirelessly with the handheld computing device," to obtain the advantages taught by Mendelson-2006. Pet. 25, 25–30, 41 n.5; Ex. 1003 ¶¶ 88–97, 125–128.

Patent Owner's Arguments

Patent Owner disputes Petitioner's contentions. Patent Owner argues that Petitioner's proposed combination is rooted in hindsight and results in a more complicated system. PO Resp. 58, 59. Specifically, Patent Owner characterizes Petitioner's combination as

> (1) eliminat[ing] Aizawa's existing transmitter so the resulting device will not require "a separate RF circuit"; (2) chang[ing] Aizawa's structure to add a second LED to transmit data using a base station, which would also require that a user remove the sensor before any data transfer can occur and thus eliminate the ability to display data in real-time; and then (3) add[ing] back in a separate communications circuit to the base station based on Mendelson 2006 so that the base station can send data to a PDA with a touch screen display.

*Id.* at 58–60 (citing, e.g., Ex. 2004 ¶ 114). Patent Owner further argues that such a modification eliminates the desired real-time monitoring employed by Mendelson-2006. *Id.* 58–59 (citing Ex. 2004 ¶¶ 113, 115).[8]

Analysis

As discussed above in Section II.D.5.iii, we determine that Petitioner demonstrated sufficiently that a person of ordinary skill in the art would have found it obvious to modify Aizawa to include an additional LED to, *inter alia*, allow for wireless transmission of sensed pulse rate and motion

---

[8] We do not address Patent Owner's argument that Mendelson-2006 does not disclose a "multi-emitter/multi-detector sensor" because Mendelson-2006 is not relied upon for such limitations. *See supra* § II.D.iii, iv.

65

IPR2020-01715
Patent 10,631,765 B1

data to a base device.  We further noted that although Aizawa discloses transmission of data for display (Ex. 1006 ¶¶ 15, 35), Aizawa is silent as to how the data is transmitted or displayed.  In light of the combination with Inokawa, therefore, Aizawa's multiple LEDs would have allowed wireless transmission of data to a base device.  *See, e.g.*, Ex. 1008 ¶ 76 ("[V]ital sign information stored in the memory 63, such as pulse and body motion, is transmitted to the base device 17 using the S-side infrared LED 23 of the pulse sensor 1 and the B-side PD 45 of the base device 17.").

Inokawa further discloses that the base device, once it receives information from the sensor, "transmits this information to the PC 59." *Id.* ¶¶ 75, 67, 77.  As described by Dr. Kenny, "the physiological sensor device's sensor component transmits physiological measurement data to an included base station via an optical communications interface, and the physiological sensor device's base station transmits signals responsive to a physiological parameter to a computer, via a network interface."  Ex. 1003 ¶ 81.

With this backdrop, we are persuaded by Petitioner's contention that it would have been obvious to implement the physiological sensor device resulting from the combined teachings of Aizawa, Inokawa, and Ohsaki as part of a physiological measurement system that includes a handheld computing device.  Indeed, Aizawa and Inokawa already teach the desirability of transmitting sensed data to, e.g., a computer or a display, although neither discloses further detail.  *See, e.g.*, Ex. 1006, 15; Ex. 1008 ¶ 75; *see also* Ex. 1047 ¶ 56 (Aizawa is silent).  In light of these teachings, we credit Dr. Kenny's testimony that transmitting sensed data wirelessly to a handheld computing device, as taught by Mendelson-2006, would have

achieved the identified benefits of, e.g., providing a low-cost display with a simple user interface and easy activation of functions and the ability to provide more effective medical care (Ex. 1003 ¶¶ 93–95). *See, e.g.*, *id.* ¶¶ 88–97, 125–128; Ex. 1047 ¶ 79. We are also persuaded that this would have been within the skill level of an ordinary artisan and would have achieved predictable results. Ex. 1003 ¶ 96.

We do not agree with Patent Owner's characterization of the proposed combination. Petitioner does not propose "(1) eliminat[ing] Aizawa's existing transmitter . . . (2) chang[ing] Aizawa's structure to add a second LED to transmit data using a base station . . .; and then (3) add[ing] back in a separate communications circuit to the base station." *Contra* PO Resp. 58–59; Ex. 1047 ¶ 77. As discussed above, Petitioner proposes that the system suggested by, *inter alia*, Aizawa and Inokawa—which includes a sensor in communication with a base device, and which contemplates additional communication from the base device to a PC—further includes a handheld computing device in wireless communication with that system. In other words, Petitioner's proposed combination effectively replaces or supplements Inokawa's PC 59 with a PDA, such as that taught by Mendelson-2006. Thus, in Petitioner's proposed combination, physiological data is sensed by Aizawa's sensor, transmitted to a base device through an additional LED, as taught by Inokawa, and further transmitted to, *inter alia*, a PDA, as taught by Mendelson-2006. *See, e.g.*, Pet. 24–30; *see also id.* at 41 n.5 (describing the proposed combination as, *inter alia*, adding "Inokawa's base station to Aizawa's physiological sensor device such that the sensor device includes a sensor and a base station with which the sensor communicates and through which the sensor communicates with a handheld

device"). Indeed, both Aizawa and Inokawa expressly contemplate transmission to an additional computing device (*see, e.g.*, Ex. 1006, 15; Ex. 1008 ¶ 75); Petitioner's proposed modification merely states that such transmission occurs wirelessly to a handheld device. The record supports this contention.

We have considered Dr. Madisetti's testimony, but it is based on the same mischaracterization put forth by Patent Owner. Ex. 2004 ¶¶ 112 (mischaracterizing the combination), 114 (same). Notwithstanding this misrepresentation of the proposed modification, Dr. Madisetti does not dispute Dr. Kenny's testimony that wireless transmission to a handheld computing device would have achieved the identified benefits, such as a low-cost device that improves medical care. *See id.* ¶¶ 112–118. As such, we credit Dr. Kenny's unrebutted testimony.

Patent Owner and Dr. Madisetti further criticize the combination, asserting that Mendelson-2006's wireless transmission exists to allow real-time monitoring, which is impossible where a sensor must be mounted on a base device to transfer information through LEDs. *Id.* ¶ 113; PO Resp. 59. However, as discussed in Section II.D.iii above, the lack of real-time measurement and transmission is simply one consideration among many. As noted in Inokawa, real-time wireless communication has its drawbacks. Ex. 1008 ¶ 5. We discern that a skilled artisan would have weighed these competing interests. "[A] given course of action often has simultaneous advantages and disadvantages, and this does not necessarily obviate motivation to combine." *Medichem*, 437 F.3d at 1165 (citation omitted).

IPR2020-01715
Patent 10,631,765 B1

viii.    *"[g] one or more processors configured to wirelessly receive one or more signals from the physiological sensor device, the one or more signals responsive to at least a physiological parameter of the user"*

The cited evidence supports Petitioner's contention that Mendelson-2006 describes wirelessly transmitting vital physiological information acquired from a sensor to a PDA, which receives it.  Pet. 57–58; *see, e.g.*, Ex. 1010, 1, 2 ("The PDA can monitor multiple wearable pulse oximeters simultaneously and allows medics to collect vital physiological information to enhance their ability to extend more effective care to those with the most urgent needs."), 3 (explaining that the PDA "has sufficient computational resources for the intended application" and "can also serve to temporarily store vital medical information received from the wearable unit"), 3 ("The [PDA's graphical user interface] also displays the subject's vital signs, activity level, body orientation, and a scrollable PPG waveform that is transmitted by the wearable device."), Fig. 3 (displaying $SpO_2$ and HR data); Ex. 1003 ¶¶ 129–132.

As discussed above, Petitioner's proposed combination involves transmission of sensed data from Aizawa's physiological sensor to a base device, as taught by Inokawa, and further wireless transmission of that data from the base station to a handheld computing device, such as a PDA.  *See supra* §§ II.D.5.iii (transmission to base station accomplished with an additional LED, as taught by Inokawa), II.D.5.vii (further transmission from base device to, e.g., a PC and/or PDA, as taught by Mendelson-2006, and contemplated by Aizawa and Inokawa).  In light of these teachings, we are persuaded by Petitioner's contention that a person of ordinary skill in the art "would have found it obvious to configure a processor of the PDA to wirelessly receive signals from the physiological sensor device" taught by

69

the combination of, *inter alia*, Aizawa, Inokawa, and Mendelson-2006, wherein "the signals [are] responsive to physiological parameters of the user." Pet. 57–58; *see, e.g.*, Ex. 1003 ¶ 132.

Petitioner's stated reasoning for the proposed modification is sufficiently supported, including by the unrebutted testimony of Dr. Kenny. Ex. 1003 ¶¶ 129–132. Patent Owner does not present any argument against this limitation, apart from the arguments already addressed in Section II.D.5.vii.

### ix. "[h]–[j] a touch-screen display configured to provide a user interface, wherein: the user interface is configured to display indicia responsive to measurements of the physiological parameter, and an orientation of the user interface is configurable responsive to a user input"

The cited evidence supports Petitioner's contention that Mendelson-2006 describes a PDA with a touchscreen display configured to display indicia responsive to measurements of, e.g., $SpO_2$ and HR. Pet. 58–61; *see, e.g.*, Ex. 1010, 3 ("The use of a PDA . . . also provides a low-cost touch screen interface.").

Petitioner acknowledges that "Mendelson-2006 does not explicitly state that an orientation of the GUI provided by the PDA is configurable responsive to a user input." Pet. 60. However, Petitioner contends that a person of ordinary skill in the art would have understood that "the LabVIEW software that was used 'to control all interactions between the PDA and the wearable unit via [t]he graphical user interface' included the option to configure an orientation of a user interface," e.g., by setting the report orientation to portrait or landscape view. *Id.* at 60–61 (alteration in

original); *see, e.g.*, Ex. 1003 ¶¶ 133–138; Ex. 1027, 186 ("Set the report orientation—portrait or landscape.").

Petitioner further contends that, in light of these teachings, a person of ordinary skill in the art "would have found it obvious to make an orientation of the PDA's user interface configurable responsive to a user input, for the sake of user convenience." Pet. 61; *see, e.g.*, Ex. 1003 ¶ 138.

Petitioner's stated reasoning for the proposed modification is sufficiently supported, including by the unrebutted testimony of Dr. Kenny. *See, e.g.*, Ex. 1003 ¶¶ 133–138. Patent Owner does not present any argument against this limitation, apart from the arguments already addressed in Section II.D.5.vii.

x.  *"[k] a storage device configured to at least temporarily store at least the measurements of the physiological parameter"*

The cited evidence supports Petitioner's contention that Mendelson-2006 teaches that the PDA is configured to store vital medical information received from the wearable pulse oximeter, and that an ordinarily skilled artisan "would have understood that the vital medical information would have included measurements of the physiological parameters obtained by the physiological sensor device (e.g., $SpO_2$ and HR)." Pet. 62; Ex. 1010, 3 ("The PDA can also serve to temporarily store vital medical information received from the wearable unit."); Ex. 1003 ¶ 140. Thus, Petitioner contends that a person of ordinary skill in the art "would have configured a storage device of the PDA to at least temporarily store measurements of physiological parameters (e.g., $SpO_2$ and HR)." Pet. 62; *see, e.g.*, Ex. 1003 ¶ 139.

Petitioner's stated reasoning for the proposed modification is sufficiently supported, including by the unrebutted testimony of Dr. Kenny. *See, e.g.*, Ex. 1003 ¶¶ 139–140. Patent Owner does not present any argument against this limitation, apart from the arguments already addressed in Section II.D.5.vii.

### xi. Reasonable Expectation of Success

Patent Owner argues that Petitioner has failed to demonstrate a reasonable expectation of success because Dr. Kenny did not perform a design analysis to create a functional sensor. PO Resp. 61–62. We disagree. As discussed in detail above, each of Petitioner's proposed modifications to Aizawa—whether to include a second emitter, as taught by Inokawa; or to include a cover with a convex surface, as taught by Ohsaki; or to communicate with a handheld computing device, as taught by Mendelson-2006—is rooted in explicit teachings of the prior art, and is supported by persuasive declarant testimony.

We credit Dr. Kenny's testimony that, for each proposed modification, the combined prior art teachings would have been applied as known, to achieve predictable results. *See, e.g.*, Ex. 1003 ¶¶ 86 (applying Inokawa's teachings would have been "nothing more than the use of a known technique to improve similar devices in the same way and combining prior art elements according to known methods to yield predictable results," e.g., improving Aizawa's sensor "to detect and record body motion in addition to blood flow"), 102 (applying Ohsaki's teachings would have been "nothing more than the use of a known technique to improve similar devices in the same way," which would "improve adhesion to a subject's skin and

72

reduce variation in the signals detected by the sensor"), 96 ("[A]pplying Mendelson-2006's . . . would have led to predictable results without altering or hindering the functions performed by the sensor."). For similar reasons discussed above with respect to each proposed modification, we conclude that that a skilled artisan would have had a reasonable expectation of success. *See supra* § II.D.5.iii, vi, vii–x; Ex. 1003 ¶¶ 79–140.

### xii. Summary

For the foregoing reasons, we determine that Petitioner has met its burden of demonstrating by a preponderance of the evidence that claim 1 would have been obvious over the cited combination of references.

### 6. Independent Claim 21

Independent claim 21 consists of limitations that are substantially similar to elements [a]–[f] of claim 1. *Compare* Ex. 1001, 44:51–45:15, *with id.* at 46:31–49 (reciting that the convex surface is "located between tissue of the user and all of the at least four detectors," instead of "above all of the at least four detectors" as in claim 1; omitting details of the "handheld computing device"). In asserting that claim 21 also would have been obvious over the combined teachings of Aizawa, Inokawa, Ohsaki, and Mendelson-2006, Petitioner refers to the same arguments presented as to claim 1. *See* Pet. 87–89; Ex. 1003 ¶¶ 173–179. Patent Owner relies on the same arguments discussed above regarding claim 1. PO Resp. 11–61.

For the same reasons discussed above, we determine that Petitioner has met its burden of demonstrating by a preponderance of the evidence that claim 21 would have been obvious over the cited combination of references. *See supra* § II.D.5.

### 7. *Dependent Claims 12, 18, and 29*

Dependent claim 12 ultimately depends from independent claim 1 and further recites "the protruding convex surface protrudes a height between 1 millimeter and 3 millimeters." Ex. 1001, 45:65–67.

Dependent claim 18 ultimately depends from independent claim 1 and further recites "the protruding convex surface protrudes a height greater than 2 millimeters and less than 3 millimeters." *Id.* at 46:23–23. Dependent claim 29 ultimately depends from independent claim 21 and includes the same further limitation as claim 18. *Id.* at 48:14–16.

Petitioner contends that the sensor rendered obvious by the combined teachings of Aizawa, Inokawa, Ohsaki, and Mendelson-2006 would have included a cover with a protruding convex surface. *See supra* § II.D.5.vi. With respect to claim 12, Petitioner contends that a person of ordinary skill in the art "would have found it obvious that a device designed to fit on a user's wrist would be on the order of millimeters," consistent with Ohsaki's disclosure that the device is in "intimate contact" with the user's skin. Pet. 78–79 (citing, e.g., Ex. 1003 ¶¶ 159–160). Petitioner also contends that an ordinarily skilled artisan would have taken user comfort into account when establishing the dimensions of the device's convex cover. *Id.* With these considerations in mind, Petitioner contends that, "in order to provide a comfortable cover featuring a protruding convex surface that prevents slippage, the surface should protrude a height between 1 millimeter and 3 millimeters," because "there would have been a finite range of possible protruding heights, and it would have been obvious to select a protruding height that would have been comfortable to the user." *Id.* (citing, e.g., Ex. 1003 ¶ 161). With respect to claims 18 and 29, Petitioner incorporates

its contentions regarding, *inter alia*, claim 12.  Pet. 87, 93; Ex. 1003 ¶¶ 169, 191.

Patent Owner argues that none of the cited references disclose the claimed height range and that Petitioner relies on hindsight reconstruction. PO Resp. 63–64 (citing, e.g., Ex. 2004 ¶¶ 121–124).  Patent Owner also characterizes Dr. Kenny's testimony as conclusory and unsupported.  *Id.* at 65–66.

Petitioner is correct that, "[w]hen there are a finite number of identified, predictable solutions, a person of ordinary skill in the art has good reason to pursue the known options within his or her technical grasp.  If this leads to the anticipated success, it is likely the product . . . of ordinary skill and common sense."  *KSR*, 550 U.S. at 398.  Petitioner has shown sufficiently that only a finite number of solutions existed with respect to the height of a convex protrusion on a tissue-facing sensor, which would have met the art-recognized goals of both (1) intimate contact between the sensor's surface and the user and (2) user comfort.  *See, e.g.*, Ex. 1009 ¶¶ 6, 25.  Bearing in mind these considerations, we credit Dr. Kenny's testimony that it would have been obvious, "in order to provide a comfortable cover featuring a protruding convex surface that prevents slippage, [that] the surface should protrude a height between 1 millimeter and 3 millimeters," as recited in claim 12, and which further includes the claimed range of 2 to 3 millimeters as recited in claims 18 and 29.  Ex. 1003 ¶ 161.  Further, the record does not support that any new and unexpected results were achieved at the claimed height greater than 2 millimeters and less than 3 millimeters.

We have considered Patent Owner's argument, and Dr. Madisetti's cited testimony.  However, it is not dispositive that none of Mendelson-799,

Ohsaki, Schulz, or Mendelson-2006 teach the claimed range. PO Resp. 63; Ex. 2004 ¶¶ 122. Petitioner relies upon the knowledge, ability, and creativity of a person of ordinary skill in the art, not the teachings of a specific reference. Notably, Dr. Madisetti does not dispute Dr. Kenny's position that there were a finite number of options available for the height of the convex surface. Ex. 2004 ¶¶ 121–124. Therefore, we do not agree that Petitioner's contentions are rooted in impermissible hindsight. *See, e.g.*, *In re McLaughlin*, 443 F.2d 1392, 1395 (CCPA 1971) ("Any judgment on obviousness is in a sense necessarily a reconstruction based upon hindsight reasoning, but so long as it takes into account only knowledge which was within the level of ordinary skill at the time the claimed invention was made and does not include knowledge gleaned only from applicant's disclosure, such a reconstruction is proper.").

Accordingly, for the foregoing reasons, we determine that Petitioner has met its burden of demonstrating by a preponderance of the evidence that claims 12, 18, and 29 would have been obvious over the cited combination of references.

### 8. *Dependent Claims 2–8, 10, 11, 13, 15–17, and 19–28*

Petitioner also contends that claims 2–8, 10, 11, 13, 15–17, and 19–28 would have been obvious based on the same combination of prior art addressed above. These challenged claims all depend directly or indirectly from independent claim 1 or 21. Petitioner identifies teachings in the prior art references that teach or suggest the limitations of these claims, and provides persuasive reasoning as to why the claimed subject matter would have been obvious to one of ordinary skill in the art. Pet. 62–87, 89–93.

Petitioner also supports its contentions for these claims with the testimony of Dr. Kenny. Ex. 1003 ¶¶ 141–172, 180–191.

Patent Owner does not present any arguments for these claims other than those we have already considered with respect to independent claims 1 and 21. PO Resp. 62 ("[T]he Petition fails to establish that independent claims 1 and 21 are obvious in view of the cited references of Ground 1 and therefore fails to establish obviousness of any of the challenged dependent claims."); *see supra* § II.D.5.

We have considered the evidence and arguments of record and determine that Petitioner has demonstrated by a preponderance of the evidence that claims 2–8, 10, 11, 13, 15–17, and 19–28 would have been obvious over the combined teachings of Aizawa, Inokawa, Ohsaki, and Mendelson-2006, for the reasons discussed in the Petition and as supported by the testimony of Dr. Kenny

### 9. Summary

For the foregoing reasons, we determine that Petitioner has met its burden of demonstrating by a preponderance of the evidence that claims 1–8, 10–13, and 15–29 would have been obvious over the cited combination of references.

### E. Obviousness over the Combined Teachings of Aizawa, Inokawa, Ohsaki, Mendelson-2006, and Bergey

Petitioner contends that claim 9 would have been obvious over the combined teachings of Aizawa, Inokawa, Ohsaki, Mendelson-2006, and Bergey. Pet. 93–96.

### 1. Overview of Bergey (Ex. 1016)

Bergey is a U.S. patent titled "Solid State Watch with Magnetic Setting," and discloses a watch in which the electronics are "hermetically sealed in the watch case to be free of dust and moisture." Ex. 1016, code (57). Moreover, the electronic components are "resiliently mounted for improved shock resistance." *Id.*

Petitioner contends that it would have been obvious to have modified the sensor of Aizawa-Inokawa-Ohsaki-Mendelson-2006 to hermetically seal the sensor components within the substrate, wall, and cover, so as to obtain advantages disclosed by Bergey, e.g., to protect the electronics and prevent condensation within the case. Pet. 88–89 (citing Ex. 1003 ¶¶ 278–281; Ex. 1016, code (57), 2:56–67, 8:48–9:34).

### 2. Analysis

Petitioner also contends that claim 9 would have been obvious over the combined teachings of Aizawa, Inokawa, Ohsaki, Mendelson-2006, and Bergey. Pet. 93–96. Claim 9 depends indirectly from independent claim 1. Petitioner identifies teachings in the prior art references that teach or suggest the limitations of this claim, and provides persuasive reasoning as to why the claimed subject matter would have been obvious to one of ordinary skill in the art. *Id.* Petitioner also supports its contentions for this claim with the testimony of Dr. Kenny. Ex. 1003 ¶¶ 76–76, 192–196.

Patent Owner does not present any argument for this claim other than those we have already considered with respect to independent claim 1. PO Resp. 66 ("Bergey's alleged disclosure of a hermetically sealed watch does not fix the deficiencies identified for Ground 1."); *see supra* § II.D.

IPR2020-01715
Patent 10,631,765 B1

We have considered the evidence and arguments of record, including those directed to claim 1 and addressed above, and we determine that Petitioner has demonstrated by a preponderance of the evidence that claim 9 would have been obvious over the combined teachings of Aizawa, Inokawa, Ohsaki, Mendelson-2006, and Bergey for the reasons discussed in the Petition and as supported by the testimony of Dr. Kenny. *See, e.g.*, Ex. 1016, 8:48–9:34; Ex. 1003 ¶¶ 192–196.

### *F. Obviousness over the Combined Teachings of Aizawa, Inokawa, Ohsaki, Mendelson-2006, and Goldsmith*

Petitioner contends that claim 14 would have been obvious over the combined teachings of Aizawa, Inokawa, Ohsaki, Mendelson-2006, and Goldsmith. Pet. 96–100.

### *1. Overview of Goldsmith (Ex. 1011)*

Goldsmith is a U.S. patent application publication titled "Watch Controller for a Medical Device," and discloses a watch controller device that communicates with an infusion device to "provid[e] convenient monitoring and control of the infusion pump device." Ex. 1011, codes (54), (57).

Goldsmith's Figures 9A and 9B are reproduced below.

IPR2020-01715
Patent 10,631,765 B1



FIG.9A

FIG 9B

Figure 9A and Figure 9B are respective front and rear views of a combined watch and controller device. *Id.* ¶¶ 30–31. As shown in Figure 9A, watch controller 900 includes housing 905, transparent member 950, display 910, input devices 925a–c, scroll wheel 930, and wrist band 940. *Id.* ¶¶ 85–86. Figure 9B shows rear-side cover 960, and a rear view of housing 905, scroll wheel 930, and wrist band 940. *Id.*

Goldsmith discloses the watch controller may interact with one or more devices, such as infusion pumps or analyte monitors. *Id.* ¶ 85; *see also id.* ¶ 88 ("The analyte sensing device 1060 may be adapted to receive data from a sensor, such as a transcutaneous sensor."). Display 910 "may display at least a portion of whatever information and/or graph is being displayed on the infusion device display or on the analyte monitor display," such as, e.g., levels of glucose. *Id.* ¶ 86. The display is customizable in a variety of configurations including user-customizable backgrounds, languages, sounds, font (including font size), and wall papers. *Id.* ¶¶ 102, 104. Additionally, the watch controller may communicate with a remote station, e.g., a

80

computer, to allow data downloading. *Id.* ¶ 89 (including wireless). The remote station may also include a cellular telephone to be "used as a conduit for remote monitoring and programming." *Id.*

### 2. Analysis

Petitioner also contends that claim 14 would have been obvious over the combined teachings of Aizawa, Inokawa, Ohsaki, Mendelson-2006, and Goldsmith. Pet. 96–100. Claim 14 depends indirectly from independent claim 1. Petitioner identifies teachings in the prior art references that teach or suggest the limitations of this claim, and provides persuasive reasoning as to why the claimed subject matter would have been obvious to one of ordinary skill in the art. *Id.* Petitioner also supports its contentions for this claim with the testimony of Dr. Kenny. Ex. 1003 ¶¶ 77–78, 197–202.

Patent Owner does not present any argument for this claim other than those we have already considered with respect to independent claim 1. PO Resp. 66–67 ("Goldsmith's alleged disclosure of a watch controller device with a display does not fix the deficiencies identified for Ground 1."); *see supra* § II.D.

We have considered the evidence and arguments of record, including those directed to claim 1 and addressed above, and we determine that Petitioner has demonstrated by a preponderance of the evidence that claim 14 would have been obvious over the combined teachings of Aizawa, Inokawa, Ohsaki, Mendelson-2006, and Goldsmith for the reasons discussed in the Petition and as supported by the testimony of Dr. Kenny. *See, e.g.*, Ex. 1011 ¶¶ 11, 87, 95, 102; Ex. 1003 ¶¶ 197–202.

IPR2020-01715
Patent 10,631,765 B1

## III.    CONCLUSION

In summary:[9]

| Claims | 35 U.S.C. § | Reference(s)/ Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1–8, 10–13, 15–29 | 103 | Aizawa, Inokawa, Ohsaki, Mendelson-2006 | 1–8, 10–13, 15–29 | |
| 9 | 103 | Aizawa, Inokawa, Ohsaki, Mendelson-2006, Bergey | 9 | |
| 14 | 103 | Aizawa, Inokawa, Ohsaki, Mendelson-2006, Goldsmith | 14 | |
| **Overall Outcome** | | | 1–29 | |

---

[9] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding*. *See* 84 Fed. Reg. 16654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

82

IPR2020-01715
Patent 10,631,765 B1

## IV.    ORDER

Upon consideration of the record before us, it is:

ORDERED that claims 1–29 of the '765 patent have been shown to be unpatentable; and

FURTHER ORDERED that, because this is a final written decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

83

IPR2020-01715
Patent 10,631,765 B1

PETITIONER:

Walter Renner
Andrew Patrick
Usman Khan
Grace Kim
FISH & RICHARDSON P.C.
Axf-ptab@fr.com
patrick@fr.com
khan@fr.com
gkim@fr.com


PATENT OWNER:

Joseph Re
Stephen Larson
Jarom Kesler
Jack Peterson
Stephen Jensen
KNOBBE, MARTENS, OLSON, & BEAR, LLP
2jrr@knobbe.com
2swl@knobbe.com
2jzk@knobbe.com
2jup@knobbe.com
2scj@knobbe.com

84

## CERTIFICATE OF SERVICE

I hereby certify that the original of this Notice of Appeal was filed via U.S.P.S. Priority Mail Express on April 12, 2022 with the Director of the United States Patent and Trademark Office at the address below:

Office of the Solicitor
United States Patent and Trademark Office
Mail Stop 8, Post Office Box 1450
Alexandria, Virginia 22313-1450

A copy of this Notice of Appeal is being filed and served on April 12, 2022 as follows:

**To the USPTO Patent Trial and Appeal Board:**
Patent Trial and Appeal Board
Madison Building East
600 Dulany Street
Alexandria, VA 22313

(*via PTAB E2E – as authorized by the Board*)

**To the U.S. Court of Appeals for the Federal Circuit:**
Clerk of Court
U.S. Court of Appeals for the Federal Circuit
717 Madison Place, N.W.
Washington, DC 20439

(*via CM/ECF – with filing fee*)

**Counsel for Petitioner Apple, Inc.**
W. Karl Renner
Andrew B. Patrick
patrick@fr.com
Usman A. Khan
khan@fr.com
Grace J. Kim

gkim@fr.com
Daniel D. Smith
Roberto J. Devoto
Fish & Richardson P.C.
3200 RBC Plaza
60 South Sixth Street
Minneapolis, MN 55402
IPR50095-0024IP2@fr.com
PTABInbound@fr.com
Axf-ptab@fr.com


(*via email pursuant to 37 C.F.R. § 42.6(e)*)


Dated:  April 12, 2022               /Jarom Kesler/
_____
                                     Jarom D. Kesler (Reg. No. 57,046)

                                     Attorney for Patent Owner
                                     Masimo Corporation

55433730

# IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | |
|---|---|---|
| In re Patent of: | Jeroen Poeze, et al. | |
| U.S. Patent No.: | 10,631,765 | Attorney Docket No.:  50095-0024IP2 |
| Issue Date: | April 28, 2020 | |
| Appl. Serial No.: | 16/725,478 | |
| Filing Date: | December 23, 2019 | |
| Title: | MULTI-STREAM DATA COLLECTION SYSTEM FOR NONINVASIVE MEASUREMENT OF BLOOD CONSTITUENTS | |

## <u>DECLARATION OF DR. THOMAS W. KENNY</u>

**Declaration**

I declare that all statements made herein on my own knowledge are true and that all statements made on information and belief are believed to be true, and further, that these statements were made with the knowledge that willful false statements and the like so made are punishable under Section 1001 of Title 18 of the United States Code.

By: _____

Thomas W. Kenny, Ph.D.

1

APPLE 1003

protruding convex surface.  APPLE-1006, Abstract, ¶¶[0002], [0005], [0008]-[0016], [0023], [0027]-[0028], [0033]; APPLE-1009, Abstract, ¶¶[0015], [0017], [0025], FIGS. 1, 2, 4A, 4B.

159.   The convex cover taught by Ohsaki is designed to be "in intimate contact with the surface of the user's skin," so as to prevent slippage of the detecting element from its position on the user's wrist.  APPLE-1009, ¶¶[0009]-[0010], FIG. 2.



APPLE-1009, FIG. 2 (annotated).

160.   In incorporating Ohsaki's teachings, a POSITA would have found it obvious that a device designed to fit on a user's wrist would be on the order of millimeters. *See also* APPLE-1010, 2 (describing its "optical reflectance transducer" as "small

(∅ = 22mm)"); *see also* APPLE-1017, 2 (describing a "standard 24-pin

(dimensions: 19 x 19 mm) microeletronic package" for its sensor); APPLE-1041,

9:40-65 (describing a protrusion on a biological measurement device that causes a

subject's tissue to deform by a depth of about 2 to 20 mm).  Additionally, the

POSITA would have taken the user's comfort into consideration—Ohsaki's

convex cover, for example, is said to solve the problem of "the user feel[ing]

uncomfortable" due to pressure from the device and belt on the user's limbs.

APPLE-1009, ¶[0006].

161.   It is my conclusion that a POSITA would have found it obvious that in order

to provide a comfortable cover featuring a protruding convex surface that prevents

slippage, the surface should protrude a height between 1 millimeter and 3

millimeters.  Indeed, there would have been a finite range of possible protruding

heights, and it would have been obvious to select a protruding height that would

have been comfortable to the user.

**xii.   <u>Claim 13</u>**

 *[13] The physiological measurement system of claim 11, wherein at least one of the detectors is configured to detect light that has been attenuated by tissue of the user.*

162.   Aizawa-Inokawa-Ohsaki renders obvious [13].  As discussed in Sections

VI.A-D, VII.A, i.-xi., and [1pre]-[1j], *supra*, the Aizawa-Inokawa-Ohsaki-

Mendelson-2006 sensor would have included a plurality of light emitting diodes,

UNITED STATES PATENT AND TRADEMARK OFFICE

―――――――

BEFORE THE PATENT TRIAL AND APPEAL BOARD

―――――――

APPLE INC.

Petitioner,

v.

MASIMO CORPORATION,

Patent Owner.

―――――――

Case IPR2020-01715
U.S. Patent 10,631,765

―――――――

**DECLARATION OF VIJAY K. MADISETTI, PH.D.**

Masimo Ex. 2004
Apple v. Masimo
IPR2020-01715

configuration that prevents slipping and various other configurations that have a tendency to slip. Ex. 1009 ¶¶[0006], [0010], [0019], [0023], [0025]. Dr. Kenny equates Ohaski's disclosure of a convex surface that prevents slippage with "improving adhesion." Ex. 1003 ¶98 (citing Ex. 1009 ¶[0025]). But Dr. Kenny's proposed modification eliminates the longitudinal shape that Ohsaki identifies as an important part of reducing slipping. Ex. 1009 ¶[0019].

54.    Ohsaki places its linear, longitudinal sensor on the backhand side of a user's wrist to avoid interacting with bones in the wrist. *See* Ex. 1009 ¶[0006] (discussing need to avoid pressing on "two bones (the radius and the ulna)"), ¶[0024] ("the radius and the ulna inside the user's wrist 4 are not pressed"); *see also*, *e.g.*, ¶¶[0023]-[0024], Abstract, Title, Fig. 1 (Ohsaki device worn on back side of wrist). As illustrated below (left), the forearm bones (the radius and ulna) on the arm's backhand (or watch) side create a longitudinal opening at the junction between the wrist and forearm with no muscle insertions. Ex. 2010 at 49 (Plate 434). The radius and ulna, against which Ohsaki warns against pressing (Ex. 1009 ¶¶[0006], [0024]), are on either side of this longitudinal opening.



Anatomical drawing of the back side (posterior) of the hand, wrist, and forearm
(partial view from Ex. 2010 at 49 (Plate 434))
Left:  Conceptual view of how a rectangular sensor that is positioned in
longitudinal direction on the wrist/forearm can avoid the radius and ulna
Right:  Conceptual view of how the same rectangular sensor placed in the
circumferential direction on wrist/forearm interacts with the radius and ulna

55.     Ohsaki indicates that its sensor's longitudinal direction needs to be
aligned with the longitudinal direction of the longitudinal opening of the user's arm
to prevent slipping.  Ex. 1009 ¶[0019].  If the sensor's longitudinal direction is
aligned with the circumferential direction of the user's wrist, the undesirable result
is "a tendency [for Ohsaki's sensor] to slip off."  Ex. 1009 ¶[0019].  As illustrated
above (right), a rectangular structure like Ohsaki's sensor and board that is aligned
with the circumferential direction of the user's wrist undesirably interacts with the
radius and ulna, which Osaki warns against.  Ex. 1009 ¶¶[0006], [0024].  In
contrast, a rectangular structure aligned with the longitudinal direction of the user's
wrist can avoid pressing against the radius and ulna.

-33-

56.    Thus, a POSITA would have understood that changing the shape of Ohsaki's rectangular board to circular would not preserve its ability to prevent slipping.  Instead, if Ohsaki's rectangular board were changed into a circular shape, a POSITA would have believed it would have resulted in slipping, and thus eliminated the advantage of Ohsaki's board.  This is because a circular shape extends equally in all directions, including in the circumferential direction of the user's wrist, which Ohsaki explains results in slipping.  Ex. 1009 ¶[0019].  As a result, a circular shape cannot be placed in a longitudinal direction and thus cannot align with the longitudinal direction of the user's wrist, as taught by Ohsaki.  As illustrated below, unlike a longitudinal sensor, a symmetrical circular shape (with a diameter equal to the long side of the rectangle, below left) would not fit within the user's anatomy in a way that it could avoid undesirably pressing against the user's radius and ulna, which Ohsaki cautioned against.



Ohsaki's Longitudinal Teachings          Dr. Kenny's Proposed Combination

Anatomical drawing of the back side (posterior) of the hand, wrist, and forearm
(partial view from Ex. 2010 at 49 (Plate 434))
Left:  Conceptual view of how a rectangular sensor that is positioned in
longitudinal direction on the wrist/forearm can avoid the radius and ulna
Right:  Conceptual view of how a circular sensor with the same diameter as the
length of the rectangular board interacts with the radius and ulna

57.     Because a symmetrical circular shape will press on the user's arm in all directions, it will interact with the user's bone structure.  Ohsaki teaches that such interactions with the user's anatomy are undesirable and result in slipping.  Ex. 1009 ¶¶[0006], [0023]-[0024].

58.     Dr. Kenny did not discuss Ohsaki's disclosure that when Ohsaki's rectangular sensor was placed in one orientation (up-and-down the arm), it helped prevent slipping.  Ex. 1009 ¶[0019].  Dr. Kenny also did not discuss Ohsaki's explanation that rotating the sensor 90 degrees, such that the long direction points in the circumferential direction of the user's wrist, the sensor "has a tendency to slip."  Ex. 1009 ¶[0019].

-35-

[0024]; *see also* ¶[0030] (single sentence identifying back side of user's forearm, which is connected to the wrist).

60.     As a result, a POSITA would not have been motivated to eliminate the longitudinal shape that Ohsaki asserts helps prevent slipping. Ex. 1009 ¶[0019]. Indeed, Ohsaki underscores the unsuitability of the proposed combination, explaining that many sensor positions and orientations are ineffective. Ex. 1009 ¶¶[0019], [0023]-[0024]. Beyond the illustrated longitudinal shape (Ex. 1009 ¶[0019], Figs. 1-2) Ohsaki has no details or explanation that a POSITA could use to implement its board into other devices, other shapes, or other measurement locations. Ohsaki indicates that only one shape (rectangular), one position (back side of the wrist, discussed further below), and one orientation (up-and-down the arm) prevent slipping. Ex. 1009 ¶¶[0019], [0023]-[0025]. Ohsaki emphasizes that its benefit occurs only when the sensor has a longitudinal shape and is on the wrist's back side, in the anatomically appropriate orientation. Ex. 1009 ¶¶[0019], [0023]-[0024].

61.     A POSITA would not have been motivated to change the shape of Ohsaki's rectangular board to combine it with Aizawa's circular sensor because a POSITA would have understood that changing Ohsaki's rectangular board into a circular shape would eliminate Ohsaki's benefit of preventing slipping.

motivated a POSITA to include a cover with a convex protrusion of a particular height.

124.   Dr. Kenny appears to have selected Mendelson 2006 and Mendelson-1988 because the references discuss a similar size (22 mm diameter and 19x19 mm square), which Dr. Kenny argues would also be used with a wrist-worn device.  Ex. 1003 ¶160.  Both Mendelson 2006 and Mendelson-1988, however, are forehead sensors, not wrist sensors.  Ex. 1010 Abstract ("wireless wearable pulse oximeter developed based on a small forehead mounted sensor"); Ex. 1017 at 1 ("SpO$_2$ obtained from the forehead…..").  I further note that other references use different sized sensors.   For example, Mendelson-1991 uses an assembled sensor that "measures approximately 38 mm in diameter and is 15 mm thick."  Ex. 1018 at 3. Dr. Kenny does not explain why a POSITA would have been motivated to select one sensor size over another, or to select one protrusion height as opposed to any other.  Dr. Kenny suggests that "a height between 1 millimeter and 3 millimeters" would "prevent[] slippage" and "would have been comfortable…."  Ex. 1003 ¶161. But that disclosure is not in any of the references which are part of Ground 1.  In fact, as discussed above (Sections VII.A.1, VII.A.2, VII.B), Ohsaki explains that its sensor's width and length (including the board) are important, but does not say anything about the height of the convex surface of the board.  *See* Ex. 1009 ¶[0019] ("the length of the detecting element 2 from the right side to the left side in FIG. 2

Appx54845

is longer than the length from the upper side to the lower side"). In my opinion, a POSITA would not have found it obvious to include a cover with a protruding convex surface "wherein the protruding convex surface protrudes a height between 1 millimeter and 3 millimeters" or "wherein the protruding convex surface protrudes a height greater than 2 millimeters and less than 3 millimeters" based on the cited references of Ground 1.

## VIII.  GROUND 2 FAILS FOR AT LEAST THE SAME REASONS AS GROUND 1

125.    Ground 2 is a five-reference combination that adds Bergey (Ex. 1016) to the combination of Aizawa, Inokawa, Ohsaki, and Mendelson 2006. Ex. 1003 ¶¶192-194. Ground 2 only challenges dependent claim 9. Pet. 9-10; Ex. 1003 ¶¶192-194. Dr. Kenny adds Bergy to Aizawa, Inokawa, Ohsaki, and Mendelson 2006 because those references do not disclose that the substrate, wall, and cover hermetically seal the at least four detectors. Ex. 1003 ¶192. Bergey's disclosure, which is related to a wristwatch, does not fix the deficiencies identified for Ground 1. As a result, in my opinion, the challenged claim of Ground 2 is nonobvious for the same reasons discussed above for Ground 1.

## IX.    GROUND 3 FAILS FOR AT LEAST THE SAME REASONS AS GROUND 1

126.    Ground 3 is a five-reference combination that adds Goldsmith (Ex. 1011) to the combination of Aizawa, Inokawa, Ohsaki, and Mendelson 2006. Ex.